**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| RAMON VILLANUEVA-BAZALDUA,<br>individually and on behalf of others<br>similarly situated,<br><br>      Plaintiff,<br><br>v.<br><br>TRUGREEN LIMITED PARTNERS[1] and,<br>TRUGREEN, INC.[2], d/b/a TRUGREEN<br>CHEMLAWN[3],<br><br>      Defendant. | )<br>)<br>)<br>)    Civil Action No.: 06-185 *(GMS)*<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**DEFENDANT'S MOTION FOR LEAVE TO FILE SUPPLEMENTAL BRIEF
IN FURTHER SUPPORT OF ITS OPPOSITION TO
PLAINTIFF'S EXPEDITED MOTION TO CONDITIONALLY CERTIFY A
FLSA COLLECTIVE ACTION**

Defendant TruGreen Limited Partnership d/b/a TruGreen ChemLawn ("TruGreen"), by

and through its attorneys, hereby moves for leave to file a Supplemental Brief in Further Support

of Its Opposition to Plaintiff's Expedited Motion to Conditionally Certify a FLSA Collective

Action. The grounds for this Motion are as follows:

    1.    As set forth in TruGreen's counsel's correspondence to the Court dated

September 13, 2006 (Docket No. 29), TruGreen requested a stay on any decision on Plaintiff's

Motion to Conditionally Certify A FLSA Collective Action (Docket No. 14) until after Mr.

Villanueva-Bazaldua's deposition, then scheduled for October 5, 2006. TruGreen further noted

---

[1]    The correct legal name is TruGreen Limited Partnership.

[2]    TruGreen, Inc. was not Plaintiff's employer, and therefore, is not a proper party in this action.

[3]    TruGreen, Inc. does not do business as (d/b/a) TruGreen ChemLawn; TruGreen Limited Partnership does do business as (d/b/a) TruGreen ChemLawn.

in its correspondence to the Court that it intended to file "appropriate supplemental briefs regarding the matters at issue based on relevant information obtained during Mr. Villaneuva-Bazaldua's deposition." Indeed, the Court queried in its October 18, 2006 Notice of Scheduling Conference (Docket No. 33) whether Plaintiff's deposition impacted the parties' positions and whether supplemental briefing was warranted.

2.      Counsel for TruGreen deposed Plaintiff on Thursday, October 5, 2006, and believes that supplemental briefing is warranted.

3.      More specifically, TruGreen believes that Plaintiff's admissions and acknowledgments under oath give further credence to the arguments first set forth in TruGreen's initial opposition memorandum. Accordingly, TruGreen has prepared a Supplemental Brief (attached as Exhibit A hereto) intended to highlight the relevant portions of Plaintiff's deposition and related legal precedent that, taken together, demonstrate further why Plaintiff's Motion for Conditional Certification should be denied.

4.      TruGreen believes that the attached Supplemental Brief will assist the Court and the parties in preparing for the discussion to be held regarding Plaintiff's Motion to Conditionally Certify A FLSA Collective Action during the scheduled status/scheduling conference.

5.      Accordingly, for all of these reasons, Defendant seeks leave to file the attached Supplemental Brief, which provides the Court with key undisputable facts and relevant precedent that further demonstrate why Plaintiff's request for conditional certification should be denied.

WHEREFORE, for all of the foregoing reasons, Defendant TruGreen Limited Partnership respectfully requests that its Motion for Leave to File a Supplemental Brief in Further Support of

its Opposition to Plaintiff's Expedited Motion to Conditionally Certify a FLSA Collective Action

be granted and that the attached Supplemental Brief be deemed to be filed as of that date.

Respectfully submitted,

_____

Michael P. Kelly (Del. Bar ID #2295)
McCarter & English
Citizens Bank Building
919 N. Market Street, 18th Floor
Wilmington, DE 19801
(302) 984-6301

*Admitted Pro Hac*
Michael L. Banks (Pa. I.D. #35052)
Sarah E. Bouchard (Pa. I.D. #77088)
OF COUNSEL:                                     1701 Market Street
MORGAN, LEWIS & BOCKIUS, LLP       Philadelphia, PA 19103-2921
(215) 963-5387/5077

Dated: October 20, 2006                       Attorneys for Defendants

3

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

RAMON VILLANUEVA-BAZALDUA,     )
individually and on behalf of others     )
similarly situated,     )
     )     Civil Action No.: 06-185 *(GMS)*
        Plaintiff,     )
     )
        v.     )
     )
TRUGREEN LIMITED PARTNERS and,     )
TRUGREEN, INC., d/b/a TRUGREEN     )
CHEMLAWN,     )
     )
        Defendant.     )

**<u>ORDER</u>**

        AND NOW, this _____ day of _____, 2006, upon consideration of

Defendant TruGreen Limited Partnership d/b/a TruGreen ChemLawn ("TruGreen"), by and

through its attorneys, hereby moves for leave to file a Supplemental Brief in Further Support of

Its Opposition to Plaintiff's Expedited Motion to Conditionally Certify a FLSA Collective

Action., it is hereby ORDERED, ADJUDGED, and DECREED that said Motion is GRANTED

and that TruGreen's Supplemental Brief attached as Exhibit A to this Motion for Leave shall be

deemed to be filed as of the date hereof.

_____
The Honorable Gregory M. Sleet

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| RAMON VILLANUEVA-BAZALDUA, individually and on behalf of others similarly situated, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No.: 06-185 *(GMS)* |
| TRUGREEN LIMITED PARTNERS and, TRUGREEN, INC., d/b/a TRUGREEN CHEMLAWN, | ) ) ) ) | |
| Defendant. | ) ) | |

**DEFENDANT'S SUPPLEMENTAL BRIEF IN FURTHER SUPPORT OF ITS
OPPOSITION TO PLAINTIFF'S EXPEDITED MOTION TO
CONDITIONALLY CERTIFY A FLSA COLLECTIVE ACTION**

Michael P. Kelly (Del. Bar ID #2295)
McCarter & English
Citizens Bank Building
919 N. Market Street, 18th Floor
Wilmington, DE 19801
(302) 984-6301

*Admitted Pro Hac*
Michael L. Banks (Pa. I.D. #35052)
Sarah E. Bouchard (Pa. I.D. #77088)
1701 Market Street
Philadelphia, PA 19103-2921
(215) 963-5387/5077

OF COUNSEL:
MORGAN, LEWIS & BOCKIUS, LLP

Dated: October 20, 2006                    Attorneys for Defendants

1

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... ii

I.   INTRODUCTION ............................................................................................... 1

II.  ARGUMENT ....................................................................................................... 3

   A.  Plaintiff's Refusal To Answer Questions At His Deposition Precludes Him
       From Serving As A Lead Plaintiff In A Class Or Collective Action ........................... 3

   B.  Plaintiff's Testimony Regarding His Own Expenses And Payments From
       Trugreen Highlight Why He And The Other H-2b Workers Are Not
       "Similarly Situated" So As To Justify Collective Action Treatment ........................... 6

   C.  Plaintiff's Fraud, Breach Of Contract, And Breach Of Covenant Of
       Good Faith And Fair Dealing Claims Are Unsuitable For Class Treatment ............ 11

III. CONCLUSION ................................................................................................... 13

## TABLE OF AUTHORITIES

### FEDERAL CASES

Bayles v. American Medical Response of Colo., Inc., 950 F. Supp. 1053 (D. Colo. 1996) .......... 9

D'Anna v. M/A-COM, Inc., 903 F. Supp. 889 (D. Md. 1995) ...................................................... 7

De La Cruz v. El Paso County Water Improvement District No. 1,
    No. EP-05-CV-206-FM, 2005 WL 2291015 (W.D. Tex. Sept. 19, 2005) ......................... 7

Felix De Ascencio v. Tyson Foods, 130 F. Supp. 2d 660 (E.D. Pa. 2001) .................................. 6

Grayson v. K-Mart Corp., 79 F.3d 1086 (11th Cir. 1996) ...................................................... 6, 7

Hoffman v. Sbarro, Inc., 982 F. Supp. 249 (S.D.N.Y. 1997) ...................................................... 7

J.B.D.L. Corp. v. Wyeth-Ayerst Laboratories, Inc., 225 F.R.D. 208 (S.D. Ohio 2003) ............... 5

Kline v. Wolf, 702 F.2d 400 (2d Cir. 1983) ............................................................................... 5

Lawrence v. Philadelphia, No. 03-CV-4009, 2004 WL 945139
    (E.D. Pa. Apr. 29, 2004) ............................................................................................... 9

Moeck v. Gray Supply Corp., No. 03-1950, 2006 WL 42368 (D.N.J. Jan. 6, 2006) ............... 2, 10

Morisky v. Public Serv. Elec. & Gas Co., 111 F. Supp. 2d 493 (D.N.J. 2000) ........................... 9

In re Safeguard Scientifics, 216 F.R.D. 577 (E.D. Pa. 2003) ...................................................... 4

Strykers Bay Neighborhood Council Inc. v. New York, 695 F. Supp. 1531
    (S.D.N.Y. 1988) ............................................................................................................. 5

Wagner v. Lehman Brothers Kuhn Loeb, Inc., 646 F. Supp. 643 (N.D. Ill. 1986) ....................... 5

Weikel v. Tower Semiconductor Ltd., 183 F.R.D. 377 (D.N.J. 1998) .......................................... 4

Wertheim v. Ariz., No. Civ. 92-0453 PHX RCB, 1992 WL. 566321
    (D. Ariz. Aug. 4, 1992) ................................................................................................ 10

### FEDERAL STATUTES

29 C.F.R. § 778.114(a) ............................................................................................................. 7

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| RAMON VILLANUEVA-BAZALDUA, individually and on behalf of others similarly situated, | ) ) ) | |
| | ) | Civil Action No.:  06-185 |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| TRUGREEN LIMITED PARTNERS[1] and, TRUGREEN, INC.[2], d/b/a TRUGREEN CHEMLAWN[3], | ) ) ) ) | |
| Defendant. | ) ) | |

**DEFENDANT'S SUPPLEMENTAL BRIEF IN FURTHER SUPPORT OF ITS OPPOSITION TO PLAINTIFF'S EXPEDITED MOTION TO CONDITIONALLY CERTIFY A FLSA COLLECTIVE ACTION**

**I.     INTRODUCTION**

Plaintiff Ramon Villanueva ("Plaintiff"), the sole named plaintiff in this action, purports

to bring this action against Defendant TruGreen Limited Partnership d/b/a/ TruGreen Chemlawn

("TruGreen") on behalf of himself and what he conclusorily deems "all other similarly situated

H-2B workers" currently or formerly employed by TruGreen.  More specifically, Plaintiff seeks

to certify a collective action under Rule 216(b) of the Fair Labor Standards Act ("FLSA") as to

his claims that – even in the absence of any specific legal obligation to do so – TruGreen

unlawfully failed to compensate him or other H-2B workers for certain expenses incurred with

their respective H-2B employment.  He also seeks to represent the same class of individuals as to

---

[1]     The correct legal name is TruGreen Limited Partnership.

[2]     TruGreen, Inc. was not Plaintiff's employer, and therefore, is not a proper party in this action.

[3]     TruGreen, Inc. does not do business as (d/b/a) TruGreen ChemLawn; TruGreen Limited Partnership does do business as (d/b/a) TruGreen ChemLawn.

1

a hodgepodge of contract-based claims, all of which are premised on Plaintiff's allegations that certain promises made to him in Mexico regarding his wages and certain perquisites that he would receive when he arrived in the United States as an H-2B worker were altered by TruGreen once Plaintiff arrived at his branch in Wilmington, Delaware.

By seeking to represent himself and all other H-2B workers for all of these claims, Plaintiff alleges – as he must – that he and his claims are "similarly situated" to the claims of other H-2B workers. See generally Moeck v. Gray Supply Corp., No. 03-1950, 2006 WL 42368, at *4 (D.N.J. Jan. 6, 2006). Recognizing his burden of proof on that point, Plaintiff filed the pending Expedited Motion to Conditionally Certify An FLSA Collective Action. In addition, if he is to maintain a class action as to his contract-based claims, Plaintiff ultimately will need to satisfy, among other things, the commonality and typicality standards under Rule 23 of the Federal Rules of Civil Procedure, which standards necessarily involve an analysis strikingly similar to the "similarly situated" analysis under the FLSA. He also will need to demonstrate that he can meet the adequacy standards essential to serving as a class representative. However, Plaintiff made clear during his October 5 deposition that he cannot possibly meet any of those standards.

Far from being a routine deposition of an adequate and informed class representative, Plaintiff invoked the Fifth Amendment as to every question relating to his employment in the United States subsequent to his employment with TruGreen, which ended voluntarily in July 2004. As may be obvious, TruGreen's counsel was surprised at Plaintiff's steadfast refusal to answer questions that clearly related to the allegations in the Complaint *he* chose to file. His refusal to answer questions relating to his employment in the United States subsequent to his employment with TruGreen necessarily implicates his credibility and capability to adequately

2

represent the interests of others and therefore, his ability to serve as a named Plaintiff in any type of collective action.

Moreover, the testimony that he did provide only further reinforced the other arguments as to why this matter is not appropriate for collective treatment under the FLSA or even for class-wide treatment as to the breach of contract and related claims. In short, by Plaintiff's own admissions and explanations, he cannot demonstrate even the basic factual showing that his claims and those of the other putative plaintiffs are similarly situated let alone common or typical. Accordingly, TruGreen respectfully submits this Supplemental Brief to highlight how Plaintiff's admissions under oath undermine, as a matter of law, his improper effort to open to nationwide discovery and class-wide treatment what, at best constitutes his individualized action against TruGreen.

## II.    ARGUMENT

### A.    Plaintiff's Refusal to Answer Questions at His Deposition Precludes Him From Serving As a Lead Plaintiff in a Class or Collective Action.

Federal Rule of Civil Procedure 23(a)(4) requires that the representative plaintiff be willing and able to prosecute an action vigorously and to adequately represent the interests of others. After hearing Plaintiff's deposition testimony, TruGreen has serious concerns about both his ability and his willingness to adequately represent the interests' of others, and seriously doubts that he is similarly situated to other H2-B workers his counsel seeks to represent.[4]

First, by invoking the protection of the Fifth Amendment of the United States Constitution, Plaintiff refused to answer at least six questions regarding whether or where he worked in the United States in the years after his employment with TruGreen and how many

---

[4]    In addition, Plaintiff's status necessarily impacted the conduct of the deposition, as Plaintiff's counsel warned TruGreen's counsel that Plaintiff "ha[d] to catch an airplane to Mexico [so] [t]he deposition has to be end (sic) by 2:30." (Villanueva Tr. pp. 16-17.)

hours he worked for any U.S. employer after TruGreen. As further explained by his counsel, Plaintiff intended to invoke the Fifth Amendment "for any question like that." (Transcript of Ramon Villanueva, Oct. 5, 2006 (hereinafter "Villanueva Tr."), pp. 12-16, 22-23, 30-33.)[5] Although Plaintiff acknowledged that he has never held any other H-2B positions after TruGreen (Villanueva Tr. p. 22), he unequivocally refused to answer whether any employer for whom he worked in 2006 paid his travel- or visa- related expenses, as he contends in his Complaint TruGreen should have done. (Villanueva Tr. pp. 31-33.)

As a result, Plaintiff effectively precluded TruGreen from fully exploring questions that go directly to his ability to serve as a lead plaintiff purportedly representing the interests of others in this case. For example, TruGreen has a genuine and legitimate interest in understanding Plaintiff's work visa status, or lack thereof, and whether there are any circumstances that may preclude Plaintiff in the future from traveling freely to the United States. By invoking the Fifth Amendment to these basic and foundational questions, TruGreen (and this Court) lack any understanding of and have been deprived of any future opportunity to understand whether Plaintiff might not, at some point in the future, be able to legally return to the country for hearings, depositions, mediation, settlement conferences, or even for trial. If Plaintiff cannot be candid in these proceedings or fully participate in them, he simply cannot be and is not an adequate representative. See, e.g., In re Safeguard Scientifics, 216 F.R.D. 577, 582-83 (E.D. Pa. 2003) ("[S]erious concerns with credibility leave Lead Plaintiff vulnerable to further attacks that would impose an unnecessary disadvantage on the class. These unique defenses against Lead Plaintiff [ ] preclude him from serving as a class representative."); Weikel v. Tower Semiconductor Ltd., 183 F.R.D. 377, 396 (D.N.J. 1998) (noting both that "[t]he fact [the named

---

[5]    A true and correct copy of Plaintiff's deposition transcript is attached hereto as Exhibit A.

plaintiff] may not be readily available to attend trial has the potential for seriously interfering with his obligation to vigorously prosecute this action" and "[i]t would be inappropriate to subject members of the Class to potential trial delays created by a class representative"); <u>Wagner v. Lehman Bros. Kuhn Loeb, Inc.</u>, 646 F. Supp. 643, 660-61 (N.D. Ill. 1986) ("A court need not resolve the issue of credibility against the putative class representative in order to bar class certification. It is enough to note the existence of a credibility problem and its potential adverse impact on the class."); <u>Strykers Bay Neighborhood Council Inc. v. New York</u>, 695 F. Supp. 1531, 1537 (S.D.N.Y. 1988) (deeming named plaintiffs inadequate representatives because they failed to respond to discovery requests); <u>Kline v. Wolf</u>, 702 F.2d 400, 403 (2d Cir. 1983) (concluding that the district court is not required to resolve the issue of credibility or to find that the plaintiffs testified falsely, but rather that simply making a "preliminary determination that [the lead plaintiffs'] credibility was vulnerable to attack" is sufficient).

Furthermore, it is settled that "[t]o be an adequate representative, the named plaintiff must demonstrate a willingness and ability to play an active role in and control the litigation and to protect the absent class members." <u>J.B.D.L. Corp. v. Wyeth-Ayerst Labs., Inc.</u>, 225 F.R.D. 208, 216 (S.D. Ohio 2003). In his deposition, Plaintiff admitted under oath that, in the past, if other people were willing to sign certain documents, he believed that he "didn't have to pay attention to them in particular . . . and so [he] signed." (Villanueva Tr. p. 41.) An admitted willingness to sign documents that he has not even read strikes at the heart of Plaintiff's ability to protect the interests of the putative class and again differentiates him from other current and former TruGreen employees who take a more reasonable and considered approach to their contractual and other obligations.

