## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

RAMON VILLANUEVA-BAZALDUA,  )
individually and on behalf of others  )
similarly situated,  )
      )
      Plaintiff,  )
      )
      v.  )   Civil Action No.: 06-185 GMS
      )
TRUGREEN LIMITED PARTNERS and,  )
TRUGREEN, INC., d/b/a TRUGREEN  )
CHEMLAWN,  )
      )
      Defendant.  )

## DEFENDANT'S SUPPLEMENTAL BRIEF IN FURTHER SUPPORT OF ITS OPPOSITION TO PLAINTIFF'S EXPEDITED MOTION TO CONDITIONALLY CERTIFY A FLSA COLLECTIVE ACTION

Michael P. Kelly (Del. Bar ID #2295)
McCarter & English
Citizens Bank Building
919 N. Market Street, 18th Floor
Wilmington, DE 19801
(302) 984-6301

*Admitted Pro Hac*
Michael L. Banks (Pa. I.D. #35052)
Sarah E. Bouchard (Pa. I.D. #77088)
1701 Market Street
Philadelphia, PA 19103-2921
(215) 963-5387/5077

OF COUNSEL:
MORGAN, LEWIS & BOCKIUS, LLP

Dated: November 3, 2006

Attorneys for Defendants

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................ii

I.   INTRODUCTION.....................................................................................................1

II.  ARGUMENT..............................................................................................................3

   A.  Plaintiff's Refusal To Answer Questions At His Deposition Precludes Him
       From Serving As A Lead Plaintiff In A Class Or Collective Action ...........................3

   B.  Plaintiff's Testimony Regarding His Own Expenses And Payments From
       Trugreen Highlight Why He And The Other H-2b Workers Are Not
       "Similarly Situated" So As To Justify Collective Action Treatment .........................6

   C.  Plaintiff's Fraud, Breach Of Contract, And Breach Of Covenant Of
       Good Faith And Fair Dealing Claims Are Unsuitable For Class Treatment............11

III. CONCLUSION .............................................................................................................13

# TABLE OF AUTHORITIES

## FEDERAL CASES

Bayles v. American Medical Response of Colo., Inc., 950 F. Supp. 1053 (D. Colo. 1996)...........9

D'Anna v. M/A-COM, Inc., 903 F. Supp. 889 (D. Md. 1995).......................................................7

De La Cruz v. El Paso County Water Improvement District No. 1,
    No. EP-05-CV-206-FM, 2005 WL 2291015 (W.D. Tex. Sept. 19, 2005).........................7

Felix De Ascencio v. Tyson Foods, 130 F. Supp. 2d 660 (E.D. Pa. 2001)....................................6

Grayson v. K-Mart Corp., 79 F.3d 1086 (11th Cir. 1996).........................................................6, 7

Hoffman v. Sbarro, Inc., 982 F. Supp. 249 (S.D.N.Y. 1997).......................................................7

J.B.D.L. Corp. v. Wyeth-Ayerst Laboratories, Inc., 225 F.R.D. 208 (S.D. Ohio 2003) ...............5

Kline v. Wolf, 702 F.2d 400 (2d Cir. 1983)..................................................................................5

Lawrence v. Philadelphia, No. 03-CV-4009, 2004 WL 945139
    (E.D. Pa. Apr. 29, 2004).................................................................................................9

Moeck v. Gray Supply Corp., No. 03-1950, 2006 WL 42368 (D.N.J. Jan. 6, 2006)...............2, 10

Morisky v. Public Serv. Elec. & Gas Co., 111 F. Supp. 2d 493 (D.N.J. 2000) .............................9

In re Safeguard Scientifics, 216 F.R.D. 577 (E.D. Pa. 2003).......................................................4

Strykers Bay Neighborhood Council Inc. v. New York, 695 F. Supp. 1531
    (S.D.N.Y. 1988) .............................................................................................................5

Wagner v. Lehman Brothers Kuhn Loeb, Inc., 646 F. Supp. 643 (N.D. Ill. 1986).......................5

Weikel v. Tower Semiconductor Ltd., 183 F.R.D. 377 (D.N.J. 1998)..........................................4

Wertheim v. Ariz., No. Civ. 92-0453 PHX RCB, 1992 WL. 566321
    (D. Ariz. Aug. 4, 1992)..................................................................................................10

## FEDERAL STATUTES

29 C.F.R. § 778.114(a)...............................................................................................................7

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| RAMON VILLANUEVA-BAZALDUA,<br>individually and on behalf of others<br>similarly situated,<br><br>      Plaintiff,<br><br>      v.<br><br>TRUGREEN LIMITED PARTNERS[1] and,<br>TRUGREEN, INC.[2], d/b/a TRUGREEN<br>CHEMLAWN[3],<br><br>      Defendant. | )<br>)<br>)<br>)   Civil Action No.: 06-185<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

### DEFENDANT'S SUPPLEMENTAL BRIEF IN FURTHER SUPPORT OF ITS OPPOSITION TO PLAINTIFF'S EXPEDITED MOTION TO CONDITIONALLY CERTIFY A FLSA COLLECTIVE ACTION

**I.    INTRODUCTION**

Plaintiff Ramon Villanueva ("Plaintiff"), the sole named plaintiff in this action, purports to bring this action against Defendant TruGreen Limited Partnership d/b/a/ TruGreen Chemlawn ("TruGreen") on behalf of himself and what he conclusorily deems "all other similarly situated H-2B workers" currently or formerly employed by TruGreen. More specifically, Plaintiff seeks to certify a collective action under Rule 216(b) of the Fair Labor Standards Act ("FLSA") as to his claims that -- even in the absence of any specific legal obligation to do so – TruGreen unlawfully failed to compensate him or other H-2B workers for certain expenses incurred with their respective H-2B employment. He also seeks to represent the same class of individuals as to

---

[1]   The correct legal name is TruGreen Limited Partnership.

[2]   TruGreen, Inc. was not Plaintiff's employer, and therefore, is not a proper party in this action.

[3]   TruGreen, Inc. does not do business as (d/b/a) TruGreen ChemLawn; TruGreen Limited Partnership does do business as (d/b/a) TruGreen ChemLawn.

a hodgepodge of contract-based claims, all of which are premised on Plaintiff's allegations that certain promises made to him in Mexico regarding his wages and certain perquisites that he would receive when he arrived in the United States as an H-2B worker were altered by TruGreen once Plaintiff arrived at his branch in Wilmington, Delaware.

By seeking to represent himself and all other H-2B workers for all of these claims, Plaintiff alleges – as he must – that he and his claims are "similarly situated" to the claims of other H-2B workers. See generally Moeck v. Gray Supply Corp., No. 03-1950, 2006 WL 42368, at *4 (D.N.J. Jan. 6, 2006). Recognizing his burden of proof on that point, Plaintiff filed the pending Expedited Motion to Conditionally Certify An FLSA Collective Action. In addition, if he is to maintain a class action as to his contract-based claims, Plaintiff ultimately will need to satisfy, among other things, the commonality and typicality standards under Rule 23 of the Federal Rules of Civil Procedure, which standards necessarily involve an analysis strikingly similar to the "similarly situated" analysis under the FLSA. He also will need to demonstrate that he can meet the adequacy standards essential to serving as a class representative. However, Plaintiff made clear during his October 5 deposition that he cannot possibly meet any of those standards.

Far from being a routine deposition of an adequate and informed class representative, Plaintiff invoked the Fifth Amendment as to every question relating to his employment in the United States subsequent to his employment with TruGreen, which ended voluntarily in July 2004. As may be obvious, TruGreen's counsel was surprised at Plaintiff's steadfast refusal to answer questions that clearly related to the allegations in the Complaint *he* chose to file. His refusal to answer questions relating to his employment in the United States subsequent to his employment with TruGreen necessarily implicates his credibility and capability to adequately

2

represent the interests of others and therefore, his ability to serve as a named Plaintiff in any type

of collective action.

Moreover, the testimony that he did provide only further reinforced the other arguments

as to why this matter is not appropriate for collective treatment under the FLSA or even for

class-wide treatment as to the breach of contract and related claims. In short, by Plaintiff's own

admissions and explanations, he cannot demonstrate even the basic factual showing that his

claims and those of the other putative plaintiffs are similarly situated let alone common or

typical. Accordingly, TruGreen respectfully submits this Supplemental Brief to highlight how

Plaintiff's admissions under oath undermine, as a matter of law, his improper effort to open to

nationwide discovery and class-wide treatment what, at best constitutes his individualized action

against TruGreen.

## II.   ARGUMENT

### A.   Plaintiff's Refusal to Answer Questions at His Deposition Precludes Him From Serving As a Lead Plaintiff in a Class or Collective Action.

Federal Rule of Civil Procedure 23(a)(4) requires that the representative plaintiff be

willing and able to prosecute an action vigorously and to adequately represent the interests of

others. After hearing Plaintiff's deposition testimony, TruGreen has serious concerns about both

his ability and his willingness to adequately represent the interests' of others, and seriously

doubts that he is similarly situated to other H2-B workers his counsel seeks to represent.[4]

First, by invoking the protection of the Fifth Amendment of the United States

Constitution, Plaintiff refused to answer at least six questions regarding whether or where he

worked in the United States in the years after his employment with TruGreen and how many

---

[4]    In addition, Plaintiff's status necessarily impacted the conduct of the deposition, as Plaintiff's counsel warned TruGreen's counsel that Plaintiff "ha[d] to catch an airplane to Mexico [so] [t]he deposition has to be end (sic) by 2:30." (Villanueva Tr. pp. 16-17.)

3

hours he worked for any U.S. employer after TruGreen. As further explained by his counsel, Plaintiff intended to invoke the Fifth Amendment "for any question like that." (Transcript of Ramon Villanueva, Oct. 5, 2006 (hereinafter "Villanueva Tr."), pp. 12-16, 22-23, 30-33.)[5] Although Plaintiff acknowledged that he has never held any other H-2B positions after TruGreen (Villanueva Tr. p. 22), he unequivocally refused to answer whether any employer for whom he worked in 2006 paid his travel- or visa- related expenses, as he contends in his Complaint TruGreen should have done. (Villanueva Tr. pp. 31-33.)

As a result, Plaintiff effectively precluded TruGreen from fully exploring questions that go directly to his ability to serve as a lead plaintiff purportedly representing the interests of others in this case. For example, TruGreen has a genuine and legitimate interest in understanding Plaintiff's work visa status, or lack thereof, and whether there are any circumstances that may preclude Plaintiff in the future from traveling freely to the United States. By invoking the Fifth Amendment to these basic and foundational questions, TruGreen (and this Court) lack any understanding of and have been deprived of any future opportunity to understand whether Plaintiff might not, at some point in the future, be able to legally return to the country for hearings, depositions, mediation, settlement conferences, or even for trial. If Plaintiff cannot be candid in these proceedings or fully participate in them, he simply cannot be and is not an adequate representative. See, e.g., In re Safeguard Scientifics, 216 F.R.D. 577, 582-83 (E.D. Pa. 2003) ("[S]erious concerns with credibility leave Lead Plaintiff vulnerable to further attacks that would impose an unnecessary disadvantage on the class. These unique defenses against Lead Plaintiff [ ] preclude him from serving as a class representative."); Weikel v. Tower Semiconductor Ltd., 183 F.R.D. 377, 396 (D.N.J. 1998) (noting both that "[t]he fact [the named

---

[5]    A true and correct copy of Plaintiff's deposition transcript is attached hereto as Exhibit A.

4

plaintiff] may not be readily available to attend trial has the potential for seriously interfering with his obligation to vigorously prosecute this action" and "[i]t would be inappropriate to subject members of the Class to potential trial delays created by a class representative"); Wagner v. Lehman Bros. Kuhn Loeb, Inc., 646 F. Supp. 643, 660-61 (N.D. Ill. 1986) ("A court need not resolve the issue of credibility against the putative class representative in order to bar class certification. It is enough to note the existence of a credibility problem and its potential adverse impact on the class."); Strykers Bay Neighborhood Council Inc. v. New York, 695 F. Supp. 1531, 1537 (S.D.N.Y. 1988) (deeming named plaintiffs inadequate representatives because they failed to respond to discovery requests); Kline v. Wolf, 702 F.2d 400, 403 (2d Cir. 1983) (concluding that the district court is not required to resolve the issue of credibility or to find that the plaintiffs testified falsely, but rather that simply making a "preliminary determination that [the lead plaintiffs'] credibility was vulnerable to attack" is sufficient).

Furthermore, it is settled that "[t]o be an adequate representative, the named plaintiff must demonstrate a willingness and ability to play an active role in and control the litigation and to protect the absent class members." J.B.D.L. Corp. v. Wyeth-Ayerst Labs., Inc., 225 F.R.D. 208, 216 (S.D. Ohio 2003). In his deposition, Plaintiff admitted under oath that, in the past, if other people were willing to sign certain documents, he believed that he "didn't have to pay attention to them in particular . . . and so [he] signed." (Villanueva Tr. p. 41.) An admitted willingness to sign documents that he has not even read strikes at the heart of Plaintiff's ability to protect the interests of the putative class and again differentiates him from other current and former TruGreen employees who take a more reasonable and considered approach to their contractual and other obligations.

TruGreen has had the good fortune of employing law-abiding H-2B workers who come back to TruGreen year after year on a seasonal basis without any questions as to the legality of their presence in the United States. After his deposition, namely his refusal to answer any questions going to his ability to travel at some later date into the United States, TruGreen cannot say the same of Plaintiff. Thus, for this reason alone, Plaintiff has unequivocally set himself apart from other current and former TruGreen employees who are not constrained to talk about their status or related issues. Indeed, given that Plaintiff left in the middle of the 2004 season and cannot explain his employment in the United States in 200 (if any), it seems obvious that he is not an appropriate lead Plaintiff here, where Plaintiff has made the focus of his Complaint the terms and conditions of employment he received from TruGreen in 2004. For all of these reasons, this Court should not grant Plaintiff's Motion to Conditionally Certify a FLSA Collective Action, as he has no basis to lead this case on behalf of others purportedly similarly situated to him.

**B.    Plaintiff's Testimony Regarding His Own Expenses and Payments from TruGreen Highlight Why He and the other H-2B Workers Are Not "Similarly Situated" So As To Justify Collective Action Treatment.**

In a collective action under the FLSA, it is, at all times, the plaintiff's obligation to come forward with evidence of a "reasonable basis" for the claim of class-wide relief. See generally Grayson v. K-Mart Corp., 79 F.3d 1086, 1096 (11th Cir. 1996). Even at the early stage of conditional certification at which this matter rests, the Court must satisfy itself that there are other employees of the defendant who not only desire to opt-in,[6] but also are "similarly situated" to the plaintiff. Felix De Ascencio v. Tyson Foods, 130 F. Supp.2d 660, 663 (E.D.Pa. 2001).

---

[6]    Tellingly, more than seven months have passed since Plaintiff filed his Complaint, but he has not presented one declaration other than his own to substantiate that he is similarly situated to other H-2B workers let alone that any other current or former TruGreen H-2B worker desires to opt-in to this matter.

Plaintiff still must provide "substantial allegations that the putative class members were together

the victims of a *single* decision, policy or plan." See generally Grayson, 79 F.3d at 1097-99

(emphasis added). Further to that point, Plaintiff must do more than rest on his own speculation;

rather, he must demonstrate an actual "factual nexus between [his] situation and the situation of

other current and former [employees] sufficient to determine that they are 'similarly situated.'"

Hoffman v. Sbarro, Inc., 982 F. Supp. 249, 262 (S.D.N.Y. 1997); see also De La Cruz v. El Paso

County Water Improvement Dist. No. 1, No,. EP-05-CV-206-FM, 2005 WL 2291015, *2

(W.D.Tex. Sept. 19, 2005) (refusing to certify a class for alleged failure to pay overtime because

the court had before it "only unsupported assertions of violations that are not sufficient to meet

Plaintiff's burden. No affidavits that would provide evidence that others are similarly situated

was submitted by Plaintiffs."); D'Anna v. M/A-COM, Inc., 903 F. Supp. 889, 894 (D. Md. 1995)

(denying motion to send notice because plaintiff's allegations were "broad and vague" and lacked

"factual support" for the existence of a potential class). Here, Plaintiff's deposition testimony

confirms that there is not and cannot be any "factual nexus" between the matters at the heart of

his FLSA claim – his expenses and reimbursements while employed at the Wilmington,

Delaware location – and the expenses and reimbursement of TruGreen's current and former H-

2B workers at other locations across the country.[7]

---

[7]  To the extent Plaintiff is suggesting that Defendant's use of the fluctuating workweek
method of overtime compensation constitutes a violation of the FLSA for which collective
treatment is appropriate, that claim fails, too, as a matter of law.  By definition, in order to
establish a claim with respect to the fluctuating workweek, each putative plaintiff must
demonstrate that (1) he has hours of work that do not fluctuate from week to week; (2) he
did not receive a fixed salary as straight time pay for whatever hours he worked; and (3) he
did not have a clear mutual understanding that the fixed salary is compensation (apart from
overtime premiums) for the hours worked each workweek rather than for working 40 hours
or some other fixed amount. 29 C.F.R. § 778.114(a). Thus, by definition, the claims of any
TruGreen employee with respect to use of the fluctuating workweek method is marked by
factual distinctions, including, but not limited to, whether the individual employee agreed to

Most notably, Plaintiff broadly asserts in his Complaint that TruGreen did not account for the expenses incurred by H-2B employees, including him. In his deposition, however, (and consistent with the Declaration of Michael Matejik, attached as Exhibit B to Docket No. 18), Plaintiff admitted that he was given $150 in cash upon his arrival in Delaware to use for whatever reason he deemed appropriate. (Villanueva Tr. pp. 44-45.) This payment occurred prior to him engaging in any work, and he never had to repay TruGreen for these funds. (Villanueva Tr. pp. 44-45.) Although Plaintiff chose not to do so, there was nothing preventing him from applying those amounts to the expenses he allegedly incurred in obtaining his H-2B visa. (Villanueva Tr. p. 45.) Similarly, Plaintiff admitted in his deposition (and contrary to the allegations in his Complaint) that TruGreen purchased the airline ticket that enabled him to return home to Mexico even though Plaintiff chose to end his employment with TruGreen just midway through the season.[8]  (Villanueva Tr. p. 17.)

Thus, completely contrary to the allegations of the Complaint, Plaintiff received an unconditional amount of money at the commencement of his employment to pay for whatever Plaintiff deemed necessary and appropriate and another unconditional payment for his return expenses at the end of his employment. Where the named plaintiff does not even have a "factual nexus" to the allegations in the Complaint, he clearly cannot satisfy his burden of offering to the Court any such nexus between him and the allegedly similarly situated potential plaintiffs. Indeed, as Plaintiff's own testimony reveals, there apparently is no single policy or practice as to which H-2B workers receive unconditional payments upon their arrival, return transportation

---

the fluctuating workweek compensation plan. As set forth in Section II.C, Plaintiff admittedly knowingly accepted a compensation structure that was premised on the fluctuating workweek method of compensation.

[8]   Plaintiff claims that he paid $75 cash to cover "the remainder of what the [airline] ticket cost after the cost of the bus." (Villanueva Tr. pp. 17-18.) He does not, however, dispute that TruGreen paid for his return airline ticket.

expenses, or perhaps even additional payments to cover expenses during the season. Plaintiff

readily admitted that he does not even know whether any workers at the Wilmington branch

asked the Branch Manager for money (unconditionally or otherwise) or even how other

TruGreen branches pay their H-2B workers. (Villanueva Tr. p. 45.) Indeed, TruGreen does not

have a policy or practice that either prohibits or requires Branch Managers to provide additional

payments to H-2B workers, but rather leaves it to the discretion of each Branch Manager.

(Declaration of James Vacchiano, dated May 12, 2006, at ¶ 4, a copy of which is attached as

Exhibit A to Docket No. 18.) As such, the only way to determine which H-2B workers received

payment for their expenses – whether in or whole or in part, if at all – is to ask each individual

H-2B worker – an inquiry that is directly contrary to the purpose and nature of a collective

action.[9] See, e.g., Lawrence v. Philadelphia, No. 03-CV-4009, 2004 WL 945139, at *2 (E.D. Pa.

Apr. 29, 2004) (rejecting request for certification because "the questions of fact will likely differ

for each Plaintiff and will be unduly burdensome to both Defendant and to the Court in

managing as a collective action"); Morisky v. Public Serv. Elec. & Gas Co., 111 F. Supp.2d 493,

497-98 (D.N.J. 2000) (denying FLSA collective action certification where a "highly fact-specific

analysis of each employee's job [duties and] responsibilities" would be required); Bayles v.

American Med. Response of Colo., Inc., 950 F. Supp. 1053, 1065 (D. Colo. 1996) ("It is

---

[9] Similarly, in the Complaint, Plaintiff asserts that he is similarly situated to other current and
former TruGreen H-2B workers because each incurred the following expenses in connection
with their employment with TruGreen: the cost of obtaining a Mexican passport, visa
application and issuance fees, a border crossing fee, a third-party administrative fee paid for
processing the visa paperwork, and transportation expenses to the place of employment in
the United States. See Complaint ¶ 19. At his deposition, however, Plaintiff acknowledged
incurring only the "the amount for the office in Guanajuato, . . .and then the cost for the visa
. . . and then the cost for transportation from my home to Delaware" in connection with his
employment with TruGreen. (Villanueva Tr. p. 29-30.) Thus, by Plaintiff's own admission,
*he* did not incur all of the expenses alleged in the Complaint, and, therefore, cannot be
similarly situated to other H-2B employees who either incurred only some or, perhaps, none
of the expenses put at issue in the Complaint.

9

oxymoronic to use [a collective action] device in a case where proof regarding each individual plaintiff is required to show liability"); Wertheim v. Ariz, No. Civ. 92-0453 PHX RCB, 1992 WL 566321, at *4 (D. Ariz. Aug. 4, 1992)

In addition, Plaintiff admitted at his deposition to traveling freely to and from the United States using his passport, including frequent trips within the past six months to visit an uncle in California and other friends. (Pl. Tr. 9-12.) However, in the Complaint, Plaintiff asserts that TruGreen should have paid for the cost of his passport because it was "primarily for the benefit of the employer." (Complaint ¶ 22.) By Plaintiff's own testimony, it strains credulity that his passport was "primarily for the benefit of the employer" when Plaintiff was using his passport two years removed from his employment with TruGreen to travel to and from the United States as a tourist, simply visiting family and friends. It remains unclear what benefit, let alone primary benefit, TruGreen derives from that.

In short, putting aside that there is no legal requirement for TruGreen to pay or otherwise account for the expenses incurred by H-2B workers, Plaintiff's deposition testimony makes clear that the proof of whether such expenses were, in fact, incurred and/or paid by TruGreen is entirely specific to the individual. Accordingly, those admissions under oath put this matter squarely within the reasoning of the district court in Moeck, in which the court denied plaintiffs' motion for conditional certification in an FLSA action based on an overtime policy that allegedly varied among branches and even within branches. Id. at *5. That court reasoned, in words particularly applicable here, "[b]ecause of the many potential distinctions of each putative class member's claim, the Court finds that this case is not an appropriate one for class action certification, even at this early stage in the action." Like the court in Moeck, this Court should deny Plaintiff's motion for notice and collective treatment in its entirety.

10

**C.     Plaintiff's Fraud, Breach of Contract, and Breach of Covenant of Good Faith and Fair Dealing Claims Are Unsuitable for Class Treatment.**

Just as Plaintiff's motion to conditionally certify a collective action should be denied in light of the undisputable facts revealed at Plaintiff's deposition, so too should any future effort to certify the same class as to the contract-based claims alleged in Plaintiff's Complaint. The crux of those claims is that the expenses and compensation structure identified to Plaintiff in Mexico before he accepted employment with TruGreen were not actually the expenses incurred by and compensation eventually paid to him once he was employed by TruGreen. However, Plaintiff's claims are entirely inconsistent with and disconnected from the facts, which clearly demonstrate that there is no legitimate basis for his claims and, therefore, no basis for his attempt to represent others as to their potential claims.

