## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

**RAMON VILLANUEVA-BAZALDUA**
**individually and on behalf of others similarly**
**situated,**

        **Plaintiff**

**v.**

**TRUGREEN LIMITED PARTNERS and**
**TRUGREEN, INC.**

        **Defendants.**

**CA 1:06-cv-00185-GMS**

**Class Action**

---

## PLAINTIFF'S APPENDIX
## TO
## PLAINTIFF'S MOTION FOR RECONSIDERATION OF
## MOTION TO CONDITIONALLY CERTIFY AN FLSA CLASS
## OR ALTERNATIVELY AMENDED MOTION FOR CONDITIONAL
## CERTIFICATION

Vivian L. Rapposelli
DE. Bar No.: 3204
Rapposelli & Gonzales
1300 Grant Ave., Suite 100
Wilmington, Delaware 19806
Tel: 302-652-8711

Edward Tuddenham
Tx Bar No. 20282300
153 Upland Rd.
Cambridge, Mass 02140
617-576-2182

ATTORNEYS FOR PLAINTIFF

1

## TABLE OF CONTENTS

Affidavit of Edward Tuddenham . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . App-5

List of TruGreen Offices and H-2B workers 2003-2006
     Produced by Counsel for Defendant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .App-9

     Summary of information on List of TruGreen Offices . . . . . . . . . . . . . . . . . . . . . . . . App-21

Sample Documents From Individual H-2B Worker Files
     Produced By Defendant From LLS Files . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . App-23

     Worker A – Thorofare N.J. Office  2005
          Terms of Employment Document (TRU 1554). . . . . . . . . . . . . . . . . . . . . .App-25
          Document Listing Expenses Owed (TRU 1556) w/ English translation.. . . . .App-27

     Worker B – Malvern Pa. Office  2005
          Terms of Employment Document (TRU 2205). . . . . . . . . . . . . . . . . . . . . App-30
          Document Listing Expenses Owed (TRU 2207) w/ English translation . . . . App-32

     Worker C – Sterling Va. Office 2004
          Terms of Employment Document (TRU 1518). . . . . . . . . . . . . . . . . . . . . App-35
          Document Listing Expenses Owed (TRU 1519) w/ English Translation . . . . App-36

     Worker D – Allentown Pa. Office 2004
          Terms of Employment Document (TRU 2153). . . . . . . . . . . . . . . . . . . . . .App-39
          Document Listing Expenses Owed (TRU 2154) w/ English Translation . . . .App-40

     Worker E – S. Plainfield N.J.  2004
          Terms of Employment Document (TRU 1880) . . . . . . . . . . . . . . . . . . . . . App-43
          Document Listing Expenses Owed (TRU 1881) w/ English Translation . . . App-44

     Worker F – Westerville Ohio 2003
          Terms of Employment Document (TRU 1609) . . . . . . . . . . . . . . . . . . . . . .App-47
          Document Listing Expenses Owed (1610) w/ English Translation . . . . . . . .App-48

     Worker G – Sterling Va. Office 2006
          Terms of Employment Document (TRU 1389) w/ English Translation . . . . .App-51
          Document Listing Expenses Owed (1610) w/ English Translation . . . . . . . .App-53

Worker H – Upper Saddle River, N.J.  2006
  Terms of Employment Document (TRU 1570) w/ English Translation . . . .App-56

  Document Listing Expenses Owed (TRU 1572) w/ English Translation . . . App-58

Summaries of Information Contained In Individual Worker Files
  Produced by Defendants

  1.  Summary of Terms of Employment Documents showing number
  of workers assigned to each branch office, each year, and their wage rates. . . . . . . . .  App-62

  2.  Summary of Bate Stamp Nos. Of "terms of employment document"
  and "document listing expenses owed" from each worker file . . . . . . . . . . . . . . . . . . . .App-66

Defendants' Response To Request for Admission 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . App-76

Defendants' Responses to Plaintiff's Interrogatories 4, 5, and 31 . . . . . . . . . . . . . . . . . . . . App-80

Deposition of James Vacchiano pages 1-5, 112-113, 124, 125-126 . . . . . . . . . . . . . . . . . . App-90

TruGreen Document TRU-94 (*see* Vacchiano deposition at 124). . . . . . . . . . . . . . . . . . . . App-100

TruGreen Document TRU-530 (*see* Vacchiano deposition at 112-113). . . . . . . . . . . . . . . App-103

*Recinos-Recinos v. Express Forestry, Inc,* 2006 WL 197030 (E.D. La. 2006). . . . . . . . . . .App-105

AFFIDAVIT OF EDWARD TUDDENHAM

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

**RAMON VILLANUEVA-BAZALDUA**
**individually and on behalf of others similarly**
**situated,**

        **Plaintiff**

v.

**TRUGREEN LIMITED PARTNERS and**
**TRUGREEN, INC.**

        **Defendants.**

**CA 1:06-cv-00185-GMS**

**Class Action**

_____

### AFFIDAVIT OF EDWARD TUDDENHAM

NOW COMES Edward Tuddenham and states that were he called as a witness in this action he would testify under oath as follows:

1.    I am an attorney licensed to practice law in the State of Texas and have been so licensed since May of 1979. My business address is 153 Upland Rd., Cambridge, Mass. 02140.

2.    I am one of the attorneys of record for Plaintiff Ramon Villanueva-Bazaldua in the above referenced action.

3.    On August 29, 2006 Plaintiffs served Requests for Admission, Interrogatories, and Requests for Production on Defendants related to Plaintiff's class allegations.

4.    On September 28, 2006, Defendants served written responses to Plaintiff's discovery requests. Defendants interposed three blanket objections these requests.

5.    In an effort to try to resolve these objections and avoid a motion to compel, counsel for Plaintiff and Defendants engaged in lengthy correspondence between October and February 2007

App-5

in an effort to narrow their differences.[1]   As a result of these negotiations, from January and March 2007 Defendants produced some of the documents relevant to the class allegations and some supplemental answers to interrogatories.  The documents produced included:

A. A list of the TruGreen Branch Offices hiring H-2B workers, the number of workers hired by each branch each year, and an indication of whether those workers were paid on an hourly or a salary basis.  TRU 198B-TRU 206B.  Copy filed herewith at App-9 to App.-20.  I produced a summary of the information contained on this list which appears as App. 22  immediately behind the document produced by Defendants.

B.   Individual files for H-2B workers hired by TruGreen in 2003-2006.   Defendants represented that these files came from LLS, the entity in Mexico that recruited the workers.  TRU 1380-TRU 3370.  Each of these individual files contains, among other things, two documents signed by the worker: (1) A document setting forth the terms of employment being offered to the worker, including the wage rate and the branch office to which the worker is assigned.  This document is variously called "Terms of Employment" or "Employer Disclosure Affidavit" but contains essentially the same information regardless of title.  (2) A document setting forth the various visa fees, administrative fees, and travel expenses that the worker must pay for (these documents were called "Conditions for Obtaining a Work Visa"and "Agreement on Labor Conditions" from 2003-2005 and "Commission Agency Agreement" in 2006, but again, regardless of title, all versions set forth the same charges owed by workers).  Sample copies of eight individual worker files containing

---

[1] Without burdening the court with copies of the lengthy negotiations suffice it to say that counsel for Plaintiff wrote to counsel for Defendants on October 2, 2006, November 1, 2006, November 8, 2006, November 16, 2006, November 17, 2006, December 12, 2006 and communicated by e-mail December 1, 2006 and January 3, 2007.  Counsel for Defendant corresponded with counsel for Plaintiff on October 20, 2006, November 8, 2006, November 14, 2006, November 17, 2006, November 27, 2006, and February 9, 2007 and communicated by e-mail on December 4, 2006.

these documents are attached at App.-23 through App.-61.[2] These two documents which appear in each worker's file contain the same information the job and the expenses owed by the worker as the two documents presented to Plaintiff at the time of his recruitment that were previously filed with the Court at D.I. 16 at A16 and A17.

6. Rather than attach all of the voluminous worker files produced by Defendant, I have attached sample copies of the worker files and compiled two summaries of the voluminous documents in the individual files. The first summary, titled "Workers/Locations/Wages" at App-63 to App-65, summarizes the information on the "terms of employment" documents in each worker file. The summary is organized by branch office and indicates for each branch the number of workers whose terms of employment document assigned them to that branch office, the wage rate set forth forth on the signed "terms of employment" document, and the Bate Stamp Number of the "terms of employment" documents from which the summary was drawn.

7. The second summary, titled "Individual Worker Files" lists the Bates Stamp Numbers of the two documents (i.e. the "terms of employment" document and the document listing the expenses owed by the worker) contained in each worker file. This summary demonstrates that virtually all of the H-2B workers signed both kinds of documents. (There are a few instances where the second document does not appear in the file which may have been a copying error or an oversight at the time the documents were obtained). That summary is attached at App.-67 to App.-75.

8. The documents in the individual worker files setting forth the expenses each worker must pay indicate that in 2006 the "administrative fee" charged by LLS increased to $165.

---

[2] Translations of documents in Spanish appear immediately behind the Spanish document. Translations do not have TRU bate stamp numbers. Documents in English with a TRU bate stamp number were in English in the original produced by Defendant.

App-7

9. Copies of Defendants responses to Request for Admission 1, and Interrogatories 4, 5, and are filed herewith at App.-77 (Admission) and App.-80 to App.-86 (interrogatories).

10. Defendant continues to refuse to answer Interrogatory 31 which asked about the amount of discretionary "bonus" monies provided to H-2B workers when they arrived at work. A copy of that Interrogatory and Defendants response is filed herewith as App.-87 to App.-88.

11. Attached as App-91 through App-99 are excerpts from the deposition of James Vacchiano and the two documents produced by TruGreen referenced in those excepts, TRU-94 and TRU-530, appear at App-100 to App-102 and App-103to App-104.

12. I declare under penalty of perjury that the foregoing statements are true and correct.

Date: _3·27·2007_

Edward Tuddenham

Tx. Bar No. 20282300

App-8

LIST OF TRUGREEN OFFICES
USING H-2B WORKERS
2003-2006

PRODUCED BY COUNSEL FOR DEFENDANT
FEBRUARY 9, 2007

Morgan, Lewis & Bockius LLP
One Oxford Centre
Thirty-Second Floor
Pittsburgh, PA 15219-6401
Tel: 412.560.3300
Fax: 412.560.7001
www.morganlewis.com

**Beth M. Henke**
412.560.3346
bhenke@morganlewis.com

# Morgan Lewis
C O U N S E L O R S   A T   L A W

February 9, 2007

**VIA .PDF**

Edward Tuddenham, Esquire
153 Upland Road
Cambridge, MA  02140
*etudden@io.com*

Re:    Villanueva v. TruGreen Limited Partnership, et al.
       Civil Action No. 1:06-cv-00185-GMS (D. Del.)

Dear Ed:

I have attached an updated "Summary of H2B Workers Across Branches (LawnCare Division Only)" which accurately reflects all of the ChemLawn branches that had H-2B workers in any of the years from 2003-2006.

In comparison to the original chart, we discovered certain information that required revision and/or deletion. Specifically:

- The new chart was put into an alphabetical order by branch name (the original chart was not);

- A few typographical errors in position titles were corrected;

- Branch names were corrected;

- LandCare branches were deleted; and

- Position titles were corrected.

With respect to specific branches, please note the following:

- DC South:  Missing position information was identified and added.

- Vienna:  This branch formerly was referred to as "AgroLawn Vienna."

- Columbus North:  This branch formerly was incorrectly identified as "Columbia North."

**Morgan Lewis**
COUNSELORS AT LAW

Edward Tuddenham
February 9, 2007
Page 2

- Yaphank (LI East):  This branch formerly was incorrectly identified as "Long Island East.

- Maple Grove:  This is the only ChemLawn branch in Minnesota that used H-2B workers at any time between 2003-2006.

- Morris:  Based on new (confirmed) information received, the correct numbers of workers are reflected in the attached chart.

- Boston East:  As explained in a prior email, Plymouth and Boston East are the same branch, so the 2 workers previously identified for Plymouth were moved under Boston East.

- Westbrook:  This branch is the same as the Portland branch and, therefore, Westbrook has been deleted as duplicative.

Please feel free to contact me if you have any questions.

Very truly yours,

*Beth M. Henke*

Beth M. Henke

BMH:nmm

Attachment

App-11

1-PI/176354.1

## Summary of H2B Workers

| Year | Branch | State | Position | Pay Class |
|------|--------|-------|----------|-----------|
| 2003 | Allentown | PA | Lawn Specialist | Plan |
| 2003 | Allentown | PA | Applicator | Hourly |
| 2003 | Allentown | PA | Lawn Specialist | Plan |
| 2003 | Allentown | PA | Applicator | Hourly |
| 2003 | Allentown | PA | Lawn Specialist | Plan |
| 2003 | Allentown | PA | Lawn Specialist | Plan |
| 2004 | Allentown | PA | Lawn Specialist | Plan |
| 2004 | Allentown | PA | Lawn Specialist | Plan |
| 2004 | Allentown | PA | Lawn Specialist | Plan |
| 2004 | Allentown | PA | Lawn Specialist | Plan |
| 2004 | Allentown | PA | Lawn Specialist | Plan |
| 2004 | Allentown | PA | Lawn Specialist | Plan |
| 2005 | Allentown | PA | Lawn Specialist | Plan |
| 2005 | Allentown | PA | Lawn Specialist | Plan |
| 2005 | Allentown | PA | Lawn Specialist | Plan |
| 2005 | Allentown | PA | Lawn Specialist | Plan |
| 2005 | Allentown | PA | Lawn Specialist | Plan |
| 2005 | Allentown | PA | Lawn Specialist | Plan |
| 2006 | Allentown | PA | Lawn Specialist | Plan |
| 2006 | Allentown | PA | Lawn Specialist | Plan |
| 2006 | Allentown | PA | Lawn Specialist | Plan |
| 2003 | Bergen | NJ | Route Manager | Plan |
| 2003 | Bergen | NJ | Route Manager | Plan |
| 2003 | Bergen | NJ | Route Manager | Plan |
| 2004 | Bergen | NJ | Route Manager | Plan |
| 2004 | Bergen | NJ | Laborer | Hourly |
| 2004 | Bergen | NJ | Route Manager | Plan |
| 2004 | Bergen | NJ | Route Manager | Plan |
| 2004 | Bergen | NJ | Route Manager | Plan |
| 2005 | Bergen | NJ | Route Manager | Plan |
| 2005 | Bergen | NJ | Route Manager | Plan |
| 2005 | Bergen | NJ | Route Manager | Plan |
| 2005 | Bergen | NJ | Route Manager | Plan |
| 2005 | Bergen | NJ | Route Manager | Plan |
| 2005 | Bergen | NJ | Route Manager | Plan |
| 2006 | Bergen | NJ | Route Manager | Plan |
| 2006 | Bergen | NJ | Route Manager | Plan |
| 2006 | Bergen | NJ | Route Manager | Plan |
| 2006 | Bergen | NJ | Route Manager | Plan |
| 2006 | Boston East | MA | Applicator Non-DOT | Hourly |
| 2006 | Boston East | MA | Applicator Non-DOT | Hourly |

## Summary of H2B Workers

| Year | Branch | State | Position | Pay Class |
|------|--------|-------|----------|-----------|
| 2006 | Boston East | MA | Laborer | Hourly |
| 2006 | Boston East | MA | Laborer | Hourly |
| 2006 | Boston West | MA | Laborer | Hourly |
| 2006 | Boston West | MA | Laborer | Hourly |
| 2006 | Boston West | MA | Laborer | Hourly |
| 2006 | Boston West | MA | Laborer | Hourly |
| 2003 | Columbus North | OH | Lawn Laborer | Hourly |
| 2003 | Columbus North | OH | Lawn Laborer | Hourly |
| 2003 | Columbus North | OH | Lawn Laborer | Hourly |
| 2003 | Columbus North | OH | Lawn Laborer | Hourly |
| 2003 | DC North | DC | Lawn Care Specialist | Plan |
| 2003 | DC North | DC | Lawn Care Specialist | Plan |
| 2003 | DC North | DC | Lawn Care Specialist | Plan |
| 2003 | DC North | DC | Lawn Care Specialist | Plan |
| 2004 | DC North | DC | Lawn Care Specialist | Plan |
| 2004 | DC North | DC | Lawn Care Specialist | Plan |
| 2004 | DC North | DC | Lawn Care Specialist | Plan |
| 2005 | DC North | DC | Lawn Care Specialist | Plan |
| 2005 | DC North | DC | Lawn Care Specialist | Plan |
| 2005 | DC North | DC | Lawn Care Specialist | Plan |
| 2005 | DC North | DC | Lawn Care Specialist | Plan |
| 2005 | DC North | DC | Lawn Care Specialist | Plan |
| 2006 | DC North | DC | Lawn Care Specialist | Plan |
| 2006 | DC North | DC | Lawn Care Specialist | Plan |
| 2006 | DC North | DC | Lawn Care Specialist | Plan |
| 2006 | DC North | DC | Lawn Care Specialist | Plan |
| 2003 | DC South | DC | Laborer | Hourly |
| 2003 | DC South | DC | Laborer | Hourly |
| 2003 | DC South | DC | Laborer | Hourly |
| 2003 | DC South | DC | Laborer | Hourly |
| 2004 | DC South | DC | Laborer | Hourly |
| 2004 | DC South | DC | Laborer | Hourly |
| 2004 | DC South | DC | Laborer | Hourly |
| 2005 | DC South | DC | Laborer | Hourly |
| 2005 | DC South | DC | Laborer | Hourly |
| 2005 | DC South | DC | Laborer | Hourly |
| 2005 | DC South | DC | Laborer | Hourly |
| 2005 | DC South | DC | Laborer | Hourly |
| 2005 | DC South | DC | Laborer | Hourly |
| 2006 | DC South | DC | Laborer | Hourly |
| 2006 | DC South | DC | Laborer | Hourly |

## Summary of H2B Workers

| Year | Branch | State | Position | Pay Class |
|------|--------|-------|----------|-----------|
| 2006 | DC South | DC | Laborer | Hourly |
| 2006 | DC South | DC | Laborer | Hourly |
| 2003 | DC West | DC | Mower | Hourly |
| 2003 | DC West | DC | Lawn Laborer | Hourly |
| 2003 | DC West | DC | Lawn Laborer | Hourly |
| 2003 | DC West | DC | Lawn Laborer | Hourly |
| 2003 | DC West | DC | Lawn Laborer | Hourly |
| 2003 | DC West | DC | Mower | Hourly |
| 2003 | DC West | DC | Lawn Laborer | Hourly |
| 2003 | DC West | DC | Mower | Hourly |
| 2004 | DC West | DC | Mower | Hourly |
| 2004 | DC West | DC | Lawn Laborer | Hourly |
| 2004 | DC West | DC | Lawn Laborer | Hourly |
| 2004 | DC West | DC | Lawn Laborer | Hourly |
| 2004 | DC West | DC | Lawn Laborer | Hourly |
| 2004 | DC West | DC | Mower | Hourly |
| 2004 | DC West | DC | Lawn Laborer | Hourly |
| 2004 | DC West | DC | Mower | Hourly |
| 2004 | DC West | DC | Lawn Laborer | Hourly |
| 2005 | DC West | DC | Mower | Hourly |
| 2005 | DC West | DC | Laborer | Hourly |
| 2005 | DC West | DC | Laborer | Hourly |
| 2005 | DC West | DC | Laborer | Hourly |
| 2005 | DC West | DC | Mower | Hourly |
| 2005 | DC West | DC | Laborer | Hourly |
| 2005 | DC West | DC | Mower | Hourly |
| 2005 | DC West | DC | Mower | Hourly |
| 2005 | DC West | DC | Laborer | Hourly |
| 2005 | DC West | DC | Laborer | Hourly |
| 2005 | DC West | DC | Laborer | Hourly |
| 2005 | DC West | DC | Laborer | Hourly |
| 2006 | DC West | DC | Laborer | Hourly |
| 2006 | DC West | DC | Mower | Hourly |
| 2006 | DC West | DC | Laborer | Hourly |
| 2006 | DC West | DC | Laborer | Hourly |
| 2006 | DC West | DC | Mower | Hourly |
| 2006 | DC West | DC | Laborer | Hourly |
| 2006 | DC West | DC | Laborer | Hourly |
| 2006 | DC West | DC | Laborer | Hourly |
| 2006 | DC West | DC | Laborer | Hourly |
| 2006 | DC West | DC | Mower | Hourly |

App-14

## Summary of H2B Workers

| Year | Branch | State | Position | Pay Class |
|------|--------|-------|----------|-----------|
| 2006 | DC West | DC | Laborer | Hourly |
| 2006 | DC West | DC | Mower | Hourly |
| 2006 | DC West | DC | Laborer | Hourly |
| 2006 | DC West | DC | Laborer | Hourly |
| 2006 | DC West | DC | Laborer | Hourly |
| 2006 | DC West | DC | Laborer | Hourly |
| 2006 | Hagerstown | MD | Lawn Care Specialist DOT | Plan |
| 2006 | Hagerstown | MD | Lawn Care Specialist DOT | Plan |
| 2003 | Malvern | PA | DOT Applicator | Hourly |
| 2003 | Malvern | PA | DOT Applicator | Hourly |
| 2003 | Malvern | PA | Lawn Laborer | Hourly |
| 2003 | Malvern | PA | Lawn Laborer | Hourly |
| 2003 | Malvern | PA | Lawn Laborer | Hourly |
| 2004 | Malvern | PA | Lawn Laborer | Hourly |
| 2004 | Malvern | PA | DOT Applicator | Hourly |
| 2004 | Malvern | PA | DOT Applicator | Hourly |
| 2004 | Malvern | PA | Lawn Laborer | Hourly |
| 2004 | Malvern | PA | DOT Applicator | Hourly |
| 2004 | Malvern | PA | DOT Applicator | Hourly |
| 2004 | Malvern | PA | Lawn Laborer | Hourly |
| 2004 | Malvern | PA | Lawn Laborer | Hourly |
| 2005 | Malvern | PA | Lawn Care Specialist DOT | Plan |
| 2005 | Malvern | PA | Lawn Care Specialist DOT | Plan |
| 2005 | Malvern | PA | Lawn Care Specialist DOT | Plan |
| 2005 | Malvern | PA | Lawn Care Specialist DOT | Plan |
| 2005 | Malvern | PA | Laborer | Hourly |
| 2005 | Malvern | PA | Lawn Care Specialist DOT | Plan |
| 2005 | Malvern | PA | Lawn Care Specialist DOT | Plan |
| 2005 | Malvern | PA | Lawn Care Specialist DOT | Plan |
| 2005 | Malvern | PA | Lawn Care Specialist DOT | Plan |
| 2006 | Malvern | PA | Lawn Care Specialist Non-DOT | Plan |
| 2006 | Malvern | PA | Lawn Care Specialist DOT | Plan |
| 2006 | Malvern | PA | Lawn Care Specialist DOT | Plan |
| 2006 | Malvern | PA | Lawn Care Specialist DOT | Plan |
| 2006 | Malvern | PA | Lawn Care Specialist DOT | Plan |
| 2006 | Malvern | PA | Lawn Care Specialist DOT | Plan |
| 2006 | Malvern | PA | Lawn Care Specialist DOT | Plan |
| 2006 | Malvern | PA | Lawn Care Specialist Non-DOT | Plan |
| 2006 | Malvern | PA | Lawn Care Specialist DOT | Plan |
| 2006 | Malvern | PA | Lawn Care Specialist DOT | Plan |
| 2006 | Malvern | PA | Lawn Care Specialist Non-DOT | Plan |

## Summary of H2B Workers

| Year | Branch | State | Position | Pay Class |
|------|--------|-------|----------|-----------|
| 2006 | Malvern | PA | Lawn Care Specialist Non-DOT | Plan |
| 2003 | Maple Grove | MN | Laborer | Hourly |
| 2003 | Maple Grove | MN | Laborer | Hourly |
| 2003 | Maple Grove | MN | Laborer | Hourly |
| 2003 | Middlesex | NJ | Laborer | Hourly |
| 2003 | Middlesex | NJ | Laborer | Hourly |
| 2003 | Middlesex | NJ | Laborer | Hourly |
| 2003 | Middlesex | NJ | Laborer | Hourly |
| 2003 | Middlesex | NJ | Laborer | Hourly |
| 2003 | Middlesex | NJ | Laborer | Hourly |
| 2004 | Middlesex | NJ | Laborer | Hourly |
| 2004 | Middlesex | NJ | Laborer | Hourly |
| 2004 | Middlesex | NJ | Laborer | Hourly |
| 2004 | Middlesex | NJ | Laborer | Hourly |
| 2004 | Middlesex | NJ | Laborer | Hourly |
| 2004 | Middlesex | NJ | Laborer | Hourly |
| 2004 | Middlesex | NJ | Laborer | Hourly |
| 2004 | Middlesex | NJ | Laborer | Hourly |
| 2004 | Middlesex | NJ | Laborer | Hourly |
| 2004 | Middlesex | NJ | Laborer | Hourly |
| 2005 | Middlesex | NJ | Laborer | Hourly |
| 2005 | Middlesex | NJ | Laborer | Hourly |
| 2005 | Middlesex | NJ | Laborer | Hourly |
| 2005 | Middlesex | NJ | Laborer | Hourly |
| 2005 | Middlesex | NJ | Laborer | Hourly |
| 2005 | Middlesex | NJ | Laborer | Hourly |
| 2005 | Middlesex | NJ | N/A | N/A |
| 2005 | Middlesex | NJ | Laborer | Hourly |
| 2005 | Middlesex | NJ | Laborer | Hourly |
| 2005 | Middlesex | NJ | Laborer | Hourly |
| 2006 | Middlesex | NJ | Lawn Care Specialist | Plan |
| 2006 | Middlesex | NJ | Lawn Care Specialist DOT | Plan |
| 2006 | Middlesex | NJ | Landscape Crew Member | Hourly |
| 2006 | Middlesex | NJ | Landscape Crew Member | Hourly |
| 2006 | Middlesex | NJ | Lawn Care Specialist | Plan |
| 2006 | Middlesex | NJ | Lawn Care Specialist | Plan |
| 2006 | Middlesex | NJ | Hort Specialist | Plan |
| 2006 | Middlesex | NJ | Lawn Care Specialist DOT | Plan |
| 2006 | Middlesex | NJ | Lawn Care Specialist DOT | Plan |

*App-16*

## Summary of H2B Workers

| Year | Branch | State | Position | Pay Class |
|------|--------|-------|----------|-----------|
| 2006 | Middlesex | NJ | Lawn Care Specialist DOT | Plan |
| 2006 | Middlesex | NJ | Laborer | Hourly |
| 2006 | Middlesex | NJ | Lawn Care Specialist DOT | Plan |
| 2003 | Monmouth | NJ | Commercial Specialist | Plan |
| 2004 | Monmouth | NJ | Commercial Specialist | Plan |
| 2004 | Monmouth | NJ | Commercial Specialist | Plan |
| 2004 | Monmouth | NJ | Commercial Specialist | Plan |
| 2006 | Monmouth | NJ | Lawn Care Specialist DOT | Plan |
| 2006 | Monmouth | NJ | Lawn Care Specialist DOT | Plan |
| 2006 | Monmouth | NJ | Lawn Care Specialist DOT | Plan |
| 2006 | Monmouth | NJ | Lawn Care Specialist DOT | Plan |
| 2003 | Morris | NJ | TG Lawn Care Specialist | Plan |
| 2003 | Morris | NJ | TG Lawn Care Specialist | Plan |
| 2003 | Morris | NJ | TG Lawn Care Specialist | Plan |
| 2003 | Morris | NJ | HLS Team Member | Hourly |
| 2004 | Morris | NJ | TG Lawn Care Specialist | Plan |
| 2004 | Morris | NJ | TG Lawn Care Specialist | Plan |
| 2004 | Morris | NJ | TG Lawn Care Specialist | Plan |
| 2004 | Morris | NJ | HLS Team Member | Hourly |
| 2004 | Morris | NJ | Lawn Laborer | Hourly |
| 2004 | Morris | NJ | HLS Team Member | Hourly |
| 2004 | Morris | NJ | HLS Team Member | Hourly |
| 2004 | Morris | NJ | TG Lawn Care Specialist | Plan |
| 2005 | Morris | NJ | Lawn Care Specialist DOT | Plan |
| 2005 | Morris | NJ | TG Lawn Care Specialist | Plan |
| 2005 | Morris | NJ | Lawn Care Specialist DOT | Plan |
| 2005 | Morris | NJ | Lawn Care Specialist DOT | Plan |
| 2005 | Morris | NJ | Mower | Hourly |
| 2005 | Morris | NJ | Laborer | Hourly |
| 2005 | Morris | NJ | Mower | Hourly |
| 2005 | Morris | NJ | TG Lawn Care Specialist | Plan |
| 2005 | Morris | NJ | Mower | Hourly |
| 2005 | Morris | NJ | Lawn Care Specialist DOT | Plan |
| 2006 | Morris | NJ | Lawn Care Specialist DOT | Plan |
| 2006 | Morris | NJ | Mower | Hourly |
| 2006 | Morris | NJ | Laborer | Hourly |
| 2006 | Morris | NJ | Mower | Hourly |
| 2006 | Morris | NJ | Mower | Hourly |
| 2006 | Morris | NJ | Lawn Care Specialist DOT | Plan |
| 2006 | Morris | NJ | Lawn Care Specialist DOT | Hourly |
| 2006 | Portland | ME | Applicator Non-DOT | Hourly |

App-17

## Summary of H2B Workers

| Year | Branch | State | Position | Pay Class |
|---|---|---|---|---|
| 2006 | Portland | ME | Applicator Non-DOT | Hourly |
| 2006 | Portland | ME | Applicator Non-DOT | Hourly |
| 2006 | Richmond | VA | Lawn Care Specialist DOT | Plan |
| 2006 | Richmond | VA | Lawn Care Specialist DOT | Plan |
| 2006 | Richmond | VA | Applicator Non-DOT | Hourly |
| 2006 | Richmond | VA | Applicator Non-DOT | Hourly |
| 2006 | Rocky Hill | CT | Laborer | Hourly |
| 2006 | Rocky Hill | CT | Laborer | Hourly |
| 2006 | Rocky Hill | CT | Laborer | Hourly |
| 2006 | Rocky Hill | CT | Laborer | Hourly |
| 2006 | Rocky Hill | CT | Laborer | Hourly |
| 2003 | South Jersey | NJ | Specialist | Plan |
| 2003 | South Jersey | NJ | Specialist | Plan |
| 2003 | South Jersey | NJ | Specialist | Plan |
| 2003 | South Jersey | NJ | Specialist | Plan |
| 2003 | South Jersey | NJ | Specialist | Plan |
| 2004 | South Jersey | NJ | Specialist | Plan |
| 2004 | South Jersey | NJ | Specialist | Plan |
| 2004 | South Jersey | NJ | Specialist | Plan |
| 2004 | South Jersey | NJ | Specialist | Plan |
| 2004 | South Jersey | NJ | Specialist | Plan |
| 2004 | South Jersey | NJ | Specialist | Plan |
| 2004 | South Jersey | NJ | Specialist | Plan |
| 2004 | South Jersey | NJ | Specialist | Plan |
| 2005 | South Jersey | NJ | Specialist | Plan |
| 2005 | South Jersey | NJ | Specialist | Plan |
| 2005 | South Jersey | NJ | Specialist | Plan |
| 2005 | South Jersey | NJ | Specialist | Plan |
| 2005 | South Jersey | NJ | Specialist | Plan |
| 2005 | South Jersey | NJ | Specialist | Plan |
| 2005 | South Jersey | NJ | Specialist | Plan |
| 2006 | South Jersey | NJ | Specialist | Plan |
| 2006 | South Jersey | NJ | Specialist | Plan |
| 2006 | South Jersey | NJ | Specialist | Plan |
| 2006 | South Jersey | NJ | Specialist | Plan |
| 2006 | South Jersey | NJ | Specialist | Plan |
| 2006 | South Jersey | NJ | Specialist | Plan |
| 2006 | South Jersey | NJ | Specialist | Plan |
| 2006 | Vienna | VA | Laborer | Hourly |
| 2006 | Vienna | VA | Laborer | Hourly |

App-18        TRU0204B

## Summary of H2B Workers

| Year | Branch | State | Position | Pay Class |
|------|--------|-------|----------|-----------|
| 2006 | Vienna | VA | Laborer | Hourly |
| 2004 | Warminster | PA | Lawn Laborer | Hourly |
| 2004 | Warminster | PA | Lawn Laborer | Hourly |
| 2004 | Warminster | PA | Lawn Laborer | Hourly |
| 2004 | Warminster | PA | Lawn Laborer | Hourly |
| 2005 | Warminster | PA | Laborer | Hourly |
| 2005 | Warminster | PA | Laborer | Hourly |
| 2005 | Warminster | PA | Lawn Care Specialist DOT | Plan |
| 2005 | Warminster | PA | Lawn Care Specialist DOT | Plan |
| 2006 | Warminster | PA | Laborer | Hourly |
| 2006 | Warminster | PA | Laborer | Hourly |
| 2006 | Warminster | PA | Lawn Care Specialist DOT | Plan |
| 2006 | Warminster | PA | Lawn Care Specialist DOT | Plan |
| 2003 | Wilmington | DE | TG Lawn Care Specialist | Plan |
| 2003 | Wilmington | DE | TG Lawn Care Specialist | Plan |
| 2003 | Wilmington | DE | TG Lawn Care Specialist | Plan |
| 2003 | Wilmington | DE | TG Lawn Care Specialist | Plan |
| 2004 | Wilmington | DE | TG Lawn Care Specialist | Plan |
| 2004 | Wilmington | DE | TG Lawn Care Specialist | Plan |
| 2004 | Wilmington | DE | TG Lawn Care Specialist | Plan |
| 2004 | Wilmington | DE | TG Lawn Care Specialist | Plan |
| 2004 | Wilmington | DE | TG Lawn Care Specialist | Plan |
| 2005 | Wilmington | DE | Lawn Care Specialist DOT | Plan |
| 2005 | Wilmington | DE | Lawn Care Specialist DOT | Plan |
| 2006 | Wilmington | DE | Lawn Care Specialist DOT | Plan |
| 2006 | Wilmington | DE | Commercial Specialist | Plan |
| 2005 | WoodLawn | MD | Lawn Care Specialist DOT | Plan |
| 2005 | WoodLawn | MD | Lawn Care Specialist DOT | Plan |
| 2005 | WoodLawn | MD | Lawn Care Specialist DOT | Plan |
| 2005 | WoodLawn | MD | Lawn Care Specialist DOT | Plan |
| 2006 | WoodLawn | MD | Lawn Care Specialist DOT | Plan |
| 2006 | WoodLawn | MD | Lawn Care Specialist DOT | Plan |
| 2006 | WoodLawn | MD | Lawn Care Specialist DOT | Plan |
| 2006 | WoodLawn | MD | Lawn Care Specialist DOT | Plan |
| 2003 | Yaphank (LI East) | NY | Lawn Laborer | Hourly |
| 2003 | Yaphank (LI East) | NY | Lawn Laborer | Hourly |
| 2003 | Yaphank (LI East) | NY | Lawn Laborer | Hourly |
| 2003 | Yaphank (LI East) | NY | Lawn Laborer | Hourly |
| 2003 | Yaphank (LI East) | NY | Lawn Laborer | Hourly |
| 2003 | Yaphank (LI East) | NY | Lawn Laborer | Hourly |

TRU0205B

## Summary of H2B Workers

| Year | Branch | State | Position | Pay Class |
|------|--------|-------|----------|-----------|
| 2003 | Yaphank (LI East) | NY | Lawn Laborer | Hourly |
| 2003 | Yaphank (LI East) | NY | Lawn Laborer | Hourly |
| 2004 | Yaphank (LI East) | NY | Lawn Laborer | Hourly |
| 2004 | Yaphank (LI East) | NY | Lawn Laborer | Hourly |
| 2004 | Yaphank (LI East) | NY | Lawn Laborer | Hourly |
| 2004 | Yaphank (LI East) | NY | Lawn Laborer | Hourly |
| 2004 | Yaphank (LI East) | NY | Lawn Laborer | Hourly |
| 2004 | Yaphank (LI East) | NY | Lawn Laborer | Hourly |
| 2004 | Yaphank (LI East) | NY | Lawn Laborer | Hourly |
| 2004 | Yaphank (LI East) | NY | Lawn Laborer | Hourly |
| 2004 | Yaphank (LI East) | NY | Lawn Laborer | Hourly |
| 2006 | Yaphank (LI East) | NY | Lawn Laborer | Hourly |
| 2006 | Yaphank (LI East) | NY | Lawn Laborer | Hourly |
| 2006 | Yaphank (LI East) | NY | Lawn Laborer | Hourly |
| 2006 | Yaphank (LI East) | NY | Lawn Laborer | Hourly |
| 2006 | Yaphank (LI East) | NY | Lawn Laborer | Hourly |
| 2006 | Yaphank (LI East) | NY | Lawn Laborer | Hourly |
| 2006 | Yaphank (LI East) | NY | Lawn Laborer | Hourly |

# SUMMARY OF INFORMATION ON

## LIST OF TRUGREEN OFFICES
## USING H-2B WORKERS
2003-2006
PRODUCED BY COUNSEL FOR DEFENDANT
FEBRUARY 9, 2007

| Morgan Lewis 2.9.07 chart | | | | | | | |
|---|---|---|---|---|---|---|---|
| Location | State | 2003 total | 2004 total | 2005 total | 2006 total | | |
| Allentown | Pa | 6 | 6 | 6 | 3 | | |
| Bergen | NJ | 3 | 5 | 6 | 4 | | |
| Boston East | Ma | 0 | 0 | 0 | 4 | | |
| Boston West | Ma | 0 | 0 | 0 | 4 | | |
| Columbus North | Ohio | 4 | 0 | 0 | 0 | | |
| DC North | DC | 4 | 3 | 5 | 4 | | |
| DC South | DC | 4 | 3 | 6 | 4 | | |
| DC West | DC | 8 | 9 | 12 | 16 | | |
| Hagerstown | Md | 0 | 0 | 0 | 2 | | |
| malvern | Pa | 5 | 8 | 9 | 12 | | |
| Maple Grove | MN | 3 | 0 | 0 | 0 | | |
| Middlesex | NJ | 6 | 11 | 11 | 12 | | |
| Monmouth | NJ | 1 | 3 | 0 | 4 | | |
| Morris | NJ | 4 | 8 | 10 | 7 | | |
| Portland | Me | 0 | 0 | 0 | 3 | | |
| Richmond | Va | 0 | 0 | 0 | 4 | | |
| Rocky Hill | Conn. | 0 | 0 | 0 | 5 | | |
| south Jersey | NJ | 5 | 8 | 8 | 7 | | |
| Vienna | Va | 0 | 0 | 0 | 3 | | |
| Warminster | Pa | 0 | 4 | 4 | 4 | | |
| Wilmington | De | 4 | 6 | 2 | 2 | | |
| Woodland | Md | 0 | 0 | 4 | 4 | | |
| Yaphank | NY | 8 | 9 | 0 | 7 | | |
| | TOTALS | 65 | 83 | 83 | 115 | | 346 |

App-22

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

RAMON VILLANUEVA-BAZALDUA
individually and on behalf of others similarly
situated,

        Plaintiff

v.

