IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| RAMON VILLANUEVA-BAZALDUA,<br>individually and on behalf of others<br>similarly situated, | ) ) ) | |
| | ) | Civil Action No.: 06-185 (GMS) |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| TRUGREEN LIMITED PARTNERS[1] and,<br>TRUGREEN, INC.[2], d/b/a TRUGREEN<br>CHEMLAWN[3], | ) ) ) ) | |
| Defendant. | ) ) | |

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S
## MOTION FOR LEAVE TO FILE A FIRST AMENDED COMPLAINT

Michael P. Kelly (Del. Bar ID #2295)
McCARTER & ENGLISH LLP
919 N. Market Street, 18th Floor
Wilmington, DE 19801
(302) 984-6300

*Admitted Pro Hac*
Michael L. Banks (Pa. I.D. #35052)
Sarah E. Bouchard (Pa. I.D. #77088)
1701 Market Street
Philadelphia, PA 19103-2921
(215) 963-5387/5077

OF COUNSEL:
MORGAN, LEWIS & BOCKIUS, LLP

Dated: May 17, 2007    Attorneys for Defendants

---

[1]    The correct legal name is TruGreen Limited Partnership.

[2]    TruGreen, Inc. was not Plaintiff's employer, and therefore, is not a proper party in this action.

[3]    TruGreen, Inc. does not do business as (d/b/a) TruGreen Chemlawn; TruGreen Limited Partnership does do business as (d/b/a) TruGreen Chemlawn.

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ...................................................................................................1

II.   ARGUMENT..........................................................................................................2

   A.   Plaintiff's Attempts To Assert A RICO Claim Against James Vacchiano
        And TruGreen And To Assert Putative Class Claims For Unjust
        Enrichment And Promissory Estoppel Are Futile As A Matter Of
        LawTruGreen Chemlawn & The H-2B Program......................................2

      1.   The most offensive of Plaintiff's proposed amendments –
           the assertion of a RICO claim, including as against an
           individual employee of TruGreen – fails for a host of reasons...................2

         a.   Plaintiff's RICO theory is undermined by the processes
              and procedures of the federal and state agencies charged
              with oversight of the H-2B visa program .......................................2

         b.   Plaintiff lacks standing to pursue this RICO claim..........................3

         c.   Plaintiff cannot, as a matter of law, demonstrate the
              requisite causation to state the RICO claim he puts
              forth in his proposed First Amended Complaint.............................4

      2.   The nature of unjust enrichment and promissory estoppel
           claims renders them inappropriate for class action treatment....................6

   B.   Even Plaintiff's Individual Promissory Estoppel And Unjust
        Enrichment Claims Should Be Denied Because Of The Undue Delay
        That Has Prejudiced TruGreen ..............................................................9

   C.   Given The Timing And Circumstances Of Plaintiff's Proposed First
        Amended Complaint, It Is Apparent That Plaintiff Has Proceeded In
        Bad Faith And With Dilatory Motive And, For That Reason, Plaintiff
        And His Counsel, Should Be Sanctioned As The Court Sees Fit.........................10

III.  CONCLUSION......................................................................................................11

ME1 6405750v.1

## TABLE OF AUTHORITIES

Page

### FEDERAL CASES

*Annulli v. Panikkar,*
    200 F.3d 189 (3d Cir. 1999).................................................................................5

*Anza v. Ideal Steel Supply Corp.,*
    126 S. Ct. 1991 (2006)....................................................................................6

*Azizi v. Thornburgh,*
    908 F.2d 1130 (2d Cir. 1990)...........................................................................4

*Bd. of Regents v. Roth,*
    408 U.S. 564 (1972)........................................................................................4

*Broussard v. Meineke Discount Muffler Shops, Inc.,*
    155 F.3d 331 (4th Cir. 1998)............................................................................7

*Cureton v NCAA,*
    252 F.3d 267 (3d Cir. 2001).............................................................................9

*Hill v. Scranton,*
    411 F.3d 118 (3d Cir. 2005).............................................................................2

*Hudson v. Delta Air Lines, Inc.,*
    90 F.3d 451 (11th Cir. 1996)...........................................................................7

*Jensen v. SIPCO, Inc.,*
    38 F.3d 945 (8th Cir. 1994).............................................................................7

*Jones v. America General Life & Accident Insurance Co.,*
    213 F.R.D. 689 (S.D. Ga. 2002) .......................................................................7

*Lake v. Arnold,*
    232 F.3d 360 (3d Cir. 2000).............................................................................2

*Polich v. Burlington Northern, Inc.,*
    116 F.R.D. 258 (D. Mont. 1987)....................................................................6, 7

*Royal Siam Corp. v. Chertoff,*
    --- F.3d ---, No. 06-1947, 2007 WL 1228792 (1st Cir. Apr. 27, 2007) .....................4

*Sprague v. General Motors Corp.,*
    133 F.3d 388 (6th Cir. 1998) ..........................................................................7

Page

*Squitieri v. Gould,*
    133 F.R.D. 25 (E.D. Pa. 1990)...................................................................................7

*United States v. Otto,*
    742 F.2d 104 (3d Cir. 1984).....................................................................................5

### STATE CASES

*Bunnion v. Consolidated Rail Co.,*
    No. Civ. A. 97-4877, 1998 WL 372644 (E.D. Pa. May 14, 1998) ...................................7

*Cooper v. Broadspire Servs., Inc.,*
    No. Civ. A. 04-5289, 2005 WL 1712390 (E.D. Pa. July 20, 2005)...................................5

*Hunter v. Diocese of Wilmington,*
    1987 WL 15555 (Del. Ch. Aug. 4, 1987) ........................................................................6

*Mendoza v. Zirkle Fruit Co.,*
    No. CS-00-3024-FVS, 2000 WL. 33225470 (E.D. Wash. Sept. 27, 2000),
    *rev'd on other grounds,* 301 F.3d 1163 (9th Cir. 2002) ...........................................5

*Total Care Physicians, P.A. v. O'Hara*, 798 A.2d 1043 (Del. Super. Ct. 2001) .............................6

### DOCKETED CASES

Toth v. Bodyonics, Ltd.,
    No. 3886 JULY TERM 2002, 2004 WL 2979750 (Pa. C.P. Nov. 30, 2004) ......................7

### FEDERAL STATUTES

20 C.F.R. § 656.40.............................................................................................................3

18 U.S.C. §§ 1341, *1343*...................................................................................................5

### MISCELLANEOUS

Restatement (Second) of Contracts, § 90.............................................................................6

## I.    **INTRODUCTION**

Plaintiff's Motion for Leave to File A First Amended Complaint ("Motion") is simply the latest effort by Plaintiff Ramon Villanueva ("Plaintiff" or "Villanueva") to frustrate the orderly proceedings of what is and what should be nothing more than a single-plaintiff case. Additionally, Plaintiff seeks to divert the resources and attention of both the Court and Defendant TruGreen Limited Partnership ("Defendant" or "TruGreen") to his misguided cause – effecting legislative change for H-2B workers through the Court. Since his Motion for Conditional Certification was denied, Plaintiff has engaged in a flurry of meritless activity, culminating in this legally and factually futile Motion. Most egregiously, Plaintiff seeks to escalate his abuse of the process by impugning TruGreen's Vice President of Human Resources and TruGreen's third-party vendors by seeking to add a claim under *RICO*, the federal anti-racketeering statute, even though such a claim by him would be futile as a matter of law both for his lack of standing and lack of proximate causation. Similarly futile are his class-based claims of promissory estoppel and unjust enrichment, for by their very nature such claims are not suitable for class treatment. At best, Plaintiff's efforts to add *individualized* claims of promissory estoppel and unjust enrichment may be warranted given the liberal standard to amend, but, given Plaintiff's deliberate decision to withhold this highly individualized alternate theory of liability until six months after Plaintiff's deposition – the same date on which he was required to leave the United States because his travel visa had expired – even this effort to amend should be denied for undue delay that necessarily will prejudice Defendant. In short, although the applicable Rule of Civil Procedure directs that leave to amend a complaint should be freely given when justice so requires, justice under *these* circumstances requires that Plaintiff's Motion be denied in its entirety.

1

## II.    **ARGUMENT**

Notwithstanding the generally liberal tone of Rule 15 of the Federal Rules of Civil Procedure, the Third Circuit has made clear that trial courts maintain significant discretion to ensure that amendments are not permitted where, as here, those amendments include claims that are (1) futile as a matter of law; (2) made with undue delay and/or in bad faith; or (3) made with dilatory motive such that the amendments will unnecessarily prejudice the defendant. See Hill v. Scranton, 411 F.3d 118, 134 (3d Cir. 2005). The Court's consideration and application of these factors to deny a motion for leave to amend under Rule 15 ultimately can be reviewed only for an abuse of discretion. See generally Lake v. Arnold, 232 F.3d 360, 373 (3d Cir. 2000). As set forth in more detail below, the Court has every reason to exercise its discretion to deny Plaintiff's Motion.

> ### A.    **Plaintiff's Attempts To Assert A RICO Claim Against James Vacchiano And TruGreen And To Assert Putative Class Claims For Unjust Enrichment And Promissory Estoppel Are Futile As A Matter Of Law.**
>
> > 1.    The most offensive of Plaintiff's proposed amendments – the assertion of a RICO claim, including as against an individual employee of TruGreen – fails for a host of reasons.

The highly offensive and completely unsubstantiated thrust of Plaintiff's RICO claim is that James Vacchiano, in his capacity of Vice President of Human Resources for TruGreen and through his work with TruGreen's experienced third-party vendors, deliberately misrepresented to the federal and local governments the applicable job codes and number of the jobs for which TruGreen was seeking H-2B visas in order to obtain a lower prevailing wage.

> > a.    Plaintiff's RICO theory is undermined by the processes and procedures of the federal and state agencies charged with oversight of the H-2B visa program.

The first fundamental and fatal flaw to his theory is clear from the face of his proposed amendments, as his purported claim misunderstands (or misrepresents) the process by which

employers obtain the opportunity to employ H-2B workers.  Foremost, neither the federal nor

state governments blindly accept job codes submitted by employers as Plaintiff suggests.  Rather,

both the State Workforce Agency ("SWA") and the Department of Labor's  certifying officer

have a duty to confirm, based on the job title and job duties submitted by the employer,[4] that the

proper job codes (and, therefore, prevailing wage) are used.  See generally 20 CFR § 656.40

(explaining how the State Workforce Agency reviews and approves employer requests for

prevailing wage determinations).  Similarly, contrary to the second premise of Plaintiff's RICO

claim, there is absolutely nothing that precludes an employer from seeking more H-2B visas than

it ultimately will use.  Indeed, the very nature of the process is that these are prospective

positions that must be requested months in advance of the anticipated start date.  Given this

timing, as well as the looming annual H-2B cap, most knowingly request more H-2B visas than

they believe, at the time, they may need.  The federal agency charged with overseeing the H-2B

program is fully aware of this practice of employers requesting and obtaining approval for more

H-2B workers than they ultimately need, as the agency knowingly approves 104,000 H-2B

workers on an annual basis notwithstanding its stated cap of 66,000 H-2B workers who actually

are permitted to work in the United States in any given year.

> b.    Plaintiff lacks standing to pursue this RICO claim.

It is similarly clear from the face of Plaintiff's proposed RICO claim that Plaintiff lacks

standing to even assert such a claim.  In order to state a RICO claim, a plaintiff must have an

---

[4]    In Paragraph 31 of Plaintiff's proposed First Amended Complaint, he makes reference to the 2004 ETA submitted by TruGreen for Newport, Delaware, suggesting that TruGreen somehow duped the SWA and DOL into using the job code (and corresponding prevailing wage) for "Landscaping and Groundskeeping Workers" (408.684.010) instead of the job code for "Pesticide Handlers, Sprayers, and Applicators" (408.684.014).  As is clear from that document (attached hereto as Exhibit A), TruGreen made abundantly clear the job title ("Lawn Care *Applicator*") and the job duties ("[a]pply pesticides, herbicides, fungicides, or insecticides, to lawns using sprayers, seeders, spreaders, aerators").

actual property interest in some benefit that allegedly was harmed or denied by the allegedly unlawful conduct. "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." Bd. of Regents v. Roth, 408 U.S. 564, 577 (1972). Plaintiff's proposed amendments make clear that the result of the alleged underlying misconduct was that TruGreen allegedly was able to obtain permission to hire H-2B employees (albeit at a lower prevailing wage rate). Plaintiff, however, has no "legitimate claim of entitlement" to any H-2B visa, regardless of what the prevailing wage rate is. As set forth above, employers obtain permission to employ H-2B workers months in advance, most often without knowledge of who the H-2B worker will be. In that abstract, Plaintiff cannot demonstrate any claim of entitlement to an H-2B visa. Cf. Azizi v. Thornburgh, 908 F.2d 1130, 1134 (2d Cir. 1990) (concluding that plaintiffs' had no right to an immigrant visa and, therefore, they did not have a property interest on which to pursue a due process claim); Royal Siam Corp. v. Chertoff, --- F.3d ---, No. 06-1947, 2007 WL 1228792, at *8 (1st Cir. Apr. 27, 2007) ("The mere fact that the agency . . . approved a specialty occupation visa petition on one occasion does not create an automatic entitlement to the approval of a subsequent petition for renewal of that visa.").[5]

> c.    Plaintiff cannot, as a matter of law, demonstrate the requisite causation to state the RICO claim he puts forth in his proposed First Amended Complaint.

To be clear, TruGreen does not concede in any way that it, Mr. Vacchiano, or any of its third-party vendors engaged in any act of mail or wire fraud in connection with the H-2B program at any time. However, even accepting Plaintiff's allegations set forth in his proposed

---

[5]    All unpublished cases cited herein are attached as Exhibit B.

First Amended Complaint as true for purposes of this Motion only, the only parties allegedly

harmed by TruGreen's alleged misconduct were the federal and state agencies and governments

who issued and approved TruGreen's application to employ H-2B workers.[6] Plaintiff concedes

as much in his proposed Amended Complaint, wherein he acknowledges that the allegedly

fraudulent forms were submitted only to federal and state agencies and solely for the purpose of

obtaining permission to employ then-unidentified H-2B workers at allegedly lower prevailing

wage rates. See Proposed First Amended Complaint, at ¶¶ 32-42 (focusing exclusively on the

harm and alleged fraud perpetuated on federal and state agencies).

Where, as here, the harm resulting from the alleged misconduct does not flow to the

Plaintiffs, a RICO claim is futile for lack of causation. See, e.g., Mendoza v. Zirkle Fruit Co.,

No. CS-00-3024-FVS, 2000 WL 33225470, at *5-6 (E.D. Wash. Sept. 27, 2000) (dismissing

RICO claim brought by agricultural workers to the extent RICO claim was based on alleged

mail fraud in connection with fraudulent submission of I-9 forms because the harm from that act

flowed to the government, not the individual employees), rev'd on other grounds, 301 F.3d 1163,

1167 no. 2 (9th Cir. 2002) (noting that plaintiffs voluntarily did not appeal district court's

decision that there can be no RICO claim predicated on allegedly sending forms falsely verifying

---

[6]     To the specific claims of mail and wire fraud, an essential element of those claims is that the
mail and wire transmissions were made "in furtherance of the purportedly fraudulent
scheme." See 18 U.S.C. §§ 1341, 1343. It is not sufficient to, as Plaintiff has done here,
make conclusory allegations that the mail and wires were used. Rather, "the Plaintiff bears
the burden of pleading that particular uses of the wires [and mail] by the Defendants were
incident to an essential element of the scheme to defraud. Here, Defendants had no choice
but to use mail and wires – these were necessary submissions to the government. These
mandatory and routine business uses of the mail and wires fall short of establishing a RICO
action. As such, there can be no finding that the purpose of using the mail or wires was part
of the scheme or that the use of the mail or wires were aimed at lulling the governmental
agencies into a false sense of security or declining action. See Cooper v. Broadspire Servs.,
Inc., No. Civ. A. 04-5289, 2005 WL 1712390, at *8 (E.D. Pa. July 20, 2005); see also
Annulli v. Panikkar, 200 F.3d 189, 201 n. 10 (3d Cir. 1999); United States v. Otto, 742 F.2d
104, 108 (3d Cir. 1984).

employment eligibility because no harm flowed to the employees). Stated another way, for claims under Section 1964(c), if the plaintiff cannot demonstrate "but for" causation and that the alleged misconduct was the "proximate cause as well" of his alleged harm, his claim must fail as a matter of law. See Anza v. Ideal Steel Supply Corp., 126 S. Ct. 1991, 1996 (2006). As in Anza, if Plaintiff is correct about Defendant's alleged fraud perpetrated on the federal and state government, those entities surely can be expected to pursue appropriate remedies, but he cannot do so for want of causation. Anza, 126 at 1997.

> 2.    The nature of unjust enrichment and promissory estoppel claims renders
>        them inappropriate for class action treatment.

By their very nature, claims of unjust enrichment and promissory estoppel require highly individualized inquiries with respect to both liability and damages and, as such, are inappropriate for class-wide treatment. As such, Plaintiff's motion for leave to amend his Complaint to include class allegations for either claim should be dismissed as futile.

In order to establish a claim for promissory estoppel, a plaintiff must show, among other things, both that a promise was made; and reliance on that promise. See, e.g., Hunter v. Diocese of Wilmington, 1987 WL 15555, at *6 (Del. Ch. Aug. 4, 1987) (citing Restatement (Second) of Contracts, § 90)). In order to establish unjust enrichment, a plaintiff must show not only an "enrichment" by one party and an "impoverishment" by the other, but also the "absence of justification." See Total Care Physicians, P.A. v. O'Hara, 798 A.2d 1043, 1056 (Del. Super. Ct. 2001). On their face, these elements can be satisfied only by a highly individualized inquiry.

Numerous courts have concluded that class certification is inappropriate because of the highly individualized inquiry necessary to such common law claims. In particular, as the court in Polich v. Burlington Northern, Inc., 116 F.R.D. 258 (D. Mont. 1987), noted when it denied the plaintiff's motion for class certification on, among other claims, promissory estoppel and fraud,

"[t]he common questions of fact and law required . . . are absent" and, although the plaintiffs were proceeding under the same general legal theories, "the success or failure of such class member's claims would depend on individual facts peculiar to his or her own situation." Polich, 116 F.R.D. at 262.[7] See also Toth v. Bodyonics, Ltd., No. 3886 JULY TERM 2002, 2004 WL 2979750, at *2 (Pa. C.P. Nov. 30, 2004) (denying motion for class certification as to unjust enrichment claims (among others)). The same is true of the relevant inquiries for promissory estoppel and unjust enrichment in this case.

The existing record evidence already demonstrates how highly individualized the necessary inquiries for promissory estoppel and unjust enrichment will be. For example, Branch Managers exercised discretion as to the amount of unconditional bonuses and in kind payments to be provided to H-2B workers upon their arrival in the United States, and Branch Managers similarly exercised discretion regarding compensation to cover return transportation for individual H-2B workers. See Declaration of James A. Vacchiano, dated May 12, 2006, at ¶ 4 (describing the variation and discretion among Branch Managers with respect to providing additional compensation to H-2B workers) (originally filed at Docket No. 18, Exhibit A);

---

[7]    See also Sprague v. General Motors Corp., 133 F.3d 388, 398 (6th Cir. 1998) ("Because of their focus on individualized proof, estoppel claims are typically inappropriate for class treatment"); Broussard v. Meineke Discount Muffler Shops, Inc., 155 F.3d 331, 341 (4th Cir. 1998) (reliance element not readily susceptible to class-wide proof); Hudson v. Delta Air Lines, Inc., 90 F.3d 451, 457 (11th Cir. 1996) (even where uniform message communicated to retirees, reliance element required highly individualized proof); Jensen v. SIPCO, Inc., 38 F.3d 945, 953 (8th Cir. 1994) ("if estoppel is an available doctrine, it must be applied with factual precision and therefore is not a suitable basis for class-wide relief); Thompson v. Community Ins. Co., 213 F.R.D. 284, 296 n.8 (S.D. Ohio 2002) ("claims of fraud and promissory estoppel are generally inappropriate for class treatment because of the need to provide individualized evidence of reliance"); Jones v. Am. Gen. Life & Accident Ins. Co., 213 F.R.D. 689, 702, 702 n.12 (S.D. Ga. 2002) (same); Bunnion v. Consol. Rail Co., No. Civ. A. 97-4877, 1998 WL 372644, at *14 (E.D. Pa. May 14, 1998) (same); Squitieri v. Gould, 133 F.R.D. 25, 28 (E.D. Pa. 1990) (same with respect to misrepresentation claims).

Deposition of Ramon Villanueva, Oct. 5, 2006 (hereinafter "Villanueva Dep."),[8] at pp. 17-18 (explaining how TruGreen paid for his return transportation and claiming that he was required to pay for "part" of those costs). Similarly, even Plaintiff conceded that the amounts he paid in rent and utilities were, in fact, less than the amounts that were stated to him prior to accepting employment. See Villanueva Dep. pp. 34-35. In addition, Plaintiff conceded that he was presented with the option to be paid pursuant to a commission plan once he arrived in the United States and that he voluntarily agreed to do so (Villanueva Dep., at pp. 57-61) – which situation may or may not be consistent among the other putative class members.

Thus, whether and to what extent an individual relied on alleged promises by TruGreen (or its third-party vendors) in deciding whether to accept employment with TruGreen, whether and to what extent an individual H-2B worker was "impoverished" by TruGreen because of its compensation methods, whether and to what extent TruGreen was justified in compensating and providing for H-2B workers as it did, and, ultimately, whether and to what extent each H-2B worker incurred any damages as a result of TruGreen's conduct necessarily require an individualized inquiry into the circumstances of each individual employee's situation and circumstances – the very type of inquiry that is entirely precluded if permitted to proceed on a class-wide basis. It would be fundamentally unfair and unjust if TruGreen were precluded from inquiring as to the essential elements of the proposed unjust enrichment and promissory estoppel claims, particularly given that the record evidence (including Plaintiff's own deposition testimony) demonstrates how individualized these inquiries must be.

---

[8]    A full copy of Plaintiff's deposition transcript was filed as Attachment: # 1 Exhibit A - Part I of II and Attachment # 2 Exhibit A - Part II of II  to Defendant's Supplemental Brief in Further Support of its Opposition to Plaintiff's Motion to Conditionally Certify a FLSA Collective Action, filed 11/3/06 at Docket No. 42.

**B.    Even Plaintiff's Individual Promissory Estoppel And Unjust Enrichment Claims Should Be Denied Because Of The Undue Delay That Has Prejudiced TruGreen.**

Defendant acknowledges that, as to Plaintiff, his claims of promissory estoppel and unjust enrichment likely are not futile and, therefore, leave reasonably may be granted to permit him to include these claims (though not on a classwide basis). However, the question of undue delay "focus[es] on the plaintiff's motives for not amending their complaint to assert this claim earlier." See Cureton v NCAA, 252 F.3d 267, 273 (3d Cir. 2001). As Plaintiff repeatedly concedes, the events and information that inform his proposed unjust enrichment and promissory estoppel claims are the same events and information that served as the basis for his initial breach of contract and related claims filed more than a year ago, in March 2006. From that premise, Plaintiff conclusorily states that TruGreen will not be prejudiced by the delayed assertion of these alternative theories of relief. However, to the contrary, it is because of Plaintiff's deliberate delay that, under the circumstances, TruGreen has been prejudiced in its defense as to these individualized claims.

Specifically, despite knowing all of the facts essential to these claims, Plaintiff delayed more than six months after his deposition to assert these claims. Under ordinary circumstances, TruGreen arguably would be able to continue Plaintiff's deposition to explore these new claims. Here, however, it is not at all clear that TruGreen will be able to continue Plaintiff's deposition without incurring significant expense because Plaintiff returned to Mexico the day immediately after his deposition, as his travel visa had expired. Given these extraordinary circumstances, even if Plaintiff's individualized claims of promissory estoppel and unjust enrichment are not futile, he should not be permitted to amend his complaint to include those claims in light of the prejudice it will cause TruGreen in its defense.

**C.     Given The Timing And Circumstances Of Plaintiff's Proposed First Amended Complaint, It Is Apparent That Plaintiff Has Proceeded In Bad Faith And With Dilatory Motive And, For That Reason, Plaintiff And His Counsel, Should Be Sanctioned As The Court Sees Fit.**

The Third Circuit has not identified specific factors that define when a plaintiff has proposed amendments to a complaint in bad faith or with dilatory motive. As such, that determination is left entirely to the discretion of the trial court in light of the specific circumstances. Here, the timing is telling of Plaintiff's bad faith and dilatory motives. Once Plaintiff's Motion for Conditional Certification was denied, Plaintiff escalated this litigation in a manner that not only ignored the procedures of this Court (through his Motion to Compel) but also escalated this litigation to a highly personal level that bears absolutely no reasonable connection to Plaintiff's original claims. One is left to assume that, upon recognizing that the heart of Plaintiff's (and his counsel's) claim was rejected, Plaintiff (and his counsel) made a conscious decision to frustrate these proceedings with a kitchen-sink approach to continuing the litigation, conjuring futile claims that arguably preserve the possibility of a nationwide class and even lengthening the applicable statute of limitations. Presumably, Plaintiff hopes to be able to propound even more class-wide discovery, continuing the blatant fishing expedition that should be avoided now that conditional certification has been denied.

Put simply, enough is enough. What started as an already improper effort to effectuate legislative change through the courts has become an even more improper effort to harass TruGreen into submission. Plaintiff's Motion does not serve any purpose but to muddy the waters, increase the cost of this litigation, and unnecessarily prolong this case. For these reasons, TruGreen asks the Court to sanction Plaintiff and his counsel in a manner it sees fit to ensure that the harassing and manipulative tactics end.

## III.    <u>CONCLUSION</u>

For all of the reasons set forth above, TruGreen respectfully requests that Plaintiff's Motion For Leave To File A First Amended Complaint be seen for what it is – an unnecessarily delayed and futile effort to frustrate this litigation – and that the Court deny the Motion in its entirety.  To the extent that the Court permits Plaintiff to amend his Complaint to include non-class-based claims of promissory estoppel and unjust enrichment, TruGreen respectfully requests that Plaintiff be ordered to appear for his deposition, at his own cost, in Delaware within a reasonable amount of time.

Respectfully submitted,

/s/ Michael P. Kelly

Michael P. Kelly (DE Bar ID #2295)
McCarter & English LLP
Citizens Bank Building
919 N. Market Street, 18th Floor
Wilmington, DE  19801
(302) 984-6301

*Admitted Pro Hac Vice*
Michael L. Banks (PA I.D. #35052)
Sarah E. Bouchard (PA I.D. #77088)
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA  19103-2921
(215) 963-5387/5077

Dated:  May 17, 2007                    Attorneys for TruGreen

## CERTIFICATE OF SERVICE

I, Michael P. Kelly, hereby certify that a true and correct copy of Defendants'

Opposition to Plaintiff's Motion for Leave to File A First Amended Complaint was served via e-

file on this 17th day of May, 2007, upon the following counsel of record:

> Vivian L. Rapposelli, Esquire
> Rapposelli & Gonzales
> 1300 Grant Ave., Suite 100
> Wilmington, DE 19806

/s/ Michael P. Kelly
Michael P. Kelly (DE Bar ID #2295)

MEI 5758839v.1

# EXHIBIT A



*Bringing seasonal labor to you. Pronto!*

October 31, 2003

*EO 901 888 366 US*

**VIA U.S. EXPRESS MAIL**
**RETURN RECEIPT REQUESTED**

Department of Labor
Division of Employment & Training
Alien Labor Certification
P.O. Box 9828
Wilmington, DE  19809-0828

      Re:    TruGreen ChemLawn (Newport)
              (14) H-2B Beneficiaries
              Form ETA 750, Part A - ORIGINAL SUBMISSION

Dear Sir or Madam:

      Enclosed please find the following documents in connection with the "Application for Alien Employment Certification for H-2B Classification" being filed by TruGreen ChemLawn:

      1. Original Form ETA 750, Part A, in duplicate; and,

      2. Original letter in support of ETA 750 from employer, in duplicate.

      We ask that you please process this matter in your usual fashion and forward recruitment instructions to us as soon as possible.  If you should have any question or concerns, please feel free to contact the undersigned.

              Sincerely,

              GREAT LAKES LABOR, LLC

              Tracy R. Drus
              President

Enclosures

**TRU03990**

Great Lakes Labor, LLC
P. O. Box 646 · Pinckney, MI  48169 · (734) 878-6818    Fax (734) 878-6852

OMB Approval No. 44-R1301

U.S. DEPARTMENT OF LABOR
Employment and Training Administration

**APPLICATION
FOR
ALIEN EMPLOYMENT CERTIFICATION**

IMPORTANT: READ CAREFULLY BEFORE COMPLETING THIS FORM
PRINT legibly in ink or use a typewriter. If you need more space to answer questions on this form, use a separate sheet. Identify each answer with the number of the corresponding question. SIGN AND DATE each sheet in original signature.

To knowingly furnish any false information in the preparation of this form and any supplement thereto or to aid, abet, or counsel another to do so is a felony punishable by $10,000 fine or 5 years in the penitentiary, or both (18 U.S.C. 1001).

**PART A. OFFER OF EMPLOYMENT**

| 1. Name of Alien (Family name in capital letter, First, Middle, Maiden) |
|---|
| (14) Unnamed H-2B Workers/Aliens |

| 2. Present Address of Alien (Number, Street, City and Town, State ZIP code or Province, Country) | 3. Type of Visa (if in U.S.) |
|---|---|
| N/A | N/A |

The following information is submitted as an offer of employment.

| 4. Name of Employer (Full name of Organization) | 5. Telephone |
|---|---|
| TruGreen Chemlawn | 302-992-9680 |

| 6. Address (Number, Street, City and Town, State ZIP code) |
|---|
| 1350 1st State Blvd. |
| Newport, DE 19804 |

| 7. Address Where Alien Will Work (if different from item 6) |
|---|
| New Castle County |

| 8. Nature of Employer's Business Activity | 9. Name of Job Title | 10. Total Hours Per Week | | 11. Work Schedule | 12. Rate of Pay | |
|---|---|---|---|---|---|---|
| | | a. Basic | b. Overtime | | a. Basic | b. Overtime |
| Lawn maintenance | Lawn care applicator | 40 | 0 | (Hourly) 7:00 a.m. 5:00 p.m. | $10.00 per hour | $15.00 per hour |

| 13. Describe Fully the Job to be Performed (Duties) |
|---|
| Apply pesticides, herbicides, fungicides, or insecticides to lawns using sprayers, seeders, spreaders, aerators. Entry level position. |

| 14. State in detail the MINIMUM education, training, and experience for a worker to perform satisfactorily the job duties described in item 13 above. | | | | 15. Other Special Requirements |
|---|---|---|---|---|

None.

| EDU-CATION (Enter number of years) | Grade School | High School | College | College Degree Required (specify) |
|---|---|---|---|---|
| | 0 | 0 | 0 | N/A |
| | | | | Major Field of Study |
| | | | | N/A |

| TRAIN-ING | No. Yrs. | No. Mos. | Type of Training |
|---|---|---|---|
| | 0 | 0 | N/A |

| EXPERI-ENCE | Job Offered | | Number Related Occupation | | Related Occupation (specify) |
|---|---|---|---|---|---|
| | Yrs. | Mos. | Yrs. | Mos. | N/A |
| | 0 | 0 | 0 | 0 | |

| 16. Occupational Title of Person Who Will Be Alien's Immediate Supervisor | ► Field Manager | 17. Number of Employees Alien Will Supervise ► 0 |
|---|---|---|

ENDORSEMENTS (Make no entry in section - for Government use only)

| Date Forms Received | |
|---|---|
| L.O. | S.O. |
| R.O. | N.O. |
| Ind. Code | Occ. Code |
| Occ. Title | |

Replaces MA 7-50A, 8 and C (Apr. 1970 edition) which is obsolete.

ETA 750 (Oct. 1979)

**TRU03991**

| 18. COMPLETE ITEMS ONLY IF JOB IS TEMPORARY | | | 19. IF JOB IS UNIONIZED (Complete) | |
|---|---|---|---|---|
| a. No. of Openings To Be Filled By Aliens Under Job Offer | b. Exact Dates You Expect To Employ Alien | | a. Number of Local | b. Name of Local |
| | From | To | | |
| 14 | 3/1/2004 | 11/30/2004 | | c. City and State |

| 20. STATEMENT FOR LIVE-AT-WORK JOB OFFERS  (Complete for Private Household ONLY) | | | | | |
|---|---|---|---|---|---|
| a. Description of Residence | b. No. Persons residing at Place of Employment | | | | c. Will free board and private room not shared with anyone be provided? ("X" one) |
| ("X" one) ☐ House ☐ Apartment | Number of Rooms | Adults | Children | Ages | ☐ YES  ☐ NO |
| | | | BOYS | | |
| | | | GIRLS | | |

**21. DESCRIBE EFFORTS TO RECRUIT U.S. WORKERS AND THE RESULTS.  (Specify Sources of Recruitment by Name)**

- Newspaper/Classified Ads
- Employee Referrals
These efforts have all been unsuccessful in recruiting U.S. workers.

**22.** Applications require various types of documentation.  Please read Part II of the instructions to assure that appropriate supporting documentation is included with your application.

**23. EMPLOYER CERTIFICATIONS**

By virtue of my signature below, I HEREBY CERTIFY the following conditions of employment.

a. I have enough funds available to pay the wage or salary offered the alien.

b. The wage offered equals or exceeds the prevailing wage and I guarantee that, if a labor certification is granted, the wage paid to the alien when the alien begins work will equal or exceed the prevailing wage which is applicable at the time the alien begins work.

c. The wage offered is not based on commissions, bonuses, or other incentives, unless I guarantee a wage paid on a weekly, bi-weekly, or monthly basis.

d. I will be able to place the alien on the payroll on or before the date of the alien's proposed entrance into the United States.

e. The job opportunity does not involve unlawful discrimination by race, creed, color, national origin, age, sex, religion, handicap, or citizenship.

f. The job opportunity is not:

   (1) Vacant because the former occupant is on strike or is being locked out in the course of a labor dispute involving a work stoppage.

   (2) At issue in a labor dispute involving a work stoppage.

g. The job opportunity's terms, conditions and occupational environment are not contrary to Federal, State or local law.

h. The job opportunity has been and is clearly open to any qualified U.S. worker.

