IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

RAMON VILLANUEVA-BAZALDUA
individually and on behalf of others similarly
situated,

          CA 1:06-cv-00185-GMS

     Plaintiff

          Class Action

v.

TRUGREEN LIMITED PARTNERS and
TRUGREEN, INC.

     Defendants.

_____

**PLAINTIFF'S REPLY BRIEF IN SUPPORT OF
MOTION FOR LEAVE TO FILE
A FIRST AMENDED COMPLAINT**

Vivian L. Rapposelli
DE Bar No. 3204
Rapposelli & Gonzales
1300 Grant Ave., Suite 100
Wilmington, DE 19806
Tel: 302-652-8711

Edward Tuddenham
TX Bar No. 20282300
153 Upland Rd.
Cambridge, MA 02140
Tel: 617-576-2182

ATTORNEYS FOR PLAINTIFF

1

TABLE OF CONTENTS

Table of Cases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

I.  PLAINTIFF HAS STATED A RICO CLAIM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

    A.  TruGreen Misstates Plaintiff's RICO Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    B.  Other Courts Have Upheld Similar  RICO Claims By Visa Workers . . . . . . . . . . . . 6

    C.  DOL "Oversight" Does Not Preempt Plaintiff's RICO Claim. . . . . . . . . . . . . . . . . 6

    D.  Plaintiff's Allegations Establish RICO Standing . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    E.  Plaintiff Has Alleged RICO Causation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

II.  ADDING UNJUST ENRICHMENT AND PROMISSORY ESTOPPEL
    CLAIMS SHOULD BE ALLOWED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

    A.  TruGreen's Class Certification Arguments Are Premature . . . . . . . . . . . . . . . . . . . 14

    B.  TruGreen Has Not Shown Prejudice Will Result From Adding
        Unjust Enrichment and Promissory Estoppel Claims . . . . . . . . . . . . . . . . . . . . . 14

III.  PLAINTIFF HAS NOT ACTED IN BAD FAITH OR WITH
    DILATORY MOTIVE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

TABLE OF CASES

*Abraham v. Singh,* 480 F.3d 351 (5th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 6, 7, 10

*Anza v. Ideal Steel Supply Corp.,* 126 S.Ct. 1991, 1998 (2006) . . . . . . . . . . . . . . 8, 9, 11, 12, 13

*Catalan v. Vermillion Ranch L.P.,* 2007 WL 38135 (D. Colo. 2007) . . . . . . . . . . . . . . 4, 6, 7, 10

*Choimbol v. Fairfield Resorts, Inc.,* 428 F.Supp.2d 437 (E.D. Va. 2006) . . . . . . . . . . . . . . . . . . 8

*Commercial Cleaning Services LLC v. Colin Service System, Inc.,*
        271 F.3d 374 (2nd Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Holmes v. Security Investor Protection Corporation,* 503 U.S. 258 (1992) . . . . . . . . . . . . 12, 13

*Jane Doe I v. Reddy,* 2003 WL 23893010 (N.D. Cal. 2003). . . . . . . . . . . . . . . . . . . 4, 6 7, 8, 10

*J.M Turner, Inc. v. Applied Bolting Tech. Products, Inc.,*
        1997 WL 83766 (E.D. Pa. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Marin v. Evans,* 2007 WL 655456 (E.D. Wash. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Mendoza v. Zirkle Fruit Co.,* 301 F.3d 1163 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . 8, 13

*Rodriguez v. McKinney,* 878 F.Supp. 744 (E.D. Pa. 1995) . . . . . . . . . . . . . . . . . . . . . . . 10, 11, 13

*Shaw v. Rolex Watch USA,* 726 F.Supp. 969 (S.D.N.Y. 1989) . . . . . . . . . . . . . . . . . . . . . . 10, 11

*Tabas v. Tabas,* 47 F.3d 1280 (3rd Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Trautz v. Weisman,* 819 F.Supp. 282 (S.D.N.Y. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

*Trollinger v. Tyson Foods, Inc.,* 370 F.3d 602 (6th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . 7, 13

*U.S. v. Brown,* 583 F.2d 659  (3rd Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Williams v. Mohawk Industries,* 465 F.3d 1277 (11th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . 7

Defendants' objections to Plaintiff's motion for leave to amend are without merit and the amendment should be allowed. As set forth below, Defendants' primary argument – that Plaintiff's RICO claim fails to state a cause of action – is without support. Courts have consistently upheld RICO claims similar to Plaintiff's involving injuries to foreign visa workers arising from fraudulent visa applications and recruitment promises. *See, e.g., Abraham v. Singh,* 480 F.3d 351 (5th Cir. 2007), *Catalan v. Vermillion Ranch L.P.,* 2007 W.L. 38135 at *5-*9 (D. Colo. 2007), and *Jane Doe I v. Reddy,* 2003 WL 23893010 (N.D. Cal. 2003). Plaintiff's RICO claim alleges injuries in the form of lost wages that are sufficient both to confer RICO standing and to meet the proximate cause requirements of RICO. Defendants' second assertion, that they will suffer undue prejudice if Plaintiff is allowed to add unjust enrichment and promissory estoppel claims, fails for lack of evidence. Defendants' assertions of bad faith and dilatory motive are similarly lacking in support and simply ignore the fact that the motion to amend was filed well within the time period agreed to in the parties' joint status report (DI 39 ¶¶ 6,7). Because Defendants have failed to show that the amendment is futile or will unduly prejudice them, leave to amend should be freely given.

## I. PLAINTIFF HAS STATED A RICO CLAIM

### A. TruGreen Misstates Plaintiff's RICO Claims

TruGreen's attack on Plaintiff's RICO claim is based on a gross mischaracterization of the claim. TruGreen focuses on only two paragraphs of Plaintiff's proposed complaint – the allegations that TruGreen's visa applications exaggerated the number of workers it needed (DI 55 ¶ 27) and misrepresented its jobs to obtain a lower prevailing wage (¶ 30) – while completely ignoring the rest of Plaintiff's detailed RICO allegations. What Plaintiff's proposed amended

complaint actually alleges is a criminal scheme by which TruGreen sought to reduce its labor costs by exploiting vulnerable foreign visa workers. (¶ 13). In order to exploit these workers, TruGreen first had to obtain H-2B visas from the U.S. government so it could legally import the foreign workers. (¶¶ 16-21). TruGreen obtained these visas by filing fraudulent visa applications with the U.S. government that misrepresented the terms and conditions of work that TruGreen intended to pay its workers. (¶ 27). These visa applications also furthered TruGreen's scheme by misrepresenting both the number of visas needed[1] (¶ 27), and the prevailing wage applicable to the jobs. (¶ 30). Once it obtained the visas, TruGreen recruited foreign workers to accept the positions through fraudulent job offers that similarly misrepresented the terms of work that TruGreen actually intended to pay. (¶¶ 46, 47). When the Mexican workers arrived in the U.S., TruGreen paid them less than had been promised to the U.S. government and to the workers. (¶¶ 53, 54). Because workers were required to pay hundreds of dollars to accept the visas (¶ 51), and were prohibited from using the visas to work for any employer other than TruGreen (¶ 15), workers had little choice but to accept the lower wages paid by TruGreen, just as TruGreen anticipated when it concocted the scheme. Those who complained, including Plaintiff, were terminated. (¶¶ 55-57). TruGreen's worker exploitation scheme injured Plaintiff

---

[1] Exaggerating the number of visas needed was a critical part of TruGreen's scheme to exploit workers. Extra visas made it possible for TruGreen to replace workers who refused to work for the wages offered upon arrival in the U.S. and thereby made it easier for TruGreen to coerce workers into accepting those wages. TruGreen's opposition to Plaintiff's motion to amend asserts that, as a factual matter, most H-2B employers exaggerate the number of visas they need and that "the federal agency charged with overseeing the H-2B program is fully aware of this practice . . ." Opposition at 3. TruGreen cites no affidavits or other evidence to support these factual assertions and they should not be considered at this time. TruGreen will have ample time to file a motion for summary judgment if it believes it can actually back up these assertions with evidence.

and other H-2B workers in their business or property by depriving them of the wages mandated

by law and promised to them in Mexico. (¶¶ 96 and 119).

B.  Other Courts Have Upheld Similar  RICO Claims By Visa Workers

Similar schemes to exploit temporary guest workers through the filing of fraudulent visa

applications and fraudulent recruitment materials have been found to state RICO claims.  For

example, in a recent Fifth Circuit case, *Abraham v. Singh,* 480 F.3d 351 (5th Cir. 2007), H-2B

workers from India alleged that their employer misrepresented the terms and conditions of work

at the time of their recruitment.  Upon arrival in the United States, the workers were paid less

than had been promised and were not provided the promised period of employment.  Reversing a

district court order dismissing the claims, the Fifth Circuit held that the H-2B worker

exploitation scheme stated a cause of action under RICO, 18 U.S.C. §§ 1962(c) and (d), the same

two provisions that Plaintiff relies upon.  In *Catalan v. Vermillion Ranch L.P.,* 2007 W.L. 38135

at *5-*9 (D. Colo. 2007), the court upheld a complaint filed by H-2A guest workers alleging

RICO violations arising out of the employer's fraudulent visa applications.  Similarly, in *Jane

Doe I v. Reddy,* 2003 WL 23893010 (N.D. Cal. 2003), workers from India alleged that their

employer arranged to bring them to the United States "on the basis of fraudulent visa petitions

and other fraudulent immigration documents" and then exploited them in a variety of ways

including failing to pay them the minimum wage and overtime required by state and federal law.

*Id.* at *3.  The Court found that these allegations stated a claim under RICO.

C.  DOL "Oversight" Does Not Preempt Plaintiff's RICO Claim.

TruGreen argues that Plaintiff's RICO claim is somehow precluded by the fact that the

Department of Labor (DOL) and state workforce agencies are charged with "oversight of the H-

2B visa program. Opposition at 2. TruGreen does not explain how this "oversight" acts to defeat Plaintiff's RICO claim, nor can it. In light of Plaintiff's allegation that TruGreen obtained DOL approval of its visa applications through fraud, DOL's approval is of no legal significance whatsoever. For example, if, as Plaintiff alleges in ¶ 30, TruGreen misrepresented information used to determine the prevailing wage, such as the location where work would be performed, or the jobs that would be performed, DOL's approval of TruGreen's wage rate would hardly insulate TruGreen from the consequences of its fraudulent misrepresentations. The fraudulent visa applications at issue in *Abraham, Catalan,* and *Jane Doe I* were also approved by the U.S. government, but none of those courts found that approval a bar to a RICO action. *Cf. Marin v. Evans,* 2007 WL 655456 (E.D. Wash. 2007) (Immigration Reform and Control Act does not preempt RICO claim).

     D.  <u>Plaintiff's Allegations Establish RICO Standing</u>

        TruGreen next argues that Plaintiff lacks standing to bring a RICO claim because he has no "claim of entitlement to an H-2B visa." Opposition at 4. This argument is beside the point. Plaintiff is not complaining that he was deprived of an H-2B visa. Rather he complains that he and other Mexican workers who worked for TruGreen were deprived of the lawful wages required by the H-2B program. There can be no question that deprivation of lawful wages for one's labor is an injury to business or property sufficient to confer RICO standing. *See Williams v. Mohawk Industries*, 465 F.3d 1277, 1286-87 (11th Cir. 2006) (receipt of depressed wages because of employer's undocumented alien hiring scheme is an injury to a worker's business or property for purposes of RICO standing); *Trollinger v. Tyson Foods, Inc.,* 370 F.3d 602, 615-18 (6th Cir. 2004) ("[I]f direct purchasers who pay too much obviously assert a direct injury, so do

direct employees who receive too little."); *Mendoza v. Zirkle Fruit Co.,* 301 F.3d 1163, 1168 (9th Cir. 2002) (lost wages is injury to business); *Jane Doe I,* 2003 WL 23893010 at * 2 (working long hours without pay is an injury to business or property for purposes of RICO standing); *Choimbol v. Fairfield Resorts, Inc.,* 428 F.Supp.2d 437, 444-45 (E.D. Va. 2006) (receipt of less than FLSA minimum wage and overtime for one's labor is an injury sufficient to confer RICO standing).

E.  Plaintiff Has Alleged RICO Causation

Finally, TruGreen argues that Plaintiff has not alleged proximate cause as required by *Anza v. Ideal Steel Supply Corp.,* 126 S.Ct. 1991, 1998 (2006), because the fraudulent visa petitions were submitted to DOL rather than to the Mexican workers.  This argument should be rejected for two, independent reasons.   First, the fraudulent visa applications constitute only one of many predicate acts supporting Plaintiff's RICO claim.  Plaintiff has also alleged predicate acts of mail and wire fraud in the transmission of the fraudulent disclosure statements used to induce Plaintiff and other Mexican workers to accept TruGreen's visas and travel to the United States.[2]  (¶¶ 46-49).   The workers' injuries flow directly from those false disclosure statements, thereby satisfying the proximate cause requirement of RICO without regard to the fraudulent visa applications. *See Anza,* 126 U.S. at 1998 (the central question with respect to proximate cause is "whether the alleged violation led directly to the plaintiff's injuries").

---

[2]    Mailings that are "incident to an essential part of a fraudulent scheme" constitute mail fraud. *Tabas v. Tabas,* 47 F.3d 1280, 1294 n. 18 (3rd Cir. 1995).  *See also U.S. v. Brown,* 583 F.2d 659, 668 (3rd Cir. 1978) ("If a mailing is part of executing the fraud, or is closely related to the scheme, a mail fraud charge will lie even though the mailing was also related to a business purpose.").  The mailing of the fraudulent disclosure terms to TruGreen's agent in Mexico for use in recruiting workers clearly fits within that definition.

Although it is not necessary to reach the question, TruGreen's fraudulent visa applications also satisfy the causation requirement of *Anza*.    The visa applications were a necessary step in gaining access to a foreign workforce.  Without those visas, TruGreen would not have been able to import Mexican workers and pay them the substandard wages at issue. Moreover, even though visa applications were submitted to the government, rather than to the workers, the applications  determined the wages and working conditions to be paid to foreign workers (along with the disclosure documents).    Fraudulent representations in those visa application forms thus directly affected the workers' wages and caused their injuries.  For example, TruGreen's fraudulent representations regarding the applicable prevailing wage level directly injured the Mexican workers by allowing TruGreen to pay an unlawfully low wage.   As explained above, the fraudulent representations regarding the numbers of workers needed also contributed to TruGreen's exploitation of its Mexican workers by making it easier for TruGreen to coerce workers into accepting unlawfully low wages.    Thus, there is a direct and immediate connection between fraudulent visa applications and the injuries suffered by Plaintiff and other Mexican workers.

Defendants do not deny the direct link between the fraudulent visa applications and the workers' injuries.  Rather, they focus on the narrow technical point that the fraudulent petitions were submitted to DOL rather than directly to the workers.    However, courts have long recognized that false statements to third parties, including government agencies, can satisfy the RICO proximate cause requirement where those false statements cause direct injury to the RICO plaintiff.  For example, no proximate cause problem was found in the three foreign guest worker RICO cases cited above even though the claims were based, in part, on fraudulent visa

applications submitted to the government. *See Abraham,* 480 F.3d 351; *Catalan,* 2007 WL 38135; *Jane Doe I,* 2003 WL 2389310. Outside the foreign worker context courts have also found fraud on government agencies sufficient to satisfy RICO proximate cause requirements where that fraud directly injures the private party bringing the suit. For example, in *Rodriguez v. McKinney,* 878 F.Supp. 744, 745 (E.D. Pa. 1995), former students of a trade school asserted RICO violations premised on the school's fraudulent certifications to the Department of Education (DOE) that the plaintiffs had the ability to benefit from the school's curriculum. As a result of these certifications the plaintiff students incurred loan debt for a worthless education. The district court found these allegations satisfied the RICO proximate cause requirement. *Id.* at 748. The mere fact that the fraud was directed at a government agency did not preclude the students from suing where it was foreseeable (and indeed intended) that the students would be harmed by the fraud. *Id.* at 749. In *Trautz v. Weisman,* 819 F.Supp. 282 (S.D.N.Y. 1993), residents of an adult care facility brought RICO action against owners for deplorable conditions at the home. *Id.* at 284. The RICO claim was grounded on fraudulent communications with the state Department of Social Services (DSS), which caused DSS to continue to renew the facility's operating certificate. That certificate was critical to the facility's ultimate goal of defrauding its residents since it could not bill the residents without the certificate. *Id.* at 285-286. *See also, Shaw v. Rolex Watch USA,* 726 F.Supp. 969 (S.D.N.Y. 1989) (upholding RICO action in which watch importer alleged that competitor made false statements to U.S. customs officials in order to induce customs officials to refuse to allow plaintiff to import watches); *J.M Turner, Inc. v. Applied Bolting Technology Products, Inc.,* 1997 WL 83766 at *8-13 (E.D. Pa. 1997) (upholding RICO claim by bolt maker against competitor based on fraudulent advertising directed at bolt

maker's customers.   Although customers were primary victims of fraud, harm to plaintiff company in lost sales was foreseeable and met proximate cause requirement).

This case falls squarely within the parameters of *Rodriguez, Trautz,* and *Shaw.*  As in those cases, TruGreen's fraud on the government was simply a necessary step in order to exploit the real victims of its scheme, the Mexican visa workers.  Without the visas, its scheme would have gone nowhere.  Moreover, as in those cases, the regulatory regime being subverted by TruGreen was specifically designed for the protection of the private parties bringing the RICO action.[3]  This connection between the regulatory regime and the RICO plaintiff's rights ensures that there is a direct link between the fraud on the government and the injury the RICO plaintiff seeks to vindicate.

In evaluating whether the requisite causal connection exists in a case, *Anza* instructs that courts should consider the "motivating principle[s]" behind the directness component of the proximate-cause standard.  126 S.Ct. at 1997.   "One motivating principle [for the proximate cause requirement] is the difficulty that can arise when a court attempts to ascertain the damages caused by some remote action." *Anza,* 126 S.Ct. at 1997.  In *Anza,* itself, the plaintiff alleged that National's scheme of defrauding the New York State government of sales taxes allowed National to use the tax savings to reduce prices and increase its market share with respect to its competitor Ideal.   The Court noted that this allegation would necessitate "a complex assessment to establish what portion of Ideal's lost sales were the product of National's decreased prices" and what

---

[3]  The regulations governing the H-2B program are designed, ultimately, to protect U.S. workers from unfair competition and wage depression.  But this goal is accomplished by strictly regulating the terms under which foreign workers may be employed.  Thus, foreign workers are the direct beneficiaries of the regulatory scheme and the ones most immediately injured by fraudulent manipulation of the regulatory protections.

portion were due to other economic factors. *Id.* In addition, the Court noted that the direct victim of the fraud, the State, lost "a substantial amount of money" and could be expected to vindicate the laws by pursuing its own claim for the lost tax revenue. Neither of these concerns arises here. The Mexican workers' damages are readily calculable: They are simply the difference between what the workers received for their labor and what they should have received in wages pursuant to non-fraudulent visa applications and TruGreen's recruitment documents. There is no need for complicated apportioning of damages as in *Anza.* This ease of calculating damages underscores the direct link between the violations and the injury. Moreover, while the U.S. government certainly suffers an abstract wrong when fraudulent visa petitions are approved, its injury is neither as immediate nor as concrete as the monetary loss suffered by the state government in *Anza.* The financial injury from fraudulent visa petitions falls on the workers who received the visas, making them, not the government, the appropriate parties to pursue a RICO claim. Plaintiff simply does not allege the kind of indirect harm, passed on from some more direct victim of the fraud, that was found to be fatal in *Anza* and *Holmes v. Security Investor Protection Corporation,* 503 U.S. 258 (1992).

Finally, the federal government's generalized right to prosecute TruGreen for visa fraud does not make it a more immediate victim of the fraud than the workers who were to be protected by the visa application process, and it certainly does not serve as a basis for finding a lack of proximate cause. *See Mohawk Industries,* 465 F.3d at 1290 (fact that U.S. government could prosecute Mohawk for importing undocumented workers does not preclude U.S. workers whose wages are depressed by such immigration violations from pursuing civil RICO claims); *Commercial Cleaning Services LLC v. Colin Service System, Inc.,* 271 F.3d 374, 385 (2nd Cir.

2001) ("If the existence of a public authority that could prosecute a claim against putative RICO defendants meant that the plaintiff is too remote under *Holmes,* then no private cause of action could ever be maintained. . . ). Indeed, the fact that Congress included visa fraud among the predicate offenses actionable under RICO, *see* 18 U.S.C. § 1961(1)(B), makes clear that Congress contemplated that private parties could rely on misrepresentations in visa applications as a predicate to private RICO action.[4] Thus, the principles set forth in *Anza* fully support the conclusion that Plaintiff's allegations of visa fraud satisfy the proximate cause requirement of RICO.[5]

In sum, either or both of the allegations of mail and wire fraud with respect to the recruitment documents and/or with respect to the fraudulent visa applications are sufficient to meet the proximate cause standards for RICO.

---

[4] The connection between the illegal activity and the injury in this case is far more direct than that found to be sufficient in *Mohawk Industries,* 465 F.3d at 1288; *Trollinger v. Tyson Foods, Inc.,* 370 F.3d at 618-19; and *Mendoza v. Zirkle Fruit Co.,* 301 F.3d at 1168-72. In each of those cases, lawful U.S. workers, alleged that their employers' illegal actions in employing and harboring large numbers of undocumented aliens resulted in depression of the wages of lawful workers. The connection between the hiring of undocumented workers and the depression of plaintiff U.S. workers' wages involves a complicated chain of causation. *See Trollinger,* 370 F.3d at 618 (listing four links in the chain of causation between hiring undocumented workers and injury to U.S. workers). Nevertheless, the Eleventh, Sixth, and Ninth Circuits found the connection sufficient to satisfy the proximate cause requirement of RICO. Here, by contrast, the connection between the promises in the fraudulent visa applications and the fraudulent recruitment materials and the underpayment of wages is direct and immediate and involves no chain of causation whatsoever.

[5] *Anza* is distinguishable from this case for another reason. In *Anza* there was no connection between the regulatory scheme being defrauded and the competitive injury the plaintiff in *Anza* sought to vindicate. A sales tax is not intended to protect competition nor, as the Court noted in *Anza,* does fraud in paying sales tax necessarily injure competitors. Here, and in cases like *Rodriguez,* the regulatory scheme being defrauded is designed specifically to regulate the terms under which H-2B workers are employed and fraud with respect to a visa application does directly affect the rights of H-2B workers.

