## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

**RAMON VILLANUEVA-BAZALDUA**
**individually and on behalf of others similarly**
**situated,**

       **Plaintiff**

**v.**

**TRUGREEN LIMITED PARTNERS and**
**TRUGREEN, INC.**

       **Defendants.**

**CA 1:06-cv-00185-GMS**

**Class Action**

---

## PLAINTIFF'S BRIEF IN SUPPORT OF
## MOTION FOR CLASS CERTIFICATION

---

Vivian L. Rapposelli
DE Bar No. 3204
Rapposelli & Gonzales
1300 Grant Ave., Suite 100
Wilmington, DE  19806
Tel: 302-652-8711

Edward Tuddenham
Tx Bar No. 20282300
272 W. 107th St. #20A
New York, NY  10025
Tel: 212-866-6026

ATTORNEYS FOR PLAINTIFF

# TABLE OF CONTENTS

I. STATEMENT OF THE CASE ………………………………………………………..6

II. FACTS SUPPORTING CLASS CERTIFICATION………………………………………..7

    A. The H-2B Visa Program………………………………………………………... 7

    B. TruGreen's H-2B Applications……………………………………………………10

    C. Evidence of Class-Wide Wage Violations………………………………………...13

III. ARGUMENT…………………………………………………………………………..19

    A. LEGAL STANDARDS FOR CLASS CERTIFICATION………………………….19

    B. PLAINTIFF'S CLAIM SATISFIES THE REQUIREMENTS OF RULE 23 (a)…...20

        1. Rule 23(a)(1). Numerosity……………………………………………...20

        2. Rule 23(a)(2). Common Questions……………………………………….21

        3. Rule 23(a)(3). Typicality…………………………………………….........21

        4. Rule 23(a)(4). Adequacy of Representation………………………………23

    C. PLAINTIFF'S CLAIM SATISFIES THE REQUIREMENTS OF RULE 23(b)(3)...23

        A. Common Questions Predominate………………………………………………24

            1. Breach of Contract……………………………………………………24

            2. Unjust Enrichment............................................................................28

            3. RICO………………………………………………………………29

    .   B. Class Treatment Is Superior to Other Available Methods of Adjudication….30

IV. CONCLUSION……………………………………………………………………….....34

## INDEX OF AUTHORITIES

*Arriaga v. Florida Pacific Farms,* 305 F.3d 1228 (11th Cir. 2002)………………………………...27

*Avila-Gonzalez v. Barajas,* 2006 WL 643297 (M.D. Fla. 2006)………………………………...32

*Ayers v. SGS Control Systems,* 2007 WL 646326 (S.D.N.Y. 2007)……………………...11, 19, 27

*Baby Neal v. Casey,* 43 F.3d 48 (3rd Cir. 1994)…………………………………………19, 21, 22

*Bauer v. City of Newark,* 81 A.2d 727 (N.J. 1951)…………………………………………………....33

*Bogosian v. Gulf Oil Corp.,* 561 F.2d 434 (3d Cir.1977)…………………………………………32

*Calderon v. Presidio Valley Farmers Assn.,* 863 F.2d 384 (5th Cir. 1989)……………………...32

*Chiang v. Veneman,* 385 F.3d 256 (3rd Cir. 2004)……………………………………………...13, 20

*Christiana Mortgage Corp. v. Delaware Mortgage Bankers Assn.,*
    136 F.R.D. 372 (D.Del. 1991)………………………………………………………………24, 27

*Dunnaville v. McCormick & Co., Inc.*, 21 F.Supp.2d 527 (D.Md.1998)………………………33

*Eisen v. Carlisle & Jacquelin,* 417 U.S. 156 (1974)……………………………………………13, 16, 19

*Eplus Tech., Inc. v. Nat'l R.R. Passenger Corp.,* 407 F.Supp.2d 758 (E.D.Va.2005)…………...33

*Forrest Associates v. Passamaquoddy Tribe,* 760 A.2d 1041 (Me 2000)……………………33

*Frederick County Fruit Growers Assn. v. Martin,* 968 F.2d 1265 (D.C. Cir. 1992)……………25

*Frederick County Fruit Growers Assn. v. McLaughlin,* 703 F.Supp.1021 (D.D.C. 1989)………32

*Georgine v. Amchem Products, Inc.,* 83 F.3d 610 (3rd Cir. 1996)………………………………31

*Grider v. Keystone Health Plan Central, Inc.*, 2006 WL 3825178 (E.D. Pa. 2006)……………20

*Gundlach v. Reinstein,* 924 F.Supp. 684 (E.D.Pa.1996)…………………………………………33

*Hoxworth v. Blinder, Robinson & Co.*, 980 F.2d 912 (3d Cir.1992)………………………...22, 23

*In re School Asbestos Litigation,* 789 F.2d 996 (3rd Cir.) *cert denied* 479 U.S. 852 (1986)……34

*In re the Prudential Ins. Co. of Am.*, 962 F.Supp. 450 (D.N.J.1997)………………………….....21

*Jo-ann Stores v. Property Operating Co.*, 880 A.2d 945 (Conn. App. 2005)………………....33

*Johnston v. HBO Film Management, Inc.,* 265 F.3d 178 (3rd Cir. 2001)……………………..24

*Maine Energy Recovery Co. v. United Steel Structures, Inc.,* 724 A.2d 1248 (Me.1999)………33

*Massachusetts v. Mylan Labs.,* 357 F.Supp.2d 314 (D.Mass.2005)……………………………33

*McCann Real Equities Series XXII, LLC v. David McDermott Chevrolet, Inc.,*
   890 A.2d 140, cert. denied, 895 A.2d 7 (2006)……………………………………………33

*Michelson v. Digital Financial Services*, 167 F.3d 715 (1st Cir.1999)…………………………33

*Microstrategy, Inc. v. Netsolve, Inc.*, 368 F.Supp.2d 533 (E.D.Va.2005)………………………33

*Mitchell v. Moore,* 729 A.2d 1200 (Pa.Super.1999)……………………………………………33

*Montelongo v. Meese,* 803 F.2d 1341, 1350 (5th Cir. 1986)……………………………………32

*Nat'l Mkt. Share, Inc. v. Sterling Nat. Bank,* 392 F.3d 520 (2d Cir.2004)………………………33

*Newton v. Merrill Lynch, Pierce, Fenner & Smith*, 259 F.3d 154 (3rd Cir. 2001)…………..20, 22

*O'Brien, et al., v. Town of Agawam,* 350 F.3d 279 (1st Cir. 2003)………………………14, 19, 27

*Okeelanta v. Bygrave,* 660 So.2d 743 (Fla. 4th DCA 1995)……………………………………32

*Philadelphia Electric Co. v. Anaconda American Brass Co.,*
   43 F.R.D. 452 (E.D.Pa. 1968)……………………………………………………………32

*Salas-Mateo v. Ochoa,* 2004 WL 1824124 (S.D. Fla. 2004)……………………………………32

*Salazar v. Presidio Valley Farmers Association,* 765 F.2d 1334 (5th Cir. 1985)………………..25

*Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479 (1985)……………………………………………29

*Stewart v. Abraham,* 275 F.3d 220 (3rd Cir. 2001)……………………………………………20

*Total Care Physicians, P.A. v. O'Hara,* 798 A.2d 1043 (Del.Super.2001)…………………28, 33

