**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| RAMON VILLANUEVA-BAZALDUA individually and on behalf of other similarly situated, | ) ) ) | Civil Action No. 06-185 (GMS) |
| | ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| TRUGREEN LIMITED PARTNERS and TRUGREEN, INC. d/b/a TRUGREEN CHEMLAWN, | ) ) ) ) | |
| Defendants. | ) ) | |

## DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

McCarter & English, LLP
Michael P. Kelly (DE Bar ID #2295)
Daniel M. Silver (DE Bar ID #4758)
Renaissance Centre
405 North King Street, 8th Floor
Wilmington, DE 19801
(302) 984-6300
mkelly@mccarter.com
dsilver@mccarter.com

*Admitted Pro Hac Vice*
Michael L. Banks (PA I.D. #35052)
Sarah E. Bouchard (PA I.D. #77088)
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103-2921
(215) 963-5387/5077

Dated: October 26, 2007          Attorneys for Defendants

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................................ 1

II.    RELEVANT BACKGROUND ........................................................................... 2

    A.   The H-2B Process ....................................................................................... 2

    B.   TruGreen's H-2B Workforce ...................................................................... 3

    C.   Procedural Background ................................................................................ 4

III.   ARGUMENT ...................................................................................................... 6

    A.   Consideration Of Plaintiff's Putative State Law Breach Of Contract Class Claim Under The Guise Of Supplemental Jurisdiction Would Be Improper. ............................... 7

        1.   Plaintiff's putative class-wide state law contract claim predominates over Plaintiff's individual FLSA claim. ................................................................ 8

        2.   Delaware courts have not addressed the novel and complex questions of contract law presented by the claims remaining in this action. ............................... 10

        3.   The circumstances of Plaintiff's Complaint – namely the efforts to achieve administrative and legislative change through litigation – further tilt the balance against the exercise of supplemental jurisdiction. ................................... 11

    B.   Plaintiff Cannot Satisfy His Burdens Under Rule 23 To Justify Proceeding With Any Of The Asserted Claims On A Class-Wide Basis. .................................... 12

        1.   The standards of review of a Rule 23 motion require a "rigorous analysis." ............. 14

        2.   Plaintiffs' claims fail to meet the typicality and adequacy prerequisites of Rule 23(a). ................................................................................................ 16

    C.   Plaintiff Cannot Satisfy Rule 23(b)(3)'s Demanding Requirements That Common Issues Predominate As To Any Of The Putative Class Claims. ........................ 21

        1.   Under either contract theory Plaintiff puts forth, Plaintiff's contract claims are not susceptible to class-wide treatment. ...................................................... 21

        2.   Plaintiff's putative unjust enrichment class claims similarly fail because highly individualized issues predominate. ............................................................ 25

    D.   Plaintiff's Proposed RICO Claims Are Futile As A Matter Of Law And, In Any Event, Are Not Appropriate For Class-Wide Adjudication. ............................... 29

    E.   Plaintiff Has Not Carried And Cannot Carry His Burden Of Establishing That A Class Action Is The Superior Method Of Adjudicating Any Of His Claims. ................ 33

IV.    CONCLUSION .................................................................................................. 35

## TABLE OF AUTHORITIES

### FEDERAL CASES

Amchem Products Inc. v. Windsor,
    521 U.S. 591 (1997)............................................................................15

Anson v. University of Texas Health Science Ctr.,
    962 F.2d 539 (5th Cir. 1992) ...........................................................22

Baby Neal v. Casey,
    43 F.3d 48 (3d Cir. 1994)..................................................................16

Bank of China, New York Branch v. NBM LLC,
    359 F.3d 171 (2d Cir. 2004) cert. dismissed, 546 U.S. 1026 (2006)...........................30

Barabin v. Aramark Corp.,
    No. 02-8057, 2003 WL 355417 (3d Cir. Jan. 24, 2003)...............................16

Barnes v. American Tobacco Co.,
    161 F.3d 127 (3d Cir. 1998)..............................................................21

Basic, Inc. v. Levinson,
    485 U.S. 224 (1988)........................................................................30

Berg Chilling System, Inc. v. Hull Corp.,
    435 F.3d 455 (3d Cir. 2006)..............................................................25

In Re Bexar County Health Facility Development Corp,
    125 F.R.D. 625 (E.D. Pa.1989)........................................................31

Borough of W. Mifflin v. Lancaster,
    45 F.3d 780 (3d Cir. 1995)........................................................7, 8, 11

In re Bridgestone/Firestone, Inc.,
    288 F.3d 1012 (7th Cir. 2002) ...........................................................23

Broussard v. Meineke Discount Muffler Shops, Inc.,
    155 F.3d 331 (4th Cir. 1998) ...........................................................31

Brooks v. BellSouth Telecomms., Inc.,
    164 F.R.D. 561 (N.D. Ala. 1995)......................................................16

Bunnion v. Consolidated Rail Co.,
    No. Civ. A. 97-4877, 1998 WL 372644 (E.D. Pa. May 14, 1998) ....................27

Chiang v. Veneman,
    385 F.3d 256 (3d Cir. 2004)..................................................................14

Chisolm v. TransSouth Finance Corp.,
    194 F.R.D. 538 (E.D. Va. 2000).............................................................30

Combustion Engineering, Inc. v. Miller Hydro Group,
    812 F. Supp. 260 (D. Me. 1992) ............................................................28

Crown, Cork & Seal Co. v. Parker,
    462 U.S. 345 (1983)..............................................................................14

Curley v. Cumberland Farms Dairy, Inc.,
    728 F. Supp. 1123 (D.N.J. 1989) ...........................................................31

De Asencio v. Tyson,
    342 F.3d 301 (3d Cir. 2003),
    app. after remand, _ F.3d _, 2007 WL 2505583 (3d Cir. 2007) ........................9, 10, 11

Eisenberg v. Gagnon,
    766 F.2d 770 (3d Cir. 1985)...........................................................17, 31

Frey v. Spokane County Fire District No. 8,
    No. CV-05-289, 2006 WL 2597956 (E.D. Wash. Sept. 11, 2006) ............................22

Gariety v. Grant Thornton, LLP,
    368 F.3d 356 (4th Cir. 2004) ................................................................31

Gen'l Telegraph Co. of Southwest v. Falcon,
    457 U.S. 147 (1982)........................................................................12, 14

Georgine v. Amchem Products, Inc.,
    83 F.3d 610 (3d Cir. 1996)] ..................................................................21

Hansberry v. Lee,
    311 U.S. 32 (1940)................................................................................17

Harris v. Fee Transport Services, Inc.,
    No. Civ. A. 05-77, 2006 WL 1994586 (N.D. Tex. May 15, 2006) ...................................33

Hasken v. City of Louisville,
    213 F.R.D. 280 (W.D. Ky. 2003)...........................................................10

Hatfield v. Oak Hill Banks,
    115 F. Supp. 2d 893 (S.D. Ohio 2000) ..................................................10

iii

Hoffman-La Roche, Inc. v. Sperling,
    493 U.S. 165 (1989)..............................................................................15

Holmes v. Sec. Investor Protection Corp.,
    503 U.S. 258 (1992)..............................................................................30

In re Initial Public Offering Securities Litigation,
    471 F.3d 24 (2d Cir. 2006), on remand, 2007 WL 2609585
    (S.D.N.Y. Aug. 30, 2007) ...........................................................12, 31

J.B.D.L. Corp. v. Wyeth-Ayerst Laboratoriess, Inc.,
    225 F.R.D. 208 (S.D. Ohio 2003)........................................................20

J.B. ex rel. Hart v. Valdez,
    186 F.3d 1280 (10th Cir. 1999) ...........................................................12

Jensen v. SIPCO, Inc.,
    38 F.3d 945 (8th Cir. 1994) .................................................................26

Jiminez v. Domino's Pizza, Inc.,
    238 F.R.D. 241 (C.D. Cal. 2006).........................................................33

Johnson v. TGF Precision Haircutters, Inc.,
    No. Civ. A. H-03-3641, 2005 WL 1994286 (S.D. Tex. Aug. 17, 2005) .....................34

Johnston v. Davis Sec., Inc.,
    217 F. Supp. 2d 1224 (D. Utah 2002)..................................................22

Johnston v. HBO Film Management, Inc.,
    265 F.3d 178 (3d Cir. 2003)..................................................12, 17, 21

Kline v. Wolf,
    702 F.2d 400 (2d Cir. 1983)................................................................19

Lerwill v. Inflight Motion Pictures, Inc.,
    343 F. Supp. 1027 (N.D. Cal. 1972) ...................................................22

In re LifeUSA Holding, Inc.,
    242 F.3d 136 (3d Cir. 2001).................................................................21

Lyon v. Whisman,
    45 F.3d 758 (3d Cir. 1995).................................................................7, 8

Matjastic v. Quantum Pharmics, Ltd.,
    No. Civ. A. 90- 0647, 1991 WL 238304 (E.D. Pa. July 22, 1991)...............................30

ME1 6870516v.1

Martin v. Dahlberg, Inc.,
    156 F.R.D. 207 (N.D. Cal. 1994)..................................................................10

In re Neurontin Marketing & Sales Pracs. Litigation,
    _ F.R.D. _, 2007 WL 2823681 (D. Mass. Sept. 27, 2007) ............................31

Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,
    259 F.3d 154 (3d Cir. 2001).................................................................12, 13

Poulos v. Caesars World, Inc.,
    379 F.3d 654 (9th Cir. 2004) ....................................................................30

Powers v. Lycoming Engines,
    _ F.R.D. _, No. Civ. A. 06-2993, 2007 WL 2782355,
    (E.D. Pa. Sept. 25, 2007) .........................................................................27

In re Prudential Insurance Co. of America Sales Practices Litigation,
    148 F.3d 283 (3d Cir. 1998)......................................................................31

R.J. Wildner Contracting Co., Inc. v. Ohio,
    913 F. Supp. 1031 (N.D. Ohio 1996).........................................................28

Reap v. Continental Casualty Co.,
    199 F.R.D. 536 (D.N.J. 2001)...................................................................13

Reyes v. Texas EZ Pawn, L.P.,
    No. Civ. A. V-03-128, 2007 WL 101808 (S.D. Tex. Jan. 8, 2007)...........33

Ruffu v. Johnson & Johnson, Inc.,
    181 F.R.D. 341 (E.D. Tex. 1998).........................................................10, 31

In re Safeguard Scientifics,
    216 F.R.D. 577 (E.D. Pa. 2003).................................................................19

Schwartz v. Dana Corp.,
    196 F.R.D. 275 (E.D. Pa. 2000).................................................................34

Sikes v. Teleline, Inc.,
    281 F.3d 1350 (11th Cir. 2002) .................................................................31

Sprague v. General Motors Corp.,
    133 F.3d 388 (6th Cir. 1998) ...............................................................17, 26

Strykers Bay Neighborhood Council Inc. v. City of New York,
    695 F. Supp. 1531 (S.D.N.Y. 1988)...........................................................19

ME1 6870516v.1

Sullivan v. Chase Investment Services,
    79 F.R.D. 246 (D.C. Cal. 1978).......................................................................32

Taffet v. Southern Co.,
    967 F.2d 1483 (11th Cir. 1992) ....................................................................29

Tombrello v. USX Corp.,
    763 F. Supp. 541 (N.D. Ala. 1991)...............................................................22

In re Unisys Corp. Retiree Medical Benefits Litigation,
    No. 969, 2003 WL 252106 (E.D. Pa. Feb. 4, 2003) .....................................14

United Mine Workers v. Gibbs,
    383 U.S. 715 (1966)..................................................................................7, 8

Wachtel v. Guardian Life Insurance Co.,
    453 F.3d 179 (3d Cir. 2006)..........................................................................13

Wagner v. Lehman Brothers Kuhn Loeb, Inc.,
    646 F. Supp. 643 (N.D. Ill. 1986) ................................................................19

Weikel v. Tower Semiconductor Ltd.,
    183 F.R.D. 377 (D.N.J. 1998)......................................................................19

Williamson v. General Dynamics Corp.,
    208 F.3d 1144 (9th Cir. 2000) .....................................................................22

Zlotnick v. TIE Commc'ns, Inc.,
    123 F.R.D. 189 (E.D. Pa.1988)....................................................................31

### STATE CASES

Cutler v. Wal-Mart Stores, Inc.,
    927 A.2d 1 (Md. App. Ct.) aff'd, 931 A.2d 1095 (Table) (Md. 2007)...................24, 27

Hall v. Equitable Life Assur. Social of U.S.,
    295 N.W. 204 (Mich. 1940)..........................................................................25

Polverari v. Peatt,
    614 A.2d 484 (Conn. App. Ct. 1992)............................................................28

Sequa Corp. v. Aetna Casualty & Surety Co.,
    No. 89C-AP-1, 1992 WL 207251 (Del. Super. Ct. Aug. 7, 1992) ...............25

VLIW Tech., LLC v. Hewlett-Packard Co.,
   840 A.2d 606 (Del. 2003) ...................................................................9

West Morris Pediatrics, P.A. v. Henry Schein, Inc.,
   897 A.2d 1140 (N.J. Super. Ct. 2004), aff'd, 2006 WL 798952
   (N.J. Super. A.D. Mar. 30, 2006)...................................................27

Z & L Lumber Co. v. Nordquist,
   502 A.2d 697 (Pa. 1985) ................................................................25


## DOCKETED CASES

Brown v. Wal-Mart Stores, Inc.,
   No. 2001 L 85, (Ill. Cir. Ct., Rock Island County) ......................15

Guerrero v. Brickman Group LLC,
   Civ. A. No. 1:05-cv-00357 (W.D. Mich.).......................................6


## MISCELLANEOUS

21 St. Mary's L.J. 5 (1989) William H. Rehnquist, Reforming Diversity
   Jurisdiction and Civil RICO, Address At the Eleventh Seminar on the
   Administration of Justice (April 7, 1989) ....................................29

132 Cong. Rec. H9371 (daily ed. Oct. 7, 1986) (statement of Rep. Boucher) .................29


## FEDERAL STATUTES and RULES

28 U.S.C. § 1367(a) ...........................................................................7

28 U.S.C. § 1367(c)(1-4) ...................................................................8

28 U.S.C. § 1367(c)(4)......................................................................11

29 U.S.C. § 216(b) ...........................................................................22

Fed. R. Civ. P. 12(h)(3).....................................................................8

Fed. R. Civ. P. 23(a) ........................................................................16

Fed. R. Civ. P. 23(a)(1).....................................................................16

Fed. R. Civ. P. 23(b)(3).................................................................1, 13

Fed. R. Civ. P. 23(c) ...................................................................................................13

Fed. R. Civ. P. 23(c)(1)(B) .........................................................................................13

Fed. R. Civ. P. 23 ...............................................................................................12, 22

ME1 6870516v.1

## I.    __INTRODUCTION__

When Plaintiff Ramon Villanueva ("Plaintiff") filed his Complaint seventeen months ago, the unmistakable thrust of his action was to effect legislative and administrative change for H-2B workers with respect to their visa and travel-related expenses. He moved quickly for conditional certification under the FLSA. The Court denied his request, noting the dearth of evidence that group-wide treatment would be proper, the important factual differences between and among putative class members, and doubts regarding the merits or viability of Plaintiff's claims. Plaintiff now seeks class certification under Fed. R. Civ. P. 23(b)(3). In support of this effort, Plaintiff attempts to bootstrap the rejected class-wide FLSA claims to his common law breach of contract claim and has shifted the emphasis to a slightly alternative theory – that TruGreen's governmental filings and "Employer Disclosure Affidavits" (essentially, term sheets) create contractual and/or quasi-contractual obligations for the benefit of H-2B employees. He has not, however, cured the dearth of evidence that class-wide treatment is proper, the significant factual differences between and among putative class members, or the doubts regarding the merits of his claims that justified the Court's denial of collective treatment in the first instance.

Plaintiff's Motion also improperly puts the class certification cart before the jurisdictional horse. Once the Court denied Plaintiff's motion for collective treatment and dismissed all FLSA claims save for Plaintiff's individual action, the federal question jurisdiction of this Court became tenuous at best. However, even if the Court exercises jurisdiction and entertains this Motion, the immediate issue is whether Plaintiff has carried his burden of demonstrating that all of the requirements of Rule 23 have been met. On the record before the Court, it is clear that he has not and cannot, for the claims are not susceptible to class-wide resolution. The common law of multiple states would control the resolution of each of these claims, and individual rather than

1

common questions of fact would predominate in the process of trying each claim to judgment,

rendering group-wide adjudication the least fair and efficient method of resolving these claims.

## II.    RELEVANT BACKGROUND

### A.    The H-2B Process

In 1952, Congress established the H-2 temporary seasonal worker program. Under this

program, certain branches of TruGreen Chemlawn rely on temporary non-immigrant workers to

fill the demand for labor during the lawn care season, which usually extends from mid-February

to early December. Typically, in or about October of the prior year, TruGreen Branch Managers

work with an experienced vendor, Great Lakes Labor, LLC ("GLL"), to evaluate their

anticipated labor needs and the likely wages and other conditions of employment that can be

offered in the given market. GLL then submits Form ETA-750As[1] on TruGreen's behalf to the

Department of Labor (DOL) for every Branch that anticipates a need[2] for H-2B workers in the

upcoming season.

In or about early February, TruGreen then begins to recruit foreign nationals in Mexico

for the upcoming season. TruGreen uses another experienced vendor, LLS International

("LLS"), to coordinate recruiting efforts in Mexico. Representatives of LLS created a form,

---

[1]   Form ETA-750A is an application form that a prospective employer submits to request temporary labor
certification for one or multiple foreign nationals. The application form requires details about the offer of
employment, including the location where the alien(s) will work, the job title, a job description, the work
schedule, and the regular and overtime rates of pay, which must be at least equal to the prevailing wage in that
market at that time. The DOL's certifying officer has a duty to confirm, based on the job title and duties
submitted by the employer that the proper job codes (and, therefore, corresponding prevailing wage) are used.
If the ETA-750A application is certified by the DOL, it is then used to apply for H-2B status for named or
unnamed workers through the U.S. Citizenship and Immigration Services.

[2]   As he did in his Motion for Leave to File A First Amended Complaint, Plaintiff suggests without any authority
whatsoever that TruGreen improperly sought more H-2B visas than it actually intended to use. The very
nature of the process is that these are prospective positions that must be requested months in advance of the
anticipated start date. Given this timing, as well as the looming annual H-2B cap, most employers knowingly
request more H-2B visas than they believe, at the time, they may need. The federal agency charged with
overseeing the H-2B program is fully aware of this practice, as it knowingly approves 104,000 H-2B workers
on an annual basis notwithstanding its cap of 66,000 H-2B workers who actually are permitted to work in the
United States in any given year.

2

called the "Employer Disclosure Affidavit," to communicate the terms and conditions of

employment, including the "starting wage" offered and monthly rent and utility expenses to be

paid by the H-2B employee. <u>See</u> Exhibit A-6 of Plaintiff's Appendix. The foreign national signs

the Employer Disclosure Affidavit, declaring that he came personally and voluntarily to LLS in

order to proceed with an application for a temporary (H-2B) work visa.

### B.    TruGreen's H-2B Workforce

Between 2003 and 2006, TruGreen employed approximately 175 foreign nationals under

the H-2B program in eleven different states (including the District of Columbia). <u>See</u> Exhibit A-

4 of Plaintiff's Appendix. Those 175 individuals filled approximately 405 open H-2B positions

within the putative class period, as half of the foreign nationals employed by TruGreen

voluntarily return for at least one additional season (unlike Plaintiff, who lasted less than one full

season). In total, TruGreen employed the following number of different employees between

2003 and 2006 in the following states:

| | |
|---|---|
| Connecticut | 5 employees |
| Washington, DC | 36 employees |
| Delaware | 7 employees |
| Massachusetts | 8 employees |
| Maryland | 7 employees |
| Maine | 4 employees |
| New Jersey | 51 employees |
| New York | 20 employees |
| Ohio | 4 employees |
| Pennsylvania | 26 employees |
| Virginia | 7 employees |

Depending on need and applicable skill sets (e.g., certification to apply pesticides, current U.S.

driver's license) these foreign nationals are employed in a variety of positions in any given year,

including as Laborers, Applicators, Lawn Care Specialists, Crew Leaders, Supervisors, and

Lawn Care Specialists. Once in the United States, certain Branches offer H-2B employees the

option to be compensated pursuant to a Specialist Compensation Plan ("Plan"), which provides

3

the opportunity to earn additional compensation through bonuses and commissions. The Branch

Managers exercise complete discretion as to whether and when to offer an employee the

opportunity to be paid pursuant to the Plan. Under this Plan, overtime compensation is paid

according to the fluctuating workweek method.[3]

TruGreen employs H-2B workers no longer than the period authorized by the DOL and

terminates the employment of each worker prior to or at the end of the DOL certification period.

Even in instances when a foreign national expresses a desire to return to TruGreen the following

season, TruGreen always establishes a new employment relationship with the worker, and only

after a new H-2B visa has been approved and a new Disclosure Affidavit had been signed.

Often, however, the employee already has spoken with the Branch Manager at the end of the

previous season regarding expectations for the next season, and, therefore, are aware of the terms

and conditions of employment to be expected even without the Employer Disclosure Affidavit.

### C.    <u>Procedural Background</u>

On or about March 17, 2006, Plaintiff filed suit against TruGreen, alleging that TruGreen

(1) made certain promises to him about wages and that he relied on these alleged promises to his

detriment when he accepted employment as an H-2B worker in the Wilmington, Delaware

Branch; and (2) somehow violated the FLSA by paying him a salary plus overtime pursuant to

the Specialist Compensation Plan to which he voluntarily agreed and by failing to account for

visa and travel-related expenses incurred during the first and last workweeks of his employment

with TruGreen. See Complaint ¶¶ 17, 23-26, 29; 34-36. Plaintiff also asserted common law

claims of fraud, breach of contract, and breach of the covenant of good faith and fair dealing,[4]

---

[3]    Employees who choose to be compensated under the Plan not only gain the opportunity to earn bonuses and commissions, but also increase the likelihood for overtime work.

[4]    It is clear from Plaintiff's Brief in Support of his Motion for Class Certification that he is seeking certification only as to the breach of contract claim. See Plaintiff's Brief (Docket No. 74), pp. 2, 24. Although TruGreen

each of which was premised both on the FLSA and on the theory that the wages paid to H-2B

employees were lower than the wages identified in disclosures to the government (the ETA-

750As) and the Employer Disclosure Affidavits.  Complaint ¶¶ 53-54.

As to his FLSA claims, Plaintiff sought to represent a class of "all H-2B workers

employed by Defendant TruGreen Limited Partners[hip] at any time between 2003 and 2006."

Complaint ¶ 9.  However, the Court rejected his request for conditional certification of those

FLSA-based claims on May 19, 2007.  In making that determination, the Court explicitly

rejected Plaintiff's claim that any factual differences between putative class members was

relevant only as to damages.  To the contrary, the Court noted that:

> Here, whether a putative class member received full reimbursement, partial
> reimbursement or no reimbursement at all, based on specific promises made, or the
> specific TruGreen office at which they were employed, goes to the heart of the claim, and
> the "similarly situated" inquiry.  Indeed, the differences in the experiences of individual
> TruGreen workers will dictate whether any one individual worker fits within the
> proposed class.

See Memorandum and Order dated March 19, 2007 ("Order") (Docket No. 44), p.9.  This

Opinion bears upon Plaintiff's pending request for class certification in two important ways.

First, that Opinion obviously speaks to the level of factual commonality among various workers'

claims for additional compensation.  Second, the fact that no workers other than Plaintiff are

asserting FLSA claims raises a serious question regarding the basis for federal subject matter

jurisdiction over the claims of such workers.  Plaintiff's Brief in Support of his Motion for Class

Certification suggests nothing about Plaintiff's views on either issue.

---

disputes that the contract claim is appropriate for class-wide treatment, this decision to forego certification on
the other claims was proper.  Of the states at issue in this case, only New Jersey, Maryland, and Delaware
recognize an independent claim for breach of the covenant of good faith and fair dealing, and, therefore, his
efforts to secure class certification to that claim would have been futile on its fact.  Similarly, any attempt to
certify his common law fraud claim would fail for all of the reasons his proposed RICO claims should fail.

One month after the Court dismissed all class-wide FLSA claims, Plaintiff curiously filed a Motion for Leave to File a First Amended Complaint to include RICO claims and unjust enrichment and promissory estoppel claims. See Docket No. 55. This request to file an Amended Complaint that includes a federal question claim was made just days after the defendant-employer in another H-2B case Plaintiff's counsel is handling filed a Motion for Reconsideration regarding supplemental jurisdiction. See Guerrero v. Brickman Group LLC, Civ. A. No. 1:05-cv-00357 (W.D. Mich.), Docket No. 123. The Court promptly granted the motion, declining to exercise supplemental jurisdiction once the class-wide FLSA claims had been dismissed. See Guerrero, Docket No. 132.

As it stands as of the date below, Plaintiff's Motion for Leave remains outstanding, and his RICO claims (as well as his unjust enrichment and promissory estoppel claims) are not yet before the Court. Plaintiff glosses over this important procedural truth, claiming to assume that claim is before the Court for the sake of judicial efficiency. See Plaintiff's Brief (Docket No. 74), p.1 n.1. In truth, however, without the craftily-timed effort to include a RICO claim, Plaintiff would be without any federal question hook to seek certification of his claims from this Court.

## III.  ARGUMENT

In the current configuration of the case, there is no apparent basis for the exercise of subject matter jurisdiction over the claims of anyone other than the named Plaintiff and, for this reason alone, the Court should deny Plaintiff's Motion. If the Court chooses to countenance Plaintiff's attempt to assert a misguided RICO claim to save federal question jurisdiction, however, the only questions to be resolved are the application of Rule 23 and the propriety of a class action as to Plaintiff's contract, unjust enrichment, and RICO claims. The Court should deny class certification as to any of these claims because as set forth below, they are not

ME1 6870516v.1

susceptible to class-wide resolution.

**A.    Consideration Of Plaintiff's Putative State Law Breach Of Contract Class Claim Under The Guise Of Supplemental Jurisdiction Would Be Improper.**

Plaintiff acknowledged in his Complaint that this Court's jurisdiction was premised entirely on federal question jurisdiction – the putative FLSA collective action – and that he merely was asking the Court to exercise supplemental jurisdiction over the state law claims asserted therein. Complaint ¶¶ 2-4. It is dubious whether Plaintiff's fact-specific class-based breach of contract claims share a common nucleus of operative facts with his remaining individual FLSA claim sufficient to make them part of the same "constitutional case" under 28 U.S.C. § 1367(a). Absent federal question jurisdiction, there is no basis for federal subject matter jurisdiction over the claims of anyone other than Plaintiff. As such, it is equally dubious that supplemental jurisdiction is available to support Plaintiff's claims in the instant Motion. See generally Lyon v. Whisman, 45 F.3d 758 (3d Cir. 1995).

Even if the Court accepts that Plaintiff's breach of contract claims are sufficiently related to the FLSA claims so as to create a "constitutional case," it remains well-settled that supplemental jurisdiction "is a doctrine of discretion, not of plaintiff's right." United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966). Ignoring this fundamental tenet, Plaintiff's Motion improperly assumes without discussion that this Court can exercise supplemental discretion over the remaining putative class claims currently pending in this matter even though the only remaining federal claim is Plaintiff's individual FLSA claim. Stated another way, Plaintiff is asking the Court to improperly "allow a federal tail to wag what is in substance a state dog." Borough of W. Mifflin v. Lancaster, 45 F.3d 780, 789 (3d Cir. 1995) (citing Gibbs, 383 U.S. at 727) (internal citations and quotations omitted).

Federal courts are courts of limited jurisdiction for a reason. They can, and must, dismiss cases in which they lack subject matter jurisdiction at any stage of the proceedings, even after final judgment has been entered. See Fed. R. Civ. P. 12(h)(3). In recognition of the delicate balance to be drawn, Congress granted district court judges the discretion to decline to exercise supplemental jurisdiction where: (1) the claim raises a novel or complex issue of state law; (2) the claim substantially predominates over the claim or claims over which the district Court has original jurisdiction; (3) the district Court has dismissed all claims over which it has original jurisdiction; or (4) in exceptional circumstances for which there are other compelling reasons for declining jurisdiction. See 28 U.S.C. § 1367(c)(1-4). A decision to decline to exercise supplemental jurisdiction will be reversed only for an abuse of discretion. See Lyon, 45 F.3d at 760. Here, the Court can and should decline to exercise supplemental jurisdiction because the state law contract claim substantially predominates over the remaining federal claim, because the remaining state law contract claim raises novel issues of state law, and because of exceptional circumstances that compel dismissal (without prejudice) of the remaining claims.

### 1. Plaintiff's putative class-wide state law contract claim predominates over Plaintiff's individual FLSA claim.

As the Supreme Court recognized in words particularly applicable here, when "the state issues substantially predominate, whether in terms of proof, of the scope of the issues raised, or the comprehensiveness of the remedy sought, the state claims may be dismissed without prejudice and left for resolution to state tribunals." Gibbs, 383 U.S. at 726. The Third Circuit further has informed this analysis, recognizing that a district court will find substantial predomination of state claims and properly exercise its discretion to decline to exercise supplemental jurisdiction "where a state claim constitutes the real body of a case, to which the federal claim is only an appendage." Borough of W. Mifflin, 45 F.3d at 789.

ME1 6870516v.1

As set forth above, Plaintiff's breach of contract theory is premised on the notion that the

Form ETA-750As submitted by TruGreen to the DOL and the Employer Disclosure Affidavits

somehow create contractual obligations that extend to each individual H-2B employee.[5]  To

pursue that theory, Plaintiff will have to make a host of offers of proof that do not relate in any

way to the offers of proof to be made in support of his individual FLSA claim.

Specifically, to establish a breach of contract under Delaware law, Plaintiff will have to

establish the existence of a contract, the breach of an obligation imposed by that contract, and

resulting damages.  See VLIW Tech., LLC v. Hewlett-Packard Co., 840 A.2d 606, 612 (Del.

2003).  Although there may be overlap with respect to the offers of proof to be made under

Plaintiff's common law bootstrapped FLSA/contract theory, it is facially evident that none of the

offers of proof to be made under the theory that the ETA-750As and Employer Disclosure

Affidavits constitute enforceable contracts with H-2B employees relate in any way to the offers

of proof Plaintiff must make for purposes of his individual FLSA claim.  For purposes of his

individual FLSA claim, Plaintiff's offers of proof are simple and straightforward.  Effectively, all

that he must demonstrate are the hours worked and the amounts paid for his first and last work

weeks with TruGreen.  Because the FLSA claim does not require any proof of a contract, an

intent to form a contract, a breach of that contract, or damages from that breach, the individual

questions of state law clearly will predominate over the otherwise discrete issues of the FLSA.

The Third Circuit Court of Appeals recently affirmed this analysis of substantial

predomination in De Asencio v. Tyson, 342 F.3d 301 (3d Cir. 2003).  In De Asencio, the

appellate court concluded that the district court "did not exercise sound discretion in granting

supplemental jurisdiction" over state law wage claims that the appellate court described as

---

[5]    To the extent Plaintiff is re-asserting his FLSA claims as a breach of contract action, he cannot do so.  As set forth in more detail in Section III.C.1, the FLSA is the lone remedy.

9

"parallel" to the federal FLSA claims.  De Asencio, 342 F.3d at 308, 312.  As the Court

explained, the relevant inquiry given these facts "centers on the terms of proof and the scope of

the issues raised in the FLSA and [state law] actions."  Id. at 309.  Ultimately, because the

analysis of the parallel state law claim necessarily would require an investigation of whether a

contract existed – an offer of proof that was not necessary under the FLSA – the appellate court

concluded that the differential in the offer of proof was significant enough to "suggest the federal

action is an appendage to the more comprehensive state action."  Id. at 312.  See also Hasken v.

City of Louisville, 213 F.R.D. 280, 284 (W.D. Ky. 2003) ("[f]ollowing the lead of other courts

faced with certifying a state-law class action with hundreds on plaintiffs on the basis of a few

individual federal claims" and refusing to certify the class); Hatfield v. Oak Hill Banks, 115 F.

Supp.2d 893, 898 (S.D. Ohio 2000) (refusing to certify a state law class where individual federal

claims were the sole jurisdictional hook in play); Ruffu v. Johnson & Johnson, Inc., 181 F.R.D.

341, 344 (E.D. Tex. 1998) (denying class certification on state law claims where the only basis

for federal jurisdiction was RICO claims that were not appropriate for class certification); Martin

v. Dahlberg, Inc., 156 F.R.D. 207, 218 (N.D. Cal. 1994) (refusing to certify a class based solely

on state law claims where the only basis for federal jurisdiction was RICO claims not appropriate

for class treatment).

       Here, there is and can be no suggestion that Plaintiff's common law contract claim is

"parallel" to the FLSA and, for all of the reasons recognized in De Asencio, the court should

exercise its sound discretion and decline to exercise supplemental jurisdiction over the remaining

state law putative class claims.

              **2.      Delaware courts have not addressed the novel and complex questions
                      of contract law presented by the claims remaining in this action.**

       Plaintiff's state law contract claim presents at least three novel and complex issues of

state law: (1) whether TruGreen's filings with the Department of Labor can create an express or

implied contract under state law; (2) whether TruGreen's Disclosure Affidavits create an express

or implied contract under state law; and (3) whether any of TruGreen's alleged deviations from

those statements in either its governmental filings or Disclosure Affidavits rise to the level of a

violation of any state law. None of these issues have been addressed by the Delaware state

courts. Rather, these issues are issues of first impression and, therefore, there must be original

testimony, offers of proof, and legal analysis on purely novel and complex state law arguments.

The resolution of these exclusively state law issues are better left to the expertise of the state

courts. See De Asencio, 342 F.3d at 311. Accordingly, under the second prong of the Section

1367 analysis, this Court has every reason to decline to exercise supplemental jurisdiction over

the remaining contract claim.

> **3.     The circumstances of Plaintiff's Complaint – namely the efforts to achieve administrative and legislative change through litigation – further tilt the balance against the exercise of supplemental jurisdiction.**

Section 1367 allows a court to consider "extraordinary circumstances" when analyzing

whether to exercise supplemental jurisdiction over sate law claims. See 28 U.S.C. § 1367(c)(4).

Generally, extraordinary circumstances that warrant the exercise of jurisdiction include

"considerations of judicial economy, convenience, and fairness to the parties." Borough of W.

Mifflin, 45 F.3d at 788. It is evident from the face of Plaintiff's Complaint that the thrust of this

case – at least until conditional certification was denied – always was to impose obligations on

H-2B workers that apply only to H-2A workers under an entirely different set of regulations.

See Order (Docket No. 44), pp. 9-10. It is equally clear from Plaintiff's Motion that Plaintiff is

attempting, at least in part, to bootstrap the rejected FLSA collective action with his remaining

state law claims. See Plaintiff's Brief (Docket No. 74), pp. 14-17. For all of the reasons that the

11

Court was "even more reluctant to conditionally certify a class" because Plaintiff's efforts to extend H2-A regulations and precedent to H-2B workers appeared on the surface to be without legal merit (Order p. 10.), the Court should be similarly reluctant to exercise supplemental jurisdiction over the remaining state law claims.

For all of these reasons, this Court can decline to exercise supplemental jurisdiction and, without going any further, can deny Plaintiff's motion in its entirety (without prejudice) because it is moot.

