# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| RAMON VILLANUEVA-BAZALDUA individually and on behalf of other similarly situated, | ) ) ) | |
| | ) | Civil Action No. 06-185 |
| Plaintiff, | ) ) | The Honorable Gregory M. Sleet |
| | ) | |
| v. | ) ) | |
| TRUGREEN LIMITED PARTNERS and TRUGREEN, INC. d/b/a TRUGREEN CHEMLAWN, | ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## COMPENDIUM OF UNREPORTED DECISIONS IN SUPPORT OF DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

McCarter & English, LLP
Michael P. Kelly (DE Bar ID #2295)
Daniel M. Silver (DE Bar ID #4758)
Renaissance Centre
405 North King Street, 8th Floor
Wilmington, DE  19801
(302) 984-6300
mkelly@mcarter.com
dsilver@mccarter.com

*Admitted Pro Hac Vice*
Michael L. Banks (PA I.D. #35052)
Sarah E. Bouchard (PA I.D. #77088)
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA  19103-2921
(215) 963-5387/5077

Dated:  October 26, 2007

Attorneys for Defendants

# TABLE OF AUTHORITIES

Barabin v. Aramark Corp.,
    No. 02-8057, 2003 WL 355417 (3d Cir. Jan. 24, 2003) ................................................1

Bunnion v. Consolidated Rail Co.,
    No. Civ. A. 97-4877, 1998 WL 372644 (E.D. Pa. May 14, 1998) ...............................2

Frey v. Spokane County Fire District No. 8,
    No. CV-05-289, 2006 WL 2597956 (E.D. Wash. Sept. 11, 2006) ...............................3

Harris v. Fee Transport Services, Inc.,
    No. Civ. A. 05-77, 2006 WL 1994586 (N.D. Tex. May 15, 2006) ...............................4

Johnson v. TGF Precision Haircutters, Inc.,
    No. Civ. A. H-03-3641, 2005 WL 1994286 (S.D. Tex. Aug. 17, 2005) .......................5

Matjastic v. Quantum Pharmics, Ltd.,
    No. Civ. A. 90- 0647, 1991 WL 238304 (E.D. Pa. July 22, 1991)................................6

In re Neurontin Marketing & Sales Pracs. Litigation,
    _ F.R.D. _, 2007 WL 2823681 (D. Mass. Sept. 27, 2007) ...........................................7

Powers v. Lycoming Engines,
    _ F.R.D. _, No. Civ. A. 06-2993, 2007 WL 2782355,
    (E.D. Pa. Sept. 25, 2007) ..............................................................................................8

Reyes  v. Texas EZ Pawn, L.P.,
    No. Civ. A. V-03-128, 2007 WL 101808 (S.D. Tex. Jan. 8, 2007)...............................9

Sequa Corp. v. Aetna Casualty & Surety Co.,
    No. 89C-AP-1, 1992 WL 207251 (Del. Super. Ct. Aug. 7, 1992) ..............................10

In re Unisys Corp. Retiree Medical Benefits Litigation,
    No. 969, 2003 WL 252106 (E.D. Pa. Feb. 4, 2003) ...................................................11

Tab 1

Westlaw.

Not Reported in F.3d
Not Reported in F.3d, 2003 WL 355417 (3rd Cir.(Pa.))
**(Cite as: 2003 WL 355417 (3rd Cir.(Pa.)))**

Page 1

▷
Only the Westlaw citation is currently available.


United States Court of Appeals, Third Circuit.
Bonita BARABIN, Randolph Robinson, Dwight
Sumpter, Erica Seamon, Louise
Anderson, Joseph Sheppard, Romont Robinson, Len
Simpkins, Kenneth Govan and
Vernon Draper, Petitioners
v.
ARAMARK CORPORATION, Aramark Services
Management of PA, Inc., Aramark
Healthcare Support Services, Inc., Dorothy Homony,
Chris Hornbecker (Eastern
District of PA Civil No. 01-cv-04161)(JCJ)
**No. 02-8057.**

Jan. 24, 2003.

Present: SCIRICA, BARRY and AMBRO, Circuit
Judges.

ORDER

SCIRICA, J.

*1 In this Title VII and 42 U.S.C. § 1981 case
alleging racial discrimination, plaintiffs seek an
interlocutory appeal under Fed.R.Civ.P. 23(f) from
the denial of their motion for class certification under
Fed.R.Civ.P. 23(b)(2) or (b)(3). The putative class
consists of "all African-Americans (150-200 persons)
who worked for Defendants at Presbyterian Medical
Center ... in the Environmental Services and Patent
Services Departments from November 15, 1999
onward, and in the Distribution Department from
October 2000 onward." Plaintiffs request
compensatory and punitive damages as well as
injunctive relief.

In Newton v. Merrill Lynch, Pierce, Fenner & Smith,
259 F.3d 154, 164 (3d Cir.2001), we held that
granting such a petition would be appropriate if it
would permit us to address: "(1) the possible case-
ending effect of an imprudent class certification
decision (the decision is likely dispositive of the
litigation); (2) an erroneous ruling; or (3) facilitate
development of the law on class certification." Id. at
165.

Plaintiffs do not appear to contend that the denial of
class certification will have a case-ending effect, nor
that the value of their claims is too small to
effectively prevent them from pursuing their claims.
Instead, plaintiffs have alleged that they are entitled
to substantial compensatory and punitive damages,
including an award of attorneys' fees and costs under
Title VII and § 1981. Therefore, we will address
whether the District Court erred or whether, at this
time, we should facilitate development of the law on
class certification.

We review the grant or denial of class certification
for abuse of discretion. In order to warrant a finding
of abuse of discretion, it must have "rest[ed] upon a
clearly erroneous finding of fact, an errant conclusion
of law or an improper application of law to fact."
Newton, 259 F.3d at 165.

Rule 23(b)(2)

Plaintiffs contend class certification is proper under
Fed.R.Civ.P. 23(b)(2) because they have alleged a
pattern and practice case. Defendants contend that
plaintiffs have not shown their alleged conduct
constituted a pattern of allegedly discriminatory
activity. See International Brotherhood of Teamsters
v. United States, 431 U.S. 324, 336 (1977) ("[A]
pattern or practice would be present only where the
denial of rights consists of something more than an
isolated, sporadic incident, but is repeated, routine, or
of a generalized nature."). Contrary to the usual
pattern and practice case, defendants contend that
plaintiffs' claims of intentional discrimination were
not directed at a company-wide pattern, practice or
policy, but rather to alleged isolated acts of two
supervisors, Dorothy Homony and Christopher
Hornbaker.

Class actions certified under Rule 23(b)(2) are
limited to those cases where the primary relief sought
is injunctive or declaratory relief. E.g., James v. City
of Dallas, 254 F.3d 551, 571 (5th Cir.2001) ("To
maintain an action under Rule 23(b)(2), [injunctive]
relief rather than monetary damages must be the
predominant form of relief the plaintiffs pursue.")
(internal citations and quotations omitted). At least
two courts of appeals have devised a test for
certification of a(b)(2) class. Under this test, where
parties seek monetary relief, a court may only certify
a class if the damages claim is incidental to the

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.3d
Not Reported in F.3d, 2003 WL 355417 (3rd Cir.(Pa.))
(Cite as: 2003 WL 355417 (3rd Cir.(Pa.)))

Page 2

primary claim for injunctive or declaratory relief. *See Molski v. Gleich*, 307 F.3d 1155, 1165 (9th Cir.2002) ("In order to permit certification, the claim for monetary damages must be incidental to the primary claim for injunctive or declaratory relief."); *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 415 (5th Cir.1998) (promulgating a test under which "monetary relief predominates in (b)(2) class actions unless it is incidental to requested injunctive or declaratory relief"). We agree. Because unnamed members of classes certified under Rule 23(b)(2) cannot opt out (as under Rule 23(b)(3)), class cohesion is necessary, and is presumed where a class suffers from a common injury and seeks class-wide injunctive relief. *E.g., Robinson v. Metro-North Commuter Railroad, Co.*, 267 F.3d 147, 163-66 (2d Cir.2001) (discussing the common injury and class-wide injunctive relief requirements of Rule 23(b)(2)). Where monetary relief is requested, cohesion is less apparent, as awarding damages normally entails examination of individual claims. *Id.*

*2 Incidental damages are those "that flow directly from liability to the class *as a whole* on the claims forming the basis of the injunctive or declaratory relief." *Allison,* 151 F.3d at 415 (emphasis in original). Consistent with this analysis, whether damages are "incidental" depends on: (1) whether such damages are of a kind to which class members would be automatically entitled; (2) whether such damages can be computed by "objective standards" and not standards reliant upon "the intangible, subjective differences of each class member's circumstances"; and (3) whether such damages would require additional hearings to determine. *See id.*

As the District Court here found:
    In reviewing the complaint in the case at bar, we cannot find that the primary relief sought is injunctive and/or declaratory in nature. Rather, it appears that the primary relief which plaintiffs seek is monetary in nature and that the request for injunctive/declaratory relief is secondary at best. Indeed, Plaintiffs do not claim that damages in this matter can be computed on the basis of some objective, uniform calculation or in an amount which naturally follows from an entitlement to a declaration or injunction against further harm. In lieu of a claim for damages that automatically flow directly to the class as a whole, Plaintiffs aver that they have been "damaged in an amount to be proven at trial." This requires that evidence of the harm suffered by each plaintiff be produced for the jury's consideration at trial. We therefore conclude that the plaintiffs do not meet the criteria for class

action certification under Rule 23(b)(2). *Barabin v. Aramark,* 210 F.R.D. 152, 161 (E.D.Pa.2002). We see no error.

Rule 23(b)(3)

The District Court found that plaintiffs did not satisfy the requirements for class certification under Rule 23(b)(3). A court may certify a class under Rule 23(b)(3) only if it finds that (1) "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members" and (2) "class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3).

The District Court held that:
    In applying the foregoing principles here, we cannot find that the predominance and superiority prerequisites have been satisfied. Indeed, it is clear from the complaint that while all of the plaintiffs aver that they were "subjected to frequent harassment and unjustified disciplinary sanctions by Caucasian supervisors not imposed on similarly situated Caucasian employees," the circumstances under which those acts of discrimination were committed and the resultant injuries are unique to each individual plaintiff. The plaintiffs' individual claims for damages would therefore require individualized evaluations and findings of the facts and defenses. We thus conclude that the plaintiffs' individual claims would predominate over the common issue of whether the disciplinary measures taken against them were discriminatory in nature. Certification under Rule 23(b)(3) would therefore be inappropriate.
*3 *Barabin,* 210 F.R.D. at 162 (citations omitted). We see no error.

For similar reasons, we hold that plaintiffs' motion for class certification also fails the superiority requirement.

For the reasons set forth, plaintiffs' motion for an interlocutory appeal under Fed.R.Civ.P. 23(f) is denied. [FN1]

    FN1. Plaintiffs' motion for leave to file petition for permission to appeal in excess of page limitation is granted. Plaintiffs' motion for leave to file reply to defendants' answer in opposition to plaintiffs' petition for permission to appeal order denying class certification is granted. Defendants' motion

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.3d
Not Reported in F.3d, 2003 WL 355417 (3rd Cir.(Pa.))
**(Cite as: 2003 WL 355417 (3rd Cir.(Pa.)))**

        to file an answer in excess of the page
        limitation is granted.

Not Reported in F.3d, 2003 WL 355417 (3rd
Cir.(Pa.))

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Tab 2

Westlaw.

Not Reported in F.Supp.                                                                                    Page 1
Not Reported in F.Supp., 1998 WL 372644 (E.D.Pa.), 5 Wage & Hour Cas.2d (BNA) 717
**(Cite as: 1998 WL 372644 (E.D.Pa.))**

▷

United States District Court, E.D. Pennsylvania.
John J. BUNNION, Jr., et al., individually and on
behalf of all others
similarly situated
v.
CONSOLIDATED RAIL CORP., et al.
**No. Civ.A. 97-4877.**

May 14, 1998.

Stephen G. Console, Law Offices of Stephen G.
Console, Phila., PA, USA, Carol A. Mager, Debora
A. O'Neill, Mager, Liebenberg & White,
Philadelphia, PA, USA, Joel C. Schochet, Mager
Liebenberg & White, Philadelphia, PA, for John J.
Bunnion, Jr., Plaintiff.

Stephen G. Console, Carol A. Mager, Debora A.
O'Neill, Joel C. Schochet, (See above), for Anthony
D. Falcone, on Behalf of Themselves and All
Similarly Situated Persons, Plaintiff.

Laurence Z. Shiekman, Brian T. Ortelere, Pepper,
Hamilton & Scheetz, Phila, PA, USA, for
Consolidated Rail Corporation, Defendant.

Laurence Z. Shiekman, Brian T. Ortelere, (See
above), for Consolidated Rail Corporation Matched
Savings Plan, Defendant.

Laurence Z. Shiekman, Brian T. Ortelere, (See
above), for Supplemental Pension Plan of
Consolidated Rail Corporation, and the Fiduciaries
and Administrators of the Foregoing Plans,
Defendant.

Stephen G. Console, Law Offices of Stephen G.
Console, Phila., PA, USA, Carol A. Mager, Debora
A. O'Neill Mager, Liebenberg & White, Philadelphia,
PA, USA, for C. Dyana Reed, Plaintiff.

Stephen G. Console, Carol A. Mager, Debora A.
O'Neill, (See above), for Frances E. Bronson,
Plaintiff.

Stephen G. Console, Carol A. Mager, Debora A.
O'Neill, (See above), for George Hall, Plaintiff.

Stephen G. Console, Carol A. Mager, Debora A.
O'Neill, (See above), for Deborah Daley, Plaintiff.

Stephen G. Console, Carol A. Mager, Debora A.
O'Neill, (See above), for John L. Raybuck, Plaintiff.

Brian T. Ortelere, Pepper, Hamilton & Scheetz,
Phila, PA, USA, for Administrative Committee of the
Conrail Matched Savings Plan, Defendant.

Brian T. Ortelere, (See above), for Supplemental
Pension Plan Administrative Committee, Defendant.

Brian T. Ortelere, (See above), for
Flexible/Medical/Dental Dependent Plan, Life
Insurance, Dismemberment and Long Term
Disability and Retirees Life Insurance Plan,
Severance Plan, Defendant.

Brian T. Ortelere, (See above), for Deborah A.
Melnyk, Defendant.

Brian T. Ortelere, (See above), for Richard J.
Davison, Defendant.

Brian T. Ortelere, (See above), for Peter F. Barr,
Defendant.

Brian T. Ortelere, (See above), for Christian D. Hill,
Defendant.

Brian T. Ortelere, (See above), for Gerhard A.
Thelen, Defendant.

Brian T. Ortelere, (See above), for Marianne S.
Gregory, Defendant.

Brian T. Ortelere, (See above), for John A.
Mckelvey, Defendant.

Brian T. Ortelere, (See above), for Richard D.
Huffman, Defendant.

Brian T. Ortelere, (See above), for Dale A. Shaub,
Fiduciaries and Administrators of the Foregoing
Plans and Other Doe Fiduciaries, Defendant.

Brian T. Ortelere, (See above), for Supplemental
Pension Plan of Consolidated Rail Corporation,
Defendant.

*MEMORANDUM*

BARTLE, J.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                                                Page 2
Not Reported in F.Supp., 1998 WL 372644 (E.D.Pa.), 5 Wage & Hour Cas.2d (BNA) 717
(Cite as: 1998 WL 372644 (E.D.Pa.))

*1 Before the court is the motion of plaintiffs for class certification under Rule 23 of the Federal Rules of Civil Procedure and 29 U.S.C. § 201 of the Fair Labor Standards Act.

This putative class action challenges the propriety of certain actions taken by Consolidated Rail Corporation ("Conrail"), a railway freight-hauling corporation, with respect to its pension plan, its treatment of older workers, and its voluntary separation program ("VSP"). Plaintiffs, all former employees of Conrail who accepted the VSP, have sued Conrail, the Conrail Matched Savings Plan, the Administrative Committee of the Conrail Matched Savings Plan, the Supplemental Pension Plan of Conrail, its administrative committee, the flexible medical/dental dependent plan, life insurance, dismemberment and long-term disability and retirees life insurance plan, severance plan, and the fiduciaries and administrators of these plans. Plaintiffs assert violations of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § § 1001 et seq., the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § § 621 et seq., and the Pennsylvania Wage Payment and Collection Law ("WPCL"), Pa. Stat. Ann. tit. 43, § § 260.1 et seq. They also allege common law claims.

Plaintiffs propose one class composed of "all persons formerly employed by defendant Conrail at any Conrail location who tendered their resignations as part of the March 1, 1996, Conrail separation plan ("VSP")." Amended Compl. ¶ 31 (hereinafter "Compl."). In addition, plaintiffs seek certification of a subclass comprised of "those VSP participants who returned to work for Conrail to positions of employment which Conrail designated as non-employee status" for the claims set forth in Counts VI, VIII, IX, X, XI, XII, and XIII. This subclass also seeks certification under 29 U.S.C. § 201 for its ADEA claim contained in Count VII.

Plaintiffs John J. Bunnion, Jr., Anthony D. Falcone, C. Dyana Reed, Frances E. Bronson, George Hall, Deborah Daley and John Raybuck seek to be the designated class representatives of the main class, with plaintiffs Bunnion, Falcone, Reed, Daley, and Raybuck seeking to represent the subclass. Plaintiffs propose Carol A. Mager, Esquire and Debora A. O'Neill, Esquire of Mager Liebenberg & White as well as Stephen G. Console, Esquire, Law Offices of Stephen G. Console, as class counsel.

I

According to plaintiffs' amended complaint, Conrail provides certain benefit plans to its employees. These include a Matched Savings Plan/Employee Stock Ownership Plan ("ESOP"), [FN1] APAR and APAR Plus, [FN2] life insurance, vacation and holiday benefits, medical and dental plans, sick-time leave, short-term disability benefits, long-term disability benefits, a Supplemental Pension Plan, a long-term incentive plan, tuition reimbursement as well as "other paid leave and stock purchase plans." Compl. ¶ 40.

> FN1. This plan, also known as an "ESOP," was described at length in a prior opinion dealing with three other class actions against Conrail. See Bennett v. Conrail Matched Savings Plan Admin. Comm., Nos. CIV. A. 97-4535, 97-5017, 97-5345, 1997 WL 700538 (E.D.Pa. Oct.30, 1997).

> FN2. Plaintiffs do not define or explain these acronyms.

On February 21, 1996 Conrail declared that it would be eliminating 900 of its employees over the next few months. To achieve this job reduction, Conrail announced on March 1, 1996, its "four stage separation plan." Stage 1 was labeled a "Voluntary Retirement Program" and was for those non-union employees who would be 55 years of age or older by February 28, 1997. Stage 2, a Voluntary Separation Program ("VSP"), was applicable to "non-union employees with 15 years of continuous Conrail service who are not covered under Stage 1 and whose applications are accepted by [Conrail]." Compl. ¶ 58. Both Stages 1 and 2 were offered immediately and simultaneously. Stages 3 and 4 were entitled "Involuntary Staff Rationalization" and the "Workforce Redeployment Program" respectively. Compl. ¶ 58.

*2 The putative class accepted the VSP, the offering of Stage 2, by April 19, 1996. Plaintiffs contend that the VSP was "devised for the purpose of substantially reducing defendants' costs of providing benefits to employees by interfering with the attainment of pension and welfare benefits by long service Conrail employees." Compl. ¶ 54. Not only was the VSP designed to deprive employees of benefits, but the plaintiffs aver that Conrail management continually and intentionally misrepresented certain facts regarding the VSP. In particular, the defendants allegedly "led the plaintiffs and other employees of Conrail to believe that if they did not accept the terms of the VSP and voluntarily terminate their

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                                     Page 3
Not Reported in F.Supp., 1998 WL 372644 (E.D.Pa.), 5 Wage & Hour Cas.2d (BNA) 717
**(Cite as: 1998 WL 372644 (E.D.Pa.))**

employment, they would be involuntarily terminated from their jobs, without any severance." Compl. ¶ 56. Plaintiffs claim that Conrail constantly reminded employees that they would soon lose their jobs and that accepting the VSP was a "dignified way to leave the company." [FN3] Compl. ¶ 62. Conrail also led plaintiffs to believe that "subsequent packages, if offered, would not be as favorable." Compl. ¶ 62. Incident to acceptance of the VSP, plaintiffs were "induced" to sign a general release of all claims. Compl. ¶¶ 61, 63.

> FN3. According to plaintiffs, in 1995, Conrail removed some involuntarily terminated employees by police escort. The reference to a "dignified" way to leave the company, plaintiffs aver, was an implicit threat of a similar undignified removal. Compl. ¶ 64.

Plaintiffs allege that had they stayed and not accepted the VSP, they would have received substantially greater benefits than those provided by the VSP. Purportedly, those who did not accept the VSP but remained Conrail employees later received a severance package of greater value, as well as a staying bonus. Compl. ¶ 84. Further, Conrail never implemented Stages 3 and 4 of the 4 stage separation plan, and no Conrail facility has yet closed.

While all the members of the putative class accepted the VSP at or around the same time, their actual departure from Conrail varied, as Conrail had "retained the right to delay the actual termination of any employee who accepted [the VSP] up to one year after the date of the acceptance." Compl. ¶ 71. When plaintiffs did eventually leave, approximately 30% of them returned to work at Conrail as "independent contractors." Compl. ¶ 81. Often they performed the exact same work they had formerly done. However, as independent contractors, they earned a lower salary, could not participate in or accrue service credit for Conrail pension plans, and received no Conrail benefits. One such named plaintiff, Anthony Falcone, was terminated one day and started work as an independent contractor the next. Although classified as independent contractors, plaintiffs claim that they were in reality Conrail employees and therefore entitled to all Conrail employee compensation levels and benefits.

Plaintiffs also aver that the VSP "disparately treated and impacted on older workers." Compl. ¶ 100. As further evidence of the fact that the VSP was not motivated by a reduction in available work,

before the announcement of the March 1, 1996 separation plan (at a time when upon information and belief Conrail knew about the intended downsizing), Conrail hired several former independent contractors under age 40, converting them into full-benefit employees.
*3 Compl. ¶ 103.

Conrail will soon cease to exist. Subsequent to Conrail's offering of the VSP, Norfolk Southern Corporation and CSX Corporation agreed to acquire Conrail jointly. In April, 1997, they formed a new entity which made a tender offer to acquire Conrail's outstanding stock. This offer was successful. By early June, 1997, the new entity created by CSX and Norfolk Southern merged into Conrail. "[P]ending governmental approval, Conrail will go out of existence and its assets will be divided between CSX and Norfolk Southern." Compl. ¶ 53.

II

In determining a motion for class action certification, we do not examine the merits of the plaintiffs' underlying claims. *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177-78, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). Rather, we focus on the requirements of Rule 23 of the Federal Rules of Civil Procedure. In order to obtain class certification plaintiffs must meet the four requirements of Rule 23(a) of the Federal Rules of Civil Procedure and at least one part of Rule 23(b). *Id.* at 162-63.

Plaintiffs have the burden of proving that this action meets the certification requirements. *Heastie v. Community Bank of Greater Peoria,* 125 F.R.D. 669, 673 (N.D.Ill.1989). The Supreme Court has explained that "[c]lass actions serve an important function in our system of civil justice." *Gulf Oil Co. v. Bernard,* 452 U.S. 89, 99, 101 S.Ct. 2193, 68 L.Ed.2d 693 (1981). In keeping with this policy, the Court of Appeals for the Third Circuit has adopted a liberal construction of Rule 23. *Eisenberg v. Gagnon,* 766 F.2d 770, 785 (3d Cir.), cert. denied, 474 U.S. 946 (1985). The court has declared that "the interests of justice require that in a doubtful case ... any error, if there is to be one, should be committed in favor of allowing a class action." *Id.*

We will first examine whether plaintiffs meet the requirements of Rule 23(a) which provides:
> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                                                                                              Page 4
Not Reported in F.Supp., 1998 WL 372644 (E.D.Pa.), 5 Wage & Hour Cas.2d (BNA) 717
**(Cite as: 1998 WL 372644 (E.D.Pa.))**

or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Defendants do not dispute that plaintiffs meet the numerosity and adequacy requirements of Rule 23(a). We agree. The main class is predicted to number approximately 600 persons, while the subclass will contain approximately 70. Further, the representative plaintiffs and their proposed class counsel will adequately represent the class and subclass.

However, defendants vigorously contest plaintiffs' ability to meet 23(a)(2), the commonality requirement, as well as 23(a)(3), the typicality requirement. Defendants essentially contend that plaintiffs' amended complaint contains too many individualized aspects to meet Rule 23(a). See Georgine v. Amchem Prod. Inc., 83 F.3d 610, 624 (3d Cir.1996), aff'd sub nom, Amchem Prod. Inc. v. Windsor, 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). [FN4]

> FN4. Overall, we find the Georgine case inapplicable here. In Georgine, the Third Circuit held that the commonality barrier is higher in a personal injury damages class action which seeks to resolve noncommon issues of liability and damages. Georgine, 83 F.3d at 627. There, some plaintiffs had various asbestos-related diseases while others had been exposed to asbestos, but no disease had yet manifested itself. The court found these factual and legal differences too extreme to sustain a finding of commonality or typicality.

*4 While the concepts of commonality and typicality are similar, they remain distinct components of Rule 23(a). Id. at 632. Commonality concerns the nature of the proposed class while typicality concerns the sufficiency of the named plaintiffs. Hassine v. Jeffes, 846 F.2d 169, 176 n. 4 (3d Cir.1988). "The commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." [FN5] Baby Neal For and By Kanter v. Casey, 43 F.3d 48, 56 (3d Cir.1994). For this reason, the commonality requirement is "easily met." Id. Factual differences may exist among plaintiffs because they do not need to share identical claims. Id. Even where facts unique to each plaintiff may be relevant, a class may still be certified, but later bifurcated. Id. at 57.

> FN5. This is unlike the (b)(3) portion of Rule 23 which requires that common issues predominate.

The typicality inquiry focuses on "whether 'the named plaintiff's individual circumstances are markedly different or ... the legal theory upon which the claims are based differs from that upon which the claims of the class members will perforce be based." Eisenberg, 766 F.2d at 786. A class meets this requirement if the named plaintiffs and the proposed class "challenge[ ] the same unlawful conduct." Baby Neal, 43 F.3d at 58. Factual differences between named plaintiffs and the class members do not defeat a motion for class certification if "the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members, and if it is based on the same legal theory." Id. "Indeed even relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories." Id. According to the Third Circuit, we must essentially discern whether potential conflicts exist within the class. Georgine, 83 F.3d at 632.

A.

Counts I, VI, and VIII assert ERISA claims for interference with benefits in violation of 29 U.S.C. § 1140. According to plaintiffs, the defendants created the VSP with the intention of interfering with their ERISA benefits and also coerced the plaintiffs to accept the VSP. [FN6] Compl. ¶ ¶ 122-23. As to Count VIII, the subclass claims that the defendants "purposefully returned these class members to nominally non-employee positions (which were actually employee positions) and refused to acknowledge their employee status for the purpose of interfering with those employees' attainment of benefits in violation of ... ERISA." Compl. ¶ 161.

> FN6. Counts I and VI are asserted on behalf of the entire class for interference with ERISA benefits and ESOP benefits, respectively.

To prevail under § 1140, a plaintiff must produce evidence showing: "(1) prohibited employer conduct; (2) taken for the purpose of interfering; (3) with the attainment of any right to which the employee may become entitled." Dewitt v. Penn-Del Directory Corp., 106 F.3d 514, 522 (3d Cir.1997).

Defendants contend that whether an employee left voluntarily or was coerced to accept the VSP, and whether the defendants withheld information

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                                                 Page 5
Not Reported in F.Supp., 1998 WL 372644 (E.D.Pa.), 5 Wage & Hour Cas.2d (BNA) 717
**(Cite as: 1998 WL 372644 (E.D.Pa.))**

regarding future benefits are individualized inquiries, inappropriate for resolution in a class action. Defendants assert that claims involving coercion are particularly inappropriate for class action citing _Ungar v. Dunkin' Donuts of America, Inc.,_ 531 F.2d 1211, 1226 (3d Cir.), cert. denied, 429 U.S. 823, 97 S.Ct. 74, 50 L.Ed.2d 84 (1976). Plaintiffs counter that the focus of a § 1140 ERISA claim is on the conduct of the defendants. The reasons that plaintiffs accepted the VSP, such as through coercion, are irrelevant.

**\*5** Certification of an ERISA action predicated upon § 1140 may be proper if the requirements of Rule 23 are met. _Fischer v. Philadelphia Elec. Co.,_ 96 F.3d 1533, 1543 (3d Cir.1996), cert. denied, 520 U.S. 1116, 117 S.Ct. 1247, 137 L.Ed.2d 329 (1997). We find that plaintiffs meet the commonality requirement of 23(a)(2) on Counts I, VI, and VIII. The proposed classes of plaintiffs need only have one question of law or fact in common. _Baby Neal,_ 43 F.3d at 56. As to Counts I and VI, the obvious question in common is whether the defendants created the VSP with the intention of interfering with plaintiffs' ERISA and ESOP benefits. Key facts in common include receipt of ERISA benefits, participation in the ESOP prior to leaving Conrail, and acceptance of the VSP by all plaintiffs. Compl. ¶¶ 31, 121, 151. As to Count VIII, a common question is whether the defendants returned the subclass members as independent contractors for the purpose of interfering with the attainment of their employee benefits. All subclass members have in common that they accepted the VSP, returned to work with Conrail to what Conrail deemed to be "non-employee" positions and therefore did not receive benefits designated for only Conrail employees.

We also find that the proposed class and subclass meet the typicality requirements on Counts I, VI, and VIII. The named plaintiffs and their proposed class members all "challenge [ ] the same unlawful conduct," that is, the alleged interference with ERISA benefits. _Baby Neal,_ 43 F.3d at 58. We see no potential conflicts between the representative plaintiffs and their proposed class and subclass members. [FN7] _Georgine,_ 83 F.3d at 632.

> FN7. We do not agree with defendants' assertions that individual issues control. Neither is such an inquiry relevant since plaintiffs only need to show one common issue. We do not see how the circumstances surrounding plaintiffs' acceptance of the VSP is pertinent to the issue of whether defendants' conduct in devising and offering

the VSP was with the intent of interfering with plaintiffs' receipt of ERISA benefits. The instant action is unlike the _Ungar_ case cited by defendants. _Ungar_ was an antitrust case which required proof of coercion as an element of illegal tying. _Ungar,_ 531 F.2d at 1226. Coercion is not an element here.

**B.**

Counts II and XIII claim that defendants breached their fiduciary duties in violation of ERISA, 29 U.S.C. § § 1104, 1105. In Count II, the entire class alleges that defendants failed to explain fully "the likelihood that they could remain in the employ of Conrail for the foreseeable future had they not elected the VSP" and failed to disclose the effect of their participation in the VSP on their "right to participate in future distributions from the ESOP." Compl. ¶ 128. But for these misrepresentations, plaintiffs allege that they would have remained Conrail employees. In Count XIII, the subclass avers that defendants failed to "enforce the various provisions of the applicable plans in a manner consistent with applicable law." Compl. ¶ 183. Without these breaches of fiduciary duty, the subclass of plaintiffs would have been able to participate in the ERISA plans.

As we discussed at length in our prior opinion which resolved the defendants' motion to dismiss, ERISA fiduciaries must act solely in the interest of the Plan participants. _See Bunnion v. Consolidated Rail Corp.,_ No. CIV. A. 97- 4877, 1998 WL 32715, at \*5 (E.D.Pa. Jan. 6, 1998). They fail to do so if they make material misrepresentations or omissions. _Id._

Citing _Sprague v. General Motors Corp.,_ 133 F.3d 388 (6th Cir.1998), defendants aver that individual issues preclude a finding of commonality or typicality. According to defendants, the plaintiffs may have relied on a myriad of different representations to which not all plaintiffs were exposed. Even though plaintiffs point to some uniform information allegedly sent to all potential plaintiffs, they cannot say to what extent each plaintiff actually relied upon such disclosures. Defendants assert that this claim should not be certified as a class because it would require an inquiry of each individual plaintiff--what each read or heard or on what, if any, representations each relied. Moreover, according to defendants, whether a statement was "material" to a plaintiff depends upon that individual plaintiff.

**\*6** Where appropriate, ERISA breach of fiduciary

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                                                    Page 6
Not Reported in F.Supp., 1998 WL 372644 (E.D.Pa.), 5 Wage & Hour Cas.2d (BNA) 717
**(Cite as: 1998 WL 372644 (E.D.Pa.))**

duty claims may be certified as a class action. *See, e.g., In re Unisys Corp. Retiree Med. Benefit "ERISA" Litig.,* 57 F.3d 1255 (3d Cir.1995), *cert, denied,* 517 U.S. 1103 (1996); *Fischer,* 96 F.3d 1533. In the amended complaint, plaintiffs allege a variety of misrepresentations and omissions. Plaintiffs aver that defendants failed to mention material information to all employees. Compl. ¶ 60. Further, some alleged misrepresentations took the form of company-wide distributions of documents or e-mails. Compl. ¶ ¶ 63, 67; Plaintiffs' Motion for Class Certification Exs. B, C, D. Conrail maintained an electronic bulletin board to post the answers to frequently asked questions regarding the VSP. Plaintiffs' Motion for Class Certification Ex. J at 123-25. Conrail also held various information sessions on the VSP at different locations. However, according to one plaintiff who attended two such sessions, the information communicated was identical, "like they were reading from a script." Plaintiffs' Motion for Class Certification Ex. K at 71-72. Other alleged misrepresentations were oral, made to a portion of the class, or in some circumstances to only one individual plaintiff. Compl. ¶ 66.

A court may further subdivide a class into subclasses when necessary to compensate for individual issues. *Wetzel v. Liberty Mut. Ins. Co.,* 508 F.2d 239, 252-53 (3d Cir.), *cert. denied,* 421 U.S. 1011 (1975). In a case similar to the instant one, a court in this district has allowed a class action for breach of fiduciary duty where, in addition to company-wide representations, there were specific representations made to only certain plaintiffs. *In re Unisys Corp. Retiree Med. Benefits ERISA Litig.,* No. CIV. A. 969, 1994 WL 284079, at *27 (E.D. Pa. June 23, 1994), *aff'd,* 57 F.3d 1255 (3d Cir.1995). Chief Judge Cahn stated, "because some plaintiffs have stronger cases than others based on their specific inquiries and the information given to them personally, the court finds that subclasses, and possibly even individual hearings will be necessary to adjudicate these claims." *Id.* The court did not hold that these individual representations precluded the continuance of the action as a class action.

Further, we agree with plaintiffs that the focus on a breach of fiduciary duty claim is the conduct of the defendants, not the plaintiffs. For this reason, reliance of plaintiffs is immaterial at the liability phase. Further, the materiality of a misrepresentation does not differ from plaintiff to plaintiff as defendants contend. In the context of an ERISA case, materiality is "a mixed question of law and fact, ultimately turning on whether 'there is a substantial likelihood

that [the misrepresentation] would mislead a reasonable employee in making an adequately informed decision about if and when to retire." ' *Fischer,* 96 F.3d at 1538 (quoting *Fischer v. Philadelphia Elec. Co.,* 994 F.2d 130, 135 (3d Cir.1993)). The standard is one of a reasonable employee, not an actual one. Therefore, we find that defendants' contentions that individual issues of materiality and reliance would predominate to be without merit. [FN8]

> FN8. Whether common issues predominate is irrelevant under Rule 23(a). Plaintiffs need only an issue of law or fact in common. *Baby Neal,* 43 F.3d at 56. We also find the defendants' citation of and reliance upon *Sprague v. General Motors Corp.,* 133 F.3d 388 (6th Cir.1998), *petition for cert, filed,* (U.S. April 6, 1998) (No. 97-1639), to be inapposite with respect to this ERISA breach of fiduciary claim. In *Sprague,* the Court of Appeals for the Sixth Circuit held that class certification on the claims of estoppel and breach of a "bilateral" contract was an abuse of discretion. *Id.* at 398-99. The breach of contract claim averred that defendant General Motors had made a "side deal" with each individual plaintiff. *Id.* at 398. The plaintiffs had signed differing forms, or no form at all, in the acceptance of this side deal. *Id.* Because the representations were not uniform, and issues of reliance were individualized, the claims of plaintiffs were not common and the representative plaintiffs could not be typical of the class. *Id.* at 398-99. As we discussed above, issues of reliance are not relevant in this ERISA claim. Further, we are confronted with predominantly uniform representations.

*7 Under the circumstances presented, we conclude that plaintiffs meet the commonality and typicality requirements of Rule 23(a) on Count II. The proposed class of plaintiffs have more than one question of law or fact in common. The obvious common issue is whether the company-wide documents or e-mails were misrepresentations which breached the fiduciary duties defendants owed the plaintiffs. Further, plaintiffs claim that the defendants uniformly omitted material information to the class. Because the plaintiffs all challenge the same unlawful conduct, that is, alleged company-wide misrepresentations and omissions, the representative plaintiffs are typical of the class. The fact that some individual plaintiffs may also have received personal

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                                                                    Page 7
Not Reported in F.Supp., 1998 WL 372644 (E.D.Pa.), 5 Wage & Hour Cas.2d (BNA) 717
(Cite as: 1998 WL 372644 (E.D.Pa.))

misrepresentations from Conrail managers or supervisors does not pose a conflict within the class. See *In re Unisys,* 1994 WL 284079, at \*27. Where "plaintiffs' evidence appears to follow a pattern, and the people they claim made the representations are largely the same people," oral representations do not preclude a finding of typicality under Rule 23(a)(2). *Bittinger v. Tecumseh Prod. Co.,* 123 F.3d 877, 884 (6th Cir.1997).

The proposed subclass of plaintiffs in Count XIII also meets the typicality and commonality requirements. A common issue is whether defendants breached their fiduciary duties in failing to enforce the plans to include the subclass members. The plans at issue were the same, and plaintiffs aver that the defendants uniformly interpreted the plans to exclude them. Because the same conduct is at issue, the representative plaintiffs are also typical of the class.

### C.

Counts III and IX assert claims for benefits pursuant to 29 U.S.C. § 1132(a)(1)(B). Count III reads that "[b]y failing to provide the class members with the benefits to which they were entitled under defendant Conrail's employee pension and welfare benefit plans, including without limitation the ESOP plan, defendants violated [ERISA]." Compl. ¶ 137. In Count IX, the subclass asserts that defendants violated ERISA by "failing to provide the class members who were returned to work by Conrail into nominally non-employee status with the benefits to which they were entitled under defendant Conrail's" ERISA plans. Compl. ¶ 166.

Pursuant to ERISA, 29 U.S.C. § 1132(a)(1)(B), a plaintiff may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."

Defendants first assert that the named plaintiffs are not typical of the class because the named plaintiffs have exhausted their administrative remedies while the other members of the class have not done so. Plaintiffs counter that administrative remedies need not be exhausted because it would be futile to do so.

Exhaustion of administrative remedies is a prerequisite to a plaintiff "seek [ing] to enforce the terms of the Plan" in court. *Berger v. Edgewater Steel Co.,* 911 F.2d 911, 916 (3d Cir.1990), cert. denied, 499 U.S. 920, 111 S.Ct. 1310, 113 L.Ed.2d 244 (1991); *Thomas v. Kemper Nat'l Ins. Co.,* 984 F.Supp. 885, 890 (E.D.Pa.1997). This requirement is

"strictly enforced" unless proceeding through the administrative remedies would be futile. *Berger,* 911 F.2d at 916.

\*8 The named plaintiffs requested benefits from the applicable Plans and upon their denial petitioned the Plans for appellate review. Attached as Exhibit P to the defendants' opposition to the motion for class certification are the various Plan Committees' written rationale for the denial of these benefits. The letter from each Committee is basically the same. The Committees state that because subclass representative plaintiffs Bunnion, Falcone, Daley, Raybuck, and Reed did not receive earnings directly from Conrail which were subject to federal income tax withholding by Conrail, they were not "employees" as defined by the Plans and thus not eligible for receipt of benefits under the Plans. As to representative plaintiffs Hall and Bronson, members of the class but not the subclass, the Committees state in a footnote that because they elected the VSP and did not return to perform any services for Conrail, they are also not employees and therefore not eligible for Plan benefits. One such letter from the Matched Savings Plan states that determinations of whether a person is an employee is "determined, in part, by looking to that individual's relationships with the Plan sponsor, including the sources and the nature of the federal income tax treatment of the individual's compensation. In other words, the claims can be properly considered only on an individualized basis." Defendants' Response in Opposition to Plaintiffs' Motion for Class Certification Ex. P at page 2.

Based upon the reasons given by the Plans for the denial of benefits, we find that requiring all members of the class to exhaust their administrative remedies would be futile. The overall class proposed by plaintiffs contains those persons who accepted the VSP, including those who later returned to Conrail as independent contractors and those who never returned to work at Conrail. The subclass comprises those members of the class who accepted the VSP and then returned to work into what Conrail designated as non-employee positions. The representative plaintiffs, members of the class and subclass, have been denied Plan benefits for the very same reasons that qualify them as members of the class--acceptance of the VSP and either a complete absence of further performance at Conrail or performance as an independent contractor. We find the statement in the one letter regarding a need to look at each individual to determine if he or she was an "employee" is not significant for purposes of the pending motion. [FN9]

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                                                                    Page 8
Not Reported in F.Supp., 1998 WL 372644 (E.D.Pa.), 5 Wage & Hour Cas.2d (BNA) 717
**(Cite as: 1998 WL 372644 (E.D.Pa.))**

FN9. The letter was written February 13, 1998, after commencement of the instant action and two days after the plaintiffs' filed their motion for class certification.

Further, we find that the requirements of commonality and typicality have been met as to Counts III and IX. The class members jointly allege that the ERISA Plans wrongfully denied benefits to those who accepted the VSP. The subclass members all have in common the fact that they accepted the VSP and then returned to work for Conrail on an independent contractor basis. They jointly allege that their re-employment status entitles them to benefits. The resolution of both counts will depend upon the interpretation and legality of plan terms. We further find that the situations of the representative plaintiffs are typical of those members of the class and subclass. Defendants note that each employee who returned as an independent contractor negotiated a separate contract, which varied among individuals, upon his or her return. However, regardless of the exact language of the contract negotiated, the subclass plaintiffs all have been classified by Conrail as independent contractors, or non-employees. In this respect they are the same. The claims of the representative subclass plaintiffs do not conflict with those of the proposed members of the subclass.

### D.

*9 In Counts IV and V plaintiffs assert the common law claims of fraud and negligent misrepresentation. As we held in our prior opinion, because of the broad reach of ERISA preemption, these claims may only assert fraud and misrepresentation regarding employment, not the employee benefit plans. *Bunnion,* 1998 WL 32715 at *8.

Defendants first note that the potential plaintiffs reside in different states, which presumably maintain different standards or requirements for these common law claims. Because the laws differ between states, and a federal court cannot create a federal version of state law claims, defendants contend that this legal difference precludes class certification. However, plaintiffs argue that sufficient contacts exist for Pennsylvania law to apply to the entire class.

The Supreme Court has held that the choice of law in a nationwide class action depends upon the significance of contacts with the state whose law the parties seek to apply. *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 821-22, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985). The Court held that the state

"must have a 'significant contact or significant aggregation of contacts' to the claims asserted by each member of the plaintiff class, contacts 'creating state interests,' in order to ensure that the choice of [ ] law is not arbitrary or unfair." *Id.* (quoting *Allstate Ins. Co. v. Hague,* 449 U.S. 302, 312-13, 101 S.Ct. 633, 66 L.Ed.2d 521 (1981)). In *Phillips,* the Supreme Court found such significant contacts lacking. The fact that Phillips Petroleum Company owned property and conducted substantial business in Kansas was not enough. *Id.* at 819.

Utilizing this significant contact analysis, a court in our district found significant contact existed such that Pennsylvania law could apply in a securities' fraud case. *Gruber v. Price Waterhouse,* 117 F.R.D. 75, 82 (E.D.Pa.1987). The corporation whose stock was at the center of the case maintained its principal place of business and its offices in Pennsylvania. *Id.* Further, a majority of the auditing work and the corporation's "financial statements were prepared in and disseminated from Pennsylvania." *Id.*

Conrail is incorporated and licensed to do business in Pennsylvania. Its principal place of business is in Philadelphia. Compl. ¶ 27. Further, plaintiffs' amended complaint avers that the Plans at issue in this lawsuit are administered in the Eastern District of Pennsylvania. Compl. ¶ 30. Indeed, the letters from the Plans rejecting the administrative appeals of the representative plaintiffs were sent from Conrail's Philadelphia address. Defendants' Response in Opposition to the Motion for Class Certification, Ex. P. Given the significant amount of contacts in Pennsylvania, we find that its law should apply. [FN10]

FN10. We believe the case of *In re Rhone-Poulenc Rorer Inc.,* 51 F.3d 1293 (7th Cir.), *cert. denied,* 516 U.S. 867, 116 S.Ct. 184, 133 L.Ed.2d 122 (1995), cited by the defendants, is inapplicable. In that case, the Seventh Circuit held that a court could not apply a legal standard which represented an amalgam of the various state laws at issue, one that "does not exist anywhere in the world." *Id.* at 1300. The significant contact test was not applied. Here, plaintiffs seek to apply Pennsylvania law, not some amalgam of legal principles.

Defendants contend that even assuming Pennsylvania law would apply, individual issues of reliance thwart class certification on these counts. Plaintiffs concede that reliance is an element of these

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                                                                    Page 9
Not Reported in F.Supp., 1998 WL 372644 (E.D.Pa.), 5 Wage & Hour Cas.2d (BNA) 717
**(Cite as: 1998 WL 372644 (E.D.Pa.))**

claims of fraud and negligent misrepresentation, but assert that reliance issues will not defeat class certification because of the common course of fraudulent action perpetrated by the defendants. Further, reliance is presumed where material information has been omitted. [FN11] As an alternative, plaintiffs contend that we can deal with reliance issues later in the litigation.

> FN11. We agree that reliance may be presumed in certain types of cases, such as securities fraud. See *Eisenberg v. Gagnon,* 766 F.2d 770, 786 (3d Cir.1985).

*10 We find that the proposed class meets the requirements of commonality and typicality on the state law claims of fraud and negligence. Plaintiffs aver that they were all led to believe in early 1996 that failure to accept the VSP would result in involuntary termination and were otherwise misled about the prospects of continued employment. Compl. ¶ 56. Whether the alleged statements occurred and whether they misrepresented the facts are common issues of fact and law. Because the same course of conduct is at issue, the misleading statements regarding future employment, the representative plaintiffs are typical and do not conflict with other members of the proposed class.

E.

Counts X avers an action under the WPCL on behalf of the subclass for non-ERISA benefits. The WPCL requires an employer to pay promptly wages, fringe benefits, and wage supplements to its employees. Pa. Stat. Ann. tit. 43, § 260.3 (West 1992). Failure to do so may subject it to a civil suit by its employees, a labor organization, or the Secretary of Labor and Industry as well as possible liquidated damages and criminal penalties. *Id.*

Again, defendants assert that issues unique to each individual plaintiff preclude a finding of commonality or typicality under Rule 23(a). Further, defendants assert that the WPCL only extends to those employees based in Pennsylvania.

One court in our district has held that the WPCL was intended to apply only to those persons employed in Pennsylvania. *Killian v. McCulloch,* 873 F.Supp. 938, 942 (E.D.Pa.1995), *aff'd,* 82 F.3d 406 (3d Cir.1996). The court, after analyzing legislative history, found that the Pennsylvania legislature "has a strong interest in enacting legislation to protect those who work in the Commonwealth, but has almost no interest in extending that protection to those who

work outside Pennsylvania." *Id.* Rather, "its primary aim is to ensure that those who are employed *in Pennsylvania* receive compensation for their work." *Id.* (emphasis added). As support for this conclusion, the court noted that no reported case allowed an out-of-state employee to assert a WPCL action in Pennsylvania.

We find this reasoning persuasive. Proposed representatives of the subclass Bunnion, Falcone, Daley, and Raybuck all reside in Pennsylvania according to the amended complaint, but no information is provided regarding the location of their work as an "independent contractor." [FN12] Compl. ¶ ¶ 6-10, 20-25. Representative plaintiff Reed is a resident of Nevada. Plaintiffs provide no information regarding the number of members of the proposed subclass who have worked for Conrail in Pennsylvania. As such, we are unable to discern whether the proposed representatives are typical of the subclass. On a claim under the WPCL, whether or not the plaintiffs worked in Pennsylvania is extremely relevant. Therefore, we find that the proposed subclass does not meet the commonality or typicality requirements of Rule 23(a).

> FN12. Later in the amended complaint, we learn that plaintiffs Bunnion and Falcone worked at the Island Avenue facility. Compl. ¶ 66(b). The court believes that this site is located in Pennsylvania.

F.

*11 Counts XI sets forth a breach of contract claim on behalf of the subclass while Count XII seeks unjust enrichment on behalf of the entire class. As we noted in our prior opinion, these claims are limited to non-ERISA benefits. *Bunnion,* 1998 WL 32715 at *9.

Again, defendants assert that issues unique to each individual plaintiff preclude a finding of commonality or typicality under Rule 23(a). As to the breach of contract claims, defendants note that the contract for each employee was unique and therefore commonality and typicality do not and cannot exist. For instance, deposition testimony reveals that plaintiff Daley could only be terminated for cause, while plaintiff Hall worked under no written contract at all. *See* Defendants' Response in Opposition to the Motion for Class Certification Exs. H at 158, and I at 42. Plaintiffs aver that the defendants created this scheme, of differing contracts, so they cannot now contest class certification on these grounds. [FN13] Further, plaintiffs contend that Conrail is the actual employer who excluded the subclass from benefits

Not Reported in F.Supp.                                                                                    Page 10
Not Reported in F.Supp., 1998 WL 372644 (E.D.Pa.), 5 Wage & Hour Cas.2d (BNA) 717
**(Cite as: 1998 WL 372644 (E.D.Pa.))**

because of their arbitrary classification as non-employees. Plaintiffs also claim that subclasses can be created if necessary.

> FN13. Plaintiffs cited the case of *Christopher v. Mobil Oil Corp.,* 950 F.2d 1209, 1221 (5th Cir.), *cert. denied,* 506 U.S. 820, 113 S.Ct. 68, 121 L.Ed.2d 35 (1992), in support of this contention. However that case, to the extent it is at all relevant, did not deal with class certification.

We note initially that it is unclear whether plaintiffs are claiming that a contract existed prior to plaintiffs' acceptance of the VSP or at the time of their return to work at Conrail as independent contractors. In either case, the subclass plaintiffs do not contest defendants' assertions that their contracts differ. Moreover, evidently not all subclass plaintiffs even had *a* contract.

Thus, in these circumstances we conclude that typicality does not exist. Commonality may exist because all subclass plaintiffs returned to work but were classified as independent contractors by Conrail. However, we find that on the breach of contract claim the representative plaintiffs are not typical of the subclass because their circumstances are "markedly different." *Eisenberg,* 766 F.2d at 786. Some had contracts, which varied, and at least one had no contract at all. Because potential conflicts may arise between the terms of the various contracts or between those plaintiffs with and without contracts, we conclude that the typicality requirement is not met. *See Georgine,* 83 F.2d at 632.

The claim for unjust enrichment in Count XII asserts that defendants "have been unjustly enriched in that they have or will receive certain monies that they would not have obtained or retained but for their wrongful conduct at the expense of the plaintiffs and the plaintiff class." Compl. ¶ 178. Defendants maintain that even if there is no contract, a court or jury would need to look at each individual "deal" to see the basis for an unjust enrichment claim.

We find that we are confronted with insufficient information to determine whether this count meets the commonality and typicality requirements. Unjust enrichment is an equitable doctrine that, in our view, depends upon the analysis of each individual situation. *See Hershey Foods Corp. v. Ralph Chapek, Inc.,* 828 F.2d 989, 999 (3d Cir.1987). As such, the claims of the representative plaintiffs are not, and cannot be, typical of those of the rest of the class.

Further, we do not know what the "wrongful conduct" mentioned in the amended complaint references. Without this knowledge we cannot determine whether the plaintiffs are all challenging the same common course of conduct. The burden is on the plaintiffs to prove that this count meets the certification requirements. Because they have failed to do so, we hold that this count is inappropriate for class certification.

G.

**\*12** The entire proposed class of plaintiffs sets forth a federal common law claim of equitable estoppel in Count XIV. Plaintiffs assert that by virtue of their material misrepresentations, "defendants are estopped from denying, or interpreting the Conrail plans so as to deny benefits under the Plans to plaintiffs and members of the plaintiff class." Compl. ¶ 192.

According to *Curcio v. John Hancock Mut. Life Ins. Co.,* 33 F.3d 226, 235 (3d Cir.1994), the elements of equitable estoppel are: "(1) a material representation, (2) reasonable and detrimental reliance upon the representation, and (3) extraordinary circumstances." Plaintiffs aver that the misrepresentations discussed earlier in this opinion were material, intentional, and constituted the necessary extraordinary circumstances.

Defendants contend that this claim is the least susceptible to class action certification because of the individual proof needed as to the reliance element. Plaintiffs claim that individual issues of reliance are not sufficient to preclude class certification and that *Curcio* shifted the burden of disproving reliance to defendants.

We do not read *Curcio* as shifting the burden of disproving reliance to the defendants. An examination under Rule 23(a) only requires we find a common issue of law or fact and that the representative plaintiffs are typical of the class. We find that these requirements are met on this count. The class of plaintiffs allegedly all accepted the VSP based upon the common representations by defendants and they all claim that these representations were material and constituted extraordinary circumstances. At this juncture, we see no conflict or potential for conflict between the representative plaintiffs and the proposed class.

III

As to Counts I, II, III, IV, V, VI, VIII, IX, XIII and XIV, which we find meet the requirements of Rule 23(a), we must next consider whether they meet at

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                                                                  Page 11
Not Reported in F.Supp., 1998 WL 372644 (E.D.Pa.), 5 Wage & Hour Cas.2d (BNA) 717
**(Cite as: 1998 WL 372644 (E.D.Pa.))**

least one of the requirements under Rule 23(b). If so, we must certify the class without consideration of the merits. *Eisen,* 417 U.S. 156, 177-78, 94 S.Ct. 2140, 40 L.Ed.2d 732. Plaintiffs initially seek certification under 23(b)(1)(A), 23(b)(1)(B), and 23(b)(2) which state in relevant part:

An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

(1) the prosecution of separate actions by or against individual members of the class would create a risk of

(A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or

(B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests or;

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; [ ]

\* \* \*

**A.**

\*13 Certification under either (b)(1) or (b)(2) constitutes a mandatory class. That is, the class members may not opt out of the action and "pursue separate litigation that might prejudice other class members or the defendant." 5 James Wm. Moore, Moore's Federal Practice § 23.40[2] (3d ed.1998) [hereinafter Moore's]. [FN14]

> FN14. This is unlike certification under 23(b)(3) where a potential class member may do just that.

Certification pursuant to Rule 23(b)(1)(A) is appropriate if it would be inconsistent and damaging to defendants to have portions of an ERISA plan interpreted in different ways by different courts. *Schutte v. Maleski,* No. CIV. A. 93-0961, 1993 WL 218898, at \*9 (E.D. Pa. June 18, 1993). "This provision ... has been construed as requiring a party seeking certification to establish that there is a realistic possibility that separate actions involving the same subject matter will be brought in the absence of a class action." 5 Moore's § 23.41[1]. Actions certified under this portion of Rule 23, seek primarily injunctive or declaratory relief. *Id.* § 23.41[5][c].

Monetary damages may also be sought, but such relief should not predominate. *Id.*

While 23(b)(1)(A) focuses on possible prejudice to the defendants, 23(b)(1)(B) focuses on possible prejudice to the members of the proposed class "and seeks to protect them against situations in which they would be prejudiced by separate litigation." 5 Moore's § 23.42[1]. Certification under (b)(1)(B) may be appropriate if this action could potentially harm, or as a practical matter would be dispositive of, claims by other class members who were not represented in that suit. *Lloyd v. City of Philadelphia,* 121 F.R.D. 246, 251 (E.D.Pa.1988).

Certifications under both 23(b)(1)(A) and 23(b)(1)(B) are common in labor relations cases. 5 Moore's § § 23.41[4], 23.42[3][c]. "Because a defendant often provides unitary treatment to all members of the putative class [in] such an area, a putative class member's rights may be implicated by litigation brought by other class members." *Id.* § 23.42[3][c].

Defendants dispute the applicability of 23(b)(1)(A) and (B) because they contend that the dissimilarity of plaintiffs' claims preclude it. According to defendants, (b)(1) should be limited to those cases with no or few individual questions.

While Rule 23(b)(1) contains no such explicit requirement, a certain level of similarity is necessary in order for multiple suits to risk prejudicing either the defendants, or plaintiffs who could be members of a class. In a fraud case in this district, the court held that "because of the individual issues of reliance endemic to proving fraud ... resolution of an individual claim will not necessarily either be dispositive of the interests of the non-party class members, or an impairment or impediment to the ability of non-party class members to protect their respective interest." *Truckway, Inc. v. General Electric,* No. CIV. A. 91-0122, 1992 WL 70575, at \*6 (E.D.Pa. March 30, 1992).

With these principles in mind, we examine the remaining counts to ascertain whether certification under 23(b)(1)(A) or (b)(1)(B) is appropriate. We find that the ERISA actions in Counts I, II, III, VI, VIII, IX, and XIII are appropriate for certification under both of these provisions of Rule 23. All of these claims relate to the interpretation and application of ERISA plans. Conrail treated the proposed class and subclass identically and any equitable relief granted will affect the entire class and

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                                                                    Page 12
Not Reported in F.Supp., 1998 WL 372644 (E.D.Pa.), 5 Wage & Hour Cas.2d (BNA) 717
(Cite as: 1998 WL 372644 (E.D.Pa.))

subclass. Failure to certify a class would leave future plaintiffs without adequate representation. Moreover, we see a high likelihood of similar lawsuits against defendants should this class be denied. [FN15] Inconsistent judgments concerning how the Plans should have been interpreted or applied would result in prejudice. While plaintiffs list a variety of relief sought in their amended complaint, ERISA specifically limits the relief available to that of an equitable, that is, declaratory or injunctive, nature. 29 U.S.C. § 1132. To the extent that money damages are awarded or sought, we find them to be incidental.

> FN15. Indeed, one such action has already been filed and assigned to the undersigned. *See Buxton v. Consolidated Rail Corp.*, No. CIV. A. 98- 2409.

*14 Our review of the state law claims as well as the claim of equitable estoppel is more difficult. Counts IV (fraud), V (misrepresentation), and XIV (equitable estoppel) all contain reliance as an essential element. While individual issues of reliance are not enough to preclude a finding of typicality or commonality under 23(a), it may be enough to preclude class certification under 23(b)(1)(A) or (B). *See Eisenberg,* 766 F.2d at 786; *Truckway,* 1992 WL 70575, at *6. Reliance also may not be enough to preclude class certification under 23(b)(3). *Eisenberg,* 766 F.2d at 786. However, under the standards for (b)(1), we agree with the court in *Truckway* that certification under this portion of the rule is inappropriate for Counts IV, V, and XIV.

Moreover, even if plaintiffs were to prevail on actions of fraud or misrepresentation the remedy would be necessarily monetary. The actions in Counts IV and V are limited to claims for employment. Since Conrail will soon cease to exist, rehiring is not an available remedy. Because money would not be merely an incidental remedy sought, certification is inappropriate under either portion of (b)(1) on Counts IV and V.

**B.**

A class may be certified under Rule 23(b)(2) if the defendants have acted in ways generally applicable to the class and final declaratory or injunctive relief is sought by the class. [FN16] 5 Moore's § 23.43[1][a]. While monetary damages may also be sought, they must be incidental to the request for equitable relief. *Id.* § 23.43[3][a]. As a practical matter, key factual questions should be dispositive as to all class members. *Stoetzner v. United States Steel Corp.,* 897 F.2d 115, 119 (3d Cir.1990). The proposed class

"must demonstrate that the interests of the class members are so like those of the individual representatives that injustice will not result from their being bound by such judgment in the subsequent application of principles of res judicata." *Hassine,* 846 F.2d at 179. Courts have described a class action under (b)(2) as one which "seeks to define the relationship between the defendant(s) and the world at large." *Id.* (quoting *Weiss v. York Hosp.,* 745 F.2d 786, 811 (3d Cir.1984)).

> FN16. According to one treatise, under (b)(2) administrative remedies need be exhausted by the named plaintiffs only, not the entire class. 5 Moore's § 23.43[1][c]. This further supports our earlier conclusion that the class members need not exhaust their administrative remedies because doing so would have been futile.

Defendants claim that (b)(2) does not apply because plaintiffs in reality seek only monetary remedies. Since Conrail will soon cease to exist, defendants contend that equitable relief could not be awarded. Conversely, plaintiffs contend that they seek primarily equitable relief.

Defendants are correct that, in determining whether a suit seeks equitable or monetary relief, a court must examine the "realities of the litigation." *Yeager's Fuel v. Pennsylvania Power & Light,* 162 F.R.D. 471, 480 (E.D.Pa.1995). On the information presently before us, we construe plaintiff's requests for relief as seeking predominantly equitable relief on the ERISA claims, as we stated earlier. However, as just discussed above, we find that the state law claims in Counts IV and V seek primarily monetary relief. For this reason they are inappropriate for certification under Rule 23(b)(2).

*15 Our examination of the ERISA claims convinces us that they are appropriate for certification under (b)(2). The proposed class and subclass of plaintiffs aver that defendants treated them equally in the denial of ERISA benefits. Their interests are essentially identical. Certain key facts are dispositive of the entire class. For example, did defendants interpret the Plans incorrectly or violate the terms of the Plan, did defendants create the VSP for the purpose of interfering with plaintiffs' ERISA benefits, and did defendants breach fiduciary duties by misrepresenting material information to the entire class? Finally, this suit seeks to define the relationship between Conrail and its employees who accepted the VSP offering. In conclusion, we find

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                                                                          Page 13
Not Reported in F.Supp., 1998 WL 372644 (E.D.Pa.), 5 Wage & Hour Cas.2d (BNA) 717
**(Cite as: 1998 WL 372644 (E.D.Pa.))**

certification under (b)(2) also appropriate.

The equitable estoppel claim in Count XIV falls between the ERISA cause of actions and the state law claims. While it requires the element of reliance, it seeks purely equitable relief. Because the claim challenges actions of defendants that were generally applicable to the class, we will certify equitable estoppel under (b)(2) at this time. This may be revisited at a later time if individual issues of reliance predominate.

### C.

Plaintiffs also seek, as an alternative, certification under 23(b)(3) if the court finds certification under (b)(1) or (b)(2) inapplicable. Because we so found as to Counts IV and V, we now examine these counts to see if they meet the certification requirements of (b)(3). An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

> (3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Fed.R.Civ.P. 23(b)(3).

To meet the requirement of Rule 23(b)(3) that common questions predominate, claims of the plaintiffs need not be identical and the "necessity of answering individual questions after answering common questions will not prevent a class action." *Heastie*, 125 F.R.D. at 675. The Advisory Committee Notes to the 1966 Amendments to Rule 23 state "a fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action, and it may remain so despite the need, if liability is found, for separate determination of the damages suffered by individuals within the class."

*16 Whether individual issues of reliance are enough to preclude certification under Rule 23(b)(3) is

unclear in this Circuit. The Third Circuit has broadly suggested that reliance alone may not be enough to defeat a motion for class action certification. *See Peil v. Speiser*, 806 F.2d 1154, 1159 n. 8 (3d Cir.1986); *Eisenberg v. Gagnon*, 766 F.2d 770, 786 (3d Cir.1985). However, it has not specifically so held. As a result, several decisions in our district, including at least one by the undersigned, have held that individual issues of reliance do prevent class certification. *See J/H Real Estate, Inc. v. Abramson*, Nos. CIV. A. 95-4176, 95-7180, 1996 WL 63712, at * 6-7 (E.D.Pa. Feb. 9, 1996); *In re Herley Sec. Litig.*, 161 F.R.D. 288, 292 (E.D.Pa.1995); *Squitieri v. Gould*, 133 F.R.D. 25, 28 (E.D.Pa.1990); *In re Bexar County Health Facility Dev. Corp. Sec. Litig.*, 125 F.R.D. 625, 636 (E.D.Pa.1989); *Gavron v. Blinder Robinson & Co.*, 115 F.R.D. 318, 325 (1987); *Snider v. Upjohn Co.*, 115 F.R.D. 536, 542 (E.D.Pa.1987). However, a recent trend of cases has held that reliance alone is not enough to preclude certification. *See Hanrahan v. Britt*, 174 F.R.D. 356, 365 (E.D.Pa.1997); *In re Intelligent Elec. Inc. Sec. Litig.*, No. CIV. A. 92-1905, 669 So.2d 1265, 1996 WL 67522, at *6 (E.D.Pa. Feb. 13, 1996); *In re Bell Atlantic Corp. Sec. Litig.*, No. CIV. A. 91-514, 1995 WL 733381, at *7 (E.D.Pa. Dec. 11, 1995); *First Eastern Corp. v. Mainwaring*, No. CIV. A. 92-1176, 1993 WL 223607, at *3 (E.D. Pa. June 22, 1993); *In re Healthcare Servs. Group Sec. Litig.*, No. CIV. A. 91-6097, 1993 WL 54437, at *7-8 (E.D.Pa. March 1, 1993); *In re Kulicke & Soffa Indus. Sec. Litig.*, No. CIV. A. 86-1656, 1990 WL 1478, at *8 (E.D.Pa. Jan. 9, 1990).

I am now convinced, based on a close reading of the Third Circuit's language in *Eisenberg* and *Peil*, as well as other recent cases in this district, that the Court of Appeals, if faced with the issue, would certify Counts IV and V, under (b)(3), based on the information present in the record. We note at this juncture that had the plaintiffs not allegedly relied on the representations regarding future employment prospects, at issue in Counts IV and V, they would still be current Conrail employees. We may later revisit our conclusion on certification if we find that individual issues of reliance may predominate.

In any event, we conclude that common class issues of law and fact predominate over any individual issues in this case on the claims of fraud and misrepresentation. While individual issues are present, especially in the context of reliance, they do not predominate. Rather, the central issues revolve around whether the defendants negligently or intentionally misrepresented information regarding

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                                                          Page 14
Not Reported in F.Supp., 1998 WL 372644 (E.D.Pa.), 5 Wage & Hour Cas.2d (BNA) 717
(Cite as: 1998 WL 372644 (E.D.Pa.))

prospects of future employment as to the fraud and misrepresentation claims in Counts IV and V. The necessity of individual information regarding reliance does not preclude the certification of this class under (b)(3).

*17 Rule 23(b)(3) also requires that the class action be the superior method of trying the case. According to the Supreme Court, "[c]lass actions [ ] may permit the plaintiffs to pool claims which would be uneconomical to litigate individually ... most of the plaintiffs would have no realistic day in court if a class action were not available." *Phillips,* 472 U.S. at 809.

We believe that a class action would be superior for trying these state law issues of fraud and misrepresentation. It is likely that the damages received from any individual claim would be uneconomical for each individual plaintiff to litigate.

As to the remaining considerations under Rule 23(b)(3), we find that each plaintiff would have no compelling interest in individually controlling separate lawsuits and that there would be no significant difficulties, presently foreseeable, in the management of the class. Finally, it is not undesirable to have this action proceed in the Eastern District of Pennsylvania. Conrail maintains its principal place of business here and most of the representative plaintiffs reside in the district.

IV

Count VII sets forth a claim for age discrimination. The ADEA requires enforcement "in accordance with the powers, remedies, and procedures" of select portions of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § § 201 *et seq. See* 29 U.S.C. § 626(b). For purposes of class action certification, we follow the relevant portion of the FLSA, 29 U.S.C. § 216, rather than Rule 23 of the Federal Rules of Civil Procedure. *Sperling v. Hoffman-La Roche, Inc.,* 118 F.R.D. 392, 399 (D.N.J.), *aff'd in part,* 862 F.2d 439 (3d Cir.1988), *aff'd,* 493 U.S. 165, 110 S.Ct. 482, 107 L.Ed.2d 480 (1989). It reads:

> An action to recover the liability prescribed ... may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

29 U.S.C. § 216(b).

The definition of "similarly situated" is not set forth in the statute. One court has found that most "courts appear to require nothing more than substantial allegations that the putative class members were together the victims of a single decision, policy, or plan infected by discrimination." *Sperling,* 118 F.R.D. at 407. While the statute requires that the plaintiffs be "similarly situated," they need not be identical. *Id.* at 405.

In *Lockhart v. Westinghouse Credit Corp.,* 879 F.2d 43, 51 (3d Cir.1989), *overruled in part on other grounds by, Hazen Paper Co. v. Biggins,* 507 U.S. 604, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993), the Court of Appeals for the Third Circuit applied a three part test to determine if the plaintiffs are similarly situated, that is, whether they were "(1) employed in the same corporate department, division and location; (2) advanced similar claims of age discrimination; and (3) sought substantially the same form of relief." The Third Circuit found this test met where the employees, although employed at different locations, all had been employees in the same division, challenged the same employment practice and sought the same forms of relief. *Id.* at 52. Further, in considering whether to certify the class, a court has significant discretion to determine whether defendants' assertion of defenses unique to each individual employee "would make manageability of the class impossible." *Id.*

*18 Plaintiffs claim that the proposed plaintiff class is similarly situated because all plaintiffs are over 40 years of age, with 15 or more years of experience at Conrail. They all elected the VSP and were rehired as independent contractors performing work similar to that which they performed as an employee, but at a lower salary and without benefits.

Defendants contend that three reasons preclude certification. First, the plaintiffs are not victims of a single decision, policy, or plan infected by discrimination. The potential class of 70 former employees worked at various facilities in varying jobs, and thus are not similarly situated. Rather, each Conrail facility made its own individual decisions regarding the rehiring of former employees as independent contractors. Second, the defendants' defenses as to each individual plaintiff in the class would be individualized, to show that defendants' actions were based on reasonable factors other than age. Certifying a class would purportedly deprive Conrail of its essential and individualized defenses.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                                                                    Page 15
Not Reported in F.Supp., 1998 WL 372644 (E.D.Pa.), 5 Wage & Hour Cas.2d (BNA) 717
**(Cite as: 1998 WL 372644 (E.D.Pa.))**

[FN17] Finally, defendants contend that fairness and procedural considerations militate against certification of this class. Here, defendants contend that they would call two defense witnesses for every ADEA plaintiff who testified, comprising at least 70 days of trial time.

> FN17. As one example, defendants note that plaintiff Falcone signed a document saying he would not represent any party in any action against Conrail. The instant action allegedly breaches this agreement.

Plaintiffs argue that the defendants again exaggerate the extent of the individual defenses. Further, according to plaintiffs, defendants fail to articulate why they could not raise their defenses if a class is certified. Plaintiffs contend the defenses raised could certainly be applied on a class-wide basis.

We find that the plaintiffs are similarly situated for the reasons asserted by plaintiffs--they are all over 40 years of age with more than 15 years of experience at Conrail, and they accepted the VSP and were re-employed as independent contractors for less money and no benefits while younger employees retained their employee positions. Although plaintiffs were employed at various facilities throughout the country, they all left Conrail pursuant to a nationwide early retirement offering, the VSP. The fact that approximately 70 plaintiffs returned to work in substantially similar positions as independent contractors, at varying locations throughout the country, indicates to us that rehiring VSP persons as independent contractors was not an isolated practice at certain locations. The plaintiffs advance the identical claim of age discrimination and seek the same relief--reinstatement as an employee or receipt of wages and benefits commensurate with that of employees. If further discovery reveals that each Conrail facility or location did maintain its own procedures regarding rehiring former employees, distinct from that of Conrail overall, this class may be decertified or further subdivided.

We also do not find defendants' allegations of individualized defenses sufficient to preclude class certification. Defendants assert that their actions were required by business necessity, a defense which could certainly be applied on a class-wide, or location-wide basis. Defendants present only two other individual defenses, both as to plaintiff Falcone. Based upon these sparse allegations, we find it is not enough to preclude class certification.

*19 In conclusion, Count VII will be certified as a class action.

V

Our final concern is the scope of the class and subclasses to be certified. Defendants did not address the scope of the class in their 79 page response. For the reasons set forth above, we find the description of the class and subclass proposed by plaintiffs to be sufficient:

In conclusion, the motion of the plaintiffs for class certification will be granted in part and denied in part. A class comprised of all persons formerly employed by Conrail at any Conrail location who separated from Conrail as part of the March 1, 1996 Conrail VSP will be certified with respect to the claims in Counts I, II, III, IV, V, VI, and XIV. A subclass comprised of those VSP participants who returned to work for Conrail to positions of employment which Conrail designated as non-employee status will be certified with respect to the claims in Counts VIII, IX, and XIII. Finally, an ADEA subclass composed of those class members over 40 years of age who were returned to work into non-employee status, will be certified on Count VII. The motion will be denied as to Counts X, XI, and XII.

*ORDER*

AND NOW, this 14th day of May, 1998, for the reasons set forth in the accompanying Memorandum, it is hereby ORDERED that the motion of plaintiffs for class certification is GRANTED in part and DENIED in part as follows:

1. A class comprised of all persons formerly employed by Conrail at any Conrail location who separated from Conrail as part of the March 1, 1996 Conrail Voluntary Separation Program ("VSP") is certified with respect to the claims in Counts I, II, III, and VI pursuant to Rule 23(b)(1)(A), (b)(1)(B), and (b)(2) of the Federal Rules of Civil Procedure.

2. The class set forth in paragraph 1 is hereby certified with respect to the claims set forth in Counts IV and V pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure.

3. A subclass comprised of those VSP participants who returned to work for Conrail in positions of employment which Conrail designated as non-employee status is certified with respect to the claims in Counts VIII, IX, and XIII pursuant to Rule 23(b)(1)(A), (b)(1)(B), and (b)(2) of the Federal

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                              Page 16
Not Reported in F.Supp., 1998 WL 372644 (E.D.Pa.), 5 Wage & Hour Cas.2d (BNA) 717
**(Cite as: 1998 WL 372644 (E.D.Pa.))**

Rules of Civil Procedure.

4. An Age Discrimination in Employment Act subclass comprised of those class members over 40 years of age who were returned to work into non-employee status, is certified on Count VII pursuant to 29 U .S.C. § § 216(b) and 626(b).

5. The motion of plaintiffs is denied in all other respects.

Not Reported in F.Supp., 1998 WL 372644 (E.D.Pa.), 5 Wage & Hour Cas.2d (BNA) 717

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Tab 3

Westlaw.

Not Reported in F.Supp.2d                                                          Page 1
Not Reported in F.Supp.2d, 2006 WL 2597956 (E.D.Wash.)
**(Cite as: 2006 WL 2597956 (E.D.Wash.))**

Only the Westlaw citation is currently available.

United States District Court,
E.D. Washington.
Garry P. FREY, Plaintiff,
v.
SPOKANE COUNTY FIRE DISTRICT NO. 8, a
Washington municipal corporation,
Defendant.
**No. CV-05-289-RHW.**

Sept. 11, 2006.

Mary Rita Giannini, R. Max Etter, Jr., Witherspoon
Kelley Davenport & Toole, Spokane, WA, for
Plaintiff.

Stephanie R. Alexander, Suzanne Kelly Michael,
Lane Powell PC, Seattle, WA, for Defendant.

**ORDER GRANTING DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT**

ROBERT H. WHALEY, Chief District Judge.

*1 Before the Court is Defendant's Motion for
Summary Judgment (Ct.Rec.10). A hearing was held
on the motion on August 29, 2006. Plaintiff was
represented by Mary Giannini and R. Max Etter, Jr.
Defendant was represented by Stephanie Alexander.

BACKGROUND FACTS
Plaintiff Garry Frey was employed with the Spokane
County Fire District (SCFD) No. 8 from 1995 to
2004, when he resigned. During his tenure at the
SCFD No. 8, he worked as a EMS Officer, as a
Deputy Chief, and also held the title of Assistant
Chief for a six-month period in 2001/02. When
Plaintiff was first employed as a Deputy Chief, he
understood that his job was exempt under the Fair
Labor Standards Act (FLSA), which meant that he
would not qualify for overtime pay. Plaintiff asserts
that as the years passed in which he was Deputy
Chief, he was assigned more duties, and much of the
work he did was considered nonexempt under the
FLSA.

Spokane County Fire District No. 8 consists of four
(4) stations. The administrative hierarchy of SCFD
No. 8 is set forth on Page 113 of Ct. Rec. 10. There is
one Chief that reports to the Board of

Commissioners. Three Deputy Chiefs report to the
Chief. Each Deputy Chief is responsible for various
divisions or units. The chain of command under the
Deputy Chiefs is Captains, then Lieutenants, and
finally Firefighters (Def. St. of Mat. Facts 11).

The SCFD is staffed by career firefighters, as well as
volunteer firefighters. The firefighters are specifically
assigned to fight fires, and to clean and perform
routine maintenance on equipment, vehicles, the
station grounds and the facilities. In 2001, SCFD No.
8 had approximately 15 full-time career firefighters,
10 part-time firefighters, 16 resident firefighters, and
44 volunteer firefighters. In 2002, SCFD No. 8 had
approximately 13 full-time career firefighters, 12
part-time firefighters, 15 resident firefighters, and 43
volunteer firefighters. In 2003, SCFD No. 8 had
approximately 15 full-time career firefighters, 15
part-time firefighters, 11 resident firefighters and 42
volunteer firefighters. During these years, SCFD No.
8 employed at least one full-time administrative
assistant employee, at least one part-time file clerk,
who assisted the deputy chiefs with filing projects,
and clerical staff who were assigned duties such as
answering the telephones for the District, distributing
mail, data entry for accounts payable, and filing.

The following are a list of management duties that
Plaintiff, as Deputy Chief, was responsible for during
the years 2001-2003. These are set forth in
Defendant's Statement of Facts and are not opposed
by Plaintiff:
(1) Responsible for managing and supervising
career firefighters and officers and maintenance
specialists, and at some point, for managing the
part-time firefighters (Def. Statement of Material
Facts 8, 9, 10);
(2) Responsible for managing several divisions of
SCFD No. 8, including risk management, EMS
training, and maintenance of facilities and
apparatus; (DSMF 13);
*2 (3) Responsible for personnel management
duties, which included interviewing, hiring,
supervising assigned staff, assigning duties to
career personnel, approving leave requests,
addressing personnel issues, and overseeing the
employee promotional and exiting processes under
the Collective Bargaining Agreement (DSMF 14);
(5) Ensure that sufficient personnel was available
to meet District's mission and research and
recommended employee policies (DSMF 14);

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                      Page 2
Not Reported in F.Supp.2d, 2006 WL 2597956 (E.D.Wash.)
**(Cite as: 2006 WL 2597956 (E.D.Wash.))**

(6) Review schedule to ensure that schedules prepared by Lieutenants properly covered all necessary shifts (DSMF 15);

(7) Organize Wellness Program, which included choosing and purchasing exercise equipment for firefighters, and setting up the location for the exercise program (DSMF 17);

(8) Manage the District's EMS program, which included ensuring training and procedures were followed (DSMF 18);

(9) Manage Ongoing Training Evaluation Program, which included making sure firefighters were in compliance with the training requirements of the Department of Health (DSMF 19);

(10) Responsible for risk management and acted as District Safety Officer. Risk management included: investigating all District accidents involving equipment or personnel, and addressing and making recommendations in relation to workers compensation and L & I claims, documenting and maintaining accurate records, and looking out for the welfare of the district personnel (DSMF 20, 21);

(11) Oversee entire collective bargaining process; was a member of the negotiating team for negotiating firefighters pay; responsible for responding to employee grievances and ensuring compliance with CBA (DSMF 22);

(12) Responsible for managing the budget for department/division and assisting in planning and implementing and developing the budget for the District's policies and procedures (DSMF 23);

(13) Code incoming invoices, which included approval of order and amount to be paid; directing payment of invoice out of particular budget number (DSMF 24);

(14) Coordinate and supervise proper maintenance of all District's apparatus and facilities; supervise maintenance staff and develop training program; maintain records for apparatus and equipment; test apparatus and equipment; and make adjustments to dispatch system settings with Chief's approval (DSMF 25, 26);

(15) Order and maintain supplies for the stations (DSMF 27); and

(16) Review and recommend changes to Standard Operating Procedure manual (DSMF 28);

While Deputy Chief, Plaintiff also had responsibilities as an 820 call duty officer. Plaintiff acted as the 820 call duty officer about 9 times a month-except when other staff were on vacation, it could be higher than that. The 820 call duty officer wore a digital pager that notified the on-call duty that there was an incoming call to the station. The 820 call duty officer would utilize the pager, cell phone, and radio while responding to or monitoring calls.

According to Plaintiff, the 820 call duty officer was the officer of the day representing the Chief in any manner. Specifically, the 820 call duty officer would respond to calls, based on the Standard Operating Procedure criteria. If the call was a large scale call, then the 820 call duty officer would respond. This included going to the scene and assisting the incident commander as needed. Assistance could mean being in charge of a division that was responding to the fire, although this occurred only occasionally. Plaintiff estimated that he fought fires less than 5 times a year when acting as the 820 call duty officer.

**\*3** If the call was an aid call, the officer would monitor the call. Monitoring included listening to the radio, and determining if anything needed to be done. While on-call, the 820 call duty officer did not have to stay at the station if they lived close enough to the SCFD boundary. Plaintiff stated that although there was not a specific response time, the unwritten rule was that the on-call officer had to be able to respond within 5-10 minutes. The only restriction placed on the on-call duty officer, other than response time, was that they were not allowed to drink alcohol or attend movies while on-call.

Plaintiff also asserts that he performed the following nonexempt tasks while employed as Deputy Chief: [FN1]

> FN1. Defendant does not dispute that Plaintiff undertook these tasks.

(1) Document and maintain various District records;

(2) Assist in budgeting, including gathering budget information and putting in it budgeting format;

(3) Respond to emails and phone calls from staff, constituents, vendors, regulatory agencies;

(4) Review and process invoices, including coding invoices with bar codes;

(5) Maintain, fill out, and file records for equipment testing;

(6) Check off and file supplies;

(7) Monitor shop equipment and tools;

(8) Meet with vendors, staff, resident firefighters, and volunteer firefighters as needed;

(9) Input equipment and apparatus information cards regarding different kinds of calls;

(10) Check time-off requests and match them with approvals;

(11) Type letters and memos according to whatever the need was;

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                      Page 3
Not Reported in F.Supp.2d, 2006 WL 2597956 (E.D.Wash.)
**(Cite as: 2006 WL 2597956 (E.D.Wash.))**

(12) Work on maintenance bids for the station;

(13) Fight fires when needed;

(14) Move apparatus to stations for preventive maintenance;

(15) Prepare burn tower for training;

(16) Help out at the various stations moving equipment for repairs;

(17) Repair equipment in stations such as leaky faucets and sprinkler systems;

(18) Pull and spray weeds and trim trees and bushes and other grounds maintenance;

(19) Shovel and plow snow;

(20) Paint the facilities;

(21) Repair cracks in cement, repair windows and other facility maintenance;

(22) Install radios, lights and sirens in vehicles;

(23) Pick up oxygen supplies;

(24) Pick up parts and supplies for EMS services;

(25) Miscellaneous housekeeping at the station, such as cleaning bathrooms and other facilities;

(26) Put chains on snow plow;

(27) Fix drier vents;

(28) Perform blood pressure tests, and

(29) Purchase painting supplies for the stations.
25 (Ct.Rec.14).

26 Plaintiff brings this present action seeking overtime pay in the amount of one and a half times his hourly rate for all the time he worked on nonexempt duties, based on the Fair Labor Standards Act, and the Washington Minimum Wage Act. Plaintiff has calculated his overtime pay to include the time he spent "on-call." Plaintiff also asserts a claim for breach of contract for unpaid wages.

Defendant moves for summary judgment, asserting that Plaintiff is an exempt employee under the Fair Labor Standards Act and the Washington Minimum Wage Act, and therefore, does not qualify for overtime pay. Defendant also asserts that Plaintiff's breach of contract claim is preempted by the Fair Labor Standards Act.

ANALYSIS

**I. Standard of Review**

*4 Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). There is no genuine issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict in that party's favor.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial," then the trial court should grant the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When considering a motion for summary judgment, a court may neither weigh the evidence nor assess credibility; instead, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

The determination of whether an employee qualifies for an exemption under the Fair Labor Standards Act is a question of law. *Cleveland v. City of Los Angeles*, 420 F.3d 981, 988 (9th Cir.2005). Factual determinations regarding how the employee spent his time and the nature of the employee's duties are questions of fact that must be decided by the trier of fact. *Ballaris v. Wacker Siltronic Corp.*, 370 F.3d 901, 910 (9th Cir.2004) ("The nature of the employees' duties is a question of fact, and the application of the FLSA to those duties is a question of law.").

In his response to Defendant's Motion for Summary Judgment, Plaintiff objects to seven of Defendant's statements of fact. For purposes of summary judgment, the Court will not consider the disputed statements of fact. The Court considered Defendant's uncontested Statements of Material Facts and Plaintiff's Statements of Material Facts in deciding Defendant's motion. As there are no genuine issues of material fact, this case is ripe for summary judgment.

**II. Fair Labor Standards Act Claim**

The FLSA requires that employers ordinarily pay their employees time and one-half for work in excess of forty hours per week. 29 U.S.C. § 207(a)(1). The FLSA provides an exemption from overtime for persons "employed in a bona fide executive, administrative, or professional capacity" and grants the Secretary of Labor broad authority to promulgate regulations to "define[ ] and delimit [ ]" the scope of the exemption. 29 U.S.C. § 213(a)(1). It is the burden of an employer to show entitlement to an exemption from the FLSA. *Baldwin v. Trailer Inns, Inc.*, 266 F.3d 1104, 1112 (9th Cir.2001). The FLSA "is to be liberally construed to apply to the furthest reaches consistent with Congressional direction. *Id.* (citing *Klem v. County of Santa Clara*, 208 F.3d 1085, 1089 (9th Cir.2000). To that end, FLSA exemptions are to be narrowly construed against ...

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2597956 (E.D.Wash.)
**(Cite as: 2006 WL 2597956 (E.D.Wash.))**

Page 4

employers and are to be withheld except as to persons plainly and unmistakenly within their terms and spirit." *Id.*

*5 It is Defendant's contention that while employed with the Spokane County Fire District No. 8, Plaintiff was employed either in an executive or administrative capacity, and therefore, was exempt from the overtime requirements of the FLSA.

To prove Plaintiff is exempt from overtime pay, Defendant must establish that Plaintiff's employment meets the requirements of the executive exemption "short test" set forth in the Department of Labor regulations: (1) Plaintiff is paid on a "salary basis"; (2) Plaintiff is paid "at a rate of not less than $250 per week ... exclusive of board, lodging, or other facilities"; (3) Plaintiff's primary duty consists of the management of the enterprise in which Plaintiff is employed or of a customarily recognized department

| 2001 | $57,706 |
|------|---------|
| 2002 | $61,327 |
| 2003 | $64,442 |

(DSMF 3).

**B. Primary Duty**

In order to prove that Plaintiff is exempt from overtime pay, Defendant must establish that his primary duty consisted of the management of the enterprise in which Plaintiff was employed or of a customarily recognized department or subdivision. 29 C.F.R. § 541.1(f).

The regulations define the terms "primary duty" and "management." Management involves:
[i]nterviewing, selecting, and training of employees, setting and adjusting their rates of pay and hours of work; directing their work; maintaining their production or sales records for use in supervision or control; appraising their productivity and efficiency for the purpose of recommending promotions or other changes in their status; handling their complaints and grievances and disciplining them when necessary; planning the work; determining the techniques to be used; apportioning the work among the workers; determining the type of materials, supplies, machinery or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or

or subdivision thereof; and (4) Plaintiff's primary duty "includes the customary and regular direction of the work of two or more other employees." 29 C.F.R. § 541.1(f) (2003) [FN2].

> FN2. The FLSA regulations were extensively amended in 2004. Because Plaintiff terminated his employment in January, 2004, the 2003 regulations are applicable to the case at bar. The regulations cited in this order are from the 2003 edition of the C.F.R.

**A. Salary**

It is undisputed that Plaintiff meets the compensation requirement. The following sets forth Plaintiff's yearly salary for the years 2001-2003:

merchandise and supplies; providing for the safety of the men and the property.
29 C.F.R. § 541.102. [FN3]

> FN3. The Court gives deference to the Department of Labor's regulations interpreting the FLSA. *Baldwin*, 206 F.3d at 1112 n. 4.

29 C.F.R. § 541.103 sets forth the standard for determining whether "management" is an employee's "primary duty":
A determination of whether an employee has management as his primary duty must be based on all the facts in a particular case. The amount of time spent in the performance of the managerial duties is a useful guide in determining whether management is the primary duty of an employee. In the ordinary case it may be taken as a good rule of thumb that primary duty means the major part, or over 50 ercent, of the employee's time. Thus, an employee who spends over 90 percent of his time in management would have management as his primary duty. Time alone however, is not the sole test, and in situations where the employee does not spend over 50 percent of his time in managerial duties, he might nevertheless have

Not Reported in F.Supp.2d                                                          Page 5
Not Reported in F.Supp.2d, 2006 WL 2597956 (E.D.Wash.)
(Cite as: 2006 WL 2597956 (E.D.Wash.))

management as his primary duty if the other pertinent factors support such a conclusion. Some of these pertinent actors are *the relative importance of the managerial duties as compared with other types of duties, the frequency with which the employee exercises discretionary powers, his relative freedom from supervision, and the relationship between his salary and the wages paid other employees for the kind of nonexempt work performed by the supervisor.*
*6 29 C.F.R. § 541.103 (emphasis added).

Here, Plaintiff asserts that while employed as Division/Deputy Chief, he spent at least half of his time performing numerous nonexempt tasks. Defendant does not dispute this contention. Rather, Defendant argues that time spent performing nonexempt tasks does not necessarily determine whether an employee is exempt. Defendant is correct. *See Baldwin,* 266 F.3d at 1114 ("We do not presume that the executive exemption fails merely because the proportion of time spent on exempt managerial tasks is less than fifty percent.")

It is undisputed by the parties that Plaintiff performed both exempt and nonexempt tasks. In cases such as this, where the managerial duties are packaged in employment with non-managerial tasks, and the management function cannot readily and economically be separated from the nonexempt tasks, the circuit instructs courts to give weight to the factors set forth in the regulations, other than time spent on management duties, in determining whether Plaintiff's primary duty was management. *Id.* at 1115.

**1. Time Spent on Management Duties**

The Court accepts Plaintiff's assertion that he spent at least fifty percent of his time on nonexempt tasks.

**2. Relative Important of the Managerial Duties Compared to Other Types of Duties**

The regulations instruct the Court to look at the relative importance of Plaintiff's managerial duties compared to his nonexempt duties. The fact that Plaintiff performed some of the same tasks as his subordinates does not render the tasks nonexempt. *Baldwin,* 266 F.3d at 1115. Likewise, the fact that Plaintiff's subordinates may have performed some managerial tasks does not demonstrate that Plaintiff is a nonexempt employee. *Id.*

Here, it is undisputed that Plaintiff was responsible for the majority of duties listed in 29 C.F.R. § 541.102. Plaintiff was involved in the hiring of the employees, was responsible for the training of the employees, and directed their work. He handled the employees' complaints and

grievances, and made recommendations with regard to discipline. He apportioned work among the employees, controlled the flow and distribution of equipment and supplies, and provided for the safety of the employees and property of SCFD No. 8.

In *Baldwin,* the circuit focused on the plaintiffs' principal value to the employer in analyzing the relative importance of the managerial duties compared to the nonexempt duties. 266 F.3d at 1115. In that case, it concluded that the principal value to the employer was directing the day-to-day operations of the trailer park that the plaintiffs managed, even though they performed a substantial amount of manual labor. *Id. (citing Dalheim v. KDFW-TV,* 918 F.2d 1220, 1227 (5th Cir.1990)) ("At least under the short tests, the employee's primary duty will usually be what she does that is of principal value to the employer, not the collateral tasks that she may also perform, even if they consume more than half her time.").

*7 Here, the same can be said of Plaintiff. Plaintiff's principal value to Defendant was the managing and supervising of the divisions and unit that were assigned to Plaintiff. The manual and clerical tasks that he performed were undertaken in order to support Plaintiff's primary value to Defendant, which was to ensure that Plaintiff's units were operating efficiently and effectively. Thus, the relative importance of Plaintiff's managerial duties compared to his nonexempt duties support the executive exemption.

**3. Frequency of Exercise of Discretionary Powers**

The Court must also consider the frequency of Plaintiff's exercise of discretionary powers. The record supports a finding that Plaintiff frequently had the opportunity to exercise discretionary powers in managing his divisions. Specifically, Plaintiff exercised discretion in delegating duties to others, in responding to 820 calls, in budgeting, in maintaining and ordering supplies, in approving the schedule and leave requests, in implementing the Wellness program, and in ensuring that the EMS officers had adequate training. Most telling of the amount of discretion exercised by Plaintiff is the fact that the Chief never directed Plaintiff to undertake the nonexempt tasks that Plaintiff now asserts renders his employment status nonexempt. Instead, the understanding was that these tasks needed to get done, and that Plaintiff had the discretion to determine how these tasks would be accomplished either by delegating the tasks to his subordinates, or performing the tasks himself. Plaintiff's frequent exercise of discretionary powers support the executive exemption.

**4. Relative Freedom from Supervision**

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2597956 (E.D.Wash.)
(Cite as: 2006 WL 2597956 (E.D.Wash.))

Page 6

The relative freedom from supervision is another factor the Court must weigh in determining Plaintiff's primary duty. In this case, at all times in question, Plaintiff was second-in-command. The only person who could provide supervision to Plaintiff was the Chief. Plaintiff stated that he communicated with the Chief daily, but there is nothing in the record to indicate that the Chief directed Plaintiff's day-to-day activities. Instead, the record indicates that Plaintiff determined what tasks he would accomplish in each day, without any input from the Chief. Specifically, Plaintiff stated in his answer to Interrogatory No. 6 that if he was all caught up with the day-to-day paperwork and filing, he would head out to do rounds. Sometimes he would visit all four stations, otherwise he would make it to only or two of the stations depending on what tasks or items needed attention on that particular day (Ct.Rec.10-13, p. 157). Plaintiff also stated that he would arrive at work between 7:00 and 8:00 a.m., which demonstrates that Plaintiff had discretion when he could arrive each morning. Although Plaintiff suggests that there was some oversight by the Chief, *i.e.* at times the Chief would direct him to visit stations, there is nothing in the record that would indicate that the Chief's oversight was so rigorous or frequent as to undermine the fact that Plaintiff was substantially free from daily supervision. *See Baldwin,* 266 F.3d at 1115. Plaintiff's relative freedom from supervision supports the executive exemption.

**5. Relationship Between Salary and Wages Paid Other Employees**

*\*8 The Court must also factor in the relationship between Plaintiff's salary and the wages paid to his subordinates. In this case, there is a significant difference between the exempt and nonexempt salaries. The following is breakdown of salaries of the different positions within SCFD No. 8, which was provided in Deputy Chief Vernon Blystone's declaration:

| Year | Highest Career Firefighters Wages (Nonexempt) | Lieutenant's Wages (Nonexempt) | Plaintiff's Salary (Exempt) |
|------|-----------------------------------------------|--------------------------------|-----------------------------|
| 2001 | $37,133 | $37,133-42,703 | $57,706 |
| 2002 | $39,361 | $39,361-45,265 | $61,327 |
| 2003 | $41,723 | $41,723-47,981 | $64,441 |

(Ct.Rec.19).

Here, it is undisputed that Plaintiff was earning at least $15,000 more a year to perform his exempt duties. This difference between the salary of Plaintiff, an exempt employee, and the wages paid nonexempt employees supports the executive exemption.

**6. Occasional Tasks**

The regulations recognize that an executive may occasionally perform nonexempt tasks. Specifically, 29 C.F.R. § 541.110 states:

(a) In addition to the type of work which by its very nature is readily identifiable as being directly and closely related to the performance of the supervisory and management duties, there is another type of work which may be considered directly and closely related to the performance of these duties. In many establishments the proper management of a department requires the performance of a variety of occasional, infrequently recurring tasks which cannot practicably be performed by the production workers and are usually performed by

the executive. These small tasks when viewed separately without regard to their relationship to the executive's overall functions might appear to constitute nonexempt work. In reality they are the means of properly carrying out the employee's management functions and responsibilities in connection with men, materials, and production. The particular tasks are not specifically assigned to the "executive" but are performed by him in his discretion.
(b) It might be possible for the executive to take one of his subordinates away from his usual tasks, instruct and direct him in the work to be done, and wait for him to finish it. It would certainly not be practicable, however, to manage a department in this fashion. With respect to such occasional and relatively inconsequential tasks, it is the practice in industry generally for the executive to perform them rather than to delegate them to other persons. When any one of these tasks is done frequently, however it takes on the character of a regular production function which could be performed by a nonexempt employee and must be counted as nonexempt work. In determining whether such work is directly and closely related to the performance of the

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2597956 (E.D.Wash.)
**(Cite as: 2006 WL 2597956 (E.D.Wash.))**

Page 7

management duties, consideration should be given to whether it is (1) the same as the work performed by any of the subordinates of the executive; or (2) a specifically assigned task of the executive employees; or (1)practicably delegable to nonexempt employees in the establishment; or (4) repetitive and frequently recurring.

*9 29 C.F.R. § 541.110.

By Plaintiff's own account, many of the various nonexempt tasks he performed were not repetitive and frequently recurring. Plaintiff stated that he did not do many of the nonexempt duties every day, but did them when they needed to be done. (Ct.Rec.14). Specifically, Plaintiff stated that "[s]ome of the tasks, while they didn't occur often, would take more than just a few minutes or an hour a day or two, or more, to complete, and so took up quite a bit of time. Other tasks happened regularly, and even though I might spend only a few minutes at a time, I had to do the task often, sometimes every day." *Id.* Plaintiff did not specify which tasks were performed daily. In reviewing the list of nonexempt tasks, however, most of the tasks that could be performed daily are ones that are directly and closely related to the management of the divisions-maintaining records, responding to emails, and other daily clerical tasks. Also, Plaintiff did not state that he was the only one responsible for shoveling snow, cleaning bathrooms, or weeding and mowing the lawn. It is undisputed that Plaintiff performed these tasks at his discretion. The tasks listed by Plaintiff are occasional tasks that were undertaken to properly carry out Plaintiff's management responsibilities.

**7. Other Considerations**

In his pleadings, Plaintiff relies on the fact that he actually performed job duties that were listed in six other job descriptions [FN4] to argue that his position as Division/Deputy Chief evolved into a non-exempt position. Reliance on these job descriptions as support for Plaintiff's contention that he was performing nonexempt duties is misplaced.

> FN4. Several months after an on-the-job truck accident, in which he injured his back and shoulder, Plaintiff asked Chief Stout to provide him with a job description so he could talk to his doctor about whether he could perform the functions of his job to return to work at least part-time. Chief Stout sent Plaintiff seven job descriptions: Division/Deputy Chief, Emergency Medical Services Officer, Risk Manager, Maintenance Officer, Resident Firefighter Officer, Career Personnel Officer, and Part-Time Firefighter Officer.

It is undisputed that when Plaintiff was originally hired, he was responsible for the EMS Division. By 2001, Plaintiff was responsible for risk management, operations, personnel, and maintenance, along with EMS (Ct.Rec.14). The seven job descriptions represent the different responsibilities that were assigned to Plaintiff. This makes sense when looking at the job description for Division/Deputy Chief. The job description states that the Division/Deputy Chief will provide administrative and management support. Specifically, the position "will be assigned responsibility of District functions *which may include:* Communications, Emergency Medical Service, Fire Prevention (Fire Marshal), Maintenance (Apparatus and/or Facilities), Operations, and Training. (Emphasis added). The job description also states that the Division/Deputy Chief will be assigned to supervise and manage one or more divisions of District personnel *which may include:* Career Firefighters and Officers, Part-Time Firefighters, Resident Firefighters, and Volunteer Firefighters and Officers. (Emphasis added). Rather than include the detailed responsibilities for each of these units and divisions in the job description for Division/Deputy Chief, separate job descriptions were created for each of the different divisions, which could then be assigned as needed by Chief Stout. The six additional job descriptions with which Plaintiff relies are the detailed listing of the duties that correspond to the department to which the Division/Deputy Chief is ultimately assigned.

*10 More importantly, the majority, if not all, of the duties listed in each of these job descriptions describe exempt responsibilities. None of the job descriptions list nonexempt tasks, such as mowing the lawn, shoveling the snow, or changing the signal lights. Consequently, the fact that Plaintiff was responsible for duties set forth in seven different job descriptions may support an argument that Plaintiff was overworked, but it does not provide support that Plaintiff was a nonexempt employee.

Here, Plaintiff's employment with the SCFD No. 8 meets the primary duty requirement of the executive exemption because Plaintiff had the authority and discretion to manage his units on a day-to-day basis without supervision and control from Chief Stout, notwithstanding that he may have spent more than half of his time on nonexempt tasks.

**c. Supervision of Two or More Employees**

In order to qualify for the executive exemption, Plaintiff must customarily and regularly direct the work of two or more other employees. 29 C.F.R. § 541.1(f).

Plaintiff asserts that because the Chief was the chief

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2597956 (E.D.Wash.)
(Cite as: 2006 WL 2597956 (E.D.Wash.))

Page 8

executive and made all decisions in managing the District, under the supervision of the Commissioners, Defendants have not met their burden of showing that he supervised two or more employees. Plaintiff's assertions are not supported by the record. Instead, the record is clear that, at a minimum, Plaintiff supervised the career firefighters as well as the part-time maintenance specialist, and during 2001- 2003, there were more than two career firefighters employed by the District. The supervision included recruiting, retaining, and resolving any problems that arose. Plaintiff was also responsible for ensuring optimum training for the EMS training of personnel; for supervising staff assigned to assist in the effective and efficient performance of the maintenance of apparatus and facilities; for supervising the resident firefighters, for approving leave requests and conducting evaluations for career fire personnel on an annual basis; for assigning career personnel to duty assignments which include station assignments and special assignments; and for administering supervision and discipline to the part-time firefighters, as required. All of these duties indicate that Plaintiff was directly responsible for the supervision of two or more employees. It is not necessary for Plaintiff to have final-decision making authority in order for the Court to find that Plaintiff managed a unit. See *Kastor v. Sam's Wholesale Club*, 131 F.Supp.2d 862, 866 (N.D.Tex.2001) (applying precedent analyzing the administrative exemption where the Fifth Circuit held that final decision-making authority is not required to the executive exemption). [FN5]

> FN5. In *Kastor*, the district court noted that if final decision-making authority were the test for determining whether a person was an executive or administrative employee, one would rarely, if ever, qualify as such an employee under the regulations. 131 F.Supp.2d at 867. The district court reasoned that "[a] president or chief executive officer of a company could say that he does not have final decision-making authority because he is only authorized to carry out the policies set by the board of directors, and the board of directors is free to review and veto his decisions. Typically, there is a hierarchy or line of supervision in any corporate entity or business wherein managers and supervisors have persons to whom they must report, and that an individual does not have final supervisory or discretionary authority does not take that person out of the realm of being a manager or supervisor in the company or business." The Court finds this analysis persuasive.

**d. Conclusion**

Defendant has met its burden of proving that Plaintiff is an executive employee who is exempt from the overtime requirements of the FLSA. Plaintiff is not entitled to overtime pay regardless of whether he worked at the station or was on-call. Thus, it is not necessary to address the parties' arguments regarding whether the time Plaintiff spent on-call is compensable.

**III. Washington Minimum Wage Act Claim**

*11 Plaintiff also alleges a claim for overtime compensation under the Washington State Minimum Wage Act (MWA). The MWA requires that employers ordinarily pay their employees time and one-half for work in excess of forty hours per week, but also provides an exemption for individuals employed in a bona fide executive, administrative, or professional capacity. Wash. Rev.Code § § 49.46.010; 49.46.130. Generally, Washington courts follow federal law when addressing issues under MWA. *Hisle v. Todd Pac. Shipyards Corp.*, 151 Wash.2d 853, 862 n. 6 (2004) ("The FLSA is persuasive authority because the MWA is based on the FLSA. Like the MWA, the FLSA requires overtime pay of one and one-half times the regular rate for every hour worked beyond 40." (Citations omitted)).

At the hearing, Plaintiff agreed that resolution of his Washington Minimum Wage Act claim is dependant on the resolution on his FLSA claim. [FN6] Because the Court concludes that Plaintiff is an exempt employee under the FLSA, he is also an exempt employee under the MWA, and therefore, is not entitled to overtime pay.

> FN6. In his response to Defendant's Motion for Summary Judgment, Plaintiff did not address separately Defendant's arguments that summary judgment is appropriate for his Washington Minimum Wage Act claim; rather Plaintiff incorporated his arguments to apply to both the FLSA and the MWA.

**IV. Breach of Contract Claim**

Defendant asserts that Plaintiff's breach of contract claim should be dismissed as a matter of law because Plaintiff's only avenue for collecting overtime compensation is under the FLSA. [FN7] The Court agrees. Claims that are directly covered by the FLSA (such as overtime claims) must be brought under the FLSA. *Williamson v. General Dynamics Corp.*, 208 F.3d 1144, 1154 (9th Cir.2000). Plaintiff's claim for breach of contract for overtime pay is preempted by the FLSA.

> FN7. In his response to Defendant's Motion for Summary Judgment, Plaintiff did not address

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2597956 (E.D.Wash.)
**(Cite as: 2006 WL 2597956 (E.D.Wash.))**

      Defendant's arguments that summary judgment is appropriate for his breach of contract claims.

Accordingly, **IT IS HEREBY ORDERED:**
  1. Defendant's Motion for Summary Judgment (Ct.Rec.10) is **GRANTED.**
  2. The Clerk of Court is directed to enter judgment in favor of Defendant.

*IT IS SO ORDERED.* The District Court Executive is hereby directed to enter this Order, furnish copies to counsel, and close the file.

 Not Reported in F.Supp.2d, 2006 WL 2597956 (E.D.Wash.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

# Tab 4

Westlaw.

Not Reported in F.Supp.2d                                                                Page 1
Not Reported in F.Supp.2d, 2006 WL 1994586 (N.D.Tex.), 11 Wage & Hour Cas.2d (BNA) 1084
**(Cite as: 2006 WL 1994586 (N.D.Tex.))**

**C**

United States District Court,
N.D. Texas, Dallas Division.
Aleatha HARRIS, Marlon Bennett, Patsy Nell Long,
Charlton J. Namachar, and Mark
Shaw, On Behalf of Themselves and All Others
Similarly Situated, Plaintiffs,
v.
FEE TRANSPORTATION SERVICES, INC., and
Frozen Food Express Industries, Inc.
Defendants.
**No. Civ.A.3:05CV0077-P.**

May 15, 2006.

*ORDER*

SOLIS, J.

*1 Now before the Court is Plaintiffs' Motion for Notice to Potential Plaintiffs and Limited Expedited Discovery, filed March 1, 2006. On April 3, 2006, Defendants filed a(1) Response to Plaintiffs' Motion for Notice to Potential Plaintiffs and Limited Expedited Discovery, a(2) Response to Plaintiffs' Request for Expedited Discovery as to Identity of Potential Plaintiffs, and (3) Objections to Evidence and Proposed Notice Filed in Support of Plaintiffs' Motion for Notice to Potential Plaintiffs and Motion to Strike. Plaintiffs did not file a Reply. After careful consideration of the parties' briefing, the evidence, and the applicable law, Plaintiffs' Motion for Notice to Potential Plaintiffs and Motion to Strike is DENIED.

I. Background

Plaintiffs Aleatha Harris, Marlon Bennett, Patsy Nell Long, Charleton J. Namachar, and Mark Shaw (collectively "Plaintiffs") are former employees of Defendants FFE Transportation Services, Inc. and Frozen Food Express Industries, Inc. (hereinafter "Defendants"). [FN1] Defendants operate one of the largest publicly owned temperature-controlled trucking companies in North America. (Def.'s Resp. at 2.)

FN1. Frozen Food Express Industries, Inc. is a holding company that wholly owns other subsidiaries including FFE Transportation Services, Inc. All Plaintiffs were formerly employed by FFE Transportation Services, Inc. or another wholly owned subsidiary of Frozen Food Express Industries, Inc. For convenience, the Plaintiffs' employers will simply be referred to as "Defendants."

Plaintiffs claim that they are all non-exempt employees who were denied overtime pay in violation of federal law. By way of affidavit, Aleatha Harris ("Harris") and Charleton J. Namachar ("Namachar") both state that they were employed as a "Customer Service Representative." [FN2] (See Pl.'s Mot., Ex. A, B.) Their job duties included "data entry, customer service, setting appointments for loads to be delivered to customers, sending messages to the drivers about appointment times, calling customers about late loads and updating the computer system." (Id.) Both state that they routinely worked in excess of 50 hours per week and were not properly paid overtime wages. (Id.) Marlon Bennett ("Bennett") states that he was employed as a "Fleet Manager" and his job duties included "scheduling drivers and being the first line of communication with drivers." (Id. at Ex. C.) Bennett further states that he did not have the authority to hire or fire drivers, and any disciplinary or management issues were directed to his superiors. Mark Shaw ("Shaw") states that he was employed for two years as a "Driver Manager" and "Driver Associate" and is currently employed as a "Driver." (Id. at Ex. D.) He claims his job duties as a Driver Manager/ Associate included "assigning loads to drivers, scheduling drivers and being the first line of communication with drivers" and he likewise lacked the authority to hire or fire drivers. (Id.) Both Bennett and Shaw state that they regularly worked in excess of 50 hours a week and were not properly paid overtime wages. (Id. at Ex. C, D.) Patsy Nell Long ("Long") did not file an affidavit, but Plaintiffs' Motion states that she was a billing clerk whose duties consisted of printing invoices, preparing freight audit bill reports, general billing, preparing subcontractor's pay and filing. (Pl.'s Mot. at 3.) All Plaintiffs, with the exception of Long, are classified as exempt employees and are paid a salary. Plaintiffs, however, claim that they should be classified as non-exempt and therefore paid overtime wages.

FN2. Both Harris and Namachar state that, at various times in their employment, their official title was "Accounts Manager," but

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                    Page 2
Not Reported in F.Supp.2d, 2006 WL 1994586 (N.D.Tex.), 11 Wage & Hour Cas.2d (BNA) 1084
**(Cite as: 2006 WL 1994586 (N.D.Tex.))**

that the job duties were the same regardless of title.

*2 Plaintiffs, on behalf of themselves and all others similarly situated, filed suit on January 12, 2005, alleging that Defendants have failed to compensate its employees for overtime work in violation of the Fair Labor Standards Act ("FLSA"). 29 U.S.C.A. § 201 et seq. Plaintiffs file the instant motion seeking to notify a group of potential plaintiffs of the pending action so that they may "opt-in" and join the collective lawsuit pursuant to 29 U.S.C.A. § 216(b). The group of potential plaintiffs sought to be notified is: "All customer service representatives, account managers, billing clerks, driver associates, driver managers or fleet managers working at FFE Transportation Services, Inc. and Frozen Food Express Industries, Inc. from January 12, 2003 to the present." (Pl.'s Mot. at 10.) Additionally, Plaintiff seeks expedited discovery, requesting that the Court order Defendants to provide, in usable electronic form, the name, last known address, telephone number, date of birth, and social security number of each current and former employee employed at each of Defendants' facilities statewide for the last three years.

## II. Legal Standard

District courts have the discretion, in appropriate cases, to allow a party asserting FLSA claims on behalf of others to notify potential plaintiffs of their right to opt-in to the suit. Hoffman-La Roche, Inc. v. Sperling, 493 U.S. 165, 169 (1989); Barnett v. Countrywide Credit Indus., Inc., No. 3:01- CV-1182-M, 2002 WL 1023161, at *1 (N.D.Tex. May 21, 2002) (Lynn, J.). But this notice is by no means mandatory, the relevant inquiry in each particular case is whether it would be appropriate to exercise such discretion. Hall v. Burk, No. 3:01-CV-2487-H, 2002 WL 413901, at *2 (N.D.Tex. Mar. 11, 2002) (Sanders, J.) (citing Camper, et al. v. Home Quality Mgmt., Inc. 200 F.R.D. 516, 519 (D.Md.2000)).

The Fifth Circuit has declined to adopt a specific test for determining whether to allow notification of potential plaintiffs. Mooney v. Aramco Servs. Co., 54 F.3d 1207, 1212 (5th Cir.1995). However, the prevailing analysis used by federal courts, and the Northern District of Texas in particular, is the two-stage approach first propounded by the court in Lusardi v. Xerox Corp., 118 F.R .D. 351 (D.N.J.1987). Mooney, 54 F.3d at 1212; Hall, 2002 WL 413901, at *2; Barnett, 2002 WL 1023161, at *1; Aguilar v. Complete Landsculpture, Inc., No.

3:04-0776-D, 2004 WL 2293842, at *1 (N.D.Tex. Oct. 7, 2004) (Fitzwater, J.). In the first stage of the analysis, the Court inquires as to whether Plaintiff has provided sufficient evidence that similarly situated plaintiffs exist. Mooney, 54 F.3d at 1213-14. At this stage, the Court uses a lenient standard, and if the Court finds certification appropriate, it usually conditionally certifies the class. At the second stage, the Court re-examines the class after notice, time for opting-in, and discovery have taken place. If it finds the class is no longer made up of similarly situated persons, it may decertify the class. This second inquiry is usually conducted in response to a motion by defendant. Id.; Barnett, 2002 WL 1023161, at *1- *2.

*3 At the initial stage, a court ordinarily possesses "minimal evidence" and is thus instructed to apply a lenient standard in determining whether to conditionally certify. Mooney, 54 F.3d at 1212. But where the parties have had the opportunity to conduct discovery on the issue of certification, the similarly situated inquiry is more stringent. Basco v. Wal-Mart Stores, Inc., No. 00-3184, 2004 WL 1497709, at *4 (E.D.La. July 2, 2004). Courts generally consider the evidence submitted and the two-step inquiry collapses into one. Id. ("[I]n light of the substantial discovery that has occurred in this matter, the Court will consider the criteria for both the first and second steps in deciding whether it should certify."); see also Pfohl v. Farmers Ins. Group, No. CV-03-3080, 2004 WL 554834, at *3 (C.D.Cal. Mar. 1, 2004) (finding that where discovery relating to the issues of certification had been undertaken, the court could proceed to the second stage of the analysis and weigh the relevant factors to determine whether plaintiffs were similarly situated); White v. Osmose, Inc., 204 F.Supp.2d 1309, 1313 n. 2 (M.D.Ala.2002) (finding it appropriate to consider the evidence submitted by the parties when discovery had been conducted); Ray v. Motel 6 Operating Ltd., No. 3-95-828, 1996 WL 938231, at *4 (D.Minn.1996) (applying a more stringent standard at the initial stage because "the facts before the Court are extensive [and] there is no need for discovery in order to reach a determination"). In the present case, the Court's Scheduling Order gave the parties over seven months to conduct discovery related to the certification issue; the Court finds this sufficient to engage the second step of the analysis. See Brooks v. Bellsouth Telecomm., Inc., 164 F.R.D. 561, 568-69 (N.D Ala.1995) (finding that a three month period for discovery was extensive enough to prompt the second stage of the analysis).

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                      Page 3
Not Reported in F.Supp.2d, 2006 WL 1994586 (N.D.Tex.), 11 Wage & Hour Cas.2d (BNA) 1084
(Cite as: 2006 WL 1994586 (N.D.Tex.))

At this second stage, when more evidence is available, courts typically consider three factors in determining whether potential plaintiffs are similarly situated. Such factors include (1) the disparate factual and employment settings of the individual plaintiffs, (2) the various defenses available to the defendant which appeared to be individual to each plaintiff, and (3) fairness and procedural considerations. *Basco,* 2004 WL 1497709, at * 4; *see also Mooney,* 54 F.3d at 1213 n. 7 (citing *Lusardi,* 118 F.R.D. at 359).

III. Analysis

In the instant case, all three second stage factors suggest that plaintiffs are not similarly situated and notification would be improper. First, even a brief recounting of the respective job titles and duties of the named plaintiffs make it abundantly clear that there is considerable variation in the factual and employment settings. Harris and Namachar both state that they were employed as a Customer Service Representatives and that their job duties included "data entry, customer service, setting appointments for loads to be delivered to customers, sending messages to the drivers about appointment times, calling customers about late loads and updating the computer system." (*See* Pl.'s Mot., Ex. A, B.) But Namachar states he finished his employment as a National Customer Service Representative, while Harris finished her tenure as an Account Manager. (*See id.*) According to affidavits submitted by Defendants, [FN3] Namachar's job duties were quite different from Harris in that he handled a variety of national and regional accounts and interacted with freight brokers when Defendants were unable to freight the customer's loads. In contrast, Harris did not work with freight brokers and worked solely with one customer in two different areas. Moreover, Defendants became dissatisfied with Harris' production and eventually re-assigned her to a non-exempt position where she was paid by the hour and eligible for overtime wages. The evidence further shows that Harris and Namachar worked extensively with customers of the Defendants, while both Bennett and Shaw state that their job primarily involved being "the first line of communication with drivers." (*See* Pl.'s Mot., Ex. C, D.) Bennett states he principally scheduled the drivers; while Shaw states that he assigned loads to the drivers. (*See id.*) Lastly, Plaintiffs' Motion states that Long was a billing clerk whose duties consisted of printing invoices, preparing freight audit bill reports, general billing, preparing subcontractor's pay and filing. (Pl.'s Mot. at 3.) According to the evidence submitted by Defendants, Long was a non-exempt employee paid on an hourly

basis and was properly compensated for all hours worked over 40 each week. (Def.'s App. at 60-61.) Plaintiffs have not attempted to refute such evidence. In sum, there is little similarity between the plaintiffs other than the fact that they all worked for the same employer and all claim violations of the FLSA.

> FN3. Such affidavits were in no way refuted by Plaintiffs.

*4 Second, because of the factual variations between each plaintiff, the Defendants would logically pursue different defenses for each plaintiff. Most significant is the fact that some of the class members challenge their classification as exempt, while other plaintiffs are already classified as non-exempt and would appear to allege that their hours were not properly recorded. The different classifications and varying job duties would require Defendants to present a highly individualized defense for each plaintiff's claims.

Finally, the Court finds that issues of fairness and manageability further counsel against certification. Defendants would likely be prejudiced in presenting a defense because of the individualized nature of the claims, and the broad scope of the proposed notice would likely exacerbate the fairness concerns. In sum, Plaintiffs' motion for notice fails the second stage analysis.

But even if the Court were to analyze the motion under the more lenient standard of the first stage, court authorized notice would still be denied. Notice is only appropriate when there is "a demonstrated similarity among the individual situations [and] ... some factual nexus which binds the named plaintiffs and potential class members together as victims of a particular alleged [policy or practice]." *Clarke v. Convergys Customer Mgmt. Group, Inc.,* 370 F.Supp.2d 601, 605 (S.D.Tex.2005). As discussed above, the five named plaintiffs represent at least three different positions within the company, all entailing significantly different job duties. The only commonality between the plaintiffs appears to be the fact that they were employed by the Defendants and now bring claims under the FLSA. But courts will not conditionally certify a collective action "simply because [plaintiffs] claim violations of the law by the same employer." *Freeman v. Wal-Mart Stores, Inc.,* 256 F.Supp.2d 941, 945 (W.D.Ark.2003). In *Freeman,* the court refused to conditionally certify a class of employees who alleged they were not being paid overtime wages because they were mis-characterized as exempt. *Id.* The court rejected the

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                              Page 4
Not Reported in F.Supp.2d, 2006 WL 1994586 (N.D.Tex.), 11 Wage & Hour Cas.2d (BNA) 1084
**(Cite as: 2006 WL 1994586 (N.D.Tex.))**

notion that all salaried employees were similarly situated regardless of the nature of their job duties. *Id.* Simply alleging violations of the law by the same employer was insufficient to justify a collective action. *Id.*

In addition, Plaintiffs have not clearly alleged a common policy or practice. In affidavits submitted by four of the five named plaintiffs, each states that they observed other employees who were subject to the same allegedly unlawful policies and practices. But allegations that "simply state that they believe other workers were discriminated against in similar ways ... [do] not satisfy the movant's [Rule] 216(b) burden." *H & R Block, Ltd. v. Housden,* 186 F.R.D. 399, 400 (E.D.Tex.1999). Plaintiffs have failed to offer anything more than conclusory allegations and have not demonstrated any factual nexus that binds the claims under a single policy.

**\*5** Furthermore, multiple courts in this circuit and elsewhere have refused to conditionally certify a class at the first stage of the analysis when the determination of whether certain employees were improperly classified as exempt would require a highly individualized inquiry. *Aguirre v. SBC Commc'ns, Inc.,* No. H-05-3198, 2006 WL 964554, at *7 (S.D.Tex. Apr. 11, 2006) (finding conditional certification inappropriate where differences among the potential plaintiffs predominated over their similarities); *Holt v. Rite Aid Corp.,* 333 F.Supp.2d 1265, 1274-75 (M.D.Ala.2004) (declining to conditionally certify collective action where individualized nature of the potential plaintiff's claims would diminish "the economy of scale envisioned by the FLSA collective action procedure"); *Reich v. Homier Distributing Co.,* 362 F.Supp.2d 1009, 1013-14 (N.D.Ind.2005) (refusing to conditionally certify where defendant's liability to any particular plaintiff would depend on a set of facts specific to that individual); *Morisky v. Pub. Serv. Elec. & Gas Co.,* 111 F.Supp.2d 493, 498 (D.N.J.2000) ("[M]any specific dissimilarities between the job duties of the name plaintiffs and the opt-in plaintiffs [ ] make certification as a collective action inappropriate."). The evidence presently before the Court shows that the differences in the named plaintiffs' job duties are significant; as such, the proper FLSA status of each employee would necessitate a fact-specific analysis of each individual plaintiff's employment terms. Such individualized analysis counsels against a collective action. Regardless of whether Plaintiffs' motion is considered through the first or second stage of the analysis, the Court does not believe that notice to

potential plaintiffs is appropriate.

III. Conclusion

For the reasons discussed above, the motion for notice to potential plaintiffs is denied. As Court authorized notice will not be issued to potential plaintiffs, the motion for limited expedited discovery is also denied. Therefore, Plaintiffs' Motion for Notice to Potential Plaintiffs and Limited Expedited Discovery is DENIED in all respects.

IT IS SO ORDERED.

Not Reported in F.Supp.2d, 2006 WL 1994586 (N.D.Tex.), 11 Wage & Hour Cas.2d (BNA) 1084

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Tab 5

Westlaw.

Not Reported in F.Supp.2d                                          Page 1
Not Reported in F.Supp.2d, 2005 WL 1994286 (S.D.Tex.)
(Cite as: 2005 WL 1994286 (S.D.Tex.))

**H**
Only the Westlaw citation is currently available.


United States District Court,
S.D. Texas, Houston Division.
Celia JOHNSON, Individually, and on Behalf of All
Others Similarly Situated,
Plaintiffs,
v.
TGF PRECISION HAIRCUTTERS, INC., Brelian,
Inc., and Frank Tavakoli, Defendants.
No. Civ.A. H-03-3641.

Aug. 17, 2005.
Brady Sherrod Edwards, Edwards, Burns & Braziel
LLP, Houston, TX, J. Derek Braziel, Edwards, Burns
& Braziel LLP, Dallas, TX, for Plaintiffs.

Margaret M. Bauer, pro se.

Maria T. Gallo, pro se.

Darlene Hamblin, pro se.

Danielle Lynn, pro se.

Rungrat Pruitt, pro se.

Polly Suzanne Landers, pro se.

Christina M. Pope, pro se.

Brenda Joyce Williams, pro se.

Maria Iris Gonzalez, pro se.

Nancy Goodlette, pro se.

Nina D. Carlson, pro se.

La Tonya Jackson, pro se.

Darlene Johnson, pro se.

Michael Guity, pro se.

Princess S. Carr, pro se.

Shirley Davis, pro se.

M. Christine Heimburger, pro se.

Carla Johnson, pro se.

M. Lillian Kennedy, pro se.

Kewanna Martin, pro se.

Dawn Renee McMullins, pro se.

Portia Moranza, pro se.

Micaiah Shearer, pro se.

Niki Stuchenko, pro se.

Vivian White, pro se.

Rhonda Sneed, pro se.

Nancy Galeano, pro se.

Linda Lee, pro se.

Michael Hernandez, pro se.

Priscilla Cruz, pro se.

Bianca Aguilar, pro se.

Kimberly Lynn Schroeder, pro se.

Angela Grace, pro se.

Kelly Alexander, pro se.

Tiffany Moore, pro se.

Solla Santana, pro se.

Gloria Salazar, pro se.

Carrie D'Agostino, pro se.

Brandy Sue Spivey, pro se.

Esther Salgado, pro se.

Manuella Valdez, pro se.

Maria Elvia Romero, pro se.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1994286 (S.D.Tex.)
(Cite as: 2005 WL 1994286 (S.D.Tex.))

Page 2

Lucila Vega, pro se.

Laquette Richardson, pro se.

Katrina Haskins, pro se.

Damita Y. White, pro se.

Lisa Britton, pro se.

Rosa Puga, pro se.

Cussundra Pleshette Jones, pro se.

Lisa A. Stormes, pro se.

Rosa Maria Hernandez, pro se.

Esmeralda Romero, pro se.

Christina Spicer-Lemire, pro se.

Willie James Kenner Jr., pro se.

Tamika Walker, pro se.

Leigh Anne Ferguson, pro se.

Dorothy Wilkerson, pro se.

Erica Salazar, pro se.

Brenda Oberholtzer, pro se.

Jacquelynne Dickerson, pro se.

Monica De La Cruz, pro se.

Wanda Brooks, pro se.

Renee P. Calderon, pro se.

Maria Cortez, pro se.

Debra Y. Davis, pro se.

Tanya Defoe, pro se.

Erin K. Doyle, pro se.

Tessany Eaglin, pro se.

Quidonya Gaines, pro se.

Tamara Thompson, pro se.

Lavenia Glover, pro se.

Vanessa Latigo, pro se.

Madonna Malone, pro se.

Devon Bell, pro se.

Stephanie Jo Ann Gonzales, pro se.

Ronald J. Laurie, pro se.

B.J. Myers, pro se.

Rhonda Davis, pro se.

Diane Diggs, pro se.

Rose Mary Gover, pro se.

Cynthia Grisham, pro se.

Amberly Hastings, pro se.

Melanie Lewis, pro se.

Marcelo Medina, pro se.

Wilma Jean Toliver, pro se.

Lisa Vitela, pro se.

Resha Alridge Bethany, pro se.

Blanca E.M. Deleon, pro se.

Brooke Lowe, pro se.

Lauri Mitchell, pro se.

Diane R. Oglesbee, pro se.

Tanya Anderson, pro se.

Susan Burkes, pro se.

Cynthia G. Estrada, pro se.

Chervon Jackson, pro se.

Lakeitha Proctor, pro se.

Sabra Red, pro se.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                    Page 3
Not Reported in F.Supp.2d, 2005 WL 1994286 (S.D.Tex.)
**(Cite as: 2005 WL 1994286 (S.D.Tex.))**

Patricia Rye, pro se.

Cecilia Sanchez, pro se.

Anni'a Scott, pro se.

Julie Arldt, pro se.

Chris Clines, pro se.

Debra Gilchrist, pro se.

Brandi Hall, pro se.

Robert Hinchcliffe, pro se.

Vanessa Khan, pro se.

Juan J. Nunez, pro se.

Tammy Sims, pro se.

Patricia Hopkins, pro se.

Mandi Scherbig, pro se.

Karen Crenshaw, pro se.

Erin K. Doyle, pro se.

Johnny S. Gonzalez, pro se.

Emma Martinez, pro se.

Micaiah Paxton Shearer, pro se.

Denishea Shorter, pro se.

Elida Halsell, pro se.

Melonnie Hicks, pro se.

Sandra E. Latigo, pro se.

Brenda Lewis, pro se.

Jessica Mattox, pro se.

Kristina Myers, pro se.

Kathy Keener Parker, pro se.

Amanda L. Scott, pro se.

Wendy Stephens, pro se.

Luchiana Thomas, pro se.

Evita Garza, pro se.

Danice Richardson, pro se.

Debra L. Stevens, pro se.

Rosibel Villacorta, pro se.

Alexis Nicole Wilson, pro se.

Peter Duong, pro se.

Nikia Johnson, pro se.

Peter Lister, pro se.

Monica Garcia, pro se.

Joy Kring, pro se.

Kimberly Williams, pro se.

Marisol Villa, pro se.

Natasha J. Wilson, pro se.

Heike B. Bassett, pro se.

Margaret Jeffers, pro se.

Patricia A. Pickens, pro se.

Amanda Gail Schvilwerve, pro se.

Eulah Banks, pro se.

Barcinas, pro se.

Jeffory H. Beadles, pro se.

Susannah Brooks-Sosebee, pro se.

Carolyn Byers, pro se.

JoAnn Mendoza, pro se.

Miriam S. Velas, pro se.

Barbara Boutte, pro se.

Benigna Garza, pro se.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1994286 (S.D.Tex.)
**(Cite as: 2005 WL 1994286 (S.D.Tex.))**

Shonquetta Lathon, pro se.

Norma Macias, pro se.

Ivette Roebuck, pro se.

Kristi Whitehorn, pro se.

Wonaldolynn Wilte, pro se.

Cheryl R. Carter, pro se.

Danielle Gallagher, pro se.

Patricia J. Jones, pro se.

Marcela Medina, pro se.

Donald A. Payne, pro se.

Jana Richardson, pro se.

Miriam Torres, pro se.

Lisa Wells, pro se.

Vonda Fisher, pro se.

Sharlene Homnick, pro se.

Toya Johnson, pro se.

Katherine Krog, pro se.

Michel LaSage, pro se.

Lisa Marie Lucio, pro se.

Margarita Monreal, pro se.

Russel Roberson, pro se.

Stacy Rogers, pro se.

Tammy Weaver, pro se.

Christy L. Corcoran, pro se.

Alicia Hannibal, pro se.

Delma Hernandez, pro se.

Natasha Mettura, pro se.

Misty Neilson, pro se.

Farnaz Razikazemi, pro se.

Jennifer Sullivan, pro se.

Kimberly Sue Brooks, pro se.

Olga Garcia, pro se.

Diana Gim, pro se.

Dara Norris, pro se.

Gwendolyn Rector, pro se.

Kimberly Warren, pro se.

Nicole Bolin, pro se.

Colleen Devine, pro se.

Priscilla A. Pace, pro se.

Cara Langton, pro se.

Kendall McClellan, pro se.

Adria B. Stone, pro se.

Corey Diamond, pro se.

Bisheba Gaines, pro se.

Shujuana L. Lastrape-Grace, pro se.

Yolanda Maire Morua, pro se.

Erica Nino, pro se.

Maria G. Quiroga, pro se.

Carol Anne Denby, pro se.

Rosemary Cain, pro se.

Tessany Eaglin, pro se.

Darla George, pro se.

Patrice A. Walden-Davies, pro se.

Erica M. Fuller, pro se.

Michael Jay Kuper, Attorney at Law, Larry Don

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                    Page 5
Not Reported in F.Supp.2d, 2005 WL 1994286 (S.D.Tex.)
**(Cite as: 2005 WL 1994286 (S.D.Tex.))**

Knippa, Knippa & Kral, Raymond L. Kalmans, Schlanger Silver et al, Houston, TX, for Defendants.

John Carl Cunningham, Attorney at Law, Bellaire, TX, for Movants.

*MEMORANDUM AND ORDER*

WERLEIN, J.

*1 Pending is Defendants' Motion to Decertify Class (Document No. 304). After carefully considering the motion, response, reply, surreply, and the applicable law, the Court concludes that the motion should be granted. [FN1]

> FN1. Also pending is Defendants' Motion to Strike Plaintiff's Surreply Filed Out of Time (Document No. 330). The filing of Plaintiff's Surreply "out of time" was occasioned by the timing of Defendants' own Reply, and their Motion to Strike is therefore DENIED. Defendants' alternative request to file additional briefing is also DENIED, as the parties have had ample opportunity fully to brief the matter presently under review.

*I. Background*

Plaintiff Celia Johnson ("Johnson") brings this action against Defendants TGF Precision Haircutters, Inc., Brelian, Inc. ("Brelian"), and Frank Tavakoli ("Tavakoli") for violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq. [FN2] Johnson, who alleges that she was an "hourly employee" of TGF, contends that although she "regularly worked in excess of 40 hours a week," Defendants made her work "off the clock" and did not pay her "time and a half for all time worked over forty hours a week." Document No. 281 ¶¶ 2, 13. She seeks unpaid backwages, liquidated damages, interest, costs, and attorney's fees.

> FN2. Johnson refers to Defendants collectively as "TGF."

Johnson also sues in behalf of "other employees similarly situated," thereby invoking the collective action provision of FLSA § 16(b), 29 U.S.C. § 216(b). Applying the lenient standard recognized in Mooney v. Aramco Servs. Co., 54 F.3d 1207 (5th Cir.1995), the Court on Johnson's motion conditionally certified a class "composed of all current and former TGF stylists and receptionists who worked for [TGF] between September 10, 2000, and the present." See Johnson v. TGF Precision

Haircutters, Inc., 319 F.Supp.2d 753, 756 (S.D.Tex.2004). Notices were sent to nearly 4,000 potential opt-in plaintiffs, and approximately 264 current and/or former employees filed written consents to join the instant action. See Document No. 304, at 4. Defendants now move for class decertification, arguing that certain of these employees were not in fact qualified to opt-in--and that those who were qualified are not "similarly situated" within the meaning of § 216(b) such as to permit the trial of a collective action.

*II. Discussion*

At this stage the Court must make a factual determination based on information gained from discovery on whether the conditionally certified class members are in fact similarly situated. See Mooney, 54 F.3d at 1214. "If the [class members] are similarly situated, the district court allows the representative action to proceed to trial." Id. If not, the district court decertifies the class, dismisses without prejudice the opt-in plaintiffs, and allows the class representative to proceed to trial on her individual claims. See id.

"During this 'second stage' analysis, a court reviews several factors, including '(1) disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; [and] (3) fairness and procedural considerations....' ' Thiessen v. Gen. Elec. Capital Corp., 267 F.3d 1095, 1103 (10th Cir.2001) (quoting Bayles v. American Med. Response of Colo., Inc., 950 F.Supp. 1053, 1066 (D.Colo.1996)); see Mooney, 54 F.3d at 1215 (quoting district court's consideration of these factors).

*2 Defendants argue for decertification on the grounds that: (1) Johnson and the opt-in Plaintiffs (collectively, "Plaintiffs") worked at 90 or more separate locations under separate management with varying policies and working conditions; (2) Plaintiffs' pay plans varied greatly in terms of hourly rates, commissions, and various forms of supplemental pay; (3) some Plaintiffs worked only part time; (4) those Plaintiffs who were receptionists averaged less than 40 hours per week and those who were stylists worked essentially on commission under circumstances that exempted them from overtime pay requirements; (5) many Plaintiffs worked for such a brief period of time at TGF that their claims would be de minimis; and (6) that Defendants' highly individualized defenses to Plaintiffs' individual claims are numerous and varying. See Document No. 304, at 12-13.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1994286 (S.D.Tex.)
(Cite as: 2005 WL 1994286 (S.D.Tex.))

A. *Disparate Factual and Employment Settings*

Defendants' initial arguments relate to the first decertification factor-- disparate factual and employment settings of the class members. *See Thiessen,* 267 F.3d at 1103; *Moody,* 54 F.3d at 1215; *Moss v. Crawford & Co.,* 201 F.R.D. 398, 409 (W.D.Pa.2000)* ("The first factor assesses the opt-in plaintiffs' job duties, geographic location, supervision, and salary.").

1. *Job Duties*

The conditionally certified class encompasses both hair stylists and receptionists, with each group having quite different and distinct primary job duties while still sharing some common tasks. According to TGF's 2002-2003 Policies & Procedures Manual (the "Manual"), stylists were responsible for consulting with customers and providing actual hair styling services, while receptionists were to welcome customers, place them with an available stylist, operate the cash register, prepare daily deposits, and answer the phone. *See* Document No. 320 ex. A ex. 2, at 34-48. Although managers are not explicitly encompassed within the conditionally certified class, it appears that some managers and assistant managers may have also worked as stylists during the period in question. *See, e.g., id.* ex. B exs. 8-9. Managers had additional duties, such as hiring, scheduling, taking disciplinary actions (including termination), taking inventory, opening and closing the store, and holding weekly meetings with staff. *See id.* ex. A ex. 2, at 49-51. The overlapping tasks of all employees were to recommend TGF's Shiva product line, help keep the store clean, and complete their own timesheets. *See id.* at 37, 41, 52. The differences in job duties between stylists and receptionists, Plaintiff suggests, could be accommodated with two sub-classes of employees. Indeed, if it were not for the far more serious differences described below, the job duties *per se* might not require decertification.

2. *Geographic Location*

Defendants emphasize that TGF conducted business at over 90 different locations. Johnson argues that because the locations are all in Texas, principally in the Houston, Austin, and San Antonio metropolitan areas, the geographic variance is minor. *Cf. Lusardi v. Xerox Corp.,* 122 F.R.D. 463, 465 (D.N.J.1988) (reaffirming decision to decertify class where, *inter alia,* a sample of approximately 1,300 opt-in plaintiffs encompassed 17 different Xerox groups in

34 cities or towns in 16 different states). Variances even within a single state, however, are not necessarily insignificant. *See, e.g., Basco v. Wal-Mart Stores, Inc.,* No. CIV.A. 00-3184, 2004 WL 1497709, at *7-8 (E.D.La. July 2, 2004) (unpublished). The putative class members in *Basco* were Wal-Mart employees who, like Plaintiffs, claimed that they were denied overtime by being forced to work off the clock and miss or work during meal and/or rest breaks. *See id.* at *2. In deciding not to certify a statewide class of potential plaintiffs, the district court observed: "A store locate[d] in Northern Louisiana faces different pressures and sales dynamics than a store in Southern Louisiana. Such variances would be equally possible within the New Orleans area even from store to store." *Id.* at *8. That observation, however, was predicated upon the court's determination that the corporate "policy" at issue in the case--one of keeping employee wage costs low--was not uniformly or systematically implemented at any given store. *See id.* at *7. Thus, the policy did not "bind" the plaintiffs' claims together in a way that promoted collective adjudication. *See id.* The evidence here is that there was a substantial variance of experiences by different Plaintiffs under different managers and at different shops around Texas. For example, at some stores some Plaintiffs state that they were not allowed to clock-in for the 15 minutes before the store opened and at other stores employees were permitted to clock-in for that preparatory quarter-hour. Some Plaintiffs say that at their store they were required to clock-out when waiting for customers and a few of those claim they were not permitted to leave the store, but other Plaintiffs who filed declarations describe no such experience. Some Plaintiffs complain that they were required to clock-out for breaks, but do not state if these were lunch breaks or additional breaks beyond those allowed with compensation. The large number of widespread shops, each with its own manager, understandably appears to have contributed materially to the dissimilarities of Plaintiffs' experiences.

3. *Common Policy and Supervision*

*3 One core question in the overall analysis essentially is whether Plaintiffs are all complaining of the same practice or policy that gives rise to their claims. Johnson contends that there was "an overarching policy to deny Plaintiffs overtime [pay]," which she contends was embodied in the Manual and "enforced by Tavakoli's tight supervisory control." Document No. 319, at 11. [FN3] Johnson points out that the Manual instructs a stylist to arrive at his/her

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1994286 (S.D.Tex.)
(Cite as: 2005 WL 1994286 (S.D.Tex.))

salon 15 minutes early so as to be "prepared to work at your scheduled time," and states that a stylist is expected to stay late if necessary to complete work on a customer, even if it means staying past the stylist's scheduled departure time. *See* Document No. 320 ex. A ex. 2, at 20. The Manual does not say that a stylist is not to be paid for the preparatory time of 15 minutes before the shop opens or for completing work on a customer at the end of the day. In fact, the Manual states that the stylist should note his/her departure time on his/her timesheet so that *"it accurately reflects the actual hours worked." See id.* (emphasis added). Likewise, although Johnson cites to a "Receptionist and Front Desk Procedures Handout," this handout states that "[r]eceptionists are always *scheduled* 15 minutes prior to opening time or the first appointment." *See id.* ex. 6, at 2. Johnson relies on the declarations of dozens of Plaintiffs who make generalized statements such as: "While employed by TGF, I was *frequently* required to, and *often* did, arrive to work early, and I was not paid for these times," (emphasis added), or "While employed by TGF, I was *frequently* required to, and *often* did, work after my shift was over, and I was not paid for these times." (emphasis added.) *See generally id.* ex. B. [FN4] Johnson also cites declarations made by a handful of former TGF managers and/or supervisors. Some state that they required stylists and receptionists at their shop to arrive early, but did not clock them in until the salon opened--or that they clocked the stylists and receptionists out once the store closed, even if the employees were still working--because Tavakoli and/or the Manual required them to do so. *See, e.g., id.* ex. B exs. 17, 40. [FN5] The policy of other managers was to have stylists and receptionists clock-in for the 15 minutes before the store opened and to stay clocked-in when working late. These managers state they received complaints from their employees about shortages in their paychecks, but do not state how they resolved those complaints. *See id.* exs. 42-43.

> FN3. As explained above, Johnson's allegations about the existence of a "common policy violating the FLSA" permitted conditional class certification to begin with. Now that discovery has been conducted, however, those allegations merit a more searching review. *Cf. Basco,* 2004 WL 1497709, at *4-5 (considering both stages of the "similarly situated" inquiry simultaneously, because substantial discovery had already occurred); *England v. New Century Fin. Corp.,* 370 F.Supp.2d 504, 509 (M.D.La.2005) (following *Basco* ).

> FN4. Defendants argue that these declarations should have been (but were not) disclosed in response to their interrogatories and requests for production--and therefore should not be considered in deciding the Motion to Decertify. Johnson replies that nearly all the declarations were made *after* she had responded to the interrogatories and requests for production. In any event, Defendants have been able to respond to the declarations and they will be considered. Defendants' conclusory objections to the declarations as "riddled with hearsay and speculative statements" are DENIED.

> FN5. It is clear that Tavakoli was involved in TGF's overall operations. *See* Document No. 281 ¶ 6; No. 301 ¶ 6. For example, a former TGF manager and a former supervisor state that Tavakoli would sometimes call and/or visit their salons to check on sales and to ensure that employees were following company policy. *See* Document No. 320 ex. B exs. 7, 55. Tavakoli himself testified that he personally attended most managers' meetings, which occurred as frequently as biweekly and sometimes involved discussion of TGF's policies and procedures. *See id.* ex. A, at 40-45. Tavakoli was also usually involved in writing the handouts used at the meetings, which often contained information on promotions, proper salon operations, and effective management skills. *See, e.g., id.* ex. A, at 42; exs. 8-11.

Johnson also points out that one part of the Manual states that employees should "clock out for all breaks." *See id.* ex. A ex. 2, at 53. [FN6] A more specific section in the Manual, however, explains that while time is deducted for a half-hour lunch break, time is *not* deducted from an employee's hourly rate for 15 minute breaks. *See id.* at 43. [FN7] Many of Plaintiffs' declarations upon which Johnson relies contain statements such as, "While employed by TGF, I was required to clock out when I took a break," without identifying the reason, nature or length of the break. *See, e.g., id.* ex. B exs. 15, 22, 24, 29, 37, 45, 59. While some declarants complain that they were required to clock-out for smoke breaks lasting less than 20 minutes, these declarants do not explain whether the smoke breaks were taken as--or in addition to--normal rest breaks. *See, e.g., id.* exs. 14, 25. [FN8]

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1994286 (S.D.Tex.)
(Cite as: 2005 WL 1994286 (S.D.Tex.))

FN6. Applicable regulations state that rest periods of a short duration, typically lasting five to 20 minutes, must be counted as hours worked, but a bona fide meal period of 30 minutes or more does not count as time worked. *See* 29 C.F.R. § § 785.18-.19.

FN7. According to the Manual, employees receive one fifteen minute break in a four to five hour shift, one fifteen minute break and one half-hour lunch in a six to eight hour shift, and two fifteen minutes breaks and a half-hour lunch in shifts exceeding eight hours. *See* Document No. 320 ex. A ex. 2, at 43.

FN8. Some declarants also complain that they were required to clock-out when engaging in *personal* phone calls. *See, e.g.*, Document No. 320 ex. A exs. 20, 27-28.

*4 Nevertheless, at least some Plaintiffs state that they were required to clock-out "while engaged in waiting activities, such as reading the newspaper, when no customers needed assistance," and a few of these Plaintiffs add that they were not permitted to leave the salon even though they were clocked out. *See, e.g., id.* exs. 31-32, 35-36, 73-74. [FN9] Another handful of Plaintiffs contend that their timesheets reflected deductions for breaks not taken. *See, e.g., id.* exs. 3, 10, 23. Several managers and/or supervisors have submitted declarations supporting these latter claims. *See, e.g., id.* exs. 40, 55, 71. One supervisor, for example, stated that Tavakoli told her to reduce the time worked on various timesheets by an hour if the timesheets did not reflect a lunch break, and Johnson has produced timesheets that appear to have been altered. *See id.* ex. A ex. 15, ex. B ex. 55. [FN10] Indeed, while Tavakoli denied requiring employees to clock-out for breaks, he admitted that if a timesheet reported eight or more hours worked in a day, TGF would deduct 30 minutes for lunch. *See id.* ex. A, at 79-81. [FN11]

FN9. Applicable regulations require that, in certain circumstances, "waiting time" be counted as time worked. *See* 29 C.F.R. § § 785.14-.17. Whether an employee is required to remain on the employer's premises, or so close to it that she cannot use the waiting time for her own purposes, is a relevant factor. *See id.* § 785.17.

FN10. The timesheets contain language

stating that "Absolutely No Overtime is approved Under any Circumstances." *See* Document No. 320 ex. A ex. 15.

FN11. Tavakoli explained, however, that he believed that if an employee was busy enough to work eight hours, the lost hourly pay would be offset by commissions. *See* Document No. 320 ex. A, at 81; *infra* at 15-16 (explaining how stylists and receptionists were paid).

Finally, Johnson complains that employees were required to attend meetings and/or training classes for which they were not paid. [FN12] With the exception of management, the Manual encourages--but does not require-- attendance at regular meetings. *See id.* ex. A ex. 2, at 19, 49. Although Tavakoli testified in his deposition that he thought stylists were paid for attending weekly meetings, approximately 54 of the 75 Plaintiffs who submitted declarations claim that they "often attended TGF meetings," and "[were] not paid for time spent at these meetings." *See id.* ex. A, at 68-69; *see* generally *id.* ex. B. A few former supervisors and/or managers acknowledge that, at the instruction of upper management (sometimes Tavakoli), they required stylists and receptionists to attend meetings for which they either were not paid or "may not have been paid." *See id.* exs. 62, 69, 71. With respect to training, the Manual states that attendance at TGF's continuing education courses-- which aspire to provide "an opportunity to stay current on the latest trends and skills necessary to excel in the hair care industry"--is mandatory for stylists interested in a management position. *Id.* ex. 2, at 14. Approximately 18 Plaintiffs stated that they attended these continuing education classes, but were not paid for doing so. *See, e.g., id.* ex. B exs. 16-17, 27-28. Again, former supervisors and/or managers acknowledge requiring stylists to attend these classes, and Tavakoli conceded in his deposition that sometimes employees were not paid for attending the classes. *See id.* ex. A, at 72-73; ex. 2, at 52 (Manual states that employees are "neither paid nor charged for company educational classes") ex. B exs. 17, 69.

FN12. Under applicable regulations, attendance at meetings, lectures, and training programs is not counted as time worked if *all* of the following conditions are met: (1) attendance is outside of the employee's regular working hours; (2) attendance is in fact voluntary; (3) the course, meeting, or lecture is not directly related to the employee's job; and (4) the

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1994286 (S.D.Tex.)
(Cite as: 2005 WL 1994286 (S.D.Tex.))

employee does not perform any productive work during such attendance. 29 C.F.R. § 785.27.

The foregoing conglomerate of diverse evidence indicates that some Plaintiffs may have prima facie claims for FLSA violations at different times, in different places, in different ways, and to differing degrees, but the evidence of varied particular violations is insufficient to show that Defendants implemented a uniform, systematically applied policy of wrongfully denying overtime pay to Plaintiffs. On the one hand, some supervisors and/or managers attribute their actions to violate the FLSA to instructions from Tavakoli, which suggests the existence of an "overarching" policy. At the same time, however, the alleged violations are not uniform; to the contrary, they are highly variable, evidently depending to a great extent upon circumstances and the attitudes and perceptions of individual managers at particular salons. The numerous variations of complaints alleged, and concomitant individual inquiries that would be required, all weigh in favor of decertification. Cf. England, 370 F.Supp.2d at 511 ("[I]ndividual inquiries must predominate in this case because of the different locations, managers, and factual situations involved at each location."); Stone v. First Union Corp., 203 F.R.D. 532, 546 (S.D.Fla.2001)(finding that personnel actions upon which plaintiffs based their complaint were "too diverse to support a collective action of 'similarly situated' individuals"); Bayles, 950 F.Supp. at 1061 ("[E]ach plaintiff's proof of violation will be individualized because it depends upon how or whether defendant's policy was implemented by individual managers with regard to individual plaintiffs...."). [FN13]

FN13. Notably, in support of their motion Defendants have submitted dozens of surveys filled out by TGF managers who did not opt-in to the instant lawsuit. See Document No. 320 ex. 17. Most of those persons were employed by TGF during the notice period. Johnson has not objected to these surveys, which are generally signed and state that the answers given therein are true, correct, and made under penalty of perjury. Many of the surveys indicate that employees who arrive before opening or stay after closing do in fact record this time on their timesheets, that they do not clock-out to talk on the phone or take a smoke break, that they do take and clock-out for a thirty minute lunch, and that attendance at

manager and training meetings is voluntary. See generally id. The individualized nature of the claims--from shop to shop and from manager to manager--is plain.

4. Salary

*5 The complexity of individualized claims alleged in this case is only exacerbated by the variety of methods by which Plaintiffs were paid. Receptionists were generally paid at an hourly rate between $5.15 and $9, but some also received commissions on sales of Shiva products. See Document No. 304, at 5. Stylists were paid the greater of (1) a varying hourly rate, or (2) commissions consisting of the aggregate of 40% of styling service income, 20% of income on sales of Shiva products, and 10% on sales of other products. See id.; Document No. 320 ex. A, at 88-89. Managers and assistant managers were paid like stylists but could earn a higher commission on styling service income, and Managers had a "specific guarantee" as their fallback rather than an hourly rate. See Document No. 304, at 5-6; exs. 7-10. Furthermore, assistant managers would sometimes receive a weekly "supplement" to their pay. See id. Other employees were likewise eligible for a weekly "key holder" supplement if they opened and closed the salon each day. See id. ex. 11. These supplements, however, differed from individual to individual. See id. exs. 11-12. Further complicating the payment process is the fact that a stylist's pay fluctuated depending upon his or her particular experience, store volume, and performance. See id. at 6-7; Document No. 320 ex. A ex. 17.

Johnson argues that these many variations do not necessarily favor decertification. See Bradford v. Bed Bath & Beyond, 184 F.Supp.2d 1342, 1351 (N.D.Ga.2002) (stating that differing annual salaries did not create an individual issue because "the compensation due to each Plaintiff can be calculated using a formula to figure the expected hourly rate for each employee based on his or her annual salary"); Moss, 201 F.R.D. at 410 (finding that variations in plaintiffs' duties, job locations, and hourly billing rates did not "differentiate the collective basis of the class to the extent that it defeats the primary objectives of a § 216(b) action"). Unlike Bradford and Moss, however, this case does not involve claimants all being paid hourly rates, with the rates being the only variable, but instead an overlay of a complex fluctuating commission system is present. The latter also implicates an FLSA exemption, which is discussed below in considering individualized defenses.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1994286 (S.D.Tex.)
(Cite as: 2005 WL 1994286 (S.D.Tex.))

Before considering the individualized defenses raised as to numerous Plaintiffs, however, it is quite evident that Plaintiffs' claims themselves are diverse and disparate, typically depending upon the perceptions and practices of individual shop managers at nearly 90 different locations in three major cities in Texas, with the claims being rendered all the more dissimilar by the fact that most of the stylists were compensated in a fluctuating commission system.

### B. Defenses

The second inquiry on decertification is whether Defendants have defenses available that appear to be individual to various Plaintiffs. *See Thiessen,* 267 F.3d at 1103; *England,* 370 F.Supp.2d at 509-10. Defendants raise the FLSA's § 7(i) exemption as to the vast majority of Plaintiffs and the *de minimis* rule as to about one-fourth of Plaintiffs. [FN14]

> FN14. Defendants invocation of the *de minimis* rule is based on their contention that approximately 70 Plaintiffs worked for TGF for fewer than 13 weeks and that their claims should therefore be rejected under the *de minimis* rule. This appears to be a misunderstanding of the *de minimis* rule, which does not have bearing on the pending decertification motion. "The *de minimis* rule provides that an employer, in recording working time, may disregard 'insubstantial or insignificant periods of time beyond the scheduled working hours, which cannot as a practical administrative matter be precisely recorded for payroll purposes." ' *Mireles v. Frio Foods, Inc.,* 899 F.2d 1407, 1414 (5th Cir.1990) (quoting 29 C.F.R. § 785.47). However, "[t]his rule applies only where there are uncertain and indefinite periods of time involved of a *few seconds or minutes duration,* and where the failure to count such time is due to considerations justified by industrial realities." 29 C.F.R. § 785.47 (emphasis added). Indeed, an employer "may not arbitrarily fail to count as hours worked any part, however small, of the employee's fixed or regular working time or practically ascertainable period of time he is regularly required to spend on duties assigned to him." *Id.*

**\*6** Section 7(i) of the FLSA states in relevant part:
No employer shall be deemed to have violated [the

overtime provisions] of this section by employing any employee of a retail or service establishment for a workweek in excess of the applicable workweek specified therein, if (1) the regular rate of pay of such employee is in excess of one and one-half times the minimum hourly rate applicable to him under the [minimum wage section] of this title, and (2) more than half his compensation for a representative period (not less than one month) represents commissions on goods or services.
29 U.S.C. § 207(i). It is uncontroverted that Defendants operate a "retail or service establishment" within the meaning of § 7(i) and are therefore entitled to assert this defense. *See* 29 C.F.R. § 779.312 *et seq.* [FN15] Johnson argues that this is simply a generalized, classwide defense, and therefore does not weigh against class certification. *See Moss,* 201 F.R.D. at 410 (explaining that second factor asks "whether the potential defenses pertain to the opt-in class as a whole or whether many different defenses will be raised with respect to each individual opt-in plaintiff"). In one sense the § 7(i) exemption pertains to the opt-in class as a whole, because Defendants assert it broadly. Functionally, however, § 7(i) is in fact a highly individualized defense because its application requires week-by-week and other periodic calculations (*e.g.,* not less than monthly on one part of the formula) specific to each individual Plaintiff and his or her particular circumstances. The "regular rate" of pay, for example, "is a rate per hour, computed for the particular workweek by a mathematical computation in which hours worked are divided into straight time earnings for such hours to obtain the statutory regular rate." 29 C.F.R. § 779.419; *see Schwind v. EW & Assocs., Inc.,* 371 F.Supp.2d 560, 567 (S.D.N.Y.2005). [FN16] With respect to commissions, § 7(i) also requires the totaling of each particular Plaintiff's commissions over a "representative period" of not less than one month. *See* 29 U.S.C. § 207(i). This "representative period" is meant to be "a period which typifies the total characteristics of an employee's earning pattern in his current employment situation, with respect to the fluctuations of the proportion of his commission earnings to his total compensation." 29 C.F.R. § 779.417. The proof required to establish these individualized § 7(i) exemption defenses would become the overwhelming focus of a trial which, to a jury or factfinder, would amount to trials of perhaps as many as 200 individual cases. [FN17] Thus, the § 7(i) exemption defense weighs heavily in favor of decertification. *Cf. Basco,* 2004 WL 1497709, at *8 ("Wal-Mart's potential defenses to any alleged FLSA overtime violations will require highly individualized

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                                                Page 11
Not Reported in F.Supp.2d, 2005 WL 1994286 (S.D.Tex.)
**(Cite as: 2005 WL 1994286 (S.D.Tex.))**

evidence concerning each associate."); _Wynn v. National Broadcasting Co., Inc.,_ 234 F.Supp.2d 1067, 1085 (C.D.Cal.2002) (declining to certify class where, _inter alia,_ individualized issues, including individualized defenses, would predominate); _Morisky v. Public Serv. Elec. and Gas Co.,_ 111 F.Supp.2d 493, 499 (D.N.J.2000) (finding that an exemption inquiry was "extremely individual and fact intensive," and deciding that "the individual nature of the inquiry required make[s] collective treatment improper in this case"); _Brooks v. BellSouth Telecomms., Inc.,_ 164 F.R.D. 561, 569 (N.D.Ala.1995) (explaining that circumstances of employment termination were diverse and that "the court, if plaintiff's suggested class were certified, would be faced with numerous individualized defenses"). [FN18]

> FN15. Johnson contends that Defendants failed to comply with certain record keeping requirements related to the § 7(i) exemption. _See_ 29 C.F.R. § § 516.16, 779.420. Even if so, such a failure would not make the § 7(i) exemption unavailable. _See Viciedo v. New Horizons Computer Learning Ctr. of Columbus, Ltd.,_ 246 F.Supp.2d 886, 899-900 (S.D.Ohio 2003).

> FN16. The FLSA "takes a single workweek as its standard and does not permit averaging of hours over 2 or more weeks." 29 C.F.R. § 778.104. Thus, "it is ... necessary to determine the hours worked and the compensation earned by ... commission employees on a weekly basis." _Id._

> FN17. This burden becomes even greater with the individualized, fluctuating nature of Plaintiffs' payment plans described above.

> FN18. Some cases have allowed a collective action to proceed in spite of individualized defenses. _See, e.g., Thiessen,_ 267 F.3d 1107; _Bradford,_ 184 F.Supp.2d at 1351. Unlike the instant case, _Thiessen_ involved pattern-or-practice discrimination claims such that individualized defenses would not become a focal point until the second stage of trial, and "could be dealt with in a series of individual trials, if necessary." _See Thiessen,_ 267 F.3d at 1107. _Bradford_ did involve an FLSA exemption, but not one like the § 7(i) exemption, which here would require individualized proof and fact findings as to

each of the individual Plaintiffs against whom the defense applies. _See Bradford,_ 184 F.Supp.2d at 1345-46, 1351.

**C. Fairness and Procedural Considerations**

*7 In the decertification analysis the Court also must "consider whether it can analyze the opt-in class with a 'broad scale approach,' ' keeping in mind the primary objectives of a collective action under § 216(b): (1) to lower the costs to plaintiffs through the pooling of resources; and (2) to limit the controversy to one proceeding which efficiently resolves common issues of law and fact that arose from the same alleged activity. _See Moss,_ 201 F.R.D. at 410 (quoting _Lusardi v. Xerox Corp.,_ 118 F.R.D. 351, 360 (D.N.J.1987), _mandamus granted sub nom. Lusardi v. Lechner,_ 855 F.2d 1062 (3d Cir.1988)). "The court must also determine whether it can coherently manage the class in a manner that will not prejudice any party." _Id._

As Johnson points out, permitting this case to proceed as a collective action would allow for the pooling of resources by Plaintiffs in an effort to vindicate what may well be relatively small claims. _See Bradford,_ 184 F.Supp.2d at 1351. This salutary benefit, however, must be weighed in the balance with all of the other factors, and those other factors on the whole weigh heavily for decertification. As has been seen, Plaintiffs' claims are not based on a uniform, systematically applied practice that violates the FLSA, which, once rejected by the Court, would permit Plaintiffs' claims all to be quantified and duly compensated. To the contrary, Plaintiffs' disparate and various claims do not present common issues of law and fact arising from the same alleged activity but depend upon varied and sundry activities of individual salon managers of different shops in about 90 different locations in three of Texas's largest urban areas. TGF's Manual, which on the whole does not require implementation of a FLSA proscribed practice, and the overall directions given to the business by Tavakoli, were perceived, understood, and applied in various ways by different managers in different store locations, understandably resulting in Plaintiffs having dissimilar claims. Moreover, some of Plaintiffs (it appears between 40 and 50) were receptionists (of which group Plaintiff Johnson is not representative), although most Plaintiffs were hair stylists whose principal task was cutting hair. A wide variety of compensation formulas applied to individual Plaintiffs depending upon whether they were receptionists, hair stylists, key holders, assistant managers, and the like. On top of the wide variety of

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                    Page 12
Not Reported in F.Supp.2d, 2005 WL 1994286 (S.D.Tex.)
**(Cite as: 2005 WL 1994286 (S.D.Tex.))**

circumstances surrounding Plaintiffs' claims, there is an overlay of Defendants' § 7(i) defenses. Defendants contend, with support in summaries of their payroll records, that the vast majority of the 264 opt-ins received more than one-half of their compensation on commissions and that more than one-half of all opt-ins earned in excess of one and one-half times the minimum hourly rate for all hours worked. These highly individualized defenses as to the great majority of all opt-ins, with the layers of fact findings required by § 7(i) as to each of those Plaintiffs, present a case where the individualized claims and individualized defenses, all of which are highly fact intensive, would not only dominate but would swallow and consume the entire case. *Cf. Basco,* 2004 WL 1497709, at *8 ("[A] collective action of this nature presents enormous manageability problems because there is no single decision, policy, or plan at issue."); *Mielke v. Laidlaw Transit, Inc.,* 313 F.Supp.2d 759, 764 (N.D.Ill.2004) (declining to certify collective action given the absence of a uniform policy, disparate factual and employment settings, and likelihood that case would not be resolved summarily); *Wynn,* 234 F.Supp.2d at 1085 (quoting *Thiessen,* 267 F.3d at 1103) (Ultimately, "given the circumstances of this case, it would be nearly impossible for [it] to be 'coherently managed and evidence presented in a manner that would not confuse the jury or unduly prejudice any party." '). Fairness and procedural considerations weigh persuasively in favor of decertification.

*8 After having weighed (1) the disparate factual and employment settings of the opt-in Plaintiffs, and the absence of a uniform, systematically applied policy violating the FLSA; (2) the highly individualized nature of Defendants' § 7(i) exemption defenses; and (3) fairness and procedural considerations, the Court finds that Plaintiffs are not "similarly situated" within the meaning of the FLSA such as to make a collective action feasible, and Defendants' Motion to Decertify will be granted.

### III. *Order*
For the foregoing reasons, it is hereby

ORDERED that Defendants' Motion to Decertify Class (Document No. 304) is GRANTED, and all opt-in Plaintiffs are DISMISSED from this action without prejudice to each such opt-in Plaintiff filing a suit in his or her own behalf. To avoid prejudice to individual opt-in Plaintiffs who may choose to file their own cases, the Court invokes its equity powers to toll the applicable statutes of limitations for 30 days after the entry of this Order. The claims of

Plaintiff Celia Johnson remain pending herein for trial.

The Clerk shall notify all parties and provide them with a signed copy of this Order.

Not Reported in F.Supp.2d, 2005 WL 1994286 (S.D.Tex.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

# Tab 6

Westlaw.

Not Reported in F.Supp.                                                                                    Page 1
Not Reported in F.Supp., 1991 WL 238304 (E.D.Pa.), RICO Bus.Disp.Guide 7831
(Cite as: 1991 WL 238304 (E.D.Pa.))

C

United States District Court, E.D. Pennsylvania.
Steven MATJASTIC, individually and on behalf of
all others similarly situated,
v.
QUANTUM PHARMICS, LTD.
Civ. A. No. 90-0647.

July 22, 1991.

Memorandum

LOWELL A. REED, Jr., District Judge:

*1 Plaintiff Steven Matjastic brought this action against defendant Quantum Pharmics, LTD ("Quantum") alleging that defendant fraudulently obtained approval to market certain generic drugs and placed them into the stream of commerce in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § § 1961 et seq. (1988), in addition to common law fraud, negligent misrepresentation, negligence, breach of implied and express warranties under the Uniform Commercial Code ("UCC") § § 2-313-15, and various consumer protection statutes.

Before me is plaintiff's motion for class certification pursuant to Fed.R.Civ.P. 23(a) and 23(b)(3). For the reasons set forth below plaintiff's motion will be denied with prejudice.

I. Factual Background

The facts of this case as articulated in plaintiff's memorandum are as follows. Quantum was the generic drug subsidiary of American Home Products ("AHP"), one of the largest drug manufacturers in the country. Quantum manufactured and marketed generic drugs. Although the ingredients in generic drugs are slightly different than name brand drugs, they are reviewed by the Food & Drug Administration ("FDA") to determine if they are the bioequivalent of the brand name drug. In order to market a new drug, a New Drug Application must be submitted to and approved by the FDA. If a manufacturer can demonstrate that the generic drug is the bioequivalent of the brand name drug, that manufacturer may submit an Abbreviated New Drug Application. Quantum submitted the abbreviated form to the FDA for approval to market Lorazapam,

minoxidil tablets, chlorazepate dipotassium tablets, meclofenamate sodium capsules, trazadone, doxepin, and diazepam ("generic drugs"). Between 1985 and 1988 the FDA approved all of Quantum's generic drugs based on the information provided by Quantum in its applications. Plaintiff alleges that in its applications Quantum misrepresented the size of its production runs for certain generic drugs and that the actual formulation of other generic drugs may not have been the bioequivalent of the brand name drugs.

In September, 1989 AHP temporarily suspended Quantum's operations and in the following month Quantum began to recall its generic drugs. By January 1990 AHP removed Quantum's generic drugs from the market and halted its production and shipping. Quantum had given up marketing approval for 25 generic drugs.

Plaintiff filed an action under RICO and made several state law claims seeking damages resulting from defendant's misrepresentations. Plaintiff now moves for class certification of all the following class:

All persons in the United States who, between August 9, 1985 and October 20, 1989, purchased Lorazapam, minoxidil tablets, meclofenamate sodium capsules, trazadone, doxepin, and diazepam manufactured by Quantum Pharmics, Ltd. Excluded from the class is defendant, its parent, subsidiaries, affiliates, directors, and officers, and all persons and entities who purchased the drugs for resale.

II. Discussion

A. Standing

*2 A plaintiff must be a member of the class he seeks to represent. In order to have standing as a class representative it is not enough to assert the claims of others, a plaintiff must allege that he has personally suffered damages. See Warth v. Seldin, 422 U.S. 490, 502 (1975). Defendant's sole argument that plaintiff lacks standing as a class representative is that, according to defendant, plaintiff has not suffered the financial damages he would seek to prove on behalf of the class. Plaintiff, however, did in fact use defendant's products and alleged that he suffered economic injury through his payment plan. I find that plaintiff's allegations as to

Not Reported in F.Supp.                                                                                                 Page 2
Not Reported in F.Supp., 1991 WL 238304 (E.D.Pa.), RICO Bus.Disp.Guide 7831
**(Cite as: 1991 WL 238304 (E.D.Pa.))**

his economic injury are sufficient to confer standing as a class representative. [FN1]

### B. *Class Certification (Rule 23(a))*

In order to maintain a class action the plaintiff must establish, to the court's satisfaction, that the elements of Fed.R.Civ.P. 23(a) and Fed.R.Civ.P. 23(b)(3) [FN2] have been satisfied. *General Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 161 (1982). In analyzing whether the plaintiff has met this threshold burden the court does not consider the merits of the case. *Eisen v. Carlisle & Jacqueline*, 417 U.S. 156, 163 (1974); *Strain v. Nutri/System*, No. 90-2772, slip op. (E.D.Pa. December 12, 1990).

Plaintiff has satisfied all of the following four elements of Rule 23(a):
(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a).      Each prerequisite will be discussed in turn.

### 1. *Numerosity (23(a)(1))*

Rule 23(a)(1) requires the class to be "so numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a)(1).    This does not require the party to provide the identity or exact number of plaintiffs.    Plaintiff has alleged that the amount of possible plaintiffs is "thousands".    This [is] sufficient to satisfy the numerosity requirement.    See e.g., *Strain supra*.

### 2. *Common Questions (23(a)(2))*

Rule 23(a)(2) requires that there be questions of law and fact common to the class.    This does not require that all questions of law or fact that are raised be common to the entire class. *Weis v. York*, 745 F.2d 786, 808-09 (3d Cir.1984), cert. denied, 470 F.2d U.S. 1060 (1985). Rule 23(a)(2) is substantially less rigorous than Rule 23(b)(3) which requires the common issues to predominate the individual issues. *Strain*, slip op. at 7.    It has been suggested that the only requirement that may be gleaned from the actual language of the rule is that there simply be at least more than one question of law or fact. *Stewart v. Winter*, 669 F.2d 328, 335 n. 16 (5th Cir.1982)

(quoting 7A Write & A. Miller, *Federal Practice and Procedure* § 1763, at 604 (2d ed. 1988)).  Indeed, in the instant case defendant has made no argument that plaintiff has not met this prerequisite.  Because there are several factual and legal issues common to the proposed plaintiff class regarding whether Quantum acted in violation [of] RICO § § 1962(a)-(d), perpetrated a fraud upon the plaintiff class and whether Quantum is liable to the plaintiff, this element has been satisfied.

### 3. *Typicality (23(a)(3))*

*3 Rule 23(a)(3) requires that the claims or defenses of the class representative be typical of the entire class. Fed.R.Civ.P. 23(a)(3).  It is not difficult for a plaintiff to establish typicality.  It is well established that factual differences in the claims of the plaintiff and other members of the class will not defeat the typicality requirement "if the plaintiff's claim arises from the same event or course of conduct that gives rise to the claims of other class members and is based on the same legal theory." *Ettinger v. Merrill Lynch, Pierce, Fenner & Smith*, 122 F.R.D. 177, 181 (E.D.Pa.1988);  See also *Strain*, slip op. at 9 (and cases cited therein).  The Court of Appeals for the Third Circuit has reaffirmed the notion that the plaintiff's circumstances do not have to be identical to the other members of the class. *Green v. USX Corp.*, 843 F.2d 1511, 1533 (3d Cir.1988), vacated on other grounds *sub nom.*, *USX Corp v. Green*, 490 U.S. 1103 (1989).    Rather "typicality entails an inquiry whether 'the named plaintiff's individual circumstances are markedly different or ... the legal theory upon which the claims are based differs from that upon which the claims of other class members will perforce be based.' " *Id.* (quoting *Eisenberg v. Gagnon*, 766 F.2d 770, 786 (3d Cir.), cert. denied *sub nom.*, *Weinstein v. Eisenberg*, 474 U.S. 946 (1985) (quoting *Weiss v. York Hospital*, 745 F.2d at 809 n. 36).

The central issue put forth by the plaintiff in this case is, *inter alia*, whether Quantum provided false information in its application as part of a fraudulent scheme to place generic drugs into the stream of commerce and induced plaintiff to purchase generic drugs that he believed to have been properly approved.    I am satisfied that this claim of the plaintiff/representative is in adequate accord with the claims of the proposed plaintiff class.

Defendant argues that plaintiff is not typical of the proposed class because  (1) although plaintiff has alleged economic injury, his damages in fact were

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                                                                                Page 3
Not Reported in F.Supp., 1991 WL 238304 (E.D.Pa.), RICO Bus.Disp.Guide 7831
(Cite as: 1991 WL 238304 (E.D.Pa.))

solely physical; and (2) plaintiff cannot establish that he relied on the alleged misrepresentations. Neither argument will render this plaintiff atypical of the class. Both issues raised by defendant Quantum go to the merits of plaintiff's claim and, as indicated earlier, it is not appropriate to consider the merits of plaintiff's complaint at this time. Because I have already determined that plaintiff has made sufficient allegations in his amended complaint, he has satisfied the element of typicality. See Order dated October 11, 1990 (Document No. 29).

### 4. *Adequacy of Representation (23(a)(4))*

Rule 23(a)(4) requires that the representative party "fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). Pursuant to this requirement the court must consider whether the class representative's counsel can assure vigorous prosecution, and whether there is a conflict of interest among the claims of the class representative and other members of the class. Satisfaction of the typicality requirement overlaps with the requirement of adequacy of representation. See *General Telephone Co. v. Falcon,* 457 U.S. 147 (1982); *Strain,* slip op. at 10. Defendant does not challenge the professional ability of plaintiff's counsel to litigate a class action. Defendant argues, however, that plaintiff could not fairly and adequately protect the interests of the class because he lacks personal knowledge regarding the litigation, that he is unaware of the substance of the complaint and, once again, that plaintiff's claim is really for personal injury even though plaintiff only alleged an economic injury. This argument is without merit. Plaintiff may not be knowledgeable of the legal principals of this case or which facts will support the legal theory put forth by his counsel, however it is not unusual for a litigant to rely principally upon his or her attorney to fill in those gaps. RICO can be a complicated body of law, especially to a lay person unfamiliar with all the legal jargon and nuances of applicable facts. As such, I find that plaintiff is sufficiently familiar with the facts of this case, and as I have already found in the previous section discussing typicality, his claims are primarily consistent with, and not adverse to the claims of proposed class, and whether he relied in fact upon the misrepresentations is a factual issue not appropriate to consider on the merits at this time.

### B. *Predominance of Common Questions (Rule 23(b)(3)).*

**\*4** Plaintiff seeks class certification under Fed.R.Civ.P. 23(b)(3). In addition to satisfying the elements of 23(a) he must also satisfy 23(b)(3). Rule 23(b)(3) provides for class certification if,

the court finds that the questions of law or fact common to the members of the class predominate over any question affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the finding include: (A) the interest of prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating other litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Fed.R.Civ.P. 23(b)(3).

Plaintiff has not demonstrated that common issues of law and fact predominate over individual issues. In count one of the complaint plaintiff alleges that defendant acted in violation of RICO, 18 U.S.C. § § 1961, *et seq.* Plaintiff alleges that defendant engaged in a fraudulent scheme to misrepresent the nature of the generic drugs, more than once within the past ten years, by use of the mails and interstate wires, in order to defraud plaintiff and members of the proposed class and obtain money. Plaintiff also alleges that he and members of the proposed plaintiff class suffered financial injury in their business or property by defendant's use or investment of income derived from the pattern of racketeering activity in the AHP and Quantum enterprises. Complaint ¶ ¶ 15-25.

A private action may be brought under RICO by "any person injured in his business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c). [FN3] This requires that the plaintiff show his injury was actually caused by the violation of § 1962. *Sedima S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496-97 (1985); *Shearin v. E.F. Hutton Group., Inc.,* 885 F.2d 1162, 1167 (3d Cir.1989); *Rosenstein v. CPC International, Inc.,* No. 90- 4970, slip op. at 5 (E.D.Pa. January 8, 1991) (citing *Haroco Inc. v. American Nat'l Bank & Trust Co.,* 747 F.2d 384, 398 (7th Cir.1984), aff'd, 473 U.S. 606 (1985). The Court of Appeals for the Third Circuit reaffirmed this notion and its purposes in *Shearin* quoting the Supreme Court which stated,

[A] plaintiff only has standing if, and can recover only to the extent that, he has been injured in his

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                                                                    Page 4
Not Reported in F.Supp., 1991 WL 238304 (E.D.Pa.), RICO Bus.Disp.Guide 7831
(Cite as: 1991 WL 238304 (E.D.Pa.))

business or property by the conduct constituting the violation ... A person who violates section 1962 is not liable for treble damages to everyone he might [have] injured by other conduct, nor is the defendant liable to those who have not been injured.

*Shearin,* 885 F.2d at 1167 (quoting *Sedima,* 473 U.S. at 496-97); see *Rosenstein,* slip op. at 6 (quoting *Strain,* No. 90-2272, slip op. at 11).

*5 The district court in *Rosenstein* faced a similar legal issue involving class certification of a RICO action. In that case the plaintiffs brought a RICO action, in addition to several state law claims, against CPC International, Inc., the manufacturer of Mazola corn oil and margarine, alleging that it marketed the products fraudulently advertising that a person's serum cholesterol level would be lowered by using those products. The action was based on the predicate acts of mail and wire fraud. The plaintiffs sought class certification for all persons who purchased the products between February 1, 1990 and the date of class certification. The court stated that because § 1964(c) requires a showing of actual injury, plaintiffs would have to show that each member of the class reasonably relied on the fraudulent acts. The court then found that such reliance would have to be shown on an individual basis because not all members of the class relied on the particular advertisements when purchasing Mazola corn oil and margarine. In denying the motion for class certification the court held that the individualized determination of reliance would have proven too complex and individual issues of reliance would then predominate over common issues. *Rosenstein* slip op. at 6-7 (see cases cited therein in which class certification was denied because individual issues of reliance predominated over common issues).

Although the particular factual situation in *Rosenstein* is somewhat distinguishable from the case at bar, its general factual and legal similarities nevertheless provide a useful analogy. In the case at bar, plaintiff seeks class certification on a RICO action based on the predicate acts of mail and wire fraud. Here too, because not all members of the class would have relied on the alleged fraudulent misrepresentation in purchasing the product, each class member would be required to prove the issue of reliance on an individualized basis. Indeed the plaintiffs in the instant case would have an even more difficult task than the plaintiffs in *Rosenstein.* In *Rosenstein* there was a direct link between the purchaser and the product. Here, there are several

circumstances in which the purchase and use of the product was not a result of the proposed class member's decision making, but rather could have been the result of a second tier of decision making through a doctor or pharmacists. Some possible scenarios, as defendant has pointed out, include:

(1) a physician prescribed the branded proprietary product but permitted substitution of a generic product (at the option of either the patient or the dispensing agent), as was the case here; (2) the class member's physician specified a generic drug, and the pharmacist made the decision to sell Quantum's product; (3) the class member's physician prescribed Quantum's product; or (5) the class member specifically requested Quantum's product from his physician or pharmacist.

Defendant's Motion in Opposition to Class Certification at 22. Thus, the individualized issues of reliance would predominate over common issues and Fed.R.Civ.P. 23(b)(3) has not been satisfied.

*6 Plaintiff argues that Rule 23(b)(3) is satisfied because of the following issues which are common to the class: (1) the issue of defendant's liability is a common link among the class members; (2) the elements of RICO focusing on the conduct of defendant is common to the class; (3) defendant defrauded plaintiff by knowingly placing unapproved generic drugs into the stream of commerce and therefore there are no individual questions with regarding the fraud or misrepresentation. [FN4]

None of these arguments can satisfy Rule 23(b)(3). As I have already discussed above, the complexity in determining individual reliance of each class member, which plaintiff alleges is in the thousands, on the actual fraudulent application renders the individual issues predominant over common issues. In order to determine if each class member actually relied on the fraudulent acts it would be necessary to determine if they knew of the acts, how they became aware of such acts, whether it affected their determination to purchase, as well as other factual determinations. Defendant, as already intimated in its brief, would presumably contest most of, if not all, each plaintiff's testimony.

The amount of time spent litigating these individual detailed issues would swallow the common issues of liability and legal elements of RICO. Although plaintiff cites several cases in which class settlement has been granted, most of them involve securities issues and distinguishable factual situations. In as

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                                                                      Page 5
Not Reported in F.Supp., 1991 WL 238304 (E.D.Pa.), RICO Bus.Disp.Guide 7831
**(Cite as: 1991 WL 238304 (E.D.Pa.))**

much as *Strain* and *Rosenstein* are the most recent pronouncements on the subject in the Eastern District of Pennsylvania and the most factually similar with respect to the complexities involved in determining individual reliance, I find them most instructive [and] persuasive and conclude that individual issues of reliance overwhelmingly predominate over common issues and plaintiff has not met the requirements of 23(b)(3). [FN5]

### B. *State Law Claims*

The remaining claims allege consumer law fraud, negligent misrepresentation, negligence, breach of express and implied warranties, and violation of various state consumer protection laws.  Similar to plaintiff's RICO claim, the claims under common law fraud, negligent misrepresentation, negligence, and breach of warranty based on fraud and misrepresentation, also raise substantial individual questions of reliance and causation.    These individual questions therefore predominate over common questions and class certification will be denied for failure to satisfy Rule 23(b)(3).

Additionally, plaintiff alleges that defendant violated various state consumer fraud laws.  The resolution of the state law issues in this count would involve the application of the laws of several states.  I agree with the court in *Rosenstein* that "Faced with the prospect of having to apply different laws to different plaintiffs, and based on the parties present submissions, the court is not satisfied that common issues of state law will predominate over individual issues of state law." *Id.* at 14.  However, in as much as plaintiff's claim for consumer fraud requires proof of fraud or misrepresentation, plaintiff faces the same dispositive difficulty in satisfying Rule 23(b)(3) and that class certification will also be denied as that count.

### III. *Conclusion*

*7 For the foregoing reasons plaintiff's motion for class certification shall be denied with prejudice on all counts for failure to meet the requirements set forth in Fed.R.Civ.P. 23(b)(3).

FN1. Defendant raised this lack of damages issue in its motion to dismiss.  After a hearing on that issue I issued an Order denying defendant's motion (Document No. 29).    In that Order I expressed some reservation about plaintiff's damage theory and available supporting proof.  I continue

to have these reservations but do not consider the merits of plaintiff's claim on a motion for certification.    See *Eisen v. Carlisle & Jacqueline,* 417 U.S. 156, 163 (1974).

FN2. The plaintiff must show that the action fits within one of the three possible class actions in 23(b).  In this case the parties do not dispute that the claim fits within 23(b)(3).

FN3. Section 1962(c) provides that, "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c).

FN4. Although plaintiff made this argument regarding the state law claims of fraud and misrepresentation I find that because such claims involve individual questions of reliance it applies to plaintiff's RICO claim as well.

FN5. Although not explicit in plaintiff's brief, it may be gleaned from plaintiffs argument that the fact that the generic drugs were placed in the stream of commerce and marketed, members of the plaintiff class could be presumed to have relied on the fact that FDA approval was properly obtained. However, this case is not appropriate for such a presumption. Because the class includes everyone who purchased the generic drugs for use, plaintiff necessarily includes people who did not rely on the fraudulent representation and therefore, reliance cannot he presumed. See *Rosenstein,* slip op. at 12 ("by not limiting the class to consumers who purchased Mazola in reliance of the ... scheme, plaintiffs necessarily include ... consumers who purchased Mazola without any knowledge of [the advertisements].").

Not Reported in F.Supp., 1991 WL 238304 (E.D.Pa.), RICO Bus.Disp.Guide 7831

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                                      Page 6
Not Reported in F.Supp., 1991 WL 238304 (E.D.Pa.), RICO Bus.Disp.Guide 7831
**(Cite as: 1991 WL 238304 (E.D.Pa.))**

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

# Tab 7

Westlaw.

2007 WL 2823681                                                                Page 1
--- F.R.D. ----, 2007 WL 2823681 (D.Mass.)
**(Cite as: 2007 WL 2823681 (D.Mass.))**

**H**
Only the Westlaw citation is currently available.

United States District Court,
D. Massachusetts.
In re NEURONTIN MARKETING, SALES
PRACTICES, AND PRODUCTS LIABILITY
LITIGATION.
**MDL Docket No. 1629.**
**Master File No. 04-10981.**

Sept. 27, 2007.

**Background:** Plaintiffs in multidistrict case filed motion to compel non-party to comply with subpoena duces tecum, and deposition subpoena. Non-party filed objection to motion.

**Holding:** The District Court, Sorokin, United States Magistrate Judge, held that jurisdiction existed under multidistrict statute to issue orders related to subpoenas issued by another district.
Objection overruled.

**[1] Federal Civil Procedure** ⬤══9

170Ak9 Most Cited Cases
The purpose of a multidistrict litigation consolidation is to avoid duplicative discovery, prevent inconsistent pretrial rulings and conserve judicial resources. 28 U.S.C.A. § 1407.

**[2] Federal Courts** ⬤══157
170Bk157 Most Cited Cases
District court in multidistrict litigation had jurisdiction to issue orders related to subpoenas issued by another district court. 28 U.S.C.A. § 1407(b).

Scott A. Edelman, Milbank, Tweed, Hadley & McCloy LLP, New York, NY, Catherine Marie Valerio Barrad, Kimberly H. Clancy, Sidley Austin Brown & Wood LLP, Los Angeles, CA, Leslie Anne Benitez, Susan E. Burnett, Kenneth Joseph Ferguson, Clark, Thomas & Winters, Austin, TX, Carter H. Burwell, Davis, Polk & Wardwell, New York, NY, Philip Henry Butler, Bradley, Arant, Rose & White LLP, Montgomery AL, David B. Chaffin, Hare & Chaffin, Daniel J. Dwyer, Hanify & King, Boston, MA, for Defendant.

Terry P Abeyta, Abeyta Nelson, Yakima, WA, Ronald Judah Aranoff, Bernstein, Liebhard & Lifshitz, LLP, Felicia S. Ennis, Robinson, Brog, Leinwand, Greene, Genovese & Gluck, New York, NY, Laureen Furey, Bagley Sloan & Monsour, Longview, TX, Thomas F. Basile, W. Stuart Calwell, The Calwell Practice, Charleston, WV, Bradley Douglas Becnel Law Offices of Daniel E. Becnel, Jr., Reserve, LA, Robert M. Becnel, Law Offices of Robert M. Becnel, Laplace, LA, George S. Bellas, Bellas & Wachowski, Ridge, IL, Pavel Bespalko, Law Office of Joel Eigerman, Boston, MA, Robert J. Bonsignore Bonsignore & Brewer, Medford, MA, Levi Boone, III, Boone Law Firm, Cleveland, MS, Rainey Cawthon, Booth Littlepage & Booth, Pensacola, FL, Walter L. Boyaki, Miranda & Boyaki, El Paso, TX, Derek T. Braslow, Cuneo, Pogust, & Manson LLP, Conshohocken, PA, Eugene Brooks, Brooks Law Firm, Savannah, GA, William L. Bross, Timothy C. Davis, Heninger, Garrison & Davis, LLC, Birmingham, AL, Joseph M. Bruno, Stephanie M. Bruno, Bruno & Bruno LLP, Dane S. Ciolino, Attorney at Law, New Orleans, LA, Andrew P. Campbell, Campbell, Waller & Poer LLC, Birmingham, AL, Ronald J. Campione, Budd Larner, PC, Short Hills, NJ, Kathleen C. Chavez, Lane Geneva, IL, Robert A. Clifford, Clifford Law Offices, Chicago, IL, John R. Climaco, Climaco, Lefkowitz, Peca, Wilcox & Garofoli, Cleveland, OH, Daniel M. Cohen, Cuneo Gilbert & LaDuca, Washington, DC, John A. Commerford, Meyers Taber & Meyers PC, Phoenix, AZ, Charles Horne Cooper, Jr., Rex H. Elliott, Cooper & Elliott, Columbus, OH, Susan G. Copeland, Law Office of J. Doyle Fuller, Montgomery, AL, W. Lloyd Copeland, Taylor, Martino & Hedge, P.C., Charles H. Dodson, Jr., Sims, Graddick & Dodson, P.C., Mobile, AL, Silas G. Cross, Jr., Cross, Poole, Goldasich & Fischer LLC, Tuscaloosa, AL, Rebecca Cunard, Cunard Law Firm, Baton Rouge, LA, Daniel D'Angelo, Gilman and Pastor, LLP, Joel Z. Eigerman, Joel Z. Eigerman, Attorney-at-Law, Boston, MA, Jeanne F. D'Esposito, Lowey, Dannenberg, Bemporad & Selinger, P.C., White Plains, NY, Annamarie A. Daley, Robins, Kaplan, Miller & Ciresi LLP, Minneapolis, MN, Samuel J. DeMaio, Girards Law Firm, Dallas, TX, Neil A. Dean, Rice, Dean & Kelsey LLC, Topeka, KS, John J. Driscoll, Brown & Crouppen PC, St. Louis, MO, James T. Dulin, Dulin & Dulin, Gulfport, MS, J. Blake Dutcher, Jr., Godlove Joyner Mayall

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

2007 WL 2823681                                                                Page 2
--- F.R.D. ----, 2007 WL 2823681 (D.Mass.)
**(Cite as: 2007 WL 2823681 (D.Mass.))**

Dzialo Dutcher & Erwin, Lawton, OK, Donald S. Edgar, Law Office of Donald S. Edgar, Jeremy R. Fietz, Edgar Law Firm, Santa Rosa, CA, Mark L. Edwards, Stipe Law Firm, Tony W. Edwards, McAlester, OK, Wanda Jean Edwards, Calvin Clifford Fayard, Jr., Fayard & Honeycutt, Denham Springs, LA, for Consolidated Plaintiff.

Ray M. Aragon, McKenna Long & Aldridge LLP, Washington, DC, Charles F. Barrett Barrett & Associates, Nashville, TN, Cedric E. Evans, Clark Thomas & Winters, Austin, TX, John A. Boyle, Marino & Associates, Newark, NJ, Paul F. Corcoran, Davis & Gilbert LLP, New York, NY, for Consolidated Defendant.

Gordon Ball, Ball & Scott Bank of America, Knoxville, TN, Don Barrett, Barrett Law Office, Lexington, MS, Daniel E. Becnel, Jr., Law Offices of Daniel E. Becnel, Jr., Reserve, LA, Richard Bemporad, Richard W. Cohen, Lowey, Dannenberg, Bemborad & Selinger, P.C., White Plains, NY, Steve W. Berman, Hagens Berman Sobol Shapiro LLP, Seattle, WA, David L. Browne, James R. Dugan, II, Dugan & Browne, PLC, New Orleans, LA, Jonathan S. Coleman, Johnson, Pope, Okor, Ruppel & Burns LLP, Tampa, FL, for Plaintiff.

Ian Crawford, Todd & Weld LLP, Boston, MA, for Intervenor.

*Order on Plaintiffs' Motion to Compel (Docket # 850)*

SOROKIN, United States Magistrate Judge.

*1 In May, 2005, the Sales and Marketing Plaintiffs served non-party Cline Davis & Mann, Inc. ("CDM") with a subpoena seeking documents related to the instant litigation. In November, 2006, the Plaintiffs filed a motion to compel CDM to comply with the subpoena. On December 20, 2006, the Court ordered CDM to produce all documents sought by the subpoena by February 1, 2007. CDM filed an objection to the motion in two letters to Judge Saris. CDM contended at that time that this Court did not have jurisdiction to issue orders related to the subpoena, and further stated concerns it had with the deadline. On January 5, 2007, Judge Saris entered two electronic endorsements on the letters stating, "File a motion if relief is requested. I do not accept motions by letter," and "[i]n this session, I require motions and oppositions." CDM never filed a motion in this Court.

On June 29, 2007, The Plaintiffs filed a motion for an Order to show cause why CDM should not be sanctioned for failure to comply with this Court's Order of December 20, 2006. On July 19, 2007, the Court denied the motion without prejudice in light of the fact that the documents sought by the Plaintiffs appeared to have been made available to them.

However, the Plaintiffs have returned to the Court because they are not fully satisfied with CDM's production to date. On September 6, 2007, the Plaintiffs filed a motion to compel CDM (1) to produce electronic documents responsive to the subpoena; and (2) to provide deposition testimony in response to a subpoena issued on August 17, 2007, pursuant to Fed.R.Civ.P. Rule 30(b)(6) and Fed.R.Civ.P. 45. On September 14, 2007, CDM sent a *letter* to the Court in which it reiterated its previous objection to the Court's jurisdiction to issue orders concerning subpoenas. The letter indicated that CDM has moved the United States District Court for the Southern District of New York (the issuing district for the subpoenas) for a protective order with regard to the document subpoena, and for an Order quashing the deposition subpoena. In a letter to the undersigned, CDM requests that this Court stay its determination of the motion to compel pending a decision by the Court in New York and asks that this Court treat its New York filings as its opposition to the Motion to Compel.

[1][2] Contrary to CDM's arguments, this Court has jurisdiction to issue orders related to the subpoenas at issue. The purpose of a multidistrict litigation consolidation is to "avoid duplicative discovery, prevent inconsistent pretrial rulings and conserve judicial resources." *In re Air Disaster,* 486 F.Supp. 241, 243 (Jud.Pan.Mult.Lit.1980). The relevant statutes and caselaw provide for an MDL Court to resolve disputes arising from the service of Rule 45 subpoenas on non-parties located in other districts, although appeals from such orders, the Sixth Circuit has ruled, lie in the Circuit Court encompassing the place in which the subpoena was served. *U.S. ex rel. Pogue v. Diabetes Treatment Centers of America, Inc.,* 444 F.3d 462, 469 (6th Cir.2006).

*2 28 U.S.C. § 1407 provides for a transfer of actions pending in different districts for the purpose of coordinated and consolidated pretrial proceedings. Section 1407(a) provides, in part: "When civil actions involving one or more common questions of fact are pending in different districts, such actions may be transferred to any district for coordinated or consolidated pretrial proceedings." 28 U.S.C.A. §

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

2007 WL 2823681                                                                  Page 3
--- F.R.D. ----, 2007 WL 2823681 (D.Mass.)
**(Cite as: 2007 WL 2823681 (D.Mass.))**

1407(a). The meaning of "pretrial proceedings" has been interpreted liberally to give the transferee district court control over any and all proceedings prior to trial. *See, e.g., In re U.S. Office Products Co. Sec. Litig.,* 251 F.Supp.2d 58, 65 (D.D.C.2003)("In a multidistrict litigation action, the transferee court has the same jurisdiction and power over pretrial proceedings that the transferor judge would have in the absence of the transfer."); *see also In re 'Agent Orange' Prod. Liability Litigation,* 597 F.Supp. 740, 751-52 (E.D.N.Y.1984) ( "Once a case has been transferred by the Panel on Multidistrict Litigation, the transferee court assumes complete jurisdiction for pretrial purposes. It has the authority to settle all pretrial motions, including dispositive motions such as those for summary judgment or approval of a settlement. The transferee court is also authorized to handle matters relating to class action certification in order to prevent inconsistent rulings and to promote judicial efficiency").

The scope of the MDL judge's authority is similarly broad. The analysis "begins with the statutory text, and ends there as well if the text is unambiguous." *BedRoc Ltd. v. United States,* 541 U.S. 176, 183, 124 S.Ct. 1587, 158 L.Ed.2d 338 (2004). Title 28 U.S.C. § 1407(b) defines the scope of the transferee judge's power over these pretrial proceedings. It specially provides that "[t]he judge or judges to whom such actions are assigned ... may exercise the powers of a district judge in any district for the purpose of conducting pretrial depositions in such coordinated or consolidated pretrial proceedings." [FN1] 28 U.S.C. § 1407(b). Thus, Congress authorized the district judge in an MDL to exercise the powers of a district judge "in *any district*" for purposes of conducting pretrial depositions. *Id.* (emphasis added). [FN2] Part of the Plaintiffs' Motion seeks compliance with a deposition subpoena.

The caselaw confirms the plain meaning of the statute. As the Sixth Circuit has noted:
... the MDL statute empowers an MDL judge to act as a judge of the deposition or discovery district. *See* 28 U.S.C. § 1407(b) ('The judge or judges to whom such [MDL] actions are assigned ... may exercise the powers of a district judge in any district for the purpose of conducting pretrial depositions in such coordinated or consolidated pretrial proceedings'). A judge presiding over an MDL case therefore may compel production by an extra-district nonparty; enforce, modify, or quash a subpoena directed to an extra-district nonparty; and hold an extra-district nonparty deponent in contempt, notwithstanding the nonparty's physical

situs in a foreign district where discovery is being conducted.

**\*3** *U.S. ex rel. Pogue v. Diabetes Treatment Centers of America, Inc.,* 444 F.3d 462, 468-469 (6th Cir.2006).

"An argument can be made that section 1407(b)'s grant of authority to the MDL judge to oversee nonparty discovery occurring outside the MDL district does not extend to enforcement of documents-only subpoenas." *Pogue,* 444 F.3d at 469 n. 4 (citation omitted). However, "... the rationale underlying the MDL statute of 'just and efficient' resolution of pretrial proceedings requires the conclusion that Section 1407(b)'s grant of authority applies to both deposition subpoenas and documents-only subpoenas." *Id.*

This reasoning has been applied in a number of other cases. In a multidistrict litigation pending in the District of Puerto Rico, a non-party witness was served with a subpoena duces tecum issued by the District of Idaho. *See In re San Juan Dupont Plaza Hotel Fire Litigation,* 117 F.R.D. 30, 32 (1987). The witness objected to the production of certain documents and, pursuant to the language of F.R.C.P. 45(d)(1), [FN3] challenged the jurisdiction of the Puerto Rico court to order the production of the documents. *Id.* at 31. The Court noted that despite the language of F.R.C.P. 45(d)(1), the enabling statute specifically permits the transferee judge to exercise the power of a district judge in any district for the purposes of conducting pretrial depositions in consolidated pretrial proceedings. *Id.* at 32. Calling the powers of the transferee judge "nothing less than plenary," the court specifically held that a magistrate judge may be appointed to resolve non-dispositive civil motions, including those relating to depositions and subpoenas addressed to non-parties, as "an ordinary consequence of the transferee judge's additional duties." *Id.* at 32. [FN4]

Finally, the Manual for Complex Litigation, cited by CDM, supports rather than contradicts the governing statutes and caselaw. It specifically notes the MDL judge's authority under 28 U.S.C. § 1407 to rule on pretrial proceedings and contrasts that authority with "other cases" in which a judge presiding over a complex case must acquire the authority to rule on the type of issue presented here by way of an interdistrict or intercircuit assignment. [FN5] MCL 4th, § 11.424.

CDM's reliance on *Stanziale v. Pepper Hamilton*

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

2007 WL 2823681                                                                Page 4
--- F.R.D. ----, 2007 WL 2823681 (D.Mass.)
**(Cite as: 2007 WL 2823681 (D.Mass.))**

*LLP,* 2007 WL 473703 (S.D.N.Y. Feb.9, 2007) is misplaced. That case was not a multi-district litigation and thus § 1407(b) did not govern. Rather it was filed in Delaware, and a Court in New York issued a non-party subpoena. When the subpoena was disputed, the Court in New York transferred the dispute to the Delaware Court, noting that "[the Delaware judge's] familiarity with not only the underlying facts but [related questions about the dispute] make him far better to hear this dispute than I." *Id.* at *5. The *Stanziale* Court also noted that there is a "clear[ ] textual basis for transfer" of motions to quash subpoenas in an MDL case from the Court that issued to subpoena to the Court that presides over the underlying MDL. *Id.* at *4.

### CONCLUSION

*4 For the foregoing reasons, the Court overrules CDM's objection to this Court's exercise of jurisdiction. The Court, however, did not have the benefit of oral argument on the Motion to Compel because counsel Cline Davis did not appear for the hearing. Accordingly, the Motion to Compel remains under advisement and the Court will hold a hearing on October 17, 2007 at 2:00 p.m.

CDM has indicated in its papers that appearing in Boston poses an undue burden and expense, a consideration of significance under Rule 45. If CDM wishes to attend the hearing on the Motion to Compel by telephone, it may do so by making arrangements with the Clerk.

SO ORDERED.

FN1. The complete text of 28 U.S.C. § 1407(b) provides: "Such coordinated or consolidated pretrial proceedings shall be conducted by a judge or judges to whom such actions are assigned by the judicial panel on multidistrict litigation. For this purpose, upon request of the panel, a circuit judge or a district judge may be designated and assigned temporarily for service in the transferee district by the Chief Justice of the United States or the chief judge of the circuit, as may be required, in accordance with the provisions of chapter 13 of this title. With the consent of the transferee district court, such actions may be assigned by the panel to a judge or judges of such district. The judge or judges to whom such actions are assigned, the members of the judicial panel on multidistrict litigation, and other circuit and district judges designated

when needed by the panel may exercise the powers of a district judge in any district for the purpose of conducting pretrial depositions in such coordinated or consolidated pretrial proceedings."

FN2. In addition, in this MDL approximately nineteen cases have been transferred to this district for pretrial proceedings from the Southern District of New York, the district in which the subpoena was served.

FN3. An action to enforce compliance with a subpoena issued pursuant to Rule 45(d)(1) must generally be brought in the court where the action is pending. *See Wm. T. Thompson Co. v. General Nutrition Corp., Inc.,* 671 F.2d 100, 102 (3d Cir.1982); *First National Bank at Thermopolis v. Western Casualty Surety Co.,* 598 F.2d 1203, 1206 (10th Cir.1979); *In re Uranium Antitrust Litigation,* 503 F.Supp. 33, 35 (N.D.Ill.1980).

FN4. In any event, in the letter filing and accompanying memorandum which CDM has asked the Court to consider as its opposition, it has made no argument that a magistrate judge (as distinct from a district judge presiding over this MDL) lacks authority to order the relief sought by the Plaintiffs.

FN5. The full text of the relevant provision from the Manual states:
When a dispute is presented to a deposition-district court, however, the assigned judge may have or be able to obtain authority to act also as deposition judge in that district, and may be able to exercise those powers by telephone. In multidistrict litigation under 28 U.S.C. § 1407(b), the 'judge or judges to whom such actions are assigned, the members of the judicial panel on multidistrict litigation, and other circuit and district judges designated when needed by the panel may exercise the powers of a district judge in any district for the purpose of conducting pretrial depositions.' In other cases, an interdistrict or intercircuit assignment may enable the judge to whom the case is assigned to act as deposition-judge in another district.
MCL 4th § 11.424.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

2007 WL 2823681
--- F.R.D. ----, 2007 WL 2823681 (D.Mass.)
**(Cite as: 2007 WL 2823681 (D.Mass.))**

--- F.R.D. ----, 2007 WL 2823681 (D.Mass.)

END OF DOCUMENT

# Tab 8

Westlaw.

2007 WL 2782355                                                                                          Page 1
--- F.R.D. ----, 2007 WL 2782355 (E.D.Pa.)
**(Cite as: 2007 WL 2782355 (E.D.Pa.))**

# H

Only the Westlaw citation is currently available.

United States District Court,
E.D. Pennsylvania.
Charles POWERS, on his own behalf and on behalf
of the class defined herein,
and Cynthia Ann Powers, .
v.
LYCOMING ENGINES, a Division of AVCO
Corporation; AVCO Corporation; and
Textron, Inc.
Plane Time, LLC, on its own behalf and on behalf of
others similarly situated,
v.
Lycoming Engines, a Division of AVCO
Corporation; AVCO Corporation; and
Textron, Inc.
**Civil Action Nos. 06-2993, 06-4228.**

Sept. 25, 2007.

**Background:** In consolidated putative class actions,
plaintiffs moved to represent a class of owners or
previous owners of aircraft that contained allegedly
defective engine crankshafts designed and built by
defendant.

**Holdings:** The District Court, Savage, J., held that:
(1) predominance requirement for class certification
was satisfied, and
(2) superiority requirement was satisfied.
Motion granted.

**[1] Federal Courts** ☞409.1

170Bk409.1 Most Cited Cases
A federal court sitting in diversity must apply the
choice-of-law rules of the forum state.

**[2] Implied and Constructive Contracts** ☞3
205Hk3 Most Cited Cases
Under Pennsylvania choice of law rules,
Pennsylvania law applied to unjust enrichment cause
of action asserted against manufacturer of allegedly
defective crankshafts in aircraft engines, as
Pennsylvania had the greatest interest in the
application of its law; defendant was incorporated
and headquartered in Pennsylvania where it
manufactured the crankshafts and received the

benefit of its conduct, and alleged defect existed from
the time the crankshafts left Pennsylvania.

**[3] Sales** ☞425
343k425 Most Cited Cases
Under Pennsylvania choice of law rules,
Pennsylvania law applied to cause of action for
breach of warranty of merchantability asserted
against manufacturer of allegedly defective
crankshafts in aircraft engines; manufacturer was
located in Pennsylvania, and thus application of
Pennsylvania law would not impinge on interests of
states that retain the privity requirement for breach of
warranty claim in the interest of reducing litigation
and costs.

**[4] Federal Civil Procedure** ☞182.5
170Ak182.5 Most Cited Cases
Numerosity requirement for class certification was
satisfied by class of owners or previous owners of
aircraft who asserted unjust enrichment and breach of
warranty claims against manufacturer of defective
engine crankshafts, as class had potentially 3,774
members based on the Federal Aviation
Administration's identification of 3,774 engines
subject to mandatory service bulletin issued by
manufacturer regarding the defect. Fed.Rules
Civ.Proc.Rule 23(a)(1), 28 U.S.C.A.

**[5] Federal Civil Procedure** ☞182.5
170Ak182.5 Most Cited Cases
Commonality requirement for class certification was
satisfied by class of owners or previous owners of
aircraft who asserted unjust enrichment and breach of
warranty claims against manufacturer of allegedly
defective engine crankshafts; among the questions of
fact common to all putative class members were what
manufacturer knew about the allegedly defective
crankshafts and when it knew it. Fed.Rules
Civ.Proc.Rule 23(a)(2), 28 U.S.C.A.

**[6] Federal Civil Procedure** ☞182.5
170Ak182.5 Most Cited Cases
Typicality requirement for class certification was
satisfied by class of owners or previous owners of
aircraft who asserted unjust enrichment and breach of
warranty claims against manufacturer of allegedly
defective engine crankshafts, as each member's claim
arose from the same course of events and each class
member would make the same or similar legal
arguments to prove liability. Fed.Rules Civ.Proc.Rule

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

2007 WL 2782355
--- F.R.D. ----, 2007 WL 2782355 (E.D.Pa.)
(Cite as: 2007 WL 2782355 (E.D.Pa.))

23(a)(3), 28 U.S.C.A.

**[7] Federal Civil Procedure ⬤⟿182.5**
170Ak182.5 Most Cited Cases
Adequacy of representation requirement for class certification was satisfied by class of owners or previous owners of aircraft who asserted unjust enrichment and breach of warranty claims against manufacturer of allegedly defective engine crankshafts; class counsel had litigated other class actions, and named plaintiffs' interests were not dissimilar to those of proposed class. Fed.Rules Civ.Proc.Rule 23(a)(4), 28 U.S.C.A.

**[8] Federal Civil Procedure ⬤⟿182.5**
170Ak182.5 Most Cited Cases
Predominance requirement for class certification was satisfied by class of owners or previous owners of aircraft who asserted unjust enrichment and breach of warranty claims against manufacturer of allegedly defective engine crankshafts; central liability issues of what and when manufacturer knew about the defects, and what warranties applied, predominated over individual questions. Fed.Rules Civ.Proc.Rule 23(b)(3), 28 U.S.C.A.

**[9] Federal Civil Procedure ⬤⟿182.5**
170Ak182.5 Most Cited Cases
Superiority requirement for class certification was satisfied by class of owners or previous owners of aircraft who asserted unjust enrichment and breach of warranty claims against manufacturer of allegedly defective engine crankshafts; cost of defending the action as well as cost of prosecuting the claims would be substantially reduced by litigating common issues in one proceeding and in one forum. Fed.Rules Civ.Proc.Rule 23(b)(3), 28 U.S.C.A.

Dianne M. Nast, Joanne E. Matusko, Joseph F. Roda, Michele Stawinski Burkholder, Roda & Nast, PC, Lancaster, PA, Erica L. Craven, Michael F. Ram, Levy, Ram & Olson, LLP, San Francisco, CA, Harry Shulman, Robert W. Mills, The Mills Firm, San Rafael, CA, Jennifer L. Gardner, John R. Climaco, Climaco Lefkowitz Peca Wilcox & Garofoli Co LPA, Cleveland, OH, Jonathan Shub, Terrianne A. Benedetto, Seeger Weiss LLP, Philadelphia, PA, Kathy Dianne Bailey, Bailey Law Group, Keith T. Vernon, The Vernon Law Firm PLLC, Washington, DC, for Charles Powers and Cynthia Ann Powers.

Catherine B. Slavin, Cozen O'Connor, Philadelphia, PA, for Lycoming Engines and AVCO Corporation.

***MEMORANDUM OPINION***

SAVAGE, District Judge.

*1 In these consolidated putative class actions, the plaintiffs move to represent a class of owners or previous owners of aircraft that contain allegedly defective engine crankshafts designed and built by Lycoming Engines. [FN1] They claim that the engines were manufactured with defective crankshafts that can cause a total loss of engine power and in-flight engine failures, and that Lycoming knew and concealed the defect that prevents the crankshafts from functioning as intended. They seek damages for the cost to replace the defective crankshafts, which includes parts, labor, transportation, storage, insurance; the loss of the use of the aircraft while the crankshafts are being replaced; and the diminished value of the aircraft.

Lycoming contends that the case is inappropriate for class certification because the facts as to both liability and damages are not common to all members of the putative class, the claims and defenses of the named plaintiffs are not typical of the class, and individual issues will predominate over the common issues. It argues that whether a given engine or crankshaft is defective, whether the planes containing the subject crankshafts were purchased used or new and when each plaintiff had or has the crankshaft replaced are questions peculiar to each individual plaintiff and not amenable to class certification.

Contrary to Lycoming's contentions, the requirements of Rule 23(a) are satisfied, and a class action is superior to other methods for the fair and efficient adjudication of the issues, qualifying it under Rule 23(b)(3). [FN2] The class is ascertainable and sufficiently definite. With more than 3000 potential plaintiffs, there is numerosity. Commonality exists because there are common fact questions regarding what and when Lycoming knew of the alleged defect. Typicality is established because each member's claim arises from the same course of events and each class member will make the same legal arguments to prove liability. Common questions predominate over individual ones. Therefore, the motion for class certification will be granted.

**I. Factual Background**
The Federal Aviation Administration ("FAA") mandates that the type of engines at issue be overhauled after every 2,000 hours of flying time or within twelve years, whichever occurs first. The crankshafts are not typically replaced during these overhauls. Thus, unlike other parts of an aircraft

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

2007 WL 2782355                                                                                        Page 3
--- F.R.D. ----, 2007 WL 2782355 (E.D.Pa.)
**(Cite as: 2007 WL 2782355 (E.D.Pa.))**

engine that must be replaced at regular intervals, crankshafts are expected to last the life of a regularly maintained aircraft.

On February 21 and April 11, 2006, Lycoming issued two Mandatory Service Bulletins ("MSB"), 569 and 569A, requiring owners of the subject engines to retire and replace more than 4000 potentially defective crankshafts that were manufactured between 1997 and 2002. The MSBs set a replacement deadline of the earliest of: February 21, 2009; the next time the engine crankcase is separated to allow inspection or replacement of parts; or at the next maintenance overhaul. [FN3]

*2 On May 25, 2006, the FAA issued a proposed Airworthiness Directive ("AD") mandating replacement of the same crankshafts addressed in the MSB. The FAA concluded that an "unsafe condition exists" because the "same metallurgical flaw that was found in 23 confirmed crankshaft failures in different groups of Lycoming 360 and 540 engines [which were covered in earlier MSB's issued in 2002 and 2005] has been found in the crankshafts of this group of engines." [FN4] The AD warned that if the crankshafts are not replaced, they will "result in total engine power loss, in-flight engine failure, and possible loss of the aircraft." The AD set a crankshaft replacement deadline of the earliest of: the next separation of the engine crankcase, the next engine overhaul, or 12 years from the date the crankshaft first entered service or was last overhauled. The AD became final on September 29, 2006, and effective November 3, 2006.

Plaintiffs claim that Lycoming had known for years that its crankshafts were unsafe and likely to fail. Based on several field reports of broken crankshafts Lycoming had received in 2002, it issued MSBs, which were followed by FAA action that grounded hundreds of aircraft with faulty crankshafts. At that time, Lycoming purportedly paid $35 million to remove, ship and replace the defective crankshafts. In 2005, Lycoming issued two more MSBs and replaced the crankshafts covered by those MSBs at its expense.

Lycoming refuses to pay all costs associated with replacing the crankshafts subject to the most recent MSBs and the AD issued in 2006. It will replace the crankshafts for free if the owners have the engines overhauled at a Lycoming facility in Pennsylvania, or will pay $14,000 of a $16,000 price for a "crankshaft and parts" kit for owners who replace the crankshafts elsewhere. After February of 2009, it will pay

nothing for the replacement kits. It refuses to pay costs for labor, shipping, alternative transportation, loss of use or other incidental costs regardless of where and by whom the replacement is done.

## II. Procedural History
Plaintiff Charles Powers, a Maryland resident, filed his initial complaint on July 10, 2006, in which he sought to represent himself and a class of other purchasers of an aircraft containing an engine with a crankshaft subject to MSBs 569 and 569A. In his initial complaint, Powers asserted claims of negligence, unjust enrichment and violation of state unfair trade practices statutes, including Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-2(4)(xxi).

Plaintiff John Car, a South Carolina resident, in his capacity as "beneficial owner" of an aircraft containing a crankshaft subject to MSBs 569 and 569A, filed his first complaint on September 21, 2006, on behalf of himself and all others similarly situated, excluding California residents, asserting claims of negligence and unjust enrichment. [FN5]

Lycoming filed a motion to dismiss the *Powers* complaint on September 11, 2006. After consolidating the *Powers* and *Car* cases on October 6, 2006, the motion to dismiss was deemed applicable to the *Car* complaint as well.

*3 After oral argument on the class certification motion, the plaintiffs filed an Amended Consolidated Complaint. The amended complaint added Charles Powers' wife, Cynthia, [FN6] as a plaintiff; substituted Plane Time, LLC for John Car as a plaintiff; [FN7] deleted the negligence claim; and, added causes of action for breach of implied warranty of merchantability and breach of implied warranty of fitness for a particular purpose. The consumer protection and unjust enrichment causes of action were retained in the amended complaint. The plaintiffs later withdrew the claims for breach of implied warranty of fitness for a particular purpose, [FN8] and for violations of unfair trade practices, [FN9] leaving only the unjust enrichment and breach of warranty of merchantability causes of action.

## III. *Conflict of Laws*
Conflicts among the states' laws arise in the treatment of the causes of action set forth in the amended complaint. Irreconcilable conflicts can be an impediment to certification. Because those conflicts affect the analysis of the typicality and adequacy requirements of Rule 23(a), and the

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

2007 WL 2782355                                                      Page 4
--- F.R.D. ----, 2007 WL 2782355 (E.D.Pa.)
(Cite as: 2007 WL 2782355 (E.D.Pa.))

manageability factor of the Rule 23(b)(3)(D) superiority test, the conflicts issues will be resolved before the class certification requirements are analyzed.

[1] A federal court sitting in diversity must apply the choice-of-law rules of the forum state. *Berg Chilling Sys., Inc. v. Hull Corp.*, 435 F.3d 455, 462 (3d Cir.2006). Accordingly, Pennsylvania choice of law rules apply here.

Pennsylvania uses a two-step process to resolve choice-of-law questions. The court must first determine whether there is a real conflict. Mere differences in the states' laws do not necessarily constitute actual conflicts. *Id.* Only where a state's governmental interests are frustrated by application of another state's law is there an actual conflict. *Lacey v. Cessna Aircraft Co.*, 932 F.2d 170, 187 (3d Cir.1991). In other words, there is no conflict where the application of either state's law renders the same result. *Berg Chilling*, 435 F.3d at 462.

If there is a true conflict, the court proceeds to the second step and decides which state has the greater interest in the application of its law. *LeJeune v. Bliss-Salem, Inc.*, 85 F.3d 1069, 1071 (3d Cir.1996) (*citing Cipolla v. Shaposka*, 439 Pa. 563, 267 A.2d 854, 855 (1970)). This flexible inquiry uses the *Restatement (Second) of Conflict of Laws* as a guide to evaluate the significance of the contacts, and the relationship of the states to the parties and the dispute. *See Berg Chilling*, 435 F.3d at 463; *Garcia v. Plaza Oldsmobile Ltd.*, 421 F.3d 216, 220 (3d Cir.2005). After characterizing the nature of the issue as founded in contract, tort or a hybrid, the court uses the appropriate *Restatement* section identifying the most relevant contacts for that type of action to assess which state has the more significant relationship and contacts to the issue. *Berg Chilling*, 435 F.3d at 463, 467; *Garcia*, 421 F.3d at 220. The contacts are weighed qualitatively within the context of the competing policies and interests of each state. *Berg Chilling*, 435 F.3d at 467-68; *In re Estate of Agostini*, 311 Pa.Super. 233, 457 A.2d 861, 871 (1983) (*citing Cipolla*, 267 A.2d at 856). After balancing the respective governmental policy interests of the affected states, the court applies the law of the state having the greater interest in the determination of the issue. *Garcia*, 421 F.3d at 220.

*4 Which Restatement section applies depends on how the issue to be litigated is characterized. Section 188 of the *Restatement* governs contract actions; § 145, tort actions; and § 148, fraud and misrepresentation. Section 188 instructs that the law of the state which has the most significant relationship with the transaction and the parties applies. It lists the following factors to consider: where the contract was made, where the contract was negotiated, the place of performance, the location of the subject matter of the contract, and where the parties reside and do business. The provision also states that "[t]hese contacts are to be evaluated according to their relative importance with respect to the particular issue." *Restatement (Second) of Conflict of Laws* § 188 (1971).

Section 145, which covers torts, considers where the injury occurred, where the conduct causing the injury occurred, the domicile of the parties and where the relationship between the parties is centered. Section 148, covering fraud and misrepresentation, takes into account primarily where the defendant made the misrepresentations, and where the plaintiff received and relied upon them. [FN10]

In this action, § 188 is applicable to the plaintiffs' implied warranty claim because it arises from a contract. A "hybrid" approach, using §§ 188 and 148, is amenable for the unjust enrichment claim because it has both fraud or misrepresentation and contract elements.

*Choice of Law and the Unjust Enrichment Claim*

[2] Plaintiffs concede that there are conflicts between the unjust enrichment laws of Pennsylvania and the laws of at least eight other states. [FN11] In fact, there are numerous differences in unjust enrichment laws among many states. However, most of those differences do not create actual conflicts. Where they do, Pennsylvania has a greater interest in applying its law.

The legal elements required to establish a claim for unjust enrichment vary from state to state. They fall into four basic categories. One group of states [FN12] requires proof of essentially the same three elements: (1) a benefit is conferred upon the defendant; (2) at the plaintiff's expense; (3) under circumstances that would make defendant's retention unjust.

A second group [FN13] requires proof of five separate elements, which are similar to the elements required by the states in the first group. The five elements of the cause of action in these states are: (1) an enrichment; (2) an economic detriment or loss; (3) a connection between the enrichment and the impoverishment; (4) the absence of justification for

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

2007 WL 2782355                                                                                                    Page 5
--- F.R.D. ----, 2007 WL 2782355 (E.D.Pa.)
(Cite as: 2007 WL 2782355 (E.D.Pa.))

the enrichment and the impoverishment; and (5) the absence of a legal remedy.

A third group, [FN14] the largest, includes an additional element, that the defendant appreciated the benefit conferred upon it. To satisfy this element, the defendant must have had knowledge or awareness that it was, in fact, receiving a benefit. [FN15] The necessary level of this awareness varies from jurisdiction to jurisdiction. In two states, Alabama and Texas, the defendant must have engaged in fraud, coercion, or other intentional conduct to induce the benefit. In twenty other states, a defendant's mere awareness of receipt of a benefit at the plaintiff's expense will suffice. This element is not an issue where the defendant failed to disclose a known defect because it had to have known it was getting a benefit.

*5 A fourth group [FN16] provides a more general description of unjust enrichment without delineating specific elements. To establish an unjust enrichment claim in these states, the plaintiff must prove that the defendant received something of value from the plaintiff and that it would violate the fundamental principles of justice, equity and good conscience for the defendant to retain the benefit without compensating the plaintiff. These concepts are similar to the legal elements in the first category of states.

Although there are numerous permutations of the elements of the cause of action in the various states, there are few real differences. In all states, the focus of an unjust enrichment claim is whether the defendant was *unjustly* enriched. At the core of each state's law are two fundamental elements-the defendant received a benefit from the plaintiff and it would be inequitable for the defendant to retain that benefit without compensating the plaintiff. The focus of the inquiry is the same in each state. Application of another variation of the cause of action than that subscribed to by a state will not frustrate or infringe upon that state's interests. In other words, regardless of which state's unjust enrichment elements are applied, the result is the same. Thus, there is no real conflict surrounding the elements of the cause of action.

Even though the legal elements of an unjust enrichment cause of action are essentially similar among the states, there are differences in how they are applied and interpreted. A significant difference is that most states, including Pennsylvania, preclude recovery on an unjust enrichment theory if an express contract governs the relationship between the parties.

Among those states, at least five have carved out exceptions to this general rule, allowing recovery on an unjust enrichment claim despite an express contract. [FN17]

The plaintiffs acknowledge that Lycoming had issued a written warranty that may preclude them from pursuing an unjust enrichment claim under Pennsylvania law. [FN18] However, they assert that if the warranty is found to be unconscionable and unenforceable, they may proceed on the unjust enrichment claim. In some states, the plaintiffs can recover under an unjust enrichment theory even if an express contract governs the relationship; but, they will not be permitted to assert such a claim under Pennsylvania law if the contract is enforced. Stated differently, the defendant manufacturer could not assert the contractual bar in those other states as it could in Pennsylvania. Thus, there is a real conflict with those states and Pennsylvania.

After weighing the factors under *Restatement* § § 188 and 148, the balance tilts in favor of applying Pennsylvania law. Pennsylvania has the most significant relationship to the transaction and the parties. It is the center of the activities that gave rise to the claims. Lycoming is a Pennsylvania manufacturer that has been sued here, where it manufactured the crankshafts and engines. Lycoming issued service bulletins and instructions, communicated orally and in writing about the crankshafts and sent press releases from its headquarters in Pennsylvania, and plans to replace crankshafts here.

*6 On the other hand, the contacts with the plaintiffs presumably took place in their home states where they purchased, operate, and moor their aircraft. Yet, considering the mobility of a plane, it could have been purchased and transported from a state other than a plaintiff's home state. Because Lycoming's engines are part of aircraft manufactured by others, it is unlikely that the plaintiffs purchased the aircraft in reliance on anything Lycoming may have represented. Consequently, the place where the false representations were received is not a factor. The § 148 factors do not impact as heavily as those in § 188, which weigh in favor of Pennsylvania in the context of the contractual bar. Therefore, Pennsylvania's interest in allowing its resident manufacturer to invoke its contractual rights where it has been sued for conduct occurring here and where it received the benefit of its conduct is greater than the interests of those states where the warranty issue is nonexistent.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

2007 WL 2782355                                                                    Page 6
--- F.R.D. ----, 2007 WL 2782355 (E.D.Pa.)
**(Cite as: 2007 WL 2782355 (E.D.Pa.))**

Not only are there variations among the states' laws regarding the legal elements and potential defenses, there are also differences as to who may bring an unjust enrichment claim. Three jurisdictions preclude indirect purchasers from asserting claims for unjust enrichment unless they have conferred a benefit directly on the defendant. [FN19] In these states, the rationale for the requirement is to insulate a defendant that is far removed from any wrongdoing from liability for a benefit he may have inadvertently or unknowingly received.

In contrast, nine other states have explicitly determined that an indirect benefit is enough. [FN20] These states have allowed indirect purchasers to establish claims for unjust enrichment so long as they can prove that the defendant benefitted at the plaintiff's expense, even if the benefit flowed indirectly from the plaintiff to the defendant. The remaining states' laws have either implicitly accepted unjust enrichment claims based on an indirect benefit or have not addressed the issue.

The engine is a component part of the aircraft. It was not purchased from Lycoming by the aircraft owner, but by the plane's manufacturer or a dealer. Hence, the class members, with few, if any, exceptions, are indirect purchasers.

To apply Pennsylvania law, which permits indirect purchasers to recover, would infringe those other states' laws because Lycoming could not be sued by the indirect purchasers in those states. Thus, there is a real conflict in those instances.

Applying the *Restatement* factors, Pennsylvania has the greatest interest in the application of its law. The defendant is incorporated and headquartered in Pennsylvania where it manufactured the crankshafts and received the benefit of its conduct, and the alleged defect existed from the time the crankshaft left Pennsylvania. Therefore, Pennsylvania law will apply to the unjust enrichment cause of action.

*Choice of Law and the Warranty of Merchantability Claim*

*7 [3] The law of implied warranty of merchantability, unlike the law of unjust enrichment, is not as varied among the states. Except for Louisiana, all states have adopted U.C.C. § 2-314, which provides that unless excluded or modified, a warranty that the goods shall be merchantable is implied in a contract for their sale. [FN21] U.C.C. § 2-314 (2003). Thus, all states, but one, share the

common source of law.

There are, nevertheless, differences among the states regarding the application of implied warranty of merchantability law. The most significant difference is the privity requirement. Thirty-five states, including Pennsylvania, do not require privity of contract to recover for breach of the implied warranty of merchantability where only economic damages are involved. Thus, there is no conflict between the warranty of merchantability laws of these thirty-four states and that of Pennsylvania. [FN22]

With respect to the fourteen states that still require privity between the parties in cases involving purely economic loss, [FN23] the plaintiffs argue that there is either no actual conflict between the laws of Pennsylvania and those of these fourteen states; or, if there is, Pennsylvania has a greater interest in applying its law to the claims of the residents of these states than do the other states.

In abolishing the privity requirement in all warranty actions four decades ago, the Pennsylvania Supreme Court determined that continuing such a requirement would "perpetuat[e] a needless chain of actions, whereby each buyer must seek redress from his own immediate seller, up the chain, until the actual manufacturer is eventually reached." *Kassab v. Central Soya*, 432 Pa. 217, 246 A.2d 848, 856 (1968). It observed that the privity requirement ignored the commercial reality that the typical purchaser buys from a retail merchant who is usually no more than an "economic conduit" between the purchaser and the manufacturer of the defective product. *Id.* at 853.

The plaintiffs contend that the national trend is toward abolishing the privity requirement, [FN24] even in the remaining fourteen states that still have remnants of the requirement. They argue that the bases for the privity requirement in nine of those states do not apply in this case either because the policies underlying the rule are not advanced or there is no legitimate interest to do so. [FN25] As to the five states whose laws they concede directly conflict with Pennsylvania law, [FN26] the plaintiffs contend that Pennsylvania has the stronger interest in having its law applied than do the other states.

The question is whether the competing states' governmental interests are frustrated by application of the other states' laws. In the fourteen states that maintain a privity requirement in implied warranty claims involving solely economic loss, the purpose of

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

2007 WL 2782355                                                                    Page 7
--- F.R.D. ----, 2007 WL 2782355 (E.D.Pa.)
(Cite as: 2007 WL 2782355 (E.D.Pa.))

the requirement is to protect "remote manufacturers." For example, in some states, the stated policy reason is to limit the damages for which remote manufacturers will be held liable, and provide foreseeability as to potential claimants. [FN27] In one state, the goal is to preserve a manufacturer's right to disclaim a warranty because it would be difficult for a manufacturer to issue disclaimers to purchasers with whom it had no contact. [FN28] Other states defer to contracting parties to determine the scope of the manufacturer's obligations and liability, using traditional contract principles where there is no damage to other property or personal injury. [FN29] One state maintains the privity requirement because litigation between a direct buyer and seller is simpler and less costly. [FN30]

*8 In light of these policy reasons, there is a real conflict between the application of Pennsylvania law and the laws of the fourteen states that require privity. Allowing the plaintiffs to sue a manufacturer with whom they did not deal directly will frustrate the interests of those states that do not permit it. On the other hand, insulating Lycoming from suit will frustrate Pennsylvania's interest in bypassing privity. Therefore, there is a real conflict, requiring a balancing of the respective interests of the states.

The balancing test results in the application of Pennsylvania law. The manufacturer is located in Pennsylvania, the interest of the fourteen privity states in protecting a resident manufacturer is absent, the manufacturer's right to disclaim a warranty will be preserved, and the goal of saving costs will not be thwarted by the application of Pennsylvania law. At the same time, Pennsylvania's interest in avoiding a needless multiplicity of actions where each buyer would have to sue his own seller and those up the distribution chain until the actual manufacturer is reached will be advanced by applying its state law. Application of Pennsylvania law will not impinge on the interests of states that retain the privity requirement in the interest of reducing litigation and costs. The litigation and its attendant costs will take place in Pennsylvania at one time, not many times in those other states. Therefore, Pennsylvania law will apply to the breach of implied warranty claims of the residents of the fourteen states that require privity of contract.

Lycoming argues that additional conflicts among the states' laws exist, rendering the implied warranty claim inappropriate for certification. First, it states that different jurisdictions have different standards to satisfy the U.C.C. § 2-607(c) notice of breach requirement, which provides that "where a tender has been accepted, the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." U.C.C. § 2-607 (2003). Lycoming contends the issue of whether notice of breach was given "will have to be resolved by the court on a plaintiff-by-plaintiff basis." [FN31] Plaintiffs retort that notice is a procedural matter and federal courts sitting in diversity apply state substantive law and federal procedural law.

Even if considered a substantive matter, notice of breach is not an issue. The determination of whether the class members provided adequate notice of the breach will not vary from plaintiff to plaintiff. The plaintiffs allege that all of the proposed class members learned of the defective crankshafts when MSBs 569 and 569A were issued, and Lycoming was put on notice of the breach upon the issuance of the AD and the filing of the lawsuit. Indeed, when it issued the MSBs, Lycoming put itself on notice.

Lycoming also points to differences among jurisdictions in the application of implied warranty law to used goods in that the standard of merchantability is lower or nonexistent for used goods in some jurisdictions. [FN32] Although only two jurisdictions, Alabama and Texas, do not recognize implied warranties in the sale of used goods, most states apply a somewhat lower standard of merchantability to used goods. These states follow the standard set forth in Comment 3 to U.C.C. § 2-314, which provides that a "contract for the sale of second-hand goods ... involves only such obligation as is appropriate to such goods." This standard recognizes that used goods ordinarily require more maintenance and repair than new products.

*9 The differences with respect to used goods is not an issue here. The claim is that the crankshafts were defective when they were new and left Lycoming's facility, and that the damage is the same no matter how old or used the aircraft or engine was when the plaintiff purchased it. Therefore, whether the plane, engine or crankshaft was new or used when each plaintiff "acquired" the subject crankshaft will not affect its merchantability.

Finally, Lycoming contends that there is a "major difference" between the laws of Louisiana and the other states. There is no actual conflict between Louisiana's implied merchantability law and § 2-314. Louisiana law provides for relief when a defect renders a product useless or diminishes its usefulness

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

or value, *see* La. Civ.Code Ann. art. 2520, while U.C.C. § 2-314 provides for relief if a product is not merchantable or not fit for the ordinary purposes for which it is used. Whether a defect renders a product useless, less useful or not merchantable requires the consideration of similar factors. Therefore, Louisiana's interest would not be frustrated by the application of Pennsylvania's implied warranty law.

There are few conflicts among the various states' laws on the implied warranty of merchantability cause of action. Where conflicts exist, Pennsylvania has a greater interest in applying its law. Therefore, Pennsylvania law will also apply to the implied warranty claim.

### IV. Legal Standards for Class Certification

To be certified, a class must satisfy all four requirements of Rule 23(a) and must fit one of the provisions of Rule 23(b). The plaintiffs must demonstrate that: (1) the size of the class is so numerous that joinder of all members is impracticable; (2) there are questions of law and fact common to the class; (3) the claims or defenses are typical of the class; and (4) the representatives will fairly and adequately protect the interests of the class. Fed.R.Civ.P. 23(a)(1)-(4). Additionally, the proposed class action must be one of the types recognized by Rule 23(b). Here, plaintiffs have moved for certification only under subsection (b)(3), which requires a finding that common questions of law or fact predominate over questions affecting only individual class members, and that a "class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3).

The burden is on the plaintiffs to demonstrate that a class should be certified. *Johnston v. HBO Film Mgmt., Inc.,* 265 F.3d 178, 183 (3d Cir.2001); *Baby Neal v. Casey,* 43 F.3d 48, 55 (3d Cir.1994). Though the plaintiffs need not establish the merits of their case at the class certification stage and the substantive allegations of the complaint must be taken as true, *Chiang v. Veneman,* 385 F.3d 256, 262 (3d Cir.2004) (*citing Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177-78, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974)), a court must conduct a rigorous analysis to determine the suitability of resolving the issues in a class action. Because certification and the merits are intertwined, this analysis necessitates a factual inquiry. *Beck v. Maximus, Inc.,* 457 F.3d 291, 297 (3d Cir.2006) (*citing Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 259 F.3d 154, 167 (3d Cir.2001)). Nonetheless, a court may not determine

the merits of the plaintiff's case. *Eisen,* 417 U.S. at 177-78, 94 S.Ct. 2140. Thus, one must look beyond the complaint and consider the substantive elements of the plaintiffs' cases. *See Newton,* 259 F.3d at 166-68.

#### Numerosity

**\*10** [4] Based on the FAA's identification of 3,774 engines subject to MSB 569A, the class has potentially 3,774 members. Although Lycoming has stated in its briefs and at oral argument that they do not contest numerosity, it argues the class will have "considerably" fewer members than 3,774, pointing out that some owners live outside the United States and some planes have more than one engine. Yet, it does not approximate how much the membership would be reduced.

Whether the number of potential class members is what the plaintiffs contend or is less as the defendants argue, there are more than enough to satisfy numerosity.

#### Commonality

[5] Commonality requires that the plaintiffs share a question of law or fact with the prospective class members. The commonality threshold is low. So long as the named plaintiffs share at least one question of fact or law with the grievances of the prospective class, the existence of individual facts and circumstances will not defeat commonality. *Baby Neal,* 43 F.3d at 56.

Among the questions of fact common to all putative class members are what Lycoming knew about the allegedly defective crankshafts and when it knew it. Those facts will not change regardless of who the class member is. Commonality has been met with respect to these fact issues.

Because there are common fact issues, there is no need to find common legal issues. Nevertheless, as the conflict of laws discussion demonstrates, the legal issues implicating liability are common to the class.

#### Typicality

[6] The typicality prong of Rule 23(a) requires that the claims or defenses of the plaintiffs are typical of the class. Fed.R.Civ.P. 23(a)(3). Typicality requires a strong similarity of legal theories to ensure that the class representatives' pursuit of their own goals will work to benefit the entire class. *Barnes v. Am. Tobacco Co.,* 161 F.3d 127, 141 (3d Cir.1998); *Jones v. GPU, Inc.,* 234 F.R.D. 82, 97 (E.D.Pa.2005). It entails an inquiry as to whether "the named plaintiff's

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

2007 WL 2782355                                                                                   Page 9
--- F.R.D. ----, 2007 WL 2782355 (E.D.Pa.)
(Cite as: 2007 WL 2782355 (E.D.Pa.))

individual circumstances are markedly different or the legal theory upon which the claims are based differs from that upon which the claims of other class members will perforce be based." *Baby Neal,* 43 F.3d at 57-58 (*quoting Eisenberg v. Gagnon,* 766 F.2d 770, 786 (3d Cir.1985)). Moreover, "[w]here the defendant can raise unique defenses to each plaintiff's claim, typicality may not exist if the defenses could threaten to become the focus of the litigation." *Jones,* 234 F.R.D. at 98. At the same time, "factual differences will not render a claim atypical if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members, and if it is based on the same legal theory." *Baby Neal,* 43 F.3d at 58 (*quoting Hoxworth v. Blinder, Robinson & Co.,* 980 F.2d 912, 923 (3d Cir.1992)). Unlike the commonality requirement, typicality requires more than "one unifying factual or legal question." *In re Paxil Litig.,* 212 F.R.D. 539, 550 (C.D.Cal.2003).

*11 Lycoming argues that neither the plaintiffs nor their claims are typical of the class. It points out that Plane Time has already complied with the AD and cannot claim diminution in value and, in contrast, the Powers have not yet had the crankshaft replaced. According to Lycoming, a class member who complies with the AD may or may not incur any replacement costs, depending on where the engine is overhauled and if it is done before or after February 2009. Lycoming notes that Plane Time bought a 2002 plane in 2004, which contained a new engine installed when the aircraft was manufactured. Powers, on the other hand, bought a new plane in 1978 that had a used, factory overhauled engine covered by MSB 569A installed in the aircraft in 2002. Lycoming contends that this may affect the viability of the plaintiffs' breach of implied warranty claims because the standard of merchantability is lower or nonexistent for used goods in some jurisdictions. [FN33]

These factual and legal differences are inconsequential and do not affect typicality. The differences between the plaintiffs regarding damages are not problematic. Although there are five different categories of damages that any class member can claim, [FN34] these differences do not vary significantly. Similarly, whether the planes or engines in the planes were new or used when purchased does not affect typicality. It does not matter if the crankshafts are in a new or used plane or engine. The claim is that the crankshafts were defective when they were new and left Lycoming's facility. Liability and damages are the same whether the aircraft or engine was new or used when the plaintiff purchased it.

Because each member's claim arises from the same course of events and each class member will make the same or similar legal arguments to prove liability, typicality is established.

*Adequacy of Representation*

[7] Rule 23(a)(4) aims to protect the interests of the class. There are two parts to this test. The first goes to the competency of counsel, and the second, to the plaintiffs' motivation and ability to protect the interests of the other class members.

Lycoming does not contest counsel's competency to prosecute a class action. Class counsel have litigated other class actions. Thus, the first part of the adequacy requirement is not at issue.

The second prong of the adequacy of representation requirement tends to merge with the commonality and typicality requirements of Rule 23(a). *Jones,* 234 F.R.D. at 98. As previously determined, the plaintiffs have met the commonality and typicality requirements.

Lycoming has not presented any plausible reason why the plaintiffs are inadequate representatives. Nor is there any. The plaintiffs' interests are not dissimilar to those of the proposed class. They have no incentive to take a position that could benefit them at the expense of the remaining members. Therefore, adequacy is established.

*Predominance and Superiority*

*12 Plaintiffs have moved for certification under subsection 23(b)(3), which requires that common questions of law or fact predominate over questions affecting only individual class members, and that a "class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3). Thus, the plaintiffs must satisfy both the predominance and the superiority aspects of Rule 23(b)(3).

In determining whether the action fits within Rule 23(b)(3), the Rule specifically directs the court to consider the interest of class members in individually controlling the litigation, the status of ongoing litigation brought by members of the class, the desirability of concentrating the litigation in the particular forum, and likely management difficulties. Fed.R.Civ.P. 23(b)(3)(A)-(D). In the end, it is the interests of the individual members in controlling

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

2007 WL 2782355                                                                                    Page 10
--- F.R.D. ----, 2007 WL 2782355 (E.D.Pa.)
**(Cite as: 2007 WL 2782355 (E.D.Pa.))**

their own litigation that drives the certification decision on predominance. The superiority analysis focuses on the advantages and disadvantages of using the class-action device in relation to other litigation methods.

*Predominance*

[8] In a class action brought under Rule 23(b)(3), common questions of law or fact must predominate over questions affecting only individual members and must be a significant part of each individual case. The predominance inquiry is "far more demanding" than the commonality requirement of Rule 23(a). *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 623-24, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997).

Rule 23(b)(3)

encompasses those cases in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results....
It is only wh[en] predominance exists that economies can be achieved by means of the class-action device.

Fed.R.Civ.P. 23(b)(3) Advisory Committee's Note. Common issues will predominate when they "present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication." 7A Wright, Miller & Kane, *Federal Practice and Procedure* § 1778 (2d ed.1986).

In this case, the central liability issues are what and when Lycoming knew about the defects, and what warranties apply. The resolution of these common issues will resolve a significant portion of the case for all class members. Information peculiar to each individual class member is not necessary to make these determinations. Each class member will seek to recover the same or similar damages caused by the same harm. All assert that they sustained losses as a result of Lycoming's design, manufacture and sale of defective crankshafts. Evidence regarding each class member's damages will be limited because the types and the amounts of damages that can be claimed are circumscribed and some are fixed. Thus, because the few individual questions for determination are not complex and can be answered without a fact-intensive inquiry, common questions predominate over individual ones.

*Superiority*

*13 [9] Rule 23(b)(3)'s superiority requirement requires the plaintiffs to prove that a "class action is

superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3). The superiority analysis assesses the advantages and disadvantages of using the class-action device in relation to other methods of litigation. The Rule itself suggests various factors to consider in making this assessment: the interest of class members in individually controlling the litigation, the state of ongoing litigation brought by class members, the desirability of concentrating the litigation in the particular forum, and likely management difficulties. *Id.*

*Material advancement of the litigation*

Litigating the proposed common issues will materially advance the litigation because it will require examination of the same witnesses and the production of generic documents that affect each class member. The cost of defending the action as well as the cost of prosecuting the claims will be substantially reduced by litigating common issues in one proceeding and in one forum.

*Class members' interest in individually controlling their lawsuit*

Whether putative class members have a significant interest in individually prosecuting their own separate lawsuits is affected by the financial stakes involved in each individual's case. The greater the damages in one's claim vis-á-vis others' claims, the greater the interest the individual has in controlling the litigation. The lesser the potential damages, the less the interest is because separate suits may be impracticable. *See* Fed.R.Civ.P. 23(b)(3) Advisory Committee's Note; *Blain v. Smithkline Beecham Corp.,* 240 F.R.D. 179, 192 (E.D.Pa.2007).

There are few differences between each class member's case with respect to both liability and damages, and the potential value of each member's case falls within a defined limited range. Class members do not have a strong interest in controlling their own litigation. Here, separate actions would be impractical and expensive to litigate. Individuals would have little incentive to direct the litigation. Their individual interests are minimal compared to the overall extent of the issues in the litigation.

*Extent of existing litigation*

There is no existing litigation that would overlap with the claims at issue in this case. The *Bristow* case is a putative class action filed on behalf of only California residents, and the class definition in the instant case excludes California residents. There is one other putative class action that has been filed by

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

2007 WL 2782355                                                                                Page 11
--- F.R.D. ----, 2007 WL 2782355 (E.D.Pa.)
**(Cite as: 2007 WL 2782355 (E.D.Pa.))**

a member of the proposed *Powers* class in state court in Illinois, *Way Point Aviation Serv. v. AVCO Corp.*, 2006-CH-22950 (Cook Cty. Circuit Court, Ill.) The case was filed three months after the initial *Powers* complaint was filed. In that state court case, the plaintiff recently filed an amended complaint. Here, in contrast, substantial discovery has been completed.

*Manageability of proposed class and choice-of-law impediments*

**\*14** In examining the manageability of the proposed class, two factors are considered: the manageability of the class for trial, [FN35] and whether there are choice-of-law conflicts in a putative nationwide class. *In re Prempro Prods. Liab. Litig.*, 230 F.R.D. 555, 562 (E.D.Ark.2005). Given the resolution of the conflicts among the laws of the various jurisdictions, there is no manageability issue. Thus, choice-of-law concerns do not present an impediment.

Because the predominance and superiority requirements of Rule 23(b)(3) are satisfied, it is appropriate to certify it as a class action.

**Conclusion**

The action satisfies the numerosity, commonality, typicality and adequacy requirements of Fed.R.Civ.P. 23(a), and the predominance and superiority requirements of Rule 23(b)(3). Therefore, the motion for class certification will be granted.

***ORDER***

**AND NOW**, this 25th day of September, 2007, upon consideration of the Plaintiffs' Motion for Class Certification (Document No. 22 of C.A. No. 06-2993 and Document No. 9 of C.A. No. 06-4228) and the defendants' responses, it is **ORDERED** that the motion is **GRANTED**.

It is **FURTHER ORDERED** as follows:

1. This action is certified as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) on behalf of the following subclasses:
   a. All persons and entities residing in any state, other than the State of California, and the District of Columbia, who before April 11, 2006 purchased and aircraft that is or was subject to Lycoming Mandatory Service Bulletin 569A and currently own that aircraft; and
   b. All persons and entities residing in any state, other than the State of California, and the District of Columbia, who before April 11, 2006 purchased an aircraft that is or was subjected to Lycoming Mandatory Service Bulletin 569A and sold that

aircraft on or after April 11, 2006.

2. Plaintiffs Charles Powers, Cynthia Powers and Plane Time, LLC are certified as class representatives; and

3. The following law firms are appointed class counsel pursuant to Fed. R. Civ. P. 23(g)(1) in the roles as designated: (1) RodaNast, P.C. as Liaison Counsel; (2) Climaco, Lefkowitz, Peca, Wilcox & Garofoli, Co., LPA as Co-Lead Counsel; (3) The Mills Law Firm as Co-Lead Counsel; (4) Bailey Law Group as Discover Chair; (5) Seeger Weiss LLP as E-Discovery Liaison; (6) The Vernon Law Firm; and (7) Levy, Ram & Olson, LLP.

> FN1. The plaintiffs named three defendants, Lycoming Engines, Avco Corporation and Textron, Inc. Since the motion for certification was filed, Textron has been dismissed. The two remaining defendants are referred to collectively as "Lycoming."

> FN2. *See* Fed.R.Civ.P. 23(a) and (b)(3).

> FN3. During an overhaul, the crankshaft is separated from the engine.

> FN4. AD 2006-20-09, 21 Fed Reg. 57407, at 57408, attached as Ex. D to *Defs. Reply and Supplement in Further Support of Mot. to Dismiss* (Doc. No. 15).

> FN5. California residents were excluded because in August of 2006, a putative class action was filed in California on behalf of all California residents who purchased engines subject to MSB 569 and 569A. *See Bristow v. Lycoming Engines, et al.*, No. Civ. S-06-1947 LKK/GGH, 2007 WL 1106098 (April 10, 2007 E.D.Cal.) (Karlton, J.). On November 13, 2006, the plaintiffs in the California action filed a motion to transfer and centralize the three cases to an MDL, which request was denied on February 9, 2007.

> FN6. Cynthia Powers is a co-owner of the aircraft.

> FN7. Although Car is the sole owner of Plane Time, LLC, that entity is the actual owner of the plane at issue.

> FN8. *See Pls.' Supplemental Mem. in*

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

2007 WL 2782355                                                                              Page 12
--- F.R.D. ----, 2007 WL 2782355 (E.D.Pa.)
**(Cite as: 2007 WL 2782355 (E.D.Pa.))**

*Support of Mot. for Class Certification*
(Doc. No. 62) at 1 n. 1.

FN9. *See Pls.' Notice of Voluntary Dismissal of Third Cause of Action* (Doc. No. 98).

FN10. Specifically, *Restatement* § 148(2) states:
When the plaintiff's action in reliance took place in whole or in part in a state other than that where the false representations were made, the forum will consider such of the following contacts, among others, as may be present in the particular case in determining the state which, with respect to the particular issues, has the most significant relationship to the occurrence and the parties:
(a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations,
(b) the place where the plaintiff received the representations,
(c) the place where the defendant made the representations,
(d) the domicile, residence, nationality, place of incorporation and place of business of the parties, (e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and
(f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant.

FN11. For purposes of the motion for class certification, the District of Columbia is considered a "state," and the state of California is not part of the analysis.

FN12. Colorado, Connecticut, District of Columbia, Illinois, Indiana, Iowa, Michigan, Nebraska, Nevada, New Hampshire, New Jersey and New York.

FN13. Arizona, Delaware, Louisiana and North Dakota.

FN14. Alabama, Alaska, Florida, Idaho, Kansas, Maine, Maryland, Missouri, New Mexico, North Carolina, Ohio, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Virginia, Wisconsin and Wyoming.

FN15. This is in contrast to states that allow recovery on a claim for unjust enrichment even if the party retaining the benefit is not a wrongdoer or mistakenly received the benefit. *See, e.g., Schock v. Nash,* 732 A.2d 217, 232 (Del.1999); *Richland Cty. v. State,* 180 N.W.2d 649, 655 (N.D.1970).

FN16. Arkansas, Georgia, Hawaii, Kentucky, Massachusetts, Minnesota, Mississippi, Montana, Oklahoma, Vermont, Washington, and West Virginia.

FN17. *See, e.g., Interbank Investments LLC v. Eagle River,* 77 P.3d 814, 816 (Colo.Ct.App.2003) (allowing recovery "on a quasi-contract when the party will have no right under an enforceable contract"); *Combustion Eng'g, Inc. v. Miller Hydro Group,* 812 F.Supp. 260, 262-63 (D.Me.1992) ( "Maine has no absolute rule barring recovery [under unjust enrichment] in the presence of a valid contract"); *United States v. Applied Pharmacy Consultants, Inc.,* 182 F.3d 603, 608-09 (8th Cir.[Ark.]1999) (rule precluding recovery under unjust enrichment when there is an express contract subject to several qualifications); *Westmont Tractor Co. v. Viking Exploration, Inc.,* 543 F.Supp. 1314, 1321 (D.Mont.1982) ("recovery in quantum meruit is appropriate in an action brought on an express or special contract where there exists an unusual and equitable reason for such recovery and the particular situation seems to justify it"); *Adelman v. Christy,* 90 F.Supp.2d 1034, 1045 (D.Ariz.2000) (the "mere existence of a contract governing the dispute does not automatically invalidate an unjust enrichment alternative theory of recovery. A theory of unjust enrichment is unavailable only to a plaintiff if that plaintiff has already received the benefit of her contractual bargain").

FN18. *Pls.' Response in Opposition to Defendants' Mot. to Dismiss* (Doc. No. 14) at 14; *Pls.' Supplemental Response in Opposition to Defendants' Mot. to Dismiss* (Doc. No. 60) at 7.

FN19. Florida, Idaho and Ohio.

FN20. Illinois, Iowa, Kansas, Maryland, Massachusetts, Michigan, New York,

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

2007 WL 2782355                                                                 Page 13
--- F.R.D. ----, 2007 WL 2782355 (E.D.Pa.)
(Cite as: 2007 WL 2782355 (E.D.Pa.))

Pennsylvania and Tennessee.

FN21. Louisiana's implied warranty law provides for relief when a defect renders a product useless or diminishes its usefulness or value. *See* La. Civ.Code Ann. art. 2520.

FN22. Louisiana does not require privity.

FN23. These states are: Alabama, Arizona, Georgia, Idaho, Illinois, Iowa, Kentucky, New York, North Carolina, Ohio, Oregon, Tennessee, Vermont and Wisconsin.

FN24. The public policy argument behind abolishing the privity requirement is that it promotes judicial economy to allow the end purchaser to bring an action directly against the manufacturer, avoiding the unnecessary litigation that would be required if the purchaser were forced to bring an action against the dealer, who in turn could bring an action against the manufacturer. *See* Clark, Barkley and Christopher Smith, *The Law of Prod. Warranties,* § 10:20 (West 2006).

FN25. Plaintiffs point to three states--Idaho, North Carolina and Wisconsin--which have suggested that they would be willing to abandon the privity requirement if presented with an appropriate case. *See Ramerth v. Hart,* 133 Idaho 194, 983 P.2d 848, 852 (1999); *Gregory v. Atrium Door and Window Co.,* 106 N.C.App. 142, 415 S.E.2d 574, 575 (1992); *Strahlendorf v. Walgreen Co.,* 16 Wis.2d 421, 114 N.W.2d 823, 830-31 (1962). In those cases, the courts recognized that the privity requirement sometimes precluded plaintiffs from obtaining relief or compensation for their economic loss. Because the specific plaintiffs in those cases were not precluded from recovery, the courts deemed it unnecessary to change the rule, but intimated that it may be abolished in the future.

FN26. Arizona, Illinois, New York, Oregon, Vermont.

FN27. Idaho, Illinois, North Carolina, Ohio and Wisconsin.

FN28. Iowa.

FN29. Alabama, Kentucky, Georgia, New York, Oregon, Tennessee and Vermont.

FN30. Arizona.

FN31. *Defs.' Second Supplemental Memo. of Law in Opposition to Pls.' Mot. for Class Certification* (Doc. No. 86) at 7.

FN32. *Defs.' Supplemental Memo. of Law in Opposition to Pls.' Mot. for Class Certification* (Doc. No. 74) at 13-14. According to the amended complaint, the Powers aircraft was purchased new in 1978, and a crankshaft subject to MSB 569A was installed in the engine during an overhaul in April of 2002. *Amended Compl.* ¶ ¶ 7-8. Plane Time purchased its 2002 aircraft in 2004, and the defective crankshaft was replaced in that aircraft on November 14, 2006. *Amended Compl.* ¶ ¶ 10-12.

FN33. *Defs.' Supplemental Memo. of Law in Opposition to Pls.' Mot. for Class Certification* (Doc. No. 74) at 13-14.

FN34. Specifically, class members can incur costs from either: (1) replacing the crankshaft at an overhaul before 2009 at a Lycoming facility, where the new crankshaft and other replacement parts are free, but the cost of the overhaul and freight charges are higher than if the overhaul were performed at another FAA authorized facility, downtime is increased and labor charges for replacing the crankshaft will accrue; (2) replacing the crankshaft during an overhaul before 2009 at a non-Lycoming facility, where the new crankshaft and replacement parts will cost $2,000 plus labor charges for replacing the crankshaft; (3) replacing the crankshaft at an overhaul after 2009, where the new crankshaft and replacement parts will cost $16,000 and labor charges will accrue; (4) replacing the crankshaft in advance of an overhaul, where the new crankshaft and replacement parts will cost $16,000 plus labor charges to remove and reinstall the engine; or (5) selling the plane prior to replacing the crankshaft at a diminished value.

FN35. The 2003 Comment to Rule 23 states that an "increasing number of courts require

2007 WL 2782355
--- F.R.D. ----, 2007 WL 2782355 (E.D.Pa.)
**(Cite as: 2007 WL 2782355 (E.D.Pa.))**

a party requesting class certification to
present a 'trial plan' that describes the issues
likely to be presented at trial and tests
whether they are susceptible of class-wide
proof." Plaintiffs have not submitted a trial
plan.

--- F.R.D. ----, 2007 WL 2782355 (E.D.Pa.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Tab 9

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 101808 (S.D.Tex.)
**(Cite as: 2007 WL 101808 (S.D.Tex.))**

Page 1

**H**
Only the Westlaw citation is currently available.

United States District Court,
S.D. Texas,
Victoria Division.
Erasmo REYES, individually and on behalf of all
others similarly situated,
Plaintiff,
v.
TEXAS EZPAWN, L.P., Defendant.
**Civil Action No. V-03-128.**

Jan. 8, 2007.

Hartley Hampton, Michael A. Josephson, Fibich
Hampton et al., Houston, TX, for Plaintiff.

Kerry E. Notestine, Eve Mantell McFadden, Littler
Mendelson, Houston, TX, for Defendant.

**COLLECTIVE ACTION PURSUANT TO 29
U.S.C. § 216(b)**

JOHN D. RAINEY, United States District Judge.

**Memorandum & Opinion**
*1 Pending before the Court is Defendant Texas
EZPawn, L.P.'s ("Defendant or EZPawn") Motion for
Decertification (Dkt.# 161). Upon consideration of
the motion, the response, and the applicable law, the
Court is of the opinion that the Motion for
Decertification should be GRANTED.

**Factual and Procedural Background**
Defendant is in the retail pawn and short-term loan
business with more than 180 locations across Texas.
Customers can receive short-term loans either
through a pawn loan or a payday loan. Defendant
makes loans secured by any item of value including
jewelry, firearms, electronics, televisions, stereos,
tools, musical instruments, and other items. Payday
loans are short-term unsecured loans that mature on
the customer's next pay date, generally seven to
thirty-seven days after the loan is made. Defendant
also sells the merchandise that customers do not
redeem or which customers sell directly to it.

The employees at each retail location include Sales
and Lending Representatives ("SLRs"), Senior SLRs,
one Assistant Store Manager ("ASM"), and one Store

Manager. SLRs are responsible for customer service
and processing customer transactions. Senior SLRs
perform the same job duties as SLRs and may also
open or close the store. Defendant classifies both
SLRs and Senior SLRs as nonexempt employees for
purposes of the overtime provisions of the Fair Labor
Standards Act ("FLSA"). It classifies ASMs and
Store Managers as exempt.

On October 31, 2003, Erasmo Reyes filed suit
claiming Defendant misclassified ASMs as exempt
employees, thereby improperly denying ASMs
overtime pay in violation of the FLSA. 29 U.S.C. §
201 et seq. Reyes filed on behalf of all other ASMs
similarly situated and sought to proceed as a
collective action pursuant to 29 U.S.C. § 216(b).
This Court conditionally certified a class by
approving the issuance of notices of the pending
action to potential "opt-in" plaintiffs that were
employed or formerly employed as ASMs by
EZPawn from October 31, 2000 to the present (Dkt.#
24). After sending out the notices, approximately 82
individuals filed written consents to join the present
action. After conducting extensive discovery,
Defendant has filed the instant Motion for
Decertification contending that the 42 or so
remaining Plaintiffs in this action are not similarly
situated. [FN1] Defendant asserts that Plaintiffs'
challenge to their exempt status requires a fact-
intensive, individualized inquiry, and therefore, that
collective action is not appropriate in this case.

> FN1. See dkt. # 185 dismissing opt-in
> plaintiffs who had withdrawn their consents
> to be a part of this action or on statute of
> limitations grounds.

**Analysis**
The FLSA requires that employees must receive one
and a half times their regular pay for hours worked in
excess of forty each week. 29 U.S.C. §
207(a)(1). This general mandate, however, does not
apply to persons employed in a bona fide executive,
administrative or professional capacity. Id. §
213(a)(1). Employees alleging that their employer
has violated this section may bring a collective action
under FLSA. The statute, in relevant part, provides:
"[a]n action to recover the liability prescribed in [this
Title] may be maintained against any employer in
any Federal or State court of competent jurisdiction
by any one or more employees for and on behalf of

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 101808 (S.D.Tex.)
(Cite as: 2007 WL 101808 (S.D.Tex.))

Page 2

himself or themselves and other employees *similarly situated." Id.* § 216(b) (emphasis added). Thus, for an opt-in class to be created under the FLSA, an employee must show he and the employees on whose behalf he is suing are "similarly situated." Plaintiffs need only show that "their positions are similar, not identical" to the positions held by the putative class members. *Grayson v. Kmart Corp.,* 79 F.3d 1086, 1096 (11th Cir.1996) (citing *Sperling v. Hoffman-LaRoche,* 118 F.R.D. 392, 407 (D.N.J.1988), aff'd in part and appeal dism'd in part, 862 F.2d 439 (3d Cir.1988)); *Riojas v. Seal Produce, Inc.,* 82 F.R.D. 613, 616 (S.D.Tex.1979). Plaintiffs bear the burden of showing they are similarly situated to the remainder of the proposed class. *Bayles v. American Med. Response of Colo., Inc.,* 950 F.Supp. 1053, 1062-63 (D.Colo.1996).

*2 The FLSA § 216(b) does not define the term "similarly situated." The prevailing standard recognized in the Fifth Circuit requires a two step inquiry. *Mooney v. Aramco Servs. Co.,* 54 F.3d 1207, 1212 (5th Cir.1995), overruled on other grounds by *Desert Palace, Inc. v. Costa,* 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003); *Johnson v. TGF Precision Haircutters, Inc.,* 319 F.Supp.2d 753, 754 (S.D.Tex.2004). First, a court will make an initial determination of whether the plaintiffs are similarly situated at the "notice stage" in order to give notice of the action to potential class members. *Mooney,* 54 F.3d at 1213-14. This conditional class certification is largely based on the allegations set forth in pleadings and affidavits, and for this reason, is governed by a lenient standard requiring "nothing more than substantial allegations that the putative class members were together the victims of a single decision, policy, or plan." *Thiessen v. General Electric Capital Corp.,* 267 F.3d 1095, 1102 (10th Cir.2001) (quoting *Bayles,* 950 F.Supp. at 1066)). After discovery is complete and more factual information is available to the court, the court is often prompted to review class certification in a motion to decertify. During this "decertification stage," and applying a stricter standard, the court will review several factors to determine if the plaintiffs are "similarly situated," including: (1) disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; and (3) fairness and procedural considerations. *Id.* at 1103; see also *Morisky v. Public Srvc. Electric & Gas Co.,* 111 F.Supp.2d 493, 498 (D.N.J.2000) (noting for purposes of a misclassification claim, "similarly situated" must be "analyzed in terms of the nature of the job duties performed by each class member, as

the ultimate issue to be determined is whether each employee was properly classified as exempt"); *Mooney v. Arabian American Oil Co.,* 1993 WL 739661, *8 (S.D.Tex.1993) (finding "due process concerns require the Court to scrutinize the opt-in plaintiffs and their respective claims with a more exacting eye to determine if they are in fact 'similarly situated' "). The Court will consider each factor in turn.

**I. Disparate Factual and Employment Settings**

This first factor assesses the opt-in plaintiffs' job duties, geographic location, supervision, and salary to determine if the Plaintiffs are similarly situated. *Johnson v. TGF Precision Haircutters, Inc.,* 2005 WL 1994286, *2 (S.D.Tex.2005); *Lusardi v. Xerox Corp.,* 118 F.R.D. 351, 358-59 (D.N.J.1987). In this case, Plaintiffs do not rely on a company-wide job description, which contemplated ASMs performing the same job function. Instead, Plaintiffs rely on their actual day-to-day job duties to support their claims. Plaintiffs contend they are similarly situated because ASMs spent the majority of their time performing the same, "standardized" non-exempt tasks. [FN2] The Plaintiffs' deposition testimony, however, reveals significant differences in each ASM's job duties, discretion, and authority, depending on the practices of individual store managers, store demographics, and location. See *Mike v. Safeco Ins. Co. of America,* 223 F.R.D. 50, 54 (D.Conn.2004) (noting "class membership is not founded upon an [company] policy or other generalized proof, but rather on the fact-specific determination of each individual plaintiff's day to day tasks"). The fact that the Plaintiffs are or were at one time ASMs of EZPawn and may have spent the majority of their time performing non-exempt tasks does not establish sufficient similarities to warrant class certification. See *Smith v. Heartland Automotive Srvcs., Inc.,* 404 F.Supp.2d 1144, 1152 (D.Minn.2005) (finding plaintiffs case for certification cannot rest solely on the fact that they spent the majority of their time performing non-exempt tasks).

FN2. Pls.' Resp. to Def.'s Mot. for Decertification, p. 8.

*3 The extent of an ASM's discretion and authority largely depended on the store manager in charge of that particular store. The management style of individual store managers often dictated the nature of the duties an ASM was required to perform. Plaintiffs rely on several specific duties that ASMs routinely performed to establish that they are similarly situated.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 101808 (S.D.Tex.)
(Cite as: 2007 WL 101808 (S.D.Tex.))

The Court will review several of the job duties relied on by Plaintiffs to highlight the differences in the individual experiences of the ASMs. For instance, store managers had different practices in the overall management of their stores. Some would divide the store into sections, with all employees, including the ASM, having responsibility for a section. [FN3] Other store managers would leave lists for the ASM and employees to complete in his or her absence. [FN4] Plaintiff Erasmo Reyes recognized after working under several different store managers that "every manager is different." [FN5]

> FN3. All deposition testimony mentioned hereafter is cited from the exhibits attached to Pls.' Resp. to D.'s Mot. for Decertification. Chasteen Dep., p. 36 (the manager would conduct monthly meetings for all employees to assign sections, address each employee's responsibilities and convey other loan and sales information); Davila Dep., p. 40:20 ("I have a certain section that I'm in charge of to complete, make sure it's done."); Walls Dep., p. 34:16 ("We had, like, sections. Everybody did, had their own section to do and to keep up.").

> FN4. Reyes Dep., p. 65:9 ("[T]he last couple of managers I had would write lists of things for me to accomplish.").

> FN5. Id.; Walls Dep., p. 36:23 (in response to whether she ever told the SLRs to do their work, she stated "[the manager] ran the guys and I ran the girls"); Cooper Dep., p. 28:17 (manager would monitor the store on his days off by "call[ing] every hour on the hour").

More specifically, ASMs had varying degrees of authority with respect to their ability to override the computer-generated price on a sale or loan amount. Some ASMs exercised this authority up to $5 or $10, while others either had no approval code or were told that all overrides required store manager approval. [FN6] Plaintiff Betty Cox's experience underscores the differences in an ASMs' override authority depending on which store manager was in charge. Her first manager would "honor" Cox's decision to sell merchandise at a discount, or Cox would simply show her the item if the manager was there for approval; however, Cox's later manager set a strict $5 limit on any discounts given without his approval. [FN7]

> FN6. Chasteen Dep., p. 50 (could use ASM passcode to override up to $10, then computer prompted for a manager's passcode for amounts above $10); Cox Dep., p. 65 (never had an approval code); Granger Dep., p. 54 (approval code for overrides of $5 or less); Johnson Dep., p. 82:11 (acting as store manager, she stated "I want to know what's being sold in my store and he--he does not have any type of window; so her ASMs could not sell anything outside of the computer-generated price without manager approval); Nunez Dep., p. 63:3 (he never used his override code without management approval, even on small amounts, because "[he] didn't want to get in trouble by anybody"); Randle Dep., p. 53:12 (as ASM, she didn't have to override an amount in the computer, but SLRs would come get her approval "out of respect" if they wanted to pay more on a loan); Walls Dep., p. 68:14 ("If it was over that ten amount, you know, I would go get [the manager].").

> FN7. Cox Dep., pp. 61:12-62:10 (Q--"Was the $5 discount amount the same under all three store managers that you worked under?" A--"No. That was actually under the first one. Now, with Sandra Renner, the lady manager, she usually--she usually would tell me, you know, 'Oh, why don't you let so-and-so have that for so-and-so.' You know, which I would do that ... I never really had to go and ask her, 'Can I discount this' or 'How much can I discount this?' I never--she never put me in that position to where I had to.").

Also, although EZPawn had very little formal training for its employees, certain ASMs took a more active role than others in training new employees. [FN8] An additional distinction appeared at the stores in the Dallas area. Unlike other areas, in Dallas, all employees were trained at a central store before being sent to their permanent locations. [FN9] Certain managers also allowed ASMs to complete company paperwork, while others did not. [FN10] Further, a few ASMs were responsible for making the work schedule each week, depending on their individual store manager's practice. [FN11] One particular Plaintiff's testimony demonstrates the differences in how managers approached scheduling. Mischka Cooper, as an ASM, was never permitted to do scheduling; however, since being promoted to store manager she allows her ASM to do the

Not Reported in F.Supp.2d                                                    Page 4
Not Reported in F.Supp.2d, 2007 WL 101808 (S.D.Tex.)
**(Cite as: 2007 WL 101808 (S.D.Tex.))**

schedules. [FN12]

Dep., p. 128 (same).

> FN8. Agnew Dep., p. 51 (never involved in training SLRs); Cooper Dep., p. 30 (same); Chasteen Dep., p. 38 (all training done by manager); Davila Dep., p. 63 (training consisted of the employees watching her do her job); Granger Dep., p. 46 (no formal training, but he would answer the questions of new employees); Cardona Dep., p. 38:3 ("I would teach [the SLRs] how to do the-- how to merchandise some items. I would teach them how to also do some of the jewelry ..."); Nunez Dep., p. 45 (manager did all of the training, although she did train employees when the manager was out); Reyes Dep., pp. 86:23 & 111-112 ("The only training that I did was show them how to sell," otherwise all training was done by the manager).

> FN9. King Dep., p. 68:9-23 (for Dallas locations, employees would be trained at the larger "store on Buckner" before "send[ing] them out to the other stores"); Walls Dep., p. 26:11 ("I did work at Woody's Store, you know, the two weeks in the training" before going to her assigned store).

> FN10. Fernandez Dep., p. 62 (manager showed her how to do all the reports and she would complete the paperwork when the manager was absent); Granger Dep., p. 32 (citing his responsibility to run all the closing paperwork); Reyes Dep., p. 88 (same); Griffin Dep., p. 38: 11 (Q--"Was there any paperwork associated with being an assistant store manager?" A-- "I didn't get to do it."); Logue Dep., p. 43:24 ("[Managers] usually are the ones who took care of all the reports and all the paperwork.").

> FN11. Agnew Dep., p. 53 (never made the schedule); Granger Dep., pp. 57-58 (same); Randle Dep., p. 42 (same); Cardona Dep., p. 41:18 (I [created schedules] a couple of times to learn and I also did a couple of times when [the manager] wasn't there"); Davila Dep., p. 50:1 ("I write the schedules. I've written it like twice. And by write, I mean, [the manager] tells me what to put and I write it."); Fernandez Dep., p. 64 (she did the schedule a few times, but the manager would have to approve it); Reyes

> FN12. Cooper Dep., p. 32:17 ("I asked [my ASM] for as much help as she could possibly give me, and that included help making their schedules.").

Each store had different policies about which employees could make the daily bank deposits. [FN13] Also, ASMs were given different roles in the interviewing and hiring process. Some took absolutely no role in hiring, while others interviewed prospective employees and made recommendations on hiring. [FN14] Likewise, ASMs also exercised varying degrees of authority with respect to customer complaints, ranging from no involvement at all to handling all the customer complaints. [FN15] Finally, ASMs may have had extra paperwork and responsibilities depending on whether their store had an in-store Payday loan operation or whether their store carried guns. [FN16] Plaintiff, Ingrid Randle's testimony highlights the various requirements that were involved with managing the Payday loan operation because she worked at two different stores in Houston. At the Airline store, she handled the Payday loans. She stated: "I organized it. I did the paperwork for them. I did the collections part for them. On Fridays is when mainly people get loans and pay on loans," [FN17] whereas at the Sheperd location "Payday loans were low." [FN18] Additionally, the particular stores that carried guns required employees to complete additional paperwork and verify from the ATF that the buyer was authorized to purchase a gun. [FN19]

> FN13. Johnson Dep., p. 60 (as ASM, she sent SLRs to the bank); King Dep., p. 43 (only manager and ASM could make bank deposits); Randle Dep., p. 41 (as ASM, she made all the bank deposits); Walls Dep., p. 38 (same); Agnew Dep., p. 40 (manager made all bank deposits); Cardona Dep., p. 44 (same); Chasteen Dep., p. 44 (all employees took turns making bank deposits).

> FN14. Cardona Dep., p. 68 (no role in hiring or interviewing); Chasteen Dep., p. 51 (same); King Dep., p. 46 (same); Cox Dep., p. 54 (hired an employee when manager was out sick, with area manager's approval); Davila Dep., p. 48-49 (interviewed an employee based on a questionnaire she filled out and gave her opinion of the applicant to the manager); Randle Dep., p. 57

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 101808 (S.D.Tex.)
(Cite as: 2007 WL 101808 (S.D.Tex.))

Page 5

(interviewed around 7 applicants); Reyes Dep., pp. 124-25 (made recommendations about applicants and sat in on interviews).

FN15. Agnew Dep., p. 50 (manager handled all customer complaints); Johnson Dep., pp. 83-84 (as ASM, she would refer all customer complaints to the manager); Davila Dep., p. 59 (handled no customer complaints); Chasteen Dep., p. 37 (senior SLRs handled only customer complaint he could remember); Fernandez Dep., p. 69 (as ASM, she implemented routine procedures for handling customer complaints); Granger Dep., p. 45 (resolved customer complaints when manager was absent); Reyes Dep., p. 109 (same).

FN16. Agnew Dep., pp. 83-84 (the ASM had to account for the money and loans made by the onsite Payday loan operation); Chasteen Dep., p. 56 (every employee did Payday loans); Cox Dep., p. 108 (as ASM, her and one or two other employees did the Payday loans; she tried to show other employees but they never picked up on it); Davila Dep., p. 61 (before audits she would have to make sure the payday loans were in order); Fernandez Dep., p. 59 (reviewed the paperwork associated with the Payday loans that SLRs made); Griffin Dep., p. 38 (required to give her passcode for the Payday loans); Johnson Dep., p. 65 (separated the Payday store from the main store during her employment); Nunez Dep., p. 31 (went to different store temporarily to train employees on how to do Payday loans).

FN17. Randle Dep., p. 64:9-12.

FN18. Id. at 64:17.

FN19. Agnew Dep., p. 56 (recounting the various requirements); Randle Dep., p. 63 (same); Chasteen Dep., p. 46 (no guns sold in store); Fernandez Dep., p. 76 (same); Gonzalez Dep., pp. 61:20-62:8 (explaining the extra requirements because his store sold rifles and shotguns, including a meeting for managers and ASMs that provided "training in rifles and shtoguns as far as in how to handle them and what to do in a situation of when a customer brought a shotgun or a rifle into the store" and training on how to receive the most up-to-date information on

their customers).

*4 The deposition testimony also reveals that individual ASMs had differing views of their own supervisory role in their store. Some ASMs believed they were the manager in charge when the store manager was absent, while others believed they had no supervisory authority, even in the store manager's absence. [FN20] ASMs oversight of other employees also varied depending on the degree of involvement by their store manager and their own willingness to manage employees. One ASM, for example, took the initiative to encourage employees to reach their sales goals and would allow an employee to leave in an emergency when the manager was absent, while another felt she had no supervision responsibilities whatsoever. [FN21] Some ASMs would advise their managers if employees were violating company policy, some would take it upon themselves to point out the violations to the employee, and others would take a completely hands-off approach in disciplining employees. [FN22] Thus, the evidence presented shows a wide array of differences in the ASMs' individual experiences depending on the management practices of individual store managers and their own perceptions of their role in the company.

FN20. Davila Dep., p. 60 (ensures tasks are done when manager is out); Fernandez Dep., p. 35 (store manager was off 3 days a week, and ASM was in charge during those times); Granger Dep., p. 43 (took on supervisor responsibilities when manager was out); Randle Dep., p. 50 (same); Griffin Dep., pp. 39-40 (did not feel she was in charge when manager was absent because she had to get his approval on everything); Logue Dep., p. 53 (considered the area manager in charge when the manager was absent); Walls Dep., p. 32 (the store ran itself, so when the manager was absent she was not the person in charge).

FN21. Cf. Reyes Dep., pp. 98-100 (offered SLRs advice on how to establish a clientele, prepared goal sheets for the employees and devised contests to encourage employees to meet their sales goals); Gonzalez Dep., p. 75 (everyone had an assigned section and as ASM, it was his responsibility to make sure the assigned area was being maintained) with Johnson Dep., p. 82 (ASMs have no responsibility for supervising the employees).

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                   Page 6
Not Reported in F.Supp.2d, 2007 WL 101808 (S.D.Tex.)
(Cite as: 2007 WL 101808 (S.D.Tex.))

FN22. Agnew Dep., p. 66 (noted employee violations of company policy and shortages and provided information to manager); Fernandez Dep., p. 65 (informed manager of employee violations of policy); *Id.* at 81-82 (consulted employee handbook to advise employee about dress policy); Reyes Dep., p. 126 (same); *Id.* at 132 (signed as witness on write-ups); King Dep., p. 41 (manager does all write-ups); Chasteen Dep., p. 51 (no involvement in discipline); Cooper Dep., p. 42 (same); Nunez Dep., p. 66 (same).

Geography also contributed to the disparate employment experiences of the ASMs. Although this lawsuit covers only the EZPawn locations in Texas, the testimony reveals that the geographic location of a particular store had a direct impact on the number of employees, annual sales, individual workload, inventory, and the importance of specific job duties. *See Johnson,* 2005 WL 1994286, *6 ("Variances even within a single state, however, are not necessarily insignificant."). In fact, even stores in the same city would operate differently. [FN23] For example, in response to whether EZPawn had central policy guidelines, Plaintiff Maria Fernandez stated "every store runs their store in a different way." [FN24] The location of a store often dictated the volume of business and the number of employees, thereby affecting an ASM's workload and responsibility. For instance, a store in a large metropolitan area such as Dallas would have 7 employees, while a store in Abilene might only have 4 employees. [FN25] Plaintiff Georgette Johnson explained that when she worked at the larger Dallas location as ASM, there were three or four SLRs, an ASM, and a store manager, whereas when she was promoted to store manager she was transferred to a smaller store and there were only two SLRs and an ASM. [FN26] The evidence here indicates there were substantial differences in the working conditions of ASMs at different locations around Texas.

FN23. Johnson Dep., pp. 36-37 & 48-49 (explaining the amount of loans the store makes annually "dictates" the size of the store and the number of employees at each location); Randle Dep., p. 45:8-12 (Q--"And does [closing the store] also require two people at least?" A--"All depends on the area that you're in and how busy your store is. It may be a manager and two people for more safety precautions."); Reyes Dep., p. 74:10-13 (explaining price variations depending on location, stating "[t]he district

manager would come in and say, 'I want that at that price.' And we always tried to say that we're in a small town. We're not in San Antonio or Houston. It's different here.").

FN24. Fernandez Dep., p. 68:14.

FN25. *Cf.* Chasteen Dep., p. 31 (Dallas); Walls Dep., p. 28 (Dallas) *with* Agnew Dep., p. 35 (Abilene).

FN26. Johnson Dep., pp. 34:3-37:6.

Plaintiffs attempt to gloss over the many differences in the factual and employment settings at each store and convince the Court that ASMs are similarly situated because they performed the same tasks. However, the evidence clearly establishes that ASMs' job duties varied from store to store depending on the management style of their superiors and store demographics. *Lusardi v. Xerox Corp.,* 122 F.R.D. 463 (D.N.J.1988) ("The opt-in plaintiffs performed different jobs at different geographic locations and were subject to different job actions ... as a result of various decisions by different supervisors made on a decentralized employee by employee basis."). Although the ASMs held the same job title, this fact alone does not necessarily mean they performed the same work. *Morisky v. Public Srvc. Electric & Gas Co.,* 111 F.Supp.2d 493, 498 (D.N.J.2000) ("Even employees who hold the same job title do not necessarily perform the same work."). Therefore, other than the global allegations of Plaintiffs that the FLSA was violated, that they were all ASMs for EZPawn at some point, and that they primarily performed non-exempt work, there is no real commonality among the Plaintiffs in their actual day to day job duties.

**II. Defenses**

*5 The second factor raises the issue of whether the potential defenses pertain to the opt-in class as a whole or whether many different defenses will be raised with respect to each individual plaintiff. *Moss v. Crawford & Co.,* 201 F.R.D. 398, 409 (W.D.Penn.2000). Because individualized defenses prevent an efficient proceeding with a representative class, several courts have granted motions for decertification on this basis. *Id.* at 410. However, the district court has the discretion to determine whether the potential defenses would make the class unmanageable. *Id.*

EZPawn maintains that ASMs were properly

Not Reported in F.Supp.2d                                                                 Page 7
Not Reported in F.Supp.2d, 2007 WL 101808 (S.D.Tex.)
**(Cite as: 2007 WL 101808 (S.D.Tex.))**

classified as exempt employees and intends to assert the various exemptions provided under the FLSA to defend against Plaintiffs' claims. *See* 29 U.S .C. § 213(a)(1) (exempting "bona fide executive, administrative, or professional" employees from the FLSA's overtime pay requirements). Defendant plans to assert the executive, administrative, or a combination of both exemptions depending on the individual circumstances of each ASM's case. The exempt or non-exempt status of any particular employee must be determined on the basis of whether his duties, responsibilities, and salary meet all the requirements of the appropriate exemption criteria. 29 C.F.R. § 542 .201(b)(2). Although the Court does not express an opinion as to the merits of the Plaintiffs' misclassification claims, the relevant statutory exemption criteria will require an individual, fact-specific analysis of each ASM's job responsibilities. *Morisky, 111 F.Supp.2d at 499* (determining whether an employee's duty is executive or administrative is extremely individual and fact-intensive, requiring "a detailed analysis of the time spent performing administrative [or executive] duties" and "a careful factual analysis of the full range of the employee's job duties and responsibilities" (quoting *Cooke v. General Dynamics Corp., 993 F.Supp. 56, 59 (D.Conn.1997)*). As discussed at lengths above, the degree of discretion and authority each ASM exercised varied depending on store management and store demographics, making this case particularly unsuitable for collective treatment when applying exemption analysis.

Further, while some Plaintiffs may fall squarely within an exemption based on their deposition testimony, EZPawn may have to use employment records and/or other contradictory witness testimony to rebut some of the Plaintiffs' allegations that they had absolutely no management duties. Defendant further intends on presenting unsatisfactory performance reviews for certain Plaintiffs to demonstrate that those Plaintiffs had exempt duties but either failed or refused to exercise those duties, thereby "convert[ing] an exempt job into a non-exempt one." [FN27] For those Plaintiffs who claim they were denied the opportunity to perform exempt tasks by their managers, EZPawn also intends to use evidence that those ASMs did not utilize the internal complaint procedure. These defenses require individualized evidence, making it difficult for EZPawn to defend all of Plaintiffs' claims with generalized proof.

FN27. D.'s Mot. for Decertification, p. 15

(quoting *Stein v. J.C. Penney Co., 557 F.Supp. 398, 405 (W.D.Tenn.1983)*).

**\*6** Another factor weighing against certification is the regulation change in August, 2004 by the Department of Labor, amending the requirements for the executive and administrative exemptions. Because the class members consist of ASMs employed by EZPawn between December 1, 2002 to the present, the amended regulations will affect the defenses applicable to each ASM depending on when each ASM was employed by EZPawn. Thus, the various individualized defenses and the different regulatory treatment required for each Plaintiff weighs against certification.

**III. Fairness and Procedural Considerations**

Finally, fairness and procedural considerations direct the court to consider the primary objectives of the FLSA § 216(b) collective action: (1) to lower costs to the plaintiffs through the pooling of resources, and (2) to limit the controversy to one proceeding which efficiently resolves common issues of law and fact that arise from the same alleged activity. *See Hoffmann-LaRoche, Inc. v. Sperling, 493 U.S. 165, 170, 110 S.Ct. 482, 107 L.Ed.2d 480 (1989)* (noting a collective action affords plaintiffs the "advantage of lower individual costs to vindicate rights by the pooling of resources" and "[t]he judicial system benefits by efficient resolution in one proceeding of common issues of law and fact"). The court must also consider whether it can coherently manage the class in a manner that will not prejudice any party or be particularly burdensome on a jury. *Thiessen v. General Electric Capital Corp., 267 F.3d 1095, 1105 (10th Cir.2001)* (finding a collective action "impose [d] extraordinary burdens on the jury, both in terms of quantity of evidence and the length of trial").

Plaintiffs contend certification of the class will further judicial economy by preventing over forty individual actions being filed all over Texas and will allow pooling of resources to help the Plaintiffs, as a class, vindicate relatively small claims. This benefit, however, must be weighed with all the other factors. In light of the individual analysis each Plaintiff's claim will require, the judicial inefficiency of having essentially forty plus mini-trials clearly outweighs any potential benefits in proceeding as a collective action. The Plaintiffs' claims are not amenable to generalized evidence and the Court would not be able to "coherently manage" the class without potentially prejudicing the parties. *Moss v. Crawford & Co., 201 F.R.D. 398, 410 (W.D.Penn.2000).* Our sister court in

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 101808 (S.D.Tex.)
**(Cite as: 2007 WL 101808 (S.D.Tex.))**

Page 8

the Southern District of Texas noted in decertifying a class:

> Plaintiffs' disparate and various claims do not present common issues of law and fact arising from the same alleged activity but depend upon varied and sundry activities of individual [ ] managers of different shops in about [20] different locations in [ ] Texas. [T]he individualized claims and individualized defenses, all of which are highly fact intensive, would not only dominate but would swallow and consume the entire case.

*7 *Johnson v. TGF Precision Haircutters, Inc.,* 2005 WL 1994286, *7 (S.D.Tex.2005). This succinctly summarizes the same reasons this Court believes that this particular action is unsuitable for collective treatment. As a consolation, Plaintiffs will have the benefit of the extensive discovery already completed in this case in pursuing their individual claims. *Smith v. Heartland Automotive Srvcs., Inc.,* 404 F.Supp.2d 1144, 1155 (D.Minn.2005). Thus, due to the numerous factual differences in each Plaintiff's case, requiring a highly fact specific inquiry, the Court is of the opinion that fairness and procedural considerations weigh against certifying this class.

Finally, Plaintiffs also argue that EZPawn should be estopped from claiming ASMs are dissimilar because it already affirmatively represented to the Court that the class members were the same when arguing its summary judgment motion. The Court is not convinced that EZPawn made any such admission in its motion for summary judgment. Although EZPawn sought summary judgment as to the class as a whole, the Court does not consider this an admission that the Plaintiffs are similarly situated for purposes of class certification. At the time Defendant filed its motion for summary judgment, the procedural posture of the case made it necessary for the Defendant to address the class claims as a whole because the case was in the "notice stage" and the class had been conditionally certified. Further, regardless of the claims in Defendant's motion for summary judgment, it is the Plaintiffs' burden to show they are similarly situated for class certification. Thus, the Court finds this argument to be without merit.

### Conclusion

For these reasons, the Court declines to certify the class and grants Defendant's Motion for Decertification (Dkt.# 161). All claims filed herein by opt-in Plaintiffs are dismissed without prejudice. To avoid prejudice to individual opt-in Plaintiffs who may choose to file their own cases, the Court invokes its equity powers to toll the applicable statute of limitations for 30 days after the entry of this Order.

The claims of Plaintiff Erasmo Reyes remain pending herein for trial.

It is so ORDERED.

Not Reported in F.Supp.2d, 2007 WL 101808 (S.D.Tex.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Tab 10

Westlaw.

Not Reported in A.2d                                              Page 1
Not Reported in A.2d, 1992 WL 207251 (Del.Super.)
**(Cite as: 1992 WL 207251 (Del.Super.))**

▷
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Superior Court of Delaware, New Castle County.
SEQUA CORPORATION, a corporation of the State
of Delaware, and Chromalloy
American Corporation, a corporation of the State of
Delaware, Plaintiffs,
v.
AETNA CASUALTY AND SURETY COMPANY,
et al., Defendants.
**Civ. A. No. 89C-AP-1.**

Submitted: July 31, 1992.
Decided: Aug. 7, 1992.

On Sequa's Motion for Entry of Final Judgment--
Denied.

Richard E. Poole and Gregory A. Inskip of Potter,
Anderson & Corroon, for plaintiffs.

Roger A. Akin, and Bruce C. Herron of Sawyer and
Akin, for defendant California Union Insurance
Company.

Elizabeth B. Sandza, Esq., Cynthia T. Andreason
and Carol S. Warren of LeBoeuf, Lamb, Leiby, &
MacRae, for defendant National Casualty Company.

Francis J. Murphy of Asby & Geddes, for London
defendants

MEMORANDUM OPINION

HERLIHY, Judge.

*1 Plaintiffs Sequa Corporation and Chromalloy
American Corporation ["plaintiffs"; "Sequa"] seek
an order entering final judgment under Superior
Court Civil Rule 54(b) on two decisions from this
Court granting summary judgment in favor of
defendants California Union ["Cal Union"] and
National Casualty ["National Casualty"]. Those two
decisions are *Sequa Corp. v. Aetna Casualty and
Surety Co.,* Del.Super., C.A. No. 89C-AP-1, Herlihy,
J. (May 21, 1992) and *Sequa Corp. v. Aetna Casualty*

*and Surety Co.,* Del. Super., C.A. No. 89C-AP-1,
Herlihy, J. (July 16, 1992).

Plaintiffs filed this suit seeking a declaration of
rights, duties, and liabilities of the parties under
insurance policies issued by defendants to plaintiffs
over forty-eight years, as the policies may be
implicated in various environmental actions brought
against the plaintiffs involving nine sites in eight
states. Fifty insurance companies were originally
named as defendants. A stay, originally entered in
January, 1992, is presently in effect until October 1,
1992. Once and if the stay is lifted, discovery on
choice of law issues will continue with respect to the
parties remaining in this case.

Under the stay, the only activity currently permitted
before the Court concerns Cal Union's and National
Casualty's motions for summary judgment. Being
case-dispositive motions, as defined by the First
Revised Case Management Order No. 1, Section XII,
they were filed in anticipation of resolving all claims
between plaintiffs and these two defendants. The
decisions on the motions involved determinations
concerning choice of law and the application of the
absolute pollution exclusion contained in policies
issued by the two defendants.

The Court found that both insurer defendants'
motions could resolve all outstanding issues between
them and plaintiffs. The Court ruled that (1) the
service of suit clause did not make Delaware law
applicable, (2) New York law was applicable, and (3)
under New York law the two defendants had no
liability to plaintiffs. By so ruling, these two
defendants are out of this litigation.

Plaintiffs ask that the Court supplement the Orders
of May 21, 1992 and July 16, 1992 to include an
express determination that there is no just reason for
delay and an express direction for the entry of
judgment, so that they may take an appeal prior to the
resolution of the issues remaining in the case. [FN1]

Superior Court Civil Rule 54(b) provides that
    When more than one claim for relief is presented in
    an action, whether as a claim, counterclaim, cross-
    claim, or third-party claim, the Court may direct
    the entry of a final judgment upon one or more but
    fewer than all of the claims or parties only upon an
    express determination that there is no just reason

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 1992 WL 207251 (Del.Super.)
(Cite as: 1992 WL 207251 (Del.Super.))

Page 2

for delay and upon an express direction for the entry of judgment.

Without this express determination and direction for the entry of judgment by the trial court, no final judgment is deemed to be entered. *Shellburne, Inc. v. Roberts,* Del.Supr., 238 A.2d 331, 335 (1968). The trial court must exercise sound discretion, taking into account judicial administrative interests as well as the equities involved, in determining whether there is no just reason for delay. *Curtiss-Wright Corp. v. General Electric Co.,* 446 U.S. 1, 8, 100 S.Ct. 1460, 1465 64 L.Ed.2d 1, 11 (1980). Among the judicial interests to be considered is the traditional policy against piecemeal appeals. *In re Tri-Star Pictures, Inc. Litigation,* Del.Ch., C.A. No. 9477, Jacobs, V.C., slip op. at 3 (Sept. 26, 1989) ["*Tri-Star* "]; *Curtiss-Wright,* 446 U.S. at 8, 100 S.Ct. at 1465, 64 L.Ed.2d at 11.

**\*2** Plaintiffs argue that because the decisions at issue were case dispositive, they satisfy the test for final judgments, as the Delaware Supreme Court defined that test in *Radulski for Taylor v. Delaware State Hospital,* Del.Supr., 541 A.2d 562, 565 (1988), and the trial court may supplement the decisions as provided in Rule 54(b). Plaintiffs base their request on two grounds. First, they contend that the two decisions at issue have created a split in Delaware case law on the subjects of discovery on the language of service of suit clauses, choice of law, and absolute pollution exclusion clauses. Second, they claim that any delay in appealing this issue could be costly in terms of time, expense and uncertainty.

Defendants Cal Union and National Casualty contend that plaintiffs have failed to demonstrate the exceptional circumstances necessary to compel the Court to enter final judgment under Rule 54(b) and thereby permit immediate appellate review.

In *Tri-Star, supra,* claims against defendant HBO had been dismissed for failing to state a claim, and plaintiffs were seeking an entry of final judgment on that decision. After a survey of the Federal standards in Rule 54(b) determinations, the *Tri-Star* Court was not persuaded that the risk of a second trial was the type of hardship compelling enough to warrant the entry of final judgment. Slip op. at 7. The Court found that the claims against the dismissed defendant involved issues common to claims left against defendants remaining in the case, and that the grant of final judgment might in effect have allowed an advisory appeal, as subsequent developments in the case could have rendered moot the contest with

regard to HBO. Slip op. at 8. In essence, the decision in *Tri-Star* implicitly recognizes that some compelling need must be present to warrant the determination there exists no just reason for delay.

At the federal level, Rule 54(b) certification will be granted where there exists "some danger of hardship or injustice through delay which would be alleviated by immediate appeal." *Ansam Associates, Inc. v. Cola Petroleum, Ltd.,* 760 F.2d 442, 445 (2d Cir.1985), quoting *Campbell v. Westmoreland Farm, Inc.,* 403 F.2d 939, 942 (2d Cir.1968). [FN2] The possibility that future developments could moot the need to review the issues that are the subject of a Rule 54(b) motion is one factor to be considered in evaluating judicial interests. *Sussex Drug Products v. Kanasco, Ltd.,* 920 F.2d 1150, 1156 (3d Cir.1990). The exercise of discretion should also take into account the policy against piecemeal appeals. *Panichella v. Pennsylvania Railroad Company,* 252 F.2d 452, 455 (3d Cir.1958).

At oral argument, plaintiffs contended that this type of comprehensive, complex insurance litigation in which they are involved is far removed from the "garden variety" multi-party case, and that this context alone should qualify delay in seeking an appeal as a hardship. They also stressed the need for the Court to balance judicial administrative interests and the equities of the case.

**\*3** The two defendants dismissed from this case are only two out of a field of fifty defendant insurance companies who provided various levels of coverage. For example, National Casualty asserts that it sold to plaintiffs a single policy of $1 million of a $20 million block of coverage, excess of $30 million over 1985-86. National Casualty's liability, had it remained in the case, would have been a fraction of the total possible liabilities involved in the entire litigation. Unlike the federal cases cited in *Tri-Star,* there is no demonstrable financial hardship to plaintiffs as a result of these decisions.

The Court agrees with plaintiffs, however, that, under a balancing test, "hardship" need not be completely financial in nature. In the administration of justice, the Court does not find a compelling reason for piecemeal appeals even in comprehensive litigation. Plaintiffs have not demonstrated that the dismissal of these two defendants at this time creates the compelling need that would warrant the entry of final judgment and a determination that no just reason exists for delay of an appeal.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 1992 WL 207251 (Del.Super.)
(Cite as: 1992 WL 207251 (Del.Super.))

Page 3

Several other defendants ("London" defendants) have indicated that, in their view, several policies they issued to plaintiffs contain absolute pollution exclusion clauses. They also indicate that some of their policies do not contain such clauses. Thus, they do not fit within the case-dispositive framework because they would remain in the case as parties even if they were successful on a partial summary judgment motion. There is the possibility, therefore, that if a Rule 54(b) determination were made in the current two cases, the Delaware Supreme Court would have to rule more than once on the same issue. This obviously militates in favor of not allowing an appeal now. The possibility of multiple appeals is a factor to be weighed on a Rule 54(b) determination. Curtiss-Wright, 446 U.S. at 8, 100 S.Ct. at 1465, 64 L.Ed.2d at 11.

Plaintiffs also argue that the Court's two decisions in this case have created a split in Delaware law that should be resolved by the Supreme Court now.

North American Philips Corp. v. Aetna Casualty and Surety Co., Del.Super., C.A. No. 88C-JA-155, Poppiti, J. (Aug. 30, 1991), another complex coverage case, involved the application of Delaware law and permitted discovery regarding a choice of law provision before choice of law was decided on summary judgment. Plaintiffs ignore the finding in the decisions at issue that, before discovery, they had access to their own information for evidence concerning the choice of law provision yet chose to assert no position on the question of applying Delaware's "most significant relationship" test, claiming instead that it needed time for discovery without demonstrating that the facts essential to its opposition were outside its knowledge and control. Since plaintiffs asserted no position and provided no basis for obtaining further discovery, the Court reviewed the record before it and determined that, under the most significant relationship test, New York law would apply.

*4 E.I. du Pont de Nemours & Co. v. Admiral Insurance Co., Del.Super., C.A. No. 89C-AU-99, Poppiti, J. (Sept. 19, 1990), also cited by plaintiffs in support of their position that a split exists in Delaware law, applied Delaware, not New York, law. Because the Court in du Pont believed that Delaware law mandated the use of extrinsic evidence to interpret contract provisions, the Court allowed further discovery on absolute pollution exclusion clauses. In contrast, the two decisions at issue were decided under New York contract principles and followed the New York cases that held similar

absolute pollution exclusion clauses did exclude pollutant damage from coverage.

Therefore, neither of the two cases at issue are inconsistent with North American Philips or du Pont.

Furthermore, the decision in Klair v. Reese, Del.Supr., 531 A.2d 219 (1987), the major support in North American Philips and du Pont for the use of extrinsic evidence, has been recently reevaluated. Pellaton v. Bank of New York, Del.Supr., 592 A.2d 473 (1991) and Citadel Holding Corp. v. Roven, Del.Supr., 603 A.2d 818 (1992) have reiterated the traditional rule that extrinsic evidence is not admissible as an aid in the interpretation of unambiguous contract terms.

In conclusion, the grant of summary judgment to Cal Union and National Casualty has not been demonstrated to provide a compelling need that would require the express determination there exists no just reason for delay. Accordingly, plaintiffs' motion under Rule 54(b) for an order directing the entry of final judgment on and for supplementation of the decisions of May 21, 1992 and July 16, 1992 is DENIED.

IT IS SO ORDERED.

> FN1. The Court intentionally made no such determination in either opinion. It was anticipated this issue would arise after these two decisions were rendered, but the Court wanted further argument on the issue addressed in this opinion.

> FN2. Many of the federal decisions have focused upon immediate economic hardship as justification for granting a Rule 54(b) certification. See Tri-Star, supra, slip op. at 5, fn. 2.

Not Reported in A.2d, 1992 WL 207251 (Del.Super.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

# Tab 11

Westlaw.

Not Reported in F.Supp.2d                                                                                    Page 1
Not Reported in F.Supp.2d, 2003 WL 252106 (E.D.Pa.), 29 Employee Benefits Cas. 2473
(Cite as: 2003 WL 252106 (E.D.Pa.))

**H**
United States District Court, E.D. Pennsylvania.
IN RE UNISYS CORPORATION RETIREE
MEDICAL BENEFITS LITIGATION.
No. 969.

Feb. 4, 2003.

BRUCE W. KAUFFMAN, Judge.

*MEMORANDUM AND ORDER*
  *1 Plaintiff retirees brought this class action against
their former employer, Unisys Corporation ("Unisys"
or "Company"), [FN1] pursuant to the Employee
Retirement Income Security Act of 1974 ("ERISA"),
29 U.S.C. § 1001, *et seq.* Now before the Court is
Unisys's Motion to Decertify the Class. [FN2] For
the reasons set forth below, the Court will grant the
Motion.

> FN1. Unisys is the product of a 1986 merger
> between the Sperry and Burroughs
> Corporations. The class of Plaintiffs
> originally included former employees of all
> three corporations. Unless otherwise stated,
> the term "Unisys" will refer to all three
> companies.

> FN2. The Court held oral argument on
> Unisys's Motion on July 16, 2002.

*RELEVANT FACTS* [FN3]

> FN3. The complete factual and procedural
> history of this case is extensive and has been
> recounted elsewhere in detail. *See, e.g., In re
> Unisys Corp.,* 57 F.3d 1255, 1257-61 (3d
> Cir.1995), *cert. denied sub nom., Unisys v.
> Pickering,* 517 U.S. 1103, 116 S.Ct. 1316,
> 134 L.Ed.2d 470 (1996); *In re Unisys Corp.,*
> 957 F.Supp. 628, 631-32 (E.D.Pa.1997); *In
> re Unisys Corp.,* 837 F.Supp. 670, 672
> (E.D.Pa.1993), *aff'd,* 58 F.3d 896 (3d
> Cir.1995).

  In September 1986, Sperry Corporation ("Sperry")
and Burroughs Corporation ("Burroughs") merged to
form Unisys. Before the merger, Sperry and
Burroughs had provided their retiring employees with
post-retirement medical coverage at little or no cost
to the retirees. After the merger, Unisys continued the

pre-existing medical benefit plans ("the predecessor
plans") for Sperry and Burroughs retirees. In 1989,
Unisys created the Post-Retirement and Extended
Disability Medical Plan ("the old plan") to cover all
employees who retired after April 1, 1989, most of
whom were former Sperry and Burroughs employees.
The predecessor plans continued to cover former
employees who had retired before April 2, 1989. On
January 1, 1993, Unisys terminated both the
predecessor plans and the old plan and replaced them
with the new Unisys Post-Retirement and Extended
Disability Medical Plan ("the new plan"). The new
plan, under which the retirees now are required to
pay the full cost of their premiums, sharply contrasts
with the old plan and the predecessor plans under
which Unisys had paid most or all of the premiums.

*RELEVANT PROCEDURAL HISTORY*
  Eight different lawsuits were filed against Unisys in
several jurisdictions in 1992 and 1993. The Judicial
Panel on Multidistrict Litigation transferred all
lawsuits filed outside this district to the Eastern
District of Pennsylvania for consolidated disposition.
*See* 28 U.S.C. § 1407. On June 9, 1993, pursuant to
stipulation of the parties and Federal Rule of Civil
Procedure 23(b)(2), the Court (Cahn, C.J.) certified
the class of approximately 21,000 former non-union
employees of Sperry, Burroughs, and Unisys
Corporations, [FN4] and identified three subclasses:
the Sperry retirees, the Burroughs retirees, and the
Unisys retirees. [FN5] Within each subclass, the
parties identified two subgroups: (1) "regular
retirees," who retired in the normal course; and (2)
"early retirees," who retired pursuant to voluntary
retirement incentive plans.

> FN4. On January 5, 1999, the case was
> reassigned from the Calendar of the
> Honorable Edward N. Cahn, former Chief
> Judge, to the Calendar of the undersigned.

> FN5. The sub-class of Sperry retirees
> includes "[a]ll non-union retired, disabled
> and other eligible former employees and
> their spouses and dependents who as of
> November 3, 1992 were participants in or
> beneficiaries of the employee welfare
> benefit plans pursuant to which Unisys or its
> predecessor, Sperry Corporation, has
> provided medical benefits to former
> employees of Sperry Corporation (or any

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                                    Page 2
Not Reported in F.Supp.2d, 2003 WL 252106 (E.D.Pa.), 29 Employee Benefits Cas. 2473
**(Cite as: 2003 WL 252106 (E.D.Pa.))**

division or unit thereof) who retired, became disabled or otherwise became eligible on or before April 1, 1989." *In re Unisys Corp. Retiree Med. Benefits ERISA Litig.,* 837 F.Supp. 670, 677 n. 10 (E.D.Pa.1993), *aff'd,* 61 F.3d 896 (3d Cir.1995).

The sub-class of Burroughs retirees includes "[a]ll non-union retired, disabled and other eligible former employees and their spouses and dependents who as of November 3, 1992 were participants in or beneficiaries of the employee welfare benefit plans pursuant to which Unisys or its predecessor, Burroughs Corporation, has provided medical benefits to former employees of Burroughs Corporation (or any division or unit thereof) who retired, became disabled or otherwise became eligible on or before May 1, 1989." *Id.* at 676 n. 9. The sub-class of Unisys retirees includes "[a]ll non-union retired, disabled and other eligible former employees and their spouses and dependents who as of November 3, 1992 were participants in or beneficiaries of the employee welfare benefit plans pursuant to which Unisys has provided medical benefits to former employees of Unisys who retired, became disabled or otherwise became eligible on or after April 2, 1989, in the case of former Sperry employees, and May 2, 1989, in the case of former Burroughs employees." *Id.* at 675 n. 8.

The Court's Certification Order set forth the substantive issues to be decided in this case as follows:

Whether Unisys violated the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq. by terminating, effective January 1, 1993, the employee welfare benefit plan pursuant to which it has provided medical benefits to class members and replacing those plans with the Unisys Post-Retirement and Extended Disability Medical Plan; whether Unisys must continue to provide coverage to class members under the costs, terms and other conditions in effect prior to that date; and whether class members are entitled to any other relief.

(Pretrial Order No. 4 ¶ 3.) The Order further stated that "[n]othing herein shall limit the ability of the parties to ... seek or oppose decertification of one or more of the classes as a whole; or to seek or oppose consolidation, expansion or decertification of defined classes or subclasses." (Pretrial Order No. 4 ¶ 5.)

*2 The class members alleged, *inter alia,* that Unisys should be held liable for a breach of fiduciary duty under 29 U.S.C. § 1132(a)(3)(B) because, although the Company had reserved the right to modify or terminate the medical benefit plans at any time, Company representatives misinformed employees that once they retired, the Company would never modify or terminate their medical benefits. [FN6] Plaintiffs contend that these misrepresentations caused them to retire earlier than they otherwise would have, or to make important life decisions that they otherwise would not have made but for their reliance on the misrepresentations.

> FN6. Plaintiffs also asserted breach of contract and estoppel claims, which the Court dismissed. *In re Unisys Corp.,* 58 F.3d 896, 904-07 (3d Cir.1995) ("Unisys II"). Thus, the only claim remaining is Plaintiffs' breach of fiduciary duty claim.

On March 10, 1997, the Court granted summary judgment in Unisys's favor on the breach of fiduciary duty claims asserted by: (1) Plaintiffs who retired more than six years prior to the filing of the Complaint, because their claims were barred by the statute of limitations; and (2) Plaintiffs who left the Company involuntarily, because they failed to establish detrimental reliance. *In re Unisys Corp.,* 957 F.Supp. 628 (E.D.Pa.1997). The Third Circuit Court of Appeals, however, reversed Judge Cahn's decision and reinstated those claims in March 2001. *In re Unisys Corp.,* 242 F.3d 497 (3d Cir.2001) ("*Unisys III* ").

The Court of Appeals concluded in *Unisys III* that some individuals may have detrimentally relied on the alleged material misrepresentations in reaching important life decisions made *after* their retirements and thus may have timely claims, depending upon the date and nature of their reliance. *Id.* at 506. Further, as to those retirees who had left the Company involuntarily, the Third Circuit held that there may be decisions other than choosing to retire that could support a breach of fiduciary duty claim. *Id.* at 507-10. After the reinstatement of approximately 13,000 class members pursuant to the *Unisys III* decision, the class consisted of approximately 15,000 members.

On January 23, 2003, the Court finally approved the settlement and dismissal of the claims of all remaining members of the Sperry sub-class. [FN7] The class, therefore, now includes approximately 9000 Unisys and Burroughs retirees.

Not Reported in F.Supp.2d                                                                      Page 3
Not Reported in F.Supp.2d, 2003 WL 252106 (E.D.Pa.), 29 Employee Benefits Cas. 2473
(Cite as: 2003 WL 252106 (E.D.Pa.))

FN7. The Court has approved other partial settlements in this case: (1) the settlement of the claims of over 7500 Sperry and Burroughs retirees in October 1994; and (2) the settlement of the claims of over 1000 Sperry retirees in December 1998. In continuing to recognize the stipulated certification of the Sperry sub-class in approving the settlement on January 23, 2003, the Court faced an inquiry distinct from that presented by Unisys's Motion to Decertify the Class. As Unisys argues in its Motion, the primary obstacles to continued class certification involve the further *litigation* of Plaintiffs' breach of fiduciary duty claims and the multitude of individual liability determinations that would have to be made during the *adjudication* of Plaintiffs' claims. *Cf. Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 620, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) ("Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, *see* Fed.R.Civ.P. 23(b)(3)(D), for the proposal is that there be no trial.") "Moreover, when taking the settlement into consideration for purposes of determining [the appropriateness of] class certification, individual issues which are normally present in ... litigation become irrelevant ... [and] do not destroy class cohesion, ... [likewise] individual issues relating to causation, injury and damage also disappear because the settlement's objective criteria provide for an objective scheme of compensation." *In re Diet Drugs,* 2000 WL 1222042, at *43 (E.D. Pa. Aug. 28, 2000). Accordingly, Unisys's Motion to Decertify the Class as it applies to the Sperry sub-class will be denied as moot.

*ANALYSIS*

"To be certified, a class must satisfy the prerequisites of Rule 23(a) and the 'parties seeking certification must also show that the action is maintainable under Rule 23(b)(1), (2), or (3).' " *Barnes v. Am. Tobacco Co.,* 161 F.3d 127, 140 (3d Cir.1998), *cert. denied,* 526 U.S. 1114, 119 S.Ct. 1760, 143 L.Ed.2d 791 (1999) (quoting *Amchem,* 521 U.S. at 614). By Stipulation and Order dated June 9, 1993, the Court certified the class in this case under Rule 23(b)(2), finding that Plaintiffs' claims satisfied the requirements of that subsection as well as those of 23(a). (Pretrial Order No. 4 ¶ 2.) Pursuant to Rule 23(c)(1), however, the Court is "required to reassess [its] class ruling as the case develops ... [and] must define, redefine, subclass, and decertify as appropriate in response to the progression of the case from assertion to facts." *Barnes,* 161 F.3d at 140 (citing *Kuehner v. Heckler,* 778 F.2d 152, 163 (3d Cir.1985)); *see also* Fed.R.Civ.P. 23(c)(1) (stating that class treatment can be "altered or amended before the decision on the merits"); *Richardson v. Byrd,* 709 F.2d 1016, 1019 (5th Cir.1983) ("Under Rule 23 the district court is charged with the duty of monitoring its class decisions in light of the evidentiary development of the case."); *Barnes v. Am. Tobacco Co.,* 176 F.R.D. 479, 498 (E.D.Pa.1997), *aff'd,* 161 F.3d 127 (3d Cir.1998) ("Federal district courts must constantly monitor the progress of the class action cases before them; it is our obligation and duty. A trial court must define, redefine, subclass and decertify the class action before it when the evidentiary development of a case requires such action.").

A class satisfies Rule 23(a) only if: "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a). Unisys does not move to decertify the class on the basis of Rule 23(a). (*See* Unisys's Reply Mem. at 2 n. 2.) Rather, it contends that Plaintiffs no longer meet the requirements of Rule 23(b)(2).

*3 "A class action is maintainable under Rule 23(b)(2) when 'the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.' " *Barnes,* 161 F.3d at 142 (quoting Fed.R.Civ.P. 23(b)(2)). Thus, "[s]ubsection (b)(2) class actions are 'limited to those class actions seeking primarily injunctive or corresponding declaratory relief.' " *Id.* (quoting 1 *Newberg on Class Actions* § 4.11, at 4-39).

Additionally, "[w]hile 23(b)(2) class actions have no predominance or superiority requirements, it is well established that the class claims must be cohesive." *Id.* at 143. To ensure such cohesiveness, the Third Circuit has "committed to the district court the discretion to deny certification in Rule 23(b)(2) cases in the presence of 'disparate factual circumstances,' " *Geraghty v. United States Parole Commission,* 719

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                           Page 4
Not Reported in F.Supp.2d, 2003 WL 252106 (E.D.Pa.), 29 Employee Benefits Cas. 2473
**(Cite as: 2003 WL 252106 (E.D.Pa.))**

F.2d 1199, 1205-06 (3d Cir.1983) (citation omitted), and has emphasized that the court "must ensure that significant individual issues do not pervade the entire action," *Barnes,* 161 F.3d at 143 (citation omitted). [FN8] *See also Santiago v. City of Philadelphia,* 72 F.R.D. 619, 628 (E.D.Pa.1976) (stating that a court "should be more hesitant in accepting a(b)(2) suit which contains significant individual issues than it should under 23(b)(3)"). Thus, "[i]f proof of the essential elements of the cause of action requires individual treatment, then class certification is unsuitable." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 259 F.3d 154, 172 (3d Cir.2001); *see also Rice v. City of Philadelphia,* 66 F.R.D. 17, 20 (E.D.Pa.1974) (holding that a case should not proceed as a(b)(2) action where "virtually all of the issues would have to be litigated individually in order to determine whether a particular alleged class member was entitled to any damages at all").

> FN8. The Third Circuit in *Barnes* explained: [T]he court must ensure that significant individual issues do not pervade the entire action because it would be unjust to bind absent class members to a negative decision where the class representative's claims present different individual issues than the claims of the absent members ... [T]he suit could become unmanageable and little value would be gained in proceeding as a class action ... if significant individual issues were to arise consistently.
> 161 F.3d at 143 (quoting *Santiago,* 72 F.R.D. at 628).

Unisys moves for decertification on the ground that Plaintiffs' breach of fiduciary duty claims are not appropriate for adjudication as a class under Rule 23(b)(2). Specifically, Unisys alleges that: (1) Plaintiffs' claims are not sufficiently cohesive; and (2) the relief sought is predominantly, if not exclusively, monetary. In response, Plaintiffs contend that they satisfy the requirements of Rule 23(b)(2) because their claims are cohesive and they seek primarily final injunctive and declaratory relief with respect to the class as a whole.

Unisys argues that Plaintiffs fail to satisfy the cohesiveness requirement of Rule 23(b)(2) because: (1) Plaintiffs will be required to present individual affirmative proof in establishing liability for a breach of fiduciary duty; and (2) many Plaintiffs will be subject to a statute of limitations defense which turns on individual facts, *i.e.,* what decision their claim is based upon and when that decision was made.

Plaintiffs concede that factual differences exist among the class members, but argue that these differences do not alter the cohesiveness of their claims because Unisys engaged in a systematic and pervasive common course of conduct of misrepresenting to employees that they would have lifetime retiree medical benefits. Thus, according to Plaintiffs, their claims actually center around a common course of conduct directed at class members, all of whom received the same messages, were led to the same erroneous understanding about the durability of their benefits, made the same kinds of personal decisions, and suffered the same kinds of harm. Additionally, Plaintiffs argue that the statute of limitations defense does not warrant decertification because it merely involves applying class-wide legal standards established in *Unisys III* to a relatively small number of uncomplicated factual possibilities presented by the retirees (*e.g.,* left their job, started pension, did not seek other employment or medical coverage, or made an important financial decision).

*\*4 A. Proof For Establishing A Breach of Fiduciary Duty Claim*

In order to establish liability on a breach of fiduciary duty claim, a plaintiff must prove that: "[1] an employer, acting as a fiduciary, [2] made a material misrepresentation that would confuse a reasonable beneficiary about his or her benefits, and [3] the beneficiary acted thereupon to his or her detriment." *Unisys III,* 242 F.3d at 505 (citations omitted). As set forth below, each of these elements will require individualized proof with respect to the remaining retirees, and the class thus lacks the cohesiveness required to be litigated as a class action under Rule 23(b)(2).

*1. Fiduciary Status*

A plaintiff asserting a breach of fiduciary duty claim first must establish that the alleged communication was made by an authorized fiduciary. *Daniels v. Thomas & Betts Corp.,* 263 F.3d 66, 72 (3d Cir.2001); *Unisys III,* 242 F.3d at 505. In the instant case, a large number of Plaintiffs base their claims on representations made by their co-workers or supervisors. [FN9] In order for those individuals to qualify as fiduciaries, they must have had actual or apparent authority to advise the Company's employees of their rights under the Plan. *Taylor v. People Natural Gas Co.,* 49 F.3d 982, 988-89 (3d Cir.1995); *In re Unisys Corp.,* MDL No. 969, 1996 U.S. Dist. LEXIS 11781, at \*16 (E.D.Pa. Aug. 14, 1996). [FN10] The Court will therefore have to determine as to each claimant whether a particular

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                    Page 5
Not Reported in F.Supp.2d, 2003 WL 252106 (E.D.Pa.), 29 Employee Benefits Cas. 2473
(Cite as: 2003 WL 252106 (E.D.Pa.))

co-worker or supervisor possessed the requisite authority to act as a fiduciary when he or she made the alleged misrepresentation. [FN11] Accordingly, the Court finds that this element of Plaintiffs' breach of fiduciary duty claims will require individualized proof as to each retiree.

> FN9. *See, e.g.,* App. to Unisys's Mem. In Supp. of Mot. Decertify Exs. 1-12 (excerpts of retirees' interrogatory responses and deposition testimony).

> FN10. "It is well settled that apparent authority (1) 'results from a manifestation by a person that another is his agent' and (2) 'exists only to the extent that it is reasonable for the third person dealing with the agent to believe that the agent is authorized.' " *Taylor,* 49 F.3d at 989 (quoting *Restatement (Second) of Agency* § 8 cmts. a & c (1958)). "[A]pparent authority arises in those situations where the principal causes persons with whom the agent deals to reasonably believe that the agent has authority." *Id.* (quoting *AT & T v. Winback & Conserve Program,* 42 F.3d 1421, 1439 (3d Cir.1994)).

> FN11. Whether a co-worker or supervisor was acting as a fiduciary when he or she made the alleged misrepresentations is a factual question. *See Bixler v. Central Pa. Teamsters Health & Welfare Fund,* 12 F.3d 1292, 1302 (3d Cir.1993).

## 2. *Material Misrepresentation*

**\*5** Additionally, each Plaintiff must establish that the alleged misrepresentation was "material." A misrepresentation is material "if there is a substantial likelihood that it would mislead a reasonable employee in making a decision regarding his benefits under the ERISA plan." *Daniels,* 263 F.3d at 73. The individual retirees in this case assert a variety of written and oral misrepresentations on which they allegedly relied to their detriment. [FN12] Thus, the Court will have to examine the circumstances surrounding each communication (*i.e.,* the timing, content, and context) in order to determine whether a particular communication rises to the level of a material misrepresentation. This analysis necessarily will entail individualized evidence, including the retiree's own testimony as to what he or she heard or read. *See Unisys III,* 242 F.3d at 507 ("Because some plaintiffs have stronger cases than others based on

their specific inquiries and the information given to them personally, the court finds that subclasses, and possibly even individual hearings, will be necessary to adjudicate these claims.") (quoting *Unisys, 957 F.Supp. at 645).* Accordingly, the Court finds that this element of Plaintiffs' breach of fiduciary claim will also require individualized inquiries.

> FN12. *See, e.g.,* App. to Unisys's Mem. In Supp. of Mot. Decertify Exs. 13-23 (excerpts of retirees' interrogatory responses and deposition testimony).

## 3. *Detrimental Reliance*

The final element of a breach of fiduciary duty claim is detrimental reliance. [FN13] As the Court has previously stated, this element of Plaintiffs' claim "has not been proved on a class-wide basis," and "hearings will be necessary to determine the extent of the reliance by and resulting harm to the [individual] retirees." *Unisys, 957 F.Supp. at 645.* Additionally, the Third Circuit recently held in *Unisys III* that some retirees may be able to show detrimental reliance through decisions other than the decision to retire. *Unisys III,* 242 F.3d at 506-07. Accordingly, the Court will have to examine the specific decisions allegedly made by the individual retirees in order to determine whether each one is sufficient to establish detrimental reliance. [FN14] *See Unisys III,* 242 F.3d at 507 ("It is, of course, not clear that the plaintiffs [alleging different types of reliance] will be able to establish their entitlement to relief, but we decline Unisys' invitation to adopt an across the board prohibition of relief based upon reasonable reliance in contexts other than retirement decisions.").

> FN13. Contrary to Plaintiffs' contention, reliance may *not* be presumed in this case. *See Unisys III,* 242 F.3d at 509 (stressing that "the character of the decision made and reliance claimed will, of course, play an important role in determining the extent of Unisys' fiduciary duty and whether that duty was breached"); Apr. 25, 2000 Mem. & Order at 8-9 ("Accordingly, the Court concludes that to prevail at trial, the ... retirees have the burden of proving that the alleged misrepresentations were 'a cause-in-fact, as well as a substantial contributing factor in' causing them to retire prematurely.") (citations omitted); *see also Daniels,* 263 F.3d at 73 ("[I]t is thus clear that, in order to make out a breach of fiduciary duty claim ... a plaintiff must

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                    Page 6
Not Reported in F.Supp.2d, 2003 WL 252106 (E.D.Pa.), 29 Employee Benefits Cas. 2473
**(Cite as: 2003 WL 252106 (E.D.Pa.))**

establish ... detrimental reliance by plaintiff on the misrepresentation.").

FN14. *See, e.g.,* App. to Unisys's Mem. In Supp. of Mot. to Decertify Exs. 24-29 (excerpts of retirees' interrogatory responses and deposition testimony).

As the Third Circuit recently stated in *In re Linerboard Antitrust Litigation,* 305 F.3d 145 (3d Cir. Sept.5, 2002), "where a presumption of reliance and loss [is] not available ... it would be necessary for each plaintiff to prove the essential elements of the cause of action and ... class action would be unsuitable." *In re Linerboard Antitrust Litigation,* 305 F.3d at 156 (citing *Newton,* 259 F.3d at 172; *Binder v. Gillespie,* 184 F.3d 1059, 1063-1066 (9th Cir.1999) (upholding class decertification where presumption of reliance and loss unavailable)). Thus, as with the other elements of Plaintiffs' breach of fiduciary duty claim, the Court finds that proving detrimental reliance will involve factual disparities among the retirees and thus present issues that preclude litigation as a class.

B. *Statute of Limitations Defense*

*\*6* Additionally, Unisys moves for decertification on the basis of its statute of limitations defense, contending that "[t]he resolution of the timeliness of each Plaintiff's claim ... also requires an individual fact-intensive inquiry." (Unisys's Mot. To Decertify at 18.) Plaintiffs, however, argue that there will be a limited number of fact patterns presented by the retirees with respect to the statute of limitations defense, and that these fact patterns can easily be resolved through the class-wide legal standards established in *Unisys III.* (Pls.' Mem. in Oppos. to Def.'s Mot. to Decertify at 19.)

"It is fundamental that a plaintiff must bring a claim before the applicable statute of limitations expires. Determining whether the statute of limitations has expired necessarily involves determining when it began to run." *Barnes,* 161 F.3d at 149. With respect to the statute of limitations, ERISA provides:

No action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the earlier of
(1) six years after (A) the date of the last action which constituted part of the breach or violation, or (B) in the case of an omission, the latest date on which the fiduciary could have cured the breach or

violation, or
(2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;
except that in the case of fraud or concealment, such actions may be commenced not later than six years after the date of discovery of such breach or violation.
29 U.S.C. § 1113.

In deciding whether a retiree's claim is barred by the statute of limitations, the Court will be faced with a myriad of individual determinations. For example, in each case the evidence may vary as to when a Unisys representative last told the employee falsely that his or her retirement health benefit was secure and when and how he or she ultimately learned that retiree medical benefits were no longer free. Indeed, there may be cases in which the employee learned the truth only when the bill came in the mail. Each of these individualized determinations could affect when the statute of limitations began to run for a given class member. Unisys's statute of limitations defense thus presents several issues which must be addressed individually by the Court. *See Barnes,* 176 F.R.D. at 502 ("In determining whether the statute of limitations precludes a plaintiff from suing on his claim, the Court necessarily would have to examine when plaintiff's injury accrued, and whether plaintiff knew or should have known of the injury and its cause. This is clearly an individual issue.").

The Court recognizes that "[a]lthough a necessity for individualized statute-of-limitations determinations invariably weighs against class certification, ... [the Third Circuit has] reject[ed] any *per se* rule that treats the presence of such issues as an automatic disqualifier." *In re Linerboard Antitrust Litigation,* 305 F.3d at 162. *See also Hoxworth v. Blinder, Robinson & Co.,* 980 F.2d 912, 924 (3d Cir.1992) ("[T]he presence of the individual issue of compliance with the statute of limitations [may] not prevent[ ] certification of class actions.") (citations omitted). In the instant case, however, the statute of limitations defense is clearly not the only factual disparity among the individual retirees. Rather, as discussed above, it is "only one of many matters raising individual issues in this case." *Barnes,* 161 F.3d at 147 n. 25 ("We acknowledge that the existence of affirmative defenses as to some class members may not by itself [be] enough [to] warrant the denial of certification.... But we note that the defenses are only one of many matters raising individual issues in this case.") (citations omitted). The Court therefore finds that, although the

Not Reported in F.Supp.2d                                                                                    Page 7
Not Reported in F.Supp.2d, 2003 WL 252106 (E.D.Pa.), 29 Employee Benefits Cas. 2473
(Cite as: 2003 WL 252106 (E.D.Pa.))

individualized nature of the statute of limitations defense by itself may not warrant decertification, when considered together with the individualized proof required for Plaintiffs' breach of fiduciary duty claims, it further reveals the lack of cohesiveness among the retirees' claims and thus further supports the need for decertification in this case. [FN15]

> FN15. Accordingly, the Court need not reach Unisys's alternative argument that because Plaintiffs now seek predominantly monetary relief, continued certification under Rule 23(b)(2) is improper.

### CONCLUSION

*7 "When the Court looks down the road to determine how this case would be tried, it is obvious that the litigation is unmanageable as a class action and would ultimately splinter into individual issues, which would have to be tried separately." _Barnes, 176 F.R.D. at 502_. Thus, the Court finds that the individual issues presented by Plaintiffs' breach of fiduciary duty claims and Unisys's statute of limitations defense pervade the entire action and preclude continuing as a class action. _See, e.g., Johnston v. HBO Film Management, Inc., 265 F.3d 178, 189 (3d Cir.2001)_ ("As proof of two ... essential elements requires individual treatment, we conclude class certification is unsuitable."); _Holmes v. Pension Plan of Bethlehem Steel, 213 F.3d 124, 137- 38 (3d Cir.2000)_ ("As already noted, the issue of liability itself requires an individualized inquiry into the equities of each claim. Thus, the District Court did not err by concluding that the proposed Class Two was overly broad and we will affirm denial of certification."); _Barnes, 161 F.3d at 146_ ("Because of the individual issues involved in this case ... we believe class treatment is inappropriate.").

Accordingly, the Court will grant Unisys's Motion and will decertify the class previously certified by the June 9, 1993 Stipulation and Order. [FN16] An appropriate Order follows.

> FN16. Although Plaintiffs argue in their Responses to Unisys's Motion that the class also meets the requirements for certification under Rule 23(b)(3), they have not moved for certification under that subsection. Moreover, it appears to the Court on the basis of the present record that Plaintiffs would not satisfy Rule 23(b)(3)'s requirement that "the questions of law or fact common to the members of the class _predominate_ over any questions affecting

only individual members." Fed.R.Civ.P. 23(b)(3) (emphasis added).

### ORDER

AND NOW, this _____ day of February, 2003, after hearing and upon consideration of Unisys's Motion to Decertify the Class and Memoranda in Support Thereof (docket nos. 356, 363, 368) and Plaintiffs' Responses Thereto (docket nos. 358, 364, 367), and for the reasons set forth in the accompanying Memorandum, IT IS ORDERED that

1. Unisys's Motion as it applies to the Sperry sub-class is DENIED AS MOOT.

2. Unisys's Motion as it applies to the remaining retirees in the class is GRANTED.

3. This class action is hereby DECERTIFIED.

Not Reported in F.Supp.2d, 2003 WL 252106 (E.D.Pa.), 29 Employee Benefits Cas. 2473

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

CERTIFICATE OF SERVICE

I, Daniel M. Silver, hereby certify that on October 29, 2007, I caused a copy of the

foregoing documents to be served upon counsel of record via the LEXIS NEXIS E-file and Serve

system.

/s/ Daniel M. Silver
Daniel M. Silver (DE Bar ID #4758)