IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

RAMON VILLANUEVA-BAZALDUA
individually and on behalf of others similarly
situated,

                               CA 1:06-cv-00185-GMS

      Plaintiff

                                 Class Action

v.

TRUGREEN LIMITED PARTNERS and
TRUGREEN, INC.

      Defendants.

---

## PLAINTIFF'S REPLY BRIEF IN SUPPORT OF
## MOTION FOR CLASS CERTIFICATION

---

Vivian L Rapposelli
DE Bar No 3204
Rapposelli & Gonzales
1300 Grant Ave., Suite 100
Wilmington, DE 19806
Tel: 302-652-8711

Edward Tuddenham
Tx Bar No. 20282300
272 W. 107th St #20A
New York, NY 10025
Tel: 212-866-6026

ATTORNEYS FOR PLAINTIFF

## TABLE OF CONTENTS

I.  THIS COURT HAS SUPPLEMENTAL JURISDICTION
    OVER PLAINTIFF'S BREACH OF CONTRACT AND
    UNJUST ENRICHMENT CLAIMS                                                    2

    A.  This Court Has Federal Question Jurisdiction Over
        Plaintiffs' Breach of Contract and Unjust Enrichment Claims            3

    B.  The Court May Exercise Supplemental Jurisdiction Over
        Plaintiffs' Contract Claim Pursuant To 28 U.S.C. § 1367(a)             9

        1.  Plaintiff's Contract Claim Satisfies § 1367(a)                     9

        2.  The Discretionary Factors In § 1367(c) Counsel in Favor
            of Exercising Supplemental Jurisdiction                           10

    C.  In The Event The Court Declines To Exercise Supplemental
        Jurisdiction Over Plaintiff's State Law Claims It Should
        Dismiss Those Claims Without Prejudice                                14

II. PLAINTIFF'S CLASS SATISFIES THE REQUIREMENTS
    OF RULE 23(a)                                                             15

    A.  Numerosity and Common Questions                                       15

    B.  Plaintiff's Claims Are Typical                                        15

    C.  Plaintiff Is An Adequate Class Representative                         15

III. PLAINTIFFS' CLASS SATISFIES THE REQUIREMENTS
     OF RULE 23(B)(3)                                                         20

    A.  Common Questions Predominate In Plaintiffs' Contract claim            20

        1.  Defendants Fail To Demonstrate The Existence Of Any
            Individual Issues                                                 22

        2.  Defendants' Legal Challenge to the FLSA aspect of
            Plaintiffs' Contract Claim Is A Merits Question
            Common To The Class and Is Wrong As A Matter Of Law              24

|     | 3. | Alleged Variations In State Law Do Not Exist And Do Not Affect Class Certification | 26 |
| B.  |    | **Common Questions Predominate In Plaintiffs' Unjust Enrichment Claim** | 27 |
|     | 1. | Common questions | 27 |
|     | 2. | Variations in State Law Don't Affect Certification of Plaintiff's Unjust Enrichment Claim | 30 |
| C.  |    | **Common Questions Predominate In Plaintiffs' RICO claim** | 32 |
|     | 1. | Reliance Is Not An Element Of Plaintiff's RICO Claim | 32 |
|     | 2. | Even If Reliance Were An Element It Would Not Defeat Class Certification | 36 |
| D.  |    | **Class Treatment Is Superior** | 38 |
| **CONCLUSION** |  |  | 41 |

## INDEX OF AUTHORITIES

*Albee v Village of Bartlett, Ill*, 861 F.Supp. 680 (N.D. Ill. 1994)
*Alfred v Okeelanta Corp*, 1991 WL 177658 (S.D.Fla 1991)
*Ansoumana v Gristede's Operating Corp*, 201 F.R.D. 81 (S.D. N.Y. 2001)
*Anza v Ideal Steel Corp.*, 126 S.Ct. 1991 (2006).
*Arriaga v Fla. Pacific Farms*, 305 F.3d 1228 (11th Cir. 2002)
*Avery v City of Talladega, Ala.*, 24 F.3d 1337 (11th Cir. 1994)
*Avila-Gonzalez v. Barajas*, 2006 WL 643297 (M.D. Fla. 2006)
*Avila-Blum v Casa de Cambio Delgado, Inc.*, 236 F.R.D. 190 (S.D.N.Y. 2006)

*Baby Neal v Casey*, 43 F.3d 48 (3rd Cir. 1994)
*Bernett v Hepburn Orchards*, 1987 WL 16939 (D.Md. 1987)
*Billet v. Storage Technology Corp.*, 72 F.R.D. 583 (S.D.N.Y. 1976)
*Broder v Cablevision Systems Corporation*, 418 F.3d 187 (2nd Cir. 2005),
*Bunnion v Consolidated Rail Corp.*, 1998 WL 372644 (E.D. Pa. 1998),

*Calderon v. Presidio Valley Farmers Assn*, 863 F.2d 384 (5th Cir. 1989)
*Castellanos-Contreras v Decatur Hotels*, 06-4340-EEF-SS (E.D. La. Oct. 22, 2007)
*Chisolm v TranSouth Financial Corporation*, 95 F.3d 331 (4th Cir. 1996)
*Cortez v. Medina's Landscaping*, 2002 WL 31175471 (N.D. Ill. 2002)
*Cutler v Wal-Mart Stores, Inc.*, 927 A.2d 1 (Md. App. Ct.) *aff'd* 931 A.2d 1095 (Md. 2007)

*Darms v. Mccullooch Oil Corp.*, 720 F.2d 490 (8th Cir. 1983);
*DeAsencio v Tyson Foods*, 342 F.3d 301 (3rd Cir. 2003).
*DeLuna v North Carolina Growers Assn.*, 338 F.Supp.2d 649 (EDNC 2004)
*Eisen v Carlisle & Jacquilin*, 417 U.S. 156 (1974)
*Fickinger v. C.I. Planning Corp.*, 103 F.R.D. 529 (E.D.Pa.1984)
*Figueroa Cardona v. Sorrells Bros. Packing Co.*, 2007 WL 672303 (M.D. Fla. 2007)
*Flores v Amignon*, 233 F.Supp.2d 462 (E.D.N.Y. 2002)
*Frederick County Fruit Growers Assn.*, 703 F.Supp.1021 (D.D.C. 1989)
*Frederick County Fruit Growers Assn v Dole*, 758 F.Supp. 17 (D.D.C. 1991)
*Frederick County Fruit Growers Assn v Martin*, 968 F.2d 1265, 1268-1269 (D.C.Cir. 1992)

*Garcia-Andrade v Madra's Café Corp.*, 2005 WL 2430195 (E.D. Mich. 2005)
*Grable & Sons Metal Products, Inc. v Darue Engineering & Mfg*, 545 U.S. 308 (2005).
*Green v. Carlson*, 653 F.2d 1022 (5th Cir.) *cert. denied* 454 U.S. 944 (1981)
*Grider v Keystone Health Plan Central, Inc.*, 2006 WL 3825178 (E.D. Pa. 2006)
*Hall v. Equitable Life Assur. Soc. Of US*, 295 N.W. 204 (Mich 1940)
*Hasken v. City of Louisville*, 173 F.Supp.2d 654 (W.D. Ky. 2001)
*Hasken v. City of Louisville*, 213 F.R.D. 280 (W.D. KY 2003)
*Hatfield v Oak Hill Banks*, 115 F.Supp2d 893 (S.D. Ohio 2000)
*Hayes v. American Airlines*, 2005 WL 2367623 (E.D N Y. 2005)

*Haywood v. Barnes*, 109 F.R.D. 568 (E.D.N.C. 1986)

*Iglesias-Mendoza v. LaBelle Farm, Inc.*, 239 F.R.D. 363, 374-375 (S.D.N.Y. 2007)

*In re Diasonics Securities Litigation*, 599 F. Supp. 447 (N.D.Ca. 1984)

*In re Orthopedic Bone Screw Products Liability Litigation*, 159 F.3d 817 (3rd Cir. 1998)

*In re Prudential Ins. Co. Of Am. Sales Practices Litigation*, 148 F.3d 282 (3rd Cir. 1998)

*In re Reyes*, 814 F.2d 168 (5th Cir. 1987)

*Int'l Molders & Allied Workers' Local Union No. 164 v. Nelson*, 102 F.R.D. 457 (N.D.Cal. 1983)

*Jane B. v. NY City Dept. Of Social Services*, 117 F.R.D. 64 (S.D.N.Y. 1987)

*Johns v. Rozet*, 141 F.R.D. 211 (D.D.C. 1992)

*Kane Associates v. Clifford*, 80 F.R.D. 402 (E.D.N.Y. 1978)

*Koresko v. Murphy*, 464 F.Supp.2d 463 (E.D. Pa. 2006)


*Leyva v. Buley*, 125 F.R.D. 512 (E.D. Wash. 1989)

*Lindsay v. Government Employees Insurance Co.*, 448 F.3d 416 (D.C. Cir. 2006).

*Martinez v. Mecca Farms, Inc.*, 213 F.R.D. 601 (S.D. Fla. 2002)

*McLaughlin v. Liberty Mutual Ins. Co.*, 224 F.R.D. 304, 313 (D. Mass. 2004)

*Mid Atlantic Telecom Inc. v. Long Distance Services Inc.*, 18 F.3d 260 (4th Cir. 1994)

*Mitchell v. Osceola Farms Co.*, 447 F.Supp. 1307 (S.D. Fla. 2006),

*Montelongo v. Meese*, 803 F.2d 1341 (5th Cir. 1986)

*Moskowitz v. Lopp*, 128 F.R.D.624 (E.D. Pa. 1989);

*Neary v. Metropolitan Property and Casualty Ins. Co.*, 472 F.Supp.2d 247 (D.Conn. 2007)

*Neder v. U.S.*, 527 U.S. 1 (1999)

*Nicodemus v. Union Pacific Corp.*, 440 F.3d 1227 (10th Cir. 2006)

*Noble v. 93 University Place Corp.*, 224 F.R.D. 330, 342 (S.D.N.Y. 2004)

*Norfolk & Western Railway Co. v. Nemitz*, 404 U.S. 37 (1971)


*Pelletier v. Zweifel*, 921 F.2d 1465 (11th Cir. 1991)

*Phoenix Bond v. Bridge*, 477 F3d 928 (7th Cir. 2007)

*Powers v. Lycoming Engines*, 2007 WL 2782355 (E.D. Pa 2007),

*Randle v. Spectran*, 129 F.R.D. 386 (D. Mass. 1988)

*Recinos-Recinos v. Express Forestry, Inc.*, 233 F.R.D. 472 (E.D. La. 2006)

*Rivera v NIBCO*, 364 F3d 1057 (9th Cir. 2004)

*Rodolico v. Unisys Corp.*, 199 F.R.D. 468 (E.D.N.Y. 2001)

*Rodriguez v. McKinny*, 878 F.Supp.744 (E.D. Pa. 1995)

*Rose v. SLM Financial Corp.*, 2007 WL 674319 (W.D. N.C. 2007)

*Salas-Mateo v. Ochoa*, 2004 WL 1824124 (S.D. Fla. 2004)

*Sequa Corp v. Aetna Cas. & Surety Co.*, 1992 WL 207251 (Del. Super. Ct. Aug 7, 1992)

*Silva-Arriaga v. Texas Exp., Inc.*, 222 F.R.D. 684 (M.D.Fla.2004)

*Six Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301 (9th Cir. 1990)

*Sprague v. General Motors*, 133 F.3d 388 (6th Cir. 1998),

*Stewart v. Associates Consumer Discount*, 183 F.R.D.189 (E.D. Pa. 1998)

*Strykers Bay Neighborhood Council Inc. v. City of New York*, 695 F.Supp 1531 (S.D.N.Y. 1988)

*Systems Management, Inc. v. Loiselle*, 303 F.3d 100 (1st Cir. 2002)
*Trautz v. Weisman*, 819 F.Supp. 282 (S.D.N.Y. 1993)
*Trollinger*, 370 F.3d 602 (6th Cir. 2004)
*United Mine Workers v. Gibbs*, 383 U.S. 715 (1966)
*Wagner v. Lehman Bros*, 646 F.Supp.643 (N.D.Ill 1986)
*Walters v. Reno*, 145 F.3d 1032 (9th Cir 1998)
*Weikel v. Tower Semiconductor Ltd.*, 183 F.R.D. 377 (D.N.J 1998),
*West Morris Pediatrics v. Harry Schein, Inc.*, 897 A.2d 1140 (N.J. Super. 2004),
*Western Colorado Fruit Growers Assn. v. Marshall*, 473 F.Supp. 693, 696 (D. Colo. 1979)
*Zavala v. Wal-Mart Stores, Inc.*, 393 F.Supp.2d 295 (D.N.J. 2005
*Zeng Liu v. Donna Karan Intl. Inc.*, 207 F.Supp.2d 191 (S.D. N.Y. 2002)
*Z.L. Lumber Co. v. Nordquist*, 502 A.2d 697 (Pa. 1985)

8 U.S.C. § 1101(a)(15)(H)(ii)(b).
18 U.S.C. §§ 1546(a), 1341, and 1343
20 C.F.R. §655.103(b)(14)
28 U.S.C. § 1367(a)
28 U.S.C. §1367(c).
28 U.S.C. §1367(d)
1 Newburg § 4.26 at 4-104

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

RAMON VILLANUEVA-BAZALDUA
individually and on behalf of others similarly
situated,

          Plaintiff

v

TRUGREEN LIMITED PARTNERS and
TRUGREEN, INC.

          Defendants.

CA 1:06-cv-00185-GMS

Class Action

## PLAINTIFF'S REPLY BRIEF IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

NOW COMES Plaintiff Ramon Villanueva, and files this reply memorandum in support of

his motion to certify his claims for breach of contract, unjust enrichment, and violations of the

Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968 (RICO ),[1] as a Rule

23(b)(3) class action.

As set forth in detail below, this Court has original federal-question jurisdiction over

Plaintiff's state law claims because the central issues posed by those claims – whether Defendants

are legally bound by the wage rates and other terms of work that the Department of Labor (DOL)

---

[1]  As of the time of filing of this Brief, the Court has not ruled on Plaintiff's motion for
leave to amend his complaint to add RICO and unjust enrichment as causes of action. (D.I. 55)
Nevertheless, Plaintiff has briefed why those causes of action should be certified as class claims
so as to avoid delay in the event the Court grants the amendment.

required in Defendants' H-2B visa applications – is a question of federal immigration law and the intent and purpose behind DOL's H-2B requirements. Even if this Court did not have original jurisdiction over Plaintiff's state law claims, the efficiencies of trying those claims at the same time as Plaintiff's FLSA and RICO claims, coupled with the novel questions of *federal* law raised by Plaintiff's state law claims counsels in favor of exercising supplemental jurisdiction over those claims.

As for the requirements of Rule 23, Defendants' opposition fails to identify any individual issues that will arise as part of the liability determination, let alone individual issues that would predominate over the numerous common questions. The fact that individual damages will vary is not a bar to certification, particularly here where damages can be calculated from Defendants' payroll records without the need for testimony from the individual class members. Even with respect to Plaintiff's RICO claims, common questions predominate. Plaintiff alleges that he and the other class members were the victims of Defendants' visa fraud on the government and the law is clear that in that situation – individual reliance by the class members need not be shown and does not stand as a barrier to class certification. Defendants also speculate that variations in state contract and unjust enrichment law will create manageability problems. However, they fail to identify any specific differences in state law that will actually arise in this case, let alone differences that could affect the outcome. Mere speculation about potential conflicts is not a basis for denying class certification.

## I.    THIS COURT HAS SUPPLEMENTAL JURISDICTION OVER PLAINTIFF'S BREACH OF CONTRACT AND UNJUST ENRICHMENT CLAIMS

Defendants argue that this Court should not exercise supplemental jurisdiction over

Plaintiffs' breach of contract and unjust enrichment claims and therefore need not reach the issue of whether those claims satisfy the requirements of Rule 23. In making this argument, Defendants completely ignore Plaintiff's claim that the Court has original federal-question jurisdiction over those two claims. Even if it did not, the Court has supplemental jurisdiction over those claims pursuant to 28 U.S.C. § 1367(a)

## A. This Court Has Federal-question Jurisdiction Over Plaintiffs' Breach of Contract and Unjust Enrichment Claims

In his Original Complaint and his proposed First Amended Complaint, Plaintiff asserted that the Court has federal-question jurisdiction over his contract and unjust enrichment claims. DI 1 ¶ 2; DI 55 Ex. A ¶ 4. Typically federal-question jurisdiction applies to causes of action created by federal law. 28 U.S.C. §1331. However, in *Grable & Sons Metal Products, Inc. v. Darue Engineering & Mfg.*, the Supreme Court reaffirmed its longstanding position that federal-question jurisdiction can also be invoked for "state-law claims that implicate significant federal issues." 545 U.S. 308, 312 (2005). The Court noted that there is no "single, precise, all-embracing" test for federal-question jurisdiction derived from federal questions embedded in state law claims. *Id.* at 314 (quoting *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 821 (1988) (Stevens, J., concurring)). Nevertheless, to fall within this second branch of federal-question jurisdiction, the plaintiff must show that "a state-law claim necessarily raise[s] a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." Id. at 314. *See also Norfolk & Western Railway Co. v. Nemitz*, 404 U.S. 37, 44-45 (1971) (railroad's employees stated federal claims when they sought to enforce assurances made by the railroad to secure Interstate Commerce

3

Commission approval of a consolidation under a provision of the Interstate Commerce Act).

In *Grable*, the defendant Darue bought a piece of property at an Internal Revenue Service (IRS) sale that the IRS had seized from Grable to pay for delinquent federal taxes. *Id.* at 310-11. Grable then filed a quiet title action in state court to establish his continuing ownership of the seized property based on the fact that he had allegedly not been properly served with notice of the IRS sale as required by federal regulations. *Id.* at 311. Darue removed the case to federal court, and the Supreme Court upheld federal jurisdiction over the state quiet title action because the central issue in the case involved the interpretation of the notice requirements in IRS regulations. *Id.* at 314-15.

Federal-question jurisdiction of the sort discussed in *Grable* has been invoked in class action contract cases in a number of circumstances similar to this one. For example, in *Broder v Cablevision Systems Corporation,* 418 F 3d 187 (2nd Cir. 2005), consumers alleged that Cablevision breached its uniform customer agreement. The plaintiffs alleged that the agreement promised to comply with all 'applicable law' (which included a federal statute requiring uniform rates) and that by violating that federal law the company breached its contract with the consumers. *Id.* at 192. Because the breach of contract action necessarily required a determination of whether the federal uniform rate law had been breached, the court held that there was federal-question jurisdiction to hear the breach of contract claim. *Id.* 194-196. The court specifically noted that it did not matter that there was no direct cause of action to enforce the federal statute. *Id.* at 196. Similarly, in *Rose v SLM Financial Corp.,* 2007 WL 674319 (W.D. N.C. 2007), a plaintiff alleged that his mortgage company breached its contract with him by increasing his interest rate above the rate disclosed prior to closing. The court found *Grable* federal-question jurisdiction because the disclosure at issue was made pursuant to the requirements of the federal Truth-In-Lending Act (TILA) and the claim

4

necessarily raised substantial questions about the TILA, including whether it created contract rights and what construction should be put on its mandated disclosures. *Id.* at \*4-5. *See also Koresko v. Murphy,* 464 F.Supp.2d 463 (E.D. Pa. 2006) (federal-question jurisdiction exists over state law action to rescind contract where plaintiff alleged defendant violated a federal disclosure statute incorporated in the contract); *Hayes v. American Airlines,* 2005 WL 2367623 (E.D.N.Y. 2005) (§ 1331 jurisdiction over state law breach of contract action against airline for failing to pay refunds mandated by federal requirements incorporated in the contract). *Cf. Nicodemus v. Union Pacific Corp.,* 440 F.3d 1227 (10th Cir. 2006) (*Grable* requires finding of §1331 jurisdiction over state law claim for unjust enrichment that raised question of effect of federal land grants to Union Pacific).

Two cases involving contract claims by foreign visa workers have addressed the issue of *Grable* federal-question jurisdiction. Although the specific facts of each case led to opposite results, the reasoning of both cases strongly supports a finding of federal-question jurisdiction over the state law claims in this case. In *Avila-Gonzalez v. Barajas,* 2006 WL 643297 (M.D. Fla. 2006), the court found federal jurisdiction over a breach of contract action filed by citrus pickers working under H-2A visas. The plaintiffs alleged that their employer had violated the work terms promised in the H-2A visa application the employer filed with DOL.[2] The court concluded that federal jurisdiction existed over these claims because of,

---

[2] In the H-2A context, employers files a form ETA-790, (called a "clearance order") to obtain DOL labor certification, rather than just an ETA-750 as in the H-2B context. Both the ETA-790 and the ETA-750 set forth the offered terms of work; the ETA-790 contains additional work terms unique to the H-2A program and is designed to be circulated to state employment service offices. *See* http://www.foreignlaborcert.doleta.gov/form.cfm (Link to ETA-750 and ETA-790 forms)

> the substantial federal interest in immigration matters and in seeing
> that businesses honor the obligations they assume in order to obtain
> governmental approval of their activities, as the Defendants did to
> obtain temporary labor certification for importation of H-2A workers.
> *Norfolk & Western Railway Co. v. Nemitz,* 404 U.S. 37, 44-45
> (1971). Because of the limited number of H-2A workers admitted
> each year, federal-question jurisdiction over state law claims
> involving these guestworkers' contracts can be exercised without
> disturbing any congressionally approved balance of federal and state
> judicial responsibilities. *Grable,* 125 S.Ct. at 2368.

*Avila-Gonzalez,* 2006 WL 643297 at *3.

In *Mitchell v. Osceola Farms Co.*, 447 F.Supp. 1307 (S.D. Fla. 2006), H-2A guestworkers

alleged federal-question jurisdiction over a breach of contract claim that they were not adequately

paid according to the terms of their employment contracts with the defendant. 447 F. Supp. 2d 1307,

1308 (S.D.Fla. 2006). The sole federal question alleged by the plaintiffs was whether the work terms

in the DOL visa application (clearance order) 'controlled' or 'trumped' the individual contracts

between the defendants and the plaintiffs. *Id.* at 1312. The Court found that this federal issue

satisfied the first factor of the *Grable* analysis: "[W]hether clearance order terms trump individual

contracts with H-2A workers may be of substantial federal interest. The federal government has

plenary control over immigration matters and has considerable interest, through the H-2A program,

in ensuring that the temporary alien workers do not displace or adversely affect the domestic

workforce." *Id.* at 1313. However, the court ultimately declined to exercise §1331 jurisdiction over

the contract claims because it found that the federal issue, though substantial, was not *disputed* in the

H-2A context. *Id.* at 1312-13. The Court noted that DOL's H-2A regulations specifically stated that

the work terms in an H-2A visa application were required to be included in the work contract and

that, in the absence of a separate work contract, the visa application itself was the work contract. 20

6

C.F.R. §655.103(b)(14). The *Mitchell* court also noted that numerous courts had previously found the H-2A visa application to be contractually enforceable.[3] *Id.* at 1312.

Applying the above law, it is clear that this Court has original federal-question jurisdiction over Plaintiffs' breach of contract claim. First, whether the H-2B visa application is contractually enforceable and, if so, how its terms should be construed, are substantial federal questions. Both *Avila-Gonzalez* and *Mitchell* agree on that point. Second, unlike the H-2A context, those federal issues are hotly disputed in this case. There is no H-2B regulation equivalent to 20 C.F.R. § 655.103(b)(14) which incorporates the terms of an H-2B visa application into a worker's contract. Nor are there any cases that have addressed the issue of whether the terms of work in an H-2B visa application are contractually enforceable. The binding nature of the work terms in an H-2B visa application remains a significant and disputed issue. Defendants readily admit that the question of whether the H-2B visa application form "can create an express or implied contract" is a significant issue in this case. Def. Opp. at 11. Defendant would characterize that as a question of state law, but it is clear from both *Avila-Gonzalez* and *Mitchell* that whether DOL's H-2B visa application form was intended to create binding obligations upon a petitioning employer is a question of federal immigration law, and the federal intent behind DOL's H-2B regulations, not a question of state law. *See also Grable*, 545 U.S. at 314-315 (meaning of federal regulations is a substantial *federal* question); *Broder*, 418 F.3d at 192 (meaning of federal statute is substantial federal question).

---

[3] A third case, *Guerrero v. Brickman LLC*, CA1:05-cv-00357 (W.D.Mich.) (Docket 132), declined to exercise jurisdiction over a state contract claim brought by H-2B workers because, unlike *Avila* and this case, there were no allegations that the ETA-750 or any other federal law or regulation was incorporated into the contract.

In addition to the general question of whether the ETA-750 is contractually enforceable, the contract claim here, like the one in *Avila-Gonzalez,* 2006 WL 643297, but unlike the one in *Mitchell,* also raises significant questions regarding the intended meaning of the federally-mandated terms in the H-2B visa application. Thus, the court will not only have to decide whether the ETA-750 is contractually enforceable, but if it is, it will also have to decide (1) whether the rate of pay and overtime rate stated in Box 12 merely sets a minimum earnings amount or also establishes the method of pay that must be used; (2) whether the description of the job in block 13 precludes the employer from employing the worker in different jobs with less favorable wages; (3) whether the language in Block 23b guaranteeing the prevailing wage in effect at the time the alien begins work requires the employer to increase the wage stated in Block 12 if the prevailing wage increases after the ETA-750 is approved; and (4) whether the language in Block 23g of the ETA-750, which requires the employer to promise to comply with all applicable Federal, State and local laws, creates a contractual right to the protections of the Fair Labor Standards Act, (FLSA) 29 U.S.C. § 201 et seq. All of these questions regarding the interpretation to be given to these federally-mandated terms in the federally-mandated H-2B visa application are intensely disputed by the parties. Thus, Plaintiffs' breach of contract claim and unjust enrichment claims present substantial and disputed federal questions.

The final *Grable* requirement, that the exercise of federal jurisdiction not disturb the congressionally approved balance of state and federal judicial responsibilities, is also easily disposed of. The ETA-750 is a federal form designed to implement federal immigration policy. The proper interpretation of this form, particularly the pre-printed parts of the form that appear in all H-2B applications nationwide, is a matter of considerable federal interest but of no interest whatsoever to

8

individual states or state courts[4]    Moreover, because of the limited number of H-2B visas issued

each year, _____, exercising jurisdiction over the contract claim in this action will in no way

open the floodgates of the federal courts to all manner of breach of contract claims.  *Cf Avila-*

*Gonzalez,* 2006 WL 643297 at *3 ("Because of the limited number of H-2A workers admitted each

year, federal-question jurisdiction over state law claims involving these guestworkers' contracts can

be exercised without disturbing any    . . balance of federal and state judicial responsibilities.").

Accordingly, *Grable* compels a finding that this court has original federal-question jurisdiction over

Plaintiffs' contract claim.

### B.    The Court May Exercise Supplemental Jurisdiction Over Plaintiffs' Contract Claim Pursuant To 28 U.S.C. § 1367(a).

Even if the Court did not have federal-question jurisdiction over Plaintiffs' contract and

unjust enrichment claims, it would still have supplemental jurisdiction over those claims because

they are part of the same case or controversy as his federal RICO claims.

### 1.    Plaintiff's Contract Claim Satisfies § 1367(a)

Title 28 U.S.C. § 1367(a) provides that "in any civil action of which the district courts have

original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that

are so related to claims in the action within such original jurisdiction that they form part of the same

case or controversy under Article III of the United States Constitution    Such supplemental

jurisdiction shall include claims that involve the joinder or intervention of additional parties." *Id*

Claims are part of the same case or controversy if they share a "common nucleus of operative fact"

---

[4]   If the issue were merely the meaning of language voluntarily added to the contract by an employer, as it was in *Mitchell,* the argument for federal jurisdiction would not be as strong.  But here, the dispute is over the meaning of standard terms required by the DOL form, a question affecting H-2B visa applications nationwide.

9

with the federal claims. *DeAsencio v Tyson Foods,* 342 F.3d 301, 308 (3rd Cir. 2003)

Here, Plaintiff's state law claims and his RICO claim are grounded in the meaning and effect

of the H-2B visa application Defendants filed with DOL. While the elements of his state law claims

and his RICO claim are different, the factual questions regarding the filing of the ETA-750, the

purpose that form was designed to serve, the meaning and effect of its terms, as well as the question

of whether the Defendants complied with its terms are common to both claims. Judicial economy,

convenience, and fairness to the litigants – the primary purpose behind supplemental jurisdiction,

*DeAsencio,* 342 F.3d at 308 – would clearly be served by trying those claims together. Thus there

can be no question that Plaintiff's contract claim satisfies the requirements of 28 U.S.C. § 1367(a).

### 2. The Discretionary Factors In § 1367(c) Counsel in Favor of Exercising Supplemental Jurisdiction

Defendants argue that, even if this Court finds supplemental jurisdiction is proper under

1367(a) it should, nevertheless, decline to exercise supplemental jurisdiction over Plaintiff's contract

and unjust enrichment claims pursuant to the four discretionary factors set forth in 28 U.S.C.

§1367(c). None of Defendants' arguments are persuasive

As for the first factor, Plaintiff's contract claim does not raise novel or complex issue of state

law, certainly not in the way that *DeAsencio* raised novel questions about the Pennsylvania Wage

Payment and Collection Law *Id* 342 F.3d at 309-310 ("whether an implied contract may give rise to

a WPCL claim has never been addressed by Pennsylvania state courts.") As set forth above, to the

extent this case involves novel or complex questions, they are questions of *federal* law regarding

*federal* immigration policy and the intended meaning and purposes behind the H-2B visa application.

Once the central question of whether the work terms in that application are enforceable, this is a

fairly ordinary breach of employment contract action that presents no novel state law questions whatsoever.

Second, Plaintiff's state law causes of action will not "substantially predominate" over his federal RICO claim. 28 U.S.C § 1367(c)(2). Substantial predominance is measured by the proof involved, the scope of issues raised, and the comprehensiveness of the remedy sought by the state and federal claims. *United Mine Workers v. Gibbs,* 383 U.S. 715, 726 (1966). Measured in these terms, Plaintiff's RICO claim clearly predominates over his state law claims. All claims will involve overlapping proof regarding the circumstances under which Defendants filed their visa applications, the substance of those applications, and the extent of Defendants' compliance with the terms of the visa application. But the issues raised by Plaintiff's RICO claim are far more numerous and complex than those raised by the contract claim and the RICO remedy is more comprehensive in that it allows for treble damages rather than single damages. Moreover, the central question raised by Plaintiff's state law claims -- the meaning of the ETA-750 terms and whether DOL intended them to be contractually enforceable – is a *federal* issue which the Court can resolve on summary judgment, further ensuring that the state court causes of action will not predominate.[5]

Defendants do not dispute these points. Rather their argument that Plaintiff's state law claims will predominate is based solely on the fact that Plaintiff seeks to certify his state law claims

---

[5] In the H-2A context, the question of whether the H-2 visa application was contractually enforceable has always been decided as a matter of law. *See e.g. Frederick County Fruit Growers Assn v Martin,* 968 F.2d 1265, 1268-1269 (D.C Cir 1992) (holding as a matter of law that H-2A visa application is contractually enforceable and affirming summary judgment for breach of that contract); *Bennett v Hepburn Orchards,* 1987 WL 16939 at *2 (D.Md. 1987) (holding as matter of law that H-2A visa application is contract of employment); *Western Colorado Fruit Growers Assn v Marshall,* 473 F.Supp. 693, 696 (D. Colo. 1979) (same). The question whether the wages and work terms in the H-2B visa application are enforceable involves similar considerations of the purpose and intent behind DOL's visa requirements. Presumably, therefore, that question will be resolved as a matter of law as well.

11

on behalf of a class of similarly situated workers. But the mere fact that Plaintiff has brought his state law claims as a class action, does not, by itself, mean that they predominate over his federal claims. If Plaintiff's motion for class certification of his RICO claim is granted, the RICO and contract claim classes will be identical in size and composition. And, even if Plaintiff's RICO claim is not certified as a class, "predomination under §1367 generally goes to the type of claim, not the number of parties involved." *DeAsencio*, 342 F.3d at 311; *Iglesias-Mendoza v. LaBelle Farm, Inc.*, 239 F.R.D. 363, 374-375 (S.D.N.Y. 2007) (noting that predominance relates to the type of claim raised, not the size of the respective classes). One of the *purposes* of the 1990 amendments to §1367 was to make clear that district courts could exercise jurisdiction over "claims that involve the joinder or intervention of additional parties." *DeAsencio* at 307. That said, the number of state law claimants is not entirely irrelevant. *DeAsencio,* and other cases cited by Defendants, make clear that where a claim presents novel and complex issues of state law requiring substantial "additional testimony and proof . . . beyond that required for the [claim that is the basis for federal jurisdiction]," a large class in the state law claim compared to a small number of federal claimants may well tip the balance against exercising supplemental jurisdiction. *Id.* at 310-311. But in the absence of any novel questions of state law, or some other reason weighing against the exercise of supplemental jurisdiction, numbers alone are not sufficient to justify a refusal to exercise supplemental jurisdiction. *See DeAsencio* at 310-311; *Lindsay v. Government Employees Insurance Co.*, 448 F.3d 416 (D.C. Cir. 2006) (reversing district court in FLSA claim for refusing to exercise supplemental jurisdiction over state law class based on numbers alone).[6]

---

[6] The cases cited by Defendants confirm that the number of state law claimants is only material when coupled with other factors. *See, e.g., Hasken v. City of Louisville*, 213 F.R.D. 280

Here, Defendants have failed to come forward with anything other than an argument about numbers of claimants. They have pointed out no novel or complex issues of state law that will arise, only *federal* issues regarding the interpretation of federal regulations and procedures. In as much as those federal issues are essentially issues of law, the proof involved in Plaintiff's state law claims will not involve additional testimony or proof beyond that involved in Plaintiff's individual RICO claim. In these circumstances the discretionary factors in Rule 1367(c) weigh in favor of exercising supplemental jurisdiction. *See, e.g., Figueroa Cardona v. Sorrells Bros. Packing Co.,* 2007 WL 672303 (M.D. Fla. 2007) (In FLSA action brought by three H-2A workers, certifying state law breach of contract claims as a Rule 23 class action on behalf of H-2A workers employed by Sorrels Bros. during 2003-2004 and 2004-2005); *Noble v. 93 University Place Corp.,* 224 F.R.D. 330, 342 (S.D.N.Y. 2004) (in FLSA claim involving three workers, court exercised supplemental jurisdiction over state law class action involving several hundred workers); *McLaughlin v. Liberty Mutual Ins Co.,* 224 F.R.D. 304, 313 (D. Mass. 2004) (finding that exercise of supplemental jurisdiction over larger state law class served judicial economy): *Ansoumana v. Gristede's Operating Corp.,* 201

---

(W.D. KY 2003) (other factors beyond the numbers in the state class tipped the balance against exercising supplemental jurisdiction, including the fact that there was already a large class action in state court litigating the state law issue that the plaintiffs sought to raise); *Hatfield v. Oak Hill Banks,* 115 F.Supp2d 893 (S.D. Ohio 2000) (denying supplemental jurisdiction over state law class action because the federal statute on which the court's jurisdiction was based barred class actions).

F.R.D. 81, 89-96 (S.D.N.Y. 2001)(in individual FLSA action, exercising supplemental jurisdiction over state law class action with much longer statute of limitations).

The fourth discretionary factor – exceptional circumstances – also weighs strongly in favor of retaining jurisdiction over Plaintiff's state law claims. As explained above, the central issue presented by those claims is one of federal law regarding the purpose and intended effect of the federal H-2B visa application process. Plaintiff believes that that substantial federal question is sufficient to give the Court original jurisdiction under 28 U.S.C. § 1331. But even if it does not quite rise to that level, the presence of that federal question imbedded in Plaintiff's contract and unjust enrichment claims weighs heavily in favor of the exercise of supplemental jurisdiction over those state law claims When that consideration is coupled with and the efficiencies of trying all claims that share a common nucleus of operative fact in one proceeding, a finding that supplemental jurisdiction should be exercised is clearly appropriate.

### C.   In The Event The Court Declines To Exercise Supplemental Jurisdiction Over Plaintiff's State Law Claims It Should Dismiss Those Claims Without Prejudice

Although Plaintiff believes that the Court should exercise jurisdiction over his state law claims, either on the basis of original federal-question jurisdiction or on the basis of supplemental jurisdiction, in the event the Court disagrees, it should dismiss those claims without prejudice so that Plaintiff can re-file them in state court. 28 U.S.C. §1367(d). *See DeAsencio,* 342 F.3d at 312 n18 (dismissing state law claims with respect to "all plaintiffs, including those who opted into the FLSA class "); *DeLuna v. North Carolina Growers Assn,* 338 F.Supp.2d 649, 653 (EDNC 2004) (declining to exercise supplemental jurisdiction and noting that "Plaintiffs are free to pursue their state law claims, including potential class claims, in state courts "); *Neary v Metropolitan Property*

14

*and Casualty Ins. Co.*, 472 F. Supp.2d 247, 253 (D. Conn. 2007) (declining supplemental jurisdiction over state law claims but noting that "Plaintiff and other putative class members remain free to pursue class claims . . . in their respective state courts ").

## II.    PLAINTIFF'S CLASS SATISFIES THE REQUIREMENTS OF RULE 23(a)

### A.    Numerosity and Common Questions

Defendants do not challenge the fact that the class satisfies the numerosity requirement and presents common questions.

### B.    Plaintiff's Claims Are Typical

Defendants' sole challenge to Plaintiff's typicality is based on their argument that common questions do not predominate. The proper test for typicality is whether the "named plaintiff's individual circumstances are markedly different or . . . the legal theory upon which the claims are based differs from that upon which the claims of the other class members will perforce be based," *Baby Neal v. Casey*, 43 F.3d 48, 57-58 (3rd Cir. 1994). Plaintiff clearly meets this standard and Defendants make no effort to argue otherwise. Accordingly the Court should find that Plaintiff satisfies the typicality requirement of Rule 23(a)(3). Defendants' concern about the predominance of common questions will be addressed below in the discussion of Rule 23(b)(3).

### C. Plaintiff Is An Adequate Class Representative

Defendants challenge Plaintiff's adequacy as a representative based solely on the grounds that he invoked his 5th Amendment privilege with respect to questions about work in the United States in 2006, two years after his employment with TruGreen ended. Defendants' argument is completely lacking in merit for several reasons. First, contrary to Defendants' assertion, DI 76 at 18, Defendants bear the burden of proof to the extent they assert that Plaintiff is somehow personally inadequate to

15

represent the class. *Stewart v. Associates Consumer Discount*, 183 F.R.D.189, 196-197 (E.D. Pa.

1998); *Moskowitz v. Lopp*, 128 F.R.D 624, 636 (E.D. Pa. 1989); *Fickinger v. C.I. Planning Corp.*,

103 F.R.D. 529, 533 (E.D.Pa.1984). Second, attacks on a named plaintiff's personal qualities are

generally rejected unless they somehow touch upon the lawsuit itself. *See Johns v. Rozet*, 141 F.R.D.

211, 218 (D.D.C. 1992) (rejecting allegations of plaintiffs' lack of integrity and credibility as not

relevant to the issue of adequacy except as they bear on the existence of conflicts or the plaintiffs'

ability to prosecute the case); *Randle v. Spectran*, 129 F.R.D. 386, (D. Mass. 1988) ("Plaintiffs'

adequacy must be assessed in light of their conduct in this or previous litigation, not based on a

subjective evaluation of their personal qualifications as ... evidenced by their prior criminal record");

*Haywood v. Barnes*, 109 F.R.D. 568, 579 (E.D.N.C. 1986) (finding named plaintiff's felony criminal

records irrelevant to adequacy inquiry). *Id.* The adequacy of representation inquiry is not intended

to be a general examination into the named plaintiff's moral righteousness. *Darms v. Mccullooch*

*Oil Corp.*, 720 F.2d 490 (8th Cir. 1983); *Green v. Carlson*, 653 F.2d 1022 (5th Cir.) *cert. denied* 454

U.S. 944 (1981); *Jane B. v. NY City Dept. Of Social Services*, 117 F.R.D. 64, 71 (S.D.N.Y. 1987)

Plaintiff's invocation of his Fifth Amendment right with respect to work in the United States

in 2006 has nothing whatsoever to do with this lawsuit. A worker's immigration status is entirely

irrelevant in an employment rights actions. *See, e.g., Daniel Castellanos-Contreras v. Decatur*

*Hotels*, 06-4340-EEF-SS (E.D. La. Oct. 22, 2007) (granting protective order precluding employer

from inquiring into immigration status of H-2B guestworkers suing for pre-employment visa and

travel expenses); *Rivera v. NIBCO*, 364 F.3d. 1057, 1065 (9th Cir. 2004) (affirming protective order

against inquiries into Title VII plaintiffs immigration status, noting that "[t]he chilling effect such

discovery could have on bringing of civil rights actions unacceptably burdens the public interest"); *In*

16

*re Reyes*, 814 F 2d 168 (5th Cir 1987) (granting mandamus overturning district court's order allowing inquiry into immigration status in FLSA claim); *Avila-Blum v Casa de Cambio Delgado, Inc*, 236 F.R.D 190, 191 (S.D.N.Y. 2006) (granting protective order prohibiting defendant from inquiring into plaintiff's immigration status in employment action); *Garcia-Andrade v Madra's Café Corp*, 2005 WL 2430195 at *1-2 (E.D. Mich 2005) (same, wage claim); *Flores v. Amignon*, 233 F.Supp.2d 462 (E.D.N.Y 2002) (same, FLSA action); *Zeng Liu v Donna Karan Intl Inc*, 207 F.Supp.2d 191 (S.D. N.Y. 2002) (same, FLSA collective action); *Cortez v Medina's Landscaping*, 2002 WL 31175471 (N.D. Ill. 2002) (denying motion to compel discovery concerning citizenship status in FLSA action) *See also, Zavala v Wal-Mart Stores, Inc*, 393 F.Supp.2d 295, 325 (D.N.J 2005) (undocumented workers entitled to bring FLSA collective action). Inasmuch as Plaintiff's immigration status is irrelevant to any issue in this case, Plaintiff's decision to invoke his Fifth Amendment right in that regard can hardly serve as a basis for finding him to be an inadequate representative.[7]

Recognizing that Plaintiff's immigration status in years unrelated to this suit is irrelevant to the merits of his claim, Defendants assert that they need to know his immigration status to determine whether he can freely travel to the United States. That is even more of a non-issue. Plaintiff testified that he has received multiple entry visas on several occasions that allow him to enter the United States. Villanueva Deposition, DI 76 Ex. B at 9-11; 26. Defendants do not dispute that fact

---

[7] Defendants argue that they need to know whether Plaintiff's 2006 employers, if any, paid his travel- or visa-related expenses or paid him in accordance with ETA-750 contracts. But whether some other employer paid those expenses or complied with an ETA-750 has no bearing on Defendants' liability for violating the ETA-750s they filed. Besides, Plaintiff clearly testified that he has never had another H-2B job since he left TruGreen Villanueva Deposition DI 76 Ex B at 22.

so, to the extent Defendants are genuinely concerned about Plaintiff's ability to enter the country, the record indicates that he has no trouble doing so. Indeed he was in the United States for his deposition. More fundamentally, a plaintiff's ability to enter the United States is not a legitimate criterion for measuring his adequacy as a class representative.[8] *See, e g , In re Diasonics Securities Litigation,* 599 F. Supp. 447, 453 (N.D.Ca. 1984) (residence outside the U.S. did not disqualify putative class representative), *Billet v. Storage Technology Corp ,* 72 F.R.D. 583, 587 (S.D.N.Y. 1976) (rejecting adequacy objection to class representative who was leaving the country and "may be living abroad during the pendency of the suit "). Even undocumented aliens who have no legal right to enter the country are routinely certified as class representatives *See, e g , Six Mexican Workers v Arizona Citrus Growers,* 904 F. 2d 1301 (9th Cir. 1990) (affirming damage awards to class of 1349 undocumented Mexican farmworkers); *Int'l Molders & Allied Workers' Local Union No. 164 v Nelson,* 102 F.R.D. 457, 465 (N.D.Cal. 1983) (certifying class represented by plaintiffs who are "not alleged to be lawful residents of the U.S."); *Walters v. Reno,* 145 F.3d 1032, 1046 (9th Cir. 1998) (certifying class of aliens in deportation proceedings and finding claim that named plaintiffs had committed document fraud irrelevant to adequacy of representation issue).

Finally, there is no merit to the argument that Plaintiff's invocation of the Fifth Amendment with respect to unauthorized employment undermines his credibility and renders him an inadequate representative. *See Walters v Reno,* 145 F.3d 1032, 1046 (9th Cir. 1998) (Immigration Service's argument that class representatives committed document fraud was not relevant to their ability to

---

[8] Defendants seem to be arguing that a class representative should reside in the United States, a requirement that would effectively preclude H-2B workers from ever filing class actions. By definition, an H-2B worker is "an alien ... having a residence in a foreign country

18

adequately represent class); *Martinez v. Mecca Farms, Inc.*, 213 F.R.D. 601, 606-607 (S.D. Fla.

2002) (rejecting claim that class representatives' undocumented status affected their credibility and

certifying class); *Ansoumana v. Gristede's Operating Corp.*, 201 F.R.D. 81, 87 (S.D.N.Y. 2001)

(rejecting claim that named plaintiffs' immigration status affected their credibility and fitness to be

class representatives and certifying FLSA collective action and Rule 23 class action); *Leyva v. Buley*,

125 F.R.D. 512, 516 (E.D. Wash. 1989) (finding plaintiff adequate representative despite character

attacks and allegations of illegal activity). Moreover attacks on a plaintiff's credibility are "not often

given much weight" at the class certification stage. *Weikel v. Tower Semiconductor Ltd.*, 183 F.R.D.

377, 397 (D.N.J. 1998), except in extreme cases such as the ones cited by Defendants. *See Weikel*,

183 F.R.D. at 391-392 (unique defenses applicable to named plaintiff made him inadequate); *Wagner

v. Lehman Bros*, 646 F.Supp 643, 659-660 (N.D.Ill 1986)(plaintiff who purchased testimony of key

witness not an adequate class representative); *Strykers Bay Neighborhood Council Inc. v. City of

New York*, 695 F.Supp 1531, 1537 (S.D.N.Y. 1988) (plaintiff inadequate because of his complete

failure to respond to interrogatories and requests for production).

Finally, Defendants argue that Plaintiff is an inadequate representative because he stated

during his deposition that he did not pay a great deal of attention to some documents he and the other

workers were given to sign when they first arrived at TruGreen. Deposition R. Villanueva at 40-41

(DI 76 Ex B) at 28-30. Those documents were simply standard pre-employment forms that

employers typically put in front of workers on their first day of work – forms with no bearing on the

claims at issue here.[9] It would be an unusual employee indeed who could claim to have read in detail

_____

which he has no intention of abandoning . . ." 8 U.S.C. § 1101(a)(15)(H)(ii)(b)

[9]  The three documents consist of an agreement to maintain confidentiality of any trade

every document he was asked to sign when beginning a new job.

Plainly, Defendants have failed to carry their burden of showing that Plaintiff is inadequate to represent the class.

## III.    PLAINTIFFS' CLASS SATISFIES THE REQUIREMENTS OF RULE 23(B)(3)

### A.    Common Questions Predominate In Plaintiffs' Contract claim

Plaintiff's contract claim alleges that Defendants did not pay the class members in the manner or in the amounts required by DOL in the ETA-750s. In his motion for class certification, Plaintiff submitted substantial evidence to support that claim. The evidence identified more than 86 of the class members were paid on a fluctuating work week basis rather than straight hourly rates and time-and-a-half overtime promised in the ETA-750. Plaintiff also submitted evidence showing that workers paid on the fluctuating work week method, as well as workers who were paid by the hour, received wages far below those promised in the ETA-750 and Employer Disclosure Affidavits. Significantly, Defendants' opposition to class certification does not dispute any of that evidence, only the legal significance of it: While Plaintiff asserts that Defendants were contractually bound by the wage promises in the ETA-750 (since DOL considers those terms to be the minimum necessary to avoid an adverse impact on U.S. workers), Defendants seem to believe that once they obtain approval for their visas, they were free to ignore the wages required by DOL and even free to use a different pay system altogether. Which of these competing views is correct is a question for the

---

secrets revealed to Plaintiff in the course of his employment, a blank notice and certification request for work opportunity and welfare to work credits, and an acknowledgment of receipt of TruGreen's employment manual. DI 76 Ex. B at 28-30. It would appear that only the last of these forms had any relevance to Plaintiff's employment.

merits,[10] not class certification, but it is clear that the resolution of that issue involves a host of questions common to each class member, including the following:

1. Whether the work terms in ETA-750 forms used to obtain visas for the class members are contractually enforceable;

2. Whether the wage terms in the form "Employer Disclosure Affidavits" presented to workers in Mexico are contractually enforceable to the extent they offer more beneficial terms than the ETA-750;

3. Whether the promise of fixed hourly wages and time-and-a-half for overtime set forth in Box 12 of every single ETA-750 precluded Defendants from paying lower hourly wages or using a different, less advantageous, pay system;

4. Whether charging less for housing than initially disclosed or giving workers the opportunity to earn commission payments can legally substitute for the fixed hourly wages and time and a half overtime promised in every ETA-750; and

5. Whether the printed terms contained in Box 23 of the ETA-750 required Defendants to pay the prevailing rate in effect at the time a worker started work and constituted a contractual promise to comply with the FLSA.

---

[10] Plaintiff does provide legal support for his position. *See, Frederick County Fruit Growers Assn.*, 968 F.2d at 1268-1269 (affirming summary judgment on behalf of class of H-2A apple pickers that employers' failure to pay DOL mandated wages promised in visa applications was a breach of contract); *id.*, 758 F.Supp. 17 at headnote 14 (holding grower liable for breach of contract for paying by a method different from the method promised in the visa petition approved by DOL). Defendants provide no legal support for their position.

These questions are clearly common to the class: If the ETA-750 given to Plaintiff gave him a contractually enforceable right to the specified wage rate, any increase mandated by the prevailing wage in effect at the time he started working, and a contractual right to compliance with the FLSA, then the ETA-750s used to import the other class members gave them those rights as well. Similarly, if the higher wage offered in the disclosure affidavit provided to Plaintiff gave him additional rights above and beyond those created by the ETA-750, then every other class member whose disclosure affidavit offered higher wages than in the ETA-750 would also be entitled to those higher wages.

### 1. Defendants Fail To Demonstrate The Existence Of Any Individual Issues

Defendants' opposition to class certification does not even discuss these common issues, let alone try to argue that any of them is individualized. Defendants mention *only one specific issue* that is allegedly not "susceptible to common proof"– the fact that class members were offered different fixed hourly rates depending on the prevailing wage in the area where they worked. Def. Opp. At 24. Plaintiff readily concedes that each of the ETA-750's offered different hourly rates depending on the area of employment. But that hardly means the different hourly rates aren't susceptible to common proof. To the contrary, the different rates are easily proven simply by offering the ETA-750 forms into evidence. Inasmuch as they were produced by Defendants and are self-authenticating, their admission should not pose any difficulties. More fundamentally, the fact that workers were offered different hourly rates is not the issue: The question presented is whether the fixed hourly rates promised in the ETA-750s, *whatever they were,* are contractually enforceable. The fact that the rate was $10 per hour in Virginia and $15 per hour in New York is not the issue; the issue is whether, given the regulatory purpose served by the ETA-750 (to ensure that the wages of similarly employed U.S. workers are not adversely affected by the importation of foreign labor), an

22

employer may legally pay foreign workers at rate different from those approved by DOL in the ETA-750.[11] The precise hourly rate offered in each ETA-750 only becomes relevant to calculate each class member's damages.

Defendants' argument that the contract claim is individualized because Defendants charged some workers less than the disclosed amount for utilities and rent and because Defendants paid incentive bonuses to some workers  But this argument only proves the commonality of the claim: Whether Defendants are entitled to credits for these items against the fixed hourly wage rates set forth in the ETA-750 is a question that can, and should, be resolved on a class-wide basis  Plaintiffs assert that these items cannot be used to satisfy the base rates set forth in the ETA-750, particularly incentive bonus payments which represent payments for work beyond that covered by base rates offered in the ETA-750.[12] *See Frederick County Fruit Growers Assn v Dole*, 758 F.Supp. 17 at headnote 11 (D.D.C. 1991) (ruling on a class-wide basis that H-2A employers were not entitled to

---

[11]  Defendants cite *Cutler v Wal-Mart Stores, Inc*, 927 A.2d 1, 10 (Md. App. Ct.) *Aff'd* 931 A.2d 1095 (Md. 2007), for the proposition that differing rates of pay preclude certification of a contract class. *Cutler* says nothing of the sort. Rather it denied certification to the workers' contract claim because there was no uniform contract or term common to the class. Although the employee handbook was given to all class members, the Court held that it did not create a contract  As a result, to prove a contract, each individual worker would have to rely on oral promises made to each individual worker by his manager at the time of hire to establish the contract term they sought to enforce. Proving thousands of individual oral contracts is clearly not a common issue. Here, by contrast, Plaintiff is seeking to enforce the contract terms common to the entire class set forth in two documents which are also common to the class – the ETA-750 and the Disclosure Affidavit. No individual or oral promises are involved.

[12]  Box 23c of the ETA-750 specifically says: "The wage offered is not based on commissions, bonuses, or other incentives unless I guarantee a wage paid on a weekly, bimonthly, or monthly basis." No such guarantee appears in any of the ETA-750s and therefore it must be assumed that the stated wage rate in Box 12 of the ETA-750 is not based on commission payments.

credit against the wage promised in their visa petition for bonuses because such bonuses were

incentives to do more than the level of work compensated by the stated wage rate). Defendants

disagree and believe they are entitled to credits for bonuses and lower housing charges (although they

cite no authority to support their position). Who is correct is a merits issue that cannot be resolved at

this point. However, the resolution will clearly be common to all class members: If Defendants

cannot count the incentive commissions Plaintiff received as offsets against the base hourly wage

promised to him in the ETA-750, then Defendants cannot use those incentive commissions as offsets

against other workers' wages. Conversely, if Defendants are entitled to offsets for Plaintiff, they are

for anyone else too. Moreover, no matter how this question of offsets is resolved, the calculation of

what is owed to each worker will remain a simple mathematical computation that can be made from

Defendants' computerized wage records. No individual testimony is necessary to make such

calculations whether or not Defendants receive credit for incentive payments or lower housing

charges.[13]

### 2.    Defendants' Legal Challenge to the FLSA aspect of Plaintiffs' Contract Claim Is A Merits Question Common To The Class and Is Wrong As A Matter Of Law

Unable to come up with any individual questions raised by Plaintiff's contract claim,

Defendants argue at length that there is no legal merit to the FLSA aspect of the claim because,

according to Defendants, FLSA rights cannot be enforced through a breach of contract claim. This

---

[13] Defendants themselves have proven how easy it is to make these calculations for each class member. Document TRU 27 and TRU 28, attached hereto as Ex. A, are calculations Defendants made from their own records comparing Plaintiff's actual earnings with what his earnings would be at the ETA-750 rate as well as the amount of credit that would be due TruGreen for lower housing charges.

merits argument is improper at the class certification stage. *Eisen v. Carlisle & Jacquilin,* 417 U.S.

156, 177-178 (1974) ("In determining the propriety of a class action, the question is not whether the

plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the

requirements of Rule 23 are met."). However, by making the argument Defendants once again prove

Plaintiff's point that the issues presented by the contract claim are common to the class. The legal

issue raised by Defendants – whether FLSA rights can be enforced through a breach of contract

action – is clearly common to the class and, contrary to Defendants' assertions; there is ample

support for Plaintiff's position that FLSA rights can be contractually enforced.[14]   The factual

question of whether the pre-printed language in Box 23 of the ETA-750 creates a contractual

promise to abide by the FLSA is also common to the class since that language appears in all of the

Defendants ETA-750s.  The efficiency of deciding these questions once for all workers is precisely

why class certification is appropriate.

   Defendants also argue that the FLSA aspect of Plaintiff's class claim has already been ruled

on. However, in denying Plaintiff's motion for an FLSA collective action the Court focused on the

insufficiency of the evidence before the Court.  Plaintiff's motion was submitted before any

significant discovery had taken place.  Now that Plaintiff has had an opportunity for discovery,

Plaintiff has provided more than sufficient record evidence to support treating his FLSA claims as

---

[14]  *See Hasken v. City of Louisville,* 173 F. Supp 2d 654, 663 (W.D. Ky. 2001) (finding that
an employer may contractually agree to abide by the FLSA and that such a promise can be
enforced contractually); *Albee v. Village of Bartlett, Ill ,* 861 F.Supp. 680, 691 (N.D. Ill. 1994)
(holding that City's promise to "adhere" to DOL overtime policies was a contractually
enforceable promise); *Avery v. City of Talladega, Ala ,* 24 F.3d 1337, 1347 (11th Cir. 1994)
(where Employee Handbook provided that overtime would be paid in accordance with the FLSA
then, "[i]f a violation of the FLSA has occurred, . . . a violation of the contract, which
incorporates the FLSA, will have occurred as well." *Id* at 1347.

class claim both in this motion and in his motion and in his amended motion for certification of an FLSA class. DI 45/46.[15] Defendants make no attempt to explain why this evidence is not sufficient to demonstrate that common questions exist with respect to this aspect of the contract claim.

### 3. Alleged Variations In State Law Do Not Exist And Do Not Affect Class Certification

Finally, Defendants argue that alleged variations in the way different states deal with ambiguous contracts precludes class certification. There are several problems with this argument. First, Defendants have failed to identify any real differences in state contract law. Defendants cite three cases that they contend demonstrate different approaches to ambiguous contracts, but even a cursory reading of the cases reveals that they merely illustrate three different principles of contract interpretation common to all states.[16] Second, Defendants have not pointed to any specific contract

---

[15] That motion was styled a motion for reconsideration or in the alternative an amended motion for certification of an FLSA class. The court denied the motion for reconsideration, but has not ruled on the arguments made with respect to the amended motion.

[16] Defendants first cite *Sequa Corp v. Aetna Cas. & Surety Co.*, 1992 WL 207251 (Del. Super. Ct. Aug 7, 1992), for the proposition that where there is no ambiguity a court may not look beyond the four corners of the contract. This is known as the "objective theory" of contracts and is common throughout the United States. Second, Defendants cite *Z.L. Lumber Co. v. Nordquist,* 502 A.2d 697 (Pa 1985), for the unremarkable proposition that when a contract is found to be ambiguous, extrinsic evidence may be admitted to resolve the ambiguity. Again this is black letter contract law. Finally, Defendants cite *Hall v. Equitable Life Assur. Soc. Of U.S.,* 295 N.W. 204, 206 (Mich 1940), for the proposition that extrinsic evidence can be considered to determine if a "latent" ambiguity is present. That is hardly unique to Michigan – as is evident from the court's reference to the Am. Jur. definition of "latent" ambiguity cited by the court: An ambiguity is latent when it, "does not arise from the words themselves, but from the ambiguous or obscure state of extrinsic circumstances to which the words of the instrument refer, and which is susceptible of explanation by a mere development of extraneous facts ..." *Id.* (quoting 20 Am. Jur. 1010). The Court also cites Black's Law dictionary for a similar definition. Clearly the Court was not relying on some unique Michigan rule. It should also be noted that Michigan is not one of the states covered by Plaintiff's proposed class.

terms that they claim are ambiguous, let alone ambiguous in a way that would be affected by the alleged variations in state law.  Defendants cannot defeat class certification simply by speculating that differences in state law exist; they have an obligation to identify specific differences in state law, show how those differences are likely to arise and why they may make a difference in the outcome of the case.  *See Kane Associates v. Clifford,* 80 F.R.D. 402, 407 (E.D.N.Y. 1978) (refusing to rule against class certification on the basis of speculation that differences in state law might arise).  *Cf. Rodolico v. Unisys Corp.,* 199 F.R.D. 468, 477 (E.D.N.Y. 2001) (speculation regarding class representative's conflicts is not a basis for denying class certification)

Moreover, Defendants do not identify any ambiguities because there simply are none in the ETA-750 and the Disclosure affidavits and the other terms in the ETA-750 that Plaintiff seeks to enforce.  Even if there were an ambiguity, the resolution of that ambiguity would not involve testimony from the individual class members: The individual class members never saw the ETA-750 and have nothing to say about its meaning.  While they saw the disclosure affidavits, they did not have any input into them and have nothing to contribute to the resolution of any ambiguity  In other words, even if there were ambiguities in the two contract documents at issue, the resolution of those ambiguities would be a common question because the individual class members have no evidence to contribute to the resolution of the ambiguities. *See e.g. Arriaga v. Fla. Pacific Farms,* 305 F.3d 1228, 1246-1248 (11th Cir. 2002) (interpreting ambiguous term in H-2A visa application as a matter of law using the rules of construction because no extrinsic evidence as to its meaning exists).

**B.     Common Questions Predominate In Plaintiffs' Unjust Enrichment Claim**

    **1.     Common questions**

Defendants' assertions that common questions do not predominate with respect to Plaintiff's unjust enrichment claim are based on a fundamental misconception of Plaintiff's claim. Plaintiff is not seeking to recover some hypothetical 'market value' for each different task performed by the different class members, as Defendants seem to think. Rather, Plaintiff's claim posits that the labor assigned by TruGreen to its H-2B workers, whatever it was, was a benefit to Defendants because they paid for it, albeit at less than the required wage. Plaintiff further argues that the minimum value of H-2B labor is the prevailing wage mandated by DOL's H-2B visa application requirements (i.e. the wages that appear in a properly filled out and approved ETA-750). If the class members received less than this mandated rate, and cannot recover it as a matter of contract, they can recover it as an equitable matter through a claim for unjust enrichment. Plaintiff may or may not be correct about that theory of recovery, but the resolution of it is clearly common to the class and such a claim is properly certified as a class action.

The difference between the claim that Plaintiff have actually alleged, and the quite different claim that Defendants characterize as "inherently individual," is best illustrated by comparing *Cutler v. Wal-Mart Stores, Inc.*, 927 A.2d 1 (Ct. App. Md. 2007), a case Defendants cite, and *Frederick County Fruit Growers Assn.*, 968 F.2d at 1272-1274. In *Cutler*, Wal-Mart employees sought compensation for time that they allegedly worked off-the-clock. However, as the court pointed out, a claim for irregular and unrecorded off-the-clock work is inherently individual. Because the work was not recorded, each Wal-Mart employee would have to testify to the hours that he or she worked off-the-clock to establish the extent of the benefit to Wal-Mart. The fact that the work was not recorded also meant that there would have to be individual testimony to determine whether Wal-Mart was aware the work was occurring and accepted the benefit. By contrast, in *Frederick County Fruit*

28

*Growers Assn.*, the court awarded equitable restitution of wages to a multi-state class of temporary visa workers. *Id.* 968 F.2d 1272-1276. The case arose as follows: DOL amended its wage regulation for H-2A workers in 1983 and apple growers then paid their H-2A workers in compliance with that new regulation during the fall harvest. Subsequently, the DOL regulation was found to have been unlawfully promulgated and the prior regulation was reinstated. The apple harvest workers then sued for equitable restitution of the difference between the wage paid pursuant to the unlawful regulation and the higher wage required by the reinstated regulation. (There was no basis for a contract claim because the growers had only offered the lower, unlawful wage) The district court granted summary judgment to the workers and awarded them restitution up the level of the higher, lawful wage rate and the Court of appeal affirmed. *Id.* Plaintiff's unjust enrichment claim seeks the same kind of relief as was awarded in *Frederick County*: Defendants paid unlawfully low wages (and with considerably less excuse than the apple growers in *Frederick County*), so as a matter of equity, Plaintiff and the other H-2B workers are entitled to the difference between the wages they were paid and the lawful wage required by DOL regulations – the same wage that every other H-2B employer must pay. No individual testimony is needed, just as it was not needed in *Frederick County* As in that case, Plaintiff only seeks payment for hours of work actually recorded and paid for by Defendants (thereby avoiding the need for individual testimony to establish the hours of work at issue or TruGreen's knowledge and acceptance of the work). Whether Plaintiff will succeed on this unjust enrichment claim is a merits question to be decided later But there can be no question that the actual unjust enrichment claim plead by Plaintiff – i.e. a claim for the difference between the lawful DOL wage rate and the wages actually paid by TruGreen – is a class-wide claim, not an

individualized one.[17]

### 2.    Variations in State Law Don't Affect Certification of Plaintiff's Unjust Enrichment Claim

Defendants' argument that Plaintiff's unjust enrichment claim should not be certified because

of "material differences in state law" is unsupported even by the cases cited by Defendants  *Powers*

*v Lycoming Engines,* 2007 WL 2782355 at *4-5 (E.D. Pa 2007), Defendants' primary authority,

contains a lengthy analysis of law of unjust enrichment in the Eastern United States.  Yet, in direct

contradiction to Defendants' claim, the court concluded that,

> Although there are numerous permutations of the elements of the
> cause of action in the various states, there are few real differences.  In
> all states, the focus of an unjust enrichment claim is whether the
> defendant was *unjustly* enriched  At the core of each state's laws are
> two fundamental elements – the defendant received a benefit from the
> plaintiff and it would be inequitable for the defendant to retain that
> benefit without compensating the plaintiff.  The focus of the inquiry
> is the same in each state. . .  [R]egardless of which state's unjust
> enrichment elements are applied, the result is the same.  Thus there is
> no real conflict surrounding the elements of the cause of action

*Id* at *5  The one difference in state law that the *Powers* court does find, and the one difference

---

[17]  Defendant citations for the proposition that unjust enrichment classes are improper do
not support that conclusion.  *Sprague v. General Motors,* 133 F.3d 388 (6th Cir. 1998), was a
promissory estoppel case, not an unjust enrichment case.  The court found that, on the specific
facts of that case, because there was no single promise made to the class, each individual class
member would have to prove the specific oral and written promises made to him in order to
prevail.  Clearly such a claim was not suited for class treatment.  *West Morris Pediatrics v. Harry
Schein, Inc.,* 897 A.2d 1140 (N.J. Super. 2004), involved different oral misrepresentations made
by three of the defendants salespersons  The court denied certification not because of any
inherent problem with class unjust enrichment claims, but because the class was not sufficiently
numerous and because different misrepresentations made to each class member – a fact that
necessarily meant that individual questions predominated.  *Bunnion v. Consolidated Rail Corp.,*
1998 WL 372644 (E.D. Pa. 1998), found that the unjust enrichment claims were too vague to
certify because the court could not determine "whether the plaintiffs are all challenging the same
course of conduct."  The court did, however, certify the class on ten other counts

cited by Defendants, has to do with whether state law recognizes a "contract bar" to an unjust enrichment claim – i.e. whether or not states allow recovery for unjust enrichment despite the existence of an express contract governing the matter. In *Powers* this was a significant difference because the defendant had issued a written warranty covering its airplane engines – a contract which in a 'contract bar' state could preclude an unjust enrichment claim. The named plaintiffs did not want to enforce the warranty contract and had to avoid it if they were to succeed on their unjust enrichment claim. Here, by contrast, Plaintiffs are not trying to avoid the contract at issue – the ETA-750 and the Disclosure Affidavit; rather, they are trying to enforce them. If they succeed, they will have recovered everything they could hope to recover under their alternative, unjust enrichment claim and the 'contract bar' principle will not matter.[18] Conversely, if they fail on the contract claim because the court finds the ETA-750 and disclosure affidavit are unenforceable, then there will be no contract to bar the class members unjust enrichment claim and the distinction between contract bar and non-contract bar states will still be irrelevant. Thus rigorous analysis demonstrates that, contrary to defendants' assertions, certifying a class in this case will not "rob" putative class members in Maine, Connecticut and Ohio of any potential remedy. Opp. At 28. Like the rest of the class, they will recover if there is a contract and, if there isn't a contract, unjust enrichment is available as an alternative basis for recovery. *See Frederick County Fruit Growers Assn.*, 968 F.2d at 1273-76 (awarding equitable restitution to class of workers employed in Maine, Massachusetts, Vermont, New York, Maryland, and Virginia without variations in state law arising as an issue).

---

[18] The damages Plaintiff seeks for his contract claim and his unjust enrichment claim are precisely the same: the wage rate mandated by the ETA-750 or any higher rate offered in the Disclosure Affidavit. The theories are truly alternative theories of recovery for the same injury and thus the 'contract bar' issue is irrelevant.

31

C.    **Common Questions Predominate In Plaintiffs' RICO claim**

Defendants do not dispute that the vast majority of the questions raised by Plaintiffs RICO claim are common to the class  Rather, their entire argument focuses on the assertion that "reliance" is a necessary element of Plaintiff's RICO claim and that reliance is unsuited for class treatment  As set forth below, reliance is not an element of the RICO claim alleged by Plaintiff and, even if it were, it would not preclude class certification

1.    **Reliance Is Not An Element Of Plaintiff's RICO Claim**

To begin with, nothing in the predicate acts of visa, mail, and wire fraud requires a showing of individual reliance on the part of the class members  Nothing in 18 U S.C. §§ 1546(a), 1341, and 1343 lists reliance as an element of the criminal violations  Visa fraud simply requires a defendant to knowingly make "any false statement with respect to a material fact in any application, affidavit, or other document required by the immigration laws or regulations prescribed thereunder." 18 U S.C. §1546(a)  The mail and visa fraud statutes prohibit a "scheme to defraud" without reference to reliance on that fraud  18 U.S.C. §§ 1341 and 1343. *See Neder v. U S,* 527 U.S. 1 (1999) ("[b]y prohibiting a 'scheme to defraud' rather than the completed fraud, the element of reliance . . . would clearly be inconsistent with the statutes Congress enacted.")  That said, Plaintiff recognizes that there is a disagreement among the courts as to whether a plaintiff must, nevertheless, show reliance in RICO cases that are based on mail and wire fraud aimed at the plaintiff *Compare Systems Management, Inc  v  Loiselle,* 303 F 3d 100, 103-104 (1st Cir. 2002) (workers injured by employer's mail fraud sent to a third party need not prove reliance), and *Grider v. Keystone Health Plan Central, Inc.,* 2006 WL 3825178 at *13 (E.D. Pa. 2006) (doctors who alleged that health care plan engaged in pattern of mail fraud did not need to establish reliance); *with  Chisolm v  TranSouth Financial*

32

*Corporation*, 95 F.3d 331, 337 (4th Cir. 1996) (reliance required for RICO case based on mail fraud);

*Pelletier v. Zweifel*, 921 F.2d 1465, 1499-1500 (11th Cir. 1991) (same). The Supreme Court has not

resolved this dispute although Justice Thomas recently made clear that, in his view, reliance is not an

element of a RICO claim. *See Anza v. Ideal Steel Corp.*, 126 S.Ct. 1991, 2007-2009 (2006)

(Thomas, J., dissenting) ("Because reliance cannot be read into [mail fraud] and [wire fraud], nor

into RICO itself, it is not an element of a civil RICO claim.").[19]

The Court need not take sides in this dispute for several reasons. First, this case is not

grounded solely on mail or wire fraud. Rather the central allegation of Plaintiff's complaint is that

Plaintiff and other Mexican guestworkers were injured by Defendants' violations of 18 U.S.C.

§1546(a) ("Fraud and misuse of visas, permits, and other documents"). The false statements

criminalized by §1546(a) all involve statements made to the government in visa applications.[20]

Plainly, Congress could not have intended to require private RICO plaintiffs to demonstrate reliance

on false statements made to the government when it decided to include violations of §1546 as civil

RICO predicate offenses. *See e.g., Trollinger*, 370 F.3d 602, 606 (6th Cir. 2004)(upholding RICO

complaint based, *inter alia,* on violations of 18 U.S.C. §1546(a)).

Moreover, even with respect to mail and wire fraud, courts have consistently held that where

---

[19] The majority in *Anza* did not reach the question of whether reliance was an element of a RICO claim.

[20] 28 U.S.C. §1546(a) establishes criminal penalties for anyone who "knowingly makes under oath or as permitted under penalty of perjury under section 1746 of title 28, United States Code, knowingly subscribes as true, any false statement with respect to a material fact in any application, affidavit, or other document required by the immigration laws or regulations prescribed thereunder, or knowingly presents any such application, affidavit, or other document which contains any such false statement or which fails to contain any reasonable basis in law or fact."

the alleged fraud is aimed at a third party, such as the government, the plaintiff injured by the fraud

need not show his own reliance. For example, in a case quite similar to this one, *Systems*

*Management, Inc v. Loiselle,* 303 F.3d 100, 103-104 (1st Cir. 2002), a janitorial service sent false

promises through the mail to Massachusetts Bay Community College indicating that it would pay the

prevailing wage to its workers if it were awarded the contract for cleaning the college. After the

contract was awarded, the defendant paid the workers less than the prevailing wage. The defendant

argued that the workers had no RICO claim because they were unaware of the promise to pay

prevailing wage and did not rely upon it. The First Circuit rejected that argument:

> It is true that at common law a civil action for fraud ordinarily
> requires proof that the defrauded plaintiff relied upon the deception,
> and some courts have imported this requirement into RICO actions
> where the predicate acts comprise mail or wire fraud. But RICO
> bases its own brand of civil liability simply on the commission of
> specified criminal acts – here criminal fraud – so long as they
> comprise a "pattern of racketeering activity;" and criminal fraud
> under the federal statute does not require "reliance" by anyone: it is
> enough that the defendant sought to deceive, whether or not he
> succeeded . .
>
> Perhaps there is some surface incongruity in allowing a civil RICO
> plaintiff to recover for fraudulent acts even though the same plaintiff
> could not (for lack of reliance) recover for fraud at common law. But
> Congress structured its civil remedy to allow recovery for harm
> caused by defined criminal acts, including violation of § 1341; and, as
> noted, the federal mail fraud statute does not require reliance. Thus,
> under a literal reading of RICO – the presumptive choice in
> interpretation – nothing more than the criminal violation and resulting
> harm is required.
>
> . . . Reliance is doubtless the most obvious way in which fraud can
> cause harm, but it is not the only way: Loiselle does not deny that a
> reasonably predictable consequence of his mailings was, by deceiving
> the college, to enable him to continue to underpay his workers. There
> is no good reason here to depart from RICO's literal language by
> importing a reliance requirement into RICO.

34

*Id* at 103-104

Similarly, in *Mid Atlantic Telecom Inc v. Long Distance Services Inc.*, 18 F.3d 260 (4th Cir. 1994), the Fourth Circuit upheld a RICO claim in which Mid-Atlantic Telecom, a reseller of long-distance telephone service, alleged that a competitor fraudulently billed its customers for extra minutes not used so as to be able to offer lower basic rates and steal Mid-Atlantic's customers. Even though Mid-Atlantic was not the recipient of the fraudulent billings and clearly did not rely on them, the court held that Mid-Atlantic could pursue its RICO claim if it could show that the fraudulent billings were purposefully devised to harm Mid-Atlantic.

In *Phoenix Bond v. Bridge*, 477 F.3d 928 (7th Cir 2007), regular bidders at a county's auctions of tax liens brought RICO claims against a competitor alleging that the competitor had engaged in a pattern of mail fraud by lying to the county about its violating the county's single-bid-per-parcel rule. The Seventh Circuit reversed the district court's dismissal of the claim and specifically held that the plaintiff bidders did not have to be the direct recipients of the fraudulent statements to bring a RICO suit. In reaching that conclusion the Court observed,

> The mail fraud statute, 18 U.S.C. § 1341, defines a fraudulent *scheme,* rather than a particular false statement, as the crime. It is illegal to obtain money by a scheme that entails fraud, if use of the mail is integral to the scheme. That's why it is unnecessary to show that the false statement was made to the victim. A scheme that injures D by making false statements through the mail to E is mail fraud, and actionable by D through RICO if the injury is not derivative of someone else's. So we held in both *In re EDC, Inc.,* 930 F.2d 1275, 1279-80 (7th Cir.1991), and *Israel Travel Advisory Service, Inc v. Israel Identity Tours, Inc.,* 61 F.3d 1250, 1257 (7th Cir.1995), and we see no reason to change course.
>
> . . . Defendants say that Phoenix Bond and BCS Services are not in the zone of interests protected by the mail fraud statute because they

35

weren't taken in by any false statement. That's just a different take on
the proposition that only recipients of the untruth have a remedy.

*Id* at 932-933.

Finally, in *Rodriguez v. McKinny*, 878 F. Supp. 744 (E.D. Pa. 1995), the court upheld a RICO

claim by a class of vocational school students against a proprietary school owner. The students

alleged that the owner's fraudulent certification to the Department of Education of the school's

eligibility for guaranteed student loans proximately caused injury to the students by causing them to

incur substantial loan debt while receiving worthless training at the school. *See also Trautz v.*

*Weisman*, 819 F. Supp. 282 (S.D.N.Y. 1993)(upholding RICO claims against nursing home which

alleged fraud on government licensing agency that allowed defendant to exploit patients in the

home). *In re Orthopedic Bone Screw Products Liability Litigation,* 159 F.3d 817, 826-828 (3rd Cir.

1998) (in common law fraud action, "the mere fact that the fraudulent misrepresentation was made to

[a federal agency] and not to the plaintiffs does not necessarily preclude a finding of legally

sufficient causation").

Thus in the context of this case, where Plaintiff alleges injuries were caused by violations of

18 U.S.C. § 1546(a) and mail and wire fraud directed at the government, neither the Plaintiff nor the

individual class members need prove individual reliance on the representations made to the

government. Even if it is necessary to prove that DOL relied on Defendants' misrepresentations, that

can easily be shown on a class wide basis by virtue of the fact that DOL recommended the visas be

approved and could not have done so if it did not believe the statements in the ETA-750 were true.

### 2.    Even If Reliance Were An Element It Would Not Defeat Class Certification

Even Defendants recognize that the "presence of individual [reliance] questions do not *per se* rule out a finding of predominance." *In re Prudential Ins. Co. Of Am. Sales Practices Litigation,* 148 F.3d 282, 315 (3rd Cir. 1998). In *Prudential*, the Third Circuit affirmed the district court's ruling that "reliance is an issue secondary to establishing the fact of defendant's liability," particularly where "most of the plaintiffs' claims do not even involve a reliance element, including their claim for breach of contract . . . and unjust enrichment." *Id* at 314-315. *See also* 1 Newburg § 4.26 at 4-104 ("Challenges based on . . . reliance have usually been rejected and will not bar predominance satisfaction because [reliance pertains] to the right of a class member to recover in contrast to underlying common issues of the defendant's liability.") This reasoning applies with equal, if not greater, force to the instant case.

Here, as in *Prudential,* reliance is not an element of Plaintiff's breach of contract and unjust enrichment causes of action, nor is it an element in his RICO claim arising out of fraudulent statements to DOL. The issue of reliance will arise, if at all, only with respect to false statements in the Employer Disclosure Affidavits given to workers in Mexico, and even then it would only arise for the 21 class members who, like Plaintiff, received Disclosure Affidavits that offered a higher wage rate than the ETA-750.[21] Moreover, even as to those individuals, the question of reliance would only arise "as an issue secondary to establishing the fact of defendant's liability,"*id* at 314-315. The Court would first have determine the primary RICO liability questions in Plaintiff's favor, questions which involve a host of common issues, including whether the business activities of TruGreen and Great Lakes Labor constituted an "enterprise" for purposes of RICO, whether

---

[21] *See* DI ____ Attachment 4 (showing rates disclosed in disclosure affidavit) and Attachment 3 (showing prevailing wage required by ETA-750). The remaining class members

TruGreen's activities in operating that enterprise constituted visa, mail and wire fraud, and if they did, whether those criminal violations constituted a "pattern of racketeering activity." The Court would also have to conclude that it was lawful for Defendants to offer more favorable wages in the disclosure affidavit than were offered in the ETA-750; otherwise there would be no damages arising from the false statements in the disclosure affidavits. It is only after resolving all of these antecedent liability questions in favor of the class that the issue of reliance would arise for the 21 workers promised more favorable wages in the disclosure affidavits. As in *Prudential,* the common questions so vastly outweigh the possibility that a handful of class members might have to testify as to reliance that class certification remains appropriate. This is not a case where each of thousands of class members will have to testify individually about their reliance; testimony by 21 workers is not unmanageable even if it were to become necessary.

Alternatively, the Court could avoid the potential testimony of 21 class members simply by limiting the RICO class claims to those arising from the fraudulent ETA-750. In so doing, no questions of individual reliance would arise for any class member, as the claims based on fraudulent statements to DOL in the ETA-750 do not require a showing of reliance. *See supra.* The handful of class members who might have slightly higher RICO damages based on the false representations in the individual disclosure affidavits could decide when they received the class notice whether the exclusion of RICO claims based on the fraudulent disclosure affidavit was sufficiently important to justify opting-out of the action.

### D.    Class Treatment Is Superior

Defendants' argument that class treatment is not the superior way to litigate Plaintiff's claims

---

were offered high wages through the ETA-750.

is based on their erroneous conclusion that individual issues predominate. As demonstrated above, that is not the case. Plaintiff's contract action asserts that Defendants are contractually bound by the promises they made in their ETA-750 visa application, and his unjust enrichment claim asserts that, even if Defendants are not contractually bound by the wage promises in the ETA-750, they are bound by those promises as a matter of equity/quasi-contract. Those liability issues will be resolved on a class-wide basis in light of the intended purposes behind the government's ETA-750 form and the H-2B visa application process. No individual issues are presented. Similarly, Plaintiff's RICO claim presents common questions because it is entirely based on the actions of Defendants. Because the claim asserts that the class members are the victims of Defendants' fraud on the Government, individual reliance need not be shown. Nor have Defendants asserted any other individual issues that would stand in the way of class certification.

Defendants' complaint that Plaintiff has not demonstrated why individual resolution of the claims is inferior to a class action is simply not true. As explained in Plaintiff's opening brief, all four of the criteria listed in Rule 23(b)(3) suggest that class certification is the superior method of adjudicating this controversy: Courts have long recognized that low-wage workers like the class members in this case have no ability or resources to pursue individual actions and that to deny class treatment is effectively to preclude workers from obtaining relief. *Recinos-Recinos v. Express Forestry, Inc.*, 233 F.R.D. 472, 477-482 (E.D. La. 2006) (certifying Rule 23 class of 300 H-2B workers who, *inter alia*, were not paid prevailing wages as required by DOL and noting that workers' foreign residence and lack of resources makes individual claims impractical); *Figueroa Cardona v. Sorrells Bros. Packing Co.*, 2007 WL 672303 (M.D. Fla. 2007) (finding class treatment of claim by H-2A workers that they were paid less than the DOL mandated wage rate was superior to other

methods of adjudication because workers "would likely not be able to bring their own actions based on their permanent homes being in Mexico, lack of proficiency in the English language, indigent status, and the small amount of individual recovery"); *Silva-Arriaga v. Texas Exp., Inc.*, 222 F.R.D. 684, 691 (M.D. Fla. 2004) ("Given their limited English skills and limited understanding of the legal system, along with the fact that few live permanently within the Middle District of Florida, it is highly unlikely that the individual plaintiffs would pursue this litigation if class certification were not allowed"); *Alfred v. Okeelanta Corp.*, 1991 WL 177658 (S.D. Fla. 1991) (certifying class action by U.S. sugarcane planters for equal treatment under H-2A contracts and noting "[i]n a case such as this involving questions common to the employment of domestic migrant farm workers the class device is the most efficient and fair method for adjudicating this claim.    The only other alternative is joinder of all class members or the filing of separate farmworker claims, both of which present manageability problems and thwart, rather than achieve, economies of time, effort and expense."). There is no other litigation that certification of a class in this case would interfere with, and concentrating the litigation in Delaware where Defendant TruGreen is organized makes this a reasonable forum for resolving the issues. Finally, there are no manageability problems that would counsel against class treatment. As noted above, there are no relevant variations in state law to complicate the case. As noted above and in Plaintiff's opening brief, similar class actions by large groups of workers seeking to enforce the wages mandated by DOL's visa application process have been litigated without management difficulties

## CONCLUSION

For all of the foregoing reasons, Defendants' objections to class certification are without merit and Plaintiff's motion for certification should be granted.

Respectfully submitted,

*/s/ Vivian L. Rapposelli*
Vivian L. Rapposelli (DE Bar #: 3204)
Rapposelli & Gonzales
1300 Grant Ave., Suite 100
Wilmington, Delaware 19806
Tel: 302-652-8711

Edward Tuddenham
Tx Bar No. 20282300
272 W. 107th St. #20A
New York, New York 10025
Tel: 212-866-6026

ATTORNEYS FOR PLAINTIFF

| Weekending | Total Hours | Gross Pay ($450 Base) Base + Commission | Total Hours | Straight $10.00 | Overtime $15.00 | Gross Pay | HOUSING ACT | HOUSING PRO |
|---|---|---|---|---|---|---|---|---|
| 3/20/2004 | 14 | | 14 | $140.00 | N/A | | $60 | $101.25 |
| 3/27/2004 | 54 | | 54 | $400.00 | $210.00 | | $60 | $101.25 |
| 4/3/2004 | 58.5 | | 58.5 | $400.00 | $277.50 | | $60 | $101.25 |
| 4/10/2004 | 66 | | 66 | $400.00 | $240.00 | | $60 | $101.25 |
| 4/17/2004 | 54.25 | | 54.25 | $400.00 | $213.75 | | $60 | $101.25 |
| 4/24/2004 | 61.5 | | 61.5 | $400.00 | $322.50 | | $60 | $101.25 |
| 5/1/2004 | 55.25 | | 55.25 | $400.00 | $228.75 | | $60 | $101.25 |
| 5/8/2004 | 55.5 | | 55.5 | $400.00 | $232.50 | | $60 | $101.25 |
| 5/15/2004 | 61.25 | | 61.25 | $400.00 | $318.75 | | $60 | $101.25 |
| 5/22/2004 | 58.25 | | 58.25 | $400.00 | $273.75 | | $60 | $101.25 |
| 5/29/2004 | 65 | | 65 | $400.00 | $375.00 | | $60 | $101.25 |
| 6/5/2004 | 52.5 | | 52.5 | $400.00 | $187.50 | | $60 | $101.25 |
| 6/12/2004 | 40 | | 40 | $400.00 | N/A | | $60 | $101.25 |
| 8/19/2004 | 55.75 | | 55.75 | $400.00 | $236.25 | | $60 | $101.25 |
| 8/26/2004 | 60.5 | | 60.5 | $400.00 | $307.50 | | $80 | $101.25 |
| TOTALS | | $8,565.63 | | | | $3,163.75 | $900.00 | $1,518.75 |

TRU0027

| Weekending | Total Hours | Gross Pay ($465 Base) Base + Commission | Total Hours | Straight $10.00 | Overtime $15.00 | Gross Pay | Total Hours | Straight $11.25 | Overtime $16.87 | Gross Pay | Total Hours | Straight $11.34 | Overtime $17.01 | Gross Pay |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3/20/2004 | 14 | | 14 | $140.00 | N/A | | 14 | $157.50 | N/A | | 14 | $158.76 | N/A | |
| 3/27/2004 | 54 | | 54 | $400.00 | $210.00 | | 54 | $450.00 | $236.18 | | 54 | $453.60 | $238.14 | |
| 4/3/2004 | 58.5 | | 58.5 | $400.00 | $277.50 | | 58.5 | $450.00 | $312.10 | | 58.5 | $453.60 | $314.69 | |
| 4/10/2004 | 58 | | 58 | $400.00 | $240.00 | | 58 | $450.00 | $283.92 | | 58 | $453.60 | $272.16 | |
| 4/17/2004 | 54.25 | | 54.25 | $400.00 | $213.75 | | 54.25 | $450.00 | $240.40 | | 54.25 | $453.60 | $242.39 | |
| 4/24/2004 | 61.5 | | 61.5 | $400.00 | $322.50 | | 61.5 | $450.00 | $382.71 | | 61.5 | $453.60 | $357.72 | |
| 5/1/2004 | 56.25 | | 56.25 | $400.00 | $228.75 | | 56.25 | $450.00 | $267.27 | | 56.25 | $453.60 | $269.40 | |
| 5/8/2004 | 55.5 | | 55.5 | $400.00 | $232.50 | | 55.5 | $450.00 | $261.49 | | 55.5 | $453.60 | $263.66 | |
| 5/15/2004 | 61.25 | | 61.25 | $400.00 | $318.75 | | 61.25 | $450.00 | $358.49 | | 61.25 | $453.60 | $361.46 | |
| 5/22/2004 | 58.25 | | 58.25 | $400.00 | $273.75 | | 58.25 | $450.00 | $307.88 | | 58.25 | $453.60 | $310.43 | |
| 5/29/2004 | 65 | | 65 | $400.00 | $375.00 | | 65 | $450.00 | $421.75 | | 65 | $453.60 | $425.26 | |
| 6/5/2004 | 52.5 | | 52.5 | $400.00 | $187.50 | | 52.5 | $450.00 | $210.88 | | 52.5 | $453.60 | $212.63 | |
| 6/12/2004 | 40 | | 40 | $400.00 | N/A | | 40 | $450.00 | N/A | | 40 | $453.60 | N/A | |
| 6/19/2004 | 55.75 | | 55.75 | $400.00 | $236.25 | | 55.75 | $450.00 | $265.70 | | 55.75 | $453.60 | $267.91 | |
| 6/26/2004 | 60.5 | | 60.5 | $400.00 | $307.50 | | 60.5 | $450.00 | $345.84 | | 60.5 | $453.60 | $348.71 | |
| TOTALS | | $9,555.63 | | | | $3,163.76 | | | | $10,349.11 | | | | $10,395 |

TRU0028

Westlaw.

Not Reported in F.Supp.          FOR EDUCATIONAL USE ONLY                                                Page 1
Not Reported in F.Supp., 1991 WL 177658 (S.D.Fla.), 119 Lab.Cas. P 35,499
**(Cite as: 1991 WL 177658 (S.D.Fla.))**

**H**

United States District Court, S.D. Florida
Resilien ALFRED et al., Plaintiffs,
v.
OKEELANTA CORPORATION, Defendant
**No. 89-8285-CIV-RYSKAMP.**

April 16, 1991.

JOHNSON, United States Magistrate Judge.

*1 This Cause is before the Court on plaintiff's Motion for Class Certification (Docket Entry 19 in 89-8250-CIV-RYSKAMP and Docket Entry 16 in 89-8285-CIV-RYSKAMP). [FN1] The matter was referred to the undersigned United States Magistrate on November 9, 1989 by the Honorable Kenneth L. Ryskamp, United States District Judge for the Southern District of Florida and became ripe for judicial review on May 18, 1990 upon receipt of the plaintiffs' Findings of Fact and Conclusions of Law under plaintiffs' Motion for Class Certification.

Background

On September 13, 1989 the United States District Court entered an order consolidating *Amilcar, et al. v. Okeelanta Corporation,* Case No. 89-8285- CIV-NESBITT (concerning nine plaintiffs employed during the 1987-88 planting season) with *Alfred, et al. v. Okeelanta Corporation,* Case No. 89-8250-CIV-RYSKAMP (concerning twenty three (23) plaintiffs employed during the 1988-89 planting season). Prior to the aforestated consolidation, plaintiffs in each of the two cases filed separate Motions for Class Certification. As a result of the foregoing consolidation, the within Report and Recommendation shall address both Motions and all supplements thereto simultaneously.

Plaintiffs are thirty two (32) domestic seasonal farm workers employed by defendant, the Okeelanta Corporation ("Okeelanta"), as sugar cane planters during the 1987-88 and/or 1988-89 planting season(s). In both three count Complaints plaintiffs allege violations of the Migrant and Seasonal Agricultural Worker Protection Act, 29 U.S.C. § 1801 *et seq* ("AWPA").

By their Motion plaintiffs seek certification of a class composed of:

All U.S. workers who were employed by the Okeelanta Corporation as sugar cane planters during the [1987-88 and 1988-89] planting season[s]

Plaintiffs further request the certification of two subclasses, one for each season. As the practices complained of allegedly occurred in both seasons the following analysis applies to both the proposed class and to each proposed subclass.

Oral argument was held on this issue on March 8, 1990, at which time each party was informed that any facts upon which they wished to rely must be introduced into evidence during the hearing as suggested by *Ezell v. Mobile Housing Board,* [32 EPD ¶ 33,727] 709 F.2d 1376 (11th Cir.1983)

Findings of Fact
Plaintiffs are domestic seasonal farm workers within the meaning of 29 U.S.C. § 1802(10)(A) employed by the Okeelanta Corporation as sugar cane planters.

Defendant Okeelanta Corporation is a corporation organized under the laws of Delaware. At all times pertinent hereto, Okeelanta acted as an agricultural employer within the meaning of 29 U.S.C. § 1802(2)

This consolidated action consists of twenty three (23) domestic farm workers employed by Okeelanta during the 1988-89 planting season and nine (9) domestic farm workers employed by Okeelanta as planters during the 1987-88 planting season

*2 In their complaints plaintiffs allege that Okeelanta intentionally violated various provisions of the Migrant and Seasonal Agricultural Worker Protection Act, 29 U.S.C. § 1801, *et seq*

Among the violations complained of are Okeelanta's failure to pay the three-fourths guarantee and failure to provide a copy of the clearance order to any domestic worker. Further, the plaintiffs contend Okeelanta treated the domestic workers less favorably than the H-2A workers by: guaranteeing a higher hourly wage to H-2A workers; providing written contracts to H-2A workers and not to U.S workers; employing H-2A workers after many U.S. workers had been terminated; and by providing end of season bonuses in the amount of 6% of gross wages to H-2A workers and not to U.S. workers

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F. Supp.                    FOR EDUCATIONAL USE ONLY                                    Page 2
Not Reported in F Supp., 1991 WL 177658 (S D.Fla.), 119 Lab.Cas. P 35,499
**(Cite as: 1991 WL 177658 (S.D.Fla.))**

Also alleged is that Okeelanta provided false and misleading information to domestic workers regarding the terms and conditions of employment This was purportedly accomplished by Okeelanta's failure to provide plaintiffs with copies of the clearance order. Instead, some of the plaintiffs were allegedly given a separate document, the Agricultural Day-Haul Checklist by the Florida Job Service, which stated differing dates of employment, omitted any reference to the three-fourths guarantee and did not disclose the bonus. Finally, plaintiffs allege that defendant intentionally failed to provide itemized wage statements showing the basis on which wages were paid and the number of piece units earned in violation of the AWPA.

During the 1987-88 planting season eight hundred ninety three (893) domestic workers were employed by Okeelanta as planters. During the 1988-89 planting season six hundred eighty six (686) domestic workers were employed by Okeelanta as planters. During both the 1987-88 planting season and the 1988-89 planting season Okeelanta also employed H-2A workers to plant sugar cane. The H-2A workers are foreign workers granted temporary non-resident visas to perform agricultural employment in the United States pursuant to 8 U.S.C. § 1188

Under the H-2A program, authorized by the Immigration and Nationality Act of 1952, 8 U.S.C. § 1101, *et seq.* (1988), as amended by the Immigration Reform and Control Act of 1986, Pub.L. No. 99-603, 106 Stat. 3359 (1986), the Attorney General may issue visas to foreign workers for temporary or seasonal work provided that the Secretary of Labor certifies that U.S. workers are unavailable to fill job openings, and that the employment of foreign workers will not adversely affect the wages and working conditions of similarly employed U.S workers. 8 U.S.C. § 1188(a)(1)(1988).

As a condition of certification for the use of H-2A workers, Okeelanta was required to test the availability of U.S. workers by circulating job offers through the employment service system, a federal-state job referral system administered by the Department of Labor's (D.O.L.) Employment and Training Administration, which job offers were required to meet the criteria set forth in 20 C.F.R. § 655.102

**\*3** In October, 1987, the Okeelanta Corporation through its agent, The Florida Fruit and Vegetable Association, placed what is known as an Agricultural and Food Processing Clearance Order with the Florida Department of Labor and Employment Security requesting that sugar cane planters be referred to the company through the Job Service System. A similar Clearance Order was placed requesting workers for the 1988-89 season [FN2]

All domestic sugar cane planters for the 1987-88 and 1988-89 planting seasons, including the plaintiffs were recruited under the Clearance Orders.

The Clearance Orders specifically represented that they described the actual terms and conditions of employment being offered and contained all the material terms and conditions of the job. The Clearance Orders also set forth the anticipated period of employment, the guarantee of work for the three-fourths of the contract period, known as the "Three-Fourths guarantee", established the rate of pay, promised that all workers would receive a copy of the applicable Clearance Order upon his arrival at the place of employment, and contained an assurance that the employer would comply with all of the requirements of 20 C.F.R. § 655 which includes a provision prohibiting the preferential treatment of H-2A workers over U.S. workers

The 1987-88 Clearance Order deals with both those workers hired for purposes of sugar cane cutting and those workers hired for purposes of sugar cane dropping. The 1988-89 Clearance Order deals with only those workers hired for purposes of sugar cane dropping

On the lead page of the 1987-88 Clearance Order (U S Department of Labor Form ETA 790 replacing Form MA 7-90) the "anticipated period of employment" is stated to be from October 26, 1987 to March 17, 1988. On page 2 of 4, paragraph 9c of the Clearance Order it states that cane dropping is "expected to end on or about January 12, 1988." The lead page of the 1987-88 Clearance Order also states that sugar cane planters are guaranteed a flat rate minimum of $4.66 per hour and a piece rate minimum of $7.00 per half mile row.

On October 30, 1987 Walter Kates, Manager/Labor Division, Florida Fruit and Vegetable Association on behalf of Okeelanta wrote to the D.O.L. amending the original application for classification of cane droppers. That amendment contained the following:

Item 5: Please add the following language: "The period of work for farm workers; field crop or sugar cane 'dropping is from October 26, 1987 to approximately January 12, 1988. Upon completion

Not Reported in F.Supp.                    FOR EDUCATIONAL USE ONLY                                    Page 3
Not Reported in F.Supp., 1991 WL 177658 (S.D.Fla.), 119 Lab.Cas. P 35,499
(Cite as: 1991 WL 177658 (S.D.Fla.))

of the planting activity, workers will be given the opportunity for full time work as harvest workers, field crop (sugar cane cutters) until the end of the season or approximately March 17, 1988.

That same letter also provided for a correction of the "$7.00 per half mile row" to "$7.20 per half mile row."

On the lead page of the 1988-89 Clearance Order (U.S. Department of Labor form ETA 790 replacing form MA 7-90) the "anticipated period of employment" is stated to be from October 14, 1988 to January 20, 1989. The lead page of the 1988-89 Clearance Order also states that sugar cane planters are guaranteed a flat rate minimum of $4.91 per hour and a piece rate minimum of $7.20 per half mile row.

*4 The Clearance Orders set forth only the anticipated period of employment. The employment need not begin or end on exactly the date specified in order to be consistent with the terms and conditions of the Clearance Orders.

At the time of the recruitment, some plaintiffs were provided an "agricultural day work checklist" ("Checklist") prepared by the Florida State Employment Service pursuant to a recruiting agreement between it and Okeelanta.

The 1987-88 Checklist represents the period of employment as being from "approximately October 14, 1987 to February 1, 1988." The guaranteed hourly wage is stated as being $3.35 and the half mile row rate is stated as being $7.00.

The 1988-89 Checklist represents the period of employment as being from September 26, 1988 to February 1, 1989. The guaranteed hourly wage is stated as being $4.91 and the half mile row rate is stated as being $7.20.

Okeelanta, through its agent, the Florida Fruit and Vegetable Association, ran newspaper advertisements in the Belle Glade Sun on September 15, 1988, the Clewiston News on September 18, 1988, and the Palm Beach Post on September 19, 1988 which represented that sugar cane planters would receive a guaranteed hourly wage of $4.91 and a half mile row rate of $7.20. All of these newspaper advertisements represented that the job started "on or about January 10, 1989" and with the exception of the Palm Beach Post stated that the job ended "on or about January 10, 1989." The Palm Beach Post represented that the job "end[ed] January 10, 1989."

The farming of sugar cane is divided into two categories, sugar cane dropping or planting and sugar cane cutting or harvesting. The planting operation is centered around a nine person crew of workers. Eight of these workers are referred to as "planters" or "droppers". The group of eight planters plants four rows at a time and are paid $7.20 per half mile row. The money earned by the group is divided equally among the eight. The ninth crew member is a "field walker" who supervises the work of the planters. The field walker is paid on an hourly basis.

Plaintiffs Alphonse Amilcar, Lucien Celene, Marie Delille, Jules Richemond, and Rosile Joseph planted sugar cane during the pay period ending October 25, 1987.

Plaintiffs Jean Louise Iresalus, Pasteur Limose, Francois Jean-Louis, and Lavana Meide planted sugar cane during the pay period ending November 1, 1987.

Plaintiffs David Noel, Celesson Jeune, and Bertholet Desir planted sugar cane during the pay period ending October 23, 1988.

Plaintiff Jean Victor planted sugar cane during the pay period ending November 6, 1988.

Plaintiffs Mepricia Desir, Marie Pierre, Anonce St. Fort, and Theresa Victor planted sugar cane during the pay period ending November 10, 1988.

Plaintiffs Resilien Alfred, Jeune Derillon, and Claude Fleusinord planted sugar cane during the period ending December 4, 1988.

Plaintiffs Lebon Michaud and Jean Voltaire planted sugar cane during the pay period ending December 11, 1988.

*5 Plaintiffs Amelica Baptiste, Noe Doreclin, Marie Fenelon, Willie Jean, David Riche, Isaac Sale, and Jean Silverain planted sugar cane during the pay period ending December 18, 1988.

On each of the check stubs furnished plaintiffs, the hours worked by the plaintiffs during the pay period are identified as "gross units."

During the 1983-84, 1984-85, 1985-86, and 1986-87 planting seasons, the Okeelanta Corporation provided sugar cane droppers with written statements for each pay period showing the number of piece work units

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                    FOR EDUCATIONAL USE ONLY                                         Page 4
Not Reported in F.Supp., 1991 WL 177658 (S.D.Fla.), 119 Lab.Cas. P 35,499
**(Cite as: 1991 WL 177658 (S.D.Fla.))**

earned.

None of the check stubs furnished plaintiffs and the other sugar cane planters during the 1987-88 and 1988-89 planting seasons included Okeelanta Corporation's employer identification number assigned by the Internal Revenue Service.

Plaintiffs' were not provided a copy of the Clearance Order upon their arrival at the job site or anytime thereafter.

### Legal Analysis

Fed.R.Civ.P., Rule 23 governs the certification and maintenance of class actions. Under Rule 23, plaintiffs must initially satisfy each of the four threshold requirements of Rule 23(a):

(1) the class must be so numerous that joinder of all members is impracticable;

(2) questions of law or fact common to the class must exist;

(3) the claims or defenses of the representative parties must be typical of the claims or defenses of the class; and

(4) the representative parties must fairly and adequately protect the interests of the class.

Plaintiffs seeking to represent the class bear the burden of establishing that all four requirements have been met. _Kirkpatrick v. J.C. Bradford & Co._, 827 F.2d 718, 721 n. 2 (11th Cir.1987), _cert. denied_, 485 U.S. 959 (1988); _see also Plekowski v. Ralston Purina Co._, 68 F.R.D. 443, 452 (M.D.Ga.1975), _appeal dismissed_ 557 F.2d 1218 (5th Cir.1977); _Bertrand v. Jorden_, Case No. 85-918, slip op. M.D.Fla.1986. These prerequisites are mandatory and the failure to establish any one is fatal to a motion for class certification, _id._

Once the requirements of Rule 23(a) have been satisfied plaintiffs must then demonstrate that the action sought to be certified falls within one of the categories set forth in Rule 23(b). _Kirkpatrick,_ 827 F.2d at 721 n. 2. In this case plaintiffs seek to apply Rule 23(b)(3) which provides for class certification where:

the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other

available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interests of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

**\*6** As stated by the Supreme Court in _General Telephone Co. of Southwest v. Falcon,_ 457 U.S. 147, 161 (1982), a class action "may only be certified if the trial court is satisfied after a rigorous analysis that the prerequisites of Rule 23(a) have been satisfied." _Id._ This Court has engaged in such an analysis and consistent with the 11th Circuit's ruling in _Ezell v. Mobile Housing Board,_ 709 F.2d 1376 (11th Cir.1983), has relied upon the pleadings filed by the parties, the evidence of record and the oral testimony and documentary evidence submitted during the hearing on class certification.

Okeelanta challenges class certification arguing that plaintiffs have failed to meet at least four of the requirements necessary for class treatment, namely, that they can "fairly and adequately protect the interests of the class" (Rule 23(a)(4)), that their claims are "typical" of the claims of the class (Rule 23(a)(3)), that "the class is so numerous that joinder of all members is impracticable" (Rule 23(a)(1)), and finally, that the class action is "superior" to other methods of adjudication (Rule 23(b)(3)). Also challenged is plaintiff's individual standing to raise their claims. Although Okeelanta raises only these points of argument, the plaintiff's burden is to show that all other prerequisites of Rule 23 have been met. For the following reasons this Court finds that such showing has been made and shall discuss the application of each of the required elements in turn.

#### A) _The Threshold Requirement of Standing has been Met_

Prior to the consideration of the criteria set forth in Rule 23, the court must first find that the named plaintiffs have individual standing to raise their claims. _Griffin v. Dugger_ [44 EPD ¶ 37,334] 823 F.2d 1476, 1482 (11th Cir.1987), _cert. denied_ [47 EPD ¶ 38,175] 406 U.S. 1005 (1988); _Brown v. Sibley,_ [26 EPD ¶ 31,985] 650 F.2d 760, 771 (5th Cir.1981). Thus, "[o]nly after the court determines

Not Reported in F Supp.         FOR EDUCATIONAL USE ONLY                    Page 5
Not Reported in F Supp., 1991 WL 177658 (S.D.Fla.), 119 Lab.Cas. P 35,499
(Cite as: 1991 WL 177658 (S.D.Fla.))

the issues for which the named plaintiffs have standing should it address the question whether the named plaintiffs have representative capacity, as defined by Rule 23(a), to assert the rights of others." *Griffin,* 823 F.2d at 1482. After a review of the pleadings filed in this case, the parties submissions during oral argument and all other evidence of record this court finds the requisite standing requirements met.

In order to meet their burden plaintiffs "must allege and show that they personally suffered injury" *Griffin,* 823 F.2d at 1482; *see also Payne v. Travenol Laboratories, Inc.,* [17 EPD ¶ 8383] 565 F.2d 895, 898 (5th Cir.1978), *cert. denied,* [17 EPD ¶ 8604A] 439 U.S. 835 (1978). If plaintiffs cannot show personal injury, no case or controversy exists, and a federal court is powerless to hear their grievance *Griffin,* 834 F.2d at 1483. "Moreover, it is not enough that a named plaintiff can establish a case or controversy between himself and the defendant by virtue of having standing as to just one of many claims he wishes to assert. Rather, each claim must be analyzed separately, and a claim cannot be asserted on behalf of a class unless at least one named plaintiff has suffered an injury that gives rise to that claim." *Id*

*7 Count I of plaintiffs' Complaint filed in Case No 89-8285-CIV-NESBITT, (the "Amilcar Complaint") alleges a claim under the AWPA for Okeelanta's violation of the terms of their working arrangement, *i e* Okeelanta's failure to abide by the terms and conditions set forth in the 1987- 88 Clearance Order. The violations alleged consist of plaintiff's termination prior to the end of the period of employment specified in the Clearance Order, defendant's failure to provide plaintiffs with the three fourths guarantee, defendant's failure to furnish plaintiffs with a copy of the Clearance Order upon their arrival at the place of employment and the defendants treatment of plaintiffs as less favorable than that visited upon the H-2A workers. This discriminatory treatment purportedly consisted of the H-2A workers having been guaranteed a higher minimum wage, [FN3] having been provided individual written contracts whereas the U.S workers were not, and having continued to be employed after many U.S workers had been terminated. Count I of the Amilcar Complaint is identical to Count I of plaintiffs' Complaint filed in Case no 89-8250-CIV-RYSKAMP (the "Alfred Complaint") except that the Clearance Order at issue in the latter is the 1988-89 Clearance Order and added to the violations alleged is that defendant treated plaintiffs less favorably than

the H-2A workers by not providing them with end of season bonuses like were provided the H-2A workers.

Count II of both the Amilcar and the Alfred Complaint are identical. In that count plaintiffs allege violations of § 1831(c) of the AWPA for Okeelanta's failure to provide itemized wage statements containing all the information required by that section. Specifically, plaintiffs allege that Okeelanta failed to furnish plaintiffs, on or before each payday, information regarding the hours of employment which were offered or the daily or weekly piece rate units produced and incorrectly identified the hours actually worked by plaintiffs as units produced, all in violation of 20 C.F.R. § 655.102(b)(8). It is further alleged that Okeelanta violated 29 U.S.C. § 1831(C)(2) by failing to provide the plaintiffs at each pay period with itemized written statements showing the basis on which wages were paid and the number of piece work units earned

Count III of the Amilcar and Alfred Complaints allege violations of 29 U.S.C. § 1831(e) for Okeelanta's providing of false or misleading information to plaintiffs concerning the terms and conditions or existence of agricultural employment Although both counts allege violations of the same provision, the specific violations alleged in some respects, differ. Count III of both Complaints allege that at the time of their recruitment, many plaintiffs were provided with an agricultural day haul check list (the "Checklist") prepared by the Florida State Employment Office pursuant to an agreement between it and Okeelanta. The Alfred Complaint alleges that the checklist incorrectly represented the period of employment as being from September 26, 1988 to February 1, 1989 rather than the period from October 14, 1988 to January 20, 1989 stated in the Clearance Order. The Alfred Complaint further alleges that Okeelanta, through its agent the Florida Fruit and Vegetable Association, ran newspaper advertisements during the recruitment period which stated that the job started "on or about October 14, 1988" and ended "about January 10, 1989," contrary to the January 20, 1989 ending date specified in the Clearance Order.

*8 Count III of the Amilcar Complaint alleges that the Checklist materially differed from the terms and conditions described in the Clearance Order by its representation that the period of employment was from October 14, 1987 to February 2, 1988 instead of the period from October 26, 1987 to January 12,

© 2006 Thomson/West No Claim to Orig U S Govt Works.

Not Reported in F.Supp.                    FOR EDUCATIONAL USE ONLY                                    Page 6
Not Reported in F.Supp., 1991 WL 177658 (S.D.Fla.), 119 Lab.Cas. P 35,499
(Cite as: 1991 WL 177658 (S.D.Fla.))

1988, stated in the Clearance Order. The Amilcar plaintiffs further allege that the checklist represented that droppers would be paid $7.00 per 1/2 mile role rather than the $7.20 per 1/2 mile row rate approved by the Department of Labor and that planters would be guaranteed $3.35 rather than $4.66 as guaranteed by the Clearance Order. Further, the checklist purportedly did not describe the three-fourths guarantee. Finally, the Amilcar plaintiffs allege that Okeelanta, through its agent, the Florida Fruit and Vegetable Association, ran newspaper advertisements which represented that the workers would be paid $7.00 per 1/2 mile row instead of the $7.20 per 1/2 mile row rate approved by the Department of Labor.

After a review of the evidence, this court is satisfied that at least one named plaintiff has suffered an injury that gives rise to each claim. This alone is sufficient to confer standing. *Griffin*, 823 F.2d at 1483. Okeelanta challenges the plaintiffs standing by claiming they were not injured by the defendants' conduct. Okeelanta's position in this regard is simply unfounded. The injuries complained of are tangible ones stemming from statutory violations of the AWPA and the Wagner-Peyser regulations. As a result of these alleged violations plaintiffs suffered monetarily by being denied the bonus and three-fourths guarantee to which they claim entitled and suffered a deprivation of their rights by not receiving the proper wage receipts and being treated less favorably than H-2A workers. As an agricultural employer within the meaning of the AWPA, it cannot be disputed that Okeelanta stands as the cause of plaintiff's alleged injuries. As seasonal farm workers within the meaning of the AWPA and domestic workers recruited under the Clearance Order the plaintiffs are without a doubt the persons protected by the statutory provisions and thus the proper parties to allege injury as a result of their violation. Consequently, plaintiffs' standing is established by their membership in the class of sugar cane planters recruited under the Clearance Order.

Accordingly, the named plaintiffs, all falling within subgroups of the proposed class, have clearly alleged and shown injury as a result of defendants actions. Okeelanta concedes that plaintiffs are seasonal farm workers within the meaning of the AWPA and that at all times pertinent, Okeelanta acted as an agricultural employer thereby entitling plaintiffs to protection of the Act. Among plaintiffs asserted injuries are defendants' failure to pay the three-fourths guarantee, the bonus and to provide proper wage receipts. The named plaintiffs specifically allege and show that they suffered these injuries as a result of defendants'

actions as their employer. The fact that plaintiffs are without specific knowledge of the protection to which they are afforded under the act does not, contrary to defendants assertion, militate against a finding of standing. The AWPA is a remedial statute with the asserted purpose of eliminating the history of abuse of farm workers, a vulnerable, often illiterate unsophisticated economic group. *See* Barret v. Adams Packing, [111 LC ¶ 35,186], 867 F.2d 1305 (11th Cir.1989), *aff'd*, [114 LC ¶ 35,322] 110 S.Ct. 49 (1990). If adopted, plaintiffs position would undermine the private right of action afforded injured farm workers under the act.

**\*9** Also without merit is Okeelanta's position that plaintiffs have no standing to raise the false and misleading recruitment claim because "not one named plaintiff has suffered the injury described in Count III." Defendants' supplemental memorandum, pages 21-24. Okeelanta's argument is based solely on its conclusion that the plaintiff's allegations lack evidentiary support. Although a court may look beyond the allegations of the Complaint in determining whether a motion for class certification can be granted, an assessment of the plaintiffs likelihood of success on the merits is inappropriate. *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 160 (1982); *Kirkpatrick v. I C Bradford & Co.*, 827 F.2d at 722-733.

Finally, Okeelanta's contention that field walker plaintiffs Amilcar, Laurent, Leandre and perhaps Louis, are not "planters" and therefore do not have individual standing to maintain this action is unpersuasive. As defendant itself concedes the Department of Labor categorizes the field walker as a "member of the crew". Simply because field walkers are not one of the eight whose pay is dependent upon the performance of their other eight crew members does not, as plaintiffs would urge, mean that field walkers are not properly categorized as "planters". [FN4] In short, this Court concludes that field walkers are properly categorized as "planters for purposes of this litigation and that all named plaintiffs both individually and as a group have standing to maintain this action.

B) *Rule 23(a)(1) Requirements Have Been Met*

(1) The Subject Class Is So Numerous That Joinder Is Impracticable

Rule 23(a)(1) provides that a class action may be maintained only if "the class is so numerous that joinder of all members is impracticable. There exists

Not Reported in F.Supp.                        FOR EDUCATIONAL USE ONLY                                    Page 7
Not Reported in F.Supp., 1991 WL 177658 (S.D.Fla.), 119 Lab.Cas. P 35,499
(Cite as: 1991 WL 177658 (S.D.Fla.))

no definite numerical standard as to what size class satisfies this numerosity requirement. *Garcia v. Gloor,* [23 EPD ¶ 30,694] 618 F.2d 264, 267 (5th Cir.1980), *cert. denied,* [24 EPD ¶ 31,478] 449 U.S. 1113 (1981); *David v. Showtime/The Movie Channel Inc.,* 697 F.Supp. 752, 756 (D.C.N.Y.1988). Rather, impracticability will be gauged according to the circumstances of the particular case. *Fifth Moorings Condominium, Inc. v. Shere,* 81 F.R.D. 712, 715-716 (S.D.Fla.1979). As stated by then Chief Judge C. Clyde Atkins.

In determining whether the "numerosity" requirement for certification of a class is satisfied, the number of members is but one factor to consider; "numerosity" is tied to impracticability of joinder under specific circumstances and, therefore, the judgement as to whether a given number of members is sufficient is not susceptible to hard and fast standards.

*Id.,* see also *Cox v. American Cast Iron Pipe Co.,* [39 EPD ¶ 36,142] 784 F.2d 1546, 1553 (11th Cir.1986), *cert denied* [41 EPD ¶ 36,474] 479 U.S. 883 (1986) (Class consisting of two hundred forty members satisfied Rule 23(b)(1) requirements. The court, citing 3a Moore's Federal practice, § 23.05(1) at n.7 (1978), noted that while there is no fixed numerosity rule, "generally less than twenty one is inadequate, more than forty adequate, with numbers in between varying according to other factors." *Id* at 1553); *Johnson v. Georgia Highway Express, Inc.,* [61 LC ¶ 9355] 417 F.2d 1122 (5th Cir.1969); *Pabon v. McIntosh,* 546 F.Supp. 1328 (D.C. pa. 1982) ("Impracticability is a subjective determination based on number, expediency and inconvenience of trying individual suits." *Id.* at 1333 citing Wright & Miller, Federal Practice and Procedure: Civil 2d § 1762 )

*10 In view of the size of the proposed class, the inconvenience of proceeding as a non-class action and the nature of the case, this court finds the numerosity requirements of Rule 23(a)(1) satisfied. It is undisputed that Okeelanta employed eight hundred ninety three (893) domestic sugar cane planters in the 1987-88 planting season and six hundred eighty six (686) in the 1988-89 planting season. At the very least the size of such a class is sufficiently numerous to make their joinder inconvenient. " 'Impracticability' does not mean impossibility. It is sufficient if it is inconvenient or difficult to join all members of a class. The trial court has broad discretion to rule on whether joinder is 'impracticable.' " *Fifth Moorings Condominium,*

81 F.R.D. at 716; *see also Aquirre v. Bustos,* 89 F.R.D. 643, 647-48 (D.N.M.1981) (class consisting of between sixty and one hundred migrant farm workers satisfied the numerosity requirement). Not only would problems of management and administration be rendered extremely difficult by joinder of all absentee class members, but also likely to result would be a needless expenditure of time and resources on behalf of the parties involved and a duplication of effort by the court. Also existing would be a risk of conflicting judgments entered on identical facts.

Apart from the numbers involved, the individual attributes of the farm worker class render joinder impracticable. Included among these factors are the geographical dispersion of the individual farm workers making up the class, the limited English speaking ability of many of its members, and the lack of legal sophistication of the class. Each of these factors has contributed to findings of impracticability of joinder in farmworker related cases and are equally relevant here. *Rodriguez by Rodriguez v. Berry Brook Farms, Inc.,* [108 LC ¶ 35,025] 672 F.Supp. 1009, 1014 (W.D.Mich.1987) (geographical dispersion of migrant farm workers, lack of sophistication and reluctance of individual members to sue for fear of jeopardizing future employment in region are appropriate factors to be considered in Rule 23(a)(1) analysis); *Leyva v. Buley,* [112 LC ¶ 35,257] 125 F.R.D. 512 (E.D.Wash.1989) (joinder of fifty migrant farm workers would be extremely burdensome in view of their lack of sophistication, limited knowledge of the American legal system, limited or non-existent English skills and geographic dispersion); *Fernandez-Rogue v. Smith,* 91 F.R.D. 117, 122 (N.D.Ga.1981) (joinder impracticable where members have little knowledge of English and the American legal system).

Also militating in favor of non joinder is the relatively small amount of damages available to individual class members. As stated by the Seventh Circuit in *Swanson v. American Consumer Industries, Inc.,* 415 F.2d 1326 (7th Cir.1969), "[t]o require a multiplicity of suits by similarly situated small claimants would run counter to one of the prime purposes of a class action." *Id.* at 1333; *see also Eisen v. Carlisle and Jacqueline,* [7 EPD ¶ 9374A] 417 U.S. 156, 158 (1974) (economic reality dictates class treatment where individual claims are only seventy dollars ($70.00) each). With the foregoing concerns noted this Court finds joinder impracticable and the numerosity requirements of Rule 23(a)(1) satisfied.

Not Reported in F.Supp.              FOR EDUCATIONAL USE ONLY                          Page 8
Not Reported in F.Supp., 1991 WL 177658 (S.D.Fla.), 119 Lab.Cas. P 35,499
**(Cite as: 1991 WL 177658 (S.D.Fla.))**

(2) This Case Involves Common Questions of Law or Fact Common to the Class

**\*11** The defendant has not challenged the plaintiffs showing of commonality under Rule 23(a)(2) apparently conceding that there is a uniform course of conduct applied to all domestic sugar cane planters. Rule 23(a)(2) requires the existence of "questions of law or fact common to the class." This requirement has been liberally construed and "is aimed at determining whether there is a need for combined treatment and a benefit to be derived therefrom". *In re Asbestos School Litigation,* 104 F.R.D. 422, 428 (E.D.Pa.1984) A common question has been defined as one which arises from a "common nucleus of operative facts" regardless of whether "the underlying facts fluctuate over the class period and vary as to individual claimants." *Haywood v. Barnes,* 109 F.R.D. 568, 577 (E.D.N.C.1986), citing *Cohen v. Uniroyal Inc.,* 77 F.R.D. 685, 690-91 (E.D.Pa.1977); *see also In re Corrugated Container Antitrust Litigation,* 80 F.R.D. 244, 250 (S.D.Tex.1978). Thus, "Rule 23 does not require that all the questions of law and fact raised by the dispute be common. The claims actually litigated in the suit must simply be those fairly represented by the named plaintiffs. (citations omitted)" *Cox v. American Cast Iron Pipe Co.,* 784 F.2d at 1546; *see also Johnson v. American Credit Co. of Georgia,* 581 F.2d 526, 532 (5th Cir.1978).

Here common questions of law and fact clearly exist In the legal sense all three claims involve allegations against defendant for AWPA violations. In Counts I and III, the central legal question common to all members of the class is whether the Clearance Orders govern the terms and conditions of Okeelanta's employment of the class and if so, whether the Clearance Orders were violated. Count II involves a legal determination common to all members of the class regarding the preferential treatment of H-2A workers. Indeed, even defendants affirmative defenses to plaintiff's specific claims raise common questions of law common to the class. Among the numerous questions of fact common to all class members are whether Okeelanta ever provided payment under the three-fourths guarantee, whether plaintiffs and other putative class members were ever furnished a copy of the Clearance Order upon their arrival at the place of employment, whether H-2A workers were given bonuses above and beyond any that may have been provided to plaintiffs and other putative class members, whether plaintiffs and the proposed class were provided with pay statements in conformance with the AWPA, and finally, whether defendants intentionally misrepresented the applicable term of employment.

Thus, although not all potential members of the class worked in the identical capacity for precisely the same period of time, they all worked as "planters" during the limited harvesting seasons in two specified years and the conditions of employment were allegedly the same. Accordingly, since each member of the class alleges the same statutory violations arising out of essentially the same period of employment, the commonality requirement has been satisfied. [FN5]

(3) The Claims of the Named Class Plaintiffs are Typical of the Claims of the Class

**\*12** Rule 23(a)(3) requires that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class." A plaintiff's claim is typical if there is a nexus between the class representative's claims or defenses and the common questions of law or fact which unite the class. *Kornberg v. Carnival Cruise Lines, Inc.,* 741 F.2d 1332, 1337 (11th Cir.1984), *cert. denied,* 470 U.S. 1004 (1985) As stated by the 11th Circuit in *Kornberg,*

A sufficient nexus is established if the claims or defenses of the class and the class representative arise from the same event or pattern or practice and are based on the same legal theory. Typicality, however, does not require identical claims or defenses. A factual variation will not render a class representative's claim atypical unless the factual position of the representative markedly differs from that of other members of the class (citations omitted).

*Id.* at 1337; *see also Appleyard v. Wallace,* 754 F.2d 955, 958 (11th Cir.1985) ("Although the considerations of subsections a(2), a(3) and a(4) tend to overlap ... 'subsection a(3) primarily directs the district court to focus on whether named representatives' claims have the same essential characteristics of the class at large'.... Thus courts have found that a strong similarity of legal theories will satisfy the typicality requirement despite substantial factual differences" (citations omitted))

In the instant case the named plaintiffs claims are sufficiently "typical" of the claims of the class as a whole so as to satisfy Rule 23(a)(3) requirements The major claims of the named plaintiffs in the

Not Reported in F Supp                    FOR EDUCATIONAL USE ONLY                              Page 9
Not Reported in F Supp , 1991 WL 177658 (S D Fla ), 119 Lab Cas P 35,499
**(Cite as: 1991 WL 177658 (S D Fla ))**

putative class are directed at the recruiting, disclosure and payment practices of Okeelanta These practices affected in the same way and during essentially the same time period anyone who came to work for Okeelanta through the recruitment channels which are the subject of this case      The practices complained of remained essentially unchanged throughout the years in question and all members of the class were subject to the same allegedly unlawful actions.

Contrary to plaintiffs contention it is not necessary that each member of the class suffer precisely the same injury as the named class representatives *Appleyard v. Wallace, 754 F.2d 955, 958 (11th Cir.1985)* (for class consisting of medicaid applicants, typicality was unaffected by factual distinctions among the plaintiffs in medical conditions because these factual variations had little relevance to the requested relief); *De La Fuente v. Stokely-Van Camp, Inc.,* [98 LC ¶ 34,417] 713 F.2d 225, 232 (7th Cir.1983) (farm workers' recruitment and disclosure claims were typical even when raised for seasons in which none of the plaintiffs were employed, in action challenging the employers practices under a Clearance Order)   Here, the factual differences are of even less significance than those presented in *Appleyard* and *De La Fuente*    Although the duration of employment, to same degree, varies, the company policies under attack, the legal theories raised and the requested relief are all identical. Thus, as a practical matter, the named plaintiffs claims would appear to embody the essential, if not identical characteristics of the class at large. *Appleyard, 754 F.2d at 958; De La Fuente, 713 F.2d at 232; see also Tidwell v. Schweiker, 677 F.2d 560, 566 (7th Cir.1982), cert. denied, 461 U.S. 905 (1983)*

**\*13** Defendants reliance on *Jamerson v. Board of Trustees of Univ. of Alabama,* [27 EPD ¶ 32,248] 662 F.2d 320 (5th Cir.1981); *White v. The Gate Rubber Co.,* [4 EPD ¶ 7711] 53 F.R.D. 412, 415 (D.Colo.1971); *Thompson v. Sun Oil Co.,* [10 EPD ¶ 10,419] 523 F.2d 647 (8th Cir.1975); and *Wright v. Stone Container Corp.,* 524 F.2d 1058 (8th Cir.1975) is also misplaced   Each of those cases involved only one named plaintiff who, although purportedly speaking for the class, was unable to name one other member who had been similarly aggrieved   Here the named plaintiffs number thirty two (32) and although they can not identify with specificity others who were similarly aggrieved they can show that the same factual circumstances prevailed   Here plaintiffs have established that all members of the proposed class

were hired under the same or similar circumstances, were exposed to the same conditions of employment, and were paid in the same routine fashion   In short, the evidence presented establishes that plaintiff's claims are typical of the claims of the class thus satisfying the requirements of Rule 23(a)(3).

(4) Plaintiff's Will Fairly and Adequately Protect The Interest Of The Class

Rule 23(a)(4) requires that the named class representatives "fairly and adequately protect the interests of the class "    The underlying purpose behind this requirement is to ensure that the legal rights of absent class members is protected *Kirkpatrick, 827 F.2d at 726*    As explained by the 11th Circuit in *Kirkpatrick,*

Because all members of the class are bound by the *res judicata* effect of the judgment, a principal factor in determining the appropriateness of class certification is the 'forthrightness and vigor with which the representative party can be expected to assert and defend the interest of the members of the class.'

*Id* at 726 (citations omitted)

In determining adequacy of representation the court must first determine whether plaintiff's counsel is qualified, experienced and generally able to conduct the proposed litigation. *Kirkpatrick, 827 F.2d at 726; Griffin,* 755 F 2d at 1532.    The next inquiry is whether the named plaintiffs have interests antagonistic to the rest of the class   *Id*   Lastly, the court must satisfy itself that the named plaintiffs possess the personal characteristics and integrity necessary to fulfill the fiduciary role of class representative. *Kirkpatrick, 827 F.2d at 726*

The first requirement is easily met.   Defendant does not contest the fact and this court is satisfied that plaintiffs' counsel both individually and the firm she represents, is qualified, experienced and fully capable of conducting this litigation.    Florida Rural Legal Services as well as individual counsel have extensive experience handling complex class action and AWPA litigation   Further, Florida Rural Legal Services has the staff necessary to provide translation in Haitian Creole and Spanish for class members, and have agreed to advance litigation costs, including the costs of notice to class members.

**\*14** As for the second requirement, this Court finds no conflict between the interests of the plaintiffs and

Not Reported in F. Supp.                    FOR EDUCATIONAL USE ONLY                    Page 10
Not Reported in F. Supp., 1991 WL 177658 (S.D.Fla.), 119 Lab.Cas. P 35,499
(Cite as: 1991 WL 177658 (S.D.Fla.))

the interest of the class regarding the desired outcome, the proof necessary to succeed, or the types of relief sought. The named plaintiffs and the rest of the class members share a substantial interest in enforcing their rights under the AWPA, securing damages for alleged violations under the Act and in preventing future violations. This Court is therefore satisfied as to the absence of any antagonistic interests the named plaintiffs may have to those of the rest of the class. *Griffin*, 755 F.2d at 1532; *see also Ga. St. Conf. of Branches of NAACP v. State of Georgia*, 99 F.R.D. 16, 34 (S.D.Ga.1983) ("It is well settled that only a conflict that goes to the very subject matter of the litigation will defeat a party's claim of representative status.")

Finally, after a review of the evidence this Court finds the named plaintiffs possess the personal integrity necessary to fulfill the fiduciary role of class representative. *Kirkpatrick, 827 F.2d at 726*. Okeelanta challenges representative status by arguing that plaintiffs display a lack of interest in the litigation, are insufficiently involved and exhibit an "alarming unfamiliarity with the suit". Okeelanta's position is without factual or legal basis. Factually, plaintiffs have demonstrated their participation and involvement in this action by appearing at oral argument, appearing for deposition and responding to plaintiffs' interrogatories. Plaintiff's counsel has stated she is in regular communication with her clients through correspondence in Creole, through client meetings and through interviews conducted in Belle Glade. Thus, despite obvious language problems and lack of sophistication plaintiffs have made a significant effort to vindicate their rights and proceed with this litigation thereby demonstrating their involvement and commitment to this action.

As for plaintiff's purported "unfamiliarity with the suit", even if true, this fact has no legal relevance to the issues at hand. None would disagree that plaintiffs, for the most part, are economically illiterate, lack sophistication, have limited knowledge of the American legal system and have limited to nonexistent English speaking skills. It is therefore not surprising that plaintiffs do not have a sophisticated understanding of the AWPA and the Wagner-Peyser regulations governing the use of H-2A workers. Such knowledge however is not required. Although plaintiffs' deposition testimony reveals an unfamiliarity with legal terminology, it also reveals a clear understanding on the part of plaintiffs as to the basic facts which compromise the legal basis for their claims. [FN6] This factual understanding is sufficient to satisfy the

representation requirements of Rule 23(a)(4). *Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363, 372 (1966).

In *Surowitz*, the Supreme Court found plaintiff in a shareholder suit to be an adequate class representative despite her "positive disavowal of any relevant knowledge or information other than the fact of her stock ownership", her lack of general knowledge of the wrongful acts serving as the basis of her complaint, her illiteracy in economic matters and her lack of education. *Id.* at 372 Along the same lines, the 11th Circuit in *Kirkpatrick, 827 F.2d at 727-728* warned that class certification should not be denied "simply because of a perceived lack of subjective interest on the part of plaintiffs unless their participation is so minimal that they virtually have abdicated to the attorneys the conduct of the case." To require a greater showing "could well prevent the vindication of legal rights of the absent class members under the guise of protecting those rights." *Id, see also Shroder v. Suburban Coastal Corp.*, 729 F.2d 1371, 1376 (11th Cir.1984); *Lawson v. Wainwright*, 108 F.R.D. 450 (S.D.Fla.1986).

C) *Rule 23(b)(3) Requirements Have Been Satisfied*

**\*15** To qualify for class certification plaintiffs must satisfy the requirements set forth in both Fed.R.Civ.P., Rule 23(a) and 23(b). *Kirkpatrick, 827 F.2d 718*. Rule 23(b)(3), applicable here, provides for class certification where:

the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interests of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action

The first prerequisite to bringing an action under Rule 23(b)(3) is that common questions of law or fact predominate over the individual issues presented by the dispute. *Roper v. Consgrove, Inc.*, 578 F.2d 1106 (5th Cir.1978), *aff'd on other grounds sub nom,*

© 2006 Thomson/West No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                    FOR EDUCATIONAL USE ONLY                        Page 11
Not Reported in F.Supp., 1991 WL 177658 (S.D.Fla.), 119 Lab.Cas. P 35,499
(Cite as: 1991 WL 177658 (S.D.Fla.))

*Deposit Guar. Natl. Bank v. Roper*, 445 U.S. 326 (1979). This standard is a practical one. As stated by the court in *In re "Agent Orange" Product Liability Litigation*, 100 F.R.D. 718, 722 (D.C.N.Y.1983), cert. denied, 484 U.S. 1004 (1988), "[w]hen common questions represent a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is a clear justification for handling the dispute on a representative rather than on an individual basis. *Id.*, citing Wright & Miller, Federal Practice and Procedure: Civil 2d § 1778. The existence of individual questions concerning class members does not necessarily defeat the commonality requirement. The Rule requires only that common questions predominate, not that they be unanimous. *Kleiner v. First Natl. Bank of Atlanta*, 97 F.R.D. 683, 691 (N.D.Ga.1983); *see also Kirkpatrick*, 827 F.2d at 725.

Having heard argument of counsel, reviewed the pleadings of the parties and the evidence of record this Court finds that common questions of law and fact predominate over the individual issues raised. *Kirkpatrick*, 827 F.2d at 725. In this action plaintiffs challenge Okeelanta's uniform employment practices imposed upon all domestic sugar cane planters. The practices complained of include Okeelanta's failure to pay a bonus, to pay the three-fourths guarantee, to provide copies of the Clearance Order, to provide proper wage receipts, and to treat all workers, domestic and H-2A uniformly. Whether in fact Okeelanta engaged in these practices, and if so whether they violated the terms of the AWPA statute and/or the Wagner-Peyser regulations are the key issues in this case. These practices, if engaged in, applied equally to all members of the class. Thus, in practical terms these practices and the legal issues they raise translate into common questions of law and fact representing a significant aspect of this case.

*16 In contrast, the individual questions at issue represent a small fraction of issues raised. The only individual determinations this Court may be required to make relate to individual damage determinations, which task itself can be simplified because the AWPA provides for statutory damages in lieu of actual damages. 29 U.S.C. § 1854(C) Accordingly, manageability problems can be avoided. Additionally, courts have repeatedly held that the need for such damage calculations does not diminish the appropriateness of Rule 23(b)(3) class certification where, as here common questions as to liability predominate. *Fifth Moorings Condominium Inc.*, 81 F.R.D. at 718-719; *Green v. Wolf*, 406 F.2d

291, 301 (2d Cir.1968), cert. denied, 395 U.S. 977 (1967); *De La Fuente*, 713 F.2d at 233; *Wolgin*, 82 F.R.D. at 176.

This Court further finds the class action device to be superior to other available methods for the fair and efficient adjudication of this controversy. In a case such as this involving questions common to the employment of domestic migrant farm workers the class device is the most efficient and fair method for adjudicating this claim. The only other alternative is joinder of all class members or the filing of separate farmworker claims, both of which present manageability problems and thwart, rather than achieve, economies of time, effort and expense. As previously discussed joinder of all class members is impracticable due to numerosity concerns as is the filing of separate claims, which is fraught with the danger of conflicting judgments. *See Fifth Moorings Condominium*, 81 F.R.D. at 718-719; *Wolgin*, 82 F.R.D. at 176; *De La Fuente*, 713 F.2d at 233. For the foregoing reasons, this Court finds no acceptable alternative to proceeding under 23(b)(3) and therefore recommends the class be certified. This Court further recommends the certification of two subclasses, one for each seasons. Accordingly, it is hereby

Recommended that plaintiff's Motion for Class Certification be Granted in accordance with the terms herein.

The parties have ten (10) days from the date of this Report and Recommendation within which to serve and file written objections, if any, with the Honorable Kenneth L. Ryskamp, United States District Judge. Failure to file objections timely shall bar the parties from attacking on appeal the factual findings contained herein. *LoConte v. Dugger*, 847 F.2d 745 (11th Cir.1988), denied, --- U.S. ---, 109 S.Ct. 397 (1988)

> FN1. Also pending is a Motion for Summary Judgment. While the class certification needs not be resolved at the outset, this Court has found that this issue should be resolved at the outset and before consideration of summary judgment. This having been accomplished within the court deems the Motion for Summary Judgment ripe as of this filing and will proceed to consider this matter in a forthcoming Report and Recommendation.

> FN2. The 1987-88 Clearance Order and the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp                    FOR EDUCATIONAL USE ONLY                              Page 12
Not Reported in F.Supp., 1991 WL 177658 (S.D.Fla.), 119 Lab.Cas. P 35,499
(Cite as: 1991 WL 177658 (S.D.Fla.))

1988-89 Clearance Order shall be collectively referred to as the "Clearance Orders."

FN3. Count I of the Amilcar Complaint alleges that H-2A workers were guaranteed $5.30 per hour versus $4.66 per hour offered the U.S. workers. Count I of the Alfred Complaint alleges that H-2A workers were guaranteed $5.30 per hour versus $4.91 per hour offered the U.S. workers.

FN4. This court likewise finds without merit defendant's assertion that plaintiff Amilcar lacks standing as to Count I because he admits in his deposition testimony that he was not terminated. As a preliminary matter, Amilcar's allegations that he did not receive a copy of the Clearance Order and was treated unfavorably as compared to the H-2A workers is sufficient to confer standing under Count I. Even assuming this was not sufficient injury to confer standing under Count I, the fact that Amilcar has standing under Count II, through the alleged violations of the AWPA and the Wagner-Peyser Act, 29 U.S.C. § 49, et seq is sufficient to establish standing for the purpose of this class action. See Griffin 823 F.2d at 1483 ("[E]ach claim must be analyzed separately, and a claim cannot be asserted on behalf of a class unless *at least one* named plaintiff has suffered an injury that gives rise to that claim") (emphasis added). Finally, a review of Amilcar's deposition testimony fails to reveal an admission by Amilcar that he was not terminated. In fact, according to Amilcar's testimony he was fired by Okeelanta prior to the season's end. (Amilcar deposition, pgs 19-23). The above analysis may however apply to plaintiff Willie Jean whose testimony indicates he was never fired by Okeelanta. (Jean deposition, pg. 18).

FN5. This Court notes that numerous similar class actions have been certified in cases brought by migrant farm workers alleging violations under the FLCRA (The predecessor statute to the AWPA). *See, e.g.*, *Haywood v. Barnes*, 109 F.R.D. 568 (E.D.N.C.1986); *DeLa Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225 (7th Cir.1983); *Aquirre*, 89 F.R.D. 643; *Leyva*, 125 F.R.D. 512

FN6. This court is unpersuaded that the cases cited by defendant demonstrate plaintiffs are inadequate to support their class. *See Rothenburg v. Security Management Co., Inc.*, 667 F.2d 958 (11th Cir.1982) (plaintiff in a shareholder derivative suit "lacked any meaningful knowledge" and "displayed an unwillingness to learn" the facts or legal issues involved, and stood to gain little from a favorable decision); *Jamerson v. Board of Trustees of Univ. of Alabama*, 662 F.2d 320 (5th Cir.1981) (employment discrimination plaintiff did not know of anyone besides himself who could be in the class); *Greenspan v. Brassler*, 78 F.R.D. 130 (S.D.N.Y.1978) (securities violation plaintiff had limited knowledge involving the facts underlying the suit); *Seiden v. Nicholson*, 69 F.R.D. 681 (N.D.Ill.1976) (securities fraud plaintiff-attorneys had "substantial lack of familiarity with the facts" of the case); *Darvin v. International Harvester Co.*, 610 F.Supp. 255 (securities fraud plaintiff's uncertain and inconsistent recollection of the factual basis of his claim was one of many factors which made him unsuitable); *Massengill v. Board of Educ.* 88 F.R.D. 181 (N.D.Ill.1980) (high school plaintiff in a due process claim who had been disciplined frequently could not meet the "high level of responsibility imposed in every class representative," nor could his mother as she evidenced a "minimal level of interest" and "minimal awareness" of the essential issues involved); *Goldchip Funding Co. v 20th Century Corp.*, 61 F.R.D. 592 (M.D.Penn.1974) (shareholder action plaintiff had little knowledge of the facts or business experience); *Apanewicz v. General Motors Corp.*, 80 F.R.D. 672 (E.D.Penn.1978) (plaintiff alleging violation of the Sherman Act had "neither claimed nor demonstrated familiarity with the vast majority of material facts"). Several factors differ between these cases and the matter at hand. A key element in this line of cases is that the respective plaintiffs had little knowledge of the facts involving their claims. Here, the plaintiffs have first hand knowledge as they personally received (or did not receive) payment, benefits, and other documents which may evidence alleged violation of the AWPA and the Wagner-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FOR EDUCATIONAL USE ONLY

Not Reported in F.Supp.                                                                    Page 13
Not Reported in F.Supp., 1991 WL 177658 (S.D.Fla.), 119 Lab.Cas. P 35,499
**(Cite as: 1991 WL 177658 (S.D.Fla.))**

Peyser regulations.

A proper representative can offer more to the prosecution of a class action than mere fulfillment of the procedural requirements of Rule 23. He can, for example, *offer his personal knowledge of the factual circumstances,* and aid in rendering decision on practical and nonlegal problems which arise during the course of litigation.

*Id.* at 678 (emphasis added). Although the plaintiffs may be uncertain as to the legal ramifications concerning their claims, it is hard to imagine parties who have a more concrete knowledge of the facts. Also, keeping in mind the social and educational position of these plaintiffs and the class they represent, it is eminently unfair to hold them to the same standard of legal acuity as, say, attorney-plaintiffs in a shareholder derivative action. Plaintiffs clearly have a tangible interest in this litigation, and stand to benefit from favorable redress. Plaintiffs have also shown much more than a "minimal level of interest" in the current litigation. *See supra,* p. 28. Finally, courts have recognized that there is no requirement that a plaintiff be the best of all possible plaintiffs, only that he adequately represent his class. *See generally* 7A Wright and Miller, Civil 2d, § 1765. In short, this court is satisfied that the circumstances of this case indicate these plaintiffs will adequately represent their class.

Not Reported in F.Supp., 1991 WL 177658 (S.D.Fla.), 119 Lab.Cas. P 35,499

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                              Page 1
Not Reported in F.Supp.2d, 2006 WL 643297 (M.D.Fla.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**Avila-Gonzalez v. Barajas
M.D.Fla.,2006.
Only the Westlaw citation is currently available.
United States District Court,M.D. Florida
Luis AVILA-GONZALEZ and Isaias Ramirez-Resendiz,
individually and on behalf of all other persons similarly
situated, Plaintiffs,
v.
Maria R. BARAJAS and Samuel Barajas, Defendants
**No. 2:04CV567-FTM-33DNF.**

March 2, 2006

Gregory S. Schell, Migrant Farmworker Justice Project,
Lake Worth, Florida, for the Plaintiffs
Maria R. Barajas and Samuel Barajas appear, Defendants,
pro se

*ORDER*
COVINGTON, J.
*1 This matter came before the Court pursuant to
Plaintiffs' Motion for Entry of Default Judgment and
Assessment of Damages against Defendants Maria R.
Barajas and Samuel Barajas (Doc. # 35), which was filed
on December 23, 2006. The Court invited the Plaintiffs to
submit such a motion in its order of November 29, 2005,
through which a default was entered against the
Defendants for their failure to comply with discovery
orders in this case (Doc. # 34). A hearing was held before
the Court on this matter on February 7, 2006 (Doc. # 42).
Although provided with notice of this hearing, the
Defendants did not appear.

Having reviewed the Plaintiffs' motion and supporting
evidence, and being fully advised in the premises, the
Court hereby enters its final judgment as follows:

1. Maria R. Barajas and Samuel Barajas jointly operate a
farm labor contracting business in Arcadia, Florida. The
Plaintiffs are among the Mexican nationals who were
admitted as guestworkers to pick citrus fruit for the
Barajases under the so-called H-2A provisions of the
Immigration and Nationality Act, §§ 1101(a)(15)(H)(ii)(a)
and 1188(a)(1). The Plaintiffs and the members of the
class contend that the Defendants violated a number of
the provisions of their job offers, or "clearance orders"
during the 2000-01, 2001-02, 2002-03 and 2003-04 citrus
harvests. Earlier, the Court certified a class consisting of
all H-2A workers employed by the Defendants during

those harvest seasons.

2. Before granting a default judgment, the Court must
determine that it has jurisdiction over the subject matter
of the dispute. *Pitts v. Seneca Sports, Inc.,* 321 F.Supp.2d
1353, 1356 (S.D.Ga.2004). While ordinarily contract
claims are adjudicated in the state courts, absent the
existence of an express federal cause of action, the Court
may exercise jurisdiction over H-2A workers' claims
because they turn on interpretation of terms dictated by
federal statutes and regulations. *Mitchell v. Osceola
Farms Co.,* No. 0580825CIVCOHN, 2005 WL 3591983,
at *2 (S.D.Fla. Dec. 29, 2005); *Grable & Sons Metal
Products, Inc. v. Darue Engineering & Manufacturing,*
125 S.Ct. 2363, 2366-67 (2005). Federal question
jurisdiction is appropriate because of the substantial
federal interest in immigration matters and in seeing that
businesses honor the obligations they assume in order to
obtain governmental approval of their activities, as the
Defendants did to obtain temporary labor certification for
importation of H-2A workers. *Norfolk & Western Railway
Co. v. Nemitz,* 404 U.S. 37, 44-45 (1971). Because of the
limited number of H-2A workers admitted each year,
federal question jurisdiction over state law claims
involving these guestworkers' contracts can be exercised
"without disturbing any congressionally approved balance
of federal and state judicial responsibilities "*Grable,* 125
S.Ct. at 2368.

3. Because the Court has entered a default against
Defendants Maria R. Barajas and Samuel Barajas, the
factual allegations of the Complaint are to be taken as
true. C. Wright, A. Miller & M. Kane, *Federal Practice &
Procedure* § 2688 (3d Ed 1998); *Miller v. Paradise of
Port Richey, Inc.,* 75 F.Supp.2d 1342, 1346
(M.D.Fla.1999). While liability is established because of
a default, allegations relating to the amount of damages
are not admitted by virtue of a default. Rather, the court
determines the amount and character of damages to be
awarded based on record evidence. *Miller,* 75 F.Supp.2d
at 1346. In this case, the Plaintiffs have provided
deposition testimony and other data to support their
claims for damages.

*2 4. At the outset, the Court notes that only partial relief
can be crafted in this case because the Defendants have
failed to produce their payroll records, despite court
orders requiring them to do so. Accordingly, the relief
granted extends only to those class members whose

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                              Page 2
Not Reported in F.Supp.2d, 2006 WL 643297 (M.D.Fla.)
**(Cite as: Not Reported in F.Supp.2d)**

identities can be gleaned from other documents collected by the Plaintiffs from third parties.

5. The Court finds that Defendants Maria R. Barajas and Samuel Barajas failed to comply with the assurance included in their clearance orders that rent-free housing would be provided to the H-2A workers, an assurance required by 20 C.F.R. § 655.102(b)(1). (Complaint ¶ 29)

|  | Period of employment (from clearance orders) | Length of period of employment | Rent paid at rate of $30/week |
|---|---|---|---|
| Workers employed in the 2000-01 harvest | October 25, 2000-July 20, 2001 | 38 weeks | $1140 |
| Workers employed in the 2001-02 harvest | October 15, 2001- June 30, 2002 | 37 weeks | $1110 |
| Workers employed in the 2002-03 harvest | November 23, 2002-June 30, 2003 | 31 weeks | $930 |
| Workers employed in the 2003-04 harvest | November 28, 2003-June 30, 2004 | 31 weeks | $930 |

6. The Court further finds that the class members did not earn the mandated adverse effect wage rate for their work because they incurred expenses primarily for the benefit of their employers which were never reimbursed. (Complaint ¶¶ 24, 26 and 27). A worker must be reimbursed for any costs incurred primarily for the employer's benefit which serve to reduce the employee's net earnings during the first week of work below the mandated wage rate. *See Arriaga v. Florida-Pacific Farms, LLC*, 305 F.3d 1228, 1236 (11th Cir.2002). In this action, the applicable wage rate is the adverse effect wage rate; to the extent that the workers' net earnings in the first week of work fell below this rate because of the pre-employment expenditures discussed below, the Barajases

Instead, the workers were charged $30 per week for this housing. (Deposition of Luis Avila-Gonzalez at 35-36, 60-61; Deposition of Isaias Ramirez-Resendiz at 15.) Based on the dates shown in the Barajases' clearance orders, the following rental amounts must be refunded to the class members:

were required to reimburse these amounts to the workers. *See* Wage and Hour Memorandum No. 99-03, February 11, 1999 ("In other words, if an employer is legally required to pay a [minimum wage] higher than the FLSA [minimum wage], then deductions are permitted only to the extent that they do not reduce the employee's pay to an effective hourly rate lower than the highest applicable required wage enforced by [the Wage-Hour Division].")

7. The record evidence reflects the following expenses primarily benefitting the Barajases were incurred by the class members and were not reimbursed:
• *Recruitment fees.* The workers were required to pay Samuel Barajas a $100 fee in order to be selected for the jobs. (Complaint ¶ 24; Deposition of Luis Avila-Gonzalez

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 3
Not Reported in F.Supp.2d, 2006 WL 643297 (M.D.Fla.)
**(Cite as: Not Reported in F.Supp.2d)**

at 14-15; 51; Deposition of Isaias Ramirez-Resendiz at 7-8). Costs incidental to an employer's recruitment program primarily benefit the employer. *Marshall v. Glassboro Serv. Assoc., Inc.*, 1979 WL 1989 (D.N.J. Oct. 19, 1979). In *Arriaga*, the Eleventh Circuit recognized that recruitment fees primarily benefit the employer but denied relief to the farmworker plaintiffs because it could not be demonstrated that the local recruiters were agents of the employer. 305 F.3d at 1244-46. In this case, there is no agency issue because Defendant Samuel Barajas himself collected the recruitment fees (Deposition of Luis Avila-Gonzalez at 14-15; 51; Deposition of Isaias Ramirez-Resendiz at 7-8).

*\*3 • Travel from home villages to Monterrey* The workers traveled at their own expense from their home villages to Monterrey, the site of the U.S. consular post that issued their H-2A visas, at a cost of approximately 400 Mexican pesos, or about $37 (Complaint ¶ 26; Deposition of Luis Avila-Gonzalez at 16; Deposition of Isaias Ramirez-Resendiz at 10). These expenses primarily benefitted the Barajases. *Arriaga*, 305 F.3d at 1237-1244, 1246-47.

• *Passports* Each worker was required to purchase a Mexican passport at a cost of approximately 450 pesos, or about $41.70. After their applications were approved, the workers had the H-2A visas stamped in their passports (Complaint ¶ 26; Deposition of Isaias Ramirez-Resendiz at 8). As indigent farmers in rural Mexico, the class members had no use for the passports other than as a prerequisite to obtaining permission to work with the Barajases. Accordingly, these costs may not be credited against the employer's obligation to pay the adverse effect wage rate. *Arriaga*, 305 F.3d at 1244.

• *Visa application fees* The class members paid a visa application fee of $100 through the Mexican bank, Banamex (Complaint ¶ 26; Deposition of Luis Avila-Gonzalez at 19; Deposition of Isaias Ramirez-Resendiz at 9, 13). These expenses primarily benefitted the employers, the Barajases. *Arriaga*, 305 F.3d at 1244.

• *Visa issuance fees* The class members paid an additional $100 for the issuance of the visa once the application was approved. (Complaint ¶ 26; Deposition of Luis Avila-Gonzalez at 17). The visa fees were primarily for the benefit of the Barajases. *Arriaga*, 305 F.3d at 1244.

• *I-94 fee* At the U.S./Mexico border, each worker paid $6 for the issuance of a U.S. immigration arrival/departure record, Form I-94 (Complaint ¶ 26; Deposition of Luis Avila-Gonzalez at 21-22; Deposition of Isaias Ramirez-Resendiz at 13-14). These expenses were incurred primarily for the benefit of the employers, the Barajases. *Arriaga*, 305 F.3d at 1244.

8. Without the Defendants' payroll records, it is impossible to determine the workers' precise earnings

during their initial week of work and the extent to which these earnings were reduced by the charges that primarily benefitted the employer. However, because the workers were guaranteed the adverse effect wage rate for their work, it is reasonable for purposes of these computations to assume that the workers were paid at the AEWR.[FN1] By definition, any expenses that primarily benefitted the employer automatically reduced workers' wages below the AEWR on a dollar-for-dollar basis. Because the expenses discussed above could not be lawfully credited against the employers' wage obligations, the Barajases were required to reimburse each worker $384.70 in their initial week of work: $100 for the recruitment fee, $37 for travel expenses from the worker's home to Monterrey, $41.70 for passport purchase, $100 for the visa application fee through Banamex, $100 for the visa issuance fee and $6 for the issuance of form I-94 at the U.S./Mexico border. Wage and Hour Memorandum No. 99-03, February 11, 1999.

> FN1. The AEWRs for Florida during the years in question were as follows: $7.25 (2000), $7.66 (2001), $7.69 (2002), $7.78 (2003) and $8.18 (2004). http://www.fwjustice.org/AEWRs97-2005.htm

*\*4 9.* Besides the expenses common to all class members, the named Plaintiffs incurred additional costs that primarily benefitted their employers and therefore should have been reimbursed. The Plaintiffs were charged $100 by Samuel Barajas for the cost of the attorney who assisted Barajas in preparing the H-2A application. (Deposition of Luis Avila-Gonzalez at 37, 44; Deposition of Isaias Ramirez-Resendiz at 21-22). They also were required by Samuel Barajas to hire a designated person in a restaurant in Monterrey to assist them in completing the visa application paperwork at a charge of about 30 pesos, or $2.78. (Deposition of Luis Avila-Gonzalez at 17-18; Deposition of Isaias Ramirez-Resendiz at 10-11.) These activities were part of the Barajases' recruitment process and primarily benefitted the employers. *Marshall v. Glassboro Service Association, Inc.*, 1979 WL 1989 (D.N.J.1979).

10. In addition to his bus fare from his home to Monterrey, Plaintiff Avila-Gonzalez incurred additional transportation costs for which he was never reimbursed. Plaintiff Avila-Gonzalez paid $100 to travel to Florida for the 2000-01 season and paid $110 for the same trip for the 2001-02 harvest, although in that season the Defendants reimbursed him $50 (Deposition of Luis Avila-Gonzalez at 23, 59, 63).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 643297 (M.D.Fla.)
(Cite as: Not Reported in F.Supp.2d)

11. The Barajases were also required to provide outbound transportation for any workers who completed the harvest 20 C.F.R. § 655.102(b)(5)(ii). Although the Plaintiffs each finished the harvest season, the Barajases failed to provide or pay for their return transportation to Mexico (Deposition of Luis Avila-Gonzalez at 47-48, 63; Deposition of Isaias Ramirez-Resendiz at 20). These expenses totaled $157 for Avila-Gonzalez for the 2000-01 harvest and $150 at the end of the 2001-02 season. (Deposition of Luis Avila-Gonzalez at 48, 65). Ramirez-Resendiz spent $147 on his return fare to Mexico following the 2001-02 season. (Deposition of Isaias Ramirez-Resendiz at 20)

12. The Plaintiffs were also entitled to reimbursement for the cost of their meals while traveling to and from the Barajases' jobsite 20 C.F.R. § 655.102(b)(5)(i) and (ii) The Defendants never reimbursed the Plaintiffs for these costs, which were approximately $50 per trip for Avila-Gonzalez and $80 per trip for Ramirez-Resendiz.

| | |
|---|---|
| Visa and recruitment fees, 2000-01 harvest | $384.70 |
| Visa and recruitment fees, 2001-02 harvest | $384.70 |
| Rent reimbursement, 2000-01 harvest | $1140.00 |
| Rent reimbursement, 2001-02 harvest | $1110.00 |
| Attorney charge | $100.00 |
| Assistance in completing visa application (2 seasons) | $5.56 |
| Inbound transportation expenses | $160.00 |
| Outbound | $307.00 |

(Deposition of Luis Avila-Gonzalez at 23, 59-60; Deposition of Isaias Ramirez-Resendiz at 14, 21).

13. The Plaintiffs also seek an award of attorney's fees under Fla. Stat. § 448.08, having prevailed in an action for wages, in this case unpaid moneys due at the adverse effect wage rate. The Plaintiffs shall file a separate motion for attorney's fees and this motion shall be referred to the magistrate judge for a report and recommendation.

14. Judgment is hereby entered in favor of the Plaintiffs and the members of the class they represent and against Maria R. Barajas and Samuel Barajas, jointly and severally, for a total of $136,747.84 This amount is divided among the Plaintiffs and the class members as follows:

*For Plaintiff Luis Avila Gonzalez*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 5
Not Reported in F.Supp.2d, 2006 WL 643297 (M.D.Fla.)
**(Cite as: Not Reported in F.Supp.2d)**

| transportation expenses | |
|---|---|
| Subsistence en route to and from Florida | $200.00 |
| (4 trips @ $50) | |
| TOTAL | $3791.96 |

*For Plaintiff Isaias Ramirez-Resendiz*

| Visa and recruitment fees, 2001-02 harvest | $384.70 |
|---|---|
| Rent reimbursement, 2001-02 harvest | $1110.00 |
| Attorney charge | $100.00 |
| Assistance in completing visa application | $2.78 |
| Inbound transportation expenses | $160.00 |
| Outbound transportation expenses | $147.00 |
| Subsistence en route to and from Florida | $160.00 |
| (2 trips @ $80) | |
| TOTAL | $2064.48 |

*For members of the class*

| CLASS MEMBER | Seasons worked | Visa and recruitment | Rent fees | TOTAL AWARD |
|---|---|---|---|---|
| Jose Santos Aguilar | 2003-04 | $384.70 | $930.00 | $1314.70 |
| Reyes Aguilar- | 2001-02 | $384.70 | $1100.00 | $1484.70 |

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 6
Not Reported in F.Supp.2d, 2006 WL 643297 (M.D.Fla.)
(Cite as: Not Reported in F.Supp.2d)

| | | | | |
|---|---|---|---|---|
| Guevara | | | | |
| Luis Alberto | 2003-04 | $384.70 | $930.00 | $1314.70 |
| Ramon Alejandro-Tejeda | 2001-02 | $384.70 | $1100.00 | $1484.70 |
| Esteban Antolin | 2003-04 | $384.70 | $930.00 | $1314.70 |
| Luis Balderas | 2001-02 | $384.70 | $1100.00 | $1484.70 |
| Maricela Barragan | 2003-04 | $384.70 | $930.00 | $1314.70 |
| Edmundo Chavez | 2003-04 | $384.70 | $930.00 | $1314.70 |
| Jesus Chavez | 2003-04 | $384.70 | $930.00 | $1314.70 |
| Roberto Chavez | 2003-04 | $384.70 | $930.00 | $1314.70 |
| Estevan Cruz | 2003-04 | $384.70 | $930.00 | $1314.70 |
| Francisco Cruz | 2003-04 | $384.70 | $930.00 | $1314.70 |
| Jose de Jesus Espinosa | 2001-02 | $384.70 | $1100.00 | $1484.70 |
| Heriberto Espinoza | 2003-04 | $384.70 | $930.00 | $1314.70 |
| Dany E Estrada | 2003-04 | $384.70 | $930.00 | $1314.70 |
| Armando Fuentes | 2003-04 | $384.70 | $930.00 | $1314.70 |
| Julio Fuentes-Dias | 2001-02 | $384.70 | $1100.00 | $1484.70 |
| Bernardo Galicia | 2001-02 | $384.70 | $1100.00 | $1484.70 |
| Vicente Galicia | 2001-02 | $384.70 | $1100.00 | $1484.70 |
| Adalberto Garcia | 2003-04 | $384.70 | $930.00 | $1314.70 |
| Camerino Garcia | 2003-04 | $384.70 | $930.00 | $1314.70 |
| Cesar Garcia | 2001-02 | $384.70 | $1100.00 | $1484.70 |
| Dolores Garcia | 2003-04 | $384.70 | $930.00 | $1314.70 |
| Gomecindo Garcia | 2003-04 | $384.70 | $930.00 | $1314.70 |

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 643297 (M.D.Fla.)
(Cite as: Not Reported in F.Supp.2d)

| | | | | |
|---|---|---|---|---|
| Isidoro Garcia | 2003-04 | $384.70 | $930.00 | $1314.70 |
| Jaime Garcia | 2003-04 | $384.70 | $930.00 | $1314.70 |
| Hector Goddy | 2001-02 | $384.70 | $1100.00 | $1484.70 |
| Adrian Gonzalez | 2003-04 | $384.70 | $930.00 | $1314.70 |
| Agustin Gonzalez | 2003-04 | $384.70 | $930.00 | $1314.70 |
| Daniel Gonzalez | 2003-04 | $384.70 | $930.00 | $1314.70 |
| Nadia Gonzalez | 2003-04 | $384.70 | $930.00 | $1314.70 |
| Angel Guerrero | 2003-04 | $384.70 | $930.00 | $1314.70 |
| Efien Guerrero | 2003-04 | $384.70 | $930.00 | $1314.70 |
| Ricardo Guerrero | 2003-04 | $384.70 | $930.00 | $1314.70 |
| Vicente Guerrero | 2003-04 | $384.70 | $930.00 | $1314.70 |
| Donaciano Guillen | 2003-04 | $384.70 | $930.00 | $1314.70 |
| Javier Guillen | 2001-02 | $384.70 | $1100.00 | $1484.70 |
| Jesus Hernandez | 2003-04 | $384.70 | $930.00 | $1314.70 |
| Jose L Hernandez | 2003-04 | $384.70 | $930.00 | $1314.70 |
| Leon Hernandez | 2003-04 | $384.70 | $930.00 | $1314.70 |
| Rafael Hernandez | 2001-02 | $384.70 | $1100.00 | $1484.70 |
| Alcidez Jimenez-Mendez | 2001-02 | $384.70 | $1100.00 | $1484.70 |
| Juan Landaverde | 2003-04 | $384.70 | $930.00 | $1314.70 |
| | 2001-02 | | | |
| Salome Landaverde | 2003-04 | $769.40 | $2030.00 | $2799.00 |
| Ezequiel Lopez-Garcia | 2001-02 | $384.70 | $1100.00 | $1484.70 |
| Elizabeth Lucatero | 2003-04 | $384.70 | $930.00 | $1314.70 |

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 643297 (M.D.Fla.)
(Cite as: Not Reported in F.Supp.2d)

Page 8

| | | | | |
|---|---|---|---|---|
| Delfina Lugo | 2003-04 | $384.70 | $930.00 | $1314.70 |
| Refugio Martinez | 2001-02 | $384.70 | $1100.00 | $1484.70 |
| Roberto Martinez | 2003-04 | $384.70 | $930.00 | $1314.70 |
| Tomas Martinez-Ramirez | 2001-02 | $384.70 | $1100.00 | $1484.70 |
| Eleazar Mejia | 2003-04 | $384.70 | $930.00 | $1314.70 |
| Fermin Mejia | 2003-04 | $384.70 | $930.00 | $1314.70 |
| Janeth Mejia | 2003-04 | $384.70 | $930.00 | $1314.70 |
| Joaquin Mejia | 2003-04 | $384.70 | $930.00 | $1314.70 |
| Salvador Mejia | 2003-04 | $384.70 | $930.00 | $1314.70 |
| Timoteo Montero | 2001-02 | $384.70 | $1100.00 | $1484.70 |
| Serafin Montoya-Avila | 2001-02 | $384.70 | $1100.00 | $1484.70 |
| Antonio Emilio Morales-Hernandez | 2001-02 | $384.70 | $1100.00 | $1484.70 |
| Ignacio Morales-Torres | 2001-02 | $384.70 | $1100.00 | $1484.70 |
| Pedro Munoz-Martinez | 2001-02 | $384.70 | $1100.00 | $1484.70 |
| Alfonso Nieto | 2003-04 | $384.70 | $930.00 | $1314.70 |
| Raul Olguin | 2001-02 | $384.70 | $1100.00 | $1484.70 |
| Benito Enrique Pastrana-Mendoza | 2001-02 | $384.70 | $1100.00 | $1484.70 |
| Eugenio Perez-Garcia | 2001-02 | $384.70 | $1100.00 | $1484.70 |
| Ciro M.L. Pina | 2001-02 | $384.70 | $1100.00 | $1484.70 |
| Adan Pintor-De | 2001-02 | $384.70 | $1100.00 | $1484.70 |

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 643297 (M.D.Fla.)
(Cite as: Not Reported in F.Supp.2d)

| La Cruz | | | | |
|---|---|---|---|---|
| Cristobal Ponce-Martinez | 2001-02 | $384.70 | $1100.00 | $1484.70 |
| Leonardo Rodriguez-Rodriguez | 2003-04 | $384.70 | $930.00 | $1314.70 |
| Alfonso Ramirez | 2003-04 | $384.70 | $930.00 | $1314.70 |
| Ignacio Ramirez | 2003-04 | $384.70 | $930.00 | $1314.70 |
| Pedro Ramirez | 2003-04 | $384.70 | $930.00 | $1314.70 |
| Salvador Ramirez | 2003-04 | $384.70 | $930.00 | $1314.70 |
| Francisco Recendis | 2001-02 | $384.70 | $1100.00 | $1484.70 |
| Misael Redon-Jimenez | 2001-02 | $384.70 | $1100.00 | $1484.70 |
| Tonino Rendon-Jimenez | 2001-02 | $384.70 | $1100.00 | $1484.70 |
| Feliciano Rodriguez | 2001-02 | $384.70 | $1100.00 | $1484.70 |
| Rafael Rodriguez-Rodriguez | 2001-02 | $384.70 | $1100.00 | $1484.70 |
| Jose I. Rosaleo | 2003-04 | $384.70 | $930.00 | $1314.70 |
| Jose Alvaro Luis Rubio-Yanez | 2001-02 | $384.70 | $1100.00 | $1484.70 |
| Juan Antonio Salas-Mendiola | 2001-02 | $384.70 | $1100.00 | $1484.70 |
| Marina L. Salcedo | 2003-04 | $384.70 | $930.00 | $1314.70 |
| Juan Saldana | 2001-02 | $384.70 | $1100.00 | $1484.70 |
| Juanito Saldana | 2003-04 | $384.70 | $930.00 | $1314.70 |
| Antolin San Juan | 2001-02 | $384.70 | $1100.00 | $1484.70 |

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 643297 (M.D.Fla.)
(Cite as: Not Reported in F.Supp.2d)

| | | | | |
|---|---|---|---|---|
| Alberto Sanchez | 2003-04 | $384.70 | $930.00 | $1314.70 |
| Guadalupe Sanchez | 2001-02 | $384.70 | $1100.00 | $1484.70 |
| Raymundo Silva | 2001-02 | $384.70 | $1100.00 | $1484.70 |
| Genaro Tavares | 2001-02 | $384.70 | $1100.00 | $1484.70 |
| Carlos Trejo | 2003-04 | $384.70 | $930.00 | $1314.70 |
| Daniel Vaquera-Rojas | 2001-02 | $384.70 | $1100.00 | $1484.70 |
| Jose Luis Vega-Hernandez | 2001-02 | $384.70 | $1100.00 | $1484.70 |
| Raul Zamora | 2001-02 | $384.70 | $1100.00 | $1484.70 |
| Victoriano Zuniga-Ramirez | 2001-02 | $384.70 | $1100.00 | $1484.70 |

*5 Accordingly, it is hereby

ORDERED, ADJUDGED, and DECREED:
(1) Plaintiffs' Motion for Entry of Default Judgment and Assessment of Damages against Defendants Maria R. Barajas and Samuel Barajas (Doc. # 35) is GRANTED as provided above
(2) The Clerk is directed to enter Judgment against Defendants in the amount of $136,747.84 as provided above

DONE and ORDERED

M.D.Fla.,2006.
Avila-Gonzalez v. Barajas
Not Reported in F.Supp.2d, 2006 WL 643297 (M.D.Fla.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works

Westlaw.

1987 WL 16939                                                                                    Page 1
Not Reported in F.Supp., 1987 WL 16939 (D.Md.), 106 Lab.Cas. P 34,913
(Cite as: 1987 WL 16939 (D.Md.))

CUnited States District Court, D. Maryland
Demora BERNETT et al., Plaintiffs,
v.
HEPBURN ORCHARDS, INC., Defendants.
No. JH-84-991.

April 14, 1987

JOSEPH C. HOWARD, District Judge.

**\*1** The instant amended complaint, filed on behalf of twenty-six migrant and seasonal agricultural workers and joined by nine others, [FN1] alleges violations of rights secured by the Migrant and Seasonal Agricultural Worker Protection Act ('AWPA'), 29 U.S.C. §§ 1801 et seq., the Wagner-Peyser Act, 29 U.S.C. §§ 49 et seq., and the common law of contracts. This case was tried to the Court on July 9, 10 and 11, 1985, and the parties subsequently submitted an array of post-trial briefs with responses and replies thereto at the Court's request. The parties also filed various post-trial motions-- defendant's motion to dismiss claims of nontestifying plaintiffs, defendant's motion to strike plaintiffs' proposed findings of fact and conclusions of law, plaintiffs' motion for prejudgment interest and defendant's motion for summary judgment--all of which have been opposed by the respective nonmoving parties. Having carefully listened to the evidence presented by the fourteen witnesses who testified at the trial, [FN2] and having studied the depositions of fourteen plaintiffs who did not testify (and of four others who did so only briefly--see conclusion of fn. 2) and the various other documentary exhibits admitted into evidence and the various briefs and memoranda submitted, the Court hereby issues its findings of fact and conclusions of law, not always specifically so denominated, pursuant to Fed. R. Civ. P. 52(a). The pending motions will be resolved in the course of this opinion at appropriate points in the discussion.

A

Initially, the Court notes that plaintiffs' proposed findings of fact and conclusions of law might unfairly prejudice the defendant were the Court to take them into consideration in the absence of a counterproposal. While plaintiffs' suggestion that defendant be encouraged to submit such a paper is one solution, the hour is much too late for further delay; indeed, the Court never intended as much time to elapse prior to the issuance of this opinion as has already expired. Accordingly, defendant's motion to strike plaintiffs' proposed findings and conclusions (Docket Entry #38) is granted. The paper will not be given any weight in deciding this dispute.

Secondly, defendant filed a motion for summary judgment on March 10, 1987, seeking summary disposition of the claims of twenty-one of the plaintiffs on the ground that they were Haitian nationals and not 'U.S. workers' permanently residing in this country, and hence not plaintiffs properly able to claim protection under the statutes involved in this action. Plaintiffs opposed the motion, arguing that the defendant's stipulation to the propriety of the status of all of these plaintiffs in the Pretrial Order (Docket Entry #22, p. 10, § 6.A.), and its failure to ever raise this defense, directly or indirectly, until some twenty months following the trial, effectively bars defendant from relying upon it now on a theory either of waiver or estoppel, or on the ground that the motion is unavailable at this juncture. The Court, on the strength of the record herein and on the logic of Guglielmo v. Scotti & Sons, Inc., 58 F.R.D. 413 (W.D. Pa. 1973), deems the defense waived. Defendant's motion for summary judgment (Docket Entry #50) is accordingly denied.

**\*2** As a final preliminary matter, defendant has moved for the dismissal of all claims made by nine plaintiffs who neither presented themselves for deposition nor appeared at the trial of this matter. The plaintiffs have objected, citing the Court to stipulations by the parties that the nine affected plaintiffs applied for work with the defendant during the same seasons and under the same conditions herein complained of as the other twenty-six plaintiffs (Pretrial Order, p. 12, §§ 6.L and 6.M). The nine affected plaintiffs concede the unavailability of any award of actual damages in their favor. Based on the Court's findings and conclusions set out below, this compromise position is sustainable by them. Accordingly, defendant's motion, first made orally at trial, then in writing following trial (Docket Entry #31), and again in writing shortly thereafter (Docket Entry #43), is denied.

B

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

1987 WL 16939                                                                                      Page 2
Not Reported in F.Supp., 1987 WL 16939 (D.Md.), 106 Lab.Cas. P 34,913
**(Cite as: 1987 WL 16939 (D.Md.))**

At issue in this case is whether an allegedly pre-employment ladder test utilized by the defendant to disqualify the plaintiffs from employability at defendant's orchards in 1983 and 1984 was conducted fairly and legitimately under the circumstances here at play.

The defendant is a family-owned business which cultivates and harvests peaches and apples, predominantly, in Western Maryland for the commercial fresh fruit market. Its produce is assured marketability when its fruits are picked just prior to full ripeness, and are shipped to arrive with a minimum of bruising. The emphasis on cosmetics requires careful pruning for sun exposure, frequent sprayings for insect control, and gentle handling at harvest to minimize bruising and subsequent marketplace rejection. The defendant employs approximately thirty people year-round, and supplements them with several hundred migrant and seasonal workers during the peach and apple harvesting months, typically July through October. These supplemental employees, if hired early in the season, harvest both peaches and apples, and perform pruning and other orchard maintenance tasks as well.

For nine of the ten years preceding trial of the instant dispute, the defendant has applied to the U.S. Department of Labor ('DOL') and the U.S. Immigration and Naturalization Service ('INS') for permission to temporarily employ foreign workers during its peak labor months. Such use of foreign labor is permitted by 8 U.S.C. § 1101(a)(15)(H)(ii) when a U.S. employer asserts and DOL certifies that qualified U.S. workers are unavailable to perform the jobs for which foreign workers, known colloquially as 'H-2's' are sought.

The system involved in procuring H-2's is complex. An employer first applies for foreign workers by submitting a 'criteria job order' to DOL. In defendant's case, each criteria job order contained two documents: an Agricultural and Food Processing Clearance Order ('clearance order') and a Job Offer for Alien Employment, Form MA-7-50B ('7-50B'). Clearance orders and 7-50B's must contain identical terms and conditions of employment for a criteria job order to be approved. Upon approval, a clearance order is circulated through these portions of the national job clearance system most likely to produce qualified domestic applicants; in this case, the clearance orders were circulated in the Maryland region and along the East Coast. A clearance order is

considered by the courts to be '**essentially an offer for a contract of employment,**' *Western Colorado Fruit Growers Assn v. Marshall*, 473 F.Supp. 693, 696 (D.Colo. 1979), which a qualified U.S. worker accepts by travelling to the worksite before the arrival of any H-2's or within the first fifty percent of their contract with an employer.

**\*3** In the event that an employer's labor needs are not being filled by U.S. workers, DOL certifies the employer as eligible to employ H-2's, and an appropriate foreign labor pool, generally already on alert, is activated, resulting in the arrival in short order of a contingent of foreign workers. The H-2's and the U.S. workers must be treated equally both in the hiring process and on the job. 20 C.F.R. § 655.202(a).

Defendant applied for H-2's in both 1983 and 1984, the years in question in this case. The parties have stipulated that all 35 plaintiffs are 'U.S. workers' and that the defendant is an 'agricultural employer' as those terms are defined in AWPA, and that AWPA consequently governs this situation. In March and in June, 1983, and again in March, 1984, defendant submitted criteria jobs ordered numbered 4072460, 4072470 and 4072492, respectively, to DOL; they were approved and the clearance order components were circulated through the job clearance system.

Ten of the plaintiffs [FN3] applied for work at Hepburn Orchards pursuant to one of the two 1983 clearance orders. The remaining 25 plaintiffs applied for similar work the following year. Each of the 35 plaintiffs was required to appear at the local job clearance system referral point, the Hagerstown, Maryland office of the state Department of Employment and Training, where the terms of the job order were or should have been explained either in English, Spanish or Haitian-Creole, a tongue spoken by the 21 Haitian plaintiffs and certain clearance system office staffers. [FN4] They were also then advised or reminded of the defendant's ladder test, which would be administered at the worksite. Plaintiffs were then escorted to the worksite [FN5] where Terry Hepburn, then defendant's vice-president, reviewed the plaintiffs' applications and administered a ladder test to them. It is this ladder test, which all the plaintiffs failed, and defendant's subsequent refusal to employ plaintiffs for a three-day, twenty-four workhour probationary period, which lies at the heart of this dispute.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

1987 WL 16939                                                                    Page 3
Not Reported in F.Supp., 1987 WL 16939 (D.Md.), 106 Lab.Cas. P 34,913
(Cite as: 1987 WL 16939 (D.Md.))

C

The ladder test has been administered by Terry Hepburn, only, at Hepburn Orchards to every *new* employee, whether H-2 or domestic, since the late 1970's. Evidence adduced at trial satisfies the Court that the test was administered generally in the following manner: An initiate would be directed to go to a 24-foot long wooden ladder, weighing approximately 45 pounds when dry, which would be lying on the ground in an area of the orchard. The initiate was directed to raise the ladder to a vertical position without bracing it against anything or anybody, to carry the ladder in a vertical position several dozen feet, and to turn around and return the ladder to its original position. These directions were given either by Terry Hepburn or by his delegate, typically the polylingual employment office escort, usually in English or in the initiate's native language.

The ladder test was not given in a scientific fashion, however. Some initiates were able to brace the foot of the ladder in a hole in the ground when raising it, but none were expressly permitted to do so. Some initiates were given only one chance (e.g., Nelson Felix), while others were given two (e.g., Demora Bernett), or more. Apparently due to the test ladder being stored on the ground in an exposed area, it was sometimes wet and thus much heavier than when it was dry. Finally, on some occasions, initiates were told to lean the ladder into a treetop without knocking off any apples, while others were told not to let the ladder hit a tree.

*4 Defendant, by Terry Hepburn, justifies the ladder test as culling out unqualified employees on the theory that the skills tested (unaided raising of the ladder and vertical portage) are job-related. Defendant concedes that it tests a worst-case scenario: ability to raise a possibly wet ladder, of the type generally used for apple harvesting in the defendant's orchard, without any assistance at all, and to carry it vertically under control for some distance. However, Terry Hepburn conceded, and other evidence proved to the Court, that workers generally braced the bottoms of their ladders in holes, against tree trunks or with a fellow worker's help when raising them in the field, and that ladders were usually dragged on the ground or carried horizontally when moving them any considerable distance, and that these field practices were acceptable to the defendant.

Defendant further defends the description of the ladder test as 'work-related' due to the need, in the defendant's fresh fruit marketing business, to minimize bruising fruit with carelessly handled ladders. However, this purpose is better served by a maximum allowable bruise rate of five percent, which defendant enforces on a worker-by-worker basis at harvest checkpoints in the field. Failure to meet productivity standards, including maximum bruise rates, is cause for dismissal after the probationary period expires.

Defendant additionally insists that the test equally serves its concern for worker safety. This may be the case--certainly an initiate who passes the test has demonstrated some desirable qualities for the job [FN6]--but, if safety is genuinely defendant's concern, then the Court is at a loss to understand why defendant does not put points on the feet of its ladders to assist workers in raising them. Instead, defendant's ladders have flat or barely rounded feet, making the raising often more difficult, as several of the initiates found when the test ladders continued to slip away from them. [FN7] What the test does measure is Terry Hepburn's personal view of the desirability of hiring a new fieldworker for apple picking on the day that he or she applies for work, even if apple picking will not begin for several more weeks and only peaches are being harvested at that time, using much shorter and lighter ladders. Further, the test only measures these factors with regard to people who have never worked for the defendant before, regardless of prior experience. It is subjectively given and subjectively judged. This subjectivity is gravely underscored by defendant's failure to administer it to former employees on the theory that they have demonstrated their abilities to handle the ladder; they may indeed have handled the ladders in an acceptable manner in a previous season, but for defendant not to retest these past employees on the day of their return in a subsequent season assumes too much, revealing that immediate ability to flawlessly execute the test on the day of arrival at the orchard is insignificant in comparison to productive performance on the job, even in defendant's view.

*5 In sum, the Court finds that the ladder test as administered by defendant does not reasonably and fairly test initiates for job-related skills.

Plaintiffs make much ado of the fact that no H-2 has ever failed the ladder test, while some 54 to 82 of the 239 U.S. worker applicants in 1983, and 51 of the

151 U.S. worker applicants in 1984, failed it. Defendant notes that its H-2 labor forces come from pools of experienced Jamaican sugar cane cutters, who are impliedly stronger than many domestic workers. Plaintiffs counter that many of them successfully passed similar ladder tests given under much more fieldwork-related conditions at other apple orchards. Defendant properly refuses to be obliged to conform its hiring standards in every particular to those of its fellow growers. Plaintiffs suggest, however, that defendant's pass-fail rates vary more markedly depending on the pending arrival or presence of H-2 workers than on the skills of the ladder test initiates, for complex economic reasons.

Particularly, it appears that U.S. workers generally are less productive in menial fieldwork than are H-2's, causing defendant to need to pay domestic employees more money for nonproductivity in order to be compensating them at DOL--established minimum field wages. Further, growers such as the defendant are obligated to pay social security contributions, unemployment insurance premiums and worker's compensation premiums on behalf of domestic workers, but not on behalf of H-2's for their transportation between Jamaica and the worksite and back again, being more expensive than transporting U.S. workers from Florida to the worksite and back, partially offsets that edge. While the evidence on this facet of the business is less than complete, the Court is satisfied that the defendant could have had and, as it appears to be a financially successful business, probably did have such venal concerns in mind when deciding whether or not to hire any new domestic applicants.

Nonetheless, the defendant's principal error occurred not in the rendering of the test per se, but in the effect which was attached to it. New domestic workers who failed the test were not hired, while new H-2's, whether they passed (and all did) or not, were hired for at least three workdays by the terms of their work contracts. The H-2's, like the U.S. workers, had only to arrive at Hepburn Orchards minimally qualified, that is, barely able to do the work described in the 7-50B, in order to be deemed to have accepted defendant's offer of employment. The terms of the contracts of the H-2's provided for a minimum three-quarters contract wage, which could only be denied if an H-2 was fired for cause, defined as being 'unable or unwilling . . . to meet the minimum production standards . . .     *after* [having] been afforded [a]

reasonable trial and training period,' *see* H-2 worker contracts at § 10, in turn defined in the criteria job orders as twenty-four workhours or three workdays.

*6 Defendant's effort to dismiss the significance of this disparity grounds itself on three points. First, defendant argues that the H-2's did not have executory contracts, but were only hired after they arrived at Hepburn Orchards *and*, if they were new to Hepburn, took and passed the ladder test. However, the ladder test was not mentioned anywhere at all in the 1983 criteria job orders, although it was mentioned as a pre-employment procedure in the 1984 job order. Yet, in 1983, two groups of H-2 workers arrived at and worked for Hepburn Orchards, signing their contracts upon their arrival there, while in 1984, the year in which the pre-employment test was articulated in the job order, the H-2's executed their contracts in Jamaica, before taking any ladder test.

Defendant argues that the timing of the signing of the H-2 contracts is irrelevant, since any new H-2 who failed the ladder test would not be hired, pursuant to the H-2 contract. Yet this term, if one can claim it is one, was never revealed to the H-2 workers in 1983, and when it was known or knowable in 1984, defendant had foreclosed its option to enforce it by signing the H-2 contracts before administering the ladder test, and thus obligating Hepburn Orchards not to fire a test-failing H-2 until a trial period had elapsed.

Finally, defendant claims that plaintiffs' interpretation of the effect of the H-2 work contracts is wholly speculative, since no H-2 has ever failed a ladder test and been sent right back to Jamaica by this defendant. However, what is sauce for the goose is sauce for the gander.

The absence of a single H-2 ladder test failure in almost a decade leaves the interpretation of the effect of the test squarely in the Court's hands. The Court's earlier finding that the ladder test does not fairly and reasonably test for job-related skills eliminates it as an obstacle for any minimally qualified initiate, to the same extent that the employer has waived it for any minimally qualified former employee. Thus, any minimally qualified initiate who applied for work at Hepburn Orchards in 1983 or 1984 should have been hired for at least the first three days, and thereafter either terminated for cause or else paid for at least three-quarters of the time which he or she could have

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

1987 WL 16939
Not Reported in F.Supp., 1987 WL 16939 (D.Md.), 106 Lab.Cas. P 34,913
(Cite as: 1987 WL 16939 (D.Md.))

worked. Failure to provide these identical terms to both H-2's and U.S. workers is a violation of defendant's assurance that it would do so, expressed in the job orders in conformance with 20 C.F.R. § 665.202(a).

### D

Were the plaintiffs minimally qualified to work at Hepburn Orchards? The evidence adduced at trial indicates that fruit harvesting is physically demanding labor, entailing frequent moving of ladders and carrying sacks of harvested fruit from the trees to roving field checkpoints. Nonetheless, the weight required to be lifted rarely exceeded 45 to 50 pounds at once, a weight which the Court accepts can be moved with moderate effort by an ordinary healthy human being. None of the plaintiff applicants was disabled or sickly; indeed, most were experienced fieldworkers and the majority appear to have been hired for similar work in other orchards soon after their experiences at Hepburn Orchards. Accordingly, at least as to the 25 plaintiffs who testified at trial or were deposed, the Court is satisfied that they were minimally qualified and should have been hired for at least the three-day probationary period.

### E

*7 AWPA and the H-2 program share a common goal of attempting to secure nonexploitative work for U.S. workers in the nation's fields and vineyards. AWPA specifically bars employers from unjustifiably violating the terms of any working arrangements made with migrant or seasonal agricultural workers. 29 U.S.C. §§ 1822(c) and 1832(c). The regulations governing the H-2 program require employers to hire domestic workers without discrimination on the basis of nonjob-related criteria, or the exact same terms offered H-2 workers, to and through the mid-point of any activated H-2 contract period. 20 C.F.R. § 655.200, et seq.

The criteria job orders submitted by defendant in its effort to procure H-2 workers constituted the working arrangements against which both domestic and H-2 employees were recruited. By its own terms, these job orders claimed to be complete documents listing all material terms involved. The reason for the DOL requirement for such assurances is clear: workers respond to the circulated announcements by travelling to the worksite at their own expense and, in keeping with the humanitarian purpose of AWPA, must be protected from unfair surprises upon arrival.

It is beyond dispute that the 1983 job orders at issue contained no reference whatsoever to any ladder test. Inasmuch as defendant then used the ladder test, found by the Court not to be legitimately job-related, to deny employment to applicants, there can be no question but that passing the ladder test was a threshhold and material term of employment. Since defendant had utilized such an employment screening device for many years, its omission from the job order must be seen as deliberate.

By the same token, the Court finds that the reference to the ladder test made in the 1984 job order is misleading, as it does not advise a prospective employee of the peculiarities of defendant's test. A mere mention of a ladder test, without more, hardly describes the procedure employed at Hepburn Orchards, where the difference between the skills tested and the permitted field practices was quite significant. Given the clear reference to a probationary period in the job order, any experienced fruit picker could well have assumed that any of a variety of acceptable ladder-handling techniques would have resulted in passage of the test. Misleading, the reference may as well have been omitted in its entirety once again.

These omissions and misrepresentations regarding the ladder test, and its effect on the employment of domestic workers, together with the consequent denial of employment contracts with guarantees equivalent to those offered the H-2's, constitute violations of both AWPA and the older Wagner-Peyser Act. However, the Court will only assess damages under AWPA in light of its more specific applicability to the facts of this case.

### F

Specific intent to violate AWPA is not required for the Court to find that there has been an intentional violation of the statutory scheme. *Salazar-Calderon v. Presidio Valley Farmers Assn.*, 765 F.2d 1334 (5th Cir.1985). Rather, the common civil standard which holds one liable for the natural and foreseeable consequences of one's acts is employed. *DeLeon v. Ramirez*, 465 F.Supp. 698, 705 (S.D.N.Y. 1979). The Court finds the defendant's violations of AWPA to have been intentional within the context of 29 U.S.C. § 1854(c).

### G

1987 WL 16939                                                                                    Page 6
Not Reported in F.Supp., 1987 WL 16939 (D.Md.), 106 Lab.Cas. P 34,913
**(Cite as: 1987 WL 16939 (D.Md.))**

*8 Evidence at trial demonstrated that the period covered by the job orders in 1983 ran from July 12, 1983 to November 4, 1983. The affected period the following year extended from July 9, 1984 to October 31, 1984. The H-2 contracts called for six-day workweeks with eight-hour workdays, and provided three-quarter contractual wage guarantees.

Plaintiffs urge the Court to award actual damages to the 25 plaintiffs who testified or were deposed on the question by assuming all 25 plaintiffs would have worked to the conclusion of the job order period if hired. The Court declines to do so, noting that if all 25 had been hired, the work period would probably have ended sooner. The Court is satisfied that applying a three-quarter contractual wage guarantee to these 25 plaintiffs is far more equitable.

Further, the Court will require at least one articulable basis for assuming that an applicant would have met productivity standards within the three-day probationary period. Should the Court be unable to make such a finding as to any plaintiff, he or she will be awarded actual damages only for that three-day period, or statutory damages, whichever is higher.

Finally, the Court will assume that no employee would have worked on the first Monday in September, Labor Day, or on the day he or she first arrived at Hepburn Orchards.

Plaintiffs further request that lost wages be determined by the applicable Adverse Effect Wage Rate ('AEWR') in each year for the peach harvest days, and by the estimated hourly rate equivalent for an estimated average 13-bushel workhour for the apple harvest days. Translated into dollars, plaintiffs seek the 1983 AEWR of $4.38/hour for peaches and an estimated $5.35/hour for applies in 1983, and the 1984 AEWR of $4.54/hour for peaches and the same estimated $5.35/hour for applies in 1984. Defendant objects, noting that the same sources from which plaintiffs derived the estimated apple picking wage of $5.35/hour, the 1983 job orders (p. 1, § 9), also clearly indicate that the wage is estimated and, in one job order, expressly not guaranteed. The Court agrees that the only guaranteed wage was AEWR, it being higher than the federal minimum wage, and will apply the appropriate AEWR for three-quarters of each of the 25 plaintiffs' potential contract periods in calculating their gross lost wages.

The law is clear that these plaintiffs are also entitled to be reimbursed for any other out-of-pocket expenses for which the H-2's would have been reimbursed. However, income earned from other sources during this period must be applied in mitigation. *Dialist Co. v. Pulford*, 42 Md.App. 173, 399 A.2d 1374 (1979).

Accordingly, the Court's calculations of actual damage awards are set out below as to each of the 25 plaintiffs who testified or were deposed, in alphabetical order. [Editor's Note: Chart omitted.]

In lieu of actual damages, AWPA permits the Court to award statutory damages up to $500 for each nonduplicative violation. 29 U.S.C. § 1854(c). Here, plaintiffs have alleged two separate violations as to each applicant, regardless of the year in which he or she applied for work at Hepburn Orchards. First, plaintiffs have alleged and proven, as discussed, *supra*, that Hepburn Orchards improperly utilized a ladder test, applied and judged in a manner that renders it impermissibly nonjob-related, as a means of denying employment to domestic migrant and seasoned agricultural workers, even for the three-day probationary period, utilizing a fall apple ladder even though virtually all plaintiffs applied during the peach harvesting time period, in violation of rights secured to them by AWPA. 29 U.S.C. §§ 1822(c) and 1832(c).

*9 Secondly, plaintiffs have alleged and proven, as discussed, *supra*, that defendant's job orders were misleading in that they failed to mention (in 1983) or too vaguely mentioned (in 1984) the ladder test which defendant was improperly employing in the first instance. Such misleading job descriptions are prohibited by 29 U.S.C. §§ 1821(f) and 1831(e) in the interest of protecting agricultural workers, who are generally poor people, from wasting their time and resources by travelling long distances in pursuit of publicly offered employment opportunities which, as described, they would be capable of procuring and satisfactorily performing.

All plaintiffs not awarded actual damages set out above seek statutory damages in the amount of $500 for each of the two violations. The Court concludes that each plaintiff, with the exception of Craig Merki, is entitled to an award of statutory damages for two violations, and takes issue but not umbrage with plaintiffs' suggestion that it be maximum permissible amount.

1987 WL 16939                                                                                      Page 7
Not Reported in F.Supp., 1987 WL 16939 (D.Md.), 106 Lab.Cas. P 34,913
(Cite as: 1987 WL 16939 (D.Md.))

Craig Merki, according to the evidence submitted, applied for work at Hepburn Orchards without first having gone to an employment service office. He was subjected to a ladder test and failed. Defendant thereupon learned that Mr. Merki had not been properly referred in the first instance, and suggested that he go to an employment service office and reapply for work at Hepburn Orchards. Defendant thus concedes that it did not consider Mr. Merki a wholly incapable person who would never have been hired under any circumstances.

However, because Mr. Merki does not appear to have reapplied after his visit to an employment service office, if indeed he ever visited such an office, he cannot claim to have been mislead by any information which he should have been given about the job via a reading of an offending job order at such office. He was, nonetheless, improperly considered by being subjected to defendant's ladder test, and so stands with his statutory rights violated in one instance, but not both.

Regarding the amount of statutory damages to be imposed, the Court considers it necessary to refrain from imposing the maximum where overt maliciousness is not evident, in order that the imposition of the maximum penalty might retain extra meaning. Yet defendant's conduct in subjecting unproven applicants to a ladder test rooted in fantasy rather than reality was certainly conscious and deliberate, with obvious results: generally qualified applicants were denied defendant's three-day probationary period and the opportunity for season-long employment, right from the start.

The Court is mindful of the extra burdens which the cosmetic-conscious market brings to bear on agricultural growers who sell their fruits fresh rather than for processing or juicing, but the Court is equally satisfied that such growers are partly responsible for these pressures. The Court, in its considerable years, has never seen an imperfect fruit used in advertisement, regardless of how inconsequential the blemish. Accordingly, the Court sees no basis for reducing a grower's obligations to its would-be employees in order to better enable it to meet self-generated market expectations without passing such costs along to the consumer.

*10 The Court will award statutory damages of $400

to each of the eighteen plaintiffs not awarded actual damages for the violation of the rights secured them by 29 U.S.C. §§ 1822(c) or 1832(c). The Court will also award statutory damages of $400 to each of the five plaintiff whose rights secured them by 29 U.S.C. §§ 1821(f) or 1831(e) were violated in 1983, when the job clearance orders made no reference whatsoever to defendant's ladder test, notwithstanding the significance which the defendant had placed upon it as a matter of practice for many years in succession. Finally, in recognition of defendant's efforts to provide more accurate job descriptions in 1984, the Court will award statutory damages of $350 to each of the twelve plaintiffs whose rights under §§ 1821(f) or 1831(e) were violated by the defendant that year.

H

Lastly, plaintiffs have moved for an award of prejudgment interest on the awards of actual damages stemming from the dates upon which the seventeen plaintiffs who have been awarded actual damages applied for work at Hepburn Orchards. Defendants oppose the motion.

Plaintiffs cite *Montelongo v. Meese*, 803 F.2d 1341, 1354 (5th Cir. 1986) for the proposition that prejudgment interest from the date of breach is appropriate when actual damages, not statutory damages, are sought and awarded. Defendant principally objects on the theory that none of these plaintiffs proved that they are entitled to actual damages. Defendant supplements its position by arguing that the awarding of prejudgment interest to those plaintiffs would be more in the line of adding insult to injury rather than fairly compensating these plaintiffs for injuries suffered at its hand.

The Court finds the reasoning of *Montelongo* to be sound, and the defendant's objections without merit or supportive authority. The Court notes that the defendant exposed itself to this potential consequence when it elected to reject generally qualified applicants on the basis of their having failed to perform like ideal employees within minutes of their arrival at its orchard while indulging in the biased notion that all Jamaicans already are ideal employees. Indeed, the defendant exposed itself to even greater damages than those awarded here, for defendant could have had no idea at the time its ladder tests were being given that any of the rejected applicants would mitigate any of their damages suffered by obtaining other gainful employment. Far from being

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

1987 WL 16939
Not Reported in F.Supp., 1987 WL 16939 (D.Md.), 106 Lab.Cas. P 34,913
**(Cite as: 1987 WL 16939 (D.Md.))**

Page 8

penal, prejudgment interest serves to reciprocate plaintiffs for defendant's possession and use of their wrongfully withheld benefits.

In striking this balance, however, the Court must acknowledge that the actual damages awarded are principally lost wages, return transportation costs and housing costs, virtually none of which would have accrued as of the dates of defendant's breaches, and not one of which awards could have been determined sooner than the last day of those plaintiffs' court-determined three-fourths time contracts of employment. Moreover, the Court takes judicial notice of the declining rates of interest which have prevailed for the last three to four years.

*11 Accordingly, plaintiffs' motion for an award of prejudgment interest to accompany each of the seventeen awards of actual damages is granted, and prejudgment interest will be awarded at the simple (not compounded) rate of five *per centum per annum* from those seventeen plaintiffs' court-determined final dates of their guaranteed three-fourths time contracts of employment to this, the date of judgment.

A separate judgment order will be issued.

> FN1 Court docket entries #7 (amended complaint), 323 (order granting motion to add three more plaintiffs), #29 (order granting motion to add five more plaintiffs) and #30 (order granting motion to add one more plaintiff); the Court orally denied plaintiffs' request for class certification at the pretrial conference on June 25, 1985, and that ruling is memorialized here.

> FN2 Ricky Snow, Demora Bernett, John Flynn, John Robert Richards, Marcus Bernett, Tofice Saint-Louis, Pierre Polinice, Nelson Felix, Danes Jean-Louis, Merlin Williams, Smole Lee Thomas, Jean Etienne, Joseph Beard and Terry Hepburn; and cameo appearances by Pierre Benjamin, Menou Desilien, Luckner Delmas and Dennis Sauveur.

> FN3 Demora Bernett, Domingo Diaz, John Flynn, Craig Merki, Terry Miller, John Robert Richards, Merilus Senat, Ricky Snow, Oldvert Ulysse and Pedro Wilson.

> FN4 Several of the plaintiffs testified in Court with the assistance of an English-Haitian-Creole interpreter.

> FN5 The evidence indicates that one plaintiff, Craig Merki, appeared at the worksite without having followed the aforementioned procedure, the effects of which independence will be discussed *infra*.

> FN6 Note that two witnesses testified that they passed their tests by bracing the ladder in holes in the ground, undetected by Terry Hepburn.

> FN7 A ladder was produced and examined by the Court in the course of the trial.

Not Reported in F.Supp., 1987 WL 16939 (D.Md.), 106 Lab.Cas. P 34,913

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.                                                           Page 1
Not Reported in F.Supp., 1998 WL 372644 (E.D.Pa.), 5 Wage & Hour Cas.2d (BNA) 717
**(Cite as: Not Reported in F.Supp.)**

▷Bunnion v. Consolidated Rail Corp
E.D.Pa.,1998.

United States District Court, E.D. Pennsylvania
John J. BUNNION, Jr., et al., individually and on
behalf of all others similarly situated
v.
CONSOLIDATED RAIL CORP., et al.
**No. Civ.A. 97-4877.**

May 14, 1998.

Stephen G. Console, Law Offices of Stephen G.
Console, Phila., PA, USA, Carol A. Mager, Debora
A. O'Neill, Mager, Liebenberg & White,
Philadelphia, PA, USA, Joel C. Schochet, Mager
Liebenberg & White, Philadelphia, PA, for John J.
Bunnion, Jr., Plaintiff.
Stephen G. Console, Carol A. Mager, Debora A.
O'Neill, Joel C. Schochet, (See above), for Anthony
D. Falcone, on Behalf of Themselves and All
Similarly Situated Persons, Plaintiff.
Laurence Z. Shiekman, Brian T. Ortelere, Pepper,
Hamilton & Scheetz, Phila, PA, USA, for
Consolidated Rail Corporation, Defendant.
Laurence Z. Shiekman, Brian T. Ortelere, (See
above), for Consolidated Rail Corporation Matched
Savings Plan, Defendant.
Laurence Z. Shiekman, Brian T. Ortelere, (See
above), for Supplemental Pension Plan of
Consolidated Rail Corporation, and the Fiduciaries
and Administrators of the Foregoing Plans,
Defendant.
Stephen G. Console, Law Offices of Stephen G.
Console, Phila., PA, USA, Carol A. Mager, Debora
A. O'NeillMager, Liebenberg & White, Philadelphia,
PA, USA, for C. Dyana Reed, Plaintiff.
Stephen G. Console, Carol A. Mager, Debora A.
O'Neill, (See above), for Frances E. Bronson,
Plaintiff.
Stephen G. Console, Carol A. Mager, Debora A.
O'Neill, (See above), for George Hall, Plaintiff.
Stephen G. Console, Carol A. Mager, Debora A.
O'Neill, (See above), for Deborah Daley, Plaintiff.
Stephen G. Console, Carol A. Mager, Debora A.
O'Neill, (See above), for John L. Raybuck, Plaintiff.
Brian T. Ortelere, Pepper, Hamilton & Scheetz,
Phila, PA, USA, for Administrative Committee of the
Conrail Matched Savings Plan, Defendant.

Brian T. Ortelere, (See above), for Supplemental
Pension Plan Administrative Committee, Defendant.
Brian T. Ortelere, (See above), for
Flexible/Medical/Dental Dependent Plan, Life
Insurance, Dismemberment and Long Term
Disability and Retirees Life Insurance Plan,
Severance Plan, Defendant.
Brian T. Ortelere, (See above), for Deborah A.
Melnyk, Defendant.
Brian T. Ortelere, (See above), for Richard J.
Davison, Defendant.
Brian T. Ortelere, (See above), for Peter F. Barr,
Defendant.
Brian T. Ortelere, (See above), for Christian D. Hill,
Defendant.
Brian T. Ortelere, (See above), for Gerhard A.
Thelen, Defendant.
Brian T. Ortelere, (See above), for Marianne S.
Gregory, Defendant.
Brian T. Ortelere, (See above), for John A.
Mckelvey, Defendant.
Brian T. Ortelere, (See above), for Richard D.
Huffman, Defendant.
Brian T. Ortelere, (See above), for Dale A. Shaub,
Fiduciaries and Administrators of the Foregoing
Plans and Other Doe Fiduciaries, Defendant.
Brian T. Ortelere, (See above), for Supplemental
Pension Plan of Consolidated Rail Corporation,
Defendant.

*MEMORANDUM*

BARTLE, J.
*1 Before the court is the motion of plaintiffs for
class certification under Rule 23 of the Federal Rules
of Civil Procedure and 29 U.S.C. § 201 of the Fair
Labor Standards Act.

This putative class action challenges the propriety of
certain actions taken by Consolidated Rail
Corporation ("Conrail"), a railway freight-hauling
corporation, with respect to its pension plan, its
treatment of older workers, and its voluntary
separation program ("VSP"). Plaintiffs, all former
employees of Conrail who accepted the VSP, have
sued Conrail, the Conrail Matched Savings Plan, the
Administrative Committee of the Conrail Matched
Savings Plan, the Supplemental Pension Plan of
Conrail, its administrative committee, the flexible
medical/dental dependent plan, life insurance,
dismemberment and long-term disability and retirees

Not Reported in F Supp.                                                                          Page 2
Not Reported in F.Supp , 1998 WL 372644 (E D Pa ), 5 Wage & Hour Cas 2d (BNA) 717
(Cite as: Not Reported in F.Supp.)

life insurance plan, severance plan, and the fiduciaries and administrators of these plans Plaintiffs assert violations of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C §§ 1001 *etseq*, the Age Discrimination in Employment Act ("ADEA"), 29 U S.C §§ 621 *etseq*, and the Pennsylvania Wage Payment and Collection Law ("WPCL"), Pa Stat Ann tit. 43, §§ 260 1 *etseq* They also allege common law claims.

Plaintiffs propose one class composed of "all persons formerly employed by defendant Conrail at any Conrail location who tendered their resignations as part of the March 1, 1996, Conrail separation plan ("VSP")." Amended Compl. ¶ 31 (hereinafter "Compl ") In addition, plaintiffs seek certification of a subclass comprised of "those VSP participants who returned to work for Conrail to positions of employment which Conrail designated as non-employee status" for the claims set forth in Counts VI, VIII, IX, X, XI, XII, and XIII. This subclass also seeks certification under 29 U.S.C § 201 for its ADEA claim contained in Count VII

Plaintiffs John J. Bunnion, Jr., Anthony D Falcone, C Dyana Reed, Frances E. Bronson, George Hall, Deborah Daley and John Raybuck seek to be the designated class representatives of the main class, with plaintiffs Bunnion, Falcone, Reed, Daley, and Raybuck seeking to represent the subclass. Plaintiffs propose Carol A. Mager, Esquire and Debora A. O'Neill, Esquire of Mager Liebenberg & White as well as Stephen G Console, Esquire, Law Offices of Stephen G Console, as class counsel

I

According to plaintiffs' amended complaint, Conrail provides certain benefit plans to its employees. These include a Matched Savings Plan/Employee Stock Ownership Plan ("ESOP"),[FN1] APAR and APAR Plus,[FN2] life insurance, vacation and holiday benefits, medical and dental plans, sick-time leave, short-term disability benefits, long-term disability benefits, a Supplemental Pension Plan, a long-term incentive plan, tuition reimbursement as well as "other paid leave and stock purchase plans."Compl ¶ 40

> FN1. This plan, also known as an "ESOP," was described at length in a prior opinion dealing with three other class actions against Conrail *SeeBennett v Conrail Matched*

*Savings Plan Admin. Comm ,* Nos. CIV. A. 97-4535, 97-5017, 97-5345, 1997 WL 700538 (E D Pa. Oct 30, 1997).

> FN2. Plaintiffs do not define or explain these acronyms.

On February 21, 1996 Conrail declared that it would be eliminating 900 of its employees over the next few months. To achieve this job reduction, Conrail announced on March 1, 1996, its "four stage separation plan." Stage 1 was labeled a "Voluntary Retirement Program" and was for those non-union employees who would be 55 years of age or older by February 28, 1997. Stage 2, a Voluntary Separation Program ("VSP"), was applicable to "non-union employees with 15 years of continuous Conrail service who are not covered under Stage 1 and whose applications are accepted by [Conrail]." Compl ¶ 58. Both Stages 1 and 2 were offered immediately and simultaneously. Stages 3 and 4 were entitled "Involuntary Staff Rationalization" and the "Workforce Redeployment Program" respectively. Compl ¶ 58.

*2 The putative class accepted the VSP, the offering of Stage 2, by April 19, 1996. Plaintiffs contend that the VSP was "devised for the purpose of substantially reducing defendants' costs of providing benefits to employees by interfering with the attainment of pension and welfare benefits by long service Conrail employees."Compl ¶ 54 Not only was the VSP designed to deprive employees of benefits, but the plaintiffs aver that Conrail management continually and intentionally misrepresented certain facts regarding the VSP. In particular, the defendants allegedly "led the plaintiffs and other employees of Conrail to believe that if they did not accept the terms of the VSP and voluntarily terminate their employment, they would be involuntarily terminated from their jobs, without any severance."Compl ¶ 56. Plaintiffs claim that Conrail constantly reminded employees that they would soon lose their jobs and that accepting the VSP was a "dignified way to leave the company."[FN3]Compl ¶ 62 Conrail also led plaintiffs to believe that "subsequent packages, if offered, would not be as favorable."Compl. ¶ 62. Incident to acceptance of the VSP, plaintiffs were "induced" to sign a general release of all claims Compl ¶¶ 61, 63.

> FN3. According to plaintiffs, in 1995, Conrail removed some involuntarily

Not Reported in F.Supp                                                    Page 3
Not Reported in F.Supp., 1998 WL 372644 (E.D.Pa.), 5 Wage & Hour Cas.2d (BNA) 717
**(Cite as: Not Reported in F.Supp.)**

terminated employees by police escort. The reference to a "dignified" way to leave the company, plaintiffs aver, was an implicit threat of a similar undignified removal Compl. ¶ 64.

Plaintiffs allege that had they stayed and not accepted the VSP, they would have received substantially greater benefits than those provided by the VSP Purportedly, those who did not accept the VSP but remained Conrail employees later received a severance package of greater value, as well as a staying bonus. Compl. ¶ 84. Further, Conrail never implemented Stages 3 and 4 of the 4 stage separation plan, and no Conrail facility has yet closed.

While all the members of the putative class accepted the VSP at or around the same time, their actual departure from Conrail varied, as Conrail had "retained the right to delay the actual termination of any employee who accepted [the VSP] up to one year after the date of the acceptance."Compl ¶ 71. When plaintiffs did eventually leave, approximately 30% of them returned to work at Conrail as "independent contractors." Compl ¶ 81. Often they performed the exact same work they had formerly done. However, as independent contractors, they earned a lower salary, could not participate in or accrue service credit for Conrail pension plans, and received no Conrail benefits One such named plaintiff, Anthony Falcone, was terminated one day and started work as an independent contractor the next. Although classified as independent contractors, plaintiffs claim that they were in reality Conrail employees and therefore entitled to all Conrail employee compensation levels and benefits

Plaintiffs also aver that the VSP "disparately treated and impacted on older workers."Compl ¶ 100
As further evidence of the fact that the VSP was not motivated by a reduction in available work, before the announcement of the March 1, 1996 separation plan (at a time when upon information and belief Conrail knew about the intended downsizing), Conrail hired several former independent contractors under age 40, converting them into full-benefit employees

*3 Compl. ¶ 103

Conrail will soon cease to exist. Subsequent to Conrail's offering of the VSP, Norfolk Southern Corporation and CSX Corporation agreed to acquire Conrail jointly In April, 1997, they formed a new entity which made a tender offer to acquire Conrail's outstanding stock. This offer was successful. By early June, 1997, the new entity created by CSX and Norfolk Southern merged into Conrail."[P]ending governmental approval, Conrail will go out of existence and its assets will be divided between CSX and Norfolk Southern."Compl ¶ 53.

II

In determining a motion for class action certification, we do not examine the merits of the plaintiffs' underlying claims *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177-78, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). Rather, we focus on the requirements of Rule 23 of the Federal Rules of Civil Procedure. In order to obtain class certification plaintiffs must meet the four requirements of Rule 23(a) of the Federal Rules of Civil Procedure and at least one part of Rule 23(b) *Id.* at 162-63

Plaintiffs have the burden of proving that this action meets the certification requirements. *Heastie v Community Bank of Greater Peoria,* 125 F.R.D. 669, 673 (N.D.Ill.1989). The Supreme Court has explained that "[c]lass actions serve an important function in our system of civil justice."*Gulf Oil Co. v. Bernard,* 452 U.S. 89, 99, 101 S.Ct. 2193, 68 L.Ed.2d 693 (1981). In keeping with this policy, the Court of Appeals for the Third Circuit has adopted a liberal construction of Rule 23 *Eisenberg v. Gagnon,* 766 F.2d 770, 785 (3d Cir.), *cert. denied,*474 U.S. 946 (1985). The court has declared that "the interests of justice require that in a doubtful case ... any error, if there is to be one, should be committed in favor of allowing a class action."*Id.*

We will first examine whether plaintiffs meet the requirements of Rule 23(a) which provides:
One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class

Defendants do not dispute that plaintiffs meet the

Not Reported in F.Supp.                                                              Page 4
Not Reported in F.Supp., 1998 WL 372644 (E.D.Pa.), 5 Wage & Hour Cas.2d (BNA) 717
**(Cite as: Not Reported in F.Supp.)**

numerosity and adequacy requirements of Rule 23(a). We agree. The main class is predicted to number approximately 600 persons, while the subclass will contain approximately 70. Further, the representative plaintiffs and their proposed class counsel will adequately represent the class and subclass.

However, defendants vigorously contest plaintiffs' ability to meet 23(a)(2), the commonality requirement, as well as 23(a)(3), the typicality requirement. Defendants essentially contend that plaintiffs' amended complaint contains too many individualized aspects to meet Rule 23(a).*See Georgine v. Amchem Prod. Inc.*, 83 F.3d 610, 624 (3d Cir.1996), *aff'd sub nom, Amchem Prod. Inc. v. Windsor*, 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) [FN4]

> FN4. Overall, we find the *Georgine* case inapplicable here. In *Georgine*, the Third Circuit held that the commonality barrier is higher in a personal injury damages class action which seeks to resolve noncommon issues of liability and damages. *Georgine*, 83 F.3d at 627. There, some plaintiffs had various asbestos-related diseases while others had been exposed to asbestos, but no disease had yet manifested itself. The court found these factual and legal differences too extreme to sustain a finding of commonality or typicality.

*4 While the concepts of commonality and typicality are similar, they remain distinct components of Rule 23(a). *Id.* at 632. Commonality concerns the nature of the proposed class while typicality concerns the sufficiency of the named plaintiffs. *Hassine v. Jeffes*, 846 F.2d 169, 176 n. 4 (3d Cir.1988). "The commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class."[FN5]*Baby Neal For and By Kanter v. Casey*, 43 F.3d 48, 56 (3d Cir.1994). For this reason, the commonality requirement is "easily met." *Id.* Factual differences may exist among plaintiffs because they do not share identical claims. *Id.* Even where facts unique to each plaintiff may be relevant, a class may still be certified, but later bifurcated. *Id.* at 57.

> FN5. This is unlike the (b)(3) portion of Rule 23 which requires that common issues predominate.

The typicality inquiry focuses on "whether 'the named plaintiff's individual circumstances are markedly different or ... the legal theory upon which the claims are based differs from that upon which the claims of the class members will perforce be based.'"*Eisenberg*, 766 F.2d at 786. A class meets this requirement if the named plaintiffs and the proposed class "challenge[ ] the same unlawful conduct." *Baby Neal*, 43 F.3d at 58. Factual differences between named plaintiffs and the class members do not defeat a motion for class certification if "the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members, and if it is based on the same legal theory."*Id.* "Indeed even relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories."*Id.* According to the Third Circuit, we must essentially discern whether potential conflicts exist within the class. *Georgine*, 83 F.3d at 632.

### A

Counts I, VI, and VIII assert ERISA claims for interference with benefits in violation of 29 U.S.C § 1140. According to plaintiffs, the defendants created the VSP with the intention of interfering with their ERISA benefits and also coerced the plaintiffs to accept the VSP.[FN6] Compl. ¶¶ 122-23. As to Count VIII, the subclass claims that the defendants "purposefully returned these class members to nominally non-employee positions (which were actually employee positions) and refused to acknowledge their employee status for the purpose of interfering with those employees' attainment of benefits in violation of ... ERISA."Compl. ¶ 161.

> FN6. Counts I and VI are asserted on behalf of the entire class for interference with ERISA benefits and ESOP benefits, respectively.

To prevail under § 1140, a plaintiff must produce evidence showing: "(1) prohibited employer conduct; (2) taken for the purpose of interfering; (3) with the attainment of any right to which the employee may become entitled."*Dewitt v. Penn-Del Directory Corp.*, 106 F.3d 514, 522 (3d Cir.1997).

Defendants contend that whether an employee left voluntarily or was coerced to accept the VSP, and

Not Reported in F.Supp.                                                                                              Page 5
Not Reported in F.Supp., 1998 WL 372644 (E.D.Pa.), 5 Wage & Hour Cas.2d (BNA) 717
(Cite as: Not Reported in F.Supp.)

whether the defendants withheld information regarding future benefits are individualized inquiries, inappropriate for resolution in a class action. Defendants assert that claims involving coercion are particularly inappropriate for class action citing *Ungar v. Dunkin' Donuts of America, Inc.,* 531 F.2d 1211, 1226 (3d Cir.), *cert. denied,* 429 U.S. 823, 97 S.Ct. 74, 50 L.Ed.2d 84 (1976). Plaintiffs counter that the focus of a § 1140 ERISA claim is on the conduct of the defendants. The reasons that plaintiffs accepted the VSP, such as through coercion, are irrelevant.

*5 Certification of an ERISA action predicated upon § 1140 may be proper if the requirements of Rule 23 are met. *Fischer v. Philadelphia Elec. Co.,* 96 F.3d 1533, 1543 (3d Cir.1996), *cert. denied,* 520 U.S. 1116, 117 S.Ct. 1247, 137 L.Ed.2d 329 (1997). We find that plaintiffs meet the commonality requirement of 23(a)(2) on Counts I, VI, and VIII. The proposed classes of plaintiffs need only have one question of law or fact in common. *Baby Neal,* 43 F.3d at 56. As to Counts I and VI, the obvious question in common is whether the defendants created the VSP with the intention of interfering with plaintiffs' ERISA and ESOP benefits. Key facts in common include receipt of ERISA benefits, participation in the ESOP prior to leaving Conrail, and acceptance of the VSP by all plaintiffs. Compl. ¶¶ 31, 121, 151. As to Count VIII, a common question is whether the defendants returned the subclass members as independent contractors for the purpose of interfering with the attainment of their employee benefits. All subclass members have in common that they accepted the VSP, returned to work with Conrail to what Conrail deemed to be "non-employee" positions and therefore did not receive benefits designated for only Conrail employees.

We also find that the proposed class and subclass meet the typicality requirements on Counts I, VI, and VIII. The named plaintiffs and their proposed class members all "challenge [ ] the same unlawful conduct," that is, the alleged interference with ERISA benefits. *Baby Neal,* 43 F.3d at 58. We see no potential conflicts between the representative plaintiffs and their proposed class and subclass members.[FN7] *Georgine,* 83 F.3d at 632.

> FN7. We do not agree with defendants' assertions that individual issues control. Neither is such an inquiry relevant since plaintiffs only need to show one common issue. We do not see how the circumstances

surrounding plaintiffs' acceptance of the VSP is pertinent to the issue of whether defendants' conduct in devising and offering the VSP was with the intent of interfering with plaintiffs' receipt of ERISA benefits. The instant action is unlike the *Ungar* case cited by defendants. *Ungar* was an antitrust case which required proof of coercion as an element of illegal tying. *Ungar,* 531 F.2d at 1226. Coercion is not an element here.

B.

Counts II and XIII claim that defendants breached their fiduciary duties in violation of ERISA, 29 U.S.C. §§ 1104, 1105. In Count II, the entire class alleges that defendants failed to explain fully "the likelihood that they could remain in the employ of Conrail for the foreseeable future had they not elected the VSP" and failed to disclose the effect of their participation in the VSP on their "right to participate in future distributions from the ESOP."Compl. ¶ 128. But for these misrepresentations, plaintiffs allege that they would have remained Conrail employees. In Count XIII, the subclass avers that defendants failed to "enforce the various provisions of the applicable plans in a manner consistent with applicable law."Compl. ¶ 183. Without these breaches of fiduciary duty, the subclass of plaintiffs would have been able to participate in the ERISA plans.

As we discussed at length in our prior opinion which resolved the defendants' motion to dismiss, ERISA fiduciaries must act solely in the interest of the Plan participants. *See Bunnion v. Consolidated Rail Corp.,* No. CIV. A. 97-4877, 1998 WL 32715, at *5 (E.D.Pa. Jan. 6, 1998). They fail to do so if they make material misrepresentations or omissions. *Id.*

Citing *Sprague v. General Motors Corp.,* 133 F.3d 388 (6th Cir.1998), defendants aver that individual issues preclude a finding of commonality or typicality. According to defendants, the plaintiffs may have relied on a myriad of different representations to which not all plaintiffs were exposed. Even though plaintiffs point to some uniform information allegedly sent to all potential plaintiffs, they cannot say to what extent each plaintiff actually relied upon such disclosures. Defendants assert that this claim should not be certified as a class because it would require an inquiry of each individual plaintiff-what each read or

Not Reported in F.Supp.                                                                                    Page 6
Not Reported in F.Supp., 1998 WL 372644 (E.D.Pa.), 5 Wage & Hour Cas.2d (BNA) 717
(Cite as: Not Reported in F.Supp.)

heard or on what, if any, representations each relied. Moreover, according to defendants, whether a statement was "material" to a plaintiff depends upon that individual plaintiff.

*6 Where appropriate, ERISA breach of fiduciary duty claims may be certified as a class action *See, e.g.,In re Unisys Corp Retiree Med. Benefit "ERISA" Litig.,* 57 F.3d 1255 (3d Cir.1995), *cert, denied,*517 U.S. 1103 (1996); *Fischer,* 96 F.3d 1533. In the amended complaint, plaintiffs allege a variety of misrepresentations and omissions. Plaintiffs aver that defendants failed to mention material information to all employees. Compl. ¶ 60. Further, some alleged misrepresentations took the form of company-wide distributions of documents or e-mails. Compl. ¶¶ 63, 67; Plaintiffs' Motion for Class Certification Exs. B, C, D. Conrail maintained an electronic bulletin board to post the answers to frequently asked questions regarding the VSP. Plaintiffs' Motion for Class Certification Ex. J at 123-25. Conrail also held various information sessions on the VSP at different locations. However, according to one plaintiff who attended two such sessions, the information communicated was identical, "like they were reading from a script."Plaintiffs' Motion for Class Certification Ex. K at 71-72 Other alleged misrepresentations were oral, made to a portion of the class, or in some circumstances to only one individual plaintiff Compl. ¶ 66.

A court may further subdivide a class into subclasses when necessary to compensate for individual issues *Wetzel v. Liberty Mut. Ins. Co.,* 508 F.2d 239, 252-53 (3d Cir.), *cert. denied,*421 U.S. 1011 (1975). In a case similar to the instant one, a court in this district has allowed a class action for breach of fiduciary duty where, in addition to company-wide representations, there were specific representations made to only certain plaintiffs. *In re Unisys Corp. Retiree Med. Benefits ERISA Litig.,* No. CIV. A. 969, 1994 WL 284079, at *27 (E.D. Pa. June 23, 1994), *aff'd,*57 F.3d 1255 (3d Cir.1995). Chief Judge Cahn stated, "because some plaintiffs have stronger cases than others based on their specific inquiries and the information given to them personally, the court finds that subclasses, and possibly even individual hearings will be necessary to adjudicate these claims."*Id.* The court did not hold that these individual representations precluded the continuance of the action as a class action.

Further, we agree with plaintiffs that the focus on a

breach of fiduciary duty claim is the conduct of the defendants, not the plaintiffs. For this reason, reliance of plaintiffs is immaterial at the liability phase. Further, the materiality of a misrepresentation does not differ from plaintiff to plaintiff as defendants contend. In the context of an ERISA case, materiality is "a mixed question of law and fact, ultimately turning on whether 'there is a substantial likelihood that [the misrepresentation] would mislead a reasonable employee in making an adequately informed decision about if and when to retire.' " *Fischer,* 96 F.3d at 1538 (quoting *Fischer v. Philadelphia Elec. Co.,* 994 F.2d 130, 135 (3d Cir.1993)) The standard is one of a reasonable employee, not an actual one Therefore, we find that defendants' contentions that individual issues of materiality and reliance would predominate to be without merit.[FN8]

> FN8 Whether common issues predominate is irrelevant under Rule 23(a). Plaintiffs need only an issue of law or fact in common. *Baby Neal,* 43 F.3d at 56. We also find the defendants' citation of and reliance upon *Sprague v. General Motors Corp.,* 133 F.3d 388 (6th Cir.1998), *petition for cert, filed,* (U.S April 6, 1998) (No. 97-1639), to be inapposite with respect to this ERISA breach of fiduciary claim. In *Sprague,* the Court of Appeals for the Sixth Circuit held that class certification on the claims of estoppel and breach of a "bilateral" contract was an abuse of discretion. *Id.* at 398-99.The breach of contract claim averred that defendant General Motors had made a "side deal" with each individual plaintiff. *Id.* at 398 The plaintiffs had signed differing forms, or no form at all, in the acceptance of this side deal.*Id.* Because the representations were not uniform, and issues of reliance were individualized, the claims of plaintiffs were not common and the representative plaintiffs could not be typical of the class. *Id.* at 398-99.As we discussed above, issues of reliance are not relevant in this ERISA claim Further, we are confronted with predominantly uniform representations.

*7 Under the circumstances presented, we conclude that plaintiffs meet the commonality and typicality requirements of Rule 23(a) on Count II. The proposed class of plaintiffs have more than one question of law or fact in common. The obvious

Not Reported in F.Supp.                                                                Page 7
Not Reported in F.Supp., 1998 WL 372644 (E.D.Pa.), 5 Wage & Hour Cas.2d (BNA) 717
(Cite as: Not Reported in F.Supp.)

common issue is whether the company-wide documents or e-mails were misrepresentations which breached the fiduciary duties defendants owed the plaintiffs. Further, plaintiffs claim that the defendants uniformly omitted material information to the class. Because the plaintiffs all challenge the same unlawful conduct, that is, alleged company-wide misrepresentations and omissions, the representative plaintiffs are typical of the class. The fact that some individual plaintiffs may also have received personal misrepresentations from Conrail managers or supervisors does not pose a conflict within the class. See In re Unisys, 1994 WL 284079, at *27. Where "plaintiffs' evidence appears to follow a pattern, and the people they claim made the representations are largely the same people," oral representations do not preclude a finding of typicality under Rule 23(a)(2). Bittinger v. Tecumseh Prod. Co., 123 F.3d 877, 884 (6th Cir.1997).

The proposed subclass of plaintiffs in Count XIII also meets the typicality and commonality requirements. A common issue is whether defendants breached their fiduciary duties in failing to enforce the plans to include the subclass members. The plans at issue were the same, and plaintiffs aver that the defendants uniformly interpreted the plans to exclude them. Because the same conduct is at issue, the representative plaintiffs are also typical of the class.

### C.

Counts III and IX assert claims for benefits pursuant to 29 U.S.C. § 1132(a)(1)(B). Count III reads that "[b]y failing to provide the class members with the benefits to which they were entitled under defendant Conrail's employee pension and welfare benefit plans, including without limitation the ESOP plan, defendants violated [ERISA]." Compl. ¶ 137. In Count IX, the subclass asserts that defendants violated ERISA by "failing to provide the class members who were returned to work by Conrail into nominally non-employee status with the benefits to which they were entitled under defendant Conrail's" ERISA plans. Compl. ¶ 166.

Pursuant to ERISA, 29 U.S.C. § 1132(a)(1)(B), a plaintiff may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."

Defendants first assert that the named plaintiffs are not typical of the class because the named plaintiffs have exhausted their administrative remedies while the other members of the class have not done so. Plaintiffs counter that administrative remedies need not be exhausted because it would be futile to do so.

Exhaustion of administrative remedies is a prerequisite to a plaintiff "seek[ing] to enforce the terms of the Plan" in court. Berger v. Edgewater Steel Co., 911 F.2d 911, 916 (3d Cir.1990), cert. denied, 499 U.S. 920, 111 S.Ct. 1310, 113 L.Ed.2d 244 (1991); Thomas v. Kemper Nat'l Ins. Co., 984 F.Supp. 885, 890 (E.D.Pa.1997). This requirement is "strictly enforced" unless proceeding through the administrative remedies would be futile. Berger, 911 F.2d at 916.

*8 The named plaintiffs requested benefits from the applicable Plans and upon their denial petitioned the Plans for appellate review. Attached as Exhibit P to the defendants' opposition to the motion for class certification are the various Plan Committees' written rationale for the denial of these benefits. The letter from each Committee is basically the same. The Committees state that because subclass representative plaintiffs Bunnion, Falcone, Daley, Raybuck, and Reed did not receive earnings directly from Conrail which were subject to federal income tax withholding by Conrail, they were not "employees" as defined by the Plans and thus not eligible for receipt of benefits under the Plans. As to representative plaintiffs Hall and Bronson, members of the class but not the subclass, the Committees state in a footnote that because they elected the VSP and did not return to perform any services for Conrail, they are also not employees and therefore not eligible for Plan benefits. One such letter from the Matched Savings Plan states that determinations of whether a person is an employee are "determined, in part, by looking to that individual's relationships with the Plan sponsor, including the sources and the nature of the federal income tax treatment of the individual's compensation. In other words, the claims can be properly considered only on an individualized basis." Defendants' Response in Opposition to Plaintiffs' Motion for Class Certification Ex. P at page 2.

Based upon the reasons given by the Plans for the denial of benefits, we find that requiring all members of the class to exhaust their administrative remedies would be futile. The overall class proposed by

Not Reported in F.Supp.                                                          Page 8
Not Reported in F.Supp., 1998 WL 372644 (E.D.Pa.), 5 Wage & Hour Cas.2d (BNA) 717
**(Cite as: Not Reported in F.Supp.)**

plaintiffs contains those persons who accepted the VSP, including those who later returned to Conrail as independent contractors and those who never returned to work at Conrail. The subclass comprises those members of the class who accepted the VSP and then returned to work into what Conrail designated as non-employee positions. The representative plaintiffs, members of the class and subclass, have been denied Plan benefits for the very same reasons that qualify them as members of the class-acceptance of the VSP and either a complete absence of further performance at Conrail or performance as an independent contractor. We find the statement in the one letter regarding a need to look at each individual to determine if he or she was an "employee" is not significant for purposes of the pending motion.[FN9]

> FN9. The letter was written February 13, 1998, after commencement of the instant action and two days after the plaintiffs' filed their motion for class certification.

Further, we find that the requirements of commonality and typicality have been met as to Counts III and IX. The class members jointly allege that the ERISA Plans wrongfully denied benefits to those who accepted the VSP. The subclass members all have in common the fact that they accepted the VSP and then returned to work for Conrail on an independent contractor basis. They jointly allege that their re-employment status entitles them to benefits. The resolution of both counts will depend upon the interpretation and legality of plan terms. We further find that the situations of the representative plaintiffs are typical of those members of the class and subclass. Defendants note that each employee who returned as an independent contractor negotiated a separate contract, which varied among individuals, upon his or her return. However, regardless of the exact language of the contract negotiated, the subclass plaintiffs all have been classified by Conrail as independent contractors, or non-employees. In this respect they are the same. The claims of the representative subclass plaintiffs do not conflict with those of the proposed members of the subclass.

### D

*9 In Counts IV and V plaintiffs assert the common law claims of fraud and negligent misrepresentation. As we held in our prior opinion, because of the broad reach of ERISA preemption, these claims may only

assert fraud and misrepresentation regarding employment, not the employee benefit plans.*Bunnion,* 1998 WL 32715 at *8.

Defendants first note that the potential plaintiffs reside in different states, which presumably maintain different standards or requirements for these common law claims. Because the laws differ between states, and a federal court cannot create a federal version of state law claims, defendants contend that this legal difference precludes class certification. However, plaintiffs argue that sufficient contacts exist for Pennsylvania law to apply to the entire class.

The Supreme Court has held that the choice of law in a nationwide class action depends upon the significance of contacts with the state whose law the parties seek to apply. *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 821-22, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985). The Court held that the state "must have a 'significant contact or significant aggregation of contacts' to the claims asserted by each member of the plaintiff class, contacts 'creating state interests,' in order to ensure that the choice of [ ] law is not arbitrary or unfair."*Id.* (quoting *Allstate Ins. Co. v Hague,* 449 U.S. 302, 312-13, 101 S.Ct. 633, 66 L.Ed.2d 521 (1981)). In *Phillips,* the Supreme Court found such significant contacts lacking. The fact that Phillips Petroleum Company owned property and conducted substantial business in Kansas was not enough.*Id.* at 819.

Utilizing this significant contact analysis, a court in our district found significant contact existed such that Pennsylvania law could apply in a securities' fraud case. *Gruber v. Price Waterhouse,* 117 F.R.D. 75, 82 (E.D.Pa.1987). The corporation whose stock was at the center of the case maintained its principal place of business and its offices in Pennsylvania.*Id.* Further, a majority of the auditing work and the corporation's "financial statements were prepared in and disseminated from Pennsylvania."*Id.*

Conrail is incorporated and licensed to do business in Pennsylvania. Its principal place of business is in Philadelphia. Compl. ¶ 27. Further, plaintiffs' amended complaint avers that the Plans at issue in this lawsuit are administered in the Eastern District of Pennsylvania. Compl. ¶ 30. Indeed, the letters from the Plans rejecting the administrative appeals of the representative plaintiffs were sent from Conrail's Philadelphia address. Defendants' Response in Opposition to the Motion for Class Certification, Ex.

Not Reported in F Supp.
Not Reported in F Supp., 1998 WL 372644 (E D Pa), 5 Wage & Hour Cas 2d (BNA) 717
**(Cite as: Not Reported in F.Supp.)**

P. Given the significant amount of contacts in Pennsylvania, we find that its law should apply.[FN10]

> FN10 We believe the case of *In re Rhone-Poulenc Rorer Inc.,* 51 F.3d 1293 (7th Cir), *cert, denied,*516 U S. 867, 116 S.Ct 184, 133 L Ed 2d 122 (1995), cited by the defendants, is inapplicable In that case, the Seventh Circuit held that a court could not apply a legal standard which represented an amalgam of the various state laws at issue, one that "does not exist anywhere in the world."*Id* at 1300.The significant contact test was not applied. Here, plaintiffs seek to apply Pennsylvania law, not some amalgam of legal principles

Defendants contend that even assuming Pennsylvania law would apply, individual issues of reliance thwart class certification on these counts. Plaintiffs concede that reliance is an element of these claims of fraud and negligent misrepresentation, but assert that reliance issues will not defeat class certification because of the common course of fraudulent action perpetrated by the defendants. Further, reliance is presumed where material information has been omitted.[FN11]As an alternative, plaintiffs contend that we can deal with reliance issues later in the litigation.

> FN11 We agree that reliance may be presumed in certain types of cases, such as securities fraud. *SeeEisenberg v Gagnon,* 766 F.2d 770, 786 (3d Cir.1985)

**\*10** We find that the proposed class meets the requirements of commonality and typicality on the state law claims of fraud and negligence. Plaintiffs aver that they were all led to believe in early 1996 that failure to accept the VSP would result in involuntary termination and were otherwise misled about the prospects of continued employment. Compl ¶ 56. Whether the alleged statements occurred and whether they misrepresented the facts are common issues of fact and law. Because the same course of conduct is at issue, the misleading statements regarding future employment, the representative plaintiffs are typical and do not conflict with other members of the proposed class.

E.

Counts X avers an action under the WPCL on behalf

of the subclass for non-ERISA benefits. The WPCL requires an employer to pay promptly wages, fringe benefits, and wage supplements to its employees. Pa. Stat. Ann. tit. 43, § 260 3 (West 1992) Failure to do so may subject it to a civil suit by its employees, a labor organization, or the Secretary of Labor and Industry as well as possible liquidated damages and criminal penalties. *Id*

Again, defendants assert that issues unique to each individual plaintiff preclude a finding of commonality or typicality under Rule 23(a) Further, defendants assert that the WPCL only extends to those employees based in Pennsylvania

One court in our district has held that the WPCL was intended to apply only to those persons employed in Pennsylvania. *Killian v. McCulloch,* 873 F.Supp. 938, 942 (E.D.Pa.1995), *aff'd,*82 F 3d 406 (3d Cir.1996). The court, after analyzing legislative history, found that the Pennsylvania legislature "has a strong interest in enacting legislation to protect those who work in the Commonwealth, but has almost no interest in extending that protection to those who work outside Pennsylvania."*Id* Rather, "its primary aim is to ensure that those who are employed *in Pennsylvania* receive compensation for their work."*Id* (emphasis added) As support for this conclusion, the court noted that no reported case allowed an out-of-state employee to assert a WPCL action in Pennsylvania.

We find this reasoning persuasive. Proposed representatives of the subclass Bunnion, Falcone, Daley, and Raybuck all reside in Pennsylvania according to the amended complaint, but no information is provided regarding the location of their work as an "independent contractor."[FN12]Compl. ¶¶ 6-10, 20-25 Representative plaintiff Reed is a resident of Nevada Plaintiffs provide no information regarding the number of members of the proposed subclass who have worked for Conrail in Pennsylvania. As such, we are unable to discern whether the proposed representatives are typical of the subclass. On a claim under the WPCL, whether or not the plaintiffs worked in Pennsylvania is extremely relevant. Therefore, we find that the proposed subclass does not meet the commonality or typicality requirements of Rule 23(a).

> FN12 Later in the amended complaint, we learn that plaintiffs Bunnion and Falcone worked at the Island Avenue facility

Not Reported in F.Supp.                                                                Page 10
Not Reported in F.Supp., 1998 WL 372644 (E.D.Pa.), 5 Wage & Hour Cas.2d (BNA) 717
**(Cite as: Not Reported in F.Supp.)**

Compl. ¶ 66(b). The court believes that this site is located in Pennsylvania.

F.

\*11 Counts XI sets forth a breach of contract claim on behalf of the subclass while Count XII seeks unjust enrichment on behalf of the entire class. As we noted in our prior opinion, these claims are limited to non-ERISA benefits. Bunnion, 1998 WL 32715 at \*9.

Again, defendants assert that issues unique to each individual plaintiff preclude a finding of commonality or typicality under Rule 23(a). As to the breach of contract claims, defendants note that the contract for each employee was unique and therefore commonality and typicality do not and cannot exist. For instance, deposition testimony reveals that plaintiff Daley could only be terminated for cause, while plaintiff Hall worked under no written contract at all. See Defendants' Response in Opposition to the Motion for Class Certification Exs. H at 158, and I at 42. Plaintiffs aver that the defendants created this scheme, of differing contracts, so they cannot now contest class certification on these grounds.[FN13] Further, plaintiffs contend that Conrail is the actual employer who excluded the subclass from benefits because of their arbitrary classification as non-employees. Plaintiffs also claim that subclasses can be created if necessary.

> FN13. Plaintiffs cited the case of Christopher v. Mobil Oil Corp., 950 F.2d 1209, 1221 (5th Cir.), cert. denied, 506 U.S. 820, 113 S.Ct. 68, 121 L.Ed.2d 35 (1992), in support of this contention. However, that case, to the extent it is at all relevant, did not deal with class certification.

We note initially that it is unclear whether plaintiffs are claiming that a contract existed prior to plaintiffs' acceptance of the VSP or at the time of their return to work at Conrail as independent contractors. In either case, the subclass plaintiffs do not contest defendants' assertions that their contracts differ. Moreover, evidently not all subclass plaintiffs even had a contract.

Thus, in these circumstances we conclude that typicality does not exist. Commonality may exist because all subclass plaintiffs returned to work but were classified as independent contractors by

Conrail. However, we find that on the breach of contract claim the representative plaintiffs are not typical of the subclass because their circumstances are "markedly different." Eisenberg, 766 F.2d at 786. Some had contracts, which varied, and at least one had no contract at all. Because potential conflicts may arise between the terms of the various contracts or between those plaintiffs with and without contracts, we conclude that the typicality requirement is not met. See Georgine, 83 F.2d at 632.

The claim for unjust enrichment in Count XII asserts that defendants "have or will receive certain monies that they would not have obtained or retained but for their wrongful conduct at the expense of the plaintiffs and the plaintiff class."Compl. ¶ 178. Defendants maintain that even if there is no contract, a court or jury would need to look at each individual "deal" to see the basis for an unjust enrichment claim.

We find that we are confronted with insufficient information to determine whether this count meets the commonality and typicality requirements. Unjust enrichment is an equitable doctrine that, in our view, depends upon the analysis of each individual situation. See Hershey Foods Corp. v. Ralph Chapek, Inc., 828 F.2d 939, 999 (3d Cir.1987). As such, the claims of the representative plaintiffs are not, and cannot be, typical of those of the rest of the class. Further, we do not know what the "wrongful conduct" mentioned in the amended complaint references. Without this knowledge we cannot determine whether the plaintiffs are all challenging the same common course of conduct. The burden is on the plaintiffs to prove that this count meets the certification requirements. Because they have failed to do so, we hold that this count is inappropriate for class certification.

G.

\*12 The entire proposed class of plaintiffs sets forth a federal common law claim of equitable estoppel in Count XIV. Plaintiffs assert that by virtue of their material misrepresentations, "defendants are estopped from denying, or interpreting the Conrail plans so as to deny benefits under the Plans to plaintiffs and members of the plaintiff class."Compl. ¶ 192.

According to Curcio v. John Hancock Mut. Life Ins. Co., 33 F.3d 226, 235 (3d Cir.1994), the elements of

Not Reported in F. Supp.                                                                                    Page 11
Not Reported in F. Supp., 1998 WL 372644 (E.D.Pa.), 5 Wage & Hour Cas.2d (BNA) 717
**(Cite as: Not Reported in F.Supp.)**

equitable estoppel are: "(1) a material representation, (2) reasonable and detrimental reliance upon the representation, and (3) extraordinary circumstances." Plaintiffs aver that the misrepresentations discussed earlier in this opinion were material, intentional, and constituted the necessary extraordinary circumstances.

Defendants contend that this claim is the least susceptible to class action certification because of the individual proof needed as to the reliance element. Plaintiffs claim that individual issues of reliance are not sufficient to preclude class certification and that *Curcio* shifted the burden of disproving reliance to defendants.

We do not read *Curcio* as shifting the burden of disproving reliance to the defendants. An examination under Rule 23(a) only requires we find a common issue of law or fact and that the representative plaintiffs are typical of the class. We find that these requirements are met on this count. The class of plaintiffs allegedly all accepted the VSP based upon the common representations by defendants and they all claim that these representations were material and constituted extraordinary circumstances. At this juncture, we see no conflict or potential for conflict between the representative plaintiffs and the proposed class.

### III

As to Counts I, II, III, IV, V, VI, VIII, IX, XIII and XIV, which we find meet the requirements of Rule 23(a), we must next consider whether they meet at least one of the requirements under Rule 23(b). If so, we must certify the class without consideration of the merits. *Eisen,* 417 U.S. 156, 177-78, 94 S.Ct. 2140, 40 L.Ed.2d 732. Plaintiffs initially seek certification under 23(b)(1)(A), 23(b)(1)(B), and 23(b)(2) which state in relevant part:
An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:
(1) the prosecution of separate actions by or against individual members of the class would create a risk of
(A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or
(B) adjudications with respect to individual members of the class which would as a practical matter be

dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests or;
(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; [ ]

### A

**\*13** Certification under either (b)(1) or (b)(2) constitutes a mandatory class. That is, the class members may not opt out of the action and "pursue separate litigation that might prejudice other class members or the defendant." 5 James Wm. Moore, Moore's Federal Practice § 23.40[2] (3d ed.1998) [hereinafter Moore's].[FN14]

> FN14. This is unlike certification under 23(b)(3) where a potential class member may do just that.

Certification pursuant to Rule 23(b)(1)(A) is appropriate if it would be inconsistent and damaging to defendants to have portions of an ERISA plan interpreted in different ways by different courts. *Schutte v. Maleski,* No. CIV.A 93-0961, 1993 WL 218898, at *9 (E.D. Pa. June 18, 1993)."This provision has been construed as requiring a party seeking certification to establish that there is a realistic possibility that separate actions involving the same subject matter will be brought in the absence of a class action." 5 Moore's § 23.41[1]. Actions certified under this portion of Rule 23, seek primarily injunctive or declaratory relief. *Id.* § 23.41[5][c]. Monetary damages may also be sought, but such relief should not predominate. *Id.*

While 23(b)(1)(A) focuses on possible prejudice to the defendants, 23(b)(1)(B) focuses on possible prejudice to the members of the proposed class "and seeks to protect them against situations in which they would be prejudiced by separate litigation." 5 Moore's § 23.42[1]. Certification under (b)(1)(B) may be appropriate if this action could potentially harm, or as a practical matter would be dispositive of, claims by other class members who were not represented in that suit. *Lloyd v. City of Philadelphia,* 121 F.R.D. 246, 251 (E.D.Pa.1988)

Certifications under both 23(b)(1)(A) and 23(b)(1)(B)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

are common in labor relations cases. 5 Moore's §§ 23.41[4], 23 42[3][c] "Because a defendant often provides unitary treatment to all members of the putative class [in] such an area, a putative class member's rights may be implicated by litigation brought by other class members."*Id* § 23 42[3][c].

Defendants dispute the applicability of 23(b)(1)(A) and (B) because they contend that the dissimilarity of plaintiffs' claims preclude it. According to defendants, (b)(1) should be limited to those cases with no or few individual questions.

While Rule 23(b)(1) contains no such explicit requirement, a certain level of similarity is necessary in order for multiple suits to risk prejudicing either the defendants, or plaintiffs who could be members of a class. In a fraud case in this district, the court held that "because of the individual issues of reliance endemic to proving fraud ... resolution of an individual claim will not necessarily either be dispositive of the interests of the non-party class members, or an impairment or impediment to the ability of non-party class members to protect their respective interest."*Truckway, Inc. v. General Electric,* No CIV. A. 91-0122, 1992 WL 70575, at *6 (E D Pa. March 30, 1992).

With these principles in mind, we examine the remaining counts to ascertain whether certification under 23(b)(1)(A) or (b)(1)(B) is appropriate. We find that the ERISA actions in Counts I, II, III, VI, VIII, IX, and XIII are appropriate for certification under both of these provisions of Rule 23. All of these claims relate to the interpretation and application of ERISA plans Conrail treated the proposed class and subclass identically and any equitable relief granted will affect the entire class and subclass. Failure to certify a class would leave future plaintiffs without adequate representation Moreover, we see a high likelihood of similar lawsuits against defendants should this class be denied.[FN15]Inconsistent judgments concerning how the Plans should have been interpreted or applied would result in prejudice. While plaintiffs list a variety of relief sought in their amended complaint, ERISA specifically limits the relief available to that of an equitable, that is, declaratory or injunctive, nature. 29 U.S.C § 1132. To the extent that money damages are awarded or sought, we find them to be incidental.

FN15 Indeed, one such action has already

been filed and assigned to the undersigned. *SeeBuxton v Consolidated Rail Corp,* No CIV. A 98-2409.

**\*14** Our review of the state law claims as well as the claim of equitable estoppel is more difficult. Counts IV (fraud), V (misrepresentation), and XIV (equitable estoppel) all contain reliance as an essential element While individual issues of reliance are not enough to preclude a finding of typicality or commonality under 23(a), it may be enough to preclude certification under 23(b)(1)(A) or (B) *SeeEisenberg,* 766 F 2d at 786;*Truckway,* 1992 WL 70575, at *6 Reliance also may not be enough to preclude class certification under 23(b)(3).*Eisenberg,* 766 F 2d at 786 However, under the standards for (b)(1), we agree with the court in *Truckway* that certification under this portion of the rule is inappropriate for Counts IV, V, and XIV.

Moreover, even if plaintiffs were to prevail on actions of fraud or misrepresentation the remedy would be necessarily monetary. The actions in Counts IV and V are limited to claims for employment Since Conrail will soon cease to exist, rehiring is not an available remedy. Because money would not be merely an incidental remedy sought, certification is inappropriate under either portion of (b)(1) on Counts IV and V

B

A class may be certified under Rule 23(b)(2) if the defendants have acted in ways generally applicable to the class and final declaratory or injunctive relief is sought by the class.[FN16] 5 Moore's § 23.43[1][a] While monetary damages may also be sought, they must be incidental to the request for equitable relief. *Id.* § 23.43[3][a]. As a practical matter, key factual questions should be dispositive as to all class members. *Stoetzner v United States Steel Corp,* 897 F 2d 115, 119 (3d Cir 1990). The proposed class "must demonstrate that the interests of the class members are so like those of the individual representatives that injustice will not result from their being bound by such judgment in the subsequent application of principles of res judicata."*Hassine,* 846 F 2d at 179. Courts have described a class action under (b)(2) as one which "seeks to define the relationship between the defendant(s) and the world at large."*Id* (quoting *Weiss v York Hosp,* 745 F 2d 786, 811 (3d Cir.1984)).

Not Reported in F.Supp.

Page 13

Not Reported in F.Supp., 1998 WL 372644 (E.D.Pa.), 5 Wage & Hour Cas.2d (BNA) 717
**(Cite as: Not Reported in F.Supp.)**

FN16. According to one treatise, under (b)(2) administrative remedies need to be exhausted by the named plaintiffs only, not the entire class. 5 Moore's § 23.43[1][c]. This further supports our earlier conclusion that the class members need not exhaust their administrative remedies because doing so would have been futile.

Defendants claim that (b)(2) does not apply because plaintiffs in reality seek only monetary remedies. Since Conrail will soon cease to exist, defendants contend that equitable relief could not be awarded. Conversely, plaintiffs contend that they seek primarily equitable relief.

Defendants are correct that, in determining whether a suit seeks equitable or monetary relief, a court must examine the "realities of the litigation." *Yeager's Fuel v. Pennsylvania Power & Light,* 162 F.R.D. 471, 480 (E.D.Pa.1995). On the information presently before us, we construe plaintiffs' requests for relief as seeking predominantly equitable relief on the ERISA claims, as we stated earlier. However, as just discussed above, we find that the state law claims in Counts IV and V seek primarily monetary relief. For this reason they are inappropriate for certification under Rule 23(b)(2).

**\*15** Our examination of the ERISA claims convinces us that they are appropriate for certification under (b)(2). The proposed class and subclass of plaintiffs aver that defendants treated them equally in the denial of ERISA benefits. Their interests are essentially identical. Certain key facts are dispositive of the entire class. For example, did defendants interpret the Plans incorrectly or violate the terms of the Plan, did defendants create the VSP for the purpose of interfering with plaintiffs' ERISA benefits, and did defendants breach fiduciary duties by misrepresenting material information to the entire class? Finally, this suit seeks to define the relationship between Conrail and its employees who accepted the VSP offering. In conclusion, we find certification under (b)(2) also appropriate.

The equitable estoppel claim in Count XIV falls between the ERISA cause of actions and the state law claims. While it requires the element of reliance, it seeks purely equitable relief. Because the claim challenges actions of defendants that were generally

applicable to the class, we will certify equitable estoppel under (b)(2) at this time. This may be revisited at a later time if individual issues of reliance predominate.

## C.

Plaintiffs also seek, as an alternative, certification under 23(b)(3) if the court finds certification under (b)(1) or (b)(2) inapplicable. Because we so found as to Counts IV and V, we now examine these counts to see if they meet the certification requirements of (b)(3). An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Fed.R.Civ.P. 23(b)(3).

To meet the requirement of Rule 23(b)(3) that common questions predominate, claims of the plaintiffs need not be identical and the "necessity of answering individual questions after answering common questions will not prevent a class action."*Heastie,* 125 F.R.D. at 675. The Advisory Committee Notes to the 1966 Amendments to Rule 23 state "a fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action, and it may remain so despite the need, if liability is found, for separate determination of the damages suffered by individuals within the class."

**\*16** Whether individual issues of reliance are enough to preclude certification under Rule 23(b)(3) is unclear in this Circuit. The Third Circuit has broadly suggested that reliance alone may not be enough to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 14
Not Reported in F.Supp., 1998 WL 372644 (E.D.Pa.), 5 Wage & Hour Cas.2d (BNA) 717
(Cite as: Not Reported in F.Supp.)

defeat a motion for class action certification. *See Peil v. Speiser*, 806 F.2d 1154, 1159 n. 8 (3d Cir.1986); *Eisenberg v. Gagnon*, 766 F.2d 770, 786 (3d Cir.1985). However, it has not specifically so held. As a result, several decisions in our district, including at least one by the undersigned, have held that individual issues of reliance do prevent class certification. *See J/H Real Estate, Inc. v. Abramson*, Nos. CIV.A. 95-4176, 95-7180, 1996 WL 63712, at *6-7 (E.D.Pa. Feb. 9, 1996); *In re Healey Sec. Litig.*, 161 F.R.D. 288, 292 (E.D.Pa.1995); *Squitieri v. Gould*, 133 F.R.D. 25, 28 (E.D.Pa.1990); *In re Bexar County Health Facility Dev. Corp. Sec. Litig.*, 125 F.R.D. 625, 636 (E.D.Pa.1989); *Gavron v. Blinder Robinson & Co.*, 115 F.R.D. 318, 325 (1987); *Snider v. Upjohn Co.*, 115 F.R.D. 536, 542 (E.D.Pa.1987). However, a recent trend of cases has held that reliance alone is not enough to preclude certification. *See Hanrahan v. Britt*, 174 F.R.D. 356, 365 (E.D.Pa.1997); *In re Intelligent Elec. Inc. Sec. Litig.*, No. CIV.A. 92-1905, 669 So.2d 1265, 1996 WL 67522, at *6 (E.D.Pa. Feb. 13, 1996); *In re Bell Atlantic Corp. Sec. Litig.*, No. CIV.A. 91-514, 1995 WL. 733381, at *7 (E.D.Pa. Dec. 11, 1995); *First Eastern Corp. v. Mainwaring*, No. CIV.A. 92-1176, 1993 WL 223607, at *3 (E.D. Pa. June 22, 1993); *In re Healthcare Servs. Group Sec. Litig.*, No. CIV.A. 91-6097, 1993 WL 54437, at *7-8 (E.D.Pa March 1, 1993); *In re Kulicke & Soffa Indus. Sec. Litig.*, No. CIV.A. 86-1656, 1990 WL 1478, at *8 (E.D.Pa. Jan. 9, 1990).

I am now convinced, based on a close reading of the Third Circuit's language in *Eisenberg* and *Peil*, as well as other recent cases in this district, that the Court of Appeals, if faced with the issue, would certify Counts IV and V, under (b)(3), based on the information present in the record. We note at this juncture that had the plaintiffs not allegedly relied on the representations regarding future employment prospects, at issue in Counts IV and V, they would still be current Conrail employees. We may later revisit our conclusion on certification if we find that individual issues of reliance may predominate.

In any event, we conclude that common class issues of law and fact predominate over any individual issues in this case on the claims of fraud and misrepresentation. While individual issues are present, especially in the context of reliance, they do not predominate. Rather, the central issues revolve around whether the defendants negligently or intentionally misrepresented information regarding

prospects of future employment as to the fraud and misrepresentation claims in Counts IV and V. The necessity of individual information regarding reliance does not preclude the certification of this class under (b)(3).

*17 Rule 23(b)(3) also requires that the class action be the superior method of trying the case. According to the Supreme Court, "[c]lass actions [ ] may permit the plaintiffs to pool claims which would be uneconomical to litigate individually ... most of the plaintiffs would have no realistic day in court if a class action were not available." *Phillips*, 472 U.S. at 809.

We believe that a class action would be superior for trying these state law issues of fraud and misrepresentation. It is likely that the damages received from any individual claim would be uneconomical for each individual plaintiff to litigate.

As to the remaining considerations under Rule 23(b)(3), we find that each plaintiff would have no compelling interest in individually controlling separate lawsuits and that there would be no significant difficulties, presently foreseeable, in the management of the class. Finally, it is not undesirable to have this action proceed in the Eastern District of Pennsylvania. Conrail maintains its principal place of business here and most of the representative plaintiffs reside in the district.

IV.

Count VII sets forth a claim for age discrimination. The ADEA requires enforcement "in accordance with the powers, remedies, and procedures" of select portions of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq. See* 29 U.S.C. § 626(b). For purposes of class action certification, we follow the relevant portion of the FLSA, 29 U.S.C. § 216, rather than Rule 23 of the Federal Rules of Civil Procedure. *Sperling v. Hoffman-La Roche, Inc.*, 118 F.R.D. 392, 399 (D.N.J.), *aff'd in part*, 862 F.2d 439 (3d Cir.1988), *aff'd*, 493 U.S. 165, 110 S.Ct. 482, 107 L.Ed.2d 480 (1989). It reads:
An action to recover the liability prescribed ... may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 372644 (E.D.Pa.), 5 Wage & Hour Cas.2d (BNA) 717
(Cite as: Not Reported in F.Supp.)

party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought

29 U.S.C. § 216(b)

The definition of "similarly situated" is not set forth in the statute. One court has found that most "courts appear to require nothing more than substantial allegations that the putative class members were together the victims of a single decision, policy, or plan infected by discrimination."*Sperling,* 118 F.R.D. at 407 While the statute requires that the plaintiffs be "similarly situated," they need not be identical. *Id.* at 405.

In *Lockhart v. Westinghouse Credit Corp.,* 879 F.2d 43, 51 (3d Cir.1989), *overruled in part on other grounds by,Hazen Paper Co. v. Biggins,* 507 U.S. 604, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993), the Court of Appeals for the Third Circuit applied a three part test to determine if the plaintiffs are similarly situated, that is, whether they were "(1) employed in the same corporate department, division and location; (2) advanced similar claims of age discrimination; and (3) sought substantially the same form of relief." The Third Circuit found this test met where the employees, although employed at different locations, all had been employees in the same division, challenged the same employment practice and sought the same forms of relief. *Id.* at 52 Further, in considering whether to certify the class, a court has significant discretion to determine whether defendants' assertion of defenses unique to each individual employee "would make manageability of the class impossible."*Id.*

**\*18** Plaintiffs claim that the proposed plaintiff class is similarly situated because all plaintiffs are over 40 years of age, with 15 or more years of experience at Conrail. They all elected the VSP and were rehired as independent contractors performing work similar to that which they performed as an employee, but at a lower salary and without benefits

Defendants contend that three reasons preclude certification. First, the plaintiffs are not victims of a single decision, policy, or plan infected by discrimination. The potential class of 70 former employees worked at various facilities in varying jobs, and thus are not similarly situated. Rather, each

Conrail facility made its own individual decisions regarding the rehiring of former employees as independent contractors. Second, the defendants' defenses as to each individual plaintiff in the class would be individualized, to show that defendants' actions were based on reasonable factors other than age. Certifying a class would purportedly deprive Conrail of its essential and individualized defenses.[FN17]Finally, defendants contend that fairness and procedural considerations militate against certification of this class. Here, defendants contend that they would need to call two defense witnesses for every ADEA plaintiff who testified, comprising at least 70 days of trial time

> FN17. As one example, defendants note that plaintiff Falcone signed a document saying he would not represent any party in any action against Conrail. The instant action allegedly breaches this agreement.

Plaintiffs argue that the defendants again exaggerate the extent of the individual defenses. Further, according to plaintiffs, defendants fail to articulate why they could not raise their defenses if a class is certified. Plaintiffs contend the defenses raised could certainly be applied on a class-wide basis.

We find that the plaintiffs are similarly situated for the reasons asserted by plaintiffs-they are all over 40 years of age with more than 15 years of experience at Conrail, and they accepted the VSP and were re-employed as independent contractors for less money and no benefits while younger employees retained their employee positions. Although plaintiffs were employed at various facilities throughout the country, they all left Conrail pursuant to a nationwide early retirement offering, the VSP. The fact that approximately 70 plaintiffs returned to work in substantially similar positions as independent contractors, at varying locations throughout the country, indicates to us that rehiring VSP persons as independent contractors was not an isolated practice at certain locations. The plaintiffs advance the identical claim of age discrimination and seek the same relief-reinstatement as an employee or receipt of wages and benefits commensurate with that of employees. If further discovery reveals that each Conrail facility or location did maintain its own procedures regarding rehiring former employees, distinct from that of Conrail overall, this class may be decertified or further subdivided

Not Reported in F.Supp.                                                                    Page 16
Not Reported in F.Supp., 1998 WL 372644 (E.D.Pa.), 5 Wage & Hour Cas.2d (BNA) 717
(Cite as: Not Reported in F.Supp.)

We also do not find defendants' allegations of individualized defenses sufficient to preclude class certification. Defendants assert that their actions were required by business necessity, a defense which could certainly be applied on a class-wide, or location-wide basis. Defendants present only two other individual defenses, both as to plaintiff Falcone. Based upon these sparse allegations, we find it is not enough to preclude class certification.

**\*19** In conclusion, Count VII will be certified as a class action.

V

Our final concern is the scope of the class and subclasses to be certified. Defendants did not address the scope of the class in their 79 page response. For the reasons set forth above, we find the description of the class and subclass proposed by plaintiffs to be sufficient:

In conclusion, the motion of the plaintiffs for class certification will be granted in part and denied in part. A class comprised of all persons formerly employed by Conrail at any Conrail location who separated from Conrail as part of the March 1, 1996 Conrail VSP will be certified with respect to the claims in Counts I, II, III, IV, V, VI, and XIV. A subclass comprised of those VSP participants who returned to work for Conrail to positions of employment which Conrail designated as non-employee status will be certified with respect to the claims in Counts VIII, IX, and XIII. Finally, an ADEA subclass composed of those class members over 40 years of age who were returned to work into non-employee status, will be certified on Count VII. The motion will be denied as to Counts X, XI, and XII.

*ORDER*

AND NOW, this 14th day of May, 1998, for the reasons set forth in the accompanying Memorandum, it is hereby ORDERED that the motion of plaintiffs for class certification is GRANTED in part and DENIED in part as follows:

1. A class comprised of all persons formerly employed by Conrail at any Conrail location who separated from Conrail as part of the March 1, 1996 Conrail Voluntary Separation Program ("VSP") is certified with respect to the claims in Counts I, II, III, and VI pursuant to Rule 23(b)(1)(A), (b)(1)(B), and (b)(2) of the Federal Rules of Civil Procedure.

2. The class set forth in paragraph 1 is hereby certified with respect to the claims set forth in Counts IV and V pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure.

3. A subclass comprised of those VSP participants who returned to work for Conrail in positions of employment which Conrail designated as non-employee status is certified with respect to the claims in Counts VIII, IX, and XIII pursuant to Rule 23(b)(1)(A), (b)(1)(B), and (b)(2) of the Federal Rules of Civil Procedure.

4. An Age Discrimination in Employment Act subclass comprised of those class members over 40 years of age who were returned to work into non-employee status, is certified on Count VII pursuant to 29 U.S.C §§ 216(b) and 626(b).

5. The motion of plaintiffs is denied in all other respects.

E.D.Pa.,1998.
Bunnion v. Consolidated Rail Corp.
Not Reported in F.Supp., 1998 WL 372644 (E.D.Pa.), 5 Wage & Hour Cas.2d (BNA) 717

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

DANIEL CASTELLANOS-                          CIVIL ACTION
CONTRERAS, et al

VERSUS                                       NO: 06-4340-EEF-SS

DECATUR HOTELS LLC, et al

## ORDER

PLAINTIFFS' MOTION FOR PROTECTIVE ORDER LIMITING INQUIRIES WITH *IN TERORREM* EFFECT (Rec. doc. 121)

### GRANTED

PLAINTIFFS' MOTION FOR PROTECTIVE ORDER LIMITING DISCOVERY FROM ABSENT OPT-IN CLASS MEMBERS (Rec. doc. 123)

### GRANTED IN PART AND DENIED IN PART

Before the undersigned are two motions filed by plaintiffs: (1) motion for protective order limiting inquiries with in terorrem effect; and (2) motion for a protective order limiting discovery from absent opt-in class members.[1] For the reasons described below the motions are granted.

### BACKGROUND OF THESE DISCOVERY ISSUES

On August 16, 2006, the plaintiffs filed suit against Decatur Hotels, LLC. ("Decatur") and F. Patrick Quinn ("Quinn"), the Chief Executive Officer of Decatur. The plaintiffs are guestworkers recruited from foreign countries to work in defendants' hotels following Hurricane Katrina. The

---

[1] The motions were filed on August 10, 2007 and noticed for August 29, 2007. Rec. doc. 128. The defendants' unopposed motions to continue the two motions to September 5, 2007 and then to September 19, 2007 were granted. Rec. docs. 130 and 133. Because of the parties' repeated filings on the two motions, they were reset for September 26, 2007 and the plaintiffs were granted leave to file a final memorandum on each motion. Rec. doc. 167.

defendants contracted with the Accent Group, a personnel services company that assisted in recruiting workers from abroad by sub-contracting with local hiring agents. The defendants arranged for plaintiffs to come to the United States on "H-2B" visas. 8 U.S.C. § 1101(a)(15)(H)(ii)(b). Under the H-2B program, the plaintiffs' immigration status is tied to their employment with Decatur and they are prohibited from working for any other employer while in the United States.

The plaintiffs allege they were enticed to leave their homes to work in defendants' hotels based on false promises. They allege the defendants violated the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, et seq., by failing to reimburse them during their first week of employment for travel, visa, recruitment, and other expenses incurred in migrating to the United States. They allege that these costs were between $3,500 and $5,000 per person, and were incurred primarily for the benefit of the defendants. The plaintiffs contend that the defendants' failure to reimburse these costs resulted in a *de facto* deduction from plaintiffs' wages such that they earned substantially less than the $5.15 per hour minimum wage in their first week of employment, in violation of 29 U.S.C. § 206(a).

The plaintiffs seek declaratory relief and also seek to assert a FLSA "opt-in" collective action for all non-supervisory guestworkers employed by the defendants between August 29, 2005 and August 16, 2006. On December 12, 2006, the plaintiffs' motion for leave to amend to add breach of contract class claims was denied as futile. Rec. doc. 77.[2]

---

[2] These first three paragraphs of the description of the litigation are based on the District Judge's order and reasons of May 15, 2007. Rec. doc. 94 at pp. 2-3.

2

At an October 26, 2006 conference, the parties reported to the District Judge that there was a legal issue as to whether the FLSA applied to the case. The parties were ordered to brief the issue. Rec. doc. 31. On May 15, 2007, the District Judge determined that the FLSA applies to H-2B workers and the plaintiffs were entitled to the protection of the act. Rec. doc. 94 at p. 11. The Court stated:

> However, whether or not the Defendants have violated the FLSA is a factual issue that is not appropriate for summary judgment. The Court takes the opportunity, though, to note that in light of its conclusion that the FLSA applies in the H-2B context, *Arriaga* and its progeny of H-2A cases become extremely persuasive precedent. *See Arriaga*, 305 F.2d at 1242 (holding that travel and visa costs are incurred by guestworkers "for the primary benefit and convenience of their employer" and thus are not "other facilities" that can be counted as wage credits pursuant to 29 U.S.C. § 203(m)); *see also De Luna-Guerroto v. N.C. Grower's Ass'n*, 338 F.Supp.2d 649 (E.D.N.C. 2004)(following *Arriaga*). While factual issues exist with respect to (1) the specific amounts paid by the Plaintiffs prior to coming to the United States and (2) the exact wages they ultimately earned working for the Defendants, the legal framework for determining whether the minimum wage provisions of the FLSA have been violated appears to be well-settled.

Rec. doc. 94 at pp. 11-12, n. 5.[3]

A status conference was conducted on May 30, 2007 at which time the District Judge requested "short written statements from the parties concerning what discovery would be needed to address the issue of conditional class certification." Rec. doc. 97. The parties were urged to meet and confer in an attempt to reach agreement on this discovery. Id.

On July 19, 2007, the District Judge amended the May 15, 2007 decision to provide for an interlocutory appeal. In all other respects the defendants' motion to alter or amend judgment was denied. The defendants argued that the decision did not address their argument that the FLSA does not require non-agricultural H-2B workers to be reimbursed for transportation, visa, and recruitment

---

[3] Arriaga v. Florida Pacific Farms, L.L.C., 305 F.3d 1228 (11th Cir. 2002).

costs. In response, the Court referred to footnote 5 of its May 15 order (quoted above) and said:

> While the Court stands by this preliminary observation on the persuasiveness of *Arriaga*, the observation is of course merely *dicta*. Ultimately, however, the Court finds that its refusal to determine, as a matter of law, whether or not the FLSA has been violated in this case is not manifestly erroneous nor manifestly unjust at this stage of the litigation.

Rec. doc. 108 at p. 3. The defendants' request for a stay of discovery pending the interlocutory appeal was denied. The Court held that, "[it] will instead allow discovery to proceed uninhibited." Id. at p. 4. It added:

> The Court previously considered allowing only limited discovery during the pendency of an interlocutory appeal, and informally received proposals from the parties concerning the potential scope of such limited discovery. Although the Court is now allowing discovery to proceed <u>uninhibited</u>, it will ensure that these proposals are filed so that the record is complete.

Id. at p. 4, n.1 (Emphasis added).[4]

On September 12, 2007, the District Judge took under submission the plaintiffs' motion for certification of a collective action and for disclosure of the names, addresses, and telephone numbers of potential opt-in plaintiffs. Rec. docs. 98 and 157. The plaintiffs sought preliminary certification of their claims as a FLSA collective action, pursuant to 29 U.S.C. § 216(b), seeking to represent all persons working on an H-2B temporary guestworker visa issued for work at Decatur during 2006 and 2007. They requested a six month opt-in period. Rec. doc. 98.

DEFENDANTS' DISCOVERY AND PLAINTIFFS' RESPONSE

In July 2007, the defendants noticed the depositions of the three named plaintiffs and all opt-in plaintiffs. The depositions were noticed for New Orleans. Each deponent was requested to produce: (1) records of expenses for travel, visa and recruitment costs for the H-2B program and

---

[4] In order to resolve a procedural problem, the defendants' request for recertification of interlocutory appeal was granted on September 5, 2007. Rec. doc. 140.

4

employment with Decatur; (2) records of communications between deponent and any recruiter; (3) records of communications between deponent and Decatur; (4) documents signed by deponent in the home country regarding the H-2B program; (5) documents submitted by deponent for an H-2B extension; (6) records of any payment received by deponent from any employment by anyone other than Decatur after deponent's arrival in the United States; (7) documents submitted by deponent to any employer, other than Decatur, regarding deponent's employment after arrival in the United States; (8) records of the identification of the recruiters with whom deponent met; (9) any communications between deponent and any other H-2B workers at Decatur concerning this litigation or the H-2B program; (10) records of any travel to the deponent's home country during or after employment with Decatur; (11) records of any expenses incurred for such travel; (12) records of any applications for employment with employers other than Decatur completed after arrival in the United States; (13) records received from the United States concerning deponent's H-2B visa; (14) records received by deponent from Southern Poverty Law Center prior to execution of opt-in notice; (15) records of notice of any meeting conducted to notify deponent of this litigation; and (16) records of pay, wages or salaries received by deponent from Decatur.  Rec. doc. 121(Exhibit 4).  The defendants reported that they would consider limiting the depositions to those plaintiffs, including opt-ins, who are in the United States and requested the identity of those plaintiffs  Id.

The plaintiffs request that defendants be prohibited from inquiring into matters that plaintiffs contend are not relevant and object to at least four of the categories in defendants' deposition notice: (6) records of any payment received by deponent from any employment by anyone other than Decatur after deponent's arrival in the United States; (7) records submitted by deponent to any employer, other than Decatur, regarding deponent's employment after arrival in the United States;

5

(10) records of any travel to the deponent's home country during or after employment with Decatur; and (12) any applications for employment with employers other than Decatur completed after arrival in the United States. The plaintiffs contend that defendants' discovery is designed to threaten the opt-in plaintiffs and cause them to withdraw from the litigation. They urge that discovery into their employment outside their first week of work with defendants is not relevant. They base this argument on their contention that the holding in Arriaga v. Fla. Pacific Farms, 305 F.3d 1228, 1237 (11th Cir. 2002)(concerning H-2A migrant farm workers), applies to H-2B workers and that plaintiffs' subsequent immigration status is not relevant to their FLSA claims. They contend that defendants may not conduct discovery in order to develop defenses under the Immigration Reform Control Act of 1986 ("IRCA") because the act does not provide a defense to a FLSA claim.[5] The plaintiffs' first motion for protective order would limit the scope of any discovery related to other employees. The plaintiffs do not dispute the defendants right to depose the three named plaintiffs.[6]

In their second motion, the plaintiffs request that the defendants be limited to six representative depositions from the opt-in plaintiffs, two from each country: Peru, Bolivia, and the Dominican Republic.[7] In support of their requested relief, the plaintiffs urge that: (1) they can

_____

[5] The IRCA is a comprehensive scheme prohibiting the employment of illegal aliens in the United States. 8 U.S.C. § 1324a. See Hoffman Plastic Compounds, Inc. v. N.L.R.B., 535 U.S. 137, 122 S.Ct. 1275, 1282 (2002).

[6] The parties sometimes refer to the named plaintiffs as "representative plaintiffs." The named plaintiffs are: (1) Daniel Castellanos-Contreras; (2) Oscar Ricardo Deheza-Ortega; and (3) Rodolfo Antonio Valdez-Baez. The court will refer to them as the "named plaintiffs."

[7] The parties sometimes refer to the persons at issue in the motion as "absent opt-in class plaintiffs." Rec. doc. 123. The plaintiffs' motion is described as a motion for protective order limiting discovery from absent opt-in class members. Rec. doc. 123. Those persons, who opted into this collective action and who were not named as plaintiffs in the original or amended complaints, will be referred to as "opt-in plaintiffs." In this order the term "plaintiffs" will refer to both the "named plaintiffs" and the "opt-in plaintiffs."

Although the defendants listed about seventy names in their deposition notice, the plaintiffs report that there are eighty-four plaintiffs with about fifty currently in the United States. See Rec. doc. 123 at p. 4.

prove their FLSA claim through testimony from a representative sample of the named and opt-in plaintiffs; (2) defendants violated the limit of ten depositions found in Fed. R. Civ. P. 30(a) when they noticed eighty-four; (3) if all of the opt-in plaintiffs are deposed it will discourage their participation in the collective action and undermine the purpose of a collective action pursuant to 29 U.S.C. § 216(b); and (4) defendants cannot show that the discovery is necessary for the defenses which they are permitted to raise.[8]

## RULE 26(b)(1) AND (c)

The parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party. Fed. R. Civ. P. 26 (b)(1). The court must focus on the claims and defenses involved in the action. Fed. Rule Civ. P. 26(b)(1) Advisory Committee's Note, 2000 amendments. "(T)he determination whether such information is discoverable because it is relevant to the claims or defenses depends on the circumstances of the pending action." Id. The defendants argue that the information sought is relevant to the claims and defenses of the parties. They do not argue that good cause is present to broaden discovery to any matter relevant to the subject matter of the case. Fed. R. Civ. P. 26 (b)(1).

The plaintiffs respond that the information sought is not relevant to the parties' claims and defenses and seek a protective order prohibiting the plaintiffs from inquiring into the employment and immigration status of plaintiffs. Pursuant to Fed. R. Civ. P. 26(c), "(u)pon motion by a party

---

[8] The plaintiffs also argue that the defendants' tactics to limit the number of opt-in plaintiffs should be considered. Rec. doc. 123 at pp. 3 and 14. The defendants reply to this argument at Rec. doc. 149 at pp. 11-15. The retaliation claim of Daniel Castellanos-Contreras, one of the named plaintiffs, was dismissed with prejudice. Rec. doc. 45. After the defendants withdrew their exhibit 7 in support of their opposition to plaintiffs' motion for collective action certification, the plaintiffs' motion to strike was withdrawn as moot. Rec. doc. 157. Because the plaintiffs' argument about defendants' tactics is related to the retaliation claims, which were dismissed, and the information contained in defendants' exhibit 7, which was withdrawn, it will not be considered. Much of the argument is addressed in terms of what was said or not said to the plaintiffs. Motion practice is not suitable for resolution of such a controversy in any event.

7

or by the person from whom discovery is sought, . . . and for good cause shown, the court in which

the action is pending . . . may make any order which justice requires to protect a party or person

from annoyance, embarrassment, oppression, or undue burden or expenses . . ." Id. The party

seeking the protective order bears the burden of establishing good cause. Landry v. Air Line Pilots

Ass'n Int'l, 901 F.2d 404, 435 (5th Cir. 1990).

### THE IN TERROREM EFFECT[9]

In Topo v. Dhir, 210 F.R.D. 76 (S.D.N.Y. 2002), the court stated:

Courts have generally recognized the in terrorem effect of inquiring into a party's
immigration status when irrelevant to any material claim. In particular, courts have
noted that allowing parties to inquire about the immigration status of other parties,
when not relevant, would present a danger of intimidating that would inhibit
plaintiffs in pursuing their rights.

Id. at p. 78 (Emphasis added and citations, brackets and quotation marks omitted). The Fifth Circuit

in In re Reyes, 814 F.2d 168,170 (5th Cir. 1987), issued a writ of mandamus and determined that the

district court erred in ordering migrant agricultural workers with FLSA claims to answer questions

concerning their citizenship and immigration status. It cited the "well established" fact that the

FLSA was "applicable to citizens and aliens alike and whether the alien is documented or

undocumented is irrelevant." Id. The Fifth Circuit held:

The district court, however, in this case ordered discovery as to information which
was completely irrelevant to the case before it and was information that could inhibit
petitioners in pursuing their rights in the case because of possible collateral wholly
unrelated consequences, because of embarrassment and inquiry into their private
lives which was not justified, and also because it opened for litigation issues which
were not present in the case.

\*   \*   \*

---

[9] Latin "in order to frighten."

8

> [T]here is much stronger justification in this case [for a writ of mandamus] where
> there is no possible relevance and the discovery could place in jeopardy unrelated
> personal status matters.

Id. at 170-71. If, as the plaintiffs contend, the discovery into their immigration status and their work

outside the first week of employment with Decatur is not relevant to the parties' claims and

defenses, then there is good cause for a protective order barring the defendants from inquiring into

those areas.

IS AN IRCA VIOLATION A BAR TO PLAINTIFFS' FLSA CLAIM?

The Immigration Reform Control Act of 1986 ("IRCA") prohibits the employment of illegal

aliens in the United States. See 8 U.S.C. § 1324a. It is undisputed that the defendants fully

complied with IRCA and the requirements for bringing H-2B guest workers into the United States

and therefore plaintiffs had legal status at the time they commenced employment with Decatur.[10]

Although the plaintiffs entered the United States legally with their H-2B visas, Decatur Hotels

contends that the subsequent actions of at least some of the plaintiffs have violated the IRCA.[11] For

example, Decatur contends that some of the plaintiffs remained illegally in the United States after

the expiration of their H-2B visas and some of them were simultaneously employed by employers

other than Decatur.[12]

-----------------------------------------

[10] The plaintiffs began work in the spring of 2006 and their H-2B visas expired on January 31, 2007.

[11] Rec. doc. 148 at p. 17 and Rec. doc. 171 at p. 6.

[12] Rec. doc. 148 at p. 9. and p. 11, n. 11. The defendants' answer does not urge that plaintiffs' FLSA claims are barred because of the plaintiffs alleged IRCA violations. In describing their defenses, however, the defendants state:

> The opt-in Plaintiffs are not similarly situated because of the defenses available, particularly in light of the fact that many of the H-2B workers sponsored by Decatur did not work for Decatur for some or all of the period they were sponsored by Decatur, others worked for other employers during their employment at Decatur, and others remained in this country, perhaps illegally, rather than returning home at the end of the period of their authorized admission. These differences not only go to the issue of whether Plaintiffs' travel was for Decatur's benefit, but also contribute to

9

The plaintiffs claim that the discovery into their immigration status and their work outside the first week of employment with Decatur is not relevant to any defense to their FLSA claims. The plaintiffs refer to any such defenses as "IRCA Defenses."[13]

In reference to the actions of the District Judge, the defendants state that the Court did not "expressly strike or reject Defendants' defenses based on the IRCA, or preclude discovery directed toward such defenses as Plaintiffs contend." Rec. doc. 148 at p. 2. Although there is some ambiguity in the defendants' filings, it is assumed that they contend that if any plaintiff violated the terms of his visa, the violation is a bar to the plaintiff's FLSA claim.[14]

In Patel v. Quality Inn South, 846 F.2d 700 (11th Cir. 1988), the plaintiff's status as an undocumented alien did not defeat his FLSA claims for unpaid back overtime wages. See also Reyes, 814 F.2d at 170. In Hoffman Plastic Containers v. NLRB, 535 U.S. 137, 122 S.Ct. 1275 (2002), the Supreme Court held that the NLRB's award of backpay to an undocumented alien who was never legally authorized to work in the United States was foreclosed by federal immigration policy expressed in the IRCA. In January 1989, the alien's employer laid him off for engaging in union organizing activities. In January 1992, the NLRB determined that the alien and three others were laid off because they were known union supporters and ordered the employees reinstated and payment of backpay for the time they were laid off. In June 1993, the alien testified before an

---

defenses based on IRCA regulations governing H-2 workers

Rec. doc. 111 at p. 19 (Emphasis added). This statement is found in Defendants' memorandum in opposition to plaintiffs' certification of collective action and for disclosure of names, addresses, and telephone numbers of potential opt-in plaintiffs. Rec. doc. 111.

[13] Rec. doc. 121 at pp. 7 and 9; Rec. doc. 162 at p. 7; and Rec. doc. 174 at p. 2.

[14] The plaintiffs contend that "[d]efendants cannot and have not explained any defense to FLSA claims offered by IRCA or to specify for the court what they believe 'IRCA defenses' is meant to cover." Rec. doc. 162 at p. 7.

administrative law judge that he was born in Mexico and was never legally admitted to or authorized

to work in the United States and admitted that he presented false identification in order to gain

employment. The NLRB found that an award of backpay was the most effective way of furthering

the IRCA policies so that undocumented and documented workers were provided with the same

protections and remedies. 122 S.Ct. at 1279. The Supreme Court held that the alien "was never

lawfully entitled to be present or employed in the United States, and thus, . . . he has no right to

claim backpay." Id. at p. 1282.

> What matters here, and what sinks both of the Board's claims, is that Congress has
> expressly made it criminally punishable for an alien to obtain employment with false
> documents. There is no reason to think that Congress nonetheless intended to permit
> backpay where but for an employer's unfair labor practices, an alien-employee would
> have remained in the United States illegally, and continued to work illegally, all the
> while successfully evading apprehension by immigration authorities. Far from
> "accommodating" IRCA, the Board's position, recognizing employer misconduct but
> discounting the misconduct of illegal alien employees, subverts it.

Id. at 1283-84 (Footnotes omitted). In reaching this decision, the Supreme Court did not discuss

either FLSA claims or Patel.

In Flores v. Amigon, 233 F.Supp.2d 462 (E.D.N.Y. 2002), the court found that Hoffman did

not apply to a FLSA claim by an immigrant for unpaid wages for work already performed. It drew

a distinction between undocumented workers seeking backpay for wages actually earned and those

seeking backpay for work not performed. Id. at 462.[15] It granted plaintiff's motion for a protective

order regarding her immigration status. In the absence of some statement in Hoffman indicating that

the decision also applies to FLSA claims, the court is persuaded that the distinction made in Flores

is correct. Patel and Flores demonstrate that any violation by the plaintiffs of the terms of their H-

---

[15] See also Liu v. Donna Daran Int'l, Inc., 207 F.Supp.2d 191 (S.D.N.Y. 2002).

2B visas is not a bar to their FLSA claims for work actually performed. If the defendants' only basis for seeking the disputed discovery is the IRCA defenses, then plaintiffs' request for a protective order should be granted.

### FOR WHOSE BENEFIT WERE THE EXPENSES INCURRED?

An essential element of the plaintiffs' FLSA claims is that they establish that their transportation, visa and recruitment expenses were incurred for the primary benefit and convenience of the defendants.[16] The defendants allege that these costs were incurred primarily for the benefit and convenience of plaintiffs and were not for materials or services incidental and necessary to defendants' business. Rec. doc. 24 at p. 2. Therefore, the defendants contend that plaintiffs have no FLSA claim for reimbursement of these expense. They urge that the determination of whether plaintiffs' travel to the United States for employment was for Decatur's benefit requires an analysis purely personal to each individual plaintiff. Rec. doc. 111 at pp. 16-17.[17]

The plaintiffs respond that Arriaga requires the conclusion that their transportation, visa and recruitment costs were incurred primarily for the benefit of the defendants. They urge that the only relevant discovery concerns: (a) the wages for the first week of employment with Decatur for each plaintiff, which can be determined from Decatur's own records; and (b) the expenses incurred by each plaintiff for transportation, visa and recruitment, which can be obtained through written discovery. If this is all that is required, there is no need for any oral (deposition) discovery on this issue.

_____

[16] 29 U.S.C. § 203(m), 29 C.F.R. § 351.32, and Arriaga, 305 F.3d at 1237.

[17] Pursuant to the FLSA, the plaintiffs must be similarly situated in order to present their claims as a collective action. 29 U.S.C. § 216(b). The defendants also contend that the discovery is relevant to whether the plaintiffs are similarly situated

12

The defendants contend that the FLSA does not require non-agricultural H-2B workers to be reimbursed for transportation, visa, and recruitment costs. In their motion to alter or amend judgment, they argued that this issue was not addressed in the May 15, 2007 decision. In response, the District Judge described the observation on the persuasiveness of Arriaga as *dicta* and stated he was "now allowing discovery to proceed uninhibited. . . ." Rec. doc. 108 at p. 4, n. 1. The plaintiffs do not offer any explanation as to what is intended by the Court's comment.

The plaintiffs contend that Arriaga demonstrates that the discovery sought by the defendants is not relevant. The Mexican migrant farm workers in Arriaga were recruited to work the 1998-1999 strawberry and raspberry seasons for certain Florida growers. The farm workers sought relief under FLSA on the ground that the growers failed to reimburse them for their travel, visa and recruitment costs at the end of their first work week, which pushed their first week's wages below the minimum wage. The court determined that the FLSA minimum wage provisions applied to the farm workers.

> If an expense is determined to be primarily for the benefit of the employer, the employer must reimburse the employee during the workweek in which the expense arose. . . . Workers must be reimbursed during the first workweek for the pre-employment expenses which primarily benefit the employer, to the point that wages are at least equivalent to the minimum wage.

305 F.3d at 1237 (Citations omitted).

Arriaga determined that the transportation and visa costs incurred by the farm workers were primarily for the benefit or convenience of the employer. Id. The farm workers paid for bus transportation from Monterrey, Mexico to Florida. The court determined that the farm workers were not coming from commutable distances and their employment necessitated that one-time transportation cost. It held that these transportation costs were an incident of and necessary to the employment of the H-2A workers. Id. at p. 1242.

13

Decatur and Quinn do not contend that the transportation expenses were the type of expenses that a worker would incur in the course of life outside of the workplace. Unlike the growers in Arriaga, Decatur and Quinn urge that the transportation expenses were incurred for the primary benefit and convenience of other employers or for the benefit of the worker in that the purpose of the transportation expense was to travel to the United States and remain here. They contend that these issues require inquiry into: (a) whether plaintiffs worked solely for Decatur during the term of their visa; (b) whether they worked for Decatur for fifty percent of the term of the visa; (c) whether they took on other employment during the term of their visa; (d) whether they were approved for other H-2B employment; (e) if so, whether that employer paid for any of their transportation costs; (f) their evidence of recruitment costs; and (g) how plaintiffs paid such costs. These issues were not raised in Arriaga.

The plaintiffs argue that their FLSA claim must be evaluated on a workweek standard and the employment history outside that first week is not relevant. 29 C.F.R. § 776.4 ("The workweek is to be taken as the standard in determining the applicability of the Act").[18] The plaintiffs contend that defendants' alleged right to investigate their immigration status and employment throughout their time in the United States is contrary to the workweek standard. In Arriaga, the growers argued that if they were required to reimburse the workers for their inbound transportation costs on the first day of employment, the worker might only work one day. The court responded that, "[t]he fact that this risks exists is not an excuse for failure to comply with the FLSA. . . ." 305 F.3d at 1236, n. 8. The plaintiffs argue that if the expenses must be reimbursed during the first workweek, the

---

[18] See also Arriaga, 305 F.3d at 1237 ("Workers must be reimbursed during the first workweek for pre-employment expenses which primarily benefit the employer, to the point that wages are at least equivalent to the minimum wage.")

defendants may not resort to events occurring thereafter to defeat the claim. Such a result would "provide a perverse incentive to employers to delay payment beyond the time allowed by the statute in order to build a record to defend against nonpayment." Rec. doc. 162 at p. 16.[19]

In resolving this issue it may be assumed that the most extreme circumstances suggested by the defendants would be demonstrated by discovery. It is assumed that following their arrival in the United States on their H-2B visas one or more of the plaintiffs immediately began to work for both Decatur and another employer. After completing the first work of employment with Decatur, the plaintiffs quit Decatur and worked for other employers through the expiration of their visas. Since then it is known that some of the plaintiffs have remained illegally in the United States and are working in violation of the IRCA. Notwithstanding these clear violations of the visa and the IRCA, the undersigned finds that plaintiffs' motion for protective order limiting inquiries with *in terrorem* effect must be granted. This information is not relevant to plaintiffs' FLSA claim, which focuses on whether the plaintiff was paid at least the minimum wage for the first weeks work. The defendants seek to employ their discovery in an after-the-fact fashion when the focus is on the first week. Even if the extreme circumstances described above were established in discovery, they do not alter the fact that the expenses for travel, visa and recruitment were incurred for the benefit and convenience of Decatur pursuant to the H-2B visas issued specifically for work with it. This conclusion follows from: (a) the Court's determination that the FLSA applies to H-2B non-agricultural workers; and (b) the Court's non-acceptance of defendants' argument that FLSA does not require non-agricultural workers to be reimbursed for transportation, visa, and recruitment costs.

---

[19] The plaintiffs report that their research has not located a single case in which a court ever considered the defendants' defenses as relevant to the analysis of whether a cost was incurred for the primary benefit and convenience of the employer. Rec. doc. 172 at p. 6. The parties and the District Judge have noted that this case presents issues of first impression.

### HOW MANY DEPOSITIONS

The plaintiffs do not dispute the defendants' right to depose the three named plaintiffs. One of the named plaintiffs, Rodolfo Valdez-Baez, has been deposed. The plaintiffs request that the defendants be limited to six depositions from the opt-in plaintiffs, two from each country: Peru, Bolivia, and the Dominican Republic. In support of their requested relief the plaintiffs urge that: (1) they can prove their FLSA claim through testimony from a representative sample of the named and opt-in plaintiffs; (2) defendants violated the limit of ten deposition found in Fed. R. Civ. P. 30(a) when they noticed eighty-four; (3) if all of the opt-in plaintiffs are deposed it will discourage their participation in the collective action and undermine the purpose of a collective action pursuant to 29 U.S.C. § 216(b); and (4) defendants cannot show that the discovery is necessary for the defenses which they are permitted to raise.

Although the defendants did not seek leave to take more than ten depositions pursuant to Fed. R. Civ. P. 30(a)(2)(A), nothing would be gained in requiring defendants to file a separate motion. The question of the number of depositions to be taken is presented by plaintiffs' motion for a protective order.

In Hoffman-La Roche Inc. v. Sperling, 493 U.S. 165, 110 S.Ct. 482 (1989), the plaintiffs brought an action under the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621. The plaintiffs filed their suit as a collective action under 29 U.S.C. § 216(b). The Supreme Court held:

> A collective action allows age discrimination plaintiffs the advantage of lower individual costs to vindicate rights by the pooling of resources. The judicial system benefits by efficient resolution in one proceeding of common issues of law and fact arising from the same alleged discriminatory activity.

110 S.Ct. at 486. The plaintiffs cite this language and other decisions to demonstrate the purposes

16

of a collective action and how the depositions of all eighty-one opt-in plaintiffs would frustrate those purposes.

The actual number of the plaintiffs sought to be deposed is not necessarily determinative. The plaintiffs brought to the court's attention <u>Geer v. Challenge Financial Investors Corp</u>., 2007 WL 1341774 (D. Kan.), which referred to other decisions in which the defendants were allowed to depose <u>all opt-in plaintiffs</u> The cases were: <u>Ingersoll v. Royal & Sunalliance USA, Inc.</u>, 2006 WL 2091097 (W.D. Wash.) (34 opt-in plaintiffs); <u>O'Brien v. Ed Donnelly Enters</u>., 2006 WL 3483956 (S.D. Ohio) (8 opt-in plaintiffs); <u>Rosen v. Reckitt & Coleman, Inc.</u>, 1994 WL 652534 (S.D.N.Y.) (49 opt-in plaintiffs); and <u>Brooks v. Farm Fresh, Inc.</u>, 759 F.Supp. 1185, 1187 (E.D.Va. 1991), rev'd on other grounds, 966 F.2d 142 (4th Cir. 1992) (125 opt-in plaintiffs). <u>Greer</u> described the number of opt-in plaintiffs in these decisions as not substantial. 2007 WL 1341774, *2. Based on these authorities, the defendants request for 81 depositions and a willingness to consider limiting the depositions to the approximately 50 opt-in plaintiffs in the United States is not *per se* unreasonable.

The plaintiffs contend that because the only factual issues are the specific amounts paid by plaintiffs prior to coming the United States and the exact amount of wages earned in the their first week of employment with Decatur, only a sample of the opt-in plaintiffs is required. If the scope of the relevant inquiry is as plaintiffs contend, discovery should be limited to a representative sample. Anything more would be duplicative.

The defendants contend that depositions from each opt-in plaintiff are necessary to determine whether the costs at issue were for the primary benefit and convenience of the defendants and whether the plaintiffs are similarly situated. If the scope is as defendants define it, then a representative sample will not suffice and individualized discovery is required. The undersigned

has determined that the discovery sought by defendants on plaintiffs' immigration status and employment with persons other than Decatur is not relevant to the plaintiffs' FLSA claim or defenses to that claim. Individualized deposition discovery is not required to develop the information relevant to the parties' claims and defenses. The plaintiffs' motion for protective order limiting deposition discovery from absent opt-in class members is granted.

## DISCOVERY

The defendants will be permitted to take the depositions of two plaintiffs from each of the three countries of origin for a total of nine depositions, including the three named plaintiffs. Within ten (10) working days of the entry of this order, the plaintiffs shall supply the defendants with the complete identification of the plaintiffs who remain in the United States. The defendants may select the six persons (two from each country of origin) to be deposed in addition to the three named plaintiffs.

The defendants' deposition notice identified sixteen matters for examination. The court's determinations of these matters are set forth as follows:

1.    Records of expenses for travel, visa and recruitment costs for the H-2B program and employment with Decatur.

The plaintiffs did not object to this topic. It is appropriate for the depositions and written discovery.

2.    Records of communications between deponent and any recruiter.

The plaintiffs did not object to this topic. It is appropriate for the depositions and written discovery.

3.    Records of communications between deponent and Decatur.

The plaintiffs did not object to this topic. It is appropriate for the depositions and written

18

discovery.

    4.       Documents signed by deponent in the home country regarding the H-2B program.

The plaintiffs did not object to this topic. It is appropriate for the depositions and written discovery.

    5.       Documents submitted by deponent for an H-2B extension.

The plaintiffs did not object to this topic. It is appropriate for the depositions and written discovery.

    6.       Records of any payment received by deponent from any employment by anyone other than Decatur after deponent's arrival in the United States.

The plaintiffs' objection to this topic is sustained.

    7.       Documents submitted by deponent to any employer, other than Decatur, regarding deponent's employment after arrival in the United States.

The plaintiffs' objection to this topic is sustained.

    8.       Records of the identification of the recruiters with whom deponent met.

The plaintiffs did not object to this topic. It is appropriate for the depositions and written discovery.

    9.       Any communications between deponent and any other H-2B workers at Decatur concerning this litigation or the H-2B program.

The plaintiffs did not object to this topic. It is appropriate for the depositions and written discovery.

    10.      Records of any travel to the deponent's home country during or after employment with Decatur.

The plaintiffs' objection to this topic is sustained.

    11.      Records of any expenses incurred for such travel.

19

The plaintiffs did not specifically object to this topic. It is closely related to number 10, and therefore the defendants will not be permitted to conduct discovery into this topic.

    12.    Records of any applications for employment with employers other than Decatur completed after arrival in the United States.

The plaintiffs' objection to this topic is sustained.

    13.    Records received from the United States concerning deponent's H-2B visa.

The plaintiffs did not object to this topic. It is appropriate for the depositions and written discovery.

    14.    Records received by deponent from Southern Poverty Law Center prior to execution of opt-in notice.

The plaintiffs did not object to this topic. It is appropriate for the depositions and written discovery.

    15.    Records of notice of any meeting conducted to notify deponent of this litigation.

The plaintiffs did not object to this topic. It is appropriate for the depositions and written discovery.

    16.    Records of pay, wages or salaries received by deponent from Decatur.

The plaintiffs did not object to this topic. It is appropriate for the depositions and written discovery.

In addition to the foregoing matters, the defendants will be permitted to conduct discovery on the following matters:

    A.    Whether any of the transportation, visa or recruitment expenses were reimbursed by third parties.

    B.    If so, the amount reimbursed and date of reimbursement.

C.    All documents relating to the reimbursement of any transportation, visa or recruitment expenses (any information identifying an employer of the plaintiffs may be redacted).

In addition to the depositions, the defendants will be deemed to have served written discovery covering the matters identified in their deposition notice, subject to the ruling on plaintiffs' objections, as well as the information regarding the reimbursement of expenses. Plaintiffs shall respond to that discovery by responding in writing and by producing all requested documents within fifteen (15) working days after entry of this order.

### PROTECTIVE ORDER

There is authority that reporting an illegal alien with a retaliatory motive is prohibited conduct under the FLSA, 29 U.S.C. § 215(a)(3). <u>Singh v. Jutla & C.D. & R.'s Oil, Inc.</u>, 214 F.Supp.2d 1056 (N.D.Cal. 2002). The defendants' request for discovery of the plaintiffs' immigration status has been denied. It is possible, however, that during the course of the litigation, information on the plaintiffs' immigration status will be disclosed. The discovery will be subject to a confidentiality order preventing the defendants from using the plaintiffs' immigration information for any purpose other than conducting this litigation and preventing the defendants from divulging the immigration status to third parties. If the parties are unable to agree on the form of such an order, they shall submit separate proposals. The court will select the one that most nearly meets the needs of this case. The court will not draft a separate order, and therefore, the parties are encouraged to engage in meaningful negotiations over the form of the order.

IT IS ORDERED that: (1) plaintiffs' motion for protective orders limiting inquiries with *in terorrem* effect (Rec. doc. 121) is GRANTED; (2) plaintiffs' motion for protective order limiting

discovery from absent opt-in class members (Rec. doc. 123) is GRANTED; (3) within ten (10) working days of the entry of this order, the plaintiffs shall provide defendants with the identification of the plaintiffs, who remain in the United States; (4) defendants shall respond to the discovery requests as modified by this order within fifteen (15) working days of the entry of this order; (5) defendants' discovery shall be subject to a confidentiality order as provided herein; and (6) in the event of any objection to this order, it is stayed pending resolution of the objection by the District Judge.

New Orleans, Louisiana, this 22nd day of October, 2007.

SALLY SHUSHAN
United States Magistrate Judge

22

Westlaw.

Not Reported in F.Supp.2d                                                                                              Page 1
Not Reported in F.Supp.2d, 2002 WL 31175471 (N.D.Ill.), 148 Lab.Cas. P 34,743
**(Cite as: Not Reported in F.Supp.2d)**

Cortez v. Medina's Landscaping, Inc.
N.D.Ill.,2002.

United States District Court, N.D. Illinois, Eastern
Division.
Abraham CORTEZ, et al., Plaintiff,
v.
MEDINA'S LANDSCAPING, et al., Defendants
No. 00 C 6320.

Sept. 30, 2002.

MEMORANDUM OPINION AND ORDER
GOTTSCHALL, District J.

*1 Plaintiff Albert Padilla seeks overtime wages and
liquidated damages from his former employer,
Medina's Landscaping, Inc., and its owner, Robert
Medina, under the Fair Labor Standards Act of 1938
("FLSA"), 29 U.S.C. §§ 201 *et seq.* In their first
motion for summary judgment, defendants argue that
Padilla's suit is barred by the statute of limitations.
Padilla cross-moves for summary judgment. Before
addressing these motions (which will be resolved in
favor of defendants), the court pauses to dispose of a
threshold issue.

Defendants have also filed a motion to compel
discovery concerning Padilla's (and a co-plaintiff's)
citizenship status. This information is relevant,
defendants argue, because undocumented aliens are
not protected by the FLSA. They base this argument
on *Hoffman Plastic Compounds, Inc. v. NLRB,* 122
S.Ct. 1275 (2002), in which the Court held that the
NLRB's award of back-pay under the National Labor
Relations Act, 29 U.S.C. §§ 151 *et seq.,* to an
undocumented alien was "foreclosed by federal
immigration policy, as expressed by Congress in the
Immigration Reform and Control Act of 1986
(IRCA)." *Id.* at 1278 Critical to the Court's holding
was the fact that the work had not been performed
and that it would have been illegal for the plaintiffs to
mitigate damages, which is required for a back-pay
award. *Id.* at 1284-85 *Hoffman* does not hold that an
undocumented alien is barred from recovering unpaid
wages for work actually performed. *Singh v. Jutla,*
214 F.Supp.2d 1056, 2002 U.S. Dist. LEXIS 14978,
at *12 (N.D.Cal. Aug. 2, 2002); *Zeng Liu v. Donna
Karan Int'l, Inc.,* 207 F.Supp.2d 191, 192
(S.D.N.Y.2002); *Flores v. Albertson's, Inc.,* No. CV

01-00515, 2002 U.S. Dist. LEXIS 6171, at *18-20
(C.D.Cal. Apr. 9, 2002); *see also Topo v. Dhir,* No.
01 Civ. 10881, 2002 U.S. Dist. LEXIS 17190
(S.D.N.Y. Sept. 11, 2002). Indeed, the Seventh
Circuit, in a decision anticipating the *Hoffman*
holding, expressly distinguished back pay for labor
"not performed" and unpaid wages for work "actually
performed." *Del Rey Tortilleria, Inc. v. NLRB,* 976
F.2d 1115, 1122 n. 7 (7th Cir.1992). Defendants'
motion to compel is denied.[FN1]

> FN1 Even were this court inclined toward
> defendants' position (which it is not), their
> request would be denied as untimely.
> Discovery in this case closed on January 31,
> '2001. The holding in *Hoffman* has been the
> rule in the Seventh Circuit since 1992. *Del
> Rey Tortilleria,* 976 F.2d at 1115

Turning then to the summary judgment motions, the
following facts are undisputed. In July and August of
1998, Padilla worked for defendants longer than 40
hours per week on several occasions. The total
number of such overtime hours was 43. Padilla was
paid for these hours at his normal rate of six dollars
per hour. Padilla's employment with defendants
terminated on August 21, 1998. In his deposition,
Padilla testified that he first realized defendants were
not paying him overtime on August 26, 2001.[FN2] That
same day, Padilla executed a consent to join this
lawsuit. The consent was filed on September 20,
2001[FN3]

> FN2. This fact does not appear in Padilla's
> statement of undisputed facts and he
> mentions it for the first time in his reply
> brief in support of his cross-motion for
> summary judgment. Normally, this would
> preclude Padilla from relying on this fact,
> but not here. Defendants attempted to
> incorporate by reference all of the facts
> contained in two-hundred-plus pages of
> appendices, which include a complete
> transcript of Padilla's deposition. Such a
> blanket incorporation is inappropriate. *See*
> N.D. Ill. Local R. 56.1(a) ("The statement
> [of undisputed facts] shall consist of short
> numbered paragraphs, including within each
> paragraph specific references to the

Not Reported in F.Supp.2d                                                                                  Page 2
Not Reported in F.Supp.2d, 2002 WL 31175471 (N.D.Ill.), 148 Lab.Cas. P 34,743
(Cite as: Not Reported in F.Supp.2d)

affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth in that paragraph.") Allowing Padilla to rely on a fact taken from defendants' appendices, given that he at least provides a page reference, seems a fitting penalty in the present circumstances.

FN3. Strangely, this document does not appear on the docket. It does, however, appear in the appendix to defendants' statement of undisputed material facts, complete with a stamp from the clerk of this court indicating that it was received on September 20, 2001. The court holds that Padilla became a party to this lawsuit on that day.

The FLSA requires that covered employees be paid time-and-a-half for hours worked above 40 in a single week. 29 U.S.C. § 216. The default limitations period for an FLSA claim is two years; for a willful violation the period is three years. *Id.* § 255(a). The gap between Padilla's termination and his joining this lawsuit was three years and 30 days. This was (at least) 30 days too late, defendants argue. Why defendants think Padilla's cause of action accrued on the last day of his employment is a bit of a mystery. As a general rule, an FLSA claim "accrues at each regular payday immediately following the work period during which the services were rendered for which the wage or overtime compensation is claimed." *Halferty v. Pulse Drug Co.,* 821 F.2d 261, 271 (5th Cir.), *modified on other grounds,* 826 F.2d 2 (1987) (per curiam). There may well have been some delay between Padilla's termination and final payday, but it would be unreasonable to suppose that the delay was 30 days or longer. Accordingly, the court holds that defendants satisfied their burden of showing that Padilla's claim is presumptively time-barred.

**\*2** The burden therefore shifts to Padilla, who, to win on summary judgment, must conclusively demonstrate the applicability of an exception to the statute of limitations. *Cf. Cathedral of Joy Baptist Church v. Village of Hazel Crest,* 22 F.3d 713, 717 (7th Cir.1994). Padilla argues for tolling based on defendants' undisputed failure to post the required FLSA notice. Federal regulations require covered employers to "post and keep posted a notice explaining the [FLSA], as prescribed by the Wage and Hour Division [of the Department of Labor], in

conspicuous places in every establishment where such employees are employed so as to permit them to observe readily a copy."29 C.F.R. § 516.4. The prescribed notice (attached as an appendix to this opinion) emphasizes the right to time-and-a-half pay for overtime and advises that employees should contact the nearest Wage and Hour Division office for additional information.

In support of his tolling argument, Padilla relies on *Bonham v. Dresser Industries, Inc.,* 569 F.2d 187 (3d Cir.1978), in which the Third Circuit held that an employer's failure to comply with a similar notice requirement under the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 621*et seq.,* tolled the running of the 180-day administrative filing period "at least until such time as the aggrieved person seeks out an attorney or acquires actual knowledge of his rights."*Bonham,* 569 F.2d at 193. Padilla argues that the same rule should also apply to toll the period in which an FLSA claimant must file suit, citing *Kamens v. Summit Stainless, Inc.,* 586 F.Supp. 324 (E.D.Pa.1984). Indeed, *Kamens* squarely holds that an employer's failure to post the notice required by 29 C.F.R. § 516.4 tolls the running of this limitations period. *Id.* at 328.Beyond merely citing *Bonham,* however, the *Kamens* court provided no reasoning for this holding.

Defendants respond with *Kazanzas v. Walt Disney World Co.,* 704 F.2d 1527 (11th Cir.1983). The district court in that case had held that the employer's failure to post the notice required by the ADEA tolled both the 180-day administrative filing period and the two-year statute of limitations period for initiating legal proceedings. The Eleventh Circuit rejected this approach: "Although in some circumstances the factors mandating tolling of the 180 day provision would also toll the [two-year] statute of limitations, it is important to separately analyze the tolling of each period, as certain factors may only be applicable to one of the periods."*Id.* at 1529.The court began its analysis by observing that "[m]odifying either period because [the plaintiff] did not have knowledge of the ADEA's time requirements contravenes the normal rule that 'ignorance of ... legal rights or failure to seek legal advice, does not toll the statute.' " *Id.* at 1530 (quoting *Howard v. Sun Oil Co.,* 404 F.2d 596, 601 (5th Cir.1968)). The ADEA was not a new law, the court noted, presumably in order to suggest that employees may (or should) know about it. The court went on to explain that the case for tolling was weaker with respect to the two-year court filing

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 3
Not Reported in F.Supp.2d, 2002 WL 31175471 (N.D.Ill.), 148 Lab.Cas. P 34,743
(Cite as: Not Reported in F.Supp.2d)

period than it was for the 180-day administrative filing period because, unlike the 180-day period, "the approved notice does not even mention the two year period." *Id.* "Additionally," the court concluded, the employer's failure to post an ADEA notice did not toll the two-year limitations period because the plaintiff was generally aware of his right not to be discriminated against on the basis of age. *Id.* at 1530-31.

\*3 Defendants focus on the last component of the Eleventh Circuit's analysis. Because Padilla has made no showing that he was unaware of his right to overtime pay, they argue, *Kazanzas* forecloses his claim. This argument has two fatal flaws. First, subsequent case law from the Eleventh Circuit makes clear that the burden to establish Padilla's general awareness of his rights is on defendants, not Padilla. *See McClinton v. Alabama By-Products Corp.*, 743 F.2d 1483, 1486 (11th Cir.1984) ("If the poster be not posted, the employer will bear the burden of proving that the employee was generally aware of his rights."). Second, Padilla's testimony that he first realized defendants did not pay him overtime on August 26, 2001 is undisputed. It is reasonable to infer that Padilla was previously unaware, even generally, that he was entitled to time-and-a-half pay for hours worked above 40 in a given week.[FN4]

> FN4. Padilla argues only that this statement indicates that he was unaware of his legal rights, not that he was unaware of the hours he worked each week or his normal hourly rate. Ignorance of the latter type could support a "discovery rule" argument: federal causes of action accrue only when the plaintiff knows or reasonably should have known that he has been injured. It was Padilla's burden to establish this exception to the statute of limitations. This court does not believe Padilla's single statement was sufficient given that he almost certainly knew his hourly rate of pay and the number of hours he worked. The facts were evident even if he did not do the arithmetic.

Another element of *Kazanzas*'s reasoning, however, is generally helpful to defendants. *Kazanzas* warns that the *Bonham* rule should not be automatically applied to toll other limitations periods, even under the same statute. This court agrees that "it is important to separately analyze the tolling of each period, as certain factors may only be applicable to

one of the periods." *Kazanzas*, 704 F.2d at 1529; *cf. Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 453 (7th Cir.1990) ("[Statutes of limitations] protect important social interests in certainty, accuracy, and repose."). Thus, the appropriate question is whether the same factors that led to adoption to the *Bonham* rule with respect to the administrative filing period under the ADEA apply with sufficiently compelling force to the FLSA statute of limitations for filing suit.

*Kazanzas* does little to advance the ball with respect to this critical question. As the Eleventh Circuit expressly recognized, modifying either period equally contravenes the general rule that ignorance of the law is irrelevant for statute of limitations purposes. *Kazanzas*, 704 F.2d at 1530. Neither did the court's observation that the ADEA was not a new statute provide any basis for distinguishing between the administrative and court filing periods-both were in the statute as originally enacted. The only distinguishing factor cited by the Eleventh Circuit was that the prescribed notice specifically mentioned the administrative filing period but not the court filing period. To accord weight to this distinction, however, would be inconsistent with Seventh Circuit case law.[FN5]"An employer's failure to post notices tolls the charge-filing period 'only until the employee acquires *general* knowledge of his right not be discriminated against on account of age,' not until the employee acquires knowledge of his 'specific rights under the ADEA' or the existence of the specific charge-filing period."*Schroeder v. Copley Newspaper*, 879 F.2d 266, 271-72 (7th Cir.1989) (quoting *McClinton*, 743 F.2d at 1486) (emphasis in original). A conspicuously placed notice stating simply that age discrimination is illegal but lacking any information concerning the charge-filing period would put employees on constructive notice of their rights and would be sufficient to preclude reliance on the *Bonham* tolling rule. Specific notice as to the precise filing period is plainly irrelevant in this context.[FN6]

> FN5. *Antenor v. D & S Farms*, 39 F.Supp.2d 1372, 1380 (S.D.Fla.1999), cited by defendants, relies solely on this distinction and is therefore not persuasive.

> FN6. The court observes that the present ADEA notice makes no mention of the 180-day administrative filing period, advising only that employees suspecting a violation should "immediately" contact the EEOC.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                  Page 4
Not Reported in F.Supp.2d, 2002 WL 31175471 (N.D.Ill.), 148 Lab.Cas. P 34,743
(Cite as: Not Reported in F.Supp.2d)

> *Equal Employment Opportunity (EEO) Poster,* at http:// www.dol.gov/esa/regs/compliance/posters/eeo.htm.

*\*4* Defendants offer another distinction. The ADEA administrative filing period is a fixed number of days for all claimants in a state; in contrast, the FLSA court filing period is generally two years, but is three years for willful violations. Defendants argue that tolling the FLSA limitations period where the employer fails to post the required notice would undermine this two-tiered structure. Genuinely uninformed violators will fail both to pay overtime and to post the required notice. For them, the *Bonham* rule could toll the limitations period indefinitely. In contrast, employers who willfully violate the FLSA can take advantage of a definite three-year limitations period simply by posting the notice.

Defendants overstate the conflict between the *Bonham* rule and the two-tiered statute of limitations. A willful violator can comply with the notice requirement only by effectively informing its employees of the violations. The notice, which must be placed in a conspicuous place, lists the minimum wage in massive bold font, and the first highlighted subsection clearly announces the right to overtime pay (see appendix). An employee will have only himself to blame if he fails to file a claim within three years after receiving such clear notice of his rights. It seems plausible to suppose that the increased risk of detection will usually outweigh the statute of limitations advantages to be gained from complying with the posting requirement. Thus, both willful and non-willful violators are likely to be found among the ranks of employers who fail to post the required notice. Application of the *Bonham* rule would preserve the two-tiered structure within this group-employees complaining of willful violations would have three years to file suit after becoming generally aware of their rights, employees alleging non-willful violations would have two.

The two-tiered structure survives in other respects as well. Non-willful double violators will still end up with a shorter limitations period than the three years allotted to willful violators who comply with the posting requirement if, as seems likely, the former can show that their employees either were already generally aware of their rights under the FLSA or became so within a year after the alleged violation. This burden is not a heavy one. For example,

showing that the plaintiff-employee worked for another employer who complied with the notice requirement would suffice. Notwithstanding defendants' exaggeration of the likely conflict, however, a rule with the potential to provide even one willful violator with a shorter limitations period than a non-willful violator creates some tension with Congress's two-tiered structure. At a minimum, this tension calls for more searching inquiry into other similarities and differences between the ADEA administrative filing period and the FLSA court filing period.

In deciding whether to transplant the *Bonham* rule into new soil, it is helpful first to take stock of its roots. By pushing forward the moment at which the limitations period begins to run rather than simply providing a plaintiff with such additional time as he or she reasonably needs, the *Bonham* rule is more an accrual doctrine than it is an equitable tolling principle. *Cf. Cada,* 920 F.2d at 450-51 (explaining that the equitable tolling doctrine does not postpone the date of accrual but merely suspends the running of the statute for a reasonably necessary period of time). When the injury itself is known or reasonably discoverable, a cause of action accrues. That it may take the plaintiff years to discover the legal (rather than factual) basis for his claim is normally irrelevant. Plaintiffs have a duty to figure out the law on their own. Put another way, there is an irrebutable presumption that plaintiffs either are generally aware of their legal rights or can reasonably be expected to become so promptly after an injury.

*\*5* Mandating that employers post a notice informing employees of their rights only makes sense on the opposite presumption; if employees generally know their rights or have a duty to learn those rights on their own, notice would be superfluous. An employer who fails to post the required notice is at least partly to blame for the employee's ignorance. As the Seventh Circuit explained in adopting the *Bonham* rule,

It is quite apparent that Congress imposed [the posting] requirement on employers to insure that protected employees would be fully informed of their rights under the ADEA. And it is equally apparent that this end would not be realized if employers were free to breach the posting requirement without penalty.

*Kephart v. Inst. of Gas Tech.,* 581 F.2d 1287, 1289 (7th Cir.1978)[FN7] The penalty under *Bonham* is that

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31175471 (N.D.Ill.), 148 Lab.Cas. P 34,743
(Cite as: Not Reported in F.Supp.2d)

the statute of limitations period does not begin to run until an employee becomes aware of his rights. To this extent, the rule shifts the cost of delay due to legal ignorance from the employee to the employer. A general awareness of one's legal rights becomes an essential prerequisite to accrual where the defendant has failed to perform its statutory information-posting obligation.

> FN7. Defendants' reliance on case law from other circuits questioning or narrowing the *Bonham* rule is misplaced. *See, e.g., Wilkerson v. Siegried Ins. Agency, Inc.,* 683 F.2d 344, 347 (10th Cir.1982) ("[T]he simple failure to post the notices, without intent to actively mislead the plaintiff respecting the cause of action, does not extend the time within which a claimant must file his or her discrimination charge.") This court is bound by *Kephart,* which remains good law in this circuit. *See, e.g., Unterreiner v. Volkswagen of Am.,* 8 F.3d 1206, 1209-10 (7th Cir.1993) The Seventh Circuit criticized an entirely different "*Bonham* rule" in *Hamilton v. Komatsu Dresser Industries, Inc.,* 964 F.2d 600, 604 n.2 (7th Cir.1992).

Several factors lead this court to conclude that something like the *Bonham* rule should apply to the FLSA limitations period for filing suit. Most critically, as under the ADEA, there would otherwise be no statutory penalty for failure to comply with the notice-posting requirement and thus no incentive for employers to comply. *See* 29 C.F.R. § 516.4; 29 U.S.C. §§ 211(c), 215(a)(5), 216(a). Given the strong counter-incentives to hide one's violations from employees and to credibly feign non-willfulness when discovered, the goal of informing employees of their rights stands a chance of realization only through a tolling rule like the one announced in *Bonham. See Kephart,* 581 F.2d at 1289 (adopting the *Bonham* rule precisely because the goal of informing employees "would not be realized if employers were free to breach the posting requirement without penalty"). Shifting the cost of delay caused by an employee's ignorance where the employer is at least partly to blame for that ignorance makes every bit as much sense in the FLSA context as it does in the ADEA context. The regulation requiring employers to post the approved FLSA notice manifestly reflects the considered judgment of the Secretary of Labor that employees cannot be reasonably expected to

learn about the rights described in that notice (including the right to overtime pay) on their own. As it did under the ADEA, such an assessment of reality trumps the ordinary (and ordinarily quite defensible) legal fiction that individuals know their rights. *See id.* at 1289 (explaining that posting requirement was designed "to insure that protected employees would be fully informed of their rights").

Finally, this court believes that the period for filing a FLSA suit is more analogous to the period for filing an administrative charge under the ADEA-where the Seventh Circuit has expressly endorsed the *Bonham* rule, *Kephart,* 581 F.2d at 1289-than it is to the period for filing an ADEA suit-where the Eleventh Circuit has suggested the *Bonham* rule may be inapplicable, *Kazanzas,* 704 F.2d at 1530. Under the ADEA, the administrative filing deadline comes first. Because the *Bonham* rule protects employees from missing this deadline and the EEOC when contacted can be expected to adequately inform employees of their rights, there is little need to extend the longer court filing period. The administrative filing deadline will generally be the critical juncture. In contrast, there is no administrative filing period under the FLSA, no right-to-sue letter explaining the process. The court filing deadline is therefore bound to be the moment when FLSA rights are either preserved or lost forever.

*6 The considerations that led the Seventh Circuit to adopt the *Bonham* rule to toll the ADEA administrative filing period apply with equal force to the FLSA statute of limitations. Accordingly, this court holds that an employer's failure to post the notice required by 29 C.F.R. § 516.4 tolls the limitations period until the employee acquires a general awareness of his rights under the FLSA. It is undisputed that Padilla first obtained such knowledge on August 20, 2001, and that he joined this lawsuit less than a month later. Padilla's claim is therefore timely and, since no other facts are disputed, he is entitled to $258.00 in damages.[FN8]

> FN8. In light of Padilla's promptness, this court need not (and does not) decide whether Padilla had two or three years from the moment he acquired general knowledge of his right to overtime (an accrual theory) or whether he had only a reasonable period of time within which to act (an equitable tolling theory). *See generally East v. Graphic Arts Indus. Joint Pension Trust,* 718 A.2d

Not Reported in F.Supp.2d                                                                                Page 6
Not Reported in F.Supp.2d, 2002 WL 31175471 (N.D.Ill.), 148 Lab.Cas. P 34,743
**(Cite as: Not Reported in F.Supp.2d)**

> 153 (D.C.1998) (adopting the latter view
> with respect to a local anti-discrimination
> ordinance's limitations period).

TABULAR OR GRAPHIC MATERIAL SET AT
THIS POINT IS NOT DISPLAYABLE    TABLE
N.D.Ill.,2002.
Cortez v. Medina's Landscaping, Inc.
Not Reported in F.Supp.2d, 2002 WL 31175471
(N.D.Ill.), 148 Lab.Cas. P 34,743

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                    Page 1
Not Reported in F.Supp.2d, 2007 WL 672303 (M.D.Fla.)
**(Cite as: Not Reported in F.Supp.2d)**

**C**Figueroa-Cardona v. Sorrells Bros. Packing Co.,
Inc.
M.D.Fla.,2007.
Only the Westlaw citation is currently available
United States District Court,M.D. Florida.
German FIGUEROA-CARDONA, Pedro Figueroa-
Torres, and Adelaido Garcia-Perez, individually and
on behalf of all other persons similarly situated,
Plaintiffs,
v.
SORRELLS BROTHERS PACKING COMPANY,
INC. Defendant.
**No. 2:05-CV-601FTM99SPC.**

Feb. 14, 2007.

Gregory S. Schell and Victoria I. Gavito, Migrant
FarmworkerJustice Project, Lake Worth, Florida, for
the plaintiffs.
David J. Stefany of Allen, Norton & Blue, Tampa,
Florida and G. Craig Soria of Sarasota, Florida, for
the defendant.

MEMORANDUM AND ORDER
MAGNUSON, J.
*1 This matter is before the Court [FN1] on Plaintiffs'
Motion for Declaration of a Class Action. Because
Plaintiffs satisfy the requirements of Federal Rule of
Civil Procedure 23, the Court grants the Motion.

> FN1. Pursuant to 28 U.S.C. § 294(d), the
> undersigned has been assigned to this case
> to address the pending motion.

BACKGROUND

Sorrells Brothers employs workers to perform citrus
harvesting in Florida. Due to the lack of available
workers within the United States, Defendant Sorrells
Brothers Packing Company, Inc. ("Sorrells
Brothers") filed a temporary labor certification
application pursuant to 20 C.F.R. §§ 655.101(a)(1)
and (b)(1) in an effort to employ temporary foreign
workers for the 2003-2004 and 2004-2005 Florida
citrus harvests. These workers are commonly referred
to as "H-2A workers." As part of the temporary labor
certification, and as required by §§ 655.101(a)(1) and
(b)(1), Sorrells Brothers prepared clearance orders.
The terms of the clearance orders conformed to the
requirements of 20 C.F.R. §§ 653.501, 655.102, and
655.103. Moreover, the clearance orders depicted the
actual terms and conditions of employment in
addition to the material terms and conditions of the
job, as required by 20 C.F.R. § 653.501(d)(3).

When Sorrells Brothers was unable to fill the
positions with United States workers, the Department
of Labor certified a shortage of labor, and
Immigration and Customs Enforcement issued H-2A
visas in order to satisfy Sorrells Brothers' labor needs
as described in the clearance orders. These clearance
orders in turn served as the employment contracts
between Sorrells Brothers and the H-2A workers,
which included Plaintiffs.

Plaintiffs German Figueroa-Cardona and Pedro
Figueroa-Torres were H-2A workers employed by
Sorrells Brothers for the 2003-2004 citrus harvest
season. Plaintiff Adelaido Garcia-Perez was an H-2A
worker hired by Sorrells Brothers for the 2004-2005
citrus harvest season. During the respective seasons,
Plaintiffs traveled from Mexico to work for Sorrells
Brothers as orange pickers.

In December 2005, Plaintiffs German Figueroa-
Cardona, Pedro Figueroa-Torres, and Adelaido
Garcia-Perez ("Plaintiffs") brought suit on behalf of
themselves and all other persons similarly situated for
damages, declaratory relief, injunctive relief, costs of
litigation, and attorney's fees against Sorrells
Brothers. In the Complaint, Plaintiffs brought three
claims: (1) Fair Labor Standards Act; (2) breach of
contract and; (3) breach of contract for retaliation.

Plaintiffs claim that while employed by Sorrells
Brothers, they and other putative class members were
paid on a piece-rate basis for their work. They
contend that their compensation did not meet the
minimum amount due under the applicable adverse
effect wage rate in 20 C.F.R. § 655.102(b)(9).
Additionally, they claim that at times, the
compensation fell below the minimum wage
provision of the Fair Labor Standards Act (FLSA) 29
U.S.C. § 206(a)*et seq.* Moreover, Plaintiffs assert
that as required by the clearance orders and C.F.R. §
655.102(b)(9)(ii)(A), Sorrells Brothers failed to
supplement the piece-rate earnings in order to ensure
that the workers' pay period earnings equaled at least

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d                                                                Page 2
Not Reported in F.Supp.2d, 2007 WL 672303 (M.D.Fla.)
(Cite as: Not Reported in F.Supp.2d)

the adverse effect wage rate. Plaintiffs also maintain Sorrells Brothers failed to adhere to the requirements in the clearance orders and 29 C.F.R. § 776.5 by neglecting to supplement the piece rate earnings of the Plaintiffs and other putative class members to ensure the pay period earnings were at least equal to the minimum wage required by the FLSA.

**\*2** Additionally, Plaintiffs contend Sorrells Brothers did not keep adequate records of Plaintiffs and other putative class members' work, as required by 20 C.F.R. § 655.102(b)(7). This includes not accurately recording the number of hours of work offered each day, the hours actually worked, and the time the work began and ceased each day.

Finally, Plaintiffs assert that Sorrells Brothers failed to provide Plaintiffs and putative members with hours and earnings statements as required by 20 C.F.R. § 655.102(b)(8). In particular, they allege that their earnings statements neither contained the correct hours of employment nor accurately reflected the hours actually worked. Plaintiffs now seek class certification on Count II of the Complaint, the breach of contract claim.

## DISCUSSION

### A. Standard of Review

Class certification is governed by Federal Rule of Civil Procedure 23.*Hudson v. Delta Air Lines, Inc.,* 90 F.3d 451, 456 (11th Cir.1996) Plaintiffs have the burden of proving that all of the requirements of Rule 23 are met, and the Court may certify a class action only after conducting a "rigorous analysis" to ensure that all of the requirements of Rule 23 have been satisfied. *Gen. Tel. Co. of the Sw. v. Falcon,* 457 U.S. 147, 161 (1982)."However a court, in determining whether to certify a class, will accept plaintiffs' substantive allegations as true."*Edmonds v. Levine,* 233 F.R.D. 638, 640 (S.D.Fla.2006) (citing *In re Carbon Dioxide Antitrust Litig.,* 149 F.R.D. 299, 232 (M.D.Fla.1993)).

To satisfy Rule 23(a), Plaintiffs must meet four prerequisites: (1) the class is so numerous that joinder of all of its members is impracticable; (2) questions of law or fact common to the class are present; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will sufficiently protect the

interests of the class. Fed.R.Civ.P. 23(a). In addition to satisfying the four prerequisites in Rule 23(a), Plaintiffs must meet one of the requirements of Rule 23(b) *Klay v. Humana, Inc.,* 382 F.3d 1241, 1250 (11th Cir.2004)

### B. Rule 23(a)

Sorrells Brothers disputes the commonality, typicality, and adequacy of representation requirements of Rule 23(a)

#### 1. *Commonality*

The commonality requirement of Rule 23(a) typically "refers to the group of characteristics of the class."*Prado-Steiman ex rel Prado v. Bush,* 221 F.3d 1266, 1279 (11th Cir.2000) To satisfy the commonality requirement, "a class action must involve issues that are susceptible to class wide proof."*Cooper v. So. Co.,* 390 F.3d 695, 714 (11th Cir.2004) (quoting *Murray v. Auslander,* 244 F.3d 807, 811 (11th Cir.2001)). However, it is not necessary that all members of the class have identical claims *Prado-Steiman,* 221 F.3d at 1279 n. 14. Commonality, like typicality, focuses "on whether a sufficient nexus exists between the legal claims of the named class representatives and those of individual class members."*Id.* at 1278

**\*3** Plaintiffs assert common questions of fact among class members. In particular, they allege that Sorrells Brothers failed to pay the adverse effect wage rate, keep accurate records, or issue proper wage statements with regard to the entire workforce of H-2A workers. Accepting plaintiffs' substantive allegations as true, the Court concludes that Plaintiffs have satisfied the commonality requirement under Rule 23(a) *SeeAvila-Gonzalez v. Barajas,* No. 2:04-cv-567-FtM-33DNF, Report and Recommendation at 8-9 (S.D.Fla. Apr. 25, 2005); *see alsoDe Leon-Granados v. Eller & Sons Trees, Inc.,* No 1:05-cv-1473-CC, Class Certification Order at 11 (N.D.Ga Sept. 28, 2006) (finding commonality even though putative class members were employed by different work crews at various locations).

#### 2 *Typicality*

Typicality requires that a class representative "possess the same interest and suffer the same injury as the class members."*Cooper,* 390 F.3d at 713

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F Supp 2d
Not Reported in F Supp 2d, 2007 WL 672303 (M D Fla )
**(Cite as: Not Reported in F.Supp.2d)**

Thus, "the typicality requirement is satisfied if 'the claims or defenses of the class and class representative arise from the same event or pattern or practice and are based on the same theory " ' *Agan v. Katzman & Korr, P A.,* 222 F R.D 692, 698 (S D Fla 2004) (quoting *Kornberg v Carnival Cruise Lines, Inc,* 741 F 2d 1332, 1337 (11th Cir 1984)) Even if the fact patterns are unique to each claim, the typicality requirement will be satisfied if the class representative and class members experienced the same unlawful conduct *Agan,* 222 F R.D at 698. However, like commonality, Rule 23 does not require that all members of the class possess identical claims *Id* at 714 Furthermore, factual differences among claims will preclude a court from certifying a class. *Id*

Plaintiffs allege that Sorrells Brothers failed to comply with its contractual promises regarding payment of wages, recordkeeping, and wage statements and they assert that their claims are identical to those of the putative class members Plaintiffs also assert that if any named Plaintiff is to recover, he or she will be required to show the same breach of contract based on the same factual premises. Because the putative class members' claims arise out of the same conduct and essentially the same fact basis, the Court concludes that Plaintiffs have satisfied the typicality requirement under Rule 23(a)(3).

### 3 Adequacy of Representation

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed R Civ P.  23(a)(4).  This requirement applies to both the named plaintiff and counsel. *London v Wal-Mart Stores, Inc,* 340 F.3d 1246, 1253 (11th Cir.2003). One goal of this requirement is to expose conflicts of interest that may exist between the named parties and the class members. *Id* A second purpose is to determine "the forthrightness and vigor with which the representative party can be expected to assert and defend the interests of the members of the class." *Id.* (quoting *Lyons v. Ga Pac Corp Salaried Employees Ret Plan,* 221 F 3d 1235, 1253 (11th Cir 2000)).

*4 The Court will not certify a class when the representative parties' interests are in conflict with the class members' interests. *Pickett v. Iowa Beef Processors,* 209 F.3d 1276, 1280 (11th Cir 2000). However, the conflict must be "fundamental, going to

the specific issues in controversy."*Id ,See alsoBieneman v. City of Chicago,* 864 F 2d 463, 465 (7th Cir 1988) (denying certification of group of landowners because some landowners claimed a decrease in value of land due to proximity to airport, while others claimed an immense benefit).

Plaintiffs contend that they are able to fully and adequately represent the interests of the putative class and that no conflict of interest exists as to other members of the class Plaintiffs also assert that all members of the class will benefit from the relief sought from Sorrells Brothers. Additionally, counsel for Plaintiffs is experienced in class action litigation in federal court Counsel has been involved in other cases similar to this one and will vigorously prosecute the action. After considering Plaintiffs' allegations, the Court concludes that Plaintiffs have satisfied the adequacy of representation requirement under Rule 23(a)(4)

### C. Rule 23(b)

Having concluded that Plaintiffs met all of the requirements of Rule 23(a), the Court will now examine whether Plaintiffs satisfy Rule 23(b) Plaintiffs pursue certification under Rule 23(b)(3), which is satisfied where "questions of law or fact common to the members of the class predominate over any questions affecting only individual members," and "a class action is superior to other available methods for the fair and efficient adjudication of the controversy."Fed R Civ P. 23(b)(3).

### 1 Predominance

" 'The issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, must predominate over those issues that are subject only to individualized proof." ' *Jackson v. Motel 6 Multipurpose, Inc,* 130 F 3d 999, 1005 (11th Cir.1997) (quoting *Kerr v City of W Palm Beach,* 875 F.2d 1546, 1558 (11th Cir 1989)) The predominance requirement focuses on legal and factual inquiries that qualify each member's claim as a controversy, and it is "far more demanding" than the commonality requirement. *Id* Common issues will not predominate over individual questions if, "as a practical matter, the resolution of this overarching common issue breaks down into an unmanageable variety of individual and legal factual issues." *Id* at

Not Reported in F.Supp.2d                                                        Page 4
Not Reported in F.Supp.2d, 2007 WL 672303 (M.D.Fla.)
**(Cite as: Not Reported in F.Supp.2d)**

1006 (citing *Andrews v. Am. Te. & Tel. Co.*, 95 F.3d 1014, 1023 (11th Cir.1996)).

Plaintiffs allege that the issues arising out of the breach of contract are common to all members of the proposed class. Furthermore, the remedies Plaintiffs seek relate to legal grievances common among all members of the class. The resolution of the breach of contract claims will resolve each class member's claim. Plaintiffs do not seek to resolve any legal or factual issue that does not apply to all members of the class. For the foregoing reasons, the Court concludes that Plaintiffs have demonstrated that common questions of fact and law predominate over any issues relating to individual class members.

### 2. *Superiority of Class Action*

**\*5** The second requirement necessary for satisfaction of Rule 23(b)(3) is that a class action is "superior to other methods for the fair and efficient adjudication of the controversy."Fed.R.Civ.P. 23(b)(3). The Court focuses on four factors when making this determination: (1) the interest of members of the class in controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the difficulties likely to be encountered in the management of a class action. Fed.R.Civ.P. 23(b)(3)(A)-(D).

As to the first factor, Plaintiffs assert that it is unlikely the individual class members would have interest in pursuing their own individual actions. Moreover, these Plaintiffs would likely not be able to bring their own actions based on their permanent homes being in Mexico, lack of proficiency in the English language, indigent status, and the small amount of individual recovery. *See, e.g.,Silva-Arriaga v. Texas Exp., Inc.,* 222 F.R.D. 684, 691 (M.D.Fla.2004) ("Given their limited English skills and limited understanding of the legal system, along with the fact that few live permanently within the Middle District of Florida, it is highly unlikely that the individual plaintiffs would pursue this litigation if class certification were not allowed"). Plaintiffs have shown that it is unlikely that the class members would be interested in pursuing individual actions. Therefore, the Court concludes that the first factor is satisfied.

Plaintiffs allege that no other lawsuits have been filed which raise the same issues as the present matter. Therefore, the Court finds that Plaintiffs have satisfied Rule 23(b)(3)(B).

Regarding the third factor, Plaintiffs state that it is most favorable to conduct the litigation in this forum. Sorrells Brothers is based in the Middle District of Florida and its principals reside here. The employment records and other evidence pertaining to the adjudication of the matter are also located in this District. The Court agrees that this District would be the most favorable forum for litigation of this action.

Finally, Plaintiffs state that although there may be administrative hurdles associated with certifying the class, the benefits of pursuing this action on a class basis outweigh any administrative burden. The class members' claims are predicated on a common set of facts and deal with the same employment contract. Thus, it will be unnecessary to hear testimony from every individual class member. The speculative administrative hurdles are not sufficient to preclude class certification. *See, e.g.,Klay,* 382 F.3d at 1272-73.

### CONCLUSION

Plaintiffs have satisfied the requirements of Rule 23 to permit class certification. Accordingly, IT IS HEREBY ORDERED that Plaintiffs' Motion for Declaration of a Class Action (Docket No. 14) is GRANTED with regard to Count II only.[FN2]The Court certifies a class of:

> FN2. This order shall not be construed as creating a class with regard to Count I, or III, or to any of the issues falling under the scope of a proper action under the FLSA, 29 U.S.C. §§ 201 *et seq* (2004)

**\*6** All individuals admitted to the United States pursuant to Section 101(a)(15)(H)(ii)(a) of the Immigration and Nationality Act, 8 U.S.C. § 1101(a)(15)(H)(ii)(a)("H-2A workers") who were employed by Sorrells Brothers Packing Company, Inc to pick citrus fruit during the 2003-2004 or 2004-2005 Florida citrus harvests.

M.D.Fla.,2007
Figueroa-Cardona v. Sorrells Bros. Packing Co., Inc.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 672303 (M.D.Fla.)
**(Cite as: Not Reported in F.Supp.2d)**

Not Reported in F.Supp.2d, 2007 WL 672303
(M.D.Fla.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works

Westlaw.

Not Reported in F.Supp.2d                                              Page 1
Not Reported in F.Supp.2d, 2005 WL 2430195 (E.D.Mich.)
**(Cite as: Not Reported in F.Supp.2d)**

Garcia-Andrate v. Madra's Cafe Corp.
E.D.Mich.,2005.
Only the Westlaw citation is currently available
United States District Court,E.D. Michigan.
Primitivo GARCIA-ANDRADE et al., Plaintiffs,
v.
MADRA'S CAFÉ CORP. et al., Defendants.
No. 04-71024.

Aug. 3, 2005.

Dennis A. Dettmer, Dennis A. DettmerAssoc.,
Detroit, MI, Teresa M. Hendricks, Robert A. Alvarez,
Michigan Migrant Legal Assistance Project, Grand
Rapids, MI, for Plaintiffs

*Plaintiff's Proposed Order*
CAPEL, Magistrate J.
**\*1** This cause came before the Court, Honorable
Wallace Capel Jr., United States Magistrate Judge
presiding, at 9:30 a.m. on July 25, 2005. By this
motion, Plaintiffs Primitivo Garcia-Andrade et al.
move the Court for a protective order governing
certain aspects of the discovery to be undertaken by
the Defendants in this action

This Court, having reviewed the submissions of the
parties, and the oral arguments presented, finds as
follows:

The information and documents [FN1] sought by the
Defendants that identify or otherwise tend to identify,
the Plaintiffs' immigration status or authorization to
work in the United States have the potential for
incriminating the Plaintiffs if they were compelled to
produce the requested information or documents [FN2]

> FN1. The information and documents sought
> include but are not limited to: immigration
> status, driver's license, identification
> documents, birth certificates, tax filings,
> passports, social security numbers,
> employment authorization, and number and
> date of border crossings

> FN2. *See, e.g.Escobar v. Baker*, 814 F.Supp.
> 1491 (W.D.Wash.1993)(plaintiffs asserted
> their Fifth Amendment right against self-
> incrimination in response to interrogatories

concerning whether they were authorized to
be employed by the INS at the time they
applied for work on the defendant's farms);
*Beltran-Tirado v. INS*, 213 F.3d 1179 (9th
Cir.2000)(plaintiff convicted of falsely using
a Social Security number was not guilty of a
crime of moral turpitude); and *Hoffman
Plastic Compounds, Inc. v. NLRA*, 535 U.S.
137, 147-148, 122 S.Ct. 1275, 152 L.Ed.2d
271 ("Aliens who use or attempt to use such
documents are subject to fines and criminal
prosecution.")

The Court notes that the Plaintiffs' have asserted their
Fifth Amendment privilege against self-incrimination
and have refused to provide any information or
documents that may incriminate them. This includes
the very information and documents sought by the
Defendants in this action. The Plaintiffs' right to
assert this privilege in this matter is fully supported
by precedent and this Court will not compel the
Plaintiffs to provide the requested information or
documents once that privilege has been asserted. [FN3]

> FN3.*Campbell v. Gerrans*, 592 F.2d 1054,
> 1057 (9th Cir.1979) ("the privilege against
> self-incrimination justified a person in
> refusing to respond to interrogatories")

Since Federal Rule of Civil Procedure 26(a) provides
that discovery may be had of any matter, "not
privileged," the discovery rules cannot reach
information that is protected by the privilege against
self-incrimination.*Campbell v. Gerrans*, 592 F.2d
1054 (9th Cir.1979); *Gatoil, Inc. v. Forest Hill State
Bank*, 104 F.R.D. 580, 581 (D.C.Md 1985); Wright
and Miller, Civil § 2018. It is well-established that
the privilege applies in civil, as well as criminal
actions. *See e.g.Maness v. Myers*, 419 U.S. 449, 95
S.Ct. 584, 42 L.Ed.2d 574 (1975); *U.S. v. Kordel*,
397 U.S. 1, 90 S.Ct. 763, 25 L.Ed.2d 1 (1970);
*McCarthy v. Arndstein*, 266 U.S. 34, 45 S.Ct. 16, 69
L.Ed. 158 (1924). As the U.S. Supreme Court stated,
The privilege [against self-incrimination] is
not ordinarily dependent upon the nature of the
proceedings in which the testimony is sought or is to
be used. It applies alike to civil and criminal
proceedings, wherever the answer might tend to
subject to criminal responsibility him who gives it

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2430195 (E.D.Mich.)
(Cite as: Not Reported in F.Supp.2d)

*Maness,* supra, at 594.

The privilege is available even if the risk of criminal prosecution is remote. *In re Folding Carton Antitrust Litigation,* 609 F.2d 867, 871 (7th Cir.1979). Courts have thus repeatedly held that the privilege against self-incrimination justified a person in refusing to answer questions at a deposition, or to respond to interrogatories, requests for admission, or to produce documents. See e.g. Wright and Miller, Civil § 2018. *In re Folding Carton Antitrust Litigation,* 609 F.2d 867, 871 (7th Cir.1979); *Wehling v. Columbia Broadcasting System,* 608 F.2d 1084, (5th Cir.1979), *rehearing denied*611 F.2d 1026 (5th Cir.1980); *In re Master Key Litigation,* 507 F.2d 292 (9th Cir.1974) (depositions); *Gordon v. Federal Deposit Ins. Corp.,* 427 F.2d 578 (D.C.Cir.1970) (interrogatories).

**\*2** Furthermore, the Defendants have not shown that they have exhausted all alternative means of discovering the information sought regarding the Plaintiffs' employment history during the time period claimed in this matter. In fact, the Plaintiffs have agreed to provide this information to the Defendants and therefore the Defendants are not prejudiced or injured by the granting of this protective order.

In addition, there is sufficient case law to support the assertion that immigration status is irrelevant in this matter and what little relevance the other information sought by the Defendants in this matter is outweighed by the Fifth Amendment concerns expressed by the Plaintiffs.[FN4]

> FN4 *Flores v. Amigon,* 233 F.Supp.2d 462 (E.D.N.Y.2002) ("the plaintiff's immigration status was irrelevant and posed a serious risk of injury to the plaintiff, outweighing any need for disclosure.")

Accordingly, the Court's following protective order balances Defendants' legitimate discovery needs, on the one hand, with Plaintiffs' ability to assert their workplace and constitutional rights without fear of adverse criminal or immigration related consequences, on the other.

### PROTECTIVE ORDER

*A. Matters As To Which Inquiries or Requests To Produce Are Barred*

1. Because of the Plaintiffs' assertion of their Fifth Amendment rights, and because of the powerful deterrent effect they would have on Plaintiffs' assertion of their workplace rights, the Court finds that there is good cause to prohibit Defendants from inquiring or requesting any documentation regarding or related to the Plaintiffs' past or current immigration or citizenship status.

2. This prohibition encompasses not only direct questions or requests for production relating to immigration status or employment authorization, but also questions or requests that seek to elicit information closely bearing upon these areas or that could lead to the discovery of the Plaintiff's immigration status or employment authorization.

### B. Other Provisions

3. All parties and their counsel shall take all necessary and available steps to ensure compliance with this protective order.

4. This protective order is entered without prejudice to the parties right to object to the provision or disclosure of the covered information on any appropriate ground, or to the right to invoke any applicable privileges with respect to such information.

5. In the event of any breach of this protective order, any party may seek appropriate equitable and legal relief therefore from the Court. In the event such a breach is proven to the satisfaction of the Court, the prevailing party shall in addition be entitled to recover costs and expenses by it in so doing.

6. Within 30 days, the Plaintiffs shall provide the Defendants with the list of previous employers for whom Plaintiffs worked during the period claimed in this action, including the address, phone number and period of employment for each.

GOOD CAUSE APPEARING, IT IS SO ORDERED.

E.D.Mich.,2005.
Garcia-Andrate v. Madra's Cafe Corp
Not Reported in F.Supp.2d, 2005 WL 2430195 (E.D.Mich.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                                      Page 1
Slip Copy, 2006 WL 3825178 (E.D.Pa.), RICO Bus.Disp.Guide 11,221
**(Cite as: Slip Copy)**

▷Grider v. Keystone Health Plan Central, Inc.
E.D.Pa.,2006.

United States District Court,E.D. Pennsylvania.
Natalie M. GRIDER, M.D. and Kutztown Family
Medicine, P.C., Plaintiffs
v.
KEYSTONE HEALTH PLAN CENTRAL, INC.,
Highmark, Inc., John S. Brouse, Capital Blue Cross,
James M. Mead and Joseph Pfister, Defendants.
**Civil Action No. 2001-CV-05641.**

Dec. 20, 2006

Kenneth A. Jacobsen, Esquire, Louis C. Bechtle,
Francis J. Farina, Esquire, Joseph A. O'Keefe, Esquire,
On behalf of Plaintiffs.
John S. Summers, Esquire, Daniel Segal, Esquire, John S.
Stapleton, Esquire, On behalf of Defendants Keystone
Health Plan Central, Inc., and Joseph Pfister.
Daniel B. Huyett, Esquire, Jeffrey B. Bukowski, Esquire,
On behalf of Defendants Capital Blue Cross and James
M. Mead.
Michael L. Martinez, Esquire, Kathleen Taylor Sooy,
Esquire, On behalf of Defendants Keystone Health Plan
Central, Inc., Capital Blue Cross, Joseph Pfister and
James M. Mead.
Sandra A. Girifalco, Esquire, Mary J. Hackett, Esquire,
On behalf of Defendants Highmark, Inc. and John S.
Brouse.

*ORDER*
JAMES KNOLL GARDNER, United States District
Judge.
*1 NOW, this 20th day of December, 2006, upon
consideration of the following submissions:
1. Plaintiffs' Amended Motion for Class Certification,
filed December 12, 2005; together with:
(a) Defendants' Joint Answer to Plaintiffs' Amended
Motion for Class Certification, which answer was filed on
behalf of all defendants on January 10, 2006;
(b) Notice of Supplemental Authority filed by defendant
Highmark, Inc. on September 18, 2006;
(b) Plaintiffs' List of Class Legal and Factual Issues under
Fed R.Civ.P. 23(c)(1)(B) and *Wachtel v. Guardian Life
Ins. Co.*, 453 F.3d 179 (3d Cir.2006), which list was filed
October 5, 2006;
(c) Plaintiffs' List of Class Defenses under Fed R.Civ.P.
23(c)(1)(B) and *Wachtel v. Guardian Life Ins.Co.*, 453

F.3d 179 (3d Cir.2006), which list was filed October 5,
2006;
(e) Defendants' Joint Response to Plaintiffs' List of Class
Claims, Issues and Defenses, which response was filed on
behalf of all defendants on October 20, 2006; and
(f) Plaintiffs' Reply to Defendants' Joint Response to
Plaintiffs' List of Class Claims, Issues and Defenses,
which reply was filed October 30, 2006;

upon consideration of the briefs of the parties; after
hearing conducted on March 6, 7, 8, 9 and 10, 2006; and
for the reasons articulated in the accompanying Opinion,

*IT IS ORDERED* that Plaintiffs' Amended Motion for
Class Certification is granted in part and denied in part.

*IT IS FURTHER ORDERED* that Counts I,[FN1] III [FN2] and
IV [FN3] of plaintiffs' Amended Complaint are certified as
class actions pursuant to Rule 23(b)(3) of the Federal
Rules of Civil Procedure.

> FN1. Count I of plaintiffs' Amended Complaint
> alleges conspiracy to commit RICO violations
> pursuant to 18 U.S.C. § 1962(d) in violation of
> 18 U.S.C. § 1962(c).

> FN2. Count III of plaintiffs' Amended Complaint
> alleges violation of section 1962(c) of the
> Racketeer Influenced and Corrupt Organizations
> Act ("RICO"), 18 U.S.C. §§ 1961-1968.

> FN3. Count IV of plaintiffs' Amended Complaint
> alleges violation of the prompt-payment
> provision of Pennsylvania's Quality Health Care
> Accountability and Protection Act, Act of May
> 17, 1921, P.L. 682, No. 284, §§ 2101-2193, as
> amended, 40 P.S. §§ 991.2101 to 991.2193.

*IT IS FURTHER ORDERED* that plaintiffs' motion for
class certification of Count V of their Amended
Complaint is denied.[FN4]

> FN4. Count V of plaintiffs' Amended Complaint
> alleges breach of contract against defendant
> Keystone Health Plan Central, Inc.

*IT IS FURTHER ORDERED* that a class is certified for
the period from January 1, 1996 through and including

Slip Copy                                                                                        Page 2
Slip Copy, 2006 WL 3825178 (E.D.Pa.), RICO Bus.Disp.Guide 11,221
**(Cite as: Slip Copy)**

October 5, 2001 on behalf of the following subclasses:

All medical service providers in connection with medical services rendered to patients insured by defendant Keystone Health Plan Central, Inc. who during the period January 1, 1996 through October 5, 2001:

(1) submitted claims for reimbursement on a fee-for-service basis for covered services which claims were denied or reduced through the application of automated edits in the claims processing software used by defendants to process those claims; and/or

(2) received less in capitation payments than the provider was entitled through the use and application of automated systems to "shave" such payments in the manner alleged in plaintiff's Amended Complaint filed October 6, 2003.

*IT IS FURTHER ORDERED* that the following factual issues are certified for class treatment:

(1) common automated bundling practices;

(2) common automated downcoding practices;

(3) a common failure to pay clean claims within the applicable statutory time period;

(4) a common failure to timely place patients on capitation rolls;

**\*2** (5) a common failure to pay appropriate capitation or fee-for-service on guest members;

(6) common proof of a conspiracy to defraud in violation of RICO;

(7) a common failure to recognize CPT prescribed modifiers;

(8) whether defendants improperly suspended claims to delay or deny payment;

(9) whether defendants failed to pay for medically necessary covered services; and

(10) whether defendants followed a "pursue and pay" or a "pay and pursue" strategy for the payment of claims under the Pennsylvania prompt payment statute.[FN5]

FN5 *See* footnote 3, above.

*IT IS FURTHER ORDERED* that the following legal issues [FN6] are certified for class treatment:

FN6. While each of these issues are based, in part, upon factual determinations, whether those factual allegations, if proven, constitute mail fraud, wire fraud, violation of the Pennsylvania prompt payment statute, conspiracy, and RICO violations are among the ultimate legal conclusions for determination in this case.

(1) whether defendants committed mail or wire fraud;

(2) whether defendants violated the Pennsylvania prompt payment statute [FN7]; and

FN7 *See* footnote 3, above.

(3) whether defendants conspired in violation of RICO [FN8]

FN8 *See* footnotes 1 and 2, above

*IT IS FURTHER ORDERED* that the following common defenses are certified for class treatment:

(1) whether the class claims are barred by disclosures contained in Keystone's common standard form, fill-in-the-blanks Primary Care Physician Provider Contract, specialist Consulting Agreement or Keystone's Administrative Manual (including updates and revisions), in effect during the class period;

(2) whether the class claims are barred by disclosures contained in the Highmark/Pennsylvania Blue Shield ("PBS") Procedural Terminology Manuals distributed by Highmark to its network of physicians during the class period;

(3) whether the class claims are barred by disclosures contained in the Highmark/PBS "Policy Review & News" distributed by Highmark to its network of physicians during the class period;

(4) whether the class claims are barred by the Statements of Remittance ("SORs") sent to providers with their reimbursement checks;

(5) whether endorsements on the SORs to the effect that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

acceptance of the "allowed amount" (that is, defendants' fee schedule amount) constituted a release and satisfaction of the class' claims for reimbursement for medical services even when such allowed amount was not paid;

(6) whether the class claims are barred because the injuries and damages of the class members were caused by the conduct of others, not defendants;

(7) whether the class claims are barred by the applicable statute of limitations; and

(8) whether the class claims are barred because of the absence of any material misrepresentations, misleading disclosures or omissions by defendants in their standard form, Primary Care Physician Provider Contract and specialist Consulting Agreement.

*IT IS FURTHER ORDERED* that pursuant to Rule 23(g) of the Federal Rules of Civil Procedure Kenneth A. Jacobsen, Esquire, Louis C. Bechtle, Esquire, Francis J. Farina, Esquire and Joseph A. O'Keefe, Esquire are each appointed class counsel.

*IT IS FURTHER ORDERED* that plaintiff Natalie M. Grider, M.D., both in her individual capacity and as President of plaintiff Kutztown Family Medicine, P.C., is approved as class representative.

**\*3**IT IS FURTHER ORDERED that on or before January 19, 2007 defendant Keystone Health Plan Central, Inc., shall provide plaintiffs' counsel with the name and last known address of every physician having a contract with Keystone during the class period.

*IT IS FURTHER ORDERED* that on or before January 26, 2007 class counsel shall present to counsel for defendants and the undersigned a proposed class notice <sup>FN9</sup> and a specific proposal for service of the class notice upon all class members in accordance with the requirements of Rule 23(c)(2)(B) of the Federal Rules of Civil Procedure.

> FN9. The official commentary to Fed.R.Civ.P. 23 notes that: "The Federal Judicial Center has created illustrative clear-notice forms that provide a helpful starting point for actions similar to those described in the forms." Fed.R.Civ.P. 23 Advisory Committee Notes 2003.

*IT IS FURTHER ORDERED* that defendants shall have

until on or before February 6, 2007 to object to plaintiffs' proposed class notice and service proposal.

*IT IS FURTHER ORDERED* that a Rule 16 Status Conference shall be conducted on the record by the undersigned on February 12, 2007 at 9:30 o'clock a.m. in a courtroom to be designated at the James A. Byrne United States Courthouse, 601 Market Street, Philadelphia, Pennsylvania, or at such other time, place and location designated by the undersigned, to resolve any objections to plaintiffs' proposed class notice and service proposal, and to approve the class notice.

*IT IS FURTHER ORDERED* that on or before March 15, 2007 plaintiffs shall serve the approved class notice upon all class members in the manner approved by the undersigned pursuant to Federal Rule of Civil Procedure 23(c)(2)(B).

*IT IS FURTHER ORDERED* that on or before March 30, 2007 plaintiffs shall file a copy of the Notice provided to class members and a certification by class counsel detailing the method of service, identifying those members to whom individual notice was provided, the reasons why any members of the class could not be identified through reasonable effort, and the proposed method by which notice will be provided to members who could not be identified through reasonable effort.

*IT IS FURTHER ORDERED* that the Clerk of Court is directed to remove this matter from the civil suspense docket BY THE COURT:

### OPINION

This matter is before the court on Plaintiffs' Amended Motion for Class Certification filed December 12, 2005. Defendants' Joint Answer to Plaintiffs' Amended Motion for Class Certification was filed January 10, 2006. A class certification hearing was conducted by the undersigned on March 6, 7, 8, 9 and 10, 2006. Plaintiffs presented the testimony of five witnesses <sup>FN10</sup> and 161 exhibits. Defendants presented the testimony of two witnesses <sup>FN11</sup> and 191 exhibits.

> FN10. Plaintiffs' witnesses were defendant Joseph M. Pfister, the former Chief Executive Officer of defendant Keystone; Ruth Jurkiewicz, Manager of Special Process Claims and Claims Operations at defendant Keystone; Nina E. Boldosser, an employee in the Electronic Data Interface Department of Amisys Synertech

Slip Copy                                                                                          Page 4
Slip Copy, 2006 WL 3825178 (E.D.Pa.), RICO Bus Disp Guide 11,221
**(Cite as: Slip Copy)**

Health System Solutions, LLC; Dr. Natalie M. Grider, the individual plaintiff and proposed class representative; and Susan Heffner, the Office Manager at plaintiff Kutztown Family Medicine

FN11. Defendants' witnesses were M. Lindsey Gunn, the Director of Medical Payment and Policy Division of defendant Highmark; and Steven M. Wiggins, who was qualified as an expert in the field of economics and econometrics.

At the conclusion of the hearing, we took the matter under advisement. Thereafter, we reviewed the transcript of the hearing testimony. We also reviewed the voluminous paper exhibits consisting of more than 15 linear feet and containing approximately 45,625 pages. In addition, we reviewed the extensive contents of five compact computer discs containing approximately 72,520 more pages of exhibits, for a total of approximately 118,145 pages of exhibits.

**\*4** Based upon our review of the testimony and exhibits, and for the following reasons, we grant in part and deny in part Plaintiffs' Amended Motion for Class Certification. Specifically, we grant plaintiffs' motion for class certification against all defendants on Count I of plaintiffs' Amended Complaint alleging conspiracy to commit RICO [FN12] violations pursuant to 18 U.S.C. § 1962(d) in violation of 18 U.S.C. § 1962(c); Count III of plaintiffs' Amended Complaint alleging violation of RICO under 18 U.S.C. § 1962(c); and Count IV of plaintiffs' Amended Complaint alleging violation of the prompt-payment provision of Pennsylvania's Quality Health Care Accountability and Protection Act [FN13] because we conclude that plaintiffs have satisfied all the prerequisites of class certification pursuant to Rule 23 of the Federal Rules of Civil Procedure regarding those counts.

FN12. Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968.

FN13. Act of May 17, 1921, P.L. 682, No. 284, §§ 2101-2193, as amended, 40 P.S. §§ 991.2101 to 991.2193.

We deny plaintiffs' motion for class certification on Count V of plaintiffs' Amended Complaint alleging breach of contract against defendant Keystone Health Plan Central, Inc. because we conclude that individual issues will predominate over any common issues of law and fact

regarding plaintiffs' breach of contract claims.

*JURISDICTION*

Jurisdiction is based upon federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1441(b). The court has supplemental jurisdiction over plaintiffs' pendent state law claims. *See* 28 U.S.C. § 1367. Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial number of the events giving rise to plaintiffs' claims allegedly occurred in this judicial district.

*PARTIES*

Plaintiff Natalie M. Grider, M.D. is a family practitioner and President of plaintiff Kutztown Family Medicine, P.C. ("Kutztown"). Plaintiffs and their affiliates provide medical services to about 4,000 patients who are insured by defendant Keystone Health Plan Central, Inc ("Keystone").

Keystone is a Health Maintenance Organization ("HMO") organized under the Pennsylvania Health Maintenance Organization Act.[FN14] Defendant Joseph Pfister is the former Chief Executive Officer of Keystone.

FN14. Act of December 29, 1972, P.L. 1701, No. 364, §§ 1-17, as amended, 40 P.S. §§ 1551-1567.

Defendant Highmark, Inc., formerly known as Pennsylvania Blue Shield ("PBS"), is an insurance company which during the entire class period (January 1, 1996 through October 5, 2001) was a 50% owner of Keystone. Defendant John S. Brouse is the former Chief Executive Officer of Highmark.

Defendant Capital Blue Cross ("Capital") is an insurance company which during the entire class period was a 50% owner of Keystone. Defendant James M. Mead is the former Chief Executive Officer of Capital. In 2003 Capital purchased Highmark's ownership interest in Keystone. Keystone is now a subsidiary of Capital.

Plaintiffs contend that during the proposed class period defendants Capital and Highmark directed and controlled the operations of Keystone and received all of its profits. Plaintiffs allege that defendants and various non-parties together form what is styled as the "Managed Care Enterprise", an entity which allegedly operates to defraud plaintiffs and the proposed class through a variety of illegal methods. Defendants deny those allegations.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

### PROCEDURAL HISTORY

**\*5** On October 5, 2001 plaintiffs filed their Complaint in the Court of Common Pleas of Philadelphia County. Defendants removed the action to this court on November 7, 2001 [FN15] By Order and Opinion of the undersigned dated September 18, 2003, we granted in part and denied in part Defendants' Motion to Dismiss, which motion was filed January 23, 2002.

> FN15. This action was originally assigned to our colleague United States District Judge Anita B. Brody. The case was transferred from the docket of District Judge Brody to the docket of Senior District Judge Thomas N. O'Neill, Jr., on November 16, 2001 and from the docket of Senior Judge O'Neill to the undersigned on December 19, 2002.

Specifically, we denied defendants' motion to dismiss based upon *Pegram v. Herdrich* [FN16], the McCarran-Ferguson Act [FN17] and the state-action-immunity doctrine [FN18] Defendants' motion to dismiss Count I of plaintiffs' Complaint alleging conspiracy to commit RICO violations was denied. Defendants' motion to dismiss Count II alleging aiding and abetting RICO violations was granted. Defendants' motion to dismiss Count III alleging illegal investment of racketeering proceeds under 18 U.S.C. § 1962(a) was granted without prejudice to file an amended complaint.

> FN16.530 U.S. 211, 120 S.Ct. 2143, 147 L.Ed.2d 164 (2000).

> FN17.15 U.S.C. § 1012

> FN18.*See Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943).

In addition, defendants' motion to dismiss Count IV was granted in part and denied in part relating to allegations of fraud, extortion, bribery and violations of the Travel Act [FN19] and Hobbs Act.[FN20] Defendants' motion to dismiss Count V alleging a violation of the Pennsylvania Quality Health Care Accountability and Protection Act was denied. Defendants' motion to dismiss Count VI alleging violation of a duty of good faith and fair dealing was granted. In all other respects, Defendants' Motion to Dismiss was denied [FN21]

> FN19.18 U.S.C. § 1952

> FN20.18 U.S.C. § 1951.

> FN21. In their Amended Complaint, plaintiffs changed the numbering of some of the counts which were also contained in the original Complaint. This was necessary to accommodate our dismissal of Counts II and VI from the original Complaint and plaintiffs' inclusion of a new count numbered V in the Amended Complaint.

On October 6, 2003 plaintiffs filed their Amended Complaint. On November 14, 2003 Defendants' Motion to Dismiss and/or Strike Certain Portions of the Amended Complaint was filed.

On December 30, 2003 a Status Conference was held by the undersigned pursuant to Federal Rule of Civil Procedure 16. At that conference the court attempted, albeit unsuccessfully, to attain consensus between counsel for the parties regarding an appropriate schedule for the completion of discovery, dispositive motions and trial. On January 14, 2004, a comprehensive Rule 16 Status Conference Order was entered by the undersigned memorializing the decisions made at the status conference held December 30, 2003.

From late 2003 until mid-2005, a plethora of motions were filed both with this court and with United States Magistrate Judge Arnold C. Rapoport. The January 2, 2003 Standing Order of the undersigned provides that all discovery disputes which cannot be amicably resolved shall be brought to the attention of Magistrate Judge Rapoport "by letter or other informal means" [FN22] Moreover, the Standing Order provides that: "Any party contending that the Order of the Magistrate Judge is clearly erroneous or contrary to law may file a Petition to Reconsider, together with a proposed Order, directed to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(A)."

> FN22. We note that because of the number of disputes and animosity between the parties, Magistrate Judge Rapoport eventually required the parties to file formal motions rather than utilize his usual less formal dispute resolution procedures.

On March 12, 2004 defendants Highmark and Capital filed notice with the Judicial Panel on Multidistrict Litigation ("MDL") that the within action may be a "tag-along" action to In *re Managed Care Litigation*, MDL

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                          Page 6
Slip Copy, 2006 WL 3825178 (E.D.Pa.), RICO Bus.Disp.Guide 11,221
**(Cite as: Slip Copy)**

No. 1334 pending before United States District Judge Federico A. Moreno in the United States District Court for the Southern District of Florida. On March 17, 2004 defendants Capital and Highmark sought a stay of all proceedings in this court pending a decision by the MDL panel. By Order dated May 5, 2004 we denied defendants' motion for stay.[FN23]

> FN23. Defendants have vacillated on the applicability of the *In re Managed Care Litigation* throughout this case. Defendants specifically argued that Judge Moreno's decision on the motion to dismiss was inapplicable to this litigation even though the issues of both cases were virtually identical *See*135 F.Supp.2d 1253 (S.D.Fla.2001) However, after our September 2003 decision on Defendants' Motion to Dismiss, defendants changed course and argued to the MDL Panel that this case should be included in that litigation.
> Specifically, in the letter seeking to add this action to the MDL case, current counsel for defendants Capital and Highmark stated: "The *Grider* Amended Complaint demonstrates that these actions raise common issues of fact."(*See* Letter from Tracy A. Roman, Esquire, dated March 12, 2004 to Michael J. Beck, Clerk, Judicial Panel on Multidistrict Litigation, attached as Exhibit A to the Motion of Defendants Capital Blue Cross and Highmark Inc. for a Stay of All Proceedings.)
> Finally, regarding the current motion for class certification, defendants argue that the decisions of Judge Moreno and the United States Court of Appeals for the Eleventh Circuit regarding certification of certain claims in the MDL Managed Care Litigation are neither applicable to, nor persuasive on, some issues involved in this matter (certification of claims brought under RICO and the applicable prompt pay statute), but are applicable and persuasive concerning another issue (breach of contract claim).

**\*6** On April 26, 2004, partly in response to the filing of innumerable motions and the slow pace of discovery, we extended the deadlines set in our January 14, 2004 Rule 16 Status Conference Order. Moreover, on August 5, 2004, because of the inability of the parties to resolve any of their discovery disputes without court intervention, we placed this matter into civil suspense but required the parties to continue the discovery process.

From late 2004 into the summer of 2005 the parties

continued their incessant motion practice and exhibited a complete inability to agree on even the most basic matters. The level of acrimony and litigiousness exhibited by counsel in this matter was unprecedented in the twenty-five years of judicial experience of the undersigned.

In response to plaintiffs' request for appointment of a special master and over defendants' objection, we appointed Karolyn Vreeland Blume, Esquire, [FN24] as Special Discovery Master by Order dated August 25, 2005, pursuant to the provisions of Rule 53 of the Federal Rules of Civil Procedure.

> FN24. Attorney Blume is known to the court as an attorney of over 29 years experience. She received a Bachelor of Arts degree with honors in political science in 1974 from Skidmore College and a Juris Doctorate degree from Villanova University School of Law in 1977.
> Attorney Blume spent the first 15 years of her career in a private, general law practice handling a broad spectrum of claims and issues for individual, business and non-profit organization clients. From 1992 through 2001 she served as Senior Law Clerk to United States Magistrate Judge Arnold C. Rapoport handling a wide variety of civil and criminal matters involving both state and federal law. Thereafter, from 2001 until 2004 Attorney Blume served as in-house counsel for PPL Corporation. Formerly she served as President of the Bar Association of Lehigh County. Attorney Blume is the founder and owner of Conflict Resolution Services located in Allentown, Pennsylvania. Currently, she provides mediation and arbitration services at all stages of conflict for businesses and other ventures.
> Attorney Blume's knowledge and experience made her uniquely qualified to serve as Special Discovery Master in this matter considering the contentiousness exhibited by the parties in the discovery process.

The next day, on August 26, 2005 we entered an Order granting in part, and denying in part, Defendants' Motion to Dismiss and/or Strike Certain Portions of the Amended Complaint. Specifically, we granted defendants' motion to dismiss all allegations of RICO violations in Counts I and II of the Amended Complaint based upon 18 U.S.C. § 1962(a).

Moreover, we granted defendants' motion to dismiss

Slip Copy
Slip Copy, 2006 WL 3825178 (E.D.Pa.), RICO Bus.Disp.Guide 11,221
**(Cite as: Slip Copy)**

Count V (breach of contract) of plaintiffs' Amended Complaint against defendants Capital Blue Cross, Highmark Inc., John S. Brouse, James M. Mead and Joseph Pfister. (Count V remains against defendant Keystone only.) We further granted defendants' motion to dismiss plaintiffs' claim for punitive damages from Counts I, III and V of plaintiffs' Amended Complaint and struck the request for punitive damages from the Amended Complaint.

Finally, we granted defendants' motion to strike paragraphs 14(f), 53(f), 53(h), 124 (as it relates to allegations regarding 18 U.S.C. § 1962(b)) and paragraphs 2(j), (m), (o), (u), (v), (w) and (x) from the prayer for relief contained in Count III of plaintiffs' Amended Complaint. We denied defendants' motion to dismiss or strike in all other respects.

On September 12, 2005 all defendants answered plaintiffs' Amended Complaint and asserted affirmative defenses to plaintiffs' claims. Defendant Keystone also asserted a counterclaim for recoupment or set-off.

By Order dated and filed September 26, 2005 we set deadlines for class discovery,[FN25] expert reports, and expert depositions regarding class discovery; plaintiffs' deadline for filing an amended motion for class certification; defendants' deadline for a response to plaintiffs' motion for class certification; a hearing date for plaintiffs' motion for class certification; [FN26] deadlines for trial expert reports and depositions; a dispositive motion deadline; a deadline for motions in limine; and a trial date.

> FN25. We note that while February 1, 2006 was the deadline established by the court for the completion of class discovery in this matter, class discovery continued, with the constant participation and oversight of Special Discovery Master Blume. Documents offered and received into evidence at the class certification hearings included those produced on the evening of Friday, March 3, 2006 when defense counsel forwarded to plaintiffs' counsel computer disks containing thousands of pages of information regarding claims submissions. We further note that there are ongoing disputes on both sides concerning the production of documents which were unresolved at the time of the class certification hearing and continue to be unresolved as of the date of this Opinion.

> FN26. In our September 26, 2005 scheduling Order, we directed the parties to submit the majority of any record in support of, or in opposition to, plaintiffs' motion for class certification by way of affidavit, deposition or admission except for those matters which required credibility determinations by the undersigned or involved complex expert testimony. Furthermore, we scheduled the entire week of March 6-10, 2006 for the presentation of any evidence and to conduct closing arguments.

*7 On February 3, 2006 we entered an Order specifically advising the parties how the class certification hearings would be conducted, set deadlines for among other things, the filing of potential exhibits, witness lists, proposed findings of fact and conclusions of law prior to the hearing and set time limits for the presentation of evidence.[FN27]

> FN27. The class certification hearing was conducted March 6, 7, 8, 9 and 10, 2006. Plaintiffs were allotted 10 hours of hearing time to conduct the direct examination of plaintiffs' witnesses, the cross-examination of defendants' witnesses, the proffer of plaintiffs' exhibits, and the articulation of all objections to defendants' testimony and exhibits.
> Similarly, all defendants collectively shared 10 hours of hearing time to conduct the direct examination of defendants' witnesses, the cross-examination of plaintiffs' witnesses, the proffer of defendants' exhibits, and the articulation of all objections to plaintiffs' testimony and exhibits. At the hearing, neither plaintiffs, nor defendants, utilized all of the time allotted by the court under this procedure.

On March 6-10, 2006 we conducted the class certification hearing in this matter. On March 10, 2006, the record was closed, closing arguments were heard by the court and the matter was taken under advisement.

On September 18, 2006 defendant Highmark filed its Notice of Supplemental Authority to bring three subsequent decisions to the attention of the court. Included were two recent decisions of the United States Court of Appeals for the Third Circuit in *Beck v. Maximus, Inc.,* 457 F.3d 291 (3d Cir.2006) and *Wachtel v. Guardian Life Insurance Co. of America,* 453 F.3d 179 (3d Cir.2006).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

On October 2, 2006 we conducted a Rule 16 conference on the record to discuss the applicability of the *Beck* and *Wachtel* cases, if any, to this action. During the conference, the parties disagreed as to the applicability of these new decisions to Plaintiffs' Amended Motion for Class Certification, but agreed that these decisions did not require reopening the record.

At the conclusion of the conference, the undersigned directed plaintiffs to file a list of all the claims, issues and defenses which they contend are appropriate for class treatment or to which they specifically seek class certification.[FN28] In addition, we permitted the parties to file additional briefs after the filing of plaintiffs' list of all claims, issues and defenses.[FN29]

> FN28. On October 5, 2006 pursuant to our directive Plaintiffs' List of Class Legal and Factual Issues under Fed.R.Civ.P. 23(c)(1)(B) and *Wachtel v. Guardian Life Ins.Co.*, 453 F.3d 179 (3d Cir.2006) ("Common Issue List") and Plaintiffs' List of Class Defenses under Fed.R.Civ.P. 23(c)(1)(B) and *Wachtel v. Guardian Life Ins.Co.*, 453 F.3d 179 (3d Cir.2006) ("Common Defense List") were both filed.

> FN29. On October 20, 2006 Defendants' Joint Response to Plaintiffs' List of Class Claims, Issues and Defenses was filed. On October 30, 2006 Plaintiffs' Reply to Defendants' Joint Response to Plaintiffs' List of Class Claims, Issues and Defenses was filed.

### CONTENTIONS OF THE PARTIES

#### Plaintiffs' Contentions

Plaintiffs seek to certify this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure. Plaintiffs' central assertion is that when contracting with plaintiffs, defendants intentionally misrepresented, and failed to disclose, internal HMO policies and practices that were designed to systematically reduce, deny, and delay reimbursement payments to plaintiffs and their business.

Plaintiffs entered into an HMO-physician agreement with defendant Keystone in December 1998 to provide medical services to the HMO's members. In addition to a complex bonus system, the agreement provides for two basic methods by which plaintiffs are paid for rendering

medical services: (1) capitation [FN30] and (2) fee-for-service.

> FN30. A "capitation" is "an annual fee paid a doctor or medical group for each patient enrolled under a health plan."Webster's Third New International Dictionary 332 (1968)

Plaintiffs allege a variety of ways in which defendants used the mail and wires to defraud plaintiffs by wrongfully delaying and denying compensation due under both methods of payment. Plaintiffs also assert that the HMO-physician agreement contains a number of misrepresentations and material omissions. Specifically, plaintiffs allege that defendants (1) "shave" capitation payments by purposefully under-reporting the number of patients enrolled in plaintiffs' practice group; and (2) defraud plaintiffs of fees for medical services rendered by wrongfully manipulating CPT [FN31] codes to decrease the amount of reimbursements.

> FN31. CPT codes refer to the standardized American Medical Association Current Procedural Terminology code set. The CPT codes were developed by the association to describe the medical services and procedures performed for the insured patient.

**\*8** In their Amended Complaint, plaintiffs also assert a number of RICO claims premised on extortion in violation of the Hobbs Act,[FN32] bribery, [FN33] and violations of the Travel Act.[FN34] However, plaintiffs do not seek class certification on those issues.

> FN32. 18 U.S.C. § 1951.

> FN33. 18 U.S.C. § 1954.

> FN34. 18 U.S.C. § 1952.

Plaintiffs assert state law causes of action alleging violations of the prompt-payment provision of Pennsylvania's Quality Health Care Accountability and Protection Act, and breach of contract against defendant Keystone only. Plaintiffs seek class certification on these state law claims.

Plaintiffs seek certification for a class period from January 1, 1996 until October 5, 2001 for the following claims in plaintiffs' Amended Complaint: (1) Count I-conspiracy to commit RICO violations pursuant to 18 U.S.C. § 1962(d) in violation of 18 U.S.C. § 1962(c); (2)

Count III-violation of RICO under 18 U.S.C. § 1962(c); (3) Count IV-violation of 40 P.S. § 991.2166 (Pennsylvania prompt payment statute, also known and referred to as Act 68); (4) Count V-breach of contract against defendant Keystone.

Plaintiffs seek class certification for this period on behalf of the following proposed subclasses:

All providers who:
1. submitted claims for reimbursement on a fee-for-service basis for covered services which claims were denied or reduced through the application of automated edits in the claims processing software used by defendants to process those claims; and/or
2. received less in capitation payments than the provider was entitled through the use and application of automated systems to "shave" such payments in the manner alleged in plaintiff's Amended Complaint and in the accompanying Memorandum of Law.

Plaintiffs' Amended Motion for Class Certification at page 1.

Concerning their RICO claims, plaintiffs only seek certification of a class based upon the RICO predicate acts of mail and wire fraud (18 U.S.C. §§ 1341 and 1343). Plaintiffs do not seek certification of a class based upon other RICO predicate acts of violations of the Hobbs Act (18 U.S.C. § 1951), the Travel Act (18 U.S.C. § 1952), interference with an employee benefit plan (18 U.S.C. § 1954) or other claims alleged in plaintiffs' Amended Complaint. Plaintiffs assert that they have focused their motion for class certification specifically and narrowly on the identical claims certified for class treatment by other courts throughout the country, that is claims of "bundling", "downcoding" and capitation "shaving".

*Common Issues*

As noted above, and pursuant to our October 2, 2006 directive, Plaintiffs' Common Issue List was filed on October 5, 2006. In that regard, plaintiffs seek certification of the following 22 factual and legal issues:
1. Whether defendants systematically bundled and downcoded claims and failed to recognize modifiers through secret "edits" in their claims processing systems and software as alleged in plaintiffs' Amended Complaint and presented at the class hearing.
*9 2. Whether defendants followed and applied the standardized American Medical Association ("AMA") Current Procedural Terminology ("CPT") code set in

processing the class' claims.
3. Whether the HCFA Form 1500 required by defendants to be used by members of the physician class in filing claims required the use of CPT codes.
4. Whether the virtually identical provisions in the Primary Care Physician Provider Contract and the specialist Consulting Agreement which required Keystone to pay providers for the "applicable procedure" performed by the provider required Keystone to pay for the CPT codes reported and billed by the provider, not as bundled and downcoded by defendants through secret edits in their claims processing system.
5. Whether defendants agreed to pay, through contract or otherwise, for medically necessary "covered services" and "applicable procedures" based on the AMA's CPT code set.
6. Whether defendants' policies and practices on "integral" services, "independent" procedures, "multiple surgical" procedures and other devices used to bundle and downcode claims, thereby denying and reducing reimbursements to providers, were disclosed in Keystone's standard form, fill-in-the-blanks Primary Care Physician Provider Contract and specialist Consulting Agreement.
7. Whether defendants policies and practices on "integral" services, "independent" procedures, "multiple surgical" procedures and other devices used to bundle and downcode claims, thereby denying and reducing reimbursements to providers, were disclosed in Keystone's Administrative Manual.
8. Whether defendants had a duty to disclose in Keystone's standard form, fill-in-the-blanks Primary Care Physician Provider Contract, specialist Consulting Agreement and Administrative Manual their policies and practices of bundling and downcoding provider claims.
9. Whether Statements of Remittance ("SORs") sent to providers which excluded CPT codes submitted with the original claim were false and misleading and contributed to the fraud perpetrated on the providers.
10. Whether the endorsement on the SORs which stated that acceptance by the provider of the "allowed amount" indicated on the SOR (i.e., the amount set by Keystone under its fees schedules) released the providers' claims, when defendants not only did not pay that "allowed amount" but, through their bundling practices, paid nothing whatsoever.
11. Whether Keystone's standardized Primary Care Physician Provider Contract and its Administrative Manual in effect during the class period were vague or misleading in describing the scope of services that were "capitated."
12. Whether Keystone omitted and excluded its detailed list of capitated services (by CPT code) from its standard

Slip Copy
Slip Copy, 2006 WL 3825178 (E.D Pa.), RICO Bus.Disp.Guide 11,221
**(Cite as: Slip Copy)**

form Primary Care Physician Provider Contract and its Administrative Manual, and improperly denied as "capitated" dozens of CPT codes which appeared on that list.

13. Whether defendants had a duty to disclose Keystone's detailed list of capitated services in Keystone's form Primary Care Physician Provider Contract and its Administrative Manual.

**\*10** 14. Whether defendants:

-"shaved" capitation payments by systematically transferring patients to "guest membership" or other so-called "dummy" accounts without notice to the provider or any request by the member; and

-delayed making capitation payments to providers for newly enrolled members.

15. Whether defendants systematically "suspended" payments while they pursued coverage from other insurers under their coordination of benefits ("COB") practices.[FN35]

> FN35 This practice is known as a "pursue and pay" practice

16. Whether defendants' pursue and pay practices violated Keystone's standard Primary Care Physician Provider Contract and specialist Consulting Agreement, its Administrative Manual and Keystone's Administrative Services Agreement with Synertech, Inc., which required a "pay and pursue"[FN36] policy for processing the class' claims

> FN36 A pay and pursue policy is a system in which Keystone pays the provider for the services rendered for medical services to a patient and follows up after payment to the provider with any claims against other insurance companies which may also be responsible for all, or some portion, of the payment made to the provider

17. Whether the provision of the Administrative Manual which defines a "clean claim" for Act 68 and other purposes as one filed "on a HCFA 1500 form or electronically," requires defendants to process claims filed in such a manner and not deviate from that definition.

18. Whether defendants systematically delayed or denied reimbursements for trauma and other high cost, expensive medical procedures in violation of Act 68 and Keystone's standard form PCP Provider Contract and specialist Consulting Agreement.

19. Whether defendants and third parties engaged in an "enterprise" and concerted activity during the class period

to perpetrate the violations of law alleged in plaintiff's Amended Complaint and presented at the class hearing

20. Whether each individual and corporate defendant was a member of the "managed care enterprise" alleged in plaintiffs' Amended Complaint and presented at the class hearing.

21. Whether defendants used wire communications and the mails to perpetrate the violations of law alleged in plaintiffs' Amended Complaint and presented at the class hearing

22. Whether plaintiffs' claims or designated facts shall be deemed to be established under Rule 37(b)(2) of the Federal Rules of Civil Procedure.

*Common Defenses*

In addition to the 22 factual and legal issues plaintiffs seek to have certified for class treatment, and pursuant to our October 2, 2006 directive, plaintiffs filed their Common Defense List on October 5, 2006. Plaintiffs do not seek certification of these common defenses. The 24 common defenses raised by defendants as identified by plaintiffs include the following:

1. The class claims are barred by disclosures contained in Keystone's common standard form, fill-in-the-blanks Primary Care Physician Provider Contract and specialist Consulting Agreement

2. The class claims are barred by disclosures contained in Keystone's Administrative Manual (including updates and revisions thereto) in effect during the class period

3. The class claims are barred by disclosures contained in the Highmark/PBS Procedural Terminology Manuals distributed by Highmark to its network of physicians during the class period.

**\*11** 4. The class claims are barred by disclosures contained in the Highmark/PBS "Policy Review & News" ("PRN") distributed by Highmark to its network of physicians during the class period.

5. The class claims are barred by the SORs sent to providers with their reimbursement checks, which SORs failed to list the medical codes and procedures submitted by the providers in their original claims

6. Endorsements on the SORs to the effect that acceptance of the "allowed amount" (that is, defendants' fee schedule amount) constituted a release and satisfaction of the class' claims for reimbursement for medical services when such allowed amount was not paid.

7. Defendants should be precluded from offering defenses or introducing evidence of defenses under Rule 37(b)(2) of the Federal Rules of Civil Procedure.

8. The class claims are barred by the doctrine of primary jurisdiction.

9. The class claims are barred because their injuries and

Slip Copy                                                                Page 11
Slip Copy, 2006 WL 3825178 (E.D.Pa.), RICO Bus.Disp.Guide 11,221
**(Cite as: Slip Copy)**

damages were caused by the conduct of others, not defendants.

10. The class claims are barred by failure to exhaust administrative or contractual remedies.

11. The class claims are barred by the applicable statute of limitations

12. The class claims are barred by the McCarran-Ferguson Act.

13. The class claims are barred because defendants are immune from suit under the state action immunity doctrine.

14. The class claims are barred because they are preempted by the Employee Retirement Income Security Act of 1974 ("ERISA") [FN37]

FN37. 29 U.S.C. §§ 1001-1461.

15. The class claims are barred because allowing their prosecution conflicts with Pennsylvania state administrative schemes governing insurance.

16. The class claims are barred by the doctrine of res judicata.

17. The class claims are barred by the doctrine of collateral estoppel

18. The class claims are barred because the medical services for which the class seeks compensation were not covered services.

19. The class claims are barred because of the absence of any material misrepresentations, misleading disclosures or omissions by defendants in their standard form, fill-in-the-blanks Primary Care Physician Provider Contract and specialist Consulting Agreement

20. The class claims are barred because defendants lack the requisite scienter, specific intent or willfullness to commit fraud.

21. The class claims are barred because defendants had no duty to disclose the information which plaintiffs allege was withheld, omitted or only partially disclosed in this litigation.

22. The class claims are barred under the doctrines of settlement, release or accord and satisfaction (to the extent not included above with respect to the SORs).

23. The class claims are barred because plaintiffs and other class members knowingly and voluntarily accepted the terms of their Primary Care Physician Provider Contracts and specialist Consulting Agreements with defendants and received some benefits under those contracts.

**\*12** 24. The class' equitable claims are barred because adequate remedies exist at law.

### Defendants' Contentions

Defendants assert that plaintiffs have not satisfied any of the factors for class certification. Initially, defendants assert that plaintiffs' proposed class is not ascertainable. Defendants contend that the proposed class definition is improper because it is vague, overbroad and includes "central issues of liability" as part of the class definition

Defendants also contend that plaintiffs do not have standing to proceed because plaintiffs have not demonstrated that they have suffered any injuries. In addition, defendants contend that individualized issues will overwhelm common issues in this matter and that a class action is not the superior method for fairly and efficiently resolving this controversy.

More specifically, defendants assert that individual issues overwhelm common issues because plaintiffs' claims require determinations on a provider-by-provider and claim-by-claim basis and because under RICO, plaintiffs must show not only injury, but also proximate causation, for each class member's injuries.

Next, defendants allege that plaintiffs' claims are not typical of the class they seek to represent because plaintiffs are paid almost exclusively on a capitation, not a fee-for-service, basis; and those claims cannot by definition be typical of specialists who bill on a fee-for-service basis. Additionally, individual plaintiffs will be subject to individual and unique defenses including reliance, materiality, ratification, release and waiver. Moreover, defendants contend that plaintiffs fail to identify any evidence that other providers suffered the same or similar injuries alleged by plaintiffs.

Defendants assert that plaintiffs and their counsel are not, and will not, adequately represent the proposed class because of possible conflicts of interest, the lack of familiarity with the basic facts of this case and the conduct of counsel in this case and other cases.

Finally, defendants assert that we should not simply accept the allegations of plaintiffs' Amended Complaint and are, in fact, required to look beyond the pleadings when determining the propriety of certifying a class.

Because the scope of our factual review is of the utmost importance, we address that question first.

### DISCUSSION

### Scope of Review

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Plaintiffs contend that the determination of class certification is required to be based on the allegations contained in their Amended Complaint. More specifically, plaintiffs contend that it is inappropriate to determine the merits of the claims of the class representatives at the class certification stage and that this is what defendants seek from the court. Plaintiffs rely on a number of cases in support of their contentions.[FN38]

> FN38.*Eisen v Carlisle & Jacquelin,* 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974); *In re. Cephalon Securities Litigation,* 1998 WL 470160 (E.D.Pa. Aug. 12, 1998)(Green, J.); *Neuberger v Shapiro,* 1998 WL 826980 (E.D.Pa. Nov 15, 1998)(Ludwig, J.)

On the contrary, defendants assert that we must look beyond the pleadings and that an examination of the elements of the underlying causes of action is critically important to the determination of whether class certification is proper. Defendants contend that in this circuit, the court is required to conduct its own inquiry as to whether the requirements of Rule 23 have been satisfied and that the court must go beyond plaintiffs' untested factual and legal allegations in determining the propriety of certifying a class. Defendants rely on a number of cases for their contentions.[FN39]

> FN39 *Gariety v. Grant Thornton LLP,* 368 F.3d 356 (4th Cir 2004); *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc,* 259 F.3d 154 (3d Cir 2001); *Johnston v HBO Film Management, Inc,* 265 F.3d 178 (3d Cir 2001)

**\*13** For the following reasons, we agree and disagree in part with each party regarding the proper scope of review of plaintiffs' factual allegations.

In *Eisen, supra,* the United States Supreme Court stated, "In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met."417 U.S. at 178, 94 S.Ct. at 2154, 40 L.Ed.2d at 749*quoting Miller v. Mackey International,* 452 F.2d 424, 427 (5th Cir 1971).

Thereafter, in *General Telephone Company of the Southwest v Falcon,* 557 U.S. 147, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982) the Supreme Court stated, "Sometimes the issues are plain enough from the pleadings to determine whether the interests of the absent

parties are fairly encompassed within the named plaintiff[s'] claim, and sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." 557 U.S. at 160, 102 S Ct at 2372, 72 L.Ed.2d at 752

In *Newton, supra* and *Johnston, supra,* and based upon the Supreme Court's decision in *Falcon, supra,* the United States Court of Appeals for the Third Circuit recognized that in certain circumstances it is appropriate for the court to look beyond the pleadings when making its class certification decision. *Newton,* 259 F.3d at 166; *Johnston,* 265 F.3d at 186

Based upon our review of the relevant precedent, we conclude that neither plaintiffs nor defendants are entirely correct on the scope of review of plaintiffs' allegations. It is clear that in appropriate circumstances we have the authority to go beyond the pleadings to make our class certification decision, *Falcon, Newton, Johnston,* but we are not required to do so. Moreover, it is equally clear that if we do go beyond the pleadings we do not determine whether plaintiffs have stated a cause of action which may ultimately prevail on the merits. *Eisen, supra*

Accordingly, we conclude that where appropriate to go beyond the pleadings, we shall do so. If going beyond the pleadings is unnecessary to our inquiry, we are not required to, but may, look beyond the pleadings. However, we will not make the forbidden determination of whether plaintiffs' have stated a claim or whether they may likely prevail on their claims. The relevant inquiry will be limited to whether, where necessary, plaintiffs have come forward with some evidence to support their contentions

### Federal Rule of Civil Procedure 23

Rule 23 of the Federal Rules of Civil Procedure sets forth the prerequisites for class certification. A proposed class must satisfy the four criteria of Rule 23(a): numerosity, commonality, typicality and adequacy of representation.

The certification requirements of Rule 23(a) embrace two basic principles: (1) the necessity and efficiency of adjudicating plaintiffs' claims as a class; and (2) the assurance of protecting the interests of absent class members.*Baby Neal v Casey,* 43 F.3d 48, 55 (3d Cir.1994). A class must comply with each of the elements of Rule 23(a) together with one of the requirements of Rule 23(b).*Amchem Products, Inc. v Windsor,* 521 U.S. 591, 117 S Ct 2231, 138 L.Ed 2d 689 (1997); *Rodriquez*

Slip Copy
Slip Copy, 2006 WL 3825178 (E.D.Pa.), RICO Bus.Disp.Guide 11,221
(Cite as: Slip Copy)

_v. McKinney_, 156 F.R.D. 112 (E.D.Pa 1994)(Brody, J.)

**\*14** Plaintiffs' proposed class seeks money damages, thus, the proposed class must satisfy the requirements of Rule 23(b)(3) regarding the issues of predominance and superiority. More specifically, the relevant issues are whether common questions of law or fact predominate and whether a class action represents the superior method for adjudicating the case. _Newton_, 259 F.3d at 181.

In that regard the applicable sections of Rules 23(a) and (b) provide:

Rule 23. Class Actions
(a) Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.
(b) Class Actions Maintainable. An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

\* \* \*

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Fed.R.Civ.P. 23(a) and (b)

| Year | Family Practice Providers | Specialists |
|------|---------------------------|-------------|
| 1996 | 1209 | 3146 |
| 1997 | 1380 | 3466 |
| 1998 | 1531 | 3980 |
| 1999 | 1632 | 4132 |

A class action is an appropriate means for expeditious litigation of the issues where a large number of individuals may have been injured, although no one person may have been damaged to a degree which would induce the institution of individual litigation. _See Eisenberg v. Nissen_, 766 F.2d 770, 785 (3d Cir.1985). "This is especially true when the defendants are corporate behemoths with a proclivity for drawing out legal proceedings for as long as humanly possible and burying their opponents in paperwork and filings." _Klay v. Humana, Inc._, 382 F.3d 1241, 1271 (11th Cir.2004), _cert. denied,_543 U.S. 1081, 125 S.Ct. 877, 160 L.Ed.2d 825 (2005).

Finally, "[t]he interests of justice require that in a doubtful case ... any error, if there is to be one, should be committed in favor of allowing a class action." _Eisenberg_, 766 F.2d at 755_(quoting Kahan v. Rosenstiel_, 424 F.2d 161, 169 (3d Cir.1970)). Taking these considerations together with the requirements of Rule 23, we address plaintiff's request for class certification.

**Numerosity**

**\*15** Rule 23(a)(1) provides that the numerosity requirement is satisfied if the class "is so numerous that joinder of all members is impracticable."Joinder must be impracticable, not impossible. _In re One Meridian Plaza Fire Litigation_, 1993 U.S. Dist. LEXIS 9841 at \*21, (E.D.Pa. July 16, 1993) (Buckwalter, J.) There is no magic number that satisfies the numerosity requirement. However, classes that include hundreds or thousands of members generally suffice for purposes of this prerequisite. _Weiss v. York Hospital_, 745 F.2d 786, 808 (3d Cir.1984).

In this case, plaintiffs have shown a potential class of thousands of doctors. Specifically, plaintiffs assert that potential class is made up of family practitioners and specialists as follows:

Slip Copy                                                                                                                      Page 14
Slip Copy, 2006 WL 3825178 (E.D.Pa.), RICO Bus Disp Guide 11,221
(Cite as: Slip Copy)

| 2000 | 1749 | 4304 |
| 2001 | 1837 | 4647 |

Defendants do not dispute that plaintiffs have satisfied the numerosity requirement. Specifically, nowhere in either Defendants' Joint Memorandum of Law in Opposition to Plaintiffs' Amended Motion for Class Certification, or at closing arguments at the class certification hearing,[FN40] did any defendant argue that the numerosity requirement has not been satisfied.

> FN40. Notes of Testimony of closing arguments held on March 10, 2006 at pages 43-93.

Notwithstanding defendants' apparent acquiescence to numerosity, we conclude that the number of family practice providers and specialists averred by plaintiffs, constitutes substantial evidence that the number of potential class members is so numerous that joinder of all of them is impracticable.

### Commonality

Rule 23(a)(2) requires that there be "questions of law or fact common to the class". The commonality requirement is satisfied if the named plaintiffs share at least one question of fact or law with the prospective class. *Weiss v. York Hospital,* 745 F.2d 786, 808-809 (3d Cir.1984) "Because the requirement may be satisfied by a single common issue, it is easily met...."*Baby Neal,* 43 F.3d at 56. It is not necessary that all putative class members share identical claims. *Hassine v. Jeffes,* 846 F.2d 169, 176-177 (3d Cir.1988).

"Even where individual facts and circumstances do become important to the resolution, class treatment is not precluded. Classes can be certified for certain particularized issues, and, under well-established principles of modern case management, actions are frequently bifurcated."*Baby Neal,* 43 F.3d at 57.

Plaintiffs allege that defendants engaged in a pattern of collective behavior, or a common scheme, which has inflicted substantial harm on the entire potential class of plaintiffs which is detrimental the health of their patients and to the welfare of the general public. Plaintiffs assert that defendants have implemented claims-processing software with the ability to manipulate the CPT codes, downcode and bundle claims and delay and wrongfully deny payments to physicians for services performed. Plaintiffs contend that, based upon defendants' actions,

the entire claims processing process is fraudulent.

**\*16** More specifically, plaintiffs assert that because defendants fail to make the appropriate and timely payments, "physicians cannot maintain their practices and cannot provide the continuity of care that patients require and which Plaintiffs seek to provide as a matter of sound medical practice."[FN41]

> FN41. Plaintiffs' Amended Complaint filed October 6, 2003 at paragraph 9.

Defendants seek to lump the commonality issue involved in Rule 23(a)(2) with the predominance issue described in Rule 23(b)(3). Specifically, defendants assert that: (1) plaintiffs have not proved whether any class member was actually injured; (2) plaintiffs' allegations of fraudulent capitation payments require member-by-member analysis; (3) plaintiffs' allegations of fraudulent fee-for-service payments require member-by-member analysis; (4) the use of automated payment processing does not change the predominance of individualized issues; (5) plaintiffs' RICO claims require individualized proof of causation by each provider; and (6) individualized questions would predominate at the trial of plaintiffs' contract and prompt payment claims.

The foregoing assertions by defendants are more appropriately addressed during our discussion of the predominance issue, below. Accordingly, we decline to address those assertions here. Moreover, notwithstanding defendants' assertions, we conclude that there are numerous common issues of fact and law which satisfy the requirements of commonality pursuant to Rule 23(a)(2).

#### Common Facts

The numerous common issues of fact include: (1) common automated bundling practices; (2) common automated downcoding practices; (3) a common failure to pay clean claims within the applicable statutory time period; (4) a common failure to timely place patients on capitation rolls; (5) a common failure to pay appropriate capitation or fee-for-service on guest members; (6) common proof of a conspiracy to defraud in violation of RICO; (7) a common failure to recognize CPT prescribed modifiers; (8) whether defendants improperly suspended claims to delay or deny payment; (9) whether defendants failed to pay for medically necessary covered services;

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 15
Slip Copy, 2006 WL 3825178 (E.D.Pa.), RICO Bus.Disp.Guide 11,221
**(Cite as: Slip Copy)**

and (10) whether defendants followed a "pursue and pay" or a "pay and pursue" strategy for the payment of claims under the Pennsylvania prompt payment statute.

### Common Legal Issues

The common issues of law, among others, include whether defendants (1) committed mail or wire fraud; (2) violated the Pennsylvania prompt pay statute; and (3) conspired in violation of RICO.[FN42]

> FN42. While each of these issues are based, in part, upon factual determinations, whether these factual allegations, if proven, constitute mail fraud, wire fraud, violation of the Pennsylvania prompt payment statute, conspiracy, and RICO violations are among the ultimate legal conclusions for determination in this case.

### Common Defenses

In addition, we conclude that numerous defenses are appropriate for classwide treatment, including defendants' contentions that: (1) the class claims are barred by disclosures contained in Keystone's common standard form, fill-in-the-blanks Primary Care Physician Provider Contract, specialist Consulting Agreement and Keystone's Administrative Manual (including updates and revisions), in effect during the class period; (2) the class claims are barred by disclosures contained in the Highmark/PBS Procedural Terminology Manuals distributed by Highmark to its network of physicians during the class period; (3) the class claims are barred by disclosures contained in the Highmark/PBS "Policy Review & News" distributed by Highmark to its network of physicians during the class period; (4) the class claims are barred by the SORs sent to providers with their reimbursement checks; (5) endorsements on the SORs to the effect that acceptance of the "allowed amount" (that is, defendants' fee schedule amount) constituted a release and satisfaction of the class' claims for reimbursement for medical services even when such allowed amount was not paid; (6) the class claims are barred because the injuries and damages of the class members were caused by the conduct of others, not defendants; (7) the class claims are barred by the applicable statute of limitations; and (8) the class claims are barred because of the absence of any material misrepresentations, misleading disclosures or omissions by defendants in their standard form Primary Care Physician Provider Contract and specialist Consulting Agreement.

*17 Based upon the foregoing, we conclude that plaintiffs have satisfied the commonality requirement of Rule 23(a)(2).

### Typicality

Rule 23(a)(3) provides that the typicality requirement is satisfied if the "claims or defenses of the representative parties are typical of the claims or defenses of the class."Fed.R.Civ.P. 23(a)(3). The typicality requirement is designed to align the interests of the class and the class representatives so that the latter will work for the benefit of the entire class through the pursuit of their own goals. *In re Prudential Insurance Company of America,* 148 F.3d 283, 311 (3d Cir.1998).

The typicality test is not overly demanding. *See O'Keefe v. Mercedes-Benz USA, LLC,* 214 F.R.D. 266, 289 (E.D.Pa.2003)(Van Antwerpen, J.). The typicality requirement may be met despite the existence of factual differences between the claims of the named plaintiffs and the claims of the proposed class.*Eisenberg,* 766 F.2d at 786. If "the class representatives ... present those common issues of law and fact that justify class treatment, thereby tending to assure that the absent class members will be adequately represented," then Rule 23(a)(3) is satisfied. *Hoxworth v. Blinder, Robinson & Co., Inc.,* 980 F.2d 912, 923 (3d Cir. 1992)(quoting *Eisenberg,* 766 F.2d at 786).

The typicality requirement is usually satisfied in cases where the proposed class representatives are challenging the same unlawful conduct which affects the named plaintiffs and the putative class even if there were varying fact patterns. *Baby Neal,* 43 F.3d at 58. "Factual differences will not render a claim atypical if the claim arises from the same event or practice or course of conduct that gives rise to the class of the class members, and if it is based upon the same legal theory."Hoxworth, 980 F.2d at 923. Moreover, even relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories. *Baby Neal,* 43 F.3d at 58.

Plaintiffs contend that they have easily met their burden of demonstrating typicality because their primary contention (that defendants unlawfully denied, delayed and reduced reimbursement payments to class members) applies equally to each member of the class. Moreover, plaintiffs assert that the same course of conduct of defendants which gives rise to plaintiffs' claims also gives rise to the claims of the entire class.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 3825178 (E.D.Pa.), RICO Bus.Disp.Guide 11,221
**(Cite as: Slip Copy)**

*Typicality Defenses*

Defendants assert four separate reasons why plaintiffs' claims are not typical. First, defendants contend that plaintiffs, who are family practice primary care providers cannot be deemed typical of approximately 4000 specialists whom they seek to represent. Second, defendants assert that plaintiffs cannot be typical of the potential class because plaintiffs fail to present evidence to establish that any other provider received improper capitation or fee-for-service payments.

**\*18** Third, defendants contend that plaintiffs are atypical because they have no standing because of the absence of any harm or actual injury to plaintiff. Fourth, defendants assert that plaintiffs are atypical because they are subject to unique defenses of reasonable reliance, materiality and ratification. For the following reasons, we disagree with defendants and find that plaintiffs have met the typicality requirement of Rule 23(a)(3).

*Specialists*

We disagree with defendants' contention that because plaintiffs are primary care providers they cannot be deemed typical of approximately 4000 specialists whom they seek to represent. Defendants expert Phillips C. Hurd testified at his deposition that if both a primary care provider and a specialist provide the same service, they would each bill the code for the procedure in the same manner.[FN43]

> FN43. Notes of Testimony of the deposition of Phillips C. Hurd conducted August 3, 2004 at page 157.

Moreover, while it is conceded that only a small portion (approximately 5%) of Dr. Grider's remuneration from Keystone comes from fee-for-service [FN44] billing, (the majority coming from capitation), there is no difference in how Dr. Grider or any specialist submits fee-for-service claims, or in how they are treated by defendants after submission. The only difference is the number of fee-for-service claims submitted by primary care physicians versus specialists. In addition, plaintiffs have submitted separate proposed subclasses for capitation and fee-for-service claims.

> FN44. In submitting the fee-for-service claim, plaintiffs use a form created by the Health Care Financing Administration and CPT codes developed by the American Medical Association

to describe the services performed for the insured patient.

Accordingly, we conclude that the defense assertion that plaintiffs' claims are not typical based upon an alleged difference between primary care physicians and specialists is without merit.

*Payments*

Defendants further contend that plaintiffs cannot be typical of the potential class because plaintiffs fail to present evidence to show that any other provider received improper capitation or fee-for-service payments. We find it disingenuous for defendants on the one hand to resist discovery requests by plaintiffs for production of documents involving other providers as overly broad, burdensome and irrelevant, and on the other hand to contend that plaintiffs cannot show injury to any other potential class member.

It would not be appropriate to permit defendants to frustrate the discovery process [FN45] and then argue that plaintiffs have not met their burden of production. As noted earlier, the question is not whether plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met. *Eisen,* 417 U.S. at 178, 94 S.Ct. at 2154, 40 L.Ed.2d at 749. Defendants treat the within motion for class certification as if it were a dispositive summary judgment motion or a trial on the merits. It is neither.

> FN45. We are not specifically ruling on any discovery issues in the within Opinion. However, as stated at the class certification hearing, we are concerned about the possibility that numerous relevant discoverable documents have been untimely produced or inappropriately withheld.

Plaintiffs have produced evidence of possible improper bundling of claims, downcoding, denial of claims as integral without prior notification and untimely payments pursuant to the Pennsylvania prompt pay statute. The evidence does not indicate that these alleged practices have been applied only to plaintiffs Natalie Grider and Kutztown Family Practice, P.C. Rather, it appears that defendants' practices involve all Keystone providers.

**\*19** Accordingly, we find defendants' assertion that plaintiffs have not shown any harm to any other member of the potential class to be without merit.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                              Page 17
Slip Copy, 2006 WL 3825178 (E.D.Pa.), RICO Bus.Disp.Guide 11,221
**(Cite as: Slip Copy)**

### Injury

In the section above, we addressed defendants' contention that plaintiffs have no standing because plaintiffs have not shown any harm or actual injury to themselves. Plaintiffs have come forward with evidence to support all of their classwide claims. Thus, we conclude that defendants have not stated a valid objection to the typicality requirement.

### Unique Defenses

Finally, defendants assert that plaintiffs are atypical because they are subject to unique defenses of reasonable reliance, materiality and ratification. We disagree.

The issue of whether a unique defense against the proposed class representative precludes class certification was recently addressed by the United States Court of Appeals for the Third Circuit in *Beck v. Maximus, Inc.,* 457 F.3d 291 (3d Cir.2006). In *Beck,* the Third Circuit stated that "[t]o defeat class certification, a defendant must show some degree of likelihood a unique defense will play a significant role at trial. If a court determines an asserted unique defense has no merit, the defense will not preclude class certification."457 F.3d at 300.

The Third Circuit further stated that a "proposed class representative is neither typical nor adequate if the representative is subject to a unique defense that is likely to become a major focus of the litigation."457 F.3d at 301.

In their brief, defendants assert three unique defenses of reasonable reliance, materiality and ratification. However, the only defense that defendants discuss in detail in opposition to plaintiffs' motion for class certification is the issue of reliance. Accordingly, we conclude that on the issues of materiality and ratification and any other purported defenses unique to the proposed class representatives, defendants fail to show some degree of likelihood that a unique defense will play a significant role at trial. *Beck, supra.* We address the issue of reliance below.

### Reliance

RICO prohibits certain conduct involving a "pattern of racketeering activity".18 U.S.C. § 1962. The RICO statute itself says nothing about reliance as a requirement either for civil liability or for proof of damages.*Systems Management, Inc. v. Loiselle,* 303 F.3d 100, 103 (1st Cir.2002). Rather, 18 U.S.C. § 1964(c), (RICO's statutory

standing provision), provides a private cause of action for "[a]ny person injured in his business or property by reason of a violation of section 1962...."

In *Holmes v. Securities Investor Protection Corporation,* 503 U.S. 258, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992) the United States Supreme Court held that a plaintiff may only sue under section 1964(c) if the alleged RICO violation was the proximate cause of plaintiff's injury.

Recently, in *Anza v. Ideal Steel Supply Corp.,* --- U.S. ----, 126 S.Ct. 1991, 164 L.Ed.2d 720 (2006) the Supreme Court again reiterated the proximate cause requirement. However, in that case, the majority stated that "because Ideal has not satisfied the proximate-cause requirement articulated in *Holmes,* we have no occasion to address the *substantial question* whether a showing of reliance is required."--- U.S. ----, 126 S.Ct. at 1998, 164 L.Ed.2d at 731. (Emphasis added.)

**\*20** Numerous circuit courts have held that reliance is an element of a RICO action based upon the predicate acts of mail and wire fraud.[FN46] In particular, the United States Court of Appeals for the Sixth Circuit has interpreted the section 1964(c) proximate causation provision to require a plaintiff to plead reliance in order to recover on a civil RICO claim predicated on acts of fraud. *Central Distributors of Beer, Inc. v. Conn,* 5 F.3d 181 (6th Cir.1993).

> FN46.*See Chisolm v. TranSouth Financial Corporation,* 95 F.3d 331 (4th Cir.1996); *Appletree Square I Limited Partnership v. W.R. Grace & Co.,* 29 F.3d 1283 (8th Cir.1994); *Pelletier v. Zweifel,* 921 F.2d 1465 (11th Cir.1991); *County of Suffolk v. Long Island Lighting Company,* 907 F.2d 1295 (2d Cir.1990).

Moreover, the United States Court of Appeals for the Fifth Circuit has stated, "The persuasive issues of individual reliance that generally exist in RICO fraud actions create a working presumption against class certification."*Sandwich Chef of Texas, Inc. v. Reliance National Indemnity Insurance Company,* 319 F.3d 205, 219 (5th Cir.2003).

We have found no decision by the United States Court of Appeals for the Third Circuit which squarely addresses whether reliance is an element that needs to be established in a civil RICO action based upon mail or wire fraud.[FN47] However, we are aware that numerous district courts in this circuit have engrafted a reliance requirement

Slip Copy
Slip Copy, 2006 WL 3825178 (E.D.Pa.), RICO Bus.Disp.Guide 11,221
(Cite as: Slip Copy)

in RICO fraud cases.[FN48]

> FN47. See New Jersey Carpenters Health Fund v. Phillip Morris, Inc., 17 F.Supp.2d 324, 339 n. 19 (D.N.J.1998)

> FN48. See Lester v. Percudani, 217 F.R.D. 345, n. 10 (M.D.Pa.2003) (Conner, J.); Smith v. Berg, 2001 U.S. Dist. LEXIS 15814 (E.D.Pa. Oct. 1, 2001) (O'Neill, Jr., J.); Warden v. McLelland, 2001 U.S. Dist. LEXIS 11786 (E.D.Pa. Aug. 8, 2001)(Hutton, J.); Truckway, Inc. v. General Electric, 1992 U.S. Dist. LEXIS 4954 (E.D.Pa. Mar. 30, 1992)(Reed, Jr., J.);

In addition, we are aware of at least one district court that has borrowed a presumption of reliance from the Third Circuit's securities law jurisprudence and applied it in the RICO context.[FN49]Moreover, we are also aware that our colleague United States District Judge Anita B. Brody permitted reliance to be proven by inference in a RICO mail fraud case.[FN50]

> FN49. Spark v. MBNA Corporation, 178 F.R.D. 431, 435-436 (D.Del.1998)

> FN50. Rodriguez v. McKinney, 156 F.R.D. 112 (E.D.Pa.1994)

However, in Systems Management, Inc. v. Loiselle, the United States Court of Appeals for the First Circuit found no basis for a reliance requirement in RICO actions alleging mail and wire fraud. The First Circuit rejected such a requirement by reasoning as follows:
It is true that at common law a civil action for fraud ordinarily requires proof that the defrauded plaintiff relied upon the deception, and some courts have imported this requirement into RICO actions where the predicate acts comprise mail or wire fraud. But RICO bases its own brand of civil liability simply on the commission of specified criminal acts-here, criminal fraud-so long as they comprise a "pattern of racketeering activity"; and criminal fraud under the federal statute does not require "reliance" by anyone: it is enough that the defendant sought to deceive, whether or not he succeeded...
Perhaps there is some surface incongruity in allowing a civil RICO plaintiff to recover for fraudulent acts even though the same plaintiff could not (for lack of reliance) recover for fraud at common law. But Congress structured its civil remedy to allow recovery for harm caused by defined criminal acts, including violation of section 1341, and, as noted, the federal mail fraud statute does not

require reliance. Thus, under a literal reading of RICO-the presumptive choice in interpretation-nothing more that the criminal violation and resulting harm is required.
*21 This is not a conclusive argument; common law (and other) concepts can often be imported to flesh out a federal statute. Indeed, we assume here that Congress intended to require not only "but for" but also "proximate cause" to link the criminal act with the harm to the plaintiff, even though the statute says nothing specific on this point. But proximate cause-largely a proxy for foreseeability-is not only a general condition of civil liability at common law but is almost essential to shape and delimit a rational remedy: otherwise the chain of causation could be endless.
By contrast, reliance is a specialized condition that happens to have grown up with common law fraud. Reliance is doubtless the most obvious way in which fraud can cause harm, but it is not the only way. There is no good reason here to depart from RICO's literal language by importing a reliance requirement into RICO.

Loiselle, 303 F.3d at 103-104. (Internal citations omitted.)(Emphasis in original.)

Additionally, in his dissent[FN51] in Anza, United States Supreme Court Justice Clarence Thomas, relying in part on the First Circuit's decision in Loiselle, stated as follows:

> FN51. In dissent, Justice Thomas answers the "substantial question" that the majority did not reach regarding whether reliance is an element that must be pled and proven in a RICO fraud action. --- U.S. ----, 126 S.Ct. at 1998, 164 L.Ed.2d at 731.

In my view, the mere fact that the predicate acts underlying a particular RICO violation happen to be fraud offenses does not mean that reliance, an element of common-law fraud, is also incorporated as an element of a civil RICO claim.
Petitioners are correct that the common law generally required a showing of justifiable reliance before a plaintiff could recover for damages caused by fraud. But RICO does not confer on private plaintiffs a right to sue defendants who engage in any act of common-law fraud; instead, racketeering activity includes, as relevant to this case, "any act which is indictable under [18 U.S.C. § ] 1341 (relating to mail fraud) [ and § ] 1343 (relating to wire fraud)." And we have recognized that these criminal statutes "did not incorporate all the elements of common-law fraud."Instead, the criminal mail fraud statute applies to anyone who "having devised or intending to devise any

Slip Copy                                                                                                          Page 19
Slip Copy, 2006 WL 3825178 (E.D.Pa.), RICO Bus.Disp.Guide 11,221
**(Cite as: Slip Copy)**

scheme or artifice to defraud    for the purposes of executing such scheme or artifice or attempting so to do, places in any post office    any manner or thing whatever to be sent or delivered by the Postal Service ..." § 1343 *See* § 1343 (similar language for wire fraud). We have specifically noted that "[b]y prohibiting the 'scheme to defraud,' rather than the completed fraud, the element of reliance .... would clearly be inconsistent with the statutes Congress enacted."

Because an individual can commit an indictable act of mail or wire fraud even if no one relies on his fraud, he can engage in a pattern of racketeering activity, in violation of § 1962, without proof of reliance. Accordingly, it cannot be disputed that the Government could prosecute a person for such behavior. The terms of § 1964(c), which broadly authorize suit by '[a]ny person injured in his business or property by reason of a violation of section 1962," permit no different conclusion when an individual brings a civil action against such a RICO violator.

*22 It is true that our decision in *Holmes* to apply the common-law proximate law requirement was likewise not compelled by the broad language of the statute. But our decision in that case was justified by the "very unlikelihood that Congress meant to allow all factually injured plaintiffs to recover." This unlikelihood stems, in part, from the nature of proximate cause, which is 'not only a general condition of civil liability at common law but is almost essential to shape and delimit a rational remedy." We also decided in *Holmes* in light of Congress' decision to use the same words to impose civil liability under RICO as it had in § 7 of the Sherman Act, 26 Stat.210, into which federal courts had implied a proximate-cause limitation. Accordingly, it was fair to interpret the broad language 'by reason of" as meaning, in all civil RICO cases, that the violation must be both the cause-in-fact and the proximate cause of the plaintiff's injury.

Here, by contrast, the civil action provision cannot be read to always require that the plaintiff have relied on the defendant's action. Reliance is not a general limitation on civil recovery in tort; it "is a specialized condition that happens to have grown up with common law fraud." For most of the predicate acts underlying RICO violations, it cannot be argued that the common law, if it even recognized such acts as civilly actionable, required proof of reliance. In other words, there is no language in § 1964(c) that could fairly be read to add a reliance requirement in fraud cases only. Nor is there any reason to believe that Congress would have defined "racketeering activity" to include acts indictable under the mail and wire fraud statutes, if it intended fraud-related acts to be predicate acts under RICO only when those acts

would have been actionable under the common law. Because reliance cannot be read into §§ 1341 and 1343, nor into RICO itself, it is not an element of a civil RICO claim.

*Anza*, --- U.S. ----, 126 S.Ct. at 2007-2009, 164 L.Ed.2d at 740-742. (Thomas, J., dissenting). (Internal citations omitted.) (Emphasis in original.)

After review of all the pertinent authority on the issue of whether reliance is an element of a RICO fraud action, and in light of no apparent precedent from the Third Circuit, we find the reasoning of both the First Circuit in *Loiselle* and of Justice Thomas' dissent in *Anza* persuasive on this issue. We conclude that reliance is not an element of a RICO claim based upon the predicate acts of mail or wire fraud. Moreover, we specifically reject the decisions of the Second, Fourth, Fifth, Sixth, Eighth and Eleventh Circuits and the district courts within this circuit that have imposed a reliance element as part of RICO mail and wire fraud claims.

In further support of our determination, we note that the Fifth Circuit in *Sandwich Chef*, *supra*, imposed a presumption against class certification of RICO claims based upon mail and wire fraud because of the reliance issue. We cannot conceive that Congress would have intended for the judiciary to eliminate from the class action forum an entire category of claims. However, that is the effect of the decisions applying reliance as an element in RICO mail and wire fraud cases. It seems that without presuming reliance it is nearly impossible to have a class certified in an area of the law where it is otherwise appropriate and judicially economical to do so. Moreover, in this circuit, the use of the class action has been viewed as a favorable device. *See Baby Neal*, *supra*.

*23 Accordingly because we conclude that reliance is not an element of a RICO fraud action, we determine that defendants have not asserted a unique defense which will preclude a finding of typicality.

In the event that we are mistaken in our application of the caselaw on the issue of reliance, we adopt as persuasive the reasoning of the United States Court of Appeals for the Eleventh Circuit in *Klay v. Humana*, *supra*, for the proposition that plaintiffs will be able to prove classwide reliance based upon circumstantial evidence. In *Klay* the Eleventh Circuit addressed the issue of reliance in a nearly identical Multi-District Litigation RICO action and determined that, as in this case: (1) the common issues of fact concerning the existence of a conspiracy, a pattern of

Slip Copy
Slip Copy, 2006 WL 3825178 (E.D.Pa.), RICO Bus.Disp.Guide 11,221
(Cite as: Slip Copy)

racketeering activity, and a Managed Care Enterprise are very substantial; and (2) even though each plaintiff must prove his or her own reliance, the circumstantial evidence which could be produced at trial is common to the whole class

Thus, the Eleventh Circuit found that the "same considerations could lead a reasonable factfinder to conclude beyond a preponderance of the evidence that each individual plaintiff relied on the defendants' representations."382 F.3d at 1259. The *Klay* court went on to further discuss these common issues of reliance as follows:

The alleged misrepresentations in the instant case are simply that the defendants repeatedly claimed they would reimburse the plaintiffs for medically necessary services they provide to the defendants' insureds, and sent the plaintiffs various [SOR] forms claiming that they had actually paid the plaintiffs the proper amounts While the [SOR] forms may raise substantial individualized issues of reliance, the antecedent representations about the defendants' reimbursement practices do not. It does not strain credulity to conclude that each plaintiff, in entering into contracts with the defendants, relied upon the defendants' representations and assumed they would be paid the amounts they were due A jury could quite reasonably infer that guarantees concerning physician pay-the very consideration upon which these agreements are based-go to the heart of these agreements, and that doctors based their assent upon them ... Consequently, while each plaintiff must prove reliance, he or she may do so through common evidence (that is, through legitimate inferences based on the nature of the alleged misrepresentations at issue).

*Klay,* 382 F.3d at 1259.

Based upon the allegations contained in plaintiffs' Amended Complaint and the evidence adduced at the hearing, we conclude that plaintiffs will be able to prove classwide reliance exactly in the manner set forth by the Eleventh Circuit in *Klay* Thus, if reliance is an element of a RICO fraud action, plaintiff will not be subject to a unique defense that will "likely become a major focus of the litigation."*Beck,* 457 F.3d at 301.

Accordingly, we find that plaintiffs have satisfied the typicality requirement because they have demonstrated a common scheme or course of conduct that applies equally to the claims of plaintiff and every prospective class member.[FN52] Moreover, based upon the record in this case, we conclude that plaintiffs have demonstrated that their claims, even if factually different,[FN53] arise out of

the same legal claims and theories as detailed in their Amended Complaint. Finally, we conclude that plaintiff will not be subject to a unique defense apart from the proposed class

FN52 "In actions under the Racketeer Influenced and Corrupt Organizations Act (RICO), the typicality requirement is satisfied if the claims of the class representative and the class arise from the same scheme by defendant to defraud the class members."*See Moore's Federal Practice §* 23.24(8)(d).

FN53 "Even relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories."*Baby Neal,* 43 F.3d at 58

### Adequacy

**\*24** Rule 23 requires that "the representative parties will fairly and adequately protect the interests of the class."Fed.R.Civ.P. 23(a)(4). This section seeks to protect the interests of absent class members. This is a two-part inquiry. "First, the adequacy of representation inquiry 'tests the qualifications of the counsel to represent the class.' Second, it 'serves to uncover conflicts of interest between named parties and the class they seek to represent.' " *In re Prudential,* 148 F.3d at 312 (Citations omitted.) For the following reasons, we conclude that plaintiffs have satisfied both tests.

### *Plaintiffs' Counsel*

Plaintiffs are represented by four attorneys in this matter. Specifically, lead counsel Kenneth A. Jacobsen, Esquire, and co-counsel Louis C. Bechtle, Esquire, Francis J. Farina, Esquire, and Joseph A. O'Keefe, Esquire, seek to represent plaintiffs and the proposed class in this matter. Attorneys Jacobsen, Farina and O'Keefe have submitted their resumes to the court. The court is independently familiar with Attorney Bechtle.

Defendants oppose the adequacy of class counsel because of concerns about the conduct of counsel in this and other litigation and the quality of the performance and filings in this case. For the following reasons, we conclude that Attorneys Jacobsen, Bechtle, Farina and O'Keefe and are more than adequate class counsel.

As noted by our former colleague, then United States District Judge, now Senior Third Circuit Court of Appeals

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 3825178 (E.D.Pa.), RICO Bus.Disp.Guide 11,221
(Cite as: Slip Copy)

Judge Franklin S. Van Antwerpen, Attorney Jacobsen "has had extensive experience dealing with multi-million dollar class actions relating to consumer protection, antitrust, environmental law, and securities litigation."[FN54]

FN54 *O'Keefe,* 214 F.R.D. at 289.

Attorney Bechtle is the former Chief Judge of the United States District Court for the Eastern District of Pennsylvania and presided over numerous class actions in his nearly 30-year career on the bench. Since 2001, Attorney Bechtle has been a partner at the law firm of Conrad, O'Brien, Gellman & Rohn in Philadelphia, Pennsylvania. Formerly, Attorney Bechtle served as the United States Attorney for the Eastern District of Pennsylvania. He brings to plaintiffs' legal team a wealth of knowledge and diverse experience.

Attorney Farina, who is also an accountant, focuses his practice on complex consumer fraud actions and is experienced in class action litigation. Attorney Farina has not previously participated in presentations to this court. However, a review of his qualifications reveals that he possesses experience and training which will be helpful to the class.

The court is familiar with Attorney O'Keefe, who has appeared before the undersigned in other federal actions. He has prior class action litigation experience. In other matters before the undersigned, Attorney O'Keefe has exhibited the requisite legal acumen, respect for the court and opposing counsel and an appropriate zeal in advocating for his clients.

*25 Throughout this litigation plaintiffs' attorneys have individually and collectively displayed their legal skills. The within motion for class certification was well-briefed, the hearing was conducted with exceptional professionalism and the closing argument by Attorney Jacobsen was concise and persuasive. Moreover, throughout this litigation plaintiffs' attorneys have vigorously represented their clients and the prospective class.

All four class counsel bring different skills, knowledge and experience for the benefit of the class as a whole. Plaintiffs' counsel have exhibited a willingness and aptitude to share the responsibilities in this hard-fought litigation. We recognize that in their zeal to represent their clients, certain counsel have become passionate about this matter. In weighing the positive attributes of the individual counsel for plaintiffs, against the objections

propounded by defendants based upon the conduct of certain of plaintiffs' counsel during this litigation, we conclude that plaintiffs' counsel will more than adequately represent the interests of the class.

*Proposed Class Plaintiffs*

Plaintiffs Natalie Grider, M.D. and Kutztown Family Medicine, P.C. seek to act as class representatives in this matter. Specifically, plaintiffs assert that they are more than adequate class representatives because their interests are aligned with the absent class members and because they have demonstrated their commitment to this case throughout the five years that it has been pending.

Defendants contend that there are a number of reasons why plaintiffs are not adequate class representatives. Initially, defendants aver that plaintiffs are inadequate class representatives because, as primary care physicians, plaintiffs receive a great majority of their revenue through capitation payments and have no motivation to represent and maximize the alleged damages on behalf of the proposed class of physicians (specialists in particular) who are compensated primarily on a fee-for-service basis.

Next, defendants assert that plaintiffs have already compromised the rights of the absent class members by dropping certain claims from their motion for class certification, such as RICO claims premised on extortion in violation of the Hobbs Act, bribery, violations of the Travel Act and bonus claims [FN55] under the individual provider contracts with Keystone. Defendants also contend that plaintiffs are not adequate class representatives because Dr. Joselito Ouano and Dr. Jin Xu, other medical providers who previously worked closely with Dr. Grider as former associates of plaintiff Kutztown, have expressed concern that Dr. Grider will not adequately protect their interests.

> FN55. Plaintiffs contend that defendants' undisclosed policies affect the amount of performance-based bonuses that each provider receives from Keystone. For instance, plaintiffs assert that provider complaints to Keystone about its billing practices and about particular payments result in decreased bonus payments from Keystone.

Finally, defendants contend that plaintiffs are not adequate class representatives because they are not typical of the absent class members. For the following reasons, we disagree with defendants and conclude that Natalie

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 22
Slip Copy, 2006 WL 3825178 (E.D.Pa.), RICO Bus.Disp.Guide 11,221
**(Cite as: Slip Copy)**

Grider, M.D. and Kutztown Family Medicine, P.C. are adequate class representatives.

**\*26** Federal Rule of Civil Procedure 23(a)(4) provides that the adequacy requirement is satisfied if "the representative parties will fairly and adequately protect the interests of the class."In assessing plaintiffs as proposed class representatives we must determine if plaintiffs are qualified and capable of pursuing common goals of the class without conflict.

In general, the burden of establishing class requirements rests with plaintiffs. *Zlotnick v. Tie Communications, Inc.,* 123 F.R.D. 189, 190 (E.D.Pa.1988) (Giles, J.). However, defendants bear the burden of proving plaintiffs' inadequacy. *Stewart v. Associates Consumer Discount Company,* 183 F.R.D. 189, 196-197 (E.D. Pa.1998)(Joyner, J.) We conclude that defendants have not met their burden on this issue.

It is often the defendant, preferring not to be successfully sued by anyone, who supposedly undertakes to assist the court in determining whether a putative class should be certified. When it comes, for instance, to determining whether "the representative parties will fairly and adequately protect the interests of the class"... it is a bit like permitting a fox, although with a pious countenance, to take charge of the chicken house.

*Eggleston v. Chicago Journeyman Plumbers,* 657 F.2d 890, 895 (7th Cir.1981)

In our discussion of the typicality requirement, above, we have already addressed defendants' contention that plaintiffs are not typical of the class of specialists they seek to represent because plaintiffs are primary care physicians. We rejected that contention in part because we concluded that primary care physicians and specialists bill similarly for fee-for-service claims and defendants process those claims similarly.

Moreover, defendants' argument that plaintiff Grider will not adequately represent the fee-for-service providers because she is a family practice doctor who is compensated primarily on a capitation basis is not supported by the evidence adduced during the class certification hearing. We found credible Dr. Grider's testimony that she is very involved in this case. She did not suggest or indicate that she would pursue any class claim more or less vigorously than any other. We find defendants' bald assertions to the contrary unpersuasive.

In the same vein, defendants assert that plaintiffs are

compromising the rights of putative class members because plaintiffs fail to seek certification of other claims, including RICO predicate claims premised on extortion in violation of the Hobbs Act, bribery, the Travel Act, or interference with an employee benefit plan, claims based upon the complex bonus system and certain other claims alleged in the Amended Complaint. We disagree.

In their amended motion for class certification, plaintiffs allege that they "have focused these amended class papers specifically and narrowly on the identical claims of 'bundling,' 'downcoding' and capitation 'shaving' uniformly certified for class treatment by numerous other courts throughout the country."[FN56] These additional claims are not before the court for class certification. Thus, we do not determine if these additional claims would be proper for class treatment.

> FN56. Plaintiffs' Amended Motion for Class Certification filed December 27, 2005 at page 2.

**\*27** Plaintiffs' narrowing of the issues in this fashion reflects either a belief that those excluded claims are not proper for class certification, or a tactical decision to conserve relatively scarce resources and time by focusing on a few stronger claims rather than diluting their efforts by pursuing additional less persuasive, marginal and doubtful claims. Under either interpretation, plaintiffs are demonstrating sound stewardship over the interests of the class. This is particularly so in light of defendants' assertion that none of plaintiffs' claims are appropriate for class treatment.

Next, defendants contend that plaintiffs are not adequate class representatives because former associates of Kutztown Family Medicine, Dr. Joselito Ouano and Dr. Jin Xu, have expressed concern that Dr. Grider will not adequately protect their interests. We disagree.

Defendants reliance on the opinions of two former, apparently disgruntled, associates does not satisfy their burden on the issue of plaintiffs' adequacy as class representatives. Moreover, we find credible and compelling Dr. Grider's testimony at the class certification hearing that she has support from other physicians, including specialists.[FN57] Accordingly, we reject defendants' argument on this issue concerning the inadequacy of plaintiffs as class representatives.

> FN57 Notes of Testimony of Natalie Grider, M.D. as a witness at the class certification hearing on March 8, 2006 at pages 36, 38-39.

*See* also the undated Statement of the Pennsylvania Academy of Family Physicians in Support of Plaintiffs' Motion for Class Certification, signed by John S. Jordan, Executive Vice President. Plaintiffs' Exhibit 99.

Finally, defendants contend that plaintiffs are not adequate class representatives because they are not typical of the absent class members. Pursuant to the Third Circuit's recent decision in *Beck, supra,* we must analyze whether plaintiffs' will be subject to a unique defense that will "likely become a major focus of the litigation."*Beck,* 457 F.3d at 301. As noted above, we determined that there are no such unique defenses.

In short, defendants' claims fail to convince the court that plaintiffs will be inadequate. The court had an opportunity to hear and observe Dr. Grider at the class certification hearing and found her to be intelligent, articulate and very interested in pursuing this action both on her own behalf and on behalf of the proposed class. Dr. Grider's testimony persuaded the court that she is eager to be a diligent class representative notwithstanding the rigors of the litigation process. Moreover, we conclude that based upon the length and contentiousness of the litigation to this point, Dr. Grider has shown an ability and desire to be present and persist for the long haul.

Accordingly, we conclude that both Dr. Grider and her medical practice are adequate class representatives and that she and her counsel will act in the best interests of the class as a whole.

### Predominance

In order to certify a class, the court must find that questions of law, fact or both predominate over questions affecting only individual members of the proposed class. Fed.R.Civ.P. 23(b)(3). In determining whether common questions predominate, the court's inquiry is directed primarily toward the issue of liability. *Bogosian v. Gulf Oil Corporation,* 561 F.2d 434, 456 (3d Cir.1977).

*28 However, "unlike commonality, predominance also measures the number and relative importance of these common issues against the remaining individual issues not susceptible to classwide proof."*Lester v. Percudani,* 217 F.R.D. at 351.[FN58]As noted in our September 18, 2003 decision regarding defendants' original motion to dismiss, the claims brought pursuant to RICO for mail and wire fraud, conspiracy claims and claims under the Pennsylvania prompt payment statute all involve alleged

omissions from the provider contracts and concealment of information concerning claims processing.

> FN58. In footnote 8 of *Lester,* Judge Conner clarified the distinction between commonality and predominance by analogy as follows: "Commonality measures the sufficiency of the evidence, testing only whether a plaintiff has properly alleged a single common issue, while predominance examines the weight of the evidence, analyzing whether the number of common issues clearly outweighs individual issues."We adopt this appropriate analogy here.

Moreover, as indicated above, we have found ten common factual issues, three common legal issues and eight common potential defenses. Moreover, there is the overriding issue regarding the existence of a conspiracy.

Defendants argue that the Rule 23(b)(3) requirement has not been met in this case because individual issues will predominate over issues common to the class. Specifically, defendants assert that: (1) plaintiffs have not proven that any class member was injured; (2) plaintiffs' allegations of fraudulent capitation payments require member-by-member analysis; (3) plaintiffs' allegations of fraudulent fee-for-service payments require member-by-member analysis; (4) the use of automated payment processing does not change the predominance of individualized issues; (5) plaintiffs' RICO claims require individualized proof of causation by each provider; and (6) individualized questions would predominate the trial of plaintiffs' contract and prompt pay claims.

We disagree with defendants that categories (1) through (5) above preclude a finding of predominance. Specifically, plaintiffs have come forward with evidence that they have been injured; a member-by-member analysis is not required for the determination of *liability,* but may likely be required for determination of damages, on either the fee-for-service, capitation and prompt pay claims; and the automated payment system is at the heart of the claims brought by plaintiffs. Moreover, the issue of causation is an element in every case. If defendants were correct, no case could ever be certified for class treatment because of the individualized nature of injury causation and determination of damages.

Furthermore, we disagree that individual issues will predominate on plaintiff's prompt pay claim (half of category 6). Individual analysis will be necessary to determine damages if plaintiffs succeed in proving

Slip Copy                                                                                              Page 24
Slip Copy, 2006 WL 3825178 (E.D.Pa.), RICO Bus.Disp.Guide 11,221
**(Cite as: Slip Copy)**

liability, but those issues do not predominate over the general liability issues of whether defendants improperly delay payment on "clean claims" by suspending all claims even though they are submitted on a fully completed HCFA-1500 form in the manner that defendant Keystone's policies define as a clean claim.

In plaintiffs' RICO claims based upon mail and wire fraud, conspiracy and the prompt pay claim, the common factual and legal issues and common defenses set forth above all apply to those claims and predominate because a common scheme is alleged and applies equally to each member of the proposed class.

*29 However, notwithstanding our predominance determination on plaintiffs' RICO, and the prompt payment statute, claims, we agree with defendants that individualized questions will predominate on plaintiffs' claim for breach of contract.

"The facts that defendants conspired to underpay doctors, and that they programmed their computer systems to frequently do so in a variety of ways, do nothing to establish that any particular doctor was underpaid on any particular occasion. *Klay,* 382 F.3d at 1264.

Furthermore, we agree with, and adopt the analysis of, the Eleventh Circuit in *Klay* regarding certification of plaintiffs' breach of contract claims: [FN59]

> FN59 *See Klay,* 382 F.3d 1264-1267.

The evidence that each doctor must introduce to make out each breach claim is essentially the same whether or not a general conspiracy or policy of breaching existed. For example, regardless of whether facts about the conspiracy or computer programs are proven, each doctor, for each alleged breach of contract (that is, each alleged underpayment), must prove the services he provided, the request for reimbursement he submitted, the amount he was entitled, the amount he actually received, and the insufficiency of the HMO's reasons for denying full payment. There are no common issues of fact that relieve each plaintiff of a substantial portion of this individual evidentiary burden.
*Klay,* 382 F.3d at 1264.

Moreover, although Keystone allegedly breached its contracts with both primary care physician providers and specialists in the same general way, it did so through a variety of means that are not subject to generalized proof by Dr. Grider or her medical group. Specifically, even though Dr. Grider can produce evidence of breach regarding certain procedures, she cannot produce evidence on most procedures performed by specialists that would each constitute a separate breach of contract.

Furthermore, we would need to create numerous subclasses to determine each allegedly improper group of contract breaches. In this context, individual issues will certainly predominate over any common issues. Thus, certification of plaintiffs' breach of contract claims are not appropriate.

Accordingly, we conclude that common issues of fact and law as well as common defenses outlined above will predominate over individual questions on plaintiffs' RICO claims based on mail and wire fraud, conspiracy claims, and plaintiffs' claim under the Pennsylvania prompt payment statute. By contrast, we further conclude that individual issues will predominate over common issues on plaintiffs' breach of contract claim and that certification of the contract claim for class treatment would be improper.

**Superiority**

The superiority requirement under Rule 23(b)(3) requires the court to balance in terms of fairness and efficiency the merits of a class action against other alternative methods of adjudicating plaintiffs' claims. *In re Prudential,* 148 F.3d at 316. Specifically, Rule 23(b)(3) sets forth four, non-exhaustive elements the court should consider:
*30 The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Fed.R.Civ.P. 23(b)(3).

A class action is clearly the superior method of adjudicating the dispute between the parties because of the central issue of whether defendants engaged in a conspiracy and the alleged "common course of fraudulent conduct to automatically delay, deny and downcode payments to plaintiffs."*In re Managed Care Litigation,* 209 F.R.D. 678, 697 (S.D.Fla.2002)

*Separate Actions*

Based upon the difficulties and disputes that have arisen during the discovery process, it is unlikely that any potential member of the plaintiff class would seek to individually bring suit against defendants on the claims involved here. It is not only the cost of litigation, but the time and effort needed to individually prosecute similar claims against defendants, that make separate actions implausible, if not impossible, for any prospective class members.

### Other Litigation

We are aware of litigation that has been brought against other insurers in the state and federal courts throughout the Commonwealth of Pennsylvania and elsewhere, including the multi-district litigation case in Florida.[FN60] However, we are not aware of any other individual suits brought against these defendants in either the state or federal courts of Pennsylvania.[FN61]

> FN60. *Klay v. Humana, supra; In re. Managed Care Litigation, supra; Pennsylvania Orthopedic Society v. Independence Blue Cross,* December Term 2000, No. 3482 (Consolidated), Control Nos. 081034, 080860 (C.C.P.Phila.)

> FN61. We note that defendant Keystone Health Plan Central, Inc., operates within the confines of the geographical area of Central Pennsylvania.

### Desirability of Forum

It is considerably desirable to concentrate this litigation in this district because all of the parties are located near to this court, and the proposed class of physicians are all located in Pennsylvania.

### Case Management

Finally, while every class action presents its own unique problems of manageability, and this case has certainly posed numerous problems for the court and the litigants in getting to the class certification stage, we are confident that there is nothing in this case which presents an extraordinary problem that cannot be handled within the parameters of the system already in place. As noted, we have appointed a Special Discovery Master in this action, and she has done an admirable job of resolving many of the underlying disputes which plagued this case prior to her appointment.

Moreover, while there are certainly remaining issues which may be tedious and cumbersome, there are no insurmountable difficulties with managing this case as a class action which would outweigh the ramifications of thousands of potential suits by the individual physicians involved here.

Accordingly, we conclude that a class action is the superior method of adjudicating the claims involved in this case.

### Damages

**\*31** The issue of individual damages is always a factor in a class action. However, the necessity for individual damage calculations does not prevent certification when common liability issues predominate over individual issues and when the court or the parties can calculate individual damages. *See Newton v. Merrill Lynch,* 259 F.3d 154, 187-189 (3d Cir.2001). In this case, plaintiffs have demonstrated that damages can be proven on a classwide basis and that they can be computed in a mechanical and efficient manner.[FN62]

> FN62. During the class hearing, plaintiffs' counsel Joseph O'Keefe, Esquire, demonstrated that the information regarding claims submitted by providers can be sorted and classified in numerous ways, including by the codes submitted, the reasons for denial given by defendant Keystone, the amounts paid and numerous other categories of information.
> Moreover, defendants' expert Professor Steven N. Wiggins testified that he received information on claims from defendant Highmark and was able to synthesize the information and, generate a report including numerous graphs and pie charts in only a few weeks' time.

Accordingly, we conclude that the individual calculation of damages does not, and should not, preclude class certification in this matter.

### CONCLUSION

For all the foregoing reasons, we grant in part and deny in part Plaintiffs' Amended Motion for Class Certification. We certify for class treatment against all defendants on Count I of plaintiffs' Amended Complaint alleging conspiracy to commit RICO violations pursuant to 18 U.S.C. § 1962(d) in violation of 18 U.S.C. § 1962(c);

Slip Copy                                                                                   Page 26
Slip Copy, 2006 WL 3825178 (E.D.Pa.), RICO Bus.Disp.Guide 11,221
**(Cite as: Slip Copy)**

Count III of plaintiffs' Amended Complaint alleging
violation of RICO under 18 U.S.C. § 1962(c); and Count
IV of plaintiffs' Amended Complaint alleging violation of
the prompt-payment provision of Pennsylvania's Quality
Health Care Accountability and Protection Act. We deny
class certification on Count V of plaintiffs' Amended
Complaint alleging breach of contract against defendant
Keystone Health Plan Central, Inc.

E.D.Pa.,2006.
Grider v. Keystone Health Plan Central, Inc.
Slip Copy, 2006 WL 3825178 (E.D.Pa.), RICO
Bus.Disp.Guide 11,221

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                    Page 1
Not Reported in F.Supp.2d, 2005 WL 2367623 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

**C**Hayes v. American Airlines, Inc.
E.D.N.Y.,2005.
Only the Westlaw citation is currently available.
United States District Court,E.D. New York.
Julia B. HAYES, individually and on behalf of all
others similarly situated, Plaintiff,
v.
AMERICAN AIRLINES, INC. Defendants.
**No. 04CV3231CBAJMA.**

Sept. 27, 2005.

Samuel K. Rosen, Wechsler Harwood, New York,
NY, for Plaintiff.
Matthew J. Morris, Richard Martin Goldstein,
Proskauer Rose, LLP, New York, NY, for Defendant.

*MEMORANDUM AND ORDER*
AMON, J.

### I. *Introduction*

*1 Plaintiff initiated this case in New York Supreme
Court. She brings this action on behalf of a class of
people who did not receive refunds of certain
surcharges when airline tickets they purchased from
defendant American Airlines ("American") expired
unused. She alleges causes of action for breach of
contract, unjust enrichment and violation of New
York General Business Law § 349.

On July 28, 2004, American removed the action to
federal court on the grounds that the this Court had
federal question jurisdiction under 28 U.S.C. § 1331
and jurisdiction under 28 U.S.C. § 1442(a)(1)
because American was acting under the direct control
of a federal agency. Plaintiff subsequently moved to
remand this action to state court arguing that removal
to this Court was improper. American opposed this
motion, asserting that federal jurisdiction existed
under both § 1331 and § 1442(a)(1). The motion was
referred to the Magistrate Judge Azrack, who
recommended that the motion be denied as
jurisdiction was present under both provisions. In her
Objections to the R & R, plaintiff argued that federal
jurisdiction was not available under either provision.

As the landscape of § 1331 jurisprudence has

changed significantly since the Magistrate Judge
issued her Report and Recommendation ("R & R"),
this Court adopts the conclusion of the Magistrate
Judge's R & R as the Opinion of this Court to the
extent that it found federal question jurisdiction
available under § 1331, but does so with an expanded
discussion of the recently decided cases.[FN1]

> FN1. The Court notes that neither party
> either notified the Court of these
> developments or requested an opportunity to
> submit briefs regarding them.

### II. *Federal Question Jurisdiction*

A defendant may remove a civil action from state
court to federal court as long as the federal court has
original jurisdiction over the matter. 28 U.S.C. §
1441(a). Original jurisdiction exists *inter alia* if the
asserted cause of action is "founded on a claim or
right arising under the Constitution, treaties or laws
of the United States."28 U.S.C. § 1331.

### A. *Pre-Grable*

In *Merrell Dow Pharmaceuticals, Inc. v. Thompson*,
478 U.S. 804, 106 S.Ct. 3229, 92 L.Ed.2d 650
(1986), the United States Supreme Court first
considered whether federal question jurisdiction
could be found where, as here, "Congress did not
intend a private federal remedy for violations of the
statute that it enacted."*Id.* at 811.The *Merrell*
negligence complaint incorporated a federal statute as
setting a standard of care which defendants had
allegedly breached. Citing prior Supreme Court case
law, petitioners argued that where "some substantial,
disputed question of federal law is a necessary
element of one of the well-pleaded state
claims,"*Franchise Tax Bd. v. Constr. Laborers
Vacation Trust*, 463 U.S. 1, 13, 103 S.Ct. 2841, 77
L.Ed.2d 420 (1983), federal question jurisdiction is
appropriate.

The *Merrell* Court disagreed, holding that "the
congressional determination that there should be no
federal remedy for the violation of this federal statute
is tantamount to a congressional conclusion that the
presence of a claimed violation of the statute as an
element of a state cause of action is insufficiently

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 2
Not Reported in F.Supp.2d, 2005 WL 2367623 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

'substantial' to confer federal-question jurisdiction."*Merrell*, 478 U.S. 804, 814, 106 S.Ct. 3229, 92 L.Ed.2d 650 (1986).

**\*2** Under this guidance, in *West 14th Commercial Corp. v. 5 West 14th Owners Corp.*, 815 F.2d 188 (2d Cir.1987), the Second Circuit Court of Appeals held that it must look beyond the face of the federal law in question "to the nature of the federal interest at stake" to determine if federal question jurisdiction is appropriate. *Id.* at 193.Although the *West 14th* court ultimately found a federal cause of action, it also noted that even in the absence of that federal cause of action, the "federal element in plaintiffs' state cause of action would still be sufficiently substantial to confer arising under jurisdiction."*Id.* at 196.The court distinguished *Merrell* on the basis that the federal statute there was "merely incorporated by reference as a standard of conduct in a state negligence action" whereas in *West 14th*"the federal issue [wa]s decisive because upon [the federal statute's] construction the vindication of rights and definition of relationships created by federal law depends."*Id.* (internal quotation marks and citations omitted). Thus, *West 14th* appeared to hold that a federal cause of action was not necessary for federal question jurisdiction in the Second Circuit.

In her objections to the Magistrate Judge's R & R, plaintiff argued that this language from *West 14th* was in fact *dicta* and directed this Court to a decision of the Second Circuit which she believed to be more faithful to *Merrell*, namely *Barbara v. New York Stock Exchange*, where the Second Circuit held that the "lack of a private right of action counsels against the finding of federal question jurisdiction."99 F.3d 49, 55 (2d Cir.1996).[FN2]

> FN2. In large part moot because of the developments discussed below, it might also be noted that a holding that the absence of a federal cause of action "counsels against" a finding of federal question jurisdiction does not preclude such a finding in such an absence.

Plaintiff also suggested that this Court ought to follow the 10th Circuit rule as enunciated in the Oklahoma cases related to the present dispute and refuse to find federal question jurisdiction in the absence of a federal cause of action.[FN3]In *Brown v. Delta Airlines*, No. Civ-03-871, 2004 U.S. Dist. LEXIS 28508 (D.Okla. Oct. 8, 2004), the Oklahoma

Western District Court relied on the 10th Circuit's decision in *Rice v. Office of Servicemembers' Group Ins.*, 260 F.3d 1240 (10th Cir.2001) which read *Merrell* as holding that for federal question jurisdiction to apply to a state law cause of action, "its resolution must necessarily turn on a substantial question of federal law, *and* that federal law in turn must create a private cause of action."*Id.* at 1245 (citing*Merrell* 478 U.S. at 808) (emphasis added). Thus, even though the *Brown* court was satisfied under facts identical to those at bar that the plaintiff's claims "would require interpretation of these statutes and that this would present a substantial question of federal law" (*Brown,*2004 U.S. Dist. LEXIS 28508, at \*7-8), it determined that the statutes did not create a private right of action and so held that removal was inappropriate.

> FN3. At the time this action was commenced, American was also defending a similar putative class action in Oklahoma state court, and three other airlines were defending similar suits in the Western District of Oklahoma. On or around August 31, 2004, American sought and obtained leave from this Court to transfer the action to the Western District of Oklahoma. However, on October 8, 2004, the Western District of Oklahoma remanded the three actions before it, concluding that plaintiffs had no private right of action under federal law (which it held was required in the 10th Circuit to establish federal question jurisdiction).*Brown v. Delta Airlines, Inc.*, No. CIV-03-8710-L;*Stem v. Continental Airlines, Inc.*, No. CIV-03-942-L;*Stem v. Northwest Airlines, Inc.*, No. CIV-03-901-L.Accordingly, American notified this Court that it would no longer seek transfer.
> On July 22, 2004, the Oklahoma state court dismissed plaintiff's actions against American, holding that the matter should be addressed to the federal courts. *Coleman v. American Airlines, Inc.*, Case No. CJ-2002-650 (Dist. Ct., Canadian County, Oklahoma) (Cunningham, J.). The Oklahoma Court of Civil Appeals affirmed this decision on March 15, 2005. *Coleman v. American Airlines, Inc.*, Case No. 101, 106 (Okla.Civ.Appl.)

**\*3** In sum, when the Magistrate Judge issued her R & R on May 13, 2005, the circuit courts were split as to

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2367623 (E.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

whether federal question jurisdiction could be found absent a federal cause of action, and some question remained as to the Second Circuit's position on this point.

## B *Grable and Broder*

On June 12, 2005, the Supreme Court decided *Grable & Sons Metal Products, Inc.,*--- U.S ----, 125 S.Ct. 2363, 162 L.Ed.2d 257 (2005). The plaintiff had brought a quiet title action in state court after property seized from him by the Internal Revenue Service ("I.R.S.") had been sold to the defendant *Grable,* 125 S.Ct. at 2365162 L.Ed.2d at 262. The plaintiff claimed that the I.R.S. had failed to provide proper notice before the seizure, as the relevant federal statute required. *Id.* The defendant then removed the action to federal court on the theory that the case presented a federal question, specifically, whether the notice given satisfied the relevant federal tax law *Id.*

The Court held that the determinative question is whether "a state-law claim necessarily raise[s] a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities."*Grable,* 125 S.Ct. at 2368162 L.Ed.2d at 265. The Court affirmed the court's determination that federal jurisdiction was appropriate, noting that *Merrell*"should be read in its entirety as treating the absence of a federal right of action as evidence relevant to, but not dispositive of, the sensitive judgments about congressional intent that § 1331 requires."*Grable,* 125 S.Ct. at 2370162 L.Ed.2d at 267 (internal citations and quotation marks omitted). Thus, it is now clear that the exercise of federal question jurisdiction is permissible in the absence of a federally created private cause of action where other indicia indicate that the exercise of federal jurisdiction would not disturb the balance between the federal and state judicial systems.

The Second Circuit recently applied the three part *Grable* test in *Broder v. Cablevision Sys. Corp.,* 418 F.3d 187 (2d Cir.2005). The plaintiffs had challenged the selective offering of a reduced cable television subscription to owners of summer homes *Id.* at 191.Plaintiffs alleged breach of contract, violation of New York General Business Law, common law fraud and unjust enrichment *Id.* at 192-93.The breach and fraud claims were based on contractual provisions

stating that rates and changes would be subject to applicable law, which would include 47 U.S.C § 543(d), requiring cable operators to offer uniform rate structures. *Id.*

Reviewing the test set out in *Grable,* the court held that plaintiff had satisfied the first prong by stating a federal issue with regard to whether Section 543(d) had been violated, and had satisfied the second prong by demonstrating that whether or not the statute was violated was the issue of contention. *Id.* at 195.As to the third prong, the court noted that the *Grable* court found this last requirement was satisfied "even in the absence of a private right of action" because it is "the rare state quiet title action that involves contested issues of federal law."*Broder,* 418 F.3d at 196 (citing *Grable,* --- U.S.t ----, 125 S.Ct. at 2371162 L.Ed.2d at 257). Accordingly, the issue could be entertained by a federal court without disturbing any congressionally approved balance of federal and state judicial responsibilities. *Id.* The court concluded that, "as in *Grable,* allowing federal jurisdiction here will not materially affect, or threaten to affect, the normal currents of litigation."*Id.* Deciding that all three *Grable* factors had been met, the court then affirmed the district court's denial of the plaintiffs' motion to remand. *Id.*

## III *Plaintiff's Cause of Action*

**\*4** This Court now evaluates plaintiff's claims in light of the three-prong *Grable* test: (1) whether the state-law claim necessarily raises a stated federal issue, (2) whether that stated federal issue is actually disputed and substantial, and (3) whether a federal forum may entertain that state-law claim without disturbing any congressionally approved balance of federal and state judicial responsibilities. *Grable,* 125 S.Ct. at 2368162 L.Ed.2d at 265. The first two prongs are easily met. Plaintiff has stated a federal issue as to whether the refunds in question are mandated by the relevant federal statutes and regulations and this issue is actually disputed and substantial. Both parties have submitted letters advocating opposing interpretations of these provisions.

As to the third prong, following the rationale of *Grable* and *Broder,* a federal determination of the issue would not "disturb any congressionally approved balance of federal and state judicial responsibilities,"*Grable,* 125 S.Ct. at 2368162 L.Ed.2d at 265, or "materially affect, or threaten to affect, the normal currents of litigation."*Broder,* 418

© 2007 Thomson/West. No Claim to Orig. U.S Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2367623 (E.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

F.3d at 196. Just as in *Broder,* it would be the rare breach of contract or unjust enrichment action or suit under New York General Business Law § 349 that would "assert a private right of action for violation of a federal law otherwise lacking one."*Broder,* 418 F.3d at 196. Moreover, once it is determined whether or not a refund of the surcharges is owed in the posited situation, the issue will be finally resolved. In this case there is no "good reason to shirk from federal jurisdiction over the dispositive and contested federal issue at the heart of [this state-law claim]."*Grable,* 125 S.Ct. at 2371 162 L.Ed.2d at 268. Moreover, the Court notes that the government has a "direct interest in the availability of a federal forum to vindicate its own administrative action."*Grable,* 125 S.Ct. at 2368 162 L.Ed.2d at 265.

Therefore, the Magistrate Judge was correct in concluding that plaintiff's cause of action is properly in federal court. Whether or not this result was certain under *Merrell* and *West 14th,* it is under *Grable* and *Broder*

### IV *Conclusion*

As this Court finds it has jurisdiction over American under § 1331, it need not decide whether jurisdiction would have been appropriate under § 1441(a)(2) as well. For the reasons stated in the R & R, and in light of the subsequent decisions in *Grable & Sons Metal Products, Inc.,* --- U.S. ----, 125 S.Ct. 2363, 162 L.Ed.2d 257 (2005) and *Broder v. Cablevision Sys Corp.,* 418 F.3d 187 (2d Cir.2005), the Court hereby adopts the R & R insofar as it finds this Court has jurisdiction over American under 28 U.S.C. § 1331 and denies plaintiff's motion to remand
SO ORDERED.

E.D.N.Y.,2005.
Hayes v. American Airlines, Inc
Not Reported in F.Supp.2d, 2005 WL 2367623 (E.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

--- F.R.D. ----
--- F.R.D. ----, 2007 WL 2782355 (E.D.Pa.)
**(Cite as: --- F.R.D. ----)**

**H**Powers v. Lycoming Engines
E.D.Pa.,2007.
Only the Westlaw citation is currently available.
  United States District Court,E.D. Pennsylvania.
Charles POWERS, on his own behalf and on behalf
of the class defined herein, and Cynthia Ann Powers,
v.
LYCOMING ENGINES, a Division of AVCO
Corporation; AVCO Corporation; and Textron, Inc.
Plane Time, LLC, on its own behalf and on behalf of
others similarly situated,
v.
Lycoming Engines, a Division of AVCO
Corporation; AVCO Corporation; and Textron, Inc.
**Civil Action Nos. 06-2993, 06-4228.**

Sept. 25, 2007.

**Background:** In consolidated putative class actions,
plaintiffs moved to represent a class of owners or
previous owners of aircraft that contained allegedly
defective engine crankshafts designed and built by
defendant.

**Holdings:** The District Court, Savage, J., held that:

(1) predominance requirement for class certification
was satisfied, and

(2) superiority requirement was satisfied.

Motion granted.

**[1] Federal Courts 170B ⚖➔409.1**

170B Federal Courts
    170BVI State Laws as Rules of Decision
        170BVI(C) Application to Particular Matters
            170Bk409 Conflict of Laws
                170Bk409.1 k. In General. Most Cited
Cases
A federal court sitting in diversity must apply the
choice-of-law rules of the forum state.

**[2] Implied and Constructive Contracts 205H ⚖➔3**

205H Implied and Constructive Contracts

        205HI Nature and Grounds of Obligation
            205HI(A) In General
                205Hk2 Constructive or Quasi Contracts
                    205Hk3 k. Unjust Enrichment. Most
Cited Cases
Under Pennsylvania choice of law rules,
Pennsylvania law applied to unjust enrichment cause
of action asserted against manufacturer of allegedly
defective crankshafts in aircraft engines, as
Pennsylvania had the greatest interest in the
application of its law; defendant was incorporated
and headquartered in Pennsylvania where it
manufactured the crankshafts and received the
benefit of its conduct, and alleged defect existed from
the time the crankshafts left Pennsylvania.

**[3] Sales 343 ⚖➔425**

343 Sales
    343VIII Remedies of Buyer
        343VIII(D) Actions and Counterclaims for
Breach of Warranty
            343k425 k. Nature and Form of Remedy.
Most Cited Cases
Under Pennsylvania choice of law rules,
Pennsylvania law applied to cause of action for
breach of warranty of merchantability asserted
against manufacturer of allegedly defective
crankshafts in aircraft engines; manufacturer was
located in Pennsylvania, and thus application of
Pennsylvania law would not impinge on interests of
states that retain the privity requirement for breach of
warranty claim in the interest of reducing litigation
and costs.

**[4] Federal Civil Procedure 170A ⚖➔182.5**

170A Federal Civil Procedure
    170AII Parties
        170AII(D) Class Actions
            170AII(D)3 Particular Classes Represented
                170Ak182.5 k. Consumers, Purchasers,
Borrowers, and Debtors. Most Cited Cases
Numerosity requirement for class certification was
satisfied by class of owners or previous owners of
aircraft who asserted unjust enrichment and breach of
warranty claims against manufacturer of defective
engine crankshafts, as class had potentially 3,774
members based on the Federal Aviation

Administration's identification of 3,774 engines subject to mandatory service bulletin issued by manufacturer regarding the defect. Fed.Rules Civ.Proc.Rule 23(a)(1), 28 U.S.C.A.

**[5] Federal Civil Procedure 170A ☜═══182.5**

170A Federal Civil Procedure
   170AII Parties
      170AII(D) Class Actions
         170AII(D)3 Particular Classes Represented
            170Ak182.5 k. Consumers, Purchasers, Borrowers, and Debtors. Most Cited Cases
Commonality requirement for class certification was satisfied by class of owners or previous owners of aircraft who asserted unjust enrichment and breach of warranty claims against manufacturer of allegedly defective engine crankshafts; among the questions of fact common to all putative class members were what manufacturer knew about the allegedly defective crankshafts and when it knew it. Fed.Rules Civ.Proc.Rule 23(a)(2), 28 U.S.C.A.

**[6] Federal Civil Procedure 170A ☜═══182.5**

170A Federal Civil Procedure
   170AII Parties
      170AII(D) Class Actions
         170AII(D)3 Particular Classes Represented
            170Ak182.5 k. Consumers, Purchasers, Borrowers, and Debtors. Most Cited Cases
Typicality requirement for class certification was satisfied by class of owners or previous owners of aircraft who asserted unjust enrichment and breach of warranty claims against manufacturer of allegedly defective engine crankshafts, as each member's claim arose from the same course of events and each class member would make the same or similar legal arguments to prove liability. Fed.Rules Civ.Proc.Rule 23(a)(3), 28 U.S.C.A.

**[7] Federal Civil Procedure 170A ☜═══182.5**

170A Federal Civil Procedure
   170AII Parties
      170AII(D) Class Actions
         170AII(D)3 Particular Classes Represented
            170Ak182.5 k. Consumers, Purchasers, Borrowers, and Debtors. Most Cited Cases
Adequacy of representation requirement for class certification was satisfied by class of owners or previous owners of aircraft who asserted unjust

enrichment and breach of warranty claims against manufacturer of allegedly defective engine crankshafts; class counsel had litigated other class actions, and named plaintiffs' interests were not dissimilar to those of proposed class. Fed.Rules Civ.Proc.Rule 23(a)(4), 28 U.S.C.A.

**[8] Federal Civil Procedure 170A ☜═══182.5**

170A Federal Civil Procedure
   170AII Parties
      170AII(D) Class Actions
         170AII(D)3 Particular Classes Represented
            170Ak182.5 k. Consumers, Purchasers, Borrowers, and Debtors. Most Cited Cases
Predominance requirement for class certification was satisfied by class of owners or previous owners of aircraft who asserted unjust enrichment and breach of warranty claims against manufacturer of allegedly defective engine crankshafts; central liability issues of what and when manufacturer knew about the defects, and what warranties applied, predominated over individual questions. Fed.Rules Civ.Proc.Rule 23(b)(3), 28 U.S.C.A.

**[9] Federal Civil Procedure 170A ☜═══182.5**

170A Federal Civil Procedure
   170AII Parties
      170AII(D) Class Actions
         170AII(D)3 Particular Classes Represented
            170Ak182.5 k. Consumers, Purchasers, Borrowers, and Debtors. Most Cited Cases
Superiority requirement for class certification was satisfied by class of owners or previous owners of aircraft who asserted unjust enrichment and breach of warranty claims against manufacturer of allegedly defective engine crankshafts; cost of defending the action as well as cost of prosecuting the claims would be substantially reduced by litigating common issues in one proceeding and in one forum. Fed.Rules Civ.Proc.Rule 23(b)(3), 28 U.S.C.A.

Dianne M. Nast, Joanne E. Matusko, Joseph F. Roda, Michele Stawinski Burkholder, Roda & Nast, PC, Lancaster, PA, Erica L. Craven, Michael F. Ram, Levy, Ram & Olson, LLP, San Francisco, CA, Harry Shulman, Robert W. Mills, The Mills Firm, San Rafael, CA, Jennifer L. Gardner, John R. Climaco, Climaco Lefkowitz Peca Wilcox & Garofoli Co.LPA, Cleveland, OH, Jonathan Shub, Terrianne A. Benedetto, Seeger Weiss LLP, Philadelphia, PA,

--- F.R.D. ----
--- F.R.D. ----, 2007 WL 2782355 (E.D.Pa.)
(Cite as: --- F.R.D. ----)

Kathy Dianne Bailey, Bailey Law Group, Keith T. Vernon, The Vernon Law Firm PLLC, Washington, DC, for Charles Powers and Cynthia Ann Powers. Catherine B. Slavin, Cozen O'Connor, Philadelphia, PA, for Lycoming Engines and AVCO Corporation.

### MEMORANDUM OPINION

SAVAGE, District Judge.

*1 In these consolidated putative class actions, the plaintiffs move to represent a class of owners or previous owners of aircraft that contain allegedly defective engine crankshafts designed and built by Lycoming Engines.[FN1] They claim that the engines were manufactured with defective crankshafts that can cause a total loss of engine power and in-flight engine failures, and that Lycoming knew and concealed the defect that prevents the crankshafts from functioning as intended. They seek damages for the cost to replace the defective crankshafts, which includes parts, labor, transportation, storage, insurance; the loss of the use of the aircraft while the crankshafts are being replaced; and the diminished value of the aircraft.

Lycoming contends that the case is inappropriate for class certification because the facts as to both liability and damages are not common to all members of the putative class, the claims and defenses of the named plaintiffs are not typical of the class, and individual issues will predominate over the common issues. It argues that whether a given engine or crankshaft is defective, whether the planes containing the subject crankshafts were purchased used or new and when each plaintiff had or has the crankshaft replaced are questions peculiar to each individual plaintiff and not amenable to class certification.

Contrary to Lycoming's contentions, the requirements of Rule 23(a) are satisfied, and a class action is superior to other methods for the fair and efficient adjudication of the issues, qualifying it under Rule 23(b)(3).[FN2] The class is ascertainable and sufficiently definite. With more than 3000 potential plaintiffs, there is numerosity. Commonality exists because there are common fact questions regarding what and when Lycoming knew of the alleged defect. Typicality is established because each member's claim arises from the same course of events and each class member will make the same legal arguments to prove liability. Common questions predominate over individual ones. Therefore, the motion for class certification will be granted.

### I. Factual Background

The Federal Aviation Administration ("FAA") mandates that the type of engines at issue be overhauled after every 2,000 hours of flying time or within twelve years, whichever occurs first. The crankshafts are not typically replaced during these overhauls. Thus, unlike other parts of an aircraft engine that must be replaced at regular intervals, crankshafts are expected to last the life of a regularly maintained aircraft.

On February 21 and April 11, 2006, Lycoming issued two Mandatory Service Bulletins ("MSB"), 569 and 569A, requiring owners of the subject engines to retire and replace more than 4000 potentially defective crankshafts that were manufactured between 1997 and 2002. The MSBs set a replacement deadline of the earliest of: February 21, 2009; the next time the engine crankcase is separated to allow inspection or replacement of parts; or at the next maintenance overhaul.[FN3]

*2 On May 25, 2006, the FAA issued a proposed Airworthiness Directive ("AD") mandating replacement of the same crankshafts addressed in the MSB. The FAA concluded that an "unsafe condition exists" because the "same metallurgical flaw that was found in 23 confirmed crankshaft failures in different groups of Lycoming 360 and 540 engines [which were covered in earlier MSB's issued in 2002 and 2005] has been found in the crankshafts of this group of engines."[FN4] The AD warned that if the crankshafts are not replaced, they will "result in total engine power loss, in-flight engine failure, and possible loss of the aircraft." The AD set a crankshaft replacement deadline of the earliest of the next separation of the engine crankcase, the next engine overhaul, or 12 years from the date the crankshaft first entered service or was last overhauled. The AD became final on September 29, 2006, and effective November 3, 2006.

Plaintiffs claim that Lycoming had known for years that its crankshafts were unsafe and likely to fail. Based on several field reports of broken crankshafts Lycoming had received in 2002, it issued MSBs, which were followed by FAA action that grounded hundreds of aircraft with faulty crankshafts. At that time, Lycoming purportedly paid $35 million to remove, ship and replace the defective crankshafts. In 2005, Lycoming issued two more MSBs and replaced the crankshafts covered by those MSBs at its

--- F.R.D. ----
--- F.R.D. ----, 2007 WL 2782355 (E.D.Pa.)
(Cite as: --- F.R.D. ----)

expense.

Lycoming refuses to pay all costs associated with replacing the crankshafts subject to the most recent MSBs and the AD issued in 2006. It will replace the crankshafts for free if the owners have the engines overhauled at a Lycoming facility in Pennsylvania, or will pay $14,000 of a $16,000 price for a "crankshaft and parts" kit for owners who replace the crankshafts elsewhere. After February of 2009, it will pay nothing for the replacement kits. It refuses to pay costs for labor, shipping, alternative transportation, loss of use or other incidental costs regardless of where and by whom the replacement is done.

## II. Procedural History

Plaintiff Charles Powers, a Maryland resident, filed his initial complaint on July 10, 2006, in which he sought to represent himself and a class of other purchasers of an aircraft containing an engine with a crankshaft subject to MSBs 569 and 569A. In his initial complaint, Powers asserted claims of negligence, unjust enrichment and violation of state unfair trade practices statutes, including Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-2(4)(xxi).

Plaintiff John Car, a South Carolina resident, in his capacity as "beneficial owner" of an aircraft containing a crankshaft subject to MSBs 569 and 569A, filed his first complaint on September 21, 2006, on behalf of himself and all others similarly situated, excluding California residents, asserting claims of negligence and unjust enrichment.[FN5]

Lycoming filed a motion to dismiss the *Powers* complaint on September 11, 2006. After consolidating the *Powers* and *Car* cases on October 6, 2006, the motion to dismiss was deemed applicable to the *Car* complaint as well.

*3 After oral argument on the class certification motion, the plaintiffs filed an Amended Consolidated Complaint. The amended complaint added Charles Powers' wife, Cynthia,[FN6] as a plaintiff; substituted Plane Time, LLC for John Car as a plaintiff;[FN7] deleted the negligence claim; and, added causes of action for breach of implied warranty of merchantability and breach of implied warranty of fitness for a particular purpose. The consumer protection and unjust enrichment causes of action

were retained in the amended complaint. The plaintiffs later withdrew the claims for breach of implied warranty of fitness for a particular purpose,[FN8] and for violations of unfair trade practices,[FN9] leaving only the unjust enrichment and breach of warranty of merchantability causes of action.

## III. *Conflict of Laws*

Conflicts among the states' laws arise in the treatment of the causes of action set forth in the amended complaint. Irreconcilable conflicts can be an impediment to certification. Because those conflicts affect the analysis of the typicality and adequacy requirements of Rule 23(a), and the manageability factor of the Rule 23(b)(3)(D) superiority test, the conflicts issues will be resolved before the class certification requirements are analyzed.

[1] A federal court sitting in diversity must apply the choice-of-law rules of the forum state. *Berg Chilling Sys., Inc. v. Hull Corp.,* 435 F.3d 455, 462 (3d Cir.2006). Accordingly, Pennsylvania choice of law rules apply here.

Pennsylvania uses a two-step process to resolve choice-of-law questions. The court must first determine whether there is a real conflict. Mere differences in the states' laws do not necessarily constitute actual conflicts. *Id.* Only where a state's governmental interests are frustrated by application of another state's law is there an actual conflict. *Lacey v. Cessna Aircraft Co.,* 932 F.2d 170, 187 (3d Cir.1991). In other words, there is no conflict where the application of either state's law renders the same result. *Berg Chilling,* 435 F.3d at 462.

If there is a true conflict, the court proceeds to the second step and decides which state has the greater interest in the application of its law. *LeJeune v. Bliss-Salem, Inc.,* 85 F.3d 1069, 1071 (3d Cir.1996) (*citing Cipolla v. Shaposka,* 439 Pa. 563, 267 A.2d 854, 855 (1970)). This flexible inquiry uses the *Restatement (Second) of Conflict of Laws* as a guide to evaluate the significance of the contacts, and the relationship of the states to the parties and the dispute. *See Berg Chilling,* 435 F.3d at 463;*Garcia v. Plaza Oldsmobile Ltd.,* 421 F.3d 216, 220 (3d Cir.2005). After characterizing the nature of the issue as founded in contract, tort or a hybrid, the court uses the appropriate *Restatement* section identifying the most

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

relevant contacts for that type of action to assess which state has the more significant relationship and contacts to the issue. *Berg Chilling,* 435 F.3d at 463, 467;*Garcia,* 421 F.3d at 220.The contacts are weighed qualitatively within the context of the competing policies and interests of each state. *Berg Chilling,* 435 F.3d at 467-68;*In re Estate of Agostini,* 311 Pa.Super. 233, 457 A.2d 861, 871 (1983) (*citing Cipolla,* 267 A.2d at 856). After balancing the respective governmental policy interests of the affected states, the court applies the law of the state having the greater interest in the determination of the issue.*Garcia,* 421 F.3d at 220.

**\*4** Which Restatement section applies depends on how the issue to be litigated is characterized. Section 188 of the *Restatement* governs contract actions; § 145, tort actions; and § 148, fraud and misrepresentation. Section 188 instructs that the law of the state which has the most significant relationship with the transaction and the parties applies. It lists the following factors to consider: where the contract was made, where the contract was negotiated, the place of performance, the location of the subject matter of the contract, and where the parties reside and do business. The provision also states that "[t]hese contacts are to be evaluated according to their relative importance with respect to the particular issue."*Restatement (Second) of Conflict of Laws* § 188 (1971).

Section 145, which covers torts, considers where the injury occurred, where the conduct causing the injury occurred, the domicile of the parties and where the relationship between the parties is centered. Section 148, covering fraud and misrepresentation, takes into account primarily where the defendant made the misrepresentations, and where the plaintiff received and relied upon them.[FN10]

In this action, § 188 is applicable to the plaintiffs' implied warranty claim because it arises from a contract. A "hybrid" approach, using §§ 188 and 148, is amenable to the unjust enrichment claim because it has both fraud or misrepresentation and contract elements.

### *Choice of Law and the Unjust Enrichment Claim*

**[2]** Plaintiffs concede that there are conflicts between the unjust enrichment laws of Pennsylvania and the laws of at least eight other states.[FN11] In fact, there are numerous differences in unjust enrichment laws among many states. However, most of those differences do not create actual conflicts. Where they do, Pennsylvania has a greater interest in applying its law.

The legal elements required to establish a claim for unjust enrichment vary from state to state. They fall into four basic categories. One group of states [FN12] requires proof of essentially the same three elements: (1) a benefit is conferred upon the defendant; (2) at the plaintiff's expense; (3) under circumstances that would make defendant's retention unjust.

A second group [FN13] requires proof of five separate elements, which are similar to the elements required by the states in the first group. The five elements of the cause of action in these states are: (1) an enrichment; (2) an economic detriment or loss; (3) a connection between the enrichment and the impoverishment; (4) the absence of justification for the enrichment and the impoverishment; and (5) the absence of a legal remedy.

A third group,[FN14] the largest, includes an additional element, that the defendant appreciated the benefit conferred upon it. To satisfy this element, the defendant must have had knowledge or awareness that it was, in fact, receiving a benefit.[FN15]The necessary level of this awareness varies from jurisdiction to jurisdiction. In two states, Alabama and Texas, the defendant must have engaged in fraud, coercion, or other intentional conduct to induce the benefit. In twenty other states, a defendant's mere awareness of receipt of a benefit at the plaintiff's expense will suffice. This element is not an issue where the defendant failed to disclose a known defect because it had to have known it was getting a benefit.

**\*5** A fourth group [FN16] provides a more general description of unjust enrichment without delineating specific elements. To establish an unjust enrichment claim in these states, the plaintiff must prove that the defendant received something of value from the plaintiff and that it would violate the fundamental principles of justice, equity and good conscience for the defendant to retain the benefit without compensating the plaintiff. These concepts are similar to the legal elements in the first category of states.

Although there are numerous permutations of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works

--- F.R.D. ----
--- F.R.D. ----, 2007 WL 2782355 (E.D.Pa.)
(Cite as: --- F.R.D. ----)

elements of the cause of action in the various states, there are few real differences. In all states, the focus of an unjust enrichment claim is whether the defendant was *unjustly* enriched. At the core of each state's law are two fundamental elements-the defendant received a benefit from the plaintiff and it would be inequitable for the defendant to retain that benefit without compensating the plaintiff. The focus of the inquiry is the same in each state. Application of another variation of the cause of action than that subscribed to by a state will not frustrate or infringe upon that state's interests. In other words, regardless of which state's unjust enrichment elements are applied, the result is the same. Thus, there is no real conflict surrounding the elements of the cause of action.

Even though the legal elements of an unjust enrichment cause of action are essentially similar among the states, there are differences in how they are applied and interpreted. A significant difference is that most states, including Pennsylvania, preclude recovery on an unjust enrichment theory if an express contract governs the relationship between the parties. Among those states, at least five have carved out exceptions to this general rule, allowing recovery on an unjust enrichment claim despite an express contract.[FN17]

The plaintiffs acknowledge that Lycoming had issued a written warranty that may preclude them from pursuing an unjust enrichment claim under Pennsylvania law.[FN18]However, they assert that if the warranty is found to be unconscionable and unenforceable, they may proceed on the unjust enrichment claim. In some states, the plaintiffs can recover under an unjust enrichment theory even if an express contract governs the relationship; but, they will not be permitted to assert such a claim under Pennsylvania law if the contract is enforced. Stated differently, the defendant manufacturer could not assert the contractual bar in those other states as it could in Pennsylvania. Thus, there is a real conflict with those states and Pennsylvania.

After weighing the factors under *Restatement*§§ 188 and 148, the balance tilts in favor of applying Pennsylvania law. Pennsylvania has the most significant relationship to the transaction and the parties. It is the center of the activities that gave rise to the claims. Lycoming is a Pennsylvania manufacturer that has been sued here, where it manufactured the crankshafts and engines. Lycoming

issued service bulletins and instructions, communicated orally and in writing about the crankshafts and sent press releases from its headquarters in Pennsylvania, and plans to replace crankshafts here.

*6 On the other hand, the contacts with the plaintiffs presumably took place in their home states where they purchased, operate, and moor their aircraft. Yet, considering the mobility of a plane, it could have been purchased and transported from a state other than a plaintiff's home state. Because Lycoming's engines are part of aircraft manufactured by others, it is unlikely that the plaintiffs purchased the aircraft in reliance on anything Lycoming may have represented. Consequently, the place where the false representations were received is not a factor. The § 148 factors do not impact as heavily as those in § 188, which weigh in favor of Pennsylvania in the context of the contractual bar. Therefore, Pennsylvania's interest in allowing its resident manufacturer to invoke its contractual rights where it has been sued for conduct occurring here and where it received the benefit of its conduct is greater than the interests of those states where the warranty issue is nonexistent.

Not only are there variations among the states' laws regarding the legal elements and potential defenses, there are also differences as to who may bring an unjust enrichment claim. Three jurisdictions preclude indirect purchasers from asserting claims for unjust enrichment unless they have conferred a benefit directly on the defendant.[FN19]In these states, the rationale for the requirement is to insulate a defendant that is far removed from any wrongdoing from liability for a benefit he may have inadvertently or unknowingly received.

In contrast, nine other states have explicitly determined that an indirect benefit is enough.[FN20]These states have allowed indirect purchasers to establish claims for unjust enrichment so long as they can prove that the defendant benefitted at the plaintiff's expense, even if the benefit flowed indirectly from the plaintiff to the defendant. The remaining states' laws have either implicitly accepted unjust enrichment claims based on an indirect benefit or have not addressed the issue.

The engine is a component part of the aircraft. It was not purchased from Lycoming by the aircraft owner, but by the plane's manufacturer or a dealer. Hence,

--- F R D ----                                                      Page 7
--- F.R.D ----, 2007 WL 2782355 (E D Pa )
(Cite as: --- F.R.D. ----)

the class members, with few, if any, exceptions, are indirect purchasers

To apply Pennsylvania law, which permits indirect purchasers to recover, would infringe those other states' laws because Lycoming could not be sued by the indirect purchasers in those states. Thus, there is a real conflict in those instances.

Applying the *Restatement* factors, Pennsylvania has the greatest interest in the application of its law. The defendant is incorporated and headquartered in Pennsylvania where it manufactured the crankshafts and received the benefit of its conduct, and the alleged defect existed from the time the crankshaft left Pennsylvania. Therefore, Pennsylvania law will apply to the unjust enrichment cause of action.

### *Choice of Law and the Warranty of Merchantability Claim*

**\*7** **[3]** The law of implied warranty of merchantability, unlike the law of unjust enrichment, is not as varied among the states. Except for Louisiana, all states have adopted U.C.C. § 2-314, which provides that unless excluded or modified, a warranty that the goods shall be merchantable is implied in a contract for their sale [FN21]U.C.C. § 2-314 (2003). Thus, all states, but one, share the common source of law.

There are, nevertheless, differences among the states regarding the application of implied warranty of merchantability law. The most significant difference is the privity requirement. Thirty-five states, including Pennsylvania, do not require privity of contract to recover for breach of the implied warranty of merchantability where only economic damages are involved. Thus, there is no conflict between the warranty of merchantability laws of these thirty-four states and that of Pennsylvania.[FN22]

With respect to the fourteen states that still require privity between the parties in cases involving purely economic loss,[FN23] the plaintiffs argue that there is either no actual conflict between the laws of Pennsylvania and those of these fourteen states; or, if there is, Pennsylvania has a greater interest in applying its law to the claims of the residents of these states than do the other states.

In abolishing the privity requirement in all warranty

actions four decades ago, the Pennsylvania Supreme Court determined that continuing such a requirement would "perpetuat[e] a needless chain of actions, whereby each buyer must seek redress from his own immediate seller, up the chain, until the actual manufacturer is eventually reached."*Kassab v. Central Soya,* 432 Pa. 217, 246 A.2d 848, 856 (1968) It observed that the privity requirement ignored the commercial reality that the typical purchaser buys from a retail merchant who is usually no more than an "economic conduit" between the purchaser and the manufacturer of the defective product. *Id.* at 853.

The plaintiffs contend that the national trend is toward abolishing the privity requirement,[FN24] even in the remaining fourteen states that still have remnants of the requirement. They argue that the bases for the privity requirement in nine of those states do not apply in this case either because the policies underlying the rule are not advanced or there is no legitimate interest to do so.[FN25] As to the five states whose laws they concede directly conflict with Pennsylvania law,[FN26] the plaintiffs contend that Pennsylvania has the stronger interest in having its law applied than do the other states.

The question is whether the competing states' governmental interests are frustrated by application of the other states' laws. In the fourteen states that maintain a privity requirement in implied warranty claims involving solely economic loss, the purpose of the requirement is to protect "remote manufacturers." For example, in some states, the stated policy reason is to limit the damages for which remote manufacturers will be held liable, and provide foreseeability as to potential claimants.[FN27] In one state, the goal is to preserve a manufacturer's right to disclaim a warranty because it would be difficult for a manufacturer to issue disclaimers to purchasers with whom it had no contact.[FN28] Other states defer to contracting parties to determine the scope of the manufacturer's obligations and liability, using traditional contract principles where there is no damage to other property or personal injury.[FN29] One state maintains the privity requirement because litigation between a direct buyer and seller is simpler and less costly.[FN30]

**\*8** In light of these policy reasons, there is a real conflict between the application of Pennsylvania law and the laws of the fourteen states that require privity. Allowing the plaintiffs to sue a manufacturer

--- F.R.D. ----
--- F.R.D. ----, 2007 WL 2782355 (E.D.Pa.)
(Cite as: --- F.R.D. ----)

with whom they did not deal directly will frustrate the interests of those states that do not permit it. On the other hand, insulating Lycoming from suit will frustrate Pennsylvania's interest in bypassing privity. Therefore, there is a real conflict, requiring a balancing of the respective interests of the states.

The balancing test results in the application of Pennsylvania law. The manufacturer is located in Pennsylvania, the interest of the fourteen privity states in protecting a resident manufacturer is absent, the manufacturer's right to disclaim a warranty will be preserved, and the goal of saving costs will not be thwarted by the application of Pennsylvania law. At the same time, Pennsylvania's interest in avoiding a needless multiplicity of actions where each buyer would have to sue his own seller and those up the distribution chain until the actual manufacturer is reached will be advanced by applying its state law. Application of Pennsylvania law will not impinge on the interests of states that retain the privity requirement in the interest of reducing litigation and costs. The litigation and its attendant costs will take place in Pennsylvania at one time, not many times in those other states. Therefore, Pennsylvania law will apply to the breach of implied warranty claims of the residents of the fourteen states that require privity of contract.

Lycoming argues that additional conflicts among the states' laws exist, rendering the implied warranty claim inappropriate for certification. First, it states that different jurisdictions have different standards to satisfy the U.C.C. § 2-607(c) notice of breach requirement, which provides that "where a tender has been accepted, the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy."U.C.C. § 2-607 (2003). Lycoming contends the issue of whether notice of breach was given "will have to be resolved by the court on a plaintiff-by-plaintiff basis."[FN31]Plaintiffs retort that notice is a procedural matter and federal courts sitting in diversity apply state substantive law and federal procedural law.

Even if considered a substantive matter, notice of breach is not an issue. The determination of whether the class members provided adequate notice of the breach will not vary from plaintiff to plaintiff. The plaintiffs allege that all of the proposed class members learned of the defective crankshafts when MSBs 569 and 569A were issued, and Lycoming was

put on notice of the breach upon the issuance of the AD and the filing of the lawsuit. Indeed, when it issued the MSBs, Lycoming put itself on notice.

Lycoming also points to differences among jurisdictions in the application of implied warranty law to used goods in that the standard of merchantability is lower or nonexistent for used goods in some jurisdictions.[FN32]Although only two jurisdictions, Alabama and Texas, do not recognize implied warranties in the sale of used goods, most states apply a somewhat lower standard of merchantability to used goods. These states follow the standard set forth in Comment 3 to U.C.C. § 2-314, which provides that a "contract for the sale of second-hand goods ... involves only such obligation as is appropriate to such goods."This standard recognizes that used goods ordinarily require more maintenance and repair than new products.

*9 The differences with respect to used goods is not an issue here. The claim is that the crankshafts were defective when they were new and left Lycoming's facility, and that the damage is the same no matter how old or used the aircraft or engine was when the plaintiff purchased it. Therefore, whether the plane, engine or crankshaft was new or used when each plaintiff "acquired" the subject crankshaft will not affect its merchantability.

Finally, Lycoming contends that there is a "major difference" between the laws of Louisiana and the other states. There is no actual conflict between Louisiana's implied merchantability law and § 2-314. Louisiana law provides for relief when a defect renders a product useless or diminishes its usefulness or value, seeLa. Civ.Code Ann. art. 2520, while U.C.C § 2-314 provides for relief if a product is not merchantable or not fit for the ordinary purposes for which it is used. Whether a defect renders a product useless, less useful or not merchantable requires the consideration of similar factors. Therefore, Louisiana's interest would not be frustrated by the application of Pennsylvania's implied warranty law.

There are few conflicts among the various states' laws on the implied warranty of merchantability cause of action. Where conflicts exist, Pennsylvania has a greater interest in applying its law. Therefore, Pennsylvania law will also apply to the implied warranty claim.

--- F.R.D. ----
--- F.R.D. ----, 2007 WL 2782355 (E.D.Pa.)
**(Cite as: --- F.R.D. ----)**

## IV. Legal Standards for Class Certification

To be certified, a class must satisfy all four requirements of Rule 23(a) and must fit one of the provisions of Rule 23(b). The plaintiffs must demonstrate that: (1) the size of the class is so numerous that joinder of all members is impracticable; (2) there are questions of law and fact common to the class; (3) the claims or defenses are typical of the class; and (4) the representatives will fairly and adequately protect the interests of the class. Fed.R.Civ.P. 23(a)(1)-(4). Additionally, the proposed class action must be one of the types recognized by Rule 23(b). Here, plaintiffs have moved for certification only under subsection (b)(3), which requires a finding that common questions of law or fact predominate over questions affecting only individual class members, and that a "class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3).

The burden is on the plaintiffs to demonstrate that a class should be certified. *Johnston v. HBO Film Mgmt., Inc.*, 265 F.3d 178, 183 (3d Cir.2001); *Baby Neal v. Casey,* 43 F.3d 48, 55 (3d Cir.1994). Though the plaintiffs need not establish the merits of their case at the class certification stage and the substantive allegations of the complaint must be taken as true, *Chiang v. Veneman,* 385 F.3d 256, 262 (3d Cir.2004) (*citing Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177-78, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974)), a court must conduct a rigorous analysis to determine the suitability of resolving the issues in a class action. Because certification and the merits are intertwined, this analysis necessitates a factual inquiry. *Beck v. Maximus, Inc.,* 457 F.3d 291, 297 (3d Cir.2006) (*citing Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 259 F.3d 154, 167 (3d Cir.2001)). Nonetheless, a court may not determine the merits of the plaintiff's case. *Eisen,* 417 U.S. at 177-78, 94 S.Ct. 2140. Thus, one must look beyond the complaint and consider the substantive elements of the plaintiffs' cases. *See Newton,* 259 F.3d at 166-68.

### Numerosity

**\*10** [4] Based on the FAA's identification of 3,774 engines subject to MSB 569A, the class has potentially 3,774 members. Although Lycoming has stated in its briefs and at oral argument that they do not contest numerosity, it argues the class will have "considerably" fewer members than 3,774, pointing out that some owners live outside the United States and some planes have more than one engine. Yet, it does not approximate how much the membership would be reduced.

Whether the number of potential class members is what the plaintiffs contend or is less as the defendants argue, there are more than enough to satisfy numerosity.

### Commonality

[5] Commonality requires that the plaintiffs share a question of law or fact with the prospective class members. The commonality threshold is low. So long as the named plaintiffs share at least one question of fact or law with the grievances of the prospective class, the existence of individual facts and circumstances will not defeat commonality. *Baby Neal,* 43 F.3d at 56.

Among the questions of fact common to all putative class members are what Lycoming knew about the allegedly defective crankshafts and when it knew it. Those facts will not change regardless of who the class member is. Commonality has been met with respect to these fact issues.

Because there are common fact issues, there is no need to find common legal issues. Nevertheless, as the conflict of laws discussion demonstrates, the legal issues implicating liability are common to the class.

### Typicality

[6] The typicality prong of Rule 23(a) requires that the claims or defenses of the plaintiffs are typical of the class. Fed.R.Civ.P. 23(a)(3). Typicality requires a strong similarity of legal theories to ensure that the class representatives' pursuit of their own goals will work to benefit the entire class. *Barnes v. Am. Tobacco Co.,* 161 F.3d 127, 141 (3d Cir.1998); *Jones v. GPU, Inc.,* 234 F.R.D. 82, 97 (E.D.Pa.2005). It entails an inquiry as to whether "the named plaintiff's individual circumstances are markedly different or the legal theory upon which the claims are based differs from that upon which the claims of other class members will perforce be based." *Baby Neal,* 43 F.3d at 57-58 (*quoting Eisenberg v. Gagnon,* 766 F.2d 770, 786 (3d Cir.1985)). Moreover, "[w]here the defendant can raise unique defenses to each plaintiff's

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

claim, typicality may not exist if the defenses could threaten to become the focus of the litigation."*Jones,* 234 F.R.D. at 98 At the same time, "factual differences will not render a claim atypical if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members, and if it is based on the same legal theory."*Baby Neal,* 43 F.3d at 58 (*quoting Hoxworth v. Blinder, Robinson & Co,* 980 F.2d 912, 923 (3d Cir.1992)). Unlike the commonality requirement, typicality requires more than "one unifying factual or legal question."*In re Paxil Litig.,* 212 F.R.D. 539, 550 (C.D.Cal.2003).

**\*11** Lycoming argues that neither the plaintiffs nor their claims are typical of the class. It points out that Plane Time has already complied with the AD and cannot claim diminution in value and, in contrast, the Powers have not yet had the crankshaft replaced. According to Lycoming, a class member who complies with the AD may or may not incur any replacement costs, depending on where the engine is overhauled and if it is done before or after February 2009. Lycoming notes that Plane Time bought a 2002 plane in 2004, which contained a new engine installed when the aircraft was manufactured. Powers, on the other hand, bought a new plane in 1978 that had a used, factory overhauled engine covered by MSB 569A installed in the aircraft in 2002. Lycoming contends that this may affect the viability of the plaintiffs' breach of implied warranty claims because the standard of merchantability is lower or nonexistent for used goods in some jurisdictions.[FN33]

These factual and legal differences are inconsequential and do not affect typicality. The differences between the plaintiffs regarding damages are not problematic. Although there are five different categories of damages that any class member can claim,[FN34] these differences do not vary significantly. Similarly, whether the planes or engines in the planes were new or used when purchased does not affect typicality. It does not matter if the crankshafts are in a new or used plane or engine. The claim is that the crankshafts were defective when they were new and left Lycoming's facility. Liability and damages are the same whether the aircraft or engine was new or used when the plaintiff purchased it.

Because each member's claim arises from the same course of events and each class member will make the same or similar legal arguments to prove liability,

typicality is established.

*Adequacy of Representation*

**[7]**Rule 23(a)(4) aims to protect the interests of the class. There are two parts to this test. The first goes to the competency of counsel, and the second, to the plaintiffs' motivation and ability to protect the interests of the other class members.

Lycoming does not contest counsel's competency to prosecute a class action. Class counsel have litigated other class actions. Thus, the first part of the adequacy requirement is not at issue.

The second prong of the adequacy of representation requirement tends to merge with the commonality and typicality requirements of Rule 23(a). *Jones,* 234 F.R.D. at 98 As previously determined, the plaintiffs have met the commonality and typicality requirements.

Lycoming has not presented any plausible reason why the plaintiffs are inadequate representatives. Nor is there any. The plaintiffs' interests are not dissimilar to those of the proposed class. They have no incentive to take a position that could benefit them at the expense of the remaining members. Therefore, adequacy is established.

*Predominance and Superiority*

**\*12** Plaintiffs have moved for certification under subsection 23(b)(3), which requires that common questions of law or fact predominate over questions affecting only individual class members, and that a "class action is superior to other available methods for the fair and efficient adjudication of the controversy."Fed.R.Civ.P. 23(b)(3) Thus, the plaintiffs must satisfy both the predominance and the superiority aspects of Rule 23(b)(3).

In determining whether the action fits within Rule 23(b)(3), the Rule specifically directs the court to consider the interest of class members in individually controlling the litigation, the status of ongoing litigation brought by members of the class, the desirability of concentrating the litigation in the particular forum, and likely management difficulties Fed.R.Civ.P. 23(b)(3)(A)-(D). In the end, it is the interests of the individual members in controlling their own litigation that drives the

--- F.R.D. ----
--- F.R.D. ----, 2007 WL 2782355 (E.D.Pa.)
**(Cite as: --- F.R.D. ----)**

certification decision on predominance. The superiority analysis focuses on the advantages and disadvantages of using the class-action device in relation to other litigation methods.

### Predominance

[8] In a class action brought under Rule 23(b)(3), common questions of law or fact must predominate over questions affecting only individual members and must be a significant part of each individual case. The predominance inquiry is "far more demanding" than the commonality requirement of Rule 23(a). *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 623-24, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997).

Rule 23(b)(3)
encompasses those cases in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.
It is only wh[en] predominance exists that economies can be achieved by means of the class-action device.

Fed.R.Civ.P. 23(b)(3) Advisory Committee's Note. Common issues will predominate when they "present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication."7A Wright, Miller & Kane, *Federal Practice and Procedure* § 1778 (2d ed.1986).

In this case, the central liability issues are what and when Lycoming knew about the defects, and what warranties apply. The resolution of these common issues will resolve a significant portion of this case for all class members. Information peculiar to each individual class member is not necessary to make these determinations. Each class member will seek to recover the same or similar damages caused by the same harm. All assert that they sustained losses as a result of Lycoming's design, manufacture and sale of defective crankshafts. Evidence regarding each class member's damages will be limited because the types and the amounts of damages that can be claimed are circumscribed and some are fixed. Thus, because the few individual questions for determination are not complex and can be answered without a fact-intensive inquiry, common questions predominate over individual ones.

### Superiority

**\*13** [9]Rule 23(b)(3)'s superiority requirement requires the plaintiffs to prove that a "class action is superior to other available methods for the fair and efficient adjudication of the controversy."Fed.R.Civ.P. 23(b)(3). The superiority analysis assesses the advantages and disadvantages of using the class-action device in relation to other methods of litigation. The Rule itself suggests various factors to consider in making this assessment: the interest of class members in individually controlling the litigation, the state of ongoing litigation brought by class members, the desirability of concentrating the litigation in the particular forum, and likely management difficulties. *Id.*

### Material advancement of the litigation

Litigating the proposed common issues will materially advance the litigation because it will require examination of the same witnesses and the production of generic documents that affect each class member. The cost of defending the action as well as the cost of prosecuting the claims will be substantially reduced by litigating common issues in one proceeding and in one forum.

### Class members' interest in individually controlling their lawsuit

Whether putative class members have a significant interest in individually prosecuting their own separate lawsuits is affected by the financial stakes involved in each individual's case. The greater the damages in one's claim vis-á-vis others' claims, the greater the interest the individual has in controlling the litigation. The lesser the potential damages, the less the interest is because separate suits may be impracticable. *See*Fed.R.Civ.P. 23(b)(3) Advisory Committee's Note; *Blain v. Smithkline Beecham Corp.,* 240 F.R.D. 179, 192 (E.D.Pa.2007).

There are few differences between each class member's case with respect to both liability and damages, and the potential value of each member's case falls within a defined limited range. Class members do not have a strong interest in controlling their own litigation. Here, separate actions would be impractical and expensive to litigate. Individuals would have little incentive to direct the litigation. Their individual interests are minimal compared to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.R.D. ----
--- F.R.D. ----, 2007 WL 2782355 (E.D.Pa.)
**(Cite as: --- F.R.D. ----)**

the overall extent of the issues in the litigation.

*Extent of existing litigation*

There is no existing litigation that would overlap with the claims at issue in this case. The *Bristow* case is a putative class action filed on behalf of only California residents, and the class definition in the instant case excludes California residents. There is one other putative class action that has been filed by a member of the proposed *Powers* class in state court in Illinois, *Way Point Aviation Serv. v. AVCO Corp.,* 2006-CH-22950 (Cook Cty. Circuit Court, Ill.) The case was filed three months after the initial *Powers* complaint was filed. In that state court case, the plaintiff recently filed an amended complaint. Here, in contrast, substantial discovery has been completed.

*Manageability of proposed class and choice-of-law impediments*

**\*14** In examining the manageability of the proposed class, two factors are considered: the manageability of the class for trial,[FN35] and whether there are choice-of-law conflicts in a putative nationwide class. *In re Prempro Prods. Liab. Litig.,* 230 F.R.D. 555, 562 (E.D.Ark.2005). Given the resolution of the conflicts among the laws of the various jurisdictions, there is no manageability issue. Thus, choice-of-law concerns do not present an impediment.

Because the predominance and superiority requirements of Rule 23(b)(3) are satisfied, it is appropriate to certify it as a class action.

### Conclusion

The action satisfies the numerosity, commonality, typicality and adequacy requirements of Fed.R.Civ.P. 23(a), and the predominance and superiority requirements of Rule 23(b)(3). Therefore, the motion for class certification will be granted.

### *ORDER*

**AND NOW,** this 25th day of September, 2007, upon consideration of the Plaintiffs' Motion for Class Certification (Document No. 22 of C.A. No. 06-2993 and Document No. 9 of C.A. No. 06-4228) and the defendants' responses, it is **ORDERED** that the motion is **GRANTED.**

It is **FURTHER ORDERED** as follows:

1. This action is certified as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) on behalf of the following subclasses:
a. All persons and entities residing in any state, other than the State of California, and the District of Columbia, who before April 11, 2006 purchased and aircraft that is or was subject to Lycoming Mandatory Service Bulletin 569A and currently own that aircraft; and
b. All persons and entities residing in any state, other than the State of California, and the District of Columbia, who before April 11, 2006 purchased an aircraft that is or was subjected to Lycoming Mandatory Service Bulletin 569A and sold that aircraft on or after April 11, 2006.

2. Plaintiffs Charles Powers, Cynthia Powers and Plane Time, LLC are certified as class representatives; and

3. The following law firms are appointed class counsel pursuant to Fed. R. Civ. P. 23(g)(1) in the roles as designated: (1) RodaNast, P.C. as Liaison Counsel; (2) Climaco, Lefkowitz, Peca, Wilcox & Garofoli, Co., LPA as Co-Lead Counsel; (3) The Mills Law Firm as Co-Lead Counsel; (4) Bailey Law Group as Discover Chair; (5) Seeger Weiss LLP as E-Discovery Liaison; (6) The Vernon Law Firm; and (7) Levy, Ram & Olson, LLP.

> FN1. The plaintiffs named three defendants, Lycoming Engines, Avco Corporation and Textron, Inc. Since the motion for certification was filed, Textron has been dismissed. The two remaining defendants are referred to collectively as "Lycoming."

> FN2. *See* Fed.R.Civ.P. 23(a) and (b)(3).

> FN3. During an overhaul, the crankshaft is separated from the engine.

> FN4. AD 2006-20-09, 21 Fed.Reg. 57407, at 57408, attached as Ex. D to *Defs' Reply and Supplement in Further Support of Mot. to Dismiss* (Doc. No. 15).

> FN5. California residents were excluded because in August of 2006, a putative class

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

action was filed in California on behalf of all California residents who purchased engines subject to MSB 569 and 569A. *See Bristow v. Lycoming Engines, et al.,* No. Civ S-06-1947 LKK/GGH, 2007 WL 1106098 (April 10, 2007 E.D.Cal.) (Karlton, J.). On November 13, 2006, the plaintiffs in the California action filed a motion to transfer and centralize the three cases to an MDL, which request was denied on February 9, 2007.

FN6. Cynthia Powers is a co-owner of the aircraft.

FN7. Although Car is the sole owner of Plane Time, LLC, that entity is the actual owner of the plane at issue.

FN8. *See Pls.' Supplemental Mem. in Support of Mot. for Class Certification* (Doc. No. 62) at 1 n. 1.

FN9. *See Pls.' Notice of Voluntary Dismissal of Third Cause of Action* (Doc. No. 98).

FN10. Specifically, *Restatement* § 148(2) states:
When the plaintiff's action in reliance took place in whole or in part in a state other than that where the false representations were made, the forum will consider such of the following contacts, among others, as may be present in the particular case in determining the state which, with respect to the particular issues, has the most significant relationship to the occurrence and the parties:
(a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations,
(b) the place where the plaintiff received the representations,
(c) the place where the defendant made the representations,
(d) the domicile, residence, nationality, place of incorporation and place of business of the parties,
(e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and
(f) the place where the plaintiff is to render performance under a contract which he has

been induced to enter by the false representations of the defendant.

FN11. For purposes of the motion for class certification, the District of Columbia is considered a "state," and the state of California is not part of the analysis.

FN12. Colorado, Connecticut, District of Columbia, Illinois, Indiana, Iowa, Michigan, Nebraska, Nevada, New Hampshire, New Jersey and New York.

FN13. Arizona, Delaware, Louisiana and North Dakota.

FN14. Alabama, Alaska, Florida, Idaho, Kansas, Maine, Maryland, Missouri, New Mexico, North Carolina, Ohio, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Virginia, Wisconsin and Wyoming.

FN15. This is in contrast to states that allow recovery on a claim for unjust enrichment even if the party retaining the benefit is not a wrongdoer or mistakenly received the benefit. *See, e.g., Schock v. Nash,* 732 A.2d 217, 232 (Del 1999); *Richland Cty v. State,* 180 N.W.2d 649, 655 (N.D.1970).

FN16. Arkansas, Georgia, Hawaii, Kentucky, Massachusetts, Minnesota, Mississippi, Montana, Oklahoma, Vermont, Washington, and West Virginia.

FN17. *See, e.g., Interbank Investments LLC v. Eagle River,* 77 P.3d 814, 816 (Colo Ct.App 2003) (allowing recovery "on a quasi-contract when the party will have no right under an enforceable contract"); *Combustion Eng'g, Inc. v. Miller Hydro Group,* 812 F.Supp. 260, 262-63 (D.Me 1992) ( "Maine has no absolute rule barring recovery [under unjust enrichment] in the presence of a valid contract"); *United States v. Applied Pharmacy Consultants, Inc.,* 182 F.3d 603, 608-09 (8th Cir.[Ark ]1999) (rule precluding recovery under unjust enrichment when there is an express contract subject to several qualifications); *Westmont Tractor Co. v.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Viking Exploration, Inc.*, 543 F Supp 1314, 1321 (D Mont 1982) ("recovery in quantum meruit is appropriate in an action brought on an express or special contract where there exists an unusual and equitable reason for such recovery and the particular situation seems to justify it"); *Adelman v. Christy*, 90 F Supp.2d 1034, 1045 (D Ariz 2000) (the "mere existence of a contract governing the dispute does not automatically invalidate an unjust enrichment alternative theory of recovery A theory of unjust enrichment is unavailable only to a plaintiff if that plaintiff has already received the benefit of her contractual bargain")

FN18.*Pls ' Response in Opposition to Defendants' Mot. to Dismiss* (Doc. No 14) at 14; *Pls.' Supplemental Response in Opposition to Defendants' Mot to Dismiss* (Doc. No. 60) at 7.

FN19. Florida, Idaho and Ohio.

FN20 Illinois, Iowa, Kansas, Maryland, Massachusetts, Michigan, New York, Pennsylvania and Tennessee.

FN21. Louisiana's implied warranty law provides for relief when a defect renders a product useless or diminishes its usefulness or value. *See*La Civ Code Ann art 2520.

FN22 Louisiana does not require privity

FN23. These states are: Alabama, Arizona, Georgia, Idaho, Illinois, Iowa, Kentucky, New York, North Carolina, Ohio, Oregon, Tennessee, Vermont and Wisconsin

FN24. The public policy argument behind abolishing the privity requirement is that it promotes judicial economy to allow the end purchaser to bring an action directly against the manufacturer, avoiding the unnecessary litigation that would be required if the purchaser were forced to bring an action against the dealer, who in turn could bring an action against the manufacturer. *See* Clark, Barkley and Christopher Smith, *The Law of Prod. Warranties,* § 10:20 (West 2006).

FN25. Plaintiffs point to three states-Idaho, North Carolina and Wisconsin-which have suggested that they would be willing to abandon the privity requirement if presented with an appropriate case. *See Ramerth v. Hart,* 133 Idaho 194, 983 P.2d 848, 852 (1999); *Gregory v. Atrium Door and Window Co.,* 106 N C App. 142, 415 S E.2d 574, 575 (1992); *Strahlendorf v. Walgreen Co.,* 16 Wis.2d 421, 114 N W.2d 823, 830-31 (1962). In those cases, the courts recognized that the privity requirement sometimes precluded plaintiffs from obtaining relief or compensation for their economic loss Because the specific plaintiffs in those cases were not precluded from recovery, the courts deemed it unnecessary to change the rule, but intimated that it may be abolished in the future.

FN26 Arizona, Illinois, New York, Oregon, Vermont.

FN27. Idaho, Illinois, North Carolina, Ohio and Wisconsin

FN28. Iowa

FN29. Alabama, Kentucky, Georgia, New York, Oregon, Tennessee and Vermont

FN30. Arizona

FN31 *Defs ' Second Supplemental Memo. of Law in Opposition to Pls.' Mot for Class Certification* (Doc. No. 86) at 7.

FN32 *Defs ' Supplemental Memo of Law in Opposition to Pls ' Mot. for Class Certification* (Doc. No. 74) at 13-14 According to the amended complaint, the Powers aircraft was purchased new in 1978, and a crankshaft subject to MSB 569A was installed in the engine during an overhaul in April of 2002. *Amended Compl* ¶¶ 7-8 Plane Time purchased its 2002 aircraft in 2004, and the defective crankshaft was replaced in that aircraft on November 14, 2006. *Amended Compl.* ¶¶ 10-12

FN33. *Defs.' Supplemental Memo. of Law in Opposition to Pls.' Mot. for Class Certification* (Doc. No. 74) at 13-14.

FN34. Specifically, class members can incur costs from either: (1) replacing the crankshaft at an overhaul before 2009 at a Lycoming facility, where the new crankshaft and other replacement parts are free, but the cost of the overhaul and freight charges are higher than if the overhaul were performed at another FAA authorized facility, downtime is increased and labor charges for replacing the crankshaft will accrue; (2) replacing the crankshaft during an overhaul before 2009 at a non-Lycoming facility, where the new crankshaft and replacement parts will cost $2,000 plus labor charges for replacing the crankshaft; (3) replacing the crankshaft at an overhaul after 2009, where the new crankshaft and replacement parts will cost $16,000 and labor charges will accrue; (4) replacing the crankshaft in advance of an overhaul, where the new crankshaft and replacement parts will cost $16,000 plus labor charges to remove and reinstall the engine; or (5) selling the plane prior to replacing the crankshaft at a diminished value.

FN35. The 2003 Comment to Rule 23 states that an "increasing number of courts require a party requesting class certification to present a 'trial plan' that describes the issues likely to be presented at trial and tests whether they are susceptible of class-wide proof." Plaintiffs have not submitted a trial plan.

E.D.Pa.,2007.
Powers v. Lycoming Engines
--- F.R.D. ----, 2007 WL 2782355 (E.D.Pa.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                          Page 1
Slip Copy, 2007 WL 674319 (W.D.N.C.)
**(Cite as: Slip Copy)**

**C**Rose v. SLM Financial Corp
W.D.N.C.,2007.
Only the Westlaw citation is currently available.
United States District Court, W.D. North Carolina,
Charlotte Division.
Gary ROSE, on behalf of himself and all others
similarly situated, Plaintiff,
v.
SLM FINANCIAL CORP. and SLM Mortgage
Corporation-NC, Defendants.
**Civil Action No. 3:05CV445.**

Feb. 28, 2007

Gary W. Jackson, The Jackson Law Group, PLLC,
Charlotte, NC, Michael G. Wimer, Arden, NC, for
Plaintiff.
Debbie Weston Harden, Meredith J. McKee,
Womble, Carlyle, Sandridge & Rice, PLLC,
Charlotte, NC, for Defendants.

**ORDER**

DAVID C. KEESLER, United States Magistrate
Judge.
**\*1THIS MATTER IS BEFORE THE COURT** on
"Plaintiff's Motion to Remand" (Document No. 8),
filed November 18, 2005. The parties have consented
to Magistrate Judge jurisdiction pursuant to 28
U.S.C. § 636(c), and this motion is ripe for
disposition.

Having carefully considered the parties' arguments,
the pleadings, and the applicable authority (including
the Truth in Lending Act and the Real Estate
Settlement Procedures Act), and having heard oral
argument, the undersigned will *deny* Plaintiff's
Motion to Remand for the reasons discussed below.

**I. *FACTUAL BACKGROUND AND
PROCEDURAL HISTORY***

Plaintiff filed this action on September 19, 2005, in
the General Court of Justice, Superior Court Division
of Mecklenburg County, North Carolina, bringing
claims for violation of North Carolina's unfair and
deceptive trade practices statute, breach of the duty of
good faith and fair dealing, and breach of contract.
Plaintiff also seeks certification of a class action in
connection with these claims.

Plaintiff's claims arise out of a mortgage loan
Plaintiff sought and obtained through Defendants. In
November 2002, Plaintiff applied for a mortgage loan
at Defendants' Asheville office. Plaintiff alleges that
Defendants made "certain written disclosures to
plaintiff about the interest rate on his loan and about
the commissions defendants would receive as brokers
of the loan."Complaint, ¶ 3. At the closing of the
loan, Plaintiff claims, Defendants "unilaterally
increased their commissions and fees, without prior
disclosure to Plaintiff, and without Plaintiff's
consent."Complaint, ¶ 4.

On October 21, 2005, Defendants timely removed the
case pursuant to 28 U.S.C. §§ 1331 and 1441,
asserting that Plaintiff's breach of contract claim
raises a federal question. On November 17, 2005,
Plaintiff filed a Motion to Remand and requested
attorney's fees and costs. Plaintiff's Motion has been
fully briefed and argued, and it is ripe for disposition.

**II. *DISCUSSION***

Federal district courts "shall have original
jurisdiction of all civil actions arising under the
Constitution, laws, or treaties of the United
States."28 U.S.C. § 1331. A defendant is entitled to
remove a case brought in state court to federal court
if the plaintiff could have brought it in federal court
originally as a civil action "arising under" federal
laws. *Grable & Sons Metal Products, Inc. v. Darue
Engineering & Manuf.*, 545 U.S. 308, 312 (2005).28
U.S.C § 1441(a) provides:
Except as otherwise expressly provided by Act of
Congress, any civil action brought in a State court of
which the district courts of the United States have
original jurisdiction, may be removed by the
defendant or the defendants, to the district court of
the United States for the district and division
embracing the place where such action is pending.

28 U.S.C. § 1441(a).

Under 28 U.S.C. § 1441(a), the existence of subject
matter jurisdiction is a threshold issue. *Chris v. Tenet,*
221 F.3d 648, 655 (4th Cir.2000) (citation omitted)
("[T]he subject matter jurisdiction of federal courts is
limited and the federal courts may exercise only that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 674319 (W.D.N.C.)
**(Cite as: Slip Copy)**

Page 2

jurisdiction which Congress has prescribed.");
*Darcangelo v. Verizon Comm., Inc.*, 292 F.3d 181,
186 (4th Cir.2002) ("In general, an action filed in
state court may be removed to federal court only if it
might have been brought in federal court originally.")

**\*2** The party seeking federal jurisdiction-here,
Defendants SLM Financial Corp. and SLM Mortgage
Corporation-NC-has the burden of proving that
subject matter jurisdiction exists. *See Lovern v.
Edwards*, 190 F.3d 648, 654 (4th Cir.1999);
*Richmond, Fredericksburg & Potomac R. Co. v.
United States*, 945 F.2d 765, 768 (4th Cir.1991);
*Norfolk Southern Ry. Co. v. Energy Development
Corp.*, 312 F.Supp.2d 833, 835 (S.D.W.Va.2004).
Absent a proper basis for subject matter jurisdiction,
a removed case must be remanded to state court. *See
Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83,
96 (1998); *Jones v. American Postal Workers Union*,
192 F.3d 417, 422 (4th Cir.1999); *Evans v. B.F.
Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999).

As explained in 2005 by the United States Supreme
Court:

The provision for federal question jurisdiction is
invoked by and large by plaintiffs pleading a cause of
action created by federal law (*e.g.*, claims under 42
U.S.C. § 1982). There is, however, another
longstanding, if less frequently encountered, variety
of federal "arising under" jurisdiction, this Court
having recognized for nearly 100 years that in certain
cases federal question jurisdiction will lie over state-
law claims that implicate significant federal issues.

*Grable*, 545 U.S. at 312 (citing *Hopkins v. Walker*,
244 U.S. 486, 490-91 (1917)). Historically, federal
courts used myriad (and, at times, seemingly
contradictory) tests and methods of analysis to
determine when jurisdiction lay over this narrow
class of claims "arising under" federal law. Before
*Grable*, the Circuits were split over whether *Merrell
Dow Pharmaceuticals Inc. v. Thompson*, 478 U.S.
804 (1986), required a federal cause of action to be
stated on the face of a complaint as a prerequisite to
the exercise of federal question jurisdiction.

*Grable* resolved this dispute, stating the appropriate
test to be used in determining when federal question
jurisdiction lies over a state-law claim:

Does a state-law claim necessarily raise a stated
federal issue, actually disputed and substantial, which
a federal forum may entertain without disturbing any
congressionally approved balance of federal and state

judicial responsibilities?

*Grable*, 545 U.S. at 312-13.

### A. *Does Plaintiff's breach of contract claim necessarily raise a federal issue?*

According to *Grable*, we must first determine
whether Plaintiff's breach of contract claim
necessarily raises a federal issue. On the face of his
Complaint, Plaintiff alleges that Defendants made
*"certain written disclosures* to plaintiff about the
interest rate on his loan and about the commissions
defendants would receive as the brokers of the
loan."Complaint, ¶ 3 (emphasis added). These
"written disclosures," Plaintiff alleges, formed the
basis of a contract to provide Plaintiff with a loan at
"the disclosed interest rate" and "with payment of the
disclosed fees."It was this contract, Plaintiff alleges,
that was breached when Defendants "unilaterally
increase[ed] the commissions and fees at or
immediately prior to closing."Complaint, ¶¶ 50-51.

**\*3** Despite these and other references to the "written
disclosures," Plaintiff did not attach any such
documents to his Complaint. Defendants attached to
their Answer and to their Brief in Opposition to
Plaintiff's Motion to Remand all of the "disclosures"
that had been provided to Plaintiff within three days
of his loan application, arguing that Plaintiff was
relying on disclosures issued pursuant to the federal
Truth in Lending Act (15 U.S.C. § 1601, *et seq.*) and
the Real Estate Settlement Procedures Act (12 U.S.C.
§ 2601, *et seq.*). Although these documents were not
attached to Plaintiff's Complaint, they are integral to
his allegations and are deemed incorporated into his
Complaint by reference. *Darcangelo v. Verizon
Communications, Inc.*, 292 F.3d 181, 195 n. 5 (4th
Cir.2002); *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609,
618 (4th Cir.1999). Plaintiff has not disputed, either
in his briefs or during oral argument, that he is
relying on these written disclosures as the basis for
his breach of contract claim.

In order for Plaintiff to succeed on his breach of
contract claim, he must first establish that "the
plaintiff and the defendant mutually agreed to the
same material terms for doing or refraining from
doing a particular thing."North Carolina Pattern Jury
Instructions (Issue of Contract Formation). Here,
Plaintiff argues that Defendants entered into a written
contract with two material terms: Defendants would

provide Plaintiff with a loan at a particular interest rate after payment of a particular "disclosed fee." Having reviewed the relevant documents, the Court concludes that Plaintiff will necessarily have to rely on one or both of the disclosures issued pursuant to federal law in order to establish the existence of a contract with these material terms

The Truth in Lending Act, 15 U.S.C. § 1601, *et seq.,* ("TILA") requires a mortgage lender or broker to disclose, *inter alia,* the "Annual Percentage Rate" ("APR") a borrower will pay in connection with a particular loan. 15 U.S.C. §§ 1638, 1639 Lenders and brokers also are required to issue a "good faith estimate" of the APR within three business days after receiving a consumer's written loan application on a purchase-money or construction mortgage. 12 C.F.R. 226.19(a)(1). Regardless of when the disclosures are made, TILA regulations expressly permit lenders and brokers to "make the disclosure based on the best information reasonably available at the time," so long as the disclosure states "clearly that the disclosure is an estimate."12 C.F.R. 226.17(c). TILA, and the federal regulations promulgated thereunder, extensively regulate the form in which the disclosures are made and restrict the specific language a lender or broker may use therein.

Similarly, mortgage brokers are required under the Real Estate Settlement Procedures Act ("RESPA") and Regulation X to provide a "good faith estimate" of all commissions and fees a borrower is expected to pay in connection with obtaining a loan within three days of receiving an application. 24 C.F.R. § 3500.7. This Good Faith Estimate must include disclosures of all expected broker fees, "commissions," and similar charges. 24 C.F.R. § 3500.7.

*4 Plaintiff argues that the TILA disclosure and the Good Faith Estimate, issued within three days of Plaintiff's loan application pursuant to TILA and RESPA, form some substantial part of the contract on which his state law claim is based. As a result, Plaintiff's claim will necessarily require resolution of a federal issue: Can TILA disclosures and RESPA Good Faith Estimates-which Defendants were required to issue under federal law using federally mandated terms-form the basis of a contract? Thus, Plaintiff's claim raises an "important issue of federal law that sensibly belongs in federal court."*Compare Grable,* 545 U.S. at 315. This case involves "a controversy respecting the conclusion and effect of the [federal] laws."*Id.* at 316 (citing *Hopkins v.*

*Walker,* 244 U.S. at 489).

### B. *Is the federal issue "actually disputed" and "substantial" such that there is a serious federal interest in having the matter heard in federal court?*

Second, the Court must decide whether the federal issue raised by Plaintiff's breach of contract claim is "actually disputed" and "substantial," such that there is a serious federal interest in having the matter decided by a federal court.

Together, TILA and RESPA form an important and extensive federal regulatory scheme intended to provide mortgage applicants with early information about the terms of the loans for which they apply. The stated purpose of TILA is "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid uninformed use of credit..."15 U.S.C. § 1601. It is for this reason that lenders and brokers often are required to issue TILA and RESPA disclosures *within three business days* after receiving a loan application-sometimes well before a potential borrower has been approved for any particular loan.

TILA and RESPA permit-and in some cases require-that these disclosures be issued as "estimates" in order to facilitate the disclosure of the information to borrowers early in the application process. Plaintiff's claim that these federally mandated disclosures constitute the basis of a written contract will require this Court to consider the construction and effect of TILA and RESPA to determine whether those statutes permit federally mandated "estimates" to be construed as such.

"The [arising under] doctrine captures the commonsense notion that a federal court ought to be able to hear claims recognized under state law that nonetheless turn on substantial questions of federal law, and thus justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues."*Grable,* 545 U.S. at 312 Where a federal regulatory scheme requires private parties to undertake certain actions in order to comply with the law, the federal courts necessarily have a serious interest in examining the scope of liability that might arise as a result. Thus, the undersigned concludes that the issue of whether TILA and RESPA disclosures can form the basis of a

contract is a serious federal interest that justifies federal jurisdiction.

### C. Will the exercise of federal jurisdiction disturb the congressionally approved balance of judicial responsibilities?

*5 Finally, the Court must decide whether the exercise of federal jurisdiction in this case will upset the congressionally approved balance of judicial responsibilities between state and federal courts. Like *Grable,* this case presents the rare situation of a substantial, contested matter of federal law embedded in a state law claim. We are unaware of any significant number of cases in this or any other jurisdiction in which parties argue that federally mandated disclosures themselves form a contract. Thus, it appears to be the "rare case" where a loan applicant attempts to construe these federally mandated disclosures as enforceable written contracts. *Compare Grable,* 545 U.S. at 315 ("[B]ecause it will be the rare state title case that raises a contested matter of federal law, federal jurisdiction to resolve genuine disagreement over federal tax title provisions will portend only a microscopic effect on the federal-state division of labor."). Granting federal jurisdiction in this instance will not open the floodgates of federal court to all breach of contract claims or all claims relevant to TILA or RESPA.

### III. CONCLUSION

This case fits into the "slim category *Grable* exemplifies," and jurisdiction in federal court over this breach of contract claim is proper. *Cf. Empire Healthchoice v. McVeigh,* --- U.S. ----, 126 S.Ct. 2121, 2137 (2006). As a result, the Court has proper supplemental jurisdiction over Plaintiff's other state law claims for violation of North Carolina's § 75-1.1 and for breach of the duty of good faith and fair dealing. Based on the Court's finding that federal jurisdiction here is proper, Plaintiff's request for attorney's fees and costs in connection with his Motion to Remand is moot.

**IT IS, THEREFORE, ORDERED** that "Plaintiff's Motion to Remand" (Document No. 8) is **DENIED.**

**IT IS FURTHER ORDERED** that Plaintiff's request for fees and costs is **DENIED.**

**IT IS FURTHER ORDERED** that the parties conduct an Initial Attorneys' Conference and file a report of that conference along with a proposed case management plan, pursuant to Fed.R.Civ.P. 26(f) and L.R. 16.1(A), on or before **March 30, 2007.**

**SO ORDERED.**

W.D.N.C.,2007
Rose v. SLM Financial Corp.
Slip Copy, 2007 WL 674319 (W.D.N.C.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F Supp 2d                                                                                     Page 1
Not Reported in F.Supp.2d, 2004 WL 1824124 (S D Fla )
**(Cite as: Not Reported in F.Supp.2d)**

C Salas-Mateo v. Ochoa
S D Fla ,2004.
Only the Westlaw citation is currently available
United States District Court,S.D. Florida.
Nicanor SALAS-MATEO and Ramon Santiago-
Santos, individually and on behalf of others similarly
situated, Plaintiffs,
v.
Jesus B. OCHOA, d/b/a Jesus B Ochoa Harvesting,
Defendant
**No. 03-14357-CIV.**

March 26, 2004

Gregory S. Schell, Migrant Farmworker Justice
Project, Lake Worth, Florida, for Plaintiffs.
Andrew B Jackson, Sebring, Florida, for Defendant.

*ORDER ON PLAINTIFF'S MOTION FOR
DECLARATION OF CLASS ACTION (DE 9)*
LYNCH, Magistrate J
**\*1** THIS CAUSE comes before this Court upon the
above referenced Motion Having reviewed the
Motion, noting that the Defendant has not filed a
response in opposition, and being otherwise advised
in the premises, this Court finds as follows:

*BACKGROUND*

1. The named Plaintiffs, Messrs Salas-Mateo and
Santiago-Santos, are two Mexican nationals who
came into this country to pick citrus fruit in Florida
during the 2002-2003 harvest season. They and 40
co-workers [FN1] were admitted into the United States
under 8 U.S.C. § 1101(a)(15)(H)(ii) of the
Immigration and Nationality Act which authorizes
foreign nationals to perform seasonal agricultural
jobs when U.S. workers are unavailable. Such
workers are generally referred to as H-2A workers
after the name of the program visa

> FN1. The Defendant applied for and
> received a total of 38 H-2A visas

2 The Defendant is a farm labor contractor who
recruited and employed the Plaintiffs for the harvest
under the H-2A program In order to participate in
that program, the Defendant filed detailed job

descriptions with the U S Department of Labor,
otherwise known as "clearance orders", that served as
the employment contract between the Plaintiffs and
the Defendant. The Defendant provided these
workers to Bentley Bros , Inc., and Ridge Harvesting,
Inc , to harvest citrus in Highlands County and
nearby areas.

3 The Plaintiffs now bring suit against the
Defendant, alleging that they were denied lawful
compensation for their work in two general respects
For Count I the Plaintiffs allege that the Defendant
violated the minimum wage provisions of the Fair
Labor Standards Act, ("FLSA"), 29 U S C § 206(a),
by failing to supplement their piece-rate earnings in
order to raise their wages to the minimum wage rate
and by failing to reimburse them during the first
week of their employment for facilities primarily
running to the Defendant's benefit, including passport
and visa-related expenses, Form I-94 issuance fees,
and the full cost of travel from their home villages to
the Defendant's jobsite. As a consequence, the
Plaintiffs seek their unpaid minimum wage plus an
additional equal amount in liquidated damages

4. For Count II the Plaintiffs allege that the
Defendant breached the terms of their employment
contract, embodied in the clearance orders, by not
paying the Plaintiffs 1) the adverse effect wage rate
of $7 69 per hour; 2) a wage commiserate with the
minimum wage provisions of the FLSA; and 3) full
reimbursement for transportation and subsistence
costs incurred between their respective homes and the
jobsite. The terms of the clearance orders are
supplied by Department of Labor regulations,
specifically, 20 C.F R. §§ 653 501, 655.102, 655 103.

5. The Plaintiffs now seek to certify a class under
Rule 23, Fed.R.Civ.P , comprising of their co-
workers The Plaintiffs estimate that the class would
consist of 40 members.

*DISCUSSION*

The Plaintiffs seek to form a class for purposes of
litigating the second count of the Complaint-for
breach of employment contract-rather than to litigate
the Complaint as a whole. This is for good reason as
the FLSA-the basis of the first count-provides an

© 2007 Thomson/West No Claim to Orig U.S Govt. Works

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1824124 (S.D.Fla.)
(Cite as: Not Reported in F.Supp.2d)

entirely different mechanism for class formation. *See* *Cameron-Grant v. Maxim Healthcare Services, Inc.,* 347 F.3d 1240, 1248-49 (11th Cir.2003) (discussing the differences between § 216(b) collective actions and Rule 23 class actions); *seealso,* *Leyva v. Buley,* 125 F.R.D. 512, 514-515 (E.D.Wash.1989) (noting this distinction in the context of a migrant laborer case). Before turning to the matter of whether the Plaintiffs state a Rule 23 class, this Court first determines the proper scope of the claims that their Rule 23 class may pursue.

**\*2** Both the FLSA and H-2A regulations affect the terms of employment of a migrant farm worker, and the Plaintiffs are suing to realize the protections afforded by each. In the case of *Arriaga v. Fla. Pacific Farms, LLC,* 305 F.3d 1228, 1235 (11th Cir.2002) the Eleventh Circuit addressed this overlap and relied upon the Supreme Court's rule that the "higher requirement" be applied. At issue in the *Arriaga* case was FLSA's requirement that an employer must pay a weekly wage "in cash or in facilities" "free and clear" of improper deductions, such that the rate is not lower than the minimum wage. The Court held that even though H-2A regulations permit employers to reimburse certain expenses, such as transportation and visa costs, halfway through the contract period, employers must comply with FLSA's higher standard that such expenses be reimbursed in the nearest pay period, i.e., the first work week. *Seeid.* at 1237.

Applying *Arriaga'* s holding to the instant case, the Plaintiffs may not sue under Count II for constructive underpayment as such a claim falls under the scope of Count I for FLSA violations. However this particular claim appears to be the only instance of overlap where the FLSA imposes the higher standard. The Plaintiffs' other claims are governed by their employment contract and H-2A regulations, and as a result, may be brought under Count II. For example, the Plaintiffs claim that they "were not paid at least the applicable adverse effect wage rate of $7.69 per hour for their labor."Department of Labor regulation 20C.F.R. § 655.102(b)(9) sets forth the workers' rate of pay. For a worker paid by the hour, subsection (i) thereof provides that he shall receive "at least the adverse effect wage rate in effect at the time the work is performed, the prevailing hourly wage rate, or the legal federal or State minimum wage rate, whichever is higher."[FN2]Subsection (ii) thereof ensures that workers paid on a piece rate basis receive the equivalent of a minimum wage. To this extent H-2A

regulation exceeds or provides the same degree of protection as the FLSA. Secondly the Plaintiffs may pursue their full transportation benefits, as provided by 20 C.F.R. § 655.102, under Count II. *SeeArriaga,* 305 F.3d at 1246.

> FN2. This Court presumes that in this instance the claimed adverse effect wage rate is highest.

This Court now turns to the requirements of certifying a class for purposes of litigating Count II. Rule 23(a) sets out the prerequisites to a class action, permitting its formation:

only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

The Plaintiffs meet their burden of demonstrating these prerequisites.

To begin with, the Plaintiffs' estimate of the putative class size as around 40 workers is sufficiently large to render joinder impracticable. *SeeBrown v. SCI Funeral Services of Fla., Inc.,* 212 F.R.D. 602, 604 (S.D.Fla.2003), *Martinez v. Mecca Farms,* 213 F.R.D. 601, 605 (S.D.Fla.2002). Moreover the geographic dispersion of the class members as well as their relatively small individual damages claims and the fact that they may not be familiar with the U.S. legal system or the English language further supports a finding that joinder would be impracticable. *SeeLeyva,* 125 F.R.D. at 515 (citing *Rodriguez v. Berrybrook Farms, Inc.,* 672 F.Supp. 1009 (W.D.Mich.1987)).

**\*3** Rule 23(a)(2) next requires that amongst the putative class members there be some degree of commonality as to a question of law or fact. *SeeBrown,* 212 F.R.D. at 604,*Martinez,* 213 F.R.D. at 605. There appears to be little difference between the class members as to their employment history with the Defendant and their claims for relief. With respect to Count II claims, the Plaintiffs allege that the Defendant, pursuant to a common course of conduct, neither paid the proper wage rate nor reimbursed them for their full transportation costs. *SeeLeyva,* 125 F.R.D. at 515-16. Rule 23(a)(3)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                    Page 3
Not Reported in F.Supp.2d, 2004 WL 1824124 (S.D.Fla.)
(Cite as: Not Reported in F.Supp.2d)

requires that the claims of the class representatives by typical of the claims of the class members, meaning that the they share the same interest and suffer the same injury. Because all of the purported class members, including the named Plaintiffs, are so similarly situated, this requirement is likewise met.

Lastly, Rule 23(a)(4) requires that the interests of the representative parties align with those of the class members and that they be able to fairly and adequately protect the interests of the class. *SeeBrown,* 212 F.R.D. at 605,*Martinez,* 213 F.R.D. at 606-07. This Court discerns no interests of the named Plaintiffs that would be antagonistic to the class members; rather, they find themselves in more or less the same situation as the co-workers with whom they seek to form the class. Counsel for the Plaintiffs, Mr. Schell, also demonstrates that he has litigated several actions on behalf of migrant workers, many of which were class actions or involved the H-2A program, and would be able to front the costs of litigation.

Having found that the Rule 23(a) prerequisites are satisfied, this Court must next determine which form of class certification is appropriate. Rule 23(b) sets out several alternative types of class actions, and the Plaintiffs seek certification under Rule 23(b)(3) for actions where commonality of issues predominate amongst the several class members and where the class action medium is the most efficacious means of adjudicating the controversy. *SeeBrown,* 212 F.R.D. at 605-06. The class claims in this case do predominate over any questions affecting the individuals members, and in fact, the Plaintiffs' claims parallel those of the putative members and are subsumed within the class's claims.

Moreover, the Plaintiffs doubt whether any individual class member would want to proceed independently given the circumstances. No other related litigation is pending, and litigation in this forum is perhaps most appropriate given that both the Defendant and the area of harvest are found in this district. Creation of a class action would also serve the interests of judicial administrative efficiency. While the amount of back wages owing to each individual member may differentiate, the basis for calculating those wages-namely the terms of the clearance orders-remains common amongst all the members. In comparison individual litigation would entail too much redundancy and duplication of effort to be practical and would deny the class members the benefits of the

class action. *SeeLeyva,* 125 F.R.D. at 518.

### CONCLUSION

*4 The Plaintiffs have satisfied the requirements of Rule 23(a) and are due class certification under Rule 23(b)(3). Accordingly, this Court certifies the class as consisting of:

All individuals admitted to the United States pursuant to Section 101(a)(15)(H)(ii)(a) of the Immigration and Nationality Act, 8 U.S.C. § 1101(a)(15)(H)(ii)(a) ("H-2A workers") who were employed by Jesus B. Ochoa to harvest citrus fruit during the 2002-03 Florida citrus harvest.

However this Order shall not be construed as creating a class with regard to Count I or issues falling within the scope of a proper FLSA action.

Based on the foregoing, it is hereby,

ORDERED AND ADJUDGED that the Plaintiffs' Motion for Declaration of a Class Action is GRANTED, and pursuant to Rule 23(c)(1)(B) a class is certified as defined above, with the named Plaintiffs acting as the representative parties and their counsel, Mr. Schell, serving as class counsel. It is further,

ORDERED AND ADJUDGED that within thirty (30) days of the date of this Order the Plaintiffs shall notify all potential class members of the instant class action in compliance with Rule 23(c)(2)(B) and file a certification with this Court of such notice, describing in detail the notification provided.

DONE AND ORDERED.

S.D.Fla.,2004.
Salas-Mateo v. Ochoa
Not Reported in F.Supp.2d, 2004 WL 1824124 (S.D.Fla.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.