5

TruGreen has had the good fortune of employing law-abiding H-2B workers who come back to TruGreen year after year on a seasonal basis without any questions as to the legality of their presence in the United States. After his deposition, namely his refusal to answer any questions going to his ability to travel at some later date into the United States, TruGreen cannot say the same of Plaintiff. Thus, for this reason alone, Plaintiff has unequivocally set himself apart from other current and former TruGreen employees who are not constrained to talk about their status or related issues. Indeed, given that Plaintiff left in the middle of the 2004 season and cannot explain his employment in the United States in 200 (if any), it seems obvious that he is not an appropriate lead Plaintiff here, where Plaintiff has made the focus of his Complaint the terms and conditions of employment he received from TruGreen in 2004. For all of these reasons, this Court should not grant Plaintiff's Motion to Conditionally Certify a FLSA Collective Action, as he has no basis to lead this case on behalf of others purportedly similarly situated to him.

**B.    Plaintiff's Testimony Regarding His Own Expenses and Payments from TruGreen Highlight Why He and the other H-2B Workers Are Not "Similarly Situated" So As To Justify Collective Action Treatment.**

In a collective action under the FLSA, it is, at all times, the plaintiff's obligation to come forward with evidence of a "reasonable basis" for the claim of class-wide relief. See generally Grayson v. K-Mart Corp., 79 F.3d 1086, 1096 (11th Cir. 1996). Even at the early stage of conditional certification at which this matter rests, the Court must satisfy itself that there are other employees of the defendant who not only desire to opt-in,[6] but also are "similarly situated" to the plaintiff. Felix De Ascencio v. Tyson Foods, 130 F. Supp.2d 660, 663 (E.D.Pa. 2001).

---

[6]    Tellingly, more than seven months have passed since Plaintiff filed his Complaint, but he has not presented one declaration other than his own to substantiate that he is similarly situated to other H-2B workers let alone that any other current or former TruGreen H-2B worker desires to opt-in to this matter.

6

Plaintiff still must provide "substantial allegations that the putative class members were together

the victims of a *single* decision, policy or plan." See generally Grayson, 79 F.3d at 1097-99

(emphasis added). Further to that point, Plaintiff must do more than rest on his own speculation;

rather, he must demonstrate an actual "factual nexus between [his] situation and the situation of

other current and former [employees] sufficient to determine that they are 'similarly situated.'"

Hoffman v. Sbarro, Inc., 982 F. Supp. 249, 262 (S.D.N.Y. 1997); see also De La Cruz v. El Paso

County Water Improvement Dist. No. 1, No,. EP-05-CV-206-FM, 2005 WL 2291015, *2

(W.D.Tex. Sept. 19, 2005) (refusing to certify a class for alleged failure to pay overtime because

the court had before it "only unsupported assertions of violations that are not sufficient to meet

Plaintiff's burden. No affidavits that would provide evidence that others are similarly situated

was submitted by Plaintiffs."); D'Anna v. M/A-COM, Inc., 903 F. Supp. 889, 894 (D. Md. 1995)

(denying motion to send notice because plaintiff's allegations were "broad and vague" and lacked

"factual support" for the existence of a potential class). Here, Plaintiff's deposition testimony

confirms that there is not and cannot be any "factual nexus" between the matters at the heart of

his FLSA claim – his expenses and reimbursements while employed at the Wilmington,

Delaware location – and the expenses and reimbursement of TruGreen's current and former H-

2B workers at other locations across the country.[7]

---

[7]    To the extent Plaintiff is suggesting that Defendant's use of the fluctuating workweek
method of overtime compensation constitutes a violation of the FLSA for which collective
treatment is appropriate, that claim fails, too, as a matter of law. By definition, in order to
establish a claim with respect to the fluctuating workweek, each putative plaintiff must
demonstrate that (1) he has hours of work that do not fluctuate from week to week; (2) he
did not receive a fixed salary as straight time pay for whatever hours he worked; and (3) he
did not have a clear mutual understanding that the fixed salary is compensation (apart from
overtime premiums) for the hours worked each workweek rather than for working 40 hours
or some other fixed amount. 29 C.F.R. § 778.114(a). Thus, by definition, the claims of any
TruGreen employee with respect to use of the fluctuating workweek method is marked by
factual distinctions, including, but not limited to, whether the individual employee agreed to

Most notably, Plaintiff broadly asserts in his Complaint that TruGreen did not account for the expenses incurred by H-2B employees, including him. In his deposition, however, (and consistent with the Declaration of Michael Matejik, attached as Exhibit B to Docket No. 18), Plaintiff admitted that he was given $150 in cash upon his arrival in Delaware to use for whatever reason he deemed appropriate. (Villanueva Tr. pp. 44-45.) This payment occurred prior to him engaging in any work, and he never had to repay TruGreen for these funds. (Villanueva Tr. pp. 44-45.) Although Plaintiff chose not to do so, there was nothing preventing him from applying those amounts to the expenses he allegedly incurred in obtaining his H-2B visa. (Villanueva Tr. p. 45.) Similarly, Plaintiff admitted in his deposition (and contrary to the allegations in his Complaint) that TruGreen purchased the airline ticket that enabled him to return home to Mexico even though Plaintiff chose to end his employment with TruGreen just midway through the season.[8] (Villanueva Tr. p. 17.)

Thus, completely contrary to the allegations of the Complaint, Plaintiff received an unconditional amount of money at the commencement of his employment to pay for whatever Plaintiff deemed necessary and appropriate and another unconditional payment for his return expenses at the end of his employment. Where the named plaintiff does not even have a "factual nexus" to the allegations in the Complaint, he clearly cannot satisfy his burden of offering to the Court any such nexus between him and the allegedly similarly situated potential plaintiffs. Indeed, as Plaintiff's own testimony reveals, there apparently is no single policy or practice as to which H-2B workers receive unconditional payments upon their arrival, return transportation

---

the fluctuating workweek compensation plan. As set forth in Section II.C, Plaintiff admittedly knowingly accepted a compensation structure that was premised on the fluctuating workweek method of compensation.

[8]   Plaintiff claims that he paid $75 cash to cover "the remainder of what the [airline] ticket cost after the cost of the bus." (Villanueva Tr. pp. 17-18.) He does not, however, dispute that TruGreen paid for his return airline ticket.

expenses, or perhaps even additional payments to cover expenses during the season. Plaintiff

readily admitted that he does not even know whether any workers at the Wilmington branch

asked the Branch Manager for money (unconditionally or otherwise) or even how other

TruGreen branches pay their H-2B workers. (Villanueva Tr. p. 45.) Indeed, TruGreen does not

have a policy or practice that either prohibits or requires Branch Managers to provide additional

payments to H-2B workers, but rather leaves it to the discretion of each Branch Manager.

(Declaration of James Vacchiano, dated May 12, 2006, at ¶ 4, a copy of which is attached as

Exhibit A to Docket No. 18.) As such, the only way to determine which H-2B workers received

payment for their expenses – whether in or whole or in part, if at all – is to ask each individual

H-2B worker – an inquiry that is directly contrary to the purpose and nature of a collective

action.[9] See, e.g., Lawrence v. Philadelphia, No. 03-CV-4009, 2004 WL 945139, at *2 (E.D. Pa.

Apr. 29, 2004) (rejecting request for certification because "the questions of fact will likely differ

for each Plaintiff and will be unduly burdensome to both Defendant and to the Court in

managing as a collective action"); Morisky v. Public Serv. Elec. & Gas Co., 111 F. Supp.2d 493,

497-98 (D.N.J. 2000) (denying FLSA collective action certification where a "highly fact-specific

analysis of each employee's job [duties and] responsibilities" would be required); Bayles v.

American Med. Response of Colo., Inc., 950 F. Supp. 1053, 1065 (D. Colo. 1996) ("It is

---

[9]     Similarly, in the Complaint, Plaintiff asserts that he is similarly situated to other current and
former TruGreen H-2B workers because each incurred the following expenses in connection
with their employment with TruGreen: the cost of obtaining a Mexican passport, visa
application and issuance fees, a border crossing fee, a third-party administrative fee paid for
processing the visa paperwork, and transportation expenses to the place of employment in
the United States. See Complaint ¶ 19. At his deposition, however, Plaintiff acknowledged
incurring only the "the amount for the office in Guanajuato, . . .and then the cost for the visa
. .. and then the cost for transportation from my home to Delaware" in connection with his
employment with TruGreen. (Villanueva Tr. p. 29-30.) Thus, by Plaintiff's own admission,
*he* did not incur all of the expenses alleged in the Complaint, and, therefore, cannot be
similarly situated to other H-2B employees who either incurred only some or, perhaps, none
of the expenses put at issue in the Complaint.

oxymoronic to use [a collective action] device in a case where proof regarding each individual plaintiff is required to show liability"); Wertheim v. Ariz, No. Civ. 92-0453 PHX RCB, 1992 WL 566321, at *4 (D. Ariz. Aug. 4, 1992)

In addition, Plaintiff admitted at his deposition to traveling freely to and from the United States using his passport, including frequent trips within the past six months to visit an uncle in California and other friends. (Pl. Tr. 9-12.) However, in the Complaint, Plaintiff asserts that TruGreen should have paid for the cost of his passport because it was "primarily for the benefit of the employer." (Complaint ¶ 22.) By Plaintiff's own testimony, it strains credulity that his passport was "primarily for the benefit of the employer" when Plaintiff was using his passport two years removed from his employment with TruGreen to travel to and from the United States as a tourist, simply visiting family and friends. It remains unclear what benefit, let alone primary benefit, TruGreen derives from that.

In short, putting aside that there is no legal requirement for TruGreen to pay or otherwise account for the expenses incurred by H-2B workers, Plaintiff's deposition testimony makes clear that the proof of whether such expenses were, in fact, incurred and/or paid by TruGreen is entirely specific to the individual. Accordingly, those admissions under oath put this matter squarely within the reasoning of the district court in Moeck, in which the court denied plaintiffs' motion for conditional certification in an FLSA action based on an overtime policy that allegedly varied among branches and even within branches. Id. at *5. That court reasoned, in words particularly applicable here, "[b]ecause of the many potential distinctions of each putative class member's claim, the Court finds that this case is not an appropriate one for class action certification, even at this early stage in the action." Like the court in Moeck, this Court should deny Plaintiff's motion for notice and collective treatment in its entirety.

10

**C.    Plaintiff's Fraud, Breach of Contract, and Breach of Covenant of Good Faith and Fair Dealing Claims Are Unsuitable for Class Treatment.**

Just as Plaintiff's motion to conditionally certify a collective action should be denied in light of the undisputable facts revealed at Plaintiff's deposition, so too should any future effort to certify the same class as to the contract-based claims alleged in Plaintiff's Complaint. The crux of those claims is that the expenses and compensation structure identified to Plaintiff in Mexico before he accepted employment with TruGreen were not actually the expenses incurred by and compensation eventually paid to him once he was employed by TruGreen. However, Plaintiff's claims are entirely inconsistent with and disconnected from the facts, which clearly demonstrate that there is no legitimate basis for his claims and, therefore, no basis for his attempt to represent others as to their potential claims.

First, as to the expenses, Plaintiff knowingly agreed, before traveling to the United States, to pay $405 for his rent, utilities, and transportation during his employment in the United States. (Villanueva Exhibit 2 (authenticated at p. 34) noting $373 for rent and utilities per month and $32 for transportation charges per month.) As Plaintiff testified, he was aware of those proposed charges, but he believed that TruGreen offered the highest compensation relative to all other employers, and the expenses were worth the exchange. (Villanueva Tr. 23-24, 43-44.) However, Plaintiff ultimately paid only $240 per month for those expenses. (Compare Pl. Ex. 2 with Villanueva Tr. pp. 34-35.) Thus, the only "breach" that occurred between the expenses identified to Plaintiff in Mexico and the expenses that he actually incurred actually benefited Plaintiff by at least $165, and he therefore suffered no harm for which he can seek damages.

Similarly, Plaintiff's breach of contract claim with respect to his compensation structure is undermined by his acknowledgment that he knowingly accepted and agreed to take an offer from his Branch Manager to go from a straight hourly wage for a 40-hour workweek with a

11

standard overtime premium (as set forth in Exhibit 2, which was offered to him in Mexico) to a

commission- and bonus-based compensation plan that afforded Plaintiff the opportunity to make

more money. (Villanueva Tr. p. 37, 48-49, 51, 55-56.) Plaintiff was not obligated to accept that

structure or even remain with that structure. In fact, he asked his Branch Manager about

returning to a forty-hour workweek and was informed that he was free to do so but that, in an

effort to manage expenses, the Branch Manager likely would not permit him to work any hours

over forty. Accordingly, because the opportunity to earn more money was better staying with

the commission- and bonus-based compensation Plan, Plaintiff *knowingly chose* to remain on

that plan. (Villanueva Tr. pp. 57-58.)

Several other facts to which Plaintiff admitted at his deposition further underscore his

inadequacy as a class representative, if only because the differentiating factors between Plaintiff

and other potential plaintiffs render their contract-based claims too dissimilar for class treatment.

For example, Plaintiff never worked for TruGreen, nor had he ever worked in the United States

prior to joining TruGreen. (Pl. Tr. 17.) By contrast, many employees return to employment with

TruGreen and, therefore, not only are aware of TruGreen's compensation structure but may be

paid on different compensation structures, depending on the manager, the branch, and the

position each H-2B worker holds. Further, Plaintiff willingly left TruGreen mid-season for a

number of individualized reasons – a minor injury to his back, his disappointment with the wages

he was receiving, and his sense that eventually some workers were going to have to return to

Mexico. (Villanueva Tr. 60-61.) By contrast, other H-2B workers remained in TruGreen's

employ for an entire season, which often extends through November.

In short, based on his admissions that he knowingly agreed to the terms and conditions of

his compensation and that he suffered no damages with respect to the expenses paid by him,

12

Plaintiff must concede that he does not have any legal or factual basis to move forward with any of the contract-based claims set forth in the Complaint. Taken together with the additional significant differentiating facts that explain the different compensation and contractual agreements as between TruGreen and its H-2B workers, as well as the different compensation and contractual agreements as between Plaintiff and other H-2B workers, Plaintiff should not be permitted to proceed with his highly individualized claim on a class-wide basis..

## III.    **CONCLUSION**

Plaintiff's deposition testimony makes clear that the unsubstantiated assertions in the Complaint that he is "similarly situated" to TruGreen's current and former H-2B workers is simply not the case. To the contrary, Plaintiff's deposition testimony reveals in numerous ways why this matter is not appropriate for collective or class action treatment – because these are, at best, highly individualized claims that should not become an administrative burden to the Court or TruGreen as a class or collective action.

To the extent Plaintiff attempts to divert attention from the facts to argue that all that is at issue is whether TruGreen is required, by law, to compensate for certain deductions, that response only highlights what TruGreen has suspected about this matter from the beginning – that Plaintiff and his counsel are improperly using the courts to effect legislative change because there undeniably is no such legal obligation for H-2B workers under any existing laws, rules, or regulations.   For all of these reasons, as well as the reasons set forth in TruGreen's initial opposition memorandum, TruGreen respectfully requests that Plaintiff's Motion for Conditional Certification be denied and all other appropriate relief.

Respectfully submitted,

_____
Michael P. Kelly (Del. Bar ID #2295)
McCarter & English
Citizens Bank Building
919 N. Market Street, 18th Floor
Wilmington, DE  19801
(302) 984-6301

*Admitted Pro Hac*
Michael L. Banks (Pa. I.D. #35052)
Sarah E. Bouchard (Pa. I.D. #77088)
OF COUNSEL:                              1701 Market Street
MORGAN, LEWIS & BOCKIUS, LLP    Philadelphia, PA  19103-2921
(215) 963-5387/5077

Dated:  October 20, 2006                 Attorneys for Defendants

14

**EXHIBIT A TO BRIEF**

**PART 1 OF 2**

1

1   IN THE UNITED STATES DISTRICT COURT
     DISTRICT OF DELAWARE

2

3 RAMON VILLANUEVA,    :  CIVIL ACTION
 Individually and all  :

4 others similarly    :
 situated,       :

5   Plaintiff     :
            :

6   vs.       :  ORIGINAL
            :

7 TRUGREEN LIMITED    :
 PARTNERS AND TRUGREEN, :

8 INC. d/b/a TRUGREEN  :
 CHEMLAWN,      :

9   Defendants    :  NO. 06-185

10

      - - - - - -

11    October 5, 2006
      - - - - - -

12

     Videotaped Oral Deposition

13 of RAMON VILLANUEVA, held in the law
 offices of Morgan Lewis, LLP, 1701

14 Market Street, 12th Floor, Philadelphia,
 Pennsylvania 19103, beginning at

15 approximately 9:29 AM, before Ann V.
 Kaufmann, a Registered Professional

16 Reporter, Certified Realtime Reporter,
 Approved Reporter of the U.S. District

17 Court, and a Notary Public of the
 Commonwealth of Pennsylvania.

18

19     - - - - - -

20

21

22   ESQUIRE DEPOSITION SERVICES
   1600 John F. Kennedy Boulevard

23   Four Penn Center, 12th Floor
  Philadelphia, Pennsylvania 19103

24    (215) 988-9191

```
 1  APPEARANCES:
 2     EDWARD TUDDENHAM, ESQUIRE
        etudden@io.com
 3     153 Upland Road
        Cambridge, MA   02140
 4     (617) 576-2182
              and
 5     RAPPOSELLI, CASTRO & GONZALES
        VIVIAN L. RAPPOSELLI, ESQUIRE
 6     vrapposelli@rcglaw.com
        PETER J. GONZALES, ESQUIRE
 7     pgonzales@rcglaw.com
        251 South Camac Street
 8     Philadelphia, PA   19107
        (267) 322-6776
 9     Counsel for Plaintiff
10     MORGAN LEWIS & BOCKIUS, LLP
        SARAH BOUCHARD, ESQUIRE
11     sbouchard@morganlewis.com
        1701 Market Street
12     Philadelphia, Pennsylvania  19103
        215-963-5000
13              and
        MORGAN, LEWIS & BOCKIUS, LLP
14     BETH M. HENKE, ESQUIRE
        bhenke@morganlewis.com
15     One Oxford Centre, 32nd Floor
        Pittsburgh, PA
16     (412) 560-3300
        Counsel for Defendants
17
    PRESENT:
18
       Andrea Regal, Spanish Interpreter
19     ParaPlus Translations, Inc.
20     Michael Matejik,
        TruGreen
21
       Jason Hoffman, Videographer
22
23
24
```

```
 1              DEPOSITION SUPPORT INDEX

 2

 3        DIRECTION TO WITNESS NOT TO ANSWER

 4                 Page 32   Line 12

 5

 6             REQUEST FOR PRODUCTION OF

 7                    INFORMATION

 8                 Page 53   Line 19

 9

10                  STIPULATIONS

11                     (NONE)

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1              THE VIDEOGRAPHER:  Good
 2  morning.  We're now on the record.  My
 3  name is Jason Hoffman.  I'm a
 4  videographer employed by Esquire
 5  Deposition Services, 1600 JFK Boulevard,
 6  Suite 1210, Philadelphia, Pennsylvania,
 7  19103.
 8              This is a video deposition
 9  for the United States District Court,
10  District of Delaware.  Today's date is
11  October 5, 2006.  The time is 9:29 a.m.
12              This deposition is being
13  held at Morgan, Lewis in Philadelphia,
14  Pennsylvania in the matter of Ramon
15  Villanueva versus TruGreen Limited
16  Partners and TruGreen, Inc.
17              The deponent is Ramon
18  Villanueva.
19              Present today counsel please
20  introduce yourselves for the record.
21              MR. TUDDENHAM:  Edward
22  Tuddenham for the plaintiff.
23              MS. RAPPOSELLI:  Vivian
24  Rappposelli for the plaintiff.
```

1              MR. GONZALES: Peter

2    Gonzales for the plaintiff.

3              MS. BOUCHARD: Sarah

4    Bouchard for TruGreen.

5              MR. MATEJIK: Michael

6    Matejik for TruGreen.

7              THE VIDEOGRAPHER: And the

8    court reporter will now swear in the

9    witness.