First, as to the expenses, Plaintiff knowingly agreed, before traveling to the United States, to pay $405 for his rent, utilities, and transportation during his employment in the United States. (Villanueva Exhibit 2 (authenticated at p. 34) noting $373 for rent and utilities per month and $32 for transportation charges per month.) As Plaintiff testified, he was aware of those proposed charges, but he believed that TruGreen offered the highest compensation relative to all other employers, and the expenses were worth the exchange. (Villanueva Tr. 23-24, 43-44.) However, Plaintiff ultimately paid only $240 per month for those expenses. (Compare Pl. Ex. 2 with Villanueva Tr. pp. 34-35.) Thus, the only "breach" that occurred between the expenses identified to Plaintiff in Mexico and the expenses that he actually incurred actually benefited Plaintiff by at least $165, and he therefore suffered no harm for which he can seek damages.

Similarly, Plaintiff's breach of contract claim with respect to his compensation structure is undermined by his acknowledgment that he knowingly accepted and agreed to take an offer from his Branch Manager to go from a straight hourly wage for a 40-hour workweek with a

11

standard overtime premium (as set forth in Exhibit 2, which was offered to him in Mexico) to a commission- and bonus-based compensation plan that afforded Plaintiff the opportunity to make more money. (Villanueva Tr. p. 37, 48-49, 51, 55-56.) Plaintiff was not obligated to accept that structure or even remain with that structure. In fact, he asked his Branch Manager about returning to a forty-hour workweek and was informed that he was free to do so but that, in an effort to manage expenses, the Branch Manager likely would not permit him to work any hours over forty. Accordingly, because the opportunity to earn more money was better staying with the commission- and bonus-based compensation Plan, Plaintiff *knowingly chose* to remain on that plan. (Villanueva Tr. pp. 57-58.)

Several other facts to which Plaintiff admitted at his deposition further underscore his inadequacy as a class representative, if only because the differentiating factors between Plaintiff and other potential plaintiffs render their contract-based claims too dissimilar for class treatment. For example, Plaintiff never worked for TruGreen, nor had he ever worked in the United States prior to joining TruGreen. (Pl. Tr. 17.) By contrast, many employees return to employment with TruGreen and, therefore, not only are aware of TruGreen's compensation structure but may be paid on different compensation structures, depending on the manager, the branch, and the position each H-2B worker holds. Further, Plaintiff willingly left TruGreen mid-season for a number of individualized reasons –a minor injury to his back, his disappointment with the wages he was receiving, and his sense that eventually some workers were going to have to return to Mexico. (Villanueva Tr. 60-61.) By contrast, other H-2B workers remained in TruGreen's employ for an entire season, which often extends through November.

In short, based on his admissions that he knowingly agreed to the terms and conditions of his compensation and that he suffered no damages with respect to the expenses paid by him,

12

Plaintiff must concede that he does not have any legal or factual basis to move forward with any of the contract-based claims set forth in the Complaint. Taken together with the additional significant differentiating facts that explain the different compensation and contractual agreements as between TruGreen and its H-2B workers, as well as the different compensation and contractual agreements as between Plaintiff and other H-2B workers, Plaintiff should not be permitted to proceed with his highly individualized claim on a class-wide basis..

## III.    **CONCLUSION**

Plaintiff's deposition testimony makes clear that the unsubstantiated assertions in the Complaint that he is "similarly situated" to TruGreen's current and former H-2B workers is simply not the case. To the contrary, Plaintiff's deposition testimony reveals in numerous ways why this matter is not appropriate for collective or class action treatment – because these are, at best, highly individualized claims that should not become an administrative burden to the Court or TruGreen as a class or collective action.

To the extent Plaintiff attempts to divert attention from the facts to argue that all that is at issue is whether TruGreen is required, by law, to compensate for certain deductions, that response only highlights what TruGreen has suspected about this matter from the beginning – that Plaintiff and his counsel are improperly using the courts to effect legislative change because there undeniably is no such legal obligation for H-2B workers under any existing laws, rules, or regulations.   For all of these reasons, as well as the reasons set forth in TruGreen's initial opposition memorandum, TruGreen respectfully requests that Plaintiff's Motion for Conditional Certification be denied and all other appropriate relief.

Respectfully submitted,

/s/ Michael P. Kelly

Michael P. Kelly (Del. Bar ID #2295)
McCarter & English
Citizens Bank Building
919 N. Market Street, 18th Floor
Wilmington, DE  19801
(302) 984-6301

*Admitted Pro Hac*
Michael L. Banks (Pa. I.D. #35052)
Sarah E. Bouchard (Pa. I.D. #77088)

OF COUNSEL:
MORGAN, LEWIS & BOCKIUS, LLP

1701 Market Street
Philadelphia, PA  19103-2921
(215) 963-5387/5077

Dated:  November 3, 2006

Attorneys for Defendants

# EXHIBIT A

# PART I OF II

1

```
          IN  THE  UNITED  STATES  DISTRICT  COURT
                  DISTRICT  OF  DELAWARE

RAMON  VILLANUEVA,              :      CIVIL  ACTION
Individually  and  all         :
others  similarly              :
situated,                      :
     Plaintiff                 :
                               :
     vs.                       :         ORIGINAL
                               :
TRUGREEN  LIMITED              :
PARTNERS  AND  TRUGREEN,       :
INC.  d/b/a  TRUGREEN          :
CHEMLAWN,                      :
     Defendants                :      NO.  06-185

                    - - - - - -
                 October  5,  2006
                    - - - - - -

                 Videotaped  Oral  Deposition
of  RAMON  VILLANUEVA,  held  in  the  law
offices  of  Morgan  Lewis,  LLP,  1701
Market  Street,  12th  Floor,  Philadelphia,
Pennsylvania  19103,  beginning  at
approximately  9:29  AM,  before  Ann  V.
Kaufmann,  a  Registered  Professional
Reporter,  Certified  Realtime  Reporter,
Approved  Reporter  of  the  U.S.  District
Court,  and  a  Notary  Public  of  the
Commonwealth  of  Pennsylvania.

                    - - - - - -
```

          ESQUIRE  DEPOSITION  SERVICES
       1600  John  F.  Kennedy  Boulevard
        Four  Penn  Center,  12th  Floor
     Philadelphia,  Pennsylvania   19103
                (215)  988-9191

2

```
 1   APPEARANCES:
 2      EDWARD TUDDENHAM, ESQUIRE
        etudden@io.com
 3      153 Upland Road
        Cambridge, MA   02140
 4      (617) 576-2182
             and
 5      RAPPOSELLI, CASTRO & GONZALES
        VIVIAN L. RAPPOSELLI, ESQUIRE
 6      vrapposelli@rcglaw.com
        PETER J. GONZALES, ESQUIRE
 7      pgonzales@rcglaw.com
        251 South Camac Street
 8      Philadelphia, PA   19107
        (267) 322-6776
 9      Counsel for Plaintiff
10      MORGAN LEWIS & BOCKIUS, LLP
        SARAH BOUCHARD, ESQUIRE
11      sbouchard@morganlewis.com
        1701 Market Street
12      Philadelphia, Pennsylvania   19103
        215-963-5000
13           and
        MORGAN, LEWIS & BOCKIUS, LLP
14      BETH M. HENKE, ESQUIRE
        bhenke@morganlewis.com
15      One Oxford Centre, 32nd Floor
        Pittsburgh, PA
16      (412) 560-3300
        Counsel for Defendants
17
    PRESENT:
18
        Andrea Regal, Spanish Interpreter
19      ParaPlus Translations, Inc.
20      Michael Matejik,
        TruGreen
21
        Jason Hoffman, Videographer
22
23
24
```

3

1           DEPOSITION SUPPORT INDEX

2

3       DIRECTION TO WITNESS NOT TO ANSWER

4               Page 32   Line 12

5

6          REQUEST FOR PRODUCTION OF

7                 INFORMATION

8               Page 53   Line 19

9

10               STIPULATIONS

11                 (NONE)

12

13

14

15

16

17

18

19

20

21

22

23

24

4

```
 1              THE VIDEOGRAPHER:  Good
 2    morning.  We're now on the record.  My
 3    name is Jason Hoffman.  I'm a
 4    videographer employed by Esquire
 5    Deposition Services, 1600 JFK Boulevard,
 6    Suite 1210, Philadelphia, Pennsylvania,
 7    19103.
 8              This is a video deposition
 9    for the United States District Court,
10    District of Delaware.  Today's date is
11    October 5, 2006.  The time is 9:29 a.m.
12              This deposition is being
13    held at Morgan, Lewis in Philadelphia,
14    Pennsylvania in the matter of Ramon
15    Villanueva versus TruGreen Limited
16    Partners and TruGreen, Inc.
17              The deponent is Ramon
18    Villanueva.
19              Present today counsel please
20    introduce yourselves for the record.
21              MR. TUDDENHAM:  Edward
22    Tuddenham for the plaintiff.
23              MS. RAPPOSELLI:  Vivian
24    Rappposelli for the plaintiff.
```

5

```
 1                MR. GONZALES:  Peter
 2   Gonzales for the plaintiff.
 3                MS. BOUCHARD:  Sarah
 4   Bouchard for TruGreen.
 5                MR. MATEJIK:  Michael
 6   Matejik for TruGreen.
 7                THE VIDEOGRAPHER:  And the
 8   court reporter will now swear in the
 9   witness.
10                MR. TUDDENHAM:  Just so it's
11   on the record, Mr. Matejik is here as a
12   corporate rep, not as an attorney, I
13   assume?
14                MS. BOUCHARD:  That's
15   correct.
16                THE INTERPRETER:  Andrea
17   Regal, the interpreter.
18                THE COURT REPORTER:  Would
19   you raise your right hand.
20                MS. HENKE:  Beth Henke for
21   defendants.
22                THE VIDEOGRAPHER:  The court
23   reporter will swear in the witness.
24
```

Ramon Villanueva

1              ...ANDREA REGAL, Spanish
2    Interpreter, 430 Clements Bridge Road,
3    Barrington, NJ  08007, having been duly
4    sworn to translate the testimony, was
5    examined and testified as follows:
6              ...RAMON VILLANUEVA,
7    Mesquite 318, Fraccion California,
8    Cueramaro, Guanajuato, Mexico  36960
9    having been duly sworn was examined and
10   testified as follows:
11                  EXAMINATION
12   BY MS. BOUCHARD:
13       Q.     Good morning,
14   Mr. Villanueva.  My name is Sarah
15   Bouchard and I'm here to take your
16   testimony today in the case that you've
17   brought against TruGreen.
18       A.      Good morning.
19       Q.      I'm going to set forth a
20   couple of ground rules for the
21   deposition today so that this can run
22   smoothly.  I need you to ask any
23   questions that you don't understand;
24   otherwise, I'm going assume that you

Ramon Villanueva

1    have understood the question as I've

2    posed it to you.

3            I need you to verbalize all

4    of your responses, which means yes or no

5    or words to verbalize your responses

6    rather than gestures.

7        A.    I understand.

8        Q.    In you need a break, just

9    let me know, we can take one as long as

10   the question is not pending.

11       A.    That's fine.

12       Q.    Okay.  Your attorneys may

13   object to a question.  They are

14   objecting for the record.  And once they

15   are finished objecting, you should

16   answer unless they specifically instruct

17   you not to.

18       A.    That's fine.

19       Q.    Finally, you are under oath

20   and this is no different than if you

21   were in a court reporter of law.

22       A.    I understand.

23       Q.    Are you on any medications

24   today?

Ramon Villanueva

```
 1          A.      No.
 2                  THE  INTERPRETER:    Excuse  me.
 3   BY MS.  BOUCHARD:
 4          Q.      Without telling me what you
 5   talked about with your attorneys, what
 6   did you do to prepare for today's
 7   deposition?
 8          A.      Well, I don't know because
 9   the only thing we did was speak, so I
10   don't know how to answer you.
11          Q.      Did you review any
12   documents?
13          A.      Yes.
14          Q.      Which ones?
15          A.      I saw several documents,
16   some of which I had seen before, they're
17   mine, but I wouldn't know which ones to
18   tell you because, pardon me, I don't
19   know what they are called.
20                  THE  INTERPRETER:    Excuse  me.
21   BY MS.  BOUCHARD:
22          Q.      If you remember reviewing
23   them recently, when I show them to you,
24   just let me know, throughout the
```

Ramon Villanueva

1  deposition.

2         A.     Okay, that's fine.

3         Q.     Have you ever been involved

4  in a lawsuit before?

5         A.     No.

6         Q.     What's your current

7  immigration status?

8         A.     I'm tourist.

9         Q.     How long does that entitle

10 you to be in the United States?

11        A.     My permit expires on I

12 think the 6th of this month.

13        Q.     When did it begin?

14        A.     I don't remember the day,

15 but it was in April.  I don't remember

16 the day.

17        Q.     So you have been on a

18 tourist visa for six months?

19        A.     No.  The thing is I've

20 returned to Mexico.  The first time I

21 got my permit was in April, but then I

22 went back to Mexico and came back again,

23 so....

24        Q.     When you had your tourist

Ramon Villanueva

1  visa in April, when did you return back
2  to Mexico?
3          A.    I think I went back in
4  May.   I don't remember the date.
5          Q.    Do you have passport stamps
6  that would show when you were here this
7  year?
8          A.    Well, my passport doesn't
9  have any stamps because I think they
10  just give me the form, and I believe
11  it's an E-94 (sic) form.
12          Q.    Do you have a copy of the
13  E-94 form?
14          A.    Well, I have the E-94 that
15  allows me to be here.   I don't have
16  copies of it.
17          Q.    Do you have it in your
18  possession today?
19          A.    No, it's in my suitcase.
20          Q.    Did you get an E-94 when
21  you were here in April?
22          A.    Yes.
23          Q.    And did you retain a copy
24  of the E-94 from your April visit?

Ramon Villanueva

```
 1         A.      It's the same one I have
 2   now.
 3         Q.      And that's the one that's
 4   in your suitcase?
 5         A.      Yes.
 6         Q.      And would that evidence all
 7   of the times that you've been in the
 8   United States for this year?
 9         A.      No.
10         Q.      What were you doing when
11   you came to the United States in April?
12         A.      What was I doing where?
13         Q.      What was the purpose of
14   your visit?
15         A.      I came to visit my uncle.
16         Q.      Where does your uncle live?
17         A.      In San Diego.
18         Q.      Other than the trip you
19   took in April, were there any other
20   visits to the United States this year
21   besides this one?
22         A.      Well, when I went back to
23   Mexico in I believe it was May and then
24   I think again in October -- pardon, I'm
```

Ramon Villanueva

1    sorry, August.

2         Q.      Just to clarify, you came

3    on a travel visa in April to May and

4    then came in August.  And then when did

5    you leave back to Mexico?

6         A.      Well, I'm here.

7         Q.      You have been on the travel

8    visa since August?

9         A.      Yes.

10        Q.      Who have you been visiting

11   since August?

12        A.      Only my uncle, and some

13   friends, but....

14        Q.      What's your current home

15   address?

16        A.      Mesquite 318, Fraccion

17   California, Cueramaro, Guanajuato,

18   Mexico, and the Zip code is 36960.

19        Q.      What did you do to earn

20   money this year?

21        A.      Work.

22        Q.      Where?

23              THE INTERPRETER:   I asked

24   the witness to please repeat it.

Ramon Villanueva

1              THE WITNESS:  Oh, I'm taking
2    the Fifth Amendment.
3              MS. BOUCHARD:  Can we take a
4    break?
5              MS. RAPPOSELLI:  Sure.
6              MR. TUDDENHAM:  Sure.
7              THE VIDEOGRAPHER:  Off tape
8    9:45.
9              (Recess.)
10             THE VIDEOGRAPHER:  Back on
11   the record 9:58.
12   BY MS. BOUCHARD:
13        Q.    Mr. Villanueva, you just
14   took the Fifth Amendment with respect to
15   my question as to where you were working
16   in 2006.  Is that because you were
17   working in the United States this year?
18             MR. TUDDENHAM:  Objection.
19   He took the Fifth Amendment to that
20   question and I don't think you are
21   entitled to keep asking him the same
22   question over and over again.
23   BY MS. BOUCHARD:
24        Q.    How many hours did you work

Ramon Villanueva

1    this year?
2                    MR. TUDDENHAM:  Same
3    objection.  Let me consult with my
4    client for a moment.
5                    THE VIDEOGRAPHER:  Off tape
6    9:59
7                    (Mr. Tuddenham,
8    Ms. Rapposelli, Mr. Gonzales and the
9    witness conferred outside of the
10   deposition room.)
11                   THE VIDEOGRAPHER:  Back on
12   the record 10:00.
13                   MR. TUDDENHAM:  For the
14   record, we object.  He has invoked his
15   Fifth Amendment with respect to that
16   question, and I don't believe you are
17   entitled to keep asking the question in
18   different ways to try and trick him into
19   waiving his Fifth Amendment right.
20                   MS. BOUCHARD:  My question
21   is a different one.  I asked him how
22   many hours he worked in 2006.  Some of
23   those hours could be in a lawful place
24   for him to work.

15

Ramon Villanueva

1     MR. TUDDENHAM:  They could
2  be, but he is entitled to invoke his
3  Fifth Amendment right, and he has.
4     MS. BOUCHARD:  Is he also
5  invoking it for that question?
6     MR. TUDDENHAM:  Yes.  He is
7  going to invoke it for any question like
8  that.
9     MS. BOUCHARD:  Well, I need
10  him to do that because that would mean
11  that he did not work any hours in a
12  lawful place.
13     MR. TUDDENHAM:  Fifth
14  Amendment right, when he invokes it,
15  doesn't mean anything at all.  It is
16  neither an affirmative answer or a
17  negative answer.
18     THE VIDEOGRAPHER:  Off tape
19  10:02.
20     (Recess.)
21     THE VIDEOGRAPHER:  Back on
22  the record 10:03.
23  BY MS. BOUCHARD:
24     Q.    Are you taking the Fifth

Ramon Villanueva

| | |
|---|---|
| 1 | Amendment with respect to how many hours |
| 2 | you worked in 2006? |
| 3 | A.    Yes. |
| 4 | Q.    My question now is for last |
| 5 | year, 2005, where did you work? |
| 6 | A.    In Cueramaro. |
| 7 | Q.    Is that in Mexico? |
| 8 | A.    Yes. |
| 9 | Q.    Did you work in the United |
| 10 | States at any time in 2005? |
| 11 | A.    No. |
| 12 | Q.    For 2004 my question is |
| 13 | this:  Did you in fact go home to Mexico |
| 14 | after leaving TruGreen? |
| 15 | A.    Yes. |
| 16 | Q.    Isn't it true that you went |
| 17 | to California after leaving TruGreen? |
| 18 | A.    No. |
| 19 | Q.    You didn't tell Lisa McHugh |
| 20 | that you were in Los Angeles in 2004? |
| 21 | A.    I don't remember. |
| 22 | Q.    When you left TruGreen, |
| 23 | they provided you with an airline |
| 24 | ticket; correct? |

Ramon Villanueva

```
 1          A.      Yes.
 2          Q.      And they paid for your
 3   return flight home to Mexico?
 4          A.      A part of it.
 5          Q.      What do you mean by "a part
 6   of it"?
 7          A.      I paid the remainder of
 8   what the ticket cost after the cost of
 9   the bus.
10          Q.      Isn't it true that TruGreen
11   provided you with an airline ticket for
12   your trip home to Mexico?
13          A.      Yes.
14          Q.      And that ticket was
15   provided to you?
16          A.      Yes.
17          Q.      Did you in fact return to
18   Mexico on that ticket?
19          A.      Yes.
20          Q.      And was that because you no
21   longer wanted to work at TruGreen
22   anymore?
23          A.      Yes.
24          Q.      If TruGreen paid for the
```

Ramon Villanueva

```
 1   airline ticket, what transportation
 2   costs did you incur on the way home?
 3                MR. TUDDENHAM:  Objection;
 4   form.
 5                You can answer.
 6        A.    Part of the plane ticket.
 7        Q.    Are you saying that came
 8   out of your paycheck in some way?
 9        A.    No.
10        Q.    Then how did you pay for
11   part of the plane ticket?
12        A.    In cash.
13        Q.    Who did you provide that
14   cash to?
15        A.    To Mike.
16        Q.    The person that's sitting
17   next to me?
18        A.    Yes.
19        Q.    How much cash did you
20   provide to him?
21        A.    I think it was somewhere
22   around $75.
23        Q.    You left midway through the
24   season in 2004; correct?
```

Ramon Villanueva

| | |
|---|---|
| 1 | A.    Yes. |
| 2 | MR. TUDDENHAM:   Sarah, is it |
| 3 | possible to make it a little warmer in |
| 4 | here? |
| 5 | MS. BOUCHARD:   Sure. |
| 6 | THE VIDEOGRAPHER:   Off tape |
| 7 | 10:09. |
| 8 | (Recess.) |
| 9 | MS. BOUCHARD:   Let's go back |
| 10 | on the record. |
| 11 | (The following took place |
| 12 | off the video record: |
| 13 | MS. BOUCHARD:   We're going |
| 14 | back on the record and for the record, I |
| 15 | have asked for an I-9 to show that he is |
| 16 | lawfully in the United States right |
| 17 | now.  He has indicated that it's in his |
| 18 | suitcase, which I understand is within |
| 19 | walking distance, and I have requested |
| 20 | it now, particularly given the answers |
| 21 | that he has given with respect to the |
| 22 | Fifth Amendment.  You have said that you |
| 23 | are not going to get it right now and |
| 24 | I'm requesting you to do so. |

Ramon Villanueva

1              MR. TUDDENHAM:  I will tell

2     you what, Sarah:  As I explained to you

3     at the beginning of this, he has to

4     catch an airplane to Mexico.  The

5     deposition has to be end by 2:30.  If

6     **you would like to spend the time between**

7     now and 2:30 having us to go walk to

8     find the -- it's an I-94, I will be

9     happy to do that right now.

10             MS. BOUCHARD:  Then I would

11     like that to happen.

12             MR. TUDDENHAM:  Great.

13             (Recess.)

14             THE VIDEOGRAPHER:  Back on

15     the record 10:37.

16     BY MS. BOUCHARD:

17         Q.    Mr. Villanueva, I'm going

18     to ask you some background questions.

19     What is your marital status?

20         A.    I am married.

21         Q.    Do you have any children?

22         A.    Yes.

23         Q.    How many?

24         A.    One.

Ramon Villanueva

1       Q.      Boy or girl?

2       A.      Girl.

3       Q.      And how old is she?

4       A.      She just turned 4.

5       Q.      What's your educational

6  background?

7       A.      Five years in university.

8       Q.      What's the university

9  called?

10      A.      University of Guadalajara.

11      Q.      Have you had any other H-2B

12  positions prior to TruGreen?

13              THE INTERPRETER:  Did you

14  say H-2B?

15              MS. BOUCHARD:  Positions.

16      A.      No.

17      Q.      Had you worked in the

18  United States prior to coming to the

19  United States for TruGreen?

20      A.      No.

21      Q.      What type of work did you

22  do in Mexico prior to working for

23  TruGreen?

24      A.      Giving classes.

Ramon Villanueva

1        MS. BOUCHARD:  To the
2  translator, does that mean taking
3  classes?
4        THE INTERPRETER:  Giving
5  classes, teaching.
6  BY MS. BOUCHARD:
7        Q.    Okay.  What did you teach?
8        A.    Math and junior high school
9  classes.
10        Q.    How long did you teach
11  those courses?
12        A.    I don't remember exactly.
13        Q.    I think I might have asked
14  this question already, but did you did
15  you work in the United States for any
16  other person besides TruGreen?
17        MR. TUDDENHAM:  You mean?
18        MS. BOUCHARD:  In 2004.
19        A.    No.
20        Q.    Have you had any other H-2B
21  positions after TruGreen?
22        A.    No.
23        Q.    Have you had any other work
24  visa that legally allows you to work in

Ramon Villanueva

1    the United States after TruGreen?