TRUGREEN LIMITED PARTNERS and
TRUGREEN, INC.

        Defendants.

CA 1:06-cv-00185-GMS

Class Action

---

PLAINTIFF'S APPENDIX
TO
PLAINTIFF'S MOTION FOR RECONSIDERATION OF
MOTION TO CONDITIONALLY CERTIFY AN FLSA CLASS
OR ALTERNATIVELY AMENDED MOTION FOR CONDITIONAL
CERTIFICATION

Vivian L. Rapposelli
DE. Bar No.: 3204
Rapposelli & Gonzales
1300 Grant Ave., Suite 100
Wilmington, Delaware 19806
Tel: 302-652-8711

Edward Tuddenham
Tx Bar No. 20282300
153 Upland Rd.
Cambridge, Mass 02140
617-576-2182

ATTORNEYS FOR PLAINTIFF

1

# TABLE OF CONTENTS

Affidavit of Edward Tuddenham . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . App-5

List of TruGreen Offices and H-2B workers 2003-2006
    Produced by Counsel for Defendant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .App-9

    Summary of information on List of TruGreen Offices . . . . . . . . . . . . . . . . . . . . . . . App-21

Sample Documents From Individual H-2B Worker Files
    Produced By Defendant From LLS Files . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . App-23

    Worker A – Thorofare N.J. Office  2005
        Terms of Employment Document (TRU 1554). . . . . . . . . . . . . . . . . . . . . . .App-25
        Document Listing Expenses Owed (TRU 1556) w/ English translation.. . . . .App-27

    Worker B – Malvern Pa. Office  2005
        Terms of Employment Document (TRU 2205). . . . . . . . . . . . . . . . . . . . . . App-30
        Document Listing Expenses Owed (TRU 2207) w/ English translation . . . . App-32

    Worker C – Sterling Va. Office 2004
        Terms of Employment Document (TRU 1518). . . . . . . . . . . . . . . . . . . . . . App-35
        Document Listing Expenses Owed (TRU 1519) w/ English Translation . . . . App-36

    Worker D – Allentown Pa. Office 2004
        Terms of Employment Document (TRU 2153). . . . . . . . . . . . . . . . . . . . . . .App-39
        Document Listing Expenses Owed (TRU 2154) w/ English Translation . . . .App-40

    Worker E – S. Plainfield N.J.  2004
        Terms of Employment Document (TRU 1880) . . . . . . . . . . . . . . . . . . . . . . App-43
        Document Listing Expenses Owed (TRU 1881) w/ English Translation . . . App-44

    Worker F – Westerville Ohio 2003
        Terms of Employment Document (TRU 1609) . . . . . . . . . . . . . . . . . . . . . .App-47
        Document Listing Expenses Owed (1610) w/ English Translation . . . . . . . .App-48

    Worker G – Sterling Va. Office 2006
        Terms of Employment Document (TRU 1389) w/ English Translation . . . . .App-51
        Document Listing Expenses Owed (1610) w/ English Translation . . . . . . . .App-53

Worker H – Upper Saddle River, N.J.  2006
    Terms of Employment Document (TRU 1570) w/ English Translation . . . .App-56

    Document Listing Expenses Owed (TRU 1572) w/ English Translation . . . App-58


Summaries of Information Contained In Individual Worker Files
    Produced by Defendants

    1.  Summary of Terms of Employment Documents showing number
    of workers assigned to each branch office, each year, and their wage rates. . . . . . . . .  App-62

    2.  Summary of Bate Stamp Nos. Of "terms of employment document"
    and "document listing expenses owed" from each worker file . . . . . . . . . . . . . . . . . . . .App-66

Defendants' Response To Request for Admission 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . App-76

Defendants' Responses to Plaintiff's Interrogatories 4, 5, and 31 . . . . . . . . . . . . . . . . . . . . App-80

Deposition of James Vacchiano pages 1-5, 112-113, 124, 125-126 . . . . . . . . . . . . . . . . . . App-90

TruGreen Document TRU-94 (*see* Vacchiano deposition at 124). . . . . . . . . . . . . . . . . . . . . App-100

TruGreen Document TRU-530 (*see* Vacchiano deposition at 112-113). . . . . . . . . . . . . . . App-103

*Recinos-Recinos v. Express Forestry, Inc,* 2006 WL 197030 (E.D. La. 2006). . . . . . . . . . .App-105

App-3

AFFIDAVIT OF EDWARD TUDDENHAM

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

RAMON VILLANUEVA-BAZALDUA
individually and on behalf of others similarly
situated,

        Plaintiff

v.

TRUGREEN LIMITED PARTNERS and
TRUGREEN, INC.

        Defendants.

CA 1:06-cv-00185-GMS

Class Action

---

AFFIDAVIT OF EDWARD TUDDENHAM

NOW COMES Edward Tuddenham and states that were he called as a witness in this action he would testify under oath as follows:

1.      I am an attorney licensed to practice law in the State of Texas and have been so licensed since May of 1979. My business address is 153 Upland Rd., Cambridge, Mass. 02140.

2.      I am one of the attorneys of record for Plaintiff Ramon Villanueva-Bazaldua in the above referenced action.

3.      On August 29, 2006 Plaintiffs served Requests for Admission, Interrogatories, and Requests for Production on Defendants related to Plaintiff's class allegations.

4.      On September 28, 2006, Defendants served written responses to Plaintiff's discovery requests. Defendants interposed three blanket objections these requests.

5.      In an effort to try to resolve these objections and avoid a motion to compel, counsel for Plaintiff and Defendants engaged in lengthy correspondence between October and February 2007

App-5

in an effort to narrow their differences.[1]  As a result of these negotiations, from January and March 2007 Defendants produced some of the documents relevant to the class allegations and some supplemental answers to interrogatories.  The documents produced included:

A. A list of the TruGreen Branch Offices hiring H-2B workers, the number of workers hired by each branch each year, and an indication of whether those workers were paid on an hourly or a salary basis.  TRU 198B-TRU 206B.  Copy filed herewith at App-9 to App.-20.  I produced a summary of the information contained on this list which appears as App. 22  immediately behind the document produced by Defendants.

B.  Individual files for H-2B workers hired by TruGreen in 2003-2006.  Defendants represented that these files came from LLS, the entity in Mexico that recruited the workers.  TRU 1380-TRU 3370.  Each of these individual files contains, among other things, two documents signed by the worker: (1) A document setting forth the terms of employment being offered to the worker, including the wage rate and the branch office to which the worker is assigned.  This document is variously called "Terms of Employment" or "Employer Disclosure Affidavit" but contains essentially the same information regardless of title.  (2) A document setting forth the various visa fees, administrative fees, and travel expenses that the worker must pay for (these documents were called "Conditions for Obtaining a Work Visa"and "Agreement on Labor Conditions" from 2003-2005 and "Commission Agency Agreement" in 2006, but again, regardless of title, all versions set forth the same charges owed by workers).  Sample copies of eight individual worker files containing

---

[1] Without burdening the court with copies of the lengthy negotiations suffice it to say that counsel for Plaintiff wrote to counsel for Defendants on October 2, 2006, November 1, 2006, November 8, 2006, November 16, 2006, November 17, 2006, December 12, 2006 and communicated by e-mail December 1, 2006 and January 3, 2007.  Counsel for Defendant corresponded with counsel for Plaintiff on October 20, 2006, November 8, 2006, November 14, 2006, November 17, 2006, November 27, 2006, and February 9, 2007 and communicated by e-mail on December 4, 2006.

these documents are attached at App.-23 through App.-61.[2] These two documents which appear in each worker's file contain the same information the job and the expenses owed by the worker as the two documents presented to Plaintiff at the time of his recruitment that were previously filed with the Court at D.I. 16 at A16 and A17.

6. Rather than attach all of the voluminous worker files produced by Defendant, I have attached sample copies of the worker files and compiled two summaries of the voluminous documents in the individual files. The first summary, titled "Workers/Locations/Wages" at App-63 to App-65, summarizes the information on the "terms of employment" documents in each worker file. The summary is organized by branch office and indicates for each branch the number of workers whose terms of employment document assigned them to that branch office, the wage rate set forth forth on the signed "terms of employment" document, and the Bate Stamp Number of the "terms of employment" documents from which the summary was drawn.

7. The second summary, titled "Individual Worker Files" lists the Bates Stamp Numbers of the two documents (i.e. the "terms of employment" document and the document listing the expenses owed by the worker) contained in each worker file. This summary demonstrates that virtually all of the H-2B workers signed both kinds of documents. (There are a few instances where the second document does not appear in the file which may have been a copying error or an oversight at the time the documents were obtained). That summary is attached at App.-67 to App.-75.

8. The documents in the individual worker files setting forth the expenses each worker must pay indicate that in 2006 the "administrative fee" charged by LLS increased to $165.

---

[2] Translations of documents in Spanish appear immediately behind the Spanish document. Translations do not have TRU bate stamp numbers. Documents in English with a TRU bate stamp number were in English in the original produced by Defendant.

App-7

9. Copies of Defendants responses to Request for Admission 1, and Interrogatories 4, 5, and are filed herewith at App.-77 (Admission) and App-80 to App.-86 (interrogatories).

10. Defendant continues to refuse to answer Interrogatory 31 which asked about the amount of discretionary "bonus" monies provided to H-2B workers when they arrived at work. A copy of that Interrogatory and Defendants response is filed herewith as App.-87 to App.-88.

11. Attached as App-91 through App-99 are excerpts from the deposition of James Vacchiano and the two documents produced by TruGreen referenced in those excepts, TRU-94 and TRU-530, appear at App-100 to App-102 and App-103to App-104.

12. I declare under penalty of perjury that the foregoing statements are true and correct.

Date: 3-27-2007

Edward Tuddenham

Tx. Bar No. 20282300

App-8

LIST OF TRUGREEN OFFICES
USING H-2B WORKERS
2003-2006

PRODUCED BY COUNSEL FOR DEFENDANT
FEBRUARY 9, 2007

Morgan, Lewis & Bockius LLP
One Oxford Centre
Thirty-Second Floor
Pittsburgh, PA 15219-6401
Tel: 412.560.3300
Fax: 412.560.7001
www.morganlewis.com

# Morgan Lewis
C O U N S E L O R S   A T   L A W

**Beth M. Henke**
412.560.3346
bhenke@morganlewis.com

February 9, 2007

**VIA .PDF**

Edward Tuddenham, Esquire
153 Upland Road
Cambridge, MA 02140
*etudden@io.com*

Re:   Villanueva v. TruGreen Limited Partnership, et al.
      Civil Action No. 1:06-cv-00185-GMS (D. Del.)

Dear Ed:

I have attached an updated "Summary of H2B Workers Across Branches (LawnCare Division Only)" which accurately reflects all of the ChemLawn branches that had H-2B workers in any of the years from 2003-2006.

In comparison to the original chart, we discovered certain information that required revision and/or deletion. Specifically:

- The new chart was put into an alphabetical order by branch name (the original chart was not);

- A few typographical errors in position titles were corrected;

- Branch names were corrected;

- LandCare branches were deleted; and

- Position titles were corrected.

With respect to specific branches, please note the following:

- DC South: Missing position information was identified and added.

- Vienna: This branch formerly was referred to as "AgroLawn Vienna."

- Columbus North: This branch formerly was incorrectly identified as "Columbia North."

1-PI/176354.1

App-10

**Morgan Lewis**
COUNSELORS AT LAW

Edward Tuddenham
February 9, 2007
Page 2

- ♦ Yaphank (LI East): This branch formerly was incorrectly identified as "Long Island East.

- ♦ Maple Grove: This is the only ChemLawn branch in Minnesota that used H-2B workers at any time between 2003-2006.

- ♦ Morris: Based on new (confirmed) information received, the correct numbers of workers are reflected in the attached chart.

- ♦ Boston East: As explained in a prior email, Plymouth and Boston East are the same branch, so the 2 workers previously identified for Plymouth were moved under Boston East.

- ♦ Westbrook: This branch is the same as the Portland branch and, therefore, Westbrook has been deleted as duplicative.

Please feel free to contact me if you have any questions.

Very truly yours,

Beth M. Henke

BMH:nmm

Attachment

App-11

## Summary of H2B Workers

| Year | Branch | State | Position | Pay Class |
|------|--------|-------|----------|-----------|
| 2003 | Allentown | PA | Lawn Specialist | Plan |
| 2003 | Allentown | PA | Applicator | Hourly |
| 2003 | Allentown | PA | Lawn Specialist | Plan |
| 2003 | Allentown | PA | Applicator | Hourly |
| 2003 | Allentown | PA | Lawn Specialist | Plan |
| 2003 | Allentown | PA | Lawn Specialist | Plan |
| 2004 | Allentown | PA | Lawn Specialist | Plan |
| 2004 | Allentown | PA | Lawn Specialist | Plan |
| 2004 | Allentown | PA | Lawn Specialist | Plan |
| 2004 | Allentown | PA | Lawn Specialist | Plan |
| 2004 | Allentown | PA | Lawn Specialist | Plan |
| 2004 | Allentown | PA | Lawn Specialist | Plan |
| 2005 | Allentown | PA | Lawn Specialist | Plan |
| 2005 | Allentown | PA | Lawn Specialist | Plan |
| 2005 | Allentown | PA | Lawn Specialist | Plan |
| 2005 | Allentown | PA | Lawn Specialist | Plan |
| 2005 | Allentown | PA | Lawn Specialist | Plan |
| 2005 | Allentown | PA | Lawn Specialist | Plan |
| 2006 | Allentown | PA | Lawn Specialist | Plan |
| 2006 | Allentown | PA | Lawn Specialist | Plan |
| 2006 | Allentown | PA | Lawn Specialist | Plan |
| 2003 | Bergen | NJ | Route Manager | Plan |
| 2003 | Bergen | NJ | Route Manager | Plan |
| 2003 | Bergen | NJ | Route Manager | Plan |
| 2004 | Bergen | NJ | Route Manager | Plan |
| 2004 | Bergen | NJ | Laborer | Hourly |
| 2004 | Bergen | NJ | Route Manager | Plan |
| 2004 | Bergen | NJ | Route Manager | Plan |
| 2004 | Bergen | NJ | Route Manager | Plan |
| 2005 | Bergen | NJ | Route Manager | Plan |
| 2005 | Bergen | NJ | Route Manager | Plan |
| 2005 | Bergen | NJ | Route Manager | Plan |
| 2005 | Bergen | NJ | Route Manager | Plan |
| 2005 | Bergen | NJ | Route Manager | Plan |
| 2005 | Bergen | NJ | Route Manager | Plan |
| 2006 | Bergen | NJ | Route Manager | Plan |
| 2006 | Bergen | NJ | Route Manager | Plan |
| 2006 | Bergen | NJ | Route Manager | Plan |
| 2006 | Bergen | NJ | Route Manager | Plan |
| 2006 | Boston East | MA | Applicator Non-DOT | Hourly |
| 2006 | Boston East | MA | Applicator Non-DOT | Hourly |

## Summary of H2B Workers

| Year | Branch | State | Position | Pay Class |
|------|--------|-------|----------|-----------|
| 2006 | Boston East | MA | Laborer | Hourly |
| 2006 | Boston East | MA | Laborer | Hourly |
| 2006 | Boston West | MA | Laborer | Hourly |
| 2006 | Boston West | MA | Laborer | Hourly |
| 2006 | Boston West | MA | Laborer | Hourly |
| 2006 | Boston West | MA | Laborer | Hourly |
| 2003 | Columbus North | OH | Lawn Laborer | Hourly |
| 2003 | Columbus North | OH | Lawn Laborer | Hourly |
| 2003 | Columbus North | OH | Lawn Laborer | Hourly |
| 2003 | Columbus North | OH | Lawn Laborer | Hourly |
| 2003 | DC North | DC | Lawn Care Specialist | Plan |
| 2003 | DC North | DC | Lawn Care Specialist | Plan |
| 2003 | DC North | DC | Lawn Care Specialist | Plan |
| 2003 | DC North | DC | Lawn Care Specialist | Plan |
| 2004 | DC North | DC | Lawn Care Specialist | Plan |
| 2004 | DC North | DC | Lawn Care Specialist | Plan |
| 2004 | DC North | DC | Lawn Care Specialist | Plan |
| 2005 | DC North | DC | Lawn Care Specialist | Plan |
| 2005 | DC North | DC | Lawn Care Specialist | Plan |
| 2005 | DC North | DC | Lawn Care Specialist | Plan |
| 2005 | DC North | DC | Lawn Care Specialist | Plan |
| 2005 | DC North | DC | Lawn Care Specialist | Plan |
| 2006 | DC North | DC | Lawn Care Specialist | Plan |
| 2006 | DC North | DC | Lawn Care Specialist | Plan |
| 2006 | DC North | DC | Lawn Care Specialist | Plan |
| 2006 | DC North | DC | Lawn Care Specialist | Plan |
| 2003 | DC South | DC | Laborer | Hourly |
| 2003 | DC South | DC | Laborer | Hourly |
| 2003 | DC South | DC | Laborer | Hourly |
| 2003 | DC South | DC | Laborer | Hourly |
| 2004 | DC South | DC | Laborer | Hourly |
| 2004 | DC South | DC | Laborer | Hourly |
| 2004 | DC South | DC | Laborer | Hourly |
| 2005 | DC South | DC | Laborer | Hourly |
| 2005 | DC South | DC | Laborer | Hourly |
| 2005 | DC South | DC | Laborer | Hourly |
| 2005 | DC South | DC | Laborer | Hourly |
| 2005 | DC South | DC | Laborer | Hourly |
| 2005 | DC South | DC | Laborer | Hourly |
| 2006 | DC South | DC | Laborer | Hourly |
| 2006 | DC South | DC | Laborer | Hourly |

## Summary of H2B Workers

| Year | Branch | State | Position | Pay Class |
|------|--------|-------|----------|-----------|
| 2006 | DC South | DC | Laborer | Hourly |
| 2006 | DC South | DC | Laborer | Hourly |
| 2003 | DC West | DC | Mower | Hourly |
| 2003 | DC West | DC | Lawn Laborer | Hourly |
| 2003 | DC West | DC | Lawn Laborer | Hourly |
| 2003 | DC West | DC | Lawn Laborer | Hourly |
| 2003 | DC West | DC | Lawn Laborer | Hourly |
| 2003 | DC West | DC | Mower | Hourly |
| 2003 | DC West | DC | Lawn Laborer | Hourly |
| 2003 | DC West | DC | Mower | Hourly |
| 2004 | DC West | DC | Mower | Hourly |
| 2004 | DC West | DC | Lawn Laborer | Hourly |
| 2004 | DC West | DC | Lawn Laborer | Hourly |
| 2004 | DC West | DC | Lawn Laborer | Hourly |
| 2004 | DC West | DC | Lawn Laborer | Hourly |
| 2004 | DC West | DC | Mower | Hourly |
| 2004 | DC West | DC | Lawn Laborer | Hourly |
| 2004 | DC West | DC | Mower | Hourly |
| 2004 | DC West | DC | Lawn Laborer | Hourly |
| 2005 | DC West | DC | Mower | Hourly |
| 2005 | DC West | DC | Laborer | Hourly |
| 2005 | DC West | DC | Laborer | Hourly |
| 2005 | DC West | DC | Laborer | Hourly |
| 2005 | DC West | DC | Mower | Hourly |
| 2005 | DC West | DC | Laborer | Hourly |
| 2005 | DC West | DC | Mower | Hourly |
| 2005 | DC West | DC | Mower | Hourly |
| 2005 | DC West | DC | Laborer | Hourly |
| 2005 | DC West | DC | Laborer | Hourly |
| 2005 | DC West | DC | Laborer | Hourly |
| 2005 | DC West | DC | Laborer | Hourly |
| 2006 | DC West | DC | Laborer | Hourly |
| 2006 | DC West | DC | Mower | Hourly |
| 2006 | DC West | DC | Laborer | Hourly |
| 2006 | DC West | DC | Laborer | Hourly |
| 2006 | DC West | DC | Mower | Hourly |
| 2006 | DC West | DC | Laborer | Hourly |
| 2006 | DC West | DC | Laborer | Hourly |
| 2006 | DC West | DC | Laborer | Hourly |
| 2006 | DC West | DC | Laborer | Hourly |
| 2006 | DC West | DC | Mower | Hourly |

### Summary of H2B Workers

| Year | Branch | State | Position | Pay Class |
|------|--------|-------|----------|-----------|
| 2006 | DC West | DC | Laborer | Hourly |
| 2006 | DC West | DC | Mower | Hourly |
| 2006 | DC West | DC | Laborer | Hourly |
| 2006 | DC West | DC | Laborer | Hourly |
| 2006 | DC West | DC | Laborer | Hourly |
| 2006 | DC West | DC | Laborer | Hourly |
| 2006 | Hagerstown | MD | Lawn Care Specialist DOT | Plan |
| 2006 | Hagerstown | MD | Lawn Care Specialist DOT | Plan |
| 2003 | Malvern | PA | DOT Applicator | Hourly |
| 2003 | Malvern | PA | DOT Applicator | Hourly |
| 2003 | Malvern | PA | Lawn Laborer | Hourly |
| 2003 | Malvern | PA | Lawn Laborer | Hourly |
| 2003 | Malvern | PA | Lawn Laborer | Hourly |
| 2004 | Malvern | PA | Lawn Laborer | Hourly |
| 2004 | Malvern | PA | DOT Applicator | Hourly |
| 2004 | Malvern | PA | DOT Applicator | Hourly |
| 2004 | Malvern | PA | Lawn Laborer | Hourly |
| 2004 | Malvern | PA | DOT Applicator | Hourly |
| 2004 | Malvern | PA | DOT Applicator | Hourly |
| 2004 | Malvern | PA | Lawn Laborer | Hourly |
| 2004 | Malvern | PA | Lawn Laborer | Hourly |
| 2005 | Malvern | PA | Lawn Care Specialist DOT | Plan |
| 2005 | Malvern | PA | Lawn Care Specialist DOT | Plan |
| 2005 | Malvern | PA | Lawn Care Specialist DOT | Plan |
| 2005 | Malvern | PA | Lawn Care Specialist DOT | Plan |
| 2005 | Malvern | PA | Laborer | Hourly |
| 2005 | Malvern | PA | Lawn Care Specialist DOT | Plan |
| 2005 | Malvern | PA | Lawn Care Specialist DOT | Plan |
| 2005 | Malvern | PA | Lawn Care Specialist DOT | Plan |
| 2005 | Malvern | PA | Lawn Care Specialist DOT | Plan |
| 2006 | Malvern | PA | Lawn Care Specialist Non-DOT | Plan |
| 2006 | Malvern | PA | Lawn Care Specialist DOT | Plan |
| 2006 | Malvern | PA | Lawn Care Specialist DOT | Plan |
| 2006 | Malvern | PA | Lawn Care Specialist DOT | Plan |
| 2006 | Malvern | PA | Lawn Care Specialist DOT | Plan |
| 2006 | Malvern | PA | Lawn Care Specialist DOT | Plan |
| 2006 | Malvern | PA | Lawn Care Specialist DOT | Plan |
| 2006 | Malvern | PA | Lawn Care Specialist Non-DOT | Plan |
| 2006 | Malvern | PA | Lawn Care Specialist DOT | Plan |
| 2006 | Malvern | PA | Lawn Care Specialist DOT | Plan |
| 2006 | Malvern | PA | Lawn Care Specialist Non-DOT | Plan |

App-15

TRU0201B

## Summary of H2B Workers

| Year | Branch | State | Position | Pay Class |
|------|--------|-------|----------|-----------|
| 2006 | Malvern | PA | Lawn Care Specialist Non-DOT | Plan |
| 2003 | Maple Grove | MN | Laborer | Hourly |
| 2003 | Maple Grove | MN | Laborer | Hourly |
| 2003 | Maple Grove | MN | Laborer | Hourly |
| 2003 | Middlesex | NJ | Laborer | Hourly |
| 2003 | Middlesex | NJ | Laborer | Hourly |
| 2003 | Middlesex | NJ | Laborer | Hourly |
| 2003 | Middlesex | NJ | Laborer | Hourly |
| 2003 | Middlesex | NJ | Laborer | Hourly |
| 2003 | Middlesex | NJ | Laborer | Hourly |
| 2004 | Middlesex | NJ | Laborer | Hourly |
| 2004 | Middlesex | NJ | Laborer | Hourly |
| 2004 | Middlesex | NJ | Laborer | Hourly |
| 2004 | Middlesex | NJ | Laborer | Hourly |
| 2004 | Middlesex | NJ | Laborer | Hourly |
| 2004 | Middlesex | NJ | Laborer | Hourly |
| 2004 | Middlesex | NJ | Laborer | Hourly |
| 2004 | Middlesex | NJ | Laborer | Hourly |
| 2004 | Middlesex | NJ | Laborer | Hourly |
| 2004 | Middlesex | NJ | Laborer | Hourly |
| 2004 | Middlesex | NJ | Laborer | Hourly |
| 2005 | Middlesex | NJ | Laborer | Hourly |
| 2005 | Middlesex | NJ | Laborer | Hourly |
| 2005 | Middlesex | NJ | Laborer | Hourly |
| 2005 | Middlesex | NJ | Laborer | Hourly |
| 2005 | Middlesex | NJ | Laborer | Hourly |
| 2005 | Middlesex | NJ | Laborer | Hourly |
| 2005 | Middlesex | NJ | Laborer | Hourly |
| 2005 | Middlesex | NJ | N/A | N/A |
| 2005 | Middlesex | NJ | Laborer | Hourly |
| 2005 | Middlesex | NJ | Laborer | Hourly |
| 2005 | Middlesex | NJ | Laborer | Hourly |
| 2006 | Middlesex | NJ | Lawn Care Specialist | Plan |
| 2006 | Middlesex | NJ | Lawn Care Specialist DOT | Plan |
| 2006 | Middlesex | NJ | Landscape Crew Member | Hourly |
| 2006 | Middlesex | NJ | Landscape Crew Member | Hourly |
| 2006 | Middlesex | NJ | Lawn Care Specialist | Plan |
| 2006 | Middlesex | NJ | Lawn Care Specialist | Plan |
| 2006 | Middlesex | NJ | Hort Specialist | Plan |
| 2006 | Middlesex | NJ | Lawn Care Specialist DOT | Plan |
| 2006 | Middlesex | NJ | Lawn Care Specialist DOT | Plan |

## Summary of H2B Workers

| Year | Branch | State | Position | Pay Class |
|------|--------|-------|----------|-----------|
| 2006 | Middlesex | NJ | Lawn Care Specialist DOT | Plan |
| 2006 | Middlesex | NJ | Laborer | Hourly |
| 2006 | Middlesex | NJ | Lawn Care Specialist DOT | Plan |
| 2003 | Monmouth | NJ | Commercial Specialist | Plan |
| 2004 | Monmouth | NJ | Commercial Specialist | Plan |
| 2004 | Monmouth | NJ | Commercial Specialist | Plan |
| 2004 | Monmouth | NJ | Commercial Specialist | Plan |
| 2006 | Monmouth | NJ | Lawn Care Specialist DOT | Plan |
| 2006 | Monmouth | NJ | Lawn Care Specialist DOT | Plan |
| 2006 | Monmouth | NJ | Lawn Care Specialist DOT | Plan |
| 2006 | Monmouth | NJ | Lawn Care Specialist DOT | Plan |
| 2003 | Morris | NJ | TG Lawn Care Specialist | Plan |
| 2003 | Morris | NJ | TG Lawn Care Specialist | Plan |
| 2003 | Morris | NJ | TG Lawn Care Specialist | Plan |
| 2003 | Morris | NJ | HLS Team Member | Hourly |
| 2004 | Morris | NJ | TG Lawn Care Specialist | Plan |
| 2004 | Morris | NJ | TG Lawn Care Specialist | Plan |
| 2004 | Morris | NJ | TG Lawn Care Specialist | Plan |
| 2004 | Morris | NJ | HLS Team Member | Hourly |
| 2004 | Morris | NJ | Lawn Laborer | Hourly |
| 2004 | Morris | NJ | HLS Team Member | Hourly |
| 2004 | Morris | NJ | HLS Team Member | Hourly |
| 2004 | Morris | NJ | TG Lawn Care Specialist | Plan |
| 2005 | Morris | NJ | Lawn Care Specialist DOT | Plan |
| 2005 | Morris | NJ | TG Lawn Care Specialist | Plan |
| 2005 | Morris | NJ | Lawn Care Specialist DOT | Plan |
| 2005 | Morris | NJ | Lawn Care Specialist DOT | Plan |
| 2005 | Morris | NJ | Mower | Hourly |
| 2005 | Morris | NJ | Laborer | Hourly |
| 2005 | Morris | NJ | Mower | Hourly |
| 2005 | Morris | NJ | TG Lawn Care Specialist | Plan |
| 2005 | Morris | NJ | Mower | Hourly |
| 2005 | Morris | NJ | Lawn Care Specialist DOT | Plan |
| 2006 | Morris | NJ | Lawn Care Specialist DOT | Plan |
| 2006 | Morris | NJ | Mower | Hourly |
| 2006 | Morris | NJ | Laborer | Hourly |
| 2006 | Morris | NJ | Mower | Hourly |
| 2006 | Morris | NJ | Mower | Hourly |
| 2006 | Morris | NJ | Lawn Care Specialist DOT | Plan |
| 2006 | Morris | NJ | Lawn Care Specialist DOT | Hourly |
| 2006 | Portland | ME | Applicator Non-DOT | Hourly |

## Summary of H2B Workers

| Year | Branch | State | Position | Pay Class |
|------|--------|-------|----------|-----------|
| 2006 | Portland | ME | Applicator Non-DOT | Hourly |
| 2006 | Portland | ME | Applicator Non-DOT | Hourly |
| 2006 | Richmond | VA | Lawn Care Specialist DOT | Plan |
| 2006 | Richmond | VA | Lawn Care Specialist DOT | Plan |
| 2006 | Richmond | VA | Applicator Non-DOT | Hourly |
| 2006 | Richmond | VA | Applicator Non-DOT | Hourly |
| 2006 | Rocky Hill | CT | Laborer | Hourly |
| 2006 | Rocky Hill | CT | Laborer | Hourly |
| 2006 | Rocky Hill | CT | Laborer | Hourly |
| 2006 | Rocky Hill | CT | Laborer | Hourly |
| 2006 | Rocky Hill | CT | Laborer | Hourly |
| 2003 | South Jersey | NJ | Specialist | Plan |
| 2003 | South Jersey | NJ | Specialist | Plan |
| 2003 | South Jersey | NJ | Specialist | Plan |
| 2003 | South Jersey | NJ | Specialist | Plan |
| 2003 | South Jersey | NJ | Specialist | Plan |
| 2004 | South Jersey | NJ | Specialist | Plan |
| 2004 | South Jersey | NJ | Specialist | Plan |
| 2004 | South Jersey | NJ | Specialist | Plan |
| 2004 | South Jersey | NJ | Specialist | Plan |
| 2004 | South Jersey | NJ | Specialist | Plan |
| 2004 | South Jersey | NJ | Specialist | Plan |
| 2004 | South Jersey | NJ | Specialist | Plan |
| 2004 | South Jersey | NJ | Specialist | Plan |
| 2005 | South Jersey | NJ | Specialist | Plan |
| 2005 | South Jersey | NJ | Specialist | Plan |
| 2005 | South Jersey | NJ | Specialist | Plan |
| 2005 | South Jersey | NJ | Specialist | Plan |
| 2005 | South Jersey | NJ | Specialist | Plan |
| 2005 | South Jersey | NJ | Specialist | Plan |
| 2006 | South Jersey | NJ | Specialist | Plan |
| 2006 | South Jersey | NJ | Specialist | Plan |
| 2006 | South Jersey | NJ | Specialist | Plan |
| 2006 | South Jersey | NJ | Specialist | Plan |
| 2006 | South Jersey | NJ | Specialist | Plan |
| 2006 | South Jersey | NJ | Specialist | Plan |
| 2006 | South Jersey | NJ | Specialist | Plan |
| 2006 | Vienna | VA | Laborer | Hourly |
| 2006 | Vienna | VA | Laborer | Hourly |

App-18                    TRU0204B

### Summary of H2B Workers

| Year | Branch | State | Position | Pay Class |
|------|--------|-------|----------|-----------|
| 2006 | Vienna | VA | Laborer | Hourly |
| 2004 | Warminster | PA | Lawn Laborer | Hourly |
| 2004 | Warminster | PA | Lawn Laborer | Hourly |
| 2004 | Warminster | PA | Lawn Laborer | Hourly |
| 2004 | Warminster | PA | Lawn Laborer | Hourly |
| 2005 | Warminster | PA | Laborer | Hourly |
| 2005 | Warminster | PA | Laborer | Hourly |
| 2005 | Warminster | PA | Lawn Care Specialist DOT | Plan |
| 2005 | Warminster | PA | Lawn Care Specialist DOT | Plan |
| 2006 | Warminster | PA | Laborer | Hourly |
| 2006 | Warminster | PA | Laborer | Hourly |
| 2006 | Warminster | PA | Lawn Care Specialist DOT | Plan |
| 2006 | Warminster | PA | Lawn Care Specialist DOT | Plan |
| 2003 | Wilmington | DE | TG Lawn Care Specialist | Plan |
| 2003 | Wilmington | DE | TG Lawn Care Specialist | Plan |
| 2003 | Wilmington | DE | TG Lawn Care Specialist | Plan |
| 2003 | Wilmington | DE | TG Lawn Care Specialist | Plan |
| 2004 | Wilmington | DE | TG Lawn Care Specialist | Plan |
| 2004 | Wilmington | DE | TG Lawn Care Specialist | Plan |
| 2004 | Wilmington | DE | TG Lawn Care Specialist | Plan |
| 2004 | Wilmington | DE | TG Lawn Care Specialist | Plan |
| 2004 | Wilmington | DE | TG Lawn Care Specialist | Plan |
| 2004 | Wilmington | DE | TG Lawn Care Specialist | Plan |
| 2005 | Wilmington | DE | Lawn Care Specialist DOT | Plan |
| 2005 | Wilmington | DE | Lawn Care Specialist DOT | Plan |
| 2006 | Wilmington | DE | Lawn Care Specialist DOT | Plan |
| 2006 | Wilmington | DE | Commercial Specialist | Plan |
| 2005 | WoodLawn | MD | Lawn Care Specialist DOT | Plan |
| 2005 | WoodLawn | MD | Lawn Care Specialist DOT | Plan |
| 2005 | WoodLawn | MD | Lawn Care Specialist DOT | Plan |
| 2005 | WoodLawn | MD | Lawn Care Specialist DOT | Plan |
| 2006 | WoodLawn | MD | Lawn Care Specialist DOT | Plan |
| 2006 | WoodLawn | MD | Lawn Care Specialist DOT | Plan |
| 2006 | WoodLawn | MD | Lawn Care Specialist DOT | Plan |
| 2006 | WoodLawn | MD | Lawn Care Specialist DOT | Plan |
| 2003 | Yaphank (LI East) | NY | Lawn Laborer | Hourly |
| 2003 | Yaphank (LI East) | NY | Lawn Laborer | Hourly |
| 2003 | Yaphank (LI East) | NY | Lawn Laborer | Hourly |
| 2003 | Yaphank (LI East) | NY | Lawn Laborer | Hourly |
| 2003 | Yaphank (LI East) | NY | Lawn Laborer | Hourly |
| 2003 | Yaphank (LI East) | NY | Lawn Laborer | Hourly |