**24. DECLARATIONS**

DECLARATION OF EMPLOYER  ➤  Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury the foregoing is true and correct.

| SIGNATURE  _James A. Vacchiano (signature)_ | DATE 10/30/2003 |
|---|---|
| NAME (Type or Print)  James A. Vacchiano | TITLE  Region People Services Manager |

AUTHORIZATION OF AGENT OF EMPLOYER    I HEREBY DESIGNATE the agent below to represent me for the purposes of labor certification and I TAKE FULL RESPONSIBILITY for accuracy of any representations made by my agent.

| SIGNATURE OF EMPLOYER  _James A. Vacchiano (signature)_ | DATE 10/30/2003 |
|---|---|
| NAME OF AGENT (Type or Print)  Great Lakes Labor | ADDRESS OF AGENT (Number, Street, City, State, ZIP code)  PO Box 646  Pinckney, MI 48169 |

TRU03992

U.S. DEPARTMENT OF LABOR
Employment and Training Administration

**APPLICATION
FOR
ALIEN EMPLOYMENT CERTIFICATION**

OMB Approval No. 44-R1301

**IMPORTANT: READ CAREFULLY BEFORE COMPLETING THIS FORM**

PRINT legibly in ink or use a typewriter. If you need more space to answer questions in this form, use a separate sheet. Identify each answer with the number of the corresponding question. SIGN AND DATE each sheet in original signature.

To knowingly furnish any false information in the preparation of this form and any supplement thereto or to aid, abet, or counsel another to do so is a felony punishable by $10,000 fine or 5 years in the penitentiary, or both (18 U.S.C. 1001)

**PART A. OFFER OF EMPLOYMENT**

| 1. Name of Alien    (Family name in capital letter, First, Middle, Maiden) |
|---|
| (14) Unnamed H-2B Workers/Aliens |

| 2. Present Address of Alien    (Number, Street, City and Town, State ZIP code or Province, Country) | 3. Type of Visa    (If in U.S.) |
|---|---|
| N/A | N/A |

The following information is submitted as an offer of employment.

| 4. Name of Employer    (Full name of Organization) | 5. Telephone |
|---|---|
| TruGreen Chemlawn | 302-992-9680 |

| 6. Address    (Number, Street, City and Town, State ZIP code) |
|---|
| 1350 1st State Blvd. Newport, DE 19804 |

| 7. Address Where Alien Will Work    (if different from item 6) |
|---|
| New Castle County |

| 8. Nature of Employer's Business Activity | 9. Name of Job Title | 10. Total Hours Per Week | | 11. Work Schedule (Hourly) | 12. Rate of Pay | |
|---|---|---|---|---|---|---|
| | | a. Basic | b. Overtime | | a. Basic | b. Overtime |
| Lawn maintenance | Lawn care applicator | 40 | 0 | 7:00 a.m. 5:00 p.m. | $ 10.00 per hour | $ 15.00 per hour |

| 13. Describe Fully the Job to be Performed    (Duties) |
|---|
| Apply pesticides, herbicides, fungicides, or insecticides to lawns using sprayers, seeders, spreaders, aerators. Entry level position. |

| 14. State in detail the MINIMUM education, training, and experience for a worker to perform satisfactorily the job duties described in item 13 above. | | | | 15. Other Special Requirements |
|---|---|---|---|---|
| | | | | None. |

| EDUCATION (Enter number of years) | Grade School | High School | College | College Degree Required    (specify) |
|---|---|---|---|---|
| | 0 | 0 | 0 | N/A |
| | | | | Major Field of Study |
| | | | | N/A |

| TRAINING | No. Yrs. | No. Mos. | Type of Training |
|---|---|---|---|
| | 0 | 0 | N/A |

| EXPERIENCE | Job Offered | | Related Occupation Number | | Related Occupation    (specify) |
|---|---|---|---|---|---|
| | Yrs. | Mos. | Yrs. | Mos. | N/A |
| | 0 | 0 | 0 | 0 | |

| 16. Occupational Title of Person Who Will Be Alien's Immediate Supervisor    ► Field Manager | 17. Number of Employees Alien Will Supervise    ► 0 |
|---|---|

◄ ENDORSEMENTS    (Make no entry in section - for Government use only)

**Date Forms Received**

| L.O. | S.O. |
|---|---|
| R.O. | N.O. |
| Ind. Code | Occ. Code |
| Occ. Title | |

Replaces MA 7-50A, B and C (Apr. 1970 edition) which is obsolete.

ETA 750 (Oct. 1979)

TRU03981

| 18. COMPLETE ITEMS ONLY IF JOB IS TEMPORARY | | | 19. IF JOB IS UNIONIZED (Complete) | |
|---|---|---|---|---|
| a. No. of Openings To Be Filled By Aliens Under Job Offer | b. Exact Dates You Expect To Employ Alien | | a. Number of Local | b. Name of Local |
| | From | To | | |
| 14 | 2/24/2004 | 11/30/2004 | | c. City and State |

**20. STATEMENT FOR LIVE-AT-WORK JOB OFFERS.** (Complete for Private Household ONLY)

| a. Description of Residence | | b. No. Persons residing at Place of Employment | | | | c. Will free board and private room not shared with any-one be provided? | ('X' one) |
|---|---|---|---|---|---|---|---|
| ('X' one) ☐ House ☐ Apartment | Number of Rooms | Adults | Children | | | | ☐ YES ☐ NO |
| | | | BOYS | Children | Ages | | |
| | | | GIRLS | | | | |

**21. DESCRIBE EFFORTS TO RECRUIT U.S. WORKERS AND THE RESULTS.** (Specify Sources of Recruitment by Name)

- Newspaper/Classified Ads
- Employee Referrals
These efforts have all been unsuccessful in recruiting U.S. workers.

22. Applications require various types of documentation. Please read Part II of the instructions to assure that appropriate supporting documentation is included with your application.

**23. EMPLOYER CERTIFICATIONS**

By virtue of my signature below, I HEREBY CERTIFY the following conditions of employment.

a. I have enough funds available to pay the wage or salary offered the alien.

b. The wage offered equals or exceeds the prevailing wage and I guarantee that, if a labor certification is granted, the wage paid to the alien when the alien begins work will equal or exceed the prevailing wage which is applicable at the time the alien begins work.

c. The wage offered is not based on commissions, bonuses, or other incentives, unless I guarantee a wage paid on a weekly, bi-weekly, or monthly basis.

d. I will be able to place the alien on the payroll on or before the date of the alien's proposed entrance into the United States.

e. The job opportunity does not involve unlawful discrimination by race, creed, color, national origin, age, sex, religion, handicap, or citizenship.

f. The job opportunity is not:

(1) Vacant because the former occupant is on strike or is being locked out in the course of a labor dispute involving a work stoppage.

(2) At issue in a labor dispute involving a work stoppage.

g. The job opportunity's terms, conditions and occupational environment are not contrary to Federal, State or local law.

h. The job opportunity has been and is clearly open to any qualified U.S. worker.

**24. DECLARATIONS**

DECLARATION OF EMPLOYER ➤ Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury the foregoing is true and correct.

| SIGNATURE | DATE |
|---|---|
| *James A. Vacchiano* | 10/22/2003 |
| NAME (Type or Print) James A. Vacchiano | TITLE Region People Services Manager |

AUTHORIZATION OF AGENT OF EMPLOYER ➤ I HEREBY DESIGNATE the agent below to represent me for the purposes of labor certification and I TAKE FULL RESPONSIBILITY for accuracy of any representations made by my agent.

| SIGNATURE OF EMPLOYER | DATE |
|---|---|
| *James A. Vacchiano* | 10/22/2003 |
| NAME OF AGENT (Type or Print) Great Lakes Labor | ADDRESS OF AGENT (Number, Street, City, State, ZIP code) PO Box 646 Pinckney, MI 48169 |

TRU03982

# EXHIBIT B

2007 WL 1228792                                                                    Page 1
--- F.3d ----, 2007 WL 1228792 (1st Cir.(Puerto Rico))
**(Cite as: 2007 WL 1228792 (1st Cir.(Puerto Rico)))**

**H**

United States Court of Appeals,
First Circuit.
ROYAL SIAM CORP. and Surasak Srisang,
Plaintiffs, Appellants,
v.
Michael CHERTOFF, Secretary of the Department of
Homeland Security, [FN*] et
al., Defendants, Appellees.
No. 06-1947.

Heard March 5, 2007.
Decided April 27, 2007.

**Background:** Employer and alien, a citizen of Thailand, brought action challenging decision of United States Citizenship and Immigration Services (CIS) to deny alien's application for renewal of his H-1B specialty occupation visa. The United States District Court for the District of Puerto Rico, 424 F.Supp.2d 338, Hector M. Laffitte, Senior District Judge, granted summary judgment for CIS, and plaintiffs appealed.

**Holding:** The Court of Appeals, Selya, Senior Circuit Judge, held that CIS's rejection of alien's application was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.
Affirmed.

**[1] Aliens, Immigration, and Citizenship** ☞207

24k207 Most Cited Cases
Court of Appeals would assume hypothetical jurisdiction with regard to alien's appeal of the denial of his application for renewal of his specialty occupation visa, where issue was one of statutory, rather than constitutional jurisdiction, and the outcome on the merits was foreordained.

**[1] Federal Courts** ☞542

170Bk542 Most Cited Cases
Court of Appeals would assume hypothetical jurisdiction with regard to alien's appeal of the denial of his application for renewal of his specialty occupation visa, where issue was one of statutory, rather than constitutional jurisdiction, and the outcome on the merits was foreordained.

the merits was foreordained.

**[2] Federal Courts** ☞776

170Bk776 Most Cited Cases
Court of Appeals reviews the district court's decision in a case assessing an agency decision de novo.

**[3] Administrative Law and Procedure** ☞413

15Ak413 Most Cited Cases
When Congress has entrusted an agency with rulemaking and administrative authority, courts ordinarily afford considerable deference to the agency's interpretation of the regulations that it has promulgated under that authority, and should withhold this deference only if the agency's interpretation is plainly erroneous or inconsistent with the regulation.

**[4] Aliens, Immigration, and Citizenship** ☞205

24k205 Most Cited Cases
United States Citizenship and Immigration Services (CIS) properly exercised its discretion, when determining whether alien, the manager of a Thai restaurant, was entitled to renewal of his specialty occupation visa, by seeking guidance from Department of Labor's Occupational Outlook Handbook regarding the requirements of food service manager positions, particularly since alien identified no other Handbook classification that was more appropriate. Immigration and Nationality Act, § 101(a)(15)(H)(i)(b), 8 U.S.C.A. § 1101(a)(15)(H)(i)(b); 8 C.F.R. § 214.2(h)(4)(iii)(A).

**[5] Aliens, Immigration, and Citizenship** ☞194

24k194 Most Cited Cases
For purposes of alien's application for renewal of his specialty occupation visa, United States Citizenship and Immigration Services (CIS) properly exercised its discretion in determining that alien's position as manager of a Thai restaurant was not one which required a bachelor's degree or its equivalent in a specific specialty; Department of Labor's Occupational Outlook Handbook made it clear that candidates for restaurant manager positions could have a wide variety of backgrounds and credentials. Immigration and Nationality Act, § 101(a)(15)(H)(i)(b), 8 U.S.C.A. § 1101(a)(15)(H)(i)(b); 8 C.F.R. §

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----, 2007 WL 1228792 (1st Cir.(Puerto Rico))
**(Cite as: 2007 WL 1228792 (1st Cir.(Puerto Rico)))**

214.2(h)(4)(iii)(A).

**[6] Aliens, Immigration, and Citizenship ⊜⇒194**
24k194 Most Cited Cases

United States Citizenship and Immigration Services's (CIS) rejection of application, by alien who was manager of a Thai restaurant, for renewal of his specialty occupation visa, was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, even though CIS previously granted alien such a visa; CIS considered all the relevant facts and correctly explicated the governing law, and it admitted that the previous grant of the visa was in error. 5 U.S.C.A. § 706(2)(A); Immigration and Nationality Act, §§ 101(a)(15)(H)(i)(b), 214(i), 8 U.S.C.A. §§ 1101(a)(15)(H)(i)(b), 1184(i); 8 C.F.R. § 214.2(h)(4)(iii)(A).

Patrick D. O'Neill, with whom O'Neill & Gilmore, P.S.C. was on brief, for appellants.

Sheldon Gisser, Office of Chief Counsel, United States Citizenship and Immigration Services, with whom Rosa Emilia Rodríguez-Vélez, United States Attorney, Nelson Pérez-Sosa, Assistant United States Attorney (Chief, Appellate Division), and Mariana E. Bauzá-Almonte, Assistant United States Attorney, were on brief, for appellees.

Before TORRUELLA, Circuit Judge, SELYA, Senior Circuit Judge, and LYNCH, Circuit Judge.

SELYA, Senior Circuit Judge.

*1 After the Department of Homeland Security (DHS), through its division of Citizenship and Immigration Services (CIS), denied a petition for renewal of a nonimmigrant specialty occupation visa, the petitioner, Royal Siam Corporation (RSC), together with the affected worker, Surasak Srisang, brought a civil action in the United States District Court for the District of Puerto Rico in hopes of reversing CIS's decision. Those hopes were never realized. After some procedural backing and filling, the district court granted summary judgment in favor of the defendants (all government agencies or actors). *See Royal Siam Corp. v. Ridge,* 424 F.Supp.2d 338 (D.P.R.2006). Upon careful consideration of the plaintiffs' appeal, we affirm.

**I. BACKGROUND**

We assume the reader's familiarity with the district court's opinion and, thus, content ourselves with a sketch of the pertinent facts and travel of the case.

RSC owns and operates an upscale Thai restaurant in Carolina, Puerto Rico. On a petition filed by RSC's predecessor in interest in 1999, Srisang--a Thai national who purportedly possessed the equivalent of a bachelor's degree in business administration--received a specialty occupation visa (colloquially known as an H-1B visa). This nonimmigrant visa allowed him to enter the United States for a three-year period in order to work as a restaurant manager. Srisang availed himself of the opportunity.

In 2002, with Srisang's visa due to expire, RSC sought its renewal. During the course of its review, CIS advised RSC of its doubts about the petition. On October 24, 2002, the agency issued a request for additional proof, noting that the "evidence submitted is not sufficient to establish that the job is specialty in scope." Although RSC made a supplemental submission, CIS eventually denied the petition. On administrative review, CIS's appeals office upheld the denial. [FN1]

RSC and Srisang thereupon commenced this action, posturing it as a request for review of a final agency decision under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706. In their complaint, they sought declaratory and injunctive relief. The district court stayed removal proceedings against Srisang. In due course, the court, while retaining jurisdiction, remanded the case to CIS for a fuller explanation of its decision. The district court found the cryptic quality of the original decision especially troubling in light of the agency's 1999 approval of an H-1B visa petition for what the court deemed to be an "equivalent position."

On remand, CIS reaffirmed its previous denial of the 2002 petition. In explaining its decision, CIS observed that it now regarded its grant of the 1999 petition (which rested on similar data) as plainly erroneous because the job, as described by RSC's predecessor in interest, did not qualify as a specialty occu-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:06-cv-00185-GMS     Document 59-2     Filed 05/17/2007     Page 10 of 71

2007 WL 1228792                                                    Page 3
--- F.3d ----, 2007 WL 1228792 (1st Cir.(Puerto Rico))
**(Cite as: 2007 WL 1228792 (1st Cir.(Puerto Rico)))**

pation. *See* 8 U.S.C. §§ 1101(a)(15)(H)(i)(b), 1184(i); 8 C.F.R. § 214.2(h)(4)(iii)(A). A job does not qualify as a specialty occupation unless it satisfies an amalgam of criteria that relate to educational requirements, complexity of the work, the specialized nature of the duties to be performed, and the like. *See* 8 C.F.R. § 214.2(h)(4)(iii)(A). In this case, the agency concluded that the proof submitted did not establish that the restaurant manager position--either in 1999 or in 2002--constituted a specialty occupation within the purview of these criteria.

**\*2** CIS's explanation did not stop there. The agency noted that its approval of the earlier petition had been erroneous for another reason as well. In 1998, CIS had found Srisang's marriage to a United States citizen fraudulent, that is, entered into for the purpose of circumventing the immigration laws. Citing 8 U.S.C. § 1154(c), CIS expressed the view that because Srisang had engaged in marriage fraud, he was "statutorily ineligible" for a specialty occupation visa.

The circumstances attendant to this alternate ground of decision are not in dispute. The marriage occurred in 1995. As a result, Srisang was conditionally granted lawful permanent resident status. In 1997, Srisang sought to make that status unconditional. Following an investigation, however, CIS found the marriage fraudulent (a finding that Srisang does not now contest). Withal, the government's left hand obviously did not appreciate what the right hand was doing. Although the marriage fraud finding was brought to CIS's attention in connection with the 1999 specialty occupation visa petition, the agency had, in an apparent oversight, approved that petition. [FN2]

With CIS's detailed amplification of the binary grounds for rejection of the 2002 visa petition in hand, the district court ruled that the denial was neither arbitrary nor capricious. *See Royal Siam*, 424 F.Supp.2d at 343. Accordingly, the court entered summary judgment in the defendants' favor. This timely appeal ensued.

**II. DISCUSSION**

On appeal, RSC and Srisang attack both of the reasons advanced by CIS in support of its decision. First,

they maintain that the restaurant manager position qualifies as a specialty occupation and that CIS, in failing to reach this conclusion, acted arbitrarily. Second, they posit that the marriage fraud bar does not apply in cases involving nonimmigrant visas. As a fallback, they exhort us to find that the government forfeited any right to invoke either rationale by approving the 1999 visa petition notwithstanding full disclosure, at that time, of both the job description and the marriage fraud.

The government rejoins that we lack jurisdiction to entertain this appeal under the Immigration and Nationality Act (INA), as amended by the REAL ID Act of 2005, 8 U.S.C. § 1252(a)(2)(B)(ii). Its second line of defense is that both grounds of decision were well-taken; that neither was waived; and that, therefore, the district court's decision is bulletproof on the merits.

Given the sprawling nature of this asseverational array, we begin at the beginning and address the jurisdictional question. We then move to the merits.

**A. *The Jurisdictional Question.***

Under 28 U.S.C. § 1291, we have jurisdiction over appeals from final decisions and orders of the district courts within this circuit. The case before us comprises an appeal from a decision of one such district court--a decision that is final inasmuch as it ends the litigation pending in that court, leaving nothing to be done but to execute the judgment. Consequently, we have jurisdiction over this appeal. *See Jilin Pharm. USA, Inc. v. Chertoff*, 447 F.3d 196, 199 n. 4 (3d Cir.2006); *El-Khader v. Monica*, 366 F.3d 562, 565-66 (7th Cir.2004).

**\*3** That is not the end of the jurisdictional issue. The real import of the government's jurisdictional exegesis relates to whether the district court had subject-matter jurisdiction. We must consider that aspect of the argument despite the government's awkward phrasing of it. After all, it normally is incumbent upon an appellate court to satisfy itself both of its own subject-matter jurisdiction and of the subject-matter jurisdiction of the trial court before proceeding further. *See Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541, 106 S.Ct. 1326, 89 L.Ed.2d 501 (1986);

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:06-cv-00185-GMS     Document 59-2     Filed 05/17/2007     Page 11 of 71

2007 WL 1228792                                                                    Page 4
--- F.3d ----, 2007 WL 1228792 (1st Cir.(Puerto Rico))
**(Cite as: 2007 WL 1228792 (1st Cir.(Puerto Rico)))**

*Irving v. United States,* 162 F.3d 154, 160 (1st Cir.1998) (en banc).

In this instance, there may be reason to think that the jurisdiction of the district court seems suspect. The INA, in its current iteration, is littered with jurisdiction-stripping provisions. Of particular pertinence here, the law provides (with exceptions not relevant to this case) that:

> Notwithstanding any other provision of law (statutory or nonstatutory) ... and regardless of whether the judgment, decision, or action is made in removal proceedings, no court shall have jurisdiction to review--
>
> ....
>
> (ii) any ... decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under [8 U.S.C. §§ 1151-1381] to be in the discretion of the Attorney General or the Secretary of Homeland Security, other than the granting of relief under [certain asylum provisions].

8 U.S.C. § 1252(a)(2)(B)(ii). The government suggests that, under this provision, no court has jurisdiction to review CIS's denial of an H-1B visa petition because such a determination is fully committed to agency discretion. *See id.* § 1184(a)(1) (stating that "[t]he admission to the United States of any alien as a nonimmigrant shall be for such time and under such conditions as the Attorney General may by regulations prescribe").

The cogency of this argument is not self-evident. Even though the jurisdiction-stripping provisions of section 1252 apply outside the removal context, *see Zhu v. Gonzales,* 411 F.3d 292, 294 (D.C.Cir.2005); *El-Khader,* 366 F.3d at 567; *CDI Info. Servs., Inc. v. Reno,* 278 F.3d 616, 620 (6th Cir.2002); *Van Dinh v. Reno,* 197 F.3d 427, 432 (10th Cir.1999), the question remains whether the statutory scheme places the authority to grant H-1B visa petitions sufficiently within CIS's discretion as to engage the gears of the jurisdictional bar.

The answer to this question is freighted with uncertainty, in part because the courts of appeals have disagreed about how to approach the matter of when a statute can be said to "specify" discretionary author-

ity. *See, e.g., Zhu,* 411 F.3d at 295 (describing various approaches). To illustrate, the Sixth Circuit determined that it lacked jurisdiction to review the denial of an H-1B visa because the regulations, rather than the pertinent statute itself, commit the matter to agency discretion. *See CDI Info. Servs.,* 278 F.3d at 619. But other circuits have rejected that interpretive model. *See, e.g., Zafar v. U.S. Atty. Gen.,* 461 F.3d 1357, 1361 (11th Cir.2006); *Zhao v. Gonzales,* 404 F.3d 295, 303 & n. 6 (5th Cir.2005). We, too, recently have rejected it, insisting that the relevant commitment to agency discretion must be found in the statute itself. *See Alsamhouri v. Gonzales,* --- F.3d ----, ----, ---- - ----, 2007 WL 1153033 (1st Cir.2007) [No. 05-2800, slip op. at 9-10]. There is, moreover, a further problem. The text of the statute upon which the government relies here, 8 U.S.C. § 1184(a)(1), is considerably less definitive in its commitment of authority to agency discretion than other statutes that have been found to animate the jurisdictional bar.

*\*4* [1] In the face of these concerns, we believe that this is a case in which we may--and should--bypass the jurisdictional question. We recognize, of course, that federal courts cannot ordinarily exercise hypothetical jurisdiction; that is, a federal court ordinarily may not assume the existence of jurisdiction in order to decide the merits of a case or controversy. *Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.,* --- U.S. ----, ----, 127 S.Ct. 1184, 1191, 167 L.Ed.2d 15 (2007); *Steel Co. v. Citizens for Better Env't,* 523 U.S. 83, 94, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). But that principle admits of an area of elasticity.

In mapping the contours of this narrow crevice, we have distinguished between Article III jurisdiction (which may never be bypassed) and statutory jurisdiction (which may occasionally be bypassed). *See, e.g., Universal Communic'n Sys., Inc. v. Lycos, Inc.,* 478 F.3d 413, 426 & n. 11 (1st Cir.2007); *Nisselson v. Lernout,* 469 F.3d 143, 150-51 (1st Cir.2006); *Parella v. Ret. Bd. of R.I. Employees' Ret. Sys.,* 173 F.3d 46, 54 (1st Cir.1999); *see also McBee v. Delica Co.,* 417 F.3d 107, 127 (1st Cir.2005) ( "[W]e have consistently interpreted the rule [against hypothetical jurisdiction] as applying in its strict form only to issues going to Article III's requirements."). In the im-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:06-cv-00185-GMS    Document 59-2    Filed 05/17/2007    Page 12 of 71

2007 WL 1228792                                                          Page 5
--- F.3d ----, 2007 WL 1228792 (1st Cir.(Puerto Rico))
**(Cite as: 2007 WL 1228792 (1st Cir.(Puerto Rico)))**

migration context, we have bypassed enigmatic juris-dictional questions in circumstances in which precedent clearly adumbrates the result on the merits. *See, e.g., Rivera-Martinez v. Ashcroft,* 389 F.3d 207, 209 n. 7 (1st Cir.2004); *Seale v. INS,* 323 F.3d 150, 152, 157 (1st Cir.2003). [FN3]

This case fits within that crevice. On the one hand, the jurisdictional question is not only thorny but also a matter of statutory, not constitutional, dimension; and its proper resolution is uncertain. On the other hand, the outcome on the merits is foreordained. Consequently, we bypass the jurisdictional question and proceed directly to the heartland of the plaintiffs' appeal.

### B. The Merits.

[2] We are bound by the same ground rules as the district court in assessing agency decisions. *S. Shore Hosp., Inc. v. Thompson,* 308 F.3d 91, 97 (1st Cir.2002). Thus, the district court's decision in this case engenders de novo review. *See id.*

Seeking a foothold, RSC and Srisang start by pointing out that an agency's unexplained departure from a prior course of action may raise arbitrariness concerns. *See, e.g., Saint Fort v. Ashcroft,* 329 F.3d 191, 203-04 (1st Cir.2003); *Davila-Bardales v. INS,* 27 F.3d 1, 5 (1st Cir.1994). That doctrine, however, does not shed any light here. At this stage of the litigation, we are not dealing with an *unexplained* departure: on remand from the district court, the agency carefully laid out the reasoning that underpinned its repudiation of the 1999 specialty occupation visa under which Srisang had been allowed to enter the country. CIS said that the earlier petition had been approved in error--and accordingly, the 2002 petition should be denied--because (i) the restaurant manager position failed to qualify as a specialty occupation and (ii) Srisang's marriage fraud rendered him statutorily ineligible for the requested largesse. Each of these grounds floats on its own bottom; if either passes muster, the district court's grant of summary judgment must be upheld.

**\*5** Rising to this challenge, RSC and Srisang contest both grounds. They argue that CIS misconstrued the administrative record, misapplied the regulations per-taining to specialty occupations, and incorrectly invoked the marriage fraud bar. In our view, CIS's determination that RSC's restaurant manager position was not a specialty occupation is dispositive here.

We do not write on a pristine page. Congress has laid out eligibility standards for the granting of H-1B specialty occupation visas. *See* 8 U.S.C. § 1101(a)(15)(H)(i)(b). Under these standards, a specialty occupation requires: "(A) theoretical and practical application of a body of highly specialized knowledge, and (B) attainment of a bachelor's or higher degree in the specific specialty (or its equivalent) as a minimum for entry into the occupation in the United States." *Id.* § 1184(i)(1). The statute also sets forth requirements pertaining to licensure (not applicable here) and providing for due recognition of experience and expertise. *See id.* § 1184(i)(2). Agency regulations flesh out these requirements. *See* 8 C.F.R. § 214.2(h). The regulations define a specialty occupation as:

> an occupation which requires theoretical and practical application of a body of highly specialized knowledge in fields of human endeavor including, but not limited to, architecture, engineering, mathematics, physical sciences, social sciences, medicine and health, education, business specialties, accounting, law, theology, and the arts, and which requires the attainment of a bachelor's degree or higher in a specific specialty, or its equivalent, as a minimum for entry into the occupation in the United States.

*Id.* § 214.2(h)(4)(ii). To satisfy this definition, a position must touch at least one of four overlapping bases. *See id.* § 214.2(h)(4)(iii)(A). These bases are set out in the margin. [FN4] The burden of proving that a particular position comes within this taxonomy (and, thus, qualifies as a specialty occupation) is on the applicant. *See* 8 U.S.C. § 1361.

Against this backdrop, we examine what transpired here. CIS, relying in part on the United States Department of Labor's occupational outlook handbook (the Handbook), determined that the plaintiffs failed to show that the restaurant manager position touched any of the four specified bases. In that regard, the agency found that the duties of the position were not more complex than those associated with similar

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:06-cv-00185-GMS    Document 59-2    Filed 05/17/2007    Page 13 of 71

2007 WL 1228792                                                    Page 6
--- F.3d ----, 2007 WL 1228792 (1st Cir.(Puerto Rico))
(Cite as: 2007 WL 1228792 (1st Cir.(Puerto Rico)))

(non-specialty) positions in the general economy.

The plaintiffs attack CIS's analysis on several fronts. First, they take aim at the agency's use of the Handbook, which recounts the particulars of numerous occupations. This array includes "food service managers," and CIS placed RSC's restaurant manager position within that niche. Doing so was an error, the plaintiffs claim, because that placement lumped RSC's establishment with less toney establishments (such as fast-food and chain restaurants). Relatedly, the plaintiffs argue that slavish devotion to the Handbook led CIS to ignore evidence demonstrating RSC's uniquely complex and specialized needs. We address these arguments in the ensemble.

*6 [3] When Congress has entrusted an agency with rulemaking and administrative authority, courts ordinarily afford considerable deference to the agency's interpretation of the regulations that it has promulgated under that authority. *See Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 414, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945); *S. Shore Hosp.,* 308 F.3d at 97. Courts should withhold this deference only if the agency's interpretation is "plainly erroneous or inconsistent with the regulation." *Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994) (quoting *Seminole Rock,* 325 U.S. at 414, 65 S.Ct. 1215). We find no indication that CIS forfeited its entitlement to deference here.

In its review of petitions for nonimmigrant work visas, CIS frequently--and sensibly--consults the occupational descriptions collected in the Handbook. Subject only to caveats at the outer fringes, the choice of what reference materials to consult is quintessentially within an agency's discretion--and, thus, courts routinely have approved CIS's practice of consulting the Handbook. *See, e.g., Blacher v. Ridge,* 436 F.Supp.2d 602, 609 (S.D.N.Y.2006); *Shanti, Inc. v. Reno,* 36 F.Supp.2d 1151, 1165 (D.Minn.1999); *Hird/Blaker Corp. v. Sava,* 712 F.Supp. 1095, 1101 n. 2 (S.D.N.Y.1989); *cf. Defensor v. Meissner,* 201 F.3d 384, 387 n. 2 (5th Cir.2000) (consulting the Handbook for a similar purpose).

[4] Here, moreover, CIS's characterization of the restaurant manager position as a species of the generic

food service manager position appears entirely reasonable. Based on the evidence before it, the agency fairly summarized the duties of RSC's restaurant manager position as follows:

[The restaurant manager] would be in charge of all operations, and he will perform duties that entail, in part: hiring, firing, and supervising employees; contacting suppliers and ordering supplies; promoting the restaurant; designing the layout of the restaurant and its equipment; estimating food and beverage costs and requisitions; conferring with food preparation and other personnel to plan menus and related activities; investigating and resolving food quality and service complaints; and handling all financial matters.

These tasks appear a good match for the duties of a food service manager, which the 2004-05 Handbook describes, in pertinent part, as follows:

Food service managers are responsible for the daily operations of restaurants and other establishments that prepare and serve meals and beverages to customers. Besides coordinating activities among various departments, such as kitchen, dining room, and banquet operations, food service managers ensure that customers are satisfied with their dining experience. In addition, they oversee the inventory and ordering of food, equipment, and supplies and arrange for the routine maintenance and upkeep of the restaurant, its equipment, and facilities. Managers generally are responsible for all of the administrative and human-resource functions of running the business, including recruiting new employees and monitoring employee performance and training.

*7 The positions coincide in two other salient respects as well. First, RSC has singled out fluency in English and Thai as an important asset for its position. Correspondingly, the Handbook notes that food service managers "need to speak well, often in several languages, with a diverse clientele and staff." Second, RSC projected an annual salary of $40,000 for the restaurant manager position. This is roughly comparable to the median annual earnings of a food service manager for a full-service restaurant in 2002 as per the Handbook ($37,280).

The plaintiffs' attempt to pass off the Handbook clas-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:06-cv-00185-GMS    Document 59-2    Filed 05/17/2007    Page 14 of 71

2007 WL 1228792                                                                Page 7
--- F.3d ----, 2007 WL 1228792 (1st Cir.(Puerto Rico))
**(Cite as: 2007 WL 1228792 (1st Cir.(Puerto Rico)))**

sification as suitable only for fast-food and chain restaurants is unavailing. A fair reading makes clear that the Handbook contemplates that the food service manager heading is to cover both full-service restaurants and less upscale operations. To cinch matters, the plaintiffs identify no other Handbook classification that is more apropos. We conclude, therefore, that it was well within the realm of the agency's discretion to seek guidance from the Handbook and, having done so, to refer to the food service manager heading.

[5] We also uphold the agency's determination that the restaurant manager position is not one that by its nature demands a bachelor's degree or its equivalent in a specific specialty. The Handbook makes pellucid that, in hiring restaurant managers, employers seek candidates with a wide variety of backgrounds and credentials, including graduates of hospitality management programs (some of which confer bachelor's degrees and some of which do not), persons trained in-house, and those with hands-on experience gained elsewhere. There is nothing in the record that compels, or even strongly supports, a conclusion that a bachelor's degree or its equivalent is a necessary credential for a restaurant manager.

In urging a contrary finding, the plaintiffs argue that there is evidence in the record to the effect that a bachelor's degree is the industry standard. That argument is disingenuous. The only "evidence" to which the plaintiffs point comprises, in its entirety, a one-paragraph statement furnished by a single restauranteur at RSC's request. The statement asserts that every applicant for a managerial position *at that particular eatery* is expected to have a degree in business administration. As CIS reasonably concluded, however, a bald assertion about the practices of a lone competitor, by itself, does not suffice to prove an industry-wide standard.

The plaintiffs have another shot in their sling. They contend that, even if a bachelor's degree is not generally required for restaurant managers, RSC is in need of a restaurant manager with a degree in business administration and related work experience. That argument does not withstand scrutiny.

The courts and the agency consistently have stated that, although a general-purpose bachelor's degree, such as a business administration degree, may be a legitimate prerequisite for a particular position, requiring such a degree, without more, will not justify the granting of a petition for an H-1B specialty occupation visa. *See, e.g., Tapis Int'l v. INS,* 94 F.Supp.2d 172, 175-76 (D.Mass.2000); *Shanti,* 36 F.Supp.2d at 1164-66; *cf. Matter of Michael Hertz Assocs.,* 19 I & N Dec. 558, 560 (BIA 1988) (providing frequently cited analysis in connection with a conceptually similar provision). This is as it should be: elsewise, an employer could ensure the granting of a specialty occupation visa petition by the simple expedient of creating a generic (and essentially artificial) degree requirement.

*8 We hasten to emphasize that a degree requirement in a specific specialty--one that relates directly to the duties and responsibilities of a particular position--is given more weight by the agency than a requirement for a generic degree. *See* 8 C.F.R. § 214.2(h)(4)(ii). This gloss is mandated by the language of the statute itself. *See* 8 U.S.C. § 1184(i)(1). Given this distinction, we cannot fault CIS's determination that RSC's requirement for a free-floating degree in business administration was insufficient, without some compelling connection to the responsibilities of the restaurant manager position, to require a finding of a specialty occupation here. [FN5]

[6] The rejection of these legal arguments brings us to the question of whether the agency, on the record as a whole, made a reasonable decision. The record reveals that CIS considered all the relevant facts and produced a closely reasoned judgment as to the nature of the work involved in the restaurant manager position. In the absence of an error of law--and we see none here--this case comes down to straight abuse-of-discretion review. Under that standard, the outcome is foreordained. While the APA authorizes a reviewing court to set aside an agency's "action, findings, [or] conclusions" if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), an agency's decision does not trigger that provision as long as it correctly explicates the governing law and turns on a plausible rendition of the facts in the re-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:06-cv-00185-GMS    Document 59-2    Filed 05/17/2007    Page 15 of 71

2007 WL 1228792                                                          Page 8
--- F.3d ----, 2007 WL 1228792 (1st Cir.(Puerto Rico))
(Cite as: 2007 WL 1228792 (1st Cir.(Puerto Rico)))

cord. [FN6] *See Granite State Concrete Co. v. Surface Transp. Bd.,* 417 F.3d 85, 92 (1st Cir.2005). In determining that the position in question did not warrant the granting of a petition for a specialty occupation visa, CIS has not operated outside the wide margins of this discretion.