As demonstrated above, Defendants' arguments against Plaintiff's proposed RICO claim are without merit. The proposed claim is not preempted by DOL's approval of fraudulent visa applications; Plaintiff's claim for lost wages is an injury to his business or property sufficient to confer RICO standing; and the connection between TruGreen's alleged fraud and Plaintiff's lost wages satisfies the proximate cause requirements of RICO. Accordingly, Plaintiff's RICO claim is not futile and the amendment to add that claim should be granted.

## II. ADDING UNJUST ENRICHMENT AND PROMISSORY ESTOPPEL CLAIMS SHOULD BE ALLOWED

### A. TruGreen's Class Certification Arguments Are Premature

TruGreen admits that Plaintiff has stated individual claims for promissory estoppel and unjust enrichment and that, given the liberal standards for amending a complaint, amendment to include those claims may be warranted. Opposition at 1, 9. However, TruGreen argues that those claims are inappropriate for class-wide treatment. That argument is premature. The issue at the motion to amend stage is whether the amendment is timely and states a cause of action (i.e. is not futile). The question of class certification should not be decide until the parties have completed class discovery and had an adequate opportunity to brief a motion for class certification.[6]

### B. TruGreen Has Not Shown Prejudice Will Result From Adding Unjust Enrichment and Promissory Estoppel Claims

TruGreen's argument that allowing Plaintiff to add unjust enrichment and promissory estoppel claims will prejudice it is entirely without support. The sole basis for the claim of

---

[6] On May 25, 2007, the Court ordered TruGreen to respond to certain discovery requests that had previously been propounded to Defendant. Defendant's responses are due on June 25 and a briefing schedule for class certification has been established.

prejudice is TruGreen's assertion that Plaintiff has already been deposed and "it is not clear that TruGreen will be able to continue Plaintiff's deposition without incurring significant expense." Opposition at 9. There are two problems with this argument: First, TruGreen does not identify any issue raised by the unjust enrichment or estoppel claims that would necessitate further questioning of Plaintiff – nor can it. At the time Defendant deposed Plaintiff, the operative complaint alleged breach of contract and fraud arising out of TruGreen's failure to comply with the promises made to Plaintiff in Mexico at the time he was recruited. Those allegations put Defendant on notice of the need to depose Plaintiff regarding the promises made to him in Mexico and the injury he sustained as a result of those promises. Plaintiff's unjust enrichment and promissory estoppel claims add no new facts to the complaint; they simply provide alternative legal theories for recovering damages for the same facts – i.e. Defendants' failure to abide by the promises made to Plaintiff. Thus Defendant's argument that granting the amendment will necessitate redeposing Plaintiff is hollow. Redepose him about what? What new fact question is raised by the addition of these two claims that is so critical that the motion to amend should be denied? None. Second, even if TruGreen could come up with some new line of inquiry necessitated by the unjust enrichment/promissory estoppel claims, Defendants' argument that it may not be able to obtain that information without undue expense is rank speculation at this point. Plaintiff testified that he had a multiple entry visa so, at this point, there is no reason to believe that he cannot return to the U.S. Even if he cannot, the Federal Rules provide for telephone depositions, video conferencing depositions, and other discovery mechanisms that may be more than adequate for TruGreen's needs. Since TruGreen has not identified any specific discovery that it needs, it is premature to address those issues now. There

will be time enough to cross those bridges if and when TruGreen can demonstrate a need to question Plaintiff further.   In the meantime, the proper procedure at this point is to allow the amendment and proceed with discovery.

## III.  PLAINTIFF HAS NOT ACTED IN BAD FAITH OR WITH DILATORY MOTIVE

Defendants assert without evidence that Plaintiff's motion to amend is made in bad faith and for the purposes of delay.  Nothing could be further from the truth.   Since August 2006, Plaintiff has been seeking documents from Defendants relating to their H-2B visa applications and recruitment efforts.    It was not until January, February and March of this year that Defendants finally produced some, although by no means all, of the documents requested by Plaintiff.    Those documents provided critical evidence supporting the factual allegations set forth in the proposed amended complaint.   After reviewing those documents, Plaintiff moved expeditiously to amend the complaint.[7]    Thus, if there was delay involved in the filing of the motion to amend it was *Defendants' delay* of nearly six-months in providing the discovery requested by Plaintiff.   Had Defendants not been so dilatory in responding to Plaintiff's August 2006 request to produce, Plaintiff would have been able to amend far sooner.

Moreover, in arguing bad faith, TruGreen completely ignores the fact that it agreed in the joint status report filed in October 2006 that Plaintiff would have 45 days from the denial of his motion to conditionally certify an FLSA collective action to amend his complaint. DI 39 ¶¶ 6,7. Plaintiff's motion to amend was filed within that deadline. Having specifically agreed to that

---

[7]  The fact that the Court's March 19 decision on Plaintiff's motion to conditionally certify an FLSA collective action occurred while Plaintiff was reviewing the documents produced by Defendants and preparing his motion to amend was mere coincidence.

provision, Defendants can hardly be heard to claim that Plaintiff's compliance with that provision was somehow dilatory or in bad faith.

CONCLUSION

For all of the foregoing reasons, Plaintiff's motion to amend should be granted.

Respectfully submitted,

/s/ Vivian L. Rapposelli

_____
Vivian L. Rapposelli
DE Bar No. 3204
Rapposelli & Gonzales
1300 Grant Ave.  Suite 100
Wilmington, Delaware 19806
Tel: 302-652-8711

Edward Tuddenham
TX Bar No. 20282300
153 Upland Rd.
Cambridge, Mass. 02140
Tel: 617-576-2182

ATTORNEYS FOR PLAINTIFF

CERTIFICATE OF SERVICE

I certify that on this 4th day of June, 2007, I served the foregoing document on Defendants by e-mailing it to the Defendant's attorneys as follows:

Michael P. Kelly          Mkelly@mccarter.com
McCarter & English
Citizens Bank Building
919 N. Market St.  18th Floor
Wilmington, DE  19801

Michael Banks          sbouchard@morganlewis.com
Sarah Bouchard
Morgan Lewis
1701 Market St.
Philadelphia, PA  19103

/s/ Vivian L. Rapposelli
Vivian L. Rapposelli

18

Slip Copy                                                                                    Page 1

Slip Copy, 2007 WL 38135 (D.Colo.)

**(Cite as: Slip Copy)**

---

Catalan v. Vermillion Ranch Ltd. Partnership
D.Colo.,2007.
Only the Westlaw citation is currently available.
United States District Court,D. Colorado.
Elieser Yael Velasquez CATALAN; Sergio
Velasquez Catalan; Humberto Heraldo Berrocal
Ortiz; Luis Alejandro Fuentes Sandoval; and Oscar
Sandoval Poblete, Plaintiffs,
v.
VERMILLION RANCH LIMITED PARTNERSHIP;
A. Wright Dickinson, III; Pauline Dickinson; Deann
Dickinson; T. Wright Dickinson; Marc Dickinson;
and Jean Marie Dickinson, Defendants.
**Civil Action No. 06-cv-01043-WYD-MJW.**

Jan. 4, 2007.

Jennifer Jung-Wuk Lee, Colorado Legal Services,
Inc., Migrant Farm Workers Division, Patricia L.
Medige, Colorado Legal Services, Inc., Edwin S.
Kahn, Kelly/Haglund/Garnsey & Kahn LLC, Denver,
CO, Kimi Marie Jackson, Colorado Legal Services,
Fort Collins, CO, for Plaintiffs.
John R. Paddock, Jr., Leslie Lynn Schluter, Pryor
Johnson Carney Karr Nixon, P.C., Greenwood
Village, CO, for Defendants.

**ORDER**
WILEY Y. DANIEL, U.S. District Judge.
**\*1** THIS MATTER is before the Court on
Defendants' Motion to Change Venue [Docket # 14]
filed on August 4, 2006; Defendants' Motion to
Dismiss [Docket # 27] filed on September 6, 2006;
and Defendants' Motion to Disqualify Colorado
Legal Services [Docket # 43] filed on September 26,
2006. I will first address Defendants' Motion to
Change Venue and then move on to Defendants'
Motion to Dismiss and Motion to Disqualify
Colorado Legal Services.

I. *DEFENDANTS' MOTION TO CHANGE VENUE*

I first address Defendants' Motion to Transfer the
Case to the United States District Court for the
District of Wyoming, wherein Defendants argue that
venue should be transferred pursuant to 28 U.S.C. §
1404(a). [Docket # 41]. 28 U.S.C. § 1404(a) provides
as follows: " for the convenience of the parties and

witnesses, in the interest of justice, a district court
may transfer any civil action to any other district or
division where it might have been brought." This
statute vests the Court with the discretion to transfer
cases to other districts to prevent unnecessary
inconvenience and expense. *Consumers Gas & Oil,
Inc. v. Farmland Industries, Inc.,* 815 F.Supp. 1403
(D.Colo.1992). Congress enacted the statute " as a '
federal housekeeping measure,' allowing easy
change of venue within a unified federal system."
*Chrysler Credit Corp. v. County Chrysler, Inc.,* 928
F.2d 1509, 1515 (10th Cir.1991) (citing *Piper
Aircraft Co. v. Reyno,* 454 U.S. 235, 254 (1981)).

Although Congress drafted section 1404(a) in
accordance with the doctrine of forum non
conveniens, " the statute was intended to revise rather
than merely codify the common law." *Chrysler
Credit Corp. v. County Chrysler, Inc.,* 928 F.2d at
1515. District courts therefore enjoy greater
discretion to transfer a case pursuant to section
1404(a) than to dismiss the action based upon the
forum non conveniens doctrine. *Id.* Plaintiff's choice
of forum is given considerable weight. *Texas E.
Transmission Corp. v. Marine Office-Appleton &
Cox Corp.,* 579 F.2d 561, 567 (10th Cir.1978).
However, Plaintiffs' choice of forum is given less
weight when the plaintiff is not a resident of the
chosen forum. *See Bailey v. Union Pacific Railroad,*
364 F.Supp.2d 1227, 1230 (D.Colo .2005).

The moving party bears the burden of showing the
existing forum is inconvenient. *Chrysler Credit Corp.
v. County Chrysler, Inc.,* 928 F.2d at 1515 (citations
omitted). " Unless the balance is strongly in favor of
the movant the plaintiff's choice of forum should
rarely be disturbed." *William A. Smith Contracting
Co. v. Travelers Indem. Co.,* 467 F.2d 662, 664 (10th
Cir.1972). This Court has previously held that "
transfer of civil actions is not favored where the
transfer would serve only to shift the burden of
inconvenience from one party to another."
*Greenberg v. Greenberg,* 954 F.Supp. 213
(D.Colo.1997)(citing *Decker Coal v. Commonwealth
Edison Co.,* 805 F.2d 834 (9th Cir.1986).

**\*2** The court must " adjudicate motions for transfer
according to an individualized, case-by-case
consideration of convenience and fairness." *Stewart
Org. v. Ricoh Corp.,* 487 U.S. 22, 29 (1988)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                              Page 2

Slip Copy, 2007 WL 38135 (D.Colo.)

**(Cite as: Slip Copy)**

(quotation omitted). " The traditional factors that a District Court weighs in considering requests to transfer under 28 U.S.C. § 1404(a) are: (1) convenience to the parties; (2) convenience of the witnesses; and (3) the interests of justice." *Metabolite Laboratories, Inc. V, Amerisourcebergen Corp.*, 2006 WL 1581750 (D.Colo.2006)(citing *Parsons v. Chesapeake & Ohio Railway Co.*, 375 U.S. 71 (1963).

A. *Application of the Factors*

1. *Convenience of the Parties*

Balancing the relative convenience of the parties, Defendants fail to show that the District of Wyoming would be more convenient. Three out of six individual Defendants live in Colorado. Additionally, while VRLP is a Wyoming partnership, VRLP operates as a Colorado business and is subject to service at 14883 CR 10 N, Maybell, Colorado, 81640. For purposes of venue, " a corporate defendant resides in any judicial district in which it is subject to personal jurisdiction, as construed to mean any state in which it is authorized to do business." *Graf v. Tastemaker*, 907 F.Supp. 1473, 1474 (D.Colo.1995). Accordingly, the majority of Defendants reside in Colorado.

Defendants argue that traveling to Denver for a two week trial will create a hardship because of their ranching operations. It is important to recognize, however, that the distance from VRLP to Cheyenne is similar to the distance from VRLP to Denver. Defendants' Maybell, Colorado location is approximately 227 miles from Denver and approximately 320 miles from Cheyenne. Defendants' location in Rock Springs, Wyoming is approximately 351 miles from Denver and 257 miles from Cheyenne. I do not find that a difference of, at most, approximately 100 miles is enough of an additional burden on Defendants to warrant a transfer of venue in this case.

Plaintiffs, on the other hand, are income eligible for Colorado Legal Services (counsel of last resort for low-income Coloradans). Plaintiffs assert that if this case is transferred, they will be forced to locate local Wyoming counsel. Consequently, removing this case to Wyoming would create a financial burden for Plaintiffs.

2. *Convenience of the Witnesses*

In weighing the convenience of the witnesses, Courts have considered: whether or not the prospective witness will be material, *Scheidt v. Klein*, 956 F.2d 963, 966 (10th Cir.1992), and whether or not the prospective witnesses would be unwilling to come to the trial in the inconvenient forum, *WestAmerica v. First Nationwide Savings*, 1987 WL 18690 (D.Colo.1987). Both Defendants and Plaintiffs list potential witnesses who are located in the respective forums. From the record before me, Defendants have not shown that the convenience of witnesses warrants a transfer of venue in this case.

**\*3** Defendants first assert that employees of the Wyoming State Workforce Agency (" WSWA" ) are needed as witnesses. The WSWA was the entity that processed Plaintiffs' H-2A applications and performed onsite inspections at the Ranch every three years. Defendants identify five potential witnesses that work in the WSA office in Rock Springs, Wyoming. Defendants also identify Margaret Blodgett (the manager of the State of Wyoming Department of Workforce Services office in Rawlins, Wyoming) as a potential witness. It is unclear, however, which of these six witnesses are necessary for the proof of this case. Further, Defendants have failed to provide evidence to this Court that these witnesses would be unwilling to come to Denver to provide testimony in this case.

Defendants also identify as witnesses: two employees of the medical clinic in Rock Springs, an employee of Union Telephone, employees of Rock Springs National Bank, and Defendants' accountant-Leslie Henderson, CPA. The medical employees treated two of the Plaintiffs when they were injured on the ranch. Defendants assert the employee from the phone company can testify as to Plaintiffs' access to the telephones. The employees from Rock Springs National Bank set up the Plaintiffs' accounts. Finally, Mr. Henderson and his firm served as accountants and advisors to defendants and prepared tax returns for H-2A employees.

Plaintiffs, on the other hand, assert that VRLP filed labor certification applications in the Denver Department of Labor office. In addition, Plaintiffs list as a witness Colorado Springs attorney, Anne Filbert, who was hired by Defendants to prepare the labor applications. Plaintiffs also list representatives of Pinnacol Assurance of Colorado who have information regarding the worker's compensation coverage and claims. Plaintiffs list unidentified employees of Brown's Park Wildlife Refuge, the U.S.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                              Page 3

Slip Copy, 2007 WL 38135 (D.Colo.)

**(Cite as: Slip Copy)**

Department of Labor, and representatives of U.S. Immigration and Customs Enforcement, who may have information regarding the claims in this action. Finally, Plaintiffs identify two individuals, Ms. Wald and Mr. Garibotti (both of whom are located in Boulder), who spoke with Plaintiffs during the relevant time period about the events that occurred on the ranch and have knowledge of ranch operations and employment conditions.

The last witness identified by Plaintiffs is Dr. Dawn Thilmany. Dr. Thilmany is Plaintiffs' expert witness and is located Colorado State University. The location of an expert witness is a factor to consider when conducting a Section 1404(a) balancing test. *See Palace Exploration Co. v. Petroleum Development Co.,* 316 F.3d 1110 (10th Cir.2003).

On balance, I find there are potential material witnesses in both Colorado and Wyoming. Accordingly, a transfer of venue is not warranted by applying this factor alone.

### 3. *Interest of Justice*

" Factors traditionally considered in an ' interest of justice' analysis relate to the efficient administration of the court system." *Coffey v. Van Dorn Iron Works,* 796 F.2d 217, 220 (7th Cir.1986). As part of this analysis, a court may consider the docket conditions of the transferee and transferor districts. *Furr,* 2005 WL 1801627, at *5. In support of their motion, Defendants emphasize that cases in Wyoming proceed to trial more quickly than in Colorado and the average number of pending cases per judge is much lower in Wyoming. On the other hand, Plaintiffs point out that the median time from filing to disposition of a case in Colorado is shorter than in Wyoming. I find that the comparative docket congestion does not tip the scale in favor of one forum over the other.

**\*4** Additionally, " there is a local interest in having localized controversies decided at home." *Bailey v. Union Pacific Railroad,* 364 F.Supp.2d 1227, 1233 (D.Colo.2005) (quoting *Gulf Oil Corp v. Gilbert,* 330 U.S. 501, 508-9 (1947). As I explained above, the alleged relevant events which lead to the filing of this action occurred in both Wyoming and Colorado. Plaintiffs flew from Chile to Rock Springs, Wyoming. Upon their arrival, Plaintiffs were taken to Rock Springs National Bank and the Rock Springs Social Security Office. However, Plaintiffs allege that five out of six Plaintiffs lived and worked in

Colorado during the period relative to the present action. Consequently, I find the local interest of Wyoming does not outweigh the local interest of Colorado.

On balance, granting Defendants Motion to Transfer in this case would merely shift the inconvenience from one party to the other. Applying the three factors to the case at hand, Plaintiff's choice of forum weighs me in favor of this jurisdiction. On the record before me, I find that Defendants have failed to meet their burden and have not shown that transfer is warranted in this case pursuant to 28 U.S .C. § 1404(a).

### II. *MOTION TO DISMISS*

I will next address Defendants' Motion to Dismiss. [Docket # 27]. Defendants request that Plaintiffs' Complaint be dismissed pursuant to Fed.R.Civ. Pro. 8(a), 9(b), and 12(b)(6).

Plaintiffs' initial Complaint was filed on June 1, 2006. [Docket # 1]. On July 20, 2006, Plaintiffs filed a First Amended Complaint, adding one additional claim. [Docket # 13]. While the Amended Complaint is lengthy (74 pages), some of the length is explained by the fact that there are six individual Plaintiffs, six individual Defendants, and one partnership Defendant, as well as a total of Ten Claims for Relief.

Approximately 65 pages of the Complaint are dedicated to the Statement of Facts. Plaintiffs statement of facts describe the relevant events in chronological order. There is some repetition of events; however, this repetition is a result of Plaintiffs separating out a statement of the relevant events that occurred to each individual Plaintiff.

Specifically, Plaintiffs allege claims for: violations of Fair Labor Standards Act, violations of Trafficking Victims Protection Reauthorization Act (" TVPRA" ), violations of Racketeer Influenced and Corrupt Organizations Act (" RICO" ) § 1962(c) (with the corporate Defendant as the enterprise), violations of RICO § 1962(c) (with the corporate Defendant, Anne Filbert and Victor Tocanini as the enterprise), violations of RICO § 1962(d) Conspiracy, violations of Colorado Wage Claims Act, Breach of Contract, False Imprisonment, Outrageous Conduct, and Promissory Estoppel.

#### A. *Federal Rule of Civil Procedure 8(a)*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 38135 (D.Colo.)

**(Cite as: Slip Copy)**

Defendants first argue that the entire Complaint should be dismissed because the Complaint violates Fed.R.Civ.Pro. 8(a). Rule 8(a) states that a complaint " shall contain (1) a short and plain statement of grounds upon which the court's jurisdiction depends, ... (2) a short and plain statement of the claim showing that the pleader is entitled to relief, and (3) a demand for judgment for the relief the pleader seeks." " The primary purpose of the [Rule 8] provisions is rooted in fair notice: Under Rule 8, a complaint ' must be presented with intelligibility sufficient for a court or opposing party to understand whether a valid claim is alleged and if so what it is.' " *Vicom, Inc. v. Harbridge Merchant Serv., Inc.,* 20 F.3d 771, 775-76 (7th 1994). Fed.R.Civ .Pro. 8(a) serves " to give opposing parties fair notice of the basis of the claim against them so that they may respond to the complaint, and to apprise the court of sufficient allegations to allow it to conclude, if the allegations are proved, that the claimant has legal right to relief." *Monument Builders of Greater Kan. City, Inc. v. Ame. Cemetery Ass'n of Kan.,* 891 F.2d 1473, 1480 (10th Cir.1989).

**\*5** I find that, although the Complaint is lengthy, it is intelligible and well-organized. While the majority of the Complaint is a general " Statement of Facts," the events are recited in chronological order and are separated out according to each Plaintiff. Further, in the " Statement of Facts," each predicate act supporting Plaintiffs' RICO claims are separately addressed. The length of the Complaint appears to be a result of the number of Plaintiffs and complexity of the claims, rather than a problem with the Complaint being disorganized and repetitive.

" [A] pleading which gives defendant fair notice of what plaintiff's claim is and the grounds upon which it rests complies with the rule." *Hanson v. Hunt Oil Co.,* 398 F.2d 578, 581 (8th Cir.1968). Despite its length, I find Plaintiffs' Complaint gives the Defendants in this case fair notice of Plaintiffs' claim and satisfies the requirements of Fed.R.Civ.Pro. 8(a). Consequently, I deny Defendants' request for relief pursuant to Rule 8(a).

## B. *Federal Rule of Civil Procedure 9(b)*

Defendants also urge this Court to apply a heightened pleading requirement to Plaintiffs claims under RICO, TVPRA, false imprisonment, and outrageous conduct pursuant to Fed.R.Civ. 9(b). Rule 9(b) requires that " in all averments of fraud or mistake,

the circumstances constituting fraud or mistake shall be stated with particularity." However, " Rule 9(b) does not require that a complaint set forth detailed evidentiary matter as to why particular defendants are responsible for particular statements, or that the allegations be factually or legally valid." *Schwartz v. Celestial Seasonings, Inc,* 124 F.3d 1246, 1253 (10th Cir.1997). " Instead, Rule 9(b) requires that the pleadings give notice to the defendants of the fraudulent statements for which they are responsible." *Id.* In other words, the complaint must give the defendants notice of what they are charged with, and " [n]o more is required by Rule 9(b)" . *Id.* This Court has explained the purpose of Rule 9(b) as follows:

The point of the rule is to provide enough notice to each defendant of the misrepresentations the defendant made so that he can answer and otherwise defend himself.... The rule does not require extensive factual pleading. As an exception to rule eight's requirement that pleadings should be simple, concise and direct, rule 9 is read restrictively, not expansively.... It does not require plaintiffs to plead extensive facts. It only requires that plaintiff prove the circumstances of the fraud.