*VLIW Technology v. Hewlett-Packard Co,* 840 A.2d 606 (Del. 2003)………………………24, 33

*Weeks v. Bareco Oil Co.,* 125 F.2d 84 (7th Cir. 1941)………………………………………....31

4

## **OTHER AUTHORITIES**

8 C.F.R. § 214.2(h)(2)………………………………………………………………9
8 C.F.R. § 214.2(h)(6)(iv)(A)……………………………………………………8
8 C.F.R. § 214.2(h)(6)(ii)(B)……………………………………………………8
8 C.F.R. § 214.2(h)(11)(iii)………………………………………………………10
20 C.F.R. § 655.0(a)(2)……………………………………………………………9
20 C.F.R. § 655.3…………………………………………………………………9
29 C.F.R. § 778.114(a)……………………………………………………………19

http://www.flcdatacenter.com/OesQuick.aspx……………………………………17
http://www.foreignlaborcert.doleta.gov/h-2b.cfm………………………………8
http://www.foreignlaborcert.doleta.gov/pdf/tegl21-06c1.PDF …………………8
http://www.foreignlaborcert.doleta.gov/wages.cfm……………………………9

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

RAMON VILLANUEVA-BAZALDUA
individually and on behalf of others similarly
situated,

        Plaintiff

v.

TRUGREEN LIMITED PARTNERS and
TRUGREEN, INC.

        Defendants.

CA 1:06-cv-00185-GMS

Class Action

_____

**PLAINTIFF'S BRIEF IN SUPPORT OF
MOTION FOR CLASS CERTIFICATION**

      Now comes Plaintiff Ramon Villanueva, and files this memorandum in support of his

motion to certify his claims for breach of contract, unjust enrichment, and violations of the

Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968 (RICO ),[1] as a

Rule 23(b)(3) class action on behalf of a class defined as:

> All persons who received H-2B visas to work for TruGreen
> Limited Partnership d/b/a TruGreen Chemlawn during 2003, 2004,
> 2005 or 2006.

**I.  STATEMENT OF THE CASE**

      Plaintiff Ramon Villanueva-Bazaldua is a citizen of Mexico who, along with other

Mexican nationals, worked as a "Lawn Care Applicator" for Defendant TruGreen Limited

---

[1]  As of the time of filing of this Brief, the Court has not ruled on Plaintiff's motion for
leave to amend his complaint to add RICO and unjust enrichment as causes of action. (D.I. 55).
Nevertheless, Plaintiff is briefing the class certification of those causes of action so as to avoid
delay in the event the Court grants the amendment.

Partnership d/b/a TruGreen Chemlawn (hereafter referred to as "TruGreen"). Each year since at least 2003, TruGreen obtained permission to employ Mexican guest workers on a temporary basis pursuant to the federal government's H-2B visa program. The gravamen of Plaintiff's First Amended Complaint is that TruGreen failed to pay its H-2B guest workers in compliance with the promises it made to the Department of Labor (DOL) in its H-2B visa applications and also failed to comply with the wage promises it made directly to its H-2B workers at the time they were recruited. Plaintiff alleges that those wage promises are enforceable on behalf of the class of H-2B workers either as a breach of contract or through an action for unjust enrichment. Plaintiff also alleges that TruGreen's false statements made to the federal government and to workers during the visa process constituted a pattern of racketeering activity actionable under RICO.

The instant motion seeks to have Plaintiff's breach of contract, unjust enrichment, and RICO claims certified as a Rule 23(b)(3) class action on behalf of all H-2B workers employed by TruGreen between 2003 and 2006.

## II.  FACTS SUPPORTING CLASS CERTIFICATION

### A.  The H-2B Visa Program

Employers with temporary or seasonal jobs who cannot find workers in the United States may seek permission from the government to import foreign workers on a temporary basis pursuant to the H-2B visa program. In order to obtain these foreign guest workers, an employer must first obtain a certification from the Secretary of Labor that qualified workers in the United States are not available and that the employment of foreign workers will not adversely affect the wages and working conditions of similarly employed United States workers or an explanation

why such certification cannot be issued.  8 C.F.R. § 214.2(h)(6)(iv)(A).  The employer obtains

this certification by filing a form ETA-750, "Application for Alien Employment Certification,"

with the State Workforce Agency (SWA) for the area where the work is to be performed.[2]   The

ETA-750 form requires the employer to list the job duties, the location and duration of the

employment, the wage to be paid and other material terms of work.  *See, e.g.,* App. Attachment

1[3] (ETA-750s produced by TruGreen).  More than one alien may be requested on one application

but only "if they are to do the same type of work on the same terms and conditions, in the same

occupation, in the same area(s) of employment during the same period."[4]  If aliens are to perform

different jobs, separate applications must be filed even if they are going to be working in the

same location. *Id.*

        The SWA reviews the ETA-750 and supporting documents to confirm that the job is

temporary in nature[5] and to determine whether the terms of work offered in the ETA-750 are

sufficiently high to avoid an adverse effect on the wages and working conditions of similarly

employed U.S. workers. 20 C.F.R. § 655.0(a)(2).   Among other things this requires the

employer to offer at least the prevailing wage for the occupation and geographic area where the

work will be performed, http://www.foreignlaborcert.doleta.gov/wages.cfm; App. Attachment 1

---

[2]  *See* DOL H-2B Certification for Temporary Nonagricultural Work,
http://www.foreignlaborcert.doleta.gov/h-2b.cfm

[3]  With this brief, Plaintiff is filing an evidentiary appendix with numerous attachments.
References to those attachments are abbreviated "App. Attachment #___".

[4]  Foreign Labor Certification Guidance Letter 21-06 rev. June 2007 Attachment A at 4
(hereafter "GL 21-06") http://www.foreignlaborcert.doleta.gov/pdf/tegl21-06c1.PDF .

[5]  H-2B visas may only be issued for jobs lasting less than a year.  8 C.F.R. § 214.2(h)
(6)(ii)(B).

(ETA 750, Box 23b), and to certify that the terms of work comply with all applicable federal, state and local laws. *Id.* (Box 23g).   The employer must attempt to recruit U.S. workers by advertising at the terms set forth in the ETA-750. GL 21-06 §IV.D. & E.  The ETA-750, the results of the employer's efforts to recruit U.S. workers, and other supporting evidence is then presented to the Department of Labor (DOL). *Id.*  §IV H.

If U.S. workers are not available to fill the employer's job openings and the terms of work offered in the ETA-750 will not adversely affect the wages and working conditions of similarly employed U.S. workers, DOL issues the employer a labor certification for the requested visas. 20 C.F.R. §§ 655.0(a)(2) and 655.3; GL 21-06 §V.  Because the terms of work offered in the ETA-750 are the basis for determining the availability of U.S. workers and the basis for making the 'no adverse effect' determination, the Department of Labor requires the ETA-750 to be signed under penalty of perjury.  App. Attachment 1 (Form ETA-750, Box 24).

Once the DOL labor certification has been obtained, the employer files a form I-129 (with the labor certification attached) with the director of Citizenship and Immigration Services (CIS) to obtain approval of H-2B visas for specific named aliens.  8 C.F.R. § 214.2(h)(2). *See* App. Attachment 2 (sample form I-129).  If CIS approves the petition, the employer transmits the CIS approval to the U.S. consulate in the country where the aliens named in the petition reside. The consulate interviews the selected workers and issues the approved visas as long as there are no grounds for excluding them (such as a criminal record).  Workers who receive visas can only work for the employer who applied for the visa and only in the job described in the employer's ETA-750; work in a different job or for a different employer is grounds for revocation of the

visa.  8 C.F.R. § 214.2(h)(11)(iii).