**B.      Plaintiff Cannot Satisfy His Burdens Under Rule 23 To Justify Proceeding With Any Of The Asserted Claims On A Class-Wide Basis.**

The basic framework of the inquiry required by Rule 23 is well-known. To justify class certification, the proponent of class treatment must establish that all of the four criteria of Rule 23(a) are met, and, that the requirements of at least one subpart of Rule 23(b) are met. See, e.g., Johnston v. HBO Film Mgmt., Inc., 265 F.3d 178 (3d Cir. 2003). This burden is not a light one, for "actual, not presumed, conformance with Rule 23(a) remains . . . indispensable." Gen'l Tel. Co. of Southwest v. Falcon, 457 U.S. 147, 160 (1982). See also In re Initial Public Offering Secs. Litig., 471 F.3d 24, 41-42 (2d Cir. 2006) (a court must determine whether the plaintiff has proven that each Rule 23 requirement is met and a lesser standard such as "some showing" for satisfying the requirements will not suffice"). As such, the court should not "blindly rely on conclusory allegations which parrot Rule 23 requirements . . ." J.B. ex rel. Hart v. Valdez, 186 F.3d 1280, 1290 n.7 (10th Cir. 1999). To evaluate whether, in fact, the plaintiffs have satisfied their burden, a court must "probe beyond the surface of plaintiffs' allegations . . . to assess whether plaintiffs' [ ] claims satisfy Fed. R. Civ. P. 23's requirements." Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 168-69 (3d Cir. 2001). To satisfy his burden, a plaintiff seeking class certification must actually "produce evidence, usually in the form of

12

affidavits, statistical evidence or both, tending to show that the individual claims share questions of fact or law with the class claims and that the individual claims are typical of those brought for the class." <u>Reap v. Continental Cas. Co.</u>, 199 F.R.D. 536, 544-45 n.6 (D.N.J. 2001) (denying class certification in part because the plaintiff "failed to produce sufficient evidence, in the form of affidavits from other class members or otherwise, to demonstrate the existence of a class").

Here, Plaintiff seeks class certification under Rule 23(b)(3), which further requires that common questions must predominate the resolution of class members' claims, and that the class device be superior to traditional methods of litigation. <u>See</u> Fed. R. Civ. P. 23(b)(3). One of the critical inquiries under Rule 23(b)(3) is whether a class-wide trial of all claims would be manageable.

Although the Court should not attempt to resolve the merits of the claims and defenses as a prelude to class certification, it must, in appropriate cases, go beyond the pleadings to determine what issues (if any) may be resolved on the basis of class-wide proof. "In reviewing a motion for class certification, a preliminary inquiry into the merits is sometimes necessary to determine whether the alleged claims can be properly resolved as a class action." <u>Newton</u>, 259 F.3d at 168. The 2003 Amendments to Rule 23(c) were designed, in part, to further the Court's inquiry into how the class claims would actually be tried. <u>See</u> Advisory Committee Note, 2003 Amendments to Fed. R. Civ. P. 23(c) ("A critical need is to determine how the case will be tried.").

In the event certification under Rule 23 is granted, in whole or in part, the class certification order must identify the claims, issues, or defenses that are to be resolved on a class-wide basis. <u>See</u> Fed. R. Civ. P. 23(c)(1)(B); <u>see also</u> <u>Wachtel v. Guardian Life Ins. Co.</u>, 453 F.3d 179, 184-188 (3d Cir. 2006). If less than all the issues presented are susceptible to class

ME1 6870516v.1

treatment, any class certification order should be limited accordingly. "Rule 23(c)(4) both imposes a duty on the court to insure that only those questions which are appropriate for class adjudication be certified, and gives it ample power to 'treat common things in common and to distinguish the distinguishable." Chiang v. Veneman, 385 F.3d 256, 267 (3d Cir. 2004) (citation omitted). In addition, considerations of efficiency should animate the certification analysis. Crown, Cork & Seal Co. v. Parker, 462 U.S. 345, 349 (1983) (court should consider not only technical requirements of Rule 23, but also the "principal purpose of the class action procedure – promotion of efficiency and economy of litigation"); In re Unisys Corp. Retiree Med. Benefits Litig., No. 969, 2003 WL 252106, at * 7 (E.D. Pa. Feb. 4, 2003) ("When the Court looks down the road to determine how this case would be tried, it is obvious that the litigation is unmanageable as a class action and would ultimately splinter into individual issues, which would have to be tried separately.") (citation omitted). To conform to Rule 23, class certification analysis must therefore proceed claim-by-claim and element-by-element.

1. **The standards of review of a Rule 23 motion require a "rigorous analysis."**

Plaintiffs' Brief in Support of his Motion for Class Certification relies on overly broad generalizations and conclusions of law, and ultimately gives short shrift to all of the relevant analysis. This approach is wholly inconsistent with the United States Supreme Court's observations in Falcon, where the Court made clear that the class action device was "designed as an *exception* to the usual rule that litigation is conducted by and on behalf of the individual named parties only." Falcon, 457 U.S. at 155 (quotation and citation omitted) (emphasis added). To that end, the Supreme Court further instructed trial courts to conduct a "*rigorous* analysis" of a plaintiffs' compliance with Rule 23 before ruling on any class certification motion. Falcon, 457 U.S. at 161 (emphasis added). The Supreme Court further has made clear that the strictures

of Rule 23 are intended to embody effective restrictions on "judicial inventiveness" in using the class action tool and cautioned that the Rule "may be endangered by those who embrace [it] too enthusiastically just as [it may be by] those who approach [it] with distaste." Amchem Prods. Inc. v. Windsor, 521 U.S. 591, 626 (1997). As such, the Court has noted that "class actions serve important goals but also present opportunities for abuse," Hoffman-La Roche, Inc. v. Sperling, 493 U.S. 165, 171 (1989), and, therefore, that courts should be circumspect when presented with the opportunity to certify a class.

The need for a rigorous analysis cannot be overstated, as it is grounded in notions of fundamental fairness and due process. Once a case has been certified to proceed as a class action, the named representatives stand in the shoes of *all* other class members (whether the class members want them to or not), and their adjudication of the claims become binding on *all* absent class members. Here, the concerns of due process are particularly acute, as there remains an absolute dearth of evidence that anyone other than Plaintiff and his counsel, in fact, want Plaintiff to represent their interests or adjudicate the claims this former disgruntled employee unilaterally has put at issue.[6]

At the same time, an employer-defendant's due process rights cannot be ignored in this context, either. The class device necessarily deprives a defendant of the opportunity to defend itself against individual claims. Thus, where, as here, the claims and potential defenses to those claims are, by their very nature, highly individualized, the Court must make certain at every step that the class device is the most appropriate process of adjudicating the claims against the defendant-employer. See Brown v. Wal-Mart Stores, Inc., No. 2001 L 85, slip op. at 31-32 (Ill. Cir. Ct. Mar. 9, 2007) (rejecting wage and hour class action where "Plaintiffs have failed to

---

[6]    Seventeen months have passed since Plaintiff filed his original Complaint, yet he has failed to secure even one affidavit from any other current or former TruGreen H-2B employee who has an interest in this lawsuit.

15

demonstrate the existence of a reasonable and accurate method of calculating damages on a class

wide basis making individual inquiry necessary to satisfy due process"). (Exhibit A hereto). <u>Cf.</u>

<u>Brooks v. BellSouth Telecomms., Inc.</u>, 164 F.R.D. 561, 567 (N.D. Ala. 1995) (noting that in the

absence of a company policy or plan to discriminate, allowing collective notice to be given to a

class of employees would be unfair to the defendant-employer, for "courts, as well as practicing

attorneys, have a responsibility to avoid the 'stirring up' of litigation through unwarranted

solicitation," which necessarily would occur under the circumstances if notice of a collective

action were given).

Ultimately, the decision to grant or deny class certification rests squarely within the

district court's discretion, and that decision can only be reversed for an abuse of that discretion,

which necessarily requires a "clearly erroneous finding of fact, errant conclusion of law, or

improper application of law to fact" <u>Barabin v. Aramark Corp.</u>, No. 02-8057, 2003 WL 355417,

at *2 (3d Cir. Jan. 24, 2003).  Given weight of authority as well as the undisputed (and

indisputable) facts, no abuse of discretion can result from denying Plaintiffs' Motion.

### 2. Plaintiffs' claims fail to meet the typicality and adequacy prerequisites of Rule 23(a).

Rule 23(a) has four well-known criteria: numerosity, "threshold" commonality, typicality

and adequacy of representation. <u>See</u> Fed. R. Civ. P. 23(a). The numerosity criterion of Fed. R.

Civ. P. 23(a)(1), which relates to practicality of joinder, and the "threshold" commonality

requirement of Fed. R. Civ. P. 23(a) principally address efficiency concerns; neither imposes a

high threshold. <u>See, e.g.,</u> <u>Baby Neal v. Casey</u>, 43 F.3d 48, 56 (3d Cir. 1994) ("The commonality

requirement will be satisfied if the named plaintiffs share at least one question of fact or law with

the grievances of the prospective class.")  The typicality and adequacy of representation

requirements of Rule 23(a)(3) and (4), which point more toward alignment of interests

underlying constitutional concerns,[7] generally require closer consideration. Once again, however, none of the criteria can be assumed.

> **a.    Plaintiff cannot demonstrate that his claims are typical of the claims of the class.**

Typicality requires consideration of whether "the named plaintiff[s'] individual circumstances are markedly different or . . . the legal theory upon which the claims are based differs from that upon which the claims of other class members will perforce be based." Johnston, 265 F.3d at 184 (quoting Eisenberg v. Gagnon, 766 F.2d 770, 786 (3d Cir. 1985). Typicality is lacking if "[a] named plaintiff who proved his own claim would not necessarily have proved anybody else's claim . . .[t]he premise of the typicality requirement is simply stated: as goes the claim of the named plaintiff, so go the claims of the class." Sprague v. General Motors Corp., 133 F.3d 388, 399 (6th Cir. 1998).

The typicality requirement of Rule 23(a)(3) involves much the same kind of analysis as the "predominance" requirement of Rule 23(b)(3). To avoid repetition, TruGreen's arguments regarding the insufficient commonality among class members' claims are set forth in Section III. C below, which addresses Rule 23(b)(3).

> **b.    Plaintiff is not an adequate class representative.**

The adequacy of representation requirement of Rule 23(a)(4) speaks not to the extent of the legal and factual overlap between the named plaintiff's claims and those of other putative class members, but rather to the characteristics of the named plaintiff as an individual and/or his or her counsel. It is a necessary but not sufficient condition of adequacy that there be no conflict between the named plaintiff and absent class members as to the claims for which certification is

---

[7]    See generally Hansberry v. Lee, 311 U.S. 32, 45 (1940) ("A selection of representatives for purposes of litigation, whose substantial interests are not necessarily or even probably the same as those whom they are deemed to represent does not afford that protection to absent parties which due process requires.")

sought; a proffered class representative whose claim was (for example) time-barred would have no conflict with class members, but he or she nevertheless would not be on adequate class representative of those with valid claims. In the words of the Rule, the class representative must demonstrate that he or she "will fairly and adequately protect the interests of the class."

Plaintiff cannot carry that burden here. Based on his deposition testimony, it is clear that Plaintiff is neither able nor willing to adequately represent the interests' of others, and TruGreen seriously doubts that his interests are aligned to other H2-B workers his counsel seeks to represent. Plaintiff repeatedly invoked the protection of the Fifth Amendment at his deposition, refusing to answer at least six questions regarding whether or where he worked in the United States in the years after his employment with TruGreen and how many hours he worked for any U.S. employer after TruGreen. As further explained by his counsel, Plaintiff intended to invoke the Fifth Amendment "for any question like that." (Villanueva Tr. pp. 12-16, 22-23, 30-33.) (Exhibit B hereto). Although Plaintiff claimed that he has never held any other H-2B positions after TruGreen (Villanueva Tr. p. 22), he unequivocally refused to answer whether any employer for whom he worked in 2006 paid his travel- or visa- related expenses, as he contends in his Complaint TruGreen should have done, or whether other employers paid him in accordance with the alleged "contracts" created by the ETA-750A of any term sheets or other disclosures provided by those employers (if any). As a result, Plaintiff effectively precluded TruGreen from fully exploring questions that go directly to his ability to serve as a lead plaintiff purportedly representing the interests of others in this case.

In addition, TruGreen has a genuine and legitimate interest in understanding Plaintiff's work visa status, or lack thereof, and whether there are any circumstances that may preclude Plaintiff in the future from traveling freely to the United States. By invoking the Fifth

18

Amendment to these basic and foundational questions, TruGreen (and this Court) now lack any understanding of and have been deprived of any future opportunity to understand whether Plaintiff might not, at some point in the future, be able to legally return to the country for hearings, depositions, mediation, settlement conferences, or even for trial. If Plaintiff cannot be candid in these proceedings or fully participate in them, he simply cannot be and is not an adequate representative. See, e.g., In re Safeguard Scientifics, 216 F.R.D. 577, 582-83 (E.D. Pa. 2003) ("[S]erious concerns with credibility leave Lead Plaintiff vulnerable to further attacks that would impose an unnecessary disadvantage on the class. These unique defenses against Lead Plaintiff [ ] preclude him from serving as a class representative.") (footnote omitted); Weikel v. Tower Semiconductor Ltd., 183 F.R.D. 377, 396 (D.N.J. 1998) (noting both that "[t]he fact [the named plaintiff] may not be readily available to attend trial has the potential for seriously interfering with his obligation to vigorously prosecute this action" and "[i]t would be inappropriate to subject members of the Class to potential trial delays created by a class representative"); Wagner v. Lehman Bros. Kuhn Loeb, Inc., 646 F. Supp. 643, 660-61 (N.D. Ill. 1986) ("A court need not resolve the issue of credibility against putative class representative in order to bar class certification. It is enough to note the existence of a credibility problem and its potential adverse impact on the class."); Strykers Bay Neighborhood Council Inc. v. City of New York, 695 F. Supp. 1531, 1537 (S.D.N.Y. 1988) (deeming named plaintiffs inadequate representatives because they failed to respond to discovery requests); Kline v. Wolf, 702 F.2d 400, 403 (2d Cir. 1983) (concluding that the district court is not required to resolve the issue of credibility or to find that the plaintiffs testified falsely, but rather that simply make a "preliminary determination that [the lead plaintiffs'] credibility was vulnerable to attack" is sufficient).

19

Furthermore, it is settled that "[t]o be an adequate representative, the named plaintiff must demonstrate a willingness and ability to play an active role in and control the litigation and to protect the absent class members." J.B.D.L. Corp. v. Wyeth-Ayerst Labs., Inc., 225 F.R.D. 208, 216 (S.D. Ohio 2003). Plaintiff admitted that he believed that he "didn't have to pay attention to [documents] in particular . . . and so [he] signed" if others were willing to sign. (Villanueva Tr. p. 41.) An admitted willingness to sign documents that he has not even read strikes at the heart of Plaintiff's ability to protect the interests of the putative class and again differentiates him from other current and former TruGreen employees who take a more reasonable and considered approach to their contractual and other obligations.

TruGreen has had the good fortune of employing law-abiding H-2B workers who come back to TruGreen year after year on a seasonal basis without any questions as to the legality of their presence in the United States. After his deposition – particularly after his refusal to answer any questions going to his ability to travel at some later date into the United States – TruGreen cannot say the same of Plaintiff. Plaintiff unequivocally has set himself apart from other current and former TruGreen employees who are not constrained to talk about their status or related issues. Indeed, given that Plaintiff left in the middle of the 2004 season and cannot explain his employment in the United States in 2005 or 2006 (if any), it seems obvious that he is not an appropriate lead Plaintiff here, where Plaintiff has made the focus of his Complaint the terms and conditions of employment he received from TruGreen in 2004. To the contrary, it appears that lead counsel has selected a mere alter ego – an absent mouthpiece who is not similarly situated to his fellow class members and who cannot fully participate in these proceedings – to achieve the legislative and/or administrative change counsel desires through litigation.

20

For all of these reasons, this Court should not grant Plaintiff's Motion to Certify a Class, as he has is not an adequate representative of the class he purports to represent.

**C.     Plaintiff Cannot Satisfy Rule 23(b)(3)'s Demanding Requirements That Common Issues Predominate As To Any Of The Putative Class Claims.**

The Court of Appeals previously has noted that under the predominance requirement of Rule 23(b)(3), class certification should be denied in cases that involve class member-specific questions as part of the analysis of liability. See Johnston, 265 F.3d at 187. Describing its opinion in In re LifeUSA Holding, Inc., 242 F.3d 136 (3d Cir. 2001), the appellate court confirmed its position that, "[r]elying on Georgine v. Amchem Products, Inc., 83 F.3d 610 (3d Cir. 1996) and Barnes v. American Tobacco Co., 161 F.3d 127 (3d Cir. 1998) . . . class certification was inappropriate in cases that present individualized issues of liability." Id. As to each of the claims for which Plaintiff seeks class certification – breach of contract, unjust enrichment, and RICO – individualized issues of liability predominate and, therefore, preclude certification.

**1.     Under either contract theory Plaintiff puts forth, Plaintiff's contract claims are not susceptible to class-wide treatment.**

As noted above, this Court already observed, that "whether a putative class member received full reimbursement, partial reimbursement or no reimbursement at all, based on specific promises made, or the specific TruGreen office at which they were employed, goes to the heart of the claim. . . ." Opinion (Docket No. 44), p. 8. Nonetheless, Plaintiff seeks class treatment of a breach of contract claim based, in significant part, on an alleged violation of the FLSA. See Plaintiff's Brief (Docket No. 74), p. 26 ("Violations of the contractual promise to comply with the FLSA will require the Court to determine whether the FLSA requires reimbursement of visa and transportation expenses. . . ."). Plaintiff's apparent dissatisfaction with the March 19 Opinion denying collective action treatment of his FLSA claim is not justification for now

attempting an "end run" around that ruling under the banner of Rule 23(b)(3).

There are two fundamental problems with Plaintiff's approach.  First, many courts have

held that FLSA claims can only be joined in private actions under the mechanism Congress has

provided by statute – 29 U.S.C. § 216(b).  Such claims (and claims under the Age Discrimination

in Employment Act) cannot be certified for class treatment under Fed. R. Civ. P. 23.  See, e.g.,

Anson v. Univ. of Texas Health Science Ctr., 962 F.2d 539, 540 (5th Cir. 1992).  Plaintiff should

not be allowed to thwart this principle by now characterizing his FLSA claim as part of a breach

of contract claim.  See also Williamson v. General Dynamics Corp., 208 F.3d 1144, 1154 (9th

Cir. 2000) (noting that FLSA is the exclusive manner by which to enforce rights provided for

under that statute); Frey v. Spokane County Fire Dist. No. 8, No. CV-05-289, 2006 WL

2597956, *11 (E.D. Wash. Sept. 11, 2006) (dismissing state common law claim for breach of

contract because it was preempted by the FLSA); Johnston v. Davis Sec., Inc., 217 F. Supp. 2d

1224 (D. Utah 2002) (dismissing state common law claims as duplicative of FLSA claims);

Tombrello v. USX Corp., 763 F. Supp. 541, 545 (N.D. Ala. 1991) ("As a matter of law, plaintiff

cannot circumvent the explicit remedy prescribed by Congress by asserting equivalent state

common law claims [for overtime] in addition to the FLSA."); Lerwill v. Inflight Motion

Pictures, Inc., 343 F. Supp. 1027, 1029 (N.D. Cal. 1972) (noting that an examination of the

FLSA "does disclose a Congressional intent that the right of action [provided by the FLSA] was

to be the sole means by which employees could enforce the rights created by [the FLSA]").

Second, Plaintiff's effort to obtain class certification of his claim under the FLSA (via an

argument that defendants contracted to pay in accordance with the FLSA) must account for what

the Court already has concluded regarding the amenability of reimbursement questions to

resolution by class-wide proof.  The Court previously and correctly concluded that such claims

would depend on individualized facts. Plaintiff makes no presentation that establishes the Court

erred in that regard, and class certification of the "contract" claim should be denied on that basis

alone, at least insofar as the claim resolves around the same types of proof that would have been

required if plaintiff's FLSA claim had been certified for collective treatment.

Even if the Court had not previously denied collective action treatment of Plaintiff's

FLSA claim, however, class certification would nevertheless be inappropriate as to Plaintiff's

contract claim. Plaintiff argues at length that a common question exists as to whether putative

class members even *have* enforceable contracts (Plaintiff's Brief (Docket No. 74), pp. 24-25),

but this would establish little, even if true; where the existence of contracts is *undisputed* (and

the contracts may be identical), claims sounding in contract often do not qualify for class

treatment. See, e.g., In re Bridgestone/Firestone, Inc., 288 F.3d 1012, 1018 (7th Cir. 2002)

(breach of warranty claims improperly certified; "[b]ecause these claims must be adjudicated

under the law of so many jurisdictions, a single nationwide class is not manageable.").

Passing the threshold question whether enforceable contracts even exist, Plaintiff argues

that the question whether contracts were breached would involve common questions.

Recognizing that the claims imagine multiple contracts, entered into at different times by

different people at different places, Plaintiff nevertheless "maintains" that each "contract" is

similar because it offered: "(1) pay by the hour at the rate listed in Box 12 on the face of the

ETA-750 . . .(2) 100% of the prevailing wage in effect for the jobs at the time the work was

actually performed if that rate was higher than the hourly wage listed on the face of the ETA-

750, . . . ; and (3) a contractual promise to pay wages in compliance with the FLSA." Plaintiff's

Brief (Docket No. 74), pp. 25-26. Whatever Plaintiff's argument may be, it certainly is *not* an

argument that all alleged contracts, if indeed enforceable written contracts are found to exist

23

under the laws of all relevant states, have the same terms; Plaintiff's own framing of the so-called "common" contract issues presupposes different rates of pay, depending perhaps on the prevailing wage of a particular market at a particular time in a particular place. These are not factual issues susceptible to common proof, but they are the key factual issues raised by Plaintiff's description.[8] See, e.g., Cutler v. Wal-Mart Stores, Inc., 927 A.2d. 1, 10 (Md. App. Ct.) (affirming lower court's refusal to certify a class because absent a uniform contract applicable to the entire class . . . the existence, formation, and terms of any such contract necessarily would vary among employees) aff'd, 931 A.2d 1095 (Table) (Md. 2007).

Just as Plaintiff ignores the numerous individual facts surrounding the asserted contract claims, he ignores or minimizes the importance of differences in applicable law. Plaintiff asserts, for example, that "[e]ven if the terms of the ETA-750 were determined to be ambiguous, the proper interpretation of those terms would remain a legal issue common to all class members." Plaintiff's Brief (Docket No. 74), p.26. No citation is provided for this assertion.

---

[8]  Plaintiff dedicates a significant portion of his Brief identifying specific alleged wage discrepancies. That emphasis on the individualized nature of the claims only reinforces TruGreen's point. In any event, as a factual matter, TruGreen is compelled to respond to Plaintiff's misstatements and generalizations of the facts of record. First, although Plaintiff goes to great lengths to allegedly demonstrate that TruGreen paid him a wage lower than the "starting wage" set forth in the Disclosure Affidavit and/or ETA-750A, he ignores the record evidence that TruGreen actually charged him less than the rent and utility expense set forth in the Disclosure Affidavit. (Villenueva Tr. pp. 46-47.) Similarly, Plaintiff goes on with an analysis of Plaintiffs' and others select payroll histories, but even a cursory analysis of the facts of records demonstrates that one can just as easily point to a number of employees who either received exactly what had been disclosed on the Employer Disclosure Affidavits, or individuals who received a more favorable overall wage than if they had been paid the regular and overtime rates set forth in the Employer Disclosure Affidavits. By way of just one example, in 2005, DC North employee Jose Gallaga earned $1,054.02 for 53.25 hours of work. Had he been paid according to the numbers set forth in his Employer Disclosure Affidavit — $12.50 straight time and $18.75 overtime – his earnings would have been only $648.45. Similarly, in 2004, Allentown employee Ramon Rodriguez earned $444.05 in his first week of work for 40.46 hours of work. However, had he been compensated at the rates set forth in his Employer Disclosure Affidavit — $9.68 straight time and $14.52 overtime – he would have earned only $394.46 for the same amount of work. In Plaintiff's Wilmington Branch, employee Roberto Hernadez earned $551.86 in his second-to-last workweek for 40 hours of work. However, had he been compensated at the rates set forth in his Employer Disclosure Affidavit -- $11.34 straight time — he would have earned only $453.60 for the same 40 hours of work. See Summary of H-2B Workers at Exhibit A4 of Plaintiff's Appendix. At bottom, if anything, these examples only reinforce how highly individualized (and, therefore, inappropriate for class treatment) Plaintiff's breach of contract claims truly are.

24

TruGreen believes no citation could be provided, as the way in which the common law deals with ambiguities and extrinsic evidence of contracts varies from state to state.[9]

State law varies in two or three different ways as to whether and when extrinsic evidence may be considered to resolve contract ambiguities. Some states follow the rule that where the contract language is clear and unambiguous, the court may not look beyond the four corners of the document to interpret the language or intent of the parties. See, e.g., Sequa Corp. v. Aetna Cas. & Surety Co., No. 89C-AP-1, 1992 WL 207251, at *4 (Del. Super. Ct. Aug. 7, 1992). Some states allow the use of extrinsic evidence to determine the intent of the parties without regard to whether ambiguity is allegedly "latent" or "patent." See, e.g., Z & L Lumber Co. v. Nordquist, 502 A.2d 697 (Pa. 1985). Other states appear to adopt something of a different course, allowing extrinsic evidence to determine *whether* a writing is ambiguous. See, e.g., Hall v. Equitable Life Assur. Soc. of U.S., 295 N.W. 204, 206 (Mich. 1940). Despite Plaintiff's confident assurance that "there is no choice-of-law questions [*sic*] that would pose manageability problems," Plaintiff's Brief (Docket No. 74), p.33, even the seemingly simple question of the "ground rules" for resolving contractual ambiguities would require the court to work through a thicket of choice-of-law issues.

In short, the terms of the "contracts" are not the same, and the applicable law is not the same. Common questions would not predominate the process of trying putative class members' contract claims to judgment.

> **2.    Plaintiff's putative unjust enrichment class claims similarly fail because highly individualized issues predominate.**

Plaintiff's arguments with respect to his putative class claims for unjust enrichment are as

---

[9]    In this regard, the choice-of-law analysis is complicated by the fact that such analysis is issue-specific, and different states' laws may apply to different issues raised by a single plaintiff. See, e.g., Berg Chilling Sys., Inc. v. Hull Corp., 435 F.3d 455, 462 (3d Cir. 2006).

superficial and faulty as his putative class contract claims, as set forth above. He argues in entirely conclusory fashion that the essential elements of the unjust enrichment claim (as provided under Delaware law) each constitute a "common issue." Running down the list of elements of the claim, he summarily decrees that each of the following is a common issue: "[w]hether [the labor of the H-2B employees] constitutes an enrichment to TruGreen"; "whether the H-2B workers' receipt of wages below those specified by the ETA-750 and/or below those promised to workers in the Employer Disclosure Affidavits constitutes an impoverishment"; what was TruGreen's "rationale" for allegedly paying employees other than what was disclosed on the Form ETA-750As and Employer Disclosure Affidavits; and whether that rationale was valid. <u>See</u> Plaintiff's Brief (Docket No. 74), p. 28. He even goes so far as to state that because all H-2B workers in the putative class "were working for TruGreen at the request of TruGreen, "[t]he relationship between the enrichment and the impoverishment [a required element of the claim under Delaware law]" also must be a common issue. By their very nature, however, even as Plaintiff has characterized them, these questions are inherently individualized. Whether "labor" constitutes an enrichment is inherently individualized, depending on the type of labor, its market value, the value of the benefit received, and the value of the payment made to the individual. Similarly, whether an individual was "impoverished" necessarily requires an analysis of the market value of that individual's work as against the individual payments made to that employee. For these reasons, courts repeatedly have rejected class certification as to unjust enrichment/promissory estoppel claims. <u>See, e.g.</u>, <u>Sprague</u>, 133 F.3d at 398 ("Because of their focus on individualized proof, estoppel claims are typically inappropriate for class treatment."); <u>Jensen v. SIPCO, Inc.</u>, 38 F.3d 945, 953 (8th Cir. 1994) ("if estoppel is an available doctrine, it must be applied with factual precision and therefore is not a suitable basis for class-wide relief");

26

Bunnion v. Consol. Rail Co., No. Civ. A. 97-4877, 1998 WL 372644, at *14 (E.D. Pa. May 14,

1998) (same); Cutler, 927 A.2d at 12 ("[t]he measure of damages for unjust enrichment is the

known gain to the Defendant. This evaluation would require individual assessments of whether

or not any benefit was conferred and accepted, retained, or even known to the Defendant.").

     In addition, Plaintiff once again glosses over material differences in applicable law.

Plaintiff assumes that Delaware's five-part test will apply, but ignores that given that Delaware

will look to the state with the "most significant relationship" to the claims at issue, the three-part

test under Connecticut, New Jersey and New York law might apply; or that the six-part test

under Maine, Maryland, Ohio, Pennsylvania, and Virginia law might apply; or that the undefined

standard under Massachusetts law might apply.  See Powers v. Lycoming Engines, __ F.R.D. __,

No. Civ. A. 06-2993, 2007 WL 2782355, *4-5 (E.D. Pa. Sept. 25, 2007) (summarizing state law

differences in unjust enrichment claims).  To permit Plaintiff's unjust enrichment claims to

proceed on a class-wide basis, the Court necessarily would have to keep a running tab of each

employee, his location, and the distinctions between their "common" unjust enrichment claims.

As the court in West Morris Pediatrics, P.A. v. Henry Schein, Inc., 897 A.2d 1140 (N.J. Super.

Ct. 2004) recognized, where (as here) variations in state law "would only operate to complicate

the already-existing burden of the multiplicity of individualized issues," class treatment is not

appropriate.  West Morris Pediatrics, 897 A.2d at 1156 (citations omitted) aff'd, 2006 WL

798952 (N.J. Super. A.D. Mar. 30, 2006).

     Finally, even if these differences in law were not sufficient to render the claims

sufficiently different for purposes of the Rule 23 analysis, there still remain differences in how

these elements of the law are applied and interpreted by each state's courts.  Yet, Plaintiff

ignores entirely the possibility for such differences.  Notably, Plaintiff assumes without

27

discussion or citation that there is no unjust enrichment claim if the Court concludes that the

Form ETA-750As and Employer Disclosure affidavits constitute enforceable contracts. <u>See</u>

Plaintiff's Brief (Docket No. 74), pp. 28-29. However, that position arguably robs putative class

members in Connecticut, Maine, and Ohio of potential remedies, for the courts in each of those

states have recognized that there may be instances in which unjust enrichment is a viable theory

even when an express contract covers the same subject. <u>See</u> <u>R.J. Wildner Contracting Co., Inc.</u>

<u>v. Ohio</u>, 913 F. Supp. 1031 (N.D. Ohio 1996) (citations omitted); <u>Combustion Eng'g, Inc. v.</u>

<u>Miller Hydro Group</u>, 812 F. Supp. 260, 262-63 (D. Me. 1992) ("Maine has no absolute rule

barring recovery [under a theory of unjust enrichment] in the presence of a valid contract");

<u>Polverari v. Peatt</u>, 614 A.2d 484 (Conn. App. Ct. 1992) (acknowledging that the existence of a

contract, in itself, does not preclude equitable relief which is inconsistent with the contract).

     Simply put, the variations in the necessary offers of proof as well as the differences in the

scope and application of the applicable law reveal that Plaintiff's unjust enrichment claims are

not susceptible to class-wide treatment.

ME1 6870516v.1

**D.    Plaintiff's Proposed RICO Claims Are Futile As A Matter Of Law And, In Any Event, Are Not Appropriate For Class-Wide Adjudication.[10]**

Plaintiff's proposed RICO claims are premised on the predicate acts of mail, wire, and visa fraud. See Proposed Amended Complaint (Docket No. 55) ¶¶ 32-42. As set forth in detail in TruGreen's Opposition to Plaintiff's Motion for Leave to File a First Amended Complaint (Docket No. 55), Plaintiff lacks standing to pursue the asserted RICO claims and, in any event, implicitly concedes by the allegations of her claim that he cannot demonstrate the requisite causation to proceed with his proposed RICO claims. For these reasons, assuming Plaintiff is permitted to amend his Complaint and, therefore, that these claims are properly before the Court at this juncture, Plaintiff's RICO claims still should be dismissed in their entirety. However, even if the Court considers these RICO claims in the context of Plaintiff's motion for class certification, it is similarly clear that these claims are not appropriate for class-wide treatment.

The causation standard for civil RICO claims grounded in fraud claims (such as Plaintiff's) ultimately requires a plaintiff to establish "that the defendant's violation not only was

---

[10]    As TruGreen expressed in its Opposition to Plaintiff's Motion for Leave to File a First Amended Complaint (Docket No. 55), Plaintiff's and his counsel's motives for bringing RICO claims in this matter are the height of bad faith. As former Chief Justice Rehnquist noted in words particularly applicable here, "Virtually everyone who has addressed the question agrees that civil RICO is now being used in ways that Congress never intended. . . . Most of the civil suits filed under the statute have nothing to do with organized crime. They are garden-variety civil fraud cases of the type traditionally litigated in state courts." William H. Rehnquist, Reforming Diversity Jurisdiction and Civil RICO, Address At the Eleventh Seminar on the Administration of Justice (April 7, 1989) in 21 St. Mary's L.J. 5, 9 (1989). (Exhibit C hereto). See also 132 Cong. Rec. H9371 (daily ed. Oct. 7, 1986) (statement of Rep. Boucher) (decrying application of RICO to "garden variety fraud" contrary to Congress's intent). (Exhibit D hereto). The majority of civil RICO cases now involve commonplace controversies such as these that have been recharacterized by resourceful attorneys to conform with the requirements of RICO: adding a few allegations of the use of the mails or wires in furtherance of a fraudulent scheme, describing how the mail or wire fraud offenses form a pattern, and explaining how the defendants conducted the affairs of an appropriate enterprise. By granting class certification in large-scale RICO "fraud" cases such as this, a federal court assumes responsibility over issues that are manifestly more properly decided in other fora. Plaintiff here seeks a finding that the TruGreen's administrative, recruiting, and compensation practices somehow violate the law. Such issues more properly are determined by individual states or by industry-specific regulatory agencies. Moreover, aggregating such claims for nationwide adjudication place the fate of an entire industry in the hands of a single jury, which lacks the expertise in the practices and economic realities of the industry possessed by experienced regulators — here, for example, the challenged practices are actively supervised by the Department of Labor, among other agencies. Cf. Taffet v. Southern Co., 967 F.2d 1483, 1494 (11th Cir. 1992) (dismissing RICO claim against utility because state regulatory scheme for determining utility rates was already in place).

29

a 'but for' cause of his injury, but was the proximate cause as well." Holmes v. Sec. Investor

Protection Corp., 503 U.S. 258, 268 (1992). That showing requires, at the least, "establish[ing]

'reasonable reliance' on the defendants' purported misrepresentations or omissions." Bank of

China, New York Branch v. NBM LLC, 359 F.3d 171, 178 (2d Cir. 2004) cert. dismissed, 546

U.S. 1026 (2006). This is a quintessentially individualized question; each plaintiff's civil RICO

claim can succeed only if *that plaintiff* relied on the defendants' alleged misrepresentations.

The Ninth Circuit Court of Appeals, which routinely has a number of Civil RICO actions

on its docket, specifically undertook to "clarify the extent to which a class action plaintiff must

establish individualized reliance to meet the causation requirement of a civil [RICO] claim

predicated on mail fraud" given that it was "an issue that bears heavily on a plaintiff's ability to

meet the predominance and superiority requirements of class certification . . ." Poulos v. Caesars

World, Inc., 379 F.3d 654, 658 (9th Cir. 2004). The appellate court recognized that "[c]ausation

lies at the heart of a civil RICO claim. Lumping claims together in a class action does not

diminish or dilute this requirement." Id. at 664. The Court further recognized that because a

plaintiff must demonstrate that the alleged misconduct proximately caused the alleged injury,

"[alleged] misrepresentations standing alone have little legal significance. To connect the dots

between the bare allegations and the injury, the class needs something more." Id. Reliance, the

Ninth Circuit explained, provides the key causal link.[11] Consistent with that premise, courts

overwhelmingly have recognized that individualized issues of reliance preclude class treatment

of RICO claims based on fraud. See, e.g., Matjastic v. Quantum Pharmics, Ltd., No. Civ. A. 90-

---

[11]    Some courts have "presumed" reliance in certain narrow contexts in civil fraud actions. Nevertheless, presuming reliance in civil RICO actions is "generally disfavored." Chisolm v. TransSouth Fin. Corp., 194 F.R.D. 538, 560 (E.D. Va.2000). The Supreme Court has presumed reliance only in the securities litigation context under the fraud-on-the-market theory. See Basic, Inc. v. Levinson, 485 U.S. 224 (1988). This conclusion was arrived at by the Basic plurality through a three-step analysis that is specific to the securities industry (relying on the "efficient capital market hypothesis") and entirely inapplicable here. Basic, 485 U.S. at 244, 246-47.