10              MR. TUDDENHAM: Just so it's

11    on the record, Mr. Matejik is here as a

12    corporate rep, not as an attorney, I

13    assume?

14              MS. BOUCHARD: That's

15    correct.

16              THE INTERPRETER: Andrea

17    Regal, the interpreter.

18              THE COURT REPORTER: Would

19    you raise your right hand.

20              MS. HENKE: Beth Henke for

21    defendants.

22              THE VIDEOGRAPHER: The court

23    reporter will swear in the witness.

24

Ramon Villanueva

1              ...ANDREA REGAL, Spanish

2    Interpreter, 430 Clements Bridge Road,

3    Barrington, NJ  08007, having been duly

4    sworn to translate the testimony, was

5    examined and testified as follows:

6              ...RAMON VILLANUEVA,

7    Mesquite 318, Fraccion California,

8    Cueramaro, Guanajuato, Mexico  36960

9    having been duly sworn was examined and

10   testified as follows:

11                  EXAMINATION

12   BY MS. BOUCHARD:

13        Q.    Good morning,

14   Mr. Villanueva.  My name is Sarah

15   Bouchard and I'm here to take your

16   testimony today in the case that you've

17   brought against TruGreen.

18        A.    Good morning.

19        Q.    I'm going to set forth a

20   couple of ground rules for the

21   deposition today so that this can run

22   smoothly.  I need you to ask any

23   questions that you don't understand;

24   otherwise, I'm going assume that you

Ramon Villanueva

```
1   have understood the question as I've
2   posed it to you.
3             I need you to verbalize all
4   of your responses, which means yes or no
5   or words to verbalize your responses
6   rather than gestures.
7        A.    I understand.
8        Q.    In you need a break, just
9   let me know, we can take one as long as
10  the question is not pending.
11       A.    That's fine.
12       Q.    Okay.  Your attorneys may
13  object to a question.  They are
14  objecting for the record.  And once they
15  are finished objecting, you should
16  answer unless they specifically instruct
17  you not to.
18       A.    That's fine.
19       Q.    Finally, you are under oath
20  and this is no different than if you
21  were in a court reporter of law.
22       A.    I understand.
23       Q.    Are you on any medications
24  today?
```

Ramon Villanueva

1        A.      No.

2                THE  INTERPRETER:   Excuse me.

3   BY MS.  BOUCHARD:

4        Q.      Without telling me what you

5   talked about with your attorneys, what

6   did you do to prepare for today's

7   deposition?

8        A.      Well, I don't know because

9   the only thing we did was speak, so I

10  don't know how to answer you.

11       Q.      Did you review any

12  documents?

13       A.      Yes.

14       Q.      Which ones?

15       A.      I saw several documents,

16  some of which I had seen before, they're

17  mine, but I wouldn't know which ones to

18  tell you because, pardon me, I don't

19  know what they are called.

20               THE  INTERPRETER:   Excuse me.

21  BY MS.  BOUCHARD:

22       Q.      If you remember reviewing

23  them recently, when I show them to you,

24  just let me know, throughout the

Ramon Villanueva

```
 1   deposition.
 2        A.      Okay, that's fine.
 3        Q.      Have you ever been involved
 4   in a lawsuit before?
 5        A.      No.
 6        Q.      What's your current
 7   immigration status?
 8        A.      I'm tourist.
 9        Q.      How long does that entitle
10   you to be in the United States?
11        A.      My permit expires on I
12   think the 6th of this month.
13        Q.      When did it begin?
14        A.      I don't remember the day,
15   but it was in April.  I don't remember
16   the day.
17        Q.      So you have been on a
18   tourist visa for six months?
19        A.      No.  The thing is I've
20   returned to Mexico.  The first time I
21   got my permit was in April, but then I
22   went back to Mexico and came back again,
23   so....
24        Q.      When you had your tourist
```

10

Ramon Villanueva

1  visa in April, when did you return back
2  to Mexico?
3          A.    I think I went back in
4  May.  I don't remember the date.
5          Q.    Do you have passport stamps
6  that would show when you were here this
7  year?
8          A.    Well, my passport doesn't
9  have any stamps because I think they
10  just give me the form, and I believe
11  it's an E-94 (sic) form.
12          Q.    Do you have a copy of the
13  E-94 form?
14          A.    Well, I have the E-94 that
15  allows me to be here.  I don't have
16  copies of it.
17          Q.    Do you have it in your
18  possession today?
19          A.    No, it's in my suitcase.
20          Q.    Did you get an E-94 when
21  you were here in April?
22          A.    Yes.
23          Q.    And did you retain a copy
24  of the E-94 from your April visit?

Ramon Villanueva

1    A.    It's the same one I have

2  now.

3    Q.    And that's the one that's

4  in your suitcase?

5    A.    Yes.

6    Q.    And would that evidence all

7  of the times that you've been in the

8  United States for this year?

9    A.    No.

10    Q.    What were you doing when

11  you came to the United States in April?

12    A.    What was I doing where?

13    Q.    What was the purpose of

14  your visit?

15    A.    I came to visit my uncle.

16    Q.    Where does your uncle live?

17    A.    In San Diego.

18    Q.    Other than the trip you

19  took in April, were there any other

20  visits to the United States this year

21  besides this one?

22    A.    Well, when I went back to

23  Mexico in I believe it was May and then

24  I think again in October -- pardon, I'm

Ramon Villanueva

```
 1   sorry, August.
 2          Q.     Just to clarify, you came
 3   on a travel visa in April to May and
 4   then came in August.  And then when did
 5   you leave back to Mexico?
 6          A.     Well, I'm here.
 7          Q.     You have been on the travel
 8   visa since August?
 9          A.     Yes.
10          Q.     Who have you been visiting
11   since August?
12          A.     Only my uncle, and some
13   friends, but....
14          Q.     What's your current home
15   address?
16          A.     Mesquite 318, Fraccion
17   California, Cueramaro, Guanajuato,
18   Mexico, and the Zip code is 36960.
19          Q.     What did you do to earn
20   money this year?
21          A.     Work.
22          Q.     Where?
23                 THE INTERPRETER:  I asked
24   the witness to please repeat it.
```

13

Ramon Villanueva

| | |
|---|---|
| 1 | THE WITNESS: Oh, I'm taking |
| 2 | the Fifth Amendment. |
| 3 | MS. BOUCHARD: Can we take a |
| 4 | break? |
| 5 | MS. RAPPOSELLI: Sure. |
| 6 | MR. TUDDENHAM: Sure. |
| 7 | THE VIDEOGRAPHER: Off tape |
| 8 | 9:45. |
| 9 | (Recess.) |
| 10 | THE VIDEOGRAPHER: Back on |
| 11 | the record 9:58. |
| 12 | BY MS. BOUCHARD: |
| 13 | Q. Mr. Villanueva, you just |
| 14 | took the Fifth Amendment with respect to |
| 15 | my question as to where you were working |
| 16 | in 2006. Is that because you were |
| 17 | working in the United States this year? |
| 18 | MR. TUDDENHAM: Objection. |
| 19 | He took the Fifth Amendment to that |
| 20 | question and I don't think you are |
| 21 | entitled to keep asking him the same |
| 22 | question over and over again. |
| 23 | BY MS. BOUCHARD: |
| 24 | Q. How many hours did you work |

Ramon Villanueva

1  this year?

2          MR. TUDDENHAM:  Same

3  objection.  Let me consult with my

4  client for a moment.

5          THE VIDEOGRAPHER:  Off tape

6  9:59

7          (Mr. Tuddenham,

8  Ms. Rapposelli, Mr. Gonzales and the

9  witness conferred outside of the

10  deposition room.)

11          THE VIDEOGRAPHER:  Back on

12  the record 10:00.

13          MR. TUDDENHAM:  For the

14  record, we object.  He has invoked his

15  Fifth Amendment with respect to that

16  question, and I don't believe you are

17  entitled to keep asking the question in

18  different ways to try and trick him into

19  waiving his Fifth Amendment right.

20          MS. BOUCHARD:  My question

21  is a different one.  I asked him how

22  many hours he worked in 2006.  Some of

23  those hours could be in a lawful place

24  for him to work.

Ramon Villanueva

1              MR. TUDDENHAM:  They could

2    be, but he is entitled to invoke his

3    Fifth Amendment right, and he has.

4              MS. BOUCHARD:  Is he also

5    invoking it for that question?

6              MR. TUDDENHAM:  Yes.  He is

7    going to invoke it for any question like

8    that.

9              MS. BOUCHARD:  Well, I need

10   him to do that because that would mean

11   that he did not work any hours in a

12   lawful place.

13             MR. TUDDENHAM:  Fifth

14   Amendment right, when he invokes it,

15   doesn't mean anything at all.  It is

16   neither an affirmative answer or a

17   negative answer.

18             THE VIDEOGRAPHER:  Off tape

19   10:02.

20             (Recess.)

21             THE VIDEOGRAPHER:  Back on

22   the record 10:03.

23   BY MS. BOUCHARD:

24        Q.      Are you taking the Fifth

Ramon Villanueva

1    Amendment with respect to how many hours

2    you worked in 2006?

3         A.    Yes.

4         Q.    My question now is for last

5    year, 2005, where did you work?

6         A.    In Cueramaro.

7         Q.    Is that in Mexico?

8         A.    Yes.

9         Q.    Did you work in the United

10   States at any time in 2005?

11        A.    No.

12        Q.    For 2004 my question is

13   this:  Did you in fact go home to Mexico

14   after leaving TruGreen?

15        A.    Yes.

16        Q.    Isn't it true that you went

17   to California after leaving TruGreen?

18        A.    No.

19        Q.    You didn't tell Lisa McHugh

20   that you were in Los Angeles in 2004?

21        A.    I don't remember.

22        Q.    When you left TruGreen,

23   they provided you with an airline

24   ticket; correct?

Ramon Villanueva

1        A.      Yes.

2            Q.      And they paid for your

3    return flight home to Mexico?

4        A.      A part of it.

5            Q.      What do you mean by "a part

6    of it"?

7        A.      I paid the remainder of

8    what the ticket cost after the cost of

9    the bus.

10           Q.      Isn't it true that TruGreen

11   provided you with an airline ticket for

12   your trip home to Mexico?

13       A.      Yes.

14           Q.      And that ticket was

15   provided to you?

16       A.      Yes.

17           Q.      Did you in fact return to

18   Mexico on that ticket?

19       A.      Yes.

20           Q.      And was that because you no

21   longer wanted to work at TruGreen

22   anymore?

23       A.      Yes.

24           Q.      If TruGreen paid for the

Ramon Villanueva

```
 1   airline ticket, what transportation
 2   costs did you incur on the way home?
 3                MR. TUDDENHAM:   Objection;
 4   form.
 5                You can answer.
 6        A.      Part of the plane ticket.
 7        Q.      Are you saying that came
 8   out of your paycheck in some way?
 9        A.      No.
10        Q.      Then how did you pay for
11   part of the plane ticket?
12        A.      In cash.
13        Q.      Who did you provide that
14   cash to?
15        A.      To Mike.
16        Q.      The person that's sitting
17   next to me?
18        A.      Yes.
19        Q.      How much cash did you
20   provide to him?
21        A.      I think it was somewhere
22   around $75.
23        Q.      You left midway through the
24   season in 2004; correct?
```

Ramon Villanueva

1       A.      Yes.

2               MR. TUDDENHAM:  Sarah, is it

3   possible to make it a little warmer in

4   here?

5               MS. BOUCHARD:  Sure.

6               THE VIDEOGRAPHER:  Off tape

7   10:09.

8               (Recess.)

9               MS. BOUCHARD:  Let's go back

10  on the record.

11              (The following took place

12  off the video record:

13              MS. BOUCHARD:  We're going

14  back on the record and for the record, I

15  have asked for an I-9 to show that he is

16  lawfully in the United States right

17  now.  He has indicated that it's in his

18  suitcase, which I understand is within

19  walking distance, and I have requested

20  it now, particularly given the answers

21  that he has given with respect to the

22  Fifth Amendment.  You have said that you

23  are not going to get it right now and

24  I'm requesting you to do so.

Ramon Villanueva

```
 1              MR. TUDDENHAM:  I will tell
 2    you what, Sarah:  As I explained to you
 3    at the beginning of this, he has to
 4    catch an airplane to Mexico.  The
 5    deposition has to be end by 2:30.  If
 6    you would like to spend the time between
 7    now and 2:30 having us to go walk to
 8    find the -- it's an I-94, I will be
 9    happy to do that right now.
10              MS. BOUCHARD:  Then I would
11    like that to happen.
12              MR. TUDDENHAM:  Great.
13              (Recess.)
14              THE VIDEOGRAPHER:  Back on
15    the record 10:37.
16    BY MS. BOUCHARD:
17        Q.    Mr. Villanueva, I'm going
18    to ask you some background questions.
19    What is your marital status?
20        A.    I am married.
21        Q.    Do you have any children?
22        A.    Yes.
23        Q.    How many?
24        A.    One.
```

ESQUIRE DEPOSITION SERVICES

Ramon Villanueva

```
 1        Q.      Boy or girl?

 2        A.      Girl.

 3        Q.      And how old is she?

 4        A.      She just turned 4.

 5        Q.      What's your educational

 6   background?

 7        A.      Five years in university.

 8        Q.      What's the university

 9   called?

10        A.      University of Guadalajara.

11        Q.      Have you had any other H-2B

12   positions prior to TruGreen?

13             THE INTERPRETER:  Did you

14   say H-2B?

15             MS. BOUCHARD:  Positions.

16        A.      No.

17        Q.      Had you worked in the

18   United States prior to coming to the

19   United States for TruGreen?

20        A.      No.

21        Q.      What type of work did you

22   do in Mexico prior to working for

23   TruGreen?

24        A.      Giving classes.
```

Ramon Villanueva

1              MS. BOUCHARD:  To the
2    translator, does that mean taking
3    classes?
4              THE INTERPRETER:  Giving
5    classes, teaching.
6    BY MS. BOUCHARD:
7         Q.    Okay.  What did you teach?
8         A.    Math and junior high school
9    classes.
10        Q.    How long did you teach
11   those courses?
12        A.    I don't remember exactly.
13        Q.    I think I might have asked
14   this question already, but did you did
15   you work in the United States for any
16   other person besides TruGreen?
17             MR. TUDDENHAM:  You mean?
18             MS. BOUCHARD:  In 2004.
19        A.    No.
20        Q.    Have you had any other H-2B
21   positions after TruGreen?
22        A.    No.
23        Q.    Have you had any other work
24   visa that legally allows you to work in

Ramon Villanueva

```
1    the United States after TruGreen?
2                    MR. TUDDENHAM:  Objection,
3    calls for a legal conclusion that he is
4    not competent to give you, but he can
5    answer.
6         A.    I'm taking the Fifth
7    Amendment.
8         Q.    How did you learn about the
9    opportunity to work at TruGreen?
10        A.    In the recruiting office in
11   Mexico.
12        Q.    What is the recruiting
13   office's name?
14        A.    If I'm not mistaken, it's
15   LLS.
16        Q.    Okay.  Who did you speak to
17   in the recruiting office?
18        A.    I don't remember their
19   name.  I only know it was a woman.
20        Q.    What did you learn about
21   the position that interested you?
22        A.    The salary.
23        Q.    What was told to you at
24   that time about the salary?
```

Ramon Villanueva

1          A.     It was the highest on the
2     list they showed me.
3          Q.     What did the list include?
4          A.     Well, names of other
5     companies, but I don't remember them.
6          Q.     Did he have any other
7     people that he knew that were also
8     interested in jobs with TruGreen?
9                 Let's strike that question;
10    okay?
11                MR. TUDDENHAM:  Can you
12    rephrase it saying "you."  You are
13    saying "he."
14                MS. BOUCHARD:  Okay.
15    BY MS. BOUCHARD:
16         Q.     Did you know of any other
17    people that had also worked for
18    TruGreen?
19         A.     No.
20         Q.     At the time you were
21    learning about the position, what did
22    you understand the position to be?
23         A.     In regard to what?
24         Q.     Did you understand it to be

Ramon Villanueva

1    a laborer position?