2              MR. TUDDENHAM:   Objection,

3    calls for a legal conclusion that he is

4    not competent to give you, but he can

5    answer.

6         A.     I'm taking the Fifth

7    Amendment.

8         Q.     How did you learn about the

9    opportunity to work at TruGreen?

10        A.     In the recruiting office in

11   Mexico.

12        Q.     What is the recruiting

13   office's name?

14        A.     If I'm not mistaken, it's

15   LLS.

16        Q.     Okay.   Who did you speak to

17   in the recruiting office?

18        A.     I don't remember their

19   name.   I only know it was a woman.

20        Q.     What did you learn about

21   the position that interested you?

22        A.     The salary.

23        Q.     What was told to you at

24   that time about the salary?

Ramon Villanueva

1         A.      It was the highest on the
2    list they showed me.
3         Q.      What did the list include?
4         A.      Well, names of other
5    companies, but I don't remember them.
6         Q.      Did he have any other
7    people that he knew that were also
8    interested in jobs with TruGreen?
9                 Let's strike that question;
10   okay?
11                MR. TUDDENHAM:   Can you
12   rephrase it saying "you."   You are
13   saying "he."
14                MS. BOUCHARD:   Okay.
15   BY MS. BOUCHARD:
16        Q.      Did you know of any other
17   people that had also worked for
18   TruGreen?
19        A.      No.
20        Q.      At the time you were
21   learning about the position, what did
22   you understand the position to be?
23        A.      In regard to what?
24        Q.      Did you understand it to be

Ramon Villanueva

1    a laborer position?

2          A.     Not necessarily, but I

3    didn't expect it to be anything

4    different.

5                MR. TUDDENHAM:  For the

6    record, just -- your question "laborer"

7    was translated "manual labor."

8                MS. BOUCHARD:  Okay.

9    BY MS. BOUCHARD:

10         Q.     What I was asking is

11   whether you remember the title of your

12   job to be laborer or applicator.

13               THE INTERPRETER:  Applicator

14   you said?

15         A.     I don't remember.

16               MS. BOUCHARD:  Mark this.

17               (Below-described document

18   marked as Villanueva Exhibit 1.)

19   BY MS. BOUCHARD:

20         Q.     Thank you for providing us

21   with your I-94 form.  I have a question

22   about your I-94 form based on testimony

23   you've previously given.  I understand

24   from your testimony that you entered the

Ramon Villanueva

1    country in August, most recently; is

2    that correct?

3        A.    That's true.

4        Q.    My understanding is that

5    the I-94 should reflect that somewhere

6    on this document.

7        A.    No.

8        Q.    Is this the only document

9    that you received since April?

10       A.    Yes.

11       Q.    And just to clarify, you

12   came here in April?

13       A.    Okay.  The thing is this

14   form that I have here is what they gave

15   me when I came in April.  But I had

16   another that, if I'm not mistaken, they

17   gave to me -- they gave me the 26th of

18   February that allowed me to come in and

19   go out over the border.

20            And so when I went back to

21   Mexico in April -- and so when I came

22   back to the United States through Los

23   Angeles, this is the one they gave me

24   because my understanding was that the

Ramon Villanueva

1   other one was to be able to go and come

2   across the border.

3         Q.     So were you California at

4   the end of March of this year?

5         A.     May I see a calendar?

6         Q.     A calendar of the month of

7   March?

8         A.     Well, the thing is that I

9   don't remember the dates exactly.  And

10  if I came up in February, then it may

11  have been in March.  The thing is I

12  don't remember because I was coming and

13  going.

14              MR. TUDDENHAM:  It may have

15  been in California in March, is what he

16  said.

17              THE INTERPRETER:  I'm

18  sorry.  Did I not say that, may have

19  been?

20              MS. RAPPOSELLI:  In

21  California.

22              MR. TUDDENHAM:  In

23  California.

24              THE INTERPRETER:

Ramon Villanueva

1   California.

2   BY MS. BOUCHARD:

3        Q.    Do you remember having a

4   conversation with Lisa McHugh over the

5   phone in March of this year?

6        A.    Yes.

7        Q.    And what did you two talk

8   about?

9        A.    Well, I was a bit confused

10  because I thought it was another friend

11  of mine by the name of Lisa.  So I was

12  actually asking about Lisa, the friend

13  of mine.

14       Q.    On this same phone call?

15       A.    I think so, if I'm not

16  mistaken.

17       Q.    So you thought that you

18  were talking to someone else other than

19  Lisa McHugh but you were asking about

20  Lisa McHugh?

21       A.    Well, when I called the

22  office, I asked for Lisa.

23             And so this woman answered

24  and I thought it was the Lisa that I was

Ramon Villanueva

1   asking for and then -- and so then it
2   was clarified that she was not the
3   person that I was looking for, and so
4   then I did start asking about the person
5   that I was asking for.
6           Q.      Why were you calling
7   TruGreen's offices?
8           A.      Because she didn't answer
9   her cell phone.
10          Q.      What were you intending to
11  talk to Lisa about?
12          A.      Well, we're friends and I
13  just wanted to know how she was and what
14  she was doing.
15          Q.      Did you ask anyone at
16  TruGreen to take documents for you?
17          A.      No.
18          Q.      What expenses did you incur
19  in obtaining H-2B visa and traveling to
20  the United States to work for TruGreen?
21          A.      Well, I don't remember the
22  numbers exactly, but it was the amount
23  for the office in Guanajuato.  I think
24  that was 155 and then the cost for the

Ramon Villanueva

1    visa, which was about 200, and then the
2    cost for transportation from my home to
3    Delaware.
4         Q.    Did your employer in 2006
5    pay for your transportation costs to and
6    from Mexico?
7              MR. TUDDENHAM:    Excuse me?
8              Objection.    What employer in
9    2006 are you talking about?
10             MS. BOUCHARD:    He said he
11   worked in 2006.
12             THE WITNESS:    No.
13             MR. TUDDENHAM:    Objection.
14   Why don't you try clarifying your
15   question?
16   BY MS. BOUCHARD:
17        Q.    You can answer.
18        A.    Could you please repeat the
19   question?
20        Q.    You have been traveling to
21   and from Mexico from the United States
22   in 2006; correct?
23        A.    Yes.
24        Q.    And you have been working

Ramon Villanueva

1    in the United States in 2006; correct?

2                    MR. TUDDENHAM:  Objection.

3    He has taken the Fifth Amendment to that

4    question three or four times.  And I

5    mean it, Sarah, when someone invokes the

6    Fifth Amendment, it doesn't become a

7    game where you get to keep trying to ask

8    the question in a different way to trick

9    him to say something else.

10                   MS. BOUCHARD:  Well, my

11   question is actually --

12                   MR. TUDDENHAM:  He has taken

13   the Fifth Amendment.  You have your

14   answer.

15                   I'm going to direct him not

16   to answer the question.

17                   MS. BOUCHARD:  So I just

18   want to make clear, my question is a

19   different one, and it's whether his

20   employer in 2006 paid for transportation

21   costs to and from the United States.

22                   And I just want to make sure

23   that that is the question that you are

24   invoking the Fifth on.

Ramon Villanueva

1           MR. TUDDENHAM:    Well, I

2    would ask you to clarify what employer

3    you are talking about.

4           No.   You need to have some

5    foundation for that.   I mean --

6           MS. BOUCHARD:    Because you

7    are taking the Fifth on the foundational

8    question.

9           MR. TUDDENHAM:    Sarah, if

10   you will clarify what you were talking

11   about, he may be able to answer the

12   question.   But if you are going to ask a

13   question that is so vague that it could

14   cover anything, he is invoking his Fifth

15   Amendment right.

16           MS. BOUCHARD:    Well, I was

17   trying to clarify that and then you

18   interrupted me.   So my question for the

19   foundation was --

20           MR. TUDDENHAM:    Well, I

21   apologize.

22           MS. BOUCHARD:    My question

23   for the foundation was --

24   BY MS. BOUCHARD:

Ramon Villanueva

1      Q.    The employer that you
2 worked for in the United States, did
3 that employer pay for your
4 transportation costs in 2006?
5      MR. TUDDENHAM:  Objection;
6 foundation.  Objection.  He has invoked
7 the Fifth Amendment to any questions
8 involving work in the United States in
9 2006.  You have your answer to that.
10 BY MS. BOUCHARD:
11      Q.    What were your travel costs
12 from Mexico to Delaware in 2004?
13      A.    Well, I don't remember
14 exactly the numbers because I paid for
15 several, several tickets.
16      Q.    Several bus tickets?
17      A.    Yes.
18      Q.    Can he approximate the
19 cost?
20      I mean can you approximate
21 the cost?  My apologies.
22      A.    I think it was somewhere
23 around $170 and then whatever I paid for
24 food, and that I have no idea.

Ramon Villanueva

1              (Below-described document
2    marked as Villanueva Exhibit 2.)
3    BY MS. BOUCHARD:
4         Q.    What's been marked before
5    you as Exhibit 2 has the title "Employer
6    Disclosure Affidavit."   Do you see the
7    box "Rent and utilities per month"?
8              Yes?
9         A.    Yes.
10        Q.    And do you see it says
11   $373?
12        A.    Yes.
13        Q.    Isn't it true that you were
14   not in fact charged $373 for rent and
15   utilities?
16        A.    Well, not entirely.  Well,
17   and, if it was, I wouldn't know how to
18   show you because on my check the -- it
19   wasn't there entirely.
20        Q.    Isn't it true that you were
21   charged $60 per week for rent and
22   utilities?
23        A.    I think that was only the
24   rent, as far as I understand.

Ramon Villanueva

1      Q.      Didn't that also include
2  utilities and transportation?
3      A.      I suppose so because I
4  didn't pay for them aside from that.
5      Q.      So you paid approximately
6  $240 per month for rent, utilities, and
7  transportation charges?
8      A.      What do you mean by
9  "utilities"?  What is meant by
10 "utilities"?
11     Q.      Electricity.
12     A.      Oh, then that's right.
13 Except for the phone.
14     Q.      You had to pay for the
15 phone charges separately?
16     A.      Yes.  My companion was in
17 charge of that; but, yes, we did have to
18 pay for that separately.  It wasn't
19 much.
20     Q.      Was your local service paid
21 for by TruGreen?  Was your local phone
22 service paid for by TruGreen?
23     A.      I think so, yes.
24     Q.      And I apologize if I asked

Ramon Villanueva

1    this, but is this your signature on this

2    document?

3             A.      Yes.

4             MR. TUDDENHAM:    Sarah, why

5    don't clarify what document you just

6    referred to?

7             MS. BOUCHARD:    I'm referring

8    to Exhibit 2, the only one with a

9    signature.    Oh, except the other one --

10   I apologize.

11   BY MS. BOUCHARD:

12            Q.      Who communicated the offer

13   in Mexico about the TruGreen job?

14            A.      The person that was in the

15   office; I don't know who that is.

16            Q.      Did you understand that to

17   be an LLS employee?

18            A.      No.

19            Q.      Who was it then?

20            A.      Well, we had to choose

21   someone from the list and they were the

22   ones that were going to give us the

23   contract or contract us, and in this

24   case it was TruGreen.

Ramon Villanueva

```
1          Q.      There was no employee in
2    Mexico from TruGreen, was there, that
3    talked to you?
4          A.      That's true, no.
5          Q.      You said you did not know
6    anyone who had worked previously for
7    TruGreen?
8          A.      That's true.
9          Q.      What were you told before
10   you accepted the offer about
11   compensation and overtime?
12         A.      What's "compensation"?
13         Q.      The amount that you are
14   paid.
15         A.      I'm sorry.  Once again,
16   what was the question?
17         Q.      What were you told about
18   your pay and overtime pay before you
19   accepted?
20         A.      I only knew what was on
21   this paper.
22                 MR. TUDDENHAM:  And, for the
23   record, the witness is indicating
24   Exhibit 2.
```

Ramon Villanueva

```
 1   BY MS. BOUCHARD:
 2        Q.     Did you understand that
 3   TruGreen would provide a uniform to you
 4   at no cost to you?
 5        A.     Well, I didn't know that
 6   because I didn't even know that I was
 7   going to be using a uniform.
 8        Q.     At some point did you learn
 9   that you would be using a uniform?
10        A.     I think when I got to
11   Delaware.
12        Q.     Did you ever have to pay
13   for the uniform?
14        A.     No.
15        Q.     Were you told in Mexico
16   that there may be opportunities to be
17   promoted at TruGreen?
18        A.     No.  And what's more, the
19   person that told me about it didn't even
20   know what all was -- what all it
21   entailed.
22        Q.     The person that you spoke
23   to did not know all the terms and
24   conditions of the TruGreen's employment
```

Ramon Villanueva

1    when you spoke to that person?

2         A.    I was referring to the job

3    itself.  She didn't know exactly what I

4    would be doing.

5         Q.    But you accepted the job

6    anyway?

7         A.    Yes.

8         Q.    Was the only TruGreen

9    facility that you worked for in

10   Wilmington?

11        A.    As far as I know, unless I

12   have worked for another office without

13   knowing it.  But I believe so.

14        Q.    Okay.  Was Mike Matejik

15   your supervisor?

16        A.    Yes.

17        Q.    Do you know Jim Vacchiano?

18        A.    No.

19        Q.    How many other H-2B workers

20   were there when you were there?

21        A.    Well, I met five, and I

22   suppose that's all of them.

23             MR. TUDDENHAM:  Are we

24   giving them separate numbers or --

Ramon Villanueva

```
1              MS. BOUCHARD:   No.
2              (Below-described document
3    marked Villanueva Exhibit 3.)
4    BY MS. BOUCHARD:
5         Q.      What's been marked as
6    Exhibit 3 should be a three-page
7    document.  Does everyone have three
8    pages?
9         A.      Yes.
10        Q.      On TruGreen Bates numbered
11   15, which I believe is the third page,
12   did you read this before signing it?
13        A.      I don't recognize -- I
14   don't remember.
15        Q.      You don't remember whether
16   you read it or not?
17        A.      I don't remember whether I
18   read it or not because I don't remember
19   or given that I don't remember.
20        Q.      Do you normally sign
21   documents that you have not read?
22        A.      No.
23        Q.      So do you think you did
24   read this document, in retrospect?
```

Ramon Villanueva

1        A.        I don't know what to tell

2   you because there were so many documents

3   that I signed.

4            Well, I have to recognize

5   the fact that I didn't pay attention to

6   them in particular.  Everybody was

7   signing and so I signed.

8        Q.        Were there some documents

9   in Mexico that you may not have read as

10  well and just signed?

11       A.        Well, in Mexico the only

12  thing they gave me were these documents,

13  the ones that are marked No. 1 and 2 --

14  no, I'm sorry, just No. 2, so that's

15  easy to remember.

16       Q.        So those are the only two

17  documents that you signed in Mexico, the

18  ones that you just previously mentioned?

19       A.        Well, actually it was only

20  two documents, this document and another

21  document that I don't have here.  But

22  this was the only one I signed.

23            MS. BOUCHARD:  This is going

24  to be Exhibit 4.

42

Ramon Villanueva

1          (Below-described document
2    marked as Villanueva Exhibit 4.)
3              MR. TUDDENHAM:  Do you have
4    a copy for me?
5              MS. BOUCHARD:  Oh, I'm
6    sorry, Ed.
7    BY MS. BOUCHARD:
8          Q.    Mr. Villanueva, is this
9    your handwriting on this document which
10   has been marked as Exhibit 4?
11         A.    Yes.
12         Q.    And did you see -- first of
13   all, did you read this document before
14   signing it?
15         A.    I think so.  I believe so.
16         Q.    Then did you understand in
17   Paragraph 8 that the costs that were
18   identified in Paragraph 7 were your
19   responsibility?
20         A.    Yes.
21         Q.    But you came to -- you
22   agreed to pay those; correct?
23         A.    I paid them.
24         Q.    But those are the costs

Ramon Villanueva

1  that you are disputing now in your

2  lawsuit?

3        A.    May I speak to my

4  attorney?

5        Q.    Sure.

6              THE VIDEOGRAPHER:  Off tape

7  11:25.

8              (Recess.)

9              THE VIDEOGRAPHER:  Back on

10  the record 11:27

11             MS. BOUCHARD:  Could the

12  court reporter repeat the question

13  that's pending on the record?

14             (The court reporter read the

15  record as follows:

16             "QUESTION:  But those are

17  the costs that you are disputing now in

18  your lawsuit?")

19        A.    Yes.

20        Q.    Why did you take the job

21  with TruGreen even though you had to pay

22  those expenses?

23        A.    Well, because on the list

24  it was the best salary.  And the people

Ramon Villanueva

1    that connected me up to the office said
2    that those were the costs that one had
3    to pay -- yes, the costs.
4            Q.    Did you see the TruGreen
5    job as an opportunity to make money that
6    you could not make in Mexico?
7            A.    Definitely, yes, and above
8    all much more quickly.
9            Q.    Did you receive $150 in
10   cash -- let me strike that question.
11   Let me go back to this.
12           This document that's Bates
13   stamped RV-2, was that presented to you
14   in Mexico or Delaware?
15           MS. RAPPOSELLI:  Can we
16   reference Defendant's Exhibit 4?   Is
17   that what you're referencing?
18           A.    Yes.
19           Q.    When you arrived in
20   Delaware, you received $150 cash when
21   you got there; correct?
22           A.    Yes.
23           Q.    You never had to repay that
24   money back?

# EXHIBIT A
# PART II OF II

Ramon Villanueva

```
 1          A.     Yes, that's true.
 2          Q.     And you could use that
 3   money how you wanted to?
 4          A.     Well, yes, even though that
 5   at that moment it had to be for food.
 6          Q.     And is that what you used
 7   it for?
 8          A.     Yes, and I believe I bought
 9   a blanket or something like that.
10          Q.     Did you receive any other
11   advances from Mike?
12          A.     No.
13          Q.     That $150 was not actually
14   an advance, but what I'm asking you is
15   whether you could have asked Mike for
16   mean if you needed it sooner.
17               MR. TUDDENHAM:  Objection,
18   form.
19          A.     I don't know.
20          Q.     Did you know of any other
21   workers that asked Mike for money sooner
22   than it was earned?
23          A.     No.  As far as I know, no.
24          Q.     Do you know how other
```

Ramon Villanueva

1    TruGreen branches pay their H-2B
2    workers?
3         A.    No.
4         Q.    Do you know if TruGreen
5    paid some of the costs of your housing?
6         A.    No.
7         Q.    You don't know?
8         A.    No, I don't know.
9         Q.    Do you know what your
10   actual transportation costs were?  In
11   other words, do you know if TruGreen
12   paid for some of your transportation
13   costs?
14               MR. TUDDENHAM:  From where
15   to where?
16   BY MS. BOUCHARD:
17        Q.    I'm just talking while
18   working in the Delaware area.
19               THE INTERPRETER:  I'm
20   sorry.  Your answer to from where to
21   where?
22               MS. BOUCHARD:  In the
23   Delaware Valley.
24        A.    Well, the only place we

Ramon Villanueva

1  went -- well, practically the only place

2  we went was to the office, and for that

3  Mike gave us passes for the bus.

4      Q.    Do you know how much the

5  bus pass actually cost?

6      A.    No.

7      Q.    Did you ever ask why you

8  were being undercharged for

9  transportation, rent, and utilities?

10              MR. TUDDENHAM:  Objection,

11  form.

12              THE INTERPRETER:  Rent,

13  transportation?

14      A.    No.

15      Q.    How did you learn that you

16  were going to take the position as

17  specialist at TruGreen?

18              MR. TUDDENHAM:  Objection;

19  form.

20      A.    I didn't know -- I didn't

21  know it was going to be that position.

22      Q.    Did you have a conversation

23  with Mike about the specialist position

24  and the benefits that could come from

Ramon Villanueva

1    you working as a specialist?

2         A.    Well, I don't quite

3    understand because I didn't speak to

4    Mike until I got here.  And when I got

5    here, I was just supposed to do what I

6    was supposed to do.

7         Q.    Do you recall a

8    conversation with Mike, with other H-2B

9    workers present, where he described the

10   specialist position and the opportunity

11   to earn more money in that position?

12        A.    Well, I remember him

13   telling us about what the job would be,

14   but I don't remember anything about

15   another position, any other position.

16        Q.    Do you recall him comparing

17   the specialist position to the laborer

18   position?

19        A.    No, I don't think so.   I

20   don't remember.

21        Q.    Do you recall him talking

22   to you about bonuses that you could earn

23   as a specialist?

24        A.    I remember him speaking to

Ramon Villanueva

1  us about commissions, but the position

2  of specialist I really didn't even know.

3        Q.    My question, though, is

4  about bonuses.  Do you recall getting

5  any bonuses?

6        A.    I think so, yes.  If you're

7  referring to the commissions that

8  appeared on our checks, then, yes.

9        Q.    And you recall getting

10  commissions?

11        A.    Sometimes.

12        Q.    What would the commissions

13  be based upon, if you remember?

14        A.    On production.

15        Q.    Is there any discussion of

16  commissions based on production in

17  what's marked as RV-1?  And I'm not sure

18  what that's Bates numbered.    I

19  apologize.

20            MR. TUDDENHAM:    Sarah,

21  before the record gets totally messed

22  up, RV-1 is his I-94.

23            MS. BOUCHARD:   No.   RV --

24            MR. TUDDENHAM:   Sarah, could

Ramon Villanueva

1   you use the exhibit numbers?  You

2   started with exhibit numbers this

3   morning.

4               MS. BOUCHARD:  What exhibit

5   number is it for the record?

6               THE INTERPRETER:  I have no

7   idea because I don't have them.  What

8   exhibit number are you looking at?

9         A.    I can tell you it's

10  Exhibit No. 2.

11  BY MS. BOUCHARD:

12        Q.    What I'm referring to, for

13  the record, is Exhibit No. 2 and I'm

14  asking if this document reflects any

15  commissions that you could potentially

16  earn.

17        A.    Yes.

18        Q.    And does it say how much?

19        A.    No.

20        Q.    Did you have any

21  understanding of how much commission you

22  would earn when you were in Mexico and

23  signed this document?

24        A.    No.

Ramon Villanueva

1          Q.      But you accepted the
2    position anyway?
3          A.      Yes, I accepted it because
4    of the salary.
5          Q.      What salary are you
6    referring to?
7          A.      The one on this page, what
8    it says here on this page.
9          Q.      Okay.  I see an hourly rate
10   on that page but I don't see a
11   guaranteed salary.
12         A.      I think it's a question of
13   language.  In Spanish we refer to this
14   as salary.
15         Q.      Okay.  Thank you.
16         A.      You're welcome.
17         Q.      Did you independently keep
18   track of your hours other than -- yeah,
19   did you independently keep track of your
20   hours on a piece of paper?
21         A.      Sometimes I did so.
22         Q.      Do you still have those
23   pieces of paper?
24         A.      I wouldn't know to tell you

Ramon Villanueva

1   for sure because if I do have them, they
2   are buried under a bunch of papers in
3   Mexico.  So I wouldn't know to tell you
4   for sure.
5         Q.      As part of this lawsuit,
6   have you checked your records in Mexico
7   to make sure that you've produced
8   everything that's related to this
9   lawsuit to your attorneys?
10        A.      Well, yes, some in Mexico
11  and some before I left here.
12        Q.      And so you just stated,
13  though, that you think they are
14  underneath some other papers in Mexico.
15              MR. TUDDENHAM:  Objection,
16  form.
17        A.      Well, what I was referring
18  to is before I left for Mexico I
19  reviewed some documents and -- and so --
20  and they're there, they were there.  And
21  then when I spoke to my attorneys --
22              THE INTERPRETER:  I'm
23  sorry.  I lost it entirely.
24        A.      Well, some documents I

Ramon Villanueva

1   reviewed here and one of them was this

2   one.   And then others I reviewed in

3   Mexico when I was there.

4            MR. TUDDENHAM:   I don't

5   think the witness is understanding your

6   questions.