App-19

TRU0205B

## Summary of H2B Workers

| Year | Branch | State | Position | Pay Class |
|------|--------|-------|----------|-----------|
| 2003 | Yaphank (LI East) | NY | Lawn Laborer | Hourly |
| 2003 | Yaphank (LI East) | NY | Lawn Laborer | Hourly |
| 2004 | Yaphank (LI East) | NY | Lawn Laborer | Hourly |
| 2004 | Yaphank (LI East) | NY | Lawn Laborer | Hourly |
| 2004 | Yaphank (LI East) | NY | Lawn Laborer | Hourly |
| 2004 | Yaphank (LI East) | NY | Lawn Laborer | Hourly |
| 2004 | Yaphank (LI East) | NY | Lawn Laborer | Hourly |
| 2004 | Yaphank (LI East) | NY | Lawn Laborer | Hourly |
| 2004 | Yaphank (LI East) | NY | Lawn Laborer | Hourly |
| 2004 | Yaphank (LI East) | NY | Lawn Laborer | Hourly |
| 2004 | Yaphank (LI East) | NY | Lawn Laborer | Hourly |
| 2006 | Yaphank (LI East) | NY | Lawn Laborer | Hourly |
| 2006 | Yaphank (LI East) | NY | Lawn Laborer | Hourly |
| 2006 | Yaphank (LI East) | NY | Lawn Laborer | Hourly |
| 2006 | Yaphank (LI East) | NY | Lawn Laborer | Hourly |
| 2006 | Yaphank (LI East) | NY | Lawn Laborer | Hourly |
| 2006 | Yaphank (LI East) | NY | Lawn Laborer | Hourly |
| 2006 | Yaphank (LI East) | NY | Lawn Laborer | Hourly |

App-20

# SUMMARY OF INFORMATION ON

## LIST OF TRUGREEN OFFICES
## USING H-2B WORKERS
2003-2006
PRODUCED BY COUNSEL FOR DEFENDANT
FEBRUARY 9, 2007

| Morgan Lewis 2.9.07 chart | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Location | State | 2003 total | 2004 total | 2005 total | 2006 total | | |
| Allentown | Pa | 6 | 6 | 6 | 3 | | |
| Bergen | NJ | 3 | 5 | 6 | 4 | | |
| Boston East | Ma | 0 | 0 | 0 | 4 | | |
| Boston West | Ma | 0 | 0 | 0 | 4 | | |
| Columbus North | Ohio | 4 | 0 | 0 | 0 | | |
| DC North | DC | 4 | 3 | 5 | 4 | | |
| DC South | DC | 4 | 3 | 6 | 4 | | |
| DC West | DC | 8 | 9 | 12 | 16 | | |
| Hagerstown | Md | 0 | 0 | 0 | 2 | | |
| malvern | Pa | 5 | 8 | 9 | 12 | | |
| Maple Grove | MN | 3 | 0 | 0 | 0 | | |
| Middlesex | NJ | 6 | 11 | 11 | 12 | | |
| Monmouth | NJ | 1 | 3 | 0 | 4 | | |
| Morris | NJ | 4 | 8 | 10 | 7 | | |
| Portland | Me | 0 | 0 | 0 | 3 | | |
| Richmond | Va | 0 | 0 | 0 | 4 | | |
| Rocky Hill | Conn. | 0 | 0 | 0 | 5 | | |
| south Jersey | NJ | 5 | 8 | 8 | 7 | | |
| Vienna | Va | 0 | 0 | 0 | 3 | | |
| Warminster | Pa | 0 | 4 | 4 | 4 | | |
| Wilmington | De | 4 | 6 | 2 | 2 | | |
| Woodland | Md | 0 | 0 | 4 | 4 | | |
| Yaphank | NY | 8 | 9 | 0 | 7 | | |
| | TOTALS | 65 | 83 | 83 | 115 | | 346 |

App-22

SAMPLE DOCUMENTS FROM
INDIVIDUAL WORKER FILES
PRODUCED BY DEFENDANT

WORKER A

THOROFARE, N.J. 2005

Affidavit

## Terms of Employment

1. **Employer / Area of Employment**

   Company Name: **TruGreen ChemLawn (Thorofare)**
   Address: **1250 Imperial Way**
   **Thorofare, NJ 08086**
   Telephone: **856-848-8444**

2. **Period of Employment**

   TBD

3. **Task Description**

   Apply pesticides, herbicides, fungicides, or insecticides to lawns using sprayers, spreaders, seeders and aerators. Entry level position.

   Standard pay rate: **$10.00**          Overtime pay rate: **$15.00**
   Special pay rate: **10**
   Payday: **Friday**                     Bi-weekly: **No**
   Hours: **7:00 AM - 5:00 PM**           Lunch Break: **minutes**
   Work Days: **5-6**

4. **Special Requirements**

   Must be bilingual, Needs U.S. driver's license, MUST HAVE INTERNATIONAL DRIVER'S LICENSE. fertilization/pesticide; high school diploma

5. **Transportation / U.S. Arrival**

   The worker will pay his/her own transportation cost from their home in Mexico to the place of employment. Worker is equally responsible for the cost of returning from the place of employment to their home at the end of the employment period.

   **Worker must travel to:**

   1250 Imperial Way
   Thorofare, NJ 08086

   **For travel related issues please contact:**

   Liason name: **Bob Recktenwal**
   Liason title: **Branch Manager**
   Liason telephone 1: **856-848-8444 (Home)**
   Liason telephone 2: **609-352-4099 (Cell)**

6. **Insurance**

   Is workers compensation insurance provided by the employer? **Yes**

7. **Benefits**

   Are any other benefits provided to the worker? **No**
   If yes, at what cost to the worker? **N/A**

8. **Tools, protective clothing, and other items that must be provided by the worker**

9. **Worker Housing**

   The employer is not responsible for worker housing. The employer agrees to assist the worker by making arrangements in advance for possible worker housing. Housing shall meet all applicable state and local codes for rental property. The worker may find their own housing at any time without incurring the prejudice of the employer against him/her. The following are estimates only and are not binding:

   Weekly charges for such housing: **$65.00**
   Are utilities included in this price? **Yes**
   If no, what will utilities cost? **N/A**

REDACTED                    03 / Junio / 05

http://www.llsint.com/LlsRecruiting/Forms/Worker/AffidavitEnglish.aspx?workerid=244...   03/06/2005





App-26

TRU1555

## CONDICIONES PARA LA OBTENCIÓN DE VISA DE TRABAJO

1. LLS INTERNATIONAL es una empresa legalmente constituída, que tiene como única finalidad promover las vacantes de empleo generadas por las compañías americanas contratantes (en lo sucesivo los **"PATRONES"**), sin actuar como patrón ni como intermediario. Durante el desempeño de sus labores, los **"PATRONES"**, deberán de respetar sus condiciones laborales. El **"PATRON"** tendrá la obligación de respetar lo estipulado en el contrato correspondiente.

2. Por lo que respecta a la jornada de trabajo establecida, el número de horas ofrecida por los **"PATRONES"**, es una simple estimación, considerando las condiciones climatológicas y otros eventos imprevistos, que pudieran directa o indirectamente afectar y/o reducir la duración de la jornada del **"SOLICITANTE"**,y con esto perjudicario en su remuneración. Si surgieren conflictos entre el **"PATRON"**, y el **"SOLICITANTE"**, serán resueltos y discutidos entre ellos. LLS INTERNATIONAL NO ES EL **"PATRÓN"**, POR LO QUE EL **"SOLICITANTE"** EXPRESAMENTE LE EXIME DE CUALQUIER RESPONSABILIDAD LABORAL.

3. En caso de que el **"PATRON"** determine que por las condiciones climatológicas y otros eventos imprevistos, el **"SOLICITANTE"** no pueda continuar prestando sus servicios durante el periodo que abarque su visa de trabajo; el **"PATRON"** deberá de cubrir los gastos del **"SOLICITANTE"** a su lugar de origen, ya que el **"SOLICITANTE"** no puede trabajar en otra compañía americana, por no estar autorizada expresamente en su visa de trabajo.

4. El **"SOLICITANTE"** dará de inmediato <u>AVISO POR ESCRITO</u> al **"PATRÓN"** de las causas justificadas que le impidan concurrir a su trabajo. En el supuesto de que el **"SOLICITANTE"** hiciere caso omiso, el **"PATRON"** avisará al Gobierno de Estados Unidos y al CONSULADO AMERICANO, para que esta última Autoridad, tome las medidas pertinentes, y en su caso, se le considere INDOCUMENTADO, y se proceda a cancelar su visa de trabajo, perdiendo el **"SOLICITANTE"** cualquier posibilidad de ser considerado para el programa de visas H2B o H2A.

5. El **"SOLICITANTE"** está de acuerdo que el servicio que presta **LLS INTERNATIONAL** es únicamente el de tramitar su visa de trabajo ante el CONSULADO AMERICANO a petición de la compañía americana contratante, es decir, el **"PATRON"**. Así mismo, el **"SOLICITANTE"** entiende que la visa de trabajo no depende de LLS INTERNATIONAL, sino del CONSULADO AMERICANO, por lo que en caso de ser rechazada la solicitud de la visa, LLS INTERNATIONAL no tiene ninguna responsabilidad u obligación de reembolsarle la cantidad que corresponda a la tramitación de su respectiva visa.

6. El programa tiene un costo de:
   a. 155 dólares (USD) para LLS INTERNATIONAL por gastos administrativos.
   b. 100 dólares (USD) por la aprobación de la visa en el Consulado.
   c. 100 dólares (USD) para el pago de derechos de visa en el Consulado.
   d. 200 dólares (USD) aproximadamente de transporte para su traslado vía terrestre
   **NOTA:** Estos pagos se realizan hasta que la persona haya sido seleccionada y tengan un lugar seguro con algún **"PATRON"**.

7. Los reembolsos sólo proceden en los siguientes casos:
   Cuando es rechazada la solicitud de visa en el Consulado (en este caso se le regresarán 100 dólares).
   Cuando por parte del **"PATRON"** solicitante no se llegue a realizar el trabajo, se procederá a colocar al trabajador con otro **"PATRON"**, en caso de no ser posible se le regresarán 255 dólares.
   **NOTA:** En todos los demás casos no procederá reembolso alguno.

8. Ni LLS INTERNATIONAL ni el **"PATRON"** contratante en Estados Unidos, serán responsables de pagar y/o devolver sus gastos de viaje, ni los que se deriven de proceso de la visa en el Consulado Americano, ESTA ES ÚNICAMENTE RESPONSABILIDAD DEL **"SOLICITANTE"**.

9. Tratándose de un nuevo **"SOLICITANTE"**, el **"SOLICITANTE"** está de acuerdo en someterse a las políticas de transporte y traslado que el "PATRON" haya requerido específicamente en cada caso, incluyendo el traslado por conducto de una línea particular de autobuses. En caso de que el **"SOLICITANTE"** rehusare a observar tales políticas de traslado, el **"SOLICITANTE"** desde este momento autoriza a LLS INTERNATIONAL a retener el pasaporte del **"SOLICITANTE"** y la visa de trabajo concedida por el Consulado, para ser sometida por LLS INTERNATIONAL a nombre del **"SOLICITANTE"** ante el Consulado, con el objeto de proceder a la cancelación de la visa de trabajo. Una vez cancelada la visa le será devuelto el pasaporte al **"SOLICITANTE"**.

10. Este documento no asegura la obtención de trabajo en los Estados Unidos de América.

11. ESTE DOCUMENTO NO ES UN CONTRATO DE TRABAJO.


Yo, el abajo firmante (el **"SOLICITANTE"**), voluntariamente declaro que acudí personalmente a LLS INTERNATIONAL, con el fin de que se me tramitara una visa temporal de trabajo, sin ser responsabilidad de LLS INTERNATIONAL la negativa del CONSULADO AMERICANO.



June 3, 2005

App-27

## CONDITIONS FOR OBTAINING A WORK VISA

1. LLS INTERNATIONAL is a legally constituted company whose sole purpose is to promote job vacancies generated by the American companies that are hiring (henceforth the **"EMPLOYERS"**) without acting as employer or intermediary. While performing their work, the **"EMPLOYERS"** must respect labor conditions. The **"EMPLOYER"** shall have the obligation to respect what is stipulated in the corresponding contract.

2. With regard to the established work day, the number of hours offered by the **"EMPLOYERS"** is a simple estimate, considering the weather conditions and other unforeseen events that may directly or indirectly affect and/or reduce the duration of the **"APPLICANT'S"** work day, and thereby harm him/her in his/her pay. If conflicts arise between the **"EMPLOYER"** and the **"EMPLOYEE,"** they shall be resolved and discussed between them. LLS INTERNATIONAL IS NOT THE **"EMPLOYER"** AND THEREFORE THE **"APPLICANT"** EXPRESSLY EXEMPTS IT OF ANY LABOR LIABILITY.

3. If the **"EMPLOYEE"** determines that, because of weather conditions and other unforeseen events, the **"APPLICANT"** cannot continue providing his/her services during the period encompassed in his/her work visa, the **"EMPLOYER"** must cover the **"APPLICANT'S"** expenses to his/her place of origin, since the **"APPLICANT"** cannot work in another American company because he/she is not expressly so authorized in his/her work visa.

4. The **"APPLICANT"** shall immediately give **WRITTEN NOTICE** to the **"EMPLOYER"** of justified causes that prevent him/her from coming to work. Should **"APPLICANT"** fail to do so, the " **EMPLOYER"** shall notify the United States government and the AMERICAN CONSULATE so that the latter authority may take the relevant steps and, if appropriate,, he/she shall be considered UNDOCUMENTED, and his/her visa shall be cancelled, and the worker will lose the possibility of returning the next year through the H2B visa program.

5. The **"APPLICANT"** agrees that the service provided by **LLS INTERNATIONAL** is solely that of processing his/her work visa with the AMERICAN CONSULATE at the request of the hiring American company, that is, the **"EMPLOYER."** The **"APPLICANT"** likewise understands that the work visa depends not on LLS INTERNATIONAL, but on the AMERICAN CONSULATE, and hence in the event that his/her work visa is denied, LLS INTERNATIONAL has no liability or obligation of reimbursing him/her the sum for processing his/her respective visa.

6. The program has a cost of:
    a. 155 (USD) dollars to LLS INTERNATIONAL for administrative expenses.
    b. 100 (USD) dollars for approval of the visa at the consulate.
    c. 100 (USD) dollars for payment of visa fees at the consulate.
    d. approximately 200 (USD) dollars transport for his/her travel by land.
    **NOTE:** These payments shall be made only after the person has been chosen and has secure placement with some **"EMPLOYER."**

7. Reimbursements shall only be in order in the following cases:
    When the visa application is rejected at the Consulate (in this case he/she will get 100 dollars back).
    When on the side of the requesting **"EMPLOYER"** the job does not come about, the worker will be placed with another **"EMPLOYER"**; if this is not possible, he/she will receive 255 dollars back.
    **NOTE:** In all other cases no reimbursement whatsoever shall be in order.

8. Neither LLS INTERNATIONAL nor the hiring **"EMPLOYER"** in the United States will be responsible for paying and/or returning his/her travel expenses, nor those resulting from processing the visa at the American Consulate. THIS IS SOLELY THE **"APPLICANT'S"** RESPONSIBILITY.

9. When the **"APPLICANT"** is new, the **"APPLICANT"** agrees to submit to the transport and travel policies that the "EMPLOYER" has requested specifically in each case, including travel over a particular bus line. Should the **"APPLICANT"** refuse to observe such travel policies, the **"APPLICANT"** authorizes **LLS INTERNATIONAL as** of that moment to withhold the **"APPLICANT'S"** passport and the work visa granted by the Consulate, to be submitted by LLS INTERNATIONAL to the Consulate for **"APPLICANT,"** in order to cancel the work visa. After the visa is cancelled, the **"APPLICANT"** will receive his/her passport.

10. This document does not assure obtaining work in the United States.

11. THIS DOCUMENT IS NOT A LABOR CONTRACT.

The undersigned (the **"APPLICANT"**) voluntarily declare that I have come personally to LLS INTERNATIONAL to have it process a temporary work visa for me, although LLS INTERNATIONAL shall not be responsible for refusal by the American consulate.

App-28                    Translation of App 27

WORKER B

MALVERN, PA. 2005

Affidavit                                                                 Página 1 de 2

## Terms of Employment

1.  **Employer / Area of Employment**

    Company Name: **TruGreen ChemLawn (Malvern)**
    Address: **510 Lapp Rd.**
    **Malvern, PA 19355**
    Telephone: **610-296-2400**

2.  **Period of Employment**

    From **9/3/2005**   to **15/11/2005**

3.  **Task Description**

    Apply pesticides, herbicides, fungicides, or insecticides to lawns using sprayers, seeders, aerators.

    Standard pay rate: **$10.00**              Overtime pay rate: **$15.00**
    Payday: **friday**                         Bi-weekly: **No**
    Hours: **7:00 AM - 4:00 PM**               Lunch Break: **minutes**
    Work Days: **5-6**

4.  **Special Requirements**

    None

5.  **Transportation / U.S. Arrival**

    The worker will pay his/her own transportation cost from their home in Mexico to the place of employment. Worker is equally responsible for the cost of returning from the place of employment to their home at the end of the employment period.

    **Worker must travel to:**

    510 Lapp Rd.
    Malvern, PA 19355

    **For travel related issues please contact:**

    Liason name: **Chris Seale/Eric Wilhelm**
    Liason title: **Branch Manager**
    Liason telephone 1: **610-296-2400**
    Liason telephone 2: **610-496-9002**

6.  **Insurance**

    Is workers compensation insurance provided by the employer?  **Yes**

7.  **Benefits**

    Are any other benefits provided to the worker?  **No**
    If yes, at what cost to the worker?  **N/A**

8.  **Tools, protective clothing, and other items that must be provided by the worker**

9.  **Worker Housing**

    The employer is not responsible for worker housing. The employer agrees to assist the worker by making arrangements in advance for possible worker housing. Housing shall meet all applicable state and local codes for rental property. The worker may find their own housing at any time without incurring the prejudice of the employer against him/her. The following are estimates only and are not binding:

    Weekly charges for such housing: **$90.00**
    Are utilities included in this price? **Yes**
    If no, what will utilities cost? **N/A**

10. **Declaration**

    The above is an accurate and correct description of employment and housing conditions as offered by:

    **TruGreen ChemLawn (Malvern)**

    and can be used in the recruitment of workers.

11. **Agreed to and signed by**

**TRU2205**

App-30

Print Name

REDACTED

Signature

3 - 7 - 2005

Date

**TRU2206**

App-31

## CONDICIONES PARA LA OBTENCIÓN DE VISA DE TRABAJO

1. LLS INTERNATIONAL es una empresa legalmente constituída, que tiene como única finalidad promover las vacantes de empleo generadas por las compañías americanas contratantes (en lo sucesivo los **"PATRONES"**), sin actuar como patrón ni como intermediario. Durante el desempeño de sus labores, los **"PATRONES"**, deberán de respetar sus condiciones laborales. El **"PATRON"** tendrá la obligación de respetar lo estipulado en el contrato correspondiente.

2. Por lo que respecta a la jornada de trabajo establecida, el número de horas ofrecida por los **"PATRONES"**, es una simple estimación, considerando las condiciones climatológicas y otros eventos imprevistos, que pudieran directa o indirectamente afectar y/o reducir la duración de la jornada del **"SOLICITANTE"**, y con esto perjudicarlo en su remuneración. Si surgieren conflictos entre el **"PATRON"**, y el **"SOLICITANTE"**, serán resueltos y discutidos entre ellos. LLS INTERNATIONAL NO ES EL **"PATRÓN"**, POR LO QUE EL **"SOLICITANTE"** EXPRESAMENTE LE EXIME DE CUALQUIER RESPONSABILIDAD LABORAL.

3. En caso de que el **"PATRON"** determine que por las condiciones climatológicas y otros eventos imprevistos, el **"SOLICITANTE"** no pueda continuar prestando sus servicios durante el período que abarque su visa de trabajo; el **"PATRON"** deberá de cubrir los gastos del **"SOLICITANTE"** a su lugar de origen, ya que el **"SOLICITANTE"** no puede trabajar en otra compañía americana, por no estar autorizada expresamente en su visa de trabajo.

4. El **"SOLICITANTE"** dará de inmediato **AVISO POR ESCRITO** al **"PATRÓN"** de las causas justificadas que le impidan concurrir a su trabajo. En el supuesto de que el **"SOLICITANTE"** hiciere caso omiso, el **"PATRON"** avisará al Gobierno de Estados Unidos y al CONSULADO AMERICANO, para que esta última Autoridad, tome las medidas pertinentes, y en su caso, se le considere INDOCUMENTADO, y se proceda a cancelar su visa de trabajo, perdiendo el **"SOLICITANTE"** cualquier posibilidad de ser considerado para el programa de visas H2B o H2A.

5. El **"SOLICITANTE"** está de acuerdo que el servicio que presta **LLS INTERNATIONAL** es únicamente el de tramitar su visa de trabajo ante el CONSULADO AMERICANO a petición de la compañía americana contratante, es decir, el **"PATRON"**. Así mismo, el **"SOLICITANTE"** entiende que la visa de trabajo no depende de LLS INTERNATIONAL, sino del CONSULADO AMERICANO, por lo que en caso de ser rechazada la solicitud de la visa, LLS INTERNATIONAL no tiene ninguna responsabilidad u obligación de reembolsarle la cantidad que corresponda a la tramitación de su respectiva visa.

6. El programa tiene un costo de:
   a. 155 dólares (USD) para LLS INTERNATIONAL por gastos administrativos.
   b. 100 dólares (USD) por la aprobación de la visa en el Consulado.
   c. 100 dólares (USD) para el pago de derechos de visa en el Consulado.
   d. 200 dólares (USD) aproximadamente de transporte para su traslado vía terrestre
   **NOTA:** Estos pagos se realizan hasta que la persona haya sido seleccionada y tengan un lugar seguro con algún **"PATRON"**.

7. Los reembolsos sólo proceden en los siguientes casos:
   Cuando es rechazada la solicitud de visa en el Consulado (en este caso se le regresarán 100 dólares.)
   Cuando por parte del **"PATRON"** solicitante no se llegue a realizar el trabajo, se procederá a colocar al trabajador con otro **"PATRON"**, en caso de no ser posible se le regresarán 255 dólares.
   **NOTA:** En todos los demás casos no procederá reembolso alguno.

8. Ni LLS INTERNATIONAL ni el **"PATRON"** contratante en Estados Unidos, serán responsables de pagar y/o devolver sus gastos de viaje, ni los que se deriven del proceso de la visa en el Consulado Americano, ESTA ES ÚNICAMENTE RESPONSABILIDAD DEL **"SOLICITANTE"**.

9. Tratándose de un nuevo **"SOLICITANTE"**, el **"SOLICITANTE"** está de acuerdo en someterse a las políticas de transporte y traslado que el "PATRON" haya requerido específicamente en cada caso, incluyendo el traslado por conducto de una línea particular de autobuses. En caso de que el **"SOLICITANTE"** rehusare a observar tales políticas de traslado, el **"SOLICITANTE"** desde este momento autoriza a LLS INTERNATIONAL a retener el pasaporte del **"SOLICITANTE"** y la visa de trabajo concedida por el Consulado, para ser sometida por LLS INTERNATIONAL a nombre del **"SOLICITANTE"** ante el Consulado, con el objeto de proceder a la cancelación de la visa de trabajo. Una vez cancelada la visa le será devuelto el pasaporte al **"SOLICITANTE"**.

10. Este documento no asegura la obtención de trabajo en los Estados Unidos de América.

11. ESTE DOCUMENTO NO ES UN CONTRATO DE TRABAJO.

Yo, el abajo firmante (el **"SOLICITANTE"**), voluntariamente declaro que acudí personalmente a LLS INTERNATIONAL, con el fin de que se me tramitara una visa temporal de trabajo, sin ser responsabilidad de LLS INTERNATIONAL la negativa del CONSULADO AMERICANO.

REDACTED                                            March 7, 2005

**TRU2207**

## CONDITIONS FOR OBTAINING A WORK VISA

1. LLS INTERNATIONAL is a legally constituted company whose sole purpose is to promote job vacancies generated by the American companies that are hiring (henceforth the **"EMPLOYERS"**) without acting as employer or intermediary. While performing their work, the **"EMPLOYERS"** must respect labor conditions. The **"EMPLOYER"** shall have the obligation to respect what is stipulated in the corresponding contract.

2. With regard to the established work day, the number of hours offered by the **"EMPLOYERS"** is a simple estimate, considering the weather conditions and other unforeseen events that may directly or indirectly affect and/or reduce the duration of the **"APPLICANT'S"** work day, and thereby harm him/her in his/her pay. If conflicts arise between the **"EMPLOYER"** and the **"EMPLOYEE,"** they shall be resolved and discussed between them. LLS INTERNATIONAL IS NOT THE **"EMPLOYER"** AND THEREFORE THE **"APPLICANT"** EXPRESSLY EXEMPTS IT OF ANY LABOR LIABILITY.

3. If the **"EMPLOYEE"** determines that, because of weather conditions and other unforeseen events, the **"APPLICANT"** cannot continue providing his/her services during the period encompassed in his/her work visa, the **"EMPLOYER"** must cover the **"APPLICANT'S"** expenses to his/her place of origin, since the **"APPLICANT"** cannot work in another American company because he/she is not expressly so authorized in his/her work visa.

4. The **"APPLICANT"** shall immediately give **WRITTEN NOTICE** to the **"EMPLOYER"** of justified causes that prevent him/her from coming to work. Should **"APPLICANT"** fail to do so, the **" EMPLOYER"** shall notify the United States government and the AMERICAN CONSULATE so that the latter authority may take the relevant steps and, if appropriate,, he/she shall be considered UNDOCUMENTED, and his/her visa shall be cancelled, and the worker will lose the possibility of returning the next year through the H2B visa program.

5. The **"APPLICANT"** agrees that the service provided by **LLS INTERNATIONAL** is solely that of processing his/her work visa with the AMERICAN CONSULATE at the request of the hiring American company, that is, the **"EMPLOYER."** The **"APPLICANT"** likewise understands that the work visa depends not on LLS INTERNATIONAL, but on the AMERICAN CONSULATE, and hence in the event that his/her work visa is denied, LLS INTERNATIONAL has no liability or obligation of reimbursing him/her the sum for processing his/her respective visa.

6. The program has a cost of:
   a. 155 (USD) dollars to LLS INTERNATIONAL for administrative expenses.
   b. 100 (USD) dollars for approval of the visa at the consulate.
   c. 100 (USD) dollars for payment of visa fees at the consulate.
   d. approximately 200 (USD) dollars transport for his/her travel by land.
   **NOTE:** These payments shall be made only after the person has been chosen and has secure placement with some **"EMPLOYER."**

7. Reimbursements shall only be in order in the following cases:
   When the visa application is rejected at the Consulate (in this case he/she will get 100 dollars back).
   When on the side of the requesting **"EMPLOYER"** the job does not come about, the worker will be placed with another **"EMPLOYER";** if this is not possible, he/she will receive 255 dollars back.
   **NOTE:** In all other cases no reimbursement whatsoever shall be in order.

8. Neither LLS INTERNATIONAL nor the hiring **"EMPLOYER"** in the United States will be responsible for paying and/or returning his/her travel expenses, nor those resulting from processing the visa at the American Consulate. THIS IS SOLELY THE **"APPLICANT'S"** RESPONSIBILITY.

9. When the **"APPLICANT"** is new, the **"APPLICANT"** agrees to submit to the transport and travel policies that the "EMPLOYER" has requested specifically in each case, including travel over a particular bus line. Should the **"APPLICANT"** refuse to observe such travel policies, the **"APPLICANT"** authorizes **LLS INTERNATIONAL as** of that moment to withhold the **"APPLICANT'S"** passport and the work visa granted by the Consulate, to be submitted by LLS INTERNATIONAL to the Consulate for **"APPLICANT,"** in order to cancel the work visa. After the visa is cancelled, the **"APPLICANT"** will receive his/her passport.

10. This document does not assure obtaining work in the United States.

11. THIS DOCUMENT IS NOT A LABOR CONTRACT.

The undersigned (the **"APPLICANT"**) voluntarily declare that I have come personally to LLS INTERNATIONAL to have it [pro]cess a temporary work visa for me, although LLS INTERNATIONAL shall not be responsible for refusal by the American [Con]sulate.

WORKER C

STERLING, VA. 2004

LLS International

## Employer Disclosure Affidavit
### for Company: TruGreen ChemLawn (Sterling)
### Order Dated:  9/29/2003 9:58:49 AM

view premium rates
view Spanish form
close this window

| | |
|---|---|
| **Name of Sponsoring H-2B company** | TruGreen ChemLawn (Sterling) |
| **Address:** | 106 Executive Dr., Sterling, VA 20166 |
| **Office Phone:** | 703-478-3225 |
| **Fax Phone:** | 703-478-3215 |
| **Mobile Phone:** | 703-906-8619 |
| **Home or Other Phone:** | 301-349-2502 |
| **Contact Name:** | Brad Brown |
| **Contact Title:** | Branch Manager |

## Work Information

**Occupation Title:** Pesticide Handlers, Sprayers, and Applicators, Vegetation

**Occupation Description:**
Apply pesticides, herbicides, fungicides, or insecticides to lawns using sprayers, seeders, spreaders, aerators.

**Employment Start Date:** 3/1/2004  **End Date:** 11/15/2004

**List the tasks and skills needed to perform the work.**

Education: none

Experience: operate a vehicle; lawn and fertilization very helpful.

Skills: bilingual; valid driver's license.

**Starting wage offered
(if different from prevailing wage):** $10  **O.T. Rate: $15**

**Average hours of work per week:** 40

**Rent and utilities per month:** 300

**Transportation charge per month
(if applicable):**

**Other charges to worker per month
(if any):**

**Comments/Instructions for worker:** none

**Day and place paycheck is distributed:** Friday

**Will the employer guarantee to supply training if the employee does not have the required skills?** YES

Signature of Employee: ___X___ REDACTED _____  Date: 28/1/2004

App-35                                    TRU1518

## ACUERDO SOBRE CONDICIONES LABORALES

1) Las condiciones laborales que las compañías norteamericanas contratantes (Patrones) proporcionan a los trabajadores tienen como fin proteger al empleado y al patrón. En base a las condiciones laborales, el patrón esta legalmente obligado a pagar lo estipulado en dicho documento, si el empleado no es remunerado de acuerdo a lo acordado, el o ella deberán de comunicarse a **L.L.S. International (81) 8040-7575 y 77** a fin de informar de esta situación.

2) El número de horas trabajadas a la semana es solamente una estimación, por lo tanto, cada trabajador debe tener en cuenta, que las condiciones climatológicas y otros eventos imprevistos pueden afectar el total de horas trabajadas a la semana y por lo tanto su ingreso. Todos los desacuerdos deben ser discutidos con el patrón que les contrató. **L.L.S. NO ES EL PATRON, favor de no comunicarse para tales asuntos.**

3) En el caso de que la Compañía Americana que lo contrató determine que por cuestiones climáticas o de fuerza mayor no puede seguir proporcionando trabajo al empleado durante el período que abarque su visa de trabajo; esta deberá cubrir los gastos del empleado a su lugar de origen, ya que el empleado no puede trabajar en otra Compañía en la que no este autorizada en su visa de trabajo. Esta situación será estrictamente responsabilidad de la empresa contratante.

4) El trabajador solo puede dejar su trabajo por causa de una emergencia, en dado caso el trabajador esta obligado a avisarle al patrón y pedir permiso por escrito. En caso de no ser así, o que el trabajador renuncie, o se vaya del lugar de trabajo si avisar, se le avisará al I.N.S. y al Consulado Americano, el trabajador será considerado como ilegal y pierde toda protección dada por la visa de trabajo, esto resultará en la cancelación de su visa y el trabajador perderá la posibilidad de regresar el año entrante mediante el programa de visas H2B.

5) El trabajador está de acuerdo y entiende que el servicio que presta **L.L.S. International** consiste estrictamente en el trámite de su visa de trabajo ante el Consulado Americano con su consentimiento y a petición de las Compañías Americanas contratantes. Asimismo entiende que la obtención de la visa de trabajo no depende sino estrictamente del Consulado Americano, por lo que en caso de ser rechazada su solicitud, **L.L.S. International** no tiene responsabilidad alguna ni compromiso de indemnizar al solicitante, únicamente a reembolsarle el importe de 100 dólares por la tramitación de su visa.

6) Los reembolsos solo proceden en los siguientes casos:
   - Cuando es rechazada su solicitud de visa en el consulado, en este caso se le regresarán 100 DÓLARES.
   - Cuando por parte de la empresa solicitante no se llegue a realizar el trabajo estando todavía en México, se procederá a colocar al trabajador en otra empresa, en caso de no ser posible se le regresarán 255 DÓLARES.
   **NOTA: En todos los demás casos NO PROCEDERA REEMBOLSO ALGUNO**

7) El servicio de L.L.S. International, tiene un costo de:
   - 155 dólares (USD) para L.L.S. por gastos Administrativos
   Los siguientes pagos es lo que cobra el Consuldo Americano:
   - 100 dólares (USD) por la tramitación de la visa en el Consulado
   - 100 dólares (USD) para el pago de derecho de visa en el Consulado.
   Transporte:
   - 200 dólares (USD) aproximadamente de trasporte para su traslado vía terrestre..
   **NOTA: Estos pagos se realizan hasta que la persona haya sido seleccionada, la persona haya aceptado el trabajo y tengan un lugar seguro en alguna Compañía.**

8) L.L.S. International o la compañía contratante en Estados Unidos no serán responsables de pagar y/o devolver sus gastos de viaje, ni los que se deriven del proceso de la visa en el Consulado Americano, **ESTA ES UNICAMENTE RESPONSABILIDAD DEL TRABAJADOR**

**Este documento no asegura la obtención de trabajo.**

**Firma del Trabajador**

_____

**Fecha**

LLS International (Monterrey)
Ocampo No. 427 Poniente
Entre Rayon y Aldama
C.P.64000
Tels.: (81) 8040 7575 / 8040 7577

**TRU1519**

## AGREEMENT ON LABOR CONDITIONS

The purpose of the labor conditions that the hiring American companies (Employers) provide to the workers is to protect the employee and the employer. Based on labor conditions, the employer is legally obliged to pay what is stipulated in that document; if the employee is not paid in accordance with what is agreed upon, he or she must notify **L.L.S. International (81) 8040-7575 and 77** in order to report this situation.

The number of hours worked in the week is only an estimate; hence each worker must bear in mind that weather conditions and other unforeseen events may affect the total hours worked in the week and therefore his/her income. All disagreements must be discussed with the employer who hired them. **L.L.S. IS NOT THE EMPLOYER, please do not contact it for such matters.**

Should the American Company that hired him/her determine that, for weather reasons or force majeure, it cannot keep providing work to the employee during the period encompassed in his/her work visa, it must cover the employee's expenses to his/her place of origin, inasmuch as the employee cannot work in another Company in which he/she is not authorized in his/her work visa. This situation will be strictly the responsibility of the hiring company.