Of course, the plaintiffs also ask us to factor into the mix CIS's earlier granting of the 1999 specialty occupation visa petition. We have taken that circumstance into account and conclude that it does not compel a reversal here.

The mere fact that the agency, by mistake or oversight, approved a specialty occupation visa petition on one occasion does not create an automatic entitlement to the approval of a subsequent petition for renewal of that visa. *See, e.g., Savoury v. U.S. Atty. Gen.,* 449 F.3d 1307, 1317-18 (11th Cir.2006); *Sussex Eng'g, Ltd. v. Montgomery,* 825 F.2d 1084, 1090 (6th Cir.1987); *see also* 8 C.F.R. § 214.1(a)(3)(i) (requiring nonimmigrant aliens applying for extensions of stay to establish either that they are admissible or that inadmissibility has been waived).

Along the same lines, this prior history does not justify the plaintiffs' claim of estoppel. We have reiterated, with a regularity bordering on the echolalic, that estoppel rarely will be invoked against the federal government. *See, e.g., Frillz, Inc. v. Lader,* 104 F.3d 515, 518 (1st Cir.1997); *United States v. Ven-Fuel, Inc.,* 758 F.2d 741, 761 (1st Cir.1985). That principle holds fast in immigration cases. *See, e.g., Costa v. INS,* 233 F.3d 31, 38 (1st Cir.2000) (requiring, among other things, a showing of "affirmative government misconduct"); *see also Andrade v. Gonzales,* 459 F.3d 538, 545 n. 2 (5th Cir.2006); *Savoury,* 449 F.3d at 1318-19. In the absence of affirmative government misconduct--and we descry none here--there is no room for invocation of the estoppel doctrine.

## III. CONCLUSION

*9 We end with a succinct summary. For the reasons elucidated above, we bypass the jurisdictional question. On the merits, the ultimate decision about whether to grant a petition for a specialty occupation visa lies within the discretion of the agency. *See* 8

U.S.C. § 1184(a)(1). Because CIS's exercise of discretion here is untainted by either legal or factual error, we discern no basis for disturbing its denial of RSC's petition. Finally, we reject out of hand the plaintiffs' entreaty that estoppel should carry the day.

We need go no further. [FN7] We hold, without serious question, that the district court did not err in granting summary judgment for the defendants.

*Affirmed.*

   FN* We have substituted Michael Chertoff as the lead defendant in place of Tom Ridge, his predecessor in office. *See* Fed. R.App. P. 43(c).

   FN1. The authority to grant or deny petitions for specialty occupation visas, formerly exercised by the Attorney General and the Immigration and Naturalization Service, now resides with DHS. *See Clark v. Martinez,* 543 U.S. 371, 374 n. 1, 125 S.Ct. 716, 160 L.Ed.2d 734 (2005); *Lattab v. Ashcroft,* 384 F.3d 8, 13 n. 2 (1st Cir.2004). For clarity of exposition, we refer to the appropriate bureau within DHS--CIS-- regardless of when agency action occurred.

   FN2. This comedy of errors allowed Srisang to depart voluntarily from the United States on January 23, 2000 (thus mooting the removal proceedings that had been brought in consequence of his sham marriage) and return three weeks later (pursuant to the specialty occupation visa petition that CIS had approved in November of 1999).

   FN3. The language that we have used in immigration cases is not identical to the language that we have used in non-immigration matters. *See Restoration Pres. Masonry, Inc. v. Grove Eur. Ltd.,* 325 F.3d 54, 59- 60 (1st Cir.2003) (describing the different formulations). At bottom, however, the approaches are entirely consistent with one another. *See id.* at 60.

   FN4. The bases are: (1) A baccalaureate or

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

higher degree or its equivalent is normally the minimum requirement for entry into the particular position;

(2) The degree requirement is common to the industry in parallel positions among similar organizations or, in the alternative, an employer may show that its particular position is so complex or unique that it can be performed only by an individual with a degree;

(3) The employer normally requires a degree or its equivalent for the position; or

(4) The nature of the specific duties are so specialized and complex that knowledge required to perform the duties is usually associated with the attainment of a baccalaureate or higher degree.

8 C.F.R. § 214.2(h)(4)(iii)(A).

FN5. The plaintiffs make a veiled suggestion that the combined requirements of a bachelor's degree in business administration plus work experience transform its degree requirement into the "equivalent" of a specialized degree. Assuming, for argument's sake, that this suggestion has been sufficiently developed, we think that the facts here afforded CIS ample discretion to reject it.

FN6. This is a highly deferential standard of review—and where, as here, an agency is called upon both to interpret regulations that it has promulgated and to find the facts, deference is doubly desirable.

FN7. The conclusions we have reached render it unnecessary for us to consider whether the agency, in arriving at its decision, correctly applied the marriage fraud bar contained in 8 U.S.C. § 1154(c) to this petition for a nonimmigrant work visa. By like token, we have no need to address either the soundness or the applicability of the government's suggestion that the APA itself (specifically, 5 U.S.C. § 701(a)(2)) may foreclose judicial review of a nonimmigrant visitor's request for an extension of stay.

--- F.3d ----, 2007 WL 1228792 (1st Cir.(Puerto Rico))

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                    Page 1
Not Reported in F.Supp.2d, 2005 WL 1712390 (E.D.Pa.), RICO Bus.Disp.Guide 10,924
**(Cite as: 2005 WL 1712390 (E.D.Pa.))**

C

United States District Court,
E.D. Pennsylvania.
Antoinette COOPER
v.
BROADSPIRE SERVICES, INC, et al.
No. Civ.A. 04-5289.

July 20, 2005.
Howard B. Segal, Howard B. Segal, Esq., Philadelphia, PA, for Antoinette Cooper.

Richard J. DeFortuna, Sarah E. Bouchard, Morgan Lewis & Bockius LLP, Philadelphia, PA, for Broadspire Services, Inc., et al.

*MEMORANDUM*
ONEILL, J.

**\*1** Plaintiff, Antoinette Cooper, a former employee of Independence Blue Cross filed a complaint on November 15, 2004 alleging that defendants, Broadspire Services, Inc. (formally Kemper Insurance Co.), Independence Blue Cross ("IBC"), and Carol Koplowitz denied her claim for short term disability benefits on August 20, 2003 in breach of her contract of insurance under Pennsylvania law and in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq. On November 16, 2004, I ordered plaintiff to file a RICO Case Statement [FN1] setting forth in detail the allegations underlying the RICO claims. Plaintiff complied with this order and filed a RICO Case Statement on December 16, 2004. Before me now is defendants' motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). For the reasons stated below I will grant defendants' motion.

> FN1. The RICO Case Statement is a pleading that may be considered part of the operative complaint for the purposes of a motion to dismiss. *See Lorenz v. CSX Corp.*, 1 F.3d 1406, 1413 (3d Cir.1993); *Smith v. Berg*, No. 99-2133, 1999 U.S. Dist. LEXIS 18298, at \*5-6 (E.D.Pa. Dec. 1, 1999).

BACKGROUND
*I. The Short Term Disability Program*

As an IBC employee, Cooper was provided with a short-term disability benefit through the Short Term Disability Program, a payroll practice maintained pursuant to 29 C.F.R. § 2510.3-1(b). Under the program, the short term disability benefit is paid out of IBC's general assets; IBC's employees pay no premium for the benefit and no monies are deducted from their pay to cover the cost of the benefit. The program defines the term "disability" for purposes of the program and sets forth the terms and conditions precedent for receipt of a benefit.

Employees who claim short-term disabilities are instructed to contact Broadspire, the third-party administrator of the program, in order to make an application. A Broadspire representative then performs a summary intake and the employee-claimant is asked to provide support for his or her short-term disability claim. Under the terms of the program, claimants have seven days to submit the requested information. At the same time, Broadspire requests job information from IBC in order to determine the scope of the employee's activity and the effect of the claimed disability on the employee's job performance. Once all of the required paperwork is received, a member of Broadspire's medical staff analyzes the employee's claim to make an initial determination. If the claim is denied, the employee is informed of the denial by letter.

Where a claim is denied, the determination letter sets out an employee's rights to appeal and to submit further information in support of his or her claim. Pursuant to the terms of the program, an employee whose claim has been denied has twenty one days within which to appeal the adverse determination and submit additional documentation in support of his or her claim. If additional documentation is submitted by the claimant, Broadspire may require an independent medical examiner to perform a further examination. Once all of the information supporting a claimant's appeal has been collected, members of Broadspire's medical staff reevaluate the claim and make a final

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                            Page 2
Not Reported in F.Supp.2d, 2005 WL 1712390 (E.D.Pa.), RICO Bus.Disp.Guide 10,924
**(Cite as: 2005 WL 1712390 (E.D.Pa.))**

determination based on the employee's job descrip-
tion. If a claimant fails to submit additional support-
ing medical documents, Broadspire has forty five
days from the initial date of the application within
which to make a final determination. Again, a
claimant is informed of this final determination by
letter.

### II. Cooper's Claim of Disability

**\*2** During her employment at IBC, Cooper suffered
from diabetes, anxiety and depression. These condi-
tions forced her to stop working on August 12, 2003.
Later that month, she filed a claim for short-term dis-
ability benefits and submitted medical documentation
regarding her conditions to Broadspire. Cooper's ap-
plication for benefits was reviewed by Broadspire
staff members and was denied on or about August 20,
2003 for allegedly failing to submit sufficient medic-
al documentation. She was informed of this decision
by letter dated August 29, 2003. Cooper appealed the
initial decision to deny her benefits shortly after re-
ceipt of the denial letter. Upon further review, Broad-
spire decided to uphold its initial finding denying her
short-term disability benefits and informed her of its
final determination by letter dated December 23,
2003. Cooper has since left her position with IBC.

### STANDARD OF REVIEW
Federal Rule of Civil Procedure 12(b)(6) permits a
court to dismiss all or part of an action for "failure to
state a claim upon which relief can be granted."
Fed.R.Civ.P. 12(b)(6) (2004). In ruling on a 12(b)(6)
motion, I must accept as true all well-pleaded allega-
tions of fact, and any reasonable inferences that may
be drawn therefrom, in plaintiff's complaint and must
determine whether "under any reasonable reading of
the pleadings, the plaintiff may be entitled to relief."
*Nami v. Fauver,* 82 F.3d 63, 65 (3d Cir.1996)
(citations omitted). Nevertheless, in evaluating
plaintiff's pleadings I will not credit any "bald asser-
tions." *In re Burlington Coat Factory Sec. Litig.,* 114
F.3d 1410, 1429 (3d Cir.1997). Nor will I accept as
true legal conclusions or unwarranted factual infer-
ences. *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct.
99, 2 L.Ed.2d 80 (1957). "The complaint will be
deemed to have alleged sufficient facts if it ad-
equately put the defendant on notice of the essential

elements of the plaintiff's cause of action." *Nami,* 82
F.3d at 65. A Rule 12(b)(6) motion is proper only if
the plaintiff "can prove no set of facts in support of
his claim which would entitle him to relief." *Conley,*
355 U.S. at 45-46.

### DISCUSSION
#### I. Breach of Contract of Insurance--Group Policy Claim

Plaintiff has failed to allege properly the existence of
a contract which could be breached. A successful
breach of contract action requires "(1) the existence
of a contract, including its essential terms; (2) a
breach of a duty imposed by the contract; and (3) res-
ultant damages." *CoreStates Bank N.A. v. Cutillo,*
723 A.2d 1053, 1058 (Pa.Super.1999) (internal cita-
tions omitted). Plaintiff's complaint alleges that she
"was insured and eligible for benefits under an em-
ployee benefit plan issued by Defendant IBC and was
a third-party beneficiary of the contract between De-
fendant Broadspire and Defendant IBC." However,
defendants argue that plaintiff's breach of contract
claim fails because plaintiff's employment relation-
ship with IBC was at-will and because the program is
not a contract. Plaintiff counters that because defend-
ant IBC offered employment to plaintiff and she ac-
cepted the offer of employment, she had an employ-
ment contract with IBC which included a short-term
disability plan.

**\*3** In Pennsylvania, "there is a strong presumption
that employment is at-will and terminable by either
party for any reason, or even no reason at all, unless
there is a statutory or contractual provision to the
contrary." *Buckwalter v. ICI Explosives USA, Inc.,*
No. 96-4795, 1998 U.S. Dist. LEXIS 276, at \*13
(E.D.Pa. Jan. 8, 1998) *citing Geary v. U.S. Steel
Corp.,* 456 Pa. 171, 319 A.2d 174, 176 (Pa.1974);
*Scully v. U.S. WATs, Inc.,* 238 F.3d 497, 505 (3d
Cir.2001) *citing Geary,* 319 A.2d at 176; *Scullion v.
Emeco Indus., Inc.,* 398 Pa.Super. 294, 580 A.2d
1356, 1358 (Pa.Super.1990). *See also Nix v. Temple
Univ. of Com. Sys. of Higher Educ.,* 408 Pa.Super.
369, 596 A.2d 1132, 1135 (Pa.Super.1991); *Mercante
v. Preston Trucking Co.,* No. 96- 5904, 1997 U.S.
Dist. LEXIS 7453, at \*1 (E.D.Pa. May 21, 1997).
Plaintiff must rebut the at-will presumption with clear

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 3
Not Reported in F.Supp.2d, 2005 WL 1712390 (E.D.Pa.), RICO Bus.Disp.Guide 10,924
**(Cite as: 2005 WL 1712390 (E.D.Pa.))**

evidence that the employment relationship was contractual. *See Buckwalter,* 1998 U.S. Dist. LEXIS 276, at *16. Plaintiff's bare allegation that her employment relationship was contractual in her response to defendants' motion to dismiss is insufficient to rebut the presumption of at-will employment, particularly in light of the IBC employment at-will policy that clearly states: "[e]mployment at-will is a term and condition of employment and continued employment for all associates employed by IBC." IBC's employment at-will policy further clarifies that "[n]o commitment or other term of employment shall be inferred or otherwise assumed from any source whatsoever, written or oral, including but not limited to any policies or statements of IBC. Policies and statements are not a contract, express or implied...." *C.f. Hennesy v. Santiago,* 708 A.2d 1269, 1278 (Pa.Super.1998) (holding plaintiff failed to state a claim of intentional interference with a contract where she failed to allege that she was a contractual employee in her complaint). Because plaintiff has not adequately rebutted the assumption that she is an at-will employee, she has failed to allege sufficiently that she was a contractual employee of IBC.

In addition, plaintiff has failed to allege the necessary terms of a contract for short-term benefits. The short-term disability program is a payroll practice maintained pursuant to C.F.R. § 2510.3-1(b), and IBC's employees pay no premium for the benefit and no monies are deducted from their pay to cover the cost of the benefit. The program is thus an employee benefit that is not based on a contractual agreement between IBC and its employees.

Plaintiff's complaint fails to allege that she was a contractual employee of IBC and fails to allege the essential terms of a contract for short-term disability benefits. Absent these allegations in the complaint, plaintiff cannot prove any set of facts to support her claim that defendants breached a contract for short-term disability benefits. I will therefore dismiss plaintiff's breach of contract claim.

*II. RICO Claims*

*4 RICO provides a private civil action to recover treble damages for injuries resulting from a defend-

ant's "racketeering activities" in violation of RICO's substantive provisions. 18 U.S.C. § 1964(c). Plaintiff alleges that defendants engaged in criminal racketeering activity by conspiring to deny her request for short-term disability benefits pursuant to the program. The Court of Appeals has explained the statutory framework for asserting civil RICO claims:

> The RICO statute authorizes civil suits by "[a]ny person injured in his business or property by reason of a violation of [18 U.S.C. § 1962]." 18 U.S.C. § 1964(c) (1988). Section 1962 contains four separate subsections, each addressing a different problem. Section 1962(a) prohibits "any person who has received any income derived ... from a pattern of racketeering activity" from using that money to acquire, establish or operate any enterprise that affects interstate commerce. Section 1962(b) prohibits any person from acquiring or maintaining an interest in, or controlling any such enterprise "through a pattern of racketeering activity." Section 1962(c) prohibits any person employed by or associated with an enterprise affecting interstate commerce from "conduct[ing] or participat[ing] ... in the conduct of such enterprise's affairs through a pattern of racketeering activity." Finally, section 1962(d) prohibits any person from "conspir[ing] to violate any of the provisions of subsections (a), (b), or (c)."

*Kehr Packages v. Fidelcor, Inc.,* 926 F.2d 1406, 1411 (3d Cir.1991). In the present case, plaintiff alleges violations of Sections 1962(a), (c), and (d).

A RICO violation requires the "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Warden v. McLelland,* 288 F.3d 105, 114 (3d Cir.2002) *quoting Sedima, S.P.R.L. v. Imrex Co., Inc., et al.,* 473 U.S. 479, 496 (1985). *See also Salinas v. United States,* 522 U.S. 52, 62, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997); *Annulli v. Panikar,* 200 F.3d 189, 198 (3d Cir.1999). Moreover, a plaintiff only has standing if she is injured in her business or property by the conduct constituting the violation. *Rehkop v. Berwick Healthcare Corp.,* 95 F.3d 285, 288 (3d Cir.1996); *Shearin v. E.F. Hutton Group, Inc.,* 885 F.2d 1162, 1164 (3d Cir.1989).

Defendants contend that plaintiff's RICO claims are deficient and incapable of surviving the motion to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 4
Not Reported in F.Supp.2d, 2005 WL 1712390 (E.D.Pa.), RICO Bus.Disp.Guide 10,924
**(Cite as: 2005 WL 1712390 (E.D.Pa.))**

dismiss because: (A) plaintiff failed to articulate any viable predicate acts of fraud, extortion, or bribery; (B) plaintiff has not adequately pled critical elements of the specific RICO claims; and (C) plaintiff lacks standing.

*A. Predicate Acts*

To state a claim under the RICO statute, a plaintiff must first allege that defendants engaged in a "pattern of racketeering activity." *See* 18 U.S.C. § 1962(c). [FN2] For RICO purposes, racketeering activity is defined as any act which is "indictable" under the federal criminal statutes set forth in 18 U.S.C. § 1961(1). Such activity includes mail fraud, 18 U.S.C. § 1341, [FN3] and wire fraud, 18 U.S.C. § 1343. [FN4] *See* 18 U.S.C. § 1961(1). Plaintiff alleges that defendants engaged in mail fraud and wire fraud by knowingly using the interstate mails and wires to further their scheme to deny short-term disability benefits to beneficiaries in order to reduce expenses and increase profits. [FN5]

> FN2. Section 1962(c) states: It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

> FN3. The mail fraud statute, 18 U.S.C. § 1341, provides in relevant part:
> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises ... for the purpose of executing such scheme or artifice or attempting to do so, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service ... or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail ... any such matter or thing ... shall be fined

under this title or imprisoned not more than 20 years, or both.

> FN4. The wire fraud statute, 18 U.S.C. § 1343 provides:
> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures or sounds for the purpose of executing such scheme or artifice, shall be fined not more than $1,000 or imprisoned not more than 20 years, or both.

> FN5. Courts apply the same analysis to determine whether a person has committed the predicate acts of mail fraud and wire fraud. *Carpenter v. United States,* 484 U.S. 19, 25 n. 6, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987) ( "The mail and wire fraud statutes share the same language in relevant part, and accordingly we apply the same analysis to both sets of offenses."); *United States v. Frey,* 42 F.3d 795, 797 n. 2 (3d Cir.1994) ("The cases construing the mail fraud statute are applicable to the wire fraud statute as well.") (citations and internal quotation marks omitted).

**\*5** Plaintiff alleges that two letters--one dated August 29, 2003 and the other dated December 23, 2003--constitute the predicate acts of mail fraud because they were sent through the United States mail system in order to continue defendants' fraudulent scheme. Plaintiff also alleges that "numerous telephone calls" from defendants to plaintiff between August 2003 and December 2003 constitute the predicate acts of wire fraud.

A plaintiff raising a claim of mail or wire fraud must establish three essential elements: (1) a scheme to defraud, (2) the use of the mails or wires for the purpose of executing the scheme, and (3) fraudulent intent. *United States v. Pharis,* 298 F.3d 228, 234 (3d Cir.2002). *See also Pereira v. United States,* 347 U.S.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Page 5
Not Reported in F.Supp.2d, 2005 WL 1712390 (E.D.Pa.), RICO Bus.Disp.Guide 10,924
(Cite as: 2005 WL 1712390 (E.D.Pa.))

1, 8, 74 S.Ct. 358, 98 L.Ed. 435 (1954); *Schuylkill Skyport Inn, Inc. v. Rich,* No. Civ. A. 95-3128, 1996 U.S. Dist. LEXIS 12655, at *47 (E.D.Pa. Aug. 20, 1996).

The words "to defraud" in the mail statute have "the common understanding of wronging one in his property rights by dishonest methods or schemes, and usually signify the deprivation of something of value by trick, deceit, chicane or overreaching." *Carpenter v. United States,* 484 U.S. 19, 27, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987) (citation and internal quotation marks omitted). In evaluating whether there is a "scheme" to defraud, the Court of Appeals has not required a scheme to be "fraudulent on its face"; rather, it "must involve some sort of fraudulent misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension." *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.,* 140 F.3d 494, 528 (3d Cir.1998) *quoting Kehr Packages,* 926 F.2d at 1415.

As with any other allegation of fraud, plaintiff's allegations of mail and wire fraud must be pled with particularity under Federal Rule of Civil Procedure 9(b). Rule 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." *See, e.g., Seville Indus. Mach. Corp. v. Southmost Mach. Corp.,* 742 F.2d 786, 791 (3d Cir.1984) (holding that 9(b) "requires plaintiffs to plead with particularity the 'circumstances' of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior."). *See also Rolo v. City Investing Co. Liquidating Trust,* 155 F.3d 644, 658 (3d Cir.1998) (holding Rule 9(b) requires "plaintiffs plead with particularity the 'circumstances' of the alleged fraud").

The purpose of Rule 9(b) is to provide a defendant with notice of the precise misconduct with which he or she is charged and to prevent false or unsubstantiated charges. *Rolo,* 155 F.3d at 658. Generally, this requires a plaintiff to plead the "who, what, when, and where details of the alleged fraud." *United States*

*ex rel. Waris v. Staff Builders, Inc.,* No. 96-1969, 1999 U.S. Dist. LEXIS 2998, at *16 (E.D.Pa. Mar. 4, 1999). However, the pleadings need not contain such specifics, as long as they adequately describe the nature and subject of an alleged fraud. *See Seville Indus. Mach. Corp.,* 742 F.2d at 791. Thus, while there is no formula for pleading fraud with particularity, fraudulent acts under RICO may be found to be insufficiently alleged where pleadings fail to inject "precision and some measure of substantiation into their allegations of fraud." *Id.*

**\*6** Defendants contend that the predicate acts alleged in the plaintiff's complaint fail to satisfy the heightened pleading requirements of Rule 9(b) because they are plead too generally to give adequate notice of the precise misconduct of which they are accused. Specifically, defendants contend that plaintiff's averments fail to describe the nature and subject of the alleged misrepresentation. *See Seville Indus. Mach. Corp.,* 742 F.2d at 791. Plaintiff contends that she has put defendants on adequate notice by alleging "numerous telephone calls" and two specific letters and the dates they were sent that were sent to plaintiff used in furtherance of defendants' scheme to deny plaintiff short-term disability benefits.

The rule regarding the pleading of fraud does not require absolute particularity or a recital of the evidence, especially when some matters are beyond the knowledge of the pleader and can only be developed through discovery. *See In re Craftmatic Secs. Litig. v. Kraftsow,* 890 F.2d 628, 645 (3d Cir.1989) (cautioning against rigid enforcement of Rule 9(b) in circumstances where the factual information is peculiarly within the defendant's knowledge or control). However, a general assertion of "fraud" or some other bald assertion or legal conclusion provides no information of the precise misconduct alleged for either the Court or the defendant and therefore is insufficient under Rule 9(b). *See In re Rockefeller Ctr. Properties, Inc. Secs. Litig.,* 311 F.3d 198, 216 (2002) ("Where it can be shown that the requisite factual information is peculiarly within a defendant's knowledge or control, the rigid requirements of Rule 9(b) may be relaxed. Nevertheless, even when the defendant retains control over the flow of information,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                        Page 6
Not Reported in F.Supp.2d, 2005 WL 1712390 (E.D.Pa.), RICO Bus.Disp.Guide 10,924
**(Cite as: 2005 WL 1712390 (E.D.Pa.))**

boilerplate and conclusory allegations will not suffice, and plaintiffs must accompany their legal theory with factual allegations that make their theoretically viable claim plausible.") (internal citations omitted); *Shapiro v. UJB Fin. Corp.,* 964 F.2d 272, 285 (3d Cir.1992) (holding "had the complaint contained a boilerplate allegation that plaintiffs believe the necessary information 'lies in defendants' exclusive control,' it still would not have satisfied Rule 9(b)").

In the instant case, plaintiff alleges "an understanding between Defendants Independence Blue Cross Blue Shield and Broadspire Services, Inc. to summarily deny short term disability claims for profit." Plaintiff contends that "defendant[s] pursued their scheme through material misrepresentations or material omissions and nondisclosures relating to their decision not to honor the terms and conditions of short-term disability plan that they issued and continue to issue to plaintiff and insureds similarly situated." Plaintiff contends that these omissions include a failure to disclose: (1) that non-medical employees would make and/or supervise the making of disability determinations; (2) that defendants would convene meetings at which certain claims for disability would be targeted in order to meet the goals of reducing insurance reserves; and (3) that defendants failed to disclose or misrepresented their role as administrators of the disability plan and that they would not be acting principally as fiduciaries of the insured. In addition, plaintiff alleges that defendants ignored medical records from plaintiff's treating physicians and "acted out of an extreme self-interest in reviewing claims". Plaintiff "requests discovery in order to substantiate" her RICO claims.

*7 Initially, I note that plaintiff has failed to provide any information regarding "who, what, when, and where details of the alleged fraud" with the exception of the dates of the two letters denying plaintiff's disability claim. *United States ex rel. Waris v. Staff Builders, Inc.,* 1999 U.S. Dist. LEXIS 2998 at *16. With regard to the overall scheme, plaintiff's averments regarding omissions must fail because plaintiff fails to plead adequately either a duty to disclose or how these alleged omissions were "reasonably calculated to deceive" in order to constitute a "scheme to defraud". [FN6] Furthermore, plaintiff's averment

that defendants conducted an alleged "meeting" where certain short-term disability claims were "targeted" fails to detail this "targeting," and relies only on bald assertions of a larger scheme to defraud IBC employees of their short-term disability benefits. Plaintiff fails to plead with the requisite factual specificity to avoid a motion to dismiss. Therefore, plaintiff's RICO claims must fail as she has failed to plead fraud with the particularity required by Rule 9(b).

> FN6. The Court of Appeals has recognized that an omission must be deceptive in nature absent a special relationship. *See Kehr Packages,* 926 F.2d at 1416. *See also Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.,* 140 F.3d 494, 528 (3d Cir.1998) (holding that an omission need only be "reasonably calculated to deceive" to constitute a "scheme to defraud"). Thus, a duty to disclose is not always a required element of fraud when there has been a material non-disclosure. *See Sonnenberg v. United States,* No. 01-2067, 2003 U.S.App. LEXIS 6503, at *11 (3d Cir. Jan. 14, 2003); *United States v. Colton,* 231 F.3d 890, 898-900 (4th Cir.2000); *United States v. Autuori,* 212 F.3d 105, 119 (2d Cir.2000). However, the non-disclosure must involve purposeful concealment of material facts with intent to deceive. *Colton,* 231 F.3d 898-900 *citing Neder v. United States,* 527 U.S. 1, 1, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999).

In addition, plaintiff's claims will not survive a motion to dismiss because she fails to adequately allege the second requirement for mail or wire fraud, the "use of mails or wires to execute the scheme." This requires that the mailings or wire communications be "incident to an essential part of the scheme," or a "step in [the] plot." *Schmuck v. United States,* 489 U.S. 705, 710-711, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989). *See also United States v. Otto,* 742 F.2d 104, 108 (3d Cir.1984). Mailings or wire communications made after the perpetrators accomplish the scheme's goal are not "for the purpose of executing" a scheme, with the exception of subsequent mailings designed to "lull victims into a false sense of security, post-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 7
Not Reported in F.Supp.2d, 2005 WL 1712390 (E.D.Pa.), RICO Bus.Disp.Guide 10,924
**(Cite as: 2005 WL 1712390 (E.D.Pa.))**

pone their ultimate complaint to the authorities, and therefore make the apprehension of the defendants less likely than if no mailings had taken place." *United States v. Maze,* 414 U.S. 395, 403, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974); *United States v. Lebovitz,* 669 F.2d 894, 896 (3d Cir.1982). *See, e.g., United States v. Sampson,* 371 U.S. 75, at 80-81, 83 S.Ct. 173, 9 L.Ed.2d 136 (1962); *United States v. Otto,* 742 F.2d 104, 108 (3d Cir.1984).

Plaintiff contends that routine business mailings closely bound with the fraudulent scheme may serve as a the basis for a charge of mail fraud. *United States v. Brown,* 583 F.2d 659, 668 (3d Cir.1978). Defendants counter that although a particular mailing or wire transmission need not be fraudulent to sustain a claim of mail or wire fraud plaintiff fails to identify any specific misstatements, omissions, or other specific conduct that constitutes part of the alleged "scheme" and that plaintiff has not alleged that she reasonably relied on any particular misrepresentation or omission to her detriment. *See Agathos v. Starlite Motel,* 60 F.3d 143, 147 (3d Cir.1995) (explaining that the elements of fraud are knowing misrepresentation, intent to induce reliance and reliance). *See also Steamfitters Local Union No. 420 v. Phillip Morris, Inc.,* 171 F.3d 912, 920 (3d Cir.1999) (identifying "whether [plaintiffs] reasonably relied on the fraud" as a "necessary element [ ]" of a fraud claim).

*8 I agree that while routine business mailings, such as the mailings in question denying the plaintiff short-term disability benefits, may support a charge of mail fraud, the mailings must be sufficiently closely related to the alleged scheme. *See Brown,* 583 F.2d at 668 ("[I]f the mailing is a part of executing the fraud, or is closely related to the scheme, a mail fraud charge will lie even though the mailing was also related to a business purpose.") Plaintiff avers that two letters and numerous phone calls were used to further defendants' alleged scheme to defraud her of short-term disability benefits. However, plaintiff has not adequately plead the purpose of the mailings within the defendants' alleged fraudulent scheme. *See Annulli v. Panikkar,* 200 F.3d 189, 201 n. 10 (3d Cir.1999). In addition, plaintiff has not alleged that the mailings were aimed at lulling the plaintiff into a false sense of security or deterring plaintiff from tak-

ing action to protect her interests. *See United States v. Otto,* 742 F.2d 104, 108 (3d Cir.1984).

The pleadings do not evince that the mailings were used in furtherance of a scheme or artifice to defraud within the meaning of the mail fraud statute and/or did not induce reliance, which is required when mail fraud serves as a predicate act under the RICO statute. [FN7] While the mails are alleged to have been used by defendants to maintain and operate their business in violation of an alleged contractual duty, plaintiff's assertions fall short of establishing a RICO action. *See Werther v. Rosen, et al.,* No. 02-CV-3589, 2002 U.S. Dist. LEXIS 22262, at *9 (E.D.Pa. Oct. 30, 2002). Plaintiff has failed to explain "how these or any other communications were false or misleading, or how they contributed to the alleged fraudulent scheme." *Warden v. McLelland,* 288 F.3d 105, 114 (3d Cir.2002). The facts alleged in the pleadings are insufficient to find that the predicate offenses of mail or wire fraud have been committed.

> FN7. Unlike common law fraud, reliance is not an element of mail fraud. *See United States v. Sanders,* 893 F.2d 133, 138 (7th 1990). However, most courts now agree that reliance must be shown when mail fraud is a predicate act in a civil RICO case. *See Allen Neurosurgical Associates, Inc. v. Lehigh Valley Health Network, et al.,* No. 99-4653, 2001 U.S. Dist. LEXIS 284, at *14 (E.D. Pa. Jan. 18, 2001).

Plaintiff avers that defendants have engaged in mail fraud and wire fraud by knowingly using the interstate mails and wires to further their scheme to deny short-term disability benefits to beneficiaries in order to reduce expenses and increase profits. While plaintiff does provide specific letters that were sent to her denying her benefits and the dates they were sent, she fails to explain how these letters perpetuate the alleged fraudulent scheme. In the words of Judge Pollack: "The problem ... is not that the pleading fails for lack of specificity with respect to the particular documents," but that the "pleading fails for lack of an allegation of the nature of the fraud alleged." *IBJ Whitehall Bank & Trust Co. v. Korman, et al.,* No. 99-1347, 2000 U.S. Dist. LEXIS 4775, at *16-17

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                              Page 8
Not Reported in F.Supp.2d, 2005 WL 1712390 (E.D.Pa.), RICO Bus.Disp.Guide 10,924
**(Cite as: 2005 WL 1712390 (E.D.Pa.))**

(E.D.Pa. Mar. 31, 2000).

*B. Pattern of Racketeering Activity*

In addition, defendants contend that the RICO claims must be dismissed because they fail to allege adequately a pattern of racketeering activity. Even if plaintiff properly alleged the predicate acts of mail and wire fraud (§ 1341 and § 1343), those predicate acts, if proven, must constitute a "pattern of racketeering activity" in order to state a RICO claim.

**\*9** The Court of Appeals has noted that "in many [RICO] cases plaintiffs will be able to withstand a facial attack on the complaint and have the opportunity to have their pattern allegations threshed out in discovery." *Banks v. Wolk,* 918 F.2d 418, 419-420 (3d Cir.1990) *quoting Swistock v. Jones,* 884 F.2d 755, 758 (3d Cir.1989). In many circumstances a dispute over the existence of a pattern of racketeering activity is better addressed in a motion for summary judgment than in a motion to dismiss. *See Swistock,* 884 F.2d at 758. Where, however, the "allegations of the complaint, taken as true, do not support the existence of either long-term criminal conduct or the threat thereof, dismissal is appropriate." *Advanced Power Sys. v. Hi-Tech Sys., Inc.,* No. 90-7952, 1992 U.S. Dist. LEXIS 6479, at *21 (E.D. Pa. April 28, 1992). *See also Marshall-Silver Constr. Co. v. Mendel,* 894 F.2d 597, 598 (3d Cir.1990).