*Gardner v. Investors Diversified Capital, Inc.,* 805 F.Supp. 874, 876 (D.Colo.1992).

### a. *RICO claims*

Plaintiffs allege RICO claims pursuant to two different sections- 18 U.S.C. § 1962(c) and 18 U.S.C. § 1962(d). A RICO plaintiff alleging a violation of 1962(c) must show " (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Vicom v. Harbridge Merchant Serv., Inc.,* 20 F.3d 771, 778 (7th Cir.1993). A RICO plaintiff alleging a violation of 1962(d), on the other hand, must show a conspiracy to violate section 1962(a), (b), or (c).

**\*6** Plaintiffs assert RICO claims identifying two distinct enterprises: the Third Claim for Relief identifies VRLP as the enterprise; and the Fourth Claim for Relief identifies VRLP, Anne Filbert, and Victor Tocanini, as the enterprise. Section 1961(4) broadly defines an enterprise as " any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). I find that the Complaint has sufficiently plead the two alleged enterprises.

In order to prove that there is a " pattern" -the third

Slip Copy

Slip Copy, 2007 WL 38135 (D.Colo.)

**(Cite as: Slip Copy)**

Page 5

element of the claim-the Supreme Court has stated that " a plaintiff ... must show that the racketeering predicates are related *and* that they amount to or pose a threat of continued criminal activity." *Id.* (quoting *H.J. Inc. V. Northwestern Bell Tel. Co.,* 492 U.S. 229, 239 (1989)). Plaintiffs properly plead this element in the First Amended Complaint. [Docket # 13, ¶¶ 566-570].

The fourth element of a RICO claim requires a Plaintiff plead " at least two predicate acts of racketeering committed within a ten-year period." 18 U.S.C.1961(5). To establish the requisite predicate acts, the plaintiff must plead and prove each element of the racketeering offense. Plaintiffs allege, as predicate acts to their RICO claims, violations of: visa fraud, violations of the Trafficking Victims Protection Act (" TVPRA ") , unlawful conduct with documents, extortion and/or criminal extortion, mail and/or wire fraud.

In the Tenth Circuit, it is clear that a plaintiff must plead any predicate acts sounding in fraud with particularity. *Cayman Exploration Corp. v. United Gas Pipe Line Co.,* 873 F.2d 1357 (10th Cir.1989)(" we hold that Rule 9(b) requires particularity in pleading RICO mail and wire fraud" ). What remains unclear in the Tenth Circuit is whether or not Rule 9(b) also applies to predicate acts not sounding in fraud (in this case, the predicate acts of extortion or human trafficking). *Compare Arena Land & Investment Co. v. Petty,* 906 F.Supp. 1470)(D. Utah 1994)(applying the requirements of Rule 9(b) to each element of a RICO violation, as well as the predicate fraud allegations), *with McLaughlin v. Anderson,* 962 F.2d 187, 194 (2nd Cir.1992) (holding that 9(b) only applies when the predicate act involves fraud, not when the predicate act is extortion).

### 1. *Predicate Acts: Fraud*

Several of Plaintiffs' predicate acts sound in Fraud. In general, actionable fraud consists of (1) a representation, (2) that is false, (3) that is material, (4) the speaker's knowledge of its falsity or ignorance of its truth, (5) the speaker's intent it be acted on, (6) the hearer's ignorance of the falsity of the representation, (7) the hearer's reliance, (8) the hearer's right to rely on it, and (9) injury. *Tal v. Hogan,* 453 F.3d 1244, 1263 (10th Cir.2006). " Failure to adequately allege any one of the nine elements is fatal to the fraud claim." *Id.*

**\*7** I find that the predicate acts of fraudulent pay

statements and Visa Fraud are plead with sufficient particularity to survive a Rule 9(b) challenge. The Complaint identifies each individual Defendant as a partner of VRLP. Plaintiffs' claim for Visa fraud alleges that " the Dickinson Defendants collectively decided to apply for H-2A visas for their workers." [Docket # 13 ¶ 496]. The Complaint goes on to detail specific facts that would tend to show these applications are fraudulent and identifies Jean Dickinson as the signatory of these applications. Similarly, the Complaint alleges that the Dickinson Defendants as a group issued pay statements which contained fraudulent misrepresentations. [Docket # 13 ¶ 537-39].

Defendants argue that the Complaint is insufficient because Plaintiffs have not identified how each particular Defendant participated in the fraud. In *Schwartz v. Celestial Seasonings, Inc.,* 124 F.3d 1246 (10th Cir.1997), however, the court held that the complaint's failure to match specific statements with specific corporate insiders did not violate Rule 9(b). " Identifying the individual sources of statements is unnecessary when the fraud allegations arise from misstatements or omissions in group-published documents such as annual reports, which presumably involve collective actions of corporate directors or officers." *Id.* at 1254. Visa applications and pay statements are similar to the group published documents in *Schwartz.* Defendants are all partners of VRLP and, although only one of the partners signed the documents, it is alleged that the others knew of and participated in creating and filing these documents as well. Consequently, I find that Plaintiffs have satisfied rule 9(b) for the predicate acts involving fraud.

### 2. *Predicate Acts: Extortion and TVPRA*

As mentioned above, it is unclear whether or not this Court must scrutinize the underlying predicate acts not sounding in fraud pursuant to Rule 9(b). Defendants recognize that the Tenth Circuit has never adopted a rule that all predicate acts of a RICO claim must be plead with particularity. However, Defendants cite to a district court case that did require a Plaintiff to plead non-fraud predicate acts with particularity. *Bache Halsey Stuart Shields v. Tracy Collins Bank & Trust Co.,* 558 F.Supp. 1042 (D.Utah 1983). This case has been criticized by other courts. *See Tryco Trucking Co. v. Belk Store Servs., Inc.,* 608 F.Supp. 812, 815 (D.C.N.C.1985) (disagreeing with *Bache* and holding that this specificity was not required at the pleadings stage),

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                         Page 6

Slip Copy, 2007 WL 38135 (D.Colo.)

**(Cite as: Slip Copy)**

see also *Cincinnati Gas & Elec. Co.,* 656 F.Supp 49, 77 (S.D.Ohio 1986). Despite this uncertainty, it is unnecessary for me to decide whether or not Rule 9 applies to the predicate acts not sounding in fraud as I find that, even applying the heightened standard, Plaintiffs have sufficiently plead the predicate acts of extortion [Docket # 13 ¶¶ 530-535] and human trafficking [*Id.* ¶¶ 525-529].

### b. *Trafficking Victim Protection Reauthorization Act claims*

**\*8** Defendants also argue that the two separate claims for relief pursuant to the TVPRA must be dismissed pursuant to Rule 9(b). Defendants urge this court to apply Rule 9(b)'s heightened pleading standard to Plaintiffs' claims for relief under the TVPRA, yet Defendants do not provide any case law supporting this position. Rule 9(b) is limited to " averments of fraud or mistake." The Supreme Court has twice rejected invitations to expand the scope of Rule 9(b). *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 515 (2002); *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163 (1993). However, as explained above, I find the Complaint sufficiently pleads the claims pursuant to the TVPRA under either the Rule 8 or Rule 9 pleading standard.

### c. *False Imprisonment and Outrageous Conduct*

Defendants ask this court to dismiss the claims for False Imprisonment and Outrageous Conduct pursuant to Rule 9(b). Once again, Defendants do not cite to any cases which would support a finding that the heightened pleading standard applies to these claims. I find that Plaintiffs' claims for False Imprisonment and Outrageous Conduct are not subject to the heightened pleading standard of Fed.R.Civ. Pro. 9(b). Neither False Imprisonment or Outrageous Conduct requires a showing of fraudulent conduct. Consequently, Defendants' request to dismiss these two claims pursuant to Rule 9(b) is denied.

### 3. *Federal Rule of Civil Procedure 12(b)(6)*

In the alternative, Defendants ask this Court to dismiss Plaintiffs' claims for TVPRA and RICO for failure to state a claim. In ruling on a Fed.R.Civ.Pro. 12(b)(6) motion to dismiss, the court " ' must accept all the well-pleaded allegations of the complaint as true and construe them in the light most favorable to the plaintiff.' " *David v. City and County of Denver,* 101 F.3d 1344, 1352 (10th Cir.1996), *cert. denied,* 522 S.Ct. 858 (1997) (quoting *Gagan v. Norton,* 35 F.3d 1473, 1474 n. 1 (10th Cir.1994)). " A complaint may be dismissed pursuant to Fed.R.Civ.P. 12(b)(6) only ' if the plaintiff can prove no set of facts to support a claim for relief.' " *Id.* (quoting *Jojola v. Chavez,* 54 F .3d 488, 490 (10th Cir.1995)). If, accepting all well-pleaded allegations as true and drawing all reasonable references in favor of plaintiffs, it appears beyond doubt that no set of facts entitle plaintiffs to relief, then the court should grant a motion to dismiss. *See Tri-Crown, Inc. v. American Fed. Sav. & Loan Ass'n,* 908 F.2d 578, 582 (10th Cir.1990).

### a. *TVPRA*

Defendants argue that Plaintiffs fail to state separate claims for violations of TVPRA, is 18 U.S.C. §§ 1589 and 1590, pursuant to Fed.R.Civ.Pro. 12(b)(6). As support for this argument, Defendants point out that Plaintiffs fail to allege they were threatened with physical violence or harmed physically. The plain language of the TVPRA does not require a showing that Plaintiffs (or, in a criminal case, the victims) were actually harmed physically. It is enough to state a claim for a violation of the TVPRA if it is alleged that plaintiffs were forced to work by " threatened abuse of law or the legal process." 18 U.S.C. § 1589. The Complaint alleges that the four Plaintiffs stating a claim under TVPRA were threatened with deportation if they did not remain on the Ranch. Accordingly, I find that the First Amended Complaint states a claim for relief pursuant to 18 U.S.C. §§ 1589 and 1590.

### b. *RICO*

**\*9** Defendants argument that Plaintiffs fail, as a matter of law, to state a claim for RICO mirrors that of their above argument that Plaintiffs fail to properly plead the RICO claims pursuant to Rule 9. As explained above, Plaintiffs sufficiently plead all elements of the RICO claims, including the pleading of the elements of the predicate acts of Visa Fraud, Mail Fraud, and TVPRA.

### 4. *Wage Claim Act*

Finally, Defendants argue that Plaintiffs' claims pursuant to the Colorado Wage Claim Act (" CWCA" ) must be dismissed against the individual Defendants. Defendants assert that there is no individual liability for unpaid wages pursuant to this

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                      Page 7

Slip Copy, 2007 WL 38135 (D.Colo.)

**(Cite as: Slip Copy)**

act, citing *Leonard v. McMorris,* 63 P.3d 323 (Colo.2003). The CWCA defines an employer as, " every person, firm, partnership, [etc.], and any agent or officer thereof, of the above mentioned classes, employing any person in Colorado." Colo.Rev.Stat. § 8-4-101(5).

The situation at hand is distinct from *Leonard v. McMorris,* as the individual Defendants in this case are partners of a limited partnership, not a corporation. The issue in *Leonard v. McMorris* was whether or not " the General Assembly intended the Wage Act's definition of ' employer' to supersede Colorado's otherwise applicable corporate law." 63 P.3d at 330. The court held that the definition did not change the corporate law principles that hold an officer and agent of a *corporation* liable in their representative capacity only and not individually. *Id.* In the present case, it is unclear which, if any, of the partners would have limited liability to third parties. Under the Colo. Uniform Limited Partnership Act, general partners remain individually liable. *See Gladin v. Von Engeln,* 195 Colo. 88 (Colo.1978). Limited partners, on the other hand, are only individually liable if the limited partner " participates in the control of the business." Colo.Rev.Stat. § 7-6-2303.

Because this is a case involving a partnership, I find that Plaintiffs have sufficiently stated a claim for violation of the CWCA against the individual Defendants.

### III. *DEFENDANTS' MOTION TO DISQUALIFY COLORADO LEGAL SERVICES*

Defendants also presented this Court with a motion to Disqualify Colorado Legal Services. For the reasons stated on the record at the December 6, 2006 hearing, I find Defendants' Motion to Disqualify Colorado Legal Services to be without merit.

In conclusion, it is

ORDERED that Defendants' Motion to Transfer Venue [Docket # 14] is **DENIED.** It is

FURTHER ORDERED that Plaintiff's Motion to Dismiss [Docket # 27] is **DENIED.** It is

FURTHER ORDERED that Defendants' Motion to Disqualify Colorado Legal Services [Docket # 43] is **DENIED.** It is

FURTHER ORDERED that Defendants' file and Answer in this matter on or before **Thursday, January 18, 2007.**

D.Colo.,2007.
Catalan v. Vermillion Ranch Ltd. Partnership
Slip Copy, 2007 WL 38135 (D.Colo.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                Page 1

Not Reported in F.Supp.2d, 2003 WL 23893010 (N.D.Cal.)

**(Cite as: Not Reported in F.Supp.2d)**

C

**Jane Doe I v. Reddy**

**N.D.Cal.,2003.**

Only the Westlaw citation is currently available.

United States District Court,N.D. California.

JANE DOE I; Jane Doe II; Lakshmi and Jarmanti Prattipati as Parents and Successors in Interest of Chanti Jyotsna Devi Prattipatti; Jane Doe III; Jane Doe IV; Jane Doe V; Jane Doe VI; Jane Doe VII; Jane Doe VIII; Sreekanth Kollipara; and All Others Similarly Situated, Plaintiffs,

v.

Lakireddy Bali REDDY, an individual; Vijay Kumar Lakireddy, an individual; Prasad Lakireddy, an individual; Jayaprakash Reddy Lakireddy, an individual; Venkateswara Reddy Lakireddy, an individual; and the businesses they controlled and/or operated, including Pasand Madras Cuisine, a California corporation; Pasand, Inc., a California corporation; Lakireddy Investment Co., a California limited liability corporation; L.B. Reddy Estate Co., a California limited liability company; Jay Construction, a California sole proprietorship; Active Tech Solutions, a California corporation; Vani Computer Solutions, a California limited liability corporation; Lakireddy Bali Reddy d/b/a Reddy Realty Co., a California sole proprietorship; and Does 1 through 100, inclusive, Defendants.

**No. C 02-05570 WHA.**

Aug. 4, 2003.

John Paul Flynn, Latham & Watkins LLP, San Francisco, CA, for Plaintiffs.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS CLAIMS IN THE FIRST AMENDED COMPLAINT

ALSUP, J.

**INTRODUCTION**

**\*1** In an 86-page complaint, plaintiffs allege that defendants fraudulently induced them to come to the United States and once they were here, held them in a state of peonage, involuntary servitude, forced labor, and in some cases, committed assault and forcible sex offenses against them. Defendants move to dismiss certain claims for failure to state a claim. Granting in

Part and Denying in Part defendants' motion, this order holds that plaintiffs' claims under RICO, the Fair Labor Standards Act, and the Alien Tort Claims Act are sufficiently pled. Because there is no private right of action under the Thirteenth Amendment or California Education Code Section 48200, and because the Anti-Peonage Act requires state action, the claims under those provisions fail as a matter of law. Finally, the fraud claims are adequately pled as to certain defendants but not as to others.

**STATEMENT**

Eleven plaintiffs, eight of whom have not identified themselves, filed this action in state court alleging 24 claims for relief against thirteen defendants.[FN1] Defendants removed this action to federal court on November 22, 2002. The complaint includes claims for peonage, involuntary servitude, slave labor, violations of the Law of Nations, RICO, the Thirteenth Amendment, California Education Code Section 48200, California Business and Professions Code § 17200, various common-law tort claims, such as assault and battery, false imprisonment, fraud and deceit, emotional distress, negligence, and for breach of contract.

> FN1. Plaintiffs include one decedent. Lakshmi and Jarmani Prattipati are the parents and successors-in-interest to Chanti Jyotsna Devi Prattipati, the decedent, their minor child, who died on November 24, 1999 (Comp.¶¶ 15, 93-106).

Plaintiffs bring this case on behalf of a class of Indian citizens, including dozens of young women, alleging a broad conspiracy committed by a web of extended family members and their related business entities. Plaintiffs claim defendants fraudulently induced them to come to the United States from India on false promises that they would be provided an education and employment opportunities, but then forced them to work long hours under arduous conditions for pay far below minimum wage and in violation of overtime laws, and sexually abused and physical beat them. Defendants allegedly exploited plaintiffs' youth, fear, caste status, poverty, unfamiliarity with the American legal system, inability to speak English, and immigration status, for defendants' personal pleasure and profit.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2003 WL 23893010 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

Defendants bring the instant motion to dismiss certain claims in plaintiffs' first amended complaint, arguing the following: (1) the RICO allegations fail to state claims for relief; (2) plaintiff's Fair Labor Standards Act claims inadequately pled interstate commerce; (3) plaintiffs' claims under the Alien Tort Claims fail because they have not alleged state action and their forced labor claims cannot be vindicated under such statute; (4) there is no private cause of action under the Thirteenth Amendment; (5) plaintiffs' claims under the Anti-Peonage Act fail because they have not alleged state action; (6) there is no private cause of action under California's Education Code Section 48200; and (7) the fraud claims do not meet Rule 9's particularity requirement. Oral argument was heard on July 17, 2003. This order Grants in Part and Denies in Part defendants' motion.

ANALYSIS

1. Legal Standard Applicable to Motion to Dismiss For Failure to State a Claim.

*2 In considering a motion to dismiss, the Court presumes the truth of well-pleaded allegations of material fact and draws all inferences in favor of the non-moving party. *Knevelbaard Dairies v. Kraft Foods, Inc.,* 232 F.3d 979, 984 (9th Cir.2000). Dismissal is proper where there is either a " lack of cognizable legal theory or the absence of sufficient facts alleged under a cognizable theory." *Balistreri v. Pacifica Police Dep't,* 901 F.2d 696, 699 (9th Cir.1988).[FN2]

> FN2. Defendants' motion directs some arguments at allegations that were not included in plaintiffs' first amended complaint. Accordingly, defendants' motion is Denied as Moot as it relates to plaintiffs' claims under the Trafficking Victims Protection Act, the successors' emotional-distress claims, and the claim for injunctive relief under RICO (Compl.¶¶ 136, 142, 230).

2. Plaintiffs Adequately State Claims Under RICO.

A. Sections 1962(c) Pattern of Racketeering Claim

Defendants contend that Count I does not successfully allege violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C.1962(c). Pleading a RICO violation under Section 1962(c) requires that the plaintiff allege: (1) an injury to plaintiffs' " business or property" resulting from (2) defendants' use of a " pattern of racketeering activity," so as to (3) effect an " enterprise" engaged in interstate commerce, in (4) any of four prohibited activities. At issue here are the first three elements.

*First,* defendants claim that plaintiffs fail to plead an " injury to business or property." Defendants argue plaintiffs instead alleged emotional distress and other personal-injury or civil-rights torts which are inadequate. The complaint, however, alleges that defendants forced plaintiffs to work long hours without pay (Compl.¶¶ 110, 130). *See e.g., Mendoza v. Zirkle Fruit Co.,* 301 F.3d 1163, 1168 n. 4 (9th Cir.2002) (" what is required is precisely what the employees allege here: a legal entitlement to business relations unhampered by schemes prohibited by the RICO predicate statutes" ). The complaint also alleges that defendants stole their personal property, including family photographs, jewelry, clothing, documents, furniture, household goods and electrical appliances (*id.* ¶¶ 55, 63, 72, 136, 142, 247). These are allegations " of concrete financial loss, and not mere ' injury to a valuable intangible property interest." ' *Oscar v. Univ. Student Coop. Ass'n,* 965 F.2d 783, 785 (9th Cir.1992) (en banc). Moreover, the fact that plaintiffs also alleged personal injury as a result of defendants' racketeering actions does not extinguish plaintiffs' standing based on their economic loss alleged. *See, e.g., Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris, Inc.,* 36 F.Supp.2d 560, 570 (E.D.N.Y.1999) (noting that " [e]conomic injury is recoverable under RICO even when the racketeering causing the injury also results in personal injuries" because " [a] contrary result would invite racketeers to evade RICO constrictions by adding personal injuries to their litany of misdeeds" ). Thus, plaintiffs adequately pled an " injury to business or property."

*Second,* defendants argue that plaintiffs fail to plead a " pattern of racketeering activity." The Ninth Circuit has held that a " pattern of racketeering activity" exists when a person commits or aids in two or more predicate acts that are sufficiently connected to pose a threat of continued criminal activity. *Allwaste, Inc. v. Hecht,* 65 F.3d 1523, 1528 (9th Cir.1995). Here, plaintiffs allege predicate acts of immigration fraud occurring between 1991 and 1999 and accomplished by at least two different defendants, L.B. Reddy and Vijay Lakireddy, with the help of the others.

Not Reported in F.Supp.2d                                                                                    Page 3

Not Reported in F.Supp.2d, 2003 WL 23893010 (N.D.Cal.)

**(Cite as: Not Reported in F.Supp.2d)**

Defendants claim that plaintiffs have only pled isolated incidents occurring separately over an eight-year period that do not rise to the level of a " pattern," and that the overwhelming activity occurred during a three-month period in 1999. This is misleading. In fact, for instance, defendants' plea agreements admitted that the visa-fraud conspiracy continued from 1986-2000 and involved over 100 victims (Compl.¶¶ 113, 119). Defendants are jointly alleged to have been involved in a course of conduct to effectuate the immigration fraud (*id.* ¶¶ 117-19, 121, 130, 134, 168). The complaint alleges a pattern of acts sufficiently connected to pose a threat of continued criminal activity. For instance, the complaint alleges:

**\*3** The general pattern of racketeering activity was as follows: Defendants arranged to bring Indian nationals to the United States, on the basis of fraudulent visa petitions and other fraudulent immigration documents, as spouses, dependents and relatives of United States citizens or as skilled workers and their dependents. Defendants employed these Indian nationals and transferred their employment among defendants' apartment buildings, office buildings, restaurants and other businesses, including Jay Construction, Reddy Realty, Pasand Madras Cuisine, Pasand, Inc., Vani Computer Solutions and Active Tech Solutions. Defendants harbored the Indian nationals in buildings owned by defendants, including by defendants Reddy, L.B. Reddy Estate Co. and Lakireddy Investment Co. Defendants lured most of these Indian nationals to the United States on the basis of knowingly false misrepresentations about what their life, status and obligations would be in the United States, told them that they were indebted to defendants for the costs of arranging their emigration to the United States, and placed them in positions of complete dependence upon defendants because of their lack of money, education, English-language skills, and their unlawful status in the United States, among other reasons. Defendants reinforced plaintiffs' and class members' sense of dependency by requiring some of the Indian nationals, including minor girls, to have sexual relations with defendants against their will. Defendants then took advantage of the Indian national's dependency and fear by employing those Indian nationals for long hours, often seven days a week, without paying them the minimum wage or overtime premiums as required by state and federal law. Defendants also converted personal property of several of the Indian nationals.