**B.  TruGreen's H-2B Applications**

During the years at issue, 2003 through 2006, TruGreen filed thirty-nine ETA-750 applications for alien employment certification: ten in 2003, eight in 2004, seven in 2005 and fourteen in 2006.[6]  App. Attachment 1 (ETA-750s); App. Attachment 3 (Summary of ETA-750s).  These applications sought permission to fill more than 500 job openings in 22 different branch offices.[7]  *Id*.  Because these applications intentionally exaggerated the number of workers needed by TruGreen, *see* D.I. 55 (First Amended Complaint at ¶¶ 27-28), the actual number of job positions filled by H-2B workers during the class period was 357, rather than 500.  *See* App. Attachment 3 (summary of ETA-750s).   Some workers worked more than one season, so that the total number of different individuals in the proposed class is at least 179 according to TruGreen.  *See* App. Attachment 4 (TruGreen list of H-2B workers produced August 10, 2007).

All of the ETA-750 applications produced by TruGreen, with one exception, sought workers for the same job position – "lawn  care applicator" App. Attachment 1 (ETA-750 Box 9) – and all used identical language to describe the duties of that job – i.e. "apply[ing] pesticides, herbicides, fungicides, or insecticides using sprayers, seeders, spreaders, aerators." *Id.* (Box 13).  The sole exception was one of the two ETA-750s filed in 2006 for TruGreen's Middlesex

---

[6]   From 2003 through 2005 TruGreen filed one ETA-750 in each of the states where it had offices, except for New Jersey where it filed one for its North Jersey offices and one for its South Jersey office.  In 2006 TruGreen filed separate applications for each of its four North Jersey offices as well as separate applications for its two Massachusetts offices.  App. Attachment 3 (Summary of ETA-750s).

[7]   It is impossible to determine the exact number of positions that TruGreen applied for because TruGreen has not produced any of the ETA-750 applications that it filed for the 2003 season.  The ETA-750 applications for 2004 through 2006 sought in excess of 500 alien workers.

County, N.J. office which sought four "Landscape Laborers" – (i.e. lawn mowers).[8] App. Attachment 1 at A1-14 (Box 9).

All 39 of TruGreen's ETA-750 visa applications from 2003 through 2006, including the one for lawn mowers, offered pay by the hour with time-and-a-half for overtime. *See* App. Attachment 1 (ETA-750 Box 12); App. Attachment 3 (Summary of ETA-750). For example the ETA-750 used to hire Plaintiff offered $10/hour and $15/hr overtime. App. Attachment 1 at A1-4, A1-5, A1-10, A1-22, A1-31 and A1-33 (Box 12). The exact hourly rate varied from one ETA-750 to another, depending on the year and location covered by the ETA-750, but all offered pay by the hour with time-and-a-half for overtime. *Id.* All of the ETA-750s also offered to pay at least "the prevailing wage which is applicable at the time the alien begins work," App. Attachment 1 (ETA-750s, Box 23b), and a promise that the job terms complied with all applicable federal, state and local laws. *Id.* (Box 23g).

Throughout the class period, TruGreen relied upon an agent, Great Lakes Labor, to assist it with the H-2B application process and with the recruitment of prospective H-2B workers. App. Attachment 5 ( TruGreen Response to Interrogatory Nos. 4 & 5); D.I. 55 (First Amended Complaint ¶¶ 23-24). Great Lakes Labor, in turn, utilized the services of a company called "LLS" to recruit and hire H-2B workers in Mexico. *Id.* ¶¶44-45; App. Attachment 5. As part of the recruitment process, TruGreen and Great Lakes Labor prepared "Employer Disclosure

---

[8]   The duties of a "Landscape Laborer" were to "mow, cut, water, and edge lawns; rake and blow leaves; dig holes for bushes; pull and chop weeds; prune; and haul topsoil and mulch." App. Attachment 1 at A1-15 (Box 13). The Middlesex County Branch also filed a second ETA-750 in 2006 for 20 "Lawn Care Applicators," the same job as all of the other TruGreen offices. App. Attachment 1 at A1-14.

Affidavits" for LLS to distribute to workers recruited in Mexico.[9] *Id*. at ¶¶46-47.  *See* App.

Attachment 6 (sample Employer Disclosure Affidavits); DI 48 at A25, 30, 35, 39, 43, 47, 51, 56

(same).  All of these disclosure affidavits offered workers the same job, using the same words as

the ETA-750s – i.e. a job "[a]pply[ing] pesticides, herbicides, fungicides or insecticides to lawns

using sprayers, seeders, spreaders, aerators." *Id*.[10]   Like the ETA-750s, all of the Disclosure

Affidavits offered workers pay by the hour and time-and-a-half for overtime.  *Id*.  Workers

accepted the terms of work set forth in the Disclosure Affidavits by signing the affidavits and

paying the various administrative and visa fees required by LLS.  D.I. 55 (First Amended

Complaint at ¶50).   These fees included a $100 visa application fee and a $100 visa issuance fee

paid to the U.S. government, a $155 administrative fee paid to LLS, and approximately $200 for

transportation to the U.S.  *Id*.  at ¶51; D.I. 48 pages 27, 28, 32, 33 (sample documents provided

to workers by LLS listing costs of obtaining visas).

Thus, TruGreen obtained visas for all of the class members pursuant to the same

regulatory process and hired them using the same two employment documents: an  ETA-750 and

an Employer Disclosure Affidavit.   Those documents offered all class members the same terms

and conditions of work, including (1) a stated hourly wage plus a stated overtime wage equal to

one-and-a-half  times the hourly wage; (2) the prevailing wage in effect at the time work

commenced; and (3) compliance with all applicable federal, state and local laws.

---

[9]  These documents were sometimes titled "Terms of Work" documents.

[10]  Again the only exception was Middlesex County, NJ where four workers signed
disclosure affidavits indicating that their job was to "mow, cut, water and edge lawns; rake and

### C.  Evidence of Class-Wide Wage Violations

Plaintiff alleges that Defendant TruGreen did not pay its H-2B workers in accordance with the wage promises set forth in the ETA-750s and the Employer Disclosure Affidavits. D.I. 55 (First Amended Complaint ¶¶28-30, 46).  Plaintiff need not prove this allegation at the class certification stage, *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177-178 (1974) ("In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met.")*; Chiang v. Veneman,* 385 F.3d 256, 262 (3rd Cir. 2004) (same).  Nevertheless, the limited discovery that Plaintiff has obtained to date provides ample support for this allegation.

To begin with, the evidence shows that most of the class members, including Plaintiff, were not even paid by the hour as promised in the ETA-750s and the Employer Disclosure Documents.  Instead, more than 86 of the class members were paid using a complicated pay system that TruGreen referred to as its "Specialist Compensation Plan."[11]  App. Attachment 7. Under this plan, a worker received a fixed weekly salary regardless of the number of hours worked during the week.  If the worker worked overtime, he also received an overtime premium for each hour of overtime equal to half of his hourly earnings rate – i.e. his salary divided by the total number of hours worked for the week. *Id.*  Under this "compensation plan", the more hours

---

blow leaves; dig holes for bushes; pull and chop weeds; prune; and haul topsoil and mulch." *See, e.g.,* App. Attachment 6 at A6-18.