0647, 1991 WL 238304, *5 (E.D. Pa. July 22, 1991) (denying class certification as to RICO

claim because the predicate acts of fraud requires proof of reliance and, therefore, that individual

issues predominate); In Re Bexar County Health Facility Dev. Corp, 125 F.R.D. 625, 636 (E.D.

Pa.1989) (necessity of proving individualized questions of reliance precludes class certification

of common law claims for fraud and negligent misrepresentation); Curley v. Cumberland Farms

Dairy, Inc., 728 F. Supp. 1123, 1133 (D.N.J. 1989) (Rule 23(b) not satisfied when importance of

details outweighs determination that alleged wrongful acts are actionable); Zlotnick v. TIE

Commc'ns, Inc., 123 F.R.D. 189, 194-95 (E.D. Pa.1988) (class certification inappropriate where

proof of reliance highly individualized); Cf. Eisenberg, 766 F.2d at 786 (individual issues did not

predominate where case "did not present extraordinarily complex questions of causation or

reliance....").[12]

The Third Circuit specifically has recognized the vital importance of reliance in RICO

actions, noting cautiously only that the "presence of individual [reliance] questions do not *per se*

rule out a finding of predominance." In re Prudential Ins. Co. of Am. Sales Practices Litig., 148

F.3d 283, 315 (3d Cir. 1998). However, even if the issue of individual reliance does not

automatically preclude class certification, it must be that "if there is any material variation in the

representations made or in the degrees of reliance thereupon," a RICO case predicated on fraud

---

[12]   See also In re Initial Public Offering Secs. Litig., 471 F.3d at 42 ("establishing reliance individually by
members of the [putative RICO] class would defeat the requirement of Rule that common questions of law or
fact predominate over questions affecting only individual members"); Gariety v. Grant Thornton, LLP, 368
F.3d 356, 362 (4th Cir. 2004) ("Because proof of reliance is generally individualized to each plaintiff allegedly
defrauded, fraud . . . claims are not readily susceptible to class action treatment, precluding certification of
such actions as a class action."); Broussard v. Meineke Discount Muffler Shops, Inc., 155 F.3d 331, 342 (4th
Cir. 1998) ("claims that 'require[] proof of . . . whether the person justifiably relied on [defendant's] statements
to his detriment' are not susceptible to class-wide treatment"); Sikes v. Teleline, Inc., 281 F.3d 1350 (11th Cir.
2002) (reversing district court's decision to certify class as to RICO fraud claims because the issue of
individual reliance was inherent in those claims and, therefore, precluded certification); In re Neurontin Mkt'g
& Sales Pracs. Litig., __ F.R.D. __, No. 04-10981, 2007 WL 2823681, at *104 (D. Mass. Sept. 27, 2007)
(denying motion for class certification of RICO claims because the proximate causation standard under RICO
precludes a finding that "questions of law or fact common to the class predominate over questions affecting
only individual members"); Ruffu, 181 F.R.D. at 344 (same).

31

is not suited for treatment as a class action. Sullivan v. Chase Inv. Servs., 79 F.R.D. 246, 252 (D.C. Cal. 1978). Stated another way, certification may be proper notwithstanding the need for a showing of individualized reliance, but only when "the plaintiffs can prove that the [ ] misrepresentations were uniform and no material variations existed in statements made to each class member." Id.

Here, the record currently before the Court amply demonstrates how highly individualized the reliance analysis necessarily must be given the nature of Plaintiff's RICO theories. This is not a case in which the same alleged "misrepresentation" was communicated to each H-2B employee. To the contrary, every H-2B applicant received each year an individualized Employer Disclosure Affidavit, setting forth individualized starting wages (that may or may not relate to the wages earned in prior years), positions, rent and utility costs, and even branch locations.[13]  Further, for employees who were returning to TruGreen, it is not clear that they, in whole or in part, even relied upon any of the contents of the Disclosure Affidavits; for employees who were recommended to TruGreen by others, it similarly is not clear if they, in whole or in part, relied on these documents.[14]  Thus, it will be relevant to determine for each class member whether or to what extent they believed the Employer Disclosure Affidavits; whether they would have agreed to employment with TruGreen notwithstanding the alleged discrepancies between the Employer Disclosure Affidavits and the actual terms of employment; whether they were concerned about the wages set forth in the Employer Disclosure Affidavits;

---

[13]  By Plaintiff's own admission, he did not see, let alone rely on, the ETA-750 or any other governmental filing. (Villanueva Tr. 37 ("I only knew [about my compensation] what was on this paper [the Employer Disclosure Affidavit].").)

[14]  Plaintiff's own purported "reliance" on the Employer Disclosure Affidavit and the relation between that reliance and his injury is in doubt given the undisputed facts of record. He admitted that notwithstanding the terms and conditions of employment (including that he would have to bear his own costs to travel to the United States), he accepted employment with TruGreen "because on the list it was the best salary." (Villanueva Tr. 43.) Further, he admitted under oath that "I have to recognize the fact that I didn't pay attention to [the documents in Mexico] in particular. Everyone was signing and so I signed." (Villanueva Tr. 41.)

32

whether they interpreted the Employer Disclosure Affidavits similarly to Plaintiff and his

counsel; and/or whether they agreed to employment with TruGreen for reasons other than what

was set forth in the Disclosure Affidavits.

In short, this is not a case in which reliance can be presumed and the Court's primary task

simply is to determine the amount of class members' individual recovery. Quite the contrary is

true. If anything can be presumed, it is that it is an individualized inquiry will be necessary to

determine reliance, if any, for each individual class member. As such, individual issues of

reliance predominate Plaintiff's RICO claims and, therefore, they are not appropriate for class

certification.

### E.    Plaintiff Has Not Carried And Cannot Carry His Burden Of Establishing That A Class Action Is The Superior Method Of Adjudicating Any Of His Claims.

Just as the need to address highly individualized issues precludes a finding of

predominance, so too does it preclude a finding that class action is the superior way of resolving

these individualized claims. The difficulties likely to be encountered in managing the proposed

class action substantially outweigh any benefits derived from consolidating the claims as a class

action. Indeed, as set forth above, there is no mechanism to avoid individualized testimony.

Because the very issues to be decided are based entirely on an individual's experience, testimony

necessarily will vary from employee to employee. Moreover, to protect TruGreen's due process

rights, TruGreen must have the opportunity to cross-examine each employee as each element of

the claims at issue. In short, any class-based trial would become unmanageable. See Jiminez v.

Domino's Pizza, Inc., 238 F.R.D. 241, 253 (C.D. Cal. 2006); Harris v. Fee Transp. Servs., Inc.,

No. Civ. A. 05-77, 2006 WL 1994586, at *4 (N.D. Tex. May 15, 2006) (noting that "issues of

fairness and manageability further counsel against certification. Defendants would likely be

prejudiced in presenting a defense because of the individualized nature of the claims . . ."); Reyes

33

v. Texas EZ Pawn, L.P., No. Civ. A. V-03-128, 2007 WL 101808, at *6 (S.D. Tex. Jan. 8, 2007) (concluding that because the nature of the claims called for an individualized analysis of the facts, "the judicial inefficiency of having essentially forty plus mini-trials clearly outweighs any potential benefit in proceeding as a collective action."); Johnson v. TGF Precision Haircutters, Inc., No. Civ. A. H-03-3641, 2005 WL 1994286, at *7 (S.D. Tex. Aug. 17, 2005) (noting that "the individualized claims and individualized defenses . . . would not only dominate but would swallow and consume the entire case").

To find superiority under Rule 23(b), a court must determine that *all* other methods of resolving the issues in the case are inferior to a class action. See Schwartz v. Dana Corp., 196 F.R.D. 275, 285 (E.D. Pa. 2000). Plaintiff has not demonstrated why the individual resolution of claims is inferior to the class mechanism, choosing instead to recite the elements of superiority set forth in Rule 23 and conclusorily declare that those standards are met. That, however, is not the burden he carries. Once again, to the contrary, all reasonable inferences are clear that individualized trials are the only methods of adjudication that will permit a fair and efficient resolution of the claims at issue.

34

IV.    **CONCLUSION**

For all of the reasons set forth above, TruGreen respectfully requests that Plaintiff's

Motion for Class Certification be denied in its entirety.

Respectfully submitted,

/s/Daniel M. Silver
McCarter & English, LLP
Michael P. Kelly (DE Bar ID #2295)
Daniel M. Silver (DE Bar ID #4758)
Renaissance Centre
405 North King Street, 8th Floor
Wilmington, DE  19801
(302) 984-6300
mkelly@mcarter.com
dsilver@mccarter.com

*Admitted Pro Hac Vice*
Michael L. Banks (PA I.D. #35052)
Sarah E. Bouchard (PA I.D. #77088)
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA  19103-2921
(215) 963-5387/5077

Dated:  October 26, 2007                Attorneys for Defendants

35

ME1 6870516v.1

# EXHIBIT A

IN THE CIRCUIT COURT OF THE FOURTEENTH JUDICIAL CIRCUIT
ROCK ISLAND COUNTY, ILLINOIS

FILED in the CIRCUIT COURT
of ROCK ISLAND COUNTY
GENERAL DIVISION

MAR - 9 2007

*Lisa L. Bierman*
Clerk of the Circuit Court

LISA BROWN, CYNTHIA CAMP, and )
JOSEPH STANFIELD on behalf of )
themselves and all others similarly situated )
)
    Plaintiffs, )
)
    v. )
)
WAL-MART STORES, INC., a Delaware )
Corporation, d/b/a WAL-MART Discount )
Stores, WAL-MART Super centers and )
SAM'S CLUB operating segments )
)
    Defendant )

No. 2001 L 85

**ORDER ON CLASS
CERTIFICATION**

## SUMMARY OF COURT'S RULING

At this stage of the litigation, this Court has been called upon to rule on a

Motion for Class Certification. Plaintiffs seek to certify a class of over 223,000

current and former hourly employees who worked for defendant in the State of

Illinois during the period June 20, 1996 to the present.

A ruling on class certification is not a ruling on the underlying merits of the

case. It is simply a determination of whether the statutory requirements set out in

735 ILCS 5/2-801 have been met so that the case can proceed as a class action

under Illinois law.

This opinion should not be interpreted as an affirmation or commentary

regarding any employment or wage practices of defendant or the underlying

merits of the case.   Plaintiffs presented argument and documents, which if

proven at trial, would indicate defendant engaged in the unacceptable practice of

allowing/expecting hourly workers to work off the clock, all to enhance corporate profitability. But again, the sole issue before this Court is whether plaintiffs have satisfied the criteria to allow the case to proceed as a class action; the merits of the underlying case are for another day.

The recent Illinois Supreme Court case of *Avery v. State Farm* 296 Ill. Dec. 448, 216 Ill.2d 100, 835 N.E.2d 801, (decided August 18, 2005) dealt with many similar legal issues. Drawing guidance from *Avery*, this Court has determined plaintiffs have not met the statutory burden to proceed as a class action.

Plaintiffs have failed to demonstrate the existence of a reasonable and accurate method of calculating damages on a class wide basis, making individual inquiry necessary to satisfy due process. The individual issues regarding damages would predominate, making class certification impractical. Therefore the request to certify the proposed class is denied.

## Table of Contents

This opinion is organized as follows:

| | Page |
|---|---|
| Overview and Background of this Case | 3 |
| PowerPoint Objections | 5 |
| Plaintiffs' Complaint | 7 |
| Defendant's Answer and Affirmative Defenses | 8 |
| Issues Presented | 9 |
| Illinois Statutory Authority | 9 |
| Illinois Class Action Case Law | 11 |
| Wal-Mart Class Action Cases in Other States | 15 |
| Factual Allegations | 17 |
| Standard to be Applied | 20 |
| Class Analysis | 21 |
|     The Numerosity Requirement | 22 |

Commonality Issue                                     22
Adequately Represent the Class Issue                  27
Appropriateness Issue                                 28
Conclusion                                            31
Reserve Issue of Appeal Under SCR 308                 32
Order                                                 33

## OVERVIEW AND BACKGROUND OF THIS CASE

Oral arguments were held January 25, 2007 on the pending Motion for Class Certification.  Attorneys present at the hearing included:

### Plaintiffs' Attorneys:

Glenn Ruud   (Ruud Scovil & Marsh- Rock Island)
Judith L. Spanier  and Grace Parasmo* (Abbey, Spanier, Rodd, Abrams, & Paradis, LLP- New York)
  * Ms. Parasmo is awaiting formal licensing in New York
Rodney P. Bridgers, Jr. (Azer & Associates- Denver)
Renee B. Taylor (Bader & Associates LLC- Denver)

### Defendant's Attorneys:

Matthew Pappas and Terri Martin  (Pappas & Schnell- Rock Island)
Ruth A. Bahe-Jachna (Greenberg Traurig, LLP- Chicago)
Donald Frederico  (Greenberg Traurig, LLP- Boston)
Jeannette M.  Brook  (Greenberg Traurig, LLP- Denver)

Ms. Spanier and Mr. Bridgers argued the motion for plaintiffs.  Mr. Pappas and Mr. Frederico argued on behalf of defendant.  Ms. Bahe-Jachna handled objections.

Plaintiffs Lisa Brown, Cynthia Camp, and Joseph Stanfield are current or former employees of the defendant.  Named plaintiffs are seeking class certification on behalf of themselves and all current and former hourly employees who worked for defendant in the State of Illinois during the period June 20, 1996

to the present. At oral argument, both sides agreed the proposed class exceeds 223,000 people and continues to grow.

Defendant is Wal-Mart Stores, Inc. and it owns and operates retail stores including Wal-Mart Discount Stores, Super Wal-Marts, and Sam's Clubs in the State of Illinois. Wal-Mart Stores, Inc. also has stores worldwide, but those stores are not included in the present action.

Plaintiffs allege that defendant required employees to work off-the-clock, without compensation, and to skip rest and meal breaks to which the employees were entitled. Plaintiffs filed a multi-count complaint on June 20, 2001.

Shortly after the case was filed, a dispute arose between attorneys as to who was in control of the litigation. There were two groups of attorneys filing conflicting pleadings, and both claimed to represent Ms. Brown, who was the sole plaintiff at the time. At defendant's request, this Court intervened.

After a hearing, a control group was established and attorneys were named to that group. Also, restrictions were instituted limiting who was authorized to file pleadings in this case. (See order of April 4, 2002.) Cynthia Camp and Joseph Stanfield were added as proposed representative plaintiffs to the case near this time.

Plaintiffs' Third Amended Complaint filed April 8, 2003 survived a motion to dismiss. Defendant answered the complaint on October 6, 2003 and filed certain affirmative defenses, which were denied in subsequent pleadings by the plaintiffs.

4

After discovery was conducted, plaintiffs filed the pending Motion for Class Certification on October 31, 2005. Defendant filed a resistance to said Motion on December 14, 2005. A briefing schedule was established and both sides supplemented the record with numerous binders containing documents and exhibits that support their respective positions.

Both sides acknowledged a trial court has discretion to permit or deny live testimony in support of the class certification motion. This Court, in its discretion, denied defendant's request to present 2-3 days worth of live testimony at the class certification hearing, but did allow each side to present a limited number of evidence depositions. Plaintiffs did not seek live testimony for the certification hearing.

One day was allowed for oral arguments. Both sides effectively reduced much of their presentation to *PowerPoint*, a paper copy of which was made part of the record. This method of presentation allowed the parties to efficiently call the Court's attention to relevant parts of documents already in the record. Attorneys for both sides are commended on their presentation.

## POWERPOINT OBJECTIONS

Both sides objected to certain *PowerPoint* documents as not being previously disclosed and not being part of the record. Since neither side had tendered their *PowerPoint* presentations to the other in advance, certain documents came as a surprise. In the interest of time, both presentations were allowed to proceed and ruling on the objections was reserved. Ruling on the objections was not critical to the ultimate issue of class certification.

One document that drew a rapid objection from defendant was plaintiffs'
*PowerPoint* #61. Defendant claimed that document was not disclosed, was not
part of the record in this case, and was a privileged attorney-client
communication. That document (a memo dated October 9, 2000) was not fully
shown in the *PowerPoint*, only highlighted words were shown, purportedly
identifying to senior level management the level of monetary exposure defendant
was facing in various states, including Illinois.

This was one of many documents plaintiffs presented to support the
contention defendant's senior management knew of the missed break problem
but did nothing to rectify the problem. So, in a sense, the document is
cumulative.

Whether a jury will ever be allowed to see plaintiffs' *PowerPoint* #61 is a
question for another day. Defendant's assertion the document is privileged is
specifically reserved. If either party needs a ruling on that document's future
admissibility in this case, then that party should file a formal written motion and
set the matter for hearing.

The *PowerPoint* only highlighted relevant portions of documents. The
Best Evidence Rule requires that when presenting a summary, that the complete
document be presented and admitted into evidence before select portions of the
document are considered. In this way the Court and the parties are assured the
quoted material is presented accurately and in context.

Therefore any document not previously disclosed and not already in the
record, is deemed excluded from the official record. Both sides are given 30

6

days to supplement the record by identifying the exhibit number where each

*PowerPoint* exhibit is found in the record of this case.  This ruling does not apply

to showing reported court cases.

### PLAINTIFFS' COMPLAINT

Plaintiffs' theories of recovery are set forth in an eight-count complaint as

amended and are summarized as follows:

| Counts I & II | Breach of Express Contract |
| Counts III & IV | Breach of Implied Contract |
| Counts V & VI | Quantum Meruit/Restitution & Promissory Estoppel |
| Counts VII and VIII | Violations of the Minimum Wage & Overtime Act and the Wage Payment and Collection Act. |

Essentially plaintiff argues that as employees of defendant, they did not

receive rest and meal breaks and/or were required to work off the clock.  In its

simplest form, the employees were not paid for all the hours to which they were

otherwise entitled.  Which form of legal theory, if any, plaintiff could recover

under is a fact question for the jury and not a question decided at the class

certification stage.

Plaintiffs claim there are essential questions common to all class members

to meet the commonality statutory requirements.  Those claimed common

questions are:

1.  As to rest and meal breaks:

    a.  Whether Wal-Mart was obligated to provide plaintiffs and the
        class with rest and meal breaks?

7

    b. Whether Wal-Mart failed to provide plaintiffs and the class with the required rest and meal breaks?

2. As to off-the-clock work:

    a. Whether plaintiffs and the class should be compensated for all time worked?

    b. Whether Wal-Mart failed to compensate plaintiffs and the class for all time worked?

3. Additional predominant questions include:

    a. Whether Wal-Mart's hourly employees are entitled to the benefits set forth in the Company's Handbook and/or Break and Meal Period and Off-The-Clock Policies?

    b. Whether Wal-Mart's time records are admissible as business records?

    c. Whether Wal-Mart's time records constitute evidence of breaches of Wal-Mart's corporate policies?

    d. Whether Wal-Mart senior management was on notice of pervasive and widespread violations of Wal-Mart's policies regarding rest and meal breaks and off-the-clock work?

    e. Whether Wal-Mart has a duty independent of the Handbook and/or policies to provide meal breaks to class members?

## DEFENDANT'S ANSWER AND AFFIRMATIVE DEFENSES

Defendants deny plaintiffs' allegations and have countered with a laundry list of affirmative defenses. The affirmative defenses include: unjust enrichment; statute of limitations; laches; estoppel; waiver; accord and satisfaction; unclean hands; lack of standing; acting outside the scope of authority; failure to mitigate damages; among other defenses.

8

## ISSUES PRESENTED IN THIS CASE

The legal issues presented in this case are as follows:

1.  What standard is to be applied in evaluating the evidence for purposes

    of class certification?  Does the Court weigh the evidence or is

    plaintiffs' evidence accepted as true for purposes of the motion?

2.  Does plaintiffs' case meet each of the four statutory requirements for

    class certification? Those being:

    (a) Is the class so numerous that joinder of all members is
        impracticable?

    (b) Are there questions of fact or law common to the class, which
        common questions predominate over any questions affecting
        only individual members?

    (c) Will the representative parties fairly and adequately protect the
        interest of the class?

    (d) Is a class action an appropriate method for the fair and efficient
        adjudication of the controversy?

## ILLINOIS STATUTORY AUTHORITY

Class actions are a statutory creation. Relevant statutory authority

pertaining to class actions in Illinois is found at 735 ILCS 5/2-801 et. seq. and the

entire section is set out below.  To understand if a class action is an appropriate

method to adjudicate this dispute, one must remain cognizant of the procedural

framework set out in the statute.

> § 2-801. Prerequisites for the maintenance of a class action. An
> action may be maintained as a class action in any court of this
> State and a party may sue or be sued as a representative party of
> the class only if the court finds:

9

(1) The class is so numerous that joinder of all members is impracticable.

(2) There are questions of fact or law common to the class, which common questions predominate over any questions affecting only individual members.

(3) The representative parties will fairly and adequately protect the interest of the class.

(4) The class action is an appropriate method for the fair and efficient adjudication of the controversy.

§ 2-802. Order and findings relative to the class. (a) Determination of Class. As soon as practicable after the commencement of an action brought as a class action, the court shall determine by order whether it may be so maintained and describe those whom the court finds to be members of the class. This order may be conditional and may be amended before a decision on the merits.

(b) Class Action on Limited Issues and Sub-classes. When appropriate, an action may be brought or maintained as a class action with respect to particular issues, or divided into sub-classes and each sub-class treated as a class. The provisions of this rule shall then be construed and applied accordingly.

§ 2-803. Notice in class cases. Upon a determination that an action may be maintained as a class action, or at any time during the conduct of the action, the court in its discretion may order such notice that it deems necessary to protect the interests of the class and the parties.
An order entered under subsection (a) or Section 2-802 of this Act, determining that an action may be maintained as a class action, may be conditioned upon the giving of such notice as the court deems appropriate.

§ 2-804. Intervention by and exclusion of class members. (a) Intervention. Any class member seeking to intervene or otherwise appear in the action may do so with leave of court and such leave shall be liberally granted except when the court finds that such intervention will disrupt the conduct of the action or otherwise prejudice the rights of the parties or the class.

(b) Exclusion. Any class member seeking to be excluded from a class action may request such exclusion and any judgment entered in the action shall not apply to persons who properly request to be

excluded.

§ 2-805. Judgments in class cases. Any judgment entered in a class action brought under Section 2-801 of this Act shall be binding on all class members, as the class is defined by the court, except those who have been properly excluded from the class under subsection (b) of Section 2-804 of this Act.

§ 2-806. Dismissal or compromise of class cases. Any action brought as a class action under Section 2-801 of this Act shall not be compromised or dismissed except with the approval of the court and, unless excused for good cause shown, upon notice as the court may direct.

## ILLINOIS CLASS ACTION CASE LAW

In Illinois, the class action statute in 2-801 is modeled after Federal Rule 23. "Given the relationship between these two provisions, federal decisions interpreting Rule 23 are persuasive authority with regard to questions of class certification in Illinois." *Avery v. State Farm Mut. Auto. Ins. Co.* (Ill. Sup. Ct. decided Aug. 18, 2005) 296 Ill .Dec. 448, 216 Ill.2d 100, 835 N.E.2d 801, and *Schlessinger v. Olsen*, 86 Ill. 2d 314, 320 (1981).

This Court sits in Illinois. It is required to apply Illinois law to the facts of this case and the Illinois Supreme Court has the final say in interpreting Illinois law. Recent Illinois Supreme Court decisions including *Avery* and *Smith v. Illinois Central Railroad* 2006 Ill. Lexis 1652 (issued November 30, 2006) offer guidance.

This Court further notes that *Avery* and *Smith* were decided long after the present case was filed. In a nutshell, *Avery* was a reminder that the Constitutional guarantee of due process remains paramount and trumps any other argument, including public policy considerations.

*Avery* is particularly insightful because it deals with similar legal issues such as predominance and using statistics to calculate damages. It also addresses what is necessary to satisfy due process when calculating damages on a class wide basis.

The *Avery* plaintiffs brought suit alleging contract and consumer fraud claims against State Farm because State Farm required the use of non-original equipment manufacturer (non-OEM) parts in repairing damaged vehicles. The Illinois Supreme Court set aside a billion dollar class action jury verdict against State Farm after the Fifth District Court of Appeals had affirmed.

In *Avery* plaintiffs claimed that the mere specification of non-OEM parts in a repair estimate created a recoverable action against State Farm. In other words the fact a non-OEM part was specified in the estimate created an entitlement to damages regardless of whether a non-OEM part was actually installed.

The repair estimates in *Avery* were relatively easy to obtain from State Farm's records, much like the time card punch records in the present case. Plaintiffs in the present case are attempting to equate a missed time card punch with a missed break much like the *Avery* plaintiffs were attempting to equate a non-OEM repair specification with a recoverable loss.

In *Avery*, there were no records available on a class-wide basis to show if non-OEM parts were actually used in the repair or if individual plaintiffs actually suffered a monetary loss. In the present case, there are no records on a class

12

wide basis to verify if the lack of a time punch actually corresponds to a missed

break by the employee.

In *Avery*, the Supreme Court rejected plaintiffs' use of what it termed

specification damages by stating:

> In our view, plaintiffs' theory of "specification damages" has no basis in the law.
> Under this theory, loss occurs when a non-OEM part is *specified* on the estimate
> rather than when the part is *installed* on the vehicle. Plaintiffs' damages expert,
> Dr. Mathur, conceded at trial that specification damages apply to any class
> member whose repair estimate *specified* a non-OEM part, regardless of whether a
> non-OEM part was used in the repair **146** of the vehicle. Thus, a policyholder
> who had been quoted a non-OEM part on his estimate could receive specification
> damages even if (1) his vehicle was repaired with an OEM part, or (2) his car was
> restored to its preloss condition. By this same reasoning, specification damages
> would apply where a non-OEM part was specified on the estimate and was used in
> the repair, but the policyholder subsequently sold his vehicle for fair market
> value. If it is the simple *specification* of the non-OEM part in a repair estimate that
> inflicts the damage, it is irrelevant, under plaintiffs' theory, what happens
> afterwards, even if the policyholder ultimately suffers no actual damage.
> *Avery*, 216 Ill.2d at 145.

Another issue *Avery* shares with the present case is predominance.  As to

that issue the Supreme Court stated:

> In the case at bar, the determination of the preloss condition of each subclass
> member's vehicle would require the individual examination of hundreds of
> thousands, if not millions, of vehicles. Undoubtedly, these examinations would
> overwhelm any question common to the subclass, rendering it impossible for such
> questions to predominate. As noted, class certification is improper unless
> "common questions predominate over any questions affecting only individual
> members." 735 ILCS 5/2-801(2) (West 1998).  *Avery*,  216 Ill. 2d at 138.

Another issue common with *Avery* was using statistics to calculate

damages.  As stated by the Supreme Court:

> The second type of contract damages awarded was installation damages. Unlike
> "specification" damages, "installation" damages were derived from a theory
> based on an actual loss. However, as explained below, the evidence offered in
> support of plaintiffs' installation damages was so speculative and uncertain that
> awarding damages based on this evidence constituted an arbitrary deprivation of
> property in violation of State Farm's due process rights. See *State Farm Mutual
> Automobile Insurance Co. v. Campbell*, 538 U.S. 408, 416, 123 S.Ct. 1513,
> 1519-20, 155 L.Ed.2d 585, 600 (2003) (due process clause of the fourteenth
> amendment prohibits imposition of arbitrary punishments)...

13

Installation damages consisted of the additional costs to be incurred by plaintiffs in removing non-OEM parts from their vehicles and replacing them with OEM parts. *150 Included in these damages was an amount to cover two days of car rental while the non-OEM parts were being replaced. Only those class members who actually had non-OEM parts installed on their vehicles were eligible to receive installation damages. Plaintiffs' expert, Dr. Mathur, explained that, for a variety of reasons, many plaintiffs who had non-OEM parts specified on their repair estimates did not, in fact, have non-OEM parts installed on their vehicles. These plaintiffs were not eligible for installation damages. Thus, in order to calculate the amount of installation damages for the nationwide class, it was necessary to estimate the number of plaintiffs who were eligible for such damages. Mathur estimated that, of the total number of plaintiffs who were quoted non-OEM parts, the percentage whose vehicles were, in fact, repaired with non-OEM parts ranged from 50% to 92%. In other words, although each class member's estimate, by definition, specified *non*-OEM parts, *OEM* parts were actually installed on the class members' cars as often as 50% of the time. Mathur testified that, in his view, the actual figure for repairs using non-OEM parts probably was closer to 92% than 50%. He calculated that, if 50% of class members received non-OEM parts, installation damages for the class as a whole would total $658,450,000. If, on the other hand, the correct figure were 92%, installation damages would total $1.2 billion,

On cross-examination, Mathur acknowledged that, with regard to installation damages, it was necessary to determine whether a non-OEM part had been installed on a class member's vehicle. However, Mathur conceded that he had no way of making this determination. Mathur also acknowledged that he had "no opinion" as to how many class members had non-OEM parts installed on their vehicles but later received fair market value for them. Mathur admitted that his calculations as to installation *151 damages might be incorrect by as much as $1 billion...

While it has become acceptable to use statistical inference in determining aggregate damages in a class action suit ( *e.g.*, 3 A. Conte & H. Newberg, Newberg on Class Actions § 10:2, at 478 (4th ed.2002)), it also is understood that the possibility of error involved in such an approach may exceed constitutional bounds. See, *e.g.*, *Bell v. Farmers Insurance Exchange*, 115 Cal.App.4th 715, 746-57, 9 Cal.Rptr.3d 544, 571-80 (2004) ...

The potential for inaccuracy in Mathur's installation-damages estimates is simply too great to support an award of damages. See *Bell*, 115 Cal.App.4th at 751-56, 9 Cal.Rptr.3d at 575-79. While expert testimony in support of damages awards may be couched in terms of probabilities or possibilities, there is a need for a reasonable *153 degree of certainty in such testimony. See *Brown v. Chicago & North Western Transportation Co.*, 162 Ill.App.3d 926, 937-38, 114 Ill.Dec. 165, 516 N.E.2d 320 (1987). Here, given the fact that Mathur conceded that the margin of error in his estimate of the amount of installation damages was a billion dollars, the requisite degree of reasonable certainty is lacking. In our view, there is no valid basis for upholding the award of installation damages for the nationwide class and, thus, no valid basis for awarding such damages with regard to a subclass. *Avery*, 216 Ill. 2d starting at 147.

## WAL-MART CLASS ACTION CASES IN OTHER STATES

This case is one of many state court cases filed around the country seeking class certification over substantially similar issues. Since each state has different statutes regarding wages and hours, plaintiff's bar opted to seek class certification in each individual state rather than on a national basis.

Comparing rulings in other states that have adopted the Federal Rule of Civil Procedure 23 model may be insightful. But as stated in *Avery*, those rulings are persuasive only and not controlling.

The initial Wal-Mart wage and hour class action case was filed in Colorado. That case was eventually settled. That settlement brought about numerous filings in other states. Other than the Colorado case, Wal-Mart has not paid any money by way of settlement or final judgment. The two cases that did go to judgment are in the process of being appealed.

State courts in California (*Savaglio v. Wal-Mart Stores, Inc.*) and Pennsylvania (*Hummel v. Wal-Mart Stores, Inc.*) previously certified a class and the cases were tried before a jury. The California jury returned a plaintiff's verdict of $173,000,000 and is on appeal. The Pennsylvania jury returned a plaintiff's verdict of $78,000,000 (liquidated damages, attorney fees and costs are not included and have yet to be calculated.) Wal-Mart is planning its appeal of the Pennsylvania judgment.

State trial courts have certified similar class action cases in Kentucky (*Nagy v. Wal-Mart Stores,* Boyd Circuit Court 01-CI-00854 issued November 21, 2006); Minnesota (*Braun v. Wal-Mart, Inc.* 2003 WL 22990114 issued November

15

9, 2003); Missouri (*Hale v. Wal-Mart Stores, Inc.*, November 1, 2005 Jackson County, MO); New Mexico (*Armijo v. Wal-Mart Stores, Inc.*, May 5, 2005 Rio Arriba County NM); and Washington (*Barnett v. Wal-Mart Stores, Inc.* November 29, 2004 King County WA). On appeal, Florida (*Oullette v. Wal-Mart Stores, Inc. 888 So. 2d 90*) allowed certification, but remanded the case back to the trial court because the class as certified was overbroad. In Massachusetts (*Salvas v. Wal-Mart Stores, Inc.* 2004 WL 3218424) the case was certified for a class action, but recently the class was decertified a few months prior to the start of trial.

Class certification has been denied in Michigan, North Carolina, Ohio, Texas, Indiana, Arizona, Maryland, Georgia, West Virginia, Oregon, and Louisiana. (Defendant's Group Exhibit 32 contains the specific cites to the denied cases.) The general reason for denying class certification was that individual issues predominated.

During oral argument, counsel talked about how Wal-Mart class action cases in other states have been handled. This Court found the presentation informative for several reasons.

First, the Fourteenth Judicial Circuit has not been a particular hot bed for class action litigation. To the best of the undersigned's knowledge, no sitting Judge in this circuit has ever presided over a class action trial.

Second, a basic understanding of how similar class action cases were tried would assist this Court in evaluating whether a class trial was appropriate in this case. In other words whether the fourth paragraph of 2-801 was satisfied.

Third, it appears that strategies for both sides evolve and change slowly but a pattern does remain. The Court learned that should this case go to trial it would take at least five full weeks. Also, defendant regularly seeks to decertify the class (like it successfully did in Massachusetts). This information is valuable for court administration reasons such as jury budgets and pre-trial scheduling should the need arise.

Fourth and finally, it established that plaintiffs in all likelihood would seek total money damages for the class (extrapolating from the Pennsylvania case) of in excess of $100,000,000 plus another $20,000,000 in costs and attorney fees. Therefore damages average less than $550 for each proposed class member, before taking into account class expenses.

### FACTUAL ALLEGATIONS

Plaintiffs claim there are a combined 151 Wal-Mart discount stores, Super-centers and Sam's Clubs in Illinois as of January 31, 2005. Plaintiffs further claim Wal-Mart records indicate that there were over 163,000 hourly employees in Illinois during the period June 20, 1996 to present. (Page 6 Plaintiff's Brief filed 10/31/05.) Wal-Mart claims the number exceeds 223,000. (Page 1 of Defendant's Brief in Opposition filed 12/14/05.) During oral argument, plaintiffs accepted defendant's number.

Plaintiffs' expert concludes that an average of 93.2% of the associates in any two-week pay period in the sample did not receive their total earned break time, including meal breaks. (Plaintiffs' Ex. 46, page 1.) The expert equates a missed time card swipe to a missed break.

17

Plaintiffs rely in part on an internal document obtained from defendant known as the "Shipley Audit"; an opinion by Dr. Martin Shapiro (Plaintiffs' Ex. # 10); and an opinion by Dr. Scott Baggett (Plaintiffs' Ex. #46 & 47).

The record is full of documentary evidence so that a jury could easily conclude that the highest levels of Wal-Mart management knew about the missed break problem for many years. Plaintiffs further claim defendant took no meaningful steps to correct the problem. Plaintiffs contend that when defendant stopped having employees clock out for breaks in 2001, it was to eliminate an electronic paper trail in an effort to reduce defendant's liability exposure. Plaintiffs have internal documents from defendant that appear to support this contention.

Plaintiffs also argue that defendant put tremendous pressure on its management to meet financial performance quotas. Bonuses were tied to these performance quotas. One variable cost that defendant's management attempted to control was employee payroll by way of staffing and overtime restrictions for each store.

Plaintiffs point out that managers that missed financial quotas were punished. Yet defendant cannot point to one instance where a manager was disciplined for violating corporate policy PD-07 (Plaintiffs' Ex. #26) regarding breaks and/or corporate policy PD-43 (Plaintiffs' Ex. # 27) regarding working off the clock. Plaintiffs argue that defendant simply paid lip service to PD-07 and PD-43 and those policies were sacrificed to meet or exceed company profit goals.

As part of its defense, defendant claims that each employee, manager and store is unique and that it needs to do individual inquiry with each employee to determine that employee's understanding of whether a contract was formed, and if so, what were the terms. Defendant claims this need for individual inquiry about liability defeats class certification.