2        A.    Not necessarily, but I

3    didn't expect it to be anything

4    different.

5            MR. TUDDENHAM:  For the

6    record, just -- your question "laborer"

7    was translated "manual labor."

8            MS. BOUCHARD:  Okay.

9    BY MS. BOUCHARD:

10       Q.    What I was asking is

11   whether you remember the title of your

12   job to be laborer or applicator.

13           THE INTERPRETER:  Applicator

14   you said?

15       A.    I don't remember.

16           MS. BOUCHARD:  Mark this.

17           (Below-described document

18   marked as Villanueva Exhibit 1.)

19   BY MS. BOUCHARD:

20       Q.    Thank you for providing us

21   with your I-94 form.  I have a question

22   about your I-94 form based on testimony

23   you've previously given.  I understand

24   from your testimony that you entered the

Ramon Villanueva

1    country in August, most recently; is
2    that correct?
3          A.    That's true.
4          Q.    My understanding is that
5    the I-94 should reflect that somewhere
6    on this document.
7          A.    No.
8          Q.    Is this the only document
9    that you received since April?
10         A.    Yes.
11         Q.    And just to clarify, you
12   came here in April?
13         A.    Okay.  The thing is this
14   form that I have here is what they gave
15   me when I came in April.  But I had
16   another that, if I'm not mistaken, they
17   gave to me -- they gave me the 26th of
18   February that allowed me to come in and
19   go out over the border.
20               And so when I went back to
21   Mexico in April -- and so when I came
22   back to the United States through Los
23   Angeles, this is the one they gave me
24   because my understanding was that the

Ramon Villanueva

1  other one was to be able to go and come
2  across the border.
3          Q.      So were you California at
4  the end of March of this year?
5          A.      May I see a calendar?
6          Q.      A calendar of the month of
7  March?
8          A.      Well, the thing is that I
9  don't remember the dates exactly.  And
10  if I came up in February, then it may
11  have been in March.  The thing is I
12  don't remember because I was coming and
13  going.
14                  MR. TUDDENHAM:  It may have
15  been in California in March, is what he
16  said.
17                  THE INTERPRETER:  I'm
18  sorry.  Did I not say that, may have
19  been?
20                  MS. RAPPOSELLI:  In
21  California.
22                  MR. TUDDENHAM:  In
23  California.
24                  THE INTERPRETER:

Ramon Villanueva

```
 1  California.
 2  BY MS. BOUCHARD:
 3       Q.    Do you remember having a
 4  conversation with Lisa McHugh over the
 5  phone in March of this year?
 6       A.    Yes.
 7       Q.    And what did you two talk
 8  about?
 9       A.    Well, I was a bit confused
10  because I thought it was another friend
11  of mine by the name of Lisa.  So I was
12  actually asking about Lisa, the friend
13  of mine.
14       Q.    On this same phone call?
15       A.    I think so, if I'm not
16  mistaken.
17       Q.    So you thought that you
18  were talking to someone else other than
19  Lisa McHugh but you were asking about
20  Lisa McHugh?
21       A.    Well, when I called the
22  office, I asked for Lisa.
23            And so this woman answered
24  and I thought it was the Lisa that I was
```

Ramon Villanueva

1    asking for and then -- and so then it

2    was clarified that she was not the

3    person that I was looking for, and so

4    then I did start asking about the person

5    that I was asking for.

6         Q.    Why were you calling

7    TruGreen's offices?

8         A.    Because she didn't answer

9    her cell phone.

10        Q.    What were you intending to

11   talk to Lisa about?

12        A.    Well, we're friends and I

13   just wanted to know how she was and what

14   she was doing.

15        Q.    Did you ask anyone at

16   TruGreen to take documents for you?

17        A.    No.

18        Q.    What expenses did you incur

19   in obtaining H-2B visa and traveling to

20   the United States to work for TruGreen?

21        A.    Well, I don't remember the

22   numbers exactly, but it was the amount

23   for the office in Guanajuato.  I think

24   that was 155 and then the cost for the

Ramon Villanueva

1    visa, which was about 200, and then the

2    cost for transportation from my home to

3    Delaware.

4         Q.    Did your employer in 2006

5    pay for your transportation costs to and

6    from Mexico?

7              MR. TUDDENHAM:  Excuse me?

8              Objection.  What employer in

9    2006 are you talking about?

10             MS. BOUCHARD:  He said he

11   worked in 2006.

12             THE WITNESS:  No.

13             MR. TUDDENHAM:  Objection.

14   Why don't you try clarifying your

15   question?

16   BY MS. BOUCHARD:

17        Q.    You can answer.

18        A.    Could you please repeat the

19   question?

20        Q.    You have been traveling to

21   and from Mexico from the United States

22   in 2006; correct?

23        A.    Yes.

24        Q.    And you have been working

31

Ramon Villanueva

| | |
|---|---|
| 1 | in the United States in 2006; correct? |
| 2 | MR. TUDDENHAM: Objection. |
| 3 | He has taken the Fifth Amendment to that |
| 4 | question three or four times. And I |
| 5 | mean it, Sarah, when someone invokes the |
| 6 | Fifth Amendment, it doesn't become a |
| 7 | game where you get to keep trying to ask |
| 8 | the question in a different way to trick |
| 9 | him to say something else. |
| 10 | MS. BOUCHARD: Well, my |
| 11 | question is actually -- |
| 12 | MR. TUDDENHAM: He has taken |
| 13 | the Fifth Amendment. You have your |
| 14 | answer. |
| 15 | I'm going to direct him not |
| 16 | to answer the question. |
| 17 | MS. BOUCHARD: So I just |
| 18 | want to make clear, my question is a |
| 19 | different one, and it's whether his |
| 20 | employer in 2006 paid for transportation |
| 21 | costs to and from the United States. |
| 22 | And I just want to make sure |
| 23 | that that is the question that you are |
| 24 | invoking the Fifth on. |

32

Ramon Villanueva

```
 1              MR. TUDDENHAM:  Well, I
 2    would ask you to clarify what employer
 3    you are talking about.
 4              No.  You need to have some
 5    foundation for that.  I mean --
 6              MS. BOUCHARD:  Because you
 7    are taking the Fifth on the foundational
 8    question.
 9              MR. TUDDENHAM:  Sarah, if
10    you will clarify what you were talking
11    about, he may be able to answer the
12    question.  But if you are going to ask a
13    question that is so vague that it could
14    cover anything, he is invoking his Fifth
15    Amendment right.
16              MS. BOUCHARD:  Well, I was
17    trying to clarify that and then you
18    interrupted me.  So my question for the
19    foundation was --
20              MR. TUDDENHAM:  Well, I
21    apologize.
22              MS. BOUCHARD:  My question
23    for the foundation was --
24    BY MS. BOUCHARD:
```

Ramon Villanueva

1    Q.    The employer that you

2    worked for in the United States, did

3    that employer pay for your

4    transportation costs in 2006?

5         MR. TUDDENHAM:    Objection;

6    foundation.    Objection.    He has invoked

7    the Fifth Amendment to any questions

8    involving work in the United States in

9    2006.    You have your answer to that.

10   BY MS. BOUCHARD:

11   Q.    What were your travel costs

12   from Mexico to Delaware in 2004?

13   A.    Well, I don't remember

14   exactly the numbers because I paid for

15   several, several tickets.

16   Q.    Several bus tickets?

17   A.    Yes.

18   Q.    Can he approximate the

19   cost?

20        I mean can you approximate

21   the cost?    My apologies.

22   A.    I think it was somewhere

23   around $170 and then whatever I paid for

24   food, and that I have no idea.

Ramon Villanueva

1              (Below-described document

2      marked as Villanueva Exhibit 2.)

3      BY MS. BOUCHARD:

4              Q.      What's been marked before

5      you as Exhibit 2 has the title "Employer

6      Disclosure Affidavit."  Do you see the

7      box "Rent and utilities per month"?

8              Yes?

9              A.      Yes.

10             Q.      And do you see it says

11     $373?

12             A.      Yes.

13             Q.      Isn't it true that you were

14     not in fact charged $373 for rent and

15     utilities?

16             A.      Well, not entirely.  Well,

17     and, if it was, I wouldn't know how to

18     show you because on my check the -- it

19     wasn't there entirely.

20             Q.      Isn't it true that you were

21     charged $60 per week for rent and

22     utilities?

23             A.      I think that was only the

24     rent, as far as I understand.

Ramon Villanueva

1     Q.     Didn't that also include
2  utilities and transportation?
3     A.     I suppose so because I
4  didn't pay for them aside from that.
5     Q.     So you paid approximately
6  $240 per month for rent, utilities, and
7  transportation charges?
8     A.     What do you mean by
9  "utilities"? What is meant by
10 "utilities"?
11    Q.     Electricity.
12    A.     Oh, then that's right.
13 Except for the phone.
14    Q.     You had to pay for the
15 phone charges separately?
16    A.     Yes. My companion was in
17 charge of that; but, yes, we did have to
18 pay for that separately. It wasn't
19 much.
20    Q.     Was your local service paid
21 for by TruGreen? Was your local phone
22 service paid for by TruGreen?
23    A.     I think so, yes.
24    Q.     And I apologize if I asked

36

Ramon Villanueva

1   this, but is this your signature on this

2   document?

3           A.      Yes.

4                   MR. TUDDENHAM:    Sarah, why

5   don't clarify what document you just

6   referred to?

7                   MS. BOUCHARD:    I'm referring

8   to Exhibit 2, the only one with a

9   signature.  Oh, except the other one --

10  I apologize.

11  BY MS. BOUCHARD:

12          Q.      Who communicated the offer

13  in Mexico about the TruGreen job?

14          A.      The person that was in the

15  office; I don't know who that is.

16          Q.      Did you understand that to

17  be an LLS employee?

18          A.      No.

19          Q.      Who was it then?

20          A.      Well, we had to choose

21  someone from the list and they were the

22  ones that were going to give us the

23  contract or contract us, and in this

24  case it was TruGreen.

Ramon Villanueva

1      Q.      There was no employee in
2   Mexico from TruGreen, was there, that
3   talked to you?
4      A.      That's true, no.
5      Q.      You said you did not know
6   anyone who had worked previously for
7   TruGreen?
8      A.      That's true.
9      Q.      What were you told before
10  you accepted the offer about
11  compensation and overtime?
12     A.      What's "compensation"?
13     Q.      The amount that you are
14  paid.
15     A.      I'm sorry.  Once again,
16  what was the question?
17     Q.      What were you told about
18  your pay and overtime pay before you
19  accepted?
20     A.      I only knew what was on
21  this paper.
22          MR. TUDDENHAM:  And, for the
23  record, the witness is indicating
24  Exhibit 2.

Ramon Villanueva

```
 1   BY MS. BOUCHARD:
 2         Q.     Did you understand that
 3   TruGreen would provide a uniform to you
 4   at no cost to you?
 5         A.     Well, I didn't know that
 6   because I didn't even know that I was
 7   going to be using a uniform.
 8         Q.     At some point did you learn
 9   that you would be using a uniform?
10         A.     I think when I got to
11   Delaware.
12         Q.     Did you ever have to pay
13   for the uniform?
14         A.     No.
15         Q.     Were you told in Mexico
16   that there may be opportunities to be
17   promoted at TruGreen?
18         A.     No.  And what's more, the
19   person that told me about it didn't even
20   know what all was -- what all it
21   entailed.
22         Q.     The person that you spoke
23   to did not know all the terms and
24   conditions of the TruGreen's employment
```

Ramon Villanueva

1   when you spoke to that person?

2        A.    I was referring to the job

3   itself.  She didn't know exactly what I

4   would be doing.

5        Q.    But you accepted the job

6   anyway?

7        A.    Yes.

8        Q.    Was the only TruGreen

9   facility that you worked for in

10  Wilmington?

11       A.    As far as I know, unless I

12  have worked for another office without

13  knowing it.  But I believe so.

14       Q.    Okay.  Was Mike Matejik

15  your supervisor?

16       A.    Yes.

17       Q.    Do you know Jim Vacchiano?

18       A.    No.

19       Q.    How many other H-2B workers

20  were there when you were there?

21       A.    Well, I met five, and I

22  suppose that's all of them.

23            MR. TUDDENHAM:  Are we

24  giving them separate numbers or --

Ramon Villanueva

1              MS. BOUCHARD:   No.

2              (Below-described document

3    marked Villanueva Exhibit 3.)

4    BY MS. BOUCHARD:

5         Q.    What's been marked as

6    Exhibit 3 should be a three-page

7    document.   Does everyone have three

8    pages?

9         A.    Yes.

10         Q.    On TruGreen Bates numbered

11   15, which I believe is the third page,

12   did you read this before signing it?

13         A.    I don't recognize -- I

14   don't remember.

15         Q.    You don't remember whether

16   you read it or not?

17         A.    I don't remember whether I

18   read it or not because I don't remember

19   or given that I don't remember.

20         Q.    Do you normally sign

21   documents that you have not read?

22         A.    No.

23         Q.    So do you think you did

24   read this document, in retrospect?

**EXHIBIT A TO BRIEF**

**PART 2 OF 2**

Ramon Villanueva

1          A.      I don't know what to tell

2    you because there were so many documents

3    that I signed.

4               Well, I have to recognize

5    the fact that I didn't pay attention to

6    them in particular.  Everybody was

7    signing and so I signed.

8          Q.      Were there some documents

9    in Mexico that you may not have read as

10   well and just signed?

11         A.      Well, in Mexico the only

12   thing they gave me were these documents,

13   the ones that are marked No. 1 and 2 --

14   no, I'm sorry, just No. 2, so that's

15   easy to remember.

16         Q.      So those are the only two

17   documents that you signed in Mexico, the

18   ones that you just previously mentioned?

19         A.      Well, actually it was only

20   two documents, this document and another

21   document that I don't have here.  But

22   this was the only one I signed.

23              MS. BOUCHARD:  This is going

24   to be Exhibit 4.

42

Ramon Villanueva

1              (Below-described document
2     marked as Villanueva Exhibit 4.)
3              MR. TUDDENHAM:  Do you have
4     a copy for me?
5              MS. BOUCHARD:  Oh, I'm
6     sorry, Ed.
7     BY MS. BOUCHARD:
8         Q.    Mr. Villanueva, is this
9     your handwriting on this document which
10    has been marked as Exhibit 4?
11        A.    Yes.
12        Q.    And did you see -- first of
13    all, did you read this document before
14    signing it?
15        A.    I think so.  I believe so.
16        Q.    Then did you understand in
17    Paragraph 8 that the costs that were
18    identified in Paragraph 7 were your
19    responsibility?
20        A.    Yes.
21        Q.    But you came to -- you
22    agreed to pay those; correct?
23        A.    I paid them.
24        Q.    But those are the costs

43

Ramon Villanueva

| | |
|---|---|
| 1 | that you are disputing now in your |
| 2 | lawsuit? |
| 3 | A.    May I speak to my |
| 4 | attorney? |
| 5 | Q.    Sure. |
| 6 | THE VIDEOGRAPHER:  Off tape |
| 7 | 11:25. |
| 8 | (Recess.) |
| 9 | THE VIDEOGRAPHER:  Back on |
| 10 | the record 11:27 |
| 11 | MS. BOUCHARD:  Could the |
| 12 | court reporter repeat the question |
| 13 | that's pending on the record? |
| 14 | (The court reporter read the |
| 15 | record as follows: |
| 16 | "QUESTION:  But those are |
| 17 | the costs that you are disputing now in |
| 18 | your lawsuit?") |
| 19 | A.    Yes. |
| 20 | Q.    Why did you take the job |
| 21 | with TruGreen even though you had to pay |
| 22 | those expenses? |
| 23 | A.    Well, because on the list |
| 24 | it was the best salary.  And the people |

Ramon Villanueva

```
 1    that connected me up to the office said

 2    that those were the costs that one had

 3    to pay -- yes, the costs.

 4         Q.    Did you see the TruGreen

 5    job as an opportunity to make money that

 6    you could not make in Mexico?

 7         A.    Definitely, yes, and above

 8    all much more quickly.

 9         Q.    Did you receive $150 in

10    cash -- let me strike that question.

11    Let me go back to this.

12              This document that's Bates

13    stamped RV-2, was that presented to you

14    in Mexico or Delaware?

15              MS. RAPPOSELLI:    Can we

16    reference Defendant's Exhibit 4?    Is

17    that what you're referencing?

18         A.    Yes.

19         Q.    When you arrived in

20    Delaware, you received $150 cash when

21    you got there; correct?

22         A.    Yes.

23         Q.    You never had to repay that

24    money back?
```

Ramon Villanueva

```
 1          A.      Yes, that's true.

 2          Q.      And you could use that

 3   money how you wanted to?

 4          A.      Well, yes, even though that

 5   at that moment it had to be for food.

 6          Q.      And is that what you used

 7   it for?

 8          A.      Yes, and I believe I bought

 9   a blanket or something like that.

10          Q.      Did you receive any other

11   advances from Mike?

12          A.      No.

13          Q.      That $150 was not actually

14   an advance, but what I'm asking you is

15   whether you could have asked Mike for

16   mean if you needed it sooner.

17                  MR. TUDDENHAM:  Objection,

18   form.

19          A.      I don't know.

20          Q.      Did you know of any other

21   workers that asked Mike for money sooner

22   than it was earned?

23          A.      No.  As far as I know, no.

24          Q.      Do you know how other
```

ESQUIRE DEPOSITION SERVICES

Ramon Villanueva

1    TruGreen branches pay their H-2B

2    workers?

3           A.    No.

4           Q.    Do you know if TruGreen

5    paid some of the costs of your housing?

6           A.    No.

7           Q.    You don't know?

8           A.    No, I don't know.

9           Q.    Do you know what your

10   actual transportation costs were?  In

11   other words, do you know if TruGreen

12   paid for some of your transportation

13   costs?