7   BY MS. BOUCHARD:

8        Q.     My question is this:   My

9   question is, you said you had a piece of

10  paper or pieces of paper where you

11  tracked the number of hours that you

12  worked at TruGreen.   Where are those

13  pieces of paper?

14       A.     In Mexico.

15       Q.     And why haven't you

16  produced those to your attorneys?

17       A.     They haven't asked for them.

18            MS. BOUCHARD:   Those would

19  truly be covered by the disclosures.

20            MR. TUDDENHAM:   I assure

21  you, Sarah, if they can be found, you

22  will get a copy of them.

23            MS. BOUCHARD:   Okay.   He

24  seems to suggest that he still has them

Ramon Villanueva

```
 1    in Mexico, by his testimony.
 2                MR. TUDDENHAM:  Well,
 3    actually what he first said was they
 4    might be in Mexico.  If they exist,
 5    believe me, we would be just as
 6    interested in seeing them as you.
 7                MS. BOUCHARD:  Okay.
 8    BY MS. BOUCHARD:
 9         Q.     What was the type of work
10    that you did on a daily basis for
11    TruGreen?
12         A.     To apply chemicals on the
13    grass -- lawns.
14         Q.     To different homes or where
15    would you go?
16         A.     At different homes and
17    different places.
18         Q.     How would you get to those
19    different places?
20         A.     Well, in a pickup truck or
21    a truck of TruGreen's.  It depended on
22    what it may be.
23         Q.     Was there a designated
24    worker who would drive?
```

Ramon Villanueva

```
 1          A.     At first, yes.
 2          Q.     Did that person have a
 3   different job description than you did?
 4          A.     I don't know.
 5          Q.     Okay.  Did you enjoy the
 6   work?
 7          A.     Well, it was work and they
 8   paid me.  It was work.
 9          Q.     Could you have earned more
10   money if you had worked more hours?
11          A.     In one day?
12          Q.     In other words, if you had
13   asked to work more hours, would they
14   have allowed you to work more hours and
15   make more money?
16          A.     In the way that they paid
17   me, not necessarily.  In the way that I
18   was paid, not necessarily.
19          Q.     Why?
20          A.     Because the more hours I
21   worked, the less they paid me per hour.
22          Q.     But you still would have
23   been getting more money because you
24   would be working more?
```

Ramon Villanueva

```
 1          A.      Yes, but my work would be

 2   worth less, my efforts would be worth

 3   less.

 4          Q.      Do you understand that

 5   that's a lawful way to pay people in the

 6   United States?

 7               MR. TUDDENHAM:  Objection,

 8   calls for a legal conclusion.

 9               MS. BOUCHARD:  I'm just

10   asking if he knows.  I'm not asking --

11               MR. TUDDENHAM:  Well, he's

12   not a lawyer.  If you want to ask him

13   his opinion as a layperson, be my guest.

14               MS. BOUCHARD:  Yes.

15          A.      In my opinion?

16          Q.      Yes.

17          A.      No.

18          Q.      Did you complain at some

19   point about how you were paid?

20          A.      Yes.

21          Q.      And who did you complain to?

22          A.      Well, I believe I did so

23   many times.  So I don't remember the

24   first time, but I believe it was at
```

Ramon Villanueva

```
1    least  on  some  occasions  to  Mike.
2           Q.      And  who  else  did  you
3    complain  to?
4           A.      Well,  I  believe  it  was  to
5    my  manager  --  well,  he  wasn't  my
6    manager,  but  Kevin  Davis.
7           Q.      Who  is  Kevin  Davis?
8           A.      Well,  I  believe  he  was  the
9    manager  of  another  group  of  workers.
10          Q.      Were  they  H-2B  workers?
11          A.      I  don't  think  so.
12          Q.      When  you  complained  to  Mike
13   about  how  you  were  paid,  what  did  he
14   tell  you?
15          A.      Well,  he  said  that  it  was
16   fine  and  he  explained  to  me  once  again
17   the  way  to  be  paid.   And  he  said  if  I
18   wished,  I  could  be  paid  according  to
19   what  this  page  says  but  that  if  I  was
20   paid  the  way  it  says  here,  then  I
21   wouldn't  receive  commissions  or
22   overtime.
23          MR. TUDDENHAM:   And  for  the
24   record,  the  witness  is  indicating
```

Ramon Villanueva

```
1    Exhibit 2.
2    BY MS. BOUCHARD:
3         Q.    So did you decide, based on
4    that conversation, to remain being paid
5    in the same way that you started being
6    paid?
7         A.    Yes, for two reasons:
8    because if I chose to work by the hour,
9    then according to what Mike said, I
10   could only work 40 hours.  And the other
11   reason is that he said it would be fine,
12   that I would make more money, and it was
13   just a question of time.
14        Q.    Were you promised any
15   number of overtime hours in Mexico?
16        A.    No.
17        Q.    You had mentioned another
18   person who I believe it was a field
19   manager.  What did you say to him about
20   how you were being paid?
21             MR. TUDDENHAM:  Objection;
22   form.  For the record, are you talking
23   about?
24   BY MS. BOUCHARD:
```

Ramon Villanueva

```
1          Q.      You mentioned Kevin Davis?
2          A.      (Witness shakes head.).
3          Q.      What did you say to him
4    with respect to your complaints about
5    wages?
6          A.      Well, I asked him if that
7    was all right and whether it was allowed
8    to do that.  And he explained to me once
9    again the pay, the way in which I was
10   paid.
11         Q.      Did anyone in Mexico
12   promise you a certain amount of
13   commissions?
14         A.      No.
15         Q.      Did you strain your back at
16   some point while working for TruGreen?
17         A.      Yes.
18         Q.      And you were paid for
19   that -- oh, let me stop.
20                 You missed a day of work for
21   that?
22         A.      Yes.
23         Q.      And you were paid for that
24   day even though you didn't work;
```

Ramon Villanueva

```
 1   correct?

 2        A.    I don't remember, but it's

 3   probable that, yeah.

 4             But I just want to clarify

 5   something:  That the problem was

 6   actually not the day of work but that as

 7   a result I could not meet my quota of

 8   production.

 9        Q.    Did your injury preclude

10   you from working hours that you wanted

11   to?

12        A.    I'm just referring to that

13   day.

14        Q.    Oh, that day.  So you

15   weren't able to make commissions on that

16   day but you were paid for that day?

17        A.    And, well, as I said

18   before, I suppose so, but I don't

19   remember exactly.

20        Q.    Why did you decide to leave

21   TruGreen?

22        A.    I believe I had many

23   reasons to do so, but the main reason

24   was that I was not receiving what I was
```

Ramon Villanueva

1    told I would receive, what's on this

2    paper.

3          Q.    Which is Exhibit 2?

4          A.    Yes.

5          Q.    Isn't it true that you just

6    stated that Mike said that you could go

7    to this system of compensation if you

8    wanted?

9                MR. TUDDENHAM:    Objection;

10    form.

11          A.    It's true that he told me

12    that, but at that point in time he told

13    me that I would be better off staying

14    with commissions because I could earn

15    more money.

16          Q.    And you chose to stay on

17    the commission plan?

18          A.    Yes.

19          Q.    What other reasons did you

20    decide -- what were the other reasons

21    you decided to leave TruGreen

22    mid-season?

23          A.    My back was not all right,

24    and because I received what you might

Ramon Villanueva

1    call a proposition from Mike that he had

2    to return some of of us to Mexico.

3    Basically that's it.

4         Q.    So you chose to volunteer?

5         A.    Well, if one could call it

6    volunteer, based on all of the bad

7    things involved, yes.

8         Q.    Did other H-2B workers

9    decide to stay?

10        A.    I don't think he offered

11   anyone else to leave.

12        Q.    That wasn't my question,

13   though.  My question was, were you the

14   only H-2B worker that left?

15        A.    As far as I know, yes.

16   Well, I at least returned alone.

17             MS. BOUCHARD:  Do you want

18   to stop so we can do the video?

19             THE VIDEOGRAPHER:  This

20   concludes videotape No. 1 at 12:03.

21             (Recess.)

22             THE VIDEOGRAPHER:  We're

23   back on the record.  This is the

24   beginning of Tape 2.  The time is

Ramon Villanueva

```
 1    12:14.
 2    BY MS. BOUCHARD:
 3           Q.      When you returned to Mexico
 4    in 2004, did you immediately begin
 5    working?
 6           A.      No.
 7           Q.      When did you start working
 8    in 2004, if at all?
 9           A.      If I'm not mistaken, I
10    don't think it was until September.
11           Q.      And what did you do?
12           A.      Give classes.
13           Q.      And what was your hourly
14    wage giving classes?
15           A.      You're going to laugh.
16           Q.      If you could estimate it in
17    American dollars, that would be great.
18           A.      Something like $2.
19           Q.      $2 an hour?
20           A.      (Witness shakes head.)
21           Q.      And about how many hours
22    per week did you work?
23           A.      Somewhere around 50.
24           Q.      On what's marked as
```

64

Ramon Villanueva

1    Exhibit 2 it states "Skills" and it says

2    "valid driver's license, bilingual."

3    Did you have a valid driver's license?

4           A.    Yes.

5           Q.    And are you bilingual?

6           A.    Well, I wouldn't know how

7    to -- I don't believe that I have the

8    ability to evaluate that.

9           Q.    But you presented yourself

10   as bilingual to TruGreen?

11          A.    Well, in reality it wasn't

12   me who made that decision.    It was the

13   person with whom I spoke in Guanajuato.

14   She was asking me some questions in

15   English and that's what she decided,

16   that I was bilingual.

17          MS. BOUCHARD:    Okay.    Thank

18   you.    I don't have any further

19   questions.

20          MR. TUDDENHAM:    We will

21   reserve ours to the time of trial.

22          THE VIDEOGRAPHER:    That

23   concludes today's videotape deposition.

24   The time is 12:19.

Ramon Villanueva

1                    (Witness excused.)

2                    (Whereupon the examination

3        adjourned at 12:19 p.m.)

4                        - - - - - -

Ramon Villanueva

```
1
2              C E R T I F I C A T E
3
4              I hereby certify that the
5    witness was duly sworn by me and that
6    the deposition is a true record of the
7    testimony given by the witness
8              It was requested before
9    completion of the deposition that the
10   witness RAMON VILLANUEVA, have the
11   opportunity to read and sign the
12   deposition transcript.
13
14
15
16
17   ----------------------------
18         Ann V. Kaufmann, RPR, CRR
19
20
21              (The foregoing certification
22   of this transcript does not apply to any
23   reproduction of the same by any means,
24   unless under the direct control and/or
```

Ramon Villanueva

1   supervision of the certifying reporter.)

2          INSTRUCTION TO THE WITNESS

3              Please read your deposition

4   over carefully and make any necessary

5   corrections.  You should state the

6   reason in the appropriate space on the

7   errata sheets for any corrections that

8   are made.

9              After doing so, please sign

10   the errata sheet and date it.

11              You are signing same subject

12   to the changes you have noted on the

13   errata sheet, which will be attached to

14   your deposition.

15              It is imperative that you

16   return the original errata sheet to the

17   deposing attorney within thirty (30)

18   days of receipt of the deposition

19   transcript by you.  If you fail to do

20   so, the deposition transcript may be

21   deemed to be accurate and may be used in

22   court.

23

24

Ramon Villanueva

| 1 | | | |
|---|---|---|---|
| 2 | | - - - - - - | |
| 3 | | E R R A T A | |
| 4 | | - - - - - - | |
| 5 | P A G E | L I N E | C H A N G E |
| 6 | ____ | ____ | _____ |
| 7 | ____ | ____ | _____ |
| 8 | ____ | ____ | _____ |
| 9 | ____ | ____ | _____ |
| 10 | - - - - | - - - - | _____ |
| 11 | ____ | ____ | _____ |
| 12 | ____ | ____ | _____ |
| 13 | ____ | ____ | _____ |
| 14 | ____ | ____ | _____ |
| 15 | ____ | ____ | _____ |
| 16 | ____ | ____ | _____ |
| 17 | ____ | ____ | _____ |
| 18 | ____ | ____ | _____ |
| 19 | ____ | ____ | _____ |
| 20 | ____ | ____ | _____ |
| 21 | ____ | ____ | _____ |
| 22 | ____ | ____ | _____ |
| 23 | ____ | ____ | _____ |
| 24 | ____ | ____ | _____ |

ESQUIRE DEPOSITION SERVICES

Ramon Villanueva

```
 1    ____    ____    _____
 2         ACKNOWLEDGEMENT  OF  DEPONENT
 3              I,  _____, do
 4    hereby  certify  that  I  have  read  the
 5    foregoing  pages,  _____and  that  the
 6    same  is  a  correct  transcription  of  the
 7    answers  given  by  me  to  the  questions
 8    therein  propounded,  except  for  the
 9    corrections  or  changes  in  form  or
10    substance,  if  any,  noted  in  the  attached
11    errata  sheet.
12              _____
13              DATE
14
15    Subscribed  and  sworn  to  me  this  _____
16    day  of  _____,  2005.
17    My  Commission  expires:
18
              _____
19
20
21    _____
              Notary  Public
22
23
24

      ESQUIRE  DEPOSITION  SERVICES
```

70

**A**

ability 64:8
able 27:1 32:11
  60:15
accepted 37:10,19
  39:5 51:1,3
accurate 67:21
ACKNOWLEDG...
  69:2
ACTION 1:3
actual 46:10
address 12:15
adjourned 65:3
advance 45:14
advances 45:11
Affidavit 34:6
affirmative 15:16
agreed 42:22
airline 16:23 17:11
  18:1
airplane 20:4
allowed 26:18 55:14
  59:7
allows 10:15 22:24
Amendment 13:2,14
  13:19 14:15,19
  15:3,14 16:1 19:22
  23:7 31:3,6,13
  32:15 33:7
American 63:17
amount 29:22 37:13
  59:12
Andrea 2:18 5:16
  6:1
and/or 66:24
Angeles 16:20 26:23
Ann 1:15 66:18
answer 3:3 7:16
  8:10 15:16,17 18:5
  23:5 29:8 30:17
  31:14,16 32:11
  33:9 46:20
answered 28:23
answers 19:20 69:7
anymore 17:22
anyway 39:6 51:2
apologies 33:21
apologize 32:21
  35:24 36:10 49:19
APPEARANCES
  2:1
appeared 49:8
applicator 25:12,13
apply 54:12 66:22
appropriate 67:6
Approved 1:16
approximate 33:18
  33:20
approximately 1:15

35:5
April 9:15,21 10:1
  10:21,24 11:11,19
  12:3 26:9,12,15,21
area 46:18
arrived 44:19
aside 35:4
asked 12:23 14:21
  19:15 22:13 28:22
  35:24 45:15,21
  53:17 55:13 59:6
asking 13:21 14:17
  25:10 28:12,19
  29:1,4,5 45:14
  50:14 56:10,10
  64:14
assume 5:13 6:24
assure 53:20
attached 67:13
  69:10
attention 41:5
attorney 5:12 43:4
  67:17
attorneys 7:12 8:5
  52:9,21 53:16
August 12:1,4,8,11
  26:1
a.m 4:11

**B**

back 9:22,21 10:1,3
  11:22 12:5 13:10
  14:11 15:21 19:9
  19:14 20:14 26:20
  26:22 43:9 44:11
  44:24 59:15 61:23
  62:23
background 20:18
  21:6
bad 62:6
Barrington 6:3
based 25:22 49:13
  49:16 58:3 62:6
Basically 62:3
basis 54:10
Bates 40:10 44:12
  49:18
beginning 1:14 20:3
  62:24
believe 10:10 11:23
  14:16 39:13 40:11
  42:15 45:8 54:5
  56:22,24 57:4,8
  58:18 60:22 64:7
Below-described
  25:17 34:1 40:2
  42:1
benefits 47:24
best 43:24
Beth 2:14 5:20

better 61:13
bhenke@morganl...
  2:14
bilingual 64:2,5,10
  64:16
bit 28:9
blanket 45:9
BOCKIUS 2:10,13
bonuses 48:22 49:4
  49:5
border 26:19 27:2
Bouchard 2:10 5:3,4
  5:14 6:12,15 8:3
  8:21 13:3,12,23
  14:20 15:4,9,23
  19:5,9,13 20:10,16
  21:15 22:1,6,18
  24:14,15 25:8,9,16
  25:19 28:2 30:10
  30:16 31:10,17
  32:6,16,22,24
  33:10 34:3 36:7,11
  38:1 40:1,4 41:23
  42:5,7 43:11 46:16
  46:22 49:23 50:4
  50:11 53:7,18,23
  54:7,8 56:9,14
  58:2,24 62:17 63:2
  64:17
bought 45:8
Boulevard 1:22 4:5
box 34:7
Boy 21:1
branches 46:1
break 7:8 13:4
Bridge 6:2
brought 6:17
bunch 52:2
buried 52:2
bus 17:9 33:16 47:3
  47:5

**C**

C 66:2,2
calendar 27:5,6
California 42:17 12:17
  16:17 27:3,15,21
  27:23 28:1
call 28:14 62:1,5
called 8:19 21:9
  28:21
calling 29:6
calls 23:3 56:8
Camac 2:7
Cambridge 2:3
carefully 67:4
case 6:16 36:24
cash 18:12,14,19
  44:10,20
CASTRO 2:5

catch 20:4
cell 29:9
Center 1:23
Centre 2:15
certain 59:12
certification 66:21
Certified 1:16
certify 66:4 69:4
certifying 67:1
CHANGE 68:5
changes 67:12 69:9
charge 35:17
charged 34:14,21
charges 35:7,15
check 34:18
checked 52:6
checks 49:8
chemicals 54:12
CHEMLAWN 1:8
children 20:21
choose 36:20
chose 58:8 61:16
  62:4
CIVIL 1:3
clarified 29:2
clarify 12:2 26:11
  32:2,10,17 36:5
  60:4
clarifying 30:14
classes 21:24 22:3,5
  22:9 63:12,14
clear 31:18
Clements 6:2
client 14:4
code 12:18
come 26:18 27:1
  47:24
coming 21:18 27:12
commission 50:21
  61:17 69:17
commissions 49:1,7
  49:10,12,16 50:15
  57:21 59:13 60:15
  61:14
Commonwealth
  1:17
communicated
  36:12
companies 24:5
companion 35:16
comparing 48:16
compensation 37:11
  37:12 61:7
competent 23:4
complain 56:18,21
  57:3
complained 57:12
complaints 59:4
completion 66:9
concludes 62:20

64:23
conclusion 23:3 56:8
conditions 38:24
conferred 14:9
confused 28:9
connected 44:1
consult 14:3
contract 36:23,23
control 66:24
conversation 28:4
  47:22 48:8 58:4
copies 10:16
copy 10:12,23 42:4
  53:22
corporate 5:12
correct 5:15 16:24
  18:24 26:2 30:22
  31:1 42:22 44:21
  60:1 69:6
corrections 67:5,7
  69:9
cost 17:8,8 29:24
  30:2 33:19,21 38:4
  47:5
costs 18:2 30:5
  31:21 33:4,11
  42:17,24 43:17
  44:2,3 46:5,10,13
counsel 2:9,16 4:19
country 26:1
couple 6:20
courses 22:11
court 1:1,17 4:9 5:8
  5:18,22 7:21 43:12
  43:14 67:22
cover 32:14
covered 53:19
CRR 66:18
Cueramaro 6:8
  12:17 16:6
current 9:6 12:14

**D**

daily 54:10
date 4:10 10:4 67:10
  69:13
dates 27:9
Davis 57:6,7 59:1
day 9:14,16 55:11
  59:20,24 60:6,13
  60:14,16,16 69:16
days 67:18
decide 58:3 60:20
  61:20 62:9
decided 61:21 64:15
decision 64:12
deemed 67:21
defendants 1:9 2:16
  5:21
Defendant's 44:16

**Definitely** 44:7
**Delaware** 1:1 4:10
  30:3 33:12 38:11
  44:14,20 46:18,23
**depended** 54:21
**deponent** 4:17 69:2
**deposing** 67:17
**deposition** 1:12,22
  3:1 4:5,8,12 6:21
  8:7 9:1 14:10 20:5
  64:23 66:6,9,12
  67:3,14,18,20
  69:24
**described** 48:9
**description** 55:3
**designated** 54:23
**Diego** 11:17
**different** 7:20 14:18
  14:21 25:4 31:8,19
  54:14,16,17,19
  55:3
**direct** 31:15 66:24
**DIRECTION** 3:3
**Disclosure** 34:6
**disclosures** 53:19
**discussion** 49:15
**disputing** 43:1,17
**distance** 19:19
**District** 1:1,1,16 4:9
  4:10
**document** 25:17
  26:6,8 34:1 36:2,5
  40:2,7,24 41:20,21
  42:1,9,13 44:12
  50:14,23
**documents** 8:12,15
  29:16 40:21 41:2,8
  41:12,17,20 52:19
  52:24
**doing** 11:10,12
  29:14 39:4 67:9
**dollars** 63:17
**drive** 54:24
**driver's** 64:2,3
**duly** 6:3,9 66:5
**d/b/a** 1:8

**E**
**E** 66:2,2 68:3
**earn** 12:19 48:11,22
  50:16,22 61:14
**earned** 45:22 55:9
**easy** 41:15
**Ed** 42:6
**educational** 21:5
**Edward** 2:2 4:21
**efforts** 56:2
**Electricity** 35:11
**employed** 4:4
**employee** 36:17 37:1

**employer** 30:4,8
  31:20 32:2 33:1,3
  34:5
**employment** 38:24
**English** 64:15
**enjoy** 55:5
**entailed** 38:21
**entered** 25:24
**entirely** 34:16,19
  52:23
**entitle** 9:9
**entitled** 13:21 14:17
  15:2
**errata** 67:7,10,13,16
  69:11
**Esquire** 1:22 2:2,5,6
  2:10,14 4:4 69:24
**estimate** 63:16
**etudden@io.com**
  2:2
**evaluate** 64:8
**Everybody** 41:6
**evidence** 11:6
**exactly** 22:12 27:9
  29:22 33:14 39:3
  60:19
**examination** 6:11
  65:2
**examined** 6:5,9
**Excuse** 8:2,20 30:7
**excused** 65:1
**exhibit** 25:18 34:2,5
  36:8 37:24 40:3,6
  41:24 42:2,10
  44:16 50:1,2,4,8
  50:10,13 58:1 61:3
  64:1
**exist** 54:4
**expect** 25:3
**expenses** 29:18
  43:22
**expires** 9:11 69:17
**explained** 20:2
  57:16 59:8
**E-94** 10:11,13,14,20
  10:24

**F**
**F** 1:22 66:2
**facility** 39:9
**fact** 16:13 17:17
  34:14 41:5
**fail** 67:19
**far** 34:24 39:11
  45:23 62:15
**February** 26:18
  27:10
**field** 58:18
**Fifth** 13:2,14,19
  14:15,19 15:3,13

**15:24 19:22 23:6
  31:3,6,13,24 32:7
  32:14 33:7
**Finally** 7:19
**find** 20:8
**fine** 7:11,18 9:2
  57:16 58:11
**finished** 7:15
**first** 9:20 42:12 54:3
  55:1 56:24
**five** 21:7 39:21
**flight** 17:3
**Floor** 1:14,23 2:15
**following** 19:11
**follows** 6:5,10 43:15
**food** 33:24 45:5
**foregoing** 66:21
  69:5
**form** 10:10,11,13
  18:4 25:21,22
  26:14 45:18 47:11
  47:19 52:16 58:22
  61:10 69:9
**forth** 6:19
**found** 53:21
**foundation** 32:5,19
  32:23 33:6
**foundational** 32:7
**four** 1:23 31:4
**Fraccion** 6:7 12:16
**friend** 28:10,12
**friends** 12:13 29:12
**further** 64:18