The worker may only leave his/her work due to an emergency; in such a case, the worker is obliged to notify the employer and ask for permission in writing. If that is not the case, or the worker quits, or leaves the workplace without giving notice, the I.N.S. and the American Consulate will be notified, the worker will be considered out of status and loses all protection provided by the work visa; this will result in cancellation of his/her visa and the worker will lose the possibility of returning the following year through the H2B visa program.

The worker is in agreement and understands that the service provided by **L.L.S. International** consists strictly in arranging his/her visa with the American Consulate with his/her consent and at the request of the American Companies hiring. He/she likewise understands that obtaining the work visa depends solely and strictly on the American Consulate, and hence if his/her application is rejected, **L.L.S. International** has no responsibility and no commitment to compensate the applicant, but only to reimburse him/her the sum of 100 dollars for processing his/her visa.

Reimbursements are only in order in the following cases:
- When his/her visa request is rejected at the consulate; in this case, he/she will receive 100 DOLLARS back.
- When the requesting company does not undertake the work, while one is still in Mexico, the worker will be placed in another company; if this is not possible, he/she will receive 255 DOLLARS back.

**NOTE: In all other cases NO REIMBURSEMENT WHATSOEVER SHALL BE IN ORDER.**

The L.L.S. International service has a cost of:
- 155 (USD) dollars to L.L.S. for administrative expenses

The following payments are what the American Consulate charges:
- 100 (USD) dollars for processing the visa at the Consulate.
- 100 (USD) dollars for payment of visa fee at the Consulate

Transport:
- Approximately 200 (USD) dollars transportation for your travel by land.

**NOTE: These payments are only made when the person has been chosen, the person has accepted the job, and they have a secure post at some Company.**

L.L.S. International or the hiring company in the United States will not be responsible for paying and/or returning his/her travel expenses, nor those resulting from the visa process in the American Consulate; **THIS IS SOLELY THE WORKER'S RESPONSIBILITY**

This document does not assure obtaining work.

| | |
|---|---|
| **LLS International (Monterrey)**<br>Ocampo No. 427 Poniente<br>Entre Rayon y Aldama<br>C.P. 64000<br>Phone Nos.: (81) 8040 7575 / 8040 7577 | [signature]<br>**Worker's Signature**<br>[hand written]<br>—————————<br>**Date** |

WORKER D

ALLENTOWN, PA. 2004

## Employer Disclosure Affadavit
### for Company: TruGreen ChemLawn (Allentown)
### Order Dated: 9/25/2003 1:40:25 PM

view Spanish form
close this window

| | |
|---|---|
| Name of Sponsoring H-2B company | TruGreen ChemLawn (Allentown) |
| Address: | 764 Roble Rd., Allentown, PA 18109 |
| Office Phone: | 610-266-1240 |
| Fax Phone: | 610-266-6194 |
| Mobile Phone: | 610-587-9730 |
| Home or Other Phone: | 610-767-5754 |
| Contact Name: | Larry Steckel |
| Contact Title: | Branch Manager |

## Work Information

**Occupation Title:**  Pesticide Handlers, Sprayers, and Applicators, Vegetation

**Occupation Description:** Apply pesticides, herbicides, fungicides, or insecticides to lawns using sprayers, seeders, aerators.

**Employment Start Date:**  3/15/2004  **End Date:** 11/15/2004

**List the tasks and skills needed to perform the work.**

Education: n/a

Experience: lawn and fertilization very helpful.

Skills: valid driver's license; bilingual

| | |
|---|---|
| Starting wage offered (if different from prevailing wage): | $9.68  **O.T. Rate:** $14.52 |
| Average hours of work per week: | 40 |
| Rent and utilities per month: | 260 |
| Transportation charge per month (if applicable): | |
| Other charges to worker per month (if any): | |
| Comments/Instructions for worker: | n/a |
| Day and place paycheck is distributed: | Friday |

Will the employer guarantee to supply training if the employee does not have the required skills? YES

Signature of Employer    REDACTED    Date: 04-Dec-03

**TRU2153**

## ACUERDO SOBRE CONDICIONES LABORALES

1) Las condiciones laborales que las compañias norteamericanas contratantes (Patrones) proporcionan a los trabajadores tienen como fin proteger al empleado y al patrón. En base a las condiciones laborales, el patrón esta legalmente obligado a pagar lo estipulado en dicho documento, si el empleado no es remunerado de acuerdo a lo acordado, el o ella deberán de comunicarse a **L.L.S. International (81) 8040-7575 y 77** a fin de informar de esta situación.

2) El número de horas trabajadas a la semana es solamente una estimación, por lo tanto, cada trabajador debe tener en cuenta, que las condiciones climatológicas y otros eventos imprevistos pueden afectar el total de horas trabajadas a la semana y por lo tanto su ingreso. Todos los desacuerdos deben ser discutidos con el patrón que les contrató. **L.L.S. NO ES EL PATRON, favor de no comunicarse para tales asuntos.**

3) En el caso de que la Compañia Americana que lo contrató determine que por cuestiones climáticas o de fuerza mayor no puede seguir proporcionando trabajo al empleado durante el período que abarque su visa de trabajo; esta deberá cubrir los gastos del empleado a su lugar de origen, ya que el empleado no puede trabajar en otra Compañia en la que no este autorizada en su visa de trabajo. Esta situación será estrictamente responsabilidad de la empresa contratante.

4) El trabajador solo puede dejar su trabajo por causa de una emergencia, en dado caso el trabajador esta obligado a avisarle al patrón y pedir permiso por escrito. En caso de no ser así, o que el trabajador renuncie, o se vaya del lugar de trabajo si avisar, se le avisará al I.N.S. y al Consulado Americano, el trabajador será considerado como ilegal y pierde toda protección dada por la visa de trabajo, esto resultará en la cancelación de su visa y el trabajador perderá la posibilidad de regresar el año entrante mediante el programa de visas H2B.

5) El trabajador está de acuerdo y entiende que el servicio que presta **L.L.S. International** consiste estrictamente en el trámite de su visa de trabajo ante el Consulado Americano con su consentimiento y a petición de las Compañias Americanas contratantes. Asimismo entiende que la obtención de la visa de trabajo no depende sino estrictamente del Consulado Americano, por lo que en caso de ser rechazada su solicitud, **L.L.S. International** no tiene responsabilidad alguna ni compromiso de indemnizar al solicitante, únicamente a reembolsarle el importe de 100 dólares por la tramitación de su visa.

6) Los reembolsos solo proceden en los siguientes casos:
   - Cuando es rechazada su solicitud de visa en el consulado, en este caso se le regresarán 100 DÓLARES.
   - Cuando por parte de la empresa solicitante no se llegue a realizar el trabajo estando todavía en México, se procederá a colocar al trabajador en otra empresa, en caso de no ser posible se le regresarán 255 DÓLARES.
   **NOTA: En todos los demás casos NO PROCEDERA REEMBOLSO ALGUNO**

7) El servicio de L.L.S. International, tiene un costo de:
   - 155 dólares (USD) para L.L.S. por gastos Administrativos
   Los siguientes pagos es lo que cobra el Consuldo Americano:
   - 100 dólares (USD) por la tramitación de la visa en el Consulado
   - 100 dólares (USD) para el pago de derecho de visa en el Consulado.
   Transporte:
   - 200 dólares (USD) aproximadamente de trasporte para su traslado vía terrestre..
   **NOTA: Estos pagos se realizan hasta que la persona haya sido seleccionada, la persona haya aceptado el trabajo y tengan un lugar seguro en alguna Compañia.**

8) L.L.S. International o la compañia contratante en Estados Unidos no serán responsables de pagar y/o devolver sus gastos de viaje, ni los que se deriven del proceso de la visa en el Consulado Americano, **ESTA ES UNICAMENTE RESPONSABILIDAD DEL TRABAJADOR**

**Este documento no asegura la obtención de trabajo.**

REDACTED

Firma del Trabajador

04 / DIC / 03
Fecha

**TRU2154**

## AGREEMENT ON LABOR CONDITIONS

The purpose of the labor conditions that the hiring American companies (Employers) provide to the workers is to protect the employee and the employer. Based on labor conditions, the employer is legally obliged to pay what is stipulated in that document; if the employee is not paid in accordance with what is agreed upon, he or she must notify **L.L.S. International (81) 8040-7575 and 77** in order to report this situation.

The number of hours worked in the week is only an estimate; hence each worker must bear in mind that weather conditions and other unforeseen events may affect the total hours worked in the week and therefore his/her income. All disagreements must be discussed with the employer who hired them. **L.L.S. IS NOT THE EMPLOYER, please do not contact it for such matters.**

Should the American Company that hired him/her determine that, for weather reasons or force majeure, it cannot keep providing work to the employee during the period encompassed in his/her work visa, it must cover the employee's expenses to his/her place of origin, inasmuch as the employee cannot work in another Company in which he/she is not authorized in his/her work visa. This situation will be strictly the responsibility of the hiring company.

The worker may only leave his/her work due to an emergency; in such a case, the worker is obliged to notify the employer and ask for permission in writing. If that is not the case, or the worker quits, or leaves the workplace without giving notice, the I.N.S. and the American Consulate will be notified, the worker will be considered out of status and loses all protection provided by the work visa; this will result in cancellation of his/her visa and the worker will lose the possibility of returning the following year through the H2B visa program.

The worker is in agreement and understands that the service provided by **L.L.S. International** consists strictly in arranging his/her visa with the American Consulate with his/her consent and at the request of the American Companies hiring. He/she likewise understands that obtaining the work visa depends solely and strictly on the American Consulate, and hence if his/her application is rejected, **L.L.S. International** has no responsibility and no commitment to compensate the applicant, but only to reimburse him/her the sum of 100 dollars for processing his/her visa.

Reimbursements are only in order in the following cases:
- When his/her visa request is rejected at the consulate; in this case, he/she will receive 100 DOLLARS back.
- When the requesting company does not undertake the work, while one is still in Mexico, the worker will be placed in another company; if this is not possible, he/she will receive 255 DOLLARS back.

**NOTE: In all other cases NO REIMBURSEMENT WHATSOEVER SHALL BE IN ORDER.**

The L.L.S. International service has a cost of:
- 155 (USD) dollars to L.L.S. for administrative expenses

The following payments are what the American Consulate charges:
- 100 (USD) dollars for processing the visa at the Consulate.
- 100 (USD) dollars for payment of visa fee at the Consulate

Transport:
- Approximately 200 (USD) dollars transportation for your travel by land.

**NOTE: These payments are only made when the person has been chosen, the person has accepted the job, and they have a secure post at some Company.**

L.L.S. International or the hiring company in the United States will not be responsible for paying and/or returning his/her travel expenses, nor those resulting from the visa process in the American Consulate; **THIS IS SOLELY THE WORKER'S RESPONSIBILITY**

This document does not assure obtaining work.

LLS International (Monterrey)
Ocampo No. 427 Poniente
Entre Rayon y Aldama
C.P. 64000
Phone Nos.: (81) 8040 7575 / 8040 7577

[signature]
**Worker's Signature**
[hand written]
_____
**Date**

19

2

Taking *si* to be *sin*]

Translation of App 40

WORKER E

S. PLAINFIELD, N.J. 2004


LLS International

Página 1 de 1

# Employer Disclosure Affidavit

## for Company: TruGreen ChemLawn (So. Plainfield)
## Order Dated: 9/29/2003 9:43:53 AM

view premium rates
view Spanish form
close this window

| | |
|---|---|
| Name of Sponsoring H-2B company | TruGreen ChemLawn (So. Plainfield) |
| Address: | 117 Corporate Blvd., South Plainfield, NJ 07080 |
| Office Phone: | 908-755-2795 |
| Fax Phone: | 908-755-5279 |
| Mobile Phone: | 908-413-8212 |
| Home or Other Phone: | 908-537-7675 |
| Contact Name: | Scott Heist |
| Contact Title: | Branch Manager |

# Work Information

**Occupation Title:**      Pesticide Handlers, Sprayers, and Applicators, Vegetation

**Occupation Description:**
Apply pesticides, herbicides, fungicides, or insecticides to lawns using sprayers, seeders, spreaders, aerators.

**Employment Start Date:**      3/2/2004    **End Date:** 11/15/2004

**List the tasks and skills
needed to perform the work.**

Education: none

Experience: lawn and fertilization very helpful.

Skills: bilingual; valid driver's license

**Starting wage offered
(if different from prevailing wage):**      $10 **O.T. Rate:** $15

**Average hours of work per week:**      40

**Rent and utilities per month:**      340

**Transportation charge per month
(if applicable):**      40

**Other charges to worker per month
(if any):**

**Comments/Instructions for worker:**      Returning workers will be paid $11.00/hour. Average hours per week are 40-50. Workers must have workboots

**Day and place paycheck is distributed:**      Friday

**Will the employer guarantee to supply training if the employee does not have the required skills?** YES

**Signature of Employer:**    REDACTED    **Date:** 26/02/2004

http://www.llsint.com/lls/hsys2/formC eda.asp?S=JSKPWOIWFF226200491725&CUSTID=622&OR    26/02/2004

**TRU1880**

## ACUERDO SOBRE CONDICIONES LABORALES

1) Las condiciones laborales de las compañías norteamericanas contratantes (Patrones) proporcionan a los trabajadores tienen como fin proteger al empleado y al patrón. En base a las condiciones laborales, el patrón esta legalmente obligado a pagar lo estipulado en dicho documento, si el empleado no es remunerado de acuerdo a lo acordado, el o ella deberán de comunicarse a **L.L.S. International (81) 8040-7575 y 77** a fin de informar de esta situación.

2) El número de horas trabajadas a la semana es solamente una estimación, por lo tanto, cada trabajador debe tener en cuenta, que las condiciones climatológicas y otros eventos imprevistos pueden afectar el total de horas trabajadas a la semana y por lo tanto su ingreso. Todos los desacuerdos deben ser discutidos con el patrón que les contrató. **L.L.S. NO ES EL PATRON, favor de no comunicarse para tales asuntos.**

3) En el caso de que la Compañía Americana que lo contrató determine que por cuestiones climáticas o de fuerza mayor no puede seguir proporcionando trabajo al empleado durante el período que abarque su visa de trabajo; esta deberá cubrir los gastos del empleado a su lugar de origen, ya que el empleado no puede trabajar en otra Compañía en la que no este autorizada en su visa de trabajo. Esta situación será estrictamente responsabilidad de la empresa contratante.

4) El trabajador solo puede dejar su trabajo por causa de una emergencia, en dado caso el trabajador esta obligado a avisarle al patrón y pedir permiso por escrito. En caso de no ser así, o que el trabajador renuncie, o se vaya del lugar de trabajo sin avisar, se le avisará al I.N.S. y al Consulado Americano, el trabajador será considerado como ilegal y pierde toda protección dada por la visa de trabajo, esto resultará en la cancelación de su visa y el trabajador perderá la posibilidad de regresar el año entrante mediante el programa de visas H2B.

5) El trabajador está de acuerdo y entiende que el servicio que presta **L.L.S. International** consiste estrictamente en el trámite de su visa de trabajo ante el Consulado Americano con su consentimiento y a petición de las Compañías Americanas contratantes. Asimismo entiende que la obtención de la visa de trabajo no depende sino estrictamente del Consulado Americano, por lo que en caso de ser rechazada su solicitud, **L.L.S. International** no tiene responsabilidad alguna ni compromiso de indemnizar al solicitante, únicamente a reembolsarle el importe de 100 dólares por la tramitación de su visa.

6) Los reembolsos solo proceden en los siguientes casos:
   - Cuando es rechazada su solicitud de visa en el consulado, en este caso se le regresarán 100 DÓLARES.
   - Cuando por parte de la empresa solicitante no se llegue a realizar el trabajo estando todavía en México, se procederá a colocar al trabajador en otra empresa, en caso de no ser posible se le regresarán 255 DÓLARES.
   **NOTA: En todos los demás casos NO PROCEDERA REEMBOLSO ALGUNO**

7) El servicio de L.L.S. International, tiene un costo de:
   - 155 dólares (USD) para L.L.S. por gastos Administrativos
   Los siguientes pagos es lo que cobra el Consulado Americano:
   - 100 dólares (USD) por la tramitación de la visa en el Consulado
   - 100 dólares (USD) para el pago de derecho de visa en el Consulado.
   Transporte:
   - 200 dólares (USD) aproximadamente de trasporte para su traslado vía terrestre.
   **NOTA: Estos pagos se realizan hasta que la persona haya sido seleccionada, la persona haya aceptado el trabajo y tengan un lugar seguro en alguna Compañía.**

8) L.L.S. International o la compañía contratante en Estados Unidos no serán responsables de pagar y/o devolver sus gastos de viaje, ni los que se deriven del proceso de la visa en el Consulado Americano, **ESTA ES UNICAMENTE RESPONSABILIDAD DEL TRABAJADOR**

**Este documento no asegura la obtención de trabajo.**

REDACTED

**Firma del Trabajador**

_26/02/2004_

**Fecha**

LLS International (Monterrey)
Ocampo No. 427 Poniente
Entre Rayon y Aldama
C.P.64000
Tels.: (81) 8040 7575 / 8040 7577

App-44

TRU1881

## AGREEMENT ON LABOR CONDITIONS

The purpose of the labor conditions that the hiring American companies (Employers) provide to the workers is to protect the employee and the employer. Based on labor conditions, the employer is legally obliged to pay what is stipulated in that document; if the employee is not paid in accordance with what is agreed upon, he or she must notify **L.L.S. International (81) 8040-7575 and 77** in order to report this situation.

The number of hours worked in the week is only an estimate; hence each worker must bear in mind that weather conditions and other unforeseen events may affect the total hours worked in the week and therefore his/her income. All disagreements must be discussed with the employer who hired them. **L.L.S. IS NOT THE EMPLOYER, please do not contact it for such matters.**

Should the American Company that hired him/her determine that, for weather reasons or force majeure, it cannot keep providing work to the employee during the period encompassed in his/her work visa, it must cover the employee's expenses to his/her place of origin, inasmuch as the employee cannot work in another Company in which he/she is not authorized in his/her work visa. This situation will be strictly the responsibility of the hiring company.

The worker may only leave his/her work due to an emergency; in such a case, the worker is obliged to notify the employer and ask for permission in writing. If that is not the case, or the worker quits, or leaves the workplace without giving notice, the I.N.S. and the American Consulate will be notified, the worker will be considered out of status and loses all protection provided by the work visa; this will result in cancellation of his/her visa and the worker will lose the possibility of returning the following year through the H2B visa program.

The worker is in agreement and understands that the service provided by **L.L.S. International** consists strictly in arranging his/her visa with the American Consulate with his/her consent and at the request of the American Companies hiring. He/she likewise understands that obtaining the work visa depends solely and strictly on the American Consulate, and hence if his/her application is rejected, **L.L.S. International** has no responsibility and no commitment to compensate the applicant, but only to reimburse him/her the sum of 100 dollars for processing his/her visa.

Reimbursements are only in order in the following cases:
- When his/her visa request is rejected at the consulate; in this case, he/she will receive 100 DOLLARS back.
- When the requesting company does not undertake the work, while one is still in Mexico, the worker will be placed in another company; if this is not possible, he/she will receive 255 DOLLARS back.
**NOTE: In all other cases NO REIMBURSEMENT WHATSOEVER SHALL BE IN ORDER.**

The L.L.S. International service has a cost of:
- 155 (USD) dollars to L.L.S. for administrative expenses
The following payments are what the American Consulate charges:
- 100 (USD) dollars for processing the visa at the Consulate.
- 100 (USD) dollars for payment of visa fee at the Consulate
Transport:
- Approximately 200 (USD) dollars transportation for your travel by land.
**NOTE: These payments are only made when the person has been chosen, the person has accepted the job, and they have a secure post at some Company.**

L.L.S. International or the hiring company in the United States will not be responsible for paying and/or returning his/her travel expenses, nor those resulting from the visa process in the American Consulate; **THIS IS SOLELY THE WORKER'S RESPONSIBILITY**
This document does not assure obtaining work.

| | |
|---|---|
| LLS International (Monterrey)<br>Ocampo No. 427 Poniente<br>Entre Rayon y Aldama<br>C.P. 64000<br>Phone Nos.: (81) 8040 7575 / 8040 7577 | [signature]<br>**Worker's Signature**<br>[hand written]<br>_____<br>**Date** |

19

2

[Taking *si* to be *sin*]

App-45

Translation of App 44

WORKER F

WESTERVILLE, OHIO 2003

LLS International                                                    Página 1 de 1

# Employer Disclosure Affadavit
## for Company:   TruGreen-ChemLawn
## Order Dated:   12/10/2002 7:27:35 PM

view Spanish form
close this window

**Name of Sponsoring H-2B company**        TruGreen-ChemLawn
**Address:**                               461 Enterprise Drive, Westerville, OH 43081
**Office Phone:**                          614-431-0825
**Fax Phone:**                             614-431-0155
**Mobile Phone:**                          614-832-5540
**Home or Other Phone:**                   740-548-5480
**Contact Name:**                          Al Karow
**Contact Title:**                         Branch Manager

# Work Information

**Occupation Title:**                      Landscaping and Groundskeeping Workers
**Occupation Description:**
Mow, cut, water, and edge lawns; rake and blow leaves; dig holes for bushes; pull and chop weeds; prune; and h and mulch.

**Employment Start Date:**                 4/10/2003   **End Date:** 11/30/2003
**List the tasks and skills
needed to perform the work.**

Education: High School diploma or GED

Experience: none

Skills: Good English required (bilingual)

**Starting wage offered
(if different from prevailing wage):**     $10   **O.T. Rate:** $15
**Average hours of work per week:**        40
**Rent and utilities per month:**          164
**Transportation charge per month
(if applicable):**
**Other charges to worker per month
(if any):**
**Comments/Instructions for worker:**
**Day and place paycheck is distributed:**   Friday
**Will the employer guarantee to supply training if the employee does not have the required skills?** YES

**Signature of Employer:**

**Title:**                                 REDACTED             **Date:** 21/01/2003

http://www.llsint.com/lls/hsys2/formC_eda.asp?S=MIQSLGVRFF121200315028&CUS...   21/01/2003

## ACUERDO SOBRE CONDICIONES LABORALES

1) Las condiciones laborales que las compañías norteamericanas contratantes (Patrones) proporcionan a los trabajadores tienen como fin proteger al empleado y al patrón. En base a las condiciones laborales, el patrón esta legalmente obligado a pagar lo estipulado en dicho documento, si el empleado no es remunerado de acuerdo a lo acordado, el o ella deberán de comunicarse a **L.L.S. International (81) 8040-7575 y 77** a fin de informar de esta situación.

2) El número de horas trabajadas a la semana es solamente una estimación, por lo tanto, cada trabajador debe tener en cuenta, que las condiciones climatológicas y otros eventos imprevistos pueden afectar el total de horas trabajadas a la semana y por lo tanto su ingreso. Los gastos de renta y servicios no deben de exceder el 20% del ingreso establecido. Todos los desacuerdos deben ser discutidos con el patrón que lo contrató. **L.L.S. NO ES EL PATRON, favor de no comunicarse para tales asuntos.**

3) En el caso de que la Compañía Americana que lo contrató determine que por cuestiones climáticas o de fuerza mayor no puede seguir proporcionando trabajo al empleado durante el período que abarque su visa de trabajo; esta deberá cubrir los gastos del empleado a su lugar de origen, ya que el empleado no puede trabajar en otra Compañía en la que no este autorizada en su visa de trabajo. Esta situación será estrictamente responsabilidad de la empresa contratante.

4) El trabajador solo puede dejar su trabajo por causa de una emergencia, en dado caso el trabajador esta obligado a avisarle al patrón y pedir permiso por escrito. En caso de no ser así, o que el trabajador renuncie, o se vaya del lugar de trabajo sin avisar, se le avisará a su lugar de origen, se le avisará a su I.N.S. y al Consulado Americano, el trabajador será considerado como ilegal y pierde toda protección dada por la visa de trabajo, esto resultará en la cancelación de su visa y el trabajador perderá la posibilidad de regresar el año entrante mediante el programa de visas H2B.

5) El trabajador está de acuerdo y entiende que el servicio que presta **L.L.S. International** consiste estrictamente en el trámite de su visa de trabajo ante el Consulado Americano con su consentimiento y a petición de las Compañías Americanas contratantes. Asimismo entiende que la obtención de la visa de trabajo no depende sino estrictamente del Consulado Americano, por lo que en caso de ser rechazada su solicitud, **L.L.S. International** no tiene responsabilidad alguna ni compromiso de indemnizar al solicitante, únicamente a reembolsarle el importe de 100 dólares por la tramitación de su visa.

6) Los reembolsos solo proceden en los siguientes casos:
   - Cuando es rechazada su solicitud de visa en el consulado, en este caso se le regresarán 100 DÓLARES.
   - Cuando por parte de la empresa solicitante no se llegue a realizar el trabajo, se procederá a colocar al trabajador en otra empresa, en caso de no ser posible se le regresarán 255 DÓLARES.
   **NOTA: En todos los demás casos NO PROCEDERA REEMBOLSO ALGUNO**

7) El servicio de L.L.S. International, tiene un costo de:
   - 155 dólares (USD) por gastos de Reclutamiento
   - 100 dólares (USD) por la tramitación de la visa en el Consulado
   - 100 dólares (USD) para el pago de derecho de visa en el Consulado.
   - 200 dólares (USD) aproximadamente de trasporte para su traslado via terrestre..
   **NOTA: Estos pagos se realizan hasta que la persona haya sido seleccionada y tengan un lugar seguro en alguna Compañía.**

8) L.L.S. International o la compañía contratante en Estados Unidos no serán responsables de pagar y/o devolver sus gastos de viaje, ni los que se deriven del proceso de la visa en el Consulado Americano, **ESTA ES UNICAMENTE RESPONSABILIDAD DEL TRABAJADOR**

9) **Este documento no asegura la obtención de trabajo.**

REDACTED
**Firma del Trabajador**

REDACTED

**Testigo(** )          **Testigo(** 21-Enero-2003          )

App-48

## AGREEMENT ON LABOR CONDITIONS

The purpose of the labor conditions that the hiring American companies (Employers) provide to the workers is to protect the employee and the employer. Based on labor conditions, the employer is legally obliged to pay what is stipulated in that document; if the employee is not paid in accordance with what is agreed upon, he or she must notify **L.L.S. International (81) 8040-7575 and 77** in order to report this situation.

The number of hours worked in the week is only an estimate; hence each worker must bear in mind that weather conditions and other unforeseen events may affect the total hours worked in the week and therefore his/her income. All disagreements must be discussed with the employer who hired them. **L.L.S. IS NOT THE EMPLOYER, please do not contact it for such matters.**

Should the American Company that hired him/her determine that, for weather reasons or force majeure, it cannot keep providing work to the employee during the period encompassed by his/her work visa, it must cover the employee's expenses to his/her place of origin, inasmuch as the employee cannot work in another Company in which he/she is not authorized in his/her work visa. This situation will be strictly the responsibility of the hiring company.

The worker may only leave his/her work due to an emergency; in such a case, the worker is obliged to notify the employer and ask for permission in writing. If that is not the case, or the worker quits, or leaves the workplace without giving notice, the I.N.S. and the American Consulate will be notified, the worker will be considered out of status and loses all protection provided by the work visa; this will result in cancellation of his/her visa and the worker will lose the possibility of returning the following year through the H2B visa program.

The worker is in agreement and understands that the service provided by **L.L.S. International** consists strictly in arranging his/her visa with the American Consulate with his/her consent and at the request of the American Companies hiring. He/she likewise understands that obtaining the work visa depends solely and strictly on the American Consulate, and hence if his/her application is rejected, **L.L.S. International** has no responsibility and no commitment to compensate the applicant, but only to reimburse him/her the sum of 100 dollars for processing his/her visa.

Reimbursements are only in order in the following cases:
- When his/her visa request is rejected at the consulate; in this case, he/she will receive 100 DOLLARS back.
- When the requesting company does not undertake the work, while one is still in Mexico, the worker will be placed in another company; if this is not possible, he/she will receive 255 DOLLARS back.

**NOTE: In all other cases NO REIMBURSEMENT WHATSOEVER SHALL BE IN ORDER.**

The L.L.S. International service has a cost of:
- 155 (USD) dollars to L.L.S. for administrative expenses

The following payments are what the American Consulate charges:
- 100 (USD) dollars for processing the visa at the Consulate.
- 100 (USD) dollars for payment of visa fee at the Consulate

Transport:
- Approximately 200 (USD) dollars transportation for your travel by land.

**NOTE: These payments are only made when the person has been chosen, the person has accepted the job, and they have a secure post at some Company.**

L.L.S. International or the hiring company in the United States will not be responsible for paying and/or returning his/her travel expenses, nor those resulting from the visa process in the American Consulate; **THIS IS SOLELY THE WORKER'S RESPONSIBILITY**

This document does not assure obtaining work.

19

2

---

| LLS International (Monterrey)<br>Ocampo No. 427 Poniente<br>Entre Rayon y Aldama<br>C.P. 64000<br>Phone Nos.: (81) 8040 7575 / 8040 7577 | [signature]<br>**Worker's Signature**<br>[hand written]<br><br>————————<br>**Date** |
| --- | --- |

---

[Taking *si* to be *sin*]

Translation of App 48

WORKER G

STERLING, VA. 2006

Affidavit

Página 1 de 2

## Condiciones de Trabajo

1.  **Empleador/ Area de Trabajo**

    Nombre de la Empresa: **TruGreen ChemLawn (Sterling)**
    Direccion: **106 Executive Dr.**
    **Sterling, VA 20166**
    Telefono: **703-478-3225**

2.  **Periodo de Trabajo**

    Inicio **3/2/2006**    Termino **11/30/2006**

3.  **Descripcion de Trabajo**

    Apply pesticides, herbicides, fungicides, or insecticides to lawns using sprayers, seeders, spreaders, aerators. Entry level position.

    Cuota de Pago normal: **$10.50**           Cuota de pago tiempo extra: **$15.75**
    Dia de Pago: **Friday**                                      Quincenal: **No**
    Horas: **7:00 AM - 5:00 PM**        Tiempo para comida: **30 minutes**
    Dias de Trabajo: **5-6**

4.  **Requerimientos especiales**

    None

5.  **Transportacion./ Llegada a U.S.**

    El trabajador pagara sus propios gastos de transportacion desde su casa en Mexico al lugar de su trabajo. El trabajador es igualmente responsible for el costo de regreso de su lugar de trabajo a su casa en Mexico al finalizar el periodo de trabajo.

    **El trabajador de be de viajar a:**

    106 Executive Dr.
    Sterling, VA 20166

    **Para asuntos relacionados con el viaje por favor contactar a:**

    Persona de Contacto: **Brad Brown**
    Titulo del Contacto: **Branch Manager**
    Telefono de Contacto: **703-478-3225**
    Telefono de Contacto: **703-906-8619**

6.  **Aseguranza**

    Se provee de Seguro de compensacion del trabajor? **Yes**

7.  **Beneficios**

    Hay algun otro beneficio para el trabajador? **No**
    Si es asi, a que costo para el trabajador? **N/A**

8.  **Herramientas, ropa protectora, u otro articulo el cual debe ser proporcionado por el trabajador**

9.  **Vivienda**

    El patron no es responsible de la vivienda del trabajador. El patron solo ayuda a los trabajadores haciendo los arreglos de vivienda previos a la llegada del trabajador. La vivienda debe de estar de acuerdo con todo los requerimientos para propiedades de renta del Estado y Locales. El trabajador puede encontrar su propia vivienda a cualquier tiempo sin que haya discriminacion por parte del empleador hacia el o ella. La siguiente informacion solo son estimados y no es obligatorio el aceptarlos:

    Cargos por Vivienda por Semana: **$75.00**
    Gastos Semanales de Trasporte: **$0.00**
    Se incluyen los gastos por utilidades (electricidad, etc)? **No**

## REDACTED

'Affidavit

# Terms of Employment

1. **Employer / Area of Employment**

   Company Name: TruGreen ChemLawn

   Address:

   Telephone:

2. **Period of Employment**

3. **Task Description**

   Apply pesticides, herbicides, fungicides, or insecticides to lawns using sprayers, spreaders, seeders and aerators. Entry level position.

   Standard pay rate:                      Overtime pay rate:

   Payday:                      Bi-weekly:
   Hours:                      Lunch Break:
   Work Days:

4. **Special Requirements**

5. **Transportation / U.S. Arrival**

   The worker will pay his/her own transportation cost from their home in Mexico to the place of employment. Worker is equally responsible for the cost of returning from the place of employment to their home at the end of the employment period.

   Worker must travel to:

   For travel related issues please contact:
   Liason name:
   Liason title:
   Liason telephone 1:
   Liason telephone 2:

6. **Insurance**

   Is workers compensation insurance provided by the employer?  **Yes**

7. **Benefits**

   Are any other benefits provided to the worker?  **No**
   If yes, at what cost to the worker?  **N/A**

8. **Tools, protective clothing, and other items that must be provided by the worker**

9. **Worker Housing**

   The employer is not responsible for worker housing. The employer agrees to assist the worker by making arrangements in advance for possible worker housing. Housing shall meet all applicable state and local codes for rental property. The worker may find their own housing at any time without incurring the prejudice of the employer against him/her. The following are estimates only and are not binding.

   Weekly charges for such housing:
   Are utilities included in this price?
   If no, what will utilities cost?

REDACTED

App-52                      Translation of App 51

## CONDICIONES PARA LA OBTENCIÓN DE VISA DE TRABAJO

1. LLS-MEXICO es una empresa legalmente constituída, que tiene como única finalidad promover las vacantes de empleo generadas por las compañías americanas contratantes (en lo sucesivo los **"PATRONES"**), sin actuar como patrón ni como intermediario. Durante el desempeño de sus labores, los **"PATRONES"**, deberán de respetar sus condiciones laborales. El **"PATRON"** tendrá la obligación de respetar lo estipulado en el contrato correspondiente.

2. Por lo que respecta a la jornada de trabajo establecida, el número de horas ofrecida por los **"PATRONES"**, es una simple estimación, considerando las condiciones climatológicas y otros eventos imprevistos, que pudieran directa o indirectamente afectar y/o reducir la duración de la jornada del **"SOLICITANTE"**, y con esto perjudicarlo en su remuneración. Si surgieren conflictos entre el **"PATRON"**, y el **"SOLICITANTE"**, serán resueltos y discutidos entre ellos. LLS-MEXICO NO ES EL **"PATRÓN"**, POR LO QUE EL **"SOLICITANTE"** EXPRESAMENTE LE EXIME DE CUALQUIER RESPONSABILIDAD LABORAL.

3. En caso de que el **"PATRON"** determine que las condiciones climatológicas y otros eventos imprevistos, el **"SOLICITANTE"** no pueda continuar prestando sus servicios durante el período que abarque su visa de trabajo; el **"PATRON"** deberá de cubrir los gastos del **"SOLICITANTE"** a su lugar de origen, ya que el **"SOLICITANTE"** no puede trabajar en otra compañía americana, por no estar autorizada expresamente en su visa de trabajo.

4. El **"SOLICITANTE"** dará de inmediato **AVISO POR ESCRITO** al **"PATRÓN"** de las causas justificadas que le impidan concurrir a su trabajo. En el supuesto de que el **"SOLICITANTE"** hiciere caso omiso, el **"PATRON"** avisará al Gobierno de Estados Unidos y al CONSULADO AMERICANO, para que ésta última Autoridad, tome las medidas pertinentes, y en su caso, se le considere INDOCUMENTADO, y se proceda a cancelar su visa de trabajo, perdiendo el **"SOLICITANTE"** cualquier posibilidad de ser considerado para el programa de visas H2B o H2A.

5. El **"SOLICITANTE"** está de acuerdo que el servicio que presta LLS-MEXICO es únicamente el de tramitar su visa de trabajo ante el CONSULADO AMERICANO a petición de la compañía americana contratante, es decir, el **"PATRON"**. Así mismo, el **"SOLICITANTE"** entiende que la visa de trabajo no depende de LLS-MEXICO, sino del CONSULADO AMERICANO, por lo que en caso de ser rechazada la solicitud de la visa, LLS-MEXICO no tiene ninguna responsabilidad u obligación de reembolsarle la cantidad que corresponda a la tramitación de su respectiva visa.

6. El programa tiene un costo de:
   a. 165 dólares (USD) para LLS-MEXICO por gastos administrativos.
   b. 100 dólares (USD) por la aprobación de la visa en el Consulado.
   c. 100 dólares (USD) para el pago de derechos de visa en el Consulado.
   d. 200 dólares (USD aproximadamente de transporte para su traslado vía terrestre
   **NOTA:** Estos pagos se realizan hasta que la persona haya sido seleccionada y tengan un lugar seguro con algún **"PATRON"**.