While a pattern of racketeering activity requires at least two acts of racketeering activity, two such acts "may not be sufficient." *H.J., Inc. v. Northwestern Bell Telephone Co., et al.,* 492 U.S. 229, 237-38, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989) *quoting Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. at 496 n. 14 (1985). In other words, Section 1961's two act requirement does not define a pattern of racketeering activity so much as it sets a minimum condition for such patterns to exist. *H.J., Inc.,* 492 U.S. at 237-38. In addition, the Supreme Court has written that a pattern contains two defining characteristics: relatedness and continuity. *See H.J., Inc.,* 492 U.S. at 239 (holding a pattern of racketeering activity requires the predicate acts be "related, and that they pose a threat of continued criminal activity"). Predicate acts are related when they have "the same or similar purposes,

results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.,* 492 U.S. at 240. The parties do not appear to dispute the relatedness of the alleged predicate acts of mail fraud and wire fraud. [FN8] However, defendants contest the continuity of those acts.

> FN8. Relatedness "will nearly always be satisfied in cases alleging at least two acts of mail fraud stemming from the same fraudulent transaction." *Kehr Packages,* 926 F.2d at 1414.

"[C]ontinuity is both a closed and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.,* 492 U.S. at 241. If a plaintiff alleges a RICO violation over a closed period ("closed-ended" scheme), she must prove a series of related predicates lasting a "substantial period of time." *Id.,* at 242. If, however, she "alleges a RICO violation before continuity is established ('open-ended' scheme), she must prove a 'threat of continuity.' " *Hughes v. Consol-Pennsylvania Coal Co.,* 945 F.2d 594, 609-610 (3d Cir.1991) *citing H.J., Inc.,* 492 U.S. at 242. A threat of continuity exists when the predicate acts are a part of defendant's "regular way of doing business," or there is evidence that the predicate acts themselves involve a distinct threat of long-term racketeering activity either implicitly or explicitly. *H.J., Inc.,* 492 U.S. at 242.

**\*10** Defendants contend that plaintiff has at best alleged a "closed-ended" scheme that lasted but four months, and is therefore insufficient to allege a "pattern of racketeering activity" for purposes of Section 1962(c). Plaintiff contends that a single scheme could support a pattern of racketeering activity, and that whether the predicate acts proved establish a threat of continued racketeering activity depends on the specific facts of each case. *See Swistock,* 884 F.2d at 758 (explaining that although the Supreme Court has not explicitly held that the existence of a RICO pattern as a jury question, the Supreme Court has held that a district court improperly dismissed a plaintiff's RICO claim because the threat of continuity may be estab-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 9
Not Reported in F.Supp.2d, 2005 WL 1712390 (E.D.Pa.), RICO Bus.Disp.Guide 10,924
**(Cite as: 2005 WL 1712390 (E.D.Pa.))**

lished at trial).

"Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy [the 'substantial period of time'] requirement: Congress was concerned in RICO with long-term criminal conduct." *H.J., Inc.,* 492 U.S. at 242. The Court of Appeals has considered what constitutes a "substantial period of time" for the "closed-ended" continuity prong of RICO's "pattern" requirement, and has concluded that conduct lasting less than twelve months is insufficient to meet the standard. *Plater-Zybrek v. Abraham,* No. 97- 3322, 1998 U.S. Dist. LEXIS 1736, at *23-24 (E.D.Pa. Feb. 17, 1998) *citing Tabas v. Tabas,* 47 F.3d 1280, 1293 (3d Cir.1995). *See also Marshall-Silver Constr. Co. v. Mendel,* 894 F.2d 593, 598 (3d Cir.1990) (holding that plaintiff's alleged acts of mail fraud and extortion lasting seven months showed "neither 'long-term' criminal conduct nor the threat thereof."); *Hughes,* 945 F.2d at 610-611 (holding that 10 months is not a substantial period of time and therefore there was no continuity under a closed-ended scheme); *Hindes v. Castle,* 937 F.2d 868, 875 (3d Cir.1991) (holding eight months of a closed-ended scheme did not establish continuity); *Kehr Packages,* 926 F.2d at 1413 (holding predicate acts that lasted less than seven months did not satisfy the continuity requirement); *Banks v. Wolk,* 918 F.2d 418, 422-423 (3d Cir.1990) (holding an eight month period of predicate acts as insufficient). Plaintiff alleges a series of events over a four month period; this is insufficient to support a closed-ended scheme.

Plaintiff does allege indirectly that there is the threat of related future behavior on the part of the defendants. Although plaintiff alleges that defendants engaged in similar misconduct with respect to other "policyholders and insureds," plaintiff does not allege any specific facts beyond these bald accusations. If I were to accept plaintiff's bald accusations, then virtually any single incident involving alleged fraud could "be converted into a pattern of racketeering activity through the use of baseless stock phrases in a pleading." *Advanced Power Sys., Inc. v. Hi-Tech Sys., Inc.,* No. 90-7952, 1992 U.S. Dist. LEXIS 6479, at *23 (E.D. Pa. April 28, 1992). Plaintiff may not "compensate for the inadequacy of [her] pleading through

the use in [her] brief of bald statements that track the language of previous court decisions." *Id.,* at *23-24. There is no basis in plaintiff's pleadings to support a claim that defendants' alleged conduct would continue in the future.

**\*11** In cases where the alleged conduct did not extend over such a substantial period of time, or did not otherwise suggest a threat of continuation, the Court of Appeals has warned against attempts to convert alleged "garden variety" fraud into RICO claims. *Advanced Power Sys.,* 1992 U.S. Dist. LEXIS 6479 at *25 citing Banks v. Wolk,* 918 F.2d at 423 (dismissal appropriate where complaint alleges participation in one act of real estate fraud, with no indication from the facts alleged that such fraud would have continued or represented a regular way of doing business). I am mindful that the continuity analysis is flexible. *See H.J., Inc.,* 492 U.S. at 243. *See also Envtl. Tectonics v. W.S. Kirkpatrick, Inc.,* 847 F.2d 1052, 1063 (3d Cir.1988) (following a "flexible interpretation of RICO's pattern requirement"). However, the pleadings do not provide a basis from which it reasonably could be inferred that defendants' alleged misconduct poses a threat to future criminal activity. Therefore, plaintiff's Section 1962(c) will be dismissed for a failure to allege a pattern of racketeering activity.

*C. Standing*

Defendants argue that even if plaintiff has sufficiently pled the predicate acts of mail and wire fraud and a pattern of racketeering activity plaintiff's claims will not survive a motion to dismiss: they assert that she lacks standing to pursue her RICO claims because she did not plead adequately that she suffered a compensable injury to her business or property. Defendants also contend that plaintiff has not alleged that the injury suffered was proximately caused by defendant's purported acts of racketeering. I agree. In her pleadings, plaintiff alleges that defendants were engaged in racketeering activity by denying plaintiff's disability benefits through mail and wire fraud, and because of this denial, plaintiff: (1) did not receive her disability benefits; (2) was terminated from her employment; (3) lost her health benefits; (4) could not receive necessary medical treatment; and (4) consequently fell behind in her bills and ruined her cred-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                    Page 10
Not Reported in F.Supp.2d, 2005 WL 1712390 (E.D.Pa.), RICO Bus.Disp.Guide 10,924
**(Cite as: 2005 WL 1712390 (E.D.Pa.))**

it.

To have standing, a RICO plaintiff must show that the alleged violations proximately caused injury to her business or property. *See* 18 U.S.C. § 1964(c); *Holmes v. Security Investor Protection Corp.,* 503 U.S. 258, 267-68, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992); *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985) ("[T]he plaintiff only has standing if, and can only recover to the extent that, [she] has been injured in [her] business or property by the conduct constituting the violation"). An indirect injury remotely caused by a RICO violation will not satisfy the proximate cause requirement. *See Callahan v. A.E.V., Inc.,* 182 F.3d 237, 262-63 (3d Cir.1999) (holding that the ability to pursue RICO claims is limited to those feeling the "direct impact of the fraud"). Plaintiff has not alleged adequately how the purported RICO violations, the use of mail and wire fraud to further an alleged scheme to deny IBC employees short-term disability benefits, proximately caused her termination from employment, loss of health benefits, and ruined credit. *See Holmes,* 503 U.S. at 268 (holding that recovery under RICO is available only to those who can establish a "direct relation between the injury asserted and the injurious conduct alleged"). The injury to business or property element of section 1964(c) can be satisfied by allegations of actual monetary loss, ie. out-of-pocket loss. *Maio v. Aetna Inc.,* 221 F.3d 472, 483 (3d Cir.2000). *See also Steele v. Hosp. Corp. of Am.,* 36 F.3d 69, 70 (9th Cir.1994) (stating that plaintiffs have not suffered a financial loss under RICO if they have paid none of the allegedly excessive charges out of their own pockets). While plaintiff alleges a tangible financial loss, she fails to allege adequately how that financial loss is a direct result of the denial of short-term benefits.

**\*12** Moreover, "[t]o have been injured in [her] business or property, a plaintiff must have a property interest." *Browne v. Abelhak,* No. 98-6688, 2000 U.S. Dist. LEXIS 12064, at *8-9 (Aug. 23, 2000). "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Board of Regents v. Roth,* 408 U.S. 564,

577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). As previously discussed, plaintiff has failed to allege properly the existence of either an employment contract or a contract for short-term disability benefits. Thus, plaintiff has asserted no property interest in the benefit program. Therefore, plaintiff does not allege adequately any injury to her "business or property" proximately caused by the alleged RICO violations which would confer RICO standing.

*D. Investment of Racketeering Income--18 U.S.C. § 1962(a)*

Defendants also argue that plaintiff's Section 1962(a) [FN9] claim should be dismissed because plaintiff has failed to allege that she was injured by the investment of racketeering proceeds. Initially, I note that plaintiff fails to allege an injury resulting from the investment of racketeering income distinct from an injury caused by the defendants' alleged predicate acts. Nonetheless, plaintiff alleges that defendants engaged in mail and wire fraud by knowingly using interstate mails and wires to further their scheme to deny short-term disability benefits in order to reduce expenses and increase profits, and used income made from that scheme to invest in the stock market, bonds, mutual funds, etc.

> FN9. Section 1962(a) states in pertinent part:
> It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity ... to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

Section 1962(a) was enacted primarily to halt the investment of racketeering proceeds in legitimate businesses. *Lightning Lube, Inc. v. Witco Corp.,* 4 F.3d 1153, 1188 (3d Cir.1993). The Court of Appeals has held that allegations that the income was used or invested to continue the fraudulent scheme are insufficient to state a claim under Section 1962(a). *Id.,* at

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 1712390 (E.D.Pa.), RICO Bus.Disp.Guide 10,924
**(Cite as: 2005 WL 1712390 (E.D.Pa.))**

1188-1189; *Brittingham v. Mobil Corp.,* 943 F.2d 297, 304 (3d Cir.1991). *See also Glessner v. Kenny,* 952 F.2d 702, 709 (3d Cir.1991); *Rose v. Bartle,* 871 F.2d 331, 357-358 (3d Cir.1989); *Allied Erecting and Dismantling v. U.S. Steel,* 786 F.Supp. 1223, 1228-29 (W.D.Pa.1992). Thus, a plaintiff seeking civil damages for a violation of Section 1962(a) must plead facts tending to show that she was injured by the use or investment of racketeering income distinct from an injury caused by the predicate acts themselves. *Glessner v. Kenny,* 952 F.2d at 708; *Banks v. Wolk,* 918 F.2d at 421; *Leonard v. Shearson Lehman/American Express, Inc.,* 687 F.Supp. 177, 181 (E.D.Pa.1988); *Gilbert v. Prudential-Bache Secs., Inc.,* 643 F.Supp. 107, 111 (E.D.Pa.1986); *Lawyers Title Ins. Corp. v. Barbone, et al.,* No. 90-1121, 1990 U.S. Dist. LEXIS 14786, at *3 (E.D.Pa. Oct. 31, 1990). Because plaintiff has failed to allege any facts showing injury from the use or investment of racketeering income and has no standing to assert a claim for damages based on a violation of Section 1962(a), plaintiff's Section 1962(a) claim will be dismissed.

*E. RICO Conspiracy--18 U.S.C. § 1962(d)*

**\*13** Plaintiff claims RICO conspiracy pursuant to 18 U.S.C. § 1962(d) alleging that defendants conspired to violate Section 1962(c) and/or Section 1962(a). Defendants argue that this count should be dismissed because plaintiff has not alleged a conspiracy to violate Sections 1962(a) or (c). Plaintiff contends that the conspiracy is "to deny short-term disability benefits to Independence Blue Cross Blue Shield employees" and that direct proof will be provided via discovery.

Under Section 1962(d), "it shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section." Any claim under Section 1962(d) based on a conspiracy to violate the other subsections of Section 1962 necessarily must fail if the substantive claims are themselves deficient. *Lightning Lube, Inc. v. Witco Corp.,* 4 F.3d 1153, 1191 (3d Cir.1993) (holding that the actions alleged to constitute violations of subsections 1962(a), (b), and (c) were not violations of those subsections, and thus they also failed to serve as the object of a Section 1962(d) conspiracy). Because plaintiff has not alleged properly a substantive violation of Sec-

tion 1962(a) or Section 1962(c), she has failed to show how the alleged conspiracy to commit those violations caused her injury. Therefore, plaintiff's Section 1962(d) claim will be dismissed.

An appropriate order follows.

*ORDER*

AND NOW, this 20th day of July 2005, upon consideration of defendants' motion to dismiss, plaintiff's response thereto, and defendants' reply brief, and for the reasons set forth in the accompanying memorandum, it is ORDERED that defendants' motion is GRANTED and plaintiff's complaint is DISMISSED.

Not Reported in F.Supp.2d, 2005 WL 1712390 (E.D.Pa.), RICO Bus.Disp.Guide 10,924

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                    Page 1
Not Reported in F.Supp.2d, 2000 WL 33225470 (E.D.Wash.), RICO Bus.Disp.Guide 9997
**(Cite as: 2000 WL 33225470 (E.D.Wash.))**

☞

United States District Court, E.D. Washington.
Olivia MENDOZA and Juana Mendiola, Individually
and on Behalf of All Others
Similarly Situated, Plaintiffs
v.
ZIRKLE FRUIT CO., a Washington Corporation,
Matson Fruit Company, a Washington
Corporation and Selective Employment Agency, Inc.,
a Washington Corporation,
Defendants.
**No. CS-00-3024-FVS.**

Sept. 27, 2000.

ORDER GRANTING DEFENDANTS' MOTION
TO DISMISS AND REMANDING CAUSE TO
STATE COURT
VAN SICKLE, Chief District J.

*1 BEFORE THE COURT is a motion to dismiss and
for a stay of discovery filed by defendants Zirkle
Fruit Company ("Zirkle"), Matson Fruit Company
("Matson") and Selective Employment Agency, Inc.
("Selective"). The Court heard oral argument on the
motion on August 31, 2000. The plaintiffs were rep-
resented by Steve W. Berman, Andrew M. Volk,
Kevin P. Roddy, and Howard W. Foster. The defend-
ants were represented by Brendan V. Monahan
(Selective), Ryan M. Edgely (Matson and Zirkle),
and Walter G. Meyer (Zirkle).

Procedural Background
Defendants Zirkle Fruit Company ("Zirkle") and
Matson Fruit Company ("Matson") grow, package,
and sell fruit. The plaintiffs/class representatives,
Olivia Mendoza and Juana Mendiola, were lawfully
employed by Zirkle as laborers. The plaintiffs allege
that Zirkle and Matson are engaged in two related il-
legal schemes for the purpose of depressing employ-
ee wages, in violation of the Racketeer Influenced
and Corrupt Organizations Act ("RICO"), 18 U.S.C.
§ 1961 *et. seq.*: the "Illegal Immigrant Hiring
Scheme" and the "I-9 Mail Fraud Scheme." The
plaintiffs further claim in Count 2 that Matson and
Zirkle entered into a civil conspiracy with a third de-

fendant, Selective Employment Agency, Inc.
("Selective"), to violate the Immigration and Nation-
ality Act ("INA"), 8 U.S.C. § 1324, in violation of
state law. [FN1] The plaintiffs brought this action in-
dividually and on behalf of all other similarly situated
laborers.

> FN1. Selective is an employment agency
> which has referred workers to Zirkle and
> Matson. The plaintiffs claim that "Matson
> and Zirkle have entered into these joint ven-
> tures [with Selective] for the primary pur-
> pose of shifting certain aspects of Illegal Im-
> migrant Hiring Scheme from themselves to
> an outside firm." Compl. at ¶ 41.

Defendants Zirkle and Matson seek dismissal of the
complaint pursuant to Fed.R.Civ.P. 12(b)(6); defend-
ant Selective has joined in the motion. [FN2] The de-
fendants argue that the plaintiffs' complaint should be
dismissed for the following reasons: (1) the plaintiffs
fail to adequately allege the elements of any predicate
act under RICO; (2) the plaintiffs lack standing to
pursue a claim under RICO; (3) the plaintiffs' claims
interfere with the comprehensive enforcement
scheme established by the Immigration Reform and
Control Act; and (4) federal preemption of the state
law civil conspiracy claim.

> FN2. Defendant Selective has filed a separ-
> ate motion to dismiss it as a party-defendant
> for lack of subject matter jurisdiction.

The Court finds that although plaintiffs have properly
alleged that defendants have violated federal immig-
ration laws, defendants' motion to dismiss will be
granted. The Court finds that plaintiffs' alleged dam-
ages are simply too speculative to survive the motion.
However, the Court finds that plaintiffs' state law
conspiracy claims are not preempted by federal law,
and the Court remands the state claims to state court.
The Court also finds that plaintiffs' RICO claims do
not interfere with the enforcement scheme of the Im-
migration Reform and Control Act and finds that if
this cause were to proceed in federal court, defendant
Selective would be dismissed under this Circuit's jur-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 2
Not Reported in F.Supp.2d, 2000 WL 33225470 (E.D.Wash.), RICO Bus.Disp.Guide 9997
**(Cite as: 2000 WL 33225470 (E.D.Wash.))**

isprudence on "pendent party jurisdiction."

Factual Background As Alleged in Complaint
The following are the facts alleged in the Complaint and in Plaintiff's RICO Case Statement:

### A. The "Illegal Immigrant Hiring Scheme"

*2 Since 1996, defendants Matson and Zirkle have knowingly hired at least 50 undocumented workers per year as part of a scheme to depress employee wages. Defendants have exploited these workers' precarious economic situation and fear of asserting their rights to drive the wage rate for both documented and undocumented workers to a level lower than it would be if defendants did not hire undocumented workers. Defendant Zirkle has entered into an association-in-fact enterprise with defendant Selective, an employment agency, to knowingly hire undocumented workers and depress the hourly wages paid to all of Zirkle's workers. Defendant Matson has entered into an identical association-in-fact enterprise with Selective.

In early 1999 defendant Matson was audited by the Immigration and Naturalization Service ("INS") for its suspected hiring of undocumented workers. The INS found that in 1998 74% of Matson's workforce (493 of 661 workers) was undocumented, and had been hired with false papers. The INS has made similar findings in the past against defendant Zirkle. Matson maintains two sets of books, one that shows all of its workers, and one that excludes all workers known to Matson to be undocumented and working under false papers. Matson and Zirkle have in many cases rehired undocumented workers using different false papers, even after being forced to fire these workers by the INS. Defendants Matson and Zirkle each hire undocumented workers with actual knowledge that each undocumented person was either smuggled into the U.S., or harbored once in the U.S.

### B. The "I-9 Mail Fraud Scheme"

Defendants Matson and Zirkle send I-9 forms to the INS through the U.S. mail for the undocumented workers referred to above. Defendants Matson and Zirkle falsely state on these forms (or cause defendant Selective to falsely state when filling out forms for Matson and Zirkle's employees) that these em-

ployees' eligibility to work in the U.S. has been verified. Matson and Zirkle (or Selective) complete these forms knowing that the Social Security numbers used to "verify" these workers' employment eligibility are false. This I-9 scheme is perpetrated in furtherance of the illegal hiring scheme discussed above.

### C. The Relationship with Selective

Matson and Zirkle each have a contractual relationship with Selective, whereby Selective hires workers to work for Matson and Zirkle; Selective takes responsibility for paying the employees' wages (for which it is reimbursed by Matson or Zirkle), withholding taxes and preparing the paper-work for each employee, in return for which it is paid a fee, Matson and Zirkle have directed and continue to direct Selective to hire undocumented workers and to prepare the false I-9 forms referred to above.

### D. Harm and Damages

Plaintiffs and the class that they represent have been harmed by the lower wages paid by defendants Matson and Zirkle as a result of the Illegal Immigrant Hiring Scheme.

### Analysis
### A. Rule 12(b)(6) Standard

*3 "On a motion to dismiss we are required to read the complaint charitably, to take all well-pleaded facts as true, and to assume that all general allegations embrace whatever specific facts might be necessary to support them." *Peloza v. Capistrano Unified Sch. Dist.,* 37 F.3d 517, 521 (9th Cir.1994).

### B. Failure to Allege Elements of RICO Predicate Acts

Under RICO, it is unlawful for any person associated with any enterprise to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity. *See* 18 U.S.C. § 1962(c). Racketeering activity includes any act which is indictable under § 274 of the Immigration and Nationality Act, if the act "was committed for the purpose of financial gain." 18 U.S.C. § 1961(1)(F). Any act which is indictable as mail fraud under 18 U.S.C. § 1341 also constitutes racketeering activity. *See* 18 U.S.C. § 1961(1)(B). The plaintiffs have alleged mail fraud and violations of § 274 of the INA as RICO predicate acts.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                           Page 3
Not Reported in F.Supp.2d, 2000 WL 33225470 (E.D.Wash.), RICO Bus.Disp.Guide 9997
**(Cite as: 2000 WL 33225470 (E.D.Wash.))**

The defendants argue that the predicate acts, as alleged by the plaintiffs, are insufficient to establish a RICO claim. Although not necessary to the Court's ruling on the instant motion, the Court discusses below its findings as to defendants' arguments. The Court finds that plaintiffs have adequately pled the predicate act of violating the Immigration and Nationality Act, but have not adequately pled the predicate act of mail fraud.

*1. Illegal Immigrant Hiring Scheme.*
Plaintiffs allege that Matson and Zirkle continually and knowingly hire workers of illegal status because those workers are willing to accept sub-market wages. Specifically, plaintiffs allege that Matson and Zirkle each have employed at least 50 illegal aliens in each year from 1996 to the present with actual knowledge of the aliens' illegal status and with knowledge that the aliens were either smuggled into the United States or harbored once in the United States, in violation of the Immigration and Nationality Act ("INA").

Section 274 of the INA provides in part:
> Any person who, during any 12-month period, knowingly hires for employment at least 10 individuals with actual knowledge that the individuals are aliens described in subparagraph (B) shall be fined under Title 18, or imprisoned for not more than 5 years, or both.

8 U.S.C. § 1324(a)(3)(A). An alien described in subparagraph (B) is an alien unauthorized to be employed who "has been brought into the United States in violation of" the provisions of 8 U.S.C. § 1324(a). 8 U.S.C. § 1324(a)(3)(B), 1324(h)(3). The portion of Section 1324(a) which appears most germane here prohibits bringing a known alien into the United States "in any manner whatsoever" at "a place other than a designated port of entry or place other than as designated by the Commissioner, regardless of whether such alien has received prior official authorization to come to, enter, or reside in the United States..." 8 U.S.C. § 1324(a)(1)(A)(i).

*4 The defendants argue that the plaintiffs' first predicate act fails to the extent that the plaintiffs allege that the defendants knew that the illegal workers were "harbored" in the United States. On this point, defendants may be correct. Section 1324(a) some-

what redundantly defines "harboring" as concealing, harboring, or "shield[ing] from detection" an alien in any place with knowledge "or in reckless disregard of the fact" that the alien has "come to, entered or remains in the United States in violation of law." 8 U.S.C. § 1324(a)(1)(A)(iii). Plaintiffs may not be able to show that defendants knew more than the legal status of the people that they hired. [FN4]

> FN4. Some courts have interpreted the "harboring" provision of the INA to cover a broad range of actions, meaning that the plaintiffs might be able to show that the defendants themselves "harbored" workers, which would constitute a separate RICO predicate act. *See United States v. Kim,* 193 F.3d 567 (2d Cir.1999) (defendant found guilty of harboring alien by knowingly employing illegal alien).

However, plaintiffs do not have to allege that defendants harbored any aliens. The complaint alleges that defendant Matson knew that the undocumented workers were "either *smuggled into the U.S.* and/or harbored once he or she was in the U.S." Compl. at ¶ 29 (emphasis added) and alleges that defendants Zirkle knew that "each [undocumented worker] was either smuggled into the U.S. or harbored once in the U.S." *Id.* at ¶ 32. A common sense understanding of "smuggled" is "unlawfully brought," the language of Section 1324(a)(3)(B). [FN5] Therefore the plaintiffs have adequately pled a predicate act under RICA by alleging that the defendants knew that some of their workers were unlawfully brought into the United States.

> FN5. Black's Law Dictionary defines "smuggling" as "[f]raudulent taking into a country, or out of it, merchandise which is lawfully prohibited."

The defendants next argue that the plaintiffs have no factual basis for the assertion that the defendants had "actual knowledge" that workers were unlawfully brought into the United States. The defendants argue that the plaintiffs cannot state a claim without pleading such details as when workers were smuggled into the United States, where workers were smuggled into

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 33225470 (E.D.Wash.), RICO Bus.Disp.Guide 9997
**(Cite as: 2000 WL 33225470 (E.D.Wash.))**

the United States, how the workers were smuggled into the United States, and how the defendants had "actual knowledge" of those events.

Rule 8 of the Federal Rules of Civil Procedure does not require the plaintiffs to plead their cause of action in the detail the defendants demand. Rule 8 states that a pleading which sets forth a claim for relief shall contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The plaintiffs argue that non-fraud RICO claims are subject to the pleading requirements of Rule 8. That appears to be the majority rule. *See MCM v. Andrews-Bartlett & Assoc., Inc.,* 62 F.3d 967 (7th Cir.1995) (applying notice pleading to non-fraud RICO claims); *Rose v. Bartle,* 871 F.2d 331, 356 (3rd Cir.1989) (finding unwarranted the defendant's suggestion that a charge of racketeering, with its implications of links to organized crime, should not be easier to plead than accusations of fraud, which are subject to the special pleading requirements of Rule 9); *Colony at Holbrook, Inc. v. Strata G.C., Inc.,* 928 F.Supp. 1224, 1234 (E.D.N.Y.1996) ("[A]llegations of non-fraud based predicate acts need only comply with Rule 8(a) and contain a 'short and plain statement' showing the pleader is entitled to relief."); *United States v. International Brotherhood of Teamsters,* 708 F.Supp. 1388, 1369 (S.D.N.Y.1989); *Lewis v. Sporck,* 612 F.Supp. 1316, 1324 (N.D.Cal.1985); *but see Plount v. American Home Assurance Co.,* 668 F.Supp. 204, 206-07 (S.D.N.Y.1987) (requiring non-fraud RICO claims to be pled with particularity). The Court finds that plaintiffs' allegations as to the "Illegal Immigrant Hiring Scheme" satisfy Rule 8.

**\*5** The Court's inquiry, however, does not end there. The Court must also determine whether Local Rule 3.2, which requires a RICO plaintiffs to file a RICO Case Statement, effectively heightens the plaintiffs' pleading requirement for the purpose of a 12(b)(6) motion to dismiss. The plaintiffs indirectly argue that LR 3.2 is inconsistent with Rule 8 to the extent that it heightens the plaintiffs' pleading standard.

Rule 83 of the Federal Rules of Civil Procedure grants district courts the discretion to promulgate local rules, so long as the local rule is "not inconsistent"

with a Federal Rule of Civil Procedure. *See Frazier v. Heebe,* 482 U.S. 641, 107 S.Ct. 2607 (1987); Fed.R.Civ.P. 83(a). Plaintiffs raise a valid concern that a local rule which heightens the pleading standard may be inconsistent with the spirit and intent of Rule 8 and its clear mandate of notice pleading. However, as resolution of this issue is not necessary to the Court's ruling on this motion, the Court declines to comment further.

### 2. I-9 Mail Fraud Scheme

The plaintiffs also allege that Matson and Zirkle engage in mail fraud--a separate RICO predicate act. The plaintiffs allege that Matson and Zirkle complete or have Selective complete false Employee Eligibility Verification Forms ("I-9 forms") for illegal workers that they hire; the plaintiffs further allege that some of these forms have been sent through the mails, under penalty of perjury, to the INS, with actual knowledge that the workers being employed were ineligible for employment. The plaintiffs allege that this mail fraud scheme furthers the Illegal Immigrant Hiring Scheme, detailed above. The defendants contend' that the plaintiffs have failed to plead sufficiently the elements of mail fraud and have failed to plead the act with enough specificity, and have thus failed to plead a predicate act under RICO.

#### a) The Elements of Mail Fraud

To establish a violation of the mail fraud statute, 18 U.S.C. § 1341, the plaintiffs must show: (1) the defendants formed a scheme or artifice to defraud; (2) the defendants used the United States mails or caused a use of the United States mails in furtherance of the scheme; and (3) the defendants did so with the specific intent to deceive or defraud. *See Rothman v. Vedder Park Mgmt.,* 912 F.2d 315, 316 (9th Cir.1990). The mail fraud statute prohibits the use of the mails to obtain money or property from the one who is deceived. *See United States v. Lew,* 875 F.2d 219, 221 (9th Cir.1989) (immigration attorney's conviction for mail fraud overturned because though the attorney sent fraudulent work papers to the Department of Labor on behalf of his illegal alien clients, the Department of Labor was not the source of the financial gain) (cited in *Monterey Plaza Hotel, Ltd. v. Local 483 of the Hotel and Restaurant Employees Union,* 215 F.3d 923, 926 (9th Cir.2000)); *United States v.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:06-cv-00185-GMS    Document 59-2    Filed 05/17/2007    Page 32 of 71

Not Reported in F.Supp.2d                                                                    Page 5
Not Reported in F.Supp.2d, 2000 WL 33225470 (E.D.Wash.), RICO Bus.Disp.Guide 9997
**(Cite as: 2000 WL 33225470 (E.D.Wash.))**

*Thomas,* 32 F.3d 418 (9th Cir.1994). The defendants argue that because the INS was the party that was allegedly deceived by the fraudulent I-9 forms, and because the INS was not the source of the defendants' alleged financial gain, the defendants' alleged conduct does not constitute mail fraud and cannot form the basis of that RICO predicate act.

*6 Plaintiffs claim that *United States v. Kim,* 193 F.3d 567 (2d Cir.1999) supports their contention that mailing false I-9 forms is an actionable violation. The issue here, however, is not whether such a scheme is a violation of the INA, as was the issue in *Kim,* but whether mailing false I-9 forms to the INS constitutes mail fraud in this instance. More to the point is *United States v. Hubbard, et. al.,* 96 F.3d 1223 (9th Cir.1996), cited by plaintiffs at oral argument, in which the court held that in a scheme to sell cars with rolled-back odometers, the state's mailing of new titles with the false odometer readings to the cars' new owners was "sufficiently closely related" to the underlying scheme to constitute mail fraud.

However, the underlying basis for the court's finding in *Hubbard* was that the party defrauded was the party deceived by the mailing, even though the mailing did not come from the defendant. *See Hubbard,* 96 F.3d at 1229 (defendants could be charged with mail fraud because use of U.S. mails by state agency to mail new owners titles containing false odometer readings was reasonably foreseeable by defendants, although not made intentionally part of scheme to defraud). Here, by contrast, the party that plaintiffs allege was defrauded of money is the plaintiff class, while the party deceived by the mailings was the INS. Thus, although it is not necessary to the underlying conclusion reached on this motion, the Court finds that plaintiffs have not as a matter of law adequately alleged the elements of mail fraud.

### b) Sufficiency of the Pleadings Under Rule 9

In addition, defendants argue that the plaintiffs have failed to plead the allegation of mail fraud with enough specificity to satisfy Fed. Rule Civ. P. 9(b). Rule 9(b) requires "the identification of the circumstances constituting fraud so that the defendant can prepare an adequate answer from the allegations," including the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations. *Schreiber Distrib, Co. v. Serv-Well Furniture Co., Inc.,* 806 F.2d 1393, 1400-01 (9th Cir.1986) (internal quotation omitted).

The plaintiffs concede that their fraud-based RICO claim is subject to the heightened pleading requirement of Rule 9(b) of the Federal Rules of Civil Procedure. *See e.g., Lancaster Community Hosp. v. Antelope Valley Hosp. Dist.,* 940 F.2d 397, 405 (9th Cir.1991). However, the plaintiffs argue that they need to conduct discovery before they can satisfy all of the requirements of Rule 9(b); they also argue that defendants have been put on sufficient notice as to the nature of their claim to proceed to the discovery phase. Plaintiffs point out, accurately, that *Wool v. Tandem Computers, Inc.,* 818 F.2d 1433, 1439 (9th Cir.1987), established precedent for relaxing the requirements of Rule 9 where the "plaintiffs cannot be expected to have personal knowledge of the facts constituting the wrongdoing." *Id.*

*7 Although the plaintiffs need not plead their allegation with the specificity suggested by defendants, here the plaintiffs' inability to plead the particulars of the alleged mail fraud scheme is intimately connected to the flawed pleading of the elements of the offense; that is, plaintiffs do not know the particulars of the mailings in question because, as discussed above, although they are the party allegedly harmed by the fraud, they were not the party deceived by the mailings. Therefore, although plaintiffs and defendants raise interesting issues regarding the requirements of Rule 9 in this situation, the Court declines to consider the issue further.

### C. RICO Standing

The defendants argue that the plaintiffs lack standing to bring a RICO claim because they have not been injured by the defendants' practices. RICO provides a private cause of action for damages only to those individuals "injured in [their] business or property by reason of" a violation of the law's substantive provisions. *See* 18 U.S.C. § 1964(c). The defendants argue that the plaintiffs' alleged injury does not confer standing because (1) the injury was not proximately caused by the defendants' alleged violations and (2) the claimed injury is not sufficiently concrete.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 33225470 (E.D.Wash.), RICO Bus.Disp.Guide 9997
(Cite as: 2000 WL 33225470 (E.D.Wash.))