(*id.* ¶ 130). These allegations are sufficient to plead a " pattern of racketeering."

*Third,* defendants take issue with plaintiffs' characterization of them as an " enterprise." To plead an " association-in-fact" RICO enterprise under 18 U.S.C.1961(4), plaintiffs must allege an ongoing organization, whether formal or informal, that exists " separate and apart from the pattern of racketeering activities" it conducts. *United States v. Turkette,* 452 U.S. 576, 582-83, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981). It is not necessary to show that the enterprise has some function wholly *unrelated* to the racketeering activity. " Rather, it is sufficient to show that the organization has an existence beyond that which is merely necessary to commit the predicate acts of racketeering." *Chang v. Chen,* 80 F.3d 1293, 1299 (9th Cir.1996) (internal punctuation marks omitted). Sufficient interconnections to constitute an enterprise may be based on similar or related business purposes among members, shared assets and overlapping corporate officers and personnel. *United States v. Feldman,* 853 F.2d 648, 655-56 (9th Cir.1988).

The complaint alleges that defendants worked together for legitimate purposes in their family-owned business:

**\*4** On information and belief, these enterprises essentially form a series of closely-related, family-owned conglomerates of businesses managed and controlled by the individual defendants, who are close relatives and who act interchangeably as managers of the various components of the family business, with defendant Reddy serving as patriarch of the family and the ultimate decision maker with regard to the operations of the family businesses and with the other individual defendants reporting to Reddy and managing components of the businesses. On information and belief, the family conglomerate includes Pasand Madras Cuisine, Pasand, Inc., Lakireddy Investment Co., L.B. Reddy Estate Co., Jay Construction, Active Tech Solutions, Vani Computer Solutions, and Reddy Realty Co., which are run as part of a single conglomerate without regard to any formalities of ownership. The family conglomerate owns and operates Indian restaurants in Berkeley and Santa Clara and formerly owned and operated an Indian restaurant in Santa Rosa. The family conglomerate also owns, manages and maintains a large quantity of residential and commercial real estate, mainly in Berkeley. The family conglomerate also performs some computer work, although the computer business is mainly a front for visa fraud.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                         Page 4

Not Reported in F.Supp.2d, 2003 WL 23893010 (N.D.Cal.)

**(Cite as: Not Reported in F.Supp.2d)**

(Compl.¶ 127.) Plaintiffs plead that an enterprise was " formed by defendants consist[ing] of an association-in-fact between all the defendants" (*id.* ¶ 128). Plaintiffs also plead separate association-in-fact enterprises between each and every defendant, " each of which defendants manage, operate, and control for both legitimate and illegitimate purposes" (*ibid.*). This order finds that the allegations are adequate.

Defendants argue that plaintiffs allege associations with corporate entities unrelated to the enterprise. Of the eight corporate defendants in the complaint, only two (Pasand Madras Cuisine and Active Tech Solutions), they maintain, are specifically alleged to have done acts in the alleged racketeering activity. This is not correct. For instance, defendant companies, such as Jay Construction, Reddy Realty, Pasand, Inc., and Vani Computer Solutions, allegedly employed plaintiffs (*id.* ¶ 130). Defendants also argue that plaintiffs' conclusory allegations of the associations-in-fact between each of the defendants are insufficient. The allegations meet notice pleading rules, however, and no greater particularity is required. Plaintiffs maintain that they allege defendants worked together and " combined together in different groupings and conspired through their family and business connections to engage in the patterns of racketeering" (Opp. at 18). Whether plaintiffs can prove the specific interconnections adequately will be determined only after discovery. Defendants also contend that the complaint fails to show an enterprise that has a separate existence from the alleged racketeering activity. This is incorrect. The complaint alleges that the conglomerate operates restaurants, manages real estate, and performs computer work. This is adequate to plead an enterprise distinct from the racketeering.

**\*5** Finally, defendants contest whether plaintiffs have adequately alleged a decision-making mechanism. There must be " some sort of structure" within a RICO enterprise " for the making of decisions, whether it be hierarchical or consensual [and] some mechanism for controlling and directing the affairs of the group on an on-going, rather than an *ad hoc,* basis." *Chang,* 80 F.3d at 1299 (citation omitted). With regard to a decision-making apparatus, the complaint alleges that defendant Reddy, like a godfather at the apex of a mob, served as the patriarch of the family and was the ultimate decision-maker:

Defendant Reddy played a leadership role in the conspiracy that gives rise to this civil case because he

was the primary organizer, leader, and decision-maker in the conspiracy to bring these aliens into the United States illegally; he directed others who assisted him in carrying out this conspiracy; and he determined where the aliens would work when they arrived in the United States, where they would live, and how much money, if any, they would be paid for their work.

*Id.* ¶ 117, 37 (alleging the individual defendants were alter egos of the corporate defendants) Accordingly, the complaint adequately alleges a decision-making apparatus that did not proceed on an *ad hoc* basis. Accordingly, plaintiffs' RICO claim under Section 1962(c) shall go forward.

B. Section 1962(a) Investment-Injury Claims

Count II, plaintiffs' second RICO claim, is under 18 U.S.C.1962(a). It prohibits investing or reinvesting income derived from a pattern of racketeering activity in a manner that causes injury to plaintiffs. Plaintiffs must allege that they were " injured by the use or investment of racketeering income" and not merely injured by the predicate acts. *Nugget Hydroelec., L.P., v. Pac. Gas & Elec. Co.,* 981 F.2d 429, 437 (9th Cir.1992). Plaintiffs must demonstrate more than that proceeds from the racketeering activity were reinvested into the business and helped defendant expand their racketeering activities. *E.g.,* *U.S. Concord Inc., v. Harris Graphics Corp.,* 757 F.Supp. 1053, 1060 (N.D.Cal.1991) (" that defendant's ability to reinvest its ill-gotten gains kept it afloat" is not adequate).

Plaintiffs allege that defendants' reinvestment of racketeering income aided in expanding the scope and profitability of the racketeering enterprise. Such claims are not adequate for a reinvestment claim under Section 1962(a). Notwithstanding, plaintiffs also allege separate injuries that flowed directly from the reinvestment. Defendants used proceeds:
to influence police and other government officials in India and to obtain such officials' cooperation in helping to further and to cover up defendants' unlawful schemes; to induce defendants' employees, associates, and other co-conspirators and confederates not to criticize, complain about, or interfere with defendants' pattern of racketeering activity; to pay attorneys and others to participate in and help to accomplish defendants' immigration fraud schemes; to increase the economic and other control, power, and influence that defendants wielded over plaintiffs and plaintiffs' family members, thereby

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2003 WL 23893010 (N.D.Cal.)

**(Cite as: Not Reported in F.Supp.2d)**

making it more difficult for plaintiffs to seek outside assistance from government officials or others; and to induce defendants' confederates and agents to engage in acts of retaliation or threats of retaliation against plaintiffs' and class members' and the families of plaintiffs and class members for the purpose of coercing plaintiffs and class members not to escape or complain ...

**\*6** (Compl.¶¶ 140-41). The wrongs alleged clearly go beyond those predicate acts upon which the racketeering activity claims were based. Specifically, plaintiffs allege that defendants used the proceeds in order to make it more difficult for plaintiffs to assert their rights, to eliminate plaintiffs' alternatives and to assure secrecy of their scheme so that plaintiffs' rights would not be vindicated. These harms are separate and apart from the actual forced-labor violations and are adequate to plead an investment-income RICO claim. Accordingly, defendant's motion to dismiss the investment-injury RICO claim is Denied.

   C. Conspiracy RICO Claims Under Section 1962(d)

Even if one or more defendants did not itself commit any predicate acts, it could be liable for conspiring with others to commit those acts if it " knew about and agreed to facilitate the scheme." *Salinas v. United States,* 522 U.S. 52, 66, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997).

Here, plaintiffs maintain that defendants participated in a common scheme and plan to violate plaintiffs' rights. The complaint alleges that defendants had a unity of interest and ownership such that the corporate defendants were alter egos of the individual defendants or were mere shells. Accordingly, it is alleged that knowledge about the scheme can be imputed to the corporate entities. The complaint alleges that defendants were joint employers or a single employer of plaintiffs. Finally the complaint alleges that each and every defendant aided and abetted sexual abuse of plaintiffs (Compl.¶¶ 31-32, 37, 119-21, 130, 168, 204, 216). These allegations are sufficient for plaintiffs' conspiracy claims to go forward. *Salinas v. United States,* 522 U.S. at 66.

   D. Application of *In Pari Delicto* to Plaintiffs' RICO Claims

Defendants additionally maintain that because plaintiffs were complicit in the immigration violations alleged, they cannot collect racketeering

damages under RICO under the doctrine of *in pari delicto. In pari delicto* means " in equal fault" and is a common-law doctrine which bars a plaintiff's recovery due to his own wrongful conduct. Admitting that the alleged offenses, if proven, may properly give rise to tort and statutory-wage violations, defendants nevertheless claim that RICO liability is inappropriate. They point to the purpose behind RICO which is " to see that innocent parties who are the victims of organized crime have a right to obtain proper redress." 116 Cong. Rec. H35346-47 (Oct. 7, 1970). Defendants also allege that California's doctrine of unclean hands should limit plaintiffs' recovery for misconduct in which plaintiffs participated.

Regardless of whether defendants' arguments have merit, this order finds that they are inadequate to bar relief at this stage. Defendants contend that " [i]n paragraph 133, plaintiffs admit they entered the United States illegally and they knew it" (Reply at 10). Paragraph 133 does not so state. Instead, it alleges that *defendants* knew " that such coming in to, entry, and residence was and would be in violation of the law" (Compl.¶ 133). Particularly with plaintiffs who according to the complaint were vulnerable and powerless, this order cannot say as a matter of law that plaintiffs were " equally" at fault for the alleged immigration fraud. Accordingly, defendants' argument that the *in pari delicto* or unclean hands doctrines bar plaintiffs' RICO fails at this stage.

   3. Plaintiffs Properly Plead a Fair Labor Standards Act Violation.

**\*7** Defendants allege that Count VI fails to state a claim under the federal Fair Labor Standards Act, 29 U.S.C. 201, or that at least plaintiffs must provide a more definite statement. They say the complaint is too unclear " to allow a meaningful inquiry into whether the FLSA could apply to some of the plaintiffs, to all of them, or to none" (Opening Br. at 22).

The FLSA requires payment of minimum wage and overtime, prohibits child labor and applies to every employee " who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce." 29 U.S.C. 206-07. Plaintiffs argue that paragraphs 133 and 168-70 of the complaint, too voluminous to copy here in full, satisfy the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 6

Not Reported in F.Supp.2d, 2003 WL 23893010 (N.D.Cal.)

**(Cite as: Not Reported in F.Supp.2d)**

jurisdictional requirements by alleging interstate commerce and FLSA jurisdiction. Defendants reply that the complaint merely alleges that some plaintiffs worked in *local* restaurants. Paragraph 133 of the complaint asserts that plaintiffs worked in the family businesses without pay. Additionally the complaint alleges:

This common business enterprise includes, but is not limited to, the operation of Indian restaurants in Berkeley, California and Santa Clara, California, the operation of a now-defunct Indian restaurant in Santa Rosa, California, the management, maintenance and repair of numerous residential and commercial properties located in Berkeley, California, and the operation of Active Tech Solutions in Berkeley, California.

At all relevant times, employees of defendants' business enterprise, and employees of each individual component of this business enterprise, have regularly handled, sold, or otherwise worked on goods and materials that were moved in or produced for commerce within the meaning of the FLSA; and at all relevant times defendants' business enterprise, and each individual component of this business enterprise, has had gross annual revenues and gross annual sales that exceed $500,000.

Plaintiffs and other similarly-situated employees performed work for the individual defendants and the separate business entity defendants by performing janitorial and kitchen work in the defendants' restaurants, by performing maintenance, painting, gardening, janitorial and repair work on residential and commercial properties owned by defendants, and by performing computer work in the offices of Active Tech Solutions.

Plaintiffs and other similarly-situated employees employed by defendants are or were all non-exempt employees as defined by the FLSA, 29 U.S.C. § 203(e).

(Compl.¶¶ 168-70).

While defendants are correct that the complaint alleges that the employer-defendants were California corporations operating in California, (*id.* ¶ 23), the allegations nevertheless are adequate at this stage to put defendants on notice of the claim. To survive a motion to dismiss, the complaint must satisfy only the minimal notice pleading requirements of Rule 8(a)(2). This requires only that the complaint include " a short and plain statement of the claim showing that the pleader is entitled to relief." F.R.C.P. 8(a)(2). Accordingly, defendants' motion to dismiss

or for plaintiffs' to provide a more definite statement is Denied.

4. Plaintiffs' Claims Under the Alien Tort Claims Act May Proceed.

**\*8** In Count V, plaintiffs allege that they were forced to relinquish universally-recognized and protected rights to be free from cruel, inhuman and degrading treatment, deprived of privacy, personal liberty and security, and denied free choice of employment and other conditions of work in violation of the Alien Tort Claims Act. The Alien Tort Claims Act ( " ATCA" ), 28 U.S.C. 1350, provides: " The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." The ATCA provides not only subject-matter jurisdiction, but also a cause of action. *In re Estate of Ferdinand Marcos, Human Rights Litig.,* 25 F.3d 1467, 1475 (9th Cir.1994).

Defendants argue that to the extent plaintiffs assert causes of action based on rights perceived to exist under unratified treaties, no such rights exist. While defendant is correct that unratified treaties will not independently create a cause of action, an ATCA claim need not arise from a violation of a treaty. As noted above, an ATCA claim may rest upon any " specific, universal, and obligatory" norm recognized by the international community. *Ibid.* [FN3]

> FN3. For instance, the Convention on the Rights of the Child, the Universal Declaration of Human Rights, and the International Covenant on Civil and Political Rights have not been ratified by the United States. Nonetheless, " [t]he Universal Declaration of Human Rights is a resolution of the General Assembly of the United Nations. As such, it is a powerful and authoritative statement of the customary international law of human rights." *Siderman de Blake v.. Republic of Argentina,* 965 F.2d 699, 719 (9th Cir.1992).

[T]he law of nations may be ascertained by consulting the work of jurists, writing professedly on public law; or by the general usage and practice of nations; or by judicial decisions recognising and enforcing that law. Where there is no treaty, and no controlling executive or legislative act or judicial decision, resort must be had to the customs and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2003 WL 23893010 (N.D.Cal.)

**(Cite as: Not Reported in F.Supp.2d)**

usages of civilized nations; and, as evidence of these, to the works of jurists and commentators.... Evidence of the law of nations may also be garnered from international agreements and United Nations declarations.

*Alvarez-Machain v. United States,* 331 F.3d 604, *33-34 (9th Cir. June 3, 2003)* (internal punctuation marks and citations omitted).

Here, plaintiffs allege that defendants' actions violated international law relating to forced labor, debt bondage and human trafficking.[FN4] Defendants contend that forced-labor claims must " amount[ ] to actual slavery" (Opening Br. at 6), although they provide no decision so holding. Many cases and international instruments make clear, however, that modern forms of slavery violate *jus cogens* norms of international law, no less than historical chattel slavery.[FN5] *E.g., In re World War II Era Japanese Forced Labor Litig.,* 164 F.Supp.2d 1160, 1179 (N.D.Cal.2001). The complaint cites many international law instruments prohibiting modern forms of slavery, such as the International Covenant on Civil and Political Rights, U.S., June 8, 1992, 993 U.N.T.S. 171., International Covenant on Economic, Social and Cultural Rights, U.S., Oct. 5, 1977, 993 U.N.T.S. 3, 1966, American Convention on Human Rights, U.S., June 1, 1977, 1114 U.N.T.S. 123 (Comp.¶ 162).

> **FN4.** Under international law, as explained in the Traffic Victims Protection Act, " forced labor" occurs when a defendant obtains the labor or services of a person-
> (1) by threats of serious harm to, or physical restraint against, that person or another person;
> (2) by means of any scheme, plan, or pattern intended to cause the person to believe that, if the person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint; or
> (3) by means of the abuse or threatened abuse of law or the legal process
> 18 U.S.C. 1589.

> **FN5.** *Jus cogens* norms of international law are that cannot be overridden. *Alvarez-Machain,* 331 F.3d 604. As the Ninth Circuit has explained:
> The term *jus cogens* refers to a category of " peremptory norms" that are " accepted and recognized by the international community

of states as a whole as ... norms from which no derogation is permitted." *Siderman de Blake v. Republic of Argentina,* 965 F.2d 699, 714 (9th Cir.1992) (quoting Vienna Convention on the Law of Treaties, art. 53, May 23, 1969, 1155 U.N.T.S. 332, 8 I.L.M. 679). Customary international law, a direct descendent of the " law of nations," is a related, but distinct, concept. *Id.* ...
> Customary international law, like international law defined by treaties and other international agreements, rests on the consent of states. A state that persistently objects to a norm of customary international law that other states accept is not bound by that norm....
> In contrast, *jus cogens* embraces customary laws considered binding on all nations and is derived from values taken to be fundamental by the international community, rather than from the fortuitous or self-interested choices of nations. Whereas customary international law derives solely from the consent of states, the fundamental and universal norms constituting *jus cogens* transcend such consent....
> *Id.* at *19-20 (citation omitted).

Defendants maintain that the ATCA does not apply to acts committed in the United States because it is reserved for " rogues and tyrants" and where the " governments are the oppressors" (Reply at 5). Defendants, however, cite no authority for such a limitation. Plaintiffs are not required to allege state action when challenging conduct that is part of an overall forced-labor scheme. *Kadic v. Karadzic,* 70 F.3d 232, 242 (2d Cir.1995) (holding that ATCA extends to acts of genocide, war crimes and summary execution regardless of whether individual acted under color of state law); *Iwanowa v. Ford Motor Co.,* 67 F.Supp.2d 424, 445 (D.N.J.1999) (extending the cause of action to slave trading and the systematic use of slave labor by private individuals and corporations).

**\*9** Defendants also note that " there are no allegations that the [plaintiffs] were held prisoners in brothels or subjected to a life of hard labor in sweatshops" (Reply. at 8). It is clear that the complaint herein alleges forced labor, which is prohibited under the law of nations. Whether the facts in this case will rise to the level of a violation of such international norms has not been adequately developed on this record. What is clear is that the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                     Page 8

Not Reported in F.Supp.2d, 2003 WL 23893010 (N.D.Cal.)

(Cite as: Not Reported in F.Supp.2d)

complaint meets notice pleading rules by its assertions explaining that plaintiffs were brought to the United States and forced to work involuntarily and how defendants reinforced their coercive conduct through threats, physical beatings, sexual battery, fraud and unlawful substandard working conditions. These allegations are sufficient to state claims for forced labor, debt bondage and trafficking under the ATCA.

Defendants' final arguments essentially requests that the Court ignore the ATCA. They state: " What the ATCA does in reality is eliminate our federal, state and local laws and incorporate through judicial fiat ' international norms' many of which might be repugnant to American justice" (*id.* at 8). It is settled, however, that the ATCA provides a cause of action for violations of the law of nations. *In re Estate of Ferdinand Marcos, Human Rights Litig.,* 25 F.3d at 1474-75. The Ninth Circuit is expected to decide what will be the source of law for violations of the law of nations under the ATCA upon its en banc review of *Doe v. Unocal Corp.,* 2002 WL 31063976 (9th Cir. Sept.18, 2002). En banc oral argument took place June 17, 2003.

### 5. There is No Private Cause of Action Under the Thirteenth Amendment.

Count IV is based on the Thirteenth Amendment to the United States Constitution. Defendants argue that a private cause of action may not be brought directly under the Thirteenth Amendment. Neither the Supreme Court nor the Ninth Circuit nor, for that matter, any circuit at all, has directly addressed this question. *E.g., Cato v.. United States,* 70 F.3d 1103, 1109 n. 7, 1110 (9th Cir.1995). Plaintiffs maintain that " every court of appeal to address the issue has assumed that damages claims for forced labor or involuntary servitude are available directly under the 13th Amendment" (Opp. at 3). *E.g., Channer v. Hall,* 112 F.3d 214, 217 (5th Cir.1997) (assuming *arguendo,* that the Thirteenth Amendment directly gives rise to a cause of action for damages under the analysis articulated in *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) and its progeny" ); *Terry Props., Inc., v. Standard Oil Co.,* 799 F.2d 1523, 1533-34 (11th Cir.1986) (" corporate appellees, as private actors, may be liable" " directly under the Thirteenth Amendment" ); *Alma Soc'y Inc. v. Mellon,* 601 F.2d 1225, 1237-38 (2d Cir.1979); *Cox v. Stanton,* 529 F.2d 47, 50 (4th Cir.1975); *Flood v. Kuhn,* 443 F.2d 264, 268 (2d Cir.1971).[FN6] These

circuit decisions, however, did not provide any analysis of why a private cause of action might (or might not) be implied under the Thirteenth Amendment. Instead, they merely so assumed in order to reach a firmer legal ground upon which to deny a claim.

> FN6. Plaintiffs cite *United States v. Kozminski,* 487 U.S. 931, 942, 108 S.Ct. 2751, 101 L.Ed.2d 788 (1988), and *The Civil Rights Cases,* 109 U.S. 3, 20, 3 S.Ct. 18, 27 L.Ed. 835 (1883), in support of their claim that the Thirteenth Amendment is " self-executing," applies to any existing state of circumstances " and established universal freedom" (Opp. at 3). These cases, however, like most decisions under the Thirteenth Amendment, analyzed the breadth of circumstances covered by the amendment. They did not address whether a plaintiff other than the state can seek to privately enforce the amendment.

*\*10 As for the district courts, it appears that just about every decision to consider the issue has concluded that there is no private right of action under the Thirteenth Amendment. Most of the cases, however, provide only a summary declaration so stating. *E.g., Del Elmer v. Metzger,* 967 F.Supp. 398, 402 (S.D.Cal.1997) (" Plaintiff has pointed to no authority, and the court knows of none, allowing a plaintiff to proceed directly under the Thirteenth Amendment against private parties such as the defendants here" ).[FN7]

> FN7. *See, e.g., Holland v. Bd. of Trustees of Univ. of the Dist. of Columbia,* 794 F.Supp. 420, 424 (D.D.C.1992); *Baker v. McDonald's Corp.,* 686 F.Supp. 1474, 1480 n. 12 (S.D.Fla.1987); *Doe v. Keane,* 658 F.Supp. 216, 220 (W.D.Mich.1987); *Sanders v. A.J. Canfield Co.,* 635 F.Supp. 85, 87 (N.D.Ill.1986); *Westray v. Porhole, Inc.,* 586 F.Supp. 834, 838-39 (D.Md.1984); *Vietnamese Fishermen's Assoc. v. Knights of the Ku Klux Klan,* 518 F.Supp. 993, 1012 (S.D.Tex.1981).