[11]   TruGreen produced a chart indicating that 86 class members were paid using the "Plan." *See* App. Attachment 4.  However, many of the workers that TruGreen lists as having been paid by the hour were actually paid using the "compensation plan."  For example, TruGreen's chart shows that all 20 of the workers employed at the Yaphank, NY branch between 2003 and 2006 were paid by the hour. *Id.*  An examination of the pay records for those workers shows that they were, in fact, paid using the compensation plan – and received wages far below those offered in the ETA-750 as a result.  App. Attachment 13; App. Attachment 11.

a worker worked, the lower his hourly earnings rate and the lower his overtime premium.   For

example, Plaintiff was paid a fixed weekly salary of $450/week no matter how many hours he

worked.  App. Attachment 8.   If he worked exactly 40 hours, he received $11.25 per hour ($450

wk ÷ 40 hr/ wk. = $11.25/hr).  However, if he worked 50 hours, he would only earn the

equivalent of $9/hour ($450/wk ÷ 50 hours/wk = $9/hour), and if he worked 70 hours in a week,

he would only earn $6.42/hour.  His overtime premium also decreased as he worked more

hours.[12]  This method of pay, where a worker gets a fixed salary and earns less and less per hour

the more hours he works is commonly referred to as a "fluctuating work week method" of pay.

*See O'Brien, et al., v. Town of Agawam,* 350 F.3d 279, 287-288 (1st Cir. 2003) (describing

fluctuating work week method of pay).

Not only did TruGreen's use of the fluctuating work week method of pay directly

contradict the promises in the ETA-750s and Employer Disclosure Affidavits that workers would

be paid a fixed hourly rate and time and a half for overtime, it also resulted in wages far below

those promised in the ETA-750s and Disclosure Affidavits.  For example, although Plaintiff was

promised $10/hour and $15/hour overtime in the ETA-750 and $11.34/hour and $17.01/hour

overtime in his Disclosure Affidavit, he averaged only $8.30 per hour on the compensation plan

---

[12]   If he worked 50 hours/wk, he would receive a premium of $4.50 for each of his ten
hours of overtime ($9/hr ÷ 2 = $4.50/hr).  If he worked 60 hours his overtime premium would be
$3.75/hr ($7.50 ÷ 2 = $3.75), and if he worked 70 hours it would be $3.21/hr ($6.42/hr ÷ 2).

and his overtime rate was only $11.77 per hour.[13]   The other 86+ class members who were paid

on the fluctuating work week method[14] also received wages far below those promised in the

ETA-750 and Disclosure Affidavits as a result of this method of pay.  TruGreen has produced

only limited payroll information for its H-2B workers.[15]   However, even that limited discovery

shows unequivocally that TruGreen's use of the fluctuating work week method of pay resulted in

wages far below those promised in the ETA-750s and Employer Disclosure Affidavits.

Appendix Attachment 9 are examples of TruGreen wage records which show on their fact that

H-2B workers paid using the fluctuating work week method received less per hour than had been

promised to them in the ETA-750 and Employer Disclosure Affidavits.  Also attached as App.

Attachment 11 is an analysis of the partial electronic payroll data supplied by TruGreen.  This

---

[13]   Plaintiff's wage rates for his 15 weeks of work were as follows:

| Week | Hourly Rate | Overtime rate | Week | Hourly Rate | Overtime Rate |
|------|-------------|---------------|------|-------------|---------------|
| 1 | $11.25 | n/a | 9 | $7.25 | $11.02 |
| 2 | $ 8.33 | $12.49 | 10 | $7.73 | $11.59 |
| 3 | $7.69 | $11.63 | 11 | $6.92 | $10.38 |
| 4 | $8.04 | $12.06 | 12 | $8.57 | $12.85 |
| 5 | $8.29 | $12.43 | 13 | $11.25 | n/a |
| 6 | $7.37 | $11.05 | 14 | $8.07 | $12.10 |
| 7 | $8.14 | $12.21 | 15 | $7.43 | $11.14 |
| 8 | $8.11 | $12.16 | | | |

App. Attachment 8 (summary of Plaintiff's wages).  In calculating these rates, Plaintiff has not
included commissions since his disclosure affidavit indicated that commissions were to be paid
over and above Plaintiff's base hourly rate of $11.34.  App. Attachment 6 at A6-2.  Even if the
commissions are taken into account, Plaintiff only averaged $9.53/hour.  App. Attachment 8.

[14]   As explained in footnote 11 above, TruGreen's chart showing 86 workers paid by the
fluctuating work week method understates the number of workers actually paid by that method.

[15]   Pursuant to Plaintiff's discovery requests, TruGreen produced computer payroll
summaries for the first two and last two weeks of the season as well as some of the underlying
payroll records for those same weeks.  App. Attachment 11, 12, and 13.

summary shows that the vast majority of workers paid on the compensation plan received wages below those promised in the ETA-750 and Disclosure Affidavits during some of the four weeks covered by the electronic pay records.[16]  These charts are based on the limited payroll data.  In keeping with the mandate of *Eisen* that Plaintiff need not prove his claims at the class certification stage, these charts are not intended to be exhaustive lists of all of the wage violations that resulted from TruGreen's use of the fluctuating work week method of pay. However, they clearly illustrate that substantial facts exist to back up Plaintiff's allegations of class-wide underpayment of wages.

Workers paid by the fluctuating work week method were not the only ones who received wages below those promised by TruGreen in its ETA-750s and Disclosure Affidavits.  During the years in question approximately 45 different H-2B workers were paid fixed hourly wages.[17] Even these class members did not receive the straight hourly rates and overtime promised by TruGreen.  Attached as App. Attachment 10 are sample TruGreen payroll records for H-2B workers who were paid by the hour at rates below those promised in the ETA-750 and the Disclosure Affidavits.  As with payroll records for workers paid on the fluctuating work week

---

[16]   This analysis understates the number of workers who earned less than promised because it does not separate out the commission payments.  Those payments should not be counted as they are offered over and above the stated hourly wage.  If those commissions were excluded, the number of workers not earning the promised ETA-750 wage would be even higher than App. Attachment 11 shows.  *See* App. Attachment 11 at page 1 (giving examples of workers who earned less than the ETA-750 wages when commissions are excluded).

[17]   Again this number is only approximate because TruGreen's chart showing the method by which workers were paid falsely overstates the number of workers paid by the hour.  *See* footnote 12 above.  Once Plaintiff has been able to conduct discovery and obtain all of the relevant wage records, it should be a relatively easy matter to determine the exact number paid by the fluctuating work week method and by fixed hourly rates.

compensation plan, these hourly documents are not intended to provide an exhaustive list of all hourly workers paid less than the promised wage. They are only meant to illustrate that there is substantial evidence to back up Plaintiff's allegations. *See also* App. Attachment 11 (analysis of TruGreen electronic payroll data showing hourly workers paid less than promised wage); App. Attachment 14 at A15-2 (e-mail exchange indicating that 2004 H-2B workers in Warminster, PA Branch were complaining about being paid less than the rate shown in their Employer Disclosure Affidavits).