Defendant further claims there are other explanations of why employees may have failed to swipe in/out for a break such as:

1. Forgetting to swipe in/out.

2. Forgetting to bring their time card/badge to work.

3. Working outside the store and being unable to swipe in/out.

4. Voluntarily choosing not to take a break.

5. Voluntarily taking a short break.

6. Taking more intermittent breaks rather than one or two regularly scheduled breaks.

7. Voluntarily taking a short meal break.

8. Substituting meal period time for coming in late or leaving early.

9. Time clock malfunction.

The claims are set out in defendant's pleadings and the expert's review of the reports of Dr. Baggett and Dr. Shapiro (Plaintiffs Ex. #55). Defendant claims that these variations are defenses and require individualized inquiry thereby defeating class certification.

When asked during oral arguments whether the value of defendant's defenses could be calculated or quantified on a class wide basis without

19

individual inquiry, defendant's counsel correctly responded that plaintiffs bear

that burden.  The record is void of any such calculation.

### STANDARD TO BE APPLIED

The plaintiff in a class action has the burden of establishing the

prerequisites for class certification, and the trial court must find the statutory

prerequisites present before it can sanction maintenance of suit as a class

action. *Wheatley v. Board of Educ. of Tp. High School Dist.* 205, 77 Ill.Dec. 115,

99 Ill.2d 481, 459 N.E.2d 1364 (Ill. 1984).

When determining whether a class should be certified, a court is not to

make a preliminary determination of the merits of the underlying claims. *Eisen v.*

*Carlisle & Jacquelin* 417 U.S. 156, 40 L.Ed. 2d 732, 94 S. Ct. 2140.  To

determine whether the proposed class should be certified, the Court accepts the

allegations of the complaint as true.  *Clark v. TAP Pharm. Prods., Inc.* 343 Ill.

App. 3d 538, at 544.

The Court may consider any matters of fact or law properly presented by

the record, including the pleadings, depositions, affidavits, answers to

interrogatories and any evidence that has been adduced at the hearings. *Gordon*

*v. Boden* 224 Ill. App. 3d 195, at 199.  The class action device is flexible in

nature and may be adjusted or modified by the trial court at a later point in the

litigation to accommodate any changes or newly discovered facts as they arise.

*Gordon v. Boden* 224 Ill. App. 3d 195, at 202.

In this case the Court has considered the pleadings of record, the

numerous exhibits, the affidavits, and depositions of record.  The Court did not

consider the oral argument *PowerPoint* to the extent it did not correspond to

evidence already in the record in this case. The Court's role at this stage is less

than the role of fact finder, but more than accepting plaintiff's assertions without

challenge. Much like the role of the Court in ruling on a pre-trial motion *in limine*.

As stated by the U.S. Supreme Court in *Gen. Tel. Co. of the Southwest v.*

*Falcon*, 457 U.S. 147, 160 (U.S. 1982)

> Sometimes the issues are plain enough from the pleadings to determine whether
> the interests of the absent parties are fairly encompassed within the named
> plaintiff's claim, and sometimes it may be necessary for the court to probe behind
> the pleadings before coming to rest on the certification question. Even after a
> certification order is entered, the judge remains free to modify it in the light of
> subsequent developments in the litigation.

The *Falcon* case was also cited in *Petty v. Wal-Mart Stores, Inc.*, 148 Ohio

App.3d 348, 355 (Ohio Ct. App. 2002) which stated "Although a court may not

determine the merits of the action at the class certification stage, it may, and

must, examine the nature of the underlying claims for the purpose of determining

whether common questions predominate."

This Court deems it appropriate to delve into the methodology used by

plaintiffs' experts to determine whether the expert's opinions regarding class wide

damages are admissible into evidence before the jury. It is not the role of this

Court at the class certification stage to determine facts; but it is appropriate to

determine whether plaintiffs' evidence and methodology in calculating damages

is otherwise admissible to a jury as a matter of law.

## CLASS ANALYSIS

Again, the four statutory elements for class certification are:

    I.      The class is so numerous that joinder of all members is
               impracticable (numerosity);

II.     There are questions of fact or law common to the class, which common questions predominate over any questions affecting only individual members (commonality);

III.    The representative parties will fairly and adequately protect the interest of the class (adequacy of representation),

IV.     Class action is an appropriate method for the fair and efficient adjudication of the controversy (appropriateness) 735 ILCS 5/2-801.

## I.     The Numerosity Requirement

Paragraph one requires that the class be so numerous that joinder of all members is impracticable 735 ILCS 5/2-801(1). The numerosity requirement is relatively easy to meet.

In *Gordon v. Boden*, 224 Ill.App.3d 195, 586 N.E.2d 461 (Ill. App. Ct. 1991) that Court found that numerosity in 2-801(1) was established by a proposed class potentially numbering in the hundreds of thousands or millions.

Here, plaintiffs identify the class members as "all current and former hourly employees of Wal-Mart in the State of Illinois during the period June 20, 1996 to the present." Based on this definition, there are potentially in excess of 223,000 related employee claims. Joinder of all of the alleged claims would be impracticable. Therefore, based on plaintiffs' class definition, numerosity is satisfied.

## II.     Commonality Issue

Paragraph two requires that there be questions of fact or law common to the class, which predominate over any questions affecting only individual members 735 ILCS 5/2-801(2). Plaintiffs claim that various predominating common issues bind the proposed class members. This may be true as to

22

liability issues, but a more in depth analysis shows that individual issues concerning damages predominate these common issues.

As noted in the *Avery* case, it is permissible to use statistics to calculate damages. In *Avery*, the Illinois Supreme Court stated it should be tolerably accurate so as to not deprive the defendants of their due process. The Court states that while "it has become acceptable to use statistical inference in determining aggregate damages in a class action suit, it also is understood that the possibility of error involved in such an approach may exceed constitutional bounds." *Avery*, 216 Ill. 2d. at 151.

If damages can reasonably be calculated with some certainty for the entire class, due process rights of the defendant are preserved. The jury calculates liability and money damages for the class as a whole. Defendant then has little or no concern with the division of the damages among individual members of the class. In other words, defendant writes one check to the class, and defendant's liability to the class is extinguished. Division of the award is then left to class members, plaintiffs' attorneys and the Court to decide.

Plaintiffs have retained Dr. Baggett and Dr. Shapiro to render opinions in this case. Plaintiffs contend their experts were able to take samples and express an opinion regarding what percent of the proposed class missed a break in any given time period. The expert equates a missed time punch with a missed break. Plaintiffs' experts analyzed the data, took a sample, and determined with some certainty the number or percentage of missed time punches for the sample size and extrapolated this number to the class. With this information, plaintiffs

23

contend it is then relatively easy to calculate the total amount of money damages suffered by the class.

During oral argument Mr. Bridgers was able to expand upon and clarify for the Court plaintiffs' intended course to satisfy due process. If the class is certified, plaintiffs intend to request the time records of each and every class member. Any member that opts out of the class pursuant to 2-804(b) would be deleted from the data. Plaintiffs would then seek to present that information to the jury to establish damages for the class, just like Dr. Shapiro and Dr. Baggett did with their samples. Mr. Bridgers further argued that class members with no claim for damages would/could opt out of the class, leaving only those with claims as active class members.

Plaintiffs' method assumes too much. It assumes all 223,000 class members will have actual notice. It also assumes that class members without a claim will actually take the time to opt out of the class. It also assumes that a missed time clock punch equates to a missed break. As previously discussed herein, this is similar to the problem encountered by plaintiffs in the *Avery* case when they equated specification damages to a monetary loss.

Plaintiffs' statistical data does not adequately reflect the correct amount of uncompensated work. A missed time punch does not always mean a missed break. If plaintiffs' data is inaccurate, individual inquiry into each member's resulting damages will be necessary to ensure that due process is met and defendant is not required to extensively overpay.

24

If plaintiffs are permitted to use their method to calculate damages, it would effectively set the upper limit on the range of damages for which defendant might be liable. But this methodology completely ignores the laundry list of affirmative defenses asserted by defendant. Some of these defenses are quite plausible and supported in the record by affidavits. Not every employee is going to remember his or her ID/time card every day they work. Not every employee is going to remember to punch in/out for each and every break. The record establishes that some employees took their full break and did not punch out. Under plaintiffs' methodology, they would be compensated again.

Plaintiffs' experts do not account for these defenses and never have. Without accounting for these defenses, individual plaintiffs and the class as a whole are unjustly enriched. Since the list of defenses was not considered at all by plaintiffs' experts, the accuracy of assessing damages on a class-wide basis is suspect.

Other trial level Courts around the country have been troubled by Plaintiffs' proposed methodology in calculating damages for the class. This Court shares that concern.

In a similar case from Ohio, the Court held:

> In this case, the damages are not susceptible of class-wide proof because there is no acceptable method of computing the damages on a class-wide basis. The damages will be highly individualized and depend on the testimony of each employee to determine how many breaks or meals they missed, how much time they were required to spend working off the clock, as well as the amount of their wages. Therefore, we find that the disparate damages supports the denial of the class certification. *Petty v. Wal-Mart Stores, Inc.*, 148 Ohio App.3d 348, 773 N.E.2d 576 (Ohio App. 2nd Dist., 2002).

25

In Massachusetts the trial Court initially certified the class action. Then, before trial, another Judge barred plaintiff's expert, Dr. Shapiro, and decertified the class. (See ruling of November 7, 2006 in *Polion v. Wal-Mart Stores, Inc.* in the Superior Court of Massachusetts case # 01-03645.) On page 71 of that ruling the Massachusetts Trial Court stated:

> The court accepts that in all likelihood, Wal-Mart's timekeeping records reflect instances of Wal-Mart misconduct. The court's concern with respect to Shapiro's methodology is his refusal to acknowledge the possibility that the timekeeping records contain inconsistencies beyond a de minimus level. Shapiro has pre-determined that nothing reported in the affidavits and deposition transcripts—which indicate that the breaks were taken but not reported, that TARs were not completed, that one-minute clock-outs were occasionally utilized, and that associates used operator-accountable registers while not logged in properly—or the coaching reports—which indicate that at least some associates in fact continued not to clock in or our for breaks they took—could ever result in more than de minimus errors in the time records. Shapiro's decision to disregard, without at least limited investigation, the Wal-Mart produced affidavits and deposition testimony and other documentation which indicate that timekeeping procedures were not always followed contributes to the finding that his underlying methodology is unreliable.

This Court believes the issue of liability could be tried as a class action if damages could reasonably and accurately be calculated on a class wide basis. But plaintiffs have failed in their burden of proof and more specifically they failed to demonstrate that their statistical data is accurate enough to determine an aggregate amount of damages without stripping defendant of due process.

Because plaintiffs have not put forth any statistical way to account for or quantify these defenses on a class wide basis, this would leave the jury to speculate as to damages or would require extensive individual inquiry as to each claim. Regardless, either situation is fatal to plaintiffs' request for class

certification. The commonality prong has not been met and therefore class certification must be denied.

Even though plaintiffs did not propose a sub-class, the Court did consider using or certifying a sub-class as authorized in 2-802(b). But the flaw in the damage calculation applies to potential sub-classes as well.

III.    **Adequately Represent the Class Issue**

Paragraph three requires that the representative parties will fairly and adequately protect the interest of the class 735 ILCS 5/2-801(3). This pertains to the representative parties and attorneys for the proposed class.

This rule is meant to protect potential class members. "The law is clear that a single class cannot be fairly and adequately represented by the named Plaintiffs if the members of that class have antagonistic or conflicting interests." *Donovan v. Estate of Fitzimmons*, 778 F.2d 298, 323 (7th Cir. 1985). Defendants argue that because Ms. Camp was an hourly department manager of different Wal-Mart stores, she is directly antagonistic to the proposed class. Defendant asserts that Ms. Camp is "arguably a perpetrator of the specific conduct giving rise to Plaintiffs' claims." Def. Memorandum at p. 78.

Plaintiffs, on the other hand, argue that because Camp was an hourly employee who simply followed orders from higher management, she adequately represents the class. Defendant has not presented evidence that supports the conclusion that Ms. Camp's supervisory position would put her in an adverse position with her class members in this action. The Court concludes she is simply an hourly employee seeking just compensation from her employer.

Except for brief oral argument by Mr. Frederico, it is uncontested that the lawyers for plaintiff can adequately represent the class. Members of the control group of attorneys have successfully tried class actions in the past, including the Pennsylvania Wal-Mart case. Ms. Spanier represented to the Court in oral argument that she has 21 years experience in class action litigation.

This Court concludes plaintiffs and their attorneys adequately represent the class.

## IV.    Appropriateness Issue

As the fourth prong in the class certification test, 2-801(4) requires that the "class action is an appropriate method for the fair and efficient adjudication of the controversy" 735 ILCS 5/2-801(4). In other words, can a class trial be conducted in a way that is efficient, yet fair to both sides?

Courts have recognized certain public policy factors in addressing whether a class action is appropriate. "The consumer class action is an inviting procedural device to address frauds that cause small damages to large groups. When brought by plaintiffs who have no other avenue of legal redress, the consumer class action provides restitution to the injured and deterrence to the wrongdoer. Thus, the ends of equity and justice are attained." *Gordon v. Boden* 224 Ill. App. 3d 195, at 204.

The policy objective behind the class action is to encourage individuals, who may otherwise lack incentive to file individual actions because their damages are small, to join with others to vindicate their rights in a single action. *Hansberry v. Lee* 311 U.S. 32, 41 (1940).

28

Courts have also considered that a putative plaintiff may encounter retaliation because of a lawsuit. As noted by a Federal Court: "It also is reasonably presumed that those potential class members still employed by Treasure Chest might be unwilling to sue individually or join a suit for fear of retaliation at their jobs." *Mullen v. Treasure Chest Casino, LLC*, 186 F3d 620, 625 (5th Cir. 1999)

Defendant is the world's largest retailer with immense financial resources, well beyond that of a typical individual hourly worker in one of its retail stores. An individual worker earning less than $30,000 per year is not going to have the same level of access to attorneys and experts that Wal-Mart has. Even if the typical worker visits with an attorney, most workers would not find it cost effective to retain an attorney to file suit over money damages amounting to less than $550 per worker.

To summarize, factors that weigh in favor of class certification in this case include:

- Defendant has greater access to attorneys than the typical Wal-Mart employee.

- The damages per employee are relatively small, probably less than $550 per employee.

- Litigating 223,000 individual claims would be time consuming and burdensome on the court system.

- Claims would probably not be pursued by individuals.

- The opportunity for defendant to intimidate individual potential claimants into silence is great.

- Public policy dictates that an employer should properly pay its employees.

29

Defendant argues that given the nature of defendant's affirmative defenses, due process requires individualized questioning of each class member to determine the extent, if any, of Wal-Mart's liability.   Plaintiffs counter that argument by claiming defendants do not always have the right to cross-examine all adverse witnesses.

Defendant also cites the case of *In re Fibreboard Corp.*, 893 F.2d 706 (5th Cir. 1990) in which the Court found that representational testimony from a small number of representatives, expert testimony regarding questionnaires filled out by plaintiffs, and summary evidence as to total damage award was not enough to satisfy due process. The Court made its decision by considering the following:

1. There was no certainty that the experts' statistical measures of representativeness and commonality would be sufficient for the jury to make informed judgments concerning damages.

2. There were disparities among members of the class concerning severity, nature and type of damages incurred.

3. The elements of the case in products liability focused on individuals-- not groups.

4. There were too many disparities among class members for their common concerns to predominate.

When the defendant's affirmative defenses depend on facts particular to each plaintiff's case, class certification is erroneous. *Broussard v. Meineke Disc. Muffler Shops*, 155 F.3d 331, 342 (4th Cir. 1998).

In the present case, defendant's affirmative defenses are very individualized in nature such as waiver, laches, and gratuitous performance, among others.   In fairness, defendant will not be able to establish such claims

without being given the ability to delve into each employee's individual work record. Stripping defendant of the opportunity to present affirmative defenses properly through individualized inquiries will strip it of due process as guaranteed by the U.S. Constitution.

Assuming 2000 working hours in a year, and assuming the examination of each individual class member averaged 30 minutes, one could conduct at most 4,000 individual damage hearings in a year. That means it would take nearly 56 YEARS for one Court to calculate damages for the proposed class, making a class trial conducted in this fashion obviously unmanageable.

Plaintiffs' expert has been unable to put forth any method to calculate what percentage of the employees fall into each of the various affirmative defenses raised by defendant. Fairness and the U.S. Constitution dictate defendant has a right to a procedure that allows it to present these defenses. As previously noted herein, the Illinois Supreme Court set aside the *Avery* verdict because of similar concerns over plaintiffs' expert's damage calculations.

In summary, Plaintiffs' expert can statistically calculate the upper end of plaintiff's damages. Plaintiffs' expert can't calculate or quantify how much the affirmative defenses would reduce those damages. Because the damages can't reasonably be calculated, class certification is not the appropriate method of adjudication in this case.

## CONCLUSION

Plaintiffs have failed to demonstrate the existence of a reasonable and accurate method of calculating damages on a class wide basis making individual

31

inquiry necessary to satisfy due process. The individual issues regarding damages would predominate, making class certification impractical.

If the class were certified using the damage calculation methodology advanced by plaintiffs' expert, defendant would be denied the opportunity to present otherwise plausible defenses, which means, denied due process. Declining to certify the class action turns away the class, but not the claims of individual employees. Individual employees who have been harmed still have every right to file individual suits to recover their damages for unpaid wages.

Some Courts in other states have certified similar class actions, while some have not. In Illinois, our Supreme Court reminded us through *Avery* that the Constitutional guarantee of due process trumps other arguments. This Court is compelled to follow the directive in *Avery* and deny plaintiffs' request for class certification. Any deviation from that directive will need to come from a reviewing Court.

### RESERVE ISSUE OF APPEAL UNDER SCR 308

While this case was pending, SCR 306 was amended and paragraph (a)(8) was added to permit an interlocutory appeal of decisions denying or granting class action certification. But an endnote indicates that the amended rule does not apply to cases filed prior to the amendment.

To the extent the new SCR 306(a)(8) does not apply to this case, this Court will entertain requests from counsel by separate motion to request the Appellate Court consider this case ripe for a discretionary interlocutory appeal under SCR 308. It would appear to be a waste of time and money for the parties,

32

their attorneys, and the taxpayers of this county to conduct a jury trial for the

three representative plaintiffs before they could appeal this Court's ruling on

class certification.

The issues to be presented on such an appeal appear to be:

**a. Should the Motion for Class Certification have been
granted in whole or in part?**
**b. If it should have been granted in part, then what part?**

At various times throughout the administration of this case, this Court has

offered to either refer the case to a court-annexed mediator or to actively assist

the parties with settlement talks and to date the parties have declined. Both sides

are encouraged to reconsider their views on settlement.

At the conclusion of oral argument, this Court complimented counsel for

both sides on the quality of their presentation and this Court wishes to renew that

comment. Counsel for both sides did a thorough and professional job in

representing their respective clients in this case. The only disappointment for this

Court is that, absent this decision being overturned on appeal, this Court will not

have an opportunity to watch top-notch counsel present a complex civil trial to a

jury.

## ORDER

IT IS THEREFORE ORDERED:

1.      For the reasons stated herein, Plaintiffs' Motion for Class

Certification is denied.

33

2.    Attorneys Glenn Ruud and Matthew Pappas shall receive copies

of this Order and are ordered to forward copies of the Court's

Order to the respective attorneys within their group.

3.    Both sides are given 30 days to supplement the record by

identifying the exhibit number and filing date where each

*PowerPoint* exhibit is found in the record of this case. Any

*PowerPoint* exhibit not so identified shall be deemed excluded

from the record.

4.    Ruling is reserved as to whether plaintiffs' *PowerPoint* #61, (a

memo dated October 9, 2000), is a privileged communication.


Enter:  March 9, 2007

Mark A. VandeWiele
Circuit Court Judge


Copies to:

Attorney Glenn Ruud
Attorney Matthew Pappas

34

# EXHIBIT B

## PART 1 OF 2

1

1    IN THE UNITED STATES DISTRICT COURT
          DISTRICT OF DELAWARE

2

3    RAMON VILLANUEVA,              :    CIVIL ACTION
     Individually and all          :
4    others similarly              :
     situated,                     :
5        Plaintiff                 :
                                   :
6        vs.                       :        ORIGINAL
                                   :
7    TRUGREEN LIMITED              :
     PARTNERS AND TRUGREEN,        :
8    INC. d/b/a TRUGREEN           :
     CHEMLAWN,                     :
9        Defendants                :    NO. 06-185
10
                        - - - - - -
11              October 5, 2006
                        - - - - - -
12
                    Videotaped Oral Deposition
13   of RAMON VILLANUEVA, held in the law
     offices of Morgan Lewis, LLP, 1701
14   Market Street, 12th Floor, Philadelphia,
     Pennsylvania 19103, beginning at
15   approximately 9:29 AM, before Ann V.
     Kaufmann, a Registered Professional
16   Reporter, Certified Realtime Reporter,
     Approved Reporter of the U.S. District
17   Court, and a Notary Public of the
     Commonwealth of Pennsylvania.

18
19                      - - - - - -
20
21
22          ESQUIRE DEPOSITION SERVICES
            1600 John F. Kennedy Boulevard
23          Four Penn Center, 12th Floor
            Philadelphia, Pennsylvania  19103
24                (215) 988-9191

2

```
1    APPEARANCES:
2        EDWARD TUDDENHAM, ESQUIRE
         etudden@io.com
3        153 Upland Road
         Cambridge, MA   02140
4        (617) 576-2182
              and
5        RAPPOSELLI, CASTRO & GONZALES
         VIVIAN L. RAPPOSELLI, ESQUIRE
6        vrapposelli@rcglaw.com
         PETER J. GONZALES, ESQUIRE
7        pgonzales@rcglaw.com
         251 South Camac Street
8        Philadelphia, PA   19107
         (267) 322-6776
9        Counsel for Plaintiff
10       MORGAN LEWIS & BOCKIUS, LLP
         SARAH BOUCHARD, ESQUIRE
11       sbouchard@morganlewis.com
         1701 Market Street
12       Philadelphia, Pennsylvania   19103
         215-963-5000
13            and
         MORGAN, LEWIS & BOCKIUS, LLP
14       BETH M. HENKE, ESQUIRE
         bhenke@morganlewis.com
15       One Oxford Centre, 32nd Floor
         Pittsburgh, PA
16       (412) 560-3300
         Counsel for Defendants
17
     PRESENT:
18
         Andrea Regal, Spanish Interpreter
19       ParaPlus Translations, Inc.
20       Michael Matejik,
         TruGreen
21
         Jason Hoffman, Videographer
22
23
24
```

1          D E P O S I T I O N   S U P P O R T   I N D E X

2

3      D I R E C T I O N   T O   W I T N E S S   N O T   T O   A N S W E R

4                    P a g e   3 2     L i n e   1 2

5

6        R E Q U E S T   F O R   P R O D U C T I O N   O F

7                      I N F O R M A T I O N

8                    P a g e   5 3     L i n e   1 9

9

10                    S T I P U L A T I O N S

11                        ( N O N E )

12

13

14

15

16

17

18

19

20

21

22

23

24

4

| | |
|---|---|
| 1 | THE VIDEOGRAPHER: Good |
| 2 | morning. We're now on the record. My |
| 3 | name is Jason Hoffman. I'm a |
| 4 | videographer employed by Esquire |
| 5 | Deposition Services, 1600 JFK Boulevard, |
| 6 | Suite 1210, Philadelphia, Pennsylvania, |
| 7 | 19103. |
| 8 | This is a video deposition |
| 9 | for the United States District Court, |
| 10 | District of Delaware. Today's date is |
| 11 | October 5, 2006. The time is 9:29 a.m. |
| 12 | This deposition is being |
| 13 | held at Morgan, Lewis in Philadelphia, |
| 14 | Pennsylvania in the matter of Ramon |
| 15 | Villanueva versus TruGreen Limited |
| 16 | Partners and TruGreen, Inc. |
| 17 | The deponent is Ramon |
| 18 | Villanueva. |
| 19 | Present today counsel please |
| 20 | introduce yourselves for the record. |
| 21 | MR. TUDDENHAM: Edward |
| 22 | Tuddenham for the plaintiff. |
| 23 | MS. RAPPOSELLI: Vivian |
| 24 | Rappposelli for the plaintiff. |

5

1              MR. GONZALES:  Peter

2   Gonzales for the plaintiff.

3              MS. BOUCHARD:  Sarah

4   Bouchard for TruGreen.

5              MR. MATEJIK:  Michael

6   Matejik for TruGreen.

7              THE VIDEOGRAPHER:  And the

8   court reporter will now swear in the

9   witness.

10             MR. TUDDENHAM:  Just so it's

11  on the record, Mr. Matejik is here as a

12  corporate rep, not as an attorney, I

13  assume?

14             MS. BOUCHARD:  That's

15  correct.

16             THE INTERPRETER:  Andrea

17  Regal, the interpreter.

18             THE COURT REPORTER:  Would

19  you raise your right hand.

20             MS. HENKE:  Beth Henke for

21  defendants.

22             THE VIDEOGRAPHER:  The court

23  reporter will swear in the witness.

24

6

Ramon Villanueva

1              ...ANDREA REGAL, Spanish

2    Interpreter, 430 Clements Bridge Road,

3    Barrington, NJ  08007, having been duly

4    sworn to translate the testimony, was

5    examined and testified as follows:

6              ...RAMON VILLANUEVA,

7    Mesquite 318, Fraccion California,

8    Cueramaro, Guanajuato, Mexico  36960

9    having been duly sworn was examined and

10   testified as follows:

11                 EXAMINATION

12   BY MS. BOUCHARD:

13        Q.     Good morning,

14   Mr. Villanueva.  My name is Sarah

15   Bouchard and I'm here to take your

16   testimony today in the case that you've

17   brought against TruGreen.

18        A.     Good morning.

19        Q.     I'm going to set forth a

20   couple of ground rules for the

21   deposition today so that this can run

22   smoothly.  I need you to ask any

23   questions that you don't understand;

24   otherwise, I'm going assume that you

7

Ramon Villanueva

1    have understood the question as I've

2    posed it to you.

3              I need you to verbalize all

4    of your responses, which means yes or no

5    or words to verbalize your responses

6    rather than gestures.

7        A.    I understand.

8        Q.    In you need a break, just

9    let me know, we can take one as long as

10   the question is not pending.

11       A.    That's fine.

12       Q.    Okay. Your attorneys may

13   object to a question. They are

14   objecting for the record. And once they

15   are finished objecting, you should

16   answer unless they specifically instruct

17   you not to.

18       A.    That's fine.

19       Q.    Finally, you are under oath

20   and this is no different than if you

21   were in a court reporter of law.

22       A.    I understand.

23       Q.    Are you on any medications

24   today?

8

Ramon Villanueva

```
 1         A.      No.
 2                 THE INTERPRETER:  Excuse me.
 3  BY MS.  BOUCHARD:
 4         Q.      Without telling me what you
 5  talked about with your attorneys, what
 6  did you do to prepare for today's
 7  deposition?
 8         A.      Well, I don't know because
 9  the only thing we did was speak, so I
10  don't know how to answer you.
11         Q.      Did you review any
12  documents?
13         A.      Yes.
14         Q.      Which ones?
15         A.      I saw several documents,
16  some of which I had seen before, they're
17  mine, but I wouldn't know which ones to
18  tell you because, pardon me, I don't
19  know what they are called.
20                 THE INTERPRETER:  Excuse me.
21  BY MS. BOUCHARD:
22         Q.      If you remember reviewing
23  them recently, when I show them to you,
24  just let me know, throughout the
```

9

Ramon Villanueva

1    deposition.

2          A.      Okay, that's fine.

3          Q.      Have you ever been involved

4    in a lawsuit before?

5          A.      No.

6          Q.      What's your current

7    immigration status?

8          A.      I'm tourist.

9          Q.      How long does that entitle

10   you to be in the United States?

11         A.      My permit expires on I

12   think the 6th of this month.

13         Q.      When did it begin?

14         A.      I don't remember the day,

15   but it was in April.  I don't remember

16   the day.

17         Q.      So you have been on a

18   tourist visa for six months?

19         A.      No.  The thing is I've

20   returned to Mexico.  The first time I

21   got my permit was in April, but then I

22   went back to Mexico and came back again,

23   so....

24         Q.      When you had your tourist

10

Ramon Villanueva

1  visa in April, when did you return back

2  to Mexico?

3       A.    I think I went back in

4  May.   I don't remember the date.

5       Q.    Do you have passport stamps

6  that would show when you were here this

7  year?

8       A.    Well, my passport doesn't

9  have any stamps because I think they

10  just give me the form, and I believe

11  it's an E-94 (sic) form.

12       Q.    Do you have a copy of the

13  E-94 form?

14       A.    Well, I have the E-94 that

15  allows me to be here.   I don't have

16  copies of it.

17       Q.    Do you have it in your

18  possession today?

19       A.    No, it's in my suitcase.

20       Q.    Did you get an E-94 when

21  you were here in April?

22       A.    Yes.

23       Q.    And did you retain a copy

24  of the E-94 from your April visit?

11

Ramon Villanueva

1      A.      It's the same one I have

2   now.

3      Q.      And that's the one that's

4   in your suitcase?

5      A.      Yes.

6      Q.      And would that evidence all

7   of the times that you've been in the

8   United States for this year?

9      A.      No.

10      Q.      What were you doing when

11   you came to the United States in April?

12      A.      What was I doing where?

13      Q.      What was the purpose of

14   your visit?

15      A.      I came to visit my uncle.

16      Q.      Where does your uncle live?

17      A.      In San Diego.

18      Q.      Other than the trip you

19   took in April, were there any other

20   visits to the United States this year

21   besides this one?

22      A.      Well, when I went back to

23   Mexico in I believe it was May and then

24   I think again in October -- pardon, I'm

Ramon Villanueva

1    sorry, August.

2            Q.      Just to clarify, you came

3    on a travel visa in April to May and

4    then came in August.  And then when did

5    you leave back to Mexico?

6            A.      Well, I'm here.

7            Q.      You have been on the travel

8    visa since August?

9            A.      Yes.

10           Q.      Who have you been visiting

11   since August?

12           A.      Only my uncle, and some

13   friends, but....

14           Q.      What's your current home

15   address?

16           A.      Mesquite 318, Fraccion

17   California, Cueramaro, Guanajuato,

18   Mexico, and the Zip code is 36960.

19           Q.      What did you do to earn

20   money this year?

21           A.      Work.

22           Q.      Where?

23                   THE INTERPRETER:  I asked

24   the witness to please repeat it.

13

Ramon Villanueva

1           THE WITNESS:  Oh, I'm taking
2     the Fifth Amendment.
3           MS. BOUCHARD:  Can we take a
4     break?
5           MS. RAPPOSELLI:  Sure.
6           MR. TUDDENHAM:  Sure.
7           THE VIDEOGRAPHER:  Off tape
8     9:45.
9           (Recess.)
10          THE VIDEOGRAPHER:  Back on
11    the record 9:58.
12    BY MS. BOUCHARD:
13        Q.    Mr. Villanueva, you just
14    took the Fifth Amendment with respect to
15    my question as to where you were working
16    in 2006.  Is that because you were
17    working in the United States this year?
18          MR. TUDDENHAM:  Objection.
19    He took the Fifth Amendment to that
20    question and I don't think you are
21    entitled to keep asking him the same
22    question over and over again.
23    BY MS. BOUCHARD:
24        Q.    How many hours did you work

Ramon Villanueva

1    this year?

2                    MR. TUDDENHAM:  Same

3    objection.  Let me consult with my

4    client for a moment.

5                    THE VIDEOGRAPHER:  Off tape

6    9:59

7                    (Mr. Tuddenham,

8    Ms. Rapposelli, Mr. Gonzales and the

9    witness conferred outside of the

10   deposition room.)

11                   THE VIDEOGRAPHER:  Back on

12   the record 10:00.

13                   MR. TUDDENHAM:  For the

14   record, we object.  He has invoked his

15   Fifth Amendment with respect to that

16   question, and I don't believe you are

17   entitled to keep asking the question in

18   **different ways to try and trick him into**

19   waiving his Fifth Amendment right.

20                   MS. BOUCHARD:  My question

21   is a different one.  I asked him how

22   many hours he worked in 2006.  Some of

23   those hours could be in a lawful place

24   for him to work.

Ramon Villanueva

1          MR. TUDDENHAM:  They could

2    be, but he is entitled to invoke his

3    Fifth Amendment right, and he has.

4          MS. BOUCHARD:  Is he also

5    invoking it for that question?

6          MR. TUDDENHAM:  Yes.  He is

7    going to invoke it for any question like

8    that.

9          MS. BOUCHARD:  Well, I need

10   him to do that because that would mean

11   that he did not work any hours in a

12   lawful place.

13         MR. TUDDENHAM:  Fifth

14   Amendment right, when he invokes it,

15   doesn't mean anything at all.  It is

16   neither an affirmative answer or a

17   negative answer.

18         THE VIDEOGRAPHER:  Off tape

19   10:02.

20         (Recess.)

21         THE VIDEOGRAPHER:  Back on

22   the record 10:03.

23   BY MS. BOUCHARD:

24       Q.    Are you taking the Fifth

16

Ramon Villanueva

1   Amendment with respect to how many hours

2   you worked in 2006?

3        A.     Yes.

4        Q.     My question now is for last

5   year, 2005, where did you work?

6        A.     In Cueramaro.

7        Q.     Is that in Mexico?

8        A.     Yes.

9        Q.     Did you work in the United

10  States at any time in 2005?

11       A.     No.

12       Q.     For 2004 my question is

13  this:  Did you in fact go home to Mexico

14  after leaving TruGreen?

15       A.     Yes.

16       Q.     Isn't it true that you went

17  to California after leaving TruGreen?

18       A.     No.

19       Q.     You didn't tell Lisa McHugh

20  that you were in Los Angeles in 2004?

21       A.     I don't remember.

22       Q.     When you left TruGreen,

23  they provided you with an airline

24  ticket; correct?

17

Ramon Villanueva

1        A.       Yes.

2        Q.       And they paid for your

3   return flight home to Mexico?

4        A.       A part of it.

5        Q.       What do you mean by "a part

6   of it"?

7        A.       I paid the remainder of

8   what the ticket cost after the cost of

9   the bus.

10       Q.       Isn't it true that TruGreen

11  provided you with an airline ticket for

12  your trip home to Mexico?

13       A.       Yes.

14       Q.       And that ticket was

15  provided to you?

16       A.       Yes.

17       Q.       Did you in fact return to

18  Mexico on that ticket?

19       A.       Yes.

20       Q.       And was that because you no

21  longer wanted to work at TruGreen

22  anymore?

23       A.       Yes.

24       Q.       If TruGreen paid for the

18

Ramon Villanueva

1   airline ticket, what transportation

2   costs did you incur on the way home?

3                MR. TUDDENHAM:    Objection;

4   form.

5                You can answer.

6        A.      Part of the plane ticket.

7        Q.      Are you saying that came

8   out of your paycheck in some way?

9        A.      No.

10        Q.      Then how did you pay for

11   part of the plane ticket?

12        A.      In cash.

13        Q.      Who did you provide that

14   cash to?

15        A.      To Mike.

16        Q.      The person that's sitting

17   next to me?

18        A.      Yes.

19        Q.      How much cash did you

20   provide to him?

21        A.      I think it was somewhere

22   around $75.

23        Q.      You left midway through the

24   season in 2004; correct?

19

Ramon Villanueva

1          A.      Yes.

2                  MR. TUDDENHAM:  Sarah, is it

3     possible to make it a little warmer in

4     here?

5                  MS. BOUCHARD:  Sure.

6                  THE VIDEOGRAPHER:  Off tape

7     10:09.

8                  (Recess.)

9                  MS. BOUCHARD:  Let's go back

10    on the record.

11                 (The following took place

12    off the video record:

13                 MS. BOUCHARD:  We're going

14    back on the record and for the record, I

15    have asked for an I-9 to show that he is

16    lawfully in the United States right

17    now.  He has indicated that it's in his

18    suitcase, which I understand is within

19    walking distance, and I have requested

20    it now, particularly given the answers

21    that he has given with respect to the

22    Fifth Amendment.  You have said that you

23    are not going to get it right now and

24    I'm requesting you to do so.

20

Ramon Villanueva

1          MR. TUDDENHAM:  I will tell
2  you what, Sarah:  As I explained to you
3  at the beginning of this, he has to
4  catch an airplane to Mexico.  The
5  deposition has to be end by 2:30.  If
6  you would like to spend the time between
7  now and 2:30 having us to go walk to
8  find the -- it's an I-94, I will be
9  happy to do that right now.
10          MS. BOUCHARD:  Then I would
11  like that to happen.
12          MR. TUDDENHAM:  Great.
13          (Recess.)
14          THE VIDEOGRAPHER:  Back on
15  the record 10:37.
16  BY MS. BOUCHARD:
17      Q.     Mr. Villanueva, I'm going
18  to ask you some background questions.
19  What is your marital status?
20      A.     I am married.
21      Q.     Do you have any children?
22      A.     Yes.
23      Q.     How many?
24      A.     One.