14              MR. TUDDENHAM:  From where

15   to where?

16   BY MS. BOUCHARD:

17          Q.    I'm just talking while

18   working in the Delaware area.

19              THE INTERPRETER:  I'm

20   sorry.  Your answer to from where to

21   where?

22              MS. BOUCHARD:  In the

23   Delaware Valley.

24          A.    Well, the only place we

Ramon Villanueva

1    went -- well, practically the only place
2    we went was to the office, and for that
3    Mike gave us passes for the bus.
4         Q.    Do you know how much the
5    bus pass actually cost?
6         A.    No.
7         Q.    Did you ever ask why you
8    were being undercharged for
9    transportation, rent, and utilities?
10             MR. TUDDENHAM:    Objection,
11   form.
12             THE INTERPRETER:    Rent,
13   transportation?
14        A.    No.
15        Q.    How did you learn that you
16   were going to take the position as
17   specialist at TruGreen?
18             MR. TUDDENHAM:    Objection;
19   form.
20        A.    I didn't know -- I didn't
21   know it was going to be that position.
22        Q.    Did you have a conversation
23   with Mike about the specialist position
24   and the benefits that could come from

Ramon Villanueva

1   you working as a specialist?

2        A.    Well, I don't quite

3   understand because I didn't speak to

4   Mike until I got here.   And when I got

5   here, I was just supposed to do what I

6   was supposed to do.

7        Q.    Do you recall a

8   conversation with Mike, with other H-2B

9   workers present, where he described the

10  specialist position and the opportunity

11  to earn more money in that position?

12       A.    Well, I remember him

13  telling us about what the job would be,

14  but I don't remember anything about

15  another position, any other position.

16       Q.    Do you recall him comparing

17  the specialist position to the laborer

18  position?

19       A.    No, I don't think so.   I

20  don't remember.

21       Q.    Do you recall him talking

22  to you about bonuses that you could earn

23  as a specialist?

24       A.    I remember him speaking to

Ramon Villanueva

1    us about commissions, but the position

2    of specialist I really didn't even know.

3         Q.    My question, though, is

4    about bonuses.  Do you recall getting

5    any bonuses?

6         A.    I think so, yes.  If you're

7    referring to the commissions that

8    appeared on our checks, then, yes.

9         Q.    And you recall getting

10   commissions?

11        A.    Sometimes.

12        Q.    What would the commissions

13   be based upon, if you remember?

14        A.    On production.

15        Q.    Is there any discussion of

16   commissions based on production in

17   what's marked as RV-1?  And I'm not sure

18   what that's Bates numbered.  I

19   apologize.

20             MR. TUDDENHAM:  Sarah,

21   before the record gets totally messed

22   up, RV-1 is his I-94.

23             MS. BOUCHARD:  No.  RV --

24             MR. TUDDENHAM:  Sarah, could

Ramon Villanueva

1   you use the exhibit numbers?  You

2   started with exhibit numbers this

3   morning.

4              MS. BOUCHARD:  What exhibit

5   number is it for the record?

6              THE INTERPRETER:  I have no

7   idea because I don't have them.  What

8   exhibit number are you looking at?

9       A.    I can tell you it's

10  Exhibit No. 2.

11  BY MS. BOUCHARD:

12      Q.    What I'm referring to, for

13  the record, is Exhibit No. 2 and I'm

14  asking if this document reflects any

15  commissions that you could potentially

16  earn.

17      A.    Yes.

18      Q.    And does it say how much?

19      A.    No.

20      Q.    Did you have any

21  understanding of how much commission you

22  would earn when you were in Mexico and

23  signed this document?

24      A.    No.

51

Ramon Villanueva

1        Q.      But you accepted the
2   position anyway?
3        A.      Yes, I accepted it because
4   of the salary.
5        Q.      What salary are you
6   referring to?
7        A.      The one on this page, what
8   it says here on this page.
9        Q.      Okay.  I see an hourly rate
10  on that page but I don't see a
11  guaranteed salary.
12       A.      I think it's a question of
13  language.  In Spanish we refer to this
14  as salary.
15       Q.      Okay.  Thank you.
16       A.      You're welcome.
17       Q.      Did you independently keep
18  track of your hours other than -- yeah,
19  did you independently keep track of your
20  hours on a piece of paper?
21       A.      Sometimes I did so.
22       Q.      Do you still have those
23  pieces of paper?
24       A.      I wouldn't know to tell you

Ramon Villanueva

1    for sure because if I do have them, they

2    are buried under a bunch of papers in

3    Mexico.  So I wouldn't know to tell you

4    for sure.

5         Q.    As part of this lawsuit,

6    have you checked your records in Mexico

7    to make sure that you've produced

8    everything that's related to this

9    lawsuit to your attorneys?

10        A.    Well, yes, some in Mexico

11   and some before I left here.

12        Q.    And so you just stated,

13   though, that you think they are

14   underneath some other papers in Mexico.

15             MR. TUDDENHAM:  Objection,

16   form.

17        A.    Well, what I was referring

18   to is before I left for Mexico I

19   reviewed some documents and -- and so --

20   and they're there, they were there.  And

21   then when I spoke to my attorneys --

22             THE INTERPRETER:  I'm

23   sorry.  I lost it entirely.

24        A.    Well, some documents I

53

Ramon Villanueva

1   reviewed here and one of them was this

2   one. And then others I reviewed in

3   Mexico when I was there.

4                MR. TUDDENHAM:  I don't

5   think the witness is understanding your

6   questions.

7   BY MS. BOUCHARD:

8        Q.      My question is this:  My

9   question is, you said you had a piece of

10  paper or pieces of paper where you

11  tracked the number of hours that you

12  worked at TruGreen.  Where are those

13  pieces of paper?

14       A.      In Mexico.

15       Q.      And why haven't you

16  produced those to your attorneys?

17       A.      They haven't asked for them.

18                MS. BOUCHARD:  Those would

19  truly be covered by the disclosures.

20                MR. TUDDENHAM:  I assure

21  you, Sarah, if they can be found, you

22  will get a copy of them.

23                MS. BOUCHARD:  Okay.  He

24  seems to suggest that he still has them

54

Ramon Villanueva

1    in Mexico, by his testimony.

2                MR. TUDDENHAM:   Well,

3    actually what he first said was they

4    might be in Mexico.   If they exist,

5    believe me, we would be just as

6    interested in seeing them as you.

7                MS. BOUCHARD:   Okay.

8    BY MS. BOUCHARD:

9         Q.     What was the type of work

10   that you did on a daily basis for

11   TruGreen?

12        A.     To apply chemicals on the

13   grass -- lawns.

14        Q.     To different homes or where

15   would you go?

16        A.     At different homes and

17   different places.

18        Q.     How would you get to those

19   different places?

20        A.     Well, in a pickup truck or

21   a truck of TruGreen's.   It depended on

22   what it may be.

23        Q.     Was there a designated

24   worker who would drive?

Ramon Villanueva

```
 1          A.     At first, yes.
 2          Q.     Did that person have a
 3  different job description than you did?
 4          A.     I don't know.
 5          Q.     Okay.  Did you enjoy the
 6  work?
 7          A.     Well, it was work and they
 8  paid me.  It was work.
 9          Q.     Could you have earned more
10  money if you had worked more hours?
11          A.     In one day?
12          Q.     In other words, if you had
13  asked to work more hours, would they
14  have allowed you to work more hours and
15  make more money?
16          A.     In the way that they paid
17  me, not necessarily.  In the way that I
18  was paid, not necessarily.
19          Q.     Why?
20          A.     Because the more hours I
21  worked, the less they paid me per hour.
22          Q.     But you still would have
23  been getting more money because you
24  would be working more?
```

ESQUIRE DEPOSITION SERVICES

Ramon Villanueva

```
 1          A.      Yes, but my work would be
 2     worth  less,  my  efforts  would  be  worth
 3     less.
 4          Q.      Do  you  understand  that
 5     that's  a  lawful  way  to  pay  people  in  the
 6     United  States?
 7               MR.  TUDDENHAM:   Objection,
 8     calls  for  a  legal  conclusion.
 9               MS.  BOUCHARD:   I'm  just
10     asking  if  he  knows.   I'm  not  asking  --
11               MR.  TUDDENHAM:   Well,  he's
12     not  a  lawyer.   If  you  want  to  ask  him
13     his  opinion  as  a  layperson,  be  my  guest.
14               MS.  BOUCHARD:   Yes.
15          A.      In  my  opinion?
16          Q.      Yes.
17          A.      No.
18          Q.      Did  you  complain  at  some
19     point  about  how  you  were  paid?
20          A.      Yes.
21          Q.      And  who  did  you  complain  to?
22          A.      Well,  I  believe  I  did  so
23     many  times.   So  I  don't  remember  the
24     first  time,  but  I  believe  it  was  at
```

57

Ramon Villanueva

```
1    least on some occasions to Mike.
2          Q.     And who else did you
3    complain to?
4          A.     Well, I believe it was to
5    my manager -- well, he wasn't my
6    manager, but Kevin Davis.
7          Q.     Who is Kevin Davis?
8          A.     Well, I believe he was the
9    manager of another group of workers.
10         Q.     Were they H-2B workers?
11         A.     I don't think so.
12         Q.     When you complained to Mike
13   about how you were paid, what did he
14   tell you?
15         A.     Well, he said that it was
16   fine and he explained to me once again
17   the way to be paid.  And he said if I
18   wished, I could be paid according to
19   what this page says but that if I was
20   paid the way it says here, then I
21   wouldn't receive commissions or
22   overtime.
23              MR. TUDDENHAM:  And for the
24   record, the witness is indicating
```

Ramon Villanueva

1   Exhibit 2.

2   BY MS. BOUCHARD:

3        Q.      So did you decide, based on

4   that conversation, to remain being paid

5   in the same way that you started being

6   paid?

7        A.      Yes, for two reasons:

8   because if I chose to work by the hour,

9   then according to what Mike said, I

10  could only work 40 hours.  And the other

11  reason is that he said it would be fine,

12  that I would make more money, and it was

13  just a question of time.

14       Q.      Were you promised any

15  number of overtime hours in Mexico?

16       A.      No.

17       Q.      You had mentioned another

18  person who I believe it was a field

19  manager.  What did you say to him about

20  how you were being paid?

21               MR. TUDDENHAM:  Objection;

22  form.  For the record, are you talking

23  about?

24  BY MS. BOUCHARD:

59

Ramon Villanueva

1          Q.      You mentioned Kevin Davis?

2          A.      (Witness shakes head.).

3          Q.      What did you say to him

4    with respect to your complaints about

5    wages?

6          A.      Well, I asked him if that

7    was all right and whether it was allowed

8    to do that.  And he explained to me once

9    again the pay, the way in which I was

10   paid.

11         Q.      Did anyone in Mexico

12   promise you a certain amount of

13   commissions?

14         A.      No.

15         Q.      Did you strain your back at

16   some point while working for TruGreen?

17         A.      Yes.

18         Q.      And you were paid for

19   that -- oh, let me stop.

20                 You missed a day of work for

21   that?

22         A.      Yes.

23         Q.      And you were paid for that

24   day even though you didn't work;

Ramon Villanueva

```
1    correct?
2         A.     I don't remember, but it's
3    probable that, yeah.
4               But I just want to clarify
5    something:  That the problem was
6    actually not the day of work but that as
7    a result I could not meet my quota of
8    production.
9         Q.     Did your injury preclude
10   you from working hours that you wanted
11   to?
12        A.     I'm just referring to that
13   day.
14        Q.     Oh, that day.  So you
15   weren't able to make commissions on that
16   day but you were paid for that day?
17        A.     And, well, as I said
18   before, I suppose so, but I don't
19   remember exactly.
20        Q.     Why did you decide to leave
21   TruGreen?
22        A.     I believe I had many
23   reasons to do so, but the main reason
24   was that I was not receiving what I was
```

Ramon Villanueva

```
 1    told I would receive, what's on this
 2    paper.
 3            Q.      Which is Exhibit 2?
 4            A.      Yes.
 5            Q.      Isn't it true that you just
 6    stated that Mike said that you could go
 7    to this system of compensation if you
 8    wanted?
 9                    MR. TUDDENHAM:    Objection;
10    form.
11            A.      It's true that he told me
12    that, but at that point in time he told
13    me that I would be better off staying
14    with commissions because I could earn
15    more money.
16            Q.      And you chose to stay on
17    the commission plan?
18            A.      Yes.
19            Q.      What other reasons did you
20    decide -- what were the other reasons
21    you decided to leave TruGreen
22    mid-season?
23            A.      My back was not all right,
24    and because I received what you might
```

Ramon Villanueva

1    call a proposition from Mike that he had

2    to return some of of us to Mexico.

3    Basically that's it.

4         Q.    So you chose to volunteer?

5         A.    Well, if one could call it

6    volunteer, based on all of the bad

7    things involved, yes.

8         Q.    Did other H-2B workers

9    decide to stay?

10        A.    I don't think he offered

11   anyone else to leave.

12        Q.    That wasn't my question,

13   though.  My question was, were you the

14   only H-2B worker that left?

15        A.    As far as I know, yes.

16   Well, I at least returned alone.

17             MS. BOUCHARD:  Do you want

18   to stop so we can do the video?

19             THE VIDEOGRAPHER:  This

20   concludes videotape No. 1 at 12:03.

21             (Recess.)

22             THE VIDEOGRAPHER:  We're

23   back on the record.  This is the

24   beginning of Tape 2.  The time is

63

Ramon Villanueva

```
1    12:14.
2    BY MS. BOUCHARD:
3         Q.    When you returned to Mexico
4    in 2004, did you immediately begin
5    working?
6         A.    No.
7         Q.    When did you start working
8    in 2004, if at all?
9         A.    If I'm not mistaken, I
10   don't think it was until September.
11        Q.    And what did you do?
12        A.    Give classes.
13        Q.    And what was your hourly
14   wage giving classes?
15        A.    You're going to laugh.
16        Q.    If you could estimate it in
17   American dollars, that would be great.
18        A.    Something like $2.
19        Q.    $2 an hour?
20        A.    (Witness shakes head.)
21        Q.    And about how many hours
22   per week did you work?
23        A.    Somewhere around 50.
24        Q.    On what's marked as
```

Ramon Villanueva

1    Exhibit 2 it states "Skills" and it says
2    "valid driver's license, bilingual."
3    Did you have a valid driver's license?
4            A.    Yes.
5            Q.    And are you bilingual?
6            A.    Well, I wouldn't know how
7    to -- I don't believe that I have the
8    ability to evaluate that.
9            Q.    But you presented yourself
10   as bilingual to TruGreen?
11           A.    Well, in reality it wasn't
12   me who made that decision.  It was the
13   person with whom I spoke in Guanajuato.
14   She was asking me some questions in
15   English and that's what she decided,
16   that I was bilingual.
17                   MS. BOUCHARD:  Okay.  Thank
18   you.  I don't have any further
19   questions.
20                   MR. TUDDENHAM:  We will
21   reserve ours to the time of trial.
22                   THE VIDEOGRAPHER:  That
23   concludes today's videotape deposition.
24   The time is 12:19.

65

Ramon Villanueva

1          (Witness excused.)

2          (Whereupon the examination

3     adjourned at 12:19 p.m.)

4               - - - - - -

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

66

Ramon Villanueva

```
 1
 2              C E R T I F I C A T E
 3
 4         I  hereby  certify  that  the
 5    witness  was  duly  sworn  by  me  and  that
 6    the  deposition  is  a  true  record  of  the
 7    testimony  given  by  the  witness
 8              It  was  requested  before
 9    completion  of  the  deposition  that  the
10    witness  RAMON  VILLANUEVA,  have  the
11    opportunity  to  read  and  sign  the
12    deposition  transcript.
13
14
15
16
17    - - - - - - - - - - - - - - - - - - - - - - - -
18         Ann  V.  Kaufmann,  RPR,  CRR
19
20
21              (The  foregoing  certification
22    of  this  transcript  does  not  apply  to  any
23    reproduction  of  the  same  by  any  means,
24    unless  under  the  direct  control  and/or
```

ESQUIRE DEPOSITION SERVICES

67

Ramon Villanueva

1    supervision of the certifying reporter.)

2         INSTRUCTION TO THE WITNESS

3              Please read your deposition

4    over carefully and make any necessary

5    corrections. You should state the

6    reason in the appropriate space on the

7    errata sheets for any corrections that

8    are made.

9              After doing so, please sign

10   the errata sheet and date it.

11             You are signing same subject

12   to the changes you have noted on the

13   errata sheet, which will be attached to

14   your deposition.

15             It is imperative that you

16   return the original errata sheet to the

17   deposing attorney within thirty (30)

18   days of receipt of the deposition

19   transcript by you. If you fail to do

20   so, the deposition transcript may be

21   deemed to be accurate and may be used in

22   court.