**G**
**game** 31:7
**gestures** 7:6
**getting** 49:4,9 55:23
**girl** 21:1,2
**give** 10:10 23:4
  36:22 63:12
**given** 19:20,21
  25:23 40:19 66:7
  69:7
**giving** 21:24 22:4
  39:24 63:14
**go** 16:13 19:9 20:7
  26:19 27:1 44:11
  54:15 61:6
**going** 6:19,24 15:7
  19:13,23 20:17
  27:13 31:15 32:12
  36:22 38:7 41:23
  47:16,21 63:15
**Gonzales** 2:5,6 5:1,2
  14:8
**Good** 4:1 6:13,18
**grass** 54:13
**great** 20:12 63:17
**ground** 6:20

**group** 57:9
**Guadalajara** 21:10
**Guanajuato** 6:8
  12:17 29:23 64:13
**guaranteed** 51:11
**guest** 56:13

**H**
**hand** 5:19
**handwriting** 42:9
**happen** 20:11
**happy** 20:9
**head** 59:2 63:20
**held** 1:13 4:13
**Henke** 2:14 5:20,20
**high** 22:8
**highest** 24:1
**Hoffman** 2:21 4:3
**home** 12:14 16:13
  17:3,12 18:2 30:2
**homes** 54:14,16
**hour** 55:21 58:8
  63:19
**hourly** 51:9 63:13
**hours** 13:24 14:22
  14:23 15:11 16:1
  51:18,20 53:11
  55:10,13,14,20
  58:10,15 60:10
  63:21
**housing** 46:5
**H-2B** 21:11,14
  22:20 29:19 39:19
  46:1 48:8 57:10
  62:8,14

**I**
**idea** 33:24 50:7
**identified** 42:18
**immediately** 63:4
**immigration** 9:7
**imperative** 67:15
**include** 24:3 35:1
**incur** 18:2 29:18
**independently** 51:17
  51:19
**INDEX** 3:1
**indicated** 19:17
**indicating** 37:23
  57:24
**Individually** 1:3
**INFORMATION**
  3:7
**injury** 60:9
**instruct** 7:16
**INSTRUCTION**
  67:2
**intending** 29:10
**interested** 23:21
  24:8 54:6

**interpreter** 2:18
  5:16,17 6:2 8:2,20
  12:23 21:13 22:4
  25:13 27:17,24
  46:19 47:12 50:6
  52:22
**interrupted** 32:18
**introduce** 4:20
**invoke** 15:2,7
**invoked** 14:14 33:6
**invokes** 15:14 31:5
**invoking** 15:5 31:24
  32:14
**involved** 9:3 62:7
**involving** 33:8
**I-9** 19:15
**I-94** 20:8 25:21,22
  26:5 49:22

**J**
**J** 2:6
**Jason** 2:21 4:3
**JFK** 4:5
**Jim** 39:17
**job** 25:12 36:13 39:2
  39:5 43:20 44:5
  48:13 55:3
**jobs** 24:8
**John** 1:22
**junior** 22:8

**K**
**Kaufmann** 1:15
  66:18
**keep** 13:21 14:17
  31:7 51:17,19
**Kennedy** 1:22
**Kevin** 57:6,7 59:1
**knew** 24:7 37:20
**know** 7:9 8:8,10,17
  8:19,24 23:19
  24:16 29:13 34:17
  36:15 37:5 38:5,6
  38:20,23 39:3,11
  39:17 41:1 45:19
  45:20,23,24 46:4,7
  46:8,9,11 47:4,20
  47:21 49:2 51:24
  52:3 55:4 62:15
  64:6
**knowing** 39:13
**knows** 56:10

**L**
**L** 2:5
**labor** 25:7
**laborer** 25:1,6,12
  48:17
**language** 51:13
**laugh** 63:15

law 1:13 7:21
lawful 14:23 15:12
    56:5
lawfully 19:16
lawns 54:13
lawsuit 9:4 43:2,18
    52:5,9
lawyer 56:12
layperson 56:13
learn 23:8,20 38:8
    47:15
learning 24:21
leave 12:5 60:20
    61:21 62:11
leaving 16:14,17
left 16:22 18:23
    52:11,18 62:14
legal 23:3 56:8
legally 22:24
Let's 19:9 24:9
Lewis 1:13 2:10,13
    4:13
license 64:2,3
Limited 1:7 4:15
Line 3:4,8 68:5
Lisa 16:19 28:4,11
    28:12,19,20,22,24
    29:11
list 24:2,3 36:21
    43:23
little 19:3
live 11:16
LLP 1:13 2:10,13
LLS 23:15 36:17
local 35:20,21
long 7:9 9:9 22:10
longer 17:21
looking 29:3 50:8
Los 16:20 26:22
lost 52:23

––––– M –––––
M 2:14
MA 2:3
main 60:23
manager 57:5,6,9
    58:19
manual 25:7
March 27:4,7,11,15
    28:5
marital 20:19
Mark 25:16
marked 25:18 34:2
    34:4 40:3,5 41:13
    42:2,10 49:17
    63:24
Market 1:14 2:11
married 20:20
Matejik 2:20 5:5,6
    5:11 39:14

Math 22:8
matter 4:14
McHugh 16:19 28:4
    28:19,20
mean 15:10,15 17:5
    22:2,17 31:5 32:5
    33:20 35:8 45:16
means 7:4 66:23
meant 35:9
medications 7:23
meet 60:7
mentioned 41:18
    58:17 59:1
Mesquite 6:7 12:16
messed 49:21
met 39:21
Mexico 6:8 9:20,22
    10:2 11:23 12:5,18
    16:7,13 17:3,12,18
    20:4 21:22 23:11
    26:21 30:6,21
    33:12 36:13 37:2
    38:15 41:9,11,17
    44:6,14 50:22 52:3
    52:6,10,14,18 53:3
    53:14 54:1,4 58:15
    59:11 62:2 63:3
Michael 2:20 5:5
midway 18:23
mid-season 61:22
Mike 18:15 39:14
    45:11,15,21 47:3
    47:23 48:4,8 57:1
    57:12 58:9 61:6
    62:1
mine 8:17 28:11,13
missed 59:20
mistaken 23:14
    26:16 28:16 63:9
moment 14:4 45:5
money 12:20 44:5
    44:24 45:3,21
    48:11 55:10,15,23
    58:12 61:15
month 9:12 27:6
    34:7 35:6
months 9:18
Morgan 1:13 2:10
    2:13 4:13
morning 4:2 6:13,18
    50:3

––––– N –––––
name 4:3 6:14 23:13
    23:19 28:11
names 24:4
necessarily 25:2
    55:17,18
necessary 67:4
need 6:22 7:3,8 15:9

32:4
needed 45:16
negative 15:17
neither 15:16
never 44:23
NJ 6:3
normally 40:20
Notary 1:17 69:21
noted 67:12 69:10
number 50:5,8
    53:11 58:15
numbered 40:10
    49:18
numbers 29:22
    33:14 39:24 50:1,2

––––– O –––––
oath 7:19
object 7:13 14:14
objecting 7:14,15
objection 13:18 14:3
    18:3 23:2 30:8,13
    31:2 33:5,6 45:17
    47:10,18 52:15
    56:7 58:21 61:9
obtaining 29:19
occasions 17:14
October 1:11 4:11
    11:24
offer 36:12 37:10
offered 62:10
office 23:10,17
    28:22 29:23 36:15
    39:12 44:1 47:2
offices 1:13 29:7
office's 23:13
oh 13:1 35:12 36:9
    42:5 59:19 60:14
okay 7:12 9:2 22:7
    23:16 24:10,14
    25:8 26:13 39:14
    51:9,15 53:23 54:7
    55:5 64:17
old 21:3
once 7:14 37:15
    57:16 59:8
ones 8:14,17 36:22
    41:13,18
opinion 56:13,15
opportunities 38:16
opportunity 23:9
    44:5 48:10 66:11
Oral 1:12
original 67:16
outside 14:9
overtime 37:11,18
    57:22 58:15
Oxford 2:15

––––– P –––––

PA 2:8,15
page 3:4,8 40:11
    51:7,8,10 57:19
    68:5
pages 40:8 69:5
paid 17:2,7,24 31:20
    33:14,23 35:5,20
    35:22 37:14 42:23
    46:5,12 55:8,16,18
    55:21 56:19 57:13
    57:17,18,20 58:4,6
    58:20 59:10,18,23
    60:16
paper 37:21 51:20
    51:23 53:10,10,13
    61:23
papers 52:2,14
Paragraph 42:17,18
ParaPlus 2:19
pardon 8:18 11:24
part 17:4,5 18:6,11
    52:5
particular 41:6
particularly 19:20
Partners 1:7 4:16
pass 47:5
passes 47:3
passport 10:5,8
pay 18:10 30:5 33:3
    35:4,14,18 37:18
    37:18 38:12 41:5
    42:22 43:21 44:3
    46:1 56:5 59:9
paycheck 18:8
pending 7:10 43:13
Penn 1:23
Pennsylvania 1:14
    1:17,23 2:12 4:6
    4:14
people 24:7,17 43:24
    56:5
permit 9:11,21
person 18:16 22:16
    29:3,4 36:14 38:19
    38:22 39:1 55:2
    58:18 64:13
Peter 2:6 5:1
pgonzales@rcgla...
    2:7
Philadelphia 1:14
    1:23 2:8,12 4:6,13
phone 28:5,14 29:9
    35:13,15,21
pickup 54:20
piece 51:20 53:9
pieces 51:23 53:10
    53:13
Pittsburgh 2:15
place 14:23 15:12
    19:11 46:24 47:1

places 54:17,19
plaintiff 1:5 2:9 4:22
    4:24 5:2
plan 61:17
plane 18:6,11
please 4:19 12:24
    30:18 67:3,9
point 38:8 56:19
    59:16 61:12
posed 7:2
position 23:21 24:21
    24:22 25:1 47:16
    47:21,23 48:10,11
    48:15,15,17,18
    49:1 51:2
positions 21:12,15
    22:21
possession 10:18
possible 19:3
potentially 50:15
practically 47:1
preclude 60:9
prepare 8:6
present 2:17 4:19
    48:9
presented 44:13
    64:9
previously 25:23
    37:6 41:18
prior 21:12,18,22
probable 60:3
problem 60:5
produced 52:7
    53:16
production 3:6
    49:14,16 60:8
Professional 1:15
promise 59:12
promised 58:14
promoted 38:17
proposition 62:1
propounded 69:8
provide 18:13,20
    38:3
provided 16:23
    17:11,15
providing 25:20
Public 1:17 69:21
purpose 11:13
p.m 65:3

––––– Q –––––
question 7:1,10,13
    13:15,20,22 14:16
    14:17,20 15:5,7
    16:4,12 22:14 24:9
    25:6,21 30:15,19
    31:4,8,11,16,18,23
    32:8,12,13,18,22
    37:16 43:12,16

44:10 49:3 51:12
53:8,9 58:13 62:12
62:13
**questions** 6:23 20:18
33:7 53:6 64:14,19
69:7
**quickly** 44:8
**quite** 48:2
**quota** 60:7

**R**
**R** 66:2 68:3,3
**raise** 5:19
**Ramon** 1:3,13 4:14
4:17 6:6 66:10
**Rapposelli** 2:5,5
4:23 13:5 14:8
27:20 44:15
**Rappposelli** 4:24
**rate** 51:9
**read** 40:12,16,18,21
40:24 41:9 42:13
43:14 66:11 67:3
69:4
**reality** 64:11
**really** 49:2
**Realtime** 1:16
**reason** 58:11 60:23
67:6
**reasons** 58:7 60:23
61:19,20
**recall** 48:7,16,21
49:4,9
**receipt** 67:18
**receive** 44:9 45:10
57:21 61:1
**received** 26:9 44:20
61:24
**receiving** 60:24
**Recess** 13:9 15:20
19:8 20:13 43:8
62:21
**recognize** 40:13
41:4
**record** 4:2,20 5:11
7:14 13:11 14:12
14:14 15:22 19:10
19:12,14,14 20:15
25:6 37:23 43:10
43:13,15 49:21
50:5,13 57:24
58:22 62:23 66:6
**records** 52:6
**recruiting** 23:10,12
23:17
**refer** 51:13
**reference** 44:16
**referencing** 44:17
**referred** 36:6
**referring** 36:7 39:2

49:7 50:12 51:6
52:17 60:12
**reflect** 26:5
**reflects** 50:14
**Regal** 2:18 5:17 6:1
**regard** 24:23
**Registered** 1:15
**related** 52:8
**remain** 58:4
**remainder** 17:7
**remember** 8:22 9:14
9:15 10:4 16:21
22:12 23:18 24:5
25:11,15 27:9,12
28:3 29:21 33:13
40:14,15,17,18,19
41:15 48:12,14,20
48:24 49:13 56:23
60:2,19
**rent** 34:7,14,21,24
35:6 47:9,12
**rep** 5:12
**repay** 44:23
**repeat** 12:24 30:18
43:12
**rephrase** 24:12
**reporter** 1:16,16,16
5:8,18,23 7:21
43:12,14 67:1
**reproduction** 66:23
**REQUEST** 3:6
**requested** 19:19
66:8
**requesting** 19:24
**reserve** 64:21
**respect** 13:14 14:15
16:1 19:21 59:4
**responses** 7:4,5
**responsibility** 42:19
**result** 60:7
**retain** 10:23
**retrospect** 40:24
**return** 10:1 17:3,17
62:2 67:16
**returned** 9:20 62:16
63:3
**review** 8:11
**reviewed** 52:19 53:1
53:2
**reviewing** 8:22
**right** 5:19 14:19
15:3,14 19:16,23
20:9 32:15 35:12
59:7 61:23
**Road** 2:3 6:2
**room** 14:10
**RPR** 66:18
**rules** 6:20
**run** 6:21
**RV** 49:23

**RV-1** 49:17,22
**RV-2** 44:13

**S**
**salary** 23:22,24
43:24 51:4,5,11,14
**San** 11:17
**Sarah** 2:10 5:3 6:14
19:2 20:2 31:5
32:9 36:4 49:20,24
53:21
**saw** 8:15
**saying** 18:7 24:12,13
**says** 34:10 51:8
57:19,20 64:1
**sbouchard@morg...**
2:11
**school** 22:8
**season** 18:24
**see** 27:5 34:6,10
42:12 44:4 51:9,10
**seeing** 54:6
**seen** 8:16
**separate** 39:24
**separately** 35:15,18
**September** 63:10
**service** 35:20,22
**Services** 1:22 4:5
69:24
**set** 6:19
**shakes** 59:2 63:20
**sheet** 67:10,13,16
69:11
**sheets** 67:7
**show** 8:23 10:6
19:15 34:18
**showed** 24:2
**sic** 10:11
**sign** 40:20 66:11
67:9
**signature** 36:1,9
**signed** 41:3,7,10,17
41:22 50:23
**signing** 40:12 41:7
42:14 67:11
**similarly** 1:4
**sitting** 18:16
**situated** 1:4
**six** 9:18
**Skills** 64:1
**smoothly** 6:22
**sooner** 45:16,21
**sorry** 12:1 27:18
37:15 41:14 42:6
46:20 52:23
**South** 2:7
**space** 67:6
**Spanish** 2:18 6:1
51:13
**speak** 8:9 23:16 43:3

48:3
**speaking** 48:24
**specialist** 47:17,23
48:1,10,17,23 49:2
**specifically** 7:16
**spend** 20:6
**spoke** 38:22 39:1
52:21 64:13
**stamped** 44:13
**stamps** 10:5,9
**start** 29:4 63:7
**started** 50:2 58:5
**state** 67:5
**stated** 52:12 61:6
**states** 1:1 4:9 9:10
11:8,11,20 13:17
16:10 19:16 21:18
21:19 22:15 23:1
26:22 29:20 30:21
31:1,21 33:2,8
56:6 64:1
**status** 9:7 20:19
**stay** 61:16 62:9
**staying** 61:13
**STIPULATIONS**
3:10
**stop** 59:19 62:18
**strain** 59:15
**Street** 1:14 2:7,11
**strike** 24:9 44:10
**subject** 67:11
**Subscribed** 69:15
**substance** 69:10
**suggest** 53:24
**suitcase** 10:19 11:4
19:18
**Suite** 4:6
**supervision** 67:1
**supervisor** 39:15
**SUPPORT** 3:1
**suppose** 35:3 39:22
60:18
**supposed** 48:5,6
**sure** 13:5,6 19:5
31:22 43:5 49:17
52:1,4,7
**swear** 5:8,23
**sworn** 6:4,9 66:5
69:15
**system** 61:7

**T**
**T** 66:2,2 68:3
**take** 6:15 7:9 13:3
29:16 43:20 47:16
**taken** 31:3,12
**talk** 28:7 29:11
**talked** 8:5 37:3
**talking** 28:18 30:9
32:3,10 46:17

48:21 58:22
**tape** 13:7 14:5 15:18
19:6 43:6 62:24
**teach** 22:7,10
**teaching** 22:5
**tell** 8:18 16:19 20:1
41:1 50:9 51:24
52:3 57:14
**telling** 8:4 48:13
**terms** 38:23
**testified** 6:5,10
**testimony** 6:4,16
25:22,24 54:1 66:7
**Thank** 25:20 51:15
64:17
**thing** 8:9 9:19 26:13
27:8,11 41:12
**things** 62:7
**think** 9:12 10:3,9
11:24 13:20 18:21
22:13 28:15 29:23
33:22 34:23 35:23
38:10 40:23 42:15
48:19 49:6 51:12
52:13 53:5 57:11
62:10 63:10
**third** 40:11
**thirty** 67:17
**thought** 28:10,17,24
**three** 31:4 40:7
**three-page** 40:6
**ticket** 16:24 17:8,11
17:14,18 18:1,6,11
**tickets** 33:15,16
**time** 4:11 9:20 16:10
20:6 23:24 24:20
56:24 58:13 61:22
62:24 64:21,24
**times** 11:7 31:4
56:23
**title** 25:11 34:5
**today** 4:19 6:16,21
7:24 10:18
**today's** 4:10 8:6
64:23
**told** 23:23 37:9,17
38:15,19 61:1,11
61:12
**totally** 49:21
**tourist** 9:8,18,24
**track** 51:18,19
**tracked** 53:11
**transcript** 66:12,22
67:19,20
**transcription** 69:6
**translate** 6:4
**translated** 25:7
**Translations** 2:19
**translator** 22:2
**transportation** 18:1

30:2,5 31:20 33:4
35:2,7 46:10,12
47:9,13
**travel** 12:3,7 33:11
**traveling** 29:19
30:20
**trial** 64:21
**trick** 14:18 31:8
**trip** 11:18 17:12
**truck** 54:20,21
**true** 16:16 17:10
26:3 34:13,20 37:4
37:8 45:1 61:5,11
66:6
**TruGreen** 1:7,7,8
2:20 4:15,16 5:4,6
6:17 16:14,17,22
17:10,21,24 21:12
21:19,23 22:16,21
23:1,9 24:8,18
29:16,20 35:21,22
36:13,24 37:2,7
38:3,17 39:8 40:10
43:21 44:4 46:1,4
46:11 47:17 53:12
54:11 59:16 60:21
61:21 64:10
**TruGreen's** 29:7
38:24 54:21
**truly** 53:19
**try** 14:18 30:14
**trying** 31:7 32:17
**Tuddenham** 2:2
4:21,22 5:10 13:6
13:18 14:2,7,13
15:1,6,13 18:3
19:2 20:1,12 22:17
23:2 24:11 25:5
27:14,22 30:7,13
31:2,12 32:1,9,20
33:5 36:4 37:22
39:23 42:3 45:17
46:14 47:10,18
49:20,24 52:15
53:4,20 54:2 56:7
56:11 57:23 58:21
61:9 64:20
**turned** 21:4
**two** 28:7 41:16,20
58:7
**type** 21:21 54:9

___ **U** ___
**uncle** 11:15,16 12:12
**undercharged** 47:8
**underneath** 52:14
**understand** 6:23 7:7
7:22 19:18 24:22
24:24 25:23 34:24
36:16 38:2 42:16

48:3 56:4
**understanding** 26:4
26:24 50:21 53:5
**understood** 7:1
**uniform** 38:3,7,9,13
**United** 1:1 4:9 9:10
11:8,11,20 13:17
16:9 19:16 21:18
21:19 22:15 23:1
26:22 29:20 30:21
31:1,21 33:2,8
56:6
**university** 21:7,8,10
**use** 45:2 50:1
**utilities** 34:7,15,22
35:2,6,9,10 47:9
**U.S** 1:16

___ **V** ___
**V** 1:15 66:18
**Vacchiano** 39:17
**vague** 32:13
**valid** 64:2,3
**Valley** 46:23
**verbalize** 7:3,5
**versus** 4:15
**video** 4:8 19:12
62:18
**videographer** 2:21
4:1,4 5:7,22 13:7
13:10 14:5,11
15:18,21 19:6
20:14 43:6,9 62:19
62:22 64:22
**videotape** 62:20
64:23
**Videotaped** 1:12
**Villanueva** 13,13
4:15,18 6:6,14
13:13 20:17 25:18
34:2 40:3 42:2,8
66:10
**visa** 9:18 10:1 12:3,8
22:24 29:19 30:1
**visit** 10:24 11:14,15
**visiting** 12:10
**visits** 11:20
**Vivian** 2:5 4:23
**volunteer** 62:4,6
**vrapposelli@rcgla...**
2:6
**vs** 1:6

___ **W** ___
**wage** 63:14
**wages** 59:5
**waiving** 14:19
**walk** 20:7
**walking** 19:19

**want** 31:18,22 56:12
60:4 62:17
**wanted** 17:21 29:13
45:3 60:10 61:8
**warmer** 19:3
**wasn't** 34:19 35:18
57:5 62:12 64:11
**way** 18:2,8 31:8
55:16,17 56:5
57:17,20 58:5 59:9
**ways** 14:18
**week** 34:21 63:22
**welcome** 51:16
**went** 9:22 10:3
11:22 16:16 26:20
47:1,2
**weren't** 60:15
**we're** 4:2 19:13
29:12 62:22
**Wilmington** 39:10
**wished** 57:18
**witness** 3:3 5:9,23
12:24 13:1 14:9
30:12 37:23 53:5
57:24 59:2 63:20
65:1 66:5,7,10
67:2
**woman** 23:19 28:23
**words** 7:5 46:11
55:12
**work** 12:21 13:24
14:24 15:11 16:5,9
17:21 21:21 22:15
22:23,24 23:9
29:20 33:8 54:9
55:6,7,8,13,14
56:1 58:8,10 59:20
59:24 60:6 63:22
**worked** 14:22 16:2
21:17 24:17 30:11
33:2 37:6 39:9,12
53:12 55:10,21
**worker** 54:24 62:14
**workers** 39:19 45:21
46:2 48:9 57:9,10
62:8
**working** 13:15,17
21:22 30:24 46:18
48:1 55:24 59:16
60:10 63:5,7
**worth** 56:2,2
**wouldn't** 8:17 34:17
51:24 52:3 57:21
64:6

___ **Y** ___
**yeah** 51:18 60:3
**year** 10:7 11:8,20
12:20 13:17 14:1
16:5 27:4 28:5

**years** 21:7

___ **Z** ___
**Zip** 12:18

___ **$** ___
**$150** 44:9,20 45:13
**$170** 33:23
**$2** 63:18,19
**$240** 35:6
**$373** 34:11,14
**$60** 34:21
**$75** 18:22

___ **0** ___
**02140** 2:3
**06-185** 1:9
**08007** 6:3

___ **1** ___
**1** 25:18 41:13 62:20
**10:00** 14:12
**10:02** 15:19
**10:03** 15:22
**10:09** 19:7
**10:37** 20:15
**11:25** 43:7
**11:27** 43:10
**12** 3:4
**12th** 1:14,23
**12:03** 62:20
**12:14** 63:1
**12:19** 64:24 65:3
**1210** 4:6
**15** 40:11
**153** 2:3
**155** 29:24
**1600** 1:22 4:5
**1701** 1:13 2:11
**19** 3:8
**19103** 1:14,23 2:12
4:7
**19107** 2:8

___ **2** ___
**2** 34:2,5 36:8 37:24
41:13,14 50:10,13
58:1 61:3 62:24
64:1
**2:30** 20:5,7
**200** 30:1
**2004** 16:12,20 18:24
22:18 33:12 63:4,8
**2005** 16:5,10 69:16
**2006** 1:11 4:11
13:16 14:22 16:2
30:4,9,11,22 31:1
31:20 33:4,9
**215** 1:24
**215-963-5000** 2:12

**251** 2:7
**26th** 26:17
**267** 2:8

___ **3** ___
**3** 40:3,6
**30** 67:17
**318** 6:7 12:16
**32** 3:4
**32nd** 2:15
**322-6776** 2:8
**36960** 6:8 12:18

___ **4** ___
**4** 21:4 41:24 42:2,10
44:16
**40** 58:10
**412** 2:16
**430** 6:2

___ **5** ___
**5** 1:11 4:11
**50** 63:23
**53** 3:8
**560-3300** 2:16
**576-2182** 2:4

___ **6** ___
**6th** 9:12
**617** 2:4

___ **7** ___
**7** 42:18

___ **8** ___
**8** 42:17

___ **9** ___
**9:29** 1:15 4:11
**9:45** 13:8
**9:58** 13:11
**9:59** 14:6
**988-9191** 1:24

Número de salida

0 7 4 7 8 2 7 4 0 1 2

Servicio de Inmigración
y Naturalización
I-94
Registro de Salida

ADMITTED
APR 0 9 2006
Class B-2
Until
OCT 0 7 2006

14. Apellido
V I L L A N U E V A
15. Nombre
R A M O N
16. Fecha de nacimiento (día/mes/año)
2 J 10 J 7 J 8
17. Ciudadanía
M E X I C A N

Vea al reverso

STAPLE HERE

---

**Aviso:** Si una persona no inmigrante acepta empleo sin autorización está sujeta a deportación.
**Importante:** Guarde este permiso en su poder; *lo debe presentar al salir de los E.U.A.* El no
hacerlo podrá demorar su entrada en el futuro a los E.U.A.
Usted está autorizado a permanecer en los E.U.A. solamente hasta la fecha indicada en este
formulario. Si permanece en los E.U.A. sin permiso de las autoridades de inmigración
después de esta fecha estará violando las leyes.
Presente este permiso al salir de los Estados Unidos a:
   - la línea de transporte marítimo o aéreo;
   - un oficial canadiense, al cruzar la frontera con el Canadá;
   - un oficial estadounidense, al cruzar la frontera con Méjico.
Los estudiantes que planean volver a entrar a los E.U.A. dentro de los 30 días siguientes a la
fecha de salida para regresar a la misma institución educativa, deben ver la sección de
"Entrada-Salida" en la página 2 del formulario I-20, antes de entregar este permiso.