7. Los reembolsos sólo proceden en los siguientes casos:
   Cuando es rechazada la solicitud de visa en el Consulado (en este caso se le regresarán 100 dólares).
   Cuando por parte del **"PATRON"** solicitante no se llegue a realizar el trabajo, se procederá a colocar al trabajador con otro **"PATRON"**, en caso de no ser posible se le regresarán 265 dólares.
   **NOTA:** En todos los demás casos no procederá reembolso alguno.

8. NI LLS-MEXICO ni el **"PATRON"** contratante en Estados Unidos, serán responsables de pagar y/o devolver sus gastos de viaje, ni los que se deriven de proceso de la visa en el Consulado Americano, ESTA ES ÚNICAMENTE RESPONSABILIDAD DEL **"SOLICITANTE"**.

9. Tratándose de un nuevo **"SOLICITANTE"**, el **"SOLICITANTE"** está de acuerdo en someterse a las políticas de transporte y traslado que el **"PATRON"** haya requerido específicamente en cada caso, incluyendo el traslado por conducto de una línea particular de autobuses. En caso de que el **"SOLICITANTE"** rehusare a observar tales políticas de traslado, el **"SOLICITANTE"** desde este momento autoriza a LLS-MEXICO a retener el pasaporte del **"SOLICITANTE"** y la visa de trabajo concedida por el Consulado, para ser sometida por LLS-MEXICO a nombre del **"SOLICITANTE"** ante el Consulado, con el objeto de de proceder a la cancelación de la visa de trabajo. Una vez cancelada la visa le será devuelto el pasaporte al **"SOLICITANTE"**.

10. Este documento no asegura la obtención de trabajo en los Estados Unidos de América.

11. ESTE DOCUMENTO NO ES UN CONTRATO DE TRABAJO.

Yo, el abajo firmante (el **"SOLICITANTE"**), voluntariamente declaro que acudí personalmente a LLS-MEXICO, con el fin de que se me tramitara una visa temporal de trabajo, sin ser responsabilidad de LLS-MEXICO la negativa del CONSULADO AMERICANO.

**REDACTED**                                              January 12, 2006
————————————————                          ——————————————
Nicanor Diaz Martinez

**CONDITIONS FOR OBTAINING A WORK VISA**

1.  LLS INTERNATIONAL is a legally constituted company whose sole purpose is to promote job vacancies generated by the American companies that are hiring (henceforth the **"EMPLOYERS"**) without acting as employer or intermediary. While performing their work, the **"EMPLOYERS"** must respect labor conditions. The **"EMPLOYER"** shall have the obligation to respect what is stipulated in the corresponding contract.

2.  With regard to the established work day, the number of hours offered by the **"EMPLOYERS"** is a simple estimate, considering the weather conditions and other unforeseen events that may directly or indirectly affect and/or reduce the duration of the **"APPLICANT'S"** work day, and thereby harm him/her in his/her pay. If conflicts arise between the **"EMPLOYER"** and the **"EMPLOYEE,"** they shall be resolved and discussed between them. LLS INTERNATIONAL IS NOT THE **"EMPLOYER"** AND THEREFORE THE **"APPLICANT"** EXPRESSLY EXEMPTS IT OF ANY LABOR LIABILITY.

3.  If the **"EMPLOYEE"** determines that, because of weather conditions and other unforeseen events, the **"APPLICANT"** cannot continue providing his/her services during the period encompassed in his/her work visa, the **"EMPLOYER"** must cover the **"APPLICANT'S"** expenses to his/her place of origin, since the **"APPLICANT"** cannot work in another American company because he/she is not expressly so authorized in his/her work visa.

4.  The **"APPLICANT"** shall immediately give **WRITTEN NOTICE** to the **"EMPLOYER"** of justified causes that prevent him/her from coming to work. Should **"APPLICANT"** fail to do so, the " **EMPLOYER"** shall notify the United States government and the AMERICAN CONSULATE so that the latter authority may take the relevant steps and, if appropriate,, he/she shall be considered UNDOCUMENTED, and his/her visa shall be cancelled, and the worker will lose the possibility of returning the next year through the H2B visa program.

5.  The **"APPLICANT"** agrees that the service provided by **LLS INTERNATIONAL** is solely that of processing his/her work visa with the AMERICAN CONSULATE at the request of the hiring American company, that is, the **"EMPLOYER."** The **"APPLICANT"** likewise understands that the work visa depends not on LLS INTERNATIONAL, but on the AMERICAN CONSULATE, and hence in the event that his/her work visa is denied, LLS INTERNATIONAL has no liability or obligation of reimbursing him/her the sum for processing his/her respective visa.

6.  The program has a cost of:
    a.  165 (USD) dollars to LLS INTERNATIONAL for administrative expenses.
    b.  100 (USD) dollars for approval of the visa at the consulate.
    c.  100 (USD) dollars for payment of visa fees at the consulate.
    d.  approximately 200 (USD) dollars transport for his/her travel by land.
    **NOTE:** These payments shall be made only after the person has been chosen and has secure placement with some **"EMPLOYER."**

7.  Reimbursements shall only be in order in the following cases:
    When the visa application is rejected at the Consulate (in this case he/she will get 100 dollars back).
    When on the side of the requesting **"EMPLOYER"** the job does not come about, the worker will be placed with another **"EMPLOYER"**; if this is not possible, he/she will receive 255 dollars back.
    **NOTE:** In all other cases no reimbursement whatsoever shall be in order.

8.  Neither LLS INTERNATIONAL nor the hiring **"EMPLOYER"** in the United States will be responsible for paying and/or returning his/her travel expenses, nor those resulting from processing the visa at the American Consulate. THIS IS SOLELY THE **"APPLICANT'S"** RESPONSIBILITY.

9.  When the **"APPLICANT"** is new, the **"APPLICANT"** agrees to submit to the transport and travel policies that the "EMPLOYER" has requested specifically in each case, including travel over a particular bus line. Should the **"APPLICANT"** refuse to observe such travel policies, the **"APPLICANT"** authorizes **LLS INTERNATIONAL as** of that moment to withhold the **"APPLICANT'S"** passport and the work visa granted by the Consulate, to be submitted by LLS INTERNATIONAL to the Consulate for **"APPLICANT,"** in order to cancel the work visa. After the visa is cancelled, the **"APPLICANT"** will receive his/her passport.

10. This document does not assure obtaining work in the United States.

11. THIS DOCUMENT IS NOT A LABOR CONTRACT.

the undersigned (the **"APPLICANT"**) voluntarily declare that I have come personally to LLS INTERNATIONAL to have it ccess a temporary work visa for me, although LLS INTERNATIONAL shall not be responsible for refusal by the American nsulate.

        [name hand written]

20

21

2:

App-54            Translation of App 53

WORKER H

UPPER SADDLE RIVER, N.J. 2006

Affidavit                                                                 Página 1 de 2

## Condiciones de Trabajo

1. **Empleador/ Area de Trabajo**

   Nombre de la Empresa: **TruGreen ChemLawn (Upper Saddle)**
   Direccion: **118 Rt. 17 North**
   **PO Box 117**
   **Upper Saddle River, NJ 07458**
   Telefono: **201-825-8833**

2. **Periodo de Trabajo**

   Inicio **3/2/2006**   Termino **11/15/2006**

3. **Descripcion de Trabajo**

   Apply pesticides, herbicides, fungicides, or insecticides to lawns using sprayers, seeders, spreaders, aerators.

   Cuota de Pago normal: **$12.50**              Cuota de pago tiempo extra: **$18.75**
   Dia de Pago: **Friday**                              Quincenal: **No**
   Horas: **7:00 AM - 3:30 PM**          Tiempo para comida: **30 minutes**
   Dias de Trabajo: **5-6**

4. **Requerimientos especiales**

   None

5. **Transportacion./ Llegada a U.S.**

   El trabajador pagara sus propios gastos de transportacion desde su casa en Mexico al lugar de su trabajo. El trabajador es igualmente responsible for el costo de regreso de su lugar de trabajo a su casa en Mexico al finalizar el periodo de trabajo.

   **El trabajador de be de viajar a:**

   118 Rt. 17 North
   PO Box 117
   Upper Saddle River, NJ 07458

   **Para asuntos relacionados con el viaje por favor contactar a:**

   Persona de Contacto: **Bob Coursen**
   Titulo del Contacto: **Branch Manager**
   Telefono de Contacto: **201-825-8833**
   Telefono de Contacto: **201-206-9148**

6. **Aseguranza**

   Se provee de Seguro de compensacion del trabajor? **Yes**

7. **Beneficios**

   Hay algun otro beneficio para el trabajador? **No**
   Si es asi, a que costo para el trabajador? **N/A**

8. **Herramientas, ropa protectora, u otro articulo el cual debe ser proporcionado por el trabajador**

9. **Vivienda**

   El patron no es responsible de la vivenda del trabajador. El patron solo ayida a los trabajadores haciendo los arreglos de vivienda previos a la llegada del trabajador. La vivienda debe de estar de acuerdo con todo los requerimientos para propiedades de renta del Estado y Locales. El trabajador puede encontrar su propia vivienda a cualquier tiempo sin que haya discriminacion por parte del empleador hacia el o ella. La siguiente informacion solo son estimados y no es obligatorio el aceptarlos:

   Cargos por Vivienda por Semana: **$42.00**
   Gastos Semanales de Trasporte: **$0.00**
   Se incluyen los gastos por utilidades (electricidad, etc)? **No**

REDACTED

http://www.mexicanlabor.com/LlsRecruiting/Forms/Worker/AffidavitSpanish.aspx?work...  21/02/2006

Affidavit

# Terms of Employment

1. **Employer / Area of Employment**

   Company Name: TruGreen ChemLawn
   Address:
   Telephone:

2. **Period of Employment**

3. **Task Description**

   Apply pesticides, herbicides, fungicides, or insecticides to lawns using sprayers, spreaders, seeders and aerators. Entry level position.

   Standard pay rate: _____    Overtime pay rate:

   Payday:                          Bi-weekly:
   Hours:                           Lunch Break:
   Work Days:

4. **Special Requirements**

5. **Transportation / U.S. Arrival**

   The worker will pay his/her own transportation cost from their home in Mexico to the place of employment. Worker is equally responsible for the cost of returning from the place of employment to their home at the end of the employment period.

   Worker must travel to:


   For travel related issues please contact:
   Liason name:
   Liason title:
   Liason telephone 1:
   Liason telephone 2:

6. **Insurance**

   Is workers compensation insurance provided by the employer?  Yes

7. **Benefits**

   Are any other benefits provided to the worker?  No
   If yes, at what cost to the worker?  N/A

8. **Tools, protective clothing, and other items that must be provided by the worker**
   none

9. **Worker Housing**

   The employer is not responsible for worker housing. The employer agrees to assist the worker by making arrangements in advance for possible worker housing. Housing shall meet all applicable state and local codes for rental property. The worker may find their own housing at any time without incurring the prejudice of the employer against him/her. The following are estimates only and are not binding.
   Weekly charges for such housing:
   Are utilities included in this price?
   If no, what will utilities cost?

REDACTED

## CONTRATO DE COMISIÓN MERCANTIL

CONTRATO DE COMISIÓN MERCANTIL (en lo sucesivo referido como el "**Contrato**") que celebran por una parte Leobardo Ramírez Zapata                                (en lo sucesivo referido como el "**Comitente**") por su propio derecho, y por LLS MEXICO, S. DE R.L. DE C.V. (en lo sucesivo referido como el "**Comisionista**" y junto con el Comitente referidos como las "**Partes**" e individualmente referidos como "**Parte**"), mismo que celebran de conformidad con las siguientes declaraciones y cláusulas

## D E C L A R A C I O N E S :

DECLARA EL COMITENTE:

I. Que está en búsqueda de empleo, por lo tanto ha solicitado del Comisionista sus servicios para promover al Comitente con empleadores en los Estados Unidos de América, mediante la solicitud de servicios previamente firmada por el Comitente la cual se agrega al presente Contrato como "**Anexo 1**", para formar parte integral del mismo.

II. Que ha solicitado al Comisionista que mediante el pago de una contraprestación (a) tramite al Comitente una visa de trabajo ante el Consulado de los Estados Unidos de América, y (b) coloque al Comitente con un empleador en los Estados Unidos de América, en un empleo temporal, en los términos y condiciones que más adelante se establecen.

III. Que considera que el Comisionista posee la habilidad y capacidad para lograr los fines mencionados en la Declaración que antecede.

DECLARA EL COMISIONISTA POR CONDUCTO DE SU APODERADO:

IV. Que su Representada es una persona moral constituida conforme a las leyes mexicanas.

V. Que la capacidad con la que se ostenta y las facultades con las que suscribe el presente Contrato no le han sido modificadas ni revocadas en forma alguna.

VI. Que el Comisionista se dedica principal, pero no exclusivamente, a (a) gestionar y tramitar visas temporales de trabajo con el Consulado de Estados Unidos de América en México, y (b) promover las vacantes de empleo generadas por empleadores en los Estados Unidos de América, sin actuar como patrón ni como intermediario.

VII. Que ha recibido del Comitente una solicitud de servicios, por virtud de la cual el Comitente, mediante el pago de una contraprestación al Comisionista, solicita el servicio de (a) tramitación de visa de trabajo ante el Consulado de los Estados Unidos de América, y (b) coloque al Comitente con un empleador en los Estados Unidos de América, en un empleo temporal, en los términos y condiciones que más adelante se establecen.

EN VIRTUD DE LO ANTERIOR, las Partes convienen en obligarse de conformidad con las siguientes

## C L Á U S U L A S :

PRIMERA. TÉRMINOS DEFINIDOS. Salvo que lo contrario se prevea en otras Cláusulas de este Contrato o sin perjuicio de otros términos aquí utilizados, los siguientes términos tendrán los significados que se les asignan:

"**Patrón**", significa el empleador estadounidense contratante (el cual podrá ser persona física o moral), con la cual el Comitente tendrá la relación de trabajo.

"**USD**", significa Dólares de los Estados Unidos de América, en recursos inmediatamente disponibles.

SEGUNDA. COMISIÓN. Sujeto a los términos y condiciones previstas en este Contrato, el Comitente designa y confiere al Comisionista un mandato mercantil para que en su nombre y representación, por cuenta y costo únicamente del Comitente (a) tramite una visa temporal de trabajo ante el Consulado de los Estados Unidos de América, y (b) coloque al Comitente con un empleador en los Estados Unidos de América, en un empleo temporal, y de esta forma se le promocione en las vacantes de empleo de los Patrones contratantes (en lo sucesivo, el "**Encargo**").

TERCERA. EJECUCIÓN DEL ENCARGO. El Comisionista en este acto se obliga a emplear sus mejores esfuerzos, relaciones, experiencia, conocimientos y elementos para llevar a cabo el Encargo de manera eficiente, diligente y en el menor tiempo posible. El Comitente en este acto reconoce que el Comisionista no garantiza la obtención de trabajo en los Estados Unidos de América. En la medida posible, el Comitente obedecerá las políticas de transportación del Comisionista.

Si el Comitente optara por utilizar su propio medio de transportación entonces el Comitente en este acto libera e indemniza y mantendrá a salvo al Comisionista (y sus accionistas, socios, directores y funcionarios) libre y a salvo de cualquier responsabilidad que surja como resultado de ello, incluso por no llegar a tiempo con el Patrón.

CUARTA. CONTRAPRESTACIÓN.

4.1 La contraprestación que las Partes han convenido por la ejecución que haga el Comisionista del Encargo, será la siguiente: (i) USD$165, por gastos administrativos para el Comisionista; (ii) USD$100, por la aprobación de la visa en el Consulado; (iii) USD$100, para el pago de derechos de visa en el Consulado, y (iv) USD$200, aproximadamente por el transporte para el traslado vía terrestre del Comisionista.

4.2 Los pagos anteriormente señalados se realizarán una vez que el Comitente haya sido seleccionado y tenga un lugar seguro con algún Patrón.

4.3 El Comisionista no tiene ninguna responsabilidad u obligación de rembolsar al Comitente la cantidad que corresponda a la tramitación de la respectiva visa del Comitente.

4.4    Los reembolsos sólo proceden en los siguientes casos: (i) Cuando es rechazada la solicitud de visa en el Consulado (en este caso se reembolsarán USD$100); (ii) Cuando por parte del Patrón solicitante no se llegue a realizar el trabajo, se procederá a colocar al Comitente con otro Patrón, en caso de no ser posible se le regresarán USD$255. En todos los demás casos no procederá reembolso alguno.

*App-58*

TRU1572

[Reverso].
Página 2.

**QUINTA. VIGENCIA.** Este Contrato entrará en vigor y será efectivo a partir de la fecha de su firma, en el entendido de que será obligatorio para las Partes por 365 días naturales. No obstante lo anterior, este Contrato podrá darse por terminado en cualquier momento por cualquiera de las Partes, mediante notificación por escrito con 5 (cinco) días naturales de anticipación a la otra Parte. La obligación del Comisionista cesará según lo que suceda primero del vencimiento del término antes mencionado o al colocar al Comitente con el Patrón.

**SEXTA. RELACIÓN ENTRE LAS PARTES.** Nada en este Contrato será considerado o interpretado para constituir al Comitente y a el Comisionista como agentes o empleados uno del otro, y ninguna de las disposiciones de este Contrato será interpretada para responsabilizar al Comisionista por las deudas, responsabilidades y obligaciones del Comitente, Excepto por lo expresamente convenido en este Contrato, las Partes convienen en no emprender o tomar acción o realizar algún acto que (a) crearía una obligación a la otra Parte, y (b) hacer que cualquier tercero crea que una de las Partes es un representante de la otra Parte o que esté autorizado para actuar en nombre y representación de la otra.

**SÉPTIMA. INDEMNIZACIÓN.** El Comitente en este acto expresamente reconoce y comprende que no tiene ninguna relación patronal y/o laboral con el Comisionista, ni con sus accionistas, directores, funcionarios o empleados, por lo que el Comisionista no tiene responsabilidad alguna en materia de seguridad social, de vivienda, de ahorro para el retiro e impuestos sobre nómina, ni cualesquier otra obligación de cualesquier naturaleza hacia el Comitente salvo lo aquí establecido.

En virtud de lo anterior, el Comitente en este acto releva, libera y conviene, en mantener libre a salvo al Comisionista, a sus accionistas, directores, funcionarios o empleados, de cualesquier contingencia, cantidad, responsabilidad u obligación de cualquier naturaleza, derivado de la obligación entre el Comitente y el Patrón. Esta cláusula subsistirá y permanecerá vigente, por un término de 5 (cinco) años contados a partir de la fecha en que el Comitente deje su trabajo con el Patrón o en que se termine el presente Contrato, según lo que suceda.

**OCTAVA. AUSENCIA DE VICIOS.** Las Partes en este acto reconocen que el presente Contrato no importa error, lesión, coerción, violencia, mala fé o intimidación alguna entre las Partes y que ninguna de ellas ha abusado de la ignorancia, miseria o inexperiencia de la otra Parte y por lo tanto, en este acto renuncian a cualquier derecho que tuvieran para rescindir o anular el presente Contrato en los términos de los artículos 17 y 1818 del Código Civil Federal.

**NOVENA.- MISCELÁNEO.**

**9.1 DIVISIBILIDAD.** Si cualquier término o disposición de este Contrato es, en cualquier medida declarada ilegal, no válida, nula o no ejecutable, las disposiciones restantes de este Contrato no serán afectadas o perjudicadas, y todos los otros términos y disposiciones de este Contrato permanecerán con total vigencia y efecto en la medida más amplia permitida por ley.

**9.2 ASISTENCIA MUTUA.** Cada Parte deberá firmar cualquier documento posterior según lo requiera razonablemente la otra Parte, pero únicamente en la medida que el efecto de dichos documentos sea el dar cumplimiento y efecto legal a los derechos y obligaciones establecidos en este Contrato.

**9.3 ACUERDO ÍNTEGRO Y MODIFICACIONES.** Este Contrato y la Solicitud constituyen el acuerdo íntegro entre las' Partes específicamente con respecto a los asuntos que aquí se contemplan y no existen otras manifestaciones, garantías o promesas, ya sean escritas o verbales, expresas o implícitas entre las Partes con respecto a este Contrato. Este Contrato se compone del presente documento y de sus respectivos Anexos, los cuales forman parte integral del mismo. Ninguna modificación o reforma al presente Contrato será obligatoria para las Partes a menos que sea un documento por escrito y firmado a nombre de las Partes por conducto de sus representantes o apoderados autorizados.

**DÉCIMA. LEGISLACIÓN APLICABLE Y JURISDICCIÓN.** Las Partes en este acto reconocen y acuerdan que este Contrato es de naturaleza mercantil, y como tal será regido e interpretado de conformidad con el Código de Comercio y el Código Civil Federal aplicado supletoriamente. Para todas las cuestiones pertinentes a la interpretación, cumplimiento y aplicación de este Contrato, las Partes expresamente se someten a la jurisdicción de los Tribunales competentes del fuero común en la Ciudad de Monterrey, Nuevo León, México, renunciando a cualquier otra jurisdicción que pudieran tener derecho por razón de sus domicilios presentes y futuros.

EN CONSTANCIA DE LO CUAL, las Partes firman el presente Contrato en la ciudad de Guanajuato , Estado de Guanajuato el día 21 de Febrero

| EL COMITENTE: | EL COMISIONISTA:<br>LLS MÉXICO, S. DE R.L. DE C.V. |
|---|---|
| Por : _____ | Por : _____ |
| Nombre : _____ | Nombre : _María Alejandra Dominguez Ramirez_<br>Puesto: Apoderado |
| Testigo: _____<br>Nombre: _____ | Testigo: _____<br>Nombre: _____ |

App-59

TRU1573

**Commission Agency Agreement**

Commission Agency (henceforth referred to as the '**Agreement**") which is signed on the one hand by Jose Esteban Hernandez Neri (henceforth referred to as the "**Principal**") in his/her own name and by LLS Mexico, S. de C.V. (henceforth referred to as the "**Agent**") and together with the Principal referred to as the "**Parties**") which is signed in accordance with the following declarations and clauses.

## DECLARATIONS:

**THE PRINCIPAL DECLARES:**

I. That he/she is seeking employment and hence has requested from the Agent its services in the United States of America through the request for services previously signed by the Principal which is attached to this Contract as "Attachment 1" to form an integral part of it.

II. That he/she has asked the Agent by paying a consideration (a) to arrange a work visa for the Principal with the United States Consulate and (b) to place the Principal with an employer in the United States of America in a temporary employment under the terms and conditions established further on.

III. That he/she considers that the Agent has the ability and capacity to achieve the purposes stated in the foregoing Declaration.

**THE AGENT DECLARES THROUGH ITS ATTORNEY-IN-FACT:**

IV. That the party he/she represents is a legal entity established in accordance with Mexican legislation.

V. That the capacity that he/she bears and the powers with which he/she signs this Agreement have not been changed or revoked in any manner.

VI. That the Agent is devoted principally but not exclusively to (a) arranging and processing temporary work visas with the United States Consulate in Mexico and (b) promoting employment positions generated by employers in the United States without acting as employer or as intermediary.

VII. That he/she has received from the Principal a request for services by virtue of which the Principal, by the payment of a consideration to the Agent requests the service of (a) processing a work visa with the United States Consulate and (b) placing the Principal with an employer in the United States in a temporary employment under the terms and conditions set forth below.

BY VIRTUE OF THE FOREGOING, the Parties agree to bind themselves in accordance with the following

## CLAUSES:

**ONE. TERMS DEFINED.** Unless otherwise provided for in other Clauses of this Agreement and without prejudice to other terms here used, the following terms shall have the meanings assigned to them.

"Employer" means the United States hiring employer (which may be a physical person or a legal entity) with which the Principal will have the work relationship.

"USD" means United States dollars in funds immediately available.

**TWO. COMMISSION.** Subject to the terms and conditions set forth in this Agreement, the Principal designates and confers on the Agent a commercial mandate so that on his/her behalf and at the expense and cost solely of the Principal (a) it may arrange a temporary work visa with the United States Consulate, and (b) place the Principal with an employer in the United States in a temporary employment and in this manner he/she may be placed in the employment positions of the hiring Employers (henceforth, the "Commission").

**THREE. EXECUTION OF THE COMMISSION.** The Principal is hereby bound to employ its best efforts, relationships, experience, knowledge and means to carry out the Commission efficiently, diligently, and in the least possible time. The Principal hereby recognizes that the Agent does not guarantee obtaining a job in the United States. Insofar as possible, the Principal will observe the Agent's transportation policies.

If the Principal opts to use his/her own means of transportation then the Principal hereby exempts and compensates and will hold harmless the Agent (and its shareholders, partners, board members, and employees) free and safeguarded from any liability that may arise as a result of it, including for not reaching the Employer on time.

**FOUR. CONSIDERATION.**

4.1 The consideration that the Parties have agreed upon for the Agent's execution of the Commission shall be as follows: (i) USD$ 165.00 for administrative expenses to the Agent, (ii) USD$100 for approval of the visa at the Consulate, (iii) USD$ 100 for payment of visa fees at the Consulate, and (iv) approximately USD$200.00 for transportation for the Principal's land travel.

4.2 The payments indicated above shall be made after the Principal has been selected and has secure placement with some Employer.

4.3 The Agent has no responsibility or obligation to reimburse the Principal the sum for processing the Principal's respective visa.

4.4 Reimbursements shall only be in order in the following cases (i) When the visa request is rejected at the Consulate (in this case $100 shall be reimbursed) (ii) When the requesting Employer does not perform the work, the Principal shall be placed with another Employer; if that is not possible he/she shall get USD$255 back. In all other cases no reimbursement shall be in order.

*App-60*          Translation of App 58

**VALIDITY PERIOD.** This agreement shall go into effect as the date of its signing with the understanding that it will be binding on the Parties for 365 calendar days. The foregoing withstanding, this Agreement may be terminated at any time by either of the Parties, through notification in writing with 5 (five) calendar days advance notice to the other Party. The Agent's obligation shall cease depending on whichever happens first: the aforementioned expiration period or the Principal is placed with the Employer. ////

**RELATIONSHIP BETWEEN THE PARTIES** Nothing in this Agreement shall be considered or interpreted to constitute the Principal and Agent as representatives or employees of one other, and none of the provisions of this Agreement shall be interpreted to bind the Agent for the Principal's debts, liabilities, and obligations. Except for what is expressly agreed upon in this Agreement, the Parties agree to not undertake or take action or perform any act that (a) would create an obligation on the other Party, and (b) make any third party believe that one of the Parties is a representative of the other Party or that it is authorized to act on behalf of the other.

**COMPENSATION.** The Principal hereby expressly recognizes and understands that it has no employer and/or labor relationship with the Agent, nor with its shareholders, board members, officials or employees, and hence the Agent has no responsibility whatsoever in the area of social security, housing, retirement savings, and payroll taxes nor any other obligation of any nature toward the Principal, except what is here established.

By virtue of the foregoing, the Principal hereby exempts, releases, and agrees to hold harmless the Agent or its shareholders, board members, officials, or employees from any contingency, sum, responsibility or obligation of any nature, resulting from this clause or obligation between the Principal and the Employer. This clause shall subsist and shall remain in effect for a period of 5 (five) years starting from the date when the Principal leaves his/her work with the Employer or on which this Contract ends, as the case may be.

**ABSENCE OF DEFECTS.** The Parties hereby recognize that this Agreement does not entail error, injury, coercion, violence, bad faith, or any intimidation between the Parties, and that neither of them has taken advantage of the ignorance, destitution, or inexperience of the other Party, and therefore they hereby waive any right that they may have to rescind or void this Agreement in the terms of articles [illegible] and 1615 of the Federal Civil Code.

**NINE. MISCELLANEOUS**

**9.1 DIVISIBILITY.** If any term or provision of this Agreement is in any measure declared illegal, not valid, null or not executable, the remaining provisions of this Agreement shall not be affected or harmed, and all other terms and provisions of this Agreement shall remain fully in effect in the broadest measure permitted by law.

**9.2 MUTUAL ASSISTANCE.** Each Party must sign any subsequent document as reasonably requested by the other Party, but only to the extent that the effect of such documents is to assure compliance and legal effect to the rights and obligations established in this Agreement.

**9.3 FULL AGREEMENT AND MODIFICATIONS.** This Agreement and the Application constitute the complete agreement between the Parties, specifically with regard to the matters here considered, and there are no other manifestations, guarantees or promises, whether written or verbal, express or implicit, between the Parties with regard to this Agreement. This Agreement is comprised of this document and its respective Attachments, which are integrally part of it. No modification or amendment to this Agreement shall be binding on the Parties unless it is in a document in writing and signed on behalf of the Parties through their authorized representatives or proxies.

**TEN. APPLICABLE LEGISLATION AND JURISDICTION.** The Parties hereby recognize and agree that this Contract is of a commercial mature, and as such it shall be governed and interpreted in accordance with the Code of Commerce and the Federal Civil Code [illegible]. For all questions related to the interpretation, fulfillment, and application of this Agreement, the Parties expressly submit to the jurisdiction of the competent courts of the common venue in the City of Monterrey, Nuevo Leon, Mexico, waiving any other venue to which they might be entitled by reason of their present or future domiciles.

IN RECORD OF WHICH, the Parties sign this Agreement in the city of Cholula, State of Puebla,

| THE PRINCIPAL | THE AGENT |
| --- | --- |
| | LLS MEXICO, S. de R.L. de C.V. |
| By [signature] | By [signature] |
| Name: | Name: |
| | Position Attorney-in-fact |
| Witness [signature] | |
| Name | Witness [signature] |
| | Name |

App-61                    Translation of App 59

# SUMMARY OF

# TERMS OF EMPLOYMENT DOCUMENTS

Produced By Defendants

**Workers/Locations/Wages**
**Information From Terms Of Employment Documents**

| Branch | State | Year | Offered Wage Rate | Offered O/T Rate | Number Of Workers Assigned To Branch | | | | Bate Stamps of Documents Summarized |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | 2003 | 2004 | 2005 | 2006 | |
| Newport | DE | 2006 | 11 | 16.5 | | | | 2 | 2234, 3021 |
| Newport | DE | 2005 | 10 | 15 | | | 5 | | 2211, 2228, 3025, 3030, 3033 |
| Newport | DE | 2004 | 11.34 | 17.01 | | 6 | | | 2013, 2022, 2027, 2034, 2170, 2176 |
| Newport | DE | 2003 | 10 | 15 | 4 | | | | 2017, 2020, 2029, 2198 |
| Baltimore | Md | 2006 | 10.67 | 16 | | | | 5 | 3241, 3246, 3249, 3306, 3313, |
| Baltimore | Md | 2005 | 11 | 16 | | | 4 | | 3252, 3254, 3316, 3321 |
| Gaitherburg | Md | 2006 | 12.5 | 18.75 | | | | 5 | 2695, 2702, 2707, 2712, 2717 |
| Gaitherburg | Md | 2005 | 12.5 | 18.75 | | | 8 | | 2105, 2108, 2593, 2722, 2724, 2731, 2735, 2740 |
| Gaitherburg | Md | 2004 | 12.5 | 18.75 | | 4 | | | 2084, 2090, 2095, 2102 |
| Gaitherburg | Md | 2003 | 9 | 13.5 | 4 | | | | 2080, 2088, 2093, 2098 |
| Hagerstown | Md | 2006 | 10.67 | 16 | | | | 6 | 2250, 2305, 2316, 2330, 2687, 2688 |
| Lorton | Va | 2006 | 10.5 | 15.75 | | | | 4 | 3038, 3043, 3048, 3087 |
| Lorton | Va | 2005 | 10 | 15 | | | 8 | | 3053, 3058, 3063, 3066, 3069, 3074, 3077, 3083 |
| Lorton | Va | 2004 | 10 | 15 | | 3 | | | 1993, 1999, 2005 |
| Lorton | Va | 2003 | 10 | 15 | 4 | | | | 1989, 1995, 2001, 2008 |
| Richmond | Va | 2006 | 8.97 | 13.45 | | | | 4 | 2031, 2938, 2943, 2950 |
| Sterling | Va | 2006 | 10.5 | 15.75 | | | | 26 | 1383, 1384, 1385, 1389, 1396, 1399, 1404, 1409, 1410, 1416, 1421, 1426, 1431, 1436, 1441, 1444, 1449, 1452, 1455, 1456 |
| Sterling | Va | 2005 | 10 | 15 | | | 18 | | 1392, 1465, 1469, 1470, 1473, 1476, 1479, 1482, 1485, 1490, 1493, 1496, 1500, 1508, 1512, 1514, 2428 |
| Sterling | Va | 2004 | 10 | 15 | | 8 | | | 1518, 1827, 1833, 1839, 1853, 1855, 1865, 1869 |
| Sterling | Va | 2004 | 10.17 | 15.25 | | 1 | | | 1820) |
| Sterling | Va | 2003 | 10 | 15 | 9 | | | | 1520, 1824, 1829, 1835, 1841, 1845, 1849, 1857, 1861, |
| Allentown | Pa | 2006 | 11.5 | 17.25 | | | | 5 | 2281, 3269, 3274, 3281, 3339 |
| Allentown | Pa | 2006 | 11.36 | 17.04 | | | | 3 | 3258, 3291, 3296 |
| Allentown | Pa | 2005 | 10 | 15 | | | 6 | | 2291, 3303, 3326, 3329, 3333, 3336 |
| Allentown | Pa | 2004 | 9.68 | 14.52 | | 9 | | | 2120, 2127, 2133, 2143, 2149, 2153, 2158, 2164, 2297 |
| Allentown | Pa | 2003 | 9.68 | 14.52 | 6 | | | | 2123, 2129, 2135, 2139, 2145, 2160 |
| Malvern | Pa | 2007 | 11.32 | 16.98 | | | | | |
| Malvern | Pa | 2006 | 11.36 | 17.04 | | | | 12 | 1530 |
| Malvern | Pa | 2005 | 10 | 15 | | | 13 | | 2351, 2367, 2384, 2395, 3093, 3096, 3099, 3102, 3105, 3108, 3111, 3114 2205, 2359, 2375, 3117, 3120, 3124, 3129, 3133, 3138, 3142, 3146, 3150, 3152 |