### 1. *Direct Injury*

The Supreme Court has held that to satisfy the injury requirement of RICO, the alleged RICO predicate acts must be a "but for cause" and a "proximate cause" of the alleged injury. *See Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268 (1992). In determining whether an injury is too remote to allow for recovery under RICO, courts are to apply a three-factor test: (1) whether there are more direct victims of the alleged violation who can be counted on to vindicate the law; (2) whether it will be difficult to ascertain the amount of damages attributable to the violation; and (3) whether allowing recovery for indirect injuries would force the court to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury to obviate the risk of multiple recoveries. *See Oregon Laborers-Employers Health & Welfare Trust Fund v. Philip Morris Inc.*, 185 F.3d 957, 963 (9th Cir.1999) (citing *Holmes*, 503 U.S. at 269-70). This three-part "remoteness" test blends together what previously had been two distinct concepts: (1) proximate causation and (2) a concrete injury. Although *Holmes* blends these two concepts together, because the Court today reaches different conclusions about the sufficiency of plaintiffs' case as to each element the Court will discuss each element separately.

The first remoteness factor addresses the issue of proximate causation. In *Holmes*, the Supreme Court dismissed a RICO claim brought by a securities insurance corporation that insured a group of securities brokers because the plaintiff did not establish that the defendant's violation was the proximate cause of the plaintiff's injury. *See Holmes*, 503 U.S. at 271-73, 112 S.Ct. at 1319-21. The plaintiff-insurer alleged that the defendant defrauded the brokers' customers; the customers thereupon lost their securities; the customers' brokers could not cover the losses; and the plaintiff-insurer was then contractually obligated to cover the losses. *Id.* The Supreme Court found that the racketeering activity was not the proximate cause of the plaintiff's injury because the plaintiff's duty to cover the debts was triggered only by the brokers' intervening insolvency. *Id.*

*8 Similarly, the Ninth Circuit recently held that a health plan did not have standing to bring a RICO suit against a tobacco company to recover the costs of medical care to smokers covered by the plan because the injury to the plan was entirely derivative of the harm suffered by the plan participants. *See Oregon Laborers*, 185 F.3d at 964. The Ninth Circuit also found proximate cause lacking in *Imagineering, Inc. v. Kiewit Pacific Co.*, 976 F.2d 1303, 1310-11 (9th Cir.1992), where subcontractors of the second-lowest-bidding prime contractor on a government project alleged that the defendant-contractor who was awarded the contract had violated federal setaside regulations in its bidding. 976 F.3d at 1311. The court found that although the defendants' actions might have injured the plaintiffs, "it was the intervening inability of the prime contractors to secure the primary contracts that was the direct cause of plaintiffs' injuries." *Sheperd v. American Honda Motor Co., Inc.*, 822 F.Supp. 625, 628 (N.D.Cal.1993) (discussing *Imagineering* ).

This case also appears superficially similar to a number of cases in which district courts have found that plaintiffs who alleged predicate acts of making false statements to, or otherwise misleading, governmental agencies were merely "indirect" victims. *See Medgar Evers House Tenants Ass'n. v. Medgar Evers Houses Associates, L.P.*, 25 F.Supp.2d 116, 121 (E.D.N.Y.1998); *Barr Laboratories, Inc. v. Quantum Pharmics, Inc.*, 827 F.Supp. 111 (S.D.N.Y.1993); *Kingston Square Tenants Ass'n. v. Tuskegee Gardens, Ltd.*, 792 F.Supp. 1566 (S.D.Fla.1992). Similarly, here one of the predicate acts alleged by plaintiffs is filing false I-9 forms with the INS, and even the illegal hiring scheme could be seen as having the INS as its most direct victim. Indeed, defendants argue that the INS is the party to most properly bring an action for defendants' alleged violations of law.

However, this case is distinguishable. The illegal hiring scheme alleged here does not depend on the intervening actions--or inactions--of any government agency or any other third person. By operation of the laws of supply and demand, simply by expanding the available labor pool through the predicate act of knowingly hiring illegal workers (as alleged by plaintiffs), defendants Matson and Zirkle could have driven down wages for documented and undocumented workers alike to some degree. [FN6] There-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Page 7
Not Reported in F.Supp.2d, 2000 WL 33225470 (E.D.Wash.), RICO Bus.Disp.Guide 9997
**(Cite as: 2000 WL 33225470 (E.D.Wash.))**

fore, plaintiffs have stated a claim that they are the direct victims of defendants' illegal hiring scheme.

> FN6. The Supreme Court's observation that the direct injury requirement of RICO is predicated on the idea that "[A] plaintiff who complained of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts was generally said to stand a too remote a distance to recover." *Holmes,* 503 U.S. at 267, is valid in addressing this issue. Plaintiffs' alleged harms here do not flow from a third person's misfortunes, although they may be related to the misfortunes of the undocumented workers who are allegedly exploited by defendants, and may be related to the misfortunes of the INS, the agency allegedly deceived by defendants' mail fraud scheme.

### 2. Speculative Damages

This is not to say, however, that other intervening factors have not influenced plaintiffs' damages. Indeed, it is the degree to which defendants could have caused plaintiffs alleged injuries in light of these other factors that is the most troubling aspect of plaintiffs' case. Thus, after turning to the second and third elements in the *Holmes* remoteness analysis, the Court finds that the plaintiffs' alleged injury is too speculative to confer standing.

**\*9** The second and third *Holmes* elements are: "(2) whether it will be difficult to ascertain the amount of the plaintiff's damages attributable to defendant's wrongful conduct: and (3) whether the courts will have to adopt complicated rules apportioning damages to obviate the risk of multiple recoveries." *Oregon Laborers,* 185 F.3d at 963. A showing of "injury" requires proof of a concrete loss. *See Imagineering,* 976 F.2d at 1310-11. "Speculative" injuries are insufficient to confer RICO standing. *Id.* at 1311. Although the third *Holmes* element is not operative here because there is no other method known to the Court for plaintiffs to recover for defendants' alleged wrongdoing, the second element is crucial.

In *Imagineering,* the Ninth Circuit considered a plaintiff-subcontractor's claim that it suffered a loss

of profits when defendant received contract bid through racketeering activity and plaintiff's contractor was the next lowest bidder. *Id.* The court held that the plaintiff's claim of damages was too speculative to confer standing because (1) the plaintiff could not prove that its contractor would have actually acquired the bid absent the defendant's racketeering activity; (2) there was no proof that the contractor would not switch sub-contractors during the pendency of the project; and (3) the plaintiff failed to specify whether it was claiming loss of the opportunity to realize profits or loss of specific, identifiable profits. *Id., see also Oscar v. University Students Co-operative Ass'n,* 965 F.2d 783, 785 (9th Cir.1992) (*en banc* ) (claim that plaintiff suffered losses in the reduced rent she could charge to sublet her apartment was insufficient where plaintiff did not allege that she had a right to sublet her apartment nor that she ever had sublet the apartment or wanted to sublet the apartment). [FN7]

> FN7. Indeed, *Imagineering* could be read to require proof that a plaintiff actually paid money as a result of the racketeering activity in order to have standing to bring a RICO claim. *See id.* at 1310 ("[T]he facts alleged do not establish 'proof of concrete financial loss,' let alone show that money was paid out as a result of [the defendant's] alleged racketeering activity."); *see also Sheperd v. American Honda Motor Co.,* 822 F.Supp. 625, 628 (N.D.Cal.1993).

Also instructive on this issue is *Sheperd v. American Honda Motor Co.,* 822 F.Supp. 625 (N.D.Cal.1993). In *Sheperd,* the plaintiffs, owners of a Honda car dealership, alleged that American Honda, which allocated new cars to Honda dealerships, conspired with other dealerships to fabricate the number of Honda cars being sold in the United States. The plaintiffs further alleged that when they refused to misreport the number of cars sold by their dealership, they were allocated a lower number of popular cars. The plaintiffs were unable to compete with dealerships that received a high number of popular cars and were forced to sell their dealership at a distressed price. *Sheperd;* 822 F.Supp. at 627.

The district court found that the plaintiffs lacked

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                        Page 8
Not Reported in F.Supp.2d, 2000 WL 33225470 (E.D.Wash.), RICO Bus.Disp.Guide 9997
**(Cite as: 2000 WL 33225470 (E.D.Wash.))**

standing to bring a RICO claim because the injury to their car dealership was too speculative:

> There can be no doubt that the alleged diversion tactics and reduced allocations would have been likely to have some adverse effect on the profitability of the Sheperds' dealership, and consequently affect the market value of the dealership. But the financial losses reflected in reduced profitability and a distressed sale price are too attenuated from the alleged wrongful conduct of defendants to give plaintiffs standing to recover treble damages under RICO.... For this Court, or a jury, to assess what portion of the dealership's diminished profitability and market value were attributable to the defendants' wrongful conduct, apart from other factors, would be an exercise in sheer speculation.
>
> *10 Although courts may be willing to permit such speculation in other contexts, Supreme Court and Ninth Circuit precedent indicate that it is not tolerable in the context of RICO with its provision for treble damages.

*Id.* at 630.

Here, as in *Imagineering* and *Sheperd,* the plaintiffs' main flaw is their inability to concretely establish the degree to which their wages have been affected by the defendants' alleged violations. As the Ninth Circuit stated in *Imagineering* "[e]ssentially, the [direct injury] rule has more to do with problems of proof than foreseeability," 976 F.2d at 1312.

A wide range of factors determines the wage for orchard laborers in the Yakima Valley. Plaintiffs have argued that they will be able to show, through expert testimony and statistical and demographic modeling, what the relevant labor market would look like absent the hiring of undocumented workers. However, such evidence would not be sufficient to remove plaintiffs' damage claim from the realm of sheer speculation. Plaintiffs may be able to show what the prevailing wage rate might be if no illegal workers were hired by any employers in the region. However, it would be extremely difficult to show with the required specificity what impact defendant's alleged wrongdoing has had in the context of the whole labor market. In addition, the wage rate that plaintiffs might have been paid would depend on the wage rate paid by other orchardists and similar em-

ployers, the general availability of laborers, documented and undocumented, in the Yakima Valley, the profitability of the defendants' businesses, the qualifications of each plaintiff, whether the plaintiffs individually or as a class would have been hired at a higher rate, and other factors.

Sifting through those factors to determine the exact amount of loss attributable to the defendants' alleged violations would be a daunting task at best. And, as the court in *Sheperd* stated. "[a]lthough courts may be willing to permit such speculation in other contexts, Supreme Court and Ninth Circuit precedent indicate that it is not tolerable in the context of RICO with its provision for treble damages." 822 F.Supp. at 630. The Court finds that plaintiffs have failed to allege a sufficiently non-speculative financial loss that resulted from defendants' wrongdoing to sustain their RICO claim. Plaintiffs have thus failed to establish standing to bring this action. On that basis, the Court will grant defendants' motion to dismiss.

### D. "Preemption" of Plaintiffs' RICO Claims

Defendants argue that plaintiffs' RICO claims interfere with the "comprehensive enforcement scheme" of the Immigration Reform and Control Act ("IRCA"). This assertion has no merit. Congress would not have included violations of the immigration laws, including 8 U.S.C. § 1324(a), as a predicate act under RICO if it had not intended for citizens to bring exactly the kind of action now before the Court.

### E. Preemption of Plaintiffs' State Law Civil Conspiracy Claim

*11 Defendants assert both that plaintiffs' state conspiracy claim is preempted by the "comprehensive... enforcement scheme mandated by the IRCA" and that plaintiff's claims are expressly preempted by the language of the IRCA. Neither assertion bears out.

Defendants' more general assertion fails because IRCA's express preemption language limits the preemptive scope of the statute. IRCA states that "[t]he provisions of [IRCA] preempt any State or local law imposing civil or criminal sanctions (other than through licensing and similar laws) upon those who employ, or recruit, or refer for a fee for employment,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 33225470 (E.D.Wash.), RICO Bus.Disp.Guide 9997
**(Cite as: 2000 WL 33225470 (E.D.Wash.))**

unauthorized aliens." 8 U.S.C. § 1342a(h)(2). Because Congress has expressly defined the preemptive reach of IRCA, this language both defines and limits the preemptive reach of the statute. *See Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 517 (1992). Therefore, defendants' claim that plaintiffs' state law conspiracy claim is preempted by the "comprehensive... enforcement scheme mandated by the IRCA" is rejected.

Defendant's second assertion fails because the preemption language quoted above refers only to "civil or criminal sanctions," 8 U.S.C. § 1342a(h)(2), which does not cover plaintiffs' claims for civil money damages. As stated above, because IRCA contains an express preemption provision, the language of that provision provides strict limits on the scope of the statute's preemption of state law. *See Cipollone,* 505 U.S. at 524 ("[E]ach phrase within [a preemption clause] limits the universe" of laws preempted.) Because "sanctions" are distinct from the "damages" sought by plaintiffs, the preemption clause of IRCA does not cover the remedy sought by plaintiffs, and IRCA does not preempt plaintiffs' state law conspiracy claim for civil damages.

### F. Defendant Selective's Motion to Dismiss It as a Pendant Party

Selective moves to dismiss the state law civil conspiracy claims against it on the grounds that this Court lacks subject matter jurisdiction to hear a claim against a pendant party. Prior to 1990, district courts had little explicit statutory authority to exercise supplemental jurisdiction over parties and claims that lacked an independent basis for being in federal court. Case law focused on two rather amorphous concepts: "ancillary jurisdiction" and "pendent jurisdiction." In 1990, Congress passed the supplemental jurisdiction statute. codified at 28 U.S.C. § 1367, which granted broad authority for supplemental jurisdiction in federal-question cases while limiting supplemental jurisdiction in diversity cases.

This case presents the type of supplemental jurisdiction that prompted Congress to enact § 1367; pendent party jurisdiction. [FN8] Because of the Ninth Circuit's historically hostile view toward pendent party jurisdiction, and its pre- § 1367 holdings that such

jurisdiction is unconstitutional, an overview of the development of this law is necessary.

> FN8. In addition to involving a state claim that is appended to the claim that provides the anchoring source of federal jurisdiction, a pendent party claim requires for its resolution the inclusion of a new party.

In *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130 (1966), a unanimous Supreme Court enunciated a test for determining when supplemental jurisdiction meets the constitutional requirement of Article III, § 2. *Gibbs* involved the most basic pendent jurisdiction scenario--a plaintiff sought to bring a federal claim and a state claim against the same non-diverse defendant. The Court held that jurisdiction exists when the relationship between the federal claim and "the state claim permits the conclusion that the entire action before the court comprises but one constitutional 'case.' " *Gibbs,* 383 U.S. at 725, 86 S.Ct. at 1138 (1966). "The state and federal claims must derive from a common nucleus of operative fact" such that the plaintiff "would ordinarily be expected to try them all in one judicial proceeding." *Id.*

**\*12** Soon after *Gibbs,* the federal courts began to grapple with pendent party jurisdiction. While the language in *Gibbs* strongly suggests that its test applies to all variations of supplemental jurisdiction, the Ninth Circuit was quick to limit the new test to the facts of that case. The Ninth Circuit refused to apply the broad *Gibbs* test to pendent parties and instead relied on the pre-*Gibbs* constitutional rule that jurisdiction exists only if the new claim involves the same parties. *See Hymer v. Chai,* 407 F.2d 136, 137 (9th Cir.1969) (holding that "[j]oinder of claims, not joinder of parties" was the object of the pendent jurisdiction doctrine, and that the doctrine "was not designed to permit a party without a federally cognizable claim to invoke federal jurisdiction by joining a different party plaintiff asserting an independent federal claim growing out of the same operative facts"); *Williams v. United States,* 405 F.2d 951 (9th Cir.1969).

After *Hymer,* the Supreme Court itself began to limit pendent party jurisdiction, but always for lack of statutory authority rather than on constitutional grounds.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 33225470 (E.D.Wash.), RICO Bus.Disp.Guide 9997
**(Cite as: 2000 WL 33225470 (E.D.Wash.))**

In *Aldinger v. Howard,* 427 U.S. 1, 96 S.Ct. 2413 (1976), the Court held that there was no statutory authority whereby a plaintiff could attach a state claim against a county to a § 1983 action against county officials. *See Aldinger,* 427 U.S. at 16-17, 96 S.Ct. at 2421- 22. The Court also noted that its decision was buttressed by the fact that the plaintiff could have brought all claims in state court. *Id.,* 427 U.S. at 18, 96 S.Ct. 2422.

The great majority of circuits interpreted *Aldinger* to allow pendent party jurisdiction in cases in which the plaintiff could not sue all defendants in state court: for example, in cases in which the United States was a party. The Ninth Circuit, however, retained its firm stance that pendent party jurisdiction in any form simply exceeded the scope of Article III. *See Ayala v. United States,* 550 F.2d 1196, 1200 n. 8 (9th Cir.1977) ("our difficulty with pendent party jurisdiction is a constitutional one under Article III"). The *Ayala* court explained that:

> It should be emphasized that, putting to one side the potential statutory analysis underlying our decision in *Williams,* it is clear that *Hymer* 's rejection of pendent party theory was not based on a ferreted congressional disinclination, but rather rested on a more fundamental constitutional consideration.
> The Supreme Court's affirmance in *Aldinger,* grounded as it was on a congressional disinclination to allowing pendent party jurisdiction. may thus be read merely as another avoidance of the ultimate question of constitutional power left unanswered by the Court in *Moor v. County of Alameda.*

*Ayala,* 550 F.2d at 1199-1200 (citation omitted). The Ninth Circuit has never overruled *Ayala.*

The issue came to a head in 1989 with the Supreme Court's decision that pendent party jurisdiction had to be expressly authorized by statute, effectively eliminating all pendent party jurisdiction. *See Finely v. United States,* 490 U.S. 545, 109 S.Ct. 2003 (1989). In *Finely* the plaintiff had brought a claim against the United States under the Federal Tort Claims Act; the plaintiff had no choice but to bring the claim in federal court. The Supreme Court held that the district court lacked jurisdiction to hear the plaintiff's state claims against other defendants, even though the claims arose out of a common nucleus of operative fact. The Court made very clear that its holding was statutory and not constitutional; it closed the opinion by inviting Congress to change the result. *Id.,* 490 U.S. at 556, 109 S.Ct. at 2010 ("Whatever we say regarding the scope of jurisdiction conferred by a particular statute can of course be changed by Congress.").

**\*13** In 1990, Congress did just that when it enacted 28 U.S.C. § 1367. That statute provides that, except for a few specific types of cases, [FN9] the district courts have "supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III" including claims "that involve the joinder or intervention of additional parties." 28 U.S.C. § 1367(a). Thus, Congress extended the bounds of supplemental jurisdiction in federal-question cases as far as Article III permits.

> FN9. The exceptions stated in § 1367(b) involve cases in which the anchoring claim is brought to federal court under diversity jurisdiction.

Since the enactment of § 1367, other courts have embraced pendent party jurisdiction as long as the *Gibbs* "common nucleus of operative fact" test is met. *See, e.g., Franceskin v. Credit Suisse,* 2000 WL 719494, *4 (2nd Cir.2000); In Re Prudential Insur. Co.,* 148 F.3d 283, 383 (3rd Cir.1997). As one commentator has put it:

> Only one federal circuit, the Ninth, has ever indicated that the exercise of pendent party jurisdiction may be constitutionally impermissible under Article III. The Ninth Circuit, however, which openly acknowledged its 'historic hostility to pendent party jurisdiction,' never expressly identified the nature of this constitutional infirmity and stood alone among the federal courts on this issue. As previously argued, Article III does not compel the position espoused by the Ninth Circuit, and such a position is clearly contrary to the long judicial history of permitting supplemental jurisdiction over claims involving additional parties under other circumstances.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2000 WL 33225470 (E.D.Wash.), RICO Bus.Disp.Guide 9997

**(Cite as: 2000 WL 33225470 (E.D.Wash.))**

Denis F. McLaughlin, *The Federal Supplemental Jurisdiction Statute--A Constitutional and Statutory Analysis,* 24 ARIZ.ST.L.J. 849, 903-04 (1992).

A resigned Eastern District of California, facing the very issue that is now before the Court, found that it lacked subject matter jurisdiction to hear a state claim against a pendent party. *See Elsaas v. County of Placer,* 35 F.Supp.2d 757 (E.D.Cal.1999). First, the court acknowledged that Congress had provided authorization for pendent party jurisdiction, but recognized that "congressional approval of pendent party jurisdiction, as manifested in 28 U.S.C. § 1367, is effective only if pendent party jurisdiction is permitted under Article III." *Id.* at 759. It then noted that the Supreme Court has yet to decide whether pendent party jurisdiction is permissible under Article III. *See id.* at 760.

Left with no authoritative decisions of the Supreme Court, the district court felt bound by pre § 1367 Ninth Circuit precedent:

> Whatever its deficiency in analysis, *Ayala* clearly expressed the Ninth Circuit's view that Article III does not permit pendent party jurisdiction. No decision of the United States Court of Appeals for the Ninth Circuit or the United States Supreme Court has overruled *Ayala* 's rejection of pendent party jurisdiction on constitutional grounds, nor does the passage of § 1367 alter the holding. Thus, *Ayala* remains the law on pendent party jurisdiction in the Ninth Circuit, and this court, being bound, may not exercise jurisdiction over plaintiffs' claims against the Union....
>
> *14 Despite my firm conviction that the result of *Ayala* does not comport with practical governance, and even in the absence of articulated justification, I am, of course, bound by it unless overtaken by subsequent law. I must conclude that *Ayala* represents the last expression of the law by which I am bound. While I can hope that the Court of Appeals will reconsider, until then I am obligated to apply *Ayala* 's holding.

*Id.* at 760-61; *see also, Eads v. Eads,* 135 B.R. 387, 394 n .11 (Bankr.E.D.Cal 1991) (noting, in dicta, that "this circuit has expressed the view that adding pendent parties in connection with pendent claims exceeds the bounds of Article III").

The only indication from the Ninth Circuit itself that the result should be otherwise is found in *Yanez v. United States,* 989 F.2d 323 (9th Cir.1993). In *Yanez,* a federal defendant complained that the theory of relief posited by the plaintiff in federal court was inconsistent with the plaintiff's theory in a related claim previously brought in state court. The Ninth Circuit allowed the inconsistent theories, in part because under *Ayala* the plaintiff had no choice but to bring two separate actions in two separate forums, *See id.* at 327. The Court noted:

> Although Congress has now explicitly authorized pendent party jurisdiction ("supplemental jurisdiction"), 28 U.S.C.A. § 1367 (West Supp.1992), the section is not retroactive. Section 1367 applies to civil actions commenced on or after Dec. 1, 1990. The Judicial Improvements Act of 1990, Pub.L. No. 101-650, § 310(c).

*Id.* at n. 3.

*Yanez* could be read as an acknowledgment that pendent party jurisdiction is now permissible in civil actions commenced after December 1, 1990. The Court declines to adopt such a reading, however. If the Ninth Circuit truly intended to reverse *Ayala,* one would think that it would do so explicitly and not through dicta placed in a footnote.

As plaintiffs point out, some district courts within the Ninth Circuit have recently permitted pendent party jurisdiction, at least in the pendent-plaintiff context, *see Ziegler v. Ziegler,* 28 F.Supp.2d 601, 618-19 (E.D.Wash.1998) (Nielsen, C.J.); *c.f. Guzman v. Onard Lemon Assoc., Ltd.,* 1992 WL 510094, *8-9 (C.D.Cal.1992) (permitting pendent-plaintiff jurisdiction, though it recognized such jurisdiction was questionable); *Irwin v. Mascott,* 1999 WL 1814712, *4 (N.D.Cal.1999), perhaps casting some doubt upon the continued vitality of *Ayala.* As that decision has not been overruled, however, this Court has no choice but to acknowledge that if this cause were to be maintained in federal court, the Court would lack jurisdiction over defendant Selective.

IT IS HEREBY ORDERED:

Defendants' Motion to Dismiss (Ct.Rec.15) is GRANTED.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Page 12
Not Reported in F.Supp.2d, 2000 WL 33225470 (E.D.Wash.), RICO Bus.Disp.Guide 9997
**(Cite as: 2000 WL 33225470 (E.D.Wash.))**

1. Plaintiffs have alleged facts to support the predicate act of hiring undocumented aliens (the "Illegal Immigrant Hiring Scheme"), a predicate act under RICO.

**\*15** 2. However, plaintiffs' alleged injury is too speculative for purposes of RICO standing. Plaintiffs thus lack standing to bring this action.

3. The complaint is dismissed without leave to amend because amendment would be futile. *See Allwaste, Inc. v. Hecht,* 65 F.3d 1523, 1530 (9th Cir.1995).

4. Plaintiffs' RICO claims do not interfere with the enforcement scheme of the federal immigration laws.

5. Plaintiffs' state law conspiracy claim is not preempted by federal law.

6. If this cause were to remain in federal court, the Court would not have jurisdiction over defendant Selective.

7. All remaining state law claims are REMANDED to state court.

IT IS SO ORDERED. The District Court Executive is hereby directed to enter this order and furnish copies to counsel.

Not Reported in F.Supp.2d, 2000 WL 33225470 (E.D.Wash.), RICO Bus.Disp.Guide 9997

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                                                  Page 1
Not Reported in A.2d, 1987 WL 15555 (Del.Ch.)
**(Cite as: 1987 WL 15555 (Del.Ch.))**

**C**

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware, Kent County.
N. Joseph HUNTER, Ann M. Hunter, John Borden,
Raymond J. Stone, Dorothy L.
Stone, Larry Biddle, Linda Biddle, Francis S. Coyle,
III, Mary Coyle, Frank
Rosenacker, Elizabeth Rosenacker, Daniel C. Ros-
setti, Jr., Delores M. Rossetti,
William J. O'leary, Patricia Ann O'leary, James E.
Grill, Jeanne L. Grill,
Harry G. Farrow, Jr., Gregory S. Kramedas, Avelina
Kramedas, Paul J. Duphily,
Joan T. Duphily, James Peel, Joan Peel, Kenneth Re-
illy, Thomasine Whitehurst,
Kathryn Lamb, Michael H. Radebach, Mary Ann P.
Radebach, Alan F. Robinson, Jr.,
Sandra S. Robinson, Mary Muttle, Michael McFadd,
Sarah Lewis and Grace H. Rezac
Plaintiffs,
v.
DIOCESE OF WILMINGTON, an unincorporated
association of the State of Delaware,
Robert E. Mulvee, Bishop of the Diocese of Wilm-
ington, CHURCH of the Holy
Cross, Dover, Delaware, a religious corporation of
the State of Delaware, and
Thomas J. Peterman, President of Church of the Holy
Cross, Dover, Delaware,
Defendants.

Submitted: July 23, 1987.
Decided: August 4, 1987.
Gary R. Dodge, Dodge & O'Brien, P. A., Dover, for
plaintiffs

James P. Collins, Sr., Healy & Collins, Wilmington,
for Diocese of Wilmington and Bishop Robert E.
Mulvee

Joseph W. Maybee, Dover, for Church of Holy
Cross, Dover, Delaware and Father Thomas J. Peter-
man.

MEMORANDUM OPINION
ALLEN, Chancellor.

*1 This suit presents the question whether the Holy
Cross Roman Catholic Church of Dover, Delaware is
legally required by contract to continue to operate the
Holy Cross High School, even though the Parish
Council--a representative body of the congregation-
-has decided that, given alternative demands for lim-
ited financial resources of the church, it is no longer
in the parish's best interest to continue to operate the
school.

Plaintiffs, parents of students who have attended
Holy Cross High School, having failed to convince
the Parish Council or the Bishop of the Roman Cath-
olic Diocese of Wilmington that continued operation
of the school is appropriate, now turn to this Court
and assert legal rights to require that result. They
seek specific performance of an alleged contract
between themselves and the Roman Catholic Diocese
of Wilmington and the Roman Catholic Church of
the Holy Cross to continue in operation Holy Cross
High School for the coming academic year.

Pending is an application for a preliminary injunc-
tion. The tests for the issuance of such a remedy are
well known. First, plaintiff must establish a reason-
able probability of ultimate success on the merits
upon final hearing. Second, plaintiff must establish
an imminent threat of irreparable injury, that is, in-
jury that would not be adequately compensated by
money damages or equitable relief shaped at a later
time. Third, plaintiff must demonstrate that the injury
threatened to plaintiff outweighs the injury to defend-
ant that might arise if the remedy is improvidently
granted. Finally, any public interest implicated by the
application will be considered. Shields v. Shields,
Del. Ch., 498 A.2d 161, 166 (1985); Gimbel v. Signal
Companies, Inc., Del. Ch., 316 A.2d 599 (1974),
aff'd, Del. Supr., 316 A.2d 619 (1974).

For the reasons that follow, I hold that plaintiffs have
not shown a reasonable likelihood that the remedy of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                       Page 2
Not Reported in A.2d, 1987 WL 15555 (Del.Ch.)
**(Cite as: 1987 WL 15555 (Del.Ch.))**

specific performance which they seek will be granted upon final hearing of this matter. So concluding, I need not address the other elements of the test for the granting of preliminary injunctive relief and will decline to issue the preliminary injunction sought. [FN1]

In assessing the probability of ultimate success of the claims asserted, two basic questions are presented: Was an enforceable contract formed which obligated defendants to operate Holy Cross High School for the academic year 1987-88 and, if so, is that contract one that is specifically enforceable in equity in the circumstances presented. Before turning to a discussion of each of these issues, it will be helpful to sketch the background facts of the dispute as they appear at this time.

I.

Holy Cross High School is the only Catholic secondary school in the State of Delaware located south of the Chesapeake and Delaware Canal. Holy Cross High School and its companion elementary school are owned, operated and funded by the Church of the Holy Cross, Dover, Delaware ('Holy Cross Church'), a religious corporation (see 27 Del. C. §§ 115-118) consisting of the local parish congregation. The governing body of the parish is the Holy Cross Parish Council. Father Thomas J. Peterman was, during the time relevant to this action, pastor of that congregation and president of the incorporated entity.

**\*2** The parish is located within the Catholic Diocese of Wilmington, which is geographically defined to include the State of Delaware and nine counties of Maryland's eastern shore. The affairs of the Diocese, like those of the parishes of which it is comprised, are administered through a religious corporation. The Ordinary of the Diocese, Bishop Robert Mulvee, has, under Church rules that the parties regard as binding, final and complete authority over all matters within the Diocese, including the administration of parish schools. Thus, under those rules, the Holy Cross Parish Council has, in matters affecting the high school, a consultative role.

The feasibility of continuing to operate Holy Cross High School has been in question at least since 1982.

Enrollment at the school has been declining. During the academic year beginning in 1981, 228 students were enrolled; 214 were enrolled in 1982; 187 in 1983, 153 in 1984; and 107 in 1986-87. The projected enrollment for the coming year (1987-88) is between 63 and 67 students, less than 30% of the school's 240 student capacity. [FN2] Moreover, the decline in enrollment has been principally among Catholic students, while the attendance of non-Catholic students has remained nearly constant. The percentage of non-Catholic teachers has risen steadily to now approximately 50%. These statistics have drawn into question, in the minds of some parishioners, the school's role as a distinctively Catholic, rather than simply a Christian high school.

In addition, as enrollment declined, the operating deficits for Holy Cross High School increased and remain, in recent years, at a substantial level. For the 1984-85 academic year, the deficit was $108,030 and for 1985-86, it was $94,243. Annual contributions of $30,000 from the Holy Cross Educational Foundation in each of those two years reduced by that amount the subsidy that Holy Cross Church provided from its offertory collection. No contribution from the Holy Cross Educational Foundation, however, is available for the upcoming year to reduce the projected deficit of $80,000 to $90,000.

In addition to enrollment and financial problems, limitations in the dated physical facility as well as the lack of co-curricular activities such as athletics and band, and questions about the quality of education at the high school all contributed to loss of support for the high school in the parish.

The issue of the viability of the high school has created a division in the parish concerning the parish's mission and priorities. While parents of students enrolled in the high school support continuation of the school, other parishioners and Diocesan officials believe that the Holy Cross Church's subsidy has diverted funds from other missions.

In December, 1986, the Parish Council commenced discussions regarding the viability of continued operation of the high school. Father Peterman at that time informed Father Cini, Episcopal Vicar for the Wilm-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1987 WL 15555 (Del.Ch.)
(Cite as: 1987 WL 15555 (Del.Ch.))

Page 3

ington Diocese, that in fairness to parents and to teachers, whose contracts would be negotiated in March, a decision had to be made as to whether the school would be open in 1987-88. In response, Father Peterman was told that the Diocese had commissioned a consultant, Catholic School Management, to conduct a viability study, the results of which would be reported in April. Upon learning of this, Father Peterman, on January 14, 1987, wrote to Father Cini to inquire if the relatively late time frame of the viability study implied that the school would remain open for the coming year. On February 12, 1987, Sister Marie Kelly, Superintendent of Schools, replied via letter addressed to Father Peterman. It reads in pertinent part:

*3 In your letter of January 14 to Father Cini you asked that [sic] if the time limits (February-May) of the study . . . implies that the high school will remain open. If so, something from the diocese to that effect would be appreciated so that administrators and instructors can prepare accordingly.
The response to your question is yes.
It is the policy of the diocese that a definite procedure be followed where there is some question of the continued viability of a school. The outline of these procedures were distributed to schools and parishes in 1986. The required procedure has not been followed.
***
Included in the requirements outlined in the official policy is that parents and other persons affected . . . be given sufficient and adequate notice. That notice should be given no later than February of the year the change or close is expected.
Holy Cross is in the midst of a process and cannot meet the deadlines. Therefore, the diocese would not agree to allow the school to close in June, 1987.

A notation on the letter indicates that a copy was sent to Father Cini. Father Peterman replied on February 16, accepting the letter as an explanation of policy to pass on to administrators. There is no indication that the letter was shown to others.

The Parent-Teachers Guild ('PTG') of Holy Cross High School met on February 12, 1987, the same day that Father Peterman received Sister Kelly's reply. At

that meeting, Father Peterman, on instructions from the Episcopal Vicar, announced that Holy Cross High School would remain open for the 1987-1988 school year. Father Peterman characterizes his announcement to that effect as 'unequivocal.'

Sister Marie Kelly also addressed those present at the February 12 PTG meeting. She advised that a long-term viability study would be conducted in March and expressed her opinion that the Diocese would not agree to allow the school to close as early as June of 1987. She assumed, in making the statement, that the results of the study would be positive, that at least 107 students would be enrolled and that, if necessary, parents would commit themselves to pay increased tuition.