The decision in *Turner v. Unification Church,* 473 F.Supp. 367, 373-74 (D.R.I.1978), is perhaps the most detailed in its analysis. *First,* the court recognized the power of the courts to imply an action for damages under the Thirteenth Amendment. *Id.* at 374. Relying on the Supreme Court's analysis of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 9

Not Reported in F.Supp.2d, 2003 WL 23893010 (N.D.Cal.)

**(Cite as: Not Reported in F.Supp.2d)**

Fourth Amendment in *Bivens, Turner* held that using the Thirteenth Amendment as a basis for private relief was not " appropriate" or " necessary." *Ibid.* The court focused primarily on the fact that, unlike the Fourth Amendment, violations of the Thirteenth Amendment cover private wrongdoing. Such injuries traditionally have been addressed by state tort law. " When private wrongdoing can be adequately redressed by state law, there is much less compulsion for the judiciary to erect an additional constitutional cause of action." *Ibid.* The court was concerned that " [i]mplying the requested cause of action truly would ' constitutionalize' a large portion of state tort law," which unlike in *Bivens,* is not inconsistent or hostile to the federal interest at stake. *Ibid.*

Plaintiffs maintain that under the Supreme Court's analysis of other constitutional amendments, private rights of action may be available as long as there are " no ' special factors counseling hesitation in the absence of affirmative action by Congress,' no explicit statutory prohibition against the relief sought, and no exclusive statutory alternative remedy." *Schweiker v. Chilicky,* 487 U.S. 412, 421, 108 S.Ct. 2460, 101 L.Ed.2d 370 (1988) (citation omitted) (referencing *Bivens* (Fourth Amendment)); *Carlson v. Green,* 446 U.S. 14, 18-20, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980) (Eighth Amendment); *Davis v. Passman,* 442 U.S. 228, 245-48, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979) (Fifth Amendment). In the Thirteenth Amendment context, Congress has not enacted a statutory prohibition. There is no exclusive statutory remedy for actions challenging involuntary servitude and forced labor. Nonetheless, this order agrees with *Turner* that state laws proscribing false imprisonment, intentional infliction of emotional distress, and assault and battery are adequate to redress injuries under the Thirteenth Amendment.

This order finds *Turner* and the other district court authority to be persuasive. Given that no decision has ever actually upheld a private right of action under the Thirteenth Amendment and many have rejected it, this order likewise will reject it. Accordingly, plaintiffs' claim under the Thirteenth Amendment shall be Dismissed With Prejudice.

6. The Anti-Peonage Act Requires State Action.

**\*11** Plaintiffs allege in Count III that defendants violated the prohibition against debt bondage in the Anti-Peonage Act, 42 U.S.C.1994, which provides:
FN8

FN8. The predecessor to the Act was first passed in 1867. Act of March 2, 1867, c. 187, 14 Stat. 546.

The holding of any person to service or labor under the system known as peonage is abolished and forever prohibited in any Territory or State of the United States; and all acts, laws, resolutions, orders, regulations, or usages of any Territory or State, which have heretofore established, maintained, or enforced, or by virtue of which any attempt shall hereafter be made to establish, maintain, or enforce, directly or indirectly, the voluntary or involuntary service or labor of any persons as peons, in liquidation of any debt or obligation, or otherwise, are declared null and void.

Defendants challenge rests on the lack of state action. No decision has ever upheld a private right of action under the Anti-Peonage Act absent state action. Some courts have assumed, either explicitly or implicitly, that state action was unnecessary and rejected a right of action on other grounds. No court has ever expressly held, however, that state action was unnecessary. The only appellate authority on the issue states that the Anti-Peonage Act " renders invalid *only* the ' acts, laws, resolutions, orders, regulations or usages' of the states" of the United States. *Craine v. Alexander,* 756 F.2d 1070, 1074 (5th Cir.1985) (emphasis added). All Supreme Court decisions under the Act involved state action. *E.g., Pollock v. Williams,* 322 U.S. 4, 5, 64 S.Ct. 792, 88 L.Ed. 1095 (1944); *Bailey v. Alabama,* 219 U.S. 219, 31 S.Ct. 145, 55 L.Ed. 191 (1910); *Clyatt v. United States,* 197 U.S. 207, 25 S.Ct. 429, 49 L.Ed. 726 (1905). Thus, the Supreme Court has not had occasion to comment on whether state action is required.

Plaintiffs maintain that the Act should be read as containing two separate clauses with two separate mandates. They maintain that while the second clause of the Act prohibits state action, there is no comparable restriction in the first clause. The Act was intended to implement the Thirteenth Amendment, whose language it mirrors and which has no state-action requirement. *Bailey,* 219 U.S. at 241-42. Plaintiffs point to language in *Clyatt* that they maintain demonstrates that state action is not required:
In the exercise of [Thirteenth Amendment] power Congress has enacted these sections denouncing peonage, and punishing one who holds another in that condition of involuntary servitude. This legislation is

Not Reported in F.Supp.2d                                                                          Page 10

Not Reported in F.Supp.2d, 2003 WL 23893010 (N.D.Cal.)

**(Cite as: Not Reported in F.Supp.2d)**

not limited to the Territories or other parts of the strictly National domain, but is operative in the States and wherever the sovereignty of the United States extends. We entertain no doubt of the validity of this legislation, or of its applicability to the case of any person holding another in a state of peonage, and this whether there be municipal ordinance or state law sanctioning such holding. It operates directly on every citizen of the Republic, wherever his residence may be.

*Clyatt,* 197 U.S. at 218. The problem with plaintiffs' reliance on this quotation is that *Clyatt* was speaking not only of the predecessor statute to Section 1994, but also of the predecessor to 18 U.S.C. 1581.[FN9] As *Craine* explained, this weighs in favor of a finding that state action is required under Section 1994. *Craine* held that the Anti-Peonage Act does not reach " usages or customs of individuals that might be likened to conditions of peonage. The remedy for such individual acts lies in the criminal sanction of 18 U.S.C. § 1581 against holding another to a condition of peonage." *Craine,* 756 F.2d at 1075. This order finds that defendants' construction is correct. Accordingly, plaintiffs' claims under the Anti-Peonage Act are Dismissed With Prejudice.

> FN9. 18 U.S.C. 1581 now reads:
> Whoever holds or returns any person to a condition of peonage, or arrests any person with the intent of placing him in or returning him to a condition of peonage, shall be fined under this title or imprisoned not more than 20 years, or both. If death results from the violation of this section, or if the violation includes kidnapping or an attempt to kidnap, aggravated sexual abuse or the attempt to commit aggravated sexual abuse, or an attempt to kill, the defendant shall be fined under this title or imprisoned for any term of years or life, or both.
> Revised Statute Section 5526, as referred to in *Clyatt,* read:
> Every person who holds, arrests, returns, or causes to be held, arrested, or returned, or in any manner aids in the arrest or return of any person to a condition of peonage, shall be punished by a fine of not less than one thousand nor more than five thousand dollars, or by imprisonment not less than one year nor more than five years, or by both.

7. There is No Private Right of Action Under

California Education Code Section 48200.

**\*12** Count XXIII alleges that defendants failed to provide an education to Does I, II, III, V, VI and the decedent in violation of California Education Code Section 48200 (Compl.¶¶ 49, 62, 71, 83, 89, 99, 251-52, 271). Defendants, including Lakireddy Bali Reddy who was a " *de facto* legal guardian" of the Does, allegedly induced plaintiffs to come to this country by fraudulently promising an education (*id.* ¶ 251). Section 48200 provides:

[E]ach parent, guardian, or other person having control or charge of the pupil shall send the pupil to the public full-time day school ... of the school district in which the residence of either the parent or legal guardian is located.

Plaintiffs suggest that a private right of action should be impliedly read into Section 48200. Neither the language of California Education Code Section 48200 itself, nor any other statutory provision or case makes clear whether Section 48200 gives rise to a private right of action. This appears to be an open question of law in California. Furthermore, no legislative history of the precedent provision to Section 48200 has been provided to the Court.

Plaintiffs would apply applying the private-right-of-action analysis found in *Jacbellis v. State Farm Fire & Casualty Co.,* 120 F.3d 171 (9th Cir.1997). Under that framework, however, this order concludes that a private right of action should not be implied. *Jacbellis* noted that a court should determine whether there is an " absence of alternative remedies to the harm caused by violations of the [statute]" and whether there are " analytical difficulties and adverse practical consequences." *Id.* at 174. *Jacbellis* also sanctioned the test adopted by California in *Middlesex Ins. Co. v. Mann,* 124 Cal.App.3d 558, 570, 177 Cal.Rptr. 495 (1981), which examined whether: (1) the plaintiff belongs to the class of persons the statute is intended to protect; (2) a private remedy will appropriately further the purpose of the legislation; and (3) such a remedy appears to be needed to assure the effectiveness of the statute. *Id.* at 175, 177 Cal.Rptr. 495.

Plaintiffs clearly belong to the class of persons Section 48200 intended to protect. There are, however, alternative remedies for violations of Section 48200. There are adequate administrative procedures are in place to ensure compliance. The right to free education established by California Education Code Section 48200 may not be

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2003 WL 23893010 (N.D.Cal.)

**(Cite as: Not Reported in F.Supp.2d)**

withdrawn without the procedures in Sections 48900 and 48000.2 being followed. *Slayton v. Pomona Unified Sch. Dist.,* 161 Cal.App.3d 538, 549-50, 207 Cal.Rptr. 705 (1984). Failure by parents or guardians to send their children to school is criminally punishable. Thus, under Section 48293, " [a]ny parent, guardian, or other person having control or charge of any pupil who fails to comply with this chapter, unless excused or exempted therefrom, is guilty of an infraction and shall be punished...." While existence of criminal penalties does not itself preclude a private right of action, here, a private cause of action does not appear to be needed to assure the effectiveness of the statute.

**\*13** This holding seems to be consistent with the holdings California courts interpreting other education code provisions. For example, the appellate court in *Tirpak v. Los Angeles Unified Sch. Dist.,* 187 Cal.App.3d 639, 645, 232 Cal.Rptr. 61 (1986), held that provisions of the California Education Code addressing suspension and expulsion proceedings did not create a private right of action for damages. As the court stated:

Although, these sections are broader than those litigated in *Keech* because they apply to all children, they clearly retain their administrative character. They do not expressly set forth a private cause of action for damages for breach of their provisions. And we otherwise do not discern a mandatory duty of care owed to plaintiffs with respect to economic damages arising from educational injury. The appropriate remedy for a breach of these statutory provisions is to proceed by way of administrative mandamus or injunction to enforce the procedures contained therein.

As in *Tirpak,* there is no express private cause of action in Section 48200, and the appropriate remedy appears to be alternatively provided. This order concludes that an implied private right of action is not recognized under California Education Code Section 48200 and Dismisses With Prejudice plaintiffs' claims.

8. Plaintiffs' Fraud Claim Pleads the Requisite Specificity

Contrary to defendants' motion, this order upholds Count XVI's fraud claims. Plaintiffs adequately allege the nature and circumstances of the alleged fraud, which involved an alleged scheme to induce immigration based on promises of education (Compl.¶¶ 49-50, 57-58, 66-67, 73, 85, 91, 94-95,

102, 014, 110, 116, 121, 133, 220-23). For instance, as alleged in paragraph forty-nine:

Defendant Reddy subsequently induced Doe I to emigrate to the United States by making false promises and misrepresentations to her, which she relied upon, including by telling Doe I in early 1999 that Reddy would enroll her in school if she came to the United States. If fact, Reddy had no intention of enrolling Doe I in school and did not enroll Doe I in school. Shortly before Doe I first came to the United States in or about April 1999, defendant Reddy, who was in the United States, had a telephone conversation with Doe I, who was in India, about the arrangements for Doe I's travel to the United States, in furtherance of defendants' scheme to induce Doe I to come to the United States illegally.

(*id.* ¶ 49, 232 Cal.Rptr. 61).

While the fraud allegation is targeted at *all* defendants, however, the complaint only alleges specific actions by *some* of the defendants and not *all* of the defendants. This is inadequate under the Rule 9. Accordingly, this order Dismisses the fraud claims against all defendants *except* those named as specifically committing acts of fraud in the complaint, namely, Defendants Lakireddy Bali Reddy, Vijay Lakireddy, Venkateswara Reddy Lakireddy, Active Tech Solutions, Prasad Lakireddy, Jayaprakash Lakireddy and Annapurna Lakireddy.

CONCLUSION

**\*14** Plaintiffs' claims under the Thirteenth Amendment and California Education Code Section 48200 are Dismissed With Prejudice because no private cause of action is recognized. Plaintiffs' claim under the Anti-Peonage Act is Dismissed With Prejudice because state action is not alleged. Additionally, plaintiffs' fraud claims against all defendants *except* Lakireddy Bali Reddy, Vijay Lakireddy, Venkateswara Reddy Lakireddy, Active Tech Solutions, Prasad Lakireddy, Jayaprakash Lakireddy and Annapurna Lakireddy are Dismissed. Plaintiffs' claims under RICO, the Fair Labor Standards Act and the Alien Tort Claims Act shall go forward.

In light of the length of the complaint, including 86 pages and over 350 paragraphs (counting subparts), it is clear that plaintiffs have attempted to plead all facts that they in good faith could plead. It thus appears that absent active case management by the Court, a new and even lengthier complaint will be

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2003 WL 23893010 (N.D.Cal.)

**(Cite as: Not Reported in F.Supp.2d)**

filed, forcing the Court and the parties to retread this voluminous briefing. Therefore, leave to amend the complaint will not automatically be granted. Instead, plaintiffs may seek leave to amend through a new motion specifically designed to respond to the specific concerns articulated herein with a proffer of new (specific and detailed) allegations that would overcome the stated reasons for dismissal by August 18, 2003. Any such motion will be limited to 20 pages plus a declaration by counsel setting forth the good-faith basis for the new allegations.

IT IS SO ORDERED.

N.D.Cal.,2003.
Jane Doe I v. Reddy
Not Reported in F.Supp.2d, 2003 WL 23893010 (N.D.Cal.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp., 1997 WL 83766 (E.D.Pa.), 1997-1 Trade Cases P 71,857

**(Cite as: Not Reported in F.Supp.)**



**J & M Turner, Inc. v. Applied Bolting Technology Products, Inc.**
E.D.Pa.,1997.

United States District Court, E.D. Pennsylvania.
J & M TURNER, INC., Plaintiff,
v.
APPLIED BOLTING TECHNOLOGY PRODUCTS,
INC. et al., Defendants.
APPLIED BOLTING TECHNOLOGY PRODUCTS,
INC., Plaintiff,
v.
J & M TURNER, INC. et al.
**Nos. CIV. A. 96-5819, CIV. A. 95-2179.**

Feb. 24, 1997.

Order

VANARTSDALEN, S.J.
**\*1** For the reasons set forth in the accompanying memorandum, it is ORDERED that:

1) Applied's Motion for Summary Judgment (No. 95-2179, filed document no. 65) is DENIED;

2) Turner's Motion to Strike the Declarations of Wayne Wallace and John Shipp (No. 95-2179, filed document no. 75) is DENIED;

3) Applied's Motion to Dismiss Turner's Counterclaim (No. 96-5819, filed document no. 6) is DENIED;

4) Applied's Motion for a Preliminary Injunction (No. 95-2179, filed document no. 67) is DENIED; and

5) Turner's Motion for the Appointment of an Expert by the Court (No. 95-2179, filed document no. 75) is DENIED.

Memorandum

There are several outstanding motions in these related cases involving J & M Turner, Inc. (" Turner" ) and Applied Bolting Technology Products, Inc. (" Applied" ). Outstanding motions in *J & M Turner, Inc. v. Applied Bolting Technology Products, Inc.,* Civil Action No. 95-2179, include Applied's motion

for summary judgment, Turner's motion to strike certain declarations, and Turner's motion for the appointment of an expert. Still outstanding in *Applied Bolting Technology Products, Inc. v. J & M Turner,* Civil Action No. 96-5819, is Applied's motion to dismiss Turner's counterclaim. Filed under both civil action numbers is Applied's motion for a preliminary injunction against Turner's alleged false advertising. For the reasons set forth below, each of these motions will be denied.

I. Factual Background

Turner and Applied are competing small businesses which manufacture direct tension indicators (" DTIs" ). DTIs are washers with protrusions spaced around the washer surface, and are used with high strength nuts and bolts to fasten structural steel on physical structures such as buildings and bridges. When DTIs are used as part of a bolt assembly, the protrusions flatten as the bolt is tightened and the pressure increases. The extent to which the protrusions flatten serves as a useful measure of the tension of the bolt assembly. Presently, only Turner and Applied compete for domestic sales of DTIs.[FN1]

> FN1. The only other domestic manufacturer of DTIs is Beth Fast, Inc. Turner's president, F. Jonathan Turner, owns all the stock of Beth Fast, and Turner currently holds a license to sell DTIs manufactured by Beth Fast.

An industry standard established by the American Society for Testing and Material (" ASTM" ), F959-94a, sets chemical, dimensional, and mechanical requirements for DTIs. The ASTM is a voluntary organization that provides a forum for interested parties to develop industry standards through a consensus process. No one disputes that compliance with this standard is extremely important to DTI purchasers, and consequently, to DTI producers.

The instant suits arise from a previous lawsuit between the same parties. [FN2] The parties settled that prior suit by mutual agreement, and purported to release each other from all claims. Turner, however, subsequently instituted a suit against Applied which included claims for breach of the settlement agreement, as well as additional claims for false

Not Reported in F.Supp.                                                                                   Page 2

Not Reported in F.Supp., 1997 WL 83766 (E.D.Pa.), 1997-1 Trade Cases P 71,857

**(Cite as: Not Reported in F.Supp.)**

advertising and unfair competition. *J & M Turner, Inc. v. Applied Bolting Technology Products, Inc.,* Civil Action No. 95-2179. Turner alleges, *inter alia,* that Applied's use of " made to ASTM F959" in its advertising is false and misleading in violation of the Lanham Act § 43(a)(1)(B). 15 U.S.C. § 1125(a)(1)(B). In that action, Turner sought a preliminary injunction prohibiting Applied from advertising that its DTIs conform to the ASTM F959 standard. After a twelve day evidentiary hearing, this court denied Turner's request for injunctive relief.

> FN2. In that case, Turner sued Applied and two of its officers, alleging patent infringement, misappropriation of trade secrets, and breach of employment agreements.

**\*2** Subsequently, Applied filed a separate suit against Turner, asserting, *inter alia,* claims for false advertising and unfair competition. *Applied Bolting Technology Products, Inc. v. J & M Turner,* Civil Action No. 96-5819. Applied's claims arise from alleged misrepresentations made by Turner concerning the quality of Applied's DTIs. Turner, in response to Applied's suit, filed counterclaims reasserting false advertising and unfair competition claims, and adding, *inter alia,* civil RICO claims.

### II. Discussion

Several motions filed in these related cases are currently before the court. I will address separately the arguments raised by each of these motions.

### A. Applied's Motion for Summary Judgment (96-2179)

Applied has moved for summary judgment on Turner's two claims for false advertising and unfair competition.[FN3] First, Turner asserts that Applied's use of " made to ASTM F959" in its advertising is false and misleading in violation of § 43(a)(1)(B) of the Lanham Act. 15 U.S.C. § 1125(a)(1)(B). Second, Turner contends that an allegedly false statement in Applied's newsletter, " Let's Torque Tension," also constitutes a violation of § 43(a)(1)(B). Applied argues, however, that no legal or factual basis exists for these claims.

> FN3. Summary judgment is appropriate only where " the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine issue of material fact exists where a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson,* 477 U.S. at 248. A court must consider the evidence, and all inferences drawn from it, in the light most favorable to the nonmoving party. *Tigg Corp. v. Dow Corning Corp.,* 822 F.2d 358, 361 (3d Cir.1987).

### 1. Applied's " Made to ASTM F959" Advertising

The Lanham Act prohibits a business from making false or misleading statements about its products. *See U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia,* 898 F.2d 914, 922-23 (3d Cir.), *cert. denied,* 498 U.S. 816, 111 S.Ct. 58, 112 L.Ed.2d 33 (1990); *Max Daetwyler Corp. v. Input Graphics, Inc.,* 545 F.Supp. 165, 171 (E.D.Pa.1982). Turner argues that Applied's DTIs do not conform to ASTM F959, and that its use of " made to ASTM F959" advertising in its selling literature and order acknowledgment forms constitutes a violation of the Lanham Act. The crucial determination, then, is whether Applied's DTIs satisfy the standard set by ASTM F959.

The standard establishes chemical, mechanical, and dimensional requirements for DTIs. The standard itself, however, specifies a test method for measuring compliance only for the mechanical requirement. Turner and Applied do not dispute that they have adopted different methods for measuring compliance with the standard's other requirements. At the evidentiary hearing on Turner's previous motion for a preliminary injunction, the parties offered conflicting testimony concerning the proper interpretation of ASTM F959. The record clearly indicates that the standard, because it is susceptible to reasonable alternative interpretations, is ambiguous. *See Mellon Bank v. Aetna Business Credit, Inc.,* 619 F.2d 1001, 1011 (3d Cir.1980). In their briefs relating to the instant motion, the parties apparently concede that at least parts of ASTM F959 are ambiguous.

**\*3** As a general rule, " [i]f the court determines that a given term in a contract is ambiguous, then the

Not Reported in F.Supp.                                                                                Page 3

Not Reported in F.Supp., 1997 WL 83766 (E.D.Pa.), 1997-1 Trade Cases P 71,857

**(Cite as: Not Reported in F.Supp.)**

interpretation of that term is a question of fact." *In Re Standardo,* 991 F.2d 1089, 1094 (3d Cir.1993) (citing *Ram Constr. Co. Inc. v. American States Ins. Co.,* 749 F.2d 1049, 1052 (3d Cir.1984)). Similarly, the interpretation of the ambiguous standard at issue would generally constitute a question of fact. Despite this general rule, Applied argues that the court should not, in the instant case, permit a jury to evaluate its compliance with ASTM F959.