Not only were the wages paid by TruGreen less than the stated hourly rates set forth in the ETA-750s and in the Disclosure Affidavits, the wages also violated TruGreen's promise made to each of the class members in its ETA-750s that it would pay at least "the prevailing wage which is applicable at the time the alien begins work." App. Attachment 1 (ETA-750 Box 23b). Prevailing wages are set on an annual basis and tend to increase from year to year.[18] Because TruGreen filed its ETA-750's in the fall for workers that would be hired the following spring, the prevailing wage applicable at the time work began was generally higher than the rate offered on the face of the ETA-750 the previous fall. Nevertheless, TruGreen did not raise its wages in compliance with the promise to pay the prevailing wage in effect at the time work began. This is evident from the Employer Disclosure Affidavits given to workers in the spring which consistently offered the prior year's prevailing wage (or less) and which were never

---

[18] The DOL prevailing wage data base, http://www.flcdatacenter.com/OesQuick.aspx, lists prevailing wages by calendar year through 2006. Beginning in July 2006, the data is reported for an annual period running from July through June of the following year.

adjusted to reflect the increase in the prevailing wage.[19]  TruGreen's failure to pay the prevailing

wage in effect at the time work commenced is also evident from the limited wage records

produced by TruGreen.  *See* App. Attachment 11 (listing workers whose wages were less than

the prevailing wage in effect when work began).

Finally, there is evidence that TruGreen violated the Fair Labor Standards Act (FLSA)

rights of the class in breach of the promise TruGreen made in the ETA-750 to comply with

federal law.  App. Attachment 1 (ETA-750 Box 23g).  It did so in at least two distinct ways:

First, it violated the FLSA rights of class members by failing to reimburse them for their visa and

transportation expenses to the extent those expenses brought their first week's wages below the

minimum wage.  *See* DI  46 (Brief in Support of Amended Motion for Certification of an FLSA

Class).[20]  Second, TruGreen violated the FLSA rights of those class members, like Plaintiff, who

were paid on the fluctuating work week method of pay.  The FLSA makes clear that an employer

who wishes to use the fluctuating work week method of pay must meet four specific criteria to

---

[19]  For example, Disclosure Affidavits  given to Warminster, PA workers in April and
June 2006 (when the prevailing wage was $11.87/hour) continued to offer the 2005 prevailing
wage of $11.36/hour.  App. Attachment 6 A6-11 affidavits given to Sterling, VA workers in
August 2006 (when prevailing wage was $10.98/hour) offered 2005 prevailing wage of
$10.50/hour.  *Id.*  At Attachment 6 A6-14; affidavits given to Baltimore, MD workers in May
and June 2006 (when the prevailing wage was $11.23/hour) offered the 2005 prevailing wage of
$10.67/hour. *Id.*  At Attachment 6 A6-16 and A6-17.

[20]  In his brief in support of his amended motion for certification of an FLSA class,
Plaintiff demonstrated that, with the possible exception of six class members who worked in the
Yaphank, NY branch, all class members suffered FLSA violations similar to those alleged by
Plaintiff.  DI 46 at 10-14.  The wage information recently provided by TruGreen shows that the
workers in Yaphank were paid far less than the $15.11/hour wage listed on the ETA-750 that
Plaintiff had used in his calculations. App. Attachment 13 at A13-1.  At the wage rates actually
paid to those Yaphank workers, it is apparent that they too experienced FLSA violations during
the first work week.  *See* DI 46 at 14.

avoid violating the FLSA. 29 C.F.R. § 778.114(a) and (c); *O'Brien,* 350 F.3d at 288. There is

evidence that TruGreen failed to comply with those criteria. For example, one of the criteria

requires that workers receive a fixed amount of straight time pay each week that is not subject to

variation. *Id.* Yet the evidence shows that workers' weekly earnings varied because of various

commissions that were paid on top of their base weekly salaries.[21] A fixed minimum salary plus

variable commissions does not comply with the requirements for use of the fluctuating work

week method of pay. *See O'Brien,* 350 F.3d at 288-289 (payment of a fixed minimum salary plus

additional amounts for working the night shift or on a day off violates the FLSA criteria for use

of the fluctuating work week); *Ayers v. SGS Control Systems,* 2007 WL 646326 at *9-10

(S.D.N.Y. 2007) (same).

## III. ARGUMENT

### A. LEGAL STANDARDS FOR CLASS CERTIFICATION

In order for a court to certify a class under Fed. R. Civ. P. 23(b)(3) the moving party must

satisfy the requirements of Rule 23(a) and Rule 23(b)(3). *Baby Neal v. Casey,* 43 F.3d 48, 55-56

(3rd Cir. 1994). While Plaintiff has submitted evidence in support of his motion for certification,

the Court is not to conduct a preliminary inquiry into the merits of Plaintiff's case. *Eisen v.

Carlisle & Jacquelin,* 417 U.S. 156, 177-178 (1974) ("In determining the propriety of a class

action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will

prevail on the merits, but rather whether the requirements of Rule 23 are met.")*; Chiang v.

Veneman,* 385 F.3d 256, 262 (3rd Cir. 2004) (same). Instead, in determining whether the class

should be certified, the court should take the substantive allegations of the complaint as true,

---

[21]    *See* App. Attachment 13 (TruGreen chart listing commission and bonus amounts).

*Chiang,* 385 F.3d at 262, and consider the factual record to determine, not the merits of

Plaintiff's claims, but whether the claims meet the requirements of Rule 23 and can be tried as

class claims. *Newton v. Merrill Lynch, Pierce, Fenner & Smith,* 259 F.3d 154, 168-169 (3rd Cir.

2001); *Grider v. Keystone Health Plan Central, Inc.,* 2006 WL 3825178 at *13 (E.D. Pa. 2006).

## B. PLAINTIFF'S CLAIM SATISFIES THE REQUIREMENTS OF RULE 23 (a)

Rule 23(a) sets forth four pre-requisites for a class action: (1) The class must be "so

numerous that joinder of all members is impracticable;" (2) There must be "questions of law and

fact common to the class;" (3) The claims of the representative parties must be "typical of the

claims . . . of the class;" and (4) The representative parties must "fairly and adequately protect

the interests of the class." Plaintiff's claim clearly meets all four of these requirements.

### 1. Rule 23(a)(1). Numerosity

"No minimum number of plaintiffs is required to maintain a suit as a class action, but

generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40,

the first prong of Rule 23(a) has been met. *Stewart v. Abraham,* 275 F.3d 220, 226-227 (3rd Cir.

2001). This case more than meets that standard as TruGreen admits to having employed at least

179 different H-2B workers during the 2003-2006 period.

A finding that a class of 179 individuals satisfies the numerosity requirement is

particularly appropriate given the geographic dispersion of class members in rural Mexico, the

relatively small amount of the individual damage claims,[22] and the class members' lack of

familiarity with the U.S. legal system. *See In re the Prudential Ins. Co. of Am.*, 962 F.Supp. 450,

510 (D.N.J.1997) (considering geographic dispersion as a factor making joinder impracticable);

---

[22]  Plaintiff estimates his breach of contract damages are less than $10,000.

20

*Salas Mateo v. Ochoa,* 2004 WL 182412 (S.D. Fla. 2004) (finding class of 40 temporary foreign workers sufficiently numerous in light of their geographic dispersion, small claims and likely lack of familiarity with U.S. courts).

### 2. Rule 23(a)(2). Common Questions

"The commonality requirement will be satisfied if the named plaintiffs share *at least one* question of fact or law with the grievances of the prospective class." *Baby Neal v. Casey,* 43 F.3d at 56 (emphasis added). The central issues posed by Plaintiff's contract and unjust enrichment claims – (1) what precise terms of work are promised by the ETA-750 and the "Employer Disclosure Affidavits" and (2) whether those terms of work are enforceable either as a matter of contract or unjust enrichment – present factual and legal questions common to the class. Plaintiff's RICO claim also presents numerous common questions including whether TruGreen's false statements to DOL during the visa application process constitute mail, wire, and visa fraud and, if so, whether those acts taken together constitute a "pattern of racketeering activity." Thus, Plaintiff's claim clearly satisfies the common question requirement. Indeed, not only are there common questions, but, as will be shown below in the discussion of Rule 23(b)(3), those questions predominate over any individual questions.