Ramon Villanueva

1          Q.     Boy or girl?

2          A.     Girl.

3          Q.     And how old is she?

4          A.     She just turned 4.

5          Q.     What's your educational

6    background?

7          A.     Five years in university.

8          Q.     What's the university

9    called?

10         A.     University of Guadalajara.

11         Q.     Have you had any other H-2B

12   positions prior to TruGreen?

13                THE INTERPRETER:  Did you

14   say H-2B?

15                MS. BOUCHARD:  Positions.

16         A.     No.

17         Q.     Had you worked in the

18   United States prior to coming to the

19   United States for TruGreen?

20         A.     No.

21         Q.     What type of work did you

22   do in Mexico prior to working for

23   TruGreen?

24         A.     Giving classes.

Ramon Villanueva

```
 1              MS.  BOUCHARD:   To the
 2    translator, does that mean taking
 3    classes?
 4              THE  INTERPRETER:   Giving
 5    classes, teaching.
 6    BY MS. BOUCHARD:
 7         Q.    Okay.   What did you teach?
 8         A.    Math and junior high school
 9    classes.
10         Q.    How long did you teach
11    those courses?
12         A.    I don't remember exactly.
13         Q.    I think I might have asked
14    this question already, but did you did
15    you work in the United States for any
16    other person besides TruGreen?
17              MR.  TUDDENHAM:  You mean?
18              MS.  BOUCHARD:   In 2004.
19         A.    No.
20         Q.    Have you had any other H-2B
21    positions after TruGreen?
22         A.    No.
23         Q.    Have you had any other work
24    visa that legally allows you to work in
```

23

Ramon Villanueva

1   the United States after TruGreen?

2           MR. TUDDENHAM:  Objection,

3   calls for a legal conclusion that he is

4   not competent to give you, but he can

5   answer.

6           A.    I'm taking the Fifth

7   Amendment.

8           Q.    How did you learn about the

9   opportunity to work at TruGreen?

10          A.    In the recruiting office in

11  Mexico.

12          Q.    What is the recruiting

13  office's name?

14          A.    If I'm not mistaken, it's

15  LLS.

16          Q.    Okay.  Who did you speak to

17  in the recruiting office?

18          A.    I don't remember their

19  name.  I only know it was a woman.

20          Q.    What did you learn about

21  the position that interested you?

22          A.    The salary.

23          Q.    What was told to you at

24  that time about the salary?

Ramon Villanueva

1        A.        It was the highest on the
2  list they showed me.
3        Q.        What did the list include?
4        A.        Well, names of other
5  companies, but I don't remember them.
6        Q.        Did he have any other
7  people that he knew that were also
8  interested in jobs with TruGreen?
9              Let's strike that question;
10  okay?
11              MR. TUDDENHAM:  Can you
12  rephrase it saying "you."  You are
13  saying "he."
14              MS. BOUCHARD:  Okay.
15  BY MS. BOUCHARD:
16        Q.    Did you know of any other
17  people that had also worked for
18  TruGreen?
19        A.    No.
20        Q.    At the time you were
21  learning about the position, what did
22  you understand the position to be?
23        A.    In regard to what?
24        Q.    Did you understand it to be

25

Ramon Villanueva

1    a laborer position?

2         A.      Not necessarily, but I

3    didn't expect it to be anything

4    different.

5              MR. TUDDENHAM:  For the

6    record, just -- your question "laborer"

7    was translated "manual labor."

8              MS. BOUCHARD:  Okay.

9    BY MS. BOUCHARD:

10        Q.      What I was asking is

11   whether you remember the title of your

12   job to be laborer or applicator.

13             THE INTERPRETER:  Applicator

14   you said?

15        A.      I don't remember.

16             MS. BOUCHARD:  Mark this.

17             (Below-described document

18   marked as Villanueva Exhibit 1.)

19   BY MS. BOUCHARD:

20        Q.      Thank you for providing us

21   with your I-94 form.  I have a question

22   about your I-94 form based on testimony

23   you've previously given.  I understand

24   from your testimony that you entered the

26

Ramon Villanueva

1  country in August, most recently; is

2  that correct?

3        A.    That's true.

4        Q.    My understanding is that

5  the I-94 should reflect that somewhere

6  on this document.

7        A.    No.

8        Q.    Is this the only document

9  that you received since April?

10       A.    Yes.

11       Q.    And just to clarify, you

12  came here in April?

13       A.    Okay.   The thing is this

14  form that I have here is what they gave

15  me when I came in April.   But I had

16  another that, if I'm not mistaken, they

17  gave to me -- they gave me the 26th of

18  February that allowed me to come in and

19  go out over the border.

20            And so when I went back to

21  Mexico in April -- and so when I came

22  back to the United States through Los

23  Angeles, this is the one they gave me

24  because my understanding was that the

27

Ramon Villanueva

1  other one was to be able to go and come

2  across the border.

3         Q.    So were you California at

4  the end of March of this year?

5         A.    May I see a calendar?

6         Q.    A calendar of the month of

7  March?

8         A.    Well, the thing is that I

9  don't remember the dates exactly.  And

10  if I came up in February, then it may

11  have been in March.  The thing is I

12  don't remember because I was coming and

13  going.

14              MR. TUDDENHAM:  It may have

15  been in California in March, is what he

16  said.

17              THE INTERPRETER:  I'm

18  sorry.  Did I not say that, may have

19  been?

20              MS. RAPPOSELLI:  In

21  California.

22              MR. TUDDENHAM:  In

23  California.

24              THE INTERPRETER:

28

Ramon Villanueva

```
 1   California.
 2   BY MS. BOUCHARD:
 3        Q.      Do you remember having a
 4   conversation with Lisa McHugh over the
 5   phone in March of this year?
 6        A.      Yes.
 7        Q.      And what did you two talk
 8   about?
 9        A.      Well, I was a bit confused
10   because I thought it was another friend
11   of mine by the name of Lisa.  So I was
12   actually asking about Lisa, the friend
13   of mine.
14        Q.      On this same phone call?
15        A.      I think so, if I'm not
16   mistaken.
17        Q.      So you thought that you
18   were talking to someone else other than
19   Lisa McHugh but you were asking about
20   Lisa McHugh?
21        A.      Well, when I called the
22   office, I asked for Lisa.
23               And so this woman answered
24   and I thought it was the Lisa that I was
```

Ramon Villanueva

1    asking for and then -- and so then it

2    was clarified that she was not the

3    person that I was looking for, and so

4    then I did start asking about the person

5    that I was asking for.

6            Q.      Why were you calling

7    TruGreen's offices?

8            A.      Because she didn't answer

9    her cell phone.

10           Q.      What were you intending to

11   talk to Lisa about?

12           A.      Well, we're friends and I

13   just wanted to know how she was and what

14   she was doing.

15           Q.      Did you ask anyone at

16   TruGreen to take documents for you?

17           A.      No.

18           Q.      What expenses did you incur

19   in obtaining H-2B visa and traveling to

20   the United States to work for TruGreen?

21           A.      Well, I don't remember the

22   numbers exactly, but it was the amount

23   for the office in Guanajuato.  I think

24   that was 155 and then the cost for the

Ramon Villanueva

1   visa, which was about 200, and then the
2   cost for transportation from my home to
3   Delaware.
4          Q.    Did your employer in 2006
5   pay for your transportation costs to and
6   from Mexico?
7                MR. TUDDENHAM:  Excuse me?
8                Objection.  What employer in
9   2006 are you talking about?
10               MS. BOUCHARD:  He said he
11  worked in 2006.
12               THE WITNESS:  No.
13               MR. TUDDENHAM:  Objection.
14  Why don't you try clarifying your
15  question?
16  BY MS. BOUCHARD:
17         Q.    You can answer.
18         A.    Could you please repeat the
19  question?
20         Q.    You have been traveling to
21  and from Mexico from the United States
22  in 2006; correct?
23         A.    Yes.
24         Q.    And you have been working

Ramon Villanueva

1   in the United States in 2006; correct?

2              MR. TUDDENHAM:  Objection.

3   He has taken the Fifth Amendment to that

4   question three or four times.  And I

5   mean it, Sarah, when someone invokes the

6   Fifth Amendment, it doesn't become a

7   game where you get to keep trying to ask

8   the question in a different way to trick

9   him to say something else.

10             MS. BOUCHARD:  Well, my

11  question is actually --

12             MR. TUDDENHAM:  He has taken

13  the Fifth Amendment.  You have your

14  answer.

15             I'm going to direct him not

16  to answer the question.

17             MS. BOUCHARD:  So I just

18  want to make clear, my question is a

19  different one, and it's whether his

20  employer in 2006 paid for transportation

21  costs to and from the United States.

22             And I just want to make sure

23  that that is the question that you are

24  invoking the Fifth on.

32

Ramon Villanueva

1      MR. TUDDENHAM:  Well, I
2  would ask you to clarify what employer
3  you are talking about.
4      No.  You need to have some
5  foundation for that.  I mean --
6      MS. BOUCHARD:  Because you
7  are taking the Fifth on the foundational
8  question.
9      MR. TUDDENHAM:  Sarah, if
10  you will clarify what you were talking
11  about, he may be able to answer the
12  question.  But if you are going to ask a
13  question that is so vague that it could
14  cover anything, he is invoking his Fifth
15  Amendment right.
16      MS. BOUCHARD:  Well, I was
17  trying to clarify that and then you
18  interrupted me.  So my question for the
19  foundation was --
20      MR. TUDDENHAM:  Well, I
21  apologize.
22      MS. BOUCHARD:  My question
23  for the foundation was --
24  BY MS. BOUCHARD:

Ramon Villanueva

```
 1        Q.      The employer that you
 2  worked for in the United States, did
 3  that employer pay for your
 4  transportation costs in 2006?
 5                MR. TUDDENHAM:  Objection;
 6  foundation.  Objection.  He has invoked
 7  the Fifth Amendment to any questions
 8  involving work in the United States in
 9  2006.  You have your answer to that.
10  BY MS. BOUCHARD:
11        Q.      What were your travel costs
12  from Mexico to Delaware in 2004?
13        A.      Well, I don't remember
14  exactly the numbers because I paid for
15  several, several tickets.
16        Q.      Several bus tickets?
17        A.      Yes.
18        Q.      Can he approximate the
19  cost?
20                I mean can you approximate
21  the cost?  My apologies.
22        A.      I think it was somewhere
23  around $170 and then whatever I paid for
24  food, and that I have no idea.
```

Ramon Villanueva

```
 1              (Below-described document
 2   marked as Villanueva Exhibit 2.)
 3   BY MS. BOUCHARD:
 4       Q.      What's been marked before
 5   you as Exhibit 2 has the title "Employer
 6   Disclosure Affidavit."  Do you see the
 7   box "Rent and utilities per month"?
 8              Yes?
 9       A.      Yes.
10       Q.      And do you see it says
11   $373?
12       A.      Yes.
13       Q.      Isn't it true that you were
14   not in fact charged $373 for rent and
15   utilities?
16       A.      Well, not entirely.  Well,
17   and, if it was, I wouldn't know how to
18   show you because on my check the -- it
19   wasn't there entirely.
20       Q.      Isn't it true that you were
21   charged $60 per week for rent and
22   utilities?
23       A.      I think that was only the
24   rent, as far as I understand.
```

Ramon Villanueva

1          Q.     Didn't that also include

2    utilities and transportation?

3          A.     I suppose so because I

4    didn't pay for them aside from that.

5          Q.     So you paid approximately

6    $240 per month for rent, utilities, and

7    transportation charges?

8          A.     What do you mean by

9    "utilities"?  What is meant by

10   "utilities"?

11         Q.     Electricity.

12         A.     Oh, then that's right.

13   Except for the phone.

14         Q.     You had to pay for the

15   phone charges separately?

16         A.     Yes.  My companion was in

17   charge of that; but, yes, we did have to

18   pay for that separately.  It wasn't

19   much.

20         Q.     Was your local service paid

21   for by TruGreen?  Was your local phone

22   service paid for by TruGreen?

23         A.     I think so, yes.

24         Q.     And I apologize if I asked

36

Ramon Villanueva

1    this, but is this your signature on this

2    document?

3           A.    Yes.

4                 MR. TUDDENHAM:   Sarah, why

5    don't clarify what document you just

6    referred to?

7                 MS. BOUCHARD:   I'm referring

8    to Exhibit 2, the only one with a

9    signature.  Oh, except the other one --

10   I apologize.

11   BY MS. BOUCHARD:

12          Q.    Who communicated the offer

13   in Mexico about the TruGreen job?

14          A.    The person that was in the

15   office; I don't know who that is.

16          Q.    Did you understand that to

17   be an LLS employee?

18          A.    No.

19          Q.    Who was it then?

20          A.    Well, we had to choose

21   someone from the list and they were the

22   ones that were going to give us the

23   contract or contract us, and in this

24   case it was TruGreen.

Ramon Villanueva

1          Q.      There was no employee in

2    Mexico from TruGreen, was there, that

3    talked to you?

4          A.      That's true, no.

5          Q.      You said you did not know

6    anyone who had worked previously for

7    TruGreen?

8          A.      That's true.

9          Q.      What were you told before

10   you accepted the offer about

11   compensation and overtime?

12         A.      What's "compensation"?

13         Q.      The amount that you are

14   paid.

15         A.      I'm sorry.  Once again,

16   what was the question?

17         Q.      What were you told about

18   your pay and overtime pay before you

19   accepted?

20         A.      I only knew what was on

21   this paper.

22         MR. TUDDENHAM:  And, for the

23   record, the witness is indicating

24   Exhibit 2.

38

Ramon Villanueva

1    BY MS. BOUCHARD:

2        Q.      Did you understand that

3    TruGreen would provide a uniform to you

4    at no cost to you?

5        A.      Well, I didn't know that

6    because I didn't even know that I was

7    going to be using a uniform.

8        Q.      At some point did you learn

9    that you would be using a uniform?

10        A.      I think when I got to

11    Delaware.

12        Q.      Did you ever have to pay

13    for the uniform?

14        A.      No.

15        Q.      Were you told in Mexico

16    that there may be opportunities to be

17    promoted at TruGreen?

18        A.      No.  And what's more, the

19    person that told me about it didn't even

20    know what all was -- what all it

21    entailed.

22        Q.      The person that you spoke

23    to did not know all the terms and

24    conditions of the TruGreen's employment

Ramon Villanueva

1    when you spoke to that person?

2        A.    I was referring to the job

3    itself. She didn't know exactly what I

4    would be doing.

5        Q.    But you accepted the job

6    anyway?

7        A.    Yes.

8        Q.    Was the only TruGreen

9    facility that you worked for in

10   Wilmington?

11       A.    As far as I know, unless I

12   have worked for another office without

13   knowing it. But I believe so.

14       Q.    Okay. Was Mike Matejik

15   your supervisor?

16       A.    Yes.

17       Q.    Do you know Jim Vacchiano?

18       A.    No.

19       Q.    How many other H-2B workers

20   were there when you were there?

21       A.    Well, I met five, and I

22   suppose that's all of them.

23           MR. TUDDENHAM:  Are we

24   giving them separate numbers or --

40

Ramon Villanueva

1            MS. BOUCHARD:   No.

2            (Below-described document

3    marked Villanueva Exhibit 3.)

4    BY MS. BOUCHARD:

5        Q.      What's been marked as

6    Exhibit 3 should be a three-page

7    document.  Does everyone have three

8    pages?

9        A.      Yes.

10       Q.      On TruGreen Bates numbered

11    15, which I believe is the third page,

12    did you read this before signing it?

13       A.      I don't recognize -- I

14    don't remember.

15       Q.      You don't remember whether

16    you read it or not?

17       A.      I don't remember whether I

18    read it or not because I don't remember

19    or given that I don't remember.

20       Q.      Do you normally sign

21    documents that you have not read?

22       A.      No.

23       Q.      So do you think you did

24    read this document, in retrospect?

Ramon Villanueva

```
1          A.      I don't know what to tell
2    you because there were so many documents
3    that I signed.
4               Well, I have to recognize
5    the fact that I didn't pay attention to
6    them in particular.  Everybody was
7    signing and so I signed.
8          Q.      Were there some documents
9    in Mexico that you may not have read as
10   well and just signed?
11         A.      Well, in Mexico the only
12   thing they gave me were these documents,
13   the ones that are marked No. 1 and 2 --
14   no, I'm sorry, just No. 2, so that's
15   easy to remember.
16         Q.      So those are the only two
17   documents that you signed in Mexico, the
18   ones that you just previously mentioned?
19         A.      Well, actually it was only
20   two documents, this document and another
21   document that I don't have here.  But
22   this was the only one I signed.
23              MS. BOUCHARD:  This is going
24   to be Exhibit 4.
```

Ramon Villanueva

1                    (Below-described document
2        marked as Villanueva Exhibit 4.)
3                    MR. TUDDENHAM:  Do you have
4        a copy for me?
5                    MS. BOUCHARD:  Oh, I'm
6        sorry, Ed.
7        BY MS. BOUCHARD:
8            Q.      Mr. Villanueva, is this
9        your handwriting on this document which
10       has been marked as Exhibit 4?
11           A.      Yes.
12           Q.      And did you see -- first of
13       all, did you read this document before
14       signing it?
15           A.      I think so.  I believe so.
16           Q.      Then did you understand in
17       Paragraph 8 that the costs that were
18       identified in Paragraph 7 were your
19       responsibility?
20           A.      Yes.
21           Q.      But you came to -- you
22       agreed to pay those; correct?
23           A.      I paid them.
24           Q.      But those are the costs

Ramon Villanueva

1    that you are disputing now in your

2    lawsuit?

3           A.     May I speak to my

4    attorney?

5           Q.     Sure.

6                  THE VIDEOGRAPHER:  Off tape

7    11:25.

8                  (Recess.)

9                  THE VIDEOGRAPHER:  Back on

10   the record 11:27

11                 MS. BOUCHARD:  Could the

12   court reporter repeat the question

13   that's pending on the record?

14                 (The court reporter read the

15   record as follows:

16                 "QUESTION:  But those are

17   the costs that you are disputing now in

18   your lawsuit?")

19          A.     Yes.

20          Q.     Why did you take the job

21   with TruGreen even though you had to pay

22   those expenses?

23          A.     Well, because on the list

24   it was the best salary.  And the people

Ramon Villanueva

1   that connected me up to the office said

2   that those were the costs that one had

3   to pay -- yes, the costs.

4        Q.     Did you see the TruGreen

5   job as an opportunity to make money that

6   you could not make in Mexico?

7        A.     Definitely, yes, and above

8   all much more quickly.

9        Q.     Did you receive $150 in

10  cash -- let me strike that question.

11  Let me go back to this.

12            This document that's Bates

13  stamped RV-2, was that presented to you

14  in Mexico or Delaware?

15            MS. RAPPOSELLI:  Can we

16  reference Defendant's Exhibit 4?  Is

17  that what you're referencing?

18       A.     Yes.

19       Q.     When you arrived in

20  Delaware, you received $150 cash when

21  you got there; correct?

22       A.     Yes.

23       Q.     You never had to repay that

24  money back?

45

Ramon Villanueva

1        A.        Yes, that's true.

2        Q.        And you could use that

3    money how you wanted to?

4        A.        Well, yes, even though that

5    at that moment it had to be for food.

6        Q.        And is that what you used

7    it for?

8        A.        Yes, and I believe I bought

9    a blanket or something like that.

10        Q.        Did you receive any other

11    advances from Mike?

12        A.        No.

13        Q.        That $150 was not actually

14    an advance, but what I'm asking you is

15    whether you could have asked Mike for

16    mean if you needed it sooner.

17            MR. TUDDENHAM:    Objection,

18    form.

19        A.        I don't know.

20        Q.        Did you know of any other

21    workers that asked Mike for money sooner

22    than it was earned?

23        A.        No.  As far as I know, no.

24        Q.        Do you know how other

46

Ramon Villanueva

1    TruGreen branches pay their H-2B

2    workers?

3          A.      No.

4          Q.      Do you know if TruGreen

5    paid some of the costs of your housing?

6          A.      No.

7          Q.      You don't know?

8          A.      No, I don't know.

9          Q.      Do you know what your

10   actual transportation costs were?  In

11   other words, do you know if TruGreen

12   paid for some of your transportation

13   costs?

14              MR. TUDDENHAM:  From where

15   to where?

16   BY MS. BOUCHARD:

17        Q.      I'm just talking while

18   working in the Delaware area.

19              THE INTERPRETER:  I'm

20   sorry.  Your answer to from where to

21   where?

22              MS. BOUCHARD:  In the

23   Delaware Valley.

24              A.      Well, the only place we

ESQUIRE DEPOSITION SERVICES

Ramon Villanueva

1   went -- well, practically the only place
2   we went was to the office, and for that
3   Mike gave us passes for the bus.
4         Q.    Do you know how much the
5   bus pass actually cost?
6         A.    No.
7         Q.    Did you ever ask why you
8   were being undercharged for
9   transportation, rent, and utilities?
10        MR. TUDDENHAM:   Objection,
11  form.
12        THE INTERPRETER:   Rent,
13  transportation?
14        A.    No.
15        Q.    How did you learn that you
16  were going to take the position as
17  specialist at TruGreen?
18        MR. TUDDENHAM:   Objection;
19  form.
20        A.    I didn't know -- I didn't
21  know it was going to be that position.
22        Q.    Did you have a conversation
23  with Mike about the specialist position
24  and the benefits that could come from

Ramon Villanueva

1    you working as a specialist?

2         A.    Well, I don't quite

3    understand because I didn't speak to

4    Mike until I got here.  And when I got

5    here, I was just supposed to do what I

6    was supposed to do.

7         Q.    Do you recall a

8    conversation with Mike, with other H-2B

9    workers present, where he described the

10   specialist position and the opportunity

11   to earn more money in that position?

12        A.    Well, I remember him

13   telling us about what the job would be,

14   but I don't remember anything about

15   another position, any other position.

16        Q.    Do you recall him comparing

17   the specialist position to the laborer

18   position?

19        A.    No, I don't think so.  I

20   don't remember.

21        Q.    Do you recall him talking

22   to you about bonuses that you could earn

23   as a specialist?

24        A.    I remember him speaking to

Ramon Villanueva

1    us about commissions, but the position

2    of specialist I really didn't even know.

3         Q.    My question, though, is

4    about bonuses.  Do you recall getting

5    any bonuses?

6         A.    I think so, yes.  If you're

7    referring to the commissions that

8    appeared on our checks, then, yes.

9         Q.    And you recall getting

10   commissions?

11        A.    Sometimes.

12        Q.    What would the commissions

13   be based upon, if you remember?

14        A.    On production.

15        Q.    Is there any discussion of

16   commissions based on production in

17   what's marked as RV-1?  And I'm not sure

18   what that's Bates numbered.  I

19   apologize.

20             MR. TUDDENHAM:  Sarah,

21   before the record gets totally messed

22   up, RV-1 is his I-94.

23             MS. BOUCHARD:  No.  RV --

24             MR. TUDDENHAM:  Sarah, could

Ramon Villanueva

1  you use the exhibit numbers?  You

2  started with exhibit numbers this

3  morning.

4            MS. BOUCHARD:  What exhibit

5  number is it for the record?

6            THE INTERPRETER:  I have no

7  idea because I don't have them.  What

8  exhibit number are you looking at?

9       A.    I can tell you it's

10 Exhibit No. 2.

11 BY MS. BOUCHARD:

12      Q.    What I'm referring to, for

13 the record, is Exhibit No. 2 and I'm

14 asking if this document reflects any

15 commissions that you could potentially

16 earn.

17      A.    Yes.

18      Q.    And does it say how much?

19      A.    No.

20      Q.    Did you have any

21 understanding of how much commission you

22 would earn when you were in Mexico and

23 signed this document?

24      A.     No.

# EXHIBIT B

## PART 2 OF 2

Ramon Villanueva

1          Q.      But you accepted the

2    position anyway?

3          A.      Yes, I accepted it because

4    of the salary.

5          Q.      What salary are you

6    referring to?

7          A.      The one on this page, what

8    it says here on this page.

9          Q.      Okay.  I see an hourly rate

10   on that page but I don't see a

11   guaranteed salary.

12         A.      I think it's a question of

13   language.  In Spanish we refer to this

14   as salary.

15         Q.      Okay.  Thank you.

16         A.      You're welcome.

17         Q.      Did you independently keep

18   track of your hours other than -- yeah,

19   did you independently keep track of your

20   hours on a piece of paper?

21         A.      Sometimes I did so.

22         Q.      Do you still have those

23   pieces of paper?

24         A.      I wouldn't know to tell you

52

Ramon Villanueva

1   for sure because if I do have them, they
2   are buried under a bunch of papers in
3   Mexico.  So I wouldn't know to tell you
4   for sure.

5         Q.     As part of this lawsuit,
6   have you checked your records in Mexico
7   to make sure that you've produced
8   everything that's related to this
9   lawsuit to your attorneys?

10        A.     Well, yes, some in Mexico
11  and some before I left here.

12        Q.     And so you just stated,
13  though, that you think they are
14  underneath some other papers in Mexico.

15              MR. TUDDENHAM:  Objection,
16  form.

17        A.     Well, what I was referring
18  to is before I left for Mexico I
19  reviewed some documents and -- and so --
20  and they're there, they were there.  And
21  then when I spoke to my attorneys --

22              THE INTERPRETER:  I'm
23  sorry.  I lost it entirely.

24        A.     Well, some documents I

ESQUIRE DEPOSITION SERVICES

53

Ramon Villanueva

1    reviewed here and one of them was this
2    one.  And then others I reviewed in
3    Mexico when I was there.
4                   MR. TUDDENHAM:  I don't
5    think the witness is understanding your
6    questions.
7    BY MS. BOUCHARD:
8         Q.      My question is this:  My
9    question is, you said you had a piece of
10   paper or pieces of paper where you
11   tracked the number of hours that you
12   worked at TruGreen.  Where are those
13   pieces of paper?
14        A.      In Mexico.
15        Q.      And why haven't you
16   produced those to your attorneys?
17        A.      They haven't asked for them.
18             MS. BOUCHARD:  Those would
19   truly be covered by the disclosures.
20             MR. TUDDENHAM:  I assure
21   you, Sarah, if they can be found, you
22   will get a copy of them.
23             MS. BOUCHARD:  Okay.  He
24   seems to suggest that he still has them

54

Ramon Villanueva

1    in Mexico, by his testimony.

2              MR. TUDDENHAM:   Well,

3    actually what he first said was they

4    might be in Mexico.   If they exist,

5    believe me, we would be just as

6    interested in seeing them as you.

7              MS. BOUCHARD:   Okay.

8    BY MS. BOUCHARD:

9         Q.      What was the type of work

10   that you did on a daily basis for

11   TruGreen?

12        A.      To apply chemicals on the

13   grass -- lawns.

14        Q.      To different homes or where

15   would you go?

16        A.      At different homes and

17   different places.

18        Q.      How would you get to those

19   different places?

20        A.      Well, in a pickup truck or

21   a truck of TruGreen's.   It depended on

22   what it may be.

23        Q.      Was there a designated

24   worker who would drive?

55

Ramon Villanueva

1        A.     At first, yes.

2        Q.     Did that person have a

3    different job description than you did?

4        A.     I don't know.

5        Q.     Okay.  Did you enjoy the

6    work?

7        A.     Well, it was work and they

8    paid me.  It was work.

9        Q.     Could you have earned more

10   money if you had worked more hours?

11       A.     In one day?

12       Q.     In other words, if you had

13   asked to work more hours, would they

14   have allowed you to work more hours and

15   make more money?

16       A.     In the way that they paid

17   me, not necessarily.  In the way that I

18   was paid, not necessarily.

19       Q.     Why?

20       A.     Because the more hours I

21   worked, the less they paid me per hour.

22       Q.     But you still would have

23   been getting more money because you

24   would be working more?

ESQUIRE DEPOSITION SERVICES

56

Ramon Villanueva

1      A.      Yes, but my work would be

2  worth less, my efforts would be worth

3  less.

4      Q.      Do you understand that

5  that's a lawful way to pay people in the

6  United States?

7            MR. TUDDENHAM:  Objection,

8  calls for a legal conclusion.

9            MS. BOUCHARD:  I'm just

10  asking if he knows.  I'm not asking --

11            MR. TUDDENHAM:  Well, he's

12  not a lawyer.  If you want to ask him

13  his opinion as a layperson, be my guest.

14            MS. BOUCHARD:  Yes.

15      A.      In my opinion?

16      Q.      Yes.

17      A.      No.

18      Q.      Did you complain at some

19  point about how you were paid?

20      A.      Yes.

21      Q.      And who did you complain to?

22      A.      Well, I believe I did so

23  many times.  So I don't remember the

24  first time, but I believe it was at

57

Ramon Villanueva

1  least on some occasions to Mike.

2        Q.      And who else did you

3  complain to?

4        A.      Well, I believe it was to

5  my manager -- well, he wasn't my

6  manager, but Kevin Davis.

7        Q.      Who is Kevin Davis?

8        A.      Well, I believe he was the

9  manager of another group of workers.

10        Q.      Were they H-2B workers?

11        A.      I don't think so.

12        Q.      When you complained to Mike

13  about how you were paid, what did he

14  tell you?

15        A.      Well, he said that it was

16  fine and he explained to me once again

17  the way to be paid. And he said if I

18  wished, I could be paid according to

19  what this page says but that if I was

20  paid the way it says here, then I

21  wouldn't receive commissions or

22  overtime.

23                MR. TUDDENHAM:  And for the

24  record, the witness is indicating

Ramon Villanueva

```
 1   Exhibit 2.
 2   BY MS. BOUCHARD:
 3        Q.     So did you decide, based on
 4   that conversation, to remain being paid
 5   in the same way that you started being
 6   paid?
 7        A.     Yes, for two reasons:
 8   because if I chose to work by the hour,
 9   then according to what Mike said, I
10   could only work 40 hours.  And the other
11   reason is that he said it would be fine,
12   that I would make more money, and it was
13   just a question of time.
14        Q.     Were you promised any
15   number of overtime hours in Mexico?
16        A.     No.
17        Q.     You had mentioned another
18   person who I believe it was a field
19   manager.  What did you say to him about
20   how you were being paid?
21             MR. TUDDENHAM:  Objection;
22   form.  For the record, are you talking
23   about?
24   BY MS. BOUCHARD:
```

59

Ramon Villanueva

1      Q.      You mentioned Kevin Davis?

2      A.      (Witness shakes head.).

3      Q.      What did you say to him

4  with respect to your complaints about

5  wages?

6      A.      Well, I asked him if that

7  was all right and whether it was allowed

8  to do that.  And he explained to me once

9  again the pay, the way in which I was

10  paid.

11      Q.      Did anyone in Mexico

12  promise you a certain amount of

13  commissions?

14      A.      No.

15      Q.      Did you strain your back at

16  some point while working for TruGreen?

17      A.      Yes.

18      Q.      And you were paid for

19  that -- oh, let me stop.

20          You missed a day of work for

21  that?

22      A.      Yes.

23      Q.      And you were paid for that

24  day even though you didn't work;

60

Ramon Villanueva

1   correct?

2          A.      I don't remember, but it's
3   probable that, yeah.

4                  But I just want to clarify
5   something:  That the problem was
6   actually not the day of work but that as
7   a result I could not meet my quota of
8   production.

9          Q.      Did your injury preclude
10  you from working hours that you wanted
11  to?

12         A.      I'm just referring to that
13  day.

14         Q.      Oh, that day.  So you
15  weren't able to make commissions on that
16  day but you were paid for that day?

17         A.      And, well, as I said
18  before, I suppose so, but I don't
19  remember exactly.

20         Q.      Why did you decide to leave
21  TruGreen?

22         A.      I believe I had many
23  reasons to do so, but the main reason
24  was that I was not receiving what I was

61

Ramon Villanueva

1    told I would receive, what's on this

2    paper.

3            Q.      Which is Exhibit 2?

4            A.      Yes.

5            Q.      Isn't it true that you just

6    stated that Mike said that you could go

7    to this system of compensation if you

8    wanted?

9                    MR. TUDDENHAM:   Objection;

10   form.

11           A.      It's true that he told me

12   that, but at that point in time he told

13   me that I would be better off staying

14   with commissions because I could earn

15   more money.

16           Q.      And you chose to stay on

17   the commission plan?

18           A.      Yes.

19           Q.      What other reasons did you

20   decide -- what were the other reasons

21   you decided to leave TruGreen

22   mid-season?

23           A.      My back was not all right,

24   and because I received what you might

Ramon Villanueva

1   call a proposition from Mike that he had

2   to return some of of us to Mexico.

3   Basically that's it.

4          Q.      So you chose to volunteer?

5          A.      Well, if one could call it

6   volunteer, based on all of the bad

7   things involved, yes.

8          Q.      Did other H-2B workers

9   decide to stay?

10          A.      I don't think he offered

11   anyone else to leave.

12          Q.      That wasn't my question,

13   though.  My question was, were you the

14   only H-2B worker that left?

15          A.      As far as I know, yes.

16   Well, I at least returned alone.

17              MS. BOUCHARD:  Do you want

18   to stop so we can do the video?

19              THE VIDEOGRAPHER:  This

20   concludes videotape No. 1 at 12:03.

21              (Recess.)

22              THE VIDEOGRAPHER:  We're

23   back on the record.  This is the

24   beginning of Tape 2.  The time is

63

Ramon Villanueva

1    12:14.

2    BY MS. BOUCHARD:

3         Q.    When you returned to Mexico

4    in 2004, did you immediately begin

5    working?

6         A.    No.

7         Q.    When did you start working

8    in 2004, if at all?

9         A.    If I'm not mistaken, I

10   don't think it was until September.

11        Q.    And what did you do?

12        A.    Give classes.

13        Q.    And what was your hourly

14   wage giving classes?

15        A.    You're going to laugh.

16        Q.    If you could estimate it in

17   American dollars, that would be great.

18        A.    Something like $2.

19        Q.    $2 an hour?

20        A.    (Witness shakes head.)

21        Q.    And about how many hours

22   per week did you work?

23        A.    Somewhere around 50.

24        Q.    On what's marked as

Ramon Villanueva

1   Exhibit 2 it states "Skills" and it says

2   "valid driver's license, bilingual."

3   Did you have a valid driver's license?

4          A.     Yes.

5          Q.     And are you bilingual?

6          A.     Well, I wouldn't know how

7   to -- I don't believe that I have the

8   ability to evaluate that.

9          Q.     But you presented yourself

10  as bilingual to TruGreen?

11         A.     Well, in reality it wasn't

12  me who made that decision.  It was the

13  person with whom I spoke in Guanajuato.

14  She was asking me some questions in

15  English and that's what she decided,

16  that I was bilingual.

17                MS. BOUCHARD:  Okay.  Thank

18  you.  I don't have any further

19  questions.

20                MR. TUDDENHAM:  We will

21  reserve ours to the time of trial.

22                THE VIDEOGRAPHER:  That

23  concludes today's videotape deposition.

24  The time is 12:19.

65

Ramon Villanueva

1                    (Witness excused.)

2                    (Whereupon the examination

3    adjourned at 12:19 p.m.)

4                    - - - - - -

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

66

Ramon Villanueva

```
 1

 2                    C E R T I F I C A T E

 3

 4         I  hereby  certify  that  the

 5  witness  was  duly  sworn  by  me  and  that

 6  the  deposition  is  a  true  record  of  the

 7  testimony  given  by  the  witness

 8             It  was  requested  before

 9  completion  of  the  deposition  that  the

10  witness  RAMON  VILLANUEVA,  have  the

11  opportunity  to  read  and  sign  the

12  deposition  transcript.

13

14

15

16                    Ann V. Kaufmann

17     - - - - - - - - - - - - - - - - - - - - - - -

18         Ann  V.  Kaufmann,  RPR,  CRR

19

20

21             (The  foregoing  certification

22  of  this  transcript  does  not  apply  to  any

23  reproduction  of  the  same  by  any  means,

24  unless  under  the  direct  control  and/or
```

Ramon Villanueva

1    supervision of the certifying reporter.)