23

24

68

Ramon Villanueva

```
 1

 2                        - - - - - -

 3               E  R  R  A  T  A

 4                        - - - - - -

 5    P A G E      L I N E          C H A N G E

 6    _ _ _ _      _ _ _ _      _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

 7    _ _ _ _      _ _ _ _      _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

 8    _ _ _ _      _ _ _ _      _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

 9    _ _ _ _      _ _ _ _      _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

10    _ _ _ _      _ _ _ _      _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

11    _ _ _ _      _ _ _ _      _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

12    _ _ _ _      _ _ _ _      _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

13    _ _ _ _      _ _ _ _      _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

14    _ _ _ _      _ _ _ _      _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

15    _ _ _ _      _ _ _ _      _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

16    _ _ _ _      _ _ _ _      _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

17    _ _ _ _      _ _ _ _      _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

18    _ _ _ _      _ _ _ _      _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

19    _ _ _ _      _ _ _ _      _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

20    _ _ _ _      _ _ _ _      _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

21    _ _ _ _      _ _ _ _      _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

22    _ _ _ _      _ _ _ _      _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

23    _ _ _ _      _ _ _ _      _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

24    _ _ _ _      _ _ _ _      _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
```

Ramon Villanueva

```
1    ____    ____    _____
2           ACKNOWLEDGEMENT OF DEPONENT
3              I, _____, do
4    hereby certify that I have read the
5    foregoing pages, _____and that the
6    same is a correct transcription of the
7    answers given by me to the questions
8    therein propounded, except for the
9    corrections or changes in form or
10   substance, if any, noted in the attached
11   errata sheet.
12              _____
13              DATE
14
15   Subscribed and sworn to me this _____
16   day of _____, 2005.
17   My Commission expires:
18
19              _____
20
21   _____
22              Notary Public
23
24
     ESQUIRE DEPOSITION SERVICES
```

**A**
ability 64:8
able 27:1 32:11
  60:15
accepted 37:10,19
  39:5 51:1,3
accurate 67:21
ACKNOWLEDG...
  69:2
ACTION 1:3
actual 46:10
address 12:15
adjourned 65:3
advance 45:14
advances 45:11
Affidavit 34:6
affirmative 15:16
agreed 42:22
airline 16:23 17:11
  18:1
airplane 20:4
allowed 26:18 55:14
  59:7
allows 10:15 22:24
Amendment 13:2,14
  13:19 14:15,19
  15:3,14 16:1 19:22
  23:7 31:3,6,13
  32:15 33:7
American 63:17
amount 29:22 37:13
  59:12
Andrea 2:18 5:16
  6:1
and/or 66:24
Angeles 16:20 26:23
Ann 1:15 66:18
answer 3:3 7:16
  8:10 15:16,17 18:5
  23:5 29:8 30:17
  31:14,16 32:11
  33:9 46:20
answered 28:23
answers 19:20 69:7
anymore 17:22
anyway 39:6 51:2
apologies 33:21
apologize 32:21
  35:24 36:10 49:19
APPEARANCES
  2:1
appeared 49:8
applicator 25:12,13
apply 54:12 66:22
appropriate 67:6
Approved 1:16
approximate 33:18
  33:20
approximately 1:15

35:5
April 9:15,21 10:1
  10:21,24 11:11,19
  12:3 26:9,12,15,21
area 46:18
arrived 44:19
aside 35:4
asked 12:23 14:21
  19:15 22:13 28:22
  35:24 45:15,21
  53:17 55:13 59:6
asking 13:21 14:17
  25:10 28:12,19
  29:1,4,5 45:14
  50:14 56:10,10
  64:14
assume 5:13 6:24
assure 53:20
attached 67:13
  69:10
attention 41:5
attorney 5:12 43:4
  67:17
attorneys 7:12 8:5
  52:9,21 53:16
August 12:1,4,8,11
  26:1
a.m 4:11

**B**
back 9:22,22 10:1,3
  11:22 12:5 13:10
  14:11 15:21 19:9
  19:14 20:14 26:20
  26:22 43:9 44:11
  44:24 39:15 61:23
  62:23
background 20:18
  21:6
bad 62:6
Barrington 6:3
based 25:22 49:13
  49:16 58:3 62:6
Basically 62:3
basis 54:10
Bates 40:10 44:12
  49:18
beginning 1:14 20:3
  62:24
believe 10:10 11:23
  14:16 39:13 40:11
  42:15 45:8 54:5
  56:22,24 57:4,8
  58:18 60:22 64:7
Below-described
  25:17 34:1 40:2
  42:1
benefits 47:24
best 43:24
Beth 2:14 5:20

better 61:13
bkenke@morganj...
  2:14
bilingual 64:2,5,10
  64:16
bit 28:9
blanket 45:9
BOCKIUS 2:10,13
bonuses 48:22 49:4
  49:5
border 26:19 27:2
Bouchard 2:10 5:3,4
  5:14 6:12,15 8:3
  8:21 13:3,12,23
  14:20 15:4,9,23
  19:5,9,13 20:10,16
  21:15 22:1,6,18
  24:14,15 25:8,9,16
  25:19 28:2 30:10
  30:16 31:10,17
  32:6,16,22,24
  33:10 34:3 36:7,11
  38:1 40:1,4 41:23
  42:5,7 43:11 46:16
  46:22 49:23 50:4
  50:11 53:7,18,23
  54:7,8 56:9,14
  58:2,24 62:17 63:2
  64:17
bought 45:8
Boulevard 1:22 4:5
box 34:7
Boy 21:1
branches 46:1
break 7:8 13:4
Bridge 6:2
brought 6:17
bunch 52:2
buried 52:2
bus 17:9 33:16 47:3
  47:5

**C**
C 66:2,2
calendar 27:5,6
California 6:7 12:17
  16:17 27:3,15,21
  27:23 28:1
call 28:14 62:1,5
called 8:19 21:9
  28:21
calling 29:6
calls 23:3 56:8
Camac 2:7
Cambridge 2:3
carefully 67:4
case 6:16 36:24
casb 18:12,14,19
  44:10,20
CASTRO 2:5

catch 20:4
cell 29:9
Center 1:23
Centre 2:15
certain 59:12
certification 66:21
Certified 1:16
certify 66:4 69:4
certifying 67:1
CHANGE 68:5
changes 67:12 69:9
charge 35:17
charged 34:14,21
charges 35:7,15
check 34:18
checked 52:6
checks 49:8
chemicals 54:12
CHEMLAWN 1:8
children 20:21
choose 36:20
chose 58:8 61:16
  62:4
CIVIL 1:3
clarified 29:2
clarify 12:2 26:11
  32:2,10,17 36:5
  60:4
clarifying 30:14
classes 21:24 22:3,5
  22:9 63:12,14
clear 31:18
Clements 6:2
client 14:4
code 12:18
come 26:18 27:1
  47:24
coming 21:18 27:12
commission 50:21
  61:17 69:17
commissions 49:1,7
  49:10,12,16 50:15
  57:21 59:13 60:15
  61:14
Commonwealth
  1:17
communicated
  36:12
companies 24:5
companion 35:16
comparing 48:16
compensation 37:11
  37:12 61:7
competent 23:4
complain 56:18,21
  57:3
complained 57:12
complaints 59:4
completion 66:9
concludes 62:20

64:23
conclusion 23:3 56:8
conditions 38:24
conferred 14:9
confused 28:9
connected 44:1
consult 14:3
contract 36:23,23
control 66:24
conversation 28:4
  47:22 48:8 58:4
copies 10:16
copy 10:12,23 42:4
  53:22
corporate 5:12
correct 5:15 16:24
  18:24 26:23 30:23
  31:1 42:22 44:21
  60:1 69:6
corrections 67:5,7
  69:9
cost 17:8,8 29:24
  30:2 33:19,21 38:4
  47:5
costs 18:2 30:5
  31:21 33:4,11
  42:17,24 43:17
  44:2,3 46:5,10,13
counsel 2:9,16 4:19
country 26:1
couple 6:20
courses 22:11
court 1:1,17 4:9 5:8
  5:18,22 7:21 43:12
  43:14 67:22
cover 32:14
covered 53:19
CRR 66:18
Cueramaro 6:8
  12:17 16:6
current 9:6 12:14

**D**
daily 54:10
date 4:10 10:4 67:10
  69:13
dates 27:9
Davis 57:6,7 59:1
day 9:14,16 55:11
  59:20,24 60:6,13
  60:14,16,16 69:16
days 67:18
decide 5:13 60:20
  61:20 62:9
decided 61:21 64:15
decision 64:12
deemed 67:21
defendants 1:9 2:16
  5:21
Defendant's 44:16

**Definitely** 44:7
**Delaware** 1:1 4:10
  30:3 33:12 38:11
  44:14,20 46:18,23
**depended** 54:21
**deponent** 4:17 69:2
**deposing** 67:17
**deposition** 1:12,22
  3:1 4:5,8,12 6:21
  8:7 9:1 14:10 20:5
  64:23 66:6,9,12
  67:3,14,18,20
  69:24
**described** 48:9
**description** 55:3
**designated** 54:23
**Diego** 11:17
**different** 7:20 14:18
  14:21 25:4 31:8,19
  54:14,16,17,19
  55:3
**direct** 31:15 66:24
**DIRECTION** 3:3
**Disclosure** 34:6
**disclosures** 53:19
**discussion** 49:15
**disputing** 43:1,17
**distance** 19:19
**District** 1:1,1,16 4:9
  4:10
**document** 25:17
  26:6,8 34:1 36:2,5
  40:2,7,24 41:20,21
  42:1,9,13 44:12
  50:14,23
**documents** 8:12,15
  29:16 40:21 41:2,8
  41:12,17,20 52:19
  52:24
**doing** 11:10,12
  29:14 39:4 67:9
**dollars** 63:17
**drive** 54:24
**driver's** 64:2,3
**duly** 6:3,9 66:5
**d/b/a** 1:8

......... E .........
**E** 66:2,2 68:3
**earn** 12:19 48:11,22
  50:16,22 61:14
**earned** 45:22 55:9
**easy** 41:15
**Ed** 42:6
**educational** 21:5
**Edward** 2:2 4:21
**efforts** 56:2
**Electricity** 35:11
**employed** 4:4
**employee** 36:17 37:1

**employer** 30:4,8
  31:20 32:2 33:1,3
  34:5
**employment** 38:24
**English** 64:15
**enjoy** 55:5
**entailed** 38:21
**entered** 25:24
**entirely** 34:16,19
  52:23
**entitle** 9:9
**entitled** 13:21 14:17
  15:2
**errata** 67:7,10,13,16
  69:11
**Esquire** 1:22 2:2,5,6
  2:10,14 4:4 69:24
**estimate** 63:16
**etudden@io.com**
  2:2
**evaluate** 64:8
**Everybody** 41:6
**evidence** 11:6
**exactly** 22:12 27:9
  29:22 33:14 39:3
  60:19
**examination** 6:11
  65:2
**examined** 6:5,9
**Excuse** 8:2,20 30:7
**excused** 65:1
**exhibit** 25:18 34:2,5
  36:8 37:24 40:3,6
  41:24 42:2,10
  44:16 50:1,2,4,8
  50:10,13 58:1 61:3
  64:1
**exist** 54:4
**expect** 25:3
**expenses** 29:18
  43:22
**expires** 9:11 69:17
**explained** 20:2
  57:16 59:18
**E-94** 10:11,13,14,20
  10:24

......... F .........
**F** 1:22 66:2
**facility** 39:9
**fact** 16:13 17:17
  34:14 41:5
**fail** 67:19
**far** 34:24 39:11
  45:23 62:15
**February** 26:18
  27:10
**field** 58:18
**Fifth** 13:2,14,19
  14:15,19 15:3,13

15:24 19:22 23:6
  31:3,6,13,24 32:7
  32:14 33:7
**Finally** 7:19
**find** 20:8
**fine** 7:11,18 9:2
  57:16 58:11
**finished** 7:15
**first** 9:20 42:12 54:3
  55:1 56:24
**five** 21:7 39:21
**flight** 17:3
**Floor** 1:14,23 2:15
**following** 19:11
**follows** 6:5,10 43:15
**food** 33:24 45:5
**foregoing** 66:21
  69:5
**form** 10:10,11,13
  18:4 25:21,22
  26:14 45:18 47:11
  47:19 52:16 58:22
  61:10 69:9
**forth** 6:19
**found** 53:21
**foundation** 32:5,19
  32:23 33:6
**foundational** 31:10
**four** 1:23 31:4
**Fraccion** 6:7 12:16
  63:21
**friend** 28:10,12
**friends** 12:13 29:12
**further** 64:18

......... G .........
**game** 31:7
**gestures** 7:6
**getting** 49:4,9 55:23
**girl** 21:1,2
**give** 10:10 23:4
  36:22 63:12
**given** 19:20,21
  25:23 40:19 66:7
  69:7
**giving** 21:24 22:4
  39:24 63:14
**go** 16:13 19:9 20:7
  26:19 27:1 44:11
  54:15 61:6
**going** 6:19,24 15:7
  19:13,23 20:17
  27:13 31:15 32:12
  36:22 38:7 41:23
  47:16,21 63:11
**Gonzales** 2:5,6 5:1,2
  14:8
**Good** 4:1 6:13,18
**grass** 54:13
**great** 20:12 63:17
**ground** 6:20

**group** 57:9
**Guadalajara** 21:10
**Guanajuato** 6:8
  12:17 29:23 64:13
**guaranteed** 51:11
**guest** 56:13

......... H .........
**hand** 5:19
**handwriting** 42:9
**happen** 20:11
**happy** 20:9
**head** 59:2 63:20
**held** 1:13 4:13
**Henke** 2:14 5:20,20
**high** 22:8
**highest** 24:1
**Hoffman** 2:10 4:4
**home** 12:14 16:13
  17:3,12 18:2 30:2
**homes** 54:14,16
**hour** 55:21 58:8
  63:19
**hourly** 51:9 63:13
**hours** 13:24 14:22
  14:23 15:11 16:1
  51:18,20 53:11
  55:10,13,14,20
  58:10,15 60:10
  63:21
**housing** 46:5
**H-2B** 21:11,14
  22:20 29:19 39:19
  46:1 48:8 57:10
  62:8,14

......... I .........
**idea** 33:24 50:7
**identified** 42:18
**immediately** 63:4
**immigration** 9:7
**imperative** 7:8
**include** 24:3 35:1
**incur** 13:3 29:8
**independently** 51:17
  51:19
**INDEX** 3:1
**indicated** 19:17
**indicating** 37:23
  57:24
**Individually** 1:3
**INFORMATION**
  3:7
**injury** 60:9
**instruct** 7:16
**INSTRUCTION**
  67:2
**intending** 29:10
**interested** 23:21
  24:8 54:6

**interpreter** 2:18
  5:16,17 6:2 8:2,20
  12:23 21:13 22:4
  25:13 27:17,24
  46:19 47:12 50:6
  52:22
**interrupted** 32:18
**introduce** 4:20
**invoke** 15:2,7
**invoked** 14:14 33:6
**invokes** 15:14 31:5
**invoking** 15:5 31:24
  32:14
**involved** 9:3 62:7
**involving** 33:8
**I-9** 19:15
**I-94** 20:8 25:21,22
  26:5 49:22

......... J .........
**J** 2:6
**Jason** 2:21 4:3
**JFK** 4:5
**Jim** 39:17
**job** 25:12 36:13 39:2
  39:5 43:20 44:5
  48:13 55:3
**jobs** 24:8
**John** 1:22
**junior** 22:8

......... K .........
**Kaufmann** 1:15
  66:18
**keep** 13:21 14:17
  31:7 51:17,19
**Kennedy** 1:22
**Kevin** 57:6,7 59:1
**knew** 24:7 37:20
**know** 7:9 8:8,10,17
  8:19,24 23:19
  24:16 29:13 34:17
  36:15 37:5 38:5,6
  38:20,23 39:3,11
  39:17 41:1 45:19
  45:20,23,24 46:4,7
  46:8,9,11 47:4,20
  47:21 49:2 51:24
  52:3 55:4 62:15
  64:6
**knowing** 39:13
**knows** 56:10

......... L .........
**L** 2:5
**labor** 25:7
**laborer** 25:1,6,12
  48:17
**language** 51:13
**laugh** 63:15

law 1:13 7:21
lawful 14:23 15:12
  56:5
lawfully 19:16
lawns 54:13
lawsuit 9:4 43:2,18
  52:5,9
lawyer 56:12
layperson 56:13
learn 23:8,20 38:8
  47:15
learning 24:21
leave 12:5 60:20
  61:21 62:11
leaving 16:14,17
left 16:22 18:23
  52:11,18 62:14
legal 23:3 56:8
legally 22:24
Let's 19:9 24:9
Lewis 1:13 2:10,13
  4:13
license 64:2,3
Limited 1:7 4:15
Line 3:4,8 68:5
Lisa 16:19 28:4,11
  28:12,19,20,22,24
  29:11
list 24:2,3 36:21
  43:23
little 19:3
live 11:16
LLP 1:13 2:10,13
LLS 23:15 36:17
local 35:20,21
long 7:9 9:9 22:10
longer 17:21
looking 29:3 50:8
Los 16:20 26:22
lost 52:23

——— M ———
M 2:14
MA 2:3
main 60:23
manager 57:5,6,9
  58:19
manual 25:7
March 27:4,7,11,15
  28:5
marital 20:19
Mark 25:16
marked 25:18 34:2
  34:4 40:3,5 41:13
  42:2,10 49:17
  63:24
Market 1:14 2:11
married 20:20
Matejik 2:20 5:5,6
  5:11 39:14

Math 22:8
matter 4:14
McHugh 16:19 28:4
  28:19,20
mean 15:10,15 17:5
  22:2,17 31:5 32:5
  33:20 35:8 45:16
means 7:4 66:23
meant 35:9
medications 7:23
meet 60:7
mentioned 41:18
  58:17 59:1
Mesquite 6:7 12:16
messed 49:21
met 39:21
Mexico 6:8 9:20,22
  10:2 11:23 12:5,18
  16:7,13 17:3,12,18
  20:4 21:22 23:11
  26:21 30:6,21
  33:12 36:13 37:2
  38:15 41:9,11,17
  44:6,14 50:22 52:3
  52:6,10,14,18 53:3
  53:14 54:1,4 58:15
  59:11 62:2 63:3
Michael 2:20 5:5
midway 18:23
mid-season 61:22
Mike 18:15 39:14
  45:11,15,21 47:3
  47:23 48:4,8 57:1
  57:12 58:9 61:6
  62:1
mine 8:17 28:11,13
missed 59:20
mistaken 23:14
  26:16 28:16 63:9
moment 14:4 45:5
money 12:20 44:5
  44:24 45:3,21
  48:11 55:10,15,23
  58:12 61:15
month 9:12 27:6
  34:7 35:6
months 9:18
Morgan 1:13 2:10
  2:13 4:13
morning 4:2 6:13,18
  50:3

——— N ———
name 4:3 6:14 23:13
  23:19 28:11
names 24:4
necessarily 25:2
  55:17,18
necessary 67:4
need 6:22 7:3,8 15:9

32:4
needed 45:16
negative 15:17
neither 15:16
never 44:23
NJ 6:3
normally 40:20
Notary 1:17 69:21
noted 67:12 69:10
number 50:5,8
  53:11 58:15
numbered 40:10
  49:18
numbers 29:22
  33:14 39:24 50:1,2