**Record of Changes**

---
---
---
---

**Port:**                                              **Departure Record**

**Date:**

**Carrier:**

**Flight#/Ship Name:**

I-94 SPANISH

---

Villanueva

EXHIBIT NO. 1

AMC 10/5/06

LLS International                                                    Página 1 de 1

# Employer Disclosure Affidavit
## for Company: Tru-Green Chemlawn (Newport)
### Order Dated: 9/29/2003 9:52:52 AM

view premium rates
view Spanish form
close this window

| | |
|---|---|
| Name of Sponsoring H-2B company | Tru-Green Chemlawn (Newport) |
| Address: | 1350 1st State Blvd , Newport, DE 19804 |
| Office Phone: | 302-992-9680 |
| Fax Phone: | 302-633-9428 |
| Mobile Phone: | 302-420-8335 |
| Home or Other Phone: | 302-376-8186 |
| Contact Name: | Mike A Matejik |
| Contact Title: | Branch Manager |

## Work Information

Occupation Title:                    Pesticide Handlers, Sprayers, and Applicators, Vegetation

Occupation Description:
Apply pesticides, herbicides, fungicides, or insecticides to lawns using sprayers, seeders, spreaders, aerators

Employment Start Date:            3/16/2004  End Date: 11/15/2004

List the tasks and skills
needed to perform the work.

Education: none

Experience: lawn fertilization very helpful

Skills: valid driver's license; bilingual

| | |
|---|---|
| Starting wage offered (if different from prevailing wage): | $11 34  O.T. Rate: $17 01 |
| Average hours of work per week: | 40 |
| Rent and utilities per month: | 373 |
| Transportation charge per month (if applicable): | 32 |
| Other charges to worker per month (if any): | |
| Comments/Instructions for worker: | Workers will receive commission based on production level |
| Day and place paycheck is distributed: | Friday |

Will the employer guarantee to supply training if the employee does not have the required skills? YES

Signature of Employee: _Ramon Villanueva_          Date: _02/20/04_

Villanueva
EXHIBIT NO. 2
AMc 10/5/06

RV-0001

lismt com/lls/hsvs2/formC eda.asp?S=NKBJNWLOJI22020047242&CUSTID=623&ORD    20/02/2004

**TRUGREEN**
**ACUERDO DE CONFIDENCIALIDAD DEL EMPLEADO**

TruGreen Limited Partnership (de aquí en adelante, "TruGreen") ha invertido considerable tiempo, dinero, y esfuerzos en el desarrollo de sus productos, equipos, programa de comercialización y otros sistemas y materiales de negocios, y en el reclutamiento y entrenamiento de sus empleados. TruGreen es propietaria y tienen un interés de propiedad valiosa en sus diversos productos, servicios, procedimientos, y sistemas (Información Confidencial de Negocios). Como empleado de TruGreen, usted tendrá acceso a la Información Confidencial de Negocios, incluyendo la información relativa a la investigación, productos, entrenamiento, administración, comercialización, y ventas.

Es importante que cada empleado reconozca y acepte que la Información Confidencial de Negocios, según exista de tiempo en tiempo, es un patrimonio valioso, especial, y único de TruGreen, y que TruGreen sufriría graves perdidas si dicha información fuese divulgada o apropiada indebidamente. El propósito de este documento es explicar ciertas obligaciones y responsabilidades legales aplicables a cada empleado con respecto a la Información Confidencial de Negocios de TruGreen, y obtener os acuerdo de cumplir estas obligaciones y responsabilidades.

Pan proteger a TruGreen y a su información de propiedad exclusiva, me comprometo a lo siguiente:

A. Me comprometo a, durante y después de mi empleo en TruGreen, no divulgar, copiar, usar, retirar, ni usar en mi beneficio propio o en beneficio de otros la Información Confidencial de Negocios de TruGreen (incluyendo, de forma no exhaustiva, su administración, manuales de comercialización y ventas, materiales de entrenamiento, listas de clientes, legajos de clientes, tarjetas de ventas, y tarjetas de servicio) que yo tenga o haya obtenido por medio de mi empleo en TruGreen.
B. No solicitaré ni alentaré, directa o indirectamente, a ningún empleado de TruGreen a alejarse o terminar su empleo en TruGreen.
C. Autorizo a TruGreen, durante mi empleo y durante un periodo posterior razonable, a usar cualquier nombre o fotografía en los materiales impresos u otras comunicaciones distribuidas por TruGreen con fines publicitarios y promocionales.
D. Notificaré a TruGreen rápidamente de todas las invenciones, mejoras, descubrimientos, y métodos que tengan relación con, o sean de utilidad para cualquier negocio de TruGreen, ahora o en el futuro, que yo haga o descubra mientras sea empleado de TruGreen. Cederé a TruGreen todos los derechos, títulos, e intereses en dichas invenciones, mejoras, descubrimientos, y métodos, y cualesquiera patentes o solicitudes de patentes relacionadas que tengan que ver con negocios que TruGreen esté realizando, o pueda razonablemente esperarse que realice, o que haya expresado previamente su intención de realizar.

En caso de una violación o amenaza de violación por mi parte de cualquier provisión de este acuerdo, los daños que TruGreen podría sufrir pueden ser difíciles o imposibles de evaluar, por lo cual TruGreen tendrá derecho a un mandamiento judicial que me impida usar o divulgar la información Confidencial de Negocios de TruGreen. Nada de lo aquí contenido se interpretará como una prohibición a TruGreen de buscar otros remedios que tenga disponibles para dicha violación o amenaza de violación, incluyendo, en forma no exhaustiva, el recobro de daños de mi por una cantidad igual a los ingresos ganados por medio o gracias a la violación.

Entiendo que este Acuerdo solo podrá ser modificado por escrito, y ello sólo por ci Presidente de TruGreen, y que ningún otro gerente o representante tiene ninguna autoridad para establecer ningún acuerdo de empleo por un periodo especificado, ni de hacer ningún acuerdo contrario al que antecede. Entiendo además, y acepto, que la consideración para firmar este Acuerdo es mi empleo y/o continuación de empleo en TruGreen, y que mi empleo puede terminarse, con o sin causa y con o sin aviso, en cualquier momento, tanto por TruGreen como por mi.
Entiendo también y acepto que pagaré los honorarios razonables de abogados y los costos judiciales incurridos por TruGreen como consecuencia de cualquier demanda judicial iniciada por TruGreen para hacer valer los términos de este Acuerdo. La validez o la posibilidad de hacer cumplir una provisión dada no afectará la validez o la posibilidad de hacer cumplir ninguna otra provisión de este Acuerdo.

_03/30/04_

RAMON VILLANUEVA BAZALPUR

TruGreen Limited Partnership
Por:    TruGreen, Inc. (su Socio General)

Por: _Yolanda Miller_

Nombre y cargo en imprenta: _Yolanda Miller  BCC_

Fecha: _3/19/04_

TH SPAN.3/2001

TU SPAN. 5/99

VILLANUEVA
EXHIBIT NO. _3_
AM 10/5/06

TRU0013

414434102 90

| Form **8850** | Pre-Screening Notice and Certification Request for | OMB No. 1545-1500 |
| (Rev. October 2002) | the Work Opportunity and Welfare-to-Work Credits | 5079082100 / 4/14/06 |
| Department of the Treasury Internal Revenue Service | | |

**Job Applicant: Fill in the lines below and check any boxes that apply. Complete only this side.**

Your Name: _RAMON VILLANUEVA BAZALDUA_    Social Security Number: _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_

Street address where you live: _213 BELMONT AVE._

City or town, state and ZIP code: _19804_

Telephone No. (     )

If you are under age 25, enter your date of birth (month, day, year)

### Work Opportunity Credit

1 ☐  Check here if you received a conditional certification from the state employment security agency (SESA) or a participating local agency for the work opportunity credit.

2 ☐  Check here if **any** of the following statements apply to you.

- I am a member of a family that has received assistance from Aid to Families with Dependent Children (AFDC) or a successor program for any 9 months during the last 18 months.

- I am a veteran and a member of a family that received food stamps for at least a 3-month period within the last 15 months.

- I was referred here by a rehabilitation agency approved by the state or the Department of Veterans Affairs.

- I am at least age 18 but **not** over age 24 and I am a member of a family that:
  a  Received food stamps for the last 6 months, OR
  b  Received food stamps for at least 3 of the last 5 months, BUT is no longer eligible to receive them.

- Within the past year, I was convicted of a felony or released from prison for a felony AND during the last 6 months I was a member of a low-income family.

- I received supplemental security income (SSI) benefits for any month ending within the last 60 days.

### Welfare-to-Work Credit

3 ☐  Check here if you received a conditional certification from the SESA or a participating local agency for the Welfare-to-Work Credit.

4 ☐  Check here if you are a member of a family that:
- Received AFDC or successor program payments for at least the last 18 months, OR
- Received AFDC or successor program payments for any 18 months beginning after August 5, 1997, OR
- Stopped being eligible for AFDC or successor program payments after August 5, 1997, because Federal or state law limited the maximum time those payments could be made.

### All Applicants

Under penalties of perjury, I declare that I gave the above information to the employer on or before the day I was offered a job, and it is, to the best of my knowledge, true, correct, and complete.

Job Applicant's signature ▶                                                                    Date: _03/20/04_

For Privacy Act and Paperwork Reduction Act Notice, see page 2.          Cat. No. 33962L          Form **8850** (Rev. 10-02)

TRU0014



*Manual del empleado de TruGreen*

## Formulario de reconocimiento del empleado

Este Manual del Empleado contiene información pertinente acerca de TruGreen y comprendo que debo consultar al departamento de servicios a las personas de TruGreen si tengo alguna pregunta que no haya sido respondida en este Manual.

Como las informaciones, políticas y beneficios aquí descritos están necesariamente sujetos a cambio, reconozco que podrán ocurrir revisiones de este Manual. También entiendo que las informaciones revisadas pueden suplantar, modificar o eliminar políticas existentes. Sólo el presidente de TruGreen Holding L.L.C. tiene la capacidad de adoptar cualquier revisión de las políticas contenidas en este Manual.

He comenzado mi relación de empleado con TruGreen voluntariamente y reconozco que no hay una duración especificada para mi empleo. Por lo tanto, yo mismo o TruGreen podemos terminar esta relación en cualquier momento si así lo deseamos, tanto con causa como sin causa.

Además reconozco que este Manual no constituye un contrato de empleo ni es un documento legal. He leído el contenido de este Manual y entiendo que es mi responsabilidad cumplir con las políticas contenidas en el Manual y en cualquier revisión futura del mismo.

_____          03/20/04
~~~~~~~~~~~~~~~~ empleado

RAMON  VILLANUEVA  BAZALDUA
~~~~~~~~~~~~~~~~ (firma o con letra de imprenta)

*Gerente: Mantenga una copia de este formulario completado de reconocimiento del empleado en el archivo personal del empleado y envíe el original a Memphis con los documentos del nuevo empleado acabado de contratar.*

*Febrero 1, 2001*                                         *Página 89*

TRU0015

## ACUERDO SOBRE CONDICIONES LABORALES

1) Las condiciones laborales que las compañias norteamericanas contratantes (Patrones) proporcionan a los trabajadores tienen como fin proteger al empleado y al patrón. En base a las condiciones laborales, el patrón esta legalmente obligado a pagar lo estipulado en dicho documento, si el empleado no es remunerado de acuerdo a lo acordado, el o ella deberán de comunicarse a L.L.S. International (81) 8040-7575 y 77 a fin de informar de esta situación

2) El número de horas trabajadas a la semana es solamente una estimación, por lo tanto, cada trabajador debe tener en cuenta, que las condiciones climatológicas y otros eventos imprevistos pueden afectar el total de horas trabajadas a la semana y por lo tanto su ingreso. Todos los desacuerdos deben ser discutidos con el patrón que les contrató L.L.S. NO ES EL PATRON, favor de no comunicarse para tales asuntos.

3) En el caso de que la Compañía Americana que lo contrató determine que por cuestiones climáticas o de fuerza mayor no puede seguir proporcionando trabajo al empleado durante el período que abarque su visa de trabajo; esta deberá cubrir los gastos del empleado a su lugar de origen, ya que el empleado no puede trabajar en otra Compañía en la que no este autorizada en su visa de trabajo. Esta situación será estrictamente responsabilidad de la empresa contratante

4) El trabajador solo puede dejar su trabajo por causa de una emergencia, en dado caso el trabajador esta obligado a avisarle al patrón y pedir permiso por escrito. En caso de no ser así, o que el trabajador renuncie, o se vaya del lugar de trabajo sin avisar, se le avisará al I.N.S. y al Consulado Americano, el trabajador será considerado como ilegal y pierde toda protección dada por la visa de trabajo, esto resultará en la cancelación de su visa y el trabajador perderá su compromiso de la posibilidad de regresar el año entrante mediante el programa de visas H2B

5) El trabajador está de acuerdo y entiende que el servicio que presta L.L.S. International consiste estrictamente en el trámite de su visa de trabajo ante el Consulado Americano con su consentimiento y a petición de las Compañías Americanas contratantes Asimismo entiende que la obtención de la visa de trabajo no depende sino estrictamente del Consulado Americano, por lo que en caso de ser rechazada su solicitud, L.L.S. International no tiene responsabilidad alguna ni compromiso de indemnizar al solicitante, únicamente a reembolsarle el importe de 100 dólares por la tramitación de su visa

6) Los reembolsos solo proceden en los siguientes casos:
   * Cuando es rechazada su solicitud de visa en el consulado, en este caso se le regresarán 100 DÓLARES.
   * Cuando por parte de la empresa solicitante no se llegue a realizar el trabajo estando todavía en México, se procederá a colocar al trabajador en otra empresa, en caso de no ser posible se le regresarán 255 DÓLARES
   NOTA: En todos los demás casos NO PROCEDERA REEMBOLSO ALGUNO

7) El servicio de L.L.S. International, tiene un costo de:
   * 155 dólares (USD) para L.L.S. por gastos Administrativos
   Los siguientes pagos es lo que cobra el Consulado Americano:
   * 100 dólares (USD) por la tramitación de la visa en el Consulado
   * 100 dólares (USD) para el pago de derecho de la visa en el Consulado
   Transporte:
   * 200 dólares (USD) aproximadamente de trasporte para su traslado via terrestre.
   NOTA: Estos pagos se realizan hasta que la persona haya sido seleccionada, la persona haya aceptado el trabajo y tengan un lugar seguro en alguna Compañia.

8) L.L.S International o la compañia contratante en Estados Unidos no serán responsables de pagar y/o devolver sus gastos de viaje, ni los que se deriven del proceso de la visa en el Consulado Americano, ESTA ES UNICAMENTE RESPONSABILIDAD DEL TRABAJADOR

Este documento no asegura la obtención de trabajo.


*Román Villanueva Barahona*
Firma del Trabajador

*20-Febrero-2004*
Fecha

S International (Monterrey)
ampo No 427 Poniente
tre Rayon y Aldama
> 64000
s : (81) 8040 7575 / 8040 7577

VILLANUEVA
EXHIBIT NO. 4
ANK 10/5/06

RV-0002

## CERTIFICATE OF SERVICE

I, Michael P. Kelly, hereby certify that a true and correct copy of Defendants'

Supplemental Brief in Further Support of its Opposition to Plaintiff's Expedited Motion to

Conditionally Certify a FLSA Collective Action was served via e-file on this 3rd day of

November, 2006, upon the following:

      Vivian L. Rapposelli, Esquire (#3204)
      Rapposelli, Castro & Gonzales
      1300 Grant Ave., St. 100
      Wilmington, DE  19806


                           /s/ Michael P. Kelly
                           Michael P. Kelly

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

RAMON VILLANUEVA-BAZALDUA,　)
individually and on behalf of others　)
similarly situated,　)
　　　　)
　　　Plaintiff,　)
　　　　)
　　v.　)　Civil Action No.: 06-185 GMS
　　　　)
TRUGREEN LIMITED PARTNERS and,　)
TRUGREEN, INC., d/b/a TRUGREEN　)
CHEMLAWN,　)
　　　　)
　　　Defendant.　)

## COMPENDIUM TO
## DEFENDANT'S SUPPLEMENTAL BRIEF IN FURTHER SUPPORT OF ITS OPPOSITION TO PLAINTIFF'S EXPEDITED MOTION TO <u>CONDITIONALLY CERTIFY A FLSA COLLECTIVE ACTION</u>

Michael P. Kelly (Del. Bar ID #2295)
McCarter & English
Citizens Bank Building
919 N. Market Street, 18th Floor
Wilmington, DE 19801
(302) 984-6301

*Admitted Pro Hac*
Michael L. Banks (Pa. I.D. #35052)
Sarah E. Bouchard (Pa. I.D. #77088)
1701 Market Street
Philadelphia, PA 19103-2921
(215) 963-5387/5077

OF COUNSEL:
MORGAN, LEWIS & BOCKIUS, LLP

Dated: November 3, 2006

Attorneys for Defendants

ME1\5941810.1

# TABLE OF CONTENTS

Tab

De La Cruz v. El Paso County Water Improvement District No. 1,
      2005 WL 2291015 (W.D. Tex.)...........................................................................................1

Lawrence v. Philadelphia, 2004 WL 945139 (E.D. Pa.)...............................................................2

Moeck v. Gray Supply Corp., 2006 WL 42368 (D.N.J.)...............................................................3

Wertheim v. Ariz., 1992 WL 566321 (D. Ariz.) ..........................................................................4

ME1\5941810.1

**1**

Westlaw.

Not Reported in F.Supp.2d                                                                                      Page 1
Not Reported in F.Supp.2d, 2005 WL 2291015 (W.D.Tex.), 10 Wage & Hour Cas.2d (BNA) 1753
**(Cite as: 2005 WL 2291015 (W.D.Tex.))**

**C**

United States District Court,
W.D. Texas, El Paso Division.
Joe DE LA CRUZ, Jesus J. Duran, Robert Gutierrez,
David Ortega, Lorenzo
Pacheco, Jr., David Robinson, Fred Walker Jr., and
Other Similarly Situated
Persons, Plaintiffs,
v.
EL PASO COUNTY WATER IMPROVEMENT
DISTRICT NO. 1, Defendant.
**No. EP-05-CV-206-FM.**

Sept. 19, 2005.

David L. Kern, Peticolas, Shapleigh, Brandys &
Kern, P.L.L.C., Mike Milligan, Attorney at Law, El
Paso, TX, for Plaintiffs.

Clara B. Burns, El Paso, TX, for Defendant.

*MEMORANDUM OPINION AND ORDER
DENYING PLAINTIFFS' MOTION FOR
COLLECTIVE ACTION
RECOGNITION*

MONTALVO, J.

**\*1** On this date, the Court considered "Plaintiffs'
Motion for Collective Action Recognition" [Rec. No.
8] and "Defendant's Response to Plaintiffs' Motion
for Collective Action Recognition" [Rec. No. 10]
filed in the above numbered and styled cause. After
carefully considering the arguments and authorities,
the Court is of the opinion that "Plaintiffs' Motion for
Collective Action Recognition" [Rec. No. 8] should
be DENIED.

Plaintiffs' suit alleges Defendant violated the Fair
Labor Standards Act (FLSA) by failing to pay them
the correct amount of earned wages. On July 27,
2005, Plaintiffs filed the instant motion requesting
the Court enter an order allowing the case to proceed
as an opt-in collective action pursuant to § 216(b) of
the FLSA. *See* 29 U.S.C. § 216(b). Plaintiffs'
statement defining the class declares: "The collective
is comprised of all current and former employees of
Defendant who worked for Defendant at any time
from June 1, 2002 ... through the present and who
were subjected to any of the unlawful pay or
retaliation practices that the named Plaintiffs are
complaining of in this case." [Rec. No. 8, pg. 2].

Unlike a class action filed under Federal Rule of
Civil Procedure 23(c), a collective action under §
216(b) provides for a procedure to "opt-in," rather
than "opt-out." *See Mooney v. Aramco Servs. Co.*, 54
F.3d 1207, 1212-13 (5th Cir.1995).

Section 216(b) of the FLSA sets forth two core
requirements to certify a collective action. Members
of the putative class must be "similarly situated" and
must provide "consent in writing ... in the court in
which such action is brought." 29 U.S.C. § 216(b).
The Fifth Circuit has not specifically addressed the
meaning of "similarly situated" in this context. [FN1]
However, courts have utilized two approaches to
determine whether a plaintiffs are similarly situated
and whether a case should proceed as a collective
action. *Mooney*, 54 F.3d at 1213-16. The two-part
approach, developed in *Lusardi v. Xerox Corp.*, 118
F.R.D. 351 (D.N.J.1987), requires the Court to decide
whether the plaintiff has presented evidence that
similarly situated plaintiffs exist. *See also Mooney*,
54 F.3d at 1213-15. The district court must decide,
"usually based only on the pleadings and any
affidavits which have been submitted," whether
notice should be given to any potential plaintiffs. *Id.*
at 1214. The decision "is made using a fairly lenient
standard" and usually results in a conditional
certification. *Id.* If the Court conditionally certifies
the class, the case then proceeds through discovery as
a representative action. *Id.* After the close of
discovery, the defendant then files a motion for
"decertification." *Id.* At this second stage, the Court
makes a factual determination, using the information
gained from discovery, on whether the putative class
members are "similarly situated." *Id.* "If the class
members are similarly situated, the district court
allows the representative action to proceed to trial."
*Id.* If not, the district court decertifies the class,
dismisses without prejudice the opt-in plaintiffs, and
allows the class representatives to proceed to trial on
their individual claims. *Id.*

> FN1. *See Mooney*, 54 F.3d at 1213 (writing
> "In other words, this line of cases, by its
> nature, does not give a recognizable form to
> an ADEA representative class, but lends
> itself to *ad hoc* analysis on a case-by-case
> basis.").