App-63

| Location | State | Year | | | | | | | Numbers |
|---|---|---|---|---|---|---|---|---|---|
| Malvern | Pa | 2004 | 10.41 | 15.62 | | | 1 | | 2052 |
| Malvern | Pa | 2004 | 10 | 15 | | | 8 | | 2037, 2041, 2044, 2046, 2056, 2060, 2068, 2074 |
| Malvern | Pa | 2003 | 10 | 15 | 3 | | | | 2048, 2063, 2070 |
| Randolph | Pa | 2006 | 11.63 | 17.44 | | | | 10 | 2406, 2417, 2876, 2881, 2896, 2891, 2896, 2901; 2921, 3263 |
| Randolph | Pa | 2005 | 11.63 | 17.44 | | | | | 2905, 2908, 2912, 2918 |
| Randolph | Pa | 2004 | 10 | 15 | | 4 | 7 | | 1949, 1952, 1959, 1970, 1977, 1986, 2180 |
| Randolph | Pa | 2003 | no info | | 9 | | | | 1938, 1939, 1945, 1954, 1961, 1966, 1974, 1981, 1984 |
| Warminster | Pa | 2006 | 11.36 | 17.04 | | | | 7 | 1576, 1581, 1584, 1592, 1595, 1599, 2616 |
| Warminster | Pa | 2005 | 9.5 | 14.25 | | 1 | 1 | | 2628 |
| Warminster | Pa | 2004 | 9.5 | 14.25 | | | 5 | | |
| Warminster | Pa | 2004 | 10.41 | 15.62 | | | 2 | | 1589, 1717, 1724, 1730, 2624 |
| Warminster | Pa | 2003 | | | 1 | | | | 1704, 1728 |
| Farmingdale | NJ | 2006 | 12.95 | 19.42 | 1 | | | 4 | 1732 |
| Farmingdale | NJ | 2004 | 10 | 15 | | | | | 3226, 3227, 3228, 3233 |
| Farmingdale | NJ | 2003 | 11.25 | 16.88 | 1 | | | | 2112; 2117 |
| S. Plainfield | NJ | 2006 | 7.94 | 11.91 | | | | 4 | 2499, 2515, 2532, 2768 |
| S. Plainfield | NJ | 2006 | 13.65 | 20.47 | | | | 8 | 2469, 2744, 2752, 2757, 2761, 2764, 2804; 2876, 2475, 2507, 2523, 2540, 2575, 2771, 2774, 2777, 2788, 2799 |
| S. Plainfield | NJ | 2005 | 10 | 15 | | 11 | | | |
| S. Plainfield | NJ | 2004 | 10 | 15 | | | 10 | | 1880, 1885, 1914, 1917, 1921, 1926, 1929, 1932, 2481, 2546 |
| S. Plainfield | NJ | 2004 | 11.37 | 17.06 | | | 7 | | 1891, 1897, 1898, 1919, 2450, 2782, 2793 |
| S. Plainfield | NJ | 2003 | 10 | 15 | 9 | | | | 1887, 1895, 1902, 1904, 1909, 2259, 2488, 2784, 2795 |
| Thorofare | NJ | 2006 | 11.36 | 17.04 | | | | 7 | 1537, 1542, 1545, 1548, 1551, 1559, 2565 |
| Thorofare | NJ | 2005 | 10 | 15 | | | | | 1554, 1767, 1770, 1775, 1780, 1784, 2216, 2222 |
| Thorofare | NJ | 2004 | 10 | 15 | | 8 | | | 1795, 1798, 1802, 1812, 1817, 2186, 2192, 2195, |
| Thorofare | NJ | 2003 | 10 | 15 | 6 | | | | 1788, 1792, 1804, 1808, 1815, 2270 |
| Upper Saddle River | NJ | 2006 | 12.5 | 18.75 | | | | 4 | 1565, 1570, 2585, 2607 |
| Upper Saddle River | NJ | 2004 | 10 | 15 | | | | | 1738, 1747, 1758, 2434, 2599 |
| Upper Saddle River | NJ | 2003 | 9 | 13.5 | 4 | | | | 1743, 1750, 1754, 1763 |
| Westerville | Ohio | 2003 | 10 | 15 | 4 | | | | 1607, 1609, 2340, 2457 |
| Westbrook | Me | 2006 | 10 | 15 | | | | 5 | 1612, 1618, 1623, 2637, 2648 |

| Location | State | Year | | | | | | | Serial numbers |
|---|---|---|---|---|---|---|---|---|---|
| Yaphank | NY | 2006 | 15.11 | 22.66 | | | | 10 | 1629, 1636, 1642, 1646, 1652, 1655, 1659, 1663, |
| Yaphank | | | | | | | | | 2661, 2676 |
| Yaphank | NY | 2004 | 13.57 | 20.36 | | 6 | | | 1677, 1686, 1689, 1696, 1701, 1705 |
| Yaphank | NY | 2004 | 11 | 16.5 | 4 | | | | 1682, 1708, 1712, 2667 |
| Rocky Hill | CT | 2006 | 11.35 | 17.02 | | | | 11 | 2442, 2810, 2818, 2824, 2832, 2838, 2844, 2850, |
| | | | | | | | | | 2858, 2864, 2870 |
| Plymouth-Andover | MA | 2006 | 11.05 | 16.57 | | | | 4 | 2957, 2965, 2979, 2996 |
| Plymouth-Andover | MA | 2006 | 13.6 | 20.4 | | | | 10 | 2973, 2987, 3002, 3008, 3014, 3349, 3357, 3363, |
| | | | | | | | | | 3369, 3370 |
| Franklin | MA | 2006 | 11.35 | 17.02 | | | | 13 | 3156, 3165, 3174, 3177, 3180, 3183, 3194, 3197, |
| | | | | | | | | | 3200, 3203, 3209, 3214, 3219 |
| Franklin | Ma | 2006 | 11.05 | 16.57 | | | | 2 | 3186, 3189 |
| | | TOTALS | | | 68 | 91 | 86 | 171 | 416 |

SUMMARY OF

BATE STAMP NUMBERS OF
TERMS OF EMPLOYMENT AND
WORKER EXPENSE DOCUMENTS
FROM INDIVIDUAL WORKER FILES
PRODUCED BY DEFENDANTS

INDIVIDUAL    WORKER FILES

Note: Each horizontal row represents one worker file for a year

| Terms of Work Document Bates No. | Document Listing Expenses Owed Bates No. | Branch | Year |
|---|---|---|---|
| 1383 | x | Sterling | 2006 |
| 1384 | x | Sterling | 2006 |
| 1385 | 1387 | Sterling | 2006 |
| 1398 | 1390 | Sterling | 2006 |
| 1392 | 1393 | Sterling | 2005 |
| 1396 | 1397 | Sterling | 2006 |
| 1399 | 1401 | Sterling | 2006 |
| 1404 | 1406 | Sterling | 2006 |
| 1409 | x | Sterling | 2006 |
| 1410 | 1413 | Sterling | 2006 |
| 1416 | 1418 | Sterling | 2006 |
| 1421 | 1422 | Sterling | 2006 |
| 1426 | 1429 | Sterling | 2006 |
| 1431 | 1433 | Sterling | 2006 |
| 1436 | 1437 | Sterling | 2006 |
| 1441 | 1442 | Sterling | 2006 |
| 1444 | 1446 | Sterling | 2006 |
| 1449 | 1450 | Sterling | 2006 |
| 1452 | 1453 | Sterling | 2006 |
| 1455 | x | Sterling | 2006 |
| 1456 | 1457 | Sterling | 2006 |
| 1459 | 1461 | Sterling | 2006 |
| 1465 | 1467 | Sterling | 2005 |
| 1469 | x | Sterling | 2005 |
| 1470 | 1471 | Sterling | 2005 |
| 1473 | 1474 | Sterling | 2005 |
| 1476 | 1477 | Sterling | 2005 |
| 1479 | 1481 | Sterling | 2005 |
| 1482 | 1484 | Sterling | 2005 |
| 1485 | 1486 | Sterling | 2005 |
| 1490 | 1492 | Sterling | 2005 |
| 1493 | 1494 | Sterling | 2005 |
| 1496 | 1499 | Sterling | 2005 |
| 1500 | 1503 | Sterling | 2005 |
| 1504 | 1507 | Sterling | 2005 |
| 1508 | 1510 | Sterling | 2005 |
| 1512 | x | Sterling | 2005 |
| 1514 | 1516 | Sterling | 2005 |
| 1518 | 1519 | Sterling | 2004 |
| 1520 | 1521 | Sterling | 2003 |
| 1524 | 1525 | Sterling | 2006 |
| 1530 | 1532 | Malvern | 2007 |
| 1537 | 1539 | Thorofare | 2006 |

App-67

| | | | |
|---|---|---|---|
| 1542 | 1543 | Thorofare | 2006 |
| 1545 | 1546 | Thorofare | 2006 |
| 1548 | 1549 | Thorofare | 2006 |
| 1551 | 1552 | Thorofare | 2006 |
| 1554 | 1556 | Thorofare | 2005 |
| 1559 | 1561 | Thorofare | 2006 |
| 1565 | 1566 | Upper Saddle R. | 2006 |
| 1570 | 1572 | Upper Saddle R. | 2006 |
| 1576 | 1578 | Warminster | 2006 |
| 1581 | x | Warminster | 2006 |
| 1584 | 1586 | Warminster | 2006 |
| 1589 | x | Warminster | 2005 |
| 1592 | 1593 | Warminster | 2005 |
| 1595 | 1597 | Warminster | 2005 |
| 1599 | x | Warminster | 2006 |
| 1600 | 1602 | Warminster | 2006 |
| 1604 | x | Sterling | 2006 |
| 1607 | 1608 | Westerville Oh. | 2003 |
| 1609 | 1610 | Westerville Oh. | 2003 |
| 1612 | 1613 | Westbrook Me. | 2006 |
| 1617 | x | Westbrook Me. | 2006 |
| 1618 | 1620 | Westbrook Me. | 2006 |
| 1623 | 1625 | Westbrook Me. | 2006 |
| 1629 | 1631 | Yaphank | 2006 |
| 1637 | 1638 | Yaphank | 2006 |
| 1642 | 1643 | Yaphank | 2006 |
| 1646 | 1649 | Yaphank | 2006 |
| 1652 | 1653 | Yaphank | 2006 |
| 1655 | 1656 | Yaphank | 2006 |
| 1659 | 1661 | Yaphank | 2006 |
| 1663 | 1665 | Yaphank | 2006 |
| 1670 | 1672 | Yaphank | 2006 |
| 1677 | 1678 | Yaphank | 2004 |
| 1682 | 1683 | Yaphank | 2004 |
| 1686 | 1688 | Yaphank | 2004 |
| 1689 | 1690 | Yaphank | 2004 |
| 1696 | 1697 | Yaphank | 2004 |
| 1701 | 1702 | Yaphank | 2004 |
| 1704 | x | Warminster | 2004 |
| 1705 | 1707 | Yaphank | 2004 |
| 1708 | 1709 | Yaphank | 2004 |
| 1712 | 1713 | Yaphank | 2004 |
| 1717 | 1718 | Warminster | 2004 |
| 1724 | 1725 | Warminster | 2004 |
| 1728 | 1729 | Warminster | 2004 |
| 1730 | 1731 | Warminster | 2004 |
| 1732 | 1734 | Warminster | 2003 |
| 1738 | 1739 | Upper Saddle R. | 2004 |
| 1743 | 1744 | Upper Saddle R. | 2003 |
| 1747 | 1748 | Upper Saddle R. | 2004 |
| 1750 | 1751 | Upper Saddle R. | 2003 |
| 1754 | 1755 | Upper Saddle R. | 2003 |

App-68

| | | | |
|---|---|---|---|
| 1758 | 1759 | Upper Saddle R. | 2004 |
| 1763 | 1764 | Upper Saddle R. | 2003 |
| 1767 | 1768 | Thorofare | 2005 |
| 1770 | 1773 | Thorofare | 2005 |
| 1775 | 1778 | Thorofare | 2005 |
| 1780 | 1782 | Thorofare | 2005 |
| 1784 | 1786 | Thorofare | 2005 |
| 1788 | 1789 | Thorofare | 2003 |
| 1792 | 1793 | Thorofare | 2003 |
| 1795 | 1794 | Thorofare | 2004 |
| 1798 | 1799 | Thorofare | 2004 |
| 1802 | 1803 | Thorofare | 2004 |
| 1804 | 1805 | Thorofare | 2003 |
| 1808 | 1809 | Thorofare | 2003 |
| 1812 | 1813 | Thorofare | 2004 |
| 1815 | 1816 | Thorofare | 2003 |
| 1817 | 1818 | Thorofare | 2004 |
| 1820 | 1821 | Sterling | 2004 |
| 1824 | 1825 | Sterling | 2003 |
| 1827 | 1828 | Sterling | 2004 |
| 1828 | 1830 | Sterling | 2003 |
| 1833 | 1834 | Sterling | 2004 |
| 1835 | 1836 | Sterling | 2003 |
| 1839 | 1840 | Sterling | 2004 |
| 1841 | 1842 | Sterling | 2003 |
| 1845 | 1846 | Sterling | 2003 |
| 1849 | 1850 | Sterling | 2003 |
| 1853 | 1854 | Sterling | 2004 |
| 1855 | 1856 | Sterling | 2004 |
| 1857 | 1858 | Sterling | 2003 |
| 1861 | 1862 | Sterling | 2003 |
| 1865 | 1866 | Sterling | 2004 |
| 1869 | 1970 | Sterling | 2004 |
| 1871 | 1873 | Sterling | 2006 |
| 1876 | 1878 | South Plainfield | 2005 |
| 1880 | 1881 | South Plainfield | 2004 |
| 1885 | 1886 | South Plainfield | 2004 |
| 1887 | 1888 | South Plainfield | 2003 |
| 1891 | 1892 | South Plainfield | 2004 |
| 1895 | 1896 | South Plainfield | 2003 |
| 1897 | x | South Plainfield | 2004 |
| 1898 | 1899 | South Plainfield | 2004 |
| 1902 | 1903 | South Plainfield | 2003 |
| 1904 | 1905 | South Plainfield | 2003 |
| 1909 | 1911 | South Plainfield | 2003 |
| 1914 | 1915 | South Plainfield | 2004 |
| 1917 | 1918 | South Plainfield | 2004 |
| 1919 | 1920 | South Plainfield | 2004 |
| 1921 | 1922 | South Plainfield | 2004 |
| 1926 | 1928 | South Plainfield | 2004 |
| 1929 | 1930 | South Plainfield | 2004 |
| 1932 | 1933 | South Plainfield | 2004 |

| | | | |
|---|---|---|---|
| 1938 | x | Randolph | 2003 |
| 1939 | 1940 | Randolph | 2003 |
| 1943 | 1944 | Randolph | 2004 |
| 1945 | 1946 | Randolph | 2003 |
| 1949 | 1950 | Randolph | 2004 |
| 1952 | 1953 | Randolph | 2004 |
| 1954 | 1956 | Randolph | 2003 |
| 1959 | 1960 | Randolph | 2004 |
| 1961 | 1963 | Randolph | 2003 |
| 1966 | 1967 | Randolph | 2003 |
| 1970 | 1971 | Randolph | 2004 |
| 1974 | 1976 | Randolph | 2003 |
| 1977 | 1978 | Randolph | 2004 |
| 1981 | 1983 | Randolph | 2003 |
| 1984 | 1985 | Randolph | 2003 |
| 1986 | 1987 | Randolph | 2004 |
| 1989 | 1990 | Lorton | 2003 |
| 1993 | 1994 | Lorton | 2004 |
| 1995 | 1996 | Lorton | 2003 |
| 1999 | 2000 | Lorton | 2004 |
| 2001 | 2002 | Lorton | 2003 |
| 2005 | 2006 | Lorton | 2004 |
| 2008 | 2009 | Lorton | 2003 |
| 2013 | 2014 | Newport Del. | 2004 |
| 2017 | 2019 | Newport Del. | 2003 |
| 2020 | 2021 | Newport Del. | 2003 |
| 2022 | 2023 | Newport Del. | 2004 |
| 2027 | 2028 | Newport Del. | 2004 |
| 2029 | 2031 | Newport Del. | 2003 |
| 2034 | 2035 | Newport Del. | 2004 Plaintiff |
| 2037 | 2038 | Malvern | 2004 |
| 2041 | 2043 | Malvern | 2004 |
| 2044 | 2045 | Malvern | 2004 |
| 2046 | 2047 | Malvern | 2004 |
| 2048 | 2049 | Malvern | 2003 |
| 2052 | 2053 | Malvern | 2004 |
| 2056 | 2057 | Malvern | 2004 |
| 2060 | 2061 | Malvern | 2004 |
| 2063 | 2065 | Malvern | 2003 |
| 2068 | 2069 | Malvern | 2004 |
| 2070 | 2071 | Malvern | 2003 |
| 2074 | 2075 | Malvern | 2004 |
| 2080 | 2081 | Gaithersburg | 2003 |
| 2084 | 2085 | Gaithersburg | 2004 |
| 2088 | 2089 | Gaithersburg | 2003 |
| 2090 | 2091 | Gaithersburg | 2004 |
| 2093 | 2094 | Gaithersburg | 2003 |
| 2095 | 2096 | Gaithersburg | 2004 |
| 2098 | 2099 | Gaithersburg | 2003 |
| 2102 | 2104 | Gaithersburg | 2004 |
| 2105 | 2106 | Gaithersburg | 2005 |
| 2108 | 2109 | Gaithersburg | 2005 |

App-70

| | | | |
|---|---|---|---|
| 2112 | 2113 | Farmingdale NJ | 2004 |
| 2117 | 2118 | Farmingdale NJ | 2003 |
| 2120 | 2121 | Allentown PA | 2004 |
| 2123 | 2124 | Allentown PA | 2003 |
| 2127 | 2128 | Allentown PA | 2004 |
| 2129 | 2130 | Allentown PA | 2003 |
| 2133 | 2134 | Allentown PA | 2004 |
| 2135 | 2136 | Allentown PA | 2003 |
| 2139 | 2140 | Allentown PA | 2003 |
| 2143 | x | Allentown PA | 2004 |
| 2145 | 2146 | Allentown PA | 2003 |
| 2149 | 2152 | Allentown PA | 2004 |
| 2153 | 2154 | Allentown PA | 2004 |
| 2158 | 2159 | Allentown PA | 2004 |
| 2160 | 2163 | Allentown PA | 2003 |
| 2164 | 2166 | Allentown PA | 2004 |
| 2170 | 2171 | Newport Del. | 2004 |
| 2176 | 2177 | Newport Del. | 2004 |
| 2180 | 2181 | Randolph | 2004 |
| 2186 | 2187 | Thorofare | 2004 |
| 2192 | 2193 | Thorofare | 2004 |
| 2195 | 2196 | Thorofare | 2004 |
| 2198 | 2199 | Newport Del. | 2005 |
| 2216 | 2217 | Thorofare | 2005 |
| 2222 | 2224 | Thorofare | 2005 |
| 2228 | 2230 | Newport Del. | 2005 |
| 2234 | 2237 | Newport Del. | 2006 |
| 2243 | 2245 | Sterling | 2006 |
| 2250 | 2253 | Hagerstown Md | 2006 |
| 2259 | 2260 | South Plainfield | 2003 |
| 2270 | 2271 | Thorofare | 2003 |
| 2281 | 2284 | Allentown PA | 2006 |
| 2291 | 2293 | Allentown PA | 2005 |
| 2297 | 2298 | Allentown PA | 2004 |
| 2305 | 2307 | Hagerstown Md | 2006 |
| 2316 | 2319 | Hagerstown Md | 2006 |
| 2330 | 2333 | Hagerstown Md | 2006 |
| 2340 | 2341 | Westerville Oh. | 2003 |
| 2351 | 2354 | Malvern | 2006 |
| 2359 | 2360 | Malvern | 2005 |
| 2367 | 2370 | Malvern | 2006 |
| 2375 | 2377 | Malvern | 2005 |
| 2384 | 2386 | Malvern | 2006 |
| 2395 | 2398 | Malvern | 2006 |
| 2406 | 2409 | Randolph | 2006 |
| 2417 | 2420 | Randolph | 2005 |
| 2428 | 2430 | Sterling | 2005 |
| 2434 | 2435 | Upper Saddle R. | 2003 |
| 2442 | 2445 | Rocky Hill CT | 2006 |
| 2450 | 2451 | South Plainfield | 2004 |
| 2457 | 2458 | Westerville Oh. | 2003 |
| 2469 | 2471 | South Plainfield | 2006 |

App-71

| | | | |
|---|---|---|---|
| 2475 | 2477 | South Plainfield | 2005 |
| 2481 | 2482 | South Plainfield | 2004 |
| 2488 | 2489 | South Plainfield | 2003 |
| 2499 | 2502 | South Plainfield | 2005 |
| 2507 | 2509 | South Plainfield | 2005 |
| 2515 | 2519 | South Plainfield | 2006 |
| 2523 | 2525 | South Plainfield | 2005 |
| 2532 | 2535 | South Plainfield | 2006 |
| 2540 | 2542 | South Plainfield | 2005 |
| 2546 | 2547 | South Plainfield | 2004 |
| 2555 | x | Sterling | 2006 |
| 2565 | 2567 | Thorofare | 2006 |
| 2575 | 2577 | Thorofare | 2005 |
| 2585 | 2587 | Upper Saddle R. | 2006 |
| 2593 | 2595 | Gaithersburg | 2005 |
| 2599 | 2600 | Upper Saddle R. | 2004 |
| 2607 | 2610 | Upper Saddle R. | 2006 |
| 2616 | 2619 | Warminster | 2006 |
| 2624 | 2625 | Warminster | 2004 |
| 2628 | 2630 | Warminster | 2005 |
| 2637 | 2640 | Westbrook Me. | 2006 |
| 2648 | 2651 | Westbrook Me. | 2006 |
| 2661 | 2663 | Yaphank | 2004 |
| 2676 | 2677 | Yaphank | 2006 |
| 2687 | x | Hagerstown Md | 2006 |
| 2688 | 2689 | Hagerstown Md | 2006 |
| 2695 | 2696 | Gaithersburg | 2006 |
| 2702 | 2705 | Gaithersburg | 2006 |
| 2707 | 2708 | Gaithersburg | 2006 |
| 2712 | 2714 | Gaithersburg | 2006 |
| 2717 | 2720 | Gaithersburg | 2006 |
| 2722 | 2723 | Gaithersburg | 2005 |
| 2724 | 2726 | Gaithersburg | 2005 |
| 2731 | 2733 | Gaithersburg | 2005 |
| 2735 | 2736 | Gaithersburg | 2005 |
| 2740 | 2741 | Gaithersburg | 2005 |
| 2744 | 2745 | South Plainfield | 2006 |
| 2749 | 2750 | South Plainfield | 2006 |
| 2752 | 2756 | South Plainfield | 2006 |
| 2757 | 2759 | South Plainfield | 2006 |
| 2761 | x | South Plainfield | 2006 |
| 2764 | 2765 | South Plainfield | 2006 |
| 2768 | x | South Plainfield | 2006 |
| 2771 | 2773 | South Plainfield | 2005 |
| 2774 | 2775 | South Plainfield | 2005 |
| 2777 | 2779 | South Plainfield | 2005 |
| 2782 | 2783 | South Plainfield | 2004 |
| 2784 | 2785 | South Plainfield | 2003 |
| 2788 | 2791 | South Plainfield | 2005 |
| 2793 | 2794 | South Plainfield | 2004 |
| 2795 | 2796 | South Plainfield | 2003 |
| 2799 | 2801 | South Plainfield | 2005 |

App-72

| | | | |
|---|---|---|---|
| 2804 | 2806 | South Plainfield | 2006 |
| 2810 | 2812 | Rocky Hill CT | 2006 |
| 2818 | 2820 | Rocky Hill CT | 2006 |
| 2824 | 2826 | Rocky Hill CT | 2006 |
| 2832 | 2834 | Rocky Hill CT | 2006 |
| 2838 | 2840 | Rocky Hill CT | 2006 |
| 2844 | 2846 | Rocky Hill CT | 2006 |
| 2850 | 2852 | Rocky Hill CT | 2006 |
| 2858 | 2860 | Rocky Hill CT | 2006 |
| 2864 | 2867 | Rocky Hill CT | 2006 |
| 2870 | 2873 | Rocky Hill CT | 2006 |
| 2876 | 2878 | Randolph | 2006 |
| 2881 | 2883 | Randolph | 2006 |
| 2886 | 2889 | Randolph | 2006 |
| 2891 | 2894 | Randolph | 2006 |
| 2896 | 2898 | Randolph | 2006 |
| 2901 | 2903 | Randolph | 2006 |
| 2905 | 2906 | Randolph | 2005 |
| 2908 | 2911 | Randolph | 2005 |
| 2912 | 2917 | Randolph | 2005 |
| 2918 | 2919 | Randolph | 2005 |
| 2921 | 2926 | Randolph | 2006 |
| 2931 | 2936 | Richmond Va | 2006 |
| 3938 | 2940 | Richmond Va | 2006 |
| 2943 | 2948 | Richmond Va | 2006 |
| 2950 | 2952 | Richmond Va | 2006 |
| 2957 | 2960 | Andover Plymouth | 2006 |
| 2965 | 2967 | Andover Plymouth | 2006 |
| 2973 | 2975 | Andover Plymouth | 2006 |
| 2979 | 2985 | Andover Plymouth | 2006 |
| 2987 | 2989 | Andover Plymouth | 2006 |
| 2996 | 2998 | Andover Plymouth | 2006 |
| 3002 | x | Andover Plymouth | 2006 |
| 3008 | 3010 | Andover Plymouth | 2006 |
| 3014 | 3016 | Andover Plymouth | 2006 |
| 3021 | 3023 | Newport Del. | 2006 |
| 3025 | 3026 | Newport Del. | 2005 |
| 3030 | 3031 | Newport Del. | 2005 |
| 3033 | 3035 | Newport Del. | 2005 |
| 3038 | 3040 | Lorton | 2006 |
| 3043 | 3044 | Lorton | 2006 |
| 3048 | 3049 | Lorton | 2006 |
| 3053 | 3054 | Lorton | 2005 |
| 3058 | 3060 | Lorton | 2005 |
| 3063 | x | Lorton | 2005 |
| 3066 | 3067 | Lorton | 2005 |
| 3069 | 3070 | Lorton | 2005 |
| 2074 | 3075 | Lorton | 2005 |
| 3077 | 3078 | Lorton | 2005 |
| 3083 | 3085 | Lorton | 2005 |
| 3087 | 3089 | Lorton | 2006 |
| 3093 | 3094 | Malvern | 2006 |

App-73

| | | | |
|---|---|---|---|
| 3096 | 3097 | Malvern | 2006 |
| 3099 | 3100 | Malvern | 2006 |
| 3102 | 3103 | Malvern | 2006 |
| 3105 | 3106 | Malvern | 2006 |
| 3108 | 3109 | Malvern | 2006 |
| 3111 | 3112 | Malvern | 2006 |
| 3114 | 3115 | Malvern | 2006 |
| 3117 | 3118 | Malvern | 2005 |
| 3120 | 3122 | Malvern | 2005 |
| 3124 | 3126 | Malvern | 2005 |
| 3129 | 3131 | Malvern | 2005 |
| 3133 | 3135 | Malvern | 2005 |
| 3138 | 3141 | Malvern | 2005 |
| 3142 | 3144 | Malvern | 2005 |
| 3146 | 3148 | Malvern | 2005 |
| 3150 | 3151 | Malvern | 2005 |
| 3152 | 3153 | Malvern | 2005 |
| 3156 | 3158 | Franklin MA | 2006 |
| 3165 | 3167 | Franklin MA | 2006 |
| 3174 | 3175 | Franklin MA | 2006 |
| 3177 | 3178 | Franklin MA | 2006 |
| 3180 | 3181 | Franklin MA | 2006 |
| 3183 | 3184 | Franklin MA | 2006 |
| 3186 | 3187 | Franklin MA | 2006 |
| 3189 | 3191 | Franklin MA | 2006 |
| 3194 | 3195 | Franklin MA | 2006 |
| 3197 | 3198 | Franklin MA | 2006 |
| 3200 | 3201 | Franklin MA | 2006 |
| 3203 | 3205 | Franklin MA | 2006 |
| 3209 | 3211 | Franklin MA | 2006 |
| 3214 | 3216 | Franklin MA | 2006 |
| 3219 | 3221 | Franklin MA | 2006 |
| 3226 | x | Farmingdale NJ | 2006 |
| 3227 | x | Farmingdale NJ | 2006 |
| 3228 | 3229 | Farmingdale NJ | 2006 |
| 3233 | 3235 | Farmingdale NJ | 2006 |
| 3241 | 3243 | Baltimore | 2006 |
| 3246 | 3247 | Baltimore | 2006 |
| 3249 | 3250 | Baltimore | 2006 |
| 3252 | x | Baltimore | 2005 |
| 3254 | 3255 | Baltimore | 2005 |
| 3258 | 3260 | Allentown PA | 2006 |
| 3263 | 3265 | Randolph | 2006 |
| 3269 | 3271 | Allentown PA | 2006 |
| 3274 | 3277 | Allentown PA | 2006 |
| 3281 | 3286 | Allentown PA | 2006 |
| 3291 | 3293 | Allentown PA | 2006 |
| 3296 | 3298 | Allentown PA | 2006 |
| 3303 | x | Allentown PA | 2005 |
| 3306 | 3308 | Baltimore | 2006 |
| 3313 | 3314 | Baltimore | 2006 |
| 3316 | 3318 | Baltimore | 2005 |

App-74

| | | | |
|---|---|---|---|
| 3321 | 3322 | Baltimore | 2005 |
| 3326 | 3327 | Allentown PA | 2005 |
| 3329 | 3330 | Allentown PA | 2005 |
| 3333 | 3334 | Allentown PA | 2005 |
| 3336 | 3337 | Allentown PA | 2005 |
| 3339 | 3342 | Allentown PA | 2006 |
| 3349 | 3351 | Plymouth MA | 2006 |
| 3357 | 3359 | Mass/NE | 2006 |
| 3363 | 3365 | Mass/NE | 2006 |
| 3369 | x | Mass/NE | 2006 |
| 3370 | x | Mass/NE | 2006 |

Defendants' Response To

Request for Admission No. 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| RAMON VILLANUEVA-BAZALDUA,<br>individually and on behalf of others<br>similarly situated,<br><br>     Plaintiff,<br><br>     v.<br><br>TRUGREEN LIMITED PARTNERS[1] and,<br>TRUGREEN, INC.[2], d/b/a TRUGREEN<br>CHEMLAWN[3],<br><br>     Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     Civil Action No.: 06-185 (GMS) |

## DEFENDANTS' RESPONSES TO
## PLAINTIFF'S FIRST REQUEST FOR ADMISSIONS

Defendants TruGreen Limited Partnership, d/b/a TruGreen Chemlawn, as well as

TruGreen, Inc. (hereinafter "Defendants" or "TruGreen"), by their attorneys, for their objections

and answers to Plaintiff's First Request for Admissions, state as follows:

**REQUEST NO. 1.**    TruGreen H-2B workers incurred the following expenses in
coming to work for TruGreen Limited Partners in each of the years 2003, 2004, 2005 and 2006:

    a. $100 H-2B visa application fee;
    b. $100 H-2B visa issuance fee;
    c. $6 I-94 fee paid at port of entry;
    d. $155 administrative fee paid to LLS;
    e. Transportation from the H-2B worker's permanent home, or if different, from the
         place of recruitment in Mexico, to the U.S. consulate where his visa was issued;
    f. Transportation from the point where the H-2B visa was issued to the work place in the
        United States;

---

[1]    The correct legal name is TruGreen Limited Partnership.

[2]    TruGreen, Inc. was not Plaintiff's employer, and therefore, is not a proper party in this
action.

[3]    TruGreen, Inc. does not do business as (d/b/a) TruGreen Chemlawn; TruGreen Limited
Partnership does do business as (d/b/a) TruGreen Chemlawn.

g. Costs of overnight accommodations incurred between the worker's home and the worker's work place in the United States;

h. Costs of obtaining a Mexican passport and photographs for the visa;

i. Cost of uniform(s) worn during work.

(Admit or deny separately for each item and for each year unless the answer is the same for all items or all years.)

**RESPONSE:**

*Defendants object to this Request for Admission No. 1 on the grounds that it is overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence concerning matters currently at issue in this case. The Court has neither certified this case as a class nor ordered a Court-facilitated notice of a collective action, and the only claims presently at issue herein are those asserted by Plaintiff. Consequently, discovery on claims Plaintiff may or may not be permitted to pursue in the future on behalf of hundreds of others in different states and regions is premature and beyond the scope of permissible discovery at this time. Defendants further object to this Request for Admission No. 1 on the grounds that it calls for speculation and on the grounds that it is overly broad in temporal scope given that Plaintiff worked for TruGreen only in 2004.*

*Subject to and without waiver of the foregoing objections, Defendants deny that Plaintiff incurred any costs or expenses for uniforms worn during work, as Defendants supplied and cleaned (and continue to supply and clean) uniforms at no cost to every employee in the field, including Plaintiff. Defendants admit that the costs described in subsections (a) through (c) refer to current H-2B visa-related fees established by the federal government for purposes of obtaining an H-2B visa and that the fees described in subsection (d) are established by LLS International ("LLS") in connection with its assistance to individuals, including Plaintiff, who use LLS's services to obtain employment in the United States. To the best of Defendants'*

2    App-78

*knowledge, information, and belief, Plaintiff, or someone on his behalf, incurred the costs*

*described in 1(a) through (d). Defendants are unaware whether or to what extent Plaintiff*

*incurred costs of transportation and/or accommodation or costs of a Mexican passport and/or*

*photographs, and, therefore, those assertions are denied.*

**REQUEST NO. 2.**    TruGreen Limited Partnership did not pay for any portion of the following costs on behalf of your H-2B workers in 2003, 2004, 2005 and 2006:

a. $100 H-2B visa application fee;
b. $100 H-2B visa issuance fee;
c. $6 I-94 fee paid at port of entry;
d. $155 administrative fee paid to LLS;
e. Transportation from the H-2B worker's permanent home, or if different, from the place of recruitment in Mexico, to the U.S. consulate where his visa was issued;
f. Transportation from the point where the H-2B visa was issued to the work place in the United States;
g. Costs of overnight accommodations incurred between the worker's home and the worker's work place in the United States;
h. Costs of obtaining a Mexican passport and photographs for the visa;
i. Cost of uniform(s) worn during work.

(Admit or deny separately for each item and for each year unless the answer is the same for all items or all years.)

**RESPONSE:**

*Defendants object to this Request for Admission No. 2 on the grounds that it is*

*overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of*

*admissible evidence concerning matters currently at issue in this case. The Court has neither*

*certified this case as a class nor ordered a Court-facilitated notice of a collective action, and the*

*only claims presently at issue herein are those asserted by Plaintiff. Consequently, discovery on*

*claims Plaintiff may or may not be permitted to pursue in the future on behalf of hundreds of*

*others in different states and regions is premature and beyond the scope of permissible discovery*

*at this time. Defendants further object to this Request for Admission No. 2 on the grounds that it*

*is overly broad in temporal scope given that Plaintiff worked for TruGreen only in 2004.*

Defendants' Response To

Plaintiff's Interrogatories 4, 5, and 31

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

RAMON VILLANUEVA-BAZALDUA, )
individually and on behalf of others )
similarly situated, )
                                 )
       Plaintiff, )      Civil Action No.: 06-185 (GMS)
                                 )
       v. )
                                   )
TRUGREEN LIMITED PARTNERS[1] and, )
TRUGREEN, INC.[2], d/b/a TRUGREEN )
CHEMLAWN[3], )
                                   )
       Defendant. )

## DEFENDANTS' RESPONSES TO
## PLAINTIFF'S INTERROGATORIES TO DEFENDANT

Defendants TruGreen Limited Partnership, d/b/a TruGreen Chemlawn, as well as

TruGreen, Inc. (hereinafter or "Defendants" or "TruGreen"), by their attorneys, in response to

Plaintiff's Interrogatories to Defendant, state as follows:

## DEFINITIONS

As used herein:

1.    "Burdensome" means that the request requires an unduly burdensome search for

information or documents that are of little value or no value to this lawsuit, so that any value

derived from production is far outweighed by the incumbent burden required to produce the

document.

---

[1]    The correct legal name is TruGreen Limited Partnership.

[2]    TruGreen, Inc. was not Plaintiff's employer, and therefore, is not a proper party in this action.

[3]    TruGreen, Inc. does not do business as (d/b/a) TruGreen Chemlawn; TruGreen Limited Partnership does do business as (d/b/a) TruGreen Chemlawn.

1

*App-81*

2.    "Overbroad" means that the request seeks information that is not relevant to any present or potential issues in this litigation.

3.    "Vague" means that the request is drafted in such a way that it does not convey, with reasonable clarity, what is requested of TruGreen, with the effect that TruGreen is required to guess the intended meaning of Plaintiff's request.

## GENERAL OBJECTIONS

1.    **Relevance.** Defendants object to each Interrogatory to the extent that it seeks information or documents that are not relevant to the subject matter or issues involved in this action or information or documents not reasonably calculated to lead to the discovery of admissible evidence.

2.    **Overbroad and unduly burdensome.** Defendants object to each Interrogatory to the extent that it is overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

3.    **Privilege.** Defendants object to each Interrogatory to the extent that it calls for disclosure of information that is protected by the attorney/client privilege or work product privilege or both. Defendants also object to each Interrogatory to the extent it calls for disclosure of information prepared in anticipation of litigation or trial preparation material.

4.    **Vague.** Defendants object to each Interrogatory to the extent that it is ambiguous and too vague to adequately apprise Defendants of what information is being sought or permit Defendants to furnish such information with reasonable effort.

5.    **Accessibility.** Defendants object to each Interrogatory to the extent that Plaintiff seeks information already in Plaintiff's possession, or which is as accessible to Plaintiff as well as Defendants.

2

ME1\5873140.1

6. **Confidential and proprietary/sensitive business information.** Defendants object to each Interrogatory to the extent that Plaintiff seeks disclosure of confidential, proprietary, and/or sensitive business information, and assert each and every applicable privilege and rule governing confidentiality to the fullest extent provided by law. To the extent that this objection has been stated, Defendants will not disclose any such information without the execution of an appropriate Confidentiality Stipulation and/or Protective Order.

7. **Speculative.** Defendants object to each Interrogatory to the extent that it calls for Defendants to speculate in order to respond.

8. **Argumentative.** Defendants object to each Interrogatory to the extent that it uses argumentative terms or otherwise implies facts which Defendants deny.

9. **Redundant.** Defendants object to each Interrogatory to the extent that it is repetitive of a prior or subsequent Interrogatory or other discovery request, and it is neither practical nor feasible to answer such an Interrogatory or discovery request again.

10. **Elaboration on documents.** Defendants object to each Interrogatory to the extent that it calls for an elaboration on documents, statements, and/or facts which otherwise speak for themselves.