After the meeting, the principal of Holy Cross High School undertook pre-registration for returning students. The letter, dated February 23, 1987 and addressed to 'parents,' reads in pertinent part as follows:

To facilitate the planning process for the 1987-88 school year, it is important that we ascertain the number of current students who plan to return to Holy Cross in September. This information will be used to determine course offerings, the number of sections needed, faculty assignments, etc.
This year the Diocese has mandated that a prepaid deposit must be made at the time of pre-registration for all secondary schools. To comply with Diocesan policy, a $50.00 non-refundable deposit must accompany this form for each student who will be returning in the fall. (emphasis in original)

Everyone proceeded on the basis that the school would be open for the following year as Father Peterman had announced. The school issued letters of acceptance to students who had applied for enrollment as freshman and registration was scheduled for March 25, 1987. Moreover, while the school had suffered a blow on February 17th when its respected principal had resigned effective June 1987, a search committee was formed to locate a replacement for him. But another disappointment then occurred when fewer than 70 students pre-enrolled without conditions pursuant to the registration drive conducted by the high school.

*4 The study of the school's long-term viability con-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Page 4
Not Reported in A.2d, 1987 WL 15555 (Del.Ch.)
**(Cite as: 1987 WL 15555 (Del.Ch.))**

ducted by Catholic School Management became available in April. Its conclusion was yet another blow to those who hoped for a bright future for the school. Citing an inability of the school to broaden its academic program and a lack of extra-curricular activities, declining enrollment and mounting financial problems, the study concluded that the high school suffers overwhelmingly from a lack of support to continue as a parish owned and operated school.

In light of the report's conclusions, the modest pre-enrollment figures, the resignation of the principal and other factors, the Parish Council, on May 12, voted to close the high school at the conclusion of the academic year. Bishop Mulvee, acting for the Diocese of Wilmington, declined to overturn the Parish Council's decision.

Implementation of that decision began promptly. A counselling session was held at which representatives from other Wilmington Diocese high schools explained their schools' programs. The Diocese agreed to provide transportation to those schools and the Parish Council agreed to allot a $500 tuition subsidy to any high school age child of active parishioners, for attendance at a Catholic high school of their choice.

In early June, letters were sent to the Middle States Association of Colleges and Schools, the National Catholic Education Association, and the Delaware Division of Public Instruction informing those bodies that Holy Cross High School would close on June 15, 1987.

## II.

Plaintiffs seek in this lawsuit an order requiring the specific performance of an alleged contract made between themselves and defendants to provide a Catholic high school education to their children at Holy Cross High School. There is no written contract so providing, all concede, but it is contended that statements made by authorized representatives of the parish constitute a promise to that effect and, in the circumstances, those statements and plaintiffs' reliance upon them form a contract.

Accordingly, the first subject to be addressed in as-

sessing the probability of ultimate success in this suit is the question whether a contract has been formed. If a contract was formed, we will have to address the separate issue whether it is a contract that a court of equity will, in these circumstances, specifically enforce.

## III.

Was a Valid Contract Formed that Obligates Defendants to Operate the High School For at Least an Additional Year?

To call a series of acts or words a contract is to conclude that the parties acted as if they intended to create, and did succeed in creating, rights and duties in themselves that a court will recognize and enforce. Thus, in its most fundamental sense, the term contract is conclusory. For this characterization, 'contract,' to be placed properly upon behavior, under conventional legal learning, there should be (1) a promise on the part of one party to act or refrain from acting in a given way; (2) offered to another, in a manner in which a reasonable observer would conclude the first party intended to be bound by acceptance, in exchange for; (3) some consideration flowing to the first party or to another; (4) which is unconditionally accepted by the second party in the terms of the offer, which may include (a) a verbal act of acceptance; and (b) performance of the sought-after act. [FN3] In some circumstances detrimental reliance by the second party upon the act or statement constituting the offer, which reliance is reasonable in the circumstances and which ought to have been anticipated by the offeror, may be effective to act as acceptance to form a contract. Compare Baird v. Gimbel Brothers, 64 F.2d 344 (2d Cir. 1933) (L. Hand, J.) with Drennan v. Star Paving Co., Cal. Supr., 333 P.2d 757 (1958) (Traynor, C. J.). See Restatement (Second) of Contracts § 87(2) (1981). This alternative concept--promissory estoppel--is described later in this opinion.

*5 Each of the elements of the formation of a contract presents issues in this case. Did defendants 'offer' a 'promise' to plaintiffs that the high school would remain open, in exchange for some consideration by plaintiffs and, if so, was any such offer accepted or was there such reasonable, foreseeable, detrimental

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1987 WL 15555 (Del.Ch.)
**(Cite as: 1987 WL 15555 (Del.Ch.))**

reliance upon such offer as to from a contract?

Broadly speaking, plaintiffs offer two theories of contract formation in support of their position that defendants are now bound by contract to operate the high school for an additional year. The first is predicated upon the statements of Father Peterman at the February 12 meeting and the follow-up letter of February 23rd. The second is predicated upon a number of verbal assurances allegedly given over the years to various plaintiffs to the effect that the high school would remain open.

### A.

I conclude that Father Peterman's 'unequivocal' statement that the school would be open in 1987-88 did constitute a 'promise' as that term is understood in the law. A promise may be defined as 'a manifestation of intention to act . . . in a specific way so made as to justify . . . [an] understanding that a commitment has been made.' Restatement (Second) of Contracts § 2. That promise, however, did not in my opinion constitute an offer of a contract. It was not offered in exchange for anything; it did not purport to seek acceptance by seeking any performance by anyone. It was gratuitous. Promises of this kind, that lack consideration, are typically not enforceable. Stonestreet v. Southern Oil Co., 37 S.E.2d 676 (N.C. 1946); Coleman v. Garrison, Del. Supr., 349 A.2d 8, 11 (1975).

Defendants did, however, ask for consideration from plaintiffs on February 23 when the school sought a $50 deposit for each student to be enrolled during the following year. May that communication be reasonably construed as an offer to become legally bound to keep the high school open? I do not believe so. While it is clear that the February 23rd letter is predicated upon the assumption that the school would be open for the forthcoming year, it cannot reasonably be interpreted as the offer of a promise to do so. The offer that was contained in that letter--which offer sought acceptance through the payment of $50--was an offer to reserve a place in the high school for the following year if, as expected, the school was operating. The payment of fifty dollars, which the February 23rd letter states as a diocese-wide requirement, cannot reasonably be interpreted as consideration sought by defendants in exchange for an undertaking to keep the

high school open. Such an undertaking could not easily be inferred from the request for the payment of such a modest consideration. It would, in my opinion, require an express articulation before a second party would be reasonable in concluding that such a commitment was offered for such a consideration.

I conclude that defendants did not intend the February 23 letter to constitute an offer to keep the school open, but rather intended as an offer to reserve a place if, as everyone then understood, the school was open. Moreover, in my view, a reasonable person (had he or she had an occasion to focus finely on the meaning of that letter) could only so interpret it. Thus, I cannot regard the payment of the asked for consideration--$50--as forming a contract to keep the school open. That the assumption upon which that offer was made--that the school would be open--proved false does give plaintiffs a legal right to rescind the transaction and receive back their fifty dollars. See Sheehan v. Hepburn, Del. Ch., 138 A.2d 810, 812 (1958). But plaintiffs do not, in my opinion, have the legal right to force defendants to make that assumption come true even though it is within defendants power to do so, for defendants never contracted so to do. [FN4]

### B.

*6 Plaintiffs proffer a second theory of contract formation--one that relies upon various statements over the years to the effect that the school would remain open. This theory depends less on the existence of an offer and acceptance than on existence of a promise and detrimental reliance by plaintiffs. See supra p. 12.

In order to prevail on a promissory estoppel theory, plaintiffs must show (1) that a promise was made, (2) that it was the reasonable expectation of the promisor to induce action or forbearance on the part of the promisee, (3) that the promisee relied on the promise and took action to his detriment, and (4) that such promise is binding because injustice can be avoided only by enforcement of the promise. Restatement (Second) of Contracts § 90; Chrysler v. Quimby, Del. Supr., 144 A.2d 123 (1958); Metropolitan Convoy Corp. v. Chrysler Corp., Del. Supr., 208 A.2d 519 (1965). The plaintiffs must be able to prove these ne-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1987 WL 15555 (Del.Ch.)
**(Cite as: 1987 WL 15555 (Del.Ch.))**

cessary elements of promissory estoppel by clear and convincing evidence. Reeder v. Sanford School, Inc., Del. Super., 397 A.2d 139 (1979).

This theory of recovery has not been shown to be likely of success for at least two reasons. First, plaintiffs have not demonstrated that they will be able to prove the existence of a promise of the kind alleged--other than the unequivocal statement of Father Peterman discussed above. Although all fourteen of the plaintiffs listed in Count II of the complaint allege a promise, they allege different promises made by different people. Some of the plaintiffs testify to representations that the school would remain open until June, 1990, while others testify to a promise to remain open 'for a minimum of five years.' In other affidavits, the affiants describe general representations that the school would remain open indefinitely or that the school would be open throughout 'their child's high school years.' Defendant Peterman flatly denies making any such statement of promise or assurance. Mr. Weaver admits that in responding to parents' inquiries he explained that the Holy Cross Parish Council made a commitment in 1985 that the school would remain open for five years, but qualified all statements by further explaining 'he had no authority to control the future or continued operation of the high school, and that the only guarantee of its future operation was the commitment of the Holy Cross Parish Council.' (Weaver Aff. ¶¶2, 3.)

The record contains only vague and varied descriptions of statements which are denied by defendant Peterman and qualified by Mr. Weaver as being only statements of assumption since he was not in any position to make such a promise concerning the future of the School. On a motion of this kind, plaintiffs must go further in establishing the factual basis of their legal claim.

Second, assuming such statements were authoritatively made and relied upon in enrolling students, I cannot conclude that injustice can only be avoided by specifically enforcing such a promise. Some of what is said in the next section relating to the relative financial impacts of granting the remedy relate to this point as well. Moreover, the existence of alternative schools-- some of which are close but do not offer a distinctively Catholic education and some of which offer a Catholic education but require a one hour journey to reach--present alternatives to the Holy Cross High School that go far in mitigating the hardship that plaintiffs face.

**\*7 \*\*\*\***
Plaintiffs assume a heavy burden when they seek, in a motion for preliminary injunction, to specifically enforce an unwritten contract. To establish a contract where no writing exists and the testimony is in some conflict is always difficult. This burden is even heavier when plaintiffs seek preliminary relief that will not merely freeze the status quo but will require defendants to act. For the foregoing reasons, I conclude that plaintiffs have not established the likely existence of a contractual obligation on the part of the defendants to operate the high school for at least an additional year.

IV.

Even Assuming that a Promise Was Made and a Contract Thereafter Came into Being, Such a Contract Will Not be Specifically Enforced in These Circumstances.

There is an independent ground for denial of the relief sought. A valid contract is not necessarily a specifically enforceable contract. [FN5] Specific performance is an equitable remedy which may be awarded when the court finds that money damages are insufficient to make the plaintiff whole and that, in order to do complete justice, specific performance is necessary. [FN6] Equitable Trust Co. v. Gallagher, Del. Ch., 108 A.2d 538 (1954); Cunningham v. Esso Standard Oil Co., Del. Supr., 118 A.2d 611 (1955). Distinctively equitable remedies such as specific performance are not matters of right but always require a court of equity to evaluate the impact of its order in the light of all of the circumstances present. Thus, for example, only a contract that is entirely fair and equal such that enforcement of it would not be harsh or oppressive is specifically enforceable. Gray Co. v. Alemite Corporation, Del. Ch., 174 A. 136 (1934); 4 Pomeroy's Equity Jurisprudence § 1405(a) (5th ed. 1941).

Plaintiffs have asked this court to specifically enforce

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1987 WL 15555 (Del.Ch.)
**(Cite as: 1987 WL 15555 (Del.Ch.))**

a contractual obligation of defendants to open and operate a school for one year at an approximate operating cost of $300,000 and at a financial loss roughly estimated at between $50,000 and $100,000, the financial consideration for the promise being a $50.00 non-refundable pre-registration payment. Moreover, no obligation on the part of plaintiffs is posited. Surely if the school is open and if they enroll their children, plaintiffs then will have a legal obligation to pay tuition and fees. But if the Court were to require the defendants to operate the school next year, I see no basis to hold that the plaintiffs (by the terms of the contracts they allege) would be obligated to enroll their children. They would have an option to do so and have at risk, should they elect not to do so, only the $50 deposit.

Assuming for present purpose that any such contract exists, it does not appear to be one that would be specifically enforced. Although courts will not examine the adequacy of consideration in determining whether a contract exists, equity does examine adequacy of consideration and may refuse specific performance on this ground when such inadequacy makes the bargain harsh or unfair. Glenn v. Tidewater Associated, Del. Ch., 101 A.2d 339 (1953). This principle has, in my opinion, application to the facts as they here appear.

**\*8** Plaintiffs' request to the court amounts to the following: Defendants should be required to open the doors of Holy Cross, curriculum in place, teachers and principal available and ready, and all the other efforts necessary to open the doors of a school completed for a total of 67 students. Defendants should be required to operate the high school at whatever that cost may be and at whatever deficit that may entail. The only consideration of the plaintiffs is the payment of $50.00 non-refundable pre-registration deposit. That is the contract contended and, as it stands, it is 'far too unequal in its mutuality ever to warrant a court of equity in riveting its chains upon [defendants].' Gray Co. v. Alemite Corp., 174 A. at 141.

Beyond that, the decision to close the high school was based on more than financial considerations. Consideration of the lack of facilities and the inabil-

ity to provide a broad and sufficient education including extracurricular activities led the defendants to conclude that it was no longer in the best interest of the parish or the students to maintain the high school. A court of equity should exercise restraint in reviewing such a decision that involves not only claimed legal rights of plaintiffs, but also questions of sound educational policy and expenditures of limited funds of a religious organization. Of course, religious corporations, like others, are bound by the contracts that they do make. But when the question is whether such a contract should be specifically enforced or whether the plaintiffs should be relegated to their legal remedy of damages, all of the circumstances including the nature of the defendants and the subject--in this instance education--with which the contract deals, may, under well developed equitable principles, be considered.

For the foregoing reasons, the application for a preliminary mandatory injunction shall be denied. IT IS SO ORDERED.

> FN1 Concluding as I do, I need not attempt to apply a more rigorous test for the issuance of a preliminary injunction when, as here, a preliminary mandatory injunction is sought. Compare Steiner v. Simmons, Del. Ch., 111 A.2d 574, 575 (1955).

> FN2 Two pre-enrollment figures appear in the record. According to the affidavit of the Episcopal Vicar for Administration and Finance Officer for the Wilmington Diocese, Father J. Thomas Cini, 67 students pre-enrolled plus an additional nine who imposed major conditions on their enrollments. Sister Marie Kelly, Superintendent of Schools of the Catholic Diocese of Wilmington, in her affidavit relies on William Weaver's survey of enrollment dated May 8, 1987 to fix the number at 63 plus an additional 7 with major conditions.

> FN3 I call this conventional learning. It could also be called rudimentary. Some behaviors that are definitely part of a contractual process do not fit easily into this seg-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                      Page 8
Not Reported in A.2d, 1987 WL 15555 (Del.Ch.)
(Cite as: 1987 WL 15555 (Del.Ch.))

mented and pure model. I am thinking particularly of the complex, multifaceted large commercial negotiation. See Leeds v. First Allied Connecticut Corp., Del. Ch., 521 A.2d 1095 (1986); see generally E. A. Farnsworth, Contracts § 3.5 (1982).

FN4 Nor do I find any basis in the diocesan policy of affording 24 months notice of a school closing to make out a contract. First, the policy is expressly limited to elementary schools. Secondly, there is no showing in this case that even that policy was communicated to plaintiffs in circumstances that would make it reasonable for them to regard it as a commitment.

FN5 It is assumed for this portion of the opinion that plaintiffs will be able to prove a valid contract was formed.

FN6 The first prerequisite to any equitable relief, including specific performance, is that plaintiff has no adequate remedy at law-- money damages will not make plaintiffs whole because of the uniqueness of the subject matter. Plaintiffs allege they have no adequate remedy at law because an education at Holy Cross is unique and they will be unable to find this anywhere else. Because I deny the grant of preliminary relief on other bases, I leave the issue of adequacy of money damages unresolved and assume for the purpose of this decision regarding preliminary relief only, that plaintiffs have no adequate remedy at law.

Not Reported in A.2d, 1987 WL 15555 (Del.Ch.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                                 Page 1
Not Reported in A.2d, 2004 WL 2979750 (Pa.Com.Pl.)
(Cite as: 2004 WL 2979750 (Pa.Com.Pl.))

**H**

Only the Westlaw citation is currently available.

Court of Common Pleas of Pennsylvania, Phil-
adelphia County.
Andrew TOTH and Richard Zatta, individually and
on behalf of all others
similarly situated
v.
BODYONICS, LTD. d/b/a/ Pinacle and General Nu-
trition Companies Inc.
**No. 3886 JULY.TERM 2002.**

Nov. 30, 2004.

*OPINION*

BERNSTEIN, J.

*1 Plaintiff brings this class action on behalf of
plaintiff, Andrew Toth [FN1] who purchased
products containing specified ingredients at defend-
ant GNC stores which were manufactured and dis-
tributed by defendant Bodyonics. Plaintiff brings
only three claims. As to defendant Bodyonics, de-
fendant claims only a violation of the UTCPCPL. As
to defendant GNC defendant claims a violation of the
UTPCPL together with a claim for unjust enrichment.
For the reasons set forth below the Motion for Class
Certification is denied.

> FN1. When this class action was initially
> filed the plaintiff designated two individuals
> as class representatives, Andrew Toth and
> Richard Zatta. Plaintiff's motion for class
> certification however, lists only one plaintiff
> Andrew Toth and makes no mention of
> Richard Zatta.

In determining whether the criteria for certification
have been satisfied, trial courts are vested with broad
discretion in making such decisions. *Weinberg, 740
A.2d at 1162* (citing *Klemow v. Time, Inc.,* 466 Pa.
189, 197, 352 A.2d 12, 16, (1976); *Prime Meats v.
Yochim,* 422 Pa.Super. 460, 619 A.2d 769, 773
(1993)). Despite having broad discretion and liberal
license, Rule 1707 does limit the court's inquiries at
the certification hearing: The hearing is confined to a

consideration of the class action allegations and is not
concerned with the merits of the controversy or with
attacks on the other averments of the complaint. Its
only purpose is to decide whether the action shall
continue as a class action or as an action with indi-
vidual parties only. It is designed to decide who shall
be the parties to the action and nothing more. Viewed
in this manner, it is clear that the merits of the action
and the right of the plaintiff to recover are to be ex-
cluded from consideration. Pa.R.C.P. 1707.

The sole issue before this court is whether the pre-
requisites for certification as stated in Pa. R.C.P.
1702 are satisfied. The purpose behind class action
suits is "to provide a means by which the claims of
many individuals could be resolved at one time,
thereby eliminating the possibility of repetitious litig-
ation and providing small claimants with a method to
seek compensation for claims that would otherwise
be too small to litigate". *DiLucido v. Terminix In-
tern., Inc.,* 450 Pa.Super. 393, 397, 676 A.2d 1237,
1239 (Pa.Super.1996). For a suit to proceed as a class
action, Rule 1702 of the Pennsylvania Rules of Civil
Procedure requires that five criteria be met:

(1) the class is so numerous that joinder of all mem-
bers is impracticable;

(2) there are questions of law or fact common to the
class;

(3) the claims or defenses of the representative
parties are typical of the claims or defenses of the
class;

(4) the representative parties will fairly and ad-
equately assert and protect the interests of the class
under the criteria set forth in Rule 1709;

(5) a class action provides a fair and efficient method
for adjudication of the controversy under the criteria
set forth in Rule 1708.

Rule 1708 of the Pennsylvania Rules of Civil Proced-
ure requires:

In determining whether a class action is a fair and ef-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 2979750 (Pa.Com.Pl.)
(Cite as: 2004 WL 2979750 (Pa.Com.Pl.))

Page 2

ficient method of adjudicating the controversy, the court shall consider among other matters the criteria set forth [below]:

**\*2** a) Where monetary recovery alone is sought, the court shall consider

(1) whether common questions of law or fact predominate over any question affecting only individual members;

(2) the size of the class and the difficulties likely to be encountered in the management of the action as a class action;

(3) whether the prosecution of separate actions by or against individual members of the class would create a risk of

(i) inconsistent or varying adjudications with respect to individual members of the class which would confront the party opposing the class with incompatible standards of conduct;

(ii) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of other members not parties to the adjudications or substantially impair or impede their ability to protect their interests;

(4) the extent and nature of any litigation already commenced by or against members of the class involving any of the same issues;

(5) whether the particular forum is appropriate for the litigation of the claims of the entire class;

(6) whether in view of the complexities of the issues or the expenses of litigation the separate claims of individual class members are insufficient in amount to support separate actions;

(7) whether it is likely that the amount which may be recovered by individual class members will be so small in relation to the expense and effort of administering the action as not to justify a class action.

(b) Where equitable or declaratory relief alone is sought, the court shall consider

(1) the criteria set forth in subsections (1) through (5) of subdivision (a), and

(2) whether the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making final equitable or declaratory relief appropriate with respect to the class.

(c) Where both monetary and other relief is sought, the court shall consider all the criteria in both subdivisions (a) and (b).

The burden of showing each of the elements in Rule 1702 is initially on the moving party. This burden "is not heavy and is thus consistent with the policy that decisions in favor of maintaining a class action should be liberally made." *Cambanis v. Nationwide Ins. Co.,* 348 Pa.Super. 41, 45, 501 A.2d 635, 637 (Pa.Super.1985). The moving party need only present evidence sufficient to make out a prima facie case "from which the court can conclude that the five class certification requirements are met." *Debbs v. Chrysler Corp.,* 2002 Pa.Super. 326, 810 A.2d 137, 153-154 (2002)(quoting *Janicik v. Prudential Ins. Co.,* 305 Pa.Super. 120, 451 A.2d 451, 455 (Pa.Super.1982)

In other contexts, the prima facie burden has been construed to mean "some evidence," "a colorable claim," "substantial evidence," or evidence that creates a rebuttable presumption that requires the opponent to rebut demonstrated elements. In the criminal law context, "the prima facie standard requires evidence of the existence of each and every element." *Commonwealth v. Martin,* 727 A.2d 1136, 1142 (Pa.Super.1999), alloc. denied, 560 Pa. 722, 745 A.2d 1220 (1999). However, "The weight and credibility of the evidence are not factors at this stage." *Commonwealth v. Marti,* 779 A.2d 1177, 1180 (Pa.Super.2001).

**\*3** In the family law context, the term " 'prima facie right to custody' means only that the party has a colorable claim to custody of the child." *McDonel v. Sohn,* 762 A.2d 1101, 1107 (Pa.Super.2000). Similarly, in the context of employment law, the Commonwealth Court has opined that a prima facie case can be established by "substantial evidence" requiring the opposing party to affirmatively rebut that evidence. See, e.g., *Williamsburg Community School District v. Com., Pennsylvania Human Rights Comm.,* 99 Pa.Cmwlth. 206, 512 A.2d 1339 (Pa.Commw.1986).

Courts have consistently interpreted the phrase "substantial evidence" to mean "more than a mere scintilla," but evidence "which a reasonable mind might

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

accept as adequate to support a conclusion." *SSEN, Inc., v. Borough Council of Eddystone,* 810 A.2d 200, 207 (Pa.Commw.2002). In *Grakelow v. Nash,* 98 Pa.Super. 316 (Pa.Super.1929), a tax case, the Superior Court said: "To ordain that a certain act or acts shall be prima facie evidence of a fact means merely that from proof of the act or acts, a rebuttable presumption of the fact shall be made; ... it attributes a specified value to certain evidence but does not make it conclusive proof of the fact in question."

Class certification is a mixed question of fact and law. *Debbs v. Chrysler Corp.,* 2002 Pa.Super. 326, 810 A.2d, 154 (Pa.Super.2002). The court must consider all the relevant testimony, depositions and other evidence pursuant to Rule 1707(c). In determining whether the prerequisites of Rule 1702 have been met, the court is only to decide who shall be the parties to the action and nothing more. The merits of the action and the plaintiffs' right to recover are excluded from consideration. 1977 Explanatory Comment to Pa. R. Civ. P. 1707. Where evidence conflicts, doubt should be resolved in favor of class certification. In making a certification decision, "courts in class certification proceedings regularly and properly employ reasonable inferences, presumptions, and judicial notice." *Janicik,* 451 A.2d at 454,455. Accordingly, this court must refrain from ruling on plaintiff's ultimate right to achieve any recovery, the credibility of the witnesses and the substantive merits of defenses raised.

Our Superior Court has instructed that it is a strong and oft-repeated policy of this Commonwealth that, decisions applying the rules for class certification should be liberally made and in favor of maintaining a class action. *Weismer by Weismer v. Beech-Nut Nutrition Corp.,* 419 Pa.Super. 403, 615 A.2d 428, 431 (Pa.Super.1992). See also *Janicik,* 451 A.2d at 454, citing and quoting *Esplin v. Hirschi,* 402 F.2d 94, 101 (10th Cir.1968) ("in a doubtful case ... any error should be committed in favor of allowing the class action").

Likewise, the Commonwealth Court has held that "in doubtful cases any error should be committed in favor of allowing class certification." *Foust v. Septa,* 756 A.2d 112, 118 (Pa.Commw.2000). This philo-

sophy is further supported by the consideration that "[t]he court may alter, modify, or revoke the certification if later developments in the litigation reveal that some prerequisite to certification is not satisfied." *Janicik,* 451 A.2d at 454.

**\*4** Within this context, the court will examine the requisite factors for class certification.

I. Numerosity

To be eligible for certification, the proponent must demonstrate that the class is "so numerous that joinder of all members is impracticable." Pa.R.C.P. 1702(1). A class is sufficiently numerous when "the number of potential individual plaintiffs would pose a grave imposition on the resources of the court and an unnecessary drain on the energies and resources of the litigants should plaintiffs sue individually." *Temple University v. Pa. Dept. of Public Welfare,* 30 Pa.Cmwlth. 595, 374 A.2d 991, 996 (1977) (123 members sufficient); *ABC Sewer Cleaning Co. v. Bell of Pa.,* 293 Pa.Super. 219, 438 A.2d 616 (1981) (250 members sufficient); *Ablin, Inc. v. Bell Tel. Co. of Pa.,* 291 Pa.Super. 40, 435 A.2d 208 (1981) (204 plaintiffs sufficiently numerous). Proponent need not plead or prove the actual number of class members, so long as he is able to "define the class with some precision" and provide "sufficient indicia to the court that more members exist than it would be practicable to join." *Janicik,* 451 A.2d at 456. The requirement of numerosity has been met herein.

II. Commonality

The second prerequisite for class certification is that "there are questions of law or fact common to the class." Pa. R. Civ. P. 1702(2). Common questions exist "if the class members' legal grievances arise out of the 'same practice or course of conduct on the part of the class opponent." *Janicik,* supra. 133, 451 A.2d at 457. Thus, it is necessary to establish that "the facts surrounding each plaintiff's claim must be substantially the same so that proof as to one claimant would be proof as to all." *Weismer by Weismer v. Beechnut Nutrition Corp.,* 419 Pa.Super. 403, 615 A.2d 428 (Pa.Super.1992)). However, where the challenged conduct affects the potential class members in diver-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                           Page 4
Not Reported in A.2d, 2004 WL 2979750 (Pa.Com.Pl.)
(Cite as: 2004 WL 2979750 (Pa.Com.Pl.))

gent ways, commonality may not exist.

"While the existence of individual questions is not necessarily fatal, it is essential that there be a predominance of common issues shared by all class members which can be justly resolved in a single proceeding." *D'Amelio v. Blue Cross of Lehigh Valley,* 347 Pa.Super. 338, 487 A.2d 995, 997 (Pa.Super.1985). In examining the commonality of the class' claims, a court should focus on the cause of injury and not the amount of alleged damages. "Once a common source of liability has been clearly identified, varying amounts of damages among the plaintiffs will not preclude class certification." See *Weismer by Weismer v. Beech-Nut Nutrition Corp.,* 419 Pa.Super. 403, 409, 615 A.2d 428, 431 (Pa.Super.). Where there exists intervening and possibly superseding causes of damage however, liability cannot be determined on a class-wide basis. *Cook v. Highland Water and Sewer Authority,* 108 Pa.Cmwlth. 222, 231, 530 A.2d 499, 504 (Pa.Cmwlth.1987).

Plaintiffs' claims under the UTPCPL fail to satisfy the commonality requirement. To recover under the UTPCPL, plaintiffs must prove reliance. See *Skurnowicz v. Lucci,* 798 A.2d 788 (Pa.Super.2002). A private UTPCPL plaintiff must show that he or she sustained injury as a result of a defendant's unlawful act. *Weinberg v. Sun Co.Inc.,* 565 Pa. 612, 777 A.2d 442, 446 (Pa.2001). Because reliance is an integral element of any UTPCPL claim, it is an inappropriate vehicle upon which to predicate a class action. In *Debbs v. Chrysler Corp.,* 810 A.2d 137, 156 (Pa.Super.2002). The Superior Court said:

*5 "The UTPCPL was addressed by our Supreme Court in *Weinberg,* supra. There, the Court held that a plaintiff bringing a private action under the UTPCPL must establish the common-law elements of reliance and causation with respect to all subsections of the UTPCPL. *Weinberg,* 777 A.2d at 446. Our Supreme Court stated: "the UTPCPL's underlying foundation is fraud prevention. Nothing in the legislative history suggests that the legislature ever intended statutory language directed against consumer fraud to do away with the traditional common law elements of reliance and causation."

"Both fraud and UTPCPL claims were at issue in *Basile,* supra. There, the plaintiffs brought a class action against H & R Block as well as Mellon Bank alleging that the defendants failed to disclose that tax refunds under H & R Block's "Rapid Refund" program were actually short-term, high interest loans. *Basile,* 729 A.2d at 577. The plaintiffs alleged, inter alia, fraud and violations of the UTPCPL. *Id.* at 578.

This Court reasoned that, as to the UTPCPL claims, the plaintiffs must show detrimental reliance. The Court noted that "an action under the UTPCPL may not be amenable to class certification due to discrepancies in the respective levels of reliance displayed by individual class members." *Id.* at 584, citing *DiLucido,* 676 A.2d at 1241. The Court held that the plaintiffs need not show individualized detrimental reliance with respect to H & R Block, because H & R Block's fiduciary relationship with the plaintiffs established detrimental reliance as a matter of law. *Id.* On the other hand, Mellon Bank had no such fiduciary relationship with the plaintiffs. *Id.* at 585, 676 A.2d 1237. Therefore, the Court concluded that:

"[The plaintiffs] may not assert the reliance inherent in such a relationship to establish this requirement. Rather, because Plaintiffs' claims against Mellon, unlike those against Block, assert conduct outside the confines of an agency relationship, Plaintiffs must establish reliance as a matter of fact on the basis of the testimony of individual class members. Because such a showing would vary between class members, Plaintiffs' claims against Mellon are not appropriate for treatment as a class action. *Id.* at 585, 676 A.2d 1237."

The Court continued:

"As noted above, Rule 1702 requires, for class certification, that "there are questions of law or fact common to the class." When determining whether a class action is a fair and efficient means of litigating the dispute, "one factor to consider is whether common questions of law or fact predominate over any question affecting only individual members." Rule 1708(a)(1).

Our Supreme Court's directions in *Klemow* and *Wein-*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                    Page 5
Not Reported in A.2d, 2004 WL 2979750 (Pa.Com.Pl.)
**(Cite as: 2004 WL 2979750 (Pa.Com.Pl.))**

berg, as well as the Court's directions in *Basile* and *DiLucido,* guide us here. In order to prove both common-law fraud and a violation of the UTPCPL, the plaintiffs must show that they suffered harm as a result of detrimental reliance on Chrysler's fraudulent conduct. See, *Klemow,* 352 A.2d at 16 (cause of action for fraud includes a showing that the plaintiff acted in reliance on defendant's misrepresentations and, as such, is not generally appropriately resolved in a plaintiff class action); *Weinberg,* 777 A.2d at 446 (to sustain a private action under the UTPCPL, plaintiffs must show that they suffered "an ascertainable loss as a result of the defendant's prohibited action"). This Court has excused proof of individual detrimental reliance where the defendant has a fiduciary relationship with the plaintiffs. *Basile,* 729 A.2d at 585. Because no fiduciary relationship has been demonstrated between the class and defendant to excuse proof of individualized reliance, the individual questions involving reliance and causation would remain a significant barrier to class certification."

**\*6** The Pennsylvania Supreme Court recently remarked that the causation requirement found in all private UTPCPL actions presented "questions of fact applicable to each individual private plaintiff that would be 'numerous and extensive' '. *Weinberg v. Sun Co.,* 565 Pa. 612, 777 A.2d 442, 446 Pa.Super. 2001). The same is true in this case. Such a determination would involve innumerable individual questions as to each class member. This cannot be established using class wide proof.

Our Appellate Courts have clearly and uniformly defined the law as requiring individualized proof of reliance under the "catch-all" clause of the UTP-CPL unless there exists a "fiduciary" relationship between the parties. Accordingly, these UTPCPL claims are not suitable for class treatment and certification is denied. This is the only claim for certification as to defendant Bodyonics.

Plaintiff claims the commonality claim is met as to the remaining claim of unjust enrichment against defendant GNC because GNC sold an "illegal product" and therefore was unjustly enriched as to all purchasers.

Although plaintiff presented into evidence limited numbers of advertisements by Bodyonics concerning the products in question and there is some limited testimony that some of these advertisements were contained in magazines generally available at GNC stores there is no specific evidence that the named plaintiff saw any specific advertisement let alone relied upon any advertisement distributed at a GNC store. Therefore the commonality question is exclusively based upon the claim that GNC was unlawfully enriched by selling an illegal product.

"Unjust Enrichment" is essentially an equitable doctrine. *Schenck v. K.E. David, Ltd.,* 446 Pa.Super. 94, 666 A.2d 327, 328 (Pa.Super.1995). The elements of unjust enrichment are "benefits conferred on defendant by plaintiff, appreciation of such benefits by defendant and acceptance and retention of such circumstances that it would be inequitable for defendant to retain the benefit without payment of value." *Id.* (quoting *Wolf v. Wolf,* 356 Pa.Super. 365, 514 A.2d 901 (Pa.Super.1986). The application of this doctrine depends on the factual circumstances of the case at issue. An unjust enrichment class requires answers to the following questions of fact: (1) whether plaintiffs conferred a benefit upon defendants, (2) whether the defendant appreciated the benefit and (3) whether the defendant accepted and retained the benefits under the circumstances that would make it inequitable for the defendant to retain the benefit without payment for value.

Herein, plaintiff seeks to charge defendant GNC with unjust enrichment for having on its store's shelves a product designed and manufactured and advertised by it's supplier without any evidence that defendant GNC knew or had any reason to suspect that the manufacturer was selling an allegedly illegal product. This is not a products liability case where the seller can be jointly responsible for a defective product. This is an action charging unjust enrichment because of the illegal sale of controlled substances only against a party that had no reason whatsoever to know or even suspect that the product was alleged to be a controlled substance.