Turner's false advertising and unfair competition claims hinge on the alleged falsity of Applied's " made to ASTM F959" advertising. Because the standard is ambiguous, Applied contends that the truth or falsity of its advertising cannot be verified without an official interpretation by the ASTM. Applied essentially argues that Turner cannot prove the " made to ASTM F959" advertising false in the absence of an official interpretation. In support of its position, Applied cites two cases: *Sandoz Pharmaceuticals Corp. v. Richardson-Vicks, Inc.,* 902 F.2d 222, 230-232 (3d Cir.1990) and *Dial A Car, Inc. v. Transportation, Inc.,* 82 F.3d 484, 488-90 (D.C.Cir.1996).

*Sandoz* presented, *inter alia,* a Lanham Act claim that the defendant falsely labeled an ingredient in its cough syrup " inactive," when Food and Drug Administration (" FDA" ) regulations required it to be labeled " active." 902 F.2d at 230 The Third Circuit, however, found that the FDA had not itself ruled conclusively on how such an ingredient should be labeled, and determined that the issue should not be decided as an original matter by a court in a Lanham Act case. *Id.* at 231-32.

The court expressed a clear reluctance to usurp an administrative agency's responsibility to interpret and enforce its own regulations. *Id.* at 231. Furthermore, the court noted that neither the Food, Drug and Cosmetic Act (" FD & C Act" ) nor the Federal Trade Commission Act (" FTC Act" ), which govern over the counter drug marketing, creates an express or implied private right of action. *Id.* The court refused to allow the plaintiff to accomplish through the Lanham Act what it could not do directly through the FD & C Act or the FTC Act. *Id.*

The D.C. Circuit recently addressed a similar issue in *Dial A Car.* The plaintiff in *Dial A Car* claimed that the defendant violated the Lanham Act by falsely representing to its taxi customers that it had legal authority to provide " Blue Car" taxicab service, a type of corporate account service billed on a contract

basis. 82 F.3d at 486. The D.C.Code and an administrative order of the D.C. Taxicab Commission govern taxis' authority to operate in D.C. *Id.* at 487. The defendant disputed the applicability of the order to its " Blue Car" services. The D.C. Circuit found that whether the order authorized defendant's activities was a question for the Taxicab Commission, and refused to enforce plaintiff's preferred interpretation of a municipal ordinance through the Lanham Act. *Id.* at 488-89.

**\*4** Both *Sandoz* and *Dial A Car,* however, are inapposite to the instant case. Significantly, the ASTM, unlike the FDA and the Taxicab Commission, does not have the authority to enforce its own regulations. In contrast to the FDA and Taxicab Commission, the ASTM is a voluntary organization that develops consensus standards. The courts in both *Sandoz* and *Dial A Car* expressed particular reluctance to usurp the authority of regulatory and administrative agencies. The ASTM, however, is not a government entity and does not exercise similar authority. Although a court must defer to an agency's interpretation of its own regulations,[FN4] the ASTM's interpretation of its standards would not be similarly binding on a court.[FN5]

> FN4. *See, e.g., Thomas Jefferson University v. Shalala,* 512 U.S. 504, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994); *Martin v. Occupational Safety and Health Review Comm'n,* 499 U.S. 144, 111 S.Ct. 1171, 113 L.Ed.2d 117 (1991).

> FN5. At this point, it appears highly questionable whether the ASTM would even be willing to provide an official interpretation. Although this litigation has been pending for nearly two years, the ASTM as yet has made no effort to clarify its standard.

Due to these factual differences, *Sandoz* and *Dial A Car* do not directly apply to the instant case. Neither party has cited, and I have not found, a case in any district of the Third Circuit suggesting that the holding in *Sandoz* has been, or should be, extended to these facts. As a general rule, the factfinder interprets a writing's ambiguous provisions. In the absence of clear and direct authority, I do not find that a departure from this general rule is justified. At issue is Applied's compliance with ASTM F959. The standard, however, is ambiguous, and the parties

Not Reported in F.Supp., 1997 WL 83766 (E.D.Pa.), 1997-1 Trade Cases P 71,857

**(Cite as: Not Reported in F.Supp.)**

have submitted conflicting evidence of the proper interpretation. Accordingly, I find that there is a genuine issue of material fact, and summary judgment is inappropriate as to Turner's claims based on Applied's " made to ASTM F959" advertising.

   2. Applied's Statements in " Let's Torque Tension"

Turner has also alleged that Applied violated the Lanham Act by distributing a newsletter, " Let's Torque Tension," falsely stating that various companies and state departments of transportation had approved Applied's DTIs. Applied has moved for summary judgment on this claim, arguing that Turner has failed to demonstrate that this statement was material to any DTI purchaser or that it caused Applied any loss.

Turner has submitted evidence, which Applied apparently does not refute, that the statement was literally false. If a statement is false on its face, " a plaintiff may make out a case under section 43(a) of the Lanham Act without reference to the advertisement's impact on the buying public." *Accu-Sort Systems, Inc. v. Lazerdata Corp.,* 820 F.Supp. 928, 931 (E.D.Pa.1993). Where a genuine issue of material fact exists as to whether an assertion is facially false, a plaintiff " need not submit evidence of deception or influence on purchasing decisions to defeat [a] motion for summary judgment." [FN6] *Id.* *Cf. Castrol Inc. v. Pennzoil Co.,* 987 F.2d 939, 943 (3d Cir.1993) ( " [B]ecause the district court properly found that the claims in this case were literally false, it did not err in ignoring ... superfluous evidence relating to the absence of consumer confusion." ). Accordingly, Turner's evidence that the statement was false on its face precludes summary judgment based on any failure to demonstrate the statement's influence on purchasers.

>   FN6. Of course, a plaintiff still bears the burden at trial of proving damages resulting from the defendant's acts of false advertising.

**\*5** Applied contends that Turner has failed to establish a sufficient causal link between the false advertising and any alleged injury. Although causation generally constitutes a question of fact, *see, e.g., Redland Soccer Club v. Department of the Army of the United States,* 55 F.3d 827, 853 (3d Cir.1995), *cert. denied,* 516 U.S. 1071, 116 S.Ct. 772, 133 L.Ed.2d 725 (1996), Applied argues that Turner, through judicial admissions, has attributed all of its

damages to Applied's " made to ASTM F959" advertising and to Applied's lower prices. At the preliminary injunction hearing, Turner's president, Jonathan M. Turner, testified that Applied, by failing to comply with ASTM F959, can produce its DTIs at a lower cost. Such lower production costs allegedly give Applied an unfair price advantage over Turner. Mr. Turner further claimed that his company lost sales to Applied as a result of Applied's lower pricing. Applied also cites to the deposition testimony of A. Craig Hood, a Turner consultant. Hood testified that Applied's lower pricing was the only reason he could recall Mr. Turner giving for his company's losses.

I find, however, that these statements are not sufficiently clear and definite to conclusively establish that the lower pricing, without any relation to the alleged false advertising in " Let's Torque Tension," is the only cause of injury to Turner. The Lanham Act provides a remedy to one who " is or is likely to be damaged...." 15 U.S.C. § 1125(a). *See U.S. Healthcare,* 898 F.2d at 922; *Accu-Sort,* 820 F.Supp. at 931; *see also American Rockwool, Inc. v. Owens-Corning Fiberglas Corp.,* 640 F.Supp. 1411, 1444 (E.D.N.C.1986) ( " Plaintiff is not required to prove that the defendant's conduct was the only or even the predominant cause of this injury." ).

Turner has submitted evidence that the statement in " Let's Torque Tension" was false; although its falsity does not directly establish its materiality or causal connection to Turner's alleged injuries, it does support a triable issue of fact. Turner has amply demonstrated that compliance with ASTM F959 is important to purchasers of DTIs. From this evidence, a reasonable jury could infer that the endorsement of other customers would be influential to purchasers who are concerned with the quality of their DTIs. Whether the statement in " Let's Torque Tension" has damaged, or is likely to damage, Turner is a question of material fact which precludes summary judgment.FN7

>   FN7. In ruling on Turner's earlier motion for a preliminary injunction, I found that Turner had not demonstrated that any customers or potential customers were influenced by the statement in " Let's Torque Tension." A court's factfinding for purposes of a motion for a preliminary injunction, however, is inapplicable in the context of a summary judgment motion. *See Country Floors, Inc.*

Not Reported in F.Supp.                                                                                 Page 5

Not Reported in F.Supp., 1997 WL 83766 (E.D.Pa.), 1997-1 Trade Cases P 71,857

**(Cite as: Not Reported in F.Supp.)**

*v. Partnership of Gepner and Ford,* 930 F.2d 1056 (3d Cir.1991) (" [I]nferences concerning credibility made in ruling on ... [a] motion for a preliminary injunction ... should not be used to support propositions that underpin the decision to grant [a] motion for summary judgment." ). For purposes of this summary judgment motion, I find that Turner has submitted sufficient evidence that the statements were literally false and from which a jury could infer that Turner was likely to be injured.

B. Turner's Motion to Strike the Declarations of I. Wayne Wallace and John G. Shipp (No. 95-2179)

In its reply brief in support of its motion for summary judgment, Applied attached declarations signed by Wayne Wallace and John Shipp. Turner seeks to strike these declarations, which essentially respond to verifications submitted by Turner in opposition to Applied's motion for summary judgment. The Turner verifications state in substance that the signatories concur with Turner's interpretation of ASTM F959; verifications signed by Howard Tinney of Birmingham Fastener & Supply and Moses Cordova of Cordova Bolt, Inc. further state that their respective companies have never ordered DTIs from lots exceeding 25,000 pieces. In his declaration, Wallace, the president of Applied, asserts that Birmingham Fastener and Cordova Bolt have purchased DTIs from lots exceeding 25,000. Wallace additionally indicates that Tinney and Cordova have accused him of initiating an investigation of their business dealings with Turner by the Antitrust Division of the United States Department of Justice. Turner argues that the Wallace declaration should be stricken because it attacks the credibility of Tinney and Cordova by raising a question of bias, and because it relies on documentation that has not been properly authenticated.

**\*6** Turner further requests that the court strike the declaration of John Shipp, the design services manager of a structural engineering company. Shipp signed a verification, submitted by Turner, purporting to set forth his understanding of the requirements of ASTM F959. In response, Applied introduced a subsequent declaration by Mr. Shipp revoking his earlier verification. In this most recent declaration, Shipp states that Turner did not advise him that the verification would be used in connection with this lawsuit. Turner argues that the court should strike this most recent declaration both because it is irrelevant

and because a court, in the context of a summary judgment motion, should disregard an affidavit which contradicts a prior sworn statement. *See Adelman-Tremblay v. Jewel Cos. Inc.,* 859 F.2d 517, 520-21 (7th Cir.1988).

This battle of the verifications and declarations serves only to underscore the existence of material facts in dispute. My consideration of the declarations at issue in no way affects my conclusions regarding Applied's motion for summary judgment. Rule 56(e) permits parties to submit affidavits in connection with a motion for summary judgment. Fed.R.Civ.P. 56(e). These declarations are based on personal knowledge, and in view of the fact that they do not affect the outcome of the summary judgment motion, I conclude that there is no reason to strike them from the record.

C. Applied's Motion to Dismiss Turner's Counterclaims (No. 96-5819).

Turner has asserted a counterclaim against Applied, alleging false advertising, unfair competition, commercial disparagement, tortious interference with contract, and violations of RICO. Applied seeks a dismissal of that counterclaim pursuant to Fed.R.Civ.P. 12(b)(6), advancing three main arguments relating to (1) Turner's claims based on Applied's " made to ASTM F959" advertising; (2) Turner's prior judicial admissions; and (3) Turner's RICO claims.

Rule 12(b)(6) allows a court to dismiss a complaint or counterclaim that fails to state a claim upon which relief can be granted. For purposes of a motion to dismiss, a court must accept as true all well-pleaded allegations and must draw all reasonable inferences in a light most favorable to the nonmoving party. *See Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 109, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979) (quoting *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)). The court's inquiry is limited to the complaint.

Neither Applied nor Turner, however, has completely limited its argument to the allegations of the pleadings. Both paries have referred to extraneous matters in their arguments relating to the " made to ASTM F959" advertising and the alleged judicial admissions. Rule 12(b) provides that where " matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment...." Fed.R.Civ.P. 12(b).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 6
Not Reported in F.Supp., 1997 WL 83766 (E.D.Pa.), 1997-1 Trade Cases P 71,857
**(Cite as: Not Reported in F.Supp.)**

Accordingly, I will construe Applied's motion, insofar as it relates to these two arguments, as a motion for summary judgment.[FN8] As to the RICO claims, however, both Applied and Turner have confined their arguments to the allegations of the pleadings. It would therefore be unfair to apply a summary judgment standard, and I will consider Applied's motion to dismiss the RICO counterclaim under the Rule 12(b)(6) standard set forth above.

> FN8. For a statement of the legal standard applicable to a motion for summary judgment, *see supra* note 1.

### 1. The " Made to ASTM F959" Advertising

*7 Applied argues that each count of Turner's counterclaim is based, at least in part, on Applied's allegedly false " made to ASTM F959" advertising. Applied essentially reiterates the argument it advanced in its motion for summary judgment in Civil Action No. 95-2179, contending that the truth or falsity of its advertising cannot be verified without an official interpretation by the ASTM. For the reasons set forth above, I find this argument unconvincing.

### 2. Turner's Judicial Admissions

Applied further contends that Turner's counterclaim should be dismissed because Turner has admitted that its only injuries stem from Applied's " made to ASTM F959" advertising and its lower pricing. Again, Applied raises substantially the same argument asserted in its motion for summary judgment. As stated above, however, I find that the statements upon which Applied relies are too indefinite to establish conclusively that no other allegedly false statement injured Turner. Again, for the reasons set forth above, I find that Applied is not entitled to summary judgment.

### 3. The RICO Claims

In its counterclaim, Turner also alleged a violation of RICO by Wayne Wallace and Kenneth Woodward, both officers and directors of Applied. Turner alleges that Wallace and Woodward had conducted their business affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). Section 1962(c) provides that:

[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or

indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

Turner identifies Wallace and Woodward as such " persons," and alleges two RICO enterprises: (1) Applied itself and (2) Wallace and Woodward as an " association in fact" enterprise. To establish a pattern of racketeering activity, Turner relies on alleged violations of the federal mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343, as well as acts of obstruction of justice in violation of 18 U.S.C. § 1503. Wallace and Woodward raise three arguments in support of their motion to dismiss these claims, and I will address each separately.

#### a. The distinctiveness requirement

Wallace and Woodward first argue that Turner has failed to allege sufficiently distinct RICO persons and enterprises. Section 1962(c) requires a claim against a " person" engaged in racketeering activity through a distinct " enterprise." Because Wallace and Woodward acted within the scope of their authority as officers and employees of Applied, they contend that they are not sufficiently distinct from the alleged enterprise.

In light of the Supreme Court decisions in *Reves v. Ernst & Young,* 507 U.S. 170, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993) and *National Organization for Women, Inc. v. Scheidler,* 510 U.S. 249, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994), the Third Circuit has recently reevaluated the scope of the distinctiveness requirement of § 1962(c). *Jaguar Cars, Inc. v. Royal Oaks Motor Car Co.,* 46 F.3d 258 (3d Cir.1995). The *Jaguar* court noted that the requirement is rooted in the statutory directive requiring conduct by a defendant " person" acting through an " enterprise." *Id.* at 268.[FN9] The court found, however, that " alleging conduct by corporate officers or employees who operate or manage a corporate enterprise satisfies this requirement. A corporation is an entity legally distinct from its officers or employees, which satisfies the " enterprise" definition of 18 U.S.C.A. § 1961(4)." *Id.* Accordingly, Turner's allegations do meet the distinctiveness requirement of § 1962(c).

> FN9. Previously, the court's jurisprudence had also focused on a different rationale, a belief that Congress intended RICO to apply only to prevent the infiltration of legitimate organizations by corrupt organizations. *Jaguar Cars,* 46 F.3d at 263. In *Jaguar*

Not Reported in F.Supp.                                                                                         Page 7

Not Reported in F.Supp., 1997 WL 83766 (E.D.Pa.), 1997-1 Trade Cases P 71,857

**(Cite as: Not Reported in F.Supp.)**

*Cars,* the court recognized that this rationale has been effectively rejected by *Reves* and *Scheidler. Id.*

*\*8* At oral argument, Wallace and Woodward's counsel did not attempt to refute the application of *Jaguar Cars* to the instant facts. Rather, for the first time, he advanced a separate argument urging dismissal of the RICO counterclaims on the ground that Turner lacks standing. The parties were given an opportunity to submit supplemental briefs addressing this new theory.

b. The standing requirement

Wallace and Woodward argue that Turner, because it claims relief based on only an indirect injury, lacks standing to sue for alleged RICO violations. Turner's RICO claims arise from the false statements allegedly made by Wallace and Woodward to Applied's customers and prospective customers in violation of the federal mail and wire fraud statutes.[FN10] Wallace and Woodward argue that the customers are the direct victims of such alleged conduct, and that Turner has been injured, if at all, only indirectly by the customers' purchase of Applied's DTIs. Wallace and Woodward contend that RICO does not confer standing on indirect victims such as Turner. Section § 1964(c) of RICO provides a private civil remedy to " [a]ny person injured in his business or property by reason of a violation of section 1962...." 18 U.S.C. § 1964(c). The Supreme Court has held that to have standing under RICO, a plaintiff must meet the injury and causation requirements of § 1964(c). *See Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985); *See also In re Sunrise Securities Litigation,* 916 F.2d 874, 878-79 (3d Cir.1990).

FN10. Although Turner has also alleged obstruction of justice as a predicate act establishing RICO liability, Applied's standing argument focuses on the alleged mail and wire fraud. Applied has advanced a separate argument urging dismissal of the RICO claims to the extent they are based on the predicate act of obstruction of justice. I will address that argument below.

The Court, in *Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992), recently addressed RICO's injury and causation requirements. The Court noted that Congress modeled § 1964(c) on the Clayton Act,

and found that a plaintiff's right to sue under RICO, as under the federal antitrust laws, requires a showing that the alleged violation was the proximate cause of plaintiff's injury. *Id.* at 267-68. At common law, proximate causation involved a " demand for some direct relationship between the injury asserted and the injurious conduct alleged." *Id.* at 268. Although acknowledging that directness is not the only requirement of causation under the Clayton Act, the Court identified several factors that have made directness a focal point. *Id.* at 269 (citing *Associated General Contractors of Cal., Inc. v. Carpenters,* 459 U.S. 519, 540, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983)). First, less direct injuries involve difficult problems of apportioning damages among various and potentially independent causes. *Id.* Second, the recognition of indirect injuries would, to avoid the risk of multiple recoveries, require a difficult apportionment of damages among plaintiffs at different levels of injury. *Id.* Finally, the Court found that, because directly injured victims will generally vindicate their own rights, the interest in deterring injurious conduct does not justify the need to confront the difficulties associated with the claims of indirect victims. *Id.*

*\*9* On the facts presented in *Holmes,* the Court held that the plaintiff, Securities Investor Protection Corporation (" SIPC" ), had not met the proximate cause requirement. *Id* at 272. SIPC had accused the defendants of conspiring in a stock manipulation scheme that led to the demise of two broker-dealers. *Id.* at 261. SIPC is a private, nonprofit corporation with a statutory duty, pursuant to the Securities Investor Protection Act, to advance funds to reimburse the customers of broker-dealers unable to meet their obligations. *Id.* As a result of the alleged stock manipulation scheme, two broker-dealers became insolvent and were unable to meet their obligations to their customers. *Id.* at 262-63. Accordingly, SIPC had to advance nearly $13 million to cover the customers' claims. *Id.* SIPC subsequently filed a RICO claim against the defendants, claiming that it was subrogated to the rights of the customers.

The Court found, however, that the defendants' conduct did not constitute the proximate cause of the customers' injuries. " [T]he link is too remote between the stock manipulation alleged and the customers' harm, being purely contingent on the harm suffered by the broker-dealers ... [t]he broker-dealers simply cannot pay their bills, and only that intervening insolvency connects the conspirators' act to the losses suffered by the nonpurchasing customers

Not Reported in F.Supp.                                                                                          Page 8

Not Reported in F.Supp., 1997 WL 83766 (E.D.Pa.), 1997-1 Trade Cases P 71,857

**(Cite as: Not Reported in F.Supp.)**

and general creditors." *Id.* at 271. The Court's decision was motivated in part by a concern that " suits by those injured only indirectly would open the door to ' massive and complex damages litigation[, which would] not only burde [n] the courts, but [would] also undermine the effectiveness of treble damages suits.' " *Id.* at 274 (quoting *Associated General Contractors,* 459 U.S. at 545).

In evaluating the proximate cause requirement, the *Holmes* Court drew a distinction between direct and indirect injuries. The Court cautioned, however, that " ' the infinite variety of claims that may arise make it virtually impossible to announce a black letter rule that will dictate the result in every case.' " *Id.* at n. 20 (quoting *Associated General Contractors,* 459 U.S. at 536). Thus, the Court's " use of the term ' direct' should merely be understood as a reference to the proximate cause enquiry that is informed by the concerns set out in the text." *Id.*

Although the Third Circuit has, since *Holmes,* addressed RICO's standing and causation requirements, the court has not encountered facts similar to those presented here. In *McCarthy v. Recordex Service, Inc.,* 80 F.3d 842 (3d Cir.1996), the court recognized that antitrust standing principles apply to alleged RICO violations. *Id.* at 855 (citing *Holmes,* 503 U.S. at 270. In *McCarthy,* the plaintiffs, the clients of attorneys who purchased photocopies of the clients' hospital records, asserted antitrust and RICO claims against the defendant hospitals and copy service providers. *Id.* at 844. Plaintiffs alleged that the defendants conspired to charge artificially high prices for the requested photocopies. *Id.* at 845. Although defendants billed plaintiffs' attorneys directly, plaintiffs alleged that these costs were eventually passed on to them. *Id.* The court found that plaintiffs, because they were not direct purchasers, lacked antitrust standing. *Id.* at 855. Accordingly, the plaintiffs also lacked RICO standing. *Id.* The court stated that the application of antitrust principles " den[ied] RICO standing to indirect victims." *Id.* (citations omitted).

**\*10** In *Rehkop v. Berwick Healthcare Corp.,* 95 F.3d 285, 289 (3d Cir.1996), the court also found that the plaintiff lacked standing to pursue a RICO claim. The court noted that RICO standing requires a plaintiff to demonstrate that " the violation was a substantial cause of the injury to his business or property." *Id.* at 288 (citing *Shearin v. E.F. Hutton Group, Inc.,* 885 F.2d 1162, 1164 (3d Cir.1989)). The plaintiff alleged that he was fired from his position as a nurse

anesthetist in retaliation for his refusal to complete fraudulent Medicare, Medicaid, and Medical Assistance forms.