### 3. Rule 23(a)(3). Typicality

"Typicality entails an inquiry whether the named plaintiff's individual circumstances are markedly different or . . . the legal theory upon which the claims are based differs from that upon which the claims of the other class members will perforce be based." *Baby Neal,* 43 F.3d at 57- 58. "Factual differences will not render a claim atypical if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members and if it is

based on the same legal theory." *Newton v. Merrill Lynch, Pierce Fenner & Smith, Inc.,* 259 F.3d 154, 184 (3rd Cir. 2001); *Hoxworth v. Blinder, Robinson & Co.*, 980 F.2d 912, 923 (3d Cir.1992). The Third Circuit has noted that even significant factual differences will not preclude a finding of typicality where there is a strong similarity of legal theories. *Baby Neal,* 43 F.3d at 58.

Plaintiff's claims are clearly "typical" under this standard.  Plaintiff's and class members' claims arise out of the same course of conduct:  Plaintiff and all class members were hired pursuant to the same visa application and recruitment process; TruGreen's ETA-750s and "Employer Disclosure Affidavits" offered Plaintiff and all members of the class the same terms and conditions of work – i.e. a fixed hourly wage, the prevailing wage in effect at the time work commenced, and compliance with all federal, state and local laws; and Plaintiff and all members of the class were affected by TruGreen's systematic decision to ignore the wage promises in those documents.  Plaintiff's claims are also based on the same legal theories as those of the class members – i.e. that the failure to comply with the greater of the wage terms set forth in its visa petitions and "disclosure affidavits" is actionable as a breach of contract or, alternatively, under a theory of unjust enrichment and constitutes a pattern of racketeering activity which injured Plaintiff and the class members in their business or property (i.e. their right to lawful wages for their labor).  The fact that class members were underpaid using hourly rates and others were underpaid using the fluctuating work week method are factual distinctions that make no difference to the typicality of Plaintiff's claims.  Regardless of where they worked or how their pay was calculated, all class members raise the same complaint, in the same factual context – that TruGreen failed to pay the rates promised in the ETA-750s and Disclosure Affidavits – and all seek redress through the same causes of action.

22

### 4. Rule 23(a)(4). Adequacy of Representation

In order to meet this requirement "(a) the plaintiff's attorney must be qualified, experienced and generally able to conduct the proposed litigation, and (b) the plaintiff must not have interests antagonistic to those of the class." *Hoxworth v. Blinder, Robinson & Co.,* 980 F.2d at 923 . As set forth in the affidavits of Edward Tuddenham and Vivian Rapposelli, Plaintiff's counsel have extensive experience representing foreign workers and in enforcing their contract rights. App. Attachments 15 and 16. There are no conflicts between Plaintiff and the other members of the class and he is clearly competent to represent the class.

### C. PLAINTIFF'S CLAIM SATISFIES THE REQUIREMENTS OF RULE 23(b)(3)

An action that meets the requirements of Rule 23(a) is certifiable as a class action if it also fits into one of the three categories set forth in Rule 23(b). Because this is a damage action, Plaintiff seeks certification under Rule 23(b)(3) which allows certification of a class if,

> the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution of defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Fed. R. Civ. P. 23(b)(3). Plaintiff's claim meets these requirements.

### A. Common Questions Predominate

The requirement that common questions predominate does not demand that all questions be common, only that common questions outweigh individual questions. *See Johnston v. HBO Film Management, Inc.,* 265 F.3d 178, 185 (3rd Cir. 2001). The focus is on the issues required to establish liability. *Christiana Mortgage Corp. v. Delaware Mortgage Bankers Assn.,* 136 F.R.D. 372, 382 (D.Del. 1991). Predominance may be established if the resolution of certain common questions significantly advances the litigation "even if their resolution does not alone establish liability." *Id.* at 382. The fact that it may be "necessary to calculate the amount of damages for each member on an individual basis . . . would not preclude class certification." *Id.*

In order to determine if common questions predominate, it is necessary to analyze how the elements of each cause of action will be established. *Id.*

### 1. Breach of Contract

There are three basic elements to a breach of contract claim:

(1) existence of a contract;
(2) breach of an obligation imposed by that contract; and
(3) resultant damage to plaintiff.

*VLIW Technology v. Hewlett-Packard Co,* 840 A.2d 606, 612 (Del. 2003). Each of these elements raises common factual and legal questions that predominate over any individual questions.

Whether a contract exists requires the court to determine two common legal questions: (1) whether the terms of work set forth in the ETA-750 are contractually enforceable and (2) whether the Employer Disclosure Affidavits signed by the class members in Mexico are enforceable contracts. The factual context in which those common legal questions will be decided is also common to the class: All of the class members received their visas pursuant to

the same ETA-750 visa application process and all were recruited in Mexico by the same

recruiter using the same Employer Disclosure Affidavit form.  Thus, the essential question of

whether the ETA-750 and the Employer Disclosure Affidavit created enforceable contract rights

is the same for all class members regardless of the year in which a class member worked or to

which TruGreen branch office the worker was assigned.  If the Court determines that the terms

of the ETA-750 used to import Plaintiff are contractually enforceable, then the terms of the ETA-

750s used to import the other class members are also enforceable.  *See, e.g., Frederick County*

*Fruit Growers Assn. v.  Martin,* 968 F.2d 1265, 1268 (D.C. Cir. 1992) (holding as a matter of

law that visa applications filed by several hundred different apple growers "created a contractual

obligation running from that grower to each of its workers").   If the Court determines that

Plaintiff can enforce the terms in his Employer Disclosure Affidavit, then every other class

member, all of whom received disclosure affidavits under similar circumstances, can enforce

their disclosure affidavits as well.  *See, e.g., Salazar v. Presidio Valley Farmers Association,* 765

F.2d 1334, 1343 (5th Cir. 1985) (holding as a matter of law that terms of work offered to guest

workers that exceed the terms required by DOL were contractually enforceable).   No individual

questions are presented by this element of Plaintiff's contract claim.

    In order to decide whether the terms of the ETA-750 and Employer Disclosure Affidavit

were breached, the Court first must determine the specific terms of work those documents

offered to the class members.  That determination also involves common questions.  Plaintiff

maintains that each ETA-750 filed by TruGreen during the class period offered: (1) pay by the

hour at the rate listed in Box 12 on the face of the ETA-750, App. Attachment 1; (2) 100% of the

prevailing wage in effect for the job at the time the work was actually performed if that rate was

25

higher than the hourly wage listed on the face of the ETA-750, *id.* (Box 23 b); and (3) a contractual promise to pay wages in compliance with the FLSA. *Id.* (Box 23g). Whether that is the meaning of the ETA-750 presents a question of contract/regulatory interpretation that is clearly common to all class members. Even if the terms of the ETA-750 were determined to be ambiguous, the proper interpretation of those terms would remain a legal issue common to all class members. None of the class members had any input into the drafting of the ETA-750 so there would be no basis for interpreting the terms differently for one class member as opposed to another.[23] In short, once the court determines what terms of work were offered in Plaintiff's ETA-750, the Court will have answered those questions for all members of the class. Thus, common questions not only predominate with respect to the determination of what terms of work were offered to class members, common questions are the only questions presented.