2         INSTRUCTION TO THE WITNESS

3              Please read your deposition

4    over carefully and make any necessary

5    corrections.  You should state the

6    reason in the appropriate space on the

7    errata sheets for any corrections that

8    are made.

9              After doing so, please sign

10   the errata sheet and date it.

11             You are signing same subject

12   to the changes you have noted on the

13   errata sheet, which will be attached to

14   your deposition.

15             It is imperative that you

16   return the original errata sheet to the

17   deposing attorney within thirty (30)

18   days of receipt of the deposition

19   transcript by you.  If you fail to do

20   so, the deposition transcript may be

21   **deemed to be accurate and may be used in**

22   court.

23

24

68

Ramon Villanueva

```
 1

 2                          - - - - - -

 3                     E   R   R   A   T   A

 4                          - - - - - -

 5      P A G E        L I N E            C H A N G E

 6      ____          ____      _____

 7      ____          ____      _____

 8      ____          ____      _____

 9      ____          ____      _____

10      - - - -       - - - -   _____

11      ____          ____      _____

12      ____          ____      _____

13      ____          ____      _____

14      ____          ____      _____

15      ____          ____      _____

16      ____          ____      _____

17      ____          ____      _____

18      ____          ____      _____

19      ____          ____      _____

20      ____          ____      _____

21      ____          ____      _____

22      ____          ____      _____

23      ____          ____      _____

24      ____          ____      _____
```

69

Ramon Villanueva

```
1    ____    ____   _____
2         ACKNOWLEDGEMENT  OF  DEPONENT
3              I, _____, do
4    hereby certify that I have read the
5    foregoing pages, _____and that the
6    same is a correct transcription of the
7    answers given by me to the questions
8    therein propounded, except for the
9    corrections or changes in form or
10   substance, if any, noted in the attached
11   errata sheet.
12              _____
13              DATE
14
15   Subscribed and sworn to me this _____
16   day of _____, 2005.
17   My Commission expires:
18
19              _____
20
21   _____
                Notary Public
22
23
24
     ESQUIRE DEPOSITION SERVICES
```

**A**

ability 64:8
able 27:1 32:11
  60:15
accepted 37:10,19
  39:5 51:1,3
accurate 67:21
ACKNOWLEDG...
  69:2
ACTION 1:3
actual 46:10
address 12:15
adjourned 65:3
advance 45:14
advances 45:11
Affidavit 34:6
affirmative 15:16
agreed 42:22
airline 16:23 17:11
  18:1
airplane 20:4
allowed 26:18 55:14
  59:7
allows 10:15 22:24
Amendment 13:2,14
  13:19 14:15,19
  15:3,14 16:1 19:22
  23:7 31:3,6,13
  32:15 33:7
American 63:17
amount 29:22 37:13
  59:12
Andrea 2:18 5:16
  6:1
and/or 66:24
Angeles 16:20 26:23
Ann 1:15 66:18
answer 3:3 7:16
  8:10 15:16,17 18:5
  23:5 29:8 30:17
  31:14,16 32:11
  33:9 46:20
answered 28:23
answers 19:20 69:7
anymore 17:22
anyway 39:6 51:2
apologies 33:21
apologize 32:21
  35:24 36:10 49:19
APPEARANCES
  2:1
appeared 49:8
applicator 25:12,13
apply 54:12 66:22
appropriate 67:6
Approved 1:16
approximate 33:18
  33:20
approximately 1:15

35:5
April 9:15,21 10:1
  10:21,24 11:11,19
  12:3 26:9,12,15,21
area 46:18
arrived 44:19
aside 35:4
asked 12:23 14:21
  19:15 22:13 28:22
  35:24 45:15,21
  53:17 55:13 59:6
asking 13:21 14:17
  25:10 28:12,19
  29:1,4,5 45:14
  50:14 56:10,10
  64:14
assume 5:13 6:24
assure 53:20
attached 67:13
  69:10
attention 41:5
attorney 5:12 43:4
  67:17
attorneys 7:12 8:5
  52:9,21 53:16
August 12:1,4,8,11
  26:1
a.m 4:11

**B**

back 9:22,22 10:1,3
  11:22 12:5 13:10
  14:11 15:21 19:9
  19:14 20:14 26:20
  26:22 43:9 44:11
  44:24 59:15 61:23
  62:23
background 20:18
  21:6
bad 62:6
Barrington 6:3
based 25:22 49:13
  49:16 58:3 62:6
Basically 62:3
basis 54:10
Bates 40:10 44:12
  49:18
beginning 1:14 20:3
  62:24
believe 10:10 11:23
  14:16 39:13 40:11
  42:15 45:8 54:5
  56:22,24 57:4,8
  58:18 60:22 64:7
Below-described
  25:17 34:1 40:2
  42:1
benefits 47:24
best 43:24
Beth 2:14 5:20

better 61:13
bhenke@morganl...
  2:14
bilingual 64:2,5,10
  64:16
bit 28:9
blanket 45:9
BOCKIUS 2:10,13
bonuses 48:22 49:4
  49:5
border 26:19 27:2
Bouchard 2:10 5:3,4
  5:14 6:12,15 8:3
  8:21 13:3,12,23
  14:20 15:4,9,23
  19:5,9,13 20:10,16
  21:15 22:1,6,18
  24:14,15 25:8,9,16
  25:19 28:2 30:10
  30:16 31:10,17
  32:6,16,22,24
  33:10 34:3 36:7,11
  38:1 40:1,4 41:23
  42:5,7 43:11 46:16
  46:22 49:23 50:4
  50:11 53:7,18,23
  54:7,8 56:9,14
  58:2,24 62:17 63:2
  64:17
bought 45:8
Boulevard 1:22 4:5
box 34:7
Boy 21:1
branches 46:1
break 7:8 13:4
Bridge 6:2
brought 6:17
bunch 52:2
buried 52:2
bus 17:9 33:16 47:3
  47:5

**C**

C 66:2,2
calendar 27:5,6
California 6:7 12:17
  16:17 27:3,15,21
  27:23 28:1
call 28:14 62:1,5
called 8:19 21:9
  28:21
calling 29:6
calls 23:3 56:8
Camac 2:7
Cambridge 2:3
carefully 67:4
case 6:16 36:24
cash 18:12,14,19
  44:10,20
CASTRO 2:5

catch 20:4
cell 29:9
Center 1:23
Centre 2:15
certain 59:12
certification 66:21
Certified 1:16
certify 66:4 69:4
certifying 67:1
CHANGE 68:5
changes 67:12 69:9
charge 35:17
charged 34:14,21
charges 35:7,15
check 34:18
checked 52:6
checks 49:8
chemicals 54:12
CHEMLAWN 1:8
children 20:21
choose 36:20
chose 58:8 61:16
  62:4
CIVIL 1:3
clarified 29:2
clarify 12:2 26:11
  32:2,10,17 36:5
  60:4
clarifying 30:14
classes 21:24 22:3,5
  22:9 63:12,14
clear 31:18
Clements 6:2
client 14:4
code 12:18
come 26:18 27:1
  47:24
coming 21:18 27:12
commission 50:21
  61:17 69:17
commissions 49:1,7
  49:10,12,16 50:15
  57:21 59:13 60:15
  61:14
Commonwealth
  1:17
communicated
  36:12
companies 24:5
companion 35:16
comparing 48:16
compensation 37:11
  37:12 61:7
competent 23:4
complain 56:18,21
  57:3
complained 57:12
complaints 59:4
completion 66:9
concludes 62:20

64:23
conclusion 23:3 56:8
conditions 38:24
conferred 14:9
confused 28:9
connected 44:1
consult 14:3
contract 36:23,23
control 66:24
conversation 28:4
  47:22 48:8 58:4
copies 10:16
copy 10:12,23 42:4
  53:22
corporate 5:12
correct 5:15 16:24
  18:24 26:2 30:22
  31:1 42:22 44:21
  60:1 69:6
corrections 67:5,7
  69:9
cost 17:8,8 29:24
  30:2 33:19,21 38:4
  47:5
costs 18:2 30:5
  31:21 33:4,11
  42:17,24 43:17
  44:2,3 46:5,10,13
counsel 2:9,16 4:19
country 26:1
couple 6:20
courses 22:11
court 1:1,17 4:9 5:8
  5:18,22 7:21 43:12
  43:14 67:22
cover 32:14
covered 53:19
CRR 66:18
Cueramaro 6:8
  12:17 16:6
current 9:6 12:14

**D**

daily 54:10
date 4:10 10:4 67:10
  69:13
dates 27:9
Davis 57:6,7 59:1
day 9:14,16 55:11
  59:20,24 60:6,13
  60:14,16,16 69:16
days 67:18
decide 58:3 60:20
  61:20 62:9
decided 61:21 64:15
decision 64:12
deemed 67:21
defendants 1:9 2:16
  5:21
Defendant's 44:16

Definitely 44:7
Delaware 1:1 4:10
  30:3 33:12 38:11
  44:14,20 46:18,23
depended 54:21
deponent 4:17 69:2
deposing 67:17
deposition 1:12,22
  3:1 4:5,8,12 6:21
  8:7 9:1 14:10 20:5
  64:23 66:6,9,12
  67:3,14,18,20
  69:24
described 48:9
description 55:3
designated 54:23
Diego 11:17
different 7:20 14:18
  14:21 25:4 31:8,19
  54:14,16,17,19
  55:3
direct 31:15 66:24
DIRECTION 3:3
Disclosure 34:6
disclosures 53:19
discussion 49:15
disputing 43:1,17
distance 19:19
District 1:1,1,16 4:9
  4:10
document 25:17
  26:6,8 34:1 36:2,5
  40:2,7,24 41:20,21
  42:1,9,13 44:12
  50:14,23
documents 8:12,15
  29:16 40:21 41:2,8
  41:12,17,20 52:19
  52:24
doing 11:10,12
  29:14 39:4 67:9
dollars 63:17
drive 54:24
driver's 64:2,3
duly 6:3,9 66:5
d/b/a 1:8

E
E 66:2,2 68:3
earn 12:19 48:11,22
  50:16,22 61:14
earned 45:22 55:9
easy 41:15
Ed 42:6
educational 21:5
Edward 2:2 4:21
efforts 56:2
Electricity 35:11
employed 4:4
employee 36:17 37:1

employer 30:4,8
  31:20 32:2 33:1,3
  34:5
employment 38:24
English 64:15
enjoy 55:5
entailed 38:21
entered 25:24
entirely 34:16,19
  52:23
entitle 9:9
entitled 13:21 14:17
  15:2
errata 67:7,10,13,16
  69:11
Esquire 1:22 2:2,5,6
  2:10,14 4:4 69:24
estimate 63:16
etudden@io.com
  2:2
evaluate 64:8
Everybody 41:6
evidence 11:6
exactly 22:12 27:9
  29:22 33:14 39:3
  60:19
examination 6:11
  65:2
examined 6:5,9
Excuse 8:2,20 30:7
excused 65:1
exhibit 25:18 34:2,5
  36:8 37:24 40:3,6
  41:24 42:2,10
  44:16 50:1,2,4,8
  50:10,13 58:1 61:3
  64:1
exist 54:4
expect 25:3
expenses 29:18
  43:22
expires 9:11 69:17
explained 20:2
  57:16 59:8
E-94 10:11,13,14,20
  10:24

F
F 1:22 66:2
facility 39:9
fact 16:13 17:17
  34:14 41:5
fail 67:19
far 34:24 39:11
  45:23 62:15
February 26:18
  27:10
field 58:18
Fifth 13:2,14,19
  14:15,19 15:3,13

15:24 19:22 23:6
  31:3,6,13,24 32:7
  32:14 33:7
Finally 7:19
find 20:8
fine 7:11,18 9:2
  57:16 58:11
finished 7:15
first 9:20 42:12 54:3
  55:1 56:24
five 21:7 39:21
flight 17:3
Floor 1:14,23 2:15
following 19:11
follows 6:5,10 43:15
food 34:23 45:5
foregoing 66:21
  69:5
form 10:10,11,13
  18:4 25:21,22
  26:14 45:18 47:11
  47:19 52:16 58:22
  61:10 69:9
forth 6:19
found 53:21
foundation 32:5,19
  32:23 33:6
foundational 32:7
four 1:23 31:4
Fraccion 6:7 12:16
friend 28:10,12
friends 12:13 29:12
further 64:18

G
game 31:7
gestures 7:6
getting 49:4,9 55:23
girl 21:1,2
give 10:10 23:4
  36:22 63:12
given 19:20,21
  25:23 40:19 66:7
  69:7
giving 21:24 22:4
  39:24 63:14
go 16:13 19:9 20:7
  26:19 27:1 44:11
  54:15 61:6
going 6:19,24 15:7
  19:13,23 20:17
  27:13 31:15 32:12
  36:22 38:7 41:23
  47:16,21 63:15
Gonzales 2:5,6 5:1,2
  14:8
Good 4:1 6:13,18
grass 54:13
great 20:12 63:17
ground 6:20

group 57:9
Guadalajara 21:10
Guanajuato 6:8
  12:17 29:23 64:13
guaranteed 51:11
guest 56:13

H
hand 5:19
handwriting 42:9
happen 20:11
happy 20:9
head 59:2 63:20
held 1:13 4:13
Henke 2:14 5:20,20
high 22:8
highest 24:1
Hoffman 2:21 4:3
home 12:14 16:13
  17:3,12 18:2 30:2
homes 54:14,16
hour 55:21 58:8
  63:19
hourly 51:9 63:13
hours 13:24 14:22
  14:23 15:11 16:1
  51:18,20 53:11
  55:10,13,14,20
  58:10,15 60:10
  63:21
housing 46:5
H-2B 21:11,14
  22:20 29:19 39:19
  46:1 48:8 57:10
  62:8,14

I
idea 33:24 50:7
identified 42:18
immediately 63:4
immigration 9:7
imperative 67:15
include 24:3 35:1
incur 18:2 29:18
independently 51:17
  51:19
INDEX 3:1
indicated 19:17
indicating 37:23
  57:24
Individually 1:3
INFORMATION
  3:7
injury 60:9
instruct 7:16
INSTRUCTION
  67:2
intending 29:10
interested 23:21
  24:8 54:6

interpreter 2:18
  5:16,17 6:2 8:2,20
  12:23 21:13 22:4
  25:13 27:17,24
  46:19 47:12 50:6
  52:22
interrupted 32:18
introduce 4:20
invoke 15:2,7
invoked 14:14 33:6
invokes 15:14 31:5
invoking 15:5 31:24
  32:14
involved 9:3 62:7
involving 33:8
I-9 19:15
I-94 20:8 25:21,22
  26:5 49:22

J
J 2:6
Jason 2:21 4:3
JFK 4:5
Jim 39:17
job 25:12 36:13 39:2
  39:5 43:20 44:5
  48:13 55:3
jobs 24:8
John 1:22
junior 22:8

K
Kaufmann 1:15
  66:18
keep 13:21 14:17
  31:7 51:17,19
Kennedy 1:22
Kevin 57:6,7 59:1
knew 24:7 37:20
know 7:9 8:8,10,17
  8:19,24 23:19
  24:16 29:13 34:17
  36:15 37:5 38:5,6
  38:20,23 39:3,11
  39:17 41:11 45:19
  45:20,23,24 46:4,7
  46:8,9,11 47:4,20
  47:21 49:2 51:24
  52:3 55:4 62:15
  64:6
knowing 39:13
knows 56:10

L
L 2:5
labor 25:7
laborer 25:1,6,12
  48:17
language 51:13
laugh 63:15

law 1:13 7:21
lawful 14:23 15:12
  56:5
lawfully 19:16
lawns 54:13
lawsuit 9:4 43:2,18
  52:5,9
lawyer 56:12
layperson 56:13
learn 23:8,20 38:8
  47:15
learning 24:21
leave 12:5 60:20
  61:21 62:11
leaving 16:14,17
left 16:22 18:23
  52:11,18 62:14
legal 23:3 56:8
legally 22:24
Let's 19:9 24:9
Lewis 1:13 2:10,13
  4:13
license 64:2,3
Limited 1:7 4:15
Line 3:4,8 68:5
Lisa 16:19 28:4,11
  28:12,19,20,22,24
  29:11
list 24:2,3 36:21
  43:23
little 19:3
live 11:16
LLP 1:13 2:10,13
LLS 23:15 36:17
local 35:20,21
long 7:9 9:9 22:10
longer 17:21
looking 29:3 50:8
Los 16:20 26:22
lost 52:23

_____ M _____

M 2:14
MA 2:3
main 60:23
manager 57:5,6,9
  58:19
manual 25:7
March 27:4,7,11,15
  28:5
marital 20:19
Mark 25:16
marked 25:18 34:2
  34:4 40:3,5 41:13
  42:2,10 49:17
  63:24
Market 1:14 2:11
married 20:20
Matejik 2:20 5:5,6
  5:11 39:14

Math 22:8
matter 4:14
McHugh 16:19 28:4
  28:19,20
mean 15:10,15 17:5
  22:2,17 31:5 32:5
  33:20 35:8 45:16
means 7:4 66:23
meant 35:9
medications 7:23
meet 60:7
mentioned 41:18
  58:17 59:1
Mesquite 6:7 12:16
messed 49:21
met 39:21
Mexico 6:8 9:20,22
  10:2 11:23 12:5,18
  16:7,13 17:3,12,18
  20:4 21:22 23:11
  26:21 30:6,21
  33:12 36:13 37:2
  38:15 41:9,11,17
  44:6,14 50:22 52:3
  52:6,10,14,18 53:3
  53:14 54:1,4 58:15
  59:11 62:2 63:3
Michael 2:20 5:5
midway 18:23
mid-season 61:22
Mike 18:15 39:14
  45:11,15,21 47:3
  47:23 48:4,8 57:1
  57:12 58:9 61:6
  62:1
mine 8:17 28:11,13
missed 59:20
mistaken 23:14
  26:16 28:16 63:9
moment 14:4 45:5
money 12:20 44:5
  44:24 45:3,21
  48:11 55:10,15,23
  58:12 61:15
month 9:12 27:6
  34:7 35:6
months 9:18
Morgan 1:13 2:10
  2:13 4:13
morning 4:2 6:13,18
  50:3

_____ N _____

name 4:3 6:14 23:13
  23:19 28:11
names 24:4
necessarily 25:2
  55:17,18
necessary 67:4
need 6:22 7:3,8 15:9

32:4
needed 45:16
negative 15:17
neither 15:16
never 44:23
NJ 6:3
normally 40:20
Notary 1:17 69:21
noted 67:12 69:10
number 50:5,8
  53:11 58:15
numbered 40:10
  49:18
numbers 29:22
  33:14 39:24 50:1,2

_____ O _____

oath 7:19
object 7:13 14:14
objecting 7:14,15
objection 13:18 14:3
  18:3 23:2 30:8,13
  31:2 33:5,6 45:17
  47:10,18 52:15
  56:7 58:21 61:9
obtaining 29:19
occasions 57:1
October 1:11 4:11
  11:24
offer 36:12 37:10
offered 62:10
office 23:10,17
  28:22 29:23 36:15
  39:12 44:1 47:2
offices 1:13 29:7
office's 23:13
oh 13:1 35:12 36:9
  42:5 59:19 60:14
okay 7:12 9:2 22:7
  23:16 24:10,14
  25:8 26:13 39:14
  51:9,15 53:23 54:7
  55:5 64:17
old 21:3
once 7:14 37:15
  57:16 59:8
ones 8:14,17 36:22
  41:13,18
opinion 56:13,15
opportunities 38:16
opportunity 23:9
  44:5 48:10 66:11
Oral 1:12
original 67:16
outside 14:9
overtime 37:11,18
  57:22 58:15
Oxford 2:15

_____ P _____

PA 2:8,15
page 3:4,8 40:11
  51:7,8,10 57:19
  68:5
pages 40:8 69:5
paid 17:2,7,24 31:20
  33:14,23 35:5,20
  35:22 37:14 42:23
  46:5,12 55:8,16,18
  55:21 56:19 57:13
  57:17,18,20 58:4,6
  58:20 59:10,18,23
  60:16
paper 37:21 51:20
  51:23 53:10,10,13
  -61:2
papers 52:2,14
Paragraph 42:17,18
ParaPlus 2:19
pardon 8:18 11:24
part 17:4,5 18:6,11
  52:5
particular 41:6
particularly 19:20
Partners 1:7 4:16
pass 47:5
passes 47:3
passport 10:5,8
pay 18:10 30:5 33:3
  35:4,14,18 37:18
  37:18 38:12 41:5
  42:22 43:21 44:3
  46:1 56:5 59:9
paycheck 18:8
pending 7:10 43:13
Penn 1:23
Pennsylvania 1:14
  1:17,23 2:12 4:6
  4:14
people 24:7,17 43:24
  56:5
permit 9:11,21
person 18:16 22:16
  29:3,4 36:14 38:19
  38:22 39:1 55:2
  58:18 64:13
Peter 2:6 5:1
pgonzales@rcgla...
  2:7
Philadelphia 1:14
  1:23 2:8,12 4:6,13
phone 28:5,14 29:9
  35:13,15,21
pickup 54:20
piece 51:20 53:9
pieces 51:23 53:10
  53:13
Pittsburgh 2:15
place 14:23 15:12
  19:11 46:24 47:1

places 54:17,19
plaintiff 1:5 2:9 4:22
  4:24 5:2
plan 61:17
plane 18:6,11
please 4:19 12:24
  30:18 67:3,9
point 38:8 56:19
  59:16 61:12
posed 7:2
position 23:21 24:21
  24:22 25:1 47:16
  47:21,23 48:10,11
  48:15,15,17,18
  49:1 51:2
positions 21:12,15
  22:21
possession 10:18
possible 19:3
potentially 50:15
practically 47:1
preclude 60:9
prepare 8:6
present 2:17 4:19
  48:9
presented 44:13
  64:9
previously 25:23
  37:6 41:18
prior 21:12,18,22
probable 60:3
problem 60:5
produced 52:7
  53:16
production 3:6
  49:14,16 60:8
Professional 1:15
promise 59:12
promised 58:14
promoted 38:17
proposition 62:1
propounded 69:8
provide 18:13,20
  38:3
provided 16:23
  17:11,15
providing 25:20
Public 1:17 69:21
purpose 11:13
p.m 65:3

_____ Q _____

question 7:1,10,13
  13:15,20,22 14:16
  14:17,20 15:5,7
  16:4,12 22:14 24:9
  25:6,21 30:15,19
  31:4,8,11,16,18,23
  32:8,12,13,18,22
  37:16 43:12,16

44:10 49:3 51:12
53:8,9 58:13 62:12
62:13
questions 6:23 20:18
33:7 53:6 64:14,19
69:7
quickly 44:8
quite 48:2
quota 60:7

**R**
R 66:2 68:3,3
raise 5:19
Ramon 1:3,13 4:14
4:17 6:6 66:10
Rapposelli 2:5,5
4:23 13:5 14:8
27:20 44:15
Rappposelli 4:24
rate 51:9
read 40:12,16,18,21
40:24 41:9 42:13
43:14 66:11 67:3
69:4
reality 64:11
really 49:2
Realtime 1:16
reason 58:11 60:23
67:6
reasons 58:7 60:23
61:19,20
recall 48:7,16,21
49:4,9
receipt 67:18
receive 44:9 45:10
57:21 61:1
received 26:9 44:20
61:24
receiving 60:24
Recess 13:9 15:20
19:8 20:13 43:8
62:21
recognize 40:13
41:4
record 4:2,20 5:11
7:14 13:11 14:12
14:14 15:22 19:10
19:12,14,14 20:15
25:6 37:23 43:10
43:13,15 49:21
50:5,13 57:24
58:22 62:23 66:6
records 52:6
recruiting 23:10,12
23:17
refer 51:13
reference 44:16
referencing 44:17
referred 36:6
referring 36:7 39:2

49:7 50:12 51:6
52:17 60:12
reflect 26:5
reflects 50:14
Regal 2:18 5:17 6:1
regard 24:23
Registered 1:15
related 52:8
remain 58:4
remainder 17:7
remember 8:22 9:14
9:15 10:4 16:21
22:12 23:18 24:5
25:11,15 27:9,12
28:3 29:21 33:13
40:14,15,17,18,19
41:15 48:12,14,20
48:24 49:13 56:23
60:2,19
rent 34:7,14,21,24
35:6 47:9,12
rep 5:12
repay 44:23
repeat 12:24 30:18
43:12
rephrase 24:12
reporter 1:16,16,16
5:8,18,23 7:21
43:12,14 67:1
reproduction 66:23
REQUEST 3:6
requested 19:19
66:8
requesting 19:24
reserve 64:21
respect 13:14 14:15
16:1 19:21 59:4
responses 7:4,5
responsibility 42:19
result 60:7
retain 10:23
retrospect 40:24
return 10:1 17:3,17
62:2 67:16
returned 9:20 62:16
63:3
review 8:11
reviewed 52:19 53:1
53:2
reviewing 8:22
right 5:19 14:19
15:3,14 19:16,23
20:9 32:15 35:12
59:7 61:23
Road 2:3 6:2
room 14:10
RPR 66:18
rules 6:20
run 6:21
RV 49:23

RV-1 49:17,22
RV-2 44:13
――――――――
**S**
salary 23:22,24
43:24 51:4,5,11,14
San 11:17
Sarah 2:10 5:3 6:14
19:2 20:2 31:5
32:9 36:4 49:20,24
53:21
saw 8:15
saying 18:7 24:12,13
says 34:10 51:8
57:19,20 64:1
sbouchard@morg…
2:11
school 22:8
season 18:24
see 27:5 34:6,10
42:12 44:4 51:9,10
seeing 54:6
seen 8:16
separate 39:24
separately 35:15,18
September 63:10
service 35:20,22
Services 1:22 4:5
69:24
set 6:19
shakes 59:2 63:20
sheet 67:10,13,16
69:11
sheets 67:7
show 8:23 10:6
19:15 34:18
showed 24:2
sic 10:11
sign 40:20 66:11
67:9
signature 36:1,9
signed 41:3,7,10,17
41:22 50:23
signing 40:12 41:7
42:14 67:11
similarly 1:4
sitting 18:16
situated 1:4
six 9:18
Skills 64:1
smoothly 6:22
sooner 45:16,21
sorry 12:1 27:18
37:15 41:14 42:6
46:20 52:23
South 2:7
space 67:6
Spanish 2:18 6:1
51:13
speak 8:9 23:16 43:3

48:3
speaking 48:24
specialist 47:17,23
48:1,10,17,23 49:2
specifically 7:16
spend 20:6
spoke 38:22 39:1
52:21 64:13
stamped 44:13
stamps 10:5,9
start 29:4 63:7
started 50:2 58:5
state 67:5
stated 52:12 61:6
states 1:1 4:9 9:10
11:8,11,20 13:17
16:10 19:16 21:18
21:19 22:15 23:1
26:22 29:20 30:21
31:1,21 33:2,8
56:6 64:1
status 9:7 20:19
stay 61:16 62:9
staying 61:13
**STIPULATIONS**
3:10
stop 59:19 62:18
strain 59:15
Street 1:14 2:7,11
strike 24:9 44:10
subject 67:11
Subscribed 69:15
substance 69:10
suggest 53:24
suitcase 10:19 11:4
19:18
Suite 4:6
supervision 67:1
supervisor 39:15
**SUPPORT** 3:1
suppose 35:3 39:22
60:18
supposed 48:5,6
sure 13:5,6 19:5
31:22 43:5 49:17
52:1,4,7
swear 5:8,23
sworn 6:4,9 66:5
69:15
system 61:7
――――――――
**T**
T 66:2,2 68:3
take 6:15 7:9 13:3
29:16 43:20 47:16
taken 31:3,12
talk 28:7 29:11
talked 8:5 37:3
talking 28:18 30:9
32:3,10 46:17

48:21 58:22
tape 13:7 14:5 15:18
19:6 43:6 62:24
teach 22:7,10
teaching 22:5
tell 8:18 16:19 20:1
41:1 50:9 51:24
52:3 57:14
telling 8:4 48:13
terms 38:23
testified 6:5,10
testimony 6:4,16
25:22,24 54:1 66:7
Thank 25:20 51:15
64:17
thing 8:9 9:19 26:13
27:8,11 41:12
things 62:7
think 9:12 10:3,9
11:24 13:20 18:21
22:13 28:15 29:23
33:22 34:23 35:23
38:10 40:23 42:15
48:19 49:6 51:12
52:13 53:5 57:11
62:10 63:10
third 40:11
thirty 67:17
thought 28:10,17,24
three 31:4 40:7
three-page 40:6
ticket 16:24 17:8,11
17:14,18 18:1,6,11
tickets 33:15,16
time 4:11 9:20 16:10
20:6 23:24 24:20
56:24 58:13 61:12
62:24 64:21,24
times 11:7 31:4
56:23
title 25:11 34:5
today 4:19 6:16,21
7:24 10:18
today's 4:10 8:6
64:23
told 23:23 37:9,17
38:15,19 61:1,11
61:12
totally 49:21
tourist 9:8,18,24
track 51:18,19
tracked 53:11
transcript 66:12,22
67:19,20
transcription 69:6
translate 6:4
translated 25:7
Translations 2:19
translator 22:2
transportation 18:1

74

30:2,5 31:20 33:4
  35:2,7 46:10,12
  47:9,13
travel 12:3,7 33:11
traveling 29:19
  30:20
trial 64:21
trick 14:18 31:8
trip 11:18 17:12
truck 54:20,21
true 16:16 17:10
  26:3 34:13,20 37:4
  37:8 45:1 61:5,11
  66:6
TruGreen 1:7,7,8
  2:20 4:15,16 5:4,6
  6:17 16:14,17,22
  17:10,21,24 21:12
  21:19,23 22:16,21
  23:1,9 24:8,18
  29:16,20 35:21,22
  36:13,24 37:2,7
  38:3,17 39:8 40:10
  43:21 44:4 46:1,4
  46:11 47:17 53:12
  54:11 59:16 60:21
  61:21 64:10
TruGreen's 29:7
  38:24 54:21
truly 53:19
try 14:18 30:14
trying 31:7 32:17
Tuddenham 2:2
  4:21,22 5:10 13:6
  13:18 14:2,7,13
  15:1,6,13 18:3
  19:2 20:1,12 22:17
  23:2 24:11 25:5
  27:14,22 30:7,13
  31:2,12 32:1,9,20
  33:5 36:4 37:22
  39:23 42:3 45:17
  46:14 47:10,18
  49:20,24 52:15
  53:4,20 54:2 56:7
  56:11 57:23 58:21
  61:9 64:20
turned 21:4
two 28:7 41:16,20
  58:7
type 21:21 54:9

_____ U _____
uncle 11:15,16 12:12
undercharged 47:8
underneath 52:14
understand 6:23 7:7
  7:22 19:18 24:22
  24:24 25:23 34:24
  36:16 38:2 42:16

48:3 56:4
understanding 26:4
  26:24 50:21 53:5
understood 7:1
uniform 38:3,7,9,13
United 1:1 4:9 9:10
  11:8,11,20 13:17
  16:9 19:16 21:18
  21:19 22:15 23:1
  26:22 29:20 30:21
  31:1,21 33:2,8
  56:6
university 21:7,8,10
Upland 2:3
use 45:2 50:1
utilities 34:7,15,22
  35:2,6,9,10 47:9
U.S 1:16

_____ V _____
V 1:15 66:18
Vacchiano 39:17
vague 32:13
valid 64:2,3
Valley 46:23
verbalize 7:3,5
versus 4:15
video 4:8 19:12
  62:18
videographer 2:21
  4:1,4 5:7,22 13:7
  13:10 14:5,11
  15:18,21 19:6
  20:14 43:6,9 62:19
  62:22 64:22
videotape 62:20
  64:23
Videotaped 1:12
Villanueva 1:3,13
  4:15,18 6:6,14
  13:13 20:17 25:18
  34:2 40:3 42:2,8
  66:10
visa 9:18 10:1 12:3,8
  22:24 29:19 30:1
visit 10:24 11:14,15
visiting 12:10
visits 11:20
Vivian 2:5 4:23
volunteer 62:4,6
vrapposelli@rcgla...
  2:6
vs 1:6

_____ W _____
wage 63:14
wages 59:5
waiving 14:19
walk 20:7
walking 19:19

want 31:18,22 56:12
  60:4 62:17
wanted 17:21 29:13
  45:3 60:10 61:8
warmer 19:3
wasn't 34:19 35:18
  57:5 62:12 64:11
way 18:2,8 31:8
  55:16,17 56:5
  57:17,20 58:5 59:9
ways 14:18
week 34:21 63:22
welcome 51:16
went 9:22 10:3
  11:22 16:16 26:20
  47:1,2
weren't 60:15
we're 4:2 19:13
  29:12 62:22
Wilmington 39:10
wished 57:18
witness 3:3 5:9,23
  12:24 13:1 14:9
  30:12 37:23 53:5
  57:24 59:2 63:20
  65:1 66:5,7,10
  67:2
woman 23:19 28:23
words 7:5 46:11
  55:12
work 12:21 13:24
  14:24 15:11 16:5,9
  17:21 21:21 22:15
  22:23,24 23:9
  29:20 33:8 54:9
  55:6,7,8,13,14
  56:1 58:8,10 59:20
  59:24 60:6 63:22
worked 14:22 16:2
  21:17 24:17 30:11
  33:2 37:6 39:9,12
  53:12 55:10,21
worker 54:24 62:14
workers 39:19 45:21
  46:2 48:9 57:9,10
  62:8
working 13:15,17
  21:22 30:24 46:18
  48:1 55:24 59:16
  60:10 63:5,7
worth 56:2,2
wouldn't 8:17 34:17
  51:24 52:3 57:21
  64:6

_____ Y _____
yeah 51:18 60:3
year 10:7 11:8,20
  12:20 13:17 14:1
  16:5 27:4 28:5

years 21:7

_____ Z _____
Zip 12:18

_____ $ _____
$150 44:9,20 45:13
$170 33:23
$2 63:18,19
$240 35:6
$373 34:11,14
$60 34:21
$75 18:22

_____ 0 _____
02140 2:3
06-185 1:9
08007 6:3

_____ 1 _____
1 25:18 41:13 62:20
10:00 14:12
10:02 15:19
10:03 15:22
10:09 19:7
10:37 20:15
11:25 43:7
11:27 43:10
12 3:4
12th 1:14,23
12:03 62:20
12:14 63:1
12:19 64:24 65:3
1210 4:6
15 40:11
153 2:3
155 29:24
1600 1:22 4:5
1701 1:13 2:11
19 3:8
19103 1:14,23 2:12
  4:7
19107 2:8

_____ 2 _____
2 34:2,5 36:8 37:24
  41:13,14 50:10,13
  58:1 61:3 62:24
  64:1
2:30 20:5,7
200 30:1
2004 16:12,20 18:24
  22:18 33:12 63:4,8
2005 16:5,10 69:16
2006 1:11 4:11
  13:16 14:22 16:2
  30:4,9,11,22 31:1
  31:20 33:4,9
215 1:24
215-963-5000 2:12

251 2:7
26th 26:17
267 2:8

_____ 3 _____
3 40:3,6
30 67:17
318 6:7 12:16
32 3:4
32nd 2:15
322-6776 2:8
36960 6:8 12:18

_____ 4 _____
4 21:4 41:24 42:2,10
  44:16
40 58:10
412 2:16
430 6:2

_____ 5 _____
5 1:11 4:11
50 63:23
53 3:8
560-3300 2:16
576-2182 2:4

_____ 6 _____
6th 9:12
617 2:4

_____ 7 _____
7 42:18

_____ 8 _____
8 42:17

_____ 9 _____
9:29 1:15 4:11
9:45 13:8
9:58 13:11
9:59 14:6
988-9191 1:24

Número de salida

0 7 4 7 8 2 7 4 0 1 2

ADMITTED
I AY
APR 0 9 2006
Class B-2
Until

OCT 0 7 2006

Servicio de Inmigración
y Naturalización
I-94
Registro de Salida

14. Apellido
V I L L A N U E V A
15. Nombre
R A M O N
16. Fecha de nacimiento (día/mes/año)
2 1 0 2 7 8
17. Ciudadanía
M E X I C A N

Vea al reverso                              STAPLE HERE

**Aviso:** Si una persona no inmigrante acepta empleo sin autorización está sujeta a deportación.
**Importante:** Guarde este permiso en su poder; *lo debe presentar al salir de los E.U.A.* El no hacerlo podrá demorar su entrada en el futuro a los E.U.A.
Usted está autorizado a permanecer en los E.U.A. solamente hasta la fecha indicada en este formulario. Si permanece en los E.U.A. sin permiso de las autoridades de inmigración después de esta fecha estará violando las leyes.
Presente este permiso al salir de los Estados Unidos a:
   - la línea de transporte marítimo o aéreo;
   - un oficial canadiense, al cruzar la frontera con el Canadá;
   - un oficial estadounidense, al cruzar la frontera con Méjico.
Los estudiantes que planean volver a entrar a los E.U.A. dentro de los 30 días siguientes a la fecha de salida para regresar a la misma institución educativa, deben ver la sección de "Entrada-Salida" en la página 2 del formulario I-20, antes de entregar este permiso.