——— O ———
oath 7:19
object 7:13 14:14
objecting 7:14,15
objection 13:18 14:3
  18:3 23:2 30:8,13
  31:2 33:5,6 45:17
  47:10,18 52:15
  56:7 58:21 61:9
obtaining 29:19
occasions 57:1
October 1:11 4:11
  11:24
offer 36:12 37:10
offered 62:10
office 23:10,17
  28:22 29:23 36:15
  39:12 44:1 47:2
offices 1:13 29:7
office's 23:13
oh 13:1 35:12 36:9
  42:5 59:19 60:14
okay 7:12 9:22 22:7
  23:16 24:10,14
  25:8 26:13 39:14
  51:9,15 53:23 54:7
  55:5 64:17
old 21:3
once 7:14 37:15
  57:16 59:8
ones 8:14,17 36:22
  41:13,18
opinion 56:13,15
opportunities 38:16
opportunity 23:9
  44:5 48:10 66:11
Oral 1:12
original 67:16
outside 14:9
overtime 37:11,18
  57:22 58:15
Oxford 2:15

——— P ———

PA 2:8,15
page 3:4,8 40:11
  51:7,8,10 57:19
  68:5
pages 40:8 69:5
paid 17:2,7,24 31:20
  33:14,23 35:5,20
  35:22 37:14 42:23
  46:5,12 55:8,16,18
  55:21 56:19 57:13
  57:17,18,20 58:4,6
  58:20 59:10,18,23
  60:16
paper 37:21 51:20
  51:23 53:10,10,13
  61:2
papers 52:2,14
Paragraph 42:17,18
ParaPlus 2:19
pardon 8:18 11:24
part 17:4,5 18:6,11
  52:5
particular 41:6
particularly 19:20
Partners 1:7 4:16
pass 47:5
passes 47:3
passport 10:5,8
pay 18:10 30:5 33:3
  35:4,14,18 37:18
  37:18 38:12 41:5
  42:22 43:21 44:3
  46:1 56:5 59:9
paycheck 18:8
pending 7:10 43:13
Penn 1:23
Pennsylvania 1:14
  1:17,23 2:12 4:6
  4:14
people 24:7,17 43:24
  56:5
permit 9:11,21
person 18:16 22:16
  29:3,4 36:14 38:19
  38:22 39:1 55:2
  58:18 64:13
Peter 2:6 5:1
pgonzales@regla...
  2:7
Philadelphia 1:14
  1:23 2:8,12 4:6,13
phone 28:5,14 29:9
  35:13,15,21
pickup 54:20
piece 51:20 53:9
pieces 51:23 53:10
  53:13
Pittsburgh 2:15
place 14:23 15:12
  19:11 46:24 47:1

places 54:17,19
plaintiff 1:5 2:9 4:22
  4:24 5:2
plan 61:17
plane 18:6,11
please 4:19 12:24
  30:18 67:3,9
point 38:8 56:19
  59:16 61:12
posed 7:2
position 23:21 24:21
  24:22 25:1 47:16
  47:21,23 48:10,11
  48:15,15,17,18
  49:1 51:2
positions 21:12,15
  22:21
possession 10:18
possible 19:3
potentially 50:15
practically 47:1
preclude 60:9
prepare 8:6
present 2:17 4:19
  48:9
presented 44:13
  64:9
previously 25:23
  37:6 41:18
prior 21:12,18,22
probable 60:3
problem 60:5
produced 52:7
  53:16
production 3:6
  49:14,16 60:8
Professional 1:15
promise 59:12
promised 58:14
promoted 38:17
proposition 62:1
propounded 69:8
provide 18:13,20
  38:3
provided 16:23
  17:11,15
providing 25:20
Public 1:17 69:21
purpose 11:13
p.m 65:3

——— Q ———
question 7:1,10,13
  13:15,20,22 14:16
  14:17,20 15:5,7
  16:4,12 22:14 24:9
  25:6,21 30:15,19
  31:4,8,11,16,18,23
  32:8,12,13,18,22
  37:16 43:12,16

73

44:10 49:3 51:12
53:8,9 58:13 62:12
62:13
**questions** 6:23 20:18
33:7 53:6 64:14,19
69:7
**quickly** 44:8
**quite** 48:2
**quota** 60:7

**R**

R 66:2 68:3,3
**raise** 5:19
**Ramon** 1:3,13 4:14
4:17 6:6 66:10
**Rapposeli** 2:5,5
4:23 13:5 14:8
27:20 44:15
**Rappposelii** 4:24
**rate** 51:9
**read** 40:12,16,18,21
40:24 41:9 42:13
43:14 66:11 67:3
69:4
**reality** 64:11
**really** 49:2
**Realtime** 1:16
**reason** 58:11 60:23
67:6
**reasons** 58:7 60:23
61:19,20
**recall** 48:7,16,21
49:4,9
**receipt** 67:18
**receive** 44:9 45:10
57:21 61:1
**received** 26:9 44:20
61:24
**receiving** 60:24
**Recess** 13:9 15:20
19:8 20:13 43:8
62:21
**recognize** 40:13
41:4
**record** 4:2,20 5:11
7:14 13:11 14:12
14:14 15:22 19:10
19:12,14,14 20:15
25:6 37:23 43:10
43:13,15 49:21
50:5,13 57:24
58:22 62:23 66:6
**records** 52:6
**recruiting** 23:10,12
23:17
**refer** 51:13
**reference** 44:16
**referencing** 44:17
**referred** 36:6
**referring** 36:7 39:2

49:7 50:12 51:6
52:17 60:12
**reflect** 26:5
**reflects** 50:14
**Regal** 2:18 5:17 6:1
**regard** 24:23
**Registered** 1:15
**related** 52:8
**remain** 58:4
**remainder** 17:7
**remember** 8:22 9:14
9:15 10:4 16:21
22:12 23:18 24:5
25:11,15 27:9,12
28:3 29:21 33:13
40:14,15,17,18,19
41:15 48:12,14,20
48:24 49:13 56:23
60:2,19
**rent** 34:7,14,21,24
35:6 47:9,12
**rep** 5:12
**repay** 44:23
**repeat** 12:24 30:18
43:12
**rephrase** 24:12
**reporter** 1:16,16,16
5:8,18,23 7:21
43:12,14 67:1
**reproduction** 66:23
**REQUEST** 3:6
**requested** 19:19
66:8
**requesting** 19:14
**reserve** 64:21
**respect** 13:14 14:15
16:1 19:21 59:4
**responses** 7:4,5
**responsibility** 42:19
**result** 60:7
**retain** 10:23
**retrospect** 40:24
**return** 10:1 17:3,17
62:2 67:16
**returned** 9:20 62:16
63:3
**review** 8:11
**reviewed** 52:19 53:1
53:2
**reviewing** 8:22
**right** 5:19 14:19
15:3,14 19:16,23
20:9 32:15 35:12
59:7 61:23
**Road** 2:3 6:2
**room** 14:10
**RPR** 66:18
**rules** 6:20
**run** 6:21
**RV** 49:23

**RV-1** 49:17,22
**RV-2** 44:13

**S**

**salary** 23:22,24
43:24 51:4,5,11,14
**San** 11:17
**Sarah** 2:10 5:3 6:14
19:2 20:2 31:5
32:9 36:4 49:20,24
53:21
**saw** 8:15
**saying** 18:7 24:12,13
**says** 34:10 51:8
57:19,20 64:1
**sbouchard@morg...**
2:11
**school** 22:8
**season** 18:24
**see** 27:5 34:6,10
42:12 44:4 51:9,10
**seeing** 54:6
**seen** 8:16
**separate** 39:24
**separately** 35:15,18
**September** 63:10
**service** 35:20,22
**Services** 1:22 4:5
69:24
**set** 6:19
**shakes** 59:2 63:20
**sheet** 67:10,13,16
69:11
**sheets** 67:7
**show** 8:23 10:6
19:15 34:18
**showed** 24:2
**sic** 10:11
**sign** 40:20 66:11
67:9
**signature** 36:1,9
**signed** 41:3,7,10,17
41:22 50:23
**signing** 40:12 41:7
42:14 67:11
**similarly** 1:4
**sitting** 18:16
**situated** 1:4
**six** 9:18
**Skills** 64:1
**smoothly** 6:22
**sooner** 45:16,21
**sorry** 12:1 27:18
37:15 41:14 42:6
46:20 52:23
**South** 2:7
**space** 67:6
**Spanish** 2:18 6:1
51:13
**speak** 8:9 23:16 43:3

48:3
**speaking** 48:24
**specialist** 47:17,23
48:1,10,17,23 49:2
**specifically** 7:16
**spend** 20:6
**spoke** 38:22 39:1
52:21 64:13
**stamped** 44:13
**stamps** 10:5,9
**start** 29:4 63:7
**started** 50:2 58:5
**state** 67:5
**stated** 52:12 61:6
**states** 1:1 4:9 9:10
11:8,11,20 13:17
16:10 19:16 21:18
21:19 22:15 23:1
26:22 29:20 30:21
31:1,21 33:2,8
56:6 64:1
**status** 9:7 20:19
**stay** 61:16 62:9
**staying** 61:13
**STIPULATIONS**
3:10
**stop** 59:19 62:18
**strain** 59:15
**Street** 1:14 2:7,11
**strike** 24:9 44:10
**subject** 67:11
**Subscribed** 69:15
**substance** 69:10
**suggest** 53:24
**suitcase** 10:19 11:4
19:18
**Suite** 4:6
**supervision** 67:1
**supervisor** 39:15
**SUPPORT** 3:1
**suppose** 35:3 39:22
60:18
**supposed** 48:5,6
**sure** 13:5,6 19:5
31:22 43:5 49:17
52:1,4,7
**swear** 5:8,23
**sworn** 6:4,9 66:5
69:15
**system** 61:7

**T**

T 66:2,2 68:3
**take** 6:15 7:9 13:3
29:16 43:20 47:16
**taken** 31:3,12
**talk** 28:7 29:11
**talked** 8:5 37:3
**talking** 28:18 30:9
32:3,10 46:17

48:21 58:22
**tape** 13:7 14:5 15:18
19:6 43:6 62:24
**teach** 22:7,10
**teaching** 22:5
**tell** 8:18 16:19 20:1
41:1 50:9 51:24
52:3 57:14
**telling** 8:4 48:13
**terms** 38:23
**testified** 6:5,10
**testimony** 6:4,16
25:22,24 54:1 66:7
**Thank** 25:20 51:15
64:17
**thing** 8:9 9:19 26:13
27:8,11 41:12
**things** 62:7
**think** 9:12 10:3,9
11:24 13:20 18:21
22:13 28:15 29:23
33:22 34:23 35:23
38:10 40:23 42:15
48:19 49:6 51:12
52:13 53:5 57:11
62:10 63:10
**third** 40:11
**thirty** 67:17
**thought** 28:10,17,24
46:17
**three** 31:4 40:7
**three-page** 40:6
**ticket** 16:24 17:8,11
17:14,18 18:1,6,11
**tickets** 33:15,16
**time** 4:11 9:20 16:10
20:6 23:24 24:20
56:24 58:13 61:12
62:24 64:21,24
**times** 11:7 31:4
56:23
**title** 25:11 34:5
**today** 4:19 6:16,21
7:24 10:18
**today's** 4:10 8:6
64:23
**told** 23:23 37:9,17
38:15,19 61:1,11
61:12
**totally** 49:21
**tourist** 9:8,18,24
**track** 51:18,19
**tracked** 53:11
**transcript** 66:12,22
67:19,20
**transcription** 69:6
**translate** 6:4
**translated** 25:7
**Translations** 2:19
**translator** 22:2
**transportation** 18:1

30:2,5 31:20 33:4
35:2,7 46:10,12
47:9,13
**travel** 12:3,7 33:11
**traveling** 29:19
30:20
**trial** 64:21
**trick** 14:18 31:8
**trip** 11:18 17:12
**truck** 54:20,21
**true** 16:16 17:10
26:3 34:13,20 37:4
37:8 45:1 61:5,11
66:6
**TruGreen** 1:7,7,8
2:20 4:15,16 5:4,6
6:17 16:14,17,22
17:10,21,24 21:12
21:19,23 22:16,21
23:1,9 24:8,18
29:16,20 35:21,22
36:13,24 37:2,7
38:3,17 39:8 40:10
43:21 44:4 46:1,4
46:11 47:17 53:12
54:11 59:16 60:21
61:21 64:10
**TruGreen's** 29:7
38:24 54:21
**truly** 53:19
**try** 14:18 30:14
**trying** 31:7 32:17
**Tuddenham** 2:2
4:21,22 5:10 13:6
13:18 14:2,7,13
15:1,6,13 18:3
19:2 20:1,12 22:17
23:2 24:11 25:5
27:14,22 30:7,13
31:2,12 32:1,9,20
33:5 36:4 37:22
39:23 42:3 45:17
46:14 47:10,18
49:20,24 52:15
53:4,20 54:2 56:7
56:11 57:23 58:21
61:9 64:20
**turned** 21:4
**two** 28:7 41:16,20
58:7
**type** 21:21 54:9

_____ **U** _____
**uncle** 11:15,16 12:12
**undercharged** 47:8
**underneath** 52:14
**understand** 6:23 7:7
7:22 19:18 24:22
24:24 25:23 34:24
36:16 38:2 42:16

48:3 56:4
**understanding** 26:4
26:24 50:21 53:5
**understood** 7:1
**uniform** 38:3,7,9,13
**United** 1:1 4:9 9:10
11:8,11,20 13:17
16:9 19:16 21:18
21:19 22:15 23:1
26:22 29:20 30:21
31:1,21 33:2,8
56:6
**university** 21:7,8,10
**Upland** 2:3
**use** 45:2 50:1
**utilities** 34:7,15,22
35:2,6,9,10 47:9
**U.S** 1:16

_____ **V** _____
**V** 1:15 66:18
**Vacchiano** 39:17
**vague** 32:13
**valid** 64:2,3
**Valley** 46:23
**verbalize** 7:3,5
**versus** 4:15
**video** 4:8 19:12
62:18
**videographer** 2:21
4:1,4 5:7,22 13:7
13:10 14:5,11
15:18,21 19:6
20:14 43:6,9 62:19
62:22 64:22
**videotape** 62:20
64:23
**Videotaped** 1:12
**Villanueva** 1:3,13
4:15,18 6:6,14
13:13 20:17 25:18
34:2 40:3 42:2,8
66:10
**visa** 9:18 10:1 12:3,8
22:24 29:19 30:1
**visit** 10:24 11:14,15
**visiting** 12:10
**visits** 11:20
**Vivian** 2:5 4:23
**volunteer** 62:4,6
**vrapposelli@rcgla...**
2:6
**vs** 1:6

_____ **W** _____
**wage** 63:14
**wages** 59:5
**waiving** 14:19
**walk** 20:7
**walking** 19:19

**want** 31:18,22 56:12
60:4 62:17
**wanted** 17:21 29:13
45:3 60:10 61:8
**warmer** 19:3
**wasn't** 34:19 35:18
57:5 62:12 64:11
**way** 18:2,8 31:8
55:16,17 56:5
57:17,20 58:5 59:9
**ways** 14:18
**week** 34:21 63:22
**welcome** 51:16
**went** 9:22 10:3
11:22 16:16 26:20
47:1,2
**weren't** 60:15
**we're** 4:2 19:13
29:12 62:22
**Wilmington** 39:10
**wished** 57:18
**witness** 3:3 5:9,23
12:24 13:1 14:9
30:12 37:23 53:5
57:24 59:2 63:20
65:1 66:5,7,10
67:2
**woman** 23:19 28:23
**words** 7:5 46:11
55:12
**work** 12:21 13:24
14:24 15:11 16:5,9
17:21 21:22 22:15
22:23,24 23:9
29:20 33:8 54:9
55:6,7,8,13,14
56:1 58:8,10 59:20
59:24 60:6 63:22
**worked** 14:22 16:2
21:17 24:17 30:11
33:2 37:6 39:9,12
53:12 55:10,21
**worker** 54:24 62:14
**workers** 39:19 45:21
46:2 48:9 57:9,10
62:8
**working** 13:15,17
21:22 30:24 46:18
48:1 55:24 59:16
60:10 63:5,7
**worth** 56:2,2
**wouldn't** 8:17 34:17
51:24 52:3 57:21
64:6

_____ **Y** _____
**yeah** 51:18 60:3
**year** 10:7 11:8,20
12:20 13:17 14:1
16:5 27:4 28:5

**years** 21:7

_____ **Z** _____
**Zip** 12:18

_____ **$** _____
**$150** 44:9,20 45:13
**$170** 33:23
**$2** 63:18,19
**$240** 35:6
**$373** 34:11,14
**$60** 34:21
**$75** 18:22

_____ **0** _____
**021** 40 2:3
**06-185** 1:9
**08007** 6:3

_____ **1** _____
**1** 25:18 41:13 62:20
**10:00** 14:12
**10:02** 15:19
**10:03** 15:22
**10:09** 19:7
**10:37** 20:15
**11:25** 43:7
**11:27** 43:10
**12** 3:4
**12th** 1:14,23
**12:03** 62:20
**12:14** 63:1
**12:19** 64:24 65:3
**1210** 4:6
**15** 40:11
**153** 2:3
**155** 29:24
**1600** 1:22 4:5
**1701** 1:13 2:11
**19** 3:8
**19103** 1:14,23 2:12
4:7
**19107** 2:8

_____ **2** _____
**2** 34:2,5 36:8 37:24
41:13,14 50:10,13
58:1 61:3 62:24
64:1
**2:30** 20:5,7
**200** 30:1
**2004** 16:12,20 18:24
22:18 33:12 63:4,8
**2005** 16:5,10 69:16
**2006** 1:11 4:11
13:16 14:22 16:2
30:4,9,11,22 31:1
31:20 33:4,9
**215** 1:24
**215-963-5000** 2:12

**251** 2:7
**26th** 26:17
**267** 2:8

_____ **3** _____
**3** 40:3,6
**30** 67:17
**318** 6:7 12:16
**32** 3:4
**32nd** 2:15
**322-6776** 2:8
**36960** 6:8 12:18

_____ **4** _____
**4** 21:4 41:24 42:2,10
44:16
**40** 58:10
**412** 2:16
**430** 6:2

_____ **5** _____
**5** 1:11 4:11
**50** 63:23
**53** 3:8
**560-3300** 2:16
**576-2182** 2:4

_____ **6** _____
**6th** 9:12
**617** 2:4

_____ **7** _____
**7** 42:18

_____ **8** _____
**8** 42:17

_____ **9** _____
**9:29** 1:15 4:11
**9:45** 13:8
**9:58** 13:11
**9:59** 14:6
**988-9191** 1:24

Número de cinta

0 7 4 7 8 2 7 4 0 1 2

Servicio de Inmigración
y Naturalización
I-94
Registro de Salida

ADMITTED
APR 0 9 2006
Class
Unti 42

OCT 0 7 2006

14. Apellido

V I L L A N U E V A

15. Nombre

R A M O N

16. Fecha de nacimiento (dd/mm/año)

2 1 0 2 7 8

17. Ciudadanía

M E X I C A N

Vea al reverso

STAPLE HERE

---

**Aviso:** Si una persona no inmigrante acepta empleo sin autorización está sujeta a deportación.
**Importante:** Guarde este permiso en su poder; *lo debe presentar al salir de los E.U.A.* El no
hacerlo podrá demorar su entrada en el futuro a los E.U.A.
Usted está autorizado a permanecer en los E.U.A. solamente hasta la fecha indicada en este
formulario. Si permanece en los E.U.A. sin permiso de las autoridades de inmigración
después de esta fecha estará violando las leyes.
Presente este permiso al salir de los Estados Unidos a:
    - la línea de transporte marítimo o aéreo;
    - un oficial canadiense, al cruzar la frontera con el Canadá;
    - un oficial estadounidense, al cruzar la frontera con Méjico.
Los estudiantes que planean volver a entrar a los E.U.A. dentro de los 30 días siguientes a la
fecha de salida para regresar a la misma institución educativa, deben ver la sección de
"Entrada-Salida" en la página 2 del formulario I-20, antes de entregar este permiso.