**\*2** The alternative to the two-part test is to analyze
the factors applicable to Rule 23 class action

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 2
Not Reported in F.Supp.2d, 2005 WL 2291015 (W.D.Tex.), 10 Wage & Hour Cas.2d (BNA) 1753
**(Cite as: 2005 WL 2291015 (W.D.Tex.))**

certification: numerosity, commonality, typicality, and adequacy of representation. *See Shushan v. University of Colorado,* 132 F.R.D. 263 (D.Colo.1990). Our Circuit has expressly refused to endorse either method over the other. *Mooney,* 54 F.3d at 1216. Because the two-stage approach appears to be the method of analysis more generally accepted, the Court will analyze the instant motion under the two-part approach.

Plaintiffs describe themselves as "ditch riders, dispatchers, river team members, and/or maintenance workers." [Rec. No. 3, pg. 1]. It is alleged by Plaintiffs that Defendant violated the "FLSA by failing to pay Plaintiffs and other similarly situated employees, or former employees, for the hours worked by such employees in excess of forty (40) hours per week at a rate not less than one and one-half times the regular hourly rate at which such employees were compensated." [Rec. No. 3, pg 3]. Plaintiffs argue that a collective action of similarly situated Plaintiffs is the appropriate method for the fair and efficient adjudication of the controversy. In opposition, Defendant argues Plaintiffs have not met their burden and put forth allegations supported by evidence that there are similarly situated employees who should have the chance to opt-in. Defendant further argues that Plaintiffs' assertions, if taken as true, show that Plaintiffs in fact were not similarly situated because the different job titles identified by Plaintiffs "connote[ ] totally different duties, responsibilities, and working conditions." [Rec. No. 10, pg. 5]. Plaintiffs correctly cite to *Mooney v. Aramco Services Co.* for the proposition that the initial burden on plaintiffs is a lenient one and only a "modest factual showing" is required to meet this burden. 54 F.3d 1207, 1214 (5th Cir.1995). However, this Court finds that Plaintiffs in the instant case have failed to even present a modest factual showing that Plaintiffs are "similarly situated."

The Court finds Plaintiffs have failed the first step of the two-step approach. While the Court recognizes the standard for satisfying the first step is "fairly lenient standard," the Plaintiff has failed to provide any evidence that others were similarly situated. Plaintiffs are required to make "substantial allegations that the putative class members were together the victims of a single decision, policy, or plan infected by discrimination." *H & R Block,* 186 F.R.D. at 400 (quoting *Mooney,* 54 F.3d at 1214 n. 8). The evidence before the Court includes only unsupported assertions of violations that are not sufficient to meet Plaintiff's burden. No affidavits that would provide evidence that others are similarly

situated was submitted by Plaintiffs. Plaintiffs produce only conclusory statements that do not even meet a "modest factual showing." Having found that the evidence presented by Plaintiffs fails to sufficiently demonstrate that "similarly situated" Plaintiffs exist, Plaintiffs' motion to certify a collective action under 29 U.S.C. § 216(b) is DENIED.

**\*3** IT IS THEREFORE ORDERED that "Plaintiffs' Motion for Collective Action Recognition" [Rec. No. 8] is DENIED.

Not Reported in F.Supp.2d, 2005 WL 2291015 (W.D.Tex.), 10 Wage & Hour Cas.2d (BNA) 1753

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**2**

**Westlaw.**

Not Reported in F.Supp.2d                                                    Page 1
Not Reported in F.Supp.2d, 2004 WL 945139 (E.D.Pa.)
**(Cite as: 2004 WL 945139 (E.D.Pa.))**

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
E.D. Pennsylvania.
Richard LAWRENCE, et al., Plaintiff,
v.
THE CITY OF PHILADELPHIA,
PENNSYLVANIA, Defendant.
**No. 03-CV-4009.**

April 29, 2004.
Robert A. Jones, Chamberlain Kaufman and Jones,
Albany, NY, Solomon Z. Krevsky, Solomon Z.
Krevsky, LLC, Harrisburg, PA, for Plaintiffs.

George A. Voegele, Jr., Mark J. Foley, Victoria L.
Zellers, Klett Rooney Lieber & Schorling,
Philadelphia, PA, for Defendant.

*MEMORANDUM*

GREEN, J.

*1 Presently before the Court is Defendant's Motion
for Misjoinder of Claims and Plaintiffs' Opposition
thereto. For the reasons set forth below, Defendant's
motion will be granted.

Background

Plaintiffs filed a Complaint against Defendant City
of Philadelphia ("City"), alleging that Defendant
violated the Fair Labor Standards Act, 29 U.S.C. §
201 *et seq.*. ("FLSA"), based on an alleged failure to
pay Plaintiffs overtime wages for scheduled hours
worked in excess of forty (40) in a single workweek.
Plaintiffs also claim that Defendant's failure to pay
Plaintiffs for unscheduled "off-the-clock" time, spent
replenishing supplies before or after compensated
hours, violates the overtime wage requirement under
the FLSA. Plaintiffs seek to maintain both claims in a
collective action against Defendant for FLSA
overtime wage violations, as authorized by FLSA §
216(b). Plaintiffs are all current or former employees
of Defendant who worked as Fire Service
Paramedics. Subsequent to the filing of the

Complaint, Plaintiffs filed numerous opt-in consent
forms for Fire Service Paramedics to become
plaintiffs in this action.

Defendant's Motion for Misjoinder of Claims

Defendant presently moves for misjoinder of
Plaintiff's off-the-clock claims pursuant to Federal
Rule of Civil Procedure 21, and in the alternative for
dismissal of the collective action pursuant to 29
U.S.C. § 216(b). Defendant argues that, unlike the
claim based on overtime compensation for regularly
scheduled hours, the "off-the-clock" claim is based
on allegations of hours worked beyond a regular
schedule, requiring an individual case-by-case
analysis for each Plaintiff. In order to meet the FLSA
§ 216(b) collective action requirement for plaintiffs
to be similarly situated to each other, Defendant
argues that this Court should look at variations in
employment activities, oversight and instruction,
whether plaintiffs worked in different geographic
locations, and discretionary powers given to
plaintiffs.

On the other hand, Plaintiffs contend that the
"similarly situated" requirement under FLSA §
216(b) is unrelated to the requirements for class
action plaintiffs pursuant to Fed.R.Civ.P. 23, and is
less strict than the requirements for joinder under
Fed.R .Civ.P. 20(a). Urging this Court to adopt a
lenient standard for the "similarly situated"
requirement, Plaintiffs rely upon *Lockhart v.
Westinghouse Credit Corp.,* 879 F.2d 43, 51 (3rd
Cir.1989), and argue that they are similarly situated
for FLSA § 216(b) purposes because although they
work in different locations: (1) all members of the
collective action work(ed) in the Fire Department's
Emergency Medical Services Unit; (2) their claims
all arise from the same pattern, plan or practice of
Defendant; and, (3) they all seek the same form of
relief--unpaid overtime compensation, liquidated
damages, costs and attorneys' fees.

Discussion

Section 216(b) of the FLSA reads, in pertinent part,
"[a]n action to recover ... may be maintained against
any employer (including a public agency) ... by any
one or more employees for and in behalf of himself
or themselves and other employees similarly
situated." 29 U.S.C. § 216(b). Under Fed.R.Civ.P.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 945139 (E.D.Pa.)
(Cite as: 2004 WL 945139 (E.D.Pa.))

21, however, "[a]ny claim against a party may be severed and proceeded with separately." Fed.R.Civ.P. 21. In *Lockhart v. Westinghouse Credit Corp.*, 879 F.2d 43 (3rd Cir.1989), *overruled on other grounds,* the Third Circuit applied a three-prong test for determining whether plaintiffs are similarly situated under FLSA § 216(b): (1) whether they all worked in the same corporate department, division and location; (2) whether they all advanced similar claims; and (3) whether they sought substantially the same form of relief. *See, Lockhart,* 879 F.2d at 51 (citing *Plummer v. General Electric Co.,* 93 F.R.D. 311, 312 (E.D.Pa.1981)). As a result, Plaintiffs pursuing a collective action under FLSA § 216(b) only need to show that their positions are "similar, not identical" to each other. *Sperling v. Hoffman-LaRoche,* 118 F.R.D. 392, 407 (D.N.J.1988), *aff'd in part and appeal dismissed in part,* 862 F.2d 439 (3rd Cir.1988), *aff'd, Hoffman-LaRoche, Inc. v. Sperling,* 493 U.S. 165, 110 S.Ct. 482, 107 L.Ed.2d 480 (1989).

**\*2** In the instant matter, all current and prospective plaintiffs are or were employed as Fire Service Paramedics within the City Fire Department's Emergency Medical Services Unit. According to Defendant's Personnel Department, each of the current Plaintiffs, and potential opt-in plaintiffs, is classified as a "Fire Service Paramedic" and has the same general job description. However, Plaintiffs work in different unit types, different platoons, different locations, and have different supervisors. Unlike the Plaintiffs' first claim, alleging failure to pay overtime wages for scheduled hours worked in excess of 40 in a single workweek, the "off-the-clock" claim does not involve regularly scheduled time that is worked by all members of the class. Rather, each of the Plaintiffs may potentially claim that on any given day he or she arrived early or departed outside of their regularly scheduled hours and were not compensated for such. The circumstances of those individual claims potentially vary too widely to conclude that in regard to their "off-the-clock" claim, the Plaintiffs are similarly situated. The questions of fact will likely differ for each Plaintiff and will be unduly burdensome to both Defendant and to the Court in managing as a collective claim. Consequently, Plaintiffs' "off-the-clock" claim for unpaid work performed outside of their regularly scheduled hours will be severed from the collective claim for unpaid overtime for regularly scheduled hours. Plaintiffs' claims for "off-the-clock" unpaid work, will be dismissed without prejudice to each plaintiff filing said claim individually. The lead Plaintiff in this matter, Richard Lawrence, will be

able to proceed in this civil action with his individual "off-the-clock" claim.

With regard to Plaintiffs' claims for unpaid overtime for regularly scheduled hours in excess of forty in a single work week, the court finds that the Plaintiffs are similarly situated for purposes of maintaining a collective action pursuant to FLSA § 216(b). Plaintiffs allege that they should be paid overtime for all weeks in which their regularly scheduled working hours exceed forty per week. This claim is the same for each Plaintiff. In its motion for misjoinder, Defendant does not assert that the Plaintiffs are not similarly situated for purposes of this claim. The Court, therefore, will permit Plaintiffs to maintain a collective active regarding their regularly scheduled hours claim. Defendant's alternative motion for dismissal of the entire action under FLSA § 216(b) will be denied.

Finally, in *Hoffman-LaRoche, Inc. v. Sperling,* 493 U.S. 165, 110 S.Ct. 482, 107 L.Ed.2d 480 (1989), the Supreme Court clearly stated that collective actions maintained under FLSA § 216(b) authorize a district court to issue court-approved notice to additional potential plaintiffs at its discretion. This Court concludes that court-supervised notice is appropriate in the interest of promoting judicial economy and an efficient resolution to the collective action claim in this case.

**\*3** An appropriate order follows.

### ORDER

AND NOW, this day of April, 2004, IT IS HEREBY ORDERED that, Defendant City of Philadelphia's Motion for Misjoinder of Claims is GRANTED, and Defendant City of Philadelphia's alternative Motion to Dismiss the entire collective action is DENIED. With the exception of the lead Plaintiff in this action, Richard Lawrence, all other Plaintiffs' claims for wages for hours for which Plaintiffs were allegedly not paid for either reporting early or departing after their regularly scheduled hours are severed from this action and dismissed without prejudice to each Plaintiff filing a separate action for said claim. If any said action is filed, it is to be randomly assigned.

IT IS FURTHER ORDERED that Plaintiffs' Motion for Approval of Notice to Prospective Additional Plaintiffs and for Discovery is GRANTED to the extent that it applies only to the collective action claim permitted as a result of this Order. The form of Notice as set forth in Exhibit No. 6 to the Declaration of Robert A. Jones shall be revised to remove all

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 945139 (E.D.Pa.)
**(Cite as: 2004 WL 945139 (E.D.Pa.))**

references to the claims dismissed as a result of this order. Defendant shall provide to Plaintiffs' counsel, within fifteen (45) days of this Order, the last known names and addresses of all such similarly situated current and former employees who have worked as Fire Service Paramedics at any time from July 7, 2000 to the present date.

Not Reported in F.Supp.2d, 2004 WL 945139 (E.D.Pa.)

**Motions, Pleadings and Filings (Back to top)**

• 2004 WL 2717159  (Trial Motion, Memorandum and Affidavit) Defendant City of Philadelphia's Response in Opposition to Plaintiffs' Motion to Compel (Jul. 6, 2004)Original Image of this Document (PDF)

• 2004 WL 2717155  (Trial Motion, Memorandum and Affidavit) Defendant City of Philadelphia's Reply to Plaintiffs' Opposition to Defendant's Motion for Misjoinder of Claims and in the Alternative for Dismissal of the Collective Action and Response to Plaintiffs' Motion for Opt-in Notice (Jan. 16, 2004)Original Image of this Document (PDF)

• 2003 WL 23903760  (Trial Motion, Memorandum and Affidavit) Defendant City of Philadelphia's Motion for Misjoinder of Claims and in the Alternative for Dismissal of the Collective Action (Dec. 11, 2003)Original Image of this Document (PDF)

• 2003 WL 23903747  (Trial Pleading) Defendant's Answer to Plaintiffs' Complaint (Sep. 22, 2003)Original Image of this Document (PDF)

• 2:03cv04009 (Docket) (Jul. 07, 2003)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

3

Westlaw.

Not Reported in F.Supp.2d                                                    Page 1
Not Reported in F.Supp.2d, 2006 WL 42368 (D.N.J.)
**(Cite as: 2006 WL 42368 (D.N.J.))**

**c**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

NOT FOR PUBLICATION

United States District Court,
D. New Jersey.
Ronald MOECK and James Wilbur, Jr., on behalf of
themselves and all others
similarly situated Plaintiffs,
v.
GRAY SUPPLY CORPORATION, Defendant.
No. 03-1950 (WGB).

Jan. 6, 2006.

Jed Mendelson, Mark Tabakman, Grotta, Glassman
& Hoffman, P.A., Roseland, New Jersey, for
Defendant Gray Supply Corporation.

Paul G. Hunezak, Stephen A. Snyder, Morris,
Downing & Sherred, LLP, Newton, New Jersey, for
Plaintiffs.

*MEMORANDUM OPINION*

BASSLER, Senior J.

*1 Plaintiffs, former employees of Defendant Gray
Supply Corporation ("Company" or "Gray"), claim
that Defendant failed to pay Plaintiffs overtime that
they were entitled to, which violated the Fair Labor
Standards Act ("FLSA") and the New Jersey Wage
and Hour Law ("Wage and Hour Law"). Plaintiffs
also bring claims for fraud and negligent
misrepresentation. Defendant now moves for
summary judgment, and Plaintiffs move to certify a
class on behalf of similarly situated employees who
were required by Defendant to work overtime
without pay.

I. Factual Background [FN1]

> FN1. All facts have been construed in the
> light most favorable to Plaintiffs, the
> nonmoving party. *Boyle v. Allegheny
> Pennsylvania, 139 F.3d 386, 393 (3d
> Cir.1998).*

Defendant Gray is in the business of installing
natural gas lines and mains for residential and
commercial purposes. Amended Complaint
("Am.Compl.") ¶ 2. The assigned work hours for
employees at Gray is from 7:30AM to 4:00PM with a
thirty-minute lunch break. Declaration of Tabakman
("Tabakman Dec."), Moeck Dep., Ex., B 86:20-
87:11. Employees are required to work an additional
thirty minutes at both the beginning and the end of
their shifts. Tabakman Dec., Dipasquale Dep., Ex. E,
20:20-21:13, 26:23-27:13. This time is referred to as
"free time" by Gray's management. *Id.* Plaintiffs
claim that since 1991, they and other Gray employees
have not received pay for this additional hour
worked. Am. Compl. ¶ 16. They further allege that
they were informed that refusal to work overtime was
grounds for termination. Tabakman Dec., Wilbur
Dep., Ex. D, 53:13-14.

Plaintiff Moeck has worked for Gray three times. He
began working around 1991 or 1992 until February
2002. He left for a year and returned to work at Gray
from 1994 to 1996. He then left for another year and
joined the Company again in 1997 until he resigned
in February 2002. Tabakman Dec., Moeck Dep., Ex.
B, 7:20-24; 8:22-10:5; 11:14-20; 12:17-13:12; 13:25-
14:10. Moeck testified that he had complained to the
shop steward of his union and to his supervisors since
1992 about having to work free time. *Id.* at 19:23-
20:2; 21:2-22:8; 23:5- 24:4, 35:8-19.

Plaintiff Wilbur began working for Gray in 1994.
Tabakman Dec., Wilbur Dep., Ex. D, 12:8-12. After
his first day of employment, he was informed that he
should be at work a half hour early. *Id.,* 50:6-51:13;
127:4-128:8; 129:9- 12. Wilbur also testified that he
complained to his shop steward. *Id.* at 17:11-23;
55:17-25. Wilbur was laid off from Gray on April 4,
2002. *Id.* at 35:4-10.

At issue here is:
• Whether the FLSA preempts Plaintiffs' state
common law claims.
• Whether the Labor Management Relations Act
preempts all of Plaintiffs' claims.
• Whether Plaintiff Wilbur's FLSA and New Jersey
Wage and Hour Law claims are time-barred.
The Court finds that the FLSA does preempt
Plaintiffs' state common law claims, the Labor
Management Relations Act does not preempt
Plaintiffs' FLSA action and Wilbur's Wage and Hour

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 42368 (D.N.J.)
(Cite as: 2006 WL 42368 (D.N.J.))

Page 2

Law claims are time-barred.

This Court has jurisdiction over this case pursuant to 28 U.S.C. § § 1331 & 1337(a) and supplemental jurisdiction over the remaining New Jersey statutory and common-law claims pursuant to 28 U.S.C. § 1367.

II. Fraud and Misrepresentation Claims Preempted by FLSA

*2 Counts three through six-Plaintiffs' fraud and negligent misrepresentation causes of action based on Gray's alleged affirmative misrepresentation and failure to disclose-are derived completely from Plaintiffs' overtime claims. Defendant argues that these counts are therefore preempted by the FLSA. The Court agrees.

Although the law is unsettled as to whether the FLSA preempts state common law causes of action, most courts have held that claims directly covered by the FLSA (such as overtime), must be brought under the FLSA. *See e.g., Chen v. Street Beat Sportswear Inc.,* 364 F.Supp.2d 269 (E.D.N.Y.2005). Courts that have considered this issue analyze whether the FLSA and common law claims are grounded in the same facts. *Petras v. Johnson,* No. 92 CIV. 8298(CSH), 1993 WL 228014, at *3 (S.D.N.Y. June 22, 1993) is instructive.

In *Petras,* which is similar to this case, the plaintiff alleged "fraud on the ground that the defendants knowingly and with intent to misrepresent and deceive the plaintiff made false representations to him to lead him to believe that he was not entitled to overtime compensation." *Id.* The court held that plaintiff's allegations of fraud "lies simply in concealing plaintiff's rights under the FLSA" and that the FLSA was the exclusive remedy for overtime payments. *Id; see also Alexander v. Vesta Ins. Group, Inc.,* 147 F.Supp.2d 1223, 1240-41 (N.D.Ala.2001) (holding plaintiffs could not merely recast "FLSA claims as common law claims" to recover damages not available under the FLSA); *Johnston v. Davis Sec., Inc.,* 217 F.Supp.2d 1224, 1227-28 (D.Utah 2002) (finding that plaintiff's common law claims, including gross negligence and negligent misrepresentation, were preempted under the FLSA because they were based on same facts and circumstances).

Likewise, Plaintiffs' contentions that Defendants "materially misrepresented" that its employees "would be paid for overtime" and "concealed the fact

... that they [Defendant's employees] would be compelled to work additional time without compensation" merely are based on Plaintiffs' overtime claims. Am. Compl. ¶ ¶ 31,38,46,51. These claims are, therefore, preempted by the FLSA. [FN2]

> FN2. Because the Court has determined that these claims are preempted by the FLSA, the Court finds it unnecessary to address Defendant's argument that the state common law claims are time-barred and that Plaintiffs have failed to state a prima facie case for these claims.

III. Labor Relations Management Act Preemption

Gray argues that Plaintiffs' entire action is prohibited by the Labor Management Relations Act ("LMRA"), which was designed to encourage employees to promote their interests collectively. Defendants contend that Plaintiffs' claims are founded "directly on rights created by a collective bargaining agreement." Gray Memorandum of Law ("Gray Mem.") at 15. In *Barrantine v. Arkansas-Best Freight System, Inc.,* 450 U.S. 728, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981), however, the Supreme Court held that FLSA rights cannot be abridged by contract or otherwise waived because this would "nullify the purposes" of the statute and thwart the legislative policies that the Act was designed to effectuate. Moreover, the Court held that congressionally granted FLSA rights take precedence over any conflicting provisions in a collectively bargained compensation arrangement.

*3 Under the FLSA, covered employers may not employ any employee "for a workweek longer than forty hours unless such employee receives compensation for his employment ... at a rate not less than one and one-half times the regular rate at which he is employed ." 29 U.S.C. § 207(a)(1). Plaintiffs' action is wholly based on "overtime wages to which they are entitled but have not received." Am. Compl. ¶  4. The Supreme Court specifically stated in *Barrantine* that the complex questions of fact and law, "e.g., what constitutes the 'regular rate,' the 'workweek,' or 'principal' rather than 'preliminary or postliminary' activities are statutory questions properly resolved under the FLSA." *Barrantine,* 450 U.S. at 728.

Plaintiffs correctly assert that the case relied on by Gray is inapposite to this one. *Valdino v. Valley Engineers,* 903 F.2d 254 (3d Cir1990) involved the proper wage rate that should be applied to a worker,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                          Page 3
Not Reported in F.Supp.2d, 2006 WL 42368 (D.N.J.)
(Cite as: 2006 WL 42368 (D.N.J.))

who claimed he should be compensated at the rate of a "journeyman" under the contract. The Third Circuit held that the LMRA preempted the FLSA where the plaintiff's claims "rest on interpretations of the underlying collective bargaining agreement ." *Id.* at 266. That is not the case here. Plaintiffs' claims are not based on an interpretation of the collective bargaining agreement with respect to the appropriate wage rate, but are based on their contention that they are entitled to overtime. Plaintiffs are not barred by the LMRA from pursuing these claims under the FLSA merely because its contractual and statutory rights arise from the same factual occurrence.

IV. Wilbur's FLSA and Wage and Labor Law Claims

*A. FLSA*

The statutory scheme of the FLSA presumes a two-year statute of limitations but provides for a longer, three-year period if a plaintiff can show that the defendant's violation of the FLSA has been "willful." 29 U.S.C. § 255(a). The Supreme Court in *McLaughlin v. Richland Shoe Co.,* 486 U.S. 128, 133, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988), held that the term "willful" means "that the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute."