## RESPONSES TO INTERROGATORIES

1. Please state the address of each TruGreen office, branch, or location where TruGreen Limited Partnership employed H-2B workers in 2003, 2004, 2005, or 2006, indicate the number of H-2B workers employed in each such office, branch or location in each of those years, and identify the supervisor in charge of H-2B workers in each such office, branch or location in each of those years.

**RESPONSE:**

*Defendants specifically incorporate General Objection Nos. 1, 2, 6, and 8. Defendants specifically object to this Interrogatory on the grounds that it is overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence concerning*

3

MEI\5873140.1

*to this Interrogatory to the extent it seeks information other than for the year 2004, the only year in which Plaintiff was employed by TruGreen. The information requested relating to Plaintiff is equally accessible to Plaintiff.*

3.    If you did not admit Admission No. 18 or No. 19, state all facts upon which you rely in denying that admission, including the annual gross volume of sales made or business done by TruGreen Limited Partnership in each of the years 2003, 2004, 2005 and 2006 (exclusive of excise taxes at the retail level that are separately stated), and whether, in each of those years you had employees engaged in commerce or in the production of goods for commerce or had employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person.

**RESPONSE:**

*Not applicable.*

4.    Please identify each person or entity who prepared and/or assisted you in preparing applications for H-2B workers in 2003, 2004, 2005 and 2006 and state the compensation paid for those services by you or any other person or entity. If different persons prepared or assisted you with applications for different periods or for your different offices or locations, identify the dates, offices or locations on behalf of which such person worked.

**RESPONSE:**

*Defendants specifically incorporate General Objection Nos. 1, 4, 5, 6, 8, and 9. Subject to and without waiver of the foregoing, TruGreen has contracted since at least 2003 with Great Lakes Labor LLC, which works directly with LLS International, to recruit prospective H-2B workers, to provide information to H-2B workers to be employed by TruGreen in a manner to be understood by those workers, and to ensure compliance with all immigration administrative and regulatory requirements. See also Defendants' Initial Disclosures and Response to Interrogatory No. 28.*

5.    Describe in detail how you located and recruited workers to accept H-2B visas to work for you in each of the years 2003, 2004, 2005 and 2006. Your answer should identify the person(s) or entity(ies) who located or recruited H-2B workers on your behalf each year (whether independent entities or TruGreen employees); the person(s) or entity(ies) who hired and/or contacted the recruiter(s), and should describe how the terms of work you were offering were communicated to the person(s) or entity(ies) recruiting or locating workers. Your answer should also describe the terms of any agreement between you and the person(s) or entities who located

5

App-84

or recruited H-2B workers for you, including the compensation, if any, to be paid to the person(s) or entities who located or recruited your H-2B workers.

**RESPONSE:**

Defendants specifically incorporate General Objection Nos. 1, 2, 4, 5, 6, 8, 9, and 10. This request is not reasonably calculated to lead to the discovery of admissible evidence and seeks information regarding TruGreen's business that is confidential, proprietary, and sensitive with respect to TruGreen's relationships with third-party vendors and the operations of those vendors. Defendants further object to the extent this Interrogatory is directed at a third-party and, therefore, requires TruGreen to speculate. Defendants further specifically object to this Interrogatory on the grounds that it is overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence concerning matters currently at issue in this case. The Court has neither certified this case as a class nor ordered a Court-facilitated notice of a collective action, and the only claims presently at issue herein are those asserted by Plaintiff. Consequently, discovery on claims Plaintiff may or may not be permitted to pursue in the future on behalf of other individuals in different states and regions is premature and beyond the scope of permissible discovery at this time. Defendants further object to this Interrogatory to the extent it seeks information other than for the year 2004, the only year in which Plaintiff was employed by TruGreen. Information regarding Plaintiff's recruitment is equally accessible to Plaintiff.

Subject to and without waiver of the foregoing, see Defendants' Response to Interrogatory No. 4; see also Defendants' Initial Disclosures. By way of further response, after TruGreen determined how many H-2B workers it would need, it communicated that information to Great Lakes Labor, who managed the recruitment and application process for prospective H-2B workers, including by working with LLS. TruGreen signed forms and provided information

6

App-85

ME1\5873140.1

*as requested by Great Lakes Labor. To the best of Defendants' knowledge, information, and belief, Great Lakes Labor and/or LLS provided all information required by law to H-2B applicants and employees, including Plaintiff.*

6.   State whether you explained or disclosed the following matters to Great Lakes LLC, Tracy Drus, Jeff West and/or LLS: (1) TruGreen's method of calculating overtime for H-2B workers, and (2) TruGreen's commission payment system. If the answer is yes to either or both, state to whom the disclosure was made, when and to whom it was made, and describe in detail what was disclosed.

**RESPONSE:**

*Defendants specifically incorporate General Objection Nos. 1, 2, 4, and 9. Defendants further specifically object to this Interrogatory on the grounds that it is overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence concerning matters currently at issue in this case. The Court has neither certified this case as a class nor ordered a Court-facilitated notice of a collective action, and the only claims presently at issue herein are those asserted by Plaintiff. Consequently, discovery on claims Plaintiff may or may not be permitted to pursue in the future on behalf of other individuals in different states and regions is premature and beyond the scope of permissible discovery at this time. Defendant further objects to this Interrogatory to the extent it seeks information other than for the year 2004, the only year in which Plaintiff was employed by TruGreen, and other than for the position of Specialist, which is the position held by Plaintiff during his employment with TruGreen.*

*Subject to and without waiver of the foregoing, see Defendants' Response to Request for Admission Nos. 26 through 32. Jim Vacchiano's discussions regarding TruGreen's Specialist's commission payment system were part of his discussion with Ms. Drus regarding TruGreen's compensation plans specifically referenced in the cited Responses to Requests for Admission.*

7.   If you did not admit Admission No. 1, No. 2, or No. 3 with respect to any item of expense in any year, state the factual basis for your response, including whether the item of expense was paid for, advanced, or reimbursed for all of your H-2B workers or only some of

App-86

MEI\5873140.1

*speculate. TruGreen is without sufficient knowledge, information or belief as to the contractual*

*agreements, if any, between Great Lakes Labor and LLS.*

30.     Describe the circumstances that led to the termination of Plaintiff's employment by Defendant in July 2004 including whether you contend that Plaintiff left voluntarily.

**RESPONSE:**

*Defendants specifically incorporate General Objection Nos. 2, 4, 5, and 10. Subject to*

*and without waiver of the foregoing objections, TruGreen responds that Plaintiff voluntarily*

*terminated his employment with TruGreen and that Plaintiff has information responsive to this*

*Interrogatory. Pursuant to Rule 33(d) of the Federal Rules of Civil Procedure, additional*

*information responsive this Interrogatory can be ascertained by Plaintiff just as easily as by*

*Defendants from the documents produced at TRU0026, TRU0047-48, and TRU0049.*

31.     Describe all "additional compensation" provided to H-2B workers by branch managers in 2003, 2004, 2005 and 2006. Your answer should identify the worker who received the compensation, the amount provided, the date of payment, and the purpose of the "additional compensation." The term "additional compensation" has the same meaning in this interrogatory as in paragraph 4 of the affidavit of James Vacchiano attached as Exhibit A to your opposition to Plaintiff's motion to conditionally certify this as an FLSA collective action.

**RESPONSE:**

*Defendants specifically incorporate General Objection Nos. 1, 2, 4, and 6. Defendants*

*specifically object to this Interrogatory on the grounds that it is overbroad, unduly burdensome,*

*and not reasonably calculated to lead to the discovery of admissible evidence concerning*

*matters currently at issue in this case. The Court has neither certified this case as a class nor*

*ordered a Court-facilitated notice of a collective action, and the only claims presently at issue*

*herein are those asserted by Plaintiff. Consequently, discovery on claims Plaintiff may or may*

*not be permitted to pursue in the future on behalf of other individuals in different states and*

*regions is premature and beyond the scope of permissible discovery at this time. Defendant*

App-87

*further objects to this Interrogatory to the extent it seeks information other than for the year*

*2004, the only year in which Plaintiff was employed by TruGreen.*

*Subject to and without waiver of the foregoing, Plaintiff and the other H-2B workers*

*employed at the Wilmington branch in 2004 received $150 at the discretion of Branch Manager*

*Mike Matejik upon their arrival for use at the individual's discretion.  TruGreen did not ask for,*

*expect, or seek repayment of this money from any individual, including Plaintiff.  See*

*Declaration of Michael Matejik, submitted in connection with Defendants' Opposition to*

*Plaintiff's Expedited Motion to Conditionally Certify a FLSA Collective Action and Reply in*

*Further Support of Its Motion for Expedited Discovery, at ¶ 3.*

32.    Describe in detail any arrangements TruGreen made to transport TruGreen H-2B to job sites in the United States or to assist H-2B workers to locate such transportation.  Your answer should identify the person(s) or entity(ies) who arranged for or assisted with transportation (whether independent entities or TruGreen employees).  Your answer should also describe the terms of any fees or costs paid by TruGreen for such transport or for arranging for transportation.

**RESPONSE:**

*Defendants specifically incorporate General Objection Nos. 1, 2, 4, 5, and 7.  It is*

*unclear to what "transport" Plaintiff is referring, and responsive information relating to*

*Plaintiff's transport (of any kind) to and within the United States during his employment with*

*TruGreen is just as readily available from him.  To the extent that Plaintiff is seeking additional*

*information regarding his transportation from Mexico to the United States, TruGreen did*

*provide such transportation and, therefore, this Interrogatory requires TruGreen to speculate.*

*To the best of Defendants' knowledge, information, and belief, Great Lakes Labor worked with*

*LLS to provide transportation to H-2B workers from Mexico to the United States.  To the extent*

*that Plaintiff is seeking additional information regarding his transportation while in Wilmington,*

*Delaware, Branch Manager Mike Matejik obtained bus passes for all H-2B workers to enable*

22

App-88

ME1\5873140.1

them to get to and from work. The $60 deduction from Plaintiff's wages was intended to defray the cost of the bus passes, along with Plaintiff's rent, phone, cable, and utilities.

McCARTER & ENGLISH, LLP

Michael P. Kelly (DE Bar ID #2295)
McCarter & English
Citizens Bank Building
919 N. Market Street, 18th Floor
Wilmington, DE 19801
(302) 984-6301

*Admitted Pro Hac Vice*
Michael L. Banks (PA I.D. #35052)
Sarah E. Bouchard (PA I.D. #77088)
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103-2921
(215) 963-5387/5077

Dated: September 28, 2006

Attorneys for TruGreen

23

App-89

Excerpts from

Deposition of James Vacchiano

```
 1        IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF DELAWARE
 2                    - - -
    RAMON VILLANUERVA-BAZALDUA, ) CIVIL ACTION
 3  Individually and on behalf  )
    of others similarly         )
 4  situated,                   )
                                )
 5              Plaintiff,       )  ORIGINAL
         -vs-                   )
 6                              )
    TRUGREEN LIMITED PARTNERS   )
 7        -and-                 )
    TRUGREEN, INC. d/b/a        )
 8  TRUGREEN CHEMLAWN,          )
                                )
 9             Defendants.      ) NO. 06-185
                    - - -
10              Oral deposition of JAMES A.
11  VACCHIANO, taken in the law offices of KRASNER &
12  RESTREPO, 239 South Camac Street, Philadelphia,
13  Pennsylvania 19107, on Tuesday, November 7, 2006,
14  beginning at approximately 9:10 a.m., before
15  Joseph J. Pignatelli, a Registered Professional
16  Reporter and Commissioner in and for the
17  Commonwealth of Pennsylvania.
18                    - - -
19
20
21
22        ESQUIRE DEPOSITION SERVICES
          Four Penn Center, 12th Floor
23        1600 John F. Kennedy Boulevard
          Philadelphia, Pennsylvania 19103
24             (215) 988-9191
```

```
 1   APPEARANCES:

 2

                 LAW OFFICES OF EDWARD TUDDENHAM
 3               BY:  EDWARD TUDDENHAM, ESQUIRE
                 153 Upland Road
 4               Cambridge, Massachusetts 02140
                 (617) 576-2182
 5                        and
                 RAPPOSELLI, CASTRO & GONZALES
 6               BY: VIVIAN L. RAPPOSELLI, ESQUIRE
                 1900 Grant Avenue, Suite 100
 7               Wilmington, Delaware 19806
                 (302) 652-8711
 8               -- Representing the Plaintiff

 9

10               MORGAN, LEWIS & BOCKIUS,LLP
                 BY: BETH M. HENKE, ESQUIRE
11               One Oxford Center, Suite 3200
                 Pittsburgh, Pennsylvania 15219
12               (412) 560-6401
                 -- Representing the Defendants

13

14                        - - -

15

16

17

18

19

20

21

22

23

24
```

3

```
1                        I N D E X

2

3   WITNESS              INTERROGATION BY              PAGE

4

5   JAMES A. VACCHIANO

6

7                   Mr. Tuddenham              6, 169

8                   Ms. Henke                    166

9

10                        -  -  -

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

JAMES A. VACCHIANO