**\*7** Indeed, to prove the product was illegally sold, plaintiff relies upon a not yet published and highly

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                    Page 6
Not Reported in A.2d, 2004 WL 2979750 (Pa.Com.Pl.)
**(Cite as: 2004 WL 2979750 (Pa.Com.Pl.))**

confidential report which analyzes the contents of the products, describes animal testing and concludes that certain ingredients do make the final product a controlled substance. [FN2] Plaintiffs rely upon thirty-five pages of highly technical scientific analysis including detailed mathematical calculations and technical analysis such as:

> FN2. Plaintiff failed to file this report with their response to defendant's motion for summary judgment because the Prothonotary would not accept it "under seal" without a specific court order. Plaintiff would only file it under seal because it has not yet been publicly released.

"Y is measured in millipollarization unit (Mp); [C] = concentration of competitor; mPo= the highest limiting value of polarization (receptor:FA complex98%) or 0% competitive displacement; mP100 = the lowest limiting value of polarization (receptor:FA complex05) or 100% competitive displacement." to conclude that the factor which everyone believed was not in the product (and therefore the products should not be classified as controlled substances) was in fact present. This is not the stuff of which anyone could conclude someone retained benefits inequitably.

Even at this stage of the proceedings, even with plaintiff's minimum prima facie burden at the certification stage, this cannot be considered prima facie proof of a common question when the uncontroverted facts are that no criminal agency, not a District Attorney in any County, not the Attorney General of Pennsylvania or any Federal criminal agency has ever declared these substances to be controlled or ever prosecuted anyone for possessing or even selling them. Pursuant to 35. P.S section 780-103 the Secretary of Health of the Commonwealth of Pennsylvania has responsibility to designate substances as controlled. No substance involved herein has ever been so designated. Likewise, Federal Law allows the Attorney General to make comparable designations and he has likewise never done so.

The Congress of the United States has recently passed legislation which will ban sales beginning in January 2005. The need for new statutory authority is compelling evidence that no one in the country except plaintiff herein based upon unpublished cutting edge scientific results believed that the law at the time of sale made the sale illegal.

III. Typicality

The third step in the certification test requires the plaintiff to show that the class action parties' claims and defenses are typical of the entire class. The purpose behind this requirement is to determine whether the class representatives' overall position on the common issues is sufficiently aligned with that of the absent class members, to ensure that pursuit of their interests will advance those of the proposed class members. *DiLucido v. Terminix Intern., Inc.,* 450 Pa.Super. 393, 404, 676 A.2d 1237, 1242 (Pa.Super.1996).

In this case, not even the named plaintiff herein believed the sale was illegal and therefore he cannot meet the typicality requirement for class certification. Indeed named plaintiff has a potential conflict which precludes him from as serving as class representative. The named Plaintiff is an experienced Commonwealth of Pennsylvania Narcotics Officer who purchased these products over an extended period of time. If he believed these were controlled substances, if he had any inkling that these might have been controlled substances he would never have risked his reputation and his job by making these purchases. Indeed, if he in any way suspected that these were controlled substances he was in position to ask his employer to do an analysis and make a determination as to legality.

*8 Having purchased the product, without questioning whether the product was legally sold, plaintiff herein is unsuitable to be the representative for a class of plaintiffs whose only hope of recovery is convincing a jury (should a Judge find there is a factual question to be resolved) that the named plaintiff had been sold an illegal controlled substance. Indeed, in testimony as the class representative, plaintiff herein may have a conflict between the position advanced by his attorney and his professional experience and responsibility, a conflict which may be successfully exploited on cross examination to the disad-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2004 WL 2979750 (Pa.Com.Pl.)

**(Cite as: 2004 WL 2979750 (Pa.Com.Pl.))**

Page 7

vantage of other class members. The single named plaintiff cannot be considered typical of the class represented.

For the reasons set forth above the plaintiff has not met the typicality requirement.

IV. Adequacy of Representation

For the class to be certified, this court must also conclude that the plaintiffs "will fairly and adequately assert and protect the interests of the class." Pa. R. Civ. P. 1702(4). In determining whether the representative parties will fairly and adequately represent the interests of the class, the court shall consider the following:

"(1) whether the attorney for the representative parties will adequately represent the interests of the class,
(2) Whether the representative parties have a conflict of interest in the maintenance of the class action, and
(3) Whether the representative parties have or can acquire financial resources to assure that the interests of the class will not be harmed." Rule 1709.

"Until the contrary is demonstrated, courts will assume that members of the bar are skilled in their profession." *Janicik,* 305 Pa.Super. at 136, 451 A.2d at 458. Here, defendants do not challenge plaintiffs' counsels' skill and therefore, the court presumes that counsel is skilled in their profession."

"Courts have generally presumed that no conflict of interest exists unless otherwise demonstrated, and have relied upon the adversary system and the court's supervisory powers to expose and mitigate any conflict." *Janicik,* 305 Pa.Super. at 136, 451 A.2d at 458. This criteria has been met.

V. Fair and Efficient Method of Adjudication

The final criteria under Pa. R. Civ. P. 1702 is a determination of whether a class action provides a fair and efficient method for adjudication of the controversy under the criteria set forth in Rule 1708. A class action is probably the least efficient or fair method for adjudicating the issue of the legality of the sale of this product. This could conceivably be

done by an individual suit or by a Declaratory Judgment Action which results would be universally precedential without the significant expense and delay of notification, class certification proceeding, and appeal. As discussed above, it is neither a fair nor efficient method of adjudication.

For the reasons set forth about, certification is denied. The above captioned matter is hereby remanded to the appropriate management track in the court of Common Pleas of Philadelphia, after the time for appeal has run.

Not Reported in A.2d, 2004 WL 2979750 (Pa.Com.Pl.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                                 Page I
Not Reported in F.Supp., 1998 WL 372644 (E.D.Pa.), 5 Wage & Hour Cas.2d (BNA) 717
(Cite as: 1998 WL 372644 (E.D.Pa.))

▷

United States District Court, E.D. Pennsylvania.
John J. BUNNION, Jr., et al., individually and on be-
half of all others
similarly situated
v.
CONSOLIDATED RAIL CORP., et al.
No. Civ.A. 97-4877.

May 14, 1998.

Stephen G. Console, Law Offices of Stephen G. Con-
sole, Phila., PA, USA, Carol A. Mager, Debora A.
O'Neill, Mager, Liebenberg & White, Philadelphia,
PA, USA, Joel C. Schochet, Mager Liebenberg &
White, Philadelphia, PA, for John J. Bunnion, Jr.,
Plaintiff.

Stephen G. Console, Carol A. Mager, Debora A.
O'Neill, Joel C. Schochet, (See above), for Anthony
D. Falcone, on Behalf of Themselves and All Simil-
arly Situated Persons, Plaintiff.

Laurence Z. Shiekman, Brian T. Ortelere, Pepper,
Hamilton & Scheetz, Phila, PA, USA, for Consolid-
ated Rail Corporation, Defendant.

Laurence Z. Shiekman, Brian T. Ortelere, (See
above), for Consolidated Rail Corporation Matched
Savings Plan, Defendant.

Laurence Z. Shiekman, Brian T. Ortelere, (See
above), for Supplemental Pension Plan of Consolid-
ated Rail Corporation, and the Fiduciaries and Ad-
ministrators of the Foregoing Plans, Defendant.

Stephen G. Console, Law Offices of Stephen G. Con-
sole, Phila., PA, USA, Carol A. Mager, Debora A.
O'Neill Mager, Liebenberg & White, Philadelphia,
PA, USA, for C. Dyana Reed, Plaintiff.

Stephen G. Console, Carol A. Mager, Debora A.
O'Neill, (See above), for Frances E. Bronson,
Plaintiff.

Stephen G. Console, Carol A. Mager, Debora A.
O'Neill, (See above), for George Hall, Plaintiff.

Stephen G. Console, Carol A. Mager, Debora A.
O'Neill, (See above), for Deborah Daley, Plaintiff.

Stephen G. Console, Carol A. Mager, Debora A.
O'Neill, (See above), for John L. Raybuck, Plaintiff.

Brian T. Ortelere, Pepper, Hamilton & Scheetz,
Phila, PA, USA, for Administrative Committee of the
Conrail Matched Savings Plan, Defendant.

Brian T. Ortelere, (See above), for Supplemental
Pension Plan Administrative Committee, Defendant.

Brian T. Ortelere, (See above), for Flexible/Medic-
al/Dental Dependent Plan, Life Insurance, Dismem-
berment and Long Term Disability and Retirees Life
Insurance Plan, Severance Plan, Defendant.

Brian T. Ortelere, (See above), for Deborah A.
Melnyk, Defendant.

Brian T. Ortelere, (See above), for Richard J. Davis-
on, Defendant.

Brian T. Ortelere, (See above), for Peter F. Barr, De-
fendant.

Brian T. Ortelere, (See above), for Christian D. Hill,
Defendant.

Brian T. Ortelere, (See above), for Gerhard A.
Thelen, Defendant.

Brian T. Ortelere, (See above), for Marianne S.
Gregory, Defendant.

Brian T. Ortelere, (See above), for John A. Mck-
elvey, Defendant.

Brian T. Ortelere, (See above), for Richard D. Huff-
man, Defendant.

Brian T. Ortelere, (See above), for Dale A. Shaub, Fi-
duciaries and Administrators of the Foregoing Plans
and Other Doe Fiduciaries, Defendant.

Brian T. Ortelere, (See above), for Supplemental
Pension Plan of Consolidated Rail Corporation, De-
fendant.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                          Page 2
Not Reported in F.Supp., 1998 WL 372644 (E.D.Pa.), 5 Wage & Hour Cas.2d (BNA) 717
**(Cite as: 1998 WL 372644 (E.D.Pa.))**

*MEMORANDUM*

BARTLE, J.

**\*1** Before the court is the motion of plaintiffs for class certification under Rule 23 of the Federal Rules of Civil Procedure and 29 U.S.C. § 201 of the Fair Labor Standards Act.

This putative class action challenges the propriety of certain actions taken by Consolidated Rail Corporation ("Conrail"), a railway freight-hauling corporation, with respect to its pension plan, its treatment of older workers, and its voluntary separation program ("VSP"). Plaintiffs, all former employees of Conrail who accepted the VSP, have sued Conrail, the Conrail Matched Savings Plan, the Administrative Committee of the Conrail Matched Savings Plan, the Supplemental Pension Plan of Conrail, its administrative committee, the flexible medical/dental dependent plan, life insurance, dismemberment and long-term disability and retirees life insurance plan, severance plan, and the fiduciaries and administrators of these plans. Plaintiffs assert violations of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 *et seq.,* the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et seq.,* and the Pennsylvania Wage Payment and Collection Law ("WPCL"), Pa. Stat. Ann. tit. 43, §§ 260.1 *et seq.* They also allege common law claims.

Plaintiffs propose one class composed of "all persons formerly employed by defendant Conrail at any Conrail location who tendered their resignations as part of the March 1, 1996, Conrail separation plan ("VSP")." Amended Compl. ¶ 31 (hereinafter "Compl."). In addition, plaintiffs seek certification of a subclass comprised of "those VSP participants who returned to work for Conrail to positions of employment which Conrail designated as non-employee status" for the claims set forth in Counts VI, VIII, IX, X, XI, XII, and XIII. This subclass also seeks certification under 29 U.S.C. § 201 for its ADEA claim contained in Count VII.

Plaintiffs John J. Bunnion, Jr., Anthony D. Falcone, C. Dyana Reed, Frances E. Bronson, George Hall, Deborah Daley and John Raybuck seek to be the designated class representatives of the main class, with plaintiffs Bunnion, Falcone, Reed, Daley, and Raybuck seeking to represent the subclass. Plaintiffs propose Carol A. Mager, Esquire and Debora A. O'Neill, Esquire of Mager Liebenberg & White as well as Stephen G. Console, Esquire, Law Offices of Stephen G. Console, as class counsel.

I

According to plaintiffs' amended complaint, Conrail provides certain benefit plans to its employees. These include a Matched Savings Plan/Employee Stock Ownership Plan ("ESOP"), [FN1] APAR and APAR Plus, [FN2] life insurance, vacation and holiday benefits, medical and dental plans, sick-time leave, short-term disability benefits, long-term disability benefits, a Supplemental Pension Plan, a long-term incentive plan, tuition reimbursement as well as "other paid leave and stock purchase plans." Compl. ¶ 40.

> FN1. This plan, also known as an "ESOP," was described at length in a prior opinion dealing with three other class actions against Conrail. *See Bennett v. Conrail Matched Savings Plan Admin. Comm.,* Nos. CIV. A. 97-4535, 97-5017, 97-5345, 1997 WL 700538 (E.D.Pa. Oct.30, 1997).

> FN2. Plaintiffs do not define or explain these acronyms.

On February 21, 1996 Conrail declared that it would be eliminating 900 of its employees over the next few months. To achieve this job reduction, Conrail announced on March 1, 1996, its "four stage separation plan." Stage 1 was labeled a "Voluntary Retirement Program" and was for those non-union employees who would be 55 years of age or older by February 28, 1997. Stage 2, a Voluntary Separation Program ("VSP"), was applicable to "non-union employees with 15 years of continuous Conrail service who are not covered under Stage 1 and whose applications are accepted by [Conrail]." Compl. ¶ 58. Both Stages 1 and 2 were offered immediately and simultaneously. Stages 3 and 4 were entitled "Involuntary Staff Rationalization" and the "Workforce Redeployment Program" respectively. Compl. ¶ 58.

**\*2** The putative class accepted the VSP, the offering

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                 Page 3
Not Reported in F.Supp., 1998 WL 372644 (E.D.Pa.), 5 Wage & Hour Cas.2d (BNA) 717
**(Cite as: 1998 WL 372644 (E.D.Pa.))**

of Stage 2, by April 19, 1996. Plaintiffs contend that the VSP was "devised for the purpose of substantially reducing defendants' costs of providing benefits to employees by interfering with the attainment of pension and welfare benefits by long service Conrail employees." Compl. ¶ 54. Not only was the VSP designed to deprive employees of benefits, but the plaintiffs aver that Conrail management continually and intentionally misrepresented certain facts regarding the VSP. In particular, the defendants allegedly "led the plaintiffs and other employees of Conrail to believe that if they did not accept the terms of the VSP and voluntarily terminate their employment, they would be involuntarily terminated from their jobs, without any severance." Compl. ¶ 56. Plaintiffs claim that Conrail constantly reminded employees that they would soon lose their jobs and that accepting the VSP was a "dignified way to leave the company." [FN3] Compl. ¶ 62. Conrail also led plaintiffs to believe that "subsequent packages, if offered, would not be as favorable." Compl. ¶ 62. Incident to acceptance of the VSP, plaintiffs were "induced" to sign a general release of all claims. Compl. ¶¶ 61, 63.

> FN3. According to plaintiffs, in 1995, Conrail removed some involuntarily terminated employees by police escort. The reference to a "dignified" way to leave the company, plaintiffs aver, was an implicit threat of a similar undignified removal. Compl. ¶ 64.

Plaintiffs allege that had they stayed and not accepted the VSP, they would have received substantially greater benefits than those provided by the VSP. Purportedly, those who did not accept the VSP but remained Conrail employees later received a severance package of greater value, as well as a staying bonus. Compl. ¶ 84. Further, Conrail never implemented Stages 3 and 4 of the 4 stage separation plan, and no Conrail facility has yet closed.

While all the members of the putative class accepted the VSP at or around the same time, their actual departure from Conrail varied, as Conrail had "retained the right to delay the actual termination of any employee who accepted [the VSP] up to one year after the date of the acceptance." Compl. ¶ 71. When plaintiffs did eventually leave, approximately 30% of

them returned to work at Conrail as "independent contractors." Compl. ¶ 81. Often they performed the exact same work they had formerly done. However, as independent contractors, they earned a lower salary, could not participate in or accrue service credit for Conrail pension plans, and received no Conrail benefits. One such named plaintiff, Anthony Falcone, was terminated one day and started work as an independent contractor the next. Although classified as independent contractors, plaintiffs claim that they were in reality Conrail employees and therefore entitled to all Conrail employee compensation levels and benefits.

Plaintiffs also aver that the VSP "disparately treated and impacted on older workers." Compl. ¶ 100.

> As further evidence of the fact that the VSP was not motivated by a reduction in available work, before the announcement of the March 1, 1996 separation plan (at a time when upon information and belief Conrail knew about the intended downsizing), Conrail hired several former independent contractors under age 40, converting them into full-benefit employees.

*3 Compl. ¶ 103.

Conrail will soon cease to exist. Subsequent to Conrail's offering of the VSP, Norfolk Southern Corporation and CSX Corporation agreed to acquire Conrail jointly. In April, 1997, they formed a new entity which made a tender offer to acquire Conrail's outstanding stock. This offer was successful. By early June, 1997, the new entity created by CSX and Norfolk Southern merged into Conrail. "[P]ending governmental approval, Conrail will go out of existence and its assets will be divided between CSX and Norfolk Southern." Compl. ¶ 53.

II

In determining a motion for class action certification, we do not examine the merits of the plaintiffs' underlying claims. *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177-78, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). Rather, we focus on the requirements of Rule 23 of the Federal Rules of Civil Procedure. In order to obtain class certification plaintiffs must meet the four requirements of Rule 23(a) of the Federal Rules of Civil Procedure and at least one part of Rule 23(b).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1998 WL 372644 (E.D.Pa.), 5 Wage & Hour Cas.2d (BNA) 717

(Cite as: 1998 WL 372644 (E.D.Pa.))

Page 4

*Id.* at 162-63.

Plaintiffs have the burden of proving that this action meets the certification requirements. *Heastie v. Community Bank of Greater Peoria,* 125 F.R.D. 669, 673 (N.D.Ill.1989). The Supreme Court has explained that "[c]lass actions serve an important function in our system of civil justice." *Gulf Oil Co. v. Bernard,* 452 U.S. 89, 99, 101 S.Ct. 2193, 68 L.Ed.2d 693 (1981). In keeping with this policy, the Court of Appeals for the Third Circuit has adopted a liberal construction of Rule 23. *Eisenberg v. Gagnon,* 766 F.2d 770, 785 (3d Cir.), *cert. denied,* 474 U.S. 946 (1985). The court has declared that "the interests of justice require that in a doubtful case ... any error, if there is to be one, should be committed in favor of allowing a class action." *Id.*

We will first examine whether plaintiffs meet the requirements of Rule 23(a) which provides:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Defendants do not dispute that plaintiffs meet the numerosity and adequacy requirements of Rule 23(a). We agree. The main class is predicted to number approximately 600 persons, while the subclass will contain approximately 70. Further, the representative plaintiffs and their proposed class counsel will adequately represent the class and subclass.

However, defendants vigorously contest plaintiffs' ability to meet 23(a)(2), the commonality requirement, as well as 23(a)(3), the typicality requirement. Defendants essentially contend that plaintiffs' amended complaint contains too many individualized aspects to meet Rule 23(a). *See Georgine v. Amchem Prod. Inc.,* 83 F.3d 610, 624 (3d Cir.1996), *aff'd sub nom, Amchem Prod. Inc. v. Windsor,* 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). [FN4]

FN4. Overall, we find the *Georgine* case inapplicable here. In *Georgine,* the Third Circuit held that the commonality barrier is higher in a personal injury damages class action which seeks to resolve noncommon issues of liability and damages. *Georgine,* 83 F.3d at 627. There, some plaintiffs had various asbestos-related diseases while others had been exposed to asbestos, but no disease had yet manifested itself. The court found these factual and legal differences too extreme to sustain a finding of commonality or typicality.

*4 While the concepts of commonality and typicality are similar, they remain distinct components of Rule 23(a). *Id.* at 632. Commonality concerns the nature of the proposed class while typicality concerns the sufficiency of the named plaintiffs. *Hassine v. Jeffes,* 846 F.2d 169, 176 n. 4 (3d Cir.1988). "The commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." [FN5] *Baby Neal For and By Kanter v. Casey,* 43 F.3d 48, 56 (3d Cir.1994). For this reason, the commonality requirement is "easily met." *Id.* Factual differences may exist among plaintiffs because they do not need to share identical claims. *Id.* Even where facts unique to each plaintiff may be relevant, a class may still be certified, but later bifurcated. *Id.* at 57.

FN5. This is unlike the (b)(3) portion of Rule 23 which requires that common issues predominate.

The typicality inquiry focuses on "whether 'the named plaintiffs individual circumstances are markedly different or ... the legal theory upon which the claims are based differs from that upon which the claims of the class members will perforce be based." *Eisenberg,* 766 F.2d at 786. A class meets this requirement if the named plaintiffs and the proposed class "challenge[ ] the same unlawful conduct." *Baby Neal,* 43 F.3d at 58. Factual differences between named plaintiffs and the class members do not defeat a motion for class certification if "the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members, and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 5
Not Reported in F.Supp., 1998 WL 372644 (E.D.Pa.), 5 Wage & Hour Cas.2d (BNA) 717
**(Cite as: 1998 WL 372644 (E.D.Pa.))**

if it is based on the same legal theory." *Id.* "Indeed even relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories." *Id.* According to the Third Circuit, we must essentially discern whether potential conflicts exist within the class. *Georgine,* 83 F.3d at 632.

### A.

Counts I, VI, and VIII assert ERISA claims for interference with benefits in violation of 29 U.S.C. § 1140. According to plaintiffs, the defendants created the VSP with the intention of interfering with their ERISA benefits and also coerced the plaintiffs to accept the VSP. [FN6] Compl. ¶¶ 122-23. As to Count VIII, the subclass claims that the defendants "purposefully returned these class members to nominally non-employee positions (which were actually employee positions) and refused to acknowledge their employee status for the purpose of interfering with those employees' attainment of benefits in violation of ... ERISA." Compl. ¶ 161.

> FN6. Counts I and VI are asserted on behalf of the entire class for interference with ERISA benefits and ESOP benefits, respectively.

To prevail under § 1140, a plaintiff must produce evidence showing: "(1) prohibited employer conduct; (2) taken for the purpose of interfering; (3) with the attainment of any right to which the employee may become entitled." *Dewitt v. Penn-Del Directory Corp.,* 106 F.3d 514, 522 (3d Cir.1997).

Defendants contend that whether an employee left voluntarily or was coerced to accept the VSP, and whether the defendants withheld information regarding future benefits are individualized inquiries, inappropriate for resolution in a class action. Defendants assert that claims involving coercion are particularly inappropriate for class action citing *Ungar v. Dunkin' Donuts of America, Inc.,* 531 F.2d 1211, 1226 (3d Cir.), *cert. denied,* 429 U.S. 823, 97 S.Ct. 74, 50 L.Ed.2d 84 (1976). Plaintiffs counter that the focus of a § 1140 ERISA claim is on the conduct of the defendants. The reasons that plaintiffs accepted the VSP, such as through coercion, are irrelevant.

*\*5 Certification of an ERISA action predicated upon § 1140 may be proper if the requirements of Rule 23 are met. *Fischer v. Philadelphia Elec. Co.,* 96 F.3d 1533, 1543 (3d Cir.1996), *cert. denied,* 520 U.S. 1116, 117 S.Ct. 1247, 137 L.Ed.2d 329 (1997). We find that plaintiffs meet the commonality requirement of 23(a)(2) on Counts I, VI, and VIII. The proposed classes of plaintiffs need only have one question of law or fact in common. *Baby Neal,* 43 F.3d at 56. As to Counts I and VI, the obvious question in common is whether the defendants created the VSP with the intention of interfering with plaintiffs' ERISA and ESOP benefits. Key facts in common include receipt of ERISA benefits, participation in the ESOP prior to leaving Conrail, and acceptance of the VSP by all plaintiffs. Compl. ¶¶ 31, 121, 151. As to Count VIII, a common question is whether the defendants returned the subclass members as independent contractors for the purpose of interfering with the attainment of their employee benefits. All subclass members have in common that they accepted the VSP, returned to work with Conrail to what Conrail deemed to be "non-employee" positions and therefore did not receive benefits designated for only Conrail employees.

We also find that the proposed class and subclass meet the typicality requirements on Counts I, VI, and VIII. The named plaintiffs and their proposed class members all "challenge [ ] the same unlawful conduct," that is, the alleged interference with ERISA benefits. *Baby Neal,* 43 F.3d at 58. We see no potential conflicts between the representative plaintiffs and their proposed class and subclass members. [FN7] *Georgine,* 83 F.3d at 632.

> FN7. We do not agree with defendants' assertions that individual issues control. Neither is such an inquiry relevant since plaintiffs only need to show one common issue. We do not see how the circumstances surrounding plaintiffs' acceptance of the VSP is pertinent to the issue of whether defendants' conduct in devising and offering the VSP was with the intent of interfering with plaintiffs' receipt of ERISA benefits. The instant action is unlike the *Ungar* case cited by defendants. *Ungar* was an antitrust case which required proof of coercion as an

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:06-cv-00185-GMS    Document 59-2    Filed 05/17/2007    Page 60 of 71

Not Reported in F.Supp.                                                                         Page 6
Not Reported in F.Supp., 1998 WL 372644 (E.D.Pa.), 5 Wage & Hour Cas.2d (BNA) 717
**(Cite as: 1998 WL 372644 (E.D.Pa.))**

element of illegal tying. *Ungar*, 531 F.2d at 1226. Coercion is not an element here.

B.

Counts II and XIII claim that defendants breached their fiduciary duties in violation of ERISA, 29 U.S.C. §§ 1104, 1105. In Count II, the entire class alleges that defendants failed to explain fully "the likelihood that they could remain in the employ of Conrail for the foreseeable future had they not elected the VSP" and failed to disclose the effect of their participation in the VSP on their "right to participate in future distributions from the ESOP." Compl. ¶ 128. But for these misrepresentations, plaintiffs allege that they would have remained Conrail employees. In Count XIII, the subclass avers that defendants failed to "enforce the various provisions of the applicable plans in a manner consistent with applicable law." Compl. ¶ 183. Without these breaches of fiduciary duty, the subclass of plaintiffs would have been able to participate in the ERISA plans.

As we discussed at length in our prior opinion which resolved the defendants' motion to dismiss, ERISA fiduciaries must act solely in the interest of the Plan participants. *See Bunnion v. Consolidated Rail Corp.*, No. CIV. A. 97- 4877, 1998 WL 32715, at *5 (E.D.Pa. Jan. 6, 1998). They fail to do so if they make material misrepresentations or omissions. *Id.*

Citing *Sprague v. General Motors Corp.*, 133 F.3d 388 (6th Cir.1998), defendants aver that individual issues preclude a finding of commonality or typicality. According to defendants, the plaintiffs may have relied on a myriad of different representations to which not all plaintiffs were exposed. Even though plaintiffs point to some uniform information allegedly sent to all potential plaintiffs, they cannot say to what extent each plaintiff actually relied upon such disclosures. Defendants assert that this claim should not be certified as a class because it would require an inquiry of each individual plaintiff--what each read or heard or on what, if any, representations each relied. Moreover, according to defendants, whether a statement was "material" to a plaintiff depends upon that individual plaintiff.

*6 Where appropriate, ERISA breach of fiduciary

duty claims may be certified as a class action. *See, e.g., In re Unisys Corp. Retiree Med. Benefit "ERISA" Litig.*, 57 F.3d 1255 (3d Cir.1995), cert, denied, 517 U.S. 1103 (1996); *Fischer*, 96 F.3d 1533. In the amended complaint, plaintiffs allege a variety of misrepresentations and omissions. Plaintiffs aver that defendants failed to mention material information to all employees. Compl. ¶ 60. Further, some alleged misrepresentations took the form of company-wide distributions of documents or e-mails. Compl. ¶¶ 63, 67; Plaintiffs' Motion for Class Certification Exs. B, C, D. Conrail maintained an electronic bulletin board to post the answers to frequently asked questions regarding the VSP. Plaintiffs' Motion for Class Certification Ex. J at 123-25. Conrail also held various information sessions on the VSP at different locations. However, according to one plaintiff who attended two such sessions, the information communicated was identical, "like they were reading from a script." Plaintiffs' Motion for Class Certification Ex. K at 71-72. Other alleged misrepresentations were oral, made to a portion of the class, or in some circumstances to only one individual plaintiff. Compl. ¶ 66.

A court may further subdivide a class into subclasses when necessary to compensate for individual issues. *Wetzel v. Liberty Mut. Ins. Co.*, 508 F.2d 239, 252-53 (3d Cir.), *cert. denied*, 421 U.S. 1011 (1975). In a case similar to the instant one, a court in this district has allowed a class action for breach of fiduciary duty where, in addition to company-wide representations, there were specific representations made to only certain plaintiffs. *In re Unisys Corp. Retiree Med. Benefits ERISA Litig.*, No. CIV. A. 969, 1994 WL 284079, at *27 (E.D. Pa. June 23, 1994), *aff'd*, 57 F.3d 1255 (3d Cir.1995). Chief Judge Cahn stated, "because some plaintiffs have stronger cases than others based on their specific inquiries and the information given to them personally, the court finds that subclasses, and possibly even individual hearings will be necessary to adjudicate these claims." *Id.* The court did not hold that these individual representations precluded the continuance of the action as a class action.

Further, we agree with plaintiffs that the focus on a breach of fiduciary duty claim is the conduct of the defendants, not the plaintiffs. For this reason, reliance

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Page 7
Not Reported in F.Supp., 1998 WL 372644 (E.D.Pa.), 5 Wage & Hour Cas.2d (BNA) 717
**(Cite as: 1998 WL 372644 (E.D.Pa.))**

of plaintiffs is immaterial at the liability phase. Further, the materiality of a misrepresentation does not differ from plaintiff to plaintiff as defendants contend. In the context of an ERISA case, materiality is "a mixed question of law and fact, ultimately turning on whether 'there is a substantial likelihood that [the misrepresentation] would mislead a reasonable employee in making an adequately informed decision about if and when to retire.' ' *Fischer,* 96 F.3d at 1538 (quoting *Fischer v. Philadelphia Elec. Co.,* 994 F.2d 130, 135 (3d Cir.1993)). The standard is one of a reasonable employee, not an actual one. Therefore, we find that defendants' contentions that individual issues of materiality and reliance would predominate to be without merit. [FN8]

> FN8. Whether common issues predominate is irrelevant under Rule 23(a). Plaintiffs need only an issue of law or fact in common. *Baby Neal,* 43 F.3d at 56. We also find the defendants' citation of and reliance upon *Sprague v. General Motors Corp.,* 133 F.3d 388 (6th Cir.1998), *petition for cert, filed,* (U.S. April 6, 1998) (No. 97-1639), to be inapposite with respect to this ERISA breach of fiduciary claim. In *Sprague,* the Court of Appeals for the Sixth Circuit held that class certification on the claims of estoppel and breach of a "bilateral" contract was an abuse of discretion. *Id.* at 398-99. The breach of contract claim averred that defendant General Motors had made a "side deal" with each individual plaintiff. *Id.* at 398. The plaintiffs had signed differing forms, or no form at all, in the acceptance of this side deal. *Id.* Because the representations were not uniform, and issues of reliance were individualized, the claims of plaintiffs were not common and the representative plaintiffs could not be typical of the class. *Id.* at 398- 99. As we discussed above, issues of reliance are not relevant in this ERISA claim. Further, we are confronted with predominantly uniform representations.

*7 Under the circumstances presented, we conclude that plaintiffs meet the commonality and typicality requirements of Rule 23(a) on Count II. The proposed class of plaintiffs have more than one question of law or fact in common. The obvious common issue is whether the company-wide documents or e-mails were misrepresentations which breached the fiduciary duties defendants owed the plaintiffs. Further, plaintiffs claim that the defendants uniformly omitted material information to the class. Because the plaintiffs all challenge the same unlawful conduct, that is, alleged company-wide misrepresentations and omissions, the representative plaintiffs are typical of the class. The fact that some individual plaintiffs may also have received personal misrepresentations from Conrail managers or supervisors does not pose a conflict within the class. *See In re Unisys,* 1994 WL 284079, at *27. Where "plaintiffs' evidence appears to follow a pattern, and the people they claim made the representations are largely the same people," oral representations do not preclude a finding of typicality under Rule 23(a)(2). *Bittinger v. Tecumseh Prod. Co.,* 123 F.3d 877, 884 (6th Cir.1997).

The proposed subclass of plaintiffs in Count XIII also meets the typicality and commonality requirements. A common issue is whether defendants breached their fiduciary duties in failing to enforce the plans to include the subclass members. The plans at issue were the same, and plaintiffs aver that the defendants uniformly interpreted the plans to exclude them. Because the same conduct is at issue, the representative plaintiffs are also typical of the class.

### C.

Counts III and IX assert claims for benefits pursuant to 29 U.S.C. § 1132(a)(1)(B). Count III reads that "[b]y failing to provide the class members with the benefits to which they were entitled under defendant Conrail's employee pension and welfare benefit plans, including without limitation the ESOP plan, defendants violated [ERISA]." Compl. ¶ 137. In Count IX, the subclass asserts that defendants violated ERISA by "failing to provide the class members who were returned to work by Conrail into nominally non-employee status with the benefits to which they were entitled under defendant Conrail's" ERISA plans. Compl. ¶ 166.

Pursuant to ERISA, 29 U.S.C. § 1132(a)(1)(B), a plaintiff may bring a civil action "to recover benefits

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.    Page 8
Not Reported in F.Supp., 1998 WL 372644 (E.D.Pa.), 5 Wage & Hour Cas.2d (BNA) 717
**(Cite as: 1998 WL 372644 (E.D.Pa.))**

due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."

Defendants first assert that the named plaintiffs are not typical of the class because the named plaintiffs have exhausted their administrative remedies while the other members of the class have not done so. Plaintiffs counter that administrative remedies need not be exhausted because it would be futile to do so.

Exhaustion of administrative remedies is a prerequisite to a plaintiff "seek [ing] to enforce the terms of the Plan" in court. *Berger v. Edgewater Steel Co.,* 911 F.2d 911, 916 (3d Cir.1990), *cert. denied,* 499 U.S. 920, 111 S.Ct. 1310, 113 L.Ed.2d 244 (1991); *Thomas v. Kemper Nat'l Ins. Co.,* 984 F.Supp. 885, 890 (E.D.Pa.1997). This requirement is "strictly enforced" unless proceeding through the administrative remedies would be futile. *Berger,* 911 F.2d at 916.