The court found that, although the filing of such fraudulent claims could constitute a predicate act for RICO purposes, the alleged violation of RICO did not cause the plaintiff's injuries. *Id.* at 289. The racketeering activity, which consisted of filing false claims, did not cause plaintiff to lose his job. *Id.* " Rather, the direct victims of the alleged racketeering were the Medicare and Medicaid programs and the taxpayers." *Id.* Plaintiff, accordingly, did not have standing to pursue a claim based on an alleged violation of § 1962(c).[FN11]

> **FN11.** The court did find, however, that plaintiff had standing to pursue a claim that defendants violated § 1962(d) by conspiring to violate § 1962(c). *Id.* at 289-90. Although not expressly addressing the issue, the court presumably concluded that the conspiracy, as distinguished from the submission of the fraudulent claims themselves, did cause plaintiff to lose his job.

I do not find that either of these cases conclusively establishes the proposition that only the direct, immediate victim of an alleged violation ever has RICO standing. The courts' statements concerning direct and indirect victims are mere dicta. Such dicta should not be followed blindly, particularly in view of the Supreme Court's admonition that the " infinite variety of claims" defies resolution by a single black-letter rule. *Holmes,* 503 U.S. at 272 n. 20. The *Holmes* Court further cautioned that its use of the term " direct" should be understood only as a reference to its proximate cause inquiry. *See also Israel Travel Advisory Service, Inc. v. Israel Identity Tours,* 61 F.3d 1250, 1257 (7th Cir.), *cert. denied,* 517 U.S. 1220, 116 S.Ct. 1847, 134 L.Ed.2d 948 (1995) (" The Supreme Court observed ... that it did not mean to preclude all possibility of recovery for injury that was transmitted indirectly; the holding of *Holmes* is no more than that common law ideas about proximate causation inform the understanding of RICO." ). Accordingly, I must apply general principles of proximate causation to determine whether Turner has alleged a sufficiently direct injury to confer RICO standing.

Generally, a RICO violation constitutes the proximate cause of an injury if it is " a substantial factor in the sequence of responsible causation, and if

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                      Page 9

Not Reported in F.Supp., 1997 WL 83766 (E.D.Pa.), 1997-1 Trade Cases P 71,857

**(Cite as: Not Reported in F.Supp.)**

the injury is reasonably foreseeable or anticipated as a natural consequence." *Prudential Ins. Co. of Am. v. United States Gypsum Co.,* 828 F.Supp. 287, 293 (D.N.J.1993). Turner's alleged injury bears a much more direct and foreseeable relationship than the injuries alleged in *Holmes, McCarthy,* or *Rehkop.*

*\*11* Turner alleges that Wallace and Woodward, in violation of the federal mail and wire fraud statues, made false representations to Applied's customers. Turner contends that this conduct constitutes a violation of § 1962(c) which resulted in lost sales and revenue. In its counterclaim, Turner avers that Wallace and Woodward formerly worked as independent contractors for Turner. They subsequently formed Applied, and began to compete with Turner for sales of DTIs. Any sale by Applied, therefore, necessarily makes Turner's sales. It is clearly foreseeable that false advertisements of a product's quality, designed to attract customers, will injure competitors by decreasing their sales and revenues. This diversion of sales from rivals is in fact the goal of business advertising.

In this regard, the instant case differs markedly from *Holmes* and *Rehkop.* In those cases, the intervening acts of the broker-dealers' insolvency and the employee's termination were not the natural and foreseeable consequences of the predicate acts. Even the attorneys' passing on of photocopying costs in *McCarthy,* although more foreseeable, was not a necessary consequence of the alleged price fixing.FN12 In the context of false advertising, in contrast, competing businesses are an inherent and essential part of the scheme. To obtain new customers through false advertising, a business must necessarily divert sales from its rivals. The harm to competitors clearly is not independent of the predicate acts directed to potential customers.

> FN12. Furthermore, in *McCarthy,* the court applied the direct purchaser rule established in its antitrust jurisprudence to plaintiffs' RICO claims. 80 F.3d at 855. As discussed below, the concerns motivating the direct purchaser rule are largely inapplicable on the instant facts.

Both the Seventh and Fourth Circuits have already found that competitors injured by a rival's false advertising or fraudulent solicitations do have RICO standing. *See Israel Travel Advisory,* 61 F.3d at 1257; *See also Mid Atl. Telecom, Inc. v. Long Distance*

*Services, Inc.,* 18 F.3d 260 (4th Cir.1994). " RICO allows suits when the predicate offenses influence customers and, derivatively, injure business rivals." *Israel Travel Advisory,* 61 F.3d at 1257. The plaintiffs in both *Israel Travel Advisory* and *Mid Atlantic* alleged that the defendants' false or fraudulent statements to customers caused the plaintiffs to lose sales.

As the Fourth Circuit recognized in *Mid Atlantic,* the plaintiff could conceivably show that " while the scheme was initially aimed only at defrauding ... customers, [the defendant] broadened the sweep of the intrigue to include [the plaintiff] as a direct target (i.e., to obtain an unfair advantage in recruiting [the plaintiff's] customers)." 18 F.3d at 260. From the allegations of the counterclaim, it seems likely that Turner could similarly demonstrate that it was a direct target of Wallace and Woodward's conduct. Furthermore, the policies motivating the focus on directness are largely inapplicable on these facts. Turner here claims injuries-lost sales and revenues-that are distinct from any harm to Applied's customers. This case accordingly does not present the difficult apportionment problems contemplated in *Holmes. See Israel Travel Advisory,* 61 F.3d at 1257 (" Our case does not present [an] ... apportionment problem, and there is no risk of multiple recoveries. The ' direct' victims-... the readers of [defendant's] ads-got what they paid for and are not complaining." ).

*\*12* Accordingly, I find that the alleged indirectness of Turner's injury does not preclude its RICO claims. A recent decision in this district further supports this conclusion. In *Rodriguez v.McKinney,* 878 F.Supp. 744, 745 (E.D.Pa.1995), plaintiffs asserted RICO claims against the defendant corporation, which operated various trade schools. Plaintiffs were former students who had incurred tuition debt through a federal student loan program. *Id.* Plaintiffs alleged that the defendant submitted fraudulent certifications to the United States Department of Education (" DOE" ) that the plaintiffs had an " ability to benefit" from the school's curriculum. *Id.* As a result of these fraudulent certifications, DOE guaranteed student loans for plaintiffs, when in fact plaintiffs were not able to benefit from defendant's courses. *Id.* Plaintiffs subsequently incurred student loan debt for what they characterized as worthless training. *Id.* at 745-46.

On these facts, the court held that the causal connection between defendants' conduct and plaintiffs' injuries did satisfy RICO's proximate cause

Not Reported in F.Supp.                                                                                                Page 10

Not Reported in F.Supp., 1997 WL 83766 (E.D.Pa.), 1997-1 Trade Cases P 71,857

**(Cite as: Not Reported in F.Supp.)**

requirement. *Id.* at 748. Noting that plaintiffs were " both essential to [the] rival's success and the first parties to be injured by it," the court found that the plaintiffs' injuries were clearly foreseeable. *Id.* The mere fact that plaintiffs alleged a " three party or ' pass through' mail fraud chain" did not destroy the causal nexus between the RICO violation and the plaintiffs' injuries. *Id.* at 749. Although the three party scheme at issue in *Rodriguez* does differ from the racketeering activity alleged here,[FN13] the case does support the conclusion that parties other than the direct recipient of an allegedly fraudulent mailing may establish RICO standing.

> FN13. In the *Rodriguez* mail fraud chain, " money or property [was] extracted from a victim by means of a mailing directed at some other person or entity..." 878 F.Supp. at 749. This mail fraud is distinguishable from Turner's allegation that Applied made false representations to customers which diverted sales from Turner to Applied.

Accordingly, the fact that Wallace and Woodward's alleged mail and wire fraud was directed to its customers does not, in the absence of more clearly applicable Third Circuit authority, preclude Turner from asserting its RICO claims. I find that Turner has alleged a sufficient causal connection between Wallace and Woodward's conduct and Turner's injuries.

In reliance on the Seventh Circuit's opinion in *Israel Travel Advisory,* however, Wallace and Woodward attempt to take the standing requirement a step further. Although the court in *Israel Travel Advisory* found that an indirectly injured victim can, under certain circumstances, have RICO standing, the court noted that " [l]ike a troll under the bridge, another problem lies in wait for a litigant who has come this far." 61 F.3d at 1257. The court found that the plaintiff must also be among the class of persons intended to be protected by the statute constituting the alleged predicate act. *Id.* at 1258. Employing a " zone of interests" analysis, the court determined that only customers are the beneficiaries of the statutory protection of the federal mail fraud statute. *Id.* Accordingly, the plaintiff, a business rival of the defendant, could not recover under RICO. *Id.*

*13 Wallace and Woodward argue that Turner, as a competitor, cannot support its RICO claims on the basis of the predicate acts of mail and wire fraud. Wallace and Woodward urge this court to adopt the

Seventh Circuit's conclusion that a RICO plaintiff must be within the zone of interests protected by the predicate acts alleged, and that business rivals are not beneficiaries of the protection of the mail and wire fraud statutes. They have failed, however, to cite any case from the Third Circuit in support of this argument.

I decline to impose an additional requirement on RICO standing in the absence of more clear guidance from the Third Circuit.[FN14] Even the Seventh Circuit recognized that " [a]n entrepreneur can recover under the common law of unfair competition when a rival tells a fib to potential customers, because the rule against fraud has been crafted for the benefit of both seller and customer." *Israel Travel Advisory,* 61 F.3d at 1257-58. The Third Circuit has not yet determined whether the federal mail and wire fraud statutes similarly protect both competitors and customers. The court in *Rodriguez* stated that " [t]o hold a defendant liable for mail fraud, a RICO plaintiff ' need not be the primary victim, only an intended victim' of the scheme." 878 F.Supp. at 748 (quoting *Prudential Ins,* 828 F.Supp. at 296; *Matter of EDC, Inc.,* 930 F.2d 1275, 1279 (7th Cir.1991). Turner's allegations, if proven, could establish that it was an intended victim of Wallace and Woodward's alleged mail and wire fraud. Accordingly, I conclude that Turner does have standing to pursue its RICO claims.

> FN14. I am particularly reluctant to impose such additional requirements in view of the expansive view of RICO liability recently expressed by the Third Circuit. " RICO is to be read broadly" to effectuate its remedial purpose. *Tabas v. Tabas,* 47 F.3d 1280, 1296 (3d Cir.1995) (en banc) (also noting that the Supreme Court has consistently struck down efforts to narrow the scope of RICO).

c. The obstruction of justice claims

Turner also alleges acts of obstruction of justice, in violation of 18 U.S.C. § 1503, as the basis of Wallace and Woodward's RICO liability. Turner avers that, during the course of both prior and pending litigation, Wallace and Woodward intentionally concealed material documents and other information. Turner further contends that Wallace lied during his deposition testimony and at the preliminary injunction hearing. Turner declares that, as a result of this conduct, it has suffered injury to its business and

Not Reported in F.Supp.                                                                                                                Page 11

Not Reported in F.Supp., 1997 WL 83766 (E.D.Pa.), 1997-1 Trade Cases P 71,857

**(Cite as: Not Reported in F.Supp.)**

property.

Wallace and Woodward argue that acts of obstruction of justice, committed during the pendency of civil litigation, cannot constitute a RICO predicate offense. In *Malley-Duff & Assoc., Inc. v. Crown Life Ins. Co.,* 792 F.2d 341 (3d Cir.1986), the Third Circuit recognized that obstructive acts committed in the course of a civil lawsuit can form the basis of RICO liability. In that case, the plaintiff asserted a RICO claim arising from alleged acts of obstruction of justice by the defendant during discovery in a prior suit between the same parties. *Id.* at 344.

*14 Despite the availability of other avenues of relief from obstructive conduct, the court found that RICO may also provide a remedy. *Id.* at 354. The court noted the Supreme Court's recognition of the broad applicability of RICO, and held that interference with a civil lawsuit can constitute an injury to business or property to support a cause of action under RICO. In the instant case, Turner alleges acts of obstruction of justice arising from Wallace and Woodward's conduct during both a pending and a prior lawsuit. Under *Malley-Duff,* Turner has stated a viable RICO claim predicated on alleged acts of obstruction of justice.[FN15]

> FN15. The only case which Wallace and Woodward cite in support of their position, *Rafferty v. Halprin,* 1991 RICO Business Disputes (CCH) ¶ 7866, at 12,097 (S.D.N.Y.1991), is clearly inapposite. In that case, the plaintiff also alleged that conduct by the defendants constituted obstruction of justice giving rise to RICO liability. The alleged conduct, however, occurred during the course of litigation still pending in another district. The court refused " to permit a litigant in a civil action pending in one district to allege in another district, a RICO claim against the parties in pending action or their privies, charges arising out of the conduct of the litigation in the other district." The court found that the recognition of such an action would encourage forum shopping and would require it to review the other district's supervision of its pending case. These concerns clearly do not apply to the instant case. To the extent that *Rafferty* can be read to require litigants to present allegations of obstruction of justice in the suit in which they arise, it is at odds with the Third

Circuit's decision in *Malley-Duff.*

**D. Applied's Motion for a Preliminary Injunction**
**(Nos. 95-2179 and 96-5819)**

Pursuant to Rule 65, Applied seeks a preliminary injunction prohibiting Turner from advertising that Applied's DTIs do not conform to ASTM F959. Applied alleges that Turner has, in violation of the Lanham Act § 43(a)(1)(B), 15 U.S.C. § 1125(a)(1)(B), misrepresented the quality of Applied's DTIs. Applied's claims stem from Turner's dissemination of a report concluding that Applied's DTIs did not satisfy the standard's requirements, as well as Turner's subsequent disparagement of the quality of Applied's products. When considering Turner's previous motion for a preliminary injunction against Applied's advertising, this court held a twelve day evidentiary hearing. Neither Applied nor Turner has requested any additional hearing. Both parties have, however, submitted additional evidence relevant to the instant motion. Upon consideration of all the evidence and the accompanying briefs, I conclude that Applied has failed to establish its entitlement to preliminary injunctive relief. The following narrative shall constitute my findings of fact and conclusions of law.

In ruling on Turner's earlier request for injunctive relief, I set forth 71 paragraphs containing my conclusions of fact, and I hereby adopt and incorporate those factual determinations for purposes of the instant motion. [FN16] *See J & M Turner, Inc. v. Applied Bolting Technology Products,* 37 U.S.P.Q.2d 1737 (E.D.Pa.1996). I previously determined that Turner commissioned Laboratory Testing, Inc. (" LTI" ) to prepare an evaluation of Applied's DTIs. On March 24, 1995, Turner transmitted the LTI report, alleging that Applied's DTIs failed to meet the ASTM's chemical, dimensional, and compression load requirements, to over 600 distributors, consulting engineers, and end-users of DTIs. Despite this wide-spread dissemination, Turner received little or no response to the report.

> FN16. The arguments and evidence relating to this motion do not change any of my previous conclusions of fact. Turner has submitted several form declarations by various people involved in the DTI market. These declarations describe the requirements of ASTM F959, in accordance with Turner's own interpretation, and the signatories in essence verify that this description

Not Reported in F.Supp., 1997 WL 83766 (E.D.Pa.), 1997-1 Trade Cases P 71,857

**(Cite as: Not Reported in F.Supp.)**

represents their understanding of the standard. Subsequently, at least one of these declarations has been revoked. I find, however, that these additional submissions merely underscore my earlier determination that different parties and witnesses have adopted different interpretations of the ambiguous standard.

Some of these declarations also purport to discredit Wallace's testimony at the hearing. Turner contends that Wallace identified several customers as having ordered lots of DTIs greater than 25,000. Turner has submitted verifications from two of these customers stating that they never made such requests. For purposes of this motion, however, I need not decide whether Wallace did make any such material misrepresentations.

Applied has cited several subsequent incidents in which Turner representatives have disparaged Applied's DTIs to customers and potential customers. In July, 1996, Jim Wilder, head of construction for the North Carolina Department of Transportation, informed Wallace that he had been contacted by a Turner sales representative. The Turner representative stated to Wilder that Applied's DTIs did not satisfy the ASTM standard. Applied had previously beaten Turner in a bidding contest to supply DTIs to the New Bern Bridge project of the North Carolina Department of Transportation.

**\*15** In a letter dated September 4, 1996, Weber Huang of the Oriental Fastener Co., Ltd. wrote to Woodward, Applied's Vice President of Sales and Marketing. Huang, who was involved in a bridge project, advised Woodward that a Turner agent had sent him a report (presumably the LTI report) showing that Turner's products were superior; Huang asked Woodward to guarantee that its DTIs satisfied ASTM F959. Applied did not win a contract to supply DTIs to this Southeast Asia bridge project.

Wallace has further declared that Roger E. Ferch, Vice President of Herrick Corporation, informed him that a Turner sales representative had told him that Applied's DTIs were inferior because they did not conform to ASTM F959. Following Ferch's discussion with the Turner representative, Jonathan Turner set forth, in a letter to Ferch, Turner's allegations concerning Applied's DTIs, and explained why its DTIs should be used on Ferch's airport construction project.

Finally, in a letter dated May 10, 1996, Jonathan Turner informed an unknown recipient that sales representatives of Nucor Fastener were offering Applied DTIs for sale with Nucor bolts. Jonathan Turner identified the Nucor representatives selling Applied DTIs, and urged the recipient to call or write " protesting this intolerable situation...." Wallace avers that Nucor subsequently terminated these sales representatives.

Applied claims that this conduct by Turner constitutes false advertising entitling Applied to preliminary injunctive relief. Applied seeks an injunction prohibiting Turner from advertising that Applied's DTIs do not conform to the ASTM F959 standard. The party requesting a preliminary injunction must prove the following four elements: (1) the plaintiff is likely to succeed on the merits after a full trial; (2) the plaintiff will suffer irreparable harm if the requested injunction is not issued; (3) the defendant will not suffer irreparable harm if the injunction is issued; and (4) the public interest is served by the issuance of the injunction. *See AT & T Co. v. Winback and Conserve Program, Inc.,* 42 F.3d 1421 (3d Cir.1994), *cert. denied,* 514 U.S. 1103, 115 S.Ct. 1838, 131 L.Ed.2d 757 (1995) (citing *Opticians Ass'n v. Independent Opticians,* 920 F.2d 187, 191-92 (3d Cir.1990). Upon consideration of each of these factors, I find that Applied is not entitled to the requested preliminary injunction.

### 1. Likelihood of Success on the Merits

Applied bases its claims against Turner on alleged false advertising in violation of § 43(a)(1)(B) of the Lanham Act. To prevail on a false advertising claim under § 43(a), a plaintiff must prove by a preponderance of the evidence: 1) that the defendant has made false or misleading statements as to his own product [or another's]; 2) that there is actual deception or at least a tendency to deceive a substantial portion of the intended audience; 3) that the deception is material in that it is likely to influence purchasing decisions; 4) that the advertised goods traveled in interstate commerce; and 5) that there is a likelihood of injury to the plaintiff in terms of declining sales, loss of good will, etc.

**\*16** *U.S. Healthcare,* 898 F.2d at 922-23 (quoting *Max Daetwyler,* 545 F.Supp. at 171). I find that Applied has failed to demonstrate its likelihood of success on the merits.

Not Reported in F.Supp.                                                                     Page 13

Not Reported in F.Supp., 1997 WL 83766 (E.D.Pa.), 1997-1 Trade Cases P 71,857

**(Cite as: Not Reported in F.Supp.)**

First, there is a serious question as to whether Turner's conduct even constitutes advertising within the meaning of the Lanham Act. Applied concedes in its reply brief that it is not seeking to prohibit Turner from disseminating the LTI report. Applied alleges that the report's damage has already been done. Rather, Applied seeks an injunction prohibiting Turner from advertising that Applied's DTIs do not satisfy the ASTM F959 standard. Although the original dissemination of the LTI report to over 600 recipients likely constitutes advertising, Applied does not seek relief on the basis of that claim. I must consider the likelihood of success on the merits of the claims relevant to the preliminary injunction. The communications to which Applied objects here may not rise to the level of public circulation actionable under the Lanham Act.

The Lanham Act prohibits false or misleading statements of fact " in commercial advertising or promotion." 18 U.S.C. § 1125(a)(1)(B) *See Ditri v. Coldwell Banker Residential Affiliates, Inc.,* 954 F.2d 869, 872 (3d Cir.1992) (noting that the Lanham Act applies only to claims of false representations in advertising). Although the Lanham Act itself does not define the terms " advertising" and " promotion," courts have found that commercial advertising or promotion for purposes of the Lanham Act consists of (1) commercial speech; (2) by a defendant in commercial competition with the plaintiff; (3) designed to influence customers to buy the defendant's products; (4) that is sufficiently disseminated to the relevant purchasing public to constitute advertising or promotion within the industry. *See Seven-Up Co. v. Coca-Cola Co.,* 86 F.3d 1379, 1384 (5th cir.1996); *Guardian Life Ins. Co. of Am. v. American Guardian Life Assurance Co.,* 1995 WL 723186 at *3 (E.D.Pa.); *Gordon & Breach Science Publishers v. American Int. of Physics,* 859 F.Supp. 1521, 1532 (S.D.N.Y.1994). Applying this standard to the evidence before me, I am not convinced that Applied can establish that Turner's conduct constitutes advertising.

Applied cites three incidents in which a Turner representative advised a customer or potential customer that Applied's DTIs did not conform to the ASTM standard, and that Turner's product was therefore superior. There is a substantial question as to whether these communications were sufficiently publicly disseminated to constitute advertising. " The level of circulation required to constitute advertising and promotion will vary from industry to industry and from case to case." *American Needle & Novelty,*

*Inc. v. Drew Pearson Marketing, Inc.,* 820 F.Supp. 1072, 1077-78 (N.D.Ill.1993). Several court have determined that isolated, individual statements to potential customers are not actionable as commercial advertising or promotion. *See Medical Graphics Corp. v. SensorMedics Corp.,* 872 F.Supp. 643 (D.Minn.1994) (holding that statements by a sales representative to one potential customer, despite plaintiff's argument that there may be many other such customers, did not constitute advertising or promotion); *American Needle,* 820 F.Supp. at 1077-78 (finding that a single letter did not constitute commercial advertising or promotion). Another court, however, has found that such incidents can, under appropriate circumstances, be actionable under the Lanham Act. *See Mobius Management Sys., Inc. v. Fourth Dimension Software, Inc.,* 880 F.Supp. 1005, 1019-1021 (S.D.N.Y.1994) (holding that a single letter addressed to a potential customer designed to discourage the customer from purchasing plaintiff's product did constitute commercial advertising or promotion under § 43(a)). *But see Garland Co. Inc. v. Ecology Roof Sys. Inc.,* 895 F.Supp. 274 (D.Kan.1995) (criticizing the court's decision in *Mobius* ).[FN17]

> [FN17.] Of course, the unavailability of relief under the Lanham Act does not affect Applied's possible common law remedies, such as commercial disparagement. In this motion, however, Applied has referred only to the Lanham Act as the basis of its claim for relief. Because Applied bears the burden of establishing its likelihood of success on the merits, I will not consider the merits of any other potential claims arising from Turner's conduct.