After the specific terms of work offered to workers have been determined, the existence of a breach of those terms will be demonstrated in the same manner for all class members by comparing the offered terms of work with TruGreen's payroll records. All of the wage violations alleged by Plaintiff can be proven by comparing the wages offered to the wages actually paid by TruGreen as shown in its pay records; there is no need to resort to individual testimony. Indeed, App. Attachment 11 has already made this comparison for the four weeks of wage data provided by TruGreen. Violations of the contractual promise to comply with the FLSA will require the Court to determine whether the FLSA requires reimbursement of visa and transportation expenses – a common legal question. *See Arriaga v. Florida Pacific Farms,* 305

---

[23] If the Court agrees with Plaintiff's interpretation of the ETA-750, Plaintiff will also have to establish the prevailing wage applicable to each of Defendants' branch offices, but proof

F.3d 1228 (11th Cir. 2002) (deciding as a matter of law that FLSA requires reimbursement of visa and transportation expenses of guest workers to the extent those costs cause wages to fall below the minimum wage). The Court will also have to determine whether TruGreen violated the requirements for use of the fluctuating work week. That issue clearly presents a question of law common to the class. *See O'Brien,* 350 F.3d at 289-290 (holding as a matter of law that fixed salary plus variable bonuses violates the 'fixed pay' requirement); *Ayers,* 2007 WL 646326 at *9-10 (same).

The amount of each worker's damages will vary, of course, but once the Court has determined the contract terms offered by the ETA-750 and the Disclosure Affidavit, and found that those terms were breached, each worker's damages can be calculated using a common formula applied to TruGreen's wage records and will not require individual testimony.[24] Damages that can be proven from records are particularly suited to class treatment. *Christiana Mortgage Corp.*, 136 F.R.D. at 384 ("The individual harm stems from business that was completed and is therefore easily proven."). In sum, none of the elements of Plaintiff's breach of contract claim will require individual testimony from the class members. In these circumstances common questions predominate.

## 2. Unjust Enrichment

---

of that issue comes from DOL publications and does not raise any individual questions necessitating testimony from the class members.

[24] Damages will simply be the difference between the hourly rate that should have been paid minus the hourly rate that was paid (not counting commissions and other such payments) multiplied by the hours worked.

> The elements of an unjust enrichment claim are:
>
> (1) an enrichment;
> (2) an impoverishment;
> (3) a relationship between the enrichment and the impoverishment;
> (4) the absence of justification; and
> (5) the absence of a remedy provided by law.

*Total Care Physicians, P.A. v. O'Hara,* 798 A.2d 1043, 1056 (Del.Super.2001). These elements present questions common to the class and do not involve any individual questions.

The enrichment in this case is the benefit that TruGreen derived from the labor of its H-2B workers. Whether that labor constitutes an enrichment of TruGreen presents a legal question that is common to the class. Similarly, whether the H-2B workers' receipt of wages below those specified by the ETA-750 and/or below those promised to workers in the Employer Disclosure Affidavits constitutes an impoverishment for purposes of an unjust enrichment claim is also a question common to the class. If working for less than the authorized/promised wage is an impoverishment for one worker, it clearly is for all others. The relationship between the enrichment and the impoverishment arises from the fact that the H-2B workers were working for TruGreen at the request of TruGreen – a relationship that is the same for all members of the class. It is difficult to imagine what justification TruGreen could have had for disregarding its sworn promises to the Department of Labor and in its Disclosure Affidavits, but whatever the rationale, its validity, or lack thereof, presents a question common to the class. Finally, the absence of a remedy provided by law turns on whether the ETA-750s and the Employer Disclosure Affidavits created enforceable contracts between TruGreen and its H-2B workers. If they created a contract for one H-2B worker, then they did for all such workers and no claim for unjust enrichment is necessary. Conversely, if those documents did not create a contract for any

one H-2B worker, they could not have for the others as well, thereby establishing the final

element of an unjust enrichment claim.  Once again, common questions not only predominate

with respect to Plaintiff's unjust enrichment claim, they are the only questions presented.  The

class members quasi-contractual unjust enrichment damages can be readily calculated from

TruGreen's payroll records without individual testimony in the same manner as their contract

damages discussed above.

### 3. RICO

In order to establish a federal civil RICO violation under § 1962(c), the plaintiffs

must satisfy four elements of proof:  "(1) conduct (2) of an enterprise (3) through a pattern (4) of

racketeering activity."  *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496 (1985).  In addition,

pursuant to 18 U.S.C. § 1964(c), a plaintiff must show that he was (1) injured in his business or

property (2) by reason of the substantive RICO violation.  As with Plaintiff's other causes of

action the elements of Plaintiff's RICO claim can be proven on a class-wide basis without the

necessity of individual testimony from the class members.

Whether the named RICO defendants, TruGreen and Vacchiano, were involved in the

conduct of an enterprise consisting of TruGreen and Great Lakes Labor are questions that turn on

the application of law to the actions of, and relationships between, TruGreen, Vacchiano and

Great Lakes Labor.  As such, those elements necessarily present questions common to the class.

*Christiana Mortgage Corp.,* 136 F.R.D. at 383 (elements of a cause of action that can be

established "by examining only the defendants conduct . . . may therefore be proven in common

for all class members.").

Whether the enterprise engaged in racketeering activity and whether it did so in a way

that constitutes a "pattern" also turns on the application of law to the actions of the defendants and, thus, those questions are also common to the class. *Christiana Mortgage Corp.,* 136 F.R.D. at 383. Plaintiff alleges that TruGreen's false statements to DOL and CIS in the visa application process constituted criminal acts under 18 U.S.C. § 1546(a) (visa fraud and misuse) and that the transmission of those (and other) false statements constituted mail and wire fraud in violation of 18 U.S.C. §§1341 and 1343. The proof of those criminal acts will come from Defendants' own testimony and the documentary record. No testimony from Plaintiff, let alone the individual class members, is necessary to establish that Defendants committed the alleged predicate criminal acts.

Finally, the proof that the class members were injured in their business or property by reason of the RICO violations will be shown by comparing the false promises made to DOL to obtain visas for the class members with the wages they actually earned as shown by TruGreen's payroll records. As with Plaintiff's contract and unjust enrichment claims, this comparison can be made based on the payroll records maintained by TruGreen without the necessity of individual testimony from the class members.

Thus, a careful analysis of the elements of each of Plaintiff's causes of action demonstrates that the questions they present are overwhelmingly, if not exclusively, common to the class.

**B. Class Treatment Is Superior to Other Available Methods of Adjudication**

The superiority requirement asks the court "to balance, in terms of fairness and efficiency, the merits of a class action against those of 'alternative available methods' of adjudication." *Georgine,* 83 F.3d at 632 (citing *Katz v. Carte Blanche Corp.,* 496 F.2d 747, 757

(3d Cir.) (en banc), *cert. denied,* 419 U.S. 885, 95 S.Ct. 152, 42 L.Ed.2d 125 (1974)).   All four

of the criteria listed in Rule 23(b)(3) suggest that class certification is the superior method of

adjudicating this controversy:

      1.   The individual members of the class have little or no ability to individually

control the prosecution of this case.   Every member of the proposed class is a low-wage worker

residing in Mexico.   These individuals simply do not have the resources or ability to pursue

actions such as this one on an individual basis.   Class treatment is not only the superior way to

proceed, it is the only way that the rights of the class members are likely to be vindicated.   The

court noted in certifying the class in *Weeks v. Bareco Oil Co.,* 125 F.2d 84 (7th Cir. 1941), "[t]o

permit the defendants to contest liability with each claimant in a single, separate suit, would, in

many cases give defendants an advantage which would be almost equivalent to closing the door

of justice to all small claimants." *Id*. at 90.   The same could be said for the class in this case.

      2.   No similar litigation has been filed by members of the class.   Thus, certifying

the class in this case will ensure that the efficient adjudication of this controversy by avoiding

multiple suits raising the same issues.

      3.   The desirability or undesirability of concentrating the litigation of the claims in

the particular forum.   It is plainly desirable to concentrate this litigation in one forum.   If the

potential class members each brought individual cases, the common questions which

predominate in this case would be needlessly re-litigated using the same evidence, numerous

times, in multiple locations.

      4.   There are no particular difficulties likely to be encountered in the management

of a class action.  To the contrary, courts commonly certify claims like Plaintiffs for class action

treatment.  *See, e.g., Frederick County Fruit Growers Assn. v. McLaughlin,* 703 F.Supp.1021

(D.D.C. 1989)*Frederick* (contract claim brought by thousands of U.S. and foreign apple pickers

against apple orchards in six different states certified as both a plaintiff and a defendant class

action); *Calderon v. Presidio Valley Farmers Assn.,* 863 F.2d 384, 389 (5th Cir. 1989) (affirming

certification of class of 800 H-2A workers seeking statutory damages for growers' breaches of

the work contract); *Montelongo v. Meese,* 803 F.2d 1341, 1350 (5th Cir. 1986) (affirming class of

U.S. workers seeking statutory damages for violation of terms of visa application); *Avila-*

*Gonzalez v. Barajas,* 2006 WL 643297 (M.D. Fla. 2006) (awarding damages to class of

temporary foreign workers alleging violations of the assurance contained in the DOL visa

application); *Salas-Mateo v. Ochoa,* 2004 WL 1824124 (S.D. Fla. 2004) (certifying class of

temporary alien workers alleging breach of the contract based on the terms of work offered in the

employer's DOL visa petition); *Okeelanta v. Bygrave,* 660 So.2d 743 (Fla. 4th DCA 1995)

(breach of employment contract by class of 10,000 H-2A workers)*.*  The fact that damages may

vary from class member to class member is not a basis for denying certification if common

questions otherwise predominate. *See, e.g., Bogosian v. Gulf Oil Corp.,* 561 F.2d 434, 456 (3d

Cir.1977); *Philadelphia Electric Co. v. Anaconda American Brass Co.*, 43 F.R.D. 452, 457

(E.D.Pa. 1968).

Finally, there is no unmanageable choice of law issues posed by this case.  While it is

true that the class members worked in different states, the elements of a common law breach of

contract claim and of unjust enrichment claim are essentially the same in all of the states at issue

here.[25]  Thus, there is no choice of law questions that would pose manageability problems.

Existence of state law variations is not alone sufficient to preclude class certification in any

_____

[25]  The elements of a breach of contract claim in the states at issue, although worded slightly differently, are legally indistinguishable:

In Connecticut, New York, and Pennsylvania breach of contract is generally described as involving the following elements: (1) agreement formation; (2) performance by one party; (3) breach of the agreement by the other party; (4) direct and proximate cause; and (5) damages. *See McCann Real Equities Series XXII, LLC v. David McDermott Chevrolet, Inc*., 890 A.2d 140, cert. denied, 895 A.2d 7 (2006) (CT);  *Nat'l Mkt. Share, Inc. v. Sterling Nat. Bank,* 392 F.3d 520, 525 (2d Cir.2004) (NY); *Gundlach v. Reinstein,* 924 F.Supp. 684, 688 (E.D.Pa.1996) (PA).

Delaware, Massachusetts, Maine, New Jersey, and Virginia word the elements slightly differently: (1) existence of a contract; (2) breach of an obligation imposed by that contract; and (3) resultant damage to plaintiff.  *See VLIW Technology v. Hewlett-Packard Co*, 840 A.2d 606, 612 (Del. 2003) (DE); *Maine Energy Recovery Co. v. United Steel Structures, Inc.,* 724 A.2d 1248, 1250 (Me.1999) (ME); *Michelson v. Digital Financial Services*, 167 F.3d 715, 720 (1st Cir.1999) (MA); *Bauer v. City of Newark,* 7 N.J. 426, 432 (1951) (NJ.);  *Eplus Tech., Inc. v. Nat'l R.R. Passenger Corp.,* 407 F.Supp.2d 758, 761 (E.D.Va.2005) (VA).

The elements of unjust enrichment are legally similar as well.  Massachusetts and Delaware involve the following elements:  (1) an enrichment; (2) an impoverishment; (3) a relation between the enrichment and the impoverishment; (4) an absence of justification; and (5) the absence of a remedy provided by law. *Massachusetts v. Mylan Labs.,* 357 F.Supp.2d 314, 324 (D.Mass.2005) (MA); *Total Care Physicians, P.A. v. O'Hara,* 798 A.2d 1043, 1056 (Del.Super.2001) (DE).

Unjust enrichment claims in Maine, Maryland, Pennsylvania and Virginia involve the following elements: (1) benefits conferred on defendant by plaintiff; (2) appreciation of such benefits by defendant; and (3) acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value. *Forrest Associates v. Passamaquoddy Tribe,*  760 A.2d 1041, 1045-46 (Me 2000) (ME); *Dunnaville v. McCormick & Co., Inc.,* 21 F.Supp.2d 527, 535 (D.Md.1998)(MD); *Mitchell v. Moore,* 729 A.2d 1200, 1203 (Pa.Super.1999) (PA); *Microstrategy, Inc. v. Netsolve, Inc.*, 368 F.Supp.2d 533, 537 (E.D.Va.2005) (VA).

Connecticut uses a slightly different formulation although its legal effect is the same:  (1) that the defendants were benefited; (2) that the defendants unjustly did not pay the plaintiffs for the benefits; and (3) that the failure of payment was to the plaintiffs' detriment.  *Jo-ann Stores v. Property Operating Co., supra,* 91 Conn. App. at 194.

event.  *In re School Asbestos Litigation,* 789 f.2d 996, 1011 (3rd Cir.) *cert denied* 479 U.S. 852 (1986).

## IV.  CONCLUSION

For all of the foregoing reasons, this Court should enter an Order:  (1) certifying this action as a Rule 23(b)(3) class action on behalf of all H-2B workers employed by TruGreen Limited Partnership at any time during 2003, 2004, 2005, or 2006; (2) requiring TruGreen to provide Plaintiff, in computer readable form, all addresses, telephone numbers and social security numbers for the class members; (3) authorizing Plaintiff to issue the notice, attached to Plaintiff's Appendix Attachment 17to the members of the class; and (4) giving the members of the class 60 days to opt-out of the action.

Respectfully submitted,


*/s/ Vivian L. Rapposelli*
Vivian L. Rapposelli
DE Bar No. 3204
Rapposelli & Gonzales
1300 Grant Ave., Suite 100
Wilmington, DE  19806
Tel: 302-652-8711

Edward Tuddenham
Tx Bar No. 20282300
272 W. 107th St. #20A
New York, NY  10025
Tel: 212-866-6026

ATTORNEYS FOR PLAINTIFF