**Record of Changes**

Port:                                        Departure Record

Date:

Carrier:

Flight#/Ship Name:

I-94 SPANISH



Villanueva

EXHIBIT NO. 1

AMC 10/5/06

LLS International                                                                                  Página 1 de 1

# Employer Disclosure Affidavit
### for Company: Tru-Green Chemlawn (Newport)
### Order Dated: 9/29/2003 9:52:52 AM

view premium rates
view Spanish form
close this window

| | |
|---|---|
| Name of Sponsoring H-2B company | Tru-Green Chemlawn (Newport) |
| Address: | 1350 1st State Blvd , Newport, DE 19804 |
| Office Phone: | 302-992-9680 |
| Fax Phone: | 302-633-9428 |
| Mobile Phone: | 302-420-8335 |
| Home or Other Phone: | 302-376-8186 |
| Contact Name: | Mike A  Matejik |
| Contact Title: | Branch Manager |

## Work Information

Occupation Title:                               Pesticide Handlers, Sprayers, and Applicators, Vegetation
Occupation Description:
Apply pesticides, herbicides, fungicides, or insecticides to lawns using sprayers, seeders, spreaders, aerators
Employment Start Date:                       3/16/2004  End Date: 11/15/2004
List the tasks and skills
needed to perform the work.

Education: none

Experience: lawn fertilization very helpful

Skills: valid driver's license; bilingual

| | |
|---|---|
| Starting wage offered (if different from prevailing wage): | $11 34  O.T. Rate: $17 01 |
| Average hours of work per week: | 40 |
| Rent and utilities per month: | 373 |
| Transportation charge per month (if applicable): | 32 |
| Other charges to worker per month (if any): | |
| Comments/Instructions for worker: | Workers will receive commission based on production level |
| Day and place paycheck is distributed: | Friday |

Will the employer guarantee to supply training if the employee does not have the required skills? YES

Signature of Employee: *Ramon Villanueva*                    Date: 02/20/04

Villaneut
EXHIBIT NO. 2
AML 10/5/06

RV-0001

**TRUGREEN**
**ACUERDO DE CONFIDENCIALIDAD DEL EMPLEADO**

TruGreen Limited Partnership (de aquí en adelante, "TruGreen") ha invertido considerable tiempo, dinero, y esfuerzos en el desarrollo de sus productos, equipos, programa de comercialización y otros sistemas y materiales de negocios, y en el reclutamiento y entrenamiento de sus empleados. TruGreen es propietaria y tienen un interés de propiedad valiosa en sus diversos productos, servicios, procedimientos, y sistemas (Información Confidencial de Negocios). Como empleado de TruGreen, usted tendrá acceso a la Información Confidencial de Negocios, incluyendo la información relativa a la investigación, productos, entrenamiento, administración, comercialización, y ventas.

Es importante que cada empleado reconozca y acepte que la Información Confidencial de Negocios, según exista de tiempo en tiempo, es un patrimonio valioso, especial, y único de TruGreen, y que TruGreen sufriría graves perdidas si dicha información fuese divulgada o apropiada indebidamente. El propósito de este documento es explicar ciertas obligaciones y responsabilidades legáis aplicables a cada empleado con respecto a la Información Confidencial de Negocios de TruGreen, y obtener os acuerdo de cumplir estas obligaciones y responsabilidades.

Pan proteger a TruGreen y a su información de propiedad exclusiva, me comprometo a lo siguiente:

A. Me comprometo a, durante y después de mi empleo en TruGreen, no divulgar, copiar, usar, retirar, ni usar en mi beneficio propio o en beneficio de otros la Información Confidencial de Negocios de TruGreen (incluyendo, de forma no exhaustiva, su administración, manuales de comercialización y ventas, materiales de entrenamiento, listas de clientes, legajos de clientes, tarjetas de ventas, y tarjetas de servicio) que yo tenga o haya obtenido por medio de mi empleo en TruGreen.
B. No solicitaré ni alentaré, directa o indirectamente, a ningún empleado de TruGreen a alejarse o terminar su empleo en TruGreen.
C. Autorizo a TruGreen, durante mi empleo y durante un periodo posterior razonable, a usar cualquier nombre o fotografía en los materiales impresos u otras comunicaciones distribuidas por TruGreen con fines publicitarios y promocionáles.
D. Notificaré a TruGreen rápidamente de todas las invenciones, mejoras, descubrimientos, y métodos que tengan relación con, o sean de utilidad para cualquier negocio de TruGreen, ahora o en el futuro, que yo haga o descubra mientras sea empleado de TruGreen. Cederé a TruGreen todos los derechos, títulos, e intereses en dichas invenciones, mejoras, descubrimientos, y métodos, y cualesquiera patentes o solicitudes de patentes relacionadas que tengan que ver con negocios que TruGreen esté realizando, o pueda razonablemente esperarse que realice, o que haya expresado previamente su intención de realizar.

En caso de una violación o amenaza de violación por mi parte de cualquier provisión de este acuerdo, los daños que TruGreen podría sufrir pueden ser difíciles o imposibles de evaluar, por lo cual TruGreen tendrá derecho a un mandamiento judicial que me impida usar o divulgar la información Confidencial de Negocios de TruGreen. Nada de lo aquí contenido se interpretará como una prohibición a TruGreen de buscar otros remedios que tenga disponibles para dicha violación o amenaza de violación, incluyendo, en forma no exhaustiva, el recobro de daños de mi por una cantidad igual a los ingresos ganados por medio o gracias a la violación.

Entiendo que este Acuerdo solo podrá ser modificado por escrito, y ello sólo por ci Presidente de TruGreen, y que ningún otro gerente o representante tiene ninguna autoridad para establecer ningún acuerdo de empleo por un período especificado, ni de hacer ningún acuerdo contrario al que antecede. Entiendo además, y acepto, que la consideración para firmar este Acuerdo es mi empleo y/o continuación de empleo en TruGreen, y que mi empleo puede terminarse, con o sin causa y con o sin aviso, en cualquier momento, tanto por TruGreen como por mi.
Entiendo también y acepto que pagaré los honorarios razonables de abogados y los costos judiciales incurridos por TruGreen como consecuencia de cualquier demanda judicial iniciada por TruGreen para hacer valer los términos de este Acuerdo. La validez o la posibilidad de hacer cumplir una provisión dada no afectará la validez o la posibilidad de hacer cumplir ninguna otra provisión de este Acuerdo.

~~███████~~ 03/20/04

~~██████~~O: _RBilley_

~~███████~~ RAMON VILLANUEVA BAZALDUC

TruGreen Limited Partnership
Por:    TruGreen, Inc. (su Socio General)

Fecha: 3/19/04

Por: _Yolanda Miller_

Nombre y cargo en imprenta: YOLANDA MILLER BCC

TII SPAN.3/2001

TU SPAN. 5/99

VILLANUEVA
**EXHIBIT NO.** 3
AVK 10/5/06

TRU0013

4144341029C

5079082100 4/4/04

**Form 8850**
(Rev. October 2002)
Department of the Treasury
Internal Revenue Service

**Pre-Screening Notice and Certification Request for the Work Opportunity and Welfare-to-Work Credits**

OMB No. 1545-1500

Job Applicant: Fill in the lines below and check any boxes that apply. Complete only this side.

Your Name: *RAMON VILLANUEVA BAZALDUA*    Social Security Number: *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*

Street address where you live: *213 BELMONT AVE.*

City or town, state and ZIP code: *19804*

Telephone No. ( )

If you are under age 25, enter your date of birth (month, day, year)

### Work Opportunity Credit

1 ☐ Check here if you received a conditional certification from the state employment security agency (SESA) or a participating local agency for the work opportunity credit.

2 ☐ Check here if **any** of the following statements apply to you.

- I am a member of a family that has received assistance from Aid to Families with Dependent Children (AFDC) or a successor program for any 9 months during the last 18 months.

- I am a veteran and a member of a family that received food stamps for at least a 3-month period within the last 15 months.

- I was referred here by a rehabilitation agency approved by the state or the Department of Veterans Affairs.

- I am at least age 18 but **not** over age 24 and I am a member of a family that:
  a  Received food stamps for the last 6 months, OR
  b  Received food stamps for at least 3 of the last 5 months, BUT is no longer eligible to receive them.

- Within the past year, I was convicted of a felony or released from prison for a felony AND during the last 6 months I was a member of a low-income family.

- I received supplemental security income (SSI) benefits for any month ending within the last 60 days.

### Welfare-to-Work Credit

3 ☐ Check here if you received a conditional certification from the SESA or a participating local agency for the Welfare-to-Work Credit.

4 ☐ Check here if you are a member of a family that:
- Received AFDC or successor program payments for at least the last 18 months, OR
- Received AFDC or successor program payments for any 18 months beginning after August 5, 1997, OR
- Stopped being eligible for AFDC or successor program payments after August 5, 1997, because Federal or state law limited the maximum time those payments could be made.

### All Applicants

Under penalties of perjury, I declare that I gave the above information to the employer on or before the day I was offered a job, and it is, to the best of my knowledge, true, correct, and complete.

Job Applicant's signature ▶    Date: *03/20/04*

For Privacy Act and Paperwork Reduction Act Notice, see page 2.    Cat. No. 33962L    Form **8850** (Rev. 10-02)

TRU0014



*Manual del empleado de TruGreen*

## Formulario de reconocimiento del empleado

Este Manual del Empleado contiene información pertinente acerca de TruGreen y comprendo que debo consultar al departamento de servicios a las personas de TruGreen si tengo alguna pregunta que no haya sido respondida en este Manual.

Como las informaciones, políticas y beneficios aquí descritos están necesariamente sujetos a cambio, reconozco que podrán ocurrir revisiones de este Manual. También entiendo que las informaciones revisadas pueden suplantar, modificar o eliminar políticas existentes. Sólo el presidente de TruGreen Holding L.L.C. tiene la capacidad de adoptar cualquier revisión de las políticas contenidas en este Manual.

He comenzado mi relación de empleado con TruGreen voluntariamente y reconozco que no hay una duración especificada para mi empleo. Por lo tanto, yo mismo o TruGreen podemos terminar esta relación en cualquier momento si así lo deseamos, tanto con causa como sin causa.

Además reconozco que este Manual no constituye un contrato de empleo ni es un documento legal. He leído el contenido de este Manual y entiendo que es mi responsabilidad cumplir con las políticas contenidas en el Manual y en cualquier revisión futura del mismo.

_____    03/20/04
Firma del empleado

RAMON  VILLANUEVA  BAZALDUA
(Nombre del empleado en letra de molde a máquina o con letra de imprenta)

*Gerente: Mantenga una copia de este formulario completado de reconocimiento del empleado en el archivo personal del empleado y envíe el original a Memphis con los documentos del nuevo empleado acabado de contratar.*

*Febrero 1, 2001*                          *Página 89*

TRU0015

## ACUERDO SOBRE CONDICIONES LABORALES

1) Las condiciones laborales que las compañías norteamericanas contratantes (Patrones) proporcionan a los trabajadores tienen como fin proteger al empleado y al patrón. En base a las condiciones laborales, el patrón esta legalmente obligado a pagar lo estipulado en dicho documento, si el empleado no es remunerado de acuerdo a lo acordado, el o ella deberán de comunicarse a L.L.S. International (81) 8040-7575 y 77 a fin de informar de esta situación

2) El número de horas trabajadas a la semana es solamente una estimación, por lo tanto, cada trabajador debe tener en cuenta, que las condiciones climatológicas y otros eventos imprevistos pueden afectar el total de horas trabajadas a la semana y por lo tanto su ingreso. Todos los desacuerdos deben ser discutidos con el patrón que les contrato. L.L.S. NO ES EL PATRON, favor de no comunicarse para tales asuntos.

3) En el caso de que la Compañía Americana que lo contrató determine que por cuestiones climáticas o de fuerza mayor no puede seguir proporcionando trabajo al empleado durante el periodo que abarque su visa de trabajo; esta deberá cubrir los gastos del empleado a su lugar de origen, ya que el empleado no puede trabajar en otra Compañía en la que no este autorizada en su visa de trabajo. Esta situación será estrictamente responsabilidad de la empresa contratante

4) El trabajador solo puede dejar su trabajo por causa de una emergencia, en dado caso el trabajador esta obligado a avisarle al patrón y pedir permiso por escrito. En caso de no ser así, o que el trabajador renuncie, o se vaya del lugar de trabajo sin avisar, se le avisará al I N S y al Consulado Americano, el trabajador será considerado como ilegal y pierde toda protección dada por la visa de trabajo, esto resultará en la cancelación de su visa y el trabajador perderá la posibilidad de regresar el año entrante mediante el programa de visas H2B

5) El trabajador está de acuerdo y entiende que el servicio que presta L.L.S. International consiste estrictamente en el trámite de su visa de trabajo ante el Consulado Americano con su consentimiento y a petición de las Compañías Americanas contratantes Asimismo entiende que la obtención de la visa de trabajo no depende sino estrictamente del Consulado Americano, por lo que en caso de ser rechazada su solicitud, L.L.S. International no tiene responsabilidad alguna ni compromiso de indemnizar al solicitante, únicamente a reembolsarle el importe de 100 dólares por la tramitación de su visa

6) Los reembolsos solo proceden en los siguientes casos:
   - Cuando es rechazada su solicitud de visa en el consulado, en este caso se le regresarán 100 DÓLARES.
   - Cuando por parte de la empresa solicitante no se; llegue a realizar el trabajo estando todavía en México, se procederá a colocar al trabajador en otra empresa, en caso de no ser posible se le regresarán 255 DÓLARES
   NOTA: En todos los demás casos NO PROCEDERA REEMBOLSO ALGUNO

7) El servicio de L.L.S. International, tiene un costo de:
   - 155 dólares (USD) para L.L.S. por gastos Administrativos
   Los siguientes pagos es lo que cobra el Consulado Americano:
   - 100 dólares (USD) por la tramitación de la visa en el Consulado
   - 100 dólares (USD) para el pago de derecho de visa en el Consulado
   Transporte;
   - 200 dólares (USD) aproximadamente de trasporte para su traslado vía terrestre,
   NOTA: Estos pagos se realizan hasta que la persona haya sido seleccionada, la persona haya aceptado el trabajo y tengan un lugar seguro en alguna Compañía.

8) L.L.S International o la compañía contratante en Estados Unidos no serán responsables de pagar y/o devolver sus gastos de viaje, ni los que se deriven del proceso de la visa en el Consulado Americano, ESTA ES UNICAMENTE RESPONSABILIDAD DEL TRABAJADOR

Este documento no asegura la obtención de trabajo.

_Ramón Villanueva Barahona_
Firma del Trabajador

_20-Febrero-2004_
Fecha

S International (Monterrey)
ampo No 427 Poniente
tre Rayon y Aldama
> 64000
s : (81) 8040 7575 / 8040 7577

Villanueva
EXHIBIT NO. 4
ANK 10/3/06

RV-0002

# EXHIBIT C

Westlaw.

21 St. Mary's L.J. 5

c

St. Mary's Law Journal
1989

Address

## *5 REMARKS OF THE CHIEF JUSTICE

William H. Rehnquist [FNa1]

Copyright (c) 1989 by the St. Mary's University of
San Antonio; William H. Rehnquist

It is a great pleasure to be here with all of you this evening to participate in the Eleventh Seminar on the Administration of Justice sponsored by the Brookings Institution. Two years ago when we met in Charlottesville, I mentioned several issues of importance to the judiciary, and am happy to see that in the past two years Congress has enacted a number of measures to improve the administration of justice. The judiciary is grateful for these laws, but as they say, judicial reform is no sport for the short-winded. More remains to be done. This evening I wish to talk about the future of the federal court system.

Just about a century ago, the noted American historian Frederick Jackson Turner, in a seminal article, proclaimed the disappearance of the American frontier. Studying the patterns of westward migration in this country, he concluded that the supply of free or relatively cheap land, which had encouraged debt-ridden Americans and wave after wave of immigrants to settle the west, had been exhausted. In my view, a similar situation obtains today with respect to the federal court system. There is virtually no unused capacity in the system as it presently exists, and the difficulties of creating substantial additional capacity counsel caution, to say the least, in

attempting it. We are in a position where we must think not about creating new federal causes of action, but of remitting to state courts some of the business now *6 handled by the federal courts. In a moment I will nominate a couple of candidates which I think deserve remittance to the state courts.

This operation of the judiciary at full capacity is a development which has occurred since the time I was admitted to the practice of law thirty-five years ago. Early in this century, the American humorist Finley Peter Dunne, writing under the pen name of " Mr. Dooley," referred to a judge he knew in these words:

" 'E's got a good judicial temperament. 'E' don't like work."

There may have been some of this attitude in evidence among judges at the time I came to the bar in the 1950s, though I think it was not so much from laziness as from lack of a full docket. But the situation has changed dramatically in the intervening years. The average federal judge works hard at his job, and the judiciary has taken every practicable step that I can think of to increase its output. Federal courts rely on computer assistance to a degree inconceivable even ten years ago; federal judges now have more law clerks than at any time in our history. Congress has increased the number of judges, and has upgraded what used to be referees in bankruptcy to bankruptcy judges. The United States Magistrates authorized by Congress are widely used as auxiliary judges at the trial level.

The Judicial Conference has requested the creation of additional judgeships just to restore the judiciary to the position it was in a few years ago, and I am hopeful that Congress will take action on this request. But I do not think Congress would favor an indefinite expansion of the number of federal judges to keep up with an ever-increasing case load, and I don't think that simply adding new judgeships would be a wise development from the point of view of the judiciary. Therefore, when we look at the long run we must keep in mind two things: first, future Congresses are not going to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

21 St. Mary's L.J. 5                                                                 Page 2

cheerfully forego the authority to create new federal causes of action, an authority which has been exercised by past Congresses without number; second, those interested in the administration of justice in the federal courts should therefore concern themselves now with cutting back on federal jurisdiction in some areas.

Many types of lawsuits which can be brought in the federal courts have a distinctly "federal" flavor: prosecutions for federal crimes; civil antitrust actions; claims of employment discrimination under Title VII of the Civil Rights Act; claims brought under Section 1983. I *7 know of no substantial body of opinion which favors the relinquishment of this sort of federal jurisdiction to state courts.

But with respect to two types of actions which may be presently brought in the federal courts, I think a strong case may be made for at least modification if not repeal. The first of these is diversity jurisdiction, and the second is civil RICO.

Diversity jurisdiction, of course, is the authority by which federal courts hear cases that don't involve any sort of federal law claim, but in which the plaintiff is a citizen of one state and the defendant of another. It was provided for in the Constitution, and enacted by the Judiciary Act of 1789, because of concern that an out-of-state litigant would suffer prejudice at the hands of a local judge and jury in a state court.

Very learned people have debated back and forth whether so-called "diversity" jurisdiction in the federal courts is needed today in the way it was needed at the time it was created by the Judiciary Act of 1789. I do not propose in my brief remarks tonight to take sides in this controversy. We have had diversity jurisdiction for two hundred years, although Congress has over the years repeatedly modified the basis for it: last year the amount in controversy requirement was raised to $50,000.

But there is one part of diversity jurisdiction as it now stands that I think is very difficult to justify, and which accounts for a very substantial number of the cases filed in the federal district courts. That is the part allowing the resident plaintiff who starts a lawsuit and who is a resident, say, of the state of Virginia, to sue in a federal court in Virginia, rather

than a state court, simply because it names as the defendant in its lawsuit an out-of-state person or corporation who is not a resident of Virginia. Whatever may be the arguments for maintaining diversity jurisdiction with respect to an out-of-state plaintiff who sues an in-state defendant in Virginia, few would seem to support the idea that there will be local prejudice against an in-state plaintiff, and therefore, that he should be entitled to take advantage of filing in federal court. If the in-state plaintiff sues in state court, then, under existing law, the out-of-state defendant-the party that could suffer prejudice against "foreigners"-may remove the case to federal court. But there is no reason for letting the plaintiff start out in federal court.

Each year approximately 71,000 cases based on diversity of citizenship are filed in federal court. Repeal of the right of an in-state plaintiff to take advantage of this jurisdiction would probably cut this *8 number in half, and afford a marked and noticeable decrease in district court filings.

Some bar associations, and indeed some federal judges, oppose even this sort of limitation on diversity jurisdiction, but when the reasons for their opposition are analyzed they are singularly unpersuasive. The lawyers say either that they prefer to have a choice of two courts in which to file such suits, or that they think the judges in the federal courts are better than the judges in the state courts. The judges say that they find diversity cases more interesting to try than many lawsuits based on federal law, and that diversity jurisdiction brings many lawyers into federal court who would not otherwise be there. But there is simply no reason for federal taxpayers to furnish federal courts for the trial of cases which have no reason for being in federal court. If the lawyers in a particular state believe the judges of that state are less able than their counterparts in the federal courts, they should take the necessary action to secure the upgrading of their own state judiciary. And if some federal judges really prefer trying cases based entirely on state law, perhaps they would be happier as state court judges.

If the nation were wondering how to spend a budget surplus, or if Congress were eager to create new federal judgeships, these reasons might be sufficient to support the retention of a kind of jurisdiction which we have had for a number of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

years. But we all know that appropriated funds are in very short supply for the judiciary, as for the rest of the government, and that there is little sentiment in or out of Congress to create a large number of new judgeships. That being the case, the arguments in favor of retaining diversity jurisdiction for the benefit of resident plaintiffs are, in my opinion, quite insufficient.

I think the situation is roughly comparable to the sort of commuter railroad that runs on the old B & O tracks from Harper's Ferry, West Virginia, some fifty miles into Union Station in downtown Washington. Its purpose is to serve commuters who live far outside the range of the bus and subway system that serves metropolitan Washington. But when the line starts up, the train is only half full with passengers from the outlying areas. The railroad, in order to increase revenue, decides to start picking up passengers in the nearby suburbs of Washington-Takoma Park and Silver Spring-even though these people are served by the subway and bus systems.

So far, so good. The railroad has made a sensible economic decision. But now time passes, the population in the outlying areas grows *9 and the train is full by the time it gets to the nearby suburbs. Do you put on a second train to accommodate the close-in passengers? If you're in private business, the answer is yes; you have a good product, you make more money by increasing sales. But if you're the government, and operate at a substantial loss, the answer is no. The purpose of the line is to serve people who can't be served by other forms of mass transit, and you accomplish that purpose with only one train.

The second train would serve only people who already have alternate transportation available. The fact that these passengers think the train is more comfortable than the bus, or that the conductors on the train are higher type people than those on the bus, shouldn't make any difference. And the fact that the conductors on the train think that the close-in passengers are a better class clientele than the ones who got on at Harper's Ferry shouldn't make any difference either. Maybe these conductors should switch to driving the buses. I hope that Congress will seriously consider eliminating this aspect of diversity jurisdiction.

Now let me turn to civil RICO. Civil filings under the Racketeer Influenced and Corrupt Organizations law have increased more than eight-fold over the last five years, to nearly a thousand cases during calendar year 1988. While that number has held somewhat steady during the past three years, there is every reason to think that we can expect a substantial increase in this already high number because of the statute's lucrative treble damages provisions and the extensive coverage recently afforded civil RICO actions by the national media, legal publications, and continuing legal education programs.

Virtually everyone who has addressed the question agrees that civil RICO is now being used in ways that Congress never intended when it enacted the statute in 1970. Most of the civil suits filed under the statute have nothing to do with organized crime. They are garden-variety civil fraud cases of the type traditionally litigated in state courts. Why does the statute work this way? In part, because it creates a civil counterpart for criminal wire fraud and mail fraud prosecutions. It does this by stating that acts indictable under those provisions, as well as many other types of criminal acts, are capable of establishing the "pattern of racketeering" which is the predicate for a civil RICO action.

Whether it is a good idea to have a civil counterpart for wire fraud and mail fraud is at least open to question, it seems to me, quite apart from the question whether treble damages should be awarded. When *10 the mail fraud statute was originally enacted in 1872 as a part of a routine revision of the postal code, it generated no congressional debate or other legislative history explaining its purpose. Since then scholars have expressed the view that its intent was to reach swindlers and defrauders who fell outside the scope of "rudimentary criminal codes, conceived for rural societies and confined by state lines and local considerations." Similarly, when the wire fraud statute was initially passed eighty years later in 1952 it served to establish a parallel offense to mail fraud and thereby close a "loophole ... in the law," which left citizens and licensees at "the mercy of some clever schemer."

With the growth of long distance communication and technology, mail fraud and wire

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

fraud-which applies to all telephone calls-have a much wider sweep now than they did when the statutes were enacted. On the criminal side this greater breadth is kept under control by the use of prosecutorial discretion by United States attorneys. They concentrate on the fraudulent schemes which are either too big or too widespread for efficient state prosecution. Garden-variety frauds and swindles are left to the state courts.

But there is no such thing as prosecutorial discretion to limit the use of civil RICO by plaintiffs' attorneys. Any good lawyer who can bring himself within the terms of the federal civil RICO provisions will sue in federal court because of the prospect of treble damages and attorney's fees which civil RICO holds out. So the question must be asked whether the kinds of frauds and swindles that have been held to come under civil RICO are really the sort of things that Congress intended to bring into the federal courts when it passed that statute in 1970. And, if not, should not this statute be at least modified?

The legislative history of the RICO Act strongly suggests that Congress never intended that civil RICO should be used, as it is today, in ordinary commercial disputes far divorced from the influences of organized crime. The legislative package which included RICO originated in the Senate. Although earlier proposals had contained treble damages provisions, no such terms were included in the bill which passed the Senate; its civil remedies were limited to injunctive actions by the United States. During hearings on the Senate bill before the House Judiciary Committee, Representative Steiger proposed the addition of a private treble damages action "similar to the private damage remedy found in the antitrust laws." He believed that "those wronged by organized crime should at least be given access to a *11 legal remedy." The House Committee approved the proposed amendment, and when the bill was summarized on the House floor, its sponsor echoed the view that the amended provisions were intended to be a weapon in the war against organized crime. He described the treble damages provisions as " another example of the antitrust remedy being adapted for 'use against organized criminality.' " The amended bill was passed by the House. The Senate did not seek a conference, and adopted the House version. However, while the legislation was

still pending before the House, Senator McClellan, the bill's Senate sponsor, expressed the view that the new treble damages provisions would be "a major new tool in extirpating the baneful influence of organized crime in our economic life."

Notwithstanding the new legislation's expressed purpose of seeking "the eradication of organized crime in the United States," the RICO provisions did not specifically refer to organized crime, because of the difficulty of defining that activity and because it was believed that requiring proof that a defendant fell within such a definition would handicap efforts to achieve the remedial objectives of the law. Consequently, the statute was intentionally written in general terms so as to permit flexible application.

In its present form, civil RICO has a tremendous reach. For example, civil RICO claims have been raised in actions relating to divorce, trespass, legal and accounting malpractice, inheritance among family members, employment benefits, and sexual harassment by a union. As Justice Byron White wrote for our Court in 1985, notwithstanding Congress' use of "self-consciously expansive language" RICO, "in its private civil version ... is evolving into something quite different from the original conception of its enactors."

In one case, elderly "life care" residents of a religious retirement community claimed that the owner had used fraud to induce them to sign contracts and had mismanaged community finances. Because the owner was judgment-proof, the residents relied on a clause in the RICO statute which permits actions not only against the owners or operators of a criminal enterprise, but against persons "associated" with it. Among others, they sued the Prudential Insurance Company, the community's mortgagee, and ultimately secured a large settlement from Prudential.

In another suit, civil RICO was invoked in an effort which some have described as standing labor law on its head. A bus company, which suffered property damage and lost profits during a strike by *12 employees, claimed that a union official had threatened several times to inflict property damage on it, and had once threatened to burn company buses. The company alleged that this constituted extortion, a "racketeering activity" under RICO,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

21 St. Mary's L.J. 5

and that the union was therefore attempting to influence the company's affairs through a pattern of racketeering activity. A federal appeals court panel held that the case could go to trial.

More recently, civil RICO was employed to hold 26 protesters at an abortion clinic in Philadelphia liable for more than $100,000 in damages and attorneys fees. Numerous similar cases are pending.

RICO's treble damages provisions create a powerful incentive for attorneys to attempt to bring facts traditionally thought to establish other causes of action within the ambit of the statute. For example, in 1988, in the first successful use of RICO in a wrongful discharge case, the trial court's award rose to $43 million when trebled.

Proposals for curtailing civil RICO have been introduced in the last three Congresses. Suggested reforms range from the complete abolition of all civil RICO actions to more modest modifications. Among the latter are the restriction or abolition of treble damages, the imposition of a prior criminal conviction or special injury requirement, and the denial of relief where the predicate illegality is confined to ordinary fraud. Others have suggested that civil RICO plaintiffs should be required to prove that the alleged racketeers derived pecuniary gain from the activity. This would allow the statute to apply to run-of-the-mill organized crime figures, but would exclude more altruistically motivated persons, such as political protesters. Some reformers urge that the "pattern of racketeering activity" requirement be redefined to necessitate proof of on-going criminal activity, rather than two unrelated criminal incidents. This, they say, would narrow the net of potential liability while still allowing civil RICO to strike against criminal infiltration of legitimate businesses and labor unions. Some individuals have even suggested that in view of RICO's treble damages provisions, the statute should be amended to allow for equally generous sanctions for frivolous claims.

I take no position as to which of the reform proposals are acceptable or which is best, but I do think that the imposition of some limitations on civil RICO actions is required so that federal courts are not required to duplicate the efforts of the state courts. No one doubts that the victim of a

fraudulent scheme should be able to obtain redress in a court. The question is under what circumstances should that take *13 place in a federal court? Overlapping criminal remedies do not present much of a problem, because state and federal prosecutions tend to work things out on a sensible basis of resource allocation. But there is no such control in the case of overlapping civil remedies. Plaintiffs make the choice that best suits their interests, and if treble damages are available in federal court, but not in state court, the cases will gravitate to the former.

Each of the three branches-through court opinions, legislative proposals, or submissions to Congress-has recently expressed recognition of the need for reforming civil RICO. I think that the time has arrived for Congress to enact amendments to civil RICO to limit its scope to the sort of wrongs that are connected to organized crime, or have some other reason for being in federal court.

[FNa1]. Chief Justice of the United States. Chief Justice Rehnquist delivered this address at the Eleventh Seminar on the Administration of Justice sponsored by the Brookings Institute on Friday, April 7, 1989.

21 St. Mary's L.J. 5

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT D

Westlaw.

132 Cong.Rec. H9371-01                                                    Page 1

132 Cong. Rec. H9371-01, 1986 WL 786910 (Cong.Rec.)

**(Publication page references are not available for this document.)**

Congressional Record --- House of Representatives
Proceedings and Debates of the 99th Congress, Second Session
Tuesday, October 7, 1986

CIVIL RICO (RACKETEER INFLUENCED CORRUPT ORGANIZATIONS)

(Continued)

The SPEAKER pro tempore (Mr. KILDEE). The gentleman from Virginia <Mr. BOUCHER> will be recognized for 20 minutes and the gentleman from Michigan <Mr. CONYERS> will be recognized for 20 minutes.

The Chair recognizes the gentleman from Virginia <Mr. BOUCHER>.

Mr. BOUCHER. Mr. Speaker, I yield myself such time as I may consume.

(Mr. BOUCHER asked and was given permission to revise and extend his remarks.)

Mr. BOUCHER. Mr. Speaker, just over 1 year ago the effort to revise and reform the civil provisions of the Racketeer Influence and Corrupt Organizations Act commenced. The bill which is before the House today results from extensive negotiations and compromise between the business and labor communities and those who have been speaking on this issue for consumer interests.

The compromise measure significantly restricts the inappropriate use of the Federal racketeering laws in private civil litigation while retaining a very carefully crafted multiple damage remedy for governments and for individuals in those instances where a consumer remedy can be alleged and proven.

Civil RICO in its present form has caused serious problems. The RICO statute was first adopted in 1970. At that time it was intended to give the Department of Justice a potent new weapon in the fight against organized crime. I think most observers would agree that on the criminal side of the statute, civil RICO has served that purpose quite well. However, with little debate or consideration of the consequences of its intended action, Congress added to RICO a private civil suit provision which is adorned with treble damages and with attorney's fees that make it virtually irresistible to any plaintiff who can allege a civil RICO injury.

2:50 p.m.

Those pleading requirements are not at all hard to meet. In fact, RICO is so broad-based that virtually any party that has become embroiled in a commercial dispute becomes a candidate for a civil RICO case.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

132 Cong.Rec. H9371-01                                                    Page 2

132 Cong. Rec. H9371-01, 1986 WL 786910 (Cong.Rec.)

(Publication page references are not available for this document.)

We all know that fraud allegations are commonly made in contract situations, and all that is needed under the current law to convert a simple contract dispute into a civil RICO case is the allegation that there was a contract and the additional allegation that either the mails or the telephones were used more than once in either forming or breaching the contract.

That constitutes either mail fraud or wire fraud, and that is sufficient to confer Federal civil RICO jurisdiction.

As a consequence of that, virtually every type of contract dispute has been turned into a RICO case. It has been used in domestic disputes between spouses and litigation between family members over inheritance rights, and in control controversies among church members. The State of Illinois has even used civil RICO to try to collect sales taxes from a merchant; and in what I suppose is the most bizzare case of all, a Federal court felt compelled to sustain a civil RICO case against FBI agents who had orchestrated an undercover sting operation.

It is truly hard to imagine a situation where the statute is being used in a more abusive way than in that factual context.

As long as the pleading requirements are met, the most basic disputes that are traditionally resolved under State law and in State courts can become and are increasingly becoming Federal cases to be litigated in Federal courts under the Federal RICO statute.

Mr. Speaker, a number of unfortunate consequences are flowing from this state of affairs. First, ordinary and reputable businessmen are being branded as racketeers simply because they become embroiled in a commercial dispute.

Second, the mere threat of bringing a civil RICO case can leverage a very substantial settlement on often less-than-substantial allegations from a businessman who desires to avoid being branded a racketeer and who is intimidated by the possibility of treble damages and attorneys fees being awarded in the event that he is not successful in the litigation.

Third, extensive use of civil RICO is supplanting other carefully crafted State and Federal remedies. This is a particular problem in the area of the Federal securities laws, where the acts of 1933 and 1934, carefully designed to control securities litigation, are being set aside by plaintiffs who act instead on the civil RICO provisions.

Finally, the federalization of thousands of mere commercial disputes, irrespective of the amount in controversy or the diversity of citizenship of the parties threatens to swamp a Federal judiciary that was never designed to handle this kind of case.

Now as one means of addressing these problems, I introduced legislation to restrict civil RICO only to those cases where a prior criminal conviction of the

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

132 Cong.Rec. H9371-01                                                      Page 3

132 Cong. Rec. H9371-01, 1986 WL 786910 (Cong.Rec.)

**(Publication page references are not available for this document.)**

defendant had been obtained. Four Supreme Court justices about 1 1/2 years ago were prepared to read that requirement into the present law.

   That bill, H.R. 2943, drew wide and bipartisan support, achieving the cosponsorship of 158 Members of this Chamber.

   Mr. Speaker, while I believe that the prior criminal conviction requirement is consistent with the original congressional intent in 1970 when RICO was enacted and is also good public policy, we have, in the spirit of compromise, crafted a RICO bill which is before the House today, which addresses the legitimate concerns of those who wish to preserve civil RICO as a remedy in consumer fraud cases.

   Now to those of my colleagues who were originally supporters of H.R. 2943 and who today may view with some skepticism the retention of a consumer multiple damage remedy, I want to assure you that the bill before us significantly restricts the use of civil RICO; that the bill before us does not in any way expand upon current law and that in the give and take of negotiation and compromise, we have not lost sight of our original purpose.

   As amended, H.R. 5445 includes the following provisions: The name of the statute is changed from "Racketeer Influenced and Corrupt Organizations Act" to "Pattern of Illicit Activity Act." The bill embodies a simple principle, of H.R. 2943, providing a treble damage civil cause of action if a criminal conviction of the defendant has been obtained.

   The compromise bill also retains a treble damage civil remedy for the U.S. Department of Justice, for State attorneys general, and for the chief legal officer of political subdivisions where State legislation specifically authorizes the filing of the suit by those legal officers.

   Throughout the debate on civil RICO reform, advocates have urged that the criminal side of the statute is an effective tool against organized crime. Therefore, we have endeavored in the course of constructing this compromise not to touch the criminal side of the statute. In no way will this legislation impede the Justice Department in its efforts to proceed against those who are involved in organized crime.

   Mr. Speaker, all other RICO actions will be limited to single damages only with one significant exception: Individuals may recover under this measure punitive damages of up to twice actual damages if and only if the injury occurs in a consumer transaction. There is no express or implied remedy under the Federal or State securities laws, and the defendant's action evidenced a wanton disregard for the rights of the plaintiff.

   Like most compromises, this bill does not bear the unqualified endorsement of all of the parties at interest. It does, however, provide substantial civil RICO reform. It will protect legitimate businesses and labor activities from unwarranted charges of racketeering. It will stop the undermining of more

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

132 Cong.Rec. H9371-01                                                    Page 4

132 Cong. Rec. H9371-01, 1986 WL 786910 (Cong.Rec.)

**(Publication page references are not available for this document.)**

appropriate State and Federal remedies for particular injuries. It will remove the
coercive threat of treble damages in mere commercial disputes. It will protect the
Federal judiciary from a future flood of cases which are more appropriately
handled in State courts, and it will provide a well-defined Federal consumer
remedy which will address situations such as that presented in the case of Gregory
versus Atlantic Permanemt Savings and Loan.

   In short, Mr. Speaker, it is a good bill; it is one that I think deserves the
support of our colleagues today.

   Mr. Speaker, I reserve the balance of my time.

   Mr. CONYERS. Mr. Speaker, I yield myself such time as I may consume.

   (Mr. CONYERS asked and was given permission to revise and extend his remarks.)

   Mr. CONYERS. Mr. Speaker, to my colleagues I would like to indicate that this
is an unhappy way to resolve a very important matter before the body. We have been
concerned about fighting crime, particularly activities that deal with crime
infiltration in the private sector. White-collar crime is one of the largest
problems that we have in American law today.

   This bill is a great improvement over previous drafts but still reduces our
effectiveness to fight white-collar crime by depriving consumer and business
remedies for victims swindled in crime and fraud schemes.

   For over a year, many have been urging that I report other more radical
proposals. Well, the surfacing of this bill by those very same people indicates to
me that this would have been unwise then, and that they have been asking for more
constriction in the law than they could possibly need.

                                3:00 p.m.

   Still I oppose any weakening of the civil RICO remedies and want still to take
care of its problems-which can be more simply accomplished. And I would have
wanted this measure to come up in the regular course of business to be debated and
possibly to have amendments offered.

   Now I must tale a moment to explain to you the tortured course of how this
measure came before the body today under the suspense calendar.

   First of all, may I say that you may think that you are dealing with H.R. 5445
that is in the back of the room and that is being circulated. That is not the
case. You are now dealing with the substitute amendment of H.R. 5445. You are not
dealing with the measure that is being passed out because there are only several
copies of this amended version that is now being floated through this body.

   I happen to object to that procedure. I happen to feel that the Subcommittee on

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

132 Cong. Rec. H9371-01, 1986 WL 786910 (Cong.Rec.)

**(Publication page references are not available for this document.)**

Criminal Justice, which did not report this bill nor ever seen it before, has not considered it. As a matter of fact the original bill was introduced on August 15, 1 day after the subcommittee reported a different civil RICO amendment.

Now, to make things more complicated, this amendment to the bill introduced after the subcommittee had reported and was discharged of responsibilities in full committee and has been circulated just now, just now. If anybody in this Chamber has an amended copy of H.R. 5445 with an amendment, raise your hand.

You do not have it because it is not circulated and it is not available. This is known as the closing-days-of-the-session-fast-shuffle. All rules are suspended. Nobody knows what is happening.

The chairman of the full committee, my friend and ally, Chairman RODINO, who propounded this, is not even here. So my colleague on the subcommittee is asked to run it through under suspension of the rules.

Does it fight crime? Does it strengthen the war against white-collar crime? The answer is, to all my fellow crime fighters, no.

What does it do for the $200 billion white-collar crime problem annually? It makes it less likely that a plaintiff can recover any damages beyond actual damages. Of course, the catch here-and lawyers have a way of working these things out, do we not-the catch here is that any business and many consumers victimized by a swindle or a fraud that is only limited to actual damages, as they are in this bill, is then in no way deterred. If all he or she has to do is pay back what he or she ripped off, he or she comes back to the same point that they were at in the beginning.

Now, some organized business interests who were before attempting to get a prior criminal conviction requirement, I think have conceded those efforts are too radical and insincere, and have come to a position a little more plausible. That is fine and dandy. Prosecutors and attorneys general came forward to the subcommittee to readily explain to anybody that had not figured it out, that they were hopelessly inundated with criminal matters and that there was no way that they would advocate limiting a civil remedy to criminal conviction because a very few relatively ever occur.

Now, what I am saying to you, ladies and gentlemen, this is known as the closing-day-fact-shuffle, "what you don't see, what you don't understand will be explained to you tomorrow in the Washington Post."

You will hear about it and say, "Hey, why did we weaken the white-collar crime effort?" Somebody is going to get up here today maybe and say, "Well, it was the best that we could do and we're tough enough on street crime." Baloney.

Well, I would like to suggest to you that we have all of the 100th Congress to do even maybe a little bit better.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

132 Cong.Rec. H9371-01                                              Page 6

132 Cong. Rec. H9371-01, 1986 WL 786910 (Cong.Rec.)

**(Publication page references are not available for this document.)**

So here we have not only a new bill different from the one the subcommittee had
reported, but now amended just hours before with another bill, because all of the
rules have been suspended.

I ask you in the name of strong civil enforcement against white-collar crime,
to please consider, if you will, what is in this bill. It may be a little bit hard
to do because you do not have a copy of it, it may be a little hard to do because
nobody has seen it on the floor except the floor manager, myself, and the clerk;
and if that is the way we are going to fight crime, by rationalizing that we
cannot do any better, I say it is a sad day in the Congress.

It is one of the reasons that I urge that we close out the business of the
House of Representatives, get back to our districts as fast as we can before this
erosion continues on goodness knows what other half-baked measures will be
squeezed.

I urge my colleagues to think about this matter carefully. If you can come to
the conclusion that this strengthens the fight against white-collar crime, I will
easily rationalize your support for this bill. But if you reach the conclusion
that it does not, that it weakens the fight in an ever-widening war in which we
are losing more and more money to big-time and small-time crooks, then I urge you
to vote "no."

Please remember that this is amongst the most important remedies that a
consumer victim has in Federal court.

He cannot follow a wrong-doing corporation or individual throughout a number of
States to try to get his remedy State by State. It would be difficult, impractical
and, as a matter of fact, unworkable.

What this does is begin to shave back a very important tool that was crafted in
the fight against corrupt organizations and racketeering activities.

Now there has been some talk about what a "great boon" civil RICO is to
lawyers. First of all, 83 percent of the analogous cases in antitrust are settled,
they are never brought to trial. Most of civil RICO cases brought to trial, the
Government won damages, and penalties for two-tenths of 1 percent on estimated
fraud in 1984, and consumers also only receive a small fraction.

But in the meantime, there is an enormous amount of motions to which anyone who
alleges a complaint would have to face before the defendants, especially if they
are corporate defendants, in a RICO trial. It is not nearly as simple to litigate
civil RICO as its been suggested.

The lawyers came before the subcommittee and told us that anybody that tells
you civil RICO is a wonderful way to collect treble damages, I invite you to read
the record. Lawyers pointed out very simply it is much easier getting $100 per
hour sitting in your office, for sure, than to extensive involvement in a complex

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

132 Cong.Rec. H9371-01                                                    Page 7

132 Cong. Rec. H9371-01, 1986 WL 786910 (Cong.Rec.)

(Publication page references are not available for this document.)

RICO case that may pay treble damages.

So what we are doing is we are acceding to the interests that are not that concerned about protecting consumers.

So I urge you to reject this amendment on procedural grounds. This is not the way we have to do it. If the bill is so good, why are we sneaking it through like this? If the bill is so good, why did we not bring it up in the full committee? I think my consumer reputation can stand scrutiny among anybody in this body. If this bill is so good, why did it get substituted at the last minute so that nobody here, including this gentleman in the well, knows precisely what we are dealing with?

So I urge you to reject this measure, and to approach the undeniably growing white-collar crime problem with the same zeal with which other crime is fought.

Mr. Speaker, I reserve the balance of my time.

Mr. BOUCHER. Mr. Speaker, I yield 1 minute to the gentleman from Texas <Mr. BRYANT>.

(Mr. BRYANT asked and was given permission to revise and extend his remarks.)

Mr. BRYANT. I thank the gentleman for yielding.

Mr. Speaker, I would simply point out that those calling for reform of the RICO statute have not been insignificant or unknown voices in our country: the Judicial Conference of the United States; Judge Abner Mikva, a progressive Member of this body before becoming a member of the District of Columbia Court of Appeals; the American Civil Liberties Union; most major labor and business organizations as well.

They did so for one reason and for one reason alone: the civil RICO statute came to be a tool of all people that bring litigation including commercial disputes of an ordinary nature, securities litigation, commercial contract disputes, tender-offer battles, banking transactions, disputed insurance claims, landlord and tenant disputes and complaints of disappointed bidders for franchises and companies; all of those have become grist for civil RICO actions.

It was widely known we needed a change in this legislation, and I point out that criminal RICO is unchanged by the bill before the House today.

Mr. BOUCHER. Mr. Speaker, I yield 1 1/4 minutes to the gentleman from California <Mr. EDWARDS>.

(Mr. EDWARDS of California asked and was given permission to revise and extend his remarks.)

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

132 Cong. Rec. H9371-01, 1986 WL 786910 (Cong.Rec.)

(Publication page references are not available for this document.)

Mr. EDWARDS of California. Mr. Speaker, this bill has had a long and difficult birth. I cannot compliment enough the gentleman from Michigan <Mr. CONYERS>, chairman of the Judiciary Committee's Subcommittee on Criminal Justice, whose single efforts in insisting on comprehensive hearings and a wide range of expert witnesses on the bill have resulted in the legislation before us today, which is far better than the original bill that had some 150 cosponsors. His indefatigable resolve to keep the crucial RICO protections for otherwise defenseless victims enabled the careful compromise being considered today.

I also thank the chairman of the Judiciary Committee, Mr. RODINO, for his outstanding leadership on this legislation; and, I compliment the gentleman from Virginia <Mr. BOUCHER> for recognizing the need for change in the civil RICO law and working tirelessly to bring it about.

The bill before us recognizes the importance of a strong Federal remedy for pervasive criminal fraud by preserving this cause of action for all victims of such crimes.

In addition, it provides automatic treble damages for governmental entities and for persons injured by defendants who have been convicted of their crimes. Furthermore, and perhaps most important, the bill provides for punitive damages for consumers who have been injured by large scale criminal activity.

On the other hand, the bill also recognizes the potential for abuse of RICO by commercial entities who often have sufficient bargaining power to bring expensive and complex civil lawsuits without being able to collect damages over and above their actual damages. For these plaintiffs, the bill provides a Federal forum, but no punitive damages.

I would like to emphasize two additional points. First, the bill does not address the rules of respondeat superior. Second, the pattern definition in the bill should be interpreted to be consistent with footnote 14 in Sedima, S.P.R.L. v. Imrex Co., Inc., 105 S. Ct. 3275 (1985).

I will vote for this legislation, which is a good balance, protecting innocent people from white collar crime and giving relief to the business community from possible abuse under the current law.

Mr. BOUCHER. Mr. Speaker, I yield 1 minute to the gentleman from California <Mr. BERMAN>.

(Mr. BERMAN asked and was given permission to revise and extend his remarks.)

Mr. BERMAN. I thank the gentleman, and I thank the Speaker.

The present RICO law is unfair. It creates the specter, as the gentleman from Virginia has said, of racketeering and participation in organized crime for defendants who are sued under the civil RICO provisions. At the same time, as the

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

132 Cong.Rec. H9371-01                                                Page 9

132 Cong. Rec. H9371-01, 1986 WL 786910 (Cong.Rec.)

(Publication page references are not available for this document.)

gentleman from Michigan knows, I share his concern that the original bill to amend
this law was far too restrictive and that even the bill that came out of the
subcommittee went too far in that it restricted people who had causes of action
that should be allowed in Federal courts. It kept them from proceeding under the
civil RICO statute as amended.

   This compromise is an excellent blend of what is good in the present situation
and what the gentleman from Virginia has been trying to get at; it protects
consumers, it restricts and eliminates frivolous suits, it provides effective
punitive damages where they are justified as well as attorneys fees, and it does
not do damage to the law of respondeat superior by keeping the current
interpretation in the present case law intact.

                              3:15 p.m.

   I believe the bill is worth supporting in its form, and I congratulate the
gentleman from Virginia for his work.

   Mr. BOUCHER. Mr. Speaker, I yield 1 minute to the gentleman from Ohio <Mr.
FEIGHAN>.

   Mr. FEIGHAN. Mr. Speaker, I thank the gentleman for yielding this time to me.

   Mr. Speaker, I rise in support of H.R. 5445. I think that this is an important
amendment to the RICO statutes that will give relief to businesses, to labor
organizations and individuals from the abuses, the many abuses, that have arisen
under the civil RICO statutes, particularly in the past several years.

   I think particularly this legislation will remove the extortionary of the civil
RICO statutes, and it will also restrain now the flood of suits that are being
brought into the Federal courts, "federalization," as the gentleman from Virginia
has said, of suits that otherwise and disputes that otherwise should remain in the
State courts.

   This is a long-awaited compromise. Many Members of this House have been working
on this compromise for several months. I think it is a thoughtful compromise. It
is one that has been thoroughly scrutinized as well.

   I think that we owe a real debt of gratitude to the gentleman from Virginia for
the hard work that he has put in to developing this compromise over the past
several months, one that will clearly bring, I think, the full support of
representatives, affected representatives, of the business community, particularly
in the financial sector, representatives of labor organizations, as well as the
critical support which I believe it has from consumer groups representing
individuals.

   Mr. CONYERS. Mr. Speaker, I yield myself such time as I may consume.

            © 2007 Thomson/West. No Claim to Orig. US Gov. Works.

132 Cong. Rec. H9371-01, 1986 WL 786910 (Cong.Rec.)

**(Publication page references are not available for this document.)**

Mr. Speaker, this measure is really weakening civil RICO, particularly as it deters fraud and white collar crime perpetuated by some businesses on other businesses. I was sort of inviting somebody to dispute me on that, but I suppose I will not get an argument on those merits today. The few colleagues of mine who are here and understand this bill know that is the truth, and that is, of course, why I oppose it.

I am prepared to concede for purposes of debate that maybe we should change civil RICO, I introduced several bills aimed at change and have always told interested Members that I would always be open to developing sensible approaches with them. But if we want to change civil RICO, we have plenty of opportunity to do so. There is no emergency that requires this be brought up under the suspension of the rules. There is absolutely nothing that requires that this bill be brought forward immediately.

This bill, while an important improvement over previous drafts, still may have numerous adverse consequences in the fight against the white collar crime. So the risk is, frankly, puzzling.

Mr. SWINDALL. Mr. Speaker, will the gentleman yield?

Mr. CONYERS. I yield to the gentleman from Georgia.

Mr. SWINDALL. Mr. Speaker, I would just like to say that while I certainly concede that this particular amendment weakens RICO, I think the pertinent is: In what respect, and what is the objective of RICO?

I think an ABA study of a task force really enlightens us on this. We find that 77 percent of all RICO actions are predicated on wire, mail and security, areas covered by other law. Only 7 percent target on crime figures. I think that is a significant point. RICO is too broad in its scope, and that is the reason we feel an amendment is needed.

Mr. CONYERS. Mr. Speaker, I appreciate my colleague from the subcommittee making that point. It was a pleasure to yield to him for his thoughtful comments.

If I might respond, the simple fact of the matter is that criminal conspirators, Mafia, orgainzed crime and racketeer conspirators all use mail and wire to swindle as well.

So we have a little bit of a problem here. This is not a matter that all nice guys and individual people who have regular garden variety business disputes use RICO to sue under mail and wire fraud. What the problem is is that the big boys use mail and wire fraud, the organized people, the killers, the drug pushers. They use mail and wire, too, because obviously it is almost impossible to commit a white-collar crime without using those devices.

It is true that some of the garden variety type cases have crept into the

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

132 Cong. Rec. H9371-01, 1986 WL 786910 (Cong.Rec.)

**(Publication page references are not available for this document.)**

matter, but that could be taken care of by other means without taking away the feature of treble damages as could most other civil RICO problems. It is the treble damages removal from the consumers and businesses that terribly disturbs me, because the consumer, for purposes of this discussion, is the little guy, the person who is deprived of even multiple damages when he can now demonstrate wanton behavior on the part of the defendant.

The other part of this equation is that business to business suits are constricted-if I understand this, and I am only going by hearsay since the amended bill was put in my hand only minutes ago-but business to business suits are limited to actual damage. Here we have a very serious problem with criminal justice and deterrence. The fact of the matter is that we now have taken the deterrent out of corporate swindles, because if you are limited to actual damages, why should you not go ahead. If you are sued, the worst that could happen is that you have to pay back the money that you cheated for. Further, businesses are not compensated, as they should be, for lost investment opportunities.

It would seem to me when I heard and recalled the level of rhetoric about fighting crime in this very chamber that this would raise the hackles of every congressional crime fighter within the sound of my voice. I am shocked that now, all of a sudden, those who wanted death to drug pushers, scrap the exclusionary rule, strengthening of sentences to deter street crime, and now when we get to the $200 billion a year swindles that are going on literally unchecked, we say let us weaken the law. There is a double standard: Use the Constitution to fight crime in the streets, go soft when fighting a $200 billion crime problem in the suits.

Mr. GEKAS. Mr. Speaker, will the gentleman yield?

Mr. CONYERS. I yield to the gentleman from Pennsylvania.

Mr. GEKAS. Mr. Speaker, I thank the gentleman for yielding to me.

Mr. Speaker, the gentleman will agree, I am sure, that the original intent of the RICO statute in which the gentleman from Michigan participated with respect to the debate thereon, and then, as I recall from what I have learned, cast a vote against it because of the fear of it going beyond its original purpose. That original intent, the gentleman will agree, is still intact; that is, to go after the racketeers, the Mafia figures and the organized crime figures so that we would have a weapon to attach against their wealth as well as their bodies for purposes of incarceration.

So the gentleman should feel satisfied that no matter what the gentleman disagrees with in this bill, that original purpose of RICO remains. In passage of this compromise today, that original grand purpose is still lodged in the law. It will permit our Justice Department and our State prosecutors and our U.S. attorneys and our task forces to go after the assets of the crime figures, the organized crime figures, the syndicates and all of that, which is the original purpose of RICO. But at the same time, the gentleman will agree, that those other

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

132 Cong.Rec. H9371-01                                                    Page 12

132 Cong. Rec. H9371-01, 1986 WL 786910 (Cong.Rec.)

**(Publication page references are not available for this document.)**

things that gave the gentleman from Michigan pause in the first instance way back
when RICO first came, how unforeseen consequences might come about, that it would
reach out beyond the vision of the Members of Congress, beyond the organized crime
syndrome, that has come full sway back to applaud the gentleman from Michigan that
he was right when he first opposed RICO when it first came to the floor of the
House. The gentleman was right, and the gentleman should join with us in
supporting this bill.

   Mr. CONYERS. Mr. Speaker, I thank the gentleman for reminding me of my earlier
position in this measure. I will explain it to the gentleman later.

   Mr. Speaker, I reserve the balance of my time.

   Mr. BOUCHER. Mr. Speaker, I yield 1 minute to the gentleman from Connecticut
<Mr. MORRISON>.

   Mr. MORRISON of Connecticut. Mr. Speaker, I thank the gentleman for yielding
this time to me.

   Mr. Speaker, I rise in support of this compromise.

   I want to underscore that I think this is a good compromise. I think we have
done something here that needed to be done.

   There were instances of abuses under RICO, but the initial legislation proposed
by the gentleman from Virginia went too far. The gentleman and I discussed it at
the time. I think that this compromise does many of the things that I think are
important.

   It preserves the rights of consumers, first and foremost, and it preserves
treble damages in a number of important instances in the area of conviction and by
the use of public officials to enforce standards.

                                3:25 p.m.

   Fraud is a problem. The gentleman from Michigan is absolutely correct; fraud is
a serious problem. But we can fight fraud at least as well under this new
statutory set of definitions as we can today. The fact is that we will do better
with a more credible and more effective statute than one that can be abused

   I commend those who have worked on this compromise and I hope this will be
passed overwhelmingly.

   Mr. BOUCHER. Mr. Speaker, I yield 1 minute to the gentleman from New York < Mr.
SCHUMER>.

   (Mr. SCHUMER asked and was given permission to revise and extend his remarks.)

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

132 Cong.Rec. H9371-01                                              Page 13

132 Cong. Rec. H9371-01, 1986 WL 786910 (Cong.Rec.)

(Publication page references are not available for this document.)

   Mr. SCHUMER. I thank the gentleman for yielding me this time.

   Mr. Speaker, I commend the gentleman from Virginia and all those who have
worked out a compromise on this issue. I come to it from a different place than
many of my colleagues. It seems to me that any kind of statute that allows
individual citizens who have justified private litigation among one another to
then label that other side a racketeer, an extorter, someone who is from the
underworld for the sole purpose of getting them to settle the suit is McCarthyism
of the worst type.

   The RICO law has allowed that. Many of my good friends, who I agree with on so
many issues, have said, "Well, that is OK because the main people who are labeled,
who are smeared in this way are corporations or accountants or are a part of big
establishment America." They have their civil liberties too, as far as I am
concerned. The smear and McCarthyite tactic that this law presently allows is a
bad tactic no matter who it is used against. I think that the provisions worked
out by the gentleman from Virginia with the chairman of the committee and so many
others eliminates that possibility. Thus, I am happy to support this legislation
and hope that Congress will be more careful when enacting criminal statutes in the
future that allow that kind of thing to happen.

   Mr. BOUCHER. Mr. Speaker, I yield such time as he may consume to the gentleman
from Florida <Mr. SMITH>.

   (Mr. SMITH of Florida asked and was given permission to revise and extend his
remarks.)

   Mr. SMITH of Florida. I thank the gentleman for yielding to me.

   Mr. Speaker, I rise in support of this legislation, strong support.

   The SPEAKER pro tempore (Mr. KILDEE). The gentleman from Michigan <Mr. CONYERS>
has 2 minutes remaining and the gentleman from Virginia <Mr. BOUCHER> has 4
minutes remaining.

   Mr. BOUCHER. Mr. Speaker, I yield the balance of my time to the gentleman from
Pennsylvania <Mr. GEKAS>.

   Mr. GEKAS. I thank the gentleman for yielding me this time.

   Mr. Speaker, the time has come to pass this RICO reform bill. I urge all the
Members to support it for a variety of reasons, not the least of which is that we
may never have another opportunity to focus on what we consider to be the abuses
in the original RICO statute.

   I repeat, Mr. Speaker, because it is worthy of repetition, that the original
purpose of the bill was to give an additional weapon to the government, as it
were, to the prosecution, as it were, to move against the syndicates and

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

132 Cong. Rec. H9371-01, 1986 WL 786910 (Cong.Rec.)

(Publication page references are not available for this document.)

racketeers and other crime figures and groupings which, perpetrating heinous
crimes, were also amassing great gobs of wealth.

   While these crime figures were amassing these great gobs of wealth and applying
their wealth to the purchase of properties and other assets, sometimes beyond the
reach of the prosecution and law enforcement agencies, civil RICO came into being,
giving an additional tool to the prosecution to move after them in civil court.
That purpose and that result is still part of the policy of law enforcement,
especially on the Federal level. That is not changed at all.

   As a matter of fact, greater focus is placed upon that by the passage of this
bill than ever before because we isolate it now as one of the chief purposes of
having civil RICO.

   Now there began a series of events spanning over many, many years where
creative attorneys at the bar were able to use the civil RICO statute once
reserved and once preserved and once aimed at the syndicate racketeer-types of
entities and individuals who began to use them against legitimate banks and
savings institutions and insurance companies and accountants and lawyers and other
small businessmen and small business entities who, all of a sudden, became targets
of the same kind of suit as was once reserved to be used against crime figures,
racketeers, syndicates involved in heinous criminal activity.

   One thing led to another when once some kind of attempt was made to carry it to
a higher court to gain definition of this, then came along the Sedima case. I ask
the gentleman from Michigan to pay particular attention to what I am saying
because I did to his remarks in our colloquy.

   In the Sedima case, it was Justice Marshall, writing for the minority who said
at that point, and I just paraphrase in my own language, that the original intent
of the RICO statute is being thwarted by the results that are now coming from our
Federal courts.

   He was calling for the Congress to act and we are, in some measure, responding
to that proclamation in the Sedima case by Supreme Court Justice Marshall and
others in the Federal establishment, some of whom testified before our own
committee.

   Now, I am not totally happy with this bill; it does not go far enough. I am not
perfectly happy with it. You have heard many of our colleagues say that on
countless pieces of legislation; it happens to be the truth. This could be a
better bill, but it goes far toward reform of RICO.

   Mr. Speaker, I rise in support of H.R. 5445 with amendments.

   In the legislative world there are no perfects and this bill, with its
amendments, is an example. I support this legislation even though it is a far cry
from the RICO reform measure that I originally cosponsored and which I have

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

132 Cong.Rec. H9371-01                                                          Page 15

132 Cong. Rec. H9371-01, 1986 WL 786910 (Cong.Rec.)

(Publication page references are not available for this document.)

consistently championed throughout this Congress. When I began that effort I
sought to ameliorate what I viewed as an abuse which had to be corrected. Sadder,
but wiser, after my experience of nearly 2 years I am constrained to agree that
this may be the best that this Congress can expect.

    After nearly a year of hearings, the Criminal Justice Subcommittee finally in
August of this year reported H.R. 5445. It did not make use of civil RICO
contingent upon proof of a prior conviction as I had strongly advocated, but by
lowering to actual damages what a plaintiff could receive under the statute in
essence it remedied the worst possibilities of abuse. Today's amended version
takes even that modest reform several steps backward-although stopping somewhat in
advance of where we stand under current law.

    My support is, therefore, grudging. House passage today will enable this bill
to go forward to be corrected at the next legislative level. The choice that we
today face has been necessitated by the unwarranted delay and demands for
compromise to which this legislation has been subjected. I sincerely hope that
this bill will now be permitted entrance onto that narrow bridge to the Senate,
access to which has been blocked by the intransigence of so few.

    I have made no secret of my misgivings concerning the new consumer fraud action
which this legislation would authorize and the fear that with it our prescription
for RICO reform will combine with the disease we sought to cure to create an even
more resistant strain of abuse. Thus my hope that this provision of the amendment
can be changed before it becomes law.

    However, I reiterate that we are at the final hour of this Congress and if
there is to be RICO reform, however slight, it must be accomplished through this
vehicle. I, therefore, ask my colleagues to support passage under suspension of
H.R. 5445 with amendments.

    Mr. SWINDALL. Mr. Speaker, will the gentleman yield?

    Mr. GEKAS. I yield to the gentleman from Georgia.

    Mr. SWINDALL. I thank the gentleman for yielding to me.

    Mr. Speaker, I would just like to approach this issue from an entirely
different perspective. I think that we have all heard complaints back home about
the skyrocketing cost of litigation and the reflective cost of insurance premiums.
I think that what we are seeing here in the RICO litigation costs is being passed
along to the overall costs of commercial insurance which is being passed on to
consumers.

    This is the type of abuse that needs to be corrected if we are genuinely
concerned with tort reform.

3:35 p.m.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

132 Cong.Rec. H9371-01                                                          Page 16

132 Cong. Rec. H9371-01, 1986 WL 786910 (Cong.Rec.)

(Publication page references are not available for this document.)

Mr. CONYERS. Mr. Speaker, I yield myself such time as I may consume.

Mr. Speaker, I would just like to point out to the ranking minority member of the subcommittee, who remembers that I voted against the original RICO bill, my vote against it was not based on civil RICO. At that time, it was an unknown sliver of words that nobody expected to amount to anything. As a fact, civil RICO did not begin to be used until the middle 1970's and the early 1980's.

Some of my fears still obtain. Every now and then, I see the mayor of the city of Detroit, and if you mention criminal RICO, you ought to move aside fast since he was the subject of one of the longest wiretaps by a friendly judge that laid it on him for a year or more because of alleged RICO violations.

The second point to my colleague, the gentleman from Georgia <Mr. SWINDALL>, who is trying to save money, an effort I completely support is that it is fraud more than litigation which increases consumers insurance premiums-by $13 billion each year.

The final point I would like to make is about the title of this bill that my other friend, the gentleman from New York <Mr. SCHUMER>, pointed out. He thought this was terrible to taint a beautiful, legitimate corporation. Well, I offered to take care of this problem with legislation I introduced changing to RICO name as I have offered to work on compromise legislation that would address the legitimate complaints. But this is precisely the problem. A few instances of abuse are cited in support of a bill that is not needed to work that abuse. That's bad policy and it is why I, reluctantly oppose this bill.

Mr. BOUCHER. Mr. Speaker, will the gentleman yield?

Mr. CONYERS. I yield to the gentleman from Virginia, the floor manager of the bill.

Mr. BOUCHER. Mr. Speaker, I thank the gentleman for his courtesy in yielding the final minute of debate.

I would say to my colleagues that this is not a perfect bill, as many who have spoken on the matter have said, but it does constitute a significant improvement over current law.

It is going to prevent in the future legitimate businessmen from being branded as racketeers simply because they have become embroiled in a commercial dispute. It is going to remove the coercive threat of treble damages in mere contract cases that today are leveraging substantial settlements on less than substantial allegations.

It is going to prevent the undermining of more carefully crafted and tailored State and Federal remedies such as the Federal securities laws.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

132 Cong.Rec. H9371-01                                                    Page 17

132 Cong. Rec. H9371-01, 1986 WL 786910 (Cong.Rec.)

**(Publication page references are not available for this document.)**

It is going to halt the federalization of thousands of mere contract cases that are more appropriately resolved in State courts, and it is going to provide an appropriate Federal consumer remedy in selected cases.

The bill is not a perfect product, but it is a good product of a very useful and constructive compromise. I very much urge its passage today.

Mr. RODINO. Mr. Speaker, I want to address two specific areas that were crucial to developing an agreement on the final language of the bill.

Particular attention was devoted to the application of the proposed amendments to pending cases. As amended, the act would apply prospectively to all cases initiated by the Government or by private persons who suffer injury resulting from conduct which formed the basis of a prior conviction under the act. In cases where there is no prior conviction for the conduct causing harm, the limitation of recovery contained in paragraph (2)(B)(i) applies except in two important situations. If a plaintiff makes the required showing in these two situations, he will also receive the full measure of treble damages afforded under section 1964 of the act.

The first exception carved out from the limitation on recovery involves pending cases where a jury verdict or district court judgment, establishing the defendant's liability, has occurred, or where a final settlement has been reached. Under this exception, the plaintiff is never subject to the actual damages limitation contained in paragraph (2)(B)(i). Thus, where litigants have sought redress for injury suffered under the act, and have progressed to the point where they have received a jury verdict or district judgment, the intention is to provide such plaintiffs with the full measure of treble damage relief as was available under the law at the time the suit was brought. This provision establishes a mandatory award of treble damages once the requisite showing has been made and is not subject to the discretion of the court. Finally, it is not necessary that the judgment be final in a pending case for treble damage recovery to apply. If, on the day of enactment, a jury verdict or district court judgment against the defendant has occurred, then plaintiffs become automatically entitled to treble damages when the judgment subsequently becomes final.

A second category of pending cases has been removed from the limitation on recovery provided that the plaintiff makes the necessary showing. Under this exception, a plaintiff may recover the full measure of treble damages for injury suffered under the act if he shows by a preponderance of the evidence that, in light of all the circumstances, it would be clearly unjust to limit recovery to that specified in paragraph (2)(B)(i) of section 1964(c). The language is explicit that a court should consider all relevant circumstances in making this equitable determination. The relevant circumstances that a court should consider include, but are not limited to, such factors as the date the suit was brought, the amount of expense and effort expended by the plaintiff sustaining the suit, and whether an alternative form of comparable relief is available to the plaintiff for the harm giving rise to the recovery under RICO. Where one or several of these factors

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

132 Cong.Rec. H9371-01                                                    Page 18

132 Cong. Rec. H9371-01, 1986 WL 786910 (Cong.Rec.)

(Publication page references are not available for this document.)

are present, and a court determines that it would be clearly unjust to apply a limitation on recovery, then treble damage recovery should be granted to the plaintiff. For example, a court may find that it would be clearly unjust to deny a plaintiff a treble damage recovery where the suit was initiated several years before and where substantial pretrial discovery and motions practice has occurred. Thus, even though the litigation may not have advanced to either a jury verdict or district court judgment, a court in considering these circumstances may decide that it would be clearly unjust to deny the plaintiff treble damage recovery if he prevails on the substantial claims.

   The second major area of agreement that should be emphasized concerns the doctrine of respondeat superior. In arriving at the final language of the RICO amendments, there was a conscious decision not to change or alter in any manner the doctrine of respondeat superior as it has heretofore been applied by the courts in RICO cases. Similarly, other aspects of civil RICO not specifically covered by the legislation are to be treated consistent with existing jurisprudence.

   The following points should also be noted. The definition of the phrase " pattern of illicit activity" is meant to be interpreted in a manner consistent with that found in footnote 14 of Sedima, S.P.R.L. v. Imrex Co., Inc., 105 S.Ct. 3275 (1985). Second, new subsection 1964(c)(2)(B)(ii)(II), defining persons who are eligible to recover punitive damages under the act, relates to the issue of whether a plaintiff has an express or implied remedy under Federal or State securities laws. It is intended that the burden of proof and the burden of persuasion for this aspect of the litigation rests with the defendant, since placing the burden on the plaintiff would require proof of a negative.

   Mr. MATSUI. Mr. Speaker, I rise in support of H.R. 5445, the Racketeer Influenced and Corrupt Organization Act Amendments. Under the present civil RICO law a person who is injured in his business or property is able to recover treble damages and costs, including attorney's fees. Many cases which have nothing to do with organized crime or racketeering activities have been brought under the RICO statute because of the leverage created by the possibility of treble damages.

   There is also the stigma associated with charges of racketeering. Some of my constituents have written to me, concerned with the manner in which this statute has been abused. These are solid citizens, pillars of the community, who have had their reputation placed in question by charges of racketeering.

   Mr. Speaker, this is a good bill. It will replace treble damages with actual damages. It will replace racketeering terminology with illicit activity. These changes are needed and I ask the House to support this bill.

   The SPEAKER pro tempore. All time has expired.

   The question is on the motion offered by the gentleman from Virginia <Mr. BOUCHER> that the House suspend the rules and pass the bill, H.R. 5445, as amended.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

132 Cong.Rec. H9371-01                                                Page 19

132 Cong. Rec. H9371-01, 1986 WL 786910 (Cong.Rec.)

(Publication page references are not available for this document.)


   The question was taken; and (two-thirds having voted in favor thereof) the
rules were suspended and the bill, as amended, was passed.

   A motion to reconsider was laid on the table.

 132 Cong. Rec. H9371-01, 1986 WL 786910 (Cong.Rec.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

## CERTIFICATE OF SERVICE

I, Daniel M. Silver, hereby certify that on October 26, 2007, I caused a copy of the

foregoing documents to be served upon counsel of record via the CM/ECF filing system.


/s/ Daniel M. Silver
Daniel M. Silver (DE Bar ID #4758)