### Record of Changes

**Port:**                                                    **Departure Record**

**Date:**

**Carrier:**

**Flight#/Ship Name:**

I-94 SPANISH

---

Villanueva
EXHIBIT NO. 1
AMC 10/5/06

ELS International                                                    Página 1 de 1

# Employer Disclosure Affidavit
## for Company: Tru-Green Chemlawn (Newport)
### Order Dated: 9/29/2003 9:52:52 AM

view premium rates
view Spanish form
close this window

| | |
|---|---|
| Name of Sponsoring H-2B company | Tru-Green Chemlawn (Newport) |
| Address: | 1350 1st State Blvd , Newport, DE 19804 |
| Office Phone: | 302-892-9680 |
| Fax Phone: | 302-633-9428 |
| Mobile Phone: | 302-420-8335 |
| Home or Other Phone: | 302-376-8186 |
| Contact Name: | Mike A Matejik |
| Contact Title: | Branch Manager |

## Work Information

Occupation Title:                         Pesticide Handlers, Sprayers, and Applicators, Vegetation

Occupation Description:
Apply pesticides, herbicides, fungicides, or insecticides to lawns using sprayers, seeders, spreaders, aerators

Employment Start Date:                    3/15/2004    End Date: 11/15/2004

List the tasks and skills
needed to perform the work.

Education: none

Experience: lawn fertilization very helpful

Skills: valid driver's license; bilingual

| | |
|---|---|
| Starting wage offered (if different from prevailing wage): | $11 34  O T. Rate: $17 01 |
| Average hours of work per week: | 40 |
| Rent and utilities per month: | 373 |
| Transportation charge per month (if applicable): | 32 |
| Other charges to worker per month (if any). | |
| Comments/Instructions for worker: | Workers will receive commission based on production level |
| Day and place paycheck is distributed: | Friday |

Will the employer guarantee to supply training if the employee does not have the required skills? YES

Signature of Employee: _Ramon Villanueva_          Date: _02/20/04_

VILLANUEV
EXHIBIT NO. 2
AML 10/5/06

RV-0001

Elsint com/lis/hsvs2/formC_eda.asp?S=NKBJNWLOJI22020047242&CUSTID=623&ORD    20/02/2004

## TRUGREEN
### ACUERDO DE CONFIDENCIALIDAD DEL EMPLEADO

TruGreen Limited Partnership (de aquí en adelante, "TruGreen") ha invertido considerable tiempo, dinero, y esfuerzos en el desarrollo de sus productos, equipos, programa de comercialización y otros sistemas y materiales de negocios, y en el reclutamiento y entrenamiento de sus empleados. TruGreen es propietaria y tienen un interés de propiedad valiosa en sus diversos productos, servicios, procedimientos, y sistemas (Información Confidencial de Negocios). Como empleado de TruGreen, usted tendrá acceso a la Información Confidencial de Negocios, incluyendo la información relativa a la investigación, productos, entrenamiento, administración, comercialización, y ventas.

Es importante que cada empleado reconozca y acepte que la Información Confidencial de Negocios, según exista de tiempo en tiempo, es un patrimonio valioso, especial, y único de TruGreen, y que TruGreen sufriría graves perdidas si dicha información fuese divulgada o apropiada indebidamente. El propósito de este documento es explicar ciertas obligaciones y responsabilidades legales aplicables a cada empleado con respecto a la Información Confidencial de Negocios de TruGreen, y obtener es acuerdo de cumplir estas obligaciones y responsabilidades.

Pan proteger a TruGreen y a su información de propiedad exclusiva, me comprometo a lo siguiente:

A. Me comprometo a, durante y después de mi empleo en TruGreen, no divulgar, copiar, usar, retirar, ni usar en mi beneficio propio o en beneficio de otros la Información Confidencial de Negocios de TruGreen (incluyendo, su administración, manuales de comercialización y ventas, materiales de entrenamiento, listas de clientes, legajos de clientes, tarjetas de ventas, y tarjetas de servicio) que yo tenga o haya obtenido por medio de mi empleo en TruGreen.
B. No solicitaré ni alentaré, directa o indirectamente, a ningún empleado de TruGreen a alejarse o terminar su empleo en TruGreen.
C. Autorizo a TruGreen, durante mi empleo y durante un periodo posterior razonable, a usar cualquier nombre o fotografía en los materiales impresos u otras comunicaciones distribuidas por TruGreen con fines publicitarios o promocionales.
D. Notificaré a TruGreen rápidamente de todas las invenciones, mejoras, descubrimientos, y métodos que tengan relación con, o sean de utilidad para cualquier negocio de TruGreen, ahora o en el futuro, que yo haga o descubra mientras sea empleado de TruGreen. Cederé a TruGreen todos los derechos, títulos, e intereses en dichas invenciones, mejoras, descubrimientos, y métodos, y cualesquiera patentes o solicitudes de patentes relacionadas que tengan que ver con negocios que TruGreen esté realizando, o pueda razonablemente esperarse que realice, o que haya expresado previamente su intención de realizar.

En caso de una violación o amenaza de violación por mi parte de cualquier provisión de este acuerdo, los daños que TruGreen podría sufrir pueden ser difíciles o imposibles de evaluar, por la cual TruGreen tendrá derecho a un mandamiento judicial que me impida usar o divulgar la información Confidencial de Negocios de TruGreen. Nada de lo aquí contenido se interpretará como una prohibición a TruGreen de buscar otros remedios que tenga disponibles para dicha violación o amenaza de violación, incluyendo, en forma no exhaustiva, el recobro de daños de mi por una cantidad igual a los ingresos ganados por medio o gracias a la violación.

Entiendo que este Acuerdo solo podrá ser modificado por escrito, y ello sólo por el Presidente de TruGreen, y que ningún otro gerente o representante tiene ninguna autoridad para establecer ningún acuerdo de empleo por un período especificado, ni de hacer ningún acuerdo contrario al que antecede. Entiendo además, y acepto, que la consideración para firmar este Acuerdo es mi empleo y/o continuación de empleo en TruGreen, y que mi empleo puede terminarse, con o sin causa y con o sin aviso, en cualquier momento, tanto por TruGreen como por mi.
Entiendo también y acepto que pagaré los honorarios razonables de abogados y los costos judiciales incurridos por TruGreen como consecuencia de cualquier demanda judicial iniciada por TruGreen para hacer valer los términos de este Acuerdo. La validez o la posibilidad de hacer cumplir una provisión dada no afectará la validez o la posibilidad de hacer cumplir ninguna otra provisión de este Acuerdo.

03/10/04

RAMON VILLANUEVA BAZALDUA

TruGreen Limited Partnership
Por:    TruGreen, Inc. (su Socio General)

Por: Yolanda Miller

Nombre y cargo en imprenta: Yolanda Miller, BCC

Fecha: 3/19/04

TH SPAN.3/2001

VILLANUEVA
EXHIBIT NO. 3
AM 10/5/06

TRU0013

414 4341 0290

**Form 8850**
(Rev. October 2002)
Department of the Treasury
Internal Revenue Service

## Pre-Screening Notice and Certification Request for the Work Opportunity and Welfare-to-Work Credits

OMB No. 1545-1500

~~Job Applicant: Fill in the lines below and check any boxes that apply. Complete only this side.~~

Your Name: *RAMON VILLANUEVA BAZALDUA*    Social Security Number: *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*

Street address where you live: *213 BELMONT AVE.*

City or town, state and ZIP code: *19804*

Telephone No. ( )

If you are under age 25, enter your date of birth (month, day, year)

### Work Opportunity Credit

1. [ ] Check here if you received a conditional certification from the state employment security agency (SESA) or a participating local agency for the work opportunity credit.

2. [ ] Check here if **any** of the following statements apply to you.
   - I am a member of a family that has received assistance from Aid to Families with Dependent Children (AFDC) or a successor program for any 9 months during the last 18 months.
   - I am a veteran and a member of a family that received food stamps for at least a 3-month period within the last 15 months.
   - I was referred here by a rehabilitation agency approved by the state or the Department of Veterans Affairs.
   - I am at least age 18 but **not** over age 24 and I am a member of a family that:
     a  Received food stamps for the last 6 months, OR
     b  Received food stamps for at least 3 of the last 5 months, BUT is no longer eligible to receive them.
   - Within the past year, I was convicted of a felony or released from prison for a felony AND during the last 6 months I was a member of a low-income family.
   - I received supplemental security income (SSI) benefits for any month ending within the last 60 days.

### Welfare-to-Work Credit

3. [ ] Check here if you received a conditional certification from the SESA or a participating local agency for the Welfare-to-Work Credit.

4. [ ] Check here if you are a member of a family that:
   - Received AFDC or successor program payments for at least the last 18 months, OR
   - Received AFDC or successor program payments for any 18 months beginning after August 5, 1997, OR
   - Stopped being eligible for AFDC or successor program payments after August 5, 1997, because Federal or state law limited the maximum time those payments could be made.

### All Applicants

Under penalties of perjury, I declare that I gave the above information to the employer on or before the day I was offered a job, and it is, to the best of my knowledge, true, correct, and complete.

~~Job Applicant's signature~~ ►                                      Date: *03/20/04*

For Privacy Act and Paperwork Reduction Act Notice, see page 2.    Cat. No. 33962L    Form **8850** (Rev. 10-02)

TRU0014



*Manual del empleado de TruGreen*

## Formulario de reconocimiento del empleado

Este Manual del Empleado contiene información pertinente acerca de TruGreen y comprendo que debo consultar al departamento de servicios a las personas de TruGreen si tengo alguna pregunta que no haya sido respondida en este Manual.

Como las informaciones, políticas y beneficios aquí descritos están necesariamente sujetos a cambio, reconozco que podrán ocurrir revisiones de este Manual. También entiendo que las informaciones revisadas pueden suplantar, modificar o eliminar políticas existentes. Sólo el presidente de TruGreen Holding L.L.C. tiene la capacidad de adoptar cualquier revisión de las políticas contenidas en este Manual.

He comenzado mi relación de empleado con TruGreen voluntariamente y reconozco que no hay una duración especificada para mi empleo. Por lo tanto, yo mismo o TruGreen podemos terminar esta relación en cualquier momento si así lo deseamos, tanto con causa como sin causa.

Además reconozco que este Manual no constituye un contrato de empleo ni es un documento legal. He leído el contenido de este Manual y entiendo que es mi responsabilidad cumplir con las políticas contenidas en el Manual y en cualquier revisión futura del mismo.

_____          03/20/04
~~~~~~~~~~~~~~~~~~~~~~~~~~eado

RAMON   VILLANUEVA   BAZALDUA
~~~~~~~~~~~~~~~~~~~~~~~~~~~ña o con letra de imprenta)

*Gerente: Mantenga una copia de este formulario completado de reconocimiento del empleado en el archivo personal del empleado y envíe el original a Memphis con los documentos del nuevo empleado acabado de contratar.*

*Febrero 1, 2001*                                    *Página 89*

TRU0015

## ACUERDO SOBRE CONDICIONES LABORALES

1) Las condiciones laborales que las compañias norteamericanas contratantes (Patrones) proporcionan a los trabajadores tienen como fin proteger al empleado y al patrón. En base a las condiciones laborales, el patrón esta legalmente obligado a pagar lo estipulado en dicho documento, si el empleado no es remunerado de acuerdo a lo acordado, el o ella deberán de comunicarse a L.L.S. International (81) 8040-7575 y 77 a fin de informar de esta situación

2) El número de horas trabajadas a la semana es solamente una estimación, por lo tanto, cada trabajador debe tener en cuenta, que las condiciones climatológicas y otros eventos imprevistos pueden afectar el total de horas trabajadas a la semana y por lo tanto su ingreso. Todos los desacuerdos deben ser discutidos con el patrón que les contrató L.L.S. NO ES EL PATRON, favor de no comunicarse para tales asuntos.

3) En el caso de que la Compañia Americana que lo contrató determine que por cuestiones climáticas o de fuerza mayor no puede seguir proporcionando trabajo al empleado durante el periodo que abarque su visa de trabajo; este deberá cubrir los gastos del empleado a su lugar de origen, ya que el empleado no puede trabajar en otra Compañia en la que no este autorizada en su visa de trabajo. Esta situación será estrictamente responsabilidad de la empresa contratante

4) El trabajador solo puede dejar su trabajo por causa de una emergencia, en dado caso el trabajador esta obligado a avisarle al patrón y pedir permiso por escrito. En caso de no ser así, o que el trabajador renuncie, o se vaya del lugar de trabajo sin avisar, se le avisará al I.N.S. y al Consulado Americano, el trabajador será considerado como ilegal y pierde toda protección dada por la visa de trabajo, esto resultará en la cancelación de su visa y el trabajador perderá la posibilidad de regresar el año entrante mediante el programa de visas H2B

5) El trabajador esta de acuerdo y entiende que el servicio que presta L.L.S. International consiste estrictamente en el trámite de su visa de trabajo ante el Consulado Americano con su consentimiento y a petición de las Compañias Americanas contratantes Asimismo entiende que la obtención de la visa de trabajo no depende sino estrictamente del Consulado Americano, por lo que en caso de ser rechazada su solicitud, L.L.S. International no tiene responsabilidad alguna ni compromiso de indemnizar al solicitante, únicamente a reembolsarle el importe de 100 dólares por la tramitación de su visa

6) Los reembolsos solo proceden en los siguientes casos:
   * Cuando es rechazada su solicitud de visa en el consulado, en este caso se le regresarán 100 DÓLARES.
   * Cuando por parte de la empresa solicitante no se llegue a realizar el trabajo estando todavia en México, se procederá a colocar al trabajador en otra empresa, en caso de no ser posible se le regresarán 235 DÓLARES
   NOTA: En todos los demás casos NO PROCEDERA REEMBOLSO ALGUNO

7) El servicio de L.L.S. International, tiene un costo de:
   * 135 dólares (USD) para L.L.S. por gastos Administrativos
   Los siguientes pagos es lo que cobra el Consulado Americano:
   * 100 dólares (USD) por la tramitación de la visa en el Consulado
   * 100 dólares (USD) para el pago de derecho de visa en el Consulado
   Transporte:
   * 200 dólares (USD) aproximadamente de trasporte para su traslado via terrestre.
   NOTA: Estos pagos se realizan hasta que la persona haya sido seleccionada, la persona haya aceptado el trabajo y tengan un lugar seguro en alguna Compañia.

8) L.L.S. International o la compañia contratante en Estados Unidos no serán responsables de pagar y/o devolver sus gastos de viaje, ni los que se deriven del proceso de la visa en el Consulado Americano, ESTA ES UNICAMENTE RESPONSABILIDAD DEL TRABAJADOR

Este documento no asegura la obtención de trabajo.

_Ramón Villanueva Barahua_
Firma del Trabajador

_20-Febrero-2004_
Fecha

S International (Monterrey)
ampo No 427 Poniente
e Rayon y Aldama
64000
: (81) 8040 7575 / 8040 7577

EXHIBIT NO. 4
Villanueva
PMK 10/3/06

RV-0002

## CERTIFICATE OF SERVICE

I, Andrew S. Dupre, hereby certify that a true and correct copy of Defendant;s Motion for

Leave to File Supplemental Brief in Furtyher Support of its Opposition to Plaintiff's Expedited

Motion to Conditionally Certify a FLSA Collective Action was served via e-file and hand

delivery on this 20th day of October, 2006, upon the following:

Vivian L. Rapposelli, Esquire (#3204)
Rapposelli, Castro & Gonzeles
916 North Union Street, Suite 2
Wilmington, DE 19805

/s/ Michael P. Kelly (#2295)
_____
Michael P. Kelly, Esq. (Del. Bar ID #2295)
McCarter & English
919 N. Market Street, 18th Floor
Wilmington, DE 19801

Andrew S. Dupre, Esq. (Del. Bar ID #4621
McCarter & English
919 N. Market Street, 18th Floor
Wilmington, DE 19801

MEI\5914407.1