Plaintiffs and Leo Dipasquale-a non-party witness-have testified that they repeatedly complained to their supervisors about not receiving overtime pay and nothing was ever done about it. Tabakman Dec., Moeck Dep., Ex. B. 40:7-42:25; Tabakman Dec., Dipasquale Dep., Ex. E. 36:25-39:24; 65:23-66:18. Plaintiff Moeck also testified that after he complained about being required to work "free time" without pay, his supervisor informed him that "if [he or other employees] didn't want to do the time, to find a new job." Tabakman Dec., Moeck Dep., Ex. B, 26:24-27:1. Dipasquale further noted during his deposition that the policy requiring "free time" at Gray ended only a couple of weeks prior to his deposition. Dipasquale Dep., Ex. E. 68:22-69:7.

As the collective bargaining agreement governing Gray's relationship with union employees expressly follows the FLSA stating that [a]ll time worked in excess of eight hours shall be paid at the rate of time and one-half the applicable rate, the Court finds that Plaintiffs have raised a genuine issue of material fact that Gray's conduct was a "willful" violation of the FLSA. Therefore, the Court finds that since the amended complaint was filed on April 28, 2004 and

Plaintiff Wilbur was laid off in April 2002, his FLSA claim is timely. [FN3]

> FN3. The courts uniformly have adopted the approach that under the FLSA "a separate cause of action accrued each payday when the [employer] excluded the overtime compensation claim." Although Plaintiffs Wilbur and Moeck may not be entitled to claims made prior to the three-year statutory period, Defendant Gray has not raised this argument and the Court is therefore reluctant to address it.

*B. Wage and Hour Law*

*4 A year after its enactment, the Wage and Hour Law was amended to add a two-year statute of limitations. *Troise v. Extel Commc'n.,* 345 N.J.Super. 231, 784 A.2d 748 (App.Div.2001). The Wage and Hour Law, however, does not contain a provision similar to the FLSA which makes an exception for willful conduct. Therefore, Wilbur's action is not timely with regard to the Wage and Hour Law. [FN4]

> FN4. Although Plaintiffs argue that the date Gray states Wilbur was laid off, April 4, 2002, is in dispute, Plaintiffs have provided no evidence to rebut the Defendant's evidence to show that this date is incorrect. Plaintiffs' Memorandum of Law ("Pls.Mem.") at 9, n. 3.

Plaintiffs argue, however, that it is well-settled that the commencement of a class action tolls the statute of limitation as to all putative class members. Pls. Mem. at 9; (citing *Crown, Cork & Seal Co., Inc., v. Parker,* 462 U.S. 345, 353-54, 103 S.Ct. 2392, 76 L.Ed.2d 628 (1983)). Although Plaintiffs are correct in its assertion, commencement of an action as a class action suspends the applicable statute of limitations during the interim period *from commencement until refusal to certify the class.* *Ravitch v. Pricewaterhouse,* 793 A.2d 939 (Penn.2002) (emphasis added). The statute of limitations for Wilbur's Wage and Hour Law claim had already expired before the class action suit had even been filed, therefore, his claim cannot be tolled pursuant to this rule.

V. Plaintiffs' Class Certification Motion

*A. FLSA*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 42368 (D.N.J.)
(Cite as: 2006 WL 42368 (D.N.J.))

Class actions under the FLSA are governed by 29 U.S.C. § 216(b). Unlike Federal Rule of Civil Procedure Rule 23, § 216(b) of the FLSA establishes an opt-in system for collective actions, mandating that "[n]o employee shall be a party plaintiff to any such action [under the FLSA] unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought." 29 U.S.C. § 216(b).

Under § 216(b), there are two threshold requirements for an action to proceed as a collective action: (1) class members must be "similarly situated" and (2) all members must affirmatively consent to join the action. Goldman v. Radio Shack Corp., No. 2:03-CV-0032, 2003 U.S. Dist. LEXIS 7611 (E.D. Pa. April 17, 2001).

In the absence of Third Circuit or Supreme Court guidance on who are "similarly situated" employees under § 216(b), a two tier test has developed amongst district courts in the Third Circuit. Id. at * 20; see also Morisky v. Public Serv. Elec. & Gas Co., 111 F.Supp.2d 493 (D.N.J.2000). At the "notice stage"-where the court determines whether notice should be given to potential class members-the court's determination typically results in "conditional certification" of a representative class. Morisky, 111 F.Supp.2d at 497. At this stage, some courts have required nothing more than "substantial allegations that the putative class members were together the victims of a single decision, policy or plan." Id. [FN5] In the second stage, after the court has more evidence and the case is ready for trial, the court applies a stricter standard.

> FN5. Although Defendant's assert that the Court should apply the modest factual showing standard applied by some courts in the first stage, the Court finds it unnecessary to address this issue as Plaintiffs' have failed to satisfy the more lenient standard.

Even though court's have recognized that the notice stage, which this case is currently in, is a lenient standard, the Court finds that Plaintiffs have failed to meet this standard. Plaintiffs have provided little evidence that the class members that they seek to represent were the victims of a single policy, decision or plan.

*5 Plaintiffs have established that one supervisor, Shawn McCord, required his workers to work "free time." See e.g., Tabakman Dec., DiPasquale Dep., Ex. E, 36:3-38:9, 45:17-19. Although Plaintiff Moeck

mentions Ed Smock as another supervisor who had used the phrase "free time," Plaintiffs have failed to establish that other supervisors employed the same policies as McCord. Although Plaintiffs intend on representing "all employees of Gray Supply who have and are required by Gray Supply to work in excess of forty (40) hours," based on Plaintiffs' own testimony, practices and reporting requirements are different at each of the four "yards" where Plaintiffs and potential class members work. See e.g., Tabakman Dec., Moeck Dep., Ex. B, 106:11-18. Plaintiffs further admit that at times they were allowed to drive directly to and from a project site. See Tabakman Dec., Moeck Dep., Ex. B, 70:20-71-9 (Moeck testified for at least six months he drove directly to and from his project site and was not entitled to overtime payments during that period). In addition, there was a call-in policy that at least DiPasquale was aware of, which allowed him to call into the office the night before and find out the location of his job so that he could go there directly, which kept him from having to work "free time." Tabakman Dec., DiPasquale Dep., Ex. E, 54;12-24.

Because of the many potential distinctions of each putative class member's claim, the Court finds that this case is not an appropriate one for class action certification, even at this early stage in the action. Based on the current evidence, the proposed class is not "similarly situated" or the victims of a single policy or plan. The Court also believes that this determination is consistent with § 216(b) of the FLSA's purpose, which was to limit private FLSA plaintiffs to employees who asserted claims in their own right and freeing employers from the burden of representative actions, therefore, the Court denies certification.

B. Wage and Hour Law

Plaintiff Moeck's Wage and Hour Law claim is also not suitable for class action treatment. First, as discussed above, Congress created the opt-in procedure under the FLSA for the purpose of limiting private FLSA plaintiffs to employees who asserted claims in their own right and freeing employers from the burden of representative actions. Hoffmann-La Roche, Inc. v. Sperling, 493 U.S. 165, 173, 110 S.Ct. 482, 107 L.Ed.2d 480 (1989). Allowing Plaintiff Moeck to circumvent the opt-in requirement and bring unnamed parties into federal court by calling upon state statutes similar to the FLSA would undermine Congress's intent to limit these types of claims to collective actions. See McClain v. Leona's Pizzeria, Inc., 222 F.R.D. 574 (N.D.Ill.2004).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 42368 (D.N.J.)
(Cite as: 2006 WL 42368 (D.N.J.))

Second, under Federal Rule of Civil Procedure Rule 23, which governs other class action claims, Plaintiffs would have to meet the prerequisites of commonality and typicality, amongst other things. As discussed above, Plaintiffs have failed to show that common issues predominate over individual issues or that their claims are typical of others in the class. *Mulder v. PCS Health Systems, Inc.,* 216 F.R.D. 307 (D.N.J.2003).

VI. Conclusion

*6 For the reasons stated in this Opinion, this Court denies Defendant's motion for summary judgment on Count One, grants Defendant's motion for summary judgment on Count Two with regard to Plaintiff Wilbur and grants Defendant's motion for summary judgment on Counts Three, Four, Five and Six. The Court further denies Plaintiffs' motion for class certification.

An appropriate Order accompanies this Opinion.

Not Reported in F.Supp.2d, 2006 WL 42368 (D.N.J.)

**Motions, Pleadings and Filings** (Back to top)

• 2004 WL 3373359 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Motion for Summary Judgment of Defendant Gray Supply Corporation, Inc. (Jun. 17, 2004)

• 2004 WL 3373357 (Trial Pleading) First Amended Answer (May 3, 2004)

• 2004 WL 3373356 (Trial Pleading) Plaintiffs' First Amended Complaint (Apr. 28, 2004)

• 2:03CV01950 (Docket) (Apr. 30, 2003)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**4**

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 566321 (D.Ariz.)
**(Cite as: 1992 WL 566321 (D.Ariz.))**

**H**
Only the Westlaw citation is currently available.

United States District Court, D. Arizona.
Pat WERTHEIM, on behalf of himself and others
similarly situated, Plaintiffs,
v.
STATE of ARIZONA; and Arizona Department of
Public Safety, Defendants.
**No. CIV. 92-0453 PHX RCB.**

Aug. 4, 1992.

Joseph W. Bell, Fredrick P. Furth, Daniel S. Mason,
Furth Fahrner & Mason, San Francisco, CA, R. Chip
Larsen, James J. Farley, Farley Robinson & Larsen,
Mesa, AZ, for Pat A. Wertheim.

Michael K. Kennedy, Gallagher & Kennedy,
Phoenix, AZ, for State of Arizona, Department of
Public Safety, (Arizona).

ORDER

BROOMFIELD, District Judge.

*1 Plaintiff moves for an order authorizing him to
provide notice of this action to other employees of
the State of Arizona who may be similarly situated
(Opt-In Class), approving the form of a proposed
notice and consent, and requiring defendants to
provide plaintiff with the names and addresses of
members of the Opt-In Class. Defendants object to
the definition of the Opt-In Class proposed by
plaintiff and raise specific objections to the proposed
form of notice and consent. The matter has been
fully briefed. Defendants also filed a separate
motion to strike certain portions of the affidavits of
Robert Tavernaro and Steven Anderson attached as
exhibits to plaintiff's motion. Plaintiff responded to
the motion to strike but defendants did not reply.
The court has heard oral argument on both motions.

Plaintiff was employed by the State of Arizona,
Department of Public Safety ("DPS") on March 5,
1989 in the position of Latent Prints Examiner
("LPE") II; he has since been promoted to LPE III.
The positions of LPE II and III are classified as
exempt for purposes of the Fair Labor Standards Act
("FLSA"). Defendants assert the positions are
properly classified as exempt because they are

"professional" occupations. Plaintiff complains that
the positions have been misclassified and that as a
result he has been denied overtime pay and pay for
on-call time, in violation of FLSA statutes and
regulations. Plaintiff brought this action on his own
behalf and on behalf of others similarly situated to
recover unpaid overtime compensation, an equal sum
in liquidated damages, interest, fees and costs,
pursuant to 29 U.S.C. § 216(b) [FN1].

Plaintiff seeks an order authorizing him to send
notice of the action and a form of consent to "others
similarly situated" in accordance with the Supreme
Court's recent approval of such procedures in
*Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165,
110 S.Ct. 482, 107 L.Ed.2d 480 (1989). Plaintiff
contends that this Opt-In Class should include:

All present or former employees of the State of
Arizona who, at any time since March 10, 1989,
worked overtime hours without receiving overtime
pay and/or were not paid for time spent in
restricted on-call status.

Plaintiff contends this class definition complies with
the test established by the Ninth Circuit in *Church v.
Consolidated Freightways, Inc.* for determining
whether the plaintiff and class members were
"similarly situated." *Church,* 137 F.R.D. 294
(N.D.Cal.1991). Plaintiff asserts that defendants
tried to avoid paying overtime wages mandated by
FLSA by incorrectly classifying employee positions
as exempt based on their rate of pay rather than on
the criteria required to be applied under FLSA.
Plaintiff further alleges all members of the defined
class were "affected by a similar plan," *Church,* 137
F.R.D. at 308, in the sense that the defendants
classified non-exempt employees as exempt and
failed to pay them for restricted on-call time.

*2 Plaintiff also seeks approval of a notice and form
of consent to be sent to members of the Opt-In Class.
Plaintiff asserts that the proposed notice and consent
attached to the motion is "clear, fair and accurate"
and tracks the language of notices and consent forms
approved in other cases.

Finally, plaintiff seeks an order requiring defendants
to produce a list of the names and addresses of the
Opt-In Class within 15 days of the date of the hearing
for use in mailing the notice and consent form to
class members. Plaintiff argues that the Court in
*Sperling* approved discovery of this information in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 566321 (D.Ariz.)
(Cite as: 1992 WL 566321 (D.Ariz.))

Page 2

order to facilitate early notice to potential class members. In addition, plaintiff reminds the court that the statute of limitations for actions brought under § 216(b) does not toll for any opt-in plaintiff until written consent has been filed.

Defendants object to plaintiff's inclusion of all state employees in the Opt-In Class. First, defendants argue that classifications for DPS employees are determined exclusively by a Law Enforcement Merit Systems Council ("LEMSC") which has no function outside the DPS. For that reason, defendants argue that classifications are not made by a "centralized decision-making process" as plaintiff has alleged, and the classifications and job conditions of employees in other state agencies and entities are unrelated to those of DPS employees. Further, defendants argue that the class plaintiff proposes is so overly broad as to include attorneys and elected officials who clearly are exempt under the statutes and regulations and not intended to be included in the class. Finally, defendants argue that the only foundation asserted by plaintiffs in support of the broad class definition is affidavits of plaintiff and two other LPEs which pertain solely to their own positions in the DPS. [FN2]

Defendants would restrict the Opt-In Class to persons employed by the DPS in the position of LPE II or LPE III. Defendants argue that classifications are fact-specific determinations that require investigation and study because of the varying specific requirements for each of the three white-collar exemptions: executive, administrative and professional. Defendants assert that the LEMSC classifies positions based on the requirements of the statute and regulations pertaining to these exemptions and deny that this determination is based solely on pay grade as plaintiff alleges.

As a second basis for limiting the Opt-In Class to persons employed as LPE II or LPE III, defendants maintain that the on-call restrictions vary greatly among the large variety of DPS positions that require on-call status, depending upon the unique demands made on various departments and the availability of personnel to meet those demands. Defendants deny there is any uniform policy within DPS concerning such restrictions and argue that plaintiff's limited experience with the restrictions placed on LPE II and III employees in Tucson does not provide grounds for asserting that other DPS employees in positions requiring on-call status are "similarly situated" for purposes of this action.

*3 Finally, defendants contend notice is not necessary to adequately inform potential class members of this action because notice and a consent form similar to that proposed by this motion were previously sent to all members of the Associated Highway Patrolmen of Arizona ("AHPA"). Defendants further argue, however, that the notice sent to AHPA members is likely to mislead persons not similarly situated to plaintiff to believe they may be part of the class. Consequently, defendants urge the court to treat any opt-in notices received as a result of that mailing with suspicion.

The court finds plaintiff has failed to make even a prima facie showing in support of his proposed definition of the Opt-In Class. First, plaintiff has shown no credible evidence in support of his allegation that he was deprived of overtime and on-call compensation as the result of a "centralized decision making process" that affected all employees of the State of Arizona. Defendants have demonstrated that the classification of LPE II and LPE III as exempt positions was made by a body whose determinations affected only DPS employees. The only evidence suggesting that all state employees are classified using the same method allegedly used by the LEMSC is a statement by another LPE, Robert Taverno, that he has been "informed" that was the case. Tavernaro Affidavit ¶ 6. This is one of the statements defendants have moved to strike. The court will grant that motion. Plaintiff may be correct that the evidence offered in support of a preliminary notice determination need not meet Rule 56(e) standards of admissibility. Tavern's statement, however, is so lacking in foundation that, even if admissible, it deserves no weight whatsoever. Tavernaro does not even go so far as to identify the source of the "information" he purports to have received.

Second, plaintiff's definition would include employees classified as non-exempt who nevertheless did not receive overtime pay for overtime work or for time spent in on-call status restrictions sufficient to require compensation under the FLSA. Any claims of such employees would necessarily have a totally different factual basis from plaintiff who alleges that he did not receive compensation for overtime work solely because he was misclassified as exempt. Thus, to the extent the Opt-In Class includes employees not paid an overtime rate for overtime work, the class must be restricted to DPS employees classified as exempt during the relevant period.

Third, plaintiff's allegation that the LEMSC

Not Reported in F.Supp.                                                                                      Page 3
Not Reported in F.Supp., 1992 WL 566321 (D.Ariz.)
(Cite as: 1992 WL 566321 (D.Ariz.))

classified positions as exempt based solely on the position's pay grade is unsupported by any credible evidence. Again, plaintiff alleges only "preliminary indications" that classifications were based on pay grade and cites in support only Tavernaro's affidavit. Again, Tavernaro bases his assertion solely on "information" he received from some unidentified source in the Human Resources Department of DPS. Tavernaro Affidavit ¶ 6. Defendants respond with an equally unsupported assertion that exempt classifications were based on "investigation and study" and on "the requirements of the Act and its regulations pertaining to white-collar exemptions." Response at 8-9 & 9 n. 3.

*4 Neither party has presented sufficient evidence for the court to reach even an inconclusive determination as to whether the exempt classifications of all DPS employees resulted from an improper reliance on pay grade alone rather than on the requirements of the statute and regulations as they pertain to each position. Without some evidence that the determination was based upon pay grade or some other improper basis applied across-the-board, the court can only conclude that the determination to classify the positions of LPE II and LPE III as exempt was based on factors unique to that position or perhaps other closely related positions not identified in plaintiff's motion. The determination that an attorney is exempt as "professional," for example, presumably would be based on a completely different analysis than a similar determination for the position of LPE II or LPE III. The court finds no grounds for including all purportedly exempt DPS employees in the Opt-In Class absent some evidence that the classification of the numerous and varied positions had a common improper basis. Thus, unless plaintiff can present some credible evidence that the classification of LPE II and LPE III as exempt was based solely or primarily on pay grade or a similarly improper basis applied to numerous other positions in DPS, the court intends to limit the Opt-In Class to persons employed in the position of LPE II or LPE III.

Plaintiff similarly has failed to make any prima facie showing that he is similarly situated to any DPS employees other than other persons employed as LPE II or LPE III with regard to his alleged deprivation of compensation for on-call time. Plaintiff implies that he has raised an issue concerning whether defendants' "policy of denying pay" for on-call time violates the FLSA. Motion at 4. The court has searched in vain for any factual basis in plaintiff's complaint or motion, however, which would indicate that the DPS,

much less the State of Arizona, has any centralized policy concerning pay for on-call status. In fact, the only evidence related to this issue, a memo from a DPS staff attorney to assistant directors, indicates that on-call restrictions are established by individual supervisors. Anderson Affidavit, Exhibit C. The memo does nothing more than provide general guidelines concerning the types of restrictions held by courts to make on-call time compensable. *Id.*

As defendants note, addressing the question of pay for on-call status requires a fact-intensive inquiry related to the peculiar characteristics of the position in question and the requirements of the employer. *Skidmore v. Swift & Co.,* 323 U.S. 134, 136-37, 65 S.Ct. 161, 163 (1944). Plaintiff may be correct that the determination of whether pay for on-call status is required under the FLSA does not require a "job duties analysis." Motion at 11. The analysis required to determine whether the restrictions placed upon the employee are sufficient to require compensation, however, would be just as individualized and fact-intensive as a job duties analysis.

*5 The court recognizes the concept so strongly relied upon by plaintiff that approval of a notice and consent form does not require a determination that all persons receiving the notice are similarly situated to the plaintiff. The court does not interpret either *Sperling* or *Church,* however, as fostering the approach suggested by plaintiff: that the court authorize notice to the broadest possible class of plaintiffs, based solely on plaintiff's unsupported allegations, and decline to make even a preliminary determination of whether the potentially huge number of opt-in plaintiffs that may result actually are or may be similarly situated to the plaintiff. The court does not consider such an approach to be consistent with orderly management of the litigation, the recognized purpose for allowing early court-approved notice to potential plaintiffs. *Sperling,* 110 S.Ct. at 487.

Further, the court disagrees with plaintiff that *Church* is directly on point on the issues raised by this motion. In *Church,* the court rejected the notion that the class must be narrowly circumscribed to include only those occupying the same positions at the same locations as the named plaintiffs, reporting to the same supervisors or terminating employment for the same reason. *Church,* 137 F.R.D. at 308. The court held, however, that "[w]hat governs the scope of the class is whether the named plaintiffs and the class members were all affected by a similar plan

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 566321 (D.Ariz.)
(Cite as: 1992 WL 566321 (D.Ariz.))

Page 4

infected by discrimination." *Id.* The court determined that the plaintiffs in that case had alleged a sufficient factual basis to indicate a common scheme of terminating older employees to reduce the costs of severance benefits. *Id.* at 309.   Unlike in *Church,* plaintiff has not provided a sufficient factual basis in this case to indicate that the employees he seeks to include in the Opt-In Class were "all affected by a similar plan" to deny them compensation for overtime and on-call status.

Until plaintiff provides some acceptable evidence [FN3] indicating that his exempt classification has the same or a similar improper basis as that of other DPS employees and/or that on-call compensation was determined pursuant to policies established by the LEMSC or another centralized decision-making body, the court will not include in the Opt-In Class any employees other than LPE II's and LPE III's. The court will, however, allow plaintiff to conduct discovery on these issues and will order defendants to respond promptly and fully to such requests.   To the extent such information has previously been requested and responses are due or past due, the court will order defendants to produce the requested information immediately or show why they are unable to do so.   In the meantime, plaintiff may at his option propose a revised form of notice and consent to be sent only to persons employed by the DPS as LPE II or LPE III, pending the court's determination of whether notice should be sent to a broader class of potential plaintiffs.   The court will not, of course, require defendants to respond to discovery requesting the names and addresses of Opt-In Class members unless plaintiff voluntarily restricts that request to the names and addresses of persons employed as LPE II and LPE III or until the class has been finally defined, either by court order or by stipulation of the parties.

*6 IT IS ORDERED denying, without prejudice, plaintiff's motion to approve and authorize notice and to require defendants to provide the name and addresses of opt-in class members (Doc. No. 6).

IT IS FURTHER ORDERED granting defendants' motion to strike.

DATED this 29 day of July, 1992.

> FN1. The statute provides in relevant part:
> Any employer who violates the provisions of section 206 or section 207 of this title shall be liable to the employee or employees affected in the amount of their ... unpaid overtime   compensation   ...   and   in   an additional   equal   amount   as   liquidated damages ...   An action to recover [such] liability may be maintained against any employer (including a public agency) in any Federal   or   State   court   of   competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated.   No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.   The court in such action shall, in addition to any judgment awarded to   the   plaintiff   or   plaintiffs,   allow   a reasonable attorney's fee to be paid by the defendant, and costs of the action.

> FN2.   The court has granted defendants' separate motion to strike portions of the affidavits of these individuals in which they state their understanding of the method by which   DPS   determined   the   exempt classifications and its similarity to the method employed by the State of Arizona outside the DPS.

> FN3.   The court emphasizes that it will not require plaintiff to provide the substantial evidence of such policies that can only be obtained after full discovery on the merits. The court finds, however, that to date plaintiff   has   provided   essentially   no evidence that exemption classifications of all DPS employees had a similar improper basis or that plaintiff's alleged deprivation of compensation for on-call status was the result of any "centralized decision-making process."

Not Reported in F.Supp., 1992 WL 566321 (D.Ariz.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## CERTIFICATE OF SERVICE

I, Michael P. Kelly, hereby certify that a true and correct copy of Compendium to

Defendants' Supplemental Brief in Further Support of its Opposition to Plaintiff's Expedited

Motion to Conditionally Certify a FLSA Collective Action was served via e-file on this 3rd day

of November, 2006, upon the following:

> Vivian L. Rapposelli, Esquire (#3204)
> Rapposelli, Castro & Gonzales
> 1300 Grant Ave., St. 100
> Wilmington, DE  19806

/s/ Michael P. Kelly
Michael P. Kelly