```
1            JAMES A. VACCHIANO, after having been
2        first duly sworn, was examined and
3        testified as follows:
4                    -  -  -
5                 EXAMINATION
6                    -  -  -
7   BY MR. TUDDENHAM:
8   Q.    State your name and address, please.
9   A.    James A. Vacchiano, 16 Stepple Chase Drive,
10  Turnersville, New Jersey 08012.
11  Q.    Have you ever had your deposition taken
12  before?
13  A.    Yes.
14  Q.    In what circumstance?
15  A.    Similar, for a work-related employment
16  issue.
17  Q.    Tell me just generally what the issue was.
18  A.    I'm trying to think.  I believe it was for
19  some type of discrimination issue in the work
20  place.
21  Q.    Did it involve an H-2B worker?
22  A.    No.  I need to make something clear for a
23  second, I had an accident two years ago, and I
24  lost some of my hearing, so in case I say what, I
```

JAMES A. VACCHIANO

1    understand the question.  I don't use that

2    term.

3    BY MR. TUDDENHAM:

4    Q.    Let me just show you a document here, I

5    apologize that I don't have an extra copy of this.

6    Let me show you TruGreen document 530.  Have you

7    ever seen that document before?

8    A.    Hang on for a second.  I never seen this

9    document before.

10   Q.    Is that your signature down there where it

11   says James Vacchiano?

12   A.    No, it's not.

13   Q.    Whose is it?

14   A.    JoAnn Ray's.

15   Q.    Your assistant?

16   A.    Acting on my authority.

17   Q.    You read this.  Did you see just above the

18   signature line, "I authorize only one agent, LLS

19   Mexico"?

20   A.    Yes.

21   Q.    Et cetera?

22   A.    Yes.

23            MS. HENKE:  The et cetera is to act

24       as my agent slash representative for

JAMES A. VACCHIANO

1          the purposes of processing visas at the

2          consulate in Monterey.

3     BY MR. TUDDENHAM:

4     Q.        Were you aware that you were authorizing

5     them to be your agent?

6     A.        In the technical terms that you're bringing

7     up today, no.

8     Q.        Were you aware that you or your assistant

9     on signing forms --

10    A.        I still don't understand even if I was

11    authorizing them, I don't understand what that

12    means that they were my agent.  You're making it

13    sound like a bad thing.  I don't even know what it

14    means what you're referring to.

15    Q.        See the very first line, why don't read

16    that out loud.  Read it out loud.

17    A.        "Please" wouldn't be bad idea. Read it out

18    loud, "please."

19              "I, James A. Vacchiano, have read the

20    consulate Monterey H-2 visa processing guidelines

21    and I agree to abide by them."

22    Q.        Have you read those guidelines?

23    A.        I don't recall.

24              MS. HENKE:  Do you want him to

JAMES A. VACCHIANO

1           That's a mischaracterization.  It wasn't

2           never, his answer wasn't never.

3     BY MR. TUDDENHAM:

4     Q.      TRU-94, I just want to go back.  Now that

5     you understand the charges that are listed there

6     at the bottom of that page, is it your

7     understanding those are the same for all H-2B

8     workers who were brought up to TruGreen ChemLawn?

9     A.      It's my understanding.

10    Q.      You talked a while back about meetings in

11    branch offices with workers where you discussed

12    whether they were happy with their compensation

13    system.

14    A.      Yes.

15    Q.      Did you document any of those meetings?

16    A.      No.

17    Q.      Would TruGreen have any piece of paper

18    whatsoever that would indicate the substance of

19    those meetings?

20    A.      No.

21    Q.      Do you remember the name of any workers

22    that you talked to who claimed to be satisfied?

23    A.      I don't, but the most recent one that I

24    talked to that I can recall, I was in the Bergen,

JAMES A. VACCHIANO

1    New Jersey branch a couple months ago and the guy

2    has been around for five years, I might think of

3    his name.  He put up his computer and showed me

4    pictures of his kids in Mexico, his new house, new

5    pool, loving life, but I cannot remember his name.

6    Q.    The conversation in 2003 with Tracy Drus

7    where you brought up this issue of the

8    compensation plan, was anybody else participating

9    in that conversation other than you and Tracy

10   Drus?

11   A.    No.

12   Q.    Did you make any kind of memo about it?

13   A    No.

14   Q.    When workers come to the U.S., as I

15   understand it, branch managers have the discretion

16   to give workers a certain amount of money or loan

17   them a certain amount of money?

18   A.    You said give them a certain amount of

19   money or loan them a certain amount of money?

20   Q.    Yes.

21   A.    Yes, they had the discretion to present

22   them some amount of money, yes.

23   Q.    Do you know which branches do that?

24   A.    They all do.

JAMES A. VACCHIANO

1    Q.      And how much do they generally give?

2    A.      You know I did some research on this and

3    what I found out was that they probably, I think

4    the variation was between seventy-five or a

5    hundred dollars and two-fifty per person,

6    I think I recall.

7    Q.      With two-fifty there weren't many branch

8    managers handing out two-fifty a person; were

9    there?

10   A.      I don't know how many.  There were some.

11   Q.      Did they tend to hand out the same amount

12   to all workers in the branch?

13          MS. HENKE:  Objection to form.

14   You started with when workers come to the

15   U.S., is that the time you're talking

16   about?

17          MR. TUDDENHAM:  Yes.

18          THE WITNESS:  Mostly, yes, but there

19   are times where a branch manager might

20   just give them some money, the same amount,

21   but he might well have stocked their whole

22   house with groceries and things.  So I

23   would say for the most part it's consistent

24   the amount within a branch location but it

TRUGREEN DOCUMENT

TRU-93 AND TRU-94

App-100

# INSTRUCTIONS – YEAR 2004

*If you follow these instructions, you will have the opportunity to apply for a visa to work in the US. The United States government makes the decision to approve or reject your application – not LLS.*

**WHEN:** Everyone needs to report to our offices before February 15. The first time you come to our office you will pay your fees and we will prepare all of your paperwork for processing. You must be on the employer's list of workers to be processed.

We will call you when you need to come to Monterrey for an interview and to leave to the United States. It will be your responsibility to make sure we have a good way to contact you. LLS will only make two attempts to notify you.

**If you do NOT report to an LLS office before February 15 to complete your paperwork, you may be replaced by another worker.**

**WHERE:** LLS International has three offices where workers can report for processing: Monterrey, Guanajuato, and Puebla. Directions to each office are on the back of this form.

You need to report to the **PUEBLA** office if you live in one of the following states:

| | | | |
|---|---|---|---|
| **Puebla** | **Tlaxcala** | **Veracruz** | **Yucatan** |
| **Distrito Federal** | **Tabasco** | **Oaxaca** | **Morelos** |
| **Campeche** | **Guerrero** | **Chiapas** | **Q. Roo** |

You need to report to the **GUANAJUATO** office if you live in one of the following states:

| | | | |
|---|---|---|---|
| **Guanajuato** | **Queretaro** | **Aguascalientes** | **Nayarit** |
| **Jalisco** | **Michoacan** | **Estado de Mexico** | **Zacatecas** |
| **San Luis Potosi** | **Hidalgo** | **Colima** | |

You need to report to the **MONTERREY** office if you live in one of the following states:

| | | | |
|---|---|---|---|
| **Nuevo Leon** | **Coahuila** | **Tamaulipas** | **Sonora** |
| **Chihuahua** | **Durango** | **Sinaloa** | **Baja Norte y Sur** |

**WHAT:** You need to bring the following things with you when you report before February 15.

1.    Passport – you must have a Mexican Passport valid for ALL of 2004. Also, bring your prior passport and visa if you have one. (It is always better to get a passport with five years duration)
2.    One passport size photograph
3.    At least $3,800 pesos to cover the costs of the visa.

App-101

**Puebla Office:**  The Puebla Office is located in the city of San Pedro Cholula at the north base of the archaeological zone which contains the pyramid and the Iglesia de los Remedios.  Cholula is about 15 minutes from downtown Puebla.  You can get there by taking a bus from "la CAPU" – the bus station in Puebla – to Cholula.  Our office is only three blocks east of the Plaza Principal in Cholula.

The address is:  **2 Oriente 601, Colonia Centro, San Pedro Cholula, Pue.**

The telephone number is: **(222) 404-6335 or (222) 404-6785**

**Guanajuato Office:**  The Guanajuato Office is located in the Colonia Marfil next to the Volkswagen dealership.

The address is:      **Villas Manchegas #10, Colonia Marfil, Guanajuato, Gto.**

The telephone number is:  **(473) 733-3175 or (473) 733-3176**

**Monterrey Office:**  The Monterrey Office is located in downtown Monterrey just one block behind the U.S. Consulate – in front of the main branch of Bital.

The address is:  **Ocampo 427 Pte., Zona Centro, Monterrey, N.L.**

The telephone numbers are:  **(818) 040-7575 or (818) 040-7577**

**Expenses**

**Administrative - $155.00 USD**
**Consulate:**
- **Application fee - $100.00 USD or peso equivalent. (non refundable)**
- **Visa (if approved) - $100.00 USD or peso equivalent**

**Transportation- $100.00 - $150.00 USD (U.S. Chartered bus)**
**Border Crossing fee- $6.00 USD**

**Total Expenses including travel incidentals- $465.00 to $525.00 U.S.**

App-102

TRU0094

TRUGREEN DOCUMENT

TRU-530

App-103

**TruGREEN ChemLawn**
**TruGREEN LandCare**

James A. Vacchiano
Region People Services Manager
New Jersey Region - Lawn Care
Mid-Atlantic Regions - Lawn and LandCare

875 Kings Highway
Woodbury, NJ 08096
Phone: 856-251-9425
Fax: 856-853-0047

Date: 2/23/2006

I, JAMES A VACCHIANO , have read the Consulate Monterrey H2 Visa Processing Guidelines and agree to abide by them.  I, or (LLS **Mexico S de RL de CV**) will be designated to process my employees at the Consulate in Monterrey for EAC-06-067-52598 and for **TRUGREEN CHEMLAWN**.

The information for the owner is:

Name:   JAMES A. VACCHIANO                                                    X DOB: 02/04/56

U.S. Citizen?        X Yes   ☐ No                    If no, Resident alien card  #  : N/A

Company Name:   TRUGREEN CHEMLAWN

Address:   875 Kings Hwy, Woodbury NJ 08096        FEIN:   36-3734669

Email:   n/a

Tel:   856-251-9425                    Fax:   856-853-0947

The information for the above-designated agent/representative is:

Name:   LLS Mexico S de RL de CV/ Lic. Salvador Morales

                                                                DOB:   May 8, 1978

Mexican Citizen?        X Yes   No        If yes, CURP or voter's card number   1983062861248

Company Name:   LLS Mexico S de RL de CV

Address:   Melchor Ocampo #427 pte. Zona Centro, Monterrey, Mexico        RFC:   LME000216QW6

Email:   Salvador@llsint.com

Tel:   80 40 75 75 / 83 40 01 60                    Fax:   80 40 75 76

Processed H2 visas at any US Embassy/Consulate before?  X Yes        ☐ No

If yes, please provide the following information:

| Countries | Company Name(s) Used | | Dates |
|---|---|---|---|
| Mexico | TRUGREEN CHEMLAWN | | 2005 |
| | | | |

**AUTHORIZATION**

I authorize only one agent, (**LLS Mexico S de RL CV**), to act as my agent/representative for the purposes of processing visas at the Consulate in Monterrey. This person is to be paid:

        X   By each applicant. The proposed fee is $165.00

This authorization is valid until explicitly revoked by notifying the H2 Visa Section.

Signature:   X James A. Vacchiano                    Date: 2/23/2006

Title: REGION PEOPLE SERVICES MANAGER

(**Fax to the Consulate— Fax: 011-5281-8340-3183**)

App-104                                    TRU00530

Westlaw.

Not Reported in F.Supp.2d                                Page 1
Not Reported in F.Supp.2d, 2006 WL 197030 (E.D.La.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Briefs and Other Related Documents
Recinos-Recinos v. Express Forestry, Inc.E.D.La.,2006.Only the Westlaw citation is currently available.

United States District Court,E.D. Louisiana.
Hugo Martin RECINOS-RECINOS, et al
v.
EXPRESS FORESTRY, INC., et al
**No. Civ.A. 05-1355.**

Jan. 24, 2006.

Mary C. Bauer, Andrew H. Turner, Kristi L. Graunke, Montgomery, AL, Hector A. Linares, New Orleans, LA, for Hugo Martin Recinos-Recinos, et al. Mark N. Mallery, Christine M. White, McGlinchey Stafford PLLC, Baton Rouge, LA, Christopher E. Moore, McGlinchey Stafford, Houston, TX, Elizabeth K. Dorminey, James Larry Stine, Paul Oliver, Wimberly, Lawson, Steckel & Schneider, P.C., Atlanta, GA, for Express Forestry, Inc., et al.

**MEMORANDUM OPINION AND PROTECTIVE ORDER**
KNOWLES, Magistrate J.
*1 In this Memorandum Opinion, the Court will further explain and supplement its rulings announced from the bench at the evidentiary hearing held in the above-captioned putative class/collective action regarding Plaintiffs' Motion for Protective Orders, Sanctions and Corrective Notice [Rec. Doc. No. 49], which was referred to the undersigned Magistrate Judge for determination [Rec. Doc. No. 68]. The purpose of the hearing was to determine whether the campaign of threats, intimidation and coercion carried out in mid-September, 2005 in the small, remote Guatemalan mountain towns of Palmira Viega and Santiago Petatan by groups of prospective and/or past seasonal workers purportedly allegedly representing the Defendants in this matter was improper and, if so, (1) whether the extent of the improprieties justify remedial action or imposition of penalties against Defendants, (2) whether there was any involvement of the Defendants through their agent, Leo Salazar, either as advisor, participant or instigator; and (3) precisely what remedy, penalties or sanctions, if any, are appropriate. As set forth more fully below, the Court has determined that the in-person campaign was improper and, indeed, may

well have been unwittingly instigated by Defendants' representative, Leo Salazar, who was dispatched by the Defendants to Guatemala on September 15, 2005, the day before campaign commenced. The express purpose of Salazar's travel to Guatemala was to address Express Forestry's seasonal workers and answer any questions they had about the captioned litigation. Because it does not appear on this record that any conduct by the Defendants' agent Salazar was willful and it was not demonstrated that he actually accompanied the band of Express Forestry's "seasonal workers" who visited certain plaintiffs, opt-in plaintiffs, potential class plaintiffs and/or their families in an attempt to facilitate the withdrawal of the captioned lawsuit, the Court finds that the imposition of sanctions is neither warranted, nor appropriate. Nevertheless, affidavit evidence and testimony elicited by the plaintiffs, together with the utter absence of any evidence of the precise statements made by Salazar to past and prospective "seasonal workers" which immediately presaged the subject face-to-face campaign, counsels in favor of issuance of a narrowly fashioned protective order designed to protect the integrity of this proceeding pending the district judge's rulings on plaintiff's motions for class certification and preliminary certification of collective action.

**BACKGROUND**

On April 7, 2005, putative class representatives, Hugo Martin Recinos-Recinos, Pablo Alvarado-Recinos and Alberto Alvarado, filed the captioned class action lawsuit. The collective/class action alleges that during the plaintiffs' and putative class members' employment with Defendants, Express Forestry, Inc., Rick Thomas and Sandy Thomas, they systematically violated the Agricultural Worker Protection Act (AWPA), 29 U.S.C. § 1801, and the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201. The action was brought on behalf of a putative class of over 300 predominantly Guatemalan and Mexican migrant workers who planted trees and performed other forestry-related tasks for the defendants seasonal business. It is not disputed that plaintiffs/putative class representatives, opt-in plaintiffs and putative class plaintiffs were brought into the United States on temporary H-2B work visas to perform arduous tasks that American workers were not willing to perform.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                             Page 2
Not Reported in F.Supp.2d, 2006 WL 197030 (E.D.La.)
(Cite as: Not Reported in F.Supp.2d)

**\*2** Defendants operate a tree-planting service in which they bid on and negotiate contracts to plant trees on land owned by other individuals and companies. To fill manpower requirements for the contracts, they imported foreign nationals to perform forestry work on a seasonal or temporary basis, in accordance with the Immigration and Nationality Act. Each of the plaintiffs or putative class plaintiffs were issued an "H-2B visa" as contemplated by the aforesaid Act. Plaintiffs allegedly spent considerable sums to process visas and travel to the United States. In some cases, the plaintiffs were required to pledge collateral in the form of a deed to their land as a condition of being hired. Plaintiffs allege that the defendants allegedly have not returned the documents.

As a condition for obtaining the visas for the plaintiffs, defendants certified to the United States Department of Labor that the wages paid the plaintiffs would equal or exceed the applicable prevailing wage, and that the job would not contravene Federal, State or local law, including the applicable requirements of the H-2B program as set forth in the regulations. Under the applicable law, plaintiffs were entitled to receive a prevailing hourly wage and overtime pay but, according to the allegations, defendants took full advantage of their indigence, inability to speak the English language [FN1] and lack of understanding of the law and grossly underpaid them as H-2B forestry workers. Pursuant to the opt-in collective action provisions of the FLSA, thirteen of the defendants' former employees have filed written consents-to-sue, indicating publicly their intention to join this action.

> FN1. Many of the immigrants speak the indigenous Mayan dialect as their primary language and Spanish as a secondary language with varying degrees of proficiency and no English.

Plaintiffs seek restitution of unpaid wages, monetary damages and declaratory and injunctive relief. Plaintiffs allege that records kept by the defendants were inadequate, inaccurate, false and misleading. They failed to pay minimum wage and the proper prevailing wage for the work performed in violation of AWPA. They further failed to pay overtime for hours worked in excess of a forty hour week and failed to reimburse plaintiffs for expenses they incurred primarily for the benefit of defendants in violation of the FLSA. As a result, plaintiffs claim

that they are entitled to recover unpaid minimum and overtime wages, plus an additional amount in liquidated damages pursuant to 29 U.S.C. § 216(b) The plaintiff class consists of all those individuals admitted as H-2B temporary foreign workers who were employed in any capacity by the defendants from April of 1999 until the date of filing the present action (April 7, 2005).

Defendants filed a Motion to Dismiss for Lack of Personal Jurisdiction, which the plaintiffs opposed. The district judge denied defendants' motion to dismiss, finding that the plaintiffs have established minimum contacts and that the Thomases made no showing with respect to the unreasonableness of this forum, let alone a compelling case that "traditional notions of fair play and substantial justice" would be offended. The court concluded that the reasonableness requirement is met. *See* Order and Reasons dated October 6, 2006 [Rec. Doc. No. 51].

**\*3** Plaintiffs' Motions for Class Certification and for Preliminary Certification of Collective Action [FN2] have been fully briefed and are submitted for determination without oral hearing.[FN3] The Court notes that defendants have not opposed "provisional certification to proceed as a collective action" at this initial stage of the proceeding under the two-tiered process outlined in *Hipp v. Liberty National Liberty National Insurance Co.*, 252 F.3d 1208, 1214 (11th Cir.2001), noting the lenient preliminary standard outlined in *Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1212 (5th Cir.1995). [FN4] Defendants did, however, request that the district court prescribe the notice to be sent to the putative class, *i.e.*, court-authorized notice as opposed to notice sent by a party, noting that the description of the lawsuit must be neutral and balanced.[FN5] Defendants further responded that they would timely furnish the requested names, last known addresses and telephone numbers (where available) of members of the putative class, "so long as the means by which the putative class members are contacted is through Court-authorized notice consistent with the examples attached to its Memorandum in Response.[FN6]

> FN2. *See* Plaintiffs' Motion for Certification of Class Action filed pursuant to Fed.R.Civ.P. 23(b)(3) [Rec. Doc. No. 22]; Plaintiffs' Motion for Preliminary Certification of Collective Action and For Disclosure of Names, Addresses and Telephone Numbers of Potential Opt-in Plaintiffs [Rec. Doc. No. 47].

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                  Page 3
Not Reported in F.Supp.2d, 2006 WL 197030 (E.D.La.)
(Cite as: Not Reported in F.Supp.2d)

FN3. *See* Defendants' Response to Defendants' Response to Plaintiffs' Motion for Certification of Collective Action [Rec. Doc. No. 57]; Plaintiffs' Reply in Support of Motion for Preliminary Certification of Collective Action [Rec. Doc. No. 58]; Defendants' Opposition to Motion for Certification of Class [Rec. Doc. No. 70]; Plaintiffs' Reply in Support of Class Certification [Rec. Doc. No. 76]; Order dated October 25, 2005 (stating that Plaintiff's Motion for Class Action shall be taken under advisement) [Rec. Doc. No. 63].

FN4. *See* Defendants' Response to Plaintiffs' Motion for Certification of Collective Action at p. 2.

FN5. *Id.* at pp. 3-9.

FN6. *Id.* at p. 9.

## PARTIES' POSITIONS AND THE EVIDENCE

*Via* motion filed September 30, 2005, plaintiffs ask the Court for extraordinary relief in the form of a protective order. They allege that they have been harassed by named and unnamed individuals, who have visited the homes and family members of named plaintiffs, opt-in plaintiffs, potential plaintiffs and their families in Guatemala. Plaintiffs contend that defendants have virtually unlimited access to putative class members, through continuing employer-employee relationships and their sole possession of class members' home addresses and telephone numbers. Plaintiffs argue that existing case law supports their position and that the circumstances of these face-to-face visits for purposes of discussing the instant lawsuit, inter alia, counsel in favor of issuance of a protective order where, as here, the defendants have engaged in coercive and improper conduct. Plaintiffs' position is that clearly, under the circumstances, a protective order is necessary to preserve the integrity of proceedings under Rule 23.

In this regard, plaintiffs contend that, in the week preceding the filing of the motion for protective orders, defendants launched an organized campaign designed to frighten, coerce and intimidate plaintiffs into withdrawing their claims. Plaintiffs contend that these individuals are agents of defendants, Express Forestry and the Thomases, and that the personal visits to the plaintiffs' and their families' homes were conducted for the purpose of coercing, threatening

and/or attempting to bribe named and/or opt-in plaintiffs to withdraw from this lawsuit.

Plaintiff/Putative Class Representative, Hugo Martin Recinos-Recinos ("Hugo"), contends that a delegation of seven individuals, including the defendants' agent/manager Leo Salazar together with Celestino Diaz (an Express Forestry recruiter) and other Express Forestry workers/crew foremen, confronted his wife, Maria Jiminez-Hernandez de Recinos ("Maria") and his sister, Amparo Maria Recinos-Recinos ("Amparo"), seeking contact information on Hugo and attempting to bribe Maria by offering more than $6,600.00 (50,000 quetzales) in return for Hugo's withdrawal from the captioned case. Maria was instructed to communicate the offer to her husband.

**\*4** Both Maria and Amparo testified consistently with their affidavits FN7 that one of the men was of Mexican descent and identified himself as Leo Salazar (Defendants' manager); both testified that they recognized Celestino Diaz, a former Express Forestry worker, who had previously accompanied Hugo to work in the United States for Express Forestry.

FN7. *See* Affidavit of Maria Jimenez-Hernandez de Recinos [Plaintiffs' Exhibit 1]; Affidavit of Amparo Maria Recinos-Recinos [Plaintiffs' Exhibit 2].

According to Amparo Recinos-Recinos, the band of seven men were escorted to their house by Celestino Diaz and made two visits to her father's home in Santiago Petatan on the morning of Friday, September 16, 2005. The first visit was at 8:00 a.m. and the group of seven individuals escorted by Diaz returned at 8:30 a.m. when Hugo's wife, Maria, was present. Both Maria and Ampara testified that the men attempted to confirm Hugo's telephone number and to determine his present address, which they both refused to divulge. Maria further testified that individuals indicated that Hugo's lawsuit posed a problem insofar as their employability in the United States was concerned and that his continued participation in the captioned lawsuit could result in family members being deported, jailed or even killed.

Plaintiff contends that the defendant's agent allegedly directed Rudy Morales to make house visits in the Guatemalan town of Palmira Vieja on behalf of Express Forestry and Rick Thomas in an attempt to coerce opt-in plaintiffs to withdraw their claims from

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 4
Not Reported in F.Supp.2d, 2006 WL 197030 (E.D.La.)
(Cite as: Not Reported in F.Supp.2d)

the instant lawsuit. Affidavits submitted on behalf of the plaintiffs state that Morales offered movants and opt-in plaintiffs H-2B visas for future work and money in exchange for withdrawing their claims. Plaintiffs submit that these unlawful activities threaten severe harm by interfering with this Court's ability and duty to determine the truth and merits of the claims asserted in the captioned class/collective action lawsuit.

Supplemental affidavits were submitted by Hugo's father, Pedro Recinos-Hernandez ("Pedro") and one of the plaintiffs in this lawsuit, Milder Ronaldo Velasquez-Diaz ("Milder"). Pedro attests that, at the end of October 2005, he was summoned to the municipality of Santiago Petatan, Concepcion Huista, Huehuetenango, Guatemala and confronted by a group of 7 young people. He recognized Celestino Diaz, a man who had been to the United States with Hugo to work for the forestry company. The men requested Hugo's number and explained the problems he had created.[FN8]

> FN8. *See* Affidavit of Pedro Recinos-Hernandez dated November 18, 2005 (tendered to the Court as evidence at the November 30, 2005 hearing).

Milder stated that Morales advised him to quit the lawsuit so that he could take advantage of the opportunity to work for Express Forestry during to the 2005-2006 planting season.[FN9] Additionally, three Opt-in Plaintiffs, Leonel Hernandez-Lopez, Domingo Aguilar and Enrique Hernandez-Lopez, submitted affidavits [Plaintiffs' Exhibits 3-5], recounting the details of September 23, 2005 house visits made by Express Forestry recruiter/contractor, Rudy Ramirez-Morales, in the remote Guatemalan town of Palmira Vieja. All three were guaranteed work with Express Forestry if they withdrew from the lawsuit and offered money in exchange for written withdrawal from this lawsuit. *See* Plaintiffs' Exhibits 3-5.

> FN9. *See* Second Affidavit of Milder Ronaldo Velasquez-Diaz dated November 20, 2005 (tendered to the Court as evidence at the November 30, 2005 hearing)

**\*5** Movants seek sanctions and a protective order directed to the defendants that:
(1) enjoins and restrains any communications with Plaintiffs and Plaintiffs' family members, except as conducted through the Court, Plaintiffs' counsel or

the formal discovery process from the present to the end of the trial;
(2) enjoins and restrains all communications related to the lawsuit with Movants (including putative class members), except as conducted through the Court, Plaintiffs' counsel or the formal discovery process from the present to the end of the trial;
(3) enjoins and restrains any inquiry, discovery or investigation of Movants and/or Movants' family members' past or present immigration status in the United States, other than questions related to the status of individual Movants during each individual's time spent actually working for the Defendants; and
(4) enjoins or restrains any reporting or other efforts to have Movants or Movants' family members arrested, detained, jailed or deported from the United States.

Defendants deny that they or any agent of theirs has engaged in any prohibited conduct and submit declarations to that effect. Defendants' position is that there is no justification for a protective order because no prohibited conduct has been engaged in by any Defendant or by any agent of Defendants. Through declarations of Rick Thomas, Sandy Thomas and Leo Salazar (Defendants' Exhibits 1-3), defendants deny they have not engaged in or directed any of the inappropriate conduct which is the subject of plaintiffs' motion for protection.

Addressing plaintiffs' demand that defendants be prohibited from inquiring into the employment history of potential class members at any time other than when those individuals were working for Express Forestry, defendants submit that they have not inquired into the "immigration status" of any of the plaintiffs but do seek information as to the work history because this is relevant to the issue of damages, *inter alia.* Defendants agree to forego such inquiries, but only if the plaintiffs agree to dismiss all of their reimbursement claims for travel, visa processing and recruitment expenses. Defendants point out that plaintiffs' argument is that these expenses must be reimbursed because they were brought to the United States "primarily for the benefit of the employer." Defendants deny that the law requires such reimbursement and further argue that, if, in fact, plaintiffs have taken advantage of their presence in the United States to work for other employers, then travel is primarily for plaintiffs' benefit and not defendants. Defendants submit that the plaintiffs have directly placed in issue whether they have worked for employers in the United States, other than defendants after their visas expired, and

Not Reported in F.Supp.2d                                                                                    Page 5
Not Reported in F.Supp.2d, 2006 WL 197030 (E.D.La.)
(Cite as: Not Reported in F.Supp.2d)

that work history is relevant to the issue of whether recruitment, visa processing and transportation costs should be reimbursed as expenses incurred "primarily for the benefit of the employer." In sum, defendants argue that the plaintiff's post-visa work history is relevant because the plaintiffs have made it an issue in the case.[FN10]

> FN10. *See Galaviz-Zamora v. Brady Farms, Inc.,* 230 F.R.D. 499 (W.D.Mi.2005) ("defendants are entitled to discover information regarding plaintiffs' work history"); *Topo v. Dhir,* 210 F.R.D. 76, 78 (S.D.N.Y.2002) ("Where plaintiff's immigration status is relevant to prove a material aspect of the defense, a protective order is not appropriate"); *Liu v. Donna Karan Int., Inc.,* 207 F.Supp.2d 1919, 193 (S.D.N.Y.2002) (only when immigration status is not relevant, would such an inquiry present a "danger of intimidation [that] would inhibit plaintiffs in pursuing their rights.").

**\*6** Defendants contend that plaintiff's reliance on *Arriaga v. Florida Pacific Farms, LLC,* 305 F.3d 1228, 1242 (11th Cir.2002) is misplaced. Defendants note that in *Arriaga,* the Eleventh Circuit dealt with the H-2A visa program and not the H-2B program at issue in this case. Under the regulations applicable to H-2A visas, an employer must pay an H-2A worker for inbound transportation and subsistence costs, if the worker completes 50% of the contract work period, unless the employer has previously done so. *See* 20 C.F.R. § 655.102(b)(5)(1). Defendant argues that the *Arriaga* court recognized the significance of whether the plaintiffs work for other employers because the regulations stipulate that when a plaintiff works for employers other than the visa-sponsoring employer, the sponsoring employer is only responsible for a *pro rata* share of travel expenses.[FN11]

> FN11. *See Arriaga,* 306 F.3d at 1232, n. 4 (noting that the rules are different when the H-2A worker has contracted employment with a subsequent employer); 20 C.F.R. § 655.102(b)(5)(ii).

Without further explanation, defendants argue that an indeterminate group of individuals apparently took it upon themselves to visit certain named and opt-in plaintiffs and/or their family members to try and talk them out of conduct (*i.e.,* prosecuting this lawsuit), which they believe is not in their community's best interest. Defendants urge the Court to refrain from entering any protective order, arguing that it would be a vain and useless effort because it would only restrain Defendants and their agents and not the independent individuals who have contacted and are attempting to contact plaintiffs, opt-in plaintiffs and their family members. Defendants' are concerned with the prospect that plaintiffs may seek to hold defendants liable for improprieties committed by independent individuals in the future.

Defendants submit that the cases cited by plaintiffs are inapposite, to wit: (1) *Gulf Oil Co. v. Bernard,* 452 U.S. 89, 1010, 101 S.Ct. 2193, 68 L.Ed.2d 693 (1981); (2) *Kleiner v. First National Bank of Atlanta,* 751 F.2d 1193 (11th Cir.1985); (3) *Hampton Hardware v. Cotter,* 156 F.R.D. 630 (N.D.Tex.1994); and (4) *Burrell v. Crown Central Petroleum Co.,* 176 F.R.D. 239 (E.D.Tex.1997). Defendants attempt to distinguish these cases on the basis that they involved concrete undisputed evidence necessary to support the issuance of a protective order, whereas here there are simply competing uncorroborated affidavits. In this regard, defendants highlight that plaintiffs' evidence is comprised of oral testimony detailing oral threats or promises made by an *indeterminate group of people*, only one of whom (Leo Salazar) was purportedly an employee or in a contractual relationship with defendants.

Leo Salazar, an Express Forestry foreman of Mexican descent, admits being in Guatemala on the dates in question but categorically denies the visits and the conversations with putative class members and their families. He further denies that he made any promises or threats. The Court notes that the defendants did not produce Salazar to testify at the hearing, leaving some question as to whether or not he was one of the seven men that visited Maria and Amparo on September 16, 2005. Most notably, the defendants dispatched Salazar to Guatemala on September 15, 2005 to address potential seasonal workers, some of whom were undoubtedly putative class plaintiffs, for the express purpose of discussing the subject pending collective and putative class action litigation and to present Express Forestry's view. Nevertheless, defendants did not see fit to produce Leo Salazar in person to testify live at a midday, midweek, two hour hearing in the United States.

**\*7** The Court notes that Leo Salazar's affidavit simply states his opinion, i.e., that he (Leo Salazar)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 197030 (E.D.La.)
(Cite as: Not Reported in F.Supp.2d)

did not threaten or coerce the workers he spoke to in Guatemala in mid-September 2005. Salazar does not say exactly what he, as a representative of the defendants, did in fact say about the captioned litigation. Additionally, neither of the Thomases indicate *via* affidavit testimony whether Salazar was given any precise instructions regarding what to say and what not to say. Apparently, Salazar was given free rein to discuss whatever questions the seasonal Guatemalan worker had regarding the litigation with potential putative class plaintiffs and how it would impact their prospects for employment with Express Forestry in the United States. It is important to note that Leo Salazar by all accounts is simply a manager and not an attorney.

Addressing plaintiff's motion seeking production of a list of all potential class members, defendants submit that such discovery should be delayed until after the Court rules on the pending Class/Collective Action Certification Motions. Defendants refer the Court to *Abdallah v. Coca-Cola,* 186 F.R.D. 672, 677 (N.D.Ga.1999) and argue that the *Abdallah* plaintiffs must cease and desist from contacting potential class members in an effort to woo them to join the lawsuit. *See Abdallah v. Coca-Cola,* 186 F.R.D. 672, 677 (N.D.Ga.1999).

Defendants note that, in addition to the class action, plaintiffs are pursuing a collective action under FLSA § 216(b). Plaintiffs have already addressed their request for the names/addresses of potential plaintiffs to the district judge, arguing that such is necessary to solicit opt-in plaintiffs for purposes of the FLSA collective action. Defendants submit that is a more efficient use of resources to deny such discovery until the Court has determined the merits of plaintiffs' motion for preliminary certification of a collective action. Defendants further suggest the probability that many of the records sought do not exist. Defendants explained that Hurricane Katrina demolished a house in Ocean Springs, Mississippi owned by the Thomases, which was where Express Forestry's business records were stored.

The Court finds that the plaintiffs produced competent evidence consisting of eleven witnesses' affidavits and live testimony to establish that a campaign designed to threaten, intimidate and coerce plaintiffs, opt-in plaintiffs and potential class members to capitulate and withdraw their pending claims was in fact perpetrated. Through no fault of the plaintiffs, it is not as clear that it was perpetrated or instigated by the defendants' agent Leo Salazar. Indeed, defendants do not deny that the intimidation

occurred, as they are in no position to do so. They do, however, admit that their manager, Leo Salazar, traveled to Guatemala to speak with putative class members (*i.e.,* persons who are impoverished and particularly vulnerable to economic threats) about the pending litigation the day before the campaign commenced. Plaintiffs correctly note that the basic facts of the campaign of intimidation are not contested, the question is whether it was sponsored, instigated or sparked by Salazar in Guatemala.

**\*8** The weight of evidence balances in favor of finding that some of the coercive conduct at issue was actually undertaken by "seasonal workers," which may well have been influenced by Leo Salazar's communications in Guatemala. The perpetrators of the campaign were either "seasonal workers" or prospective workers who are economically dependent upon Express Forestry for lucrative "tree-planting" work available in the United States annually. A protective order is necessary to halt any improper communications and to diffuse the atmosphere of threats and coercion so as to allow the orderly progress of this litigation.

ANALYSIS

1. The Applicable Standard

Fed.R.Civ.P. 26(c) provides that, upon motion by a party and for good cause shown, the court in which the action is pending may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following: (1) that the disclosure or discovery not be had; (2) that the disclosure or discovery may be had only on specified terms and conditions, including a designation of the time or place; and (3) that the discovery may be had only by a method of discovery other than that selected by the party seeking discovery.[FN12]

FN12. *See* Fed.R.Civ.P. 26(c).

If the motion for a protective order is denied in whole or in part, the court may, on such terms and conditions as are just, order that any party or other person provide or permit discovery. The provisions of Rule 37(a)(4) apply to the award of expenses incurred in relation to the motion. "Rule 26(c)'s requirement of a showing of good cause to support

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 197030 (E.D.La.)
(Cite as: Not Reported in F.Supp.2d)

the issuance of a protective order indicates that the burden is upon the movant to show the necessity of its issuance, which contemplates a particular and specific demonstration of fact as distinguished from stereotyped and conclusory statements." [FN13]

> FN13. *In re Terra Int'l, Inc.*, 134 F.3d 302, 306 (5th Cir.1998) (quotation omitted).

2. Defendants' Unilateral Contact with Potential Class Members and Plaintiffs

This case is a "collective action" under the Fair Labor Standards Act ("FLSA") as well as a proposed class action pursuant to Federal Rule of Civil Procedure 23. Plaintiffs seek to represent a class of non-supervisory workers admitted as H-2B foreign workers pursuant to 8 U.S.C. 1101(a)(15)(H)(ii)(b), who were employed by defendants between April 6, 2002 and the present. [FN14] A collective action, like a class action, prevents piecemeal litigation, inconsistent adjudications and difficult *res judicata* questions. A critical difference between a § 216(b) collective action and a Rule 23 class action is that the former requires each class member to opt in as party plaintiff upon receiving notice in order to participate in any recovery or be bound by the judgment, but the latter (Rule 23 class action) includes all absent class members who do not affirmatively opt out. [FN15]

> FN14. Plaintiff's Complaint filed April 7, 2005 at ¶ 1 [Rec. Doc. No. 1].

> FN15. *See Baldridge v. SBC Communications, Inc.*, 404 F.3d 930, 932 n. 6 (5th Cir.2005).

In spite of its own arguments against one party having unreviewed contact with absent class members, [FN16] defendants authorized unilateral contact with potential class members by its agent Leo Salazar for the express purpose of discussing the pending litigation. The undisclosed specific content of Salazar's communications/speech to potential class members is unquestionably speech of a commercial nature. Commercial speech merits constitutional safeguards only to the extent that it is accurate, in keeping with its purpose of insuring the free flow of reliable information crucial to independent decision making. Accordingly, no constitutional objection inheres in banning "forms of [commercial] communications more likely to deceive the public than to inform it." [FN17]

> FN16. *See* Defendants' Response to Plaintiff's Motion for Preliminary Certification of Collective Action, at pp. 3-9.

> FN17. *Central Hudson Gas Co. v. Public Service Commission,* 447 U.S. 557, 563, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980).

*9 It is important to note that defendants in this case rely heavily on *Gulf Oil Co. v. Bernard* 452 U.S. 89, 101 S.Ct. 2193, 68 L.Ed.2d 693 (1981) and suggest that the prior restraint strictures announced by the *en banc* court apply with equal force to this commercial case. As explained below, the defendants' position ignores the distinctions between pure and commercial speech. A fair assessment of the defendants' position requires a thorough examination of the *Gulf Oil* case, which was spawned from a set of successive race discrimination claims lodged by black employees of the Port Arthur, Texas Gulf Oil plant. [FN18]

> FN18. *See Kleiner v. First National Bank of Atlanta,* 751 F.2d 1193, 1206 (11th Cir.1985) (a commercial speech case).

In *Gulf Oil,* an initial EEOC proceeding culminated in a conciliation agreement providing for back pay. Dissatisfied with the resolution reached by the EEOC, plaintiffs, represented by local counsel in affiliation with the NAACP Legal Defense and Education Fund, filed a class action against Gulf alleging race discrimination. Before the date of class certification, Gulf requested an order limiting communications by plaintiffs and their counsel with actual or potential class members. The company testified that counsel for plaintiffs had advised potential class members that they stood to double their recovery by refusing to sign releases in favor of Gulf under the conciliation agreement. Without corroborating Gulf's unsworn allegations or specifying findings of fact, the trial court entered an order barring parties and counsel from contacting the plaintiff class without advance approval. The disputed order was patterned after a model order contained in the *Manual for Complex Litigation,* pt. II, § 1.41 (1973 ed.). [FN19]

> FN19. *See Gulf Oil,* 619 F.2d at 463-64.

On review, a panel of the former Fifth Circuit

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                    Page 8
Not Reported in F.Supp.2d, 2006 WL 197030 (E.D.La.)
(Cite as: Not Reported in F.Supp.2d)

affirmed the district court, but that panel decision was vacated by the court *en banc.* The *en banc* court reversed the district court on First Amendment grounds, holding that the attempted solicitations constituted protected speech, non-commercial political expression [FN20] which called "into play the full panoply of First Amendment safeguards against prior restraint." [FN21] The *en banc* court refused to effect the order as an unconstitutional prior restraint. The disputed order was constitutionally deficient because (1) the suppressed expression posed no certain threat of direct, immediate and irreparable harm, (2) the order was not narrowly drawn and limited to the least restrictive means of regulation and (3) it lacked predicate findings of particular abuses . [FN22]

FN20. The *Gulf Oil* case qualified as protected political expression under *NAACP v. Button,* 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963) and *In re Primus,* 436 U.S. 412, 98 S.Ct. 1893, 56 L.Ed.2d 417 (1978), because counsel for the plaintiffs had no direct financial stake in the case and because the case was a vehicle for expressing the political beliefs of the NAACP. *See Gulf Oil,* 619 F.2d at 472-73.

FN21. *Id.* at 473.

FN22. *Id.* at 473-477.

On review, the Supreme Court affirmed the *en banc* court. [FN23] Resolving the case on statutory grounds to avoid the First Amendment question, the Supreme Court concluded that the contested order thwarted the named plaintiff's ability to form a class and prosecute a class action, in violation of Rule 23. [FN24] The Court held that under Rule 23, orders barring plaintiff contacts with members of the plaintiff class "should be based upon a clear record and specific findings that reflect a weighing of the need for limitation and the potential interference with the rights of parties ." [FN25] In short, *Gulf Oil* was a classic case of noncommercial speech which directly implicated the doctrine of prior restraint.

FN23. *Gulf Oil Co. v. Bernard,* 452 U.S. 89, 101 S.Ct. 2193, 68 L.Ed.2d 693 (1981).

FN24. *Id.*

FN25. *Id.* at 101.

**\*10** Unlike *Gulf Oil,* the issue in this class/collective action case is defendants' commercial speech (*i.e.,* that of Leo Salazar's) to seasonal workers/potential class plaintiffs about the ongoing captioned litigation. Defendants' agent (Leo Salazar) has categorically denied directly contacting opt-in plaintiff (Milder Ronaldo Velazquez-Diaz) and further denied any attempt to convince or coerce or bribe him or any other putative class plaintiff to withdraw from the lawsuit in exchange for a visa/employment. However, Salazar admitted that on September 15, 2005, he traveled to Guatemala on behalf of Express Forestry for the express purpose of speaking to former employees/potential plaintiffs about the litigation that had been filed and to answer any questions that they might have. As plaintiffs' aptly point out, this is problematic because his audience consisted of indigent "seasonal employees" and potential class members dependent on Express Forestry for "seasonal work" in the United States. It is noteworthy that Express Forestry dispatched Salazar to Guatemala on September 15, 2005, which is the day before the threatening conduct allegedly commenced and approximately a month and a half before defendants expected to commence business with the necessary compliment of H-2B workers transported and ready to work for Express Forestry.

Contrary to defendants' argument, the undersigned finds that the *Kleiner* decision, a commercial speech case, is instructive rather than inapposite. In *Kleiner v. First National Bank of Atlanta,* 751 F.2d 1193, 1206 (11th Cir.1985) the Court observed:
It is unnecessary for a trial court to issue particularized findings of abusive conduct when a given form of speech is inherently conducive to overreaching and duress. The Supreme Court has acknowledged that unsupervised oral solicitations, by their very nature, are wont to produce distorted statements on the one hand and the coercion of susceptible individuals on the other:
[I]n-person solicitation may exert pressure and often demands an immediate response, without providing an opportunity for comparison or reflection. The aim and effect of in-person solicitation may be to provide a one-sided presentation and to encourage speedy and perhaps uninformed decision-making; there is no opportunity for intervention or counter-education.... [FN26]

FN26. *Id.* (citing *Ohralik v. Ohio State Bar Ass'n,* 436 U.S. 447, 457 (1978).

Not Reported in F.Supp.2d                                                    Page 9
Not Reported in F.Supp.2d, 2006 WL 197030 (E.D.La.)
(Cite as: Not Reported in F.Supp.2d)

The *Kleiner* court further observed that:

In the realm of litigation, a fair and just result often presupposes restraints on the speech of parties. *Seattle Times Co. v. Rhinehart,* 467 U.S. 20, 104 S.Ct. 2199, 2207 n. 18, 81 L.Ed.2d 17 (1984). Inroads on the principle forbidding the solicitation of exclusion requests in 23(b)(3) class actions could spell the ultimate extinction of that form of relief. Given the inherent coercion conveyed by the Bank's covert campaign,[FN27] we agree that the district court possessed the authority to regulate such contacts without the predicate record and findings required by *Bernard.*[FN28]

FN27. A telephone campaign conducted by the Bank left the court and counsel powerless to corroborate the supposedly innocent content of the conversations. The *Kleiner* court found the Bank's claims of innocence suspect because the briefing materials used to answer customer questions insinuated reprisals and distortions of fact. The court noted that the Bank's top management and counsel knew that by verbally providing information to customer's through defendant's employees there was high likelihood that the facts would become skewed in the transmission. This likelihood was further heightened by the Bank's election to use a non-lawyer, who had little familiarity with the case, but good persuasive skills, to make the primary presentation to those who would be contacting absent class members. Additionally, the loan officers who made the telephone calls were the ones who controlled the customer's line of credit, and their on-the-spot entreaties pressured the listener to reach an immediate decision to comply before hearing the opposite view. The usual cure for false speech is more speech, but in the *Kleiner,* the Bank left no time for more speech before the party opted out.

FN28. *Id.*

**\*11** The *Kleiner* court agreed that the district court had the power to regulate such contacts and noted that the trial court's order was narrowly drawn to avoid suppressing utterances worthy of first amendment protection. As a directive addressed to counsel for the Bank, the ambit of the order was restricted to communications regarding the litigation and thus did not impinge on the Bank's ability to speak with customers about routine business matters unrelated to the lawsuit.

In *Kleiner,* the class consisted of Bank borrowers, many of whom were dependent on the Bank for future financing. Not unlike *Kleiner,* the Recinos-Recinos class consists of indigent H-2B seasonal employees who are dependent upon Express Forestry for lucrative planting work in the United States annually. Not unlike the Bank in *Kleiner,* defendants authorized their representative Leo Salazar to travel to Guatemala for the express purpose of discussing the pending captioned collective/class action litigation. This the defendants have admitted. It also is important to note that Leo Salazar simply denies the plaintiff's accusations regarding coercion/bribery/threats; however, his affidavit does not reveal the specific substance of his conversations with various potential class action plaintiffs and/or their family members about the pending litigation. Defendants have not revealed the substance of the questions addressed to defendants nor Salazar's precise answers, whether scripted or unscripted. Most notably, the defendants have not provided the Court with any briefing materials utilized by Salazar to answer potential class plaintiffs' questions about the litigation. As aforestated, Salazar is a manager in the defendants' business, unschooled in the permutations of the applicable law and hardly in a position to judge whether his face-to-face communications were threatening and coercive. Considering what followed in the wake of Salazar's address, the Court can only find that such contact generated distorted statements and undue pressure, without allowing any opportunity for intervention or counter-education.

It is unnecessary for this Court to determine as a matter of fact whether Salazar was one of the seven individuals who descended upon Pedro Recinos' home on September 16, 2005 at 8:00 a.m. and then again at 8:30 a.m. Direct unilateral contact by Salazar (Defendants' agent) about the pending litigation and defendants' failure to divulge the precise contents of Salazar's representations on behalf of the company provide sufficient justification. In this regard, the Court highlights the response that the undisclosed representations apparently evoked from the potential/seasonal workers.

The undersigned Magistrate Judge finds that plaintiffs have made the requisite showing necessary for the issuance of a protective order restraining the defendants from contacting plaintiffs, opt-in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 197030 (E.D.La.)
(Cite as: Not Reported in F.Supp.2d)

plaintiffs, potential class plaintiffs and their families outside of the bounds of formal discovery *for the purpose of discussing the captioned litigation* pending issuance of the district judge's rulings on plaintiff's motions for Rule 23 certification, for preliminary certification and for notice.

**\*12** Defendants' agent Salazar has admittedly engaged in the now-proscribed conduct and plaintiffs, opt-in plaintiffs and potential class plaintiff's should be protected from these communications for the very same reasons set forth by the court in *Kleiner.* That court acknowledged, as did the Supreme Court, that unsupervised oral solicitations, by their very nature, are wont to produce distorted statements on the one hand and the coercion of susceptible individuals on the other. Moreover, in-person communications such as occurred in the present case may exert pressure and often demands an immediate response, without providing an opportunity for comparison or reflection. Clearly, the aim and effect of such in-person communication is to provide a one-sided presentation and to encourage speedy and perhaps uninformed decision-making, providing no opportunity for intervention or counter-education. The *Kleiner* court noted that, "[i]n general, an order limiting communications regarding ongoing litigation between a class and class opponents will satisfy first amendment concerns if it is grounded in good cause and issued with 'heightened sensitivity' for first amendment concerns."[FN29]

> [FN29.] *Kleiner,* 751 F.2d at 1205. *See also Abdallah v. Coca-Cola Company,* 186 F.R.D. 672, 678 (N.D.Ga.1999) (noting that, even though Coca-Cola had not given the court any reason to suspect that it will attempt to mislead its employees and coerce them into non-participation, simple reality suggests that the danger of coercion is real and justifies imposition of limitations on Coca-Cola's communications with potential class members, regardless of whether communications occur before or after class certification, the effect is still the same).

In the present case, the court recognizes that an ongoing business relationship between the defendants and the plaintiffs and potential plaintiffs may cause communications to be coercive. Where, as here, there is a relationship that is inherently coercive, the court need not make a finding that a particular abuse occurred. Here, the plaintiffs have provided the Court with sufficient evidence to show that defendants'

communications with plaintiffs and potential plaintiff's about this litigation undermine the purposes of Rule 23. It is difficult to conceive of any advice from Salazar (defendants' agent) regarding the lawsuit that is not rife with the potential for confusion and abuse given defendants interest in this lawsuit. The evidence suggests that a potential for serious abuse exists.

Accordingly, Plaintiff's Motion for Protective Order is GRANTED IN PART in that the defendants and their agents shall refrain from contacting plaintiffs, opt-in plaintiffs, potential class plaintiffs and their families outside of the bounds of formal discovery *for the purpose of discussing the captioned litigation* pending the issuance of the district judge's rulings on plaintiff's motions for Rule 23(b)(2) certification, for preliminary certification of a collective action and for issuance of notice.

### 3. Release of Contact Information Regarding Potential Plaintiffs for the Purpose of Providing Information Concerning their Rights under the FLSA AND AWPA.

The Court is convinced that such discovery sought by the plaintiffs should await the district court's ruling on the pending motions for certification of the class and/or collective action. As to corrective notice, plaintiff submits that it is necessary because the potential class consists largely of impoverished Guatemalan migrant workers who lack familiarity with their rights and the legal system. Plaintiffs argue that the notice would advise potential plaintiffs of their right to participate, of legal protections against retaliation and how to contact plaintiffs' counsel to ask about the pending lawsuit.

**\*13** "Corrective notice" has apparently already taken place insofar as the legion of affiants in favor of the plaintiffs are concerned. It is far from clear that any further "corrective notice," in addition to the notice which will issue in connection with preliminary certification, is necessary. The Court highlights the fact that the plaintiff's motion for preliminary certification of collection action is fully briefed and pending determination by the district judge. In connection with the motion for preliminary certification, plaintiff seeks production of the names, addresses and telephone numbers of all potential opt-in plaintiffs for the purpose of distribution of the proposed notice to potential opt-in plaintiffs.[FN30]

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 11
Not Reported in F.Supp.2d, 2006 WL 197030 (E.D.La.)
**(Cite as: Not Reported in F.Supp.2d)**

FN30. *See* Plaintiffs' Motion for Preliminary Certification of a Collective Action and for Disclosure of the Names Addresses and Telephone Numbers of Potential Opt-In Plaintiffs at p. 4 [Rec. Doc. No. 29].

The same discovery sought at this juncture of the proceedings is premature and should await the ruling on preliminary certification by the district judge. *See Abdallah v. Coca-Cola Company*, 186 F.R.D. 672 (N.D.Ga.1999). In *Abdallah*, the court observed that, while it could not say that orders authorizing communication with potential class members may never precede class certification, district courts must strive to avoid authorizing injurious class communication that might later prove unnecessary. Considering that the motions for Rule 23 certification and preliminary certification are presently under submission and a ruling is imminent, the undersigned Magistrate Judge is simply not convinced that there is any need for corrective notice at this juncture of the proceedings. Corrective notice will issue in due course pursuant to the district judge's ruling on the *un* contested motion for preliminary certification.

4. Reporting, Investigating or Engaging in Efforts to have Movants and their Families Arrested, Detained, Jailed or Deported from the United States.

There is no competent evidence that these threatened activities have occurred or that the defendants, their agents or non-agent individuals have made any communications aimed at having movants and/or their families arrested, detained or jailed in the U.S. or deported from the United States. As stated in open court, a protective order in this regard is not warranted.

5. Discovery Regarding Immigration Status and Work History of Plaintiffs and Potential Plaintiffs.

Plaintiffs, opt-in plaintiffs and potential plaintiffs came to the United States on Express Forestry H-2B visas and actually worked for defendants pursuant to those visas. Defendants are entitled to the discovery of the plaintiffs and potential plaintiffs' work history for purposes of the damage computation, if nothing else.

However, contrary to the defendant's argument, the *Arriaga* case supports rather than detracts from the plaintiffs' position regarding discovery directly addressing immigration status. In *Arriaga*, domestic

agricultural employers hired non-immigrant aliens from Mexico as farm laborers to work on a seasonal basis. Laborers who passed the interview process paid for their own passage to the United States, visa costs and various recruiting fees. After deducting these expenses from wages earned, the net income fell below the statutory minimum wage. The Eleventh Circuit held that the *inbound* transportation costs were "an incident of and necessary to the employment" and that the employers must reimburse the laborers for expenses paid in coming to the employment. FN31 The Court noted that the determining factor was that the transportation costs were "an inevitable and inescapable consequence of having foreign ... workers employed in the United States." FN32 The *Arriaga* court held that inbound transportation expenses were inevitable under the program employers used to recruit and hire foreign workers and that the protections of the minimum wage provisions of the FLSA indisputably apply to farmworkers. Like the transportation expenses, visa costs were deemed primarily for the benefit of the employer because the visas restricted the workers to the work described on the clearance order. The Court noted that, by participating in the H-2A program, the Growers created the need for visa costs, which are not the type of expense permitted to pass on to the Farmworkers as 'other facilities.' " FN33

FN31. *See Arriaga v. Florida Pacific Farms, LLC*, 305 F.3d 1228, 1242 (11th Cir.2002).

FN32. *Id.*

FN33. *Id.* at 1244.

**\*14** The *rationale* employed by the *Arriaga* court is applicable to the H2-B program. Plaintiffs in this case correctly note that *Arriaga* is an FLSA case which does not hinge on any differences between the H-2A and the H-2B guestworker programs. Subsequent employment may yield relevant information on the issue of damages. However, immigration status information would only be a relevant area of inquiry if plaintiffs sought reimbursement of *outbound* transportation costs from the U.S. back to the plaintiffs' home country, rather than inbound transportation costs, which are at issue in this suit and were at issue in *Arriaga*. Plaintiffs in this case only seek to recoup *inbound* travel expenses for the trip from Guatemala to the U.S. pursuant to the H-2B visa and not *outbound* travel expenses.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 12
Not Reported in F.Supp.2d, 2006 WL 197030 (E.D.La.)
**(Cite as: Not Reported in F.Supp.2d)**

Considering the applicable law, discovery regarding subsequent employment (work history) may provide information relevant to the issue of damages; however, plaintiff's subsequent immigration status is not relevant to any claim or issue in the case. Accordingly, insofar as the plaintiffs seek a protective order prohibiting direct inquiry into their immigration status post-H-2B visa immigration status, the motion is GRANTED IN PART; however, plaintiff's subsequent work history is fair grist for discovery, since it is relevant to the issue of damages.

### 6. Sanctions

The plaintiffs have not demonstrated an egregious case warranting the imposition of sanctions at this stage of the proceedings. It should be noted that the plaintiffs only partially prevailed on their motion. However, the parties should be apprised that any violation of the protective order entered restraining the defendants from unilateral communications with plaintiffs, opt-in plaintiffs, potential plaintiffs and/or their families regarding the captioned litigation pending the district judge's rulings on Rule 23 certification, preliminary certification of the collective action and notice shall result in the issuance of sanctions.

Accordingly,

IT IS ORDERED that the plaintiff's motion for protection is GRANTED IN PART and DENIED IN PART, all as more specifically set forth above.

IT IS FURTHER ORDERED defendants and their agents shall refrain from any unilateral communications with plaintiffs, opt-in plaintiffs, potential plaintiffs and/or their families *regarding the captioned litigation* pending the district judge's rulings on plaintiff's motions for Rule 23(b)(2) certification, preliminary certification of the collective action and for the issuance notice.

New Orleans, Louisiana this *23* day of January, 2006.

E.D.La.,2006.
Recinos-Recinos v. Express Forestry, Inc.
Not Reported in F.Supp.2d, 2006 WL 197030 (E.D.La.)

Briefs and Other Related Documents (Back to top)

• 2006 WL 2032687 (Trial Pleading) First Amended Complaint - Class Action (Apr. 17, 2006) Original

Image of this Document (PDF)
• 2006 WL 645529 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Motion for Contempt, Sanctions and to Compel Responses to Plaintiffs' Discovery (Feb. 13, 2006) Original Image of this Document (PDF)
• 2005 WL 3720855 (Trial Motion, Memorandum and Affidavit) Plaintiffs' First Motion to Compel Discovery (Nov. 28, 2005) Original Image of this Document (PDF)
• 2005 WL 3720853 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Reply in Support of Certification of A Class Action (Nov. 18, 2005) Original Image of this Document (PDF)
• 2005 WL 3720850 (Trial Motion, Memorandum and Affidavit) Defendants Opposition to Plaintiffs' Motion for Certification of Class (Nov. 7, 2005) Original Image of this Document (PDF)
• 2005 WL 3162165 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Reply in Support of Motion for Preliminary Certification of Collective Action and for Disclosure of the Names, Addresses and Telephone Numbers of Potential Opt-in Plaintiffs (Oct. 18, 2005) Original Image of this Document (PDF)
• 2005 WL 3162168 (Trial Motion, Memorandum and Affidavit) Movants' Reply in Support of Motion for Emergency Protective Orders. Sanctions, Corrective Notice, Expedited Hearing, and other Appropriate Relief (Oct. 18, 2005) Original Image of this Document with Appendix (PDF)
• 2005 WL 3162170 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Opposition to Defendants' Motion to Reset Hearing on Motion for Prelmevary Certification of A Collective Action (Oct. 18, 2005) Original Image of this Document with Appendix (PDF)
• 2005 WL 3162162 (Trial Motion, Memorandum and Affidavit) Defendants' Response to Plaintiffs' Motion for Certification of Collective Action (Oct. 17, 2005) Original Image of this Document with Appendix (PDF)
• 2005 WL 3162156 (Trial Motion, Memorandum and Affidavit) Defendant's Opposition to Plaintiffs' Motion for Emergency Protective Orders, Sanctions, Corrective Notice, Expedited Hearing, and Other Appropriate Relief (Oct. 11, 2005) Original Image of this Document (PDF)
• 2005 WL 3162161 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum in Opposition to Defendants' Motion to Delay Consideration of Plaintiffs' Motion for Certification of A Class (Oct. 11, 2005) Original Image of this Document with Appendix (PDF)
• 2005 WL 3162149 (Trial Motion, Memorandum

App-116