\*8 The named plaintiffs requested benefits from the applicable Plans and upon their denial petitioned the Plans for appellate review. Attached as Exhibit P to the defendants' opposition to the motion for class certification are the various Plan Committees' written rationale for the denial of these benefits. The letter from each Committee is basically the same. The Committees state that because subclass representative plaintiffs Bunnion, Falcone, Daley, Raybuck, and Reed did not receive earnings directly from Conrail which were subject to federal income tax withholding by Conrail, they were not "employees" as defined by the Plans and thus not eligible for receipt of benefits under the Plans. As to representative plaintiffs Hall and Bronson, members of the class but not the subclass, the Committees state in a footnote that because they elected the VSP and did not return to perform any services for Conrail, they are also not employees and therefore not eligible for Plan benefits. One such letter from the Matched Savings Plan states that determinations of whether a person is an employee is "determined, in part, by looking to that individual's relationships with the Plan sponsor, including the sources and the nature of the federal income tax treatment of the individual's compensation. In other words, the claims can be properly considered only on an individualized basis." Defendants' Response in

Opposition to Plaintiffs' Motion for Class Certification Ex. P at page 2.

Based upon the reasons given by the Plans for the denial of benefits, we find that requiring all members of the class to exhaust their administrative remedies would be futile. The overall class proposed by plaintiffs contains those persons who accepted the VSP, including those who later returned to Conrail as independent contractors and those who never returned to work at Conrail. The subclass comprises those members of the class who accepted the VSP and then returned to work into what Conrail designated as non-employee positions. The representative plaintiffs, members of the class and subclass, have been denied Plan benefits for the very same reasons that qualify them as members of the class-acceptance of the VSP and either a complete absence of further performance at Conrail or performance as an independent contractor. We find the statement in the one letter regarding a need to look at each individual to determine if he or she was an "employee" is not significant for purposes of the pending motion. [FN9]

> FN9. The letter was written February 13, 1998, after commencement of the instant action and two days after the plaintiffs' filed their motion for class certification.

Further, we find that the requirements of commonality and typicality have been met as to Counts III and IX. The class members jointly allege that the ERISA Plans wrongfully denied benefits to those who accepted the VSP. The subclass members all have in common the fact that they accepted the VSP and then returned to work for Conrail on an independent contractor basis. They jointly allege that their re-employment status entitles them to benefits. The resolution of both counts will depend upon the interpretation and legality of plan terms. We further find that the situations of the representative plaintiffs are typical of those members of the class and subclass. Defendants note that each employee who returned as an independent contractor negotiated a separate contract, which varied among individuals, upon his or her return. However, regardless of the exact language of the contract negotiated, the subclass plaintiffs all

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 9
Not Reported in F.Supp., 1998 WL 372644 (E.D.Pa.), 5 Wage & Hour Cas.2d (BNA) 717
**(Cite as: 1998 WL 372644 (E.D.Pa.))**

have been classified by Conrail as independent contractors, or non-employees. In this respect they are the same. The claims of the representative subclass plaintiffs do not conflict with those of the proposed members of the subclass.

### D.

**\*9** In Counts IV and V plaintiffs assert the common law claims of fraud and negligent misrepresentation. As we held in our prior opinion, because of the broad reach of ERISA preemption, these claims may only assert fraud and misrepresentation regarding employment, not the employee benefit plans. *Bunnion,* 1998 WL 32715 at \*8.

Defendants first note that the potential plaintiffs reside in different states, which presumably maintain different standards or requirements for these common law claims. Because the laws differ between states, and a federal court cannot create a federal version of state law claims, defendants contend that this legal difference precludes class certification. However, plaintiffs argue that sufficient contacts exist for Pennsylvania law to apply to the entire class.

The Supreme Court has held that the choice of law in a nationwide class action depends upon the significance of contacts with the state whose law the parties seek to apply. *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 821-22, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985). The Court held that the state "must have a 'significant contact or significant aggregation of contacts' to the claims asserted by each member of the plaintiff class, contacts 'creating state interests,' in order to ensure that the choice of [ ] law is not arbitrary or unfair." *Id.* (quoting *Allstate Ins. Co. v. Hague,* 449 U.S. 302, 312-13, 101 S.Ct. 633, 66 L.Ed.2d 521 (1981)). In *Phillips,* the Supreme Court found such significant contacts lacking. The fact that Phillips Petroleum Company owned property and conducted substantial business in Kansas was not enough. *Id.* at 819.

Utilizing this significant contact analysis, a court in our district found significant contact existed such that Pennsylvania law could apply in a securities' fraud case. *Gruber v. Price Waterhouse,* 117 F.R.D. 75, 82 (E.D.Pa.1987). The corporation whose stock was at

the center of the case maintained its principal place of business and its offices in Pennsylvania. *Id.* Further, a majority of the auditing work and the corporation's "financial statements were prepared in and disseminated from Pennsylvania." *Id.*

Conrail is incorporated and licensed to do business in Pennsylvania. Its principal place of business is in Philadelphia. Compl. ¶ 27. Further, plaintiffs' amended complaint avers that the Plans at issue in this lawsuit are administered in the Eastern District of Pennsylvania. Compl. ¶ 30. Indeed, the letters from the Plans rejecting the administrative appeals of the representative plaintiffs were sent from Conrail's Philadelphia address. Defendants' Response in Opposition to the Motion for Class Certification, Ex. P. Given the significant amount of contacts in Pennsylvania, we find that its law should apply. [FN10]

> FN10. We believe the case of *In re Rhone-Poulenc Rorer Inc.,* 51 F.3d 1293 (7th Cir.), *cert. denied,* 516 U.S. 867, 116 S.Ct. 184, 133 L.Ed.2d 122 (1995), cited by the defendants, is inapplicable. In that case, the Seventh Circuit held that a court could not apply a legal standard which represented an amalgam of the various state laws at issue, one that "does not exist anywhere in the world." *Id.* at 1300. The significant contact test was not applied. Here, plaintiffs seek to apply Pennsylvania law, not some amalgam of legal principles.

Defendants contend that even assuming Pennsylvania law would apply, individual issues of reliance thwart class certification on these counts. Plaintiffs concede that reliance is an element of these claims of fraud and negligent misrepresentation, but assert that reliance issues will not defeat class certification because of the common course of fraudulent action perpetrated by the defendants. Further, reliance is presumed where material information has been omitted. [FN11] As an alternative, plaintiffs contend that we can deal with reliance issues later in the litigation.

> FN11. We agree that reliance may be presumed in certain types of cases, such as se-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                          Page 10
Not Reported in F.Supp., 1998 WL 372644 (E.D.Pa.), 5 Wage & Hour Cas.2d (BNA) 717
**(Cite as: 1998 WL 372644 (E.D.Pa.))**

curities fraud. *See Eisenberg v. Gagnon,* 766 F.2d 770, 786 (3d Cir.1985).

**\*10** We find that the proposed class meets the requirements of commonality and typicality on the state law claims of fraud and negligence. Plaintiffs aver that they were all led to believe in early 1996 that failure to accept the VSP would result in involuntary termination and were otherwise misled about the prospects of continued employment. Compl. ¶ 56. Whether the alleged statements occurred and whether they misrepresented the facts are common issues of fact and law. Because the same course of conduct is at issue, the misleading statements regarding future employment, the representative plaintiffs are typical and do not conflict with other members of the proposed class.

### E.

Counts X avers an action under the WPCL on behalf of the subclass for non-ERISA benefits. The WPCL requires an employer to pay promptly wages, fringe benefits, and wage supplements to its employees. Pa. Stat. Ann. tit. 43, § 260.3 (West 1992). Failure to do so may subject it to a civil suit by its employees, a labor organization, or the Secretary of Labor and Industry as well as possible liquidated damages and criminal penalties. *Id.*

Again, defendants assert that issues unique to each individual plaintiff preclude a finding of commonality or typicality under Rule 23(a). Further, defendants assert that the WPCL only extends to those employees based in Pennsylvania.

One court in our district has held that the WPCL was intended to apply only to those persons employed in Pennsylvania. *Killian v. McCulloch,* 873 F.Supp. 938, 942 (E.D.Pa.1995), *aff'd,* 82 F.3d 406 (3d Cir.1996). The court, after analyzing legislative history, found that the Pennsylvania legislature "has a strong interest in enacting legislation to protect those who work in the Commonwealth, but has almost no interest in extending that protection to those who work outside Pennsylvania." *Id.* Rather, "its primary aim is to ensure that those who are employed *in Pennsylvania* receive compensation for their work." *Id.* (emphasis added). As support for this conclusion,

the court noted that no reported case allowed an out-of-state employee to assert a WPCL action in Pennsylvania.

We find this reasoning persuasive. Proposed representatives of the subclass Bunnion, Falcone, Daley, and Raybuck all reside in Pennsylvania according to the amended complaint, but no information is provided regarding the location of their work as an "independent contractor." [FN12] Compl. ¶¶ 6-10, 20-25. Representative plaintiff Reed is a resident of Nevada. Plaintiffs provide no information regarding the number of members of the proposed subclass who have worked for Conrail in Pennsylvania. As such, we are unable to discern whether the proposed representatives are typical of the subclass. On a claim under the WPCL, whether or not the plaintiffs worked in Pennsylvania is extremely relevant. Therefore, we find that the proposed subclass does not meet the commonality or typicality requirements of Rule 23(a).

> FN12. Later in the amended complaint, we learn that plaintiffs Bunnion and Falcone worked at the Island Avenue facility. Compl. ¶ 66(b). The court believes that this site is located in Pennsylvania.

### F.

**\*11** Counts XI sets forth a breach of contract claim on behalf of the subclass while Count XII seeks unjust enrichment on behalf of the entire class. As we noted in our prior opinion, these claims are limited to non-ERISA benefits. *Bunnion,* 1998 WL 32715 at \*9.

Again, defendants assert that issues unique to each individual plaintiff preclude a finding of commonality or typicality under Rule 23(a). As to the breach of contract claims, defendants note that the contract for each employee was unique and therefore commonality and typicality do not and cannot exist. For instance, deposition testimony reveals that plaintiff Daley could only be terminated for cause, while plaintiff Hall worked under no written contract at all. *See* Defendants' Response in Opposition to the Motion for Class Certification Exs. H at 158, and I at 42. Plaintiffs aver that the defendants created this scheme, of differing contracts, so they cannot now

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 11
Not Reported in F.Supp., 1998 WL 372644 (E.D.Pa.), 5 Wage & Hour Cas.2d (BNA) 717
**(Cite as: 1998 WL 372644 (E.D.Pa.))**

contest class certification on these grounds. [FN13] Further, plaintiffs contend that Conrail is the actual employer who excluded the subclass from benefits because of their arbitrary classification as non-employees. Plaintiffs also claim that subclasses can be created if necessary.

> FN13. Plaintiffs cited the case of *Christopher v. Mobil Oil Corp.*, 950 F.2d 1209, 1221 (5th Cir.), *cert. denied*, 506 U.S. 820, 113 S.Ct. 68, 121 L.Ed.2d 35 (1992), in support of this contention. However that case, to the extent it is at all relevant, did not deal with class certification.

We note initially that it is unclear whether plaintiffs are claiming that a contract existed prior to plaintiffs' acceptance of the VSP or at the time of their return to work at Conrail as independent contractors. In either case, the subclass plaintiffs do not contest defendants' assertions that their contracts differ. Moreover, evidently not all subclass plaintiffs even had *a* contract.

Thus, in these circumstances we conclude that typicality does not exist. Commonality may exist because all subclass plaintiffs returned to work but were classified as independent contractors by Conrail. However, we find that on the breach of contract claim the representative plaintiffs are not typical of the subclass because their circumstances are "markedly different." *Eisenberg*, 766 F.2d at 786. Some had contracts, which varied, and at least one had no contract at all. Because potential conflicts may arise between the terms of the various contracts or between those plaintiffs with and without contracts, we conclude that the typicality requirement is not met. *See Georgine*, 83 F.2d at 632.

The claim for unjust enrichment in Count XII asserts that defendants "have been unjustly enriched in that they have or will receive certain monies that they would not have obtained or retained but for their wrongful conduct at the expense of the plaintiffs and the plaintiff class." Compl. ¶ 178. Defendants maintain that even if there is no contract, a court or jury would need to look at each individual "deal" to see the basis for an unjust enrichment claim.

We find that we are confronted with insufficient information to determine whether this count meets the commonality and typicality requirements. Unjust enrichment is an equitable doctrine that, in our view, depends upon the analysis of each individual situation. *See Hershey Foods Corp. v. Ralph Chapek, Inc.*, 828 F.2d 939, 999 (3d Cir.1987). As such, the claims of the representative plaintiffs are not, and cannot be, typical of those of the rest of the class. Further, we do not know what the "wrongful conduct" mentioned in the amended complaint references. Without this knowledge we cannot determine whether the plaintiffs are all challenging the same common course of conduct. The burden is on the plaintiffs to prove that this count meets the certification requirements. Because they have failed to do so, we hold that this count is inappropriate for class certification.

### G.

*12 The entire proposed class of plaintiffs sets forth a federal common law claim of equitable estoppel in Count XIV. Plaintiffs assert that by virtue of their material misrepresentations, "defendants are estopped from denying, or interpreting the Conrail plans so as to deny benefits under the Plans to plaintiffs and members of the plaintiff class." Compl. ¶ 192.

According to *Curcio v. John Hancock Mut. Life Ins. Co.*, 33 F.3d 226, 235 (3d Cir.1994), the elements of equitable estoppel are: "(1) a material representation, (2) reasonable and detrimental reliance upon the representation, and (3) extraordinary circumstances." Plaintiffs aver that the misrepresentations discussed earlier in this opinion were material, intentional, and constituted the necessary extraordinary circumstances.

Defendants contend that this claim is the least susceptible to class action certification because of the individual proof needed as to the reliance element. Plaintiffs claim that individual issues of reliance are not sufficient to preclude class certification and that *Curcio* shifted the burden of disproving reliance to defendants.

We do not read *Curcio* as shifting the burden of disproving reliance to the defendants. An examination

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 372644 (E.D.Pa.), 5 Wage & Hour Cas.2d (BNA) 717
**(Cite as: 1998 WL 372644 (E.D.Pa.))**

under Rule 23(a) only requires we find a common issue of law or fact and that the representative plaintiffs are typical of the class. We find that these requirements are met on this count. The class of plaintiffs allegedly all accepted the VSP based upon the common representations by defendants and they all claim that these representations were material and constituted extraordinary circumstances. At this juncture, we see no conflict or potential for conflict between the representative plaintiffs and the proposed class.

### III

As to Counts I, II, III, IV, V, VI, VIII, IX, XIII and XIV, which we found meet the requirements of Rule 23(a), we must next consider whether they meet at least one of the requirements under Rule 23(b). If so, we must certify the class without consideration of the merits. *Eisen,* 417 U.S. 156, 177-78, 94 S.Ct. 2140, 40 L.Ed.2d 732. Plaintiffs initially seek certification under 23(b)(1)(A), 23(b)(1)(B), and 23(b)(2) which state in relevant part:

An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

(1) the prosecution of separate actions by or against individual members of the class would create a risk of

(A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or

(B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests or;

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; [ ]

* * *

### A.

**\*13** Certification under either (b)(1) or (b)(2) constitutes a mandatory class. That is, the class members may not opt out of the action and "pursue separate lit-

igation that might prejudice other class members or the defendant." 5 James Wm. Moore, Moore's Federal Practice § 23.40[2] (3d ed.1998) [hereinafter Moore's]. [FN14]

> FN14. This is unlike certification under 23(b)(3) where a potential class member may do just that.

Certification pursuant to Rule 23(b)(1)(A) is appropriate if it would be inconsistent and damaging to defendants to have portions of an ERISA plan interpreted in different ways by different courts. *Schutte v. Maleski,* No. CIV. A. 93-0961, 1993 WL 218898, at *9 (E.D. Pa. June 18, 1993). "This provision ... has been construed as requiring a party seeking certification to establish that there is a realistic possibility that separate actions involving the same subject matter will be brought in the absence of a class action." 5 Moore's § 23.41[1]. Actions certified under this portion of Rule 23, seek primarily injunctive or declaratory relief. *Id.* § 23.41[5][c]. Monetary damages may also be sought, but such relief should not predominate. *Id.*

While 23(b)(1)(A) focuses on possible prejudice to the defendants, 23(b)(1)(B) focuses on possible prejudice to the members of the proposed class "and seeks to protect them against situations in which they would be prejudiced by separate litigation." 5 Moore's § 23.42[1]. Certification under (b)(1)(B) may be appropriate if this action could potentially harm, or as a practical matter would be dispositive of, claims by other class members who were not represented in that suit. *Lloyd v. City of Philadelphia,* 121 F.R.D. 246, 251 (E.D.Pa.1988).

Certifications under both 23(b)(1)(A) and 23(b)(1)(B) are common in labor relations cases. 5 Moore's §§ 23.41[4], 23.42[3][c]. "Because a defendant often provides unitary treatment to all members of the putative class [in] such an area, a putative class member's rights may be implicated by litigation brought by other class members." *Id.* § 23.42[3][c].

Defendants dispute the applicability of 23(b)(1)(A) and (B) because they contend that the dissimilarity of plaintiffs' claims preclude it. According to defend-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                    Page 13
Not Reported in F.Supp., 1998 WL 372644 (E.D.Pa.), 5 Wage & Hour Cas.2d (BNA) 717
**(Cite as: 1998 WL 372644 (E.D.Pa.))**

ants, (b)(1) should be limited to those cases with no or few individual questions.

While Rule 23(b)(1) contains no such explicit requirement, a certain level of similarity is necessary in order for multiple suits to risk prejudicing either the defendants, or plaintiffs who could be members of a class. In a fraud case in this district, the court held that "because of the individual issues of reliance endemic to proving fraud ... resolution of an individual claim will not necessarily either be dispositive of the interests of the non-party class members, or an impairment or impediment to the ability of non-party class members to protect their respective interest." *Truckway, Inc. v. General Electric,* No. CIV. A. 91-0122, 1992 WL 70575, at *6 (E.D.Pa. March 30, 1992).

With these principles in mind, we examine the remaining counts to ascertain whether certification under 23(b)(1)(A) or (b)(1)(B) is appropriate. We find that the ERISA actions in Counts I, II, III, VI, VIII, IX, and XIII are appropriate for certification under both of these provisions of Rule 23. All of these claims relate to the interpretation and application of ERISA plans. Conrail treated the proposed class and subclass identically and any equitable relief granted will affect the entire class and subclass. Failure to certify a class would leave future plaintiffs without adequate representation. Moreover, we see a high likelihood of similar lawsuits against defendants should this class be denied. [FN15] Inconsistent judgments concerning how the Plans should have been interpreted or applied would result in prejudice. While plaintiffs list a variety of relief sought in their amended complaint, ERISA specifically limits the relief available to that of an equitable, that is, declaratory or injunctive, nature. 29 U.S.C. § 1132. To the extent that money damages are awarded or sought, we find them to be incidental.

> FN15. Indeed, one such action has already been filed and assigned to the undersigned. *See Buxton v. Consolidated Rail Corp.,* No. CIV. A. 98-2409.

**\*14** Our review of the state law claims as well as the claim of equitable estoppel is more difficult. Counts IV (fraud), V (misrepresentation), and XIV (equitable estoppel) all contain reliance as an essential element. While individual issues of reliance are not enough to preclude a finding of typicality or commonality under 23(a), it may be enough to preclude certification under 23(b)(1)(A) or (B). *See Eisenberg,* 766 F.2d at 786; *Truckway,* 1992 WL 70575, at *6. Reliance also may not be enough to preclude class certification under 23(b)(3). *Eisenberg,* 766 F.2d at 786. However, under the standards for (b)(1), we agree with the court in *Truckway* that certification under this portion of the rule is inappropriate for Counts IV, V, and XIV.

Moreover, even if plaintiffs were to prevail on actions of fraud or misrepresentation the remedy would be necessarily monetary. The actions in Counts IV and V are limited to claims for employment. Since Conrail will soon cease to exist, rehiring is not an available remedy. Because money would not be merely an incidental remedy sought, certification is inappropriate under either portion of (b)(1) on Counts IV and V.

### B.

A class may be certified under Rule 23(b)(2) if the defendants have acted in ways generally applicable to the class and final declaratory or injunctive relief is sought by the class. [FN16] 5 Moore's § 23.43[1][a]. While monetary damages may also be sought, they must be incidental to the request for equitable relief. *Id.* § 23.43[3][a]. As a practical matter, key factual questions should be dispositive as to all class members. *Stoetzner v. United States Steel Corp.,* 897 F.2d 115, 119 (3d Cir.1990). The proposed class "must demonstrate that the interests of the class members are so like those of the individual representatives that injustice will not result from their being bound by such judgment in the subsequent application of principles of res judicata." *Hassine,* 846 F.2d at 179. Courts have described a class action under (b)(2) as one which "seeks to define the relationship between the defendant(s) and the world at large." *Id.* (quoting *Weiss v. York Hosp.,* 745 F.2d 786, 811 (3d Cir.1984)).

> FN16. According to one treatise, under (b)(2) administrative remedies need be ex-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 14
Not Reported in F.Supp., 1998 WL 372644 (E.D.Pa.), 5 Wage & Hour Cas.2d (BNA) 717
**(Cite as: 1998 WL 372644 (E.D.Pa.))**

hausted by the named plaintiffs only, not the entire class. 5 Moore's § 23.43[1][c]. This further supports our earlier conclusion that the class members need not exhaust their administrative remedies because doing so would have been futile.

Defendants claim that (b)(2) does not apply because plaintiffs in reality seek only monetary remedies. Since Conrail will soon cease to exist, defendants contend that equitable relief could not be awarded. Conversely, plaintiffs contend that they seek primarily equitable relief.

Defendants are correct that, in determining whether a suit seeks equitable or monetary relief, a court must examine the "realities of the litigation." *Yeager's Fuel v. Pennsylvania Power & Light,* 162 F.R.D. 471, 480 (E.D.Pa.1995). On the information presently before us, we construe plaintiff's requests for relief as seeking predominantly equitable relief on the ERISA claims, as we stated earlier. However, as just discussed, we find that the state law claims in Counts IV and V seek primarily monetary relief. For this reason they are inappropriate for certification under Rule 23(b)(2).

**\*15** Our examination of the ERISA claims convinces us that they are appropriate for certification under (b)(2). The proposed class and subclass of plaintiffs aver that defendants treated them equally in the denial of ERISA benefits. Their interests are essentially identical. Certain key facts are dispositive of the entire class. For example, did defendants interpret the Plans incorrectly or violate the terms of the Plan, did defendants create the VSP for the purpose of interfering with plaintiffs' ERISA benefits, and did defendants breach fiduciary duties by misrepresenting material information to the entire class? Finally, this suit seeks to define the relationship between Conrail and its employees who accepted the VSP offering. In conclusion, we find certification under (b)(2) also appropriate.

The equitable estoppel claim in Count XIV falls between the ERISA cause of actions and the state law claims. While it requires the element of reliance, it seeks purely equitable relief. Because the claim chal-

lenges actions of defendants that were generally applicable to the class, we will certify equitable estoppel under (b)(2) at this time. This may be revisited at a later time if individual issues of reliance predominate.

### C.

Plaintiffs also seek, as an alternative, certification under 23(b)(3) if the court finds certification under (b)(1) or (b)(2) inapplicable. Because we so found as to Counts IV and V, we now examine these counts to see if they meet the certification requirements of (b)(3). An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

> (3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Fed.R.Civ.P. 23(b)(3).

To meet the requirement of Rule 23(b)(3) that common questions predominate, claims of the plaintiffs need not be identical and the "necessity of answering individual questions after answering common questions will not prevent a class action." *Heastie,* 125 F.R.D. at 675. The Advisory Committee Notes to the 1966 Amendments to Rule 23 state "a fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action, and it may remain so despite the need, if liability is found, for separate determination of the damages suffered by individuals within the class."

**\*16** Whether individual issues of reliance are enough to preclude certification under Rule 23(b)(3) is unclear in this Circuit. The Third Circuit has broadly

Not Reported in F.Supp.                                                                                    Page 15
Not Reported in F.Supp., 1998 WL 372644 (E.D.Pa.), 5 Wage & Hour Cas.2d (BNA) 717
**(Cite as: 1998 WL 372644 (E.D.Pa.))**

suggested that reliance alone may not be enough to defeat a motion for class action certification. *See Peil v. Speiser,* 806 F.2d 1154, 1159 n. 8 (3d Cir.1986); *Eisenberg v. Gagnon,* 766 F.2d 770, 786 (3d Cir.1985). However, it has not specifically so held. As a result, several decisions in our district, including at least one by the undersigned, have held that individual issues of reliance do prevent class certification. *See J/H Real Estate, Inc. v. Abramson,* Nos. CIV. A. 95-4176, 95-7180, 1996 WL 63712, at * 6-7 (E.D.Pa. Feb. 9, 1996); *In re Herley Sec. Litig.,* 161 F.R.D. 288, 292 (E.D.Pa.1995); *Squitieri v. Gould,* 133 F.R.D. 25, 28 (E.D.Pa.1990); *In re Bexar County Health Facility Dev. Corp. Sec. Litig.,* 125 F.R.D. 625, 636 (E.D.Pa.1989); *Gavron v. Blinder Robinson & Co.,* 115 F.R.D. 318, 325 (1987); *Snider v. Upjohn Co.,* 115 F.R.D. 536, 542 (E.D.Pa.1987). However, a recent trend of cases has held that reliance alone is not enough to preclude certification. *See Hanrahan v. Britt,* 174 F.R.D. 356, 365 (E.D.Pa.1997); *In re Intelligent Elec. Inc. Sec. Litig.,* No. CIV. A. 92-1905, 669 So.2d 1265, 1996 WL 67522, at *6 (E.D.Pa. Feb. 13, 1996); *In re Bell Atlantic Corp. Sec. Litig.,* No. CIV. A. 91-514, 1995 WL 733381, at *7 (E.D.Pa. Dec. 11, 1995); *First Eastern Corp. v. Mainwaring,* No. CIV. A. 92-1176, 1993 WL 223607, at *3 (E.D. Pa. June 22, 1993); *In re Healthcare Servs. Group Sec. Litig.,* No. CIV. A. 91-6097, 1993 WL 54437, at *7-8 (E.D.Pa. March 1, 1993); *In re Kulicke & Soffa Indus. Sec. Litig.,* No. CIV. A. 86-1656, 1990 WL 1478, at *8 (E.D.Pa. Jan. 9, 1990).

I am now convinced, based on a close reading of the Third Circuit's language in *Eisenberg* and *Peil,* as well as other recent cases in this district, that the Court of Appeals, if faced with the issue, would certify Counts IV and V, under (b)(3), based on the information present in the record. We note at this juncture that had the plaintiffs not allegedly relied on the representations regarding future employment prospects, at issue in Counts IV and V, they would still be current Conrail employees. We may later revisit our conclusion on certification if we find that individual issues of reliance may predominate.

In any event, we conclude that common class issues of law and fact predominate over any individual issues in this case on the claims of fraud and misrep-

resentation. While individual issues are present, especially in the context of reliance, they do not predominate. Rather, the central issues revolve around whether the defendants negligently or intentionally misrepresented information regarding prospects of future employment as to the fraud and misrepresentation claims in Counts IV and V. The necessity of individual information regarding reliance does not preclude the certification of this class under (b)(3).

*17 Rule 23(b)(3) also requires that the class action be the superior method of trying the case. According to the Supreme Court, "[c]lass actions [ ] may permit the plaintiffs to pool claims which would be uneconomical to litigate individually ... most of the plaintiffs would have no realistic day in court if a class action were not available." *Phillips,* 472 U.S. at 809.

We believe that a class action would be superior for trying these state law issues of fraud and misrepresentation. It is likely that the damages received from any individual claim would be uneconomical for each individual plaintiff to litigate.

As to the remaining considerations under Rule 23(b)(3), we find that each plaintiff would have no compelling interest in individually controlling separate lawsuits and that there would be no significant difficulties, presently foreseeable, in the management of the class. Finally, it is not undesirable to have this action proceed in the Eastern District of Pennsylvania. Conrail maintains its principal place of business here and most of the representative plaintiffs reside in the district.

IV

Count VII sets forth a claim for age discrimination. The ADEA requires enforcement "in accordance with the powers, remedies, and procedures" of select portions of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq. See* 29 U.S.C. § 626(b). For purposes of class action certification, we follow the relevant portion of the FLSA, 29 U.S.C. § 216, rather than Rule 23 of the Federal Rules of Civil Procedure. *Sperling v. Hoffman-La Roche, Inc.,* 118 F.R.D. 392, 399 (D.N.J.), *aff'd in part,* 862 F.2d 439 (3d Cir.1988), *aff'd,* 493 U.S. 165, 110 S.Ct. 482, 107

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Page 16
Not Reported in F.Supp., 1998 WL 372644 (E.D.Pa.), 5 Wage & Hour Cas.2d (BNA) 717
**(Cite as: 1998 WL 372644 (E.D.Pa.))**

L.Ed.2d 480 (1989). It reads:

> An action to recover the liability prescribed ... may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

29 U.S.C. § 216(b).

The definition of "similarly situated" is not set forth in the statute. One court has found that most "courts appear to require nothing more than substantial allegations that the putative class members were together the victims of a single decision, policy, or plan infected by discrimination." *Sperling,* 118 F.R.D. at 407. While the statute requires that the plaintiffs be "similarly situated," they need not be identical. *Id.* at 405.

In *Lockhart v. Westinghouse Credit Corp.,* 879 F.2d 43, 51 (3d Cir.1989), *overruled in part on other grounds by, Hazen Paper Co. v. Biggins,* 507 U.S. 604, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993), the Court of Appeals for the Third Circuit applied a three part test to determine if the plaintiffs are similarly situated, that is, whether they were "(1) employed in the same corporate department, division and location; (2) advanced similar claims of age discrimination; and (3) sought substantially the same form of relief." The Third Circuit found this test met where the employees, although employed at different locations, all had been employees in the same division, challenged the same employment practice and sought the same forms of relief. *Id.* at 52. Further, in considering whether to certify the class, a court has significant discretion to determine whether defendants' assertion of defenses unique to each individual employee "would make manageability of the class impossible." *Id.*

***18** Plaintiffs claim that the proposed plaintiff class is similarly situated because all plaintiffs are over 40 years of age, with 15 or more years of experience at Conrail. They all elected the VSP and were rehired as independent contractors performing work similar to

that which they performed as an employee, but at a lower salary and without benefits.

Defendants contend that three reasons preclude certification. First, the plaintiffs are not victims of a single decision, policy, or plan infected by discrimination. The potential class of 70 former employees worked at various facilities in varying jobs, and thus are not similarly situated. Rather, each Conrail facility made its own individual decisions regarding the rehiring of former employees as independent contractors. Second, the defendants' defenses as to each individual plaintiff in the class would be individualized, to show that defendants' actions were based on reasonable factors other than age. Certifying a class would purportedly deprive Conrail of its essential and individualized defenses. [FN17] Finally, defendants contend that fairness and procedural considerations militate against certification of this class. Here, defendants contend that they would call two defense witnesses for every ADEA plaintiff who testified, comprising at least 70 days of trial time.

> FN17. As one example, defendants note that plaintiff Falcone signed a document saying he would not represent any party in any action against Conrail. The instant action allegedly breaches this agreement.

Plaintiffs argue that the defendants again exaggerate the extent of the individual defenses. Further, according to plaintiffs, defendants fail to articulate why they could not raise their defenses if a class is certified. Plaintiffs contend the defenses raised could certainly be applied on a class-wide basis.

We find that the plaintiffs are similarly situated for the reasons asserted by plaintiffs--they are all over 40 years of age with more than 15 years of experience at Conrail, and they accepted the VSP and were re-employed as independent contractors for less money and no benefits while younger employees retained their employee positions. Although plaintiffs were employed at various facilities throughout the country, they all left Conrail pursuant to a nationwide early retirement offering, the VSP. The fact that approximately 70 plaintiffs returned to work in substantially similar positions as independent contractors, at vary-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Page 17

Not Reported in F.Supp., 1998 WL 372644 (E.D.Pa.), 5 Wage & Hour Cas.2d (BNA) 717

**(Cite as: 1998 WL 372644 (E.D.Pa.))**

ing locations throughout the country, indicates to us that rehiring VSP persons as independent contractors was not an isolated practice at certain locations. The plaintiffs advance the identical claim of age discrimination and seek the same relief--reinstatement as an employee or receipt of wages and benefits commensurate with that of employees. If further discovery reveals that each Conrail facility or location did maintain its own procedures regarding rehiring former employees, distinct from that of Conrail overall, this class may be decertified or further subdivided.

We also do not find defendants' allegations of individualized defenses sufficient to preclude class certification. Defendants assert that their actions were required by business necessity, a defense which could certainly be applied on a class-wide, or location-wide basis. Defendants present only two other individual defenses, both as to plaintiff Falcone. Based upon these sparse allegations, we find it is not enough to preclude class certification.

**\*19** In conclusion, Count VII will be certified as a class action.

### V

Our final concern is the scope of the class and subclasses to be certified. Defendants did not address the scope of the class in their 79 page response. For the reasons set forth above, we find the description of the class and subclass proposed by plaintiffs to be sufficient:

In conclusion, the motion of the plaintiffs for class certification will be granted in part and denied in part. A class comprised of all persons formerly employed by Conrail at any Conrail location who separated from Conrail as part of the March 1, 1996 Conrail VSP will be certified with respect to the claims in Counts I, II, III, IV, V, VI, and XIV. A subclass comprised of those VSP participants who returned to work for Conrail to positions of employment which Conrail designated as non-employee status will be certified with respect to the claims in Counts VIII, IX, and XIII. Finally, an ADEA subclass composed of those class members over 40 years of age who were returned to work into non-employee status, will be certified on Count VII. The motion will be denied

as to Counts X, XI, and XII.

### ORDER

AND NOW, this 14th day of May, 1998, for the reasons set forth in the accompanying Memorandum, it is hereby ORDERED that the motion of plaintiffs for class certification is GRANTED in part and DENIED in part as follows:

1. A class comprised of all persons formerly employed by Conrail at any Conrail location who separated from Conrail as part of the March 1, 1996 Conrail Voluntary Separation Program ("VSP") is certified with respect to the claims in Counts I, II, III, and VI pursuant to Rule 23(b)(1)(A), (b)(1)(B), and (b)(2) of the Federal Rules of Civil Procedure.

2. The class set forth in paragraph 1 is hereby certified with respect to the claims set forth in Counts IV and V pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure.

3. A subclass comprised of those VSP participants who returned to work for Conrail in positions of employment which Conrail designated as non-employee status is certified with respect to the claims in Counts VIII, IX, and XIII pursuant to Rule 23(b)(1)(A), (b)(1)(B), and (b)(2) of the Federal Rules of Civil Procedure.

4. An Age Discrimination in Employment Act subclass comprised of those class members over 40 years of age who were returned to work into non-employee status, is certified on Count VII pursuant to 29 U .S.C. §§ 216(b) and 626(b).

5. The motion of plaintiffs is denied in all other respects.

Not Reported in F.Supp., 1998 WL 372644 (E.D.Pa.), 5 Wage & Hour Cas.2d (BNA) 717

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.