**\*17** The final letter to which Applied objects, which apparently urges an unknown recipient to prevent Nucor sales representatives from offering Applied's DTIs for sale together with Nucor bolts, is not addressed to a member of the purchasing public. Although the letter does not identify its recipient, Applied alleges in its brief that this letter was directed to distributors. Some cases, however, have indicated that the Lanham Act provides a remedy only for statements made to potential purchasers. *See Guardian Life Insurance,* 1996 WL 723186 at *3 (finding that letters sent to state insurance commissioners, although designed to have a negative impact on sales, were not advertising because the letters were not disseminated to the insurance buying public); *Hertz Corp. v. Avis, Inc.,* 725 F.Supp. 170,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 14

Not Reported in F.Supp., 1997 WL 83766 (E.D.Pa.), 1997-1 Trade Cases P 71,857

**(Cite as: Not Reported in F.Supp.)**

171 (S.D.N.Y.1989) (noting that advertising that does not reach the consuming public is not within the purview of the Lanham Act).[FN18] These cases present a substantial impediment to Applied's claim for relief. They raise a serious question as to whether Applied can establish that Turner's conduct is actionable under the Lanham Act.

> FN18. Again, this conduct may be actionable under some other law. However, Applied has in this motion implicated only the potential success of its claims under the Lanham Act.

Even if the communications at issue do constitute commercial advertising or promotion, Applied has failed to prove that the statements were false or misleading. In ruling on Turner's request for a preliminary injunction, I determined that I was not convinced that Applied's claims that its DTIs are " made to ASTM F959" were false. This finding does not necessarily imply that Applied's DTIs do comply with ASTM F959, or that Turner's claims to the contrary are false.

Rather, I found that the standard was ambiguous. I was impressed that no end-user had ever rejected Applied's DTIs for failure to conform to standard specifications. I also note, however, that Turner has submitted evidence that many persons concur with its own interpretation of the standard's requirements. At this juncture, I cannot conclude that either Turner or Applied is more likely to succeed on its claims relating to ASTM F959. It is an ambiguous standard, subject to reasonable alternative interpretations. Given that Applied bears the burden of proving its likelihood of success on the merits, I find that the substantial doubts as to Applied's ability to establish that Turner's conduct constitutes advertising and that such advertising was false weighs against the issuance of the requested injunction.

## 2. Irreparable Harm

A party seeking a preliminary injunction must further demonstrate that it will be irreparably harmed if the court does not issue the injunctive relief. To be considered " irreparable," however, the harm must extend beyond mere money damages. *See Instant Air Freight Co. v. C.F. Air Freight, Inc.,* 882 F.2d 797, 801-03 (3d Cir.1989); *A.L.K. Corp. v. Colombia Pictures Indus., Inc.,* 440 F.2d 761, 764 (3d Cir.1971). Applied argues that it is entitled to a presumption of irreparable harm because Turner has

engaged in false comparative advertising. Some courts have indicated that a false direct comparison between competing products necessarily harms the goodwill of the disparaged business, thereby constituting irreparable harm. These courts have determined that the victim of false comparative advertising is entitled to a presumption of irreparable harm. *See, e.g., Abbott Lab. v. Mead Johnson & Co.,* 971 F.2d 6, 16 (7th Cir.1992); *McNeilab, Inc. v. American Home Products Corp.,* 848 F.2d 34, 38 (2d Cir.1988). Nonetheless, I find that, since I have concluded that Applied has failed to demonstrate a likelihood of success on the merits, it is not entitled to the benefit of such a presumption.

**\*18** Furthermore, Applied has failed to introduce any evidence that it has been, or is likely to be, irreparably harmed. In fact, Applied apparently retained its contracts to supply DTIs for the airport project and the North Carolina bridge project, even after Turner had advised the purchasers that Applied's DTIs did not conform to ASTM F959. This evidence indicates that DTI customers understand that businesses apply their own standards in criticizing their competitors' products. These customers apparently appreciate that " [r]obust debate between competitors on matters of opinion, and claims that one product or service is far superior to that of rivals, are encouraged as part of the hurly-burly inherent in a free market system...." *Licata & Co. Inc. v. Goldberg,* 812 F.Supp. 403, 408 (S.D.N.Y.1993) (citations omitted). Although Wallace avers that Applied did not obtain a contract to supply DTIs to the Southeast Asia bridge project, there is no evidence that Turner's communications with Mr. Huang caused Applied to lose the sale. Applied does not even allege that Turner did obtain the contract.

In any case, these lost sales would not constitute irreparable harm. Applied could be compensated for such lost sales through money damages. It is clear that the loss of money, no matter how substantial, cannot constitute irreparable harm. *See, e.g., Instant Air Freight,* at 801-03; *In re Arthur Treacher's Franchisee Litigation,* 689 F.2d 1137, 1145-46 (3d Cir.1982).

Although damage to a business's goodwill and reputation can constitute irreparable harm, Applied has presented no evidence of such harm. In considering Turner's motion for a preliminary injunction, I speculated that Turner's ability to advertise that Applied's DTIs did not conform to ASTM F959 could destroy much of Applied's

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                   Page 15

Not Reported in F.Supp., 1997 WL 83766 (E.D.Pa.), 1997-1 Trade Cases P 71,857

**(Cite as: Not Reported in F.Supp.)**

goodwill with its customers. This speculation has proved unfounded. Wallace, in his declaration, fails to even state a belief that Applied's goodwill or reputation has been injured. Although Applied does not seek injunctive relief stemming from the initial dissemination of the LTI report, the reaction to that report further undermines Applied's claim of irreparable injury. Turner received little or no response to its circulation of the report to over 600 distributors, consulting engineers, and end-users. If such a wide-spread dissemination generated such little reaction, it is unlikely that more isolated individual statements disparaging the quality of Applied's DTIS will cause irreparable damage. Accordingly, I find that Applied has failed to demonstrate that it will be irreparably harmed if the requested injunction is not issued.

In addition, applying the third factor enumerated in *AT & T v. Winback, see supra,* at 34, I find that Turner likewise would not suffer irreparable harm if the injunction were issued. In its brief opposing the instant motion, Turner does not address this issue, apparently conceding that it would not suffer any irreparable injury.

### 3. Public Interest

**\*19** Finally, I must consider whether the requested preliminary injunction would serve the public interest. Applied argues that the requested injunction serves the public interest by thwarting Turner's plan to eliminate Applied as a competitor. Applied alleges that Turner is attempting, through its false advertising, to reassert its monopoly of the DTI market. Applied has failed, however, to demonstrate its likelihood of success on the merits of its claim. The public interest is clearly not served by a court's prohibition of advertising that is not clearly false or misleading.

In addition, Turner emphasizes the compelling public policy expressed in the Fastener Quality Act of 1990, 15 U.S.C. § 1401-1541 (1990). The Fastener Quality Act prohibits the sale of any fastener which does not " conform [ ] to the standards and specifications to which the manufacturer represents it has been manufactured." 15 U.S.C. § 5402(14). This provision reflects a concern with the threat to public safety posed by nonconforming and substandard fasteners. *See* S.Rep. No. 101-388, 101st Cong., 2d Sess. 2. *reprinted in* 1990 U.S.Code Cong. & Ad. News 4234, 4235. Applied's alleged deviations from the standard, however, are fairly minor. There is no substantial evidence that Applied's DTIs pose any threat to public safety, despite Turner's contention that any substandard washer poses a risk of catastrophic collapse of a building, bridge, or other structure where such washer was installed.

A preliminary injunction is an extraordinary remedy which must be clearly warranted by relevant legal and factual considerations. Clearly, the public interest favors caution by a court contemplating interference with the sales practices and strategies of private industry. Absent extraordinary circumstances, the public interest is best served by allowing businesses to compete freely without court involvement. Accordingly, I find that this factor disfavors the requested injunctive relief.

### D. Turner's Motion for the Appointment of an Expert (No. 95-2179)

Pursuant to Federal Rule of Evidence 706, Turner seeks the appointment of an expert by the court. The central issue in the instant case is the proper interpretation of ASTM F959. Turner argues that the court should appoint an expert to assist the trier of fact in understanding the meaning of the standard, and to " choose between the conflicting interpretations of ASTM F959-94a that have been offered." (Memorandum of Law in Support of Plaintiff's Motion for the Appointment of an Expert by the Court at p.5). Turner suggests that the court's appointment of an expert could save time and money at an eventual trial.

Although I agree that expert testimony will be helpful to the trier of fact, I am not persuaded that the parties should not simply retain their own experts. Even if I appointed an expert, that expert's determinations would not be binding on the parties. Either Turner or Applied is bound to disagree with that expert's conclusions regarding the requirements of ASTM F959. Accordingly, I would expect that the dissatisfied party would still retain its own experts at trial to undermine and attack the findings of the court-appointed expert. Furthermore, I have determined that ASTM F959 is ambiguous; that is, it is subject to reasonable alternative interpretations. Despite cautionary instructions, a trier of fact may infer an imprimatur of judicial approval of the findings of a court-appointed expert. Such an inference could unfairly benefit the party with whom the expert agrees. In view of these concerns, I conclude that the appointment of an expert is not warranted.

Not Reported in F.Supp.                                                    Page 16
Not Reported in F.Supp., 1997 WL 83766 (E.D.Pa.), 1997-1 Trade Cases P 71,857
**(Cite as: Not Reported in F.Supp.)**


                         Conclusion

**\*20** For the reasons set forth above, the motions at
issue will all be denied. An appropriate order follows.

E.D.Pa.,1997.
J & M Turner, Inc. v. Applied Bolting Technology
Products, Inc.
Not Reported in F.Supp., 1997 WL 83766 (E.D.Pa.),
1997-1 Trade Cases P 71,857

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy                                                                          Page 1

Slip Copy, 2007 WL 655456 (E.D.Wash.), RICO Bus.Disp.Guide 11,247

**(Cite as: Slip Copy)**

Marin v. Evans
E.D.Wash.,2007.

United States District Court,E.D. Washington.
Ambrosio MARIN and Miguel Sanchez, individually
and on behalf of all others similarly situated,
Plaintiffs,
v.
William EVANS and Juan Marin, Defendants.
**No. CV-06-3090-RHW.**

Feb. 27, 2007.

Howard W. Foster, Johnson & Bell Ltd., Chicago, IL,
Terry P. Abeyta, Abeyta Nelson, Yakima, WA, for
Plaintiffs.
Brendan Victor Monahan, Velikanje Moore & Shore
PS, Ryan M. Edgley, Edgley & Beattie PS, Yakima,
WA, for Defendants.

**ORDER DENYING PLAINTIFFS' MOTION
FOR A PRESERVATION ORDER; DENYING,
IN PART, AND GRANTING IN PART
PLAINTIFF' MOTION TO STRIKE**

ROBERT H. WHALEY, Chief United States District
Judge.

*1 Before the Court is Plaintiffs' Motion to Strike
Defendants' Affirmative Defense (Ct.Rec.15) and
Plaintiffs' Motion for a Preservation Order
(Ct.Rec.18). The motions were heard without oral
argument.

**I. Plaintiffs' Motion for Preservation Order**

Plaintiffs ask the Court to enter a Preservation Order
for two separate pieces of evidence: (1) Plaintiffs'
class 1-9 forms; and (2) all of Evans Fruit Co.'s
employees' e-mails. In support of their motion,
Plaintiffs rely on the fact that in a separate case
involving *Zirkel Fruit Co*, the plaintiffs in that case
alleged that the defendants destroyed evidence. The
connection to this case is the same attorneys that
represented the defendants in that case are
representing Defendants in this case.

Here, it is undisputed that Defendants have taken
steps to prevent destruction or spoilation of the
evidence. Moreover, Plaintiffs have failed to
establish that there is any evidence of past evidence
destruction concerning the parties to the current case.

Accordingly, a preservation order is not necessary.
*See Capricorn Power Co. v. Siemens Westinghous
Power Corp.*, 220 F.R.D. 429, 433-34 (W.D.Pa.2004)
(recognizing that in the absence of significant
concern that evidence will be destroyed, preservation
order is rarely justified).

**II. Plaintiffs' Motion to Strike Defendants'
Affirmative Defenses**

Rule 12(f) provides that " the court may order
stricken from any pleading any insufficient defense
or any redundant, immaterial, impertinent, or
scandalous matter." Fed. R. Civ. R. 12(f). The
primary purpose of 12(f) is to " avoid the
expenditure of time and money that must arise from litigating
spurious issues by dispensing with those issues prior
to trial." A defense may be stricken if it is
insufficient as a matter of law, *Waste Mgmt.
Holdings, Inc. v. Gilmore*, 252 F.3d 316, 347 (4th
Cir.2001) or if it fails to adequately give notice to the
opposing party. *Wyshak v. City Nat'l Bank*, 607 F.2d
824, 827 (9th Cir.1979). A decision to strike material
from the pleadings is vested to the sound discretion
of the trial court. *Nurse v. United States*, 226 F.3d
996, 1000 (9th Cir.2000).

Plaintiffs ask the Court to strike the Defendants' duty
to mitigate defense, statute of limitations defense, and
preemption defense on the grounds that these
affirmative defenses: (1) do not provide adequate
notice; and (2) are legally insufficient as a matter of
law.

**A. Adequacy of Notice**

Plaintiffs argue that Defendants' assertions of these
affirmative defenses failed to provide them with
adequate notice. The Federal Rules of Civil
Procedure provide that a party must state " in short
and plain terms" its " defenses to each claim
asserted." Fed.R.Civ.P. 8(b). The key to determining
the sufficiency of pleading an affirmative defense is
whether it gives the plaintiff fair notice of the
defense. *Wyshak*, 607 F.2d at 827. A defendant need
not set out in detail the facts upon which he bases his
claim, but rather, must only provide fair notice of the
claim and the grounds upon which it rests. *Id.*

*2 Here, although Defendants have provided a fairly

Slip Copy                                                                                                                                                Page 2

Slip Copy, 2007 WL 655456 (E.D.Wash.), RICO Bus.Disp.Guide 11,247

**(Cite as: Slip Copy)**

short and succinct listing of their affirmative defenses, it cannot be said that Plaintiffs were not given fair notice of the defense.

### B. Legally Sufficiency

Plaintiffs assert that Defendants' affirmative defenses are not sufficient as a matter of law. An affirmative defense is legally insufficient as a matter of law when it does not constitute a valid defense under the claims and facts alleged. *Gilmore,* 252 F.3d at 347. If the issue is a pure legal question, courts are generally disinclined to grant a motion to strike if there are " disputed and substantial questions of law," especially where there is no showing of prejudicial harm. *Augustus v. Bd. of Pub. Instruction of Escambia County, Florida,* 306 F.2d 862, 868 (5th Cir.1962). Under such circumstances, the court should defer ruling on the motion and leave the sufficiency of the allegations for determination on the merits. *Id.*

### 1. Duty to Mitigate

Plaintiffs argue that a duty to mitigate defense cannot be asserted against a RICO claim. RICO prohibits individuals or enterprises from engaging in a pattern of racketeering activity. *Mendoza v. Zirkle Fruit Co.,* 301 F.3d 1163, 1168 (9th Cir.2002). The purpose of RICO is to protect: (1) lawful enterprises from being utilized by individuals for unlawful purposes; and (2) the public from individuals who would use an enterprise as a tool to facilitate illegal activity. *Cedric Kushner Promotions, Ltd. v. King,* 533 U.S. 158, 164 (2001). *Rotella v. Wood,* 528 U.S. 549, 557 (2000).

The Court did not find any federal case law dealing with the precise issue of whether a duty to mitigate is a legally sufficient defense against a RICO claim. Generally, when there is an unsettled area in RICO law, the federal courts can turn to antitrust law for guidance. *Imagineering, Inc. v. Kiewit Pacific Co.,* 976 F.2d 1303, 1311 (9th Cir.1992). In dealing with the question of whether broad common law defenses are allowed in antitrust claims, the courts examine whether the common law defense controverts the primary purposes underlying the particular federal statute in question. *Perma Life Mufflers Inc. v. Int'l Parts Corp.,* 392 U.S. 134, 138 (1968) *rev'd on other grounds,* *Copperweld Corp. v. Independent Tube Corp.,* 467 U.S. 752 (1984).

Plaintiffs cite to *Perma Life* and *Bateman Eichler, Hill Richards, Inc. v. Berner,* 472 U.S. 299 (1985),

for the proposition that a failure to mitigate " is not a recognized affirmative defense to RICO claims." In *Perma Life,* the Supreme Court rejected the idea that courts have the power to undermine the antitrust acts by denying recovery to injured parties merely because they were *in pari delicto, i.e.,* mutually or equally at fault. 392 U.S. at 137. There, the Supreme Court indicated that it would be inappropriate to invoke broad common-law barriers to relief where a private suit served important purposes. *Id.* More importantly, however, the Court reserved ruling on whether truly complete involvement and participation could be a basis for barring a plaintiff's antitrust action because the record before the Court did not support such a finding. *Id.* at 140.

**\*3** In so ruling, the Supreme Court in *Perma Life* implied that a factual inquiry would be necessary to determine whether an affirmative defense based on the plaintiff's culpability could be asserted against an antitrust claim. This conclusion finds further support in *Bateman.* Indeed, the Supreme Court in *Bateman* explicitly held that a *in pari delicto* could be asserted in a federal securities case when certain factual circumstances were present. 472 U.S. at 310-11.

Moreover, other courts have recognized the affirmative defense of failure to mitigate in claims brought under federal statutes. *See In re Visa Check/MasterMoney Antitrust Litigation* 280 F.3d 124, 149-50 (2nd Cir.2001) (noting that a duty to mitigate in antitrust claims serves the important purpose of preventing plaintiffs from seeking treble damages and profiting by refusing to mitigate) (Jacobs, CJ., dissenting); *Fishman v. Estate of Wirtz,* 807 F.2d 520, 559 (7th Cir.1987) (the plaintiff is required to mitigate damages, but the plaintiff is not required to engage in an undue risk to mitigate); *Litton Systems v. AT & T,* 700 F.2d 785, 820 n. 47 (2nd Cir.1983) (stating without explanation that a defendant has a duty to mitigate in an antitrust claim); *see also Bieter Co. v. Blomquest,* 987 F.2d 1319, 1329 (8th Cir.1993) (appearing to operate under the assumption that a duty to mitigate is a valid defense in RICO claims).

Here, there is no case law on point that directly supports the argument that the Court should rule, as a matter of law, that the affirmative defense of failure to mitigate can never be asserted in a civil RICO claim. Even if the Court were to analogize to an antitrust case, those cases relied upon by Plaintiffs do not establish that such an affirmative defense can never be asserted as a matter of law. Instead, these

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 655456 (E.D.Wash.), RICO Bus.Disp.Guide 11,247

**(Cite as: Slip Copy)**

cases support the conclusion that the Court should consider the facts of the case in determining whether a defendant can assert an affirmative defense at trial. Thus, the Court declines to strike this affirmative defense at this stage in the proceedings.

### 2. Statute of Limitations

Plaintiffs argue that Defendants' statute of limitation defense is legally sufficient as a matter of law and should be stricken. The statute of limitations period for a RICO civil action is four years. *Agency Holding Corp. v. Malley-Duff & Assoc.,* 483 U.S. 143, 156 (1987). The Ninth Circuit follows the " injury discovery" rule which has two components. *Grimmett v. Brown,* 75 F.3d 506, 510-512 (9th Cir.1996). First, the four year statute of limitations period begins to run when a plaintiff knows, or should have known, of his or her injury. *Id.* at 510. Second, " a new cause of action accrues for each new and independent injury, even if the RICO violation causing the injury happened more than four years before." *Id.*

Plaintiffs' complaint alleges that " defendants have depressed their wages by knowingly employing vast numbers of illegal immigrants, more than 5,000 in the last four years." (Ct.Rec.1). Plaintiffs' complaint was filed on September 29, 2006. Given that it is possible that there may be questions of fact regarding when Plaintiffs knew about the injury, and whether Plaintiffs are relying on the " new and independent injury" to assert the basis for the RICO violations that occurred prior to 2002, it is premature to strike this affirmative defense at this stage of the proceedings.

### 3. Preemption

**\*4** Plaintiffs argue that Defendants' defense that the Immigration Reform Control Act (IRCA) preempts Plaintiffs' civil RICO claim is legally insufficient as a matter of law and should be stricken. A RICO violation is established when the claimants show that they have suffered an injury caused by a pattern of racketeering activity that was perpetrated by either an (a) enterprise or (b) individual in control of an enterprise. § 1962(a)-(d). RICO defines " racketeering activity" as " any act which is indictable under the Immigration and Nationality Act, section 774 ... committed for the purpose of financial gain." 18 U.S.C.A. § 1961(F). Section 774 is codified as § 1324 of the IRCA. 8 U.S.C.A. § 1324.

Here, Defendants' affirmative defense that the IRCA preempts RICO is legally insufficient. The Court adopts Judge Van Sickle's reasoning in *Mendoza v. Zirkel Fruit Co.,* 2000 WL 33225470 (E.D.Wash.2000), that Congress would not have included violations of the immigration laws, including 8 U.S.C. § 1324(a), as a predicate act under RICO if had intended the IRCA to preempt civil RICO actions. Therefore, the Court strikes Defendants' affirmative defense that IRCA preempts Plaintiffs' civil RICO claims.

Accordingly, **IT IS HEREBY ORDERED:**

1. Plaintiffs' Motion for a Preservation Order (Ct.Rec.18) is **DENIED.**

2. Plaintiffs' Motion to Strike Defendants' Affirmative Defense (Ct.Rec.15) is **DENIED** in part; and **GRANTED,** in part. The Court strikes Defendants' affirmative defense that IRCA preempts Plaintiffs' civil RICO claims.

**IT IS SO ORDERED.** The District Court Executive is directed to enter this Order and forward copies to counsel.

E.D.Wash.,2007.
Marin v. Evans
Slip Copy, 2007 WL 655456 (E.D.Wash.), RICO Bus.Disp.Guide